IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KIMBERLY L. GIBBONS, in the name of the UNITED STATES OF AMERICA, | :<br>: |
| Plaintiff, | : CIVIL ACTION |
| v. | : No. 05-685 |
| KVAERNER PHILADELPHIA SHIPYARD, INC., KVAERNER, INC., and AKER KVAERNER ASA, | : |
| Defendants. | : |

FILED  FEB 10 2006

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                              FEBRUARY 10, 2006

The plaintiff has filed this qui tam[1] action, brought pursuant to the False Claims Act[2], 31

U.S.C. §§ 3729-30, for the alleged submission of false claims in order to receive training

subsidies from the United States Department of Labor and the United States Department of

---

[1] "'Qui tam' is [an] abbreviation of [the] Latin phrase 'qui tame pro domino rege quam pro si ipso in hac parte sequitur' meaning 'Who sues on behalf of the King as well as for himself.' It is an action brought by an informer, under a statute which establishes a penalty for the commission or omission of a certain act, and provides that the same shall be recoverable in a civil action, part of the penalty to go to any person who will bring such action and the remainder to the state or some other institution. It is called a 'qui tam action' because the plaintiff states that he sues as well for the state as for himself." Black's Law Dictionary 1251 (6th Ed. 1990).

[2] The False Claims Act "was passed in 1863 as a result of investigations of the fraudulent use of government funds during the Civil War," see United States v. Neifert-White Co., 390 U.S. 228, 232 (1968), and has been in existence, in one form or another, since that time. See United States ex rel. Dunleavy v. County of Delaware, 123 F.3d 734, 738 (3d Cir. 1997). The False Claims Act "sets our civil and criminal penalties for persons who knowingly submit false claims to the government." Dunleavy, 123 F.3d at 738. "Congress intended that the False Claims Act . . . and its qui tam action would help the government uncover fraud and abuse by unleashing a 'posse of ad hoc deputies to uncover and prosecute frauds against the government.'" Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999) (quoting United States ex rel. Milam v. University of Tex. M.D. Anderson Cancer Ctr., 961 F.2d 46, 49 (4th Cir. 1992)).

ENTERED
FEB 10 2006
CLERK OF COURT

Defense. Kimberly L. Gibbons ("plaintiff," "relator[3]," or "Gibbons") alleges that Defendants Kvaerner Philadelphia Shipyard Incorporated[4] ("Kvaerner Philadelphia Shipyard"), Kvaerner Incorporated ("Kvaerner"), and Aker Kvaerner ASA ("Aker Kvaerner") defrauded the United States by submitting false employee training records in order to receive larger amounts of training subsidies and reimbursement funds from the federal government.

Presently pending before me is Defendants' Motions to Quash Service of, Dismiss, and Strike Gibbons' Amended Complaint. Defendants make five arguments to support their Motions. First, Defendants argue that Gibbons failed to properly serve Kvaerner and Aker Kvaerner. Second, Defendants argue that there is no personal jurisdiction over Kvaerner or Aker Kvaerner. Third, Defendants argue that Gibbons failed to plead fraud with particularity or assert any claim of fraudulent conduct or submission of a "false claim" by Kvaerner or Aker Kvaerner. Fourth, Defendants argue that Gibbons failed to provide a simple, concise, and direct statement as required by Federal Rules of Civil Procedure 8 and 10. Fifth, Defendants argue that Gibbons failed to plead facts that support a finding of subject matter jurisdiction over her claims. For the following reasons, Defendants' Motions are granted in part and denied in part.

## I. RELEVANT BACKGROUND

According to the Gibbons' allegations set forth in her amended complaint, which I must accept as true for the purposes of deciding this motion, Jordan v. Fox, Rothschild, O'Brien &

---

[3] "The person who brings the action on behalf of the United States is called the 'qui tam relator,' or more colloquially, the 'whistleblower.'" Marc S. Raspanti & David M. Laigaie, Current Practice and Procedure Under the Whistleblower Provisions of the Federal False Claims Act, 71 Temp. L. Rev. 23, 23 n.1 (1998).

[4] According to Defendants, the name of Kvaerner Philadelphia Shipyard, Inc., was changed to Aker Philadelphia Shipyard, Inc., on October 12, 2005. The caption of this case shall be ordered to reflect this change. However, due to the fact that material facts of this case took place before the name change, I shall refer to defendant as Kvaerner Philadelphia Shipyard, not Aker Philadelphia Shipyard.

2

Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994), the facts of this case are as follows.

Once a major industrial facility, the Philadelphia Naval Shipyard was closed by the United States in 1995. After being closed, the Department of the Navy made the Shipyard available for non-military use. Assorted governmental entities improved and modernized the Shipyard so that it could function as a modern ship-building facility. These governmental entities included the United States, the Commonwealth of Pennsylvania, the Delaware River Port Authority, and the City of Philadelphia acting through the Philadelphia Industrial Development Corporation and the Philadelphia Authority for Industrial Development. The Commonwealth of Pennsylvania, the Delaware River Port Authority, the City of Philadelphia, the Philadelphia Industrial Development Corporation, and the Philadelphia Authority for Industrial Development formed a non-profit corporation called the Philadelphia Shipyard Development Corporation. The Philadelphia Shipyard Development Corporation's purpose was to sublease the Shipyard's property from the Philadelphia Authority for Industrial Development and then sub-sublease the Shipyard property to Kvaerner Philadelphia Shipyard.

On November 29, 1999, Gibbons was hired by Defendant Kvaerner Philadelphia Shipyard. Gibbons worked as an auto welder as part of the federally subsidized job training program at the Shipyard. In June of 2001, Gibbons was elected as a union representative on the Board of Directors at the Shipyard. On December 2, 2001, Gibbons was promoted to "team leader" in the Hull Erection Department's welding section.

The non-profit Philadelphia Shipyard Development Corporation's other purposes were to inspect the progress of the shipyard's construction, administer fund disbursement (including United States Government subsidies) to Kvaerner Philadelphia Shipyard for the development and

3

operation of the Shipyard, and, finally, monitor the Shipyard's developmental obligations. In order to facilitate these goals, the governmental entities and the Kvaerner Philadelphia Shipyard entered into a "Master Agreement" detailing the rights and responsibilities of each party.

According to the "Master Agreement" the governmental subsidies to Kvaerner Philadelphia Shipyard totaled $438,600,000.00. Funding under the "Master Agreement" included $137,000,000.00 for employee training programs. Of this $137,000,000.00, approximately $50,000,000.00 were grants from the United States Department of Defense, while $25,000,000.00 were grants from the United States Department of Labor through the National Reserve Account/Job Training Partnership Act and the Employee Training Agency. These subsidies provided salaries and wages to Kvaerner Philadelphia Shipyard employees who participated in the training program. The subsidies also funded the costs of providing training to the employees.

In order to receive reimbursement, Kvaerner Philadelphia Shipyard was required to meet specific requirements set forth by the Department of Labor and the Department of Defense. The purpose of the program was to be more extensive than traditional single trade skill training and most of it was necessarily required to occur "on the job" while building ships. As such the Department of Labor and the Department of Defense determined the type, level, and quality of training documentation requirements. The amount of funding was proportional to the level of assessment that each employee achieved on various individual training plans ("ITPs").

The non-profit Philadelphia Shipyard Development Corporation was designated to administer the disbursement of the federal funds. It became aware that the Kvaerner Philadelphia Shipyard did not have a reliable system for documenting its training, particularly for "on the job"

4

training. Kvaerner Philadelphia Shipyard, in particular its Production Department, resisted taking responsibility for documenting its training. The ITP documentation process was instituted in 2002 and was an attempt to develop a process that would meet the federal required training planning and documentation program. The Philadelphia Shipyard Development Corporation was required to verify that all employees that were currently being funded by the federal government were really in the training program. Kvaerner Philadelphia Shipyard was aware that their failure to provide the necessary documentation could result in a withholding or a loss of the federal training funding.

The ITP process established a plan to distribute to employees assessments in a variety of different competencies to collect data, to input data, and to report on the status of each employee's training progress. The ITPs included written assessments in such areas as Tools, Procedures, Building Methodology, Safety, Security, Ship Fitting, and Law. The training plan also included training for the Department of Defense's technical training funding. The ITP assessments were given periodically on a team-by-team basis, sometimes as often as once a month for several months. The ITP process cycle included defining a distribution schedule, printing ITPs, distributing ITPs to supervisors, updating employee ITPs, and obtaining supervisor verification.

According to Gibbons, tying federal funding to ITP requirements, however, had a consequence that Kvaerner Philadelphia Shipyard took advantage of. Essentially, the more training that was required for each employee determined the level of funding that Kvaerner Philadelphia Shipyard would receive. The poorer the results on the ITPs the greater the funding. If the employee achieved an appropriate skill level, then they were removed from the funding.

5

Gibbons alleges that Kvaerner Philadelphia Shipyard fraudulently took advantage of this situation. Periodically, each team would be called into the lunchroom by Rich Rothinberg, the ITP Coordinator for Kvaerner Philadelphia Shipyard. Rothinberg would hand out questionnaires and give some related information on the questionnaires' particular subject. Each team would be given a certain amount of time, sometimes as short as 15 minutes, to answer the questionnaire. Rothinberg would routinely tell the employees, "I know you think this is a waste of time, but it is needed to get our Federal funding, so just fill them out and answer 'No.'" Rothinberg and Kvaerner Philadelphia Shipyard knew that many of the employees did not have the knowledge to answer the questions. The employees were intentionally given little or no time to study the background information. The materials were handed out with the questionnaires and had to be filled in at that time. None of the study materials were supplied in advance. Once completed, the questionnaires would be signed by the supervisor of the team and the next team would come in the lunch room to go through the same process. The system was intentionally abused to depress the scores, convey artificially low training skills, resulting in more government funding.

Kvaerner Philadelphia Shipyard also submitted false claims, according to Gibbons, regarding the number of employees it employed. As of July 2002, Kvaerner Philadelphia Shipyard had 927 employees, 599 of which were its own employees. Kvaerner Philadelphia Shipyard received $39,544,000.00 in employee training subsidies for the first ship designated as NB001 and $1,448,000.00 for the second ship designated as NB002. During the last 30 months of the Transition Period (July 1, 2002 through December 31, 2004), the Master Agreement required Kvaerner Philadelphia Shipyard to employ an average of at least 700 Full Time Employees each calendar year. During the Initial Operating Period (January 1, 2005 through

6

December 31, 2014), the Master Agreement likewise expressly provides that Kvaerner Philadelphia Shipyard must employ an average of at least 500 Full Time Employees each calendar year. Kvaerner Philadelphia Shipyard fraudulently employed people who received no training, did no work, and were employed solely to meet the obligation to maintain a minimum number of American workers.

Kvaerner Philadelphia Shipyard's efforts included advising workers to answer surveys and questionnaires from the Department of Labor investigators indicating that they were receiving training when they were not. These efforts also created a work environment where short-term, probationary workers feared reprisals if they did not respond to surveys or questionnaires as instructed. During this time, in the "Block Assembly" portion of the main building, there were at least 30 employees who were not doing any work, not receiving any training, but were simply sitting and engaging in leisure and personal activities. The training funds from the Department of Labor were being used to subsidize the compensation to these individuals. This began in approximately 2000 and continued through early 2003.

In addition to the above, in "Grant Block," which is a separate building located next to the paint shop where employees allegedly went for training, 100 or more employees were not working, not receiving training, and engaging in other activities such as sleeping in the men's bathroom and reading papers. Many of these individuals would leave during the day and come back before closing time. In or around the year 2000, in the Grant Block building, there would be "training sheets" for individual training processes such as "track burning," how to use a grinder, safety practices, welding practices, and machinery set up. The individuals in the Grant Block were asked to sign and print their name, social security number, and department as an

acknowledgment they received training in those designated areas. Many individuals refused because they were not receiving training. Kvaerner Philadelphia Shipyard responded by having "Elwood Seleski" and Roland Perry, prior to imminent audits, approach each of the individuals who did not sign one or more of the training sheets and tell them that they were required to sign, print their name, social security numbers, and department. This continued until 2002. Thereafter, Kvaerner Philadelphia Shipyard continued the practice, but removed the requirement for a social security number and instead used "badge numbers" for identification purposes. This process continued at least through mid-2004.

In accordance with 31 U.S.C. § 3730, Gibbons served a Disclosure Statement and the relevant materials she possessed to the United States Attorney and the Attorney General. This disclosure was based on her direct and independent knowledge of the information that she acquired while she was a welder, team leader, and union representative on the Shipyard's Board of Directors. Although the United States declined to intervene in this case, it has made no claim or contention that Gibbons' Amended Complaint is based on a "public disclosure," that Gibbons is not an original source, or that her information was not direct or independent.

## II. DISCUSSION

In her Amended Complaint, Gibbons has alleged a violation of 31 U.S.C. §§ 3729(a)(1)-(3), (7). These statutory sections impose liability on a person or entity who does any one of the following:

> (1) knowingly presents, or causes to be presented to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
>
> (2) knowingly makes, uses or causes to be made or used, a false record or

8

statement to get a false or fraudulent claim paid or approved by the Government;

(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid; [or]

(7) knowingly makes, uses or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.

31 U.S.C. §§ 3729(a)(1)-(3), (7). If liability is found, the defendant is "liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, plus 3 times the amount of damages which the Government sustains because of the act of that person. . . ." Id.

As stated above, Defendants make five arguments to support their Motions to Dismiss Gibbons' Amended Complaint. First, Defendants argue that Gibbons failed to properly serve Kvaerner and Aker Kvaerner. Second, Defendants argue that there is no jurisdiction over Kvaerner or Aker Kvaerner. Third, Defendants argue that Gibbons failed to plead fraud with particularity or assert any claim of fraudulent conduct or submission of a "false claim" by Kvaerner or Aker Kvaerner. Fourth, Defendants argue that Gibbons failed to provide a simple, concise, and direct statement as required by Federal Rules of Civil Procedure 8 and 10. Fifth, Defendants argue that Gibbons failed to plead facts that support a finding of subject matter jurisdiction over her claims. I will address these arguments below.

### A.  Dismissing Defendants Kvaerner and Aker Kvaerner

Defendants first two arguments focus exclusively on dismissing Defendants Kvaerner and Aker Kvaerner. First, Defendants argue that Gibbons ineffectively served Kvaerner and Aker Kvaerner. Second, Defendants argue that there is no personal jurisdiction over Defendants Kvaerner and Aker Kvaerner because the two corporate entities have no contacts with

9

Pennsylvania. Both of these arguments are based on the information in Shipyard's Vice President of Human Relations Michael Giantomaso's deposition. Gibbons agrees with the dismissal of Kvaerner and Aker Kvaerner "without prejudice . . . to the extent that such information alleged and offered through the Michael [Giantomaso] affidavit is not accurate." (Pl.'s Reply at 1, 2). Based on the parties' agreement, I shall dismiss Defendants Kvaerner and Aker Kverner without prejudice for ineffective service and lack of personal jurisdiction.

### B.   Pleading Fraud with Particularity

Federal Rule of Civil Procedure 9(b) mandates that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b). The United States Court of Appeals for the Third Circuit's standard for Rule 9(b), however, is "a generous one" that is applied by the courts with "some flexibility." See Blue Line Coal Co. v. Equibank, 683 F. Supp. 493, 497 (E.D. Pa. 1988). As the Third Circuit explained, "focusing exclusively on [Rule 9(b)'s] 'particularity' language is 'too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules." Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984). Instead, Rule 9(b) must be read with Federal Rule of Civil Procedure 8, which requires the plaintiff to allege a "short and plain statement of the claim" and directs that averments in pleadings shall be "simple, concise, and direct." Fed. R. Civ. P. 8(a)(2), (e). To satisfy this circuit's particularity requirement for pleading fraud, Gibbons must plead with particularity the "circumstances of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent

10

behavior." Seville, 742 F.2d at 791.

If Gibbons alleges the "date, place or time" of the allegedly fraudulent conduct, then Rule 9(b)'s pleading requirement is satisfied. Id. However, if Gibbons is able to "use alternative means of injecting precision and some measure of substantiation into [her] allegations of fraud," then Gibbons need not plead the "date, place or time" of the fraud. Id.

Although Rule 9(b) requires the circumstances constituting fraud to be stated with particularity, it additionally states that "malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b). Thus, all elements of Gibbons' FCA claim under § 3729(a) must be pleaded with particularity except the knowledge with which Kvaerner Philadelphia Shipyard is alleged to have committed the offending acts.[5]

Here, Gibbons' Amended Complaint alleges fraud under § 3729(a) with sufficient particularity to satisfy Rule 9(b). Gibbons has supported her false claim allegation with the essential factual background or the "who, what, when, where, and how." In re Rockefeller Center Proposed Securities Litigation, 311 F.3d 198, 217 (3d Cir. 2003).

Most importantly, Gibbons' Amended Complaint alleges the "how" and "what" elements of fraud in two ways. First, Gibbons states Kvaerner Philadelphia Shipyard's fraudulent ITP practices were designed to artificially maintain funding to the Shipyard from the Department of Labor and Department of Defense. Second, Gibbons states Kvaerner Philadelphia Shipyard's fraudulently employed individuals in order to artificially maintain a minimum amount of

---

[5] Of course, if the statement's falsity was made to facilitate approval of a false claim and thereby turns on what a defendant intended, then that intent must be pleaded with sufficient particularity to satisfy the requirements of the first sentence of Rule 9(b). See Bower v. Jones, 978 F.2d 1004, 1012 (7th Cir. 1992). Allowing otherwise would allow plaintiffs to ignore Rule 9(b)'s particularity requirement by allowing them to survive a motion to dismiss claim of an FCA violation with nothing more than a general allegation of intent not to perform and actual nonperformance of a governmental contract.

11

American workers necessary to continue receiving Department of Labor subsidies. The Amended Complaint provides specific examples of this conduct by detailing efforts that included advising workers to falsely answer questionnaires from Department of Labor investigators and the creation of a work environment where workers feared reprisals if they did not respond to the questionnaires as instructed. Furthermore, during a significant portion of Gibbons' tenure at Kvaerner Philadelphia Shipyard, she alleges that there were at least 30 employees who were not doing any work, not receiving any training, and simply sitting, engaging in personal activities. The Amended Complaint alleges that the training subsidies from the Department of Labor were being used to subsidize the compensation to these individuals.

Gibbons' Amended Complaint alleges "when" the violations of § 3729(a) took place. Gibbons details that false ITP and hiring practices began in approximately 2000 and continued through the middle of 2004.

Gibbons's Amended Complaint also alleges "where" the § 3729(a) violations took place by identifying, not surprisingly, the Shipyard. Even more specifically, Gibbons identifies the "Grant Block," a separate building located next to the paint shop, as the area where employees ostensibly went for training, but instead where employees did no work, did not receive training, and slept or read newspapers. Furthermore, the "Grant Block" was, allegedly, where employees were fraudulently induced to indicate that they had received training for processes such as "track burning," how to use a grinder, safety practices, welding practices, and machinery set up. Gibbons further identifies "where" the § 3729(a) violations took place when she described Rothinberg's, Kvaerner Philadelphia Shipyard's ITP Coordinator, lunchroom meetings. In these lunchroom meetings, Rothinberg would hand out questionnaires and related information while

routinely telling the employees, "I know you think this is a waste of time, but it is needed to get our Federal funding, so just fill them out and answer 'No.'"

Finally, Gibbons' Amended Complaint alleges who violated § 3729(a) by imputing Rothinberg and Kvaerner Philadelphia Shipyard training supervisor Dave String. Gibbons alleges that String had two individuals, Elwood Seleski and Roland Perry, go around prior to an audit and approach each individual who did not sign one or more of the training sheets and tell them that they were required to sign, print their name, social security numbers and department. Gibbons alleges this continued until 2002. From 2002 through 2004, String required individuals who did not sign one or more of the training sheets to print their "badge numbers" instead of their social security numbers. According to Gibbons' Amended Complaint, both Rothinberg and String were acting on behalf of Kvaerner Philadelphia Shipyard when they fraudulently sought to retain federal employment subsidies.

Gibbons' Ameneded Complaint, therefore, pleaded fraud with the particularity required by Rule 9(b) with regard to Kvaerner Philadelphia Shipyard's alleged violations of the FCA's § 3729(a). Defendant's motion to dismiss Gibbons' Amended Complaint pursuant to Rule 9(b) shall be dismissed.

### C. Failure to Comply with Federal Rules of Civil Procedure 8 and 10

In addition to arguing that Gibbons' Amended Complaint was not specific enough to satisfy Rule 9(b), Defendants also argue that Gibbons' Amended Complaint fails to comply with the simple, concise, and direct requirements of Federal Rules of Civil Procedure 8(e)(1) and 10(b). I disagree.

Federal Rule of Civil Procedure 8(e)(1) requires that each "averment of a pleading shall

13

be simple, concise and direct." Fed. R. Civ. P. 8(e)(1). Under Rule 8, pleadings are to be liberally construed, and a pleading that gives notice to a defendant of the allegations made against it and the grounds upon which those allegations are based is generally sufficient. Conley v. Gibson, 355 U.S. 41, 47 (1957). "The effect of Rule 8(e)(1) is to give a party great flexibility in framing his pleading. Neither technical expressions nor any particular form of words is required. A pleader is free to select language that he believes most simply and clearly sets forth the claims or defenses that are being advanced." 5 Wright & Miller, Federal Practice and Procedure § 1281 at 704 (3d ed. 2004).

The issue here is, in reading Rule 8 together with the particularity requirements of Rule 9, does Gibbons' Amended Complaint give notice to Defendants and the basis for her § 3729(a) qui tam action against them. For the same reasons Gibbons' Amended Complaint satisfies Rule 9(b)'s particularity requirements, it satisfies Rule 8(e)(1)'s "simple, concise, and direct" requirement. Gibbons' Amended Complaint alleges the who, what, when, where, and how Kvaerner Philadelphia Shipyard violated the False Claims Act's § 3729(a) as simply, concisely and directly as necessary to satisfy both Rule 9(b) and Rule 8(e)(1). To the extent that Defendants motion relies upon Rule 8(e)(1), it is denied.

Defendants' Rule 10(b) argument also fails. Rule 10(b) requires all "averments of claim or defense shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances . . . ." Fed. R. Civ. P. 10(b). "What constitutes a single set of circumstances will depend upon the nature of the action and be determined in light of the basic objective of the rule, which is to ensure that the contents of each paragraph are composed so as to produce a lucid pleading." 5A Wright & Miller, Federal

14

Practice and Procedure § 1322 at 394-95 (3d ed. 2004). Gibbons' Amended Complaint is paragraphed and sufficiently limited to a single set of circumstances that, she believes, resulted in violations of the False Claims Act § 3729(a). Although Gibbons' admits that her paragraphs were long, the Amended Complaint comports with Rule 10(b)'s objective of being a lucid pleading and Defendants' Rule 10(b) motion is denied.[6]

### D. The False Claims Act's Jurisdictional Bar

Defendants' final argument is that Gibbons is not an "original source" of the information in her Amended Complaint and is barred by the False Claims Act's jurisdictional bar. I disagree.

"The jurisdictional bar provision [of the False Claims Act] operates to exclude qui tam actions based upon allegations of fraud or fraudulent transactions that have been publicly disclosed prior to their filing." United States, ex rel. Paranich v. Sorgnard, et al., 396 F.3d 326, 332 (3d Cir. 2005). The jurisdictional bar provision was "designed to preclude qui tam suits based on information that would have been equally available to strangers to the fraud transaction had they chosen to look for it as it was to the relator." United States ex re. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co., 944 F.2d 1149, 1152 (3d Cir. 1991). This provision also contains a "savings clause" that preserves suits brought by an "original source" of the information even where there has been a prior public disclosure. Paranich, 396 F.3d at 332.

The text of the jurisdictional bar provisions states:

(A) No court shall have jurisdiction over an action under this section based upon

---

[6] Defendants argue that Gibbons' Amended Complaint violates Rule 10(b) because it did not "clearly and concisely allege precisely what each defendant is alleged to have done wrong." (Defs.' Mot. at 20). Defendants' concern is valid. In fact, Gibbons' Amended Complaint only references wrongdoing committed by Kvaerner Philadelphia Shipyard personnel. However, having dismissed Defendants Kvaerner and Aker Kvaerner for lack of subject matter jurisdiction, Defendants Rule 10(b) concerns should be placated.

15

the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government [General] Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided that information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4). The Third Circuit has enumerated the elements of this section to divest courts of subject matter jurisdiction where:

(1) there was a "public disclosure";

(2) "in a criminal, civil or administrative hearing, in a congressional, administrative, or Government [General] Accounting Office report, hearing, audit or investigation, or from the news media";

(3) of "allegations or transactions" of the fraud;

(4) that the relator's action was "based upon"; and

(5) the relator was not an "original source" of the information.

Paranich, 396 F.3d at 332 (quoting 31 U.S.C. § 3730(e)(4)). Under the language of the statute, a "court reaches the original source question only if it finds the plaintiff's suit is based on information publically [sic] disclosed." United States ex rel. Cooper v. Blue Cross and Blue Shield of Florida, Inc., 19 F.3d 562 (11th Cir. 1994).

Here, there are two crucial problems with Defendants' attempt to apply this procedural bar. First, Defendants fail to argue that Kvaerner Philadelphia Shipyard's alleged fraud was publicly disclosed. After briefly criticizing Gibbons' Amended Complaint for failing to explain the factual predicate for her allegations, Defendants move on to arguing that Gibbons is not an

16

original source. This is impermissible. Under the language of the rule, whether Gibbons is an original source only becomes an issue after it is established that her knowledge of the alleged fraud came about through a public disclosure. Defendants' failure to even allege such a public disclosure dooms the application of the False Claims Act's jurisdictional bar provision.

The second problem with applying the jurisdictional bar provision is that Gibbons, in fact, claims to be an original source. Even if Defendants had alleged that her knowledge was attained through public disclosures, Gibbons appears to satisfy the statutory definition exception to the provision. Gibbons claims that she acquired her knowledge of the alleged fraud based on the direct and independent knowledge she acquired through her capacity as a welder, team leader, and union representative on the Board of Directors of Kvaerner Philadelphia Shipyard. Furthermore, she voluntarily provided this information to the United States before bringing this suit.

These two problems preclude me from applying the False Claims Act's jurisdiction bar provision. Defendants' Motion to Dismiss Gibbons' Amended Complaint for lack of jurisdiction, therefore, must be denied.

### III. CONCLUSION

For the aforementioned reasons, Defendants' Motion to Quash and Motion to Dismiss Defendants Kvaerner and Aker Kvaerner for lack of personal jurisdiction shall be granted. However, Defendants' Motion to Dismiss any of the claims against Defendant Kvaerner Philadelphia Shipyard shall be denied.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KIMBERLY L. GIBBONS, in the name of the UNITED STATES OF AMERICA,　　Plaintiff,　　v.　　KVAERNER PHILADELPHIA SHIPYARD, INC., KVAERNER, INC., and AKER KVAERNER ASA,　　Defendants. | CIVIL ACTION　　No. 05-685 |

## O R D E R

**AND NOW**, this 10th day of February, 2006, having considered the Defendants' Motion to Quash Service, Dismiss and Strike (Doc. No. 6), and Plaintiffs' response thereto, it is hereby **ORDERED** that:

1. Defendants' Motions to Quash for improper service and Dismiss for lack of personal jurisdiction are **GRANTED** and Defendants Kvaerner, Inc., and Aker Kvaerner, ASA, are **DISMISSED WITHOUT PREJUDICE**; and

2. Defendants Motions are **DENIED** in all other respects.

It is further **ORDERED** that the above-caption shall be changed from "Kvaerner Philadelphia Shipyard, Inc.," to "Aker Philadelphia Shipyard, Inc."

BY THE COURT:

_Robert F. Kelly_
ROBERT F. KELLY,　　Sr. J.