CONFIDENTIAL - PROTECTED HEALTH INFORMATION

                                                                                                     1

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2                       ERIE DIVISION

 3
    UNITED STATES OF AMERICA, ex rel. )
 4  DILBAGH SINGH, M.D., PAUL KIRSCH, )
    M.D., V. RAO NADELLA, M.D., and   )
 5  MARTIN JACOBS, M.D.,              )
                                      )
 6            Relators,                )
                                      ) Civil Action
 7       vs.                          ) No. 04-186E
                                      )
 8  BRADFORD REGIONAL MEDICAL CENTER, )
    V&S MEDICAL ASSOCIATES, LLC,      )
 9  PETER VACCARO, M.D., KAMRAN SALEH,)
    M.D., and DOES I through XX,      )
10                                    )
              Defendants.              )
11

12            DEPOSITION OF KAMRAN SALEH, M.D.

13            THURSDAY, AUGUST 9, 2007

14       Deposition of KAMRAN SALEH, M.D., called as a

15  witness by the Plaintiffs, taken pursuant to Notice of

16  Deposition and the Federal Rules of Civil Procedure,

17  by and before Joy A. Hartman, a Court Reporter and

18  Notary Public in and for the Commonwealth of

19  Pennsylvania, at the offices of Fox Rothschild, 625

20  Liberty Avenue, 29th Floor, Pittsburgh, Pennsylvania

21  commencing at 9:31 a.m. on the day and date above set

22  forth.

23
```

CONFIDENTIAL - PROTECTED HEALTH INFORMATION
                                                                6

```
 1    V&S Associates?
 2    A.   Well, V&S is what I own.  I am part owner in
 3    that.
 4    Q.   It still exists?
 5    A.   Yes.
 6    Q.   When did you form V&S?
 7    A.   Excuse me?
 8    Q.   When did you form V&S?
 9    A.   2000.  It was April of 2000.
10    Q.   And V&S is a corporation, correct?
11    A.   That's right, L.L.C.
12    Q.   L.L.C., and it's full name is V&S Associates
13    L.L.C.?
14    A.   V&S Medical Associates, L.L.C.
15    Q.   Who were the original shareholders or members
16    of the company?
17    A.   Me, Dr. Saleh, and Dr. Vaccaro.
18    Q.   Is the ownership the same today?
19    A.   Yes.
20    Q.   Have you ever had any other owners?
21    A.   No.
22    Q.   Do you own it 50-50?
23    A.   Yes.
```

CONFIDENTIAL - PROTECTED HEALTH INFORMATION
                                                              17

1    A.   Yes.

2    Q.   What types of referrals would you make?

3    A.   Like, if patients needed a cardiac

4    catheterization, we would send the patient for the

5    cardiac catheterization.  Some patients need an

6    endocrine evaluation, so we would send them to an

7    endocrinologist or urologist.  It was orthopedic

8    surgeons, so all kind of referrals, whatever the

9    patient's need is.

10   Q.   Would you also refer patients to the hospital

11   to be admitted as inpatients?

12   A.   Yes, we do.

13   Q.   Is it fair to say that most of your referrals

14   to a hospital went to Bradford?

15        MR. RYCHCIK:  Objection as to the form.

16   A.   Well, we refer patients wherever the

17   opportunity was, wherever the need was.  If there is

18   somebody who needed to be admitted to the hospital, we

19   admitted them to Bradford Hospital, yes.

20   Q.   Did you admit very many inpatients to Olean

21   Hospital --

22   A.   No.

23   Q.   -- or other hospitals other than Bradford?

CONFIDENTIAL - PROTECTED HEALTH INFORMATION
                                                                18

1    A.    No.

2    Q.    Outpatient referrals, they would -- would

3    outpatient referrals primarily be referrals to have

4    tests performed on somebody?

5    A.    Tests, plus evaluation by the doctors.

6    Q.    Were a portion of those outpatient referrals

7    referred to Bradford or any other hospital?

8    A.    Part of it to Bradford, part of it to Hamot

9    Medical Center, some to Cleveland Clinic, and some to

10   UPMC, depending on the need.

11   Q.    What would be your basis for distinguishing

12   which hospital you would refer somebody to for an

13   outpatient test?

14   A.    For the testing?

15   Q.    Yes.

16   A.    That would be for whether the test is available

17   in that facility and what time frame they can get the

18   test done and what kind of reading and the quality of

19   the test performed.

20   Q.    Were there certain types of services that could

21   be performed at multiple hospitals?

22   A.    Yes.

23   Q.    What types of services would those have been?

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

19

1   A.   Like blood work, like chest x-ray.

2   Q.   And if you had to refer people out for those

3   types of services, would it be your typical practice

4   to refer them over to Bradford?

5        MR. RYCHCIK:  Objection as to the form.

6   A.   Well, what we look at when we refer the patient

7   for the lab work or for the x-rays is for the

8   convenience of the patient.  Most of our population is

9   elderly patients, and they actually -- even to come to

10   the doctor's office, they have to find a ride to come.

11   So to send them farther away is more difficult, so

12   they all usually prefer the closest possible testing

13   place.

14   Q.   And that was Bradford, correct?

15   A.   And that is Bradford.

16   Q.   These other places you mentioned -- Hamot

17   Medical Center?

18   A.   Yes.

19   Q.   Where is that?

20   A.   It is in Erie.

21   Q.   How far away is that from Bradford?

22   A.   An hour and a half.

23   Q.   I cannot remember the name of the other medical

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

20

1   center or facility.

2   A.   Olean General Hospital.

3   Q.   I know you mentioned Olean, but I thought you

4   mentioned one other one.

5   A.   UPMC.

6   Q.   UPMC.  What is that?

7   A.   That is the University of Pittsburgh.

8   Q.   How far away is Pittsburgh from Bradford?

9   A.   About three and a half hours.

10   Q.   During the same period that we have been

11   discussing before you got the camera, would you

12   describe yourself and Dr. Vaccaro as being a large

13   referral source for the hospital, Bradford Hospital?

14        MR. RYCHCIK:  Objection as to the form of

15       the question.

16   A.   I can't really tell you as to whether it is a

17   large referral source, but one of the referrals as for

18   all the community organization do.  So we are a part

19   of them, one part of them.

20   Q.   Do you have any knowledge of how you stacked up

21   to other physicians in terms of how much business was

22   referred to Bradford?

23   A.   I didn't understand the question.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION
21

1   Q.   I am trying to focus on how V&S compared to

2   other physicians in the amount of business that they

3   referred to Bradford.  Did you all refer more or less

4   than other physicians in the area?

5       So my question is:  During this time period, do

6   you have any information on which to compare your

7   referrals to other physicians' referrals?

8   A.   I don't have any information on that.

9   Q.   Do you have any belief?

10   A.   Well, I mean we are a two-physician practice.

11   Most of the practices are solo practices, so that

12   increases the number of referrals; but Dr. Jamil and

13   Dr. Kirsch have significant referrals to the hospital.

14   Q.   Did you ever have an occasion to attempt to

15   quantify the number or dollar value of your referrals

16   to Bradford during this period?

17   A.   I don't recall it.

18   Q.   Now, I want to talk a little bit about your

19   decision to lease this nuclear camera.  First off,

20   describe for me what the camera was.

21   A.   It is a GE nuclear camera, and the nuclear

22   camera provides the nuclear testing, and the testing

23   done is like cardiac stress testing, bone scan,

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

22

1  thyroid scan.  It is those kind of tests that are

2  considered specialized x-ray testing.

3    Q.   Is this nuclear testing similar to or different

4  from MRIs and CT scans?

5    A.   It is different.

6    Q.   How is it different?

7    A.   Because the indications are different, and the

8  tests are different.

9    Q.   Are there certain types of tests that --

10 actually, I'm sorry.  I want to rephrase this.  You

11 perform a test in order to learn something about a

12 patient, correct?

13   A.   That's right.

14   Q.   Are there ever circumstances where you could

15 either go with a nuclear camera or with a CT scan or

16 an MRI?

17   A.   Uncommon.

18   Q.   Uncommon?

19   A.   Yes.

20   Q.   So, typically, the type of information you are

21 seeking to acquire would lead you to pick one or the

22 other?

23   A.   That's true.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION
                                                                    37

1    Bradford?
2    A.   Most of the time, that would have been
3    Bradford.
4    Q.   After you got your nuclear camera, your
5    referrals to Bradford for nuclear tests would have
6    reduced, because you were doing a large number of them
7    in your own office, correct?
8    A.   Yes.
9    Q.   Other than that, do you believe there was any
10   change in your referral patterns during the period
11   that you owned or leased the nuclear camera?
12        MR. RYCHCIK:  Are you talking about just
13        nuclear camera referral patterns?
14        MR. SIMPSON:  Other than nuclear camera.
15   Q.   Nuclear camera referrals went down because you
16   were doing them in your own office.  Were there any
17   other types of referrals that you had been doing
18   previously that your referral patterns changed after
19   you got the camera?
20   A.   No.
21   Q.   Now, at some point, you were approached by
22   Bradford with some concerns they had about the fact
23   that you had leased this camera, correct?

CONFIDENTIAL - PROTECTED HEALTH INFORMATION
43

1    A.    Yes, we did.

2    Q.    And who was it that you hired as the first

3    attorney you hired to represent you in discussions

4    with the hospital relating to the camera issue?

5    A.    Ed Kabala.

6    Q.    And did you also work with Marc Raspanti?

7    A.    Yes.

8    Q.    But Mr. Kabala came first, I guess?

9    A.    That's true.

10   Q.    At some point, did the hospital come to you

11   with concerns that by getting this nuclear camera that

12   you would be violating a hospital policy on

13   non-competition?

14   A.    Yes.

15   Q.    Was that Mr. Leonhardt that came to you?

16   A.    I don't recall.

17   Q.    Did he do that -- do you recall whether he

18   spoke with you orally about it or whether he wrote you

19   a letter?

20   A.    Both were done.  Orally, and then a letter was

21   sent, too.

22   Q.    I will go through some documents later, but I

23   just want to kind of walk through the general stages

CONFIDENTIAL - PROTECTED HEALTH INFORMATION
                                                                44

1   first.  You all had a bunch of back and forth about

2   whether this policy was legal, correct?

3     A.   That's true.

4     Q.   And you took the position that the hospital's

5   attempt to enforce this policy was an illegal attempt

6   to economic credentialing; is that correct?

7           MR. RYCHCIK:  Objection as to the form.

8        You are asking him for a legal conclusion.

9           MR. SIMPSON:  I am not asking him for a

10       conclusion.

11    Q.   I am saying you took that position with the

12   hospital, didn't you?

13    A.   Initially, when the hospital did that, we

14   thought that economic credentialing was the way to

15   stop our privileges for referrals.  That was the

16   initial thinking.  That is why we were concerned, and

17   we wanted a legal opinion on that.  But after several

18   discussions later, it became more clear as to the

19   basis for what the reason was.

20    Q.   And was it your understanding that -- let me

21   put it this way:  Do you believe the hospital ever had

22   any intention of actually denying you staff privileges

23   at the hospital?

CONFIDENTIAL - PROTECTED HEALTH INFORMATION
                                                         45

1    A.    Yes.

2    Q.    So you didn't see it as a mere bluff?

3    A.    That's true.

4    Q.    Basically, what the hospital was telling you

5  was that if you are in a business that is in

6  competition with the hospital, you are not entitled to

7  have staff privileges with the hospital, correct?

8    A.    That's true.

9           MR. MULHOLLAND:  Objection to the

10       characterization of what the hospital may or

11       may not have told him.

12   Q.    That was your understanding of what the

13  hospital position was, correct?

14   A.    That's true.

15   Q.    Now, you stated you didn't believe it was a

16  bluff; but did it also become apparent to you that the

17  hospital would rather not terminate your privileges,

18  but would rather work out some kind of arrangement

19  with you?

20   A.    That started appearing later in the course,

21  much later in the course.  Initially, it was not

22  obvious.

23   Q.    Who made the first proposal that you and the

JOHNSON and MIMLESS
(412) 765-0744

CONFIDENTIAL - PROTECTED HEALTH INFORMATION
54

1      equipment?

2         MR. SIMPSON: I'm sorry.

3  Q.  Did the hospital pay you rent to keep the

4  camera on your premises?

5  A.  Yes.

6  Q.  And that was in addition to all of the payments

7  under the sublease?

8  A.  That's true.

9  Q.  While the old camera was at your premises, was

10  it being used --

11  A.  Yes.

12  Q.  -- or was it sitting idle?

13  A.  No. It was being used.

14  Q.  How frequently was it being used?

15  A.  As frequently as it was being used before. But

16  since we signed the lease agreement, the sublease

17  agreement now, the payments that were going was the

18  income for the hospital.

19  Q.  The patients for whom it was being used, were

20  they still your patients, or did the hospital send

21  over other patients that were not your patients to

22  have tests done?

23  A.  There were sometimes, yes.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

70

```
 1          MR. RYCHCIK:  I am going to object to the
 2     extent I don't want you to divulge any types of
 3     communications you might have had with Mr.
 4     Raspanti or any of your counsel, for that
 5     matter, and I am going to instruct you not to
 6     answer to the extent that is what you are
 7     asking.
 8  Q.  All I am asking is -- well, would you typically
 9  be sent a draft of the letter before he would send the
10  final copy out to opposing counsel?
11          MR. SIMPSON:  I am not sure whether that
12     is objectionable or not.
13          MR. RYCHCIK:  I still think that is.  I
14     still think it is asking whether or not there
15     was a communication, and I don't think I want
16     him to answer that question.  You could ask him
17     another question, but --
18          MR. SIMPSON:  Well, I have already asked
19     whether he recalled seeing this letter.
20  Q.  Let me ask you this question:  Flip to page
21  159, please, the last full paragraph.  The last full
22  paragraph starts out by saying, "We know of no case
23  that more clearly establishes a hospital's attempt to
```

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

71

1   extract an exclusive referral stream from a

2   physician."

3        My question to you is:  At that time, was it

4   your belief that the hospital was trying to extract a

5   referral stream from you by invoking the non-compete

6   clause?

7     A.   Yes.  When initially we found out that there is

8   a non-compete clause, that was our understanding that

9   the hospital is trying to get referrals and making it

10  tied to our hospital privileges.  That is why you can

11  see, initially, we were concerned, and we hired the

12  counsel, and we advised them to get the counsel, too,

13  to make sure that that is not the reason why this

14  economic credentialing was based on.

15       As you can see, after several months, almost

16  two years of discussion, it was clear that that was

17  not the basis for all of this; but initially, yes,

18  that was the concern.

19    Q.   It was your belief that the hospital was trying

20  to get the referrals back that it had lost by you

21  doing them in your office?

22            MR. RYCHCIK:  Objection as to the form of

23       the question.


JOHNSON and MIMLESS
(412) 765-0744