IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ) | | |
| DILBAGH SINGH, M.D., PAUL KIRSCH, M.D., ) | | |
| V. RAO NADELLA, M.D., and ) | | |
| MARTIN JACOBS, M.D., ) | | |
| ) | | |
| Plaintiffs, ) | CIVIL ACTION NO. 04-186-E | |
| ) | | |
| v. ) | JUDGE COHILL | |
| ) | | |
| ) | | |
| BRADFORD REGIONAL MEDICAL CENTER, ) | | |
| et al., ) | | |
| ) | | |
| Defendants. ) | | |
| _____) | | |

**PLAINTIFF'S RESPONSE TO DEFENDANT BRADFORD
REGIONAL MEDICAL CENTER'S MOTION TO QUASH**

On Friday, August 24, 2007, Defendant Bradford Regional Medical Center ("BRMC") filed a motion to quash Relators' subpoena for the deposition of Daniel M. Mulholland. As Relators were preparing their response to this motion, the Court entered an order granting the motion without prejudice. In its order, the Court indicated that, because BRMC has not yet raised an advice of counsel defense, it is not appropriate to depose BRMC's attorneys regarding privileged matters. Relators agree with this point, and do not expect to be able to depose Mr. Mulholland regarding issues protected by the attorney-client privilege or work product doctrine.

However, in addition to being counsel for BRMC in this action, Mr. Mulholland was also a participant in the very transaction that forms the basis of this lawsuit. As discussed in greater detail below, Mr. Mulholland participated in non-privileged negotiations with Drs. Vaccaro and Saleh and their attorneys regarding the sublease

between V&S Medical Associates, P.C. and BRMC. In particular, Mr. Mulholland was present during a March 8, 2003 meeting at which the parties negotiated the terms of the proposed lease, including the amount of money to be paid by BRMC to V&S under the lease.

In its order, the Court indicated that it did not have sufficient information to address the issue of whether Mr. Mulholland should be subject to deposition on non-privileged factual matters. Relators take this opportunity to demonstrate why, independent of his role as attorney for BRMC, Mr. Mulholland is a key fact witness, and should be subject to deposition.[1]

### 1. **Negotiations regarding the amount of lease payments are directly relevant.**

In order to understand why Mr. Mulholland's testimony is relevant, it is necessary to describe briefly the factual background of this case. Drs. Vaccaro and Saleh are the owners of V&S Medical Associates, L.L.C., a medical practice. Saleh Dep., p. 6 (attached as Exhibit 1). Prior to 2001, they were a significant source of referrals to BRMC, both for inpatient admissions and for outpatient tests, including diagnostic tests performed on a nuclear imaging camera located at BRMC. The majority of V&S's referrals were to BRMC. Vaccaro Dep., p. 18-20, 24 (attached as Exhibit 2); Saleh Dep., p. 17-22; BRMC Dep., p. 97, 129, 175 (attached as Exhibit 3). In 2001, however, V&S decided to lease its own nuclear camera from General Electric. Rather than referring patients to BRMC for nuclear imaging tests as they had done previously, Drs. Vaccaro and Saleh began to perform such tests in their own office, thus decreasing their referrals

---

[1] Because the Court entered its order before Relators had the opportunity to file their response brief, the Court may choose to treat this response as a request for reconsideration.

to BRMC. Saleh Dep., p. 37; Vaccaro Dep., p. 25; BRMC Dep., p. 128 (agreeing that V&S's imaging was having a negative impact on the hospital).

BRMC objected to the fact that Drs. Vaccaro and Saleh were competing with the hospital, and began to put pressure on them to get out of the nuclear imaging business, threatening to revoke their staff privileges if they did not agree to a resolution of the issue. Saleh Dep., p. 43-45; Vaccaro Dep., p. 42. Through their attorneys, Drs. Vaccaro and Saleh objected to BRMC's pressure, claiming that BRMC was illegally seeking to extract referrals from V&S, in violation of the Stark and Anti-Kickback statutes. *See* Saleh Dep., p. 70-71 and Ex. 7 ("We know of no case that more clearly establishes a hospital's attempt to extract an exclusive referral stream from a physician.").

Ultimately, in 2003, the parties resolved their dispute by entering into an Equipment Sublease, pursuant to which BRMC agreed to sublease the nuclear camera from V&S. Under the sublease agreement, BRMC agreed to make monthly payments to V&S in the amount of $30,200. Of this amount, only $6,545 was for the actual sublease of the nuclear camera. The remaining $23,655 – i.e., the overwhelming majority of the lease payments – constituted payment for a purported "non-compete" agreement by V&S and Drs. Vaccaro and Saleh, prohibiting them from competing with BRMC in the nuclear imaging area. BRMC Dep., p. 142-143, 183-185 and Exhibit 20. After the execution of the sublease, Drs. Vaccaro and Saleh reverted to their prior referral patterns, referring the

vast majority of their nuclear camera tests to BRMC. [2] Saleh Dep., p. 54 (after lease, the equipment was used "[a]s frequently as it was being used before. But since we signed the lease agreement, the sublease agreement now, the payments that were going was the income for the hospital"); *id.*, p.74-75 ("It would go to the prior pattern of referral. . . . Most of the tests were done in Bradford.").

Among other things, Relators contend that the lease agreement creates a "financial relationship" between BRMC and Drs. Vaccaro and Saleh pursuant to the Stark statute, 42 U.S.C. § 1395nn, thus prohibiting BRMC from submitting Medicare claims based on referrals from such physicians. Early in this case, in its motion to dismiss Relators' complaint, BRMC argued that, in order to constitute an "indirect compensation arrangement" (and hence a "financial relationship") under the Stark statute, the compensation paid by BRMC under the sublease had to "vary with, or otherwise reflect, the volume or value of referrals or other business generated by [the] physician for the hospital." Defendants' Memorandum in Support of Joint Motion to Dismiss (Docket

---

[2] BRMC acknowledges that the purpose of the sublease was not simply to acquire a piece of equipment, but that it also hoped to get V&S's referral business as a result. Indeed, BRMC's 30(b)(6) designee, Glen Washington, admitted that "[t]he GE camera was an older model with some limited technology," and that "we did not feel that it would meet our future needs." BRMC Dep., p. 74. Mr. Washington testified that "[w]e informed [V&S] that that would not meet our future needs, because of the older technology and because of its nuclear cardiology limitations." *Id.*, p. 76. George Leonhardt, BRMC's president and CEO, agreed that the sublease arrangement was a "fairly cumbersome way to go out and acquire a piece of equipment," stating "Yes, if that was the only thing we were trying to accomplish. Obviously, it wasn't the only thing we were trying to accomplish." *Id.*, p. 140. Mr. Leonhardt admitted that BRMC hoped to get V&S's referral business as a result of the sublease. *Id.*, p. 146 ("Q. Did you expect that you would get the referral business from V&S as a result of this agreement? A. We hoped that we would."). Indeed, in evaluating the fair market value of the lease payments, BRMC ran projections estimating the expected impact on referrals under various scenarios. *Id.*, p. 154-157.

4

No. 14), p. 17. BRMC argued that, since the payments under the lease were fixed, they did not "vary with" the volume or value of referrals from Drs. Vaccaro and Saleh.

Relator responded by pointing out that it is not necessary for the compensation to "vary with" the volume or value of such referrals, but that it is sufficient if the compensation "otherwise reflects" the expected volume or value of such referrals. Response to Defendants' Joint Motion to Dismiss (Docket No. 24), p. 14 ("Quite plainly, an arrangement 'otherwise reflects' such value if it takes into account the expected value of the referrals to be provided by the physician"). The Court rejected BRMC's arguments and denied the motion to dismiss. September 13, 2006 Opinion and Order (Docket Nos. 31, 32).

Clearly, therefore, a key issue in this case is whether the payments from BRMC to V&S under the sublease, including the "noncompete" payments, take into account the expected volume or value of referrals from Drs. Vaccaro and Saleh. It is Relators' position that, in evaluating the amount of the sublease payments, BRMC took into account the expectation that, once BRMC subleased the nuclear camera from V&S, Drs. Vaccaro and Saleh would refer patients to BRMC to have nuclear camera tests, as they had done before they acquired the nuclear camera. It is beyond question, therefore, that the negotiations between BRMC and V&S over the amount to be paid under the lease agreement are directly relevant to a central issue in this case.[3]

---

[3] In its brief, BRMC asserts that "Relators cannot show that what did or did not happen at a negotiating session between Defendants is relevant to their claims." Brief in Support of Motion to Quash, p. 3. Perhaps BRMC means that it concedes this issue, so there is no need to take Mr. Mulholland's deposition. If, however, BRMC does not concede the issue, then it has no business telling the Court that negotiating sessions regarding the payments to be made under the sublease could not possibly be relevant.

**2.      Mr. Mulholland was a factual participant in the negotiations regarding the amount of the lease payments.**

During discovery in this case, BRMC and V&S produced more than 14,000 pages of documents. In reviewing these documents, Relators came across a March 20, 2003 letter produced by V&S that purported to describe a March 8, 2003 negotiating session involving BRMC, V&S, and their attorneys, including Mr. Mulholland. According to this letter, the purpose of the meeting was squarely to negotiate the terms of the proposed sublease, including specifically the amount of payments to be made by BRMC to V&S. The letter purports to recite a number of offers and counteroffers regarding the lease payments, as well as a purported agreement on a payment amount. Quite clearly, therefore, Relators have reason to believe that the details of these face-to-face negotiations might shed light on how the parties evaluated the amount of the lease payments.

As a factual participant in this meeting, Mr. Mulholland undoubtedly has non-privileged information regarding the positions asserted by the various parties, and their asserted justifications for these positions. Because this information concerns discussions between adverse parties, it is not protected by the attorney-client privilege or the work product doctrine, and is subject to discovery.

**3.      BRMC itself has recognized that the attorneys involved in the negotiations are potential fact witnesses.**

BRMC's suggestion that lawyers are off-limits is belied by its own initial disclosures, which identified individuals "likely to have discoverable information." In its disclosures, BRMC identified a number of lawyers for both parties – although it did <u>not</u>

identify Mr. Mulholland.[4]  BRMC identified Alan J. Steinberg, a partner in Mr. Mulholland's firm, Horty, Springer & Mattern, P.C., as possessing "[i]nformation concerning nonprivileged communications between counsel for BRMC and V&S, and Drs. Saleh and Vaccaro, regarding the application of BRMC's Policy on Physicians with Competing Interests to Drs. Saleh and Vaccaro and the lease of imaging equipment by BRMC from V&S."  See Exhibit 4, p. 12.  BRMC also identified V&S's lawyers as possessing similar discoverable information.

Quite clearly, therefore, BRMC recognized that the lawyers at Horty, Springer who were involved in the negotiations possess discoverable information and are fair game for discovery.  Just as clearly, there is no basis whatsoever for claiming that Mr. Steinberg possesses discoverable information, while Mr. Mulholland is off-limits.  The only difference is that BRMC has chosen to hire Mr. Mulholland as its counsel in this case, despite its knowledge that he has discoverable information.  In effect, BRMC is suggesting that a party should be able to place a witness off-limits simply by designating him as its attorney.  In fact, as discussed below, the reverse is true –a party should not hire as its attorney someone it knows is likely to be a witness.

---

[4] BRMC disingenuously asserts that "Relators have known at least since receiving Defendants' Rule 26 disclosures in November 2006 … that the Defendants involved their attorneys in negotiations."  BRMC Brief, p. 4.  What BRMC does not say, however, is that its disclosures pointedly did not identify Mr. Mulholland as an individual with discoverable knowledge, although they did identify another lawyer in the same law firm. See Exhibit B.  It was not until Relators' counsel went through the thousands of pages of documents produced by defendants, and located the letter mentioned above, that they learned Mr. Mulholland was present at a key meeting where the parties discussed the specific issue of the amount of rent payments.  Relators do not suggest that the failure to identify Mr. Mulholland as an individual with discoverable knowledge was deliberate.  However, in light of such omission, it is disingenuous at best to suggest that such disclosures apprised Relators of Mr. Mulholland's factual involvement.

Moreover, Relators and BRMC are not the only parties in this litigation. There is nothing whatsoever to prevent Drs. Vaccaro and Saleh from calling Mr. Mulholland as a witness at trial, if they believe that his testimony will help their case. Precluding Relators from taking Mr. Mulholland's deposition leaves them open to "surprise" at trial if V&S decides to take such an approach.

**4.      BRMC gets the Rules of Professional Conduct backward.**

In its brief, BRMC relies on Rule 3.7[5] of the Pennsylvania Rules of Professional Conduct, noting that, "by making Mr. Mulholland a witness, Relators have put into play the possibility that he might be a witness at trial and thus disqualifying him and his firm from representing BRMC." In fact, it is not <u>Relators</u> who have "put into play" the possibility that Mr. Mulholland or his firm might be disqualified. Rather, it is BRMC and its attorneys who have put the rule into play, by deciding to hire as counsel someone who was involved in the underlying transaction. BRMC has known for years that Mr. Mulholland was involved in the negotiations with V&S, and thus had nonprivileged information regarding such negotiations. BRMC was aware of this fact in July 2005, when it hired Mr. Mulholland and its firm to represent it in this lawsuit. *See* Stipulation, filed July 26, 2005 (Docket No. 7). It was aware of this fact in November 2006, when it served its initial disclosures, which did <u>not</u> identify Mr. Mulholland as an individual with discoverable knowledge. Relators, by contrast, did not become aware of Mr. Mulholland's factual involvement in the underlying transaction until they reviewed the thousands of pages of documents produced by BRMC and V&S.

---

[5] BRMC actually cites Rule 3.5, but Relators believe this was a typo, since it is Rule 3.7 that deals with lawyers as witnesses.

8

It is true that, with minor exceptions, Rule 3.7 does not allow an attorney to represent a client and at the same time be a witness.  However, this does not mean that a defendant can hide behind Rule 3.7 by retaining as counsel someone who was intimately involved in the facts underlying the lawsuit.  Rather, the purpose of Rule 3.7 is to ensure that lawyers do not <u>undertake</u> representation if they are likely to be witnesses.  *See* Rule 3.7 ("A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness," subject to certain exceptions).  It is up to the lawyer to consider the likely effect of Rule 3.7 before agreeing to undertake representation.  BRMC, by contrast, wants to take Rule 3.7 and turn it into a weapon to keep opposing parties from obtaining discovery.

Moreover, trial is a long way away, and there does not appear to be anything that would prevent BRMC from switching attorneys between the conclusion of discovery and the start of trial.  If BRMC can shield Mr. Mulholland from discovery during the discovery period, what is to prevent it from changing attorneys later and calling Mr. Mulholland as a witness?  If that were to happen, Relators would clearly be prejudiced by not being allowed to take his deposition.

Furthermore, Relators do not know exactly what Mr. Mulholland would say at his deposition.  It is possible that nothing very interesting or revealing occurred at the March 8, 2003 negotiating session, and Relators will have no need to call Mr. Mulholland as a witness at trial.  However, Relators are certainly entitled to take his deposition to see if that is the case – particularly since neither BRMC nor V&S have unequivocally relinquished any right to call Mr. Mulholland as a witness.

**5.    Relators have questioned other persons regarding the negotiations.**

As BRMC acknowledges, Relators questioned Drs. Vaccaro and Saleh regarding the negotiations over the lease payments, and they (quite unbelievably) claimed an almost perfect inability to recall the details of such negotiations. *See* Saleh Dep., p. 116-119; Vaccaro Dep., p. 43-45. BRMC's suggestion that Relators failed to question George Leonhardt, BRMC's 30(b)(6) designee, about such matters is completely erroneous, and is belied by the very portion of Mr. Leonhardt's deposition BRMC chose to attach as an exhibit:

> Q.  Is that how you arrived at the amount that V&S would pay under the agreement?
> A.  No. We arrived at that amount through negotiations.
> …
> Q.  Now, in the negotiations, explain to me how you arrived at the number for the portion of the agreement that covers the non-compete?
> A.  Through a long and sometimes arduous negotiation.
> Q.  What was the value that the hospital placed on the non-compete?
> A.  I don't know. If you are asking me where we started, I don't remember.
> Q.  Do you recall what V&S put on it?
> A.  At a beginning point, no, I don't.

BRMC Dep., p. 149-150. Clearly, Mr. Leonhardt is claiming at least a partial inability to remember the details of the negotiations regarding the back-and-forth between the parties over the valuation of the noncompete. If Mr. Leonhardt has suddenly gained total recall of those details, Relators would certainly like to know. What cannot be said, however, is that Mr. Mulholland is certain to have exactly the same recollection as Mr. Leonhardt, and thus has nothing to add as a witness. Moreover, a jury may well conclude that Mr. Mulholland, Mr. Leonhardt, and Drs. Vaccaro and Saleh have differing degrees of credibility, such that testimony from one is not a true substitute for testimony from another.

### 6. **BRMC's suggestion of delay is disingenuous.**

BRMC's statement that Relators "g[ave] BRMC's counsel only 10 days' notice [of the deposition] with only two weeks left [in the discovery period]" is completely disingenuous. In fact, Relators notified BRMC of their intention to depose Mr. Mulholland on August 13, 2007, shortly after taking Dr. Vaccaro's and Dr. Saleh's depositions, and asked for dates when he would be available. A week later, after BRMC had not responded, Relator's counsel asked Mr. Mulholland when he could expect a response. Mr. Mulholland stated that BRMC would respond after Mr. Mulholland conferred with V&S's counsel (who first had to confer with his own clients). Motion to Quash, p. 1-2. Having waited more than a week for a response, having been given no reason to expect that one would be forthcoming soon, and with the discovery deadline approaching, Relators determined that it was necessary to serve a subpoena on Mr. Mulholland. Counsel for Relators did so on August 21, setting the deposition for August 31, ten days later. Thus, BRMC had far more than ten days' notice of Relator's desire to depose Mr. Mulholland.[6]

Moreover, BRMC's position appears to be that any deposition of counsel is inappropriate before taking depositions of the other parties, in order to see whether the counsel's testimony is necessary. Clearly, then, BRMC is not suggesting that Relators should have taken counsel's depositions first, or that they would have agreed to such a

---

[6] BRMC's suggestion that Relator should have served a separate notice of deposition, in addition to the subpoena, is even more disingenuous. As Mr. Mulholland acknowledges, upon receipt of the subpoena, with counsel for all parties present, he informed Relators' counsel that he would be filing a motion to quash the subpoena. Since it was apparent that Mr. Mulholland was not going to make himself available on the scheduled date, it would have been misleading to serve a separate notice stating that a deposition would be taking place.

procedure without filing a motion to quash. In that regard, any delay in the taking of the other depositions is directly attributable to defendants' own actions. During discovery, BRMC and V&S took the position that Relators should not be allowed to take substantive depositions of the defendants until Relators provided certain information and documents sought by defendants in their discovery requests, information which Relators contended was irrelevant and not subject to discovery. Although Relators disagreed with this position, they accommodated defendants by not insisting on such depositions until after the Court ruled on BRMC's motion to compel (which the Court subsequently denied). The alternative would have been for Relators to force the issue by unilaterally noticing defendants' depositions without agreement of counsel, and then litigating the resulting motion for protective order or motion to compel – all of which would likely have caused the depositions to be taken no earlier. In any event, BRMC cannot complain that Relators agreed to accommodate BRMC's own desires regarding the timing of discovery, by postponing defendants' substantive depositions until after the ruling on the motion to compel.

## CONCLUSION

For the above reasons, Mr. Mulholland is clearly a relevant fact witness to the transaction underlying this lawsuit, and should be subject to deposition.

This 5th day of September, 2007.

                        Respectfully submitted,

                        /S/ Andrew M. Stone
                        Andrew M. Stone
                        (Pa. #35176)
                        Stone Law Firm, LLC
                        1400 Allegheny Bldg.
                        429 Forbes Avenue
                        Pittsburgh, Pa. 15219
                        Phone: (412) 391-2005
                        Fax: (412) 391-0853
                        astone@stones2.com
                        Attorneys for Plaintiff

                        /S/ G. Mark Simpson
                        G. Mark Simpson
                        Georgia Bar No. 647725
                        SIMPSON LAW FIRM, LLC
                        165 North Main Street
                        Jonesboro, Georgia 30236
                        Phone: (678) 610-1994
                        Fax: (678) 302-8721
                        mark@marksimpsonlaw.com

## CERTIFICATE OF SERVICE

I certify that on this 5th day of September, 2007, I caused a true copy of the foregoing to be served via first class mail to:

Jay D. Marinstein, Esq.
Carl J. Rychcik, Esq.
Fox Rothschild L.L.P.
625 Liberty Avenue
29th Floor
Pittsburgh, Pa. 15222-3115

Daniel M. Mulholland III, Esq.
Henry M. Casale, Esq.
Horty Springer & Mattern, P.C.
4614 Fifth Avenue
Pittsburgh, Pa. 15213

Paul Skirtich, Esq.
United States Attorney's Office
Civil Division
USPO & Courthouse
Pittsburgh, Pa. 15219

/s/ Andrew M. Stone
Andrew M. Stone, Esquire
Pa. # 35176
STONE LAW FIRM
1400 Allegheny Building
429 Forbes Avenue
Pittsburgh, Pennsylvania 15219
(412) 391-2005 (phone)
(412) 391-0853 (fax)
(astone@stone-law-firm.com)