CONFIDENTIAL - PROTECTED HEALTH INFORMATION

1

```
 1            IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2                       ERIE DIVISION

 3
    UNITED STATES OF AMERICA, ex rel. )
 4  DILBAGH SINGH, M.D., PAUL KIRSCH, )
    M.D., V. RAO NADELLA, M.D., and   )
 5  MARTIN JACOBS, M.D.,              )
                                      )
 6              Relators,              )
                                      ) Civil Action
 7       vs.                          ) No. 04-186E
                                      )
 8  BRADFORD REGIONAL MEDICAL CENTER, )
    V&S MEDICAL ASSOCIATES, LLC,      )
 9  PETER VACCARO, M.D., KAMRAN SALEH,)
    M.D., and DOES I through XX,      )
10                                    )
                Defendants.           )
11

12           DEPOSITION OF PETER VACCARO, M.D.

13                THURSDAY, AUGUST 9, 2007

14      Deposition of PETER VACCARO, M.D., called as a

15  witness by the Plaintiffs, taken pursuant to Notice of

16  Deposition and the Federal Rules of Civil Procedure,

17  by and before Joy A. Hartman, a Court Reporter and

18  Notary Public in and for the Commonwealth of

19  Pennsylvania, at the offices of Fox Rothschild, 625

20  Liberty Avenue, 29th Floor, Pittsburgh, Pennsylvania,

21  commencing at 2:56 p.m. on the day and date above set

22  forth.

23
```

JOHNSON and MIMLESS
(412) 765-0744

CONFIDENTIAL - PROTECTED HEALTH INFORMATION
                                                                18

1   V&S' practice before you acquired the nuclear camera
2   that you disagreed with?
3           MR. RYCHCIK:  Objection as to form of the
4       question.
5   A.  I feel like I'm here to confirm Dr. Saleh's
6   testimony, and I thought you were going to get my
7   testimony.
8   Q.  I am.  I am.  I am just trying -- I'm first
9   going to ask you if there was anything in his
10  testimony that you disagreed with.
11  A.  No.  His testimony in describing the practice
12  as it works was very accurate.
13  Q.  During that period of time, is it fair to say
14  that the vast majority of your inpatient referrals
15  were made to Bradford Medical Center?
16          MR. RYCHCIK:  Objection as to form.
17  A.  During what period OF time?
18  Q.  During the period of time before you acquired
19  the nuclear camera.
20          MR. RYCHCIK:  Objection as to the form of
21      the question.  Go ahead.  You can answer.
22  A.  Could you repeat the question, please?
23  Q.  Is it fair to say that during that period of

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

19

1  time before you got the nuclear camera, that the vast
2  majority of your inpatient referrals were to Bradford
3  regional Medical Center?
4          MR. RYCHCIK:  Same objection.  Go ahead
5       and answer.
6  A.   The inpatient referrals were based on a very
7  sensitive issue of where the patients wanted to go and
8  what was accessible, depending on their problem; and,
9  you know, there could be multiple places they could
10 go, but, you know, most of the time they would pick
11 the most convenient, which would be Bradford Medical
12 Center.
13 Q.   So is the answer to my question, then, yes?
14 A.   Yes, according to all the potential options
15 that were available.
16 Q.   The same question for outpatient referrals.  Is
17 it fair to say that most of your outpatient referrals
18 were to Bradford Regional Medical Center?
19         MR. RYCHCIK:  Objection as to the form of
20      the question.  You can answer.
21 A.   Again, Bradford Regional Medical Center was one
22 of the options; and most of the time, the patient
23 wanted to go to Bradford Regional Medical Center, and

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

20

1  if that is what they wanted, that is where they went.
2    Q.   I understand there might have been good reasons
3  to send them there.  I am just asking you for just the
4  simple facts.  It is true that most of the outpatient
5  referrals were to Bradford as opposed to somewhere
6  else?
7    A.   I just wanted to make sure that it is
8  understood that it is not just an automatic thing all
9  the time, that most of the time, it is because of
10 patient choices.
11   Q.   My question is not about the reasons.  My
12 question is about the simple fact.  It is a fact, is
13 it not, that most of the outpatient referrals were to
14 Bradford?
15   A.   Yes, they were.
16   Q.   Now, after you leased the nuclear camera --
17 well, let me ask you this:  In the period when you
18 were deciding whether or not to lease the nuclear
19 camera, do you recall doing any projections about the
20 amount of additional income that you would receive?
21   A.   There could have been some discussions.
22   Q.   Do you recall any specific discussions?
23   A.   No.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION
                                                                    24

1         Saleh, if you are able to make a reasonable

2         estimate, that is one thing.  I don't want you

3         to be guessing if you don't know.

4    Q.   Now, in terms of non-nuclear tests, other kinds

5  of tests, MRIs and CT scans, and x-rays, a similar

6  question, is it fair to say that the majority of those

7  were done at Bradford?

8    A.   Yes.

9    Q.   We talked a minute ago about whether you

10 attempted to qualify the value of getting a new

11 camera.  Did you come to a dollar figure that you

12 thought you would get for increased revenues or

13 increased profit?

14   A.   I don't recall what we actually came up with at

15 that time.

16   Q.   Would it have been in the hundreds or thousands

17 of dollars per year for you?

18   A.   It could have been.

19   Q.   Do you recall whether you looked at any other

20 cameras, other than the GE camera that you ended up

21 leasing?

22   A.   I don't recall.

23   Q.   After you got the camera, is it fair to say

CONFIDENTIAL - PROTECTED HEALTH INFORMATION
                                                                25

1   with the exception of nuclear imaging referrals, your
2   other referral patterns stayed the same?
3     A.   Yes.
4     Q.   And your nuclear imaging referrals changed in
5   that a lot of tests you were doing you were doing
6   in-house that you otherwise would have performed at
7   Bradford, correct?
8     A.   Obviously, we weren't going to be performing
9   them in the office anymore, and Bradford would be one
10  of the choices that would be decided upon.  There
11  could be several choices.
12    Q.   You might have misunderstood my question.
13         MR. RYCHCIK:  I was going to say, I think
14       he might have misunderstood the question.
15    Q.   I am talking about during the period when you
16  had the new camera, when you leased it.
17    A.   Oh, when I had the nuclear camera.  I thought
18  you meant after.
19    Q.   So with respect to nuclear imaging tests, your
20  referrals to Bradford went down, because a lot of the
21  tests that would have been done there, you were doing
22  in-house?
23    A.   Correct.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

42

1   advised you that the lease arrangement satisfied the
2   Stark statute?
3      A.   We are not giving up our -- I don't remember
4   the exact, but we are not giving up our attorney-
5   client privilege, no.
6      Q.   So you are not saying -- you are not saying, "I
7   thought this was okay, because my attorneys told me
8   this was okay"?
9      A.   Correct.
10     Q.   Did you think that the hospital was bluffing
11  when they threatened to revoke your privileges?
12     A.   No, I did not.
13     Q.   Did you have a legitimate belief that if you
14  didn't come to a resolution, they actually would
15  revoke your privileges?
16     A.   Yes, I did.
17     Q.   I think I might be asking it a little different
18  way, but I think you might have already answered it:
19  Did you ever receive any opinions, any written
20  opinions from Bradford, on the legality of your
21  proposed arrangement?
22     A.   I don't remember.
23     Q.   During your negotiations with the hospital, do

CONFIDENTIAL - PROTECTED HEALTH INFORMATION
                                                                    43

1   you recall providing the hospital with, you know,

2   numbers about the volume of tests that you did with

3   the nuclear camera and the dollar figures associated

4   with those tests?

5   A.   Well, I have heard a lot of the information

6   here today, so it is hard to differentiate now where

7   that memory came from.  From what I heard today, we

8   started going into some numbers under the under

9   arrangements potential scenario.

10  Q.   But you don't have any specific recollections

11  providing any of --

12  A.   No, I do not.

13          MR. RYCHCIK:  You got to let him finish

14      his question before you answer.  You both can't

15      be talking at the same time, so let him finish

16      his question before you answer, please.

17  Q.   And the answer to that question was no, you

18  don't have any specific recollection?

19  A.   Correct.

20  Q.   I want to show you Exhibit 21, which is a March

21  20th, 2003 letter to Alan Steinberg from Jodeen Hobbs.

22  We had talked about this earlier in Dr. Saleh's

23  deposition.  Do you recall seeing this letter

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

44

1  previously?

2  A.  No, I do not.

3  Q.  If you look at the second paragraph of the

4  first page -- well, first of all, do you recall the

5  March 8th meeting that she refers to in the second

6  paragraph?

7  A.  I know she is referring to the meeting that

8  possibly a lease agreement came up, but I don't

9  remember the actual meeting.

10  Q.  Do you remember having any meeting that lasted

11  for over three hours that --

12  A.  Most of them did.

13  Q.  Oh, most of them did?

14  A.  Yes.

15  Q.  They were all pretty long meetings?

16  A.  Yes.

17  Q.  Do you recall a very long meeting where you

18  specifically discussed the numbers on the sublease

19  arrangement?

20  A.  There could have been some numbers being

21  discussed.  It was very preliminary, but I don't

22  have -- I have a very vague recollection.

23  Q.  Do you recall making an initial proposal for a

JOHNSON and MIMLESS
(412) 765-0744

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

45

1  five-year $2,000-per-day lease?
2  A.  No, I do not.
3  Q.  Do you recall leaving the meeting with an
4  agreement -- with what you thought was an agreement
5  for a five-year $1,500-a-day lease?
6  A.  No, I do not.
7  Q.  Do you recall Bradford coming back to you with
8  a proposal for a three-year $1,200-per-day lease?
9  A.  No, I do not.
10 Q.  Let me show you Exhibit 22, which is a document
11 that Dr. Saleh looked at earlier entitled Practice
12 Statistics, did you remember seeing this document
13 before today?
14 A.  No.
15 Q.  So you don't recall this document being used as
16 part of your discussions with the hospital?
17 A.  No.
18 Q.  Do you know whether this was a document
19 prepared by V&S or by the hospital?
20 A.  No.  It looks like it would be prepared by the
21 hospital.
22 Q.  I will show you Exhibit 23 and 24 together
23 since we talked about them together with Dr. Saleh.