## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*<br>DILBAGH SINGH, M.D.,<br>PAUL KIRSCH, M.D.,<br>V. RAO NADELLA, M.D., and<br>MARTIN JACOBS, M.D.,<br><br>          Relators,<br><br>    v.<br><br>BRADFORD REGIONAL<br>  MEDICAL CENTER,<br>V & S MEDICAL ASSOCIATES, LLC,<br>PETER VACCARO, M.D.,<br>KAMRAN SALEH, M.D.,<br>and DOES I through XX,<br><br>          Defendants. | Civil Action No. 04-186E |

### NOTICE OF FILING DOCUMENTS UNDER SEAL

Defendants, through their undersigned attorneys, hereby provide notice that the attached documents, which constitute Exhibits 1 through 6 to Defendants' Motion to Compel filed with the Court in the above-captioned case on September 4, 2007 (Document 85), have been filed under seal with the Clerk of Courts office in accordance with the Court's Order dated September 5, 2007 (Document 93) granting leave to file said documents under seal.

Respectfully submitted,

September 6, 2007

*Daniel M. Mulholland III*

Daniel M. Mulholland III
HORTY, SPRINGER & MATTERN, P.C.
4614 Fifth Avenue
Pittsburgh, PA 15213
412-687-7677 (phone)
412-687-7692 (fax)
dmulholland@hortyspringer.com

Attorneys for Defendant
Bradford Regional Medical Center

166133.1<br>September 6, 2007

/s/ Carl J. Rychcik
Carl J. Rychcik
Pennsylvania ID No. 73754
FOX ROTHSCHILD, LLP
625 Liberty Avenue, 29th Floor
Pittsburgh, PA  15222
Phone:  (412) 394-5549
crychcik@foxrothschild.com

Attorneys for Defendants
V&S Medical Associates, LLC
Peter Vaccaro, M.D.
Kamran Saleh, M.D.

2

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this date he served the following with a copy of the foregoing Notice by first class United States mail, addressed as follows:

> Andrew M. Stone
> Allegheny Building, Suite 1400
> 429 Grant Street
> Pittsburgh, PA  15219
>
> G. Mark Simpson
> Simpson Law Firm, LLC
> 165 North Main Street
> Jonesboro, GA  30236
>
> Paul E. Skirtich
> Assistant U.S. Attorney
> Western District of Pennsylvania
> U.S. Post Office & Courthouse
> 700 Grant Street, Suite 4000
> Pittsburgh, PA 15219

This 6th day of September 2007.

Daniel M. Mulholland III

166133.1
September 6, 2007

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

1

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2                  ERIE DIVISION

3
UNITED STATES OF AMERICA, ex rel. )
4  DILBAGH SINGH, M.D., PAUL KIRSCH, )
   M.D., V. RAO NADELLA, M.D., and  )
5  MARTIN JACOBS, M.D.,             )
                                    )
6              Relators,            )
                                    )   Civil Action
7      vs.                          )   No. 04-186E
                                    )
8  BRADFORD REGIONAL MEDICAL CENTER, )
   V&S MEDICAL ASSOCIATES, LLC,     )
9  PETER VACCARO, M.D., KAMRAN SALEH,)
   M.D., and DOES I through XX,     )
10                                  )
               Defendants.          )
11

12      DEPOSITION OF DILBAGH SINGH, M.D.

13        TUESDAY, AUGUST 21, 2007

14      Deposition of DILBAGH SINGH, M.D., called as a

15  witness by the Defendant Bradford Regional Medical

16  Center, taken pursuant to Notice of Deposition and the

17  Federal Rules of Civil Procedure, by and before Joy A.

18  Hartman, a Court Reporter and Notary Public in and for

19  the Commonwealth of Pennsylvania, at the offices of

20  Stone Law Office, 1400 Allegheny Building, Pittsburgh,

21  Pennsylvania, commencing at 10:10 a.m. on the day and

22  date above set forth.

23

**EXHIBIT**

1



JOHNSON and MIMLESS
(412) 765-0744

ORIGINAL

Case 1:04-cv-00186-MBC    Document 96    Filed 09/06/2007    Page 5 of 55
USA et al., vs. BRMC, et al.                    Multi-Page™                    Dilbagh Singh, M.D.
No. 04-186E                                                                    August 21, 2007

Page 8

1  year. Probably in the '80s sometime.
2   Q. Do you presently have a license to practice
3  medicine in Pennsylvania?
4   A. Yes, I do.
5   Q. Do you also have a medical license in New York?
6   A. That's right.
7   Q. Are there any restrictions and limitations on
8  your license?
9   A. None that I know of.
10       MR. MULHOLLAND: Before we go any further,
11     Andy, I was neglecting to mention that I was
12     going to propose we enter into the same
13     stipulation that we did for Dr. Kirsch's
14     deposition.
15       What that has to do with, for you two
16     gentlemen, is that Mr. Stone had objected to a
17     number of questions that Mr. Rychcik and I had
18     asked Dr. Nadella and Dr. Kirsch yesterday and
19     instructed them not to answer.
20       We took exception with those instructions,
21     and we have asked the court reporter to mark
22     certain pages from their depositions for
23     further review, and we may take it up with the

Page 9

1  Court as to whether or not those questions
2  should have been answered.
3       So I believe what we stipulated to
4  yesterday is to the extent I asked or Mr.
5  Rychcik asked questions of either Dr. Kirsch or
6  Dr. Nadella yesterday, and Mr. Stone objected
7  and instructed them not to answer, that we
8  would assume that we would ask you and in Dr.
9  Jacobs' deposition, Dr. Jacobs, the same
10 questions, and that he would object in the same
11 manner.
12      Is that okay with you, Andy?
13      MR. STONE: Yes. That is correct. I
14 think it is fair to say that if the same
15 questions were asked of Dr. Singh and of Dr.
16 Jacobs that you asked to Dr. Nadella, I would
17 have the same objection and make the same
18 arguments; and, of course, you would take the
19 same exception to that, to my instruction to
20 the witness not to answer.
21      MR. MULHOLLAND: Thus, we would reserve
22 the right to ask the Court to allow us to ask
23 the same questions of Dr. Singh and Dr. Jacobs.

Page 10

1        MR. STONE:  Yes. I think that would be
2    correct.
3        MR. RYCHCIK:  I join in the stipulation on
4    behalf of V&S and Dr. Vaccaro and Dr. Saleh.
5        MR. MULHOLLAND:  Thank you.
6    Q. Doctor, are you specializing in any particular
7    type of medical practice today?
8    A. No.  I do general practice.
9    Q. General practice?
10   A. General medicine, general practice.
11   Q. Are you Board certified by any specialty board?
12   A. No, I am not.
13   Q. Did you ever take a Board certification exam
14   and fail to pass?
15   A. No, I didn't take any.
16   Q. Doctor, can you please briefly describe your
17   education, starting with the your college education,
18   moving on through medical school, and then any
19   residency programs or internships that you may have
20   participated in?
21   A. Oh, that will take you backward then now from
22   my time of graduation?
23   Q. Yes.

USA et al., vs. BRMC, et al.                Multi-Page™                Dilbagh Singh, M.D.
No. 04-186E                                                            August 21, 2007

Page 27

1  one criteria that you would use to decide where to
2  refer some patients. What other criteria, if any, do
3  you use when you decide to refer a patient for needed
4  medical services?
5  A. That is the main thing. The main thing is
6  choice and also the convenience for the family and the
7  patient, where they can transport easily and all of
8  that, yes. It does play a lot of role in that. In
9  any practice, it will.
10  Q. Does any financial relationship that you have
11  with an entity to which you refer patients that would
12  influence your decision to refer?
13      MR. STONE: I'm going to object to
14      questions along this line to refer for reasons
15      that Judge Cohill has previously indicated that
16      the business practices and professional
17      practices of the Plaintiffs is not an issue in
18      the case, and, therefore, it is not relevant
19      and discoverable, and I am going to instruct
20      the witness not to answer.
21      MR. MULHOLLAND: And we take exception
22      with that objection and ask that it please be
23      certified for review by the Court.

Case 1:04-cv-00186-MBC    Document 96    Filed 09/06/2007    Page 8 of 55

USA et al., vs. BRMC, et al.          Multi-Page          Dilbagh Singh, M.D.
No. 04-186E                                                August 21, 2007

Page 54

1 the Medical Center to the Government that you would
2 consider false, any specific statement?
3   A. I don't have any. None has been provided to
4 me.
5   Q. Doctor, are you aware of any claim for payment
6 submitted by the Medical Center to any third-party
7 payor for unnecessary services?
8   A. Not has been provided to me. I don't know.
9   Q. Are you aware of any claim submitted to the
10 Medical Center submitted to any third-party payor for
11 any services that were not provided by the Medical
12 Center?
13   A. I have no idea about those things.
14   Q. Doctor, if you could take a look at paragraph
15 11 in the Complaint, and let me know when you are
16 ready to answer some questions about it.
17   A. Okay.
18   Q. Doctor, this paragraph refers to a statement of
19 material evidence that you and the other Relators
20 filed with the Government around the time you filed
21 the Complaint.
22      Have you ever seen the statement of material
23 evidence that is referred to in this paragraph?

Page 55

1      MR. STONE: I'm going to object to any
2 questions with regard to the so-called
3 disclosure statement that was filed in this
4 case, because, again, this is the subject of a
5 prior order by Judge Cohill.
6      I believe the order and opinion are clear
7 that the Defendants at this stage are not
8 entitled to that statement, and I believe,
9 also, that they are not entitled to the
10 contents of that statement by questioning the
11 witness, the witnesses, the Relators in this
12 case.
13      I would agree that the Defendants are free
14 to question Dr. Singh and any of the other
15 Relators with regard to any material evidence
16 that supports the Complaint in this case, and,
17 certainly, you have the opportunity to ask
18 those questions here today, as you did with the
19 other Relators in this case.
20      MR. MULHOLLAND: Let me just suggest that
21 I was asking him if he had ever seen a copy of
22 the statement of the material evidence. I
23 hadn't got to the subject matter of that

Page 56

1 statement.
2      I know we went through this yesterday, and
3 I presumed our stipulation would cover those
4 questions and objections.
5      I just wanted to know to lay the
6 foundation for a question that I think even
7 you, Mr. Stone, would admit to be valid, and
8 that is a question about the subject matter of
9 the statement that I could ask him.
10      If he hasn't seen the statement, there is
11 no use to ask any other questions about it.
12      MR. STONE: I think -- my only point is I
13 don't think you are entitled to know what that
14 communication was.
15      I think what you are entitled to know is
16 the material evidence that supports the
17 Complaint in this case. I think you have been
18 asking those questions, and you are entitled to
19 continue asking those questions.
20      But I think the Order is clear that the
21 disclosure statement itself is a communica-
22 tion with the Government that we believe is
23 privileged, and the Court has ruled that it is

Page 57

1 not discoverable at this stage.
2      So just as the statement itself is not
3 discoverable in terms of producing that
4 statement, I think the questions about what is
5 in that statement are equally off limits.
6      MR. MULHOLLAND: Well, I haven't even
7 gotten to those questions. I just wanted to
8 know if he saw a copy of the statement of
9 material evidence. If he didn't see one, then
10 he, obviously, can't answer questions about it.
11      MR. STONE: You can ask him the question
12 if he remembers seeing it or not; but anything
13 further than that, anything about the
14 communication, what was in the communication, I
15 think are off limits.
16   Q. Doctor, do you remember seeing a copy of the
17 statement of material evidence that was referred to in
18 paragraph 11 of your Complaint.
19   A. The statement regarding what?
20   Q. There is a reference to something called a
21 statement of material evidence in paragraph 11 of your
22 complaint.
23   A. Can you explain to me what is the statement of

Page 58

1  material evidence?

2  Q. Well, it was in your Complaint, so that is why

3  I was asking if you ever saw anything that was named

4  that or called that or that appeared to be a statement

5  of material evidence?

6  A. Not that I am aware of at this time, no.

7      MR. MULHOLLAND: And we will reserve the

8      right to ask the other questions that were

9      subject to your questions yesterday about the

10     subject of material evidence.

11  Q. Doctor, at different places in the complaint,

12  you said that the Medical Center submitted cost

13  reports to Medicare, Medicaid, and the CHAMPUS

14  program. Do you remember, generally, making those

15  allegations in the Complaint?

16  A. It is there in the paragraph with the help of

17  the attorneys.

18  Q. Have you ever seen any cost report filed by the

19  Medical Center with Medicare, Medicaid, or CHAMPUS?

20  A. That they show it to physicians? I don't think

21  so. That is not the right — I don't think the

22  hospital shows what they filed for their claims and

23  all of that to anybody.

Case 1:04-cv-00186-MBC     Document 96     Filed 09/06/2007     Page 10 of 55

USA et al., vs. BRMC, et al.                    Multi-Page                    Dilbagh Singh, M.D.
No. 04-186E                                                                   August 21, 2007

Page 66

1  Q. 10 to 15 or 15 to 20 to buy the camera or to
2  lease it?
3  A. For the buy -- for buying the camera, for that
4  kind of a camera, buying, not leasing, buying it. A
5  lease would run into, maybe, a few hundred dollars per
6  month if we take it for three years or five years, and
7  if you have a calculator, I could calculate for you
8  how much it would cost with interest. It is not that
9  difficult.
10  Q. Aside from your experience as a physician who
11  has occasion to lease equipment, do you have any other
12  special expertise in valuing medical equipment?
13  A. Not expertise. I am not in that business; but
14  looking at the equipment and getting a couple or three
15  quotes from different vendors, one has to make up
16  their mind what is available in the market and what
17  they are charging.
18  Q. Do you have a nuclear camera in your office?
19  A. No.
20  Q. Do you have any plans to put a nuclear camera
21  in your office?
22      MR. STONE: I am going to object to any
23      questions about Dr. Singh's practice and his

Page 67

1  plans, because it is irrelevant, and it is the
2  subject of a prior order, and I direct the
3  doctor not to answer.
4      MR. MULHOLLAND: Again, I will ask that
5      that be marked for certification to the Court;
6      but I will say that in response, his prior
7      testimony immediately before that question, I
8      think made it relevant in terms of his
9      knowledge or expertise relative to the value of
10      equipment.
11      MR. STONE: Well, I think we can argue
12      about that when we argue the issue to Judge
13      Cohill.
14      (Question certified for later discussion.)
15  Q. Doctor, just let ask you another question on
16  the lines of trying to again probe your knowledge of
17  the value of the equipment. I believe you stated you
18  have an investment interest in Tri-County Diagnostics?
19      MR. STONE: I'm going to object to
20      that question and direct him not to answer.
21      (Question certified for later discussion.)
22  Q. Did you play any role in terms of selecting
23  equipment for Tri-County Diagnostics?

Page 68

1      MR. STONE: I'm going to object to that
2      and direct him not to answer.
3      MR. MULHOLLAND: Again, please mark that
4      for certification to the Court.
5      (Question certified for later discussion.)
6  Q. Doctor, if you turn to the first page of the
7  lease, the one right before the one you have open, the
8  lease, Exhibit A?
9  A. Do you mean this one?
10  Q. Yes. The one right after that page.
11  A. Okay.
12  Q. If you look at the top of the lease, would you
13  agree that the lease is between the Medical Center and
14  V&S Medical Associates?
15  A. Yes.
16  Q. And it is not with Dr. Saleh and Dr. Vaccaro as
17  individuals?
18  A. It is written there as V&S Medical Associates,
19  LLC, and Bradford Medical Center. So I assume V&S
20  stands for Vaccaro and Saleh, but it is their Medical
21  Associates, LLC.
22      MR. STONE: I will object to Dr. Singh's
23      testimony to the extent that he is not a

Page 76

1 you or to Dr. Nadella about whether or not your
2 interest in Tri-County would violate this policy?
3          MR. STONE:  I will object and direct you
4     not to answer.
5          MR. MULHOLLAND:  Again, I'm asking about
6     the policy, which I think is directly relevant,
7     based on allegations made in the Complaint
8     about it not being applied to Drs. Vaccaro and
9     Saleh.
10         MR. STONE:  To the extent that you are
11    focusing on Dr. Singh and Dr. Nadella's
12    practice, I think it is irrelevant.
13         Again, you can ask him whether he knows
14    whether it is currently in effect, and whether
15    it is applied to anybody else.  Again, getting
16    into his conduct, I think is irrelevant.
17         MR. MULHOLLAND:  Well, again, I will take
18    exception to that objection and ask that that
19    page be marked and certified to the Court.
20         (Question certified for later discussion.)
21  Q. Let me ask you a different question, Doctor:
22  Has the Medical Center ever made an inquiry to you
23  about interests that you have with competing entities

Page 75

1  is what administration wants to do and not go around
2  it, and then do only with one or two physicians,
3  preferentially, just select them because of volume or
4  because of their practices or whatever it is, and that
5  others are left out in the cold, and they have
6  supported the institution for so many years.  Many of
7  us have been there for almost 25 years.
8   Q. Is it your understanding that this policy on
9  physicians with significantly competing relationships
10 is still in effect at the hospital?
11  A. I do not know whether it is or it is not, but
12 it has not been implemented.  That, I know.
13  Q. How do you know that?
14  A. Because of whatever has gone on between Vaccaro
15 and Saleh and the hospital.  Whatever arrangements
16 they have privately now going on, which most of the
17 people know it, that they have arrangements with them,
18 that they are getting paid for some equipment, some
19 money here and some money there.
20      What kind of monies they are paying them and
21 why they are paying them, we don't know that as to
22 what kind of arrangement they have with them.
23  Q. Did the hospital ever send any communication to

Page 77

1  for the purpose of applying the policy?
2          MR. STONE:  Again, I will object and
3     direct him not to answer.
4          (Question certified for later discussion.)
5   Q. Doctor, in the third paragraph of the letter
6  that you have in front of you —
7          MR. MULHOLLAND:  By the way, please mark
8     that objection, as well.
9   Q. Doctor, in the third paragraph of the letter
10 you have in front of you, you seem to express concern
11 over how the Medical Center uses its charitable
12 resources; is that correct?
13  A. That is what it says.
14  Q. What, specifically, were your concerns about
15 the Medical Center's use of its charitable resources
16 that you voiced in this letter?
17  A. See, it is a very broad thing, because the
18 hospital is supported by communities.  Okay?  And
19 every time there is money required for certain things
20 to be done in the hospital, renovations or new
21 equipment they want to buy, they do expect some
22 community members or some community people or some
23 businesses to keep on supporting them.

Case 1:04-cv-00186-MBC    Document 96    Filed 09/06/2007    Page 12 of 55

USA et al., vs. BRMC, et al.    Multi-Page™    Dilbagh Singh, M.D.
No. 04-186E    August 21, 2007

Page 112

1 Onderdonk?

2 A. Yes.

3 Q. Do you recall who Mr. Onderdonk is?

4 A. I don't remember the name, particularly, but

5 that is where the call came from.

6 Q. This letter seems to suggest that he works for

7 Philips Medical Systems?

8 A. That is what it says on the letterhead, yes.

9 Q. In the first paragraph, he is thanking you for

10 the opportunity -- "Thank you for the opportunity to

11 propose a Philips' solution for your nuclear medicine

12 project in Bradford."

13 A. As I said, we do ask for different modalities

14 at different times from our office, not only for the

15 camera, but for other things, too, and this happens to

16 be a camera.

17 Q. He references a nuclear medicine project in

18 Bradford.

19 A. Yes.

20 Q. At this time period, was there a nuclear

21 medicine project in Bradford you were considering?

22 A. We were considering in our own office, yes --

23     MR. STONE:  I'm going to object to any

Page 113

1 testimony regarding Dr. Singh's business plan

2 or ventures, again, as being the subject of

3 Judge Cohill's prior order, and I direct him

4 not to answer any questions about the project.

5     However, this is a letter that was

6 produced with regard to the discovery in this

7 case, and he can answer whatever questions he

8 knows about the contents of the letter and,

9 generally, the circumstances; but I'm not going

10 to let him get into any venture he may have

11 been considering.

12     MR. RYCHCIK:  Again, I disagree.  I think

13 to the extent that he is relying on the

14 information in here, that is relevant as to

15 whether or not this was solely intended just to

16 gather information regarding the lease, the

17 sublease at issue; but if you are instructing

18 the witness not to answer --

19     MR. STONE:  I am instructing him not to

20 answer with regard to any plans that he may

21 have had to do any kind of a business venture.

22     But, obviously, to the extent that it is

23 relevant to the claims in the case, which is

USA et al. vs. BRMC, et al.
No. 04-186E

Multi-Page

Dilbagh Singh, M.D.
August 21, 2007

Page 114

1  the value of this particular equipment, I think
2  you can ask him about it, and he can answer
3  those questions.
4      MR. MULHOLLAND: I think any letter that
5  was produced in discovery and which is subject
6  to the witness' testimony today would allow for
7  questions about the meaning of terms in the
8  letter. So I think the question about what is
9  meant by a nuclear medicine project is a fair
10  question, notwithstanding your objection, but
11  with which we would take an exception.
12      MR. STONE: I mean, is there a question on
13  the table? Maybe we should go back. I think I
14  already instructed him not to answer. Do you
15  want to check?
16      (Previous question and answer read back as
17  follows:
18      "Question: At this time period, was there
19  a nuclear medicine project in Bradford you were
20  considering?
21      "Answer: We were considering in our own
22  office, yes --")
23      MR. STONE: Again, I will direct him not

Page 115

1  to answer with regard to any questions about
2  any business venture or plans that he had for a
3  business venture, because I don't think it is
4  germane to this case, and --
5      MR. RYCHCIK: I don't think you can have
6  your cake and eat it, too, and ask for or rely
7  upon a document for specific information, as
8  Mr. Mulholland said, and not permit us to ask
9  questions about the terms.
10      If you could note this page, as well.
11      (Question certified for later discussion.)
12      THE WITNESS: Do you want me to answer the
13  single-head camera thing that they had and that
14  is what the lease is?
15      MR. STONE: Doctor, let him ask the
16  questions.
17      THE WITNESS: I'm sorry.
18  Q. Doctor, let me ask you this: You clearly, from
19  this letter, approached a Philips Medical Systems
20  representative to get information regarding various
21  nuclear cameras, correct?
22  A. Whatever information they could send, yes.
23  Q. Well, you were asking for information about --

USA et al., vs. BRMC, et al.                 Multi-Page™                 Dilbagh Singh, M.D.
No. 04-186E                                                              August 21, 2007

Page 136

1   Q. I am just asking you if you did do that?
2   A. No. I am giving my explanation, also, that I
3   didn't have to do that.
4   Q. You testified earlier today that the two
5   primary components in deciding where to refer patients
6   for outpatient testing were convenience and patient
7   preference. Do you recall that?
8   A. Yes.
9   Q. I would like to ask you from a convenience
10  standpoint, what diagnostic imaging facilities are
11  available in Bradford, in the Bradford area, to refer
12  patients to?
13      MR. STONE: I'm going to object to the
14      extent that your question is asking with regard
15      to Dr. Singh's business or professional
16      relationships, and what Dr. Singh would do.
17      If you are just asking him whether he
18      knows if anything else is available, I will let
19      him answer that question; but we are not
20      getting into what Dr. Singh does and what Dr.
21      Nadella does with regard to referrals.
22      MR. RYCHCIK: I didn't ask him what he
23      does. I did just ask him what facilities are

Page 137

1       available; but I still disagree with your
2       objection, and I would like to note that for
3       the record. I may ask the question and have
4       you object to that.
5   Q. But my question was just, from a convenience
6   standpoint, what diagnostic facilities are available
7   in the Bradford area?
8   A. They have outpatient facilities available for
9   x-rays, for labs, for ultrasound, for CTs, for MRIs,
10  and some of the equipment which comes as portable
11  equipment, PET scanning; and all that.
12  Q. I am asking you what facilities exist, the
13  names of the facilities, the particular facilities,
14  places that doctors can refer patients to in the area?
15  A. Are you asking me the modalities or other
16  facilities in the area?
17  Q. I am asking you the names of the facilities
18  where a doctor can refer patients for those type of
19  diagnostic imaging tests.
20  A. There is Bradford, and there is Olean; and then
21  in the surrounding areas, you take 80 miles, 90 miles
22  around it, and then there is Erie where there is Hamot
23  and St. Vincent. In Buffalo, there is Buffalo group,

Case 1:04-cv-00186-MBC    Document 96    Filed 09/06/2007    Page 15 of 55
USA et al., vs. BRMC, et al.                    Multi-Page                    Dilbagh Singh, M.D.
No. 04-186E                                                                    August 21, 2007

Page 138

1 and there is Buffalo Hospital, Kenmore Hospital. It
2 is like all around, in an 80 or 90 100 miles radius or
3 20 miles radius.
4   Q. You talked about convenience being one of the
5 primary factors to you. What would be the most
6 convenient facility for patients who reside in
7 Bradford?
8   A. Again, it is tied down to patients'
9 preferences, as well. It is not my single choice.
10   Q. I am asking you just about convenience. I am
11 not talking about —
12       MR. STONE: He is not asking about what
13       you do or what you would do. He is asking what
14       the patients had available to them if they
15       wanted to seek these services, obviously, with
16       their physician.
17   A. The choices, Bradford seems to be the closest
18 and nearest to the Bradford patients, but Bradford is
19 not just the City of Bradford. Bradford is the
20 county, and that is McKean County area. Patients do
21 come from other areas to Bradford to see their
22 physician.
23       Olean might be closer to them for certain

Page 139

1 testing, so they may go there. Some other place might
2 be closer to their place, and they might go there.
3       So it is a decision between where the patient
4 lives, and who is going to take the patient. It
5 is various factors are there. It is not just a
6 clearcut thing that A to B is going to be A-B.
7       There are many in betweens that can happen,
8 where they live, who they are going to take, who is
9 going to take them for testing, especially for the
10 handicapped and elderly people. This is all given
11 consideration to everything. All the facilities are
12 being used to wherever need be.
13   Q. So Bradford may be the most convenient, but
14 there are other options available?
15   A. There are other options available, yes.
16   Q. Are you familiar with an entity known as
17 Tri-County Imaging?
18   A. I am aware of that.
19       MR. STONE: Again, I will object to any
20       questions regarding any kind of a business or
21       professional relationship that Dr. Singh or Dr.
22       Nadella have with Tri-County or any other
23       facility, and I will instruct him not to answer

Page 140

1 with regard to follow-up questions along those
2 lines.
3       (Question certified for later discussion.)
4   Q. Where is Tri-County Imaging located?
5       MR. STONE: You can answer.
6   A. In Bradford.
7   Q. Is that a facility that is open to all the
8 doctors in the community for diagnostic testing?
9       MR. STONE: I'm going to object again to
10       questions about Dr. Singh's knowledge about
11       Tri-County and how that might relate to his
12       practice or other physicians' practices in the
13       area.
14       It is not what is at issue in this case;
15       and to the extent that Judge Cohill has already
16       ruled that the focus of this case is on the
17       relationship between V&S and Bradford, I'm
18       going to instruct him not to answer any
19       questions about that.
20       MR. RYCHCIK: I am not asking him about
21       his financial relationship with Tri-County; and
22       there is absolutely nothing in Judge Cohill's
23       opinion that reflects we can't ask about his

Page 141

1 knowledge of Tri-County, particularly, for
2 purposes of determining it as a viable option
3 for all doctors in the community, including the
4 Defendants Dr. Vaccaro and Saleh in this case.
5       MR. STONE: Well, to the extent that we
6 started to go down this road yesterday, and I
7 allowed you to ask one or two questions about a
8 particular area, and then you argued that I was
9 opening the door by allowing the witness to
10 answer the first question along a certain line
11 of questioning; so, I mean, if you are going to
12 be heading down that road, I don't want you
13 telling me that I opened the door by allowing
14 him to answer a question about where Tri-County
15 is located.
16       MR. RYCHCIK: He already answered that.
17 The question I asked him is —
18       MR. STONE: So are you arguing that the
19 door is open, or are you arguing that these are
20 legitimate areas of inquiry?
21       MR. RYCHCIK: I have argued that all of
22 the areas that we have asked that you have
23 instructed him not to answer are legitimate

USA et al., vs. BRMC, et al.
No. 04-186E
Case 1:04-cv-00186-MBC    Document 96    Filed 09/06/2007    Page 16 of 55
Multi-Page
Dilbagh Singh, M.D.
August 21, 2007

Page 142

1    areas of inquiry. So I don't know how to
2    answer that.
3        MR. STONE: Now, let's ask the next
4    question. Are you going to argue that if I
5    allowed him to answer certain limited
6    questions, that the door is open for
7    everything? Is that where we are going with
8    this?
9        MR. RYCHCIK: Andy, I don't know how to
10   answer that, because I'm asking him a question
11   that I think is a legitimate question, much the
12   same way Mr. Mulholland and I have asked
13   numerous questions that we feel are legitimate
14   questions.
15       So I think this is a legitimate question,
16   and I think it is relevant, and I think it is
17   not precluded by Judge Cohill's order.
18       So if you are instructing him not to
19   answer the question, we can move on and just
20   reserve this —
21       MR. STONE: Wait. Maybe you can explain
22   how this line of inquiry of Tri-County is
23   relevant to the issue of whether the

Page 143

1    arrangement between V&S and Bradford is an
2    agreement that is in violation of the Stark
3    Law?
4        MR. RYCHCIK: One of the things that has
5    been at issue is the referral decisions and
6    patterns that have been made or that exist in
7    this case; and because of that, it is relevant
8    as to what options exist, and exploring
9    information about Tri-County Imaging and the
10   types of services that it provides, and the
11   availability that it has for the doctors in the
12   community is relevant.
13       MR. STONE: Well, it is certainly not
14   relevant to the Stark part of the case, so
15   let's talk about the kickback part of the case.
16       What does this have to do with the intent
17   of V&S in making their referrals?
18       MR. MULHOLLAND: Well, I think if you
19   allege, which you did at several points in your
20   Complaint, that the hospital provided financial
21   inducements through the lease or other means —
22   but nobody knows of anything else but the
23   lease — that the hospital were allegedly

Page 144

1    providing financial inducements to Dr. Saleh
2    and Dr. Vaccaro to refer to the hospital, then
3    I think it is perfectly legitimate to rebut
4    that allegation to show that they had no other
5    options.
6        In order to show that, I think it is a
7    very fair and absolutely necessary question to
8    ask if Dr. Saleh and Dr. Vaccaro can refer
9    patients to Tri-County Imaging, and if so, if
10   it would be convenient for them and their
11   patients to do so, given the fact that
12   Tri-County is owned by some of their
13   competitors.
14       I think this is all legitimate. I don't
15   think any of that came up during the arguments
16   in front of Judge Cohill or the briefs that
17   were submitted, and I think it is directly
18   relevant to the arguments you made in this case
19   against his clients and against mine.
20       MR. STONE: So you are saying that it is
21   related to the kickback allegations that the
22   hospital provided inducements to V&S to refer
23   patients?

Page 145

1        MR. MULHOLLAND: You said that the
2    hospital provided inducements to refer
3    patients.
4        MR. STONE: That is correct.
5        MR. MULHOLLAND: And we, of course, deny
6    that. But in order to also rebut that
7    allegation, it is necessary for us to establish
8    where Drs. Saleh and Vaccaro can send their
9    patients.
10       And in asking a question, which I think
11   and correct me if I am wrong, Carl, I think you
12   were going down the road to ask — if Saleh and
13   Vaccaro, first of all, are allowed to refer to
14   Tri-County; and, second, if they are allowed to
15   refer, would that be a convenient place for
16   their patients to go, if as all the doctors
17   have said, patient convenience is the primary
18   issue they consider in referrals.
19       All of that rebuts not only the allegation
20   of financial inducements, but it also goes to
21   the issue of intent.
22       MR. STONE: Why would this particular
23   witness be relevant? Why is his testimony

Case 1:04-cv-00186-MBC    Document 96    Filed 09/06/2007    Page 17 of 55

Page 146

1    relevant to whether V&S can refer patients to
2    any other facility?
3         MR. MULHOLLAND: No. 1, he is a Relator,
4    and, No. 2, he is an owner.
5         MR. RYCHCIK: He is the Medical Director.
6         MR. MULHOLLAND: Oh.
7         MR. RYCHCIK: And to the extent that we
8    can't ask any questions about this facility
9    because he has got a financial interest in it,
10   I think, is not supported by the intention of
11   Judge Cohill's order, nor the expressed
12   language it was written in.
13        MR. STONE: Well, up until now, I have not
14   heard Mr. Mulholland's articulation of the
15   argument that this is relevant to V&S' choice
16   of referral. This is the first time I have
17   heard that. It certainly wasn't argued in your
18   brief that was submitted last March in
19   connection with the Motion to Compel.
20        MR. RYCHCIK: I will represent it has been
21   argued in the last two depositions.
22        MR. STONE: I am merely following Judge
23   Cohill's order, which specifically says that

Page 147

1    the conduct of the Plaintiffs and their
2    business relationships is off limits, and that
3    is what it says.
4         MR. MULHOLLAND: And the questions that we
5    are posing to Dr. Singh today were not at issue
6    in the interrogatories that we were moving to
7    compel answers to.
8         Now we are asking questions on a
9    deposition that bear on a relationship that he
10   has or at least bear on an entity with whom he
11   has a relationship, a relationship where he
12   should know what, if any, barriers or
13   restrictions or inconvenience might be in place
14   for Saleh and Vaccaro to refer patients.
15        Again, this is a different line of
16   questions than what was at issue in the
17   interrogatories.
18        MR. STONE: And I agree with you to some
19   extent that this is a different argument you
20   are making now, and I agree, to a limited
21   extent. I think that to the extent that Dr.
22   Singh knows anything about whether these
23   facilities are available for V&S to refer

Page 148

1    patients, I think you can ask him those
2    questions. I think that is --
3         MR. MULHOLLAND: I will defer to Mr.
4    Rychcik, because he holds the floor.
5         MR. STONE: I will withdraw my objection
6    to that particular issue; and if you want to
7    ask him questions about whether this witness
8    knows anything about that and what the answers
9    are, you can ask him.
10   BY MR. RYCHCIK:
11   Q. Well, first of all, are you familiar with the
12   Tri-County Imaging facility?
13   A. Yes. It is there in Bradford.
14   Q. Are the services provided by the Tri-County
15   Imaging facility available to all doctors within the
16   Bradford community?
17   A. Whoever wants to send their patients there, it
18   is available.
19   Q. Is it available to Drs. Vaccaro and Saleh?
20   A. Everybody.
21   Q. Is there any preferential treatment given to
22   doctors who hold a financial interest in Tri-County
23   Imaging from the standpoint of scheduling of the

Case 1:04-cv-00186-MBC     Document 96     Filed 09/06/2007     Page 18 of 55

USA et al., vs. BRMC, et al.          Multi-Page™                    Dilbagh Singh, M.D.
No. 04-186E                                                           August 21, 2007

Page 152

1   Q. Do you know if they offer the same types of
2   services?
3   A. That is the same — it is the same kind of
4   services are offered, nuclear imaging, yes.
5   Q. Do you know if the camera at BRMC is newer than
6   the camera located at Tri-County?
7   A. I cannot predict that. I don't know.
8   Q. Have you ever been subject to a non-compete
9   agreement?
10          MR. STONE: I'm going to object to this
11  question, and I instruct him not to answer for
12  the reasons stated in Judge Cohill's order.
13          MR. RYCHCIK: Again, I would like to note
14  this page for purposes of providing it to Judge
15  Cohill.
16          (Question certified for later discussion.)
17  Q. Have you ever required a non-compete agreement
18  of any of your employees?
19          MR. STONE: Again, I'll object to the
20  question for the same reason.
21          MR. RYCHCIK: One of the things that --
22          MR. STONE: And I instruct him not to
23  answer.

Page 153

1           MR. RYCHCIK: One of the things that has
2   been testified to is the non-compete portion of
3   the sublease agreement between V&S and BRMC;
4   and because of that, once again, I think we are
5   entitled to refute allegations regarding the
6   non-compete portion of the sublease and the
7   value of the non-compete portion of the
8   sublease with respect to what is being alleged
9   here by the Relators in their Complaint.
10          MR. STONE: The value of the non-compete
11  or the value of the lease, it seems to me, is
12  an element of a defense that you have the
13  burden of proving. Now, I don't think you have
14  a right to cross-examine this witness to try to
15  make him an expert so that you can somehow
16  establish an element in a defense that you are
17  trying to establish.
18          You have asked this witness and other
19  witnesses their opinion about it, but that has
20  nothing to do with whether you have met your
21  burden to establish an element of the
22  exception.
23          It seems to me that if you have to prove

Page 154

1  that there was fair market value for this
2  particular part of the agreement, that is
3  something that you have to do independent of
4  what this witness thinks about it.
5     And so, therefore, I don't understand why
6  his opinion on what a non-compete should be has
7  anything to do with your defense in this case.
8     MR. RYCHCIK: Well, the allegations came
9  from him in this Complaint, and the allegations
10  regarding the non-compete came from him; and as
11  a result of that, we are entitled to refute
12  those allegations and to understand the basis
13  for the allegations and the basis for the
14  conclusions that he and his fellow Relators
15  made prior to making those allegations.
16     MR. MULHOLLAND: Or the lack of
17  information about the same.
18     MR. STONE: The allegations about the
19  non-compete and the value of the non-compete
20  didn't come from us. We have alleged that
21  those are kickbacks, that the payments that
22  were made pursuant to that lease were for the
23  purpose of inducing referrals. Your defense is

Page 155

1  that somehow this is related to the fair market
2  value of a non-compete.
3     This witness isn't, you know, going to be
4  the determination of whether that is fair
5  market value for that particular service that
6  you are alleging that you purchased through
7  this lease agreement.
8     MR. RYCHCIK: I think, quite frankly,
9  there has been testimony over the course of the
10  last two days regarding the value of the other
11  services portion of the sublease; and with
12  respect to those allegations, I think we are
13  entitled to explore those issues and to explore
14  the basis for the testimony that has been given
15  by the Relators as to those values.
16     MR. STONE: Well, in this case, these
17  witnesses are not -- if the value of that
18  particular part of the contract is an issue,
19  these witnesses are not going to be the
20  witnesses that are going to testify that that
21  is not a proper value.
22     MR. RYCHCIK: But that still doesn't give
23  you the basis to instruct him not to answer

Page 156

1  these questions.
2     MR. MULHOLLAND: Because we can put them
3  on the stand to establish that they have no
4  knowledge of that, which then goes to the
5  credibility of their allegations, and,
6  secondly, it narrows down who can testify about
7  it.
8     I just note for the record that in the
9  Complaint, you alleged in paragraph 82, that
10  $23,655 a month was paid under the lease for
11  all other rights and duties including a
12  covenant not to compete.
13     In paragraph 85, you say that the hospital
14  has no need for the non-compete because of the
15  policy on competing relationships. Then you
16  say, assuming a need, the amount is
17  commercially unreasonable.
18     You also say in 87 that the sublease
19  agreement is a sham, which I understand that to
20  be your argument, which we would reject; but in
21  88, you say the purpose of the sublease
22  prohibits them from competing, and then the
23  primary purpose is to give a substantial

Page 157

1  financial incentive.
2     All of it makes any of these Relators
3  information about non-competes that they have
4  been party to, their understanding of the
5  non-compete, absolutely relevant to our
6  defense.
7     MR. STONE: Well, it is not relevant,
8  because what they have done in their own
9  practices is not before the Court. That
10  doesn't justify anything that V&S and BRMC have
11  done. It is not a defense. It is not an
12  exception to the Stark Law, and it is not a
13  safe harbor to the Anti-kickback.
14     So these doctors could have all kinds of
15  different arrangements, and what they have done
16  in their own practices is not relevant to what
17  V&S and BRMC has done and whether that is
18  legal.
19     MR. MULHOLLAND: Well, we think it is
20  absolutely relevant, and we also think it is
21  relevant to establish whether or not they know
22  what they are talking about when they make
23  these kind of allegations against our clients.

USA et al., vs. BRMC, et al.                 Multi-Page™                 Dilbagh Singh, M.D.
No. 04-186E                                                              August 21, 2007

Page 158

1        At this point, I will say let's leave it
2    to the Judge.
3        MR. STONE: Again, the Court will
4    determine whether they know what they are
5    talking about when they made these allegations.
6        I mean, there is certainly sufficient
7    evidence that we have obtained directly from
8    the Defendants about what the Defendants are
9    doing.
10       So the opinion that Dr. Singh has on
11   whether it is a good non-compete or a properly
12   valued non-compete may be irrelevant to whether
13   what you have done is legal or illegal.
14       MR. MULHOLLAND: We don't think it is; but
15   at this point, I would just join in the
16   exception that Mr. Rychcik made to your
17   objection and ask that we continue, so that Dr.
18   Jacobs can have his say today.
19       MR. STONE: I'm trying to remember where
20   we were.
21   BY MR. RYCHCIK:
22   Q. I asked you if you required a non-compete
23   agreement of any of your employees?

Page 159

1        MR. STONE: And I'm going to object that
2    and instruct him not to answer for the same
3    reasons that we have argued over and over and
4    over.
5        (Question certified for later discussion.)
6    Q. You testified earlier you wished that you would
7    have been able to have Dr. Saleh have a non-compete
8    agreement. Do you recall that?
9    A. Not wish to have, but I think we didn't have
10   because of the visa and all that being there. So if
11   it was not there, it was not there. I didn't care.
12   Q. Would you agree that if it is enforceable, a
13   non-compete agreement can provide value?
14   A. I don't know. I have never had a chance to go
15   that route. I don't know.
16   Q. Why was it that you thought it would be nice to
17   have a non-compete with Dr. Saleh?
18   A. I think it serves, basically, only the purpose
19   that if somebody stays with you in an area for more
20   than a few years, then if they open up their own shop
21   next to you, you end up losing your business to this
22   guy whom you hired first and hoped to be kind of
23   continuing the services, then for that reason only, I

Page 170

1  A. From Bradford Hospital, CT and MRI?

2  Q. Yes. Are there services available in Bradford

3  for CT and MRI at any place other than the Medical

4  Center?

5  A. Not that I know of, not in Bradford area. But

6  in adjoining area, yes. Olean, yes. Olean is only

7  under 20 miles, maybe 15, 18 miles from Bradford.

8  Q. If you were to refer a patient for a nuclear

9  cardiology test, did you ever consider the type of

10 equipment needed to do the test?

11       MR. STONE: Again, I will object to the

12    extent that you are asking Dr. Singh about his

13    practices with regard to making referrals.

14       I think it is -- I don't know if you

15    wanted to rephrase that in a different way that

16    is sort of gets at your discussion earlier,

17    maybe it can be asked a different way.

18       MR. MULHOLLAND: Again, I will take

19    exception to your objection, but I will ask

20    another question.

21       (Question certified for later discussion.)

22 Q. Doctor, do physicians when they are asking

23 where to send the patient for a nuclear cardiology

Page 171

1  test ever consider the type of equipment needed for

2  that test?

3  A. I think it depends on the individual physician,

4  how they are looking at what kind of results they get

5  from there, and what kind of equipment is being used.

6     Whatever information they have, they have to

7  take a decision on that, and in medical technology,

8  the kind of ongoing new equipment, new devices, new

9  things, do keep on coming and one keeps on looking for

10 upgrading to provide better services to each and

11 everybody.

12 Q. Do you know if the equipment, the nuclear

13 cardiology equipment presently in place at Bradford

14 Regional Medical Center is newer than that available

15 at Tri-County?

16 A. I don't know. I don't know.

17 Q. Do you refer to both Tri-County and Bradford

18 Regional Medical Center?

19       MR. STONE: Again, I will object to the

20    extent that it asks questions about Dr. Singh's

21    business and his referral relationships that

22    are not relevant.

23       (Question marked for later discussion.)

Page 172

1       MR. MULHOLLAND: Subject to all the

2  reservations that we have discussed, I don't

3  have any other questions for Dr. Singh.

4       MR. RYCHCIK: I don't have anything.

5       MR. MULHOLLAND: Thank you, Doctor.

6       MR. RYCHCIK: I don't have anything,

7  subject to the same reservations.

8       MR. STONE: We will read.

9       (Whereupon, the deposition was concluded

10 at 3:00 p.m., and signature was not waived.)

11       - - -

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

1

1       IN THE UNITED STATES DISTRICT COURT
    FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2                  ERIE DIVISION

3

UNITED STATES OF AMERICA, ex rel. )
4   DILBAGH SINGH, M.D., PAUL KIRSCH, )
    M.D., V. RAO NADELLA, M.D., and  )
5   MARTIN JACOBS, M.D.,             )
                                     )
6            Relators,               )
                                     )   Civil Action
7       vs.                          )   No. 04-186E
                                     )
8   BRADFORD REGIONAL MEDICAL CENTER, )
    V&S MEDICAL ASSOCIATES, LLC,     )
9   PETER VACCARO, M.D., KAMRAN SALEH,)
    M.D., and DOES I through XX,     )
10                                   )
             Defendants.             )
11

12       DEPOSITION OF PAUL B. KIRSCH, M.D.

13          MONDAY, AUGUST 20, 2007

14       Deposition of PAUL B. KIRSCH, M.D., called as a

15  witness by the Defendant Bradford Regional Medical

16  Center, taken pursuant to Notice of Deposition and the

17  Federal Rules of Civil Procedure, by and before Joy A.

18  Hartman, a Court Reporter and Notary Public in and for

19  the Commonwealth of Pennsylvania, at the offices of

20  Stone Law Firm, 1400 Allegheny Building, Pittsburgh,

21  Pennsylvania, commencing at 2:50 p.m. on the day and

22  date above set forth.

23

EXHIBIT
1
    2

CONFIDENTIAL

ORIGINAL

USA, et al., vs. BRMC, et al.
No. 04-186E

Multi-Page

Paul B. Kirsch, M.D.
August 20, 2007

Page 5

1 assume that you understood the question, and that you
2 answered the question truthfully, and that the
3 information you are giving is complete.
4     If you need to take a break, let me know. Is
5 this okay with you?
6   A. Yes, it is.
7   Q. Now, do you understand the nature of the oath
8 you just took?
9   A. Yes, I do.
10   Q. And are you under the influence of any
11 substance that would impair your memory or your
12 ability to testify truthfully today?
13   A. No, I am not.
14     MR. MULHOLLAND: Before we get into
15     specific questions, I would like to propose a
16     stipulation, that I would ask Dr. Kirsch the
17     same questions that I asked Dr. Nadella on the
18     deposition just concluded, to which counsel for
19     the Relators interposed objections and
20     instructed Dr. Nadella not to answer.
21     This would be for the purpose of, again,
22     certifying the same questions with respect to
23     Dr. Kirsch to the Court for further review.

Page 6

1     That would be, of course, other than some
2     questions to which you objected that only had
3     to deal with Singh & Nadella. I think there
4     were a couple of those.
5     MR. STONE: I think there may have been a
6     couple. We would agree that we would have the
7     same objection and the same instruction not to
8     answer the same questions that are being
9     propounded to Dr. Kirsch that were propounded
10     to Dr. Nadella.
11     MR. RYCHCIK: I would, obviously, like to
12     join in that, as well, because there were some
13     questions that I asked, as well.
14     MR. MULHOLLAND: And we would, of course,
15     reserve our right to propose those questions
16     again to the extent that the Court ruled that
17     we were able to.
18     MR. STONE: Agreed.
19     MR. MULHOLLAND: Thank you.
20   Q. Dr. Kirsch, just for our records, what is your
21 home address?
22   A. 601 Hedgehog Lane, Bradford, Pennsylvania.
23   Q. Your home phone number, please?

Page 20

1   A. Hamot Medical Center, Erie, Pennsylvania; St.
2   Vincent's Hospital, Erie, Pennsylvania; University of
3   Pittsburgh Medical Center, Pittsburgh; Buffalo General
4   Hospital, Buffalo, New York; Millard Fillmore
5   Hospital, Buffalo, New York; Strong Memorial Hospital,
6   Rochester, New York; Cleveland Clinic, Cleveland. I
7   think that is about it.
8   Q. What criteria, if any, do you use to decide
9   where to refer a patient for nuclear cardiology
10  studies?
11        MR. STONE: I'm going to object to any
12     further question with regard to Dr. Kirsch's
13     business relationships with any entities as
14     again being irrelevant and subject to Judge
15     Cohill's order.
16        MR. MULHOLLAND: I wasn't asking for
17     business relationships. I was asking for
18     criteria that he uses as to where a patient
19     should go.
20        MR. STONE: Again, it is not relevant to
21     the case because this is about V&S and an
22     illegal arrangement that V&S had with BRMC, and
23     what Dr. Kirsch does is irrelevant to this

USA, et al., vs. BRMC, et al.
No. 04-186E

Multi-Page

Paul B. Kirsch, M.D.
August 20, 2007

Page 21

1    case.

2        MR. MULHOLLAND:  And are you instructing

3    him not to answer?

4        MR. STONE:  I am instructing him not to

5    answer.

6        MR. MULHOLLAND:  Will you please mark that

7    as a page to be certified?

8        (Question certified for later discussion.)

9    Q. Dr. Kirsch, are you a participating physician

10   in the Federal Medicare program?

11   A. Yes, I am.

12   Q. Are you a participating physician in the

13   Pennsylvania Medical Assistance program?

14   A. No, I am not.

15   Q. Have you ever been a participating physician in

16   the Pennsylvania Medical Assistance?

17   A. No, I have never been.

18   Q. Doctor, I'm going to ask that you take a look

19   at the document that was previously introduced and

20   marked as Exhibit 1 at Dr. Nadella's deposition.  This

21   is a copy of the Complaint that was filed in this case

22   by you and the other Relators.

23       MR. RYCHCIK:  The Complaint is actually

Page 33

1  Q. In paragraph 4, you refer to allegedly illegal
2  financial relationships. Are you referring to the
3  nuclear camera lease in this statement?
4  A. Yes.
5  Q. Are you referring to any other financial
6  relationship between the Medical Center and any other
7  doctor in this paragraph?
8  A. No.
9  Q. In paragraph 5, you allege that the defendants
10  made false statements to the Government when
11  submitting claims to Medicare. Can you identify any
12  specific false statement or false claim that was
13  submitted by the Medical Center to Medicare or
14  Medicaid?
15  A. I have no knowledge of what they submitted.
16  Q. Let me ask, because I didn't think that you
17  objected to this, Mr. Stone, but in paragraph 11 you
18  refer to a statement of material evidence that you and
19  the Relators filed with the Government when you filed
20  the Complaint. Have you seen this statement of
21  material evidence?
22  A. I don't remember.
23  Q. Do you recall any of the contents of the

Page 34

1  statement of material evidence?
2       MR. STONE: Again, I'm going to object to
3  the extent that you are asking about the
4  communication with the Government. I instruct
5  him not to answer the question.
6       MR. MULHOLLAND: Again, this would be
7  subject to the same stipulation we entered into
8  at the beginning of the deposition.
9       MR. STONE: That is correct.
10      (Question certified for later discussion.)
11  Q. Doctor --
12      MR. STONE: Just so it is also clear, to
13  the extent that you have questions about the
14  facts of the complaint, which is the subject
15  matter of the disclosure statement, I don't
16  have a problem with your asking questions about
17  the underlying subject matter.
18      What I have an objection to is the
19  contents of the disclosure that was provided to
20  the Government.
21  Q. Dr. Kirsch, do you recall the subject matter of
22  the disclosure made to the Government?
23  A. Yes.

Page 35

1  Q. What was that subject matter?
2  A. The subject matter had to do with the
3  submission of claims by the hospital to third-party
4  payors related to nuclear stress testing and CT
5  scanning and MRIs.
6  Q. Do you recall any more specifics about that
7  subject matter?
8  A. No.
9  Q. Dr. Kirsch, if you could turn, please, to
10  paragraph 83 of the Complaint, and take a moment and
11  let me know when you are ready to answer a question
12  about it.
13  A. Okay.
14  Q. Doctor, I think you allege here that the
15  Medical Center had no actual need for the nuclear
16  camera leased from V&S. Are you suggesting that
17  this -- that only one camera was needed to meet the
18  needs of the community?
19  A. No.
20  Q. What did you mean, then, by saying that the
21  hospital had no actual need for the camera leased from
22  V&S?
23  A. The camera was antiquated and unable to be used

Page 52

1   Q. It is the July 8th letter, yes.  If you could
2  take a look at that, and let me know when you have had
3  a chance to review it?
4   A. Okay.
5   Q. Have you seen this document before?
6   A. Yes.
7   Q. Do you recall receiving a document with similar
8  identical contents from this from Mr. Leonhardt on or
9  about the date that is on that letter?
10   A. Yes.
11   Q. Did you understand it to be his response to
12  your response to his letter?
13   A. Yes.
14   Q. Did you read it when you received it?
15   A. Yes, I did.
16   Q. Doctor, I can anticipate that this may be
17  subject to an objection, but I want to get it on the
18  record because it is different than questions I asked
19  Dr. Nadella.
20       Do you have any present plans to offer nuclear
21  cardiology or imaging services in either Bradford or
22  Olean in conjunction with Summit Health Care or anyone
23  else?

USA, et al., vs. BRMC, et al.
No. 04-186E

Case 1:04-cv-00186-MBC    Document 96    Filed 09/06/2007    Page 28 of 55
Multi-Page
Paul B. Kirsch, M.D.
August 20, 2007

Page 53

1          MR. STONE: I will object to that as being
2    irrelevant and for the reasons stated
3    previously as not discoverable under Judge
4    Cohill's prior order, and I will direct the
5    witnesses not to answer.
6          (Question certified for later discussion.)
7    Q. Are Drs. Singh and Nadella and/or Dr. Horsley
8    involved in any planned offering of imaging services
9    by you in Olean or Bradford?
10         MR. STONE: Again, I will object and
11    instruct the witness not to answer.
12         (Question certified for later discussion.)
13    Q. Do you have any plans at the present time to
14    share office space or to rent office space from Dr.
15    Singh and Dr. Nadella?
16         MR. STONE: Again, I will object and
17    direct the witness not to answer.
18         (Question certified for later discussion.)
19    Q. Do you recall discussions, Doctor, during the
20    2002-2003 time period regarding the proposed joint
21    venture with the medical staff to offer services under
22    arrangements?
23    A. Yes.

Page 59

1    or may not have are not relevant and subject to
2    Judge Cohill's prior order.
3  Q. Let me ask these questions, then, for the
4  record and then you can state if you are going to
5  lodge a similar objection.
6    What do your services to St. Vincent's consist
7  of?
8        MR. STONE:  I'm going to object and direct
9      him not to answer.
10       (Question certified for later discussion.)
11 Q. At what rate do you get compensated for your
12 services to St. Vincent's?
13       MR. STONE:  I am going to object and
14     direct him not to answer.
15       (Question certified for later discussion.)
16 Q. Does your compensation from St. Vincent's vary
17 based on the volume or value of services that you
18 refer to St. Vincent's?
19       MR. STONE:  I will object and direct him
20     not to answer.
21       (Question certified for later discussion.)
22 Q. Does the compensation you receive from St.
23 Vincent's vary based on the value of services you

Page 58

1  A. Besides all of them?
2  Q. All of them?
3  A. Yes.
4  Q. Aside from the differences of opinion that you
5  have with the hospital that are expressed in this
6  lawsuit, do you have any other dispute with the
7  hospital or members of its Board of Directors?
8  A. I would love to go into details, but I don't
9  think it is relevant.
10       MR. STONE:  I am going to object to any
11     other disputes that the doctor may or may not
12     have with the hospital.
13       MR. MULHOLLAND:  And instruct him not to
14     answer?
15       MR. STONE:  Yes.
16       (Question certified for later discussion.)
17 Q. Doctor, in response to the interrogatories that
18 were propounded by the Medical Center, you stated you
19 had a consultant relationship with St. Vincent
20 Hospital; is that correct?
21       MR. STONE:  I'm going to object to that,
22     again, for the same reasons we have previously
23     stated.  Any arrangements that Dr. Kirsch may

Page 60

1  refer to Tri-County Diagnostic?
2        MR. STONE:  Objection.  I direct him not
3      to answer.
4  Q. You stated that you had a problem with the
5  Board of Directors, but you seemed to qualify that
6  statement with respect to George Leonhardt.  Do you
7  have any personal animosity or dispute with George
8  Leonhardt?
9  A. I don't want to answer that question.  I don't
10 think it pertains to --
11       MR. STONE:  I will object and direct you
12     not to answer.
13       (Question certified for later discussion.)
14       MR. MULHOLLAND:  I don't have any other
15     questions for Dr. Kirsch at this time, again
16     subject to the stipulation we talked about
17     before.
18       MR. RYCHCIK:  If we could take a break, I
19     would appreciate it.
20       MR. STONE:  Five minutes, is that good
21     enough, or do you want a little more?
22       MR. RYCHCIK:  I would like ten minutes.
23       (Recess at taken at 3:53 p.m., and

Page 72

1 they had had to share with all the other nuclear tests

2 that they had to do.

3    Q. Back in 2003 in the Bradford area, were there

4 other options available?

5    A. You have to be more specific when you say

6 Bradford area.

7    Q. To do a nuclear test?

8    A. You said the Bradford area?

9    Q. For the patients who lived in Bradford.

10    A. Yeah.  Could they go somewhere else for nuclear

11 tests?

12    Q. Would you routinely refer them somewhere else?

13        MR. STONE:  I'm going to object to any

14    questions regarding what Dr. Kirsch's business

15    relations were with other entities.

16        I have allowed some questioning with

17    regard to his use of the Bradford Regional

18    Medical Center; but, again, I believe his

19    relationship with other entities is irrelevant,

20    and I'm going to instruct him not to answer.

21        MR. RYCHCIK:  And that is fine.  I am not

22    asking him about his business relationships

23    with any entities.

Page 73

1          I am asking him regarding the options
2    available to him and the decisions that he was
3    able to make historically from the standpoint
4    in 2003 where he referred patients for nuclear
5    camera testing, and I think it is relevant.
6    But --
7          MR. STONE: I'm going to instruct him not
8    to answer with regard to other facilities.
9          MR. RYCHCIK: Again, if we could note this
10   page, as well.
11         (Question certified for later discussion.)
12   Q. I may have asked you this: Do you recall when
13   the last conversation you had with Dr. Horsley was
14   regarding the sublease or anything related to a
15   potential arrangement between BRMC and V&S?
16   A. To my recollection, I never discussed the
17   sublease with him. Once I got a copy of the sublease
18   and once we decided to turn it over to our attorneys,
19   I had no further communication with him or any other
20   physician regarding the information in there.
21   Q. Do you have any knowledge of any specific false
22   or fraudulent patient claims made by V&S or Drs.
23   Vaccaro and Saleh?

Page 83

1    A. I agree. I did not.

2    Q. And you are not aware of what positions the

3    hospital took to enforce its policy?

4    A. No.

5    Q. Did you have any discussions with Dr. Roumani,

6    Dr. Deforno, or Dr. Aziz regarding participating in

7    this litigation?

8    A. No.

9    Q. Are you aware of whether or not any of the

10   other Relators did?

11   A. I am not aware.

12   Q. Are you aware of Drs. Roumani or Deforno or

13   Aziz expressing an unwillingness to participate in

14   this litigation?

15   A. No.

16   Q. Have you ever signed any non-compete

17   agreements?

18       MR. STONE: I'm going to object to this

19       line of questioning and direct the witness not

20       to answer.

21       MR. RYCHCIK: Well, if he is making an

22       assessment regarding the fair market value of

23       the non-compete agreements or the need for a

Page 84

1    non-compete agreement, I think it is relevant

2    to his personal knowledge of non-compete

3    agreements, but --

4        MR. STONE: Okay. I mean, to the extent

5    that you are relating it to his evaluation of

6    the non-compete, I think that is a fair

7    question.

8    A. Yes.

9    Q. You say you have been subject to a non-compete

10   agreement in the past?

11   A. Yes.

12   Q. Are you presently subject to a non-compete

13   agreement?

14       MR. STONE: I'm going to object to any

15       further questioning on his current business

16       relationships, because I think now you are

17       getting into a question of what those

18       relationships are; and he is not being offered

19       in this case as an expert on the fair market

20       value of the non-compete. We don't intend to

21       offer him for that purpose; and, therefore, his

22       opinion about it is not really relevant to this

23       case, and I instruct him not to answer.

USA, et al. vs. BRMC, et al.
No. 04-186E

Case 1:04-cv-00186-MBC    Document 96    Filed 09/06/2007    Page 33 of 55

Multi-Page

Paul B. Kirsch, M.D.
August 20, 2007

Page 85

1    MR. RYCHCIK: It is relevant if he is the
2  one who filed the lawsuit and has made the
3  allegations. That makes it relevant.
4      MR. STONE: He doesn't have to be a
5  witness to every fact in the case. There are
6  certainly other Relators, and there is
7  certainly expert testimony. Whether your
8  clients have violated the Anti-kickback laws
9  and Stark laws is not dependent on what Dr.
10  Kirsch thinks about it.
11      MR. MULHOLLAND: For what it is —
12      MR. STONE: And for that reason, I don't
13  think it is a proper question to get into his
14  own personal experience on non-compete clauses.
15      MR. MULHOLLAND: From what it is worth,
16  aside from all the other back and forth we have
17  had about these objections, I think you opened
18  the door when you allowed him to answer
19  questions about whether he was a party to a
20  non-compete.
21      That would open the door to any specific
22  questions as to the nature of the non-compete,
23  with whom the non-compete was entered into, and

Page 86

1  the terms of the non-compete.
2      MR. STONE: Well, as you know, Mr.
3  Mulholland, what I have been trying to do is I
4  have been trying to give you some latitude in
5  your questioning to give you an ability to ask
6  questions in context, and at the same time,
7  adhere to Judge Cohill's ruling that the
8  relationships that these Relators have with
9  other entities is not relevant to this case and
10  not discoverable, and so, therefore, I don't
11  think I have waived any objection by allowing
12  him to make a limited response to one question.
13      We will again assert that these questions
14  about his relationships with other entities are
15  not relevant to this case, and I'm going to
16  instruct him not to answer.
17      MR. MULHOLLAND: We would take exception
18  with that; but without belaboring the point, I
19  think we can go on.
20      MR. RYCHCIK: So is it correct that you
21  are instructing him not to answer the
22  particulars of any non-compete agreements he
23  has been a party to?

Page 87

1      MR. STONE: That's correct.
2      MR. RYCHCIK: Again, if you can note this
3  page, and we will reserve our rights to raise
4  this with the Judge.
5      (Question certified for later discussion.)
6      MR. RYCHCIK: Again, reserving our right
7  to go into additional matters, the questions
8  that I have are already ones that you have
9  already objected to.
10      While I vehemently disagree with the
11  stance that you have taken, I will reserve that
12  for another day, and we can go from there.
13      MR. MULHOLLAND: I just have a couple of
14  follow-up questions based on Mr. Rychcik's
15  questions.
16          - - -
17      FURTHER EXAMINATION
18 BY MR. MULHOLLAND:
19  Q. Doctor, are you aware that there is more than
20 one nuclear camera at Bradford Regional Medical Center
21 presently?
22  A. I believe there is two.
23  Q. Are you aware that one of the two is currently

Page 88

1 subject to the sublease which you challenged in this
2 lawsuit?
3  A. I have no knowledge of that.
4  Q. Are you aware that there is a Philips camera,
5 or a camera manufactured by Philips at the hospital?
6  A. I don't know who manufactured the cameras. I
7 know there are two cameras, because they have two
8 rooms that they can use.
9  Q. When you refer patients to the Medical Center
10 for nuclear cardiology testing, do you ever specify
11 which camera should be used for the patients?
12  A. No.
13  Q. Do you have a preference as to which camera
14 should be used by the patients?
15  A. No.
16  Q. Do you believe that the hospital cameras are at
17 least functionally equivalent to the camera used by
18 Tri-County?
19      MR. STONE: I'm going to object to the
20      question. To the extent that this is about Dr.
21      Kirsch's decision on how to refer particular
22      patients for particular tests, it is irrelevant
23      to this case, and I don't think that — again,

USA, et al., vs. BRMC, et al.          **Multi-Page™**         Paul B. Kirsch, M.D.
No. 04-186E                                              August 20, 2007

---

**Page 89**

1  I'm going to instruct him not to answer based
2  on Judge Cohill's prior ruling.
3     MR. MULHOLLAND: I was asking for his
4  opinion about whether the equipment is
5  functionally equivalent, not about his
6  referrals, nor about his business relationships
7  with Tri-County; and I think it is also
8  relevant to the extent that the Relators would
9  ever challenge any camera that is currently
10  subject to the sublease as to whether or not it
11  is functionally equivalent to other
12  alternatives that they have.
13     For the reasons we have discussed, as well
14  as for the reasons I have just stated, I think
15  it is a very relevant question and not subject
16  to the Judge's order.
17     MR. STONE: Again, what Dr. Kirsch does in
18  a particular case in terms of referring a
19  patient for a particular test? I don't
20  understand what it has to do with the case.
21     MR. MULHOLLAND: I didn't ask what he uses
22  to decide where to send a patient. I asked if
23  in his opinion the equipment was functionally

---

**Page 90**

1  equivalent to the equipment used by Tri-County.
2     MR. STONE: Well, how would he know that?
3     MR. MULHOLLAND: He is a doctor. I would
4  hope he knows what equipment is used for his
5  patients.
6     MR. STONE: He is not the person
7  administering the test. He has already
8  testified he doesn't specify which camera is to
9  be used. He already said he refers the patient
10  to the nuclear imaging department or whatever
11  for a test.
12     MR. MULHOLLAND: Again, subject to the
13  court reporter marking this page for
14  certification to the Court, I am —
15     MR. RYCHCIK: Again, I don't know if Andy
16  is understanding. You are not asking — you
17  are not comparing the two pieces of equipment
18  at the hospital.
19     MR. MULHOLLAND: No. I am comparing the
20  hospital's equipment to Tri-County's. You are
21  still objecting to that?
22     MR. STONE: Again, this isn't about the
23  quality of the equipment. This is about the

---

**Page 91**

1  sublease arrangement between V&S and the
2  hospital.
3     MR. RYCHCIK: And the options in the
4  community are certainly relevant, and the
5  testimony of a referring physician in a small
6  community as to what options are available and
7  the equivalency of the various pieces of
8  equipment are totally relevant.
9     MR. STONE: And what exception to Stark
10  would that be?
11     MR. RYCHCIK: From the standpoint of
12  offering what options are available to Drs.
13  Vaccaro and Saleh to understand the full
14  picture of what those options are is relevant
15  to this case.
16     MR. STONE: Is that a defense to a Stark
17  violation?
18     MR. MULHOLLAND: It may well be a defense
19  to the other allegations you have filed in the
20  Complaint that we made knowing false claims to
21  Medicare and that the predicate, according to
22  your theory in the case, with which we
23  disagree, it is not only a Stark violation but

---

**Page 92**

1  an Anti-kickback violation.
2     Now, if you are going to instruct him not
3  to answer, I think it is late in the day, and
4  we don't need to go into it any further, other
5  than to reserve our right to take it up with
6  Judge Cohill.
7     MR. STONE: I don't think it serves any
8  purpose to go into Dr. Kirsch's decisions about
9  where he refers his nuclear imaging patients or
10  how he makes those referrals. This is about
11  how Dr. Vaccaro and Dr. Saleh make their
12  referrals.
13     To the extent that you are trying to focus
14  this on Dr. Kirsch, I would object under the
15  order that Judge Cohill has already signed in
16  this case which admonished the Defendants not
17  to refocus this case onto the Plaintiffs and
18  try to punish them for bringing this case, and
19  that is exactly what I see this line of
20  questioning doing.
21     MR. MULHOLLAND: No. We are not trying to
22  punish them.
23     MR. STONE: Every time I let you ask a

---

USA, et al., vs. BRMC, et al.     **Multi-Page**     Paul B. Kirsch, M.D.
No. 04-186E                                      August 20, 2007

Page 93

1    question that you think is in a gray area or
2    perhaps not a gray area, then you say, I've
3    opened the door.  Well, I'm not going to let
4    you open the door, because the next thing you
5    are going to say is, we can ask the next series
6    of questions based on the previous answer that
7    you've allowed, and I'm not going to let you do
8    that.
9        MR. MULHOLLAND:  Then why don't we take it
10   up with the Judge?  There is no use in
11   belaboring the point.
12       MR. STONE:  Okay.
13       (Question certified for later discussion.)
14  Q. Let me ask you a different question, Dr.
15  Kirsch:  During your responses to Mr. Rychcik's
16  questions, I believe you said that you ceased having
17  any communications with Dr. Horsley after you turned
18  the matter over to your attorneys.  Do you recall
19  something to that effect?  Is that -- yes?
20  A. Communications meaning what?
21  Q. Well, you were responding to a question to Mr.
22  Rychcik at the time, and you said, I believe -- and
23  correct me if I am wrong -- you don't recall any

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

1

1    IN THE UNITED STATES DISTRICT COURT

2        FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3                ERIE DIVISION

4

UNITED STATES OF AMERICA, ex rel. )
5  DILBAGH SINGH, M.D., PAUL KIRSCH, )
   M.D., V. RAO NADELLA, M.D., and   )
6  MARTIN JACOBS, M.D.,              )
                                     )
7              Relators,             )
                                     )   Civil Action
8        vs.                         )   No. 04-186E
                                     )
9  BRADFORD REGIONAL MEDICAL CENTER, )
   V&S MEDICAL ASSOCIATES, LLC,      )
10 PETER VACCARO, M.D., KAMRAN SALEH,)
   M.D., and DOES I through XX,      )
11                                   )
               Defendants.           )

12

13        DEPOSITION OF V. RAO NADELLA, M.D.

14            MONDAY, AUGUST 20, 2007

15        Deposition of V. RAO NADELLA, M.D., called as a

16  witness by the Defendant Bradford Regional Medical

17  Center, taken pursuant to Notice of Deposition and the

18  Federal Rules of Civil Procedure, by and before Joy A.

19  Hartman, a Court Reporter and Notary Public in and for

20  the Commonwealth of Pennsylvania, at the offices of

21  Stone Law Firm, 1400 Allegheny Building, Pittsburgh,

22  Pennsylvania, commencing at 10:03 a.m. on the day and

23  date above set forth.

EXHIBIT

3

ORIGINAL

CONFIDENTIAL

Case 1:04-cv-00186-MBC    Document 96    Filed 09/06/2007    Page 37 of 55

Page 6

1  record — it is not meant as any insult, but are you
2  able to read written English?
3  A. Yes, sir.
4  Q. And can you understand spoken English?
5  A. Yes, sir.
6  Q. Again, I just ask that because you have a
7  slight accent.
8  A. Sure. No problem.
9  Q. Doctor, what is what your home address? Again,
10 I'm asking this just so we can have it for our records
11 if it is ever needed.
12 A. 6 Sleepy Hollow, Bradford, Pennsylvania, 16701.
13 Q. What is your home phone number?
14 A. (814) 362-6981.
15 Q. Doctor, you are you presently employed?
16 A. I work for a practice in which I am a
17 partnership.
18 Q. I see. Is that Singh & Nadella?
19 A. That is correct.
20    MR. STONE: Mr. Mulholland, before we go
21    too much further, I wasn't sure if we were
22    putting preliminary matters on the record --
23    MR. MULHOLLAND: Oh.

Page 7

1     MR. STONE: — but one of the things that
2  I wanted to put on the record before we get too
3  far into this is I want to attach as an
4  exhibit, an Opinion and Order from Judge
5  Cohill, who is the presiding judge in these
6  proceedings, which relates to a prior discovery
7  motion.
8     The Opinion and Order was dated May 31st,
9  2007, and it had to do with the relevance of
10 certain discovery that was propounded by
11 Bradford Regional Medical Center back in the
12 spring of this year.
13    The reason why I want to attach it is
14 because we believe that the scope of the
15 discovery in this case should be limited beyond
16 the general nature of discovery in the ordinary
17 case.
18    Judge Cohill has articulated his reasons
19 for refusing or denying the Defendants'
20 previous Motion to Compel Discovery, and we
21 believe that the opinion and order is relevant
22 to the questioning today; and, in particular,
23 we are asking that the questioning be limited

Page 8

1  to the allegations and subject matter of the
2  complaint and that it not be a wide ranging
3  deposition on the plaintiff in this case, Dr.
4  Nadella.
5     So with that, I would like to have it
6  attached as an exhibit.
7     MR. MULHOLLAND: Let me just say for the
8  record that while we wouldn't object to
9  attaching this as an exhibit to the deposition
10 record, we reserve the right to appeal any and
11 all components of that order or to take
12 exception.
13    Furthermore, our consent to attaching this
14 as an exhibit does not in any way constitute
15 the Medical Center's agreement with any
16 instruction that Mr. Stone or his clients may
17 try to make out of that order, and we would
18 reserve the right to dispute any such assertion
19 of privilege or any instruction not to answer
20 as the questions come up.
21    MR. RYCHCIK: And I would like to join in
22 Mr. Mulholland's statements on behalf of V&S,
23 as well.

Page 9

1     I don't think that the document does speak
2  for itself; and to the extent that Mr. Stone is
3  suggesting that we aren't entitled to take a
4  discovery deposition of the Relators here, we
5  certainly disagree with that characterization.
6     MR. MULHOLLAND: Let me just also say that
7  what we would suggest as a procedure to handle
8  any disputes over questioning today would be to
9  ask the court reporter to mark that relevant
10 part of the transcript where the disputed
11 question was asked, but you had instructed your
12 witnesses not to answer, and then we can take
13 it up with the Judge at a further date, rather
14 than call the Judge and bother him today.
15    MR. STONE: I have no objection to that
16 procedure. That is fine.
17    MR. MULHOLLAND: Hopefully, there won't be
18 any objections once you hear my questions.
19    MR. STONE: Okay.
20    (Relators' Deposition Exhibit No. 1 was
21 marked for identification.)
22 Q. Doctor, can you please give the court reporter
23 the business address of Singh & Nadella where you

USA et al., vs. BRMC, et al.
No. 04-186E

Case 1:04-cv-00186-MBC    Document 96    Filed 09/06/2007    Page 38 of 55
Multi-Page

V. Rao Nadella, M.D.
August 20, 2007

Page 18

1  is an oral agreement. We don't have a written
2  agreement.
3   Q. Are there any other owners of Singh & Nadella
4  besides you and Dr. Singh?
5   A. No.
6   Q. And what percentage of the partnership do you
7  own?
8   A. 50 percent.
9   Q. Aside from the verbal partnership agreement
10 that you described, do you have any written employment
11 agreement with Singh & Nadella as an entity?
12  A. I don't.
13  Q. Do you have any understanding with Dr. Singh
14 regarding any prohibition against competing with him
15 if your partnership were to terminate?
16  A. No.
17     MR. STONE: I'm going to object with
18 regard to the relevance of this line of
19 questions.
20     MR. MULHOLLAND: I think he said he
21 doesn't have one, so —
22     THE WITNESS: I don't.
23     MR. MULHOLLAND: — so we'll move on.

USA et al., vs. BRMC, et al.
No. 04-186E

Multi-Page

V. Rao Nadella, M.D.
August 20, 2007

Page 24

1   hospital.
2        I don't know, are you instructing him not
3   to answer, or just interposing an objection?
4        MR. STONE: I think he can answer that
5   question. Go ahead.
6   A. Yes. I now refer cases to Olean General on
7   numerous occasions for nuclear camera; but they will
8   not go under my name, because I do not perform the
9   tests in Olean General.
10       So most of the time when I refer cases to Olean
11  General for nuclear testing, it is referred to a local
12  cardiologist. Olean General has at least three
13  cardiologists on staff, and they have many internists
14  who do nuclear testing.
15       So, usually, when I refer a case for nuclear
16  testing to Olean General, it is referred to one of
17  these physicians, and I have referred a number of
18  cases to them.
19  Q. Dr. Nadella, are you a participating physician
20  in the Federal Medicare Program?
21  A. Yes.
22  Q. Are you a participating physician in the
23  Pennsylvania Medical Assistance Program?

Page 23

1   Q. So, basically, you can refer patients anywhere
2   you wanted for diagnostic imaging, correct?
3   A. That is correct, provided it is convenient to
4   the patient, provided that service is available at
5   that particular facility.
6   Q. Do you know if Olean General has a nuclear
7   camera?
8   A. I do, and they do have.
9   Q. Do you ever refer patients to Olean General for
10  nuclear cardiology tests?
11  A. Yes.
12       MR. STONE: I'm going to object to the
13       question. It is completely irrelevant what Dr.
14       Nadella — where Dr. Nadella refers his
15       patients and on what basis, and it is not
16       relevant to what V&S does with regard to
17       Bradford Regional Medical Center.
18       MR. MULHOLLAND: I think it is relevant
19       relative to any alternatives that are available
20       in the region for patients needing nuclear
21       cardiology tests, because the Relators at one
22       point had raised some questions about whether
23       or not a second camera was needed by the

Page 37

1  questions about it.

2      A. Okay.

3      Q. Doctor, this paragraph 11 of the Complaint

4  refers to a statement of material evidence that you

5  and the other Relators filed with the Government

6  around the time you filed the Complaint. Have you

7  ever seen this statement of material evidence?

8          MR. STONE: I'm going to object to any

9      questions with regard to the disclosure

10     statement itself. Again, I have no objection

11     to your asking questions about the factual

12     basis for the complaint, and I think that that

13     is what the intent of your questioning is.

14         But to the extent that you are asking

15     specifically about the disclosure statement, we

16     believe that that is a privileged document, and

17     a privileged communication with the Federal

18     Government, and that the Defendants are not

19     entitled to that under the terms of the Judge's

20     previous order.

21         MR. MULHOLLAND: Well, my recollection of

22     the Judge's previous order on this matter -- it

23     was a different order than the one you had

USA et al., vs. BRMC, et al.
No. 04-186E

Case 1:04-cv-00186-MBC    Document 96    Filed 09/06/2007    Page 41 of 55
Multi-Page

V. Rao Nadella, M.D.
August 20, 2007

Page 38

1  introduced as an exhibit at this deposition --
2  were that the Defendants could ask the Relators
3  information regarding factual statements that
4  may have appeared in that statement of material
5  evidence prior to the Judge making a decision
6  as to whether he would allow us to have a copy
7  of that statement or portions of that
8  statement.
9      That is the question that I am asking
10  today, as to, you know, his recollection, if he
11  has seen the statement.
12      If he hasn't seen the statement, then that
13  answers that question. If he has seen the
14  statement and can recall facts that were
15  alleged in the statement, I think I have the
16  right to ask him that. If he says no, then we
17  will go back to the Judge.
18      MR. STONE: I don't think you have a right
19  to know what is in the statement. I think you
20  do have a right to know the factual basis for
21  the Complaint and the facts that underlie the
22  case.
23      So you can ask him questions about the

Page 39

1  facts of the case, but I don't think that you
2  have the right to inquire about the content of
3  the disclosure statement.
4      MR. MULHOLLAND: Well, I certainly could
5  ask him whether he has seen the disclosure
6  statement. That is not asking about the
7  contents.
8      If he says no to that, then I don't have
9  much more to ask him. If he has seen the
10  disclosure statement, then I think that I can
11  ask him the factual information that was
12  subject to disclosure to the Government.
13      MR. STONE: Well, that is the facts of the
14  case, and I think you can ask him the facts of
15  the case.
16      I don't think you can ask him about the
17  communication to the Government.
18      MR. MULHOLLAND: The reading -- and Mr.
19  Rychcik was just kind enough to give me a copy
20  of the Judge's order, and it was Document 69
21  filed in this case.
22      The Judge says that, "BRMC will certainly
23  have the opportunity to ask the Relators

Page 40

1  directly about the factual information that was
2  the subject of the disclosure to the United
3  States."
4      I think that that puts the general factual
5  background about the case into the context of
6  what might have been disclosed to the
7  Government. Again, not work product, but
8  facts.
9      MR. STONE: No. My point is that the
10  factual basis for the case is something that
11  you have right to question him about.
12      What you don't have a right to question
13  him about is the disclosure to the Government;
14  and I don't see any need why at this point in
15  time you can't just ask him about the facts of
16  the case, and why it is necessary to ask him
17  specifically about the disclosure to the
18  Government.
19      MR. MULHOLLAND: That is not how I read
20  the Judge's order. I read it the same. We can
21  ask for factual information that may have been
22  in the disclosure statement, and if we can't
23  get it on deposition, we can then ask the Court

Page 41

1  again for the ability to see the disclosure
2  statement.
3      MR. RYCHCIK: Again, the next sentence
4  goes on to say, "Until the depositions are
5  taken and other factual discovery is completed,
6  BRMC cannot show that they cannot obtain a
7  substantial equivalent of the disclosure
8  statement without undue hardship."
9      I mean, the Judge is contemplating that
10  the factual information contained in the
11  disclosure statement, and this is the subject
12  of the disclosure to the United States, is
13  something that is relevant for counsel to ask
14  about it.
15      MR. STONE: Let me take a look at that.
16      Referring, specifically, to the Judge's
17  opinion, I don't think it says that the factual
18  information that was contained in the
19  disclosure statement.
20      It merely says, "The factual information
21  that was the subject of the disclosure to the
22  United States," which, again, is the facts
23  underlying the case.

Case 1:04-cv-00186-MBC   Document 96   Filed 09/06/2007   Page 42 of 55
Multi-Page

Page 42

1   Your questioning today is regarding the
2   facts underlying the case, and I don't have a
3   problem with your asking about any of the facts
4   in the case, any of the allegations in the
5   Complaint.
6       The problem I have is where you are asking
7   specifically of this witness questions about
8   the disclosure to the Government; and that, I
9   think, is not contemplated by this Order.
10      I am going to instruct the witness not to
11  answer any questions with regard to communica-
12  tions with the Government, and, specifically,
13  the disclosure statement.
14      MR. MULHOLLAND:  Well, we would certainly
15  take issue with that; and if you would please
16  mark this portion of the record, as well.
17      MR. RYCHCIK:  Again, like I said, in the
18  next sentence is the issue, and that is the one
19  you didn't focus on, Mr. Stone; and that is the
20  fact that the Judge contemplated the parties
21  being able to obtain the substantial equivalent
22  of the disclosure statement.
23      MR. STONE:  And my response to that is by

Page 43

1   being able to ask factual questions with regard
2   to the allegations in the Complaint and the
3   facts underlying the Complaint, I think that is
4   the substantial equivalent that the Judge is
5   referring to, and so I don't see any need at
6   this point in time — if you can ask all the
7   questions you want about the Complaint and the
8   facts underlying the Complaint, I don't see any
9   reason for you to be able to inquire about the
10  communications with the Government.
11      (Question certified for later discussion.)
12  BY MR. MULHOLLAND:
13  Q.  Subject to that objection and our exception to
14  the objection, let me ask you a different question
15  straight from the Judge's order:  Dr. Nadella, do you
16  recall the factual information that was the subject of
17  the disclosure to the United States?
18  A.  Can you clarify?  I'm not understanding your
19  question, you know.
20  Q.  The Judge said that we are allowed about the
21  factual information that was the subject of your
22  disclosure to the United States Government.
23  A.  Okay.

Page 44

1   Q.  My question is:  Do you recall what that
2   factual information was, which was the subject of your
3   disclosure to the Government?
4   A.  Okay.  Right.  As I understand it, I
5   still didn't understand the question that well, but
6   I'm going to answer, and if my answer is not correct,
7   you ask me again.
8       The way I understand that is is that the
9   agreement that they had, that V&S had with BRMC was
10  part of the factual disclosure, and that was the
11  center of the, you know, the allegation.
12  Q.  Was the agreement that you just referred to the
13  same written agreement which is attached to your
14  Complaint?
15  A.  Yes, sir.
16  Q.  So you are saying you gave a copy of that
17  written agreement to the Government?
18      MR. STONE:  Again, I'm going to object to
19  communications that he had with the Government.
20  If you want to ask him whether that was the
21  factual basis for the Complaint, I think you
22  can ask that.
23      MR. MULHOLLAND:  I think I can ask him if

Page 45

1   he disclosed to the Government, but let me ask
2   that second question, then.
3       (Question certified for later discussion.)
4   Q.  Doctor, was the actual agreement that you
5   attached to the Complaint part of the subject of the
6   factual information?
7   A.  Yes.  Yes.
8   Q.  Now, again, I'm going to ask you these
9   questions.  I anticipate your attorney may object, but
10  I want to get them on the record for future use, as
11  needed.
12  A.  Okay.
13  Q.  Doctor, did you ever speak or meet with Special
14  Agent Connie Murray from the Office of Inspector
15  General?
16      MR. STONE:  I'm going to object to the
17  question.
18      MR. MULHOLLAND:  Are you instructing him
19  not to answer?
20      MR. STONE:  I'm instructing him not to
21  answer.
22      MR. MULHOLLAND:  Again, any time where the
23  Relators' attorney is instructing his clients

Case 1:04-cv-00186-MBC    Document 96    Filed 09/06/2007    Page 43 of 55
USA et al., vs. BRMC, et al.                    Multi-Page™                    V. Rao Nadella, M.D.
No. 04-186E                                                                   August 20, 2007

Page 46

1     not to answer, I would ask that you mark that
2     for future reference.
3          (Question certified for later discussion.)
4     Q. Did any of the other Relators ever tell you
5   that they spoke to any Government agents or attorneys
6   about the facts alleged in the Complaint, outside the
7   presence of your counsel?
8          MR. STONE:  I'm going to object to any
9     communications with regard to the Government,
10    and I'm going to instruct the witness not to
11    answer.
12         (Question certified for later discussion.)
13    Q. Doctor, if you could turn to paragraph 83 in
14  the complaint --
15    A. Which page, please?
16    Q. It is on page 21.
17    A. 21, okay.
18    Q. Let me know when you are ready to answer a
19  couple of questions about it.
20    A. Okay. Yes.
21    Q. Doctor, here you say that BRMC has no actual
22  need for the leased property.  Is the leased property
23  you are referring to in this paragraph the same

Case 1:04-cv-00186-MBC    Document 96    Filed 09/06/2007    Page 44 of 55

USA et al., vs. BRMC, et al.                   Multi-Page™                   V. Rao Nadella, M.D.
No. 04-186E                                                                   August 20, 2007

Page 104

1     other questions about his relationship with
2     Tri-County or with any other facility to the
3     extent it has nothing to do with Drs. Vaccaro
4     and Saleh and their relationship to BRMC.
5       MR. RYCHCIK: You know, you can't expect,
6     Andy, that these gentlemen can come forward in
7     a qui tam action and make allegations asserted
8     at my clients regarding referral practices and
9     make implications regarding those referral
10     practices and have them sit here and somehow
11     because this is a qui tam action, that they are
12     allowed to make allegations, but they are not
13     required to give some context to the basis for
14     these allegations that they are making.
15       Now, Mr. Mulholland did not ask a question
16     about the relationship that Dr. Nadella had
17     with Tri-County. He asked a simple question
18     about whether or not he refers patients to
19     Tri-County, which is a completely relevant
20     question for purposes of this litigation.
21       MR. STONE: It has no relevance, because
22     it has nothing to do with Dr. Vaccaro's and Dr.
23     Saleh's referrals.

Page 103

1     can ask questions about other facilities that
2     might have this same service, but I don't think
3     you have any right to ask Dr. Nadella about any
4     relationship that he has with that facility or
5     any other facility.
6       MR. MULHOLLAND: And we think we do, and I
7     think we can take that up with the Judge at an
8     appropriate time; but let me continue with this
9     line of questioning regarding the other
10     facilities —
11       MR. STONE: Go ahead and ask the
12     questions.
13       MR. MULHOLLAND: — and his referrals to
14     them, separate and apart from any financial
15     relationship he may have, reserving the right,
16     of course, to follow up with the Judge about
17     asking about those relationships.
18       MR. STONE: Okay.
19   Q. Doctor, you are familiar with the Tri-County
20 Diagnostic in Bradford, are you not?
21   A. Yes.
22   Q. Do you refer patients there?
23       MR. STONE: I'm going to object to any

Page 105

1       MR. RYCHCIK: It does if it lays a
2     foundation.
3       MR. STONE: This case is about the
4     financial relationship between Dr. Vaccaro and
5     Dr. Saleh and BRMC, and that is the extent of
6     what this case is about —
7       MR. RYCHCIK: And, quite frankly —
8       MR. STONE: — whether that is illegal and
9     whether the hospital can bill for referrals as
10     a result from that.
11       MR. RYCHCIK: And, quite frankly, it is
12     also about these gentlemen bringing litigation
13     against the hospital and against my clients,
14     filing litigation.
15       We are entitled to understand the
16     rationale behind their motivations, the facts
17     that they had when they brought the litigation
18     and what was motivating them, quite frankly.
19     Because if it turns out that this lawsuit was a
20     frivolous action, if it turns out that they had
21     improper motives, that there is an abuse of
22     process, if they alternate reasons for doing
23     this, we are entitled to determine if we have

Page 106

1   claims against these individuals.  So we are
2   allowed to explore these types of issues.
3       This is a discovery deposition.  You are
4   taking a ruling in a Motion to Compel where
5   Judge Cohill ruled that the hospital, BRMC, was
6   not entitled to certain information, and you
7   are trying to stretch it to prevent us from
8   taking a discovery deposition here, which is
9   what we are trying to do, and we are entitled
10  to ask questions about relevant information and
11  information that may lead to discoverable
12  information.
13      You cannot use this opinion and sit here
14  and take it and take it into directions that it
15  clearly does not state and instruct a witness
16  not to answer.  I mean, we can go through this
17  exercise, but we will be calling him back, and
18  we will be going through these issues after a
19  ruling from the Judge.
20      MR. MULHOLLAND:  Does your objection still
21  stand to the question I asked?
22      MR. STONE:  The objection is -- what is
23  the question that is on the table?

Page 107

1       (Previous question read back.)
2       MR. STONE:  My objection still stands, and
3   actually, we should take a break at this point,
4   and then we can get back to this.
5       MR. MULHOLLAND:  Do you mean, do you want
6   to take a lunch break?
7       MR. STONE:  Yeah.
8       MR. MULHOLLAND:  Okay.  Afterwards, what I
9   propose to do is just get my questions about
10  that on the record, subject to whatever
11  objection you want to interpose; and then, you
12  know, we will see about taking it up with the
13  Judge.
14      What do you want for lunch?
15      MR. STONE:  An hour.
16      MR. MULHOLLAND:  An hour is fine.
17      (Discussion off the record.)
18      (Recess for lunch taken at 12:10 p.m., and
19  testimony resumed at 1:20 p.m. this date.)
20              - - -
21      MR. STONE:  At this point in time, we have
22  designated a couple of areas of questioning
23  that we felt were objectionable, and I directed

Page 112

1      not to answer.
2         (Question certified for later discussion.)
3   Q. Do you have occasion to refer patients for
4   nuclear cardiology tests to Tri-County Diagnostics?
5         MR. STONE:  I'm going to object and
6      instruct him not to answer.
7         (Question certified for later discussion.)
8   Q. If you are familiar with any diagnostic
9   equipment and nuclear cardiology presently operated by
10  Tri-County Diagnostics, what kind of equipment is it?
11        MR. STONE:  Again, I'll object and
12     instruct him not to answer.
13        (Question certified for later discussion.)
14  Q. How many nuclear cameras does Tri-County have
15  in operation at the present time?
16        MR. STONE:  I'll object and instruct him
17     not to answer.
18        (Question certified for later discussion.)
19  Q. Besides Tri-County and Bradford Regional
20  Medical Center and Olean Medical Center, where else do
21  you refer patients for nuclear cardiology tests?
22        MR. STONE:  I'll object and instruct him
23     not to answer.

Page 111

1      other matter with which you intend to withdraw
2      your instruction not to answer?
3         MR. STONE:  No.  Actually, with regard to
4      the other areas, we are going to insist that if
5      you want to pursue them, that we take it up
6      with the Judge based on the prior order that
7      the Judge had issued with regard to the
8      Defendants' prior Motion to Compel.
9         MR. MULHOLLAND:  For the record, I'm going
10     to ask some questions, additional questions
11     along the lines of what you had objected to
12     before and instructed him not to answer.
13        If you want to just interpose an
14     objection, unless you state otherwise, I will
15     assume at this point you are telling him not to
16     answer if that is okay, or just say, "Instruct
17     not to answer."
18        MR. STONE:  I will just instruct him at
19     the time.
20        MR. MULHOLLAND:  Fine.
21  Q. Are you familiar with the nuclear cardiology
22  testing equipment owned by Tri-County Diagnostics?
23        MR. STONE:  I will object and instruct him

Page 113

1         (Question certified for later discussion.)
2   Q. What percentage of your patients who require
3   nuclear cardiology tests are referred to Bradford
4   Regional Medical Center?
5         MR. STONE:  I'll object and instruct him
6      not to answer.
7         (Question certified for later discussion.)
8   Q. The same question with respect to Tri-County.
9   What percentage of tests for patients needing nuclear
10  cardiology studies are referred to Tri-County?
11        MR. STONE:  I'll object and instruct him
12     not to answer.
13        (Question certified for later discussion.)
14  Q. Before you invested in Tri-County, did you
15  refer most of your patients who needed nuclear
16  cardiology tests to Bradford Regional Medical Center?
17        MR. STONE:  I'll object and instruct him
18     not to answer.
19        (Question certified for later discussion.)
20  Q. When there was a nuclear camera -- I think I
21  asked that, but I will ask it again, just in case.
22        When there was a nuclear camera in the offices
23  of V&s Medical Associates, did you ever refer patients

USA et al., vs. BRMC, et al.          Multi-Page          V. Rao Nadella, M.D.
No. 04-186E                                                August 20, 2007

**Page 114**

1   to V&S for nuclear cardiology tests?
2          MR. STONE: Again, I will object, and
3      instruct him not to answer.
4          (Question certified for later discussion.)
5   Q. Do you believe that Tri-County addresses an
6   unmet need for nuclear cardiology tests in Bradford
7   that would not otherwise be met if Tri-County did not
8   offer nuclear cardiology testing?
9          MR. STONE: I'll object and instruct him
10     not to answer.
11         (Question certified for later discussion.)
12  Q. Given the fact that Tri-County operates a
13  nuclear camera and Bradford Regional Medical Center
14  does the same, would you consider Tri-County to be in
15  competition with Bradford Regional Medical Center?
16  A. I couldn't say. Both of them provide services,
17  similar services, so you could call it competition or
18  you can call both of them providing similar services.
19  Q. Given that you have an investment interest in
20  Tri-County, would you then consider yourself to be in
21  competition with Bradford Regional Medical Center
22  since you both offer similar services?
23         MR. STONE: I will object and instruct him

**Page 115**

1      not to answer.
2          (Question certified for later discussion.)
3   Q. Are you subject to any agreement not to compete
4   with Tri-County or the investors in Tri-County?
5          MR. STONE: I'm going to object and
6      instruct him not to answer.
7          (Question certified for later discussion.)
8   Q. If the answer to that question were yes, what
9   consideration, if any, did Tri-County give you in
10  return for the noncompete agreement?
11         MR. STONE: I'll object and instruct him
12     not to answer.
13         (Question certified for later discussion.)
14  Q. Again, if the answer regarding non-competes
15  with Tri-County was yes, by virtue of that noncompete
16  agreement, are you prohibited from referring patients
17  who need nuclear cardiology tests anywhere other than
18  Tri-County?
19         MR. STONE: I'll object and instruct him
20     not to answer.
21         (Question certified for later discussion.)
22  Q. Do you have any present plans to offer nuclear
23  cardiology or other imaging services in your office or

**Page 116**

1   in an office in Olean, New York?
2          MR. STONE: I'll object and instruct him
3      not to answer.
4          (Question certified for later discussion.)
5   Q. If the answer to the previous question was yes,
6   are Drs. Kirsch and/or Horsley involved in this
7   venture?
8          MR. STONE: I'll object and instruct him
9      not to answer.
10         (Question certified for later discussion.)
11  Q. Do you recall discussions with Bradford
12  Regional Medical Center during the time period 2002
13  and 2003 regarding a proposed joint venture between
14  the Medical Center and members of its medical staff to
15  offer imaging services under what has been termed an
16  under arrangements model?
17         MR. STONE: I'll object and instruct him
18     not to answer.
19         MR. MULHOLLAND: Let me just ask you for a
20     clarification on that, Andy, because I don't
21     think that this would be subject to the same
22     kind of rationale that you are advancing to the
23     other objections.

Page 121

1 V&S Medical Associates and BRMC?

2   A.  Well, you know, it is, like you said earlier,

3 do we have any competition with V&S?  You know, we

4 have an office, and they have an office.  We are both

5 in the same block, and even though we both provide

6 services, we provide similar services, I looked at it

7 as V&S, the hospital has taken sides in supporting one

8 group of physicians against another group of

9 physicians, and putting us at a complete disadvantage.

10      At the time when this arrangement took place

11 between BRMC and V&S, we are a three-group physician,

12 and they are a two-group physician.  As a result, they

13 become economically more stronger, the hospital, in a

14 certain amount, and we become economically more

15 weaker, and as a result, we lost a physician to whom

16 we are unable to pay acceptable salary, and he ended

17 up relocating to another place.  So from a three-

18 physician group, we shrunk into a two-physician group,

19 so I believe we have been damaged.

20   Q.  Was that other physician Dr. Aziz?

21   A.  Yes.

22   Q.  Given you felt that the V&S/BRMC equipment

23 lease put you at a competitive disadvantage, did you

Case 1:04-cv-00186-MBC    Document 96    Filed 09/06/2007    Page 49 of 55

USA et al., vs. BRMC, et al.                    Multi-Page                    V. Rao Nadella, M.D.
No. 04-186E                                                                   August 20, 2007

Page 122

1    try to address or balance out that competitive
2    disadvantage by investing in Tri-County?
3    A. That was not the --
4         MR. STONE: I'm going to object to that
5    question to the extent that it is contrary to
6    Judge Cohill's prior order, and I am going to
7    instruct him not to answer.
8         (Question certified for later discussion.)
9    Q. Dr. Nadella, did Singh & Nadella previously
10   lease office space to BRMC in its offices on North
11   Center Street in Bradford?
12   A. Yes.
13        MR. STONE: Again, I am going to object to
14   any questions along this line to the extent it
15   involves business relationships of Dr. Nadella
16   and/or Dr. Singh that are not relevant to the
17   case.
18        MR. MULHOLLAND: Again, you know, I think
19   this is of a different nature than the other
20   questions I was asking, because it also would
21   go to their motive in filing the suit to the
22   extent that they have any dispute relative to
23   that lease that was in effect, and that was my

Page 123

1    question to follow up.
2         Are you instructing him not to answer the
3    question as to whether there was a lease?
4         MR. STONE: I guess I am having a hard
5    time understanding the argument that his
6    motivation in filing the suit is relevant to
7    what is before the Court.
8         MR. MULHOLLAND: I think the Court or any
9    trier of fact should be allowed to consider
10   relationships, good, bad or indifferent,
11   between the various parties to the lawsuit to
12   determine whether or not that would affect
13   their view of their allegations, not only being
14   credible, but being allegations that standing
15   on their own, in light of their arrangements,
16   would violate the law. So, again, we can take
17   this up with the Court, but --
18        MR. STONE: Again, I think the Court has
19   addressed the issue about discovery relative to
20   the credibility of the Relators and has already
21   decided that the Defendants have failed to
22   demonstrate how the credibility of these
23   Relators relates to this lawsuit, and how it

Page 124

1    makes it more likely than not any material fact
2    in this case.
3         So, I guess, going back to Judge Cohill's
4    decision, unless you can demonstrate to me or
5    to the Court, more importantly, what Dr.
6    Nadella's motivation would have to do with the
7    ultimate issues in the case --
8         MR. RYCHCIK: I think there is a big
9    difference between dealing with an issue in an
10   order which Judge Cohill did responding to a
11   request for information regarding any criminal
12   allegations against Relators and taking the
13   position that the credibility of the Relators
14   for those purposes was not relevant versus we
15   are dealing with an issue here where there
16   clearly were ulterior motives here behind
17   making some of these allegations that were made
18   by the Relators in their Complaint, and we are
19   entitled to establish those and explore them.
20        You can try to refute them, and you can
21   take the position that you do at the time of
22   trial; but to suggest that because, again, this
23   is a qui tam action that when a Relator or a

Page 125

1    Plaintiff files a lawsuit, suddenly, they have
2    complete impunity not to answer questions that
3    you don't feel are -- you know, you get to
4    choose whether they are relevant or not, I
5    mean, you are taking an opinion from the Judge
6    and you are stretching it well beyond anything
7    that the language of the opinion states.
8         MR. MULHOLLAND: Let me just say, also,
9    that my questions had to do with Singh and
10   Nadella leasing something to Bradford Regional
11   Medical Center, which is exactly what they are
12   complaining about relative to V&S Medical
13   Associates leasing something. I think this is
14   squarely in line with what they did.
15        THE WITNESS: I can answer this. You
16   don't have to object about that.
17        MR. STONE: Read back the question if you
18   don't mind.
19        MR. MULHOLLAND: I will read it again.
20   Q. Did Dr. Singh & Nadella previously lease office
21   space to BRMC in its offices on North Center Street in
22   Bradford?
23   A. Yes. Yes, they did.

Page 126

1  Q. Did BRMC pay Singh & Nadella approximately
2  $8,000 a month for that leased space?
3  A. I don't believe that amount is correct. You
4  know, actually, we bought myself -- both myself and
5  Dr. Singh are partners in the real estate. We own the
6  building together, and BRMC had occupied about 6500
7  square foot, roughly, approximately 6500 square foot
8  in our building. You know, Dr. Singh typically has
9  handled these rental things, the rental side of the
10 business, which I know we have rented it to BRMC. I
11 couldn't tell you the exact amount, but I don't
12 remember -- but I remember it being between six and
13 seven thousand.
14 Q. Six and seven thousand per month?
15 A. That is my approximate recollection, but Dr.
16 Singh has handled these matters more than I did.
17     MR. STONE: Again, I'm going to object to
18     any further questioning along this line,
19     because, again, it gets into the business
20     relationship of this plaintiff and other
21     plaintiffs in this case, and the Judge has
22     already ruled that those are relationships that
23     are not relevant to the subject matter of this

Page 127

1  case, which is a lease agreement between V&S
2  and BRMC.
3      Unless you can demonstrate to the Court
4      that somehow these relationships would either
5      make the V&S relationship legal or provide some
6      other kind of defense, I don't see how it is
7      relevant to the claim in the case.
8      MR. MULHOLLAND: Let me ask the rest of
9      the questions along this line of this
10     questioning, and then you can object as needed.
11     MR. STONE: I will object as they come up.
12 Q. Is the lease between BRMC and Singh & Nadella
13 still in effect?
14     MR. STONE: Again, I'm going to object to
15     any further questions along this line and
16     instruct him not to answer.
17     (Question certified for later discussion.)
18 Q. While the lease was still in effect, did you
19 and Dr. Singh refer patients to BRMC?
20     MR. STONE: I'm going to object and
21     instruct the witness not to answer.
22     (Question certified for later discussion.)
23 Q. Did you believe the lease between Singh &

Page 128

1  Nadella and BRMC to be violation of either the Stark
2  law or the Anti-kickback law?
3      MR. STONE: I am going to object and
4      instruct the witness not to answer.
5      (Question certified for later discussion.)
6  Q. If the answer to that question is no, why not?
7      MR. STONE: I object and instruct him not
8      to answer.
9      (Question certified for later discussion.)
10 Q. Is there currently a dispute between BRMC and
11 Singh & Nadella about monies allegedly owed by BRMC to
12 Singh & Nadella for the lease?
13     MR. STONE: I'm going to object and
14     instruct him not to answer.
15     (Question certified for later discussion.)
16     MR. MULHOLLAND: I don't have any of other
17     questions at this time. Carl?
18     MR. RYCHCIK: Yes, I have questions.
19     - - -
20     EXAMINATION
21 BY MR. RYCHCIK:
22 Q. Doctor, my name is Carl Rychcik, and I
23 represent Drs. Vaccaro and Saleh, as well as V&S

Page 164

1  such a policy?

2    A. I didn't know whether they were going to

3  enforce it. Mr. Leonhardt and Dr. Godfrey has been

4  telling us that they were going to enforce the policy,

5  so I took them at their word.

6    Q. Did that policy cause you to make any decisions

7  to refrain from entering into any type of

8  arrangements?

9    A. At that time, we also considered putting a

10  nuclear camera in our offices, so we postponed before

11  doing anything.

12   Q. So you postponed?

13   A. Yes.

14   Q. But ultimately, you didn't refrain from

15  entering into an arrangement despite the existence of

16  this policy, correct?

17   A. Well, I think --

18        MR. STONE: I'm going to object to

19      questions about what Dr. Nadella did with

20      regard to other business arrangements that he

21      and Dr. Singh may have made, as being not

22      relevant and subject to the order that Judge

23      Cohill previously issued.

Page 165

1        MR. RYCHCIK: Again, it is relevant if he

2      is testifying that this policy is in existence

3      and that it should have been a deterrent; and

4      if he is testifying that it wasn't, in fact, a

5      deterrent, I think it is relevant.

6        MR. STONE: Do you mean with regard to the

7      BRMC and V&S transaction?

8        MR. RYCHCIK: Yes. I think it is

9      relevant.

10        MR. STONE: You can ask him about that

11      transaction.

12        MR. RYCHCIK: I am asking him if it caused

13      him to refrain from making any decisions to

14      make any investments.

15        MR. STONE: Again, whether he has

16      refrained from doing anything is not relevant

17      to the issues of this case.

18        MR. MULHOLLAND: I think it is very

19      relevant, given the fact that you alleged in

20      your Complaint that the hospital could have

21      instituted the policy against Dr. Saleh and Dr.

22      Vaccaro and chose not to. So I think that that

23      makes it relevant with respect to its

Page 166

1 application for any doctors.

2    MR. STONE: He can answer the question

3 whether it was enforced against him; but to go

4 much further than that and talk about the

5 transactions that he may or may not have gotten

6 into, again, I think goes down that road that

7 we have objected to.

8    If the question is: Did the hospital

9 enforce the policy against you, I think he can

10 answer that question.

11 Q. My question was: Did it serve as a deterrent

12 to cause you to refrain from entering into any type of

13 arrangement?

14 A. The answer is yes.

15 Q. Did it ultimately cause you to choose not to

16 enter into an arrangement up to the present time?

17 A. No. I wouldn't say up to the present time; but

18 we had waited at least two years, until after the --

19 until we had an agreement that we had not done

20 anything after doing anything -- after entering into

21 any kind of ventures. You know, I don't want to go

22 into Tri-County and find out about this here and do it

23 in the office.

Page 167

1    Before this period here, we are considering

2 doing this, and this policy, you know, and what we

3 hear from the administration postponed us at least a

4 number of years from doing anything; and ultimately,

5 we did not do anything in the office, anyhow, because

6 of that postponement. So I think we are at personal

7 harm due to that.

8 Q. You testified earlier today, I believe, that

9 the decision to refer patients for diagnostic testing

10 is one based upon convenience and patient preference;

11 is that correct?

12 A. Yes. That is the most part.

13 Q. Now, you have one of your offices in Bradford,

14 Pennsylvania, correct?

15 A. That is correct.

16 Q. And how long have -- how long have you had that

17 office in Bradford, Pennsylvania?

18 A. At least 23 years.

19 Q. I want to focus just on Bradford, Pennsylvania.

20 What options are available from the standpoint of

21 referring patients for diagnostic testing to your

22 patients located in Bradford?

23 A. What kind of testing are we talking about?

Page 168

1 Q. Why don't we talk about nuclear camera testing?

2 A. Okay. Nuclear.

3    MR. STONE: Again, I am going to object,

4 because you are asking questions about Dr.

5 Nadella's relationships that are not at issue

6 in this case.

7    This case is about the business

8 relationships and professional relationships of

9 V&S and Bradford Regional Medical Center, and

10 the Judge has already ruled in his prior

11 opinion and order that the business

12 arrangements of the Relators is not relevant

13 and is not discoverable.

14    MR. RYCHCIK: I didn't ask him about his

15 business arrangements. I asked him what

16 facilities were available for him to refer

17 patients to, his Bradford patient in the

18 Bradford region, for nuclear camera testing?

19 A. So you are talking for me to speed it up 23

20 years?

21 Q. Let me ask you this: How long has Tri-County

22 been around?

23 A. Probably three years.

Page 170

1 far as a public point, BRMC has been the only
2 institution that has the local physicians.
3       If the patient needed additional expertise than
4 what I can provide, if they need to a see a
5 cardiologist and so on and so forth, they did go to
6 other places, like Erie and Olean and so on and so
7 forth. They had been going down there, also.
8       But, you know, if the patient is stable enough,
9 we are going to investigate this further locally, and
10 the only option at that time was Bradford Regional
11 Medical Center.
12  Q. So you would say that the majority of your
13 patients who needed nuclear camera testing, you would
14 send them to Bradford?
15  A. I would say Bradford.
16  Q. Did you have any arrangement with Bradford to
17 exclusively refer patients to them?
18  A. Absolutely not.
19  Q. Would the same apply for other types of
20 diagnostic testing, such as CT and MRI?
21       MR. STONE:  I'm going to object to any
22       further questioning with regard to Dr.
23       Nadella's or Dr. Singh's arrangements for

Page 171

1     referring patients.
2       It has nothing to do with this case, and,
3     again, it gets into their business and
4     professional relationships which are not at
5     issue in this case and are not relevant to the
6     case, and the Judge has already ruled that they
7     are not discoverable. I'm going to direct him
8     not to answer.
9       MR. RYCHCIK:  He has already answered
10     that, and you waived that objection.
11       MR. STONE:  I'm not going to have him
12     answer any more of those questions. I have
13     given you a little bit of leeway, by way of
14     context, but we are not going to go through all
15     of their business relationships.
16       MR. RYCHCIK:  Again, we will mark that
17     portion of the transcript to discuss with the
18     Judge.
19       (Question certified for later discussion.)
20       MR. RYCHCIK:  I would like this marked as
21     Exhibit No. 12.
22       (Relators' Deposition Exhibit No. 12 was
23     marked for identification.)

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

1

1       IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2                   ERIE DIVISION

3   UNITED STATES OF AMERICA, ex rel. )
    DILBAGH SINGH, M.D., PAUL KIRSCH, )
4   M.D., V. RAO NADELLA, M.D., and   )
    MARTIN JACOBS, M.D.,              )
5                                     )
                 Relators,            )
6                                     )   Civil Action
         vs.                          )   No. 04-186E
7                                     )
    BRADFORD REGIONAL MEDICAL CENTER, )
8   V&S MEDICAL ASSOCIATES, LLC,      )
    PETER VACCARO, M.D., KAMRAN SALEH,)
9   M.D., and DOES I through XX,      )
                                      )
10               Defendants.          )

11

12       DEPOSITION OF MARTIN DAVID JACOBS, M.D.

13            TUESDAY, AUGUST 21, 2007

14       Deposition of MARTIN DAVID JACOBS, M.D., called

15   as a witness by the Defendant Bradford Regional

16   Medical Center, taken pursuant to Notice of Deposition

17   and the Federal Rules of Civil Procedure, by and

18   before Joy A. Hartman, a Court Reporter and Notary

19   Public in and for the Commonwealth of Pennsylvania, at

20   the offices of Stone Law Firm, 1400 Allegheny

21   Building, Pittsburgh, Pennsylvania, commencing at 3:08

22   p.m. on the day and date above set forth.

23

EXHIBIT

4

CONFIDENTIAL

JOHNSON and MIMLESS
(412) 765-0744

ORIGINAL

Case 1:04-cv-00186-MBC    Document 96    Filed 09/06/2007    Page 55 of 55

USA et al., vs. BRMC, et al.                    Multi-Page™              Martin David Jacobs, M.D.
No. 04-186E                                                                      August 21, 2007

Page 5

1  question, and that you are answering truthfully. Is
2  that okay with you?
3    A. Yes.
4    Q. If you need any breaks, just let me know. Do
5  you understand the nature of the oath you just took?
6    A. Yes.
7    Q. Are you under the influence of any substance
8  that would impair your memory or your ability to
9  testify truthfully at this deposition?
10   A. No.
11       MR. MULHOLLAND: Mr. Stone, can we assume
12    that we have the same stipulation regarding the
13    questions that you objected to and your
14    instructions not to answer that we have on
15    record for the previous three Relators'
16    depositions?
17       MR. STONE: Yes. That is correct. I
18    agree that to the extent that you have the same
19    questions for this witness that you had for the
20    other witnesses, that I would make the same
21    objection, and also instruct the witness not to
22    answer; and I'm assuming that you would take
23    exception to that instruction in the manner

Page 6

1    that you have in the previous depositions.
2       MR. MULHOLLAND: That's correct. And if
3    the Court — I'm sorry.
4       MR. STONE: I would add one further
5    qualification. I think in Dr. Singh's
6    deposition, there was a line of inquiry which I
7    did initially object to, and after arguing the
8    point, we did allow some limited questions.
9       With regard to the question of whether
10    there are options for referring patients by V&S
11    to a facility other than BRMC for certain
12    diagnostic testing, and even though that
13    involved Tri-County, we did allow some
14    questions on that point, because I thought that
15    your argument on that point made some sense and
16    we did allow those questions. So with that
17    qualification, we can proceed.
18       MR. MULHOLLAND: Thank you. I assume that
19    to the extent that the Judge were to overrule
20    your objections, we would then reserve the
21    right to ask the questions to the witnesses
22    again?
23       MR. STONE: Sure.