USA et al., vs. BRMC, et al.
No. 04-186E

Case 1:04-cv-00186-MBC     Document 96-2     Filed 09/06/2007     Page 1 of 15

Multi-Page™

Martin David Jacobs, M.D.
August 21, 2007

Page 21

1 that were never provided?

2  A. No.

3  Q. In the Complaint, you refer to a statement of

4 material evidence that you and the other Relators

5 filed with the Government when you filed the

6 Complaint. Have you ever seen a copy of the statement

7 of material evidence?

8  A. I don't remember seeing it.

9  Q. Are you aware of the subject matter of that

10 material evidence.

11  A. I am not --

12      MR. STONE: I am going to object to the

13    extent that your question is asking about the

14    content of the communication. However, to the

15    extent that you are seeking material evidence

16    which is the basis of the Complaint, I don't

17    see any problem with him responding to that

18    question.

19      MR. MULHOLLAND: Well, we will take

20    exception to your objection; but let me ask you

21    the question, then.

22  Q. Are you aware of any material evidence that you

23 contend forms the basis of the allegations in your

Page 22

1 Complaint?

2  A. By material evidence, do you mean the existence

3 of the sublease agreement and the do not compete

4 agreement?

5  Q. Do you contend that those constitute material

6 evidence of a violation?

7  A. I do.

8  Q. Are you aware of any other material evidence

9 that would support the claims in your complaint?

10  A. No.

11  Q. Have you ever seen any cost report filed by the

12 Medical Center with Medicare, Medicaid, or CHAMPUS?

13  A. No.

14  Q. Do you have any idea when those cost reports

15 may have been filed by the Medical Center?

16  A. I don't know how to put this. I know from

17 reading the Complaint that when the Medical Center

18 bills the carrier, they state that this is an honest

19 bill. Those are in the cost reports. They make those

20 statements.

21      To the extent that if the sublease agreement

22 and the do not complete agreement are illegal, then

23 those cost reports, which I have not seen, but I know

USA et al., vs. BRMC, et al.                    Multi-Page™                    Martin David Jacobs, M.D.
No. 04-186E                                                                      August 21, 2007

Page 31

1  being used for their intended purpose for patient
2  care.
3    Q. Are you aware that the hospital ever paid any
4  amount in settlement or in judgment of this lawsuit
5  that it would have come out of charitable funds?
6    A. I don't know.  Here's the way I look at that.
7  I suspect that if the hospital -- the hospital won't
8  go out of business.  I suspect that if the hospital
9  gets a substantial judgment against them, what will
10 happen is -- it will -- certainly, some of it will
11 come out of charitable funds.  What will happen is the
12 administration and the Board of Directors will change.
13 You will get new bosses, if you will, and the hospital
14 will continue.
15    And so that the fact that it is a charitable
16 institution doesn't mean that the people running it
17 should be exempt from responsibility.
18    Q. Is that a result that you would like to see a
19 new management board?
20       MR. STONE:  I'm going to object to further
21       so-called settlement discussions here where you
22       put one of the parties under oath and are
23       asking him questions about possible results of

Page 32

1  the lawsuit and possible scenarios for how this
2  thing is going to get resolved.
3       I just think it is just inappropriate, and
4  I don't know what purpose is served by that,
5  other than to just shoot the breeze about
6  possibilities.
7       MR. MULHOLLAND:  I think it has everything
8  to do with whether or not this lawsuit has
9  merit and whether or not any judgment should be
10 considered by a trier of fact in this case, if
11 it is going to impair the ability of the
12 hospital to fulfill its charitable mission.
13       MR. STONE:  I am not aware of any
14 exception in the Stark Law, the Medicare
15 Anti-kickback Law, or the Federal False Claims
16 Act that would exempt a Defendant, such as the
17 hospital here, which is what you are suggesting
18 simply because it is a charitable organization;
19 and if that is the point that you are making,
20 then I don't know any basis in law for that.
21       MR. MULHOLLAND:  I'm suggesting -- and I
22 am not suggesting anything through my
23 questions, because I am just trying to get

USA et al., vs. BRMC, et al.                    Multi-Page                    Martin David Jacobs, M.D.
No. 04-186E                                                                   August 21, 2007

Page 33

1    answers to my questions, but I think that the

2    hospital has the right to put that information

3    in front of the trier of fact, and I think the

4    trier of fact has the right to consider that.

5        I am not aware of any case law or statute

6    that would preclude us from offering that as a

7    defense.

8        MR. STONE:  What relevance does Dr.

9    Jacobs' opinion have to the case?

10       MR. MULHOLLAND:  I think it has a lot of

11   relevance, but let's move on.

12       (Question certified for later discussion.)

13   Q. Doctor, I'm going to show you another document

14   that has not been previously introduced, and I will

15   ask you to take a look at it.

16       MR. MULHOLLAND:  Will you please mark this

17   as the next exhibit, which should be No. 16?

18       (Relators' Deposition Exhibit No. 16

19   was marked for identification.)

20   A. Do you want me to read the whole thing?

21   Q. If you wish.  I just want to ask you some

22   general questions about it.

23   A. I think I got two copies.  I assume this is the

USA et al., vs. BRMC, et al.     Multi-Page™     Martin David Jacobs, M.D.
No. 04-186E     August 21, 2007

Page 39

1  MR. MULHOLLAND: We will, of course, take
2  exception to that and ask that this page be
3  marked for certification to the Court.
4      (Question certified for later discussion.)
5      MR. MULHOLLAND: I'm going to ask a few
6  other questions because the interrogatory
7  answers we already received from Dr. Jacobs
8  indicated that while he did not have an
9  investment interest in Tri-County, he performed
10  some services.
11      These are questions that are unique to Dr.
12  Jacobs. You can interpose your objection as
13  needed.
14      MR. STONE: Again, maybe as a proffer
15  here, maybe you would — are you going to be
16  asking questions about whether certain services
17  were available to V&S as an alternative to
18  Bradford? Is that the point of it, or if it is
19  some other purpose — no.
20      MR. MULHOLLAND: I think those were
21  already included in what we already stipulated.
22      MR. STONE: So what are you --
23      MR. MULHOLLAND: These are new questions.

Page 38

1  I could be wrong about this. This is my memory. I
2  don't think it ever came down to the point of a
3  concrete offer. I could be wrong, so I never got the
4  chance to say yes or no.
5  Q. Do you recall ever voicing concern to the
6  hospital about physicians who were not going to refer
7  to this proposed joint venture being part of the joint
8  venture?
9  A. I don't remember that at all.
10  Q. Around that time, were you represented by
11  Attorney Debbie Robinson for any matter?
12  A. I wasn't.
13  Q. Do you currently supervise tests performed at
14  Tri-County Imaging at Bradford?
15  A. Yes.
16  Q. What kind of tests do you supervise there?
17      MR. STONE: I'm going to object to any
18      further questioning and answers with regard to
19      Dr. Jacobs' business relationships or
20      professional relationships with other entities
21      and instruct him not to answer any further
22      questions in accordance with Judge Cohill's
23      previous order.

Page 40

1      MR. STONE: These are new questions?
2      MR. MULHOLLAND: These are dealing with
3  his test supervision.
4      MR. STONE: More financial relationships
5  that he would have with another entity?
6      MR. MULHOLLAND: With Tri-County; but some
7  of them have to do with the tests he supervises
8  there, and any compensation he may receive.
9      I was just going to suggest —
10      MR. STONE: Okay. Then I will --
11      MR. MULHOLLAND: Since his situation is
12  somewhat unique, as I understand it from the
13  interrogatory answers, I would like to get
14  these questions on the record.
15  Q. What kind of test does you supervise at
16  Tri-County, Doctor?
17      MR. STONE: I'm going to object to the
18      questions, Doctor, for the reason previously
19      stated.
20      I don't believe that Dr. Jacobs'
21      professional and business relationship with
22      other entities is relevant. In accordance with
23      Judge Cohill's previous order, I am going to

Case 1:04-cv-00186-MBC     Document 96-2     Filed 09/06/2007     Page 5 of 15
USA et al., vs. BRMC, et al.          Multi-Page™          Martin David Jacobs, M.D.
No. 04-186E                                                        August 21, 2007

Page 41

1      direct him not to answer.

2          (Question certified for later discussion.)

3    Q. Do you receive compensation from Tri-County for

4    supervising tests at the Tri-County facility?

5          MR. STONE:  Again, I will object and

6      direct him not to answer.

7          (Question certified for later discussion.)

8    Q. Are you compensated by Tri-County for

9    supervising tests on patients that you refer to

10   Tri-County?

11         MR. STONE:  Object and direct him not to

12     answer.

13         (Question certified for later discussion.)

14   Q. How is your compensation determined from

15   Tri-County?

16         MR. STONE:  I will object and direct him

17     not to answer.

18         (Question certified for later discussion.)

19   Q. Do you get paid on a per test basis by

20   Tri-County?

21         MR. STONE:  I'll object and direct him not

22     to answer.

23         MR. MULHOLLAND:  Again, we will take

Page 42

1    exception to those objections and ask that this

2    be marked for certification to the Court.

3          (Question certified for later discussion.)

4          MR. MULHOLLAND:  Subject to all the

5    stipulations and reservations that we have

6    discussed at this and the previous Relators'

7    depositions, I don't have any other questions

8    for Dr. Jacobs at this time.

9          MR. RYCHCIK:  If we could take just a

10   five-minute break, that would be helpful.

11         MR. STONE:  Sure.

12         (Recess taken at 3:56 p.m., and testimony

13   resumed at 4:03 p.m. this date.)

14             - - -

15         EXAMINATION

16   BY MR. RYCHCIK:

17   Q. Dr. Jacobs, as I believe you heard previously,

18   my name is Carl Rychcik, and I represent Drs. Vaccaro

19   and Salch, as well as V&S Medical Associates in this

20   action, and I will be asking you some questions in

21   follow-up to Mr. Mulholland.

22         You testified earlier that you are in private

23   practice in Bradford; is that correct?

USA et al., vs. BRMC, et al.          Multi-Page™          Martin David Jacobs, M.D.
No. 04-186E                                                        August 21, 2007

Page 61

1      MR. RYCHCIK:  Once again, I join in Mr.
2  Mulholland's objections to the instructions not
3  to answer, and I will reserve our right to ask
4  you any subsequent questions that may be ruled
5  upon by Judge Cohill.
6      Without waiving those rights, those are
7  all the questions I have at this time.
8      MR. MULHOLLAND:  I have no other questions
9  for Dr. Jacobs, again, subject to the
10 reservations we previously discussed.
11     MR. STONE:  Okay.  Then thank you, Doctor.
12 We will read, also.
13     MR. MULHOLLAND:  Thank you, Doctor.
14     (Whereupon, the deposition was concluded
15 at 4:29 p.m., and signature was not waived.)
16          - - -
17
18
19
20
21
22
23

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

1

1          IN THE UNITED STATES DISTRICT COURT
      FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2                    ERIE DIVISION

3

UNITED STATES OF AMERICA, ex rel. )
4   DILBAGH SINGH, M.D., PAUL KIRSCH, )
    M.D., V. RAO NADELLA, M.D., and  )
5   MARTIN JACOBS, M.D.,             )
                                     )
6              Relators,             )
                                     )   Civil Action
7        vs.                         )   No. 04-186E
                                     )
8   BRADFORD REGIONAL MEDICAL CENTER, )
    V&S MEDICAL ASSOCIATES, LLC,     )
9   PETER VACCARO, M.D., KAMRAN SALEH,)
    M.D., and DOES I through XX,     )
10                                   )
               Defendants.           )
11

12         DEPOSITION OF PETER VACCARO, M.D.

13            THURSDAY, AUGUST 9, 2007

14        Deposition of PETER VACCARO, M.D., called as a

15   witness by the Plaintiffs, taken pursuant to Notice of

16   Deposition and the Federal Rules of Civil Procedure,

17   by and before Joy A. Hartman, a Court Reporter and

18   Notary Public in and for the Commonwealth of

19   Pennsylvania, at the offices of Fox Rothschild, 625

20   Liberty Avenue, 29th Floor, Pittsburgh, Pennsylvania,

21   commencing at 2:56 p.m. on the day and date above set

22   forth.

23

EXHIBIT

5

CONFIDENTIAL

COPY

JOHNSON and MIMLESS
(412) 765-0744

USA, et al., vs. BRMC., et al.
No. 04-186E

Case 1:04-cv-00186-MBC    Document 96-2    Filed 09/06/2007    Page 8 of 15

Multi-Page™

Peter Vaccaro, M.D.
August 9, 2007

**Page 18**

1 V&S' practice before you acquired the nuclear camera
2 that you disagreed with?
3      MR. RYCHCIK: Objection as to form of the
4 question.
5 A. I feel like I'm here to confirm Dr. Saleh's
6 testimony, and I thought you were going to get my
7 testimony.
8 Q. I am. I am. I am just trying -- I'm first
9 going to ask you if there was anything in his
10 testimony that you disagreed with.
11 A. No. His testimony in describing the practice
12 as it works was very accurate.
13 Q. During that period of time, is it fair to say
14 that the vast majority of your inpatient referrals
15 were made to Bradford Medical Center?
16      MR. RYCHCIK: Objection as to form.
17 A. During what period OF time?
18 Q. During the period of time before you acquired
19 the nuclear camera.
20      MR. RYCHCIK: Objection as to the form of
21      the question. Go ahead. You can answer.
22 A. Could you repeat the question, please?
23 Q. Is it fair to say that during that period of

**Page 19**

1 time before you got the nuclear camera, that the vast
2 majority of your inpatient referrals were to Bradford
3 regional Medical Center?
4      MR. RYCHCIK: Same objection. Go ahead
5      and answer.
6 A. The inpatient referrals were based on a very
7 sensitive issue of where the patients wanted to go and
8 what was accessible, depending on their problem; and,
9 you know, there could be multiple places they could
10 go, but, you know, most of the time they would pick
11 the most convenient, which would be Bradford Medical
12 Center.
13 Q. So is the answer to my question, then, yes?
14 A. Yes, according to all the potential options
15 that were available.
16 Q. The same question for outpatient referrals. Is
17 it fair to say that most of your outpatient referrals
18 were to Bradford Regional Medical Center?
19      MR. RYCHCIK: Objection as to the form of
20      the question. You can answer.
21 A. Again, Bradford Regional Medical Center was one
22 of the options; and most of the time, the patient
23 wanted to go to Bradford Regional Medical Center, and

**Page 20**

1 if that is what they wanted, that is where they went.
2 Q. I understand there might have been good reasons
3 to send them there. I am just asking you for just the
4 simple facts. It is true that most of the outpatient
5 referrals were to Bradford as opposed to somewhere
6 else?
7 A. I just wanted to make sure that it is
8 understood that it is not just an automatic thing all
9 the time, that most of the time, it is because of
10 patient choices.
11 Q. My question is not about the reasons. My
12 question is about the simple fact. It is a fact, is
13 it not, that most of the outpatient referrals were to
14 Bradford?
15 A. Yes, they were.
16 Q. Now, after you leased the nuclear camera --
17 well, let me ask you this: In the period when you
18 were deciding whether or not to lease the nuclear
19 camera, do you recall doing any projections about the
20 amount of additional income that you would receive?
21 A. There could have been some discussions.
22 Q. Do you recall any specific discussions?
23 A. No.

**Page 21**

1 Q. Do you recall any specific quantification of
2 dollar amounts, estimates?
3 A. Obviously, we knew the number we were doing at
4 the hospital, and that doesn't take much mathematical
5 skills to figure that one out.
6 Q. How did you go about determining the number
7 of -- when you say the number we were doing at the
8 hospital, you are talking about nuclear imaging tests,
9 right?
10 A. Yes.
11 Q. How did you go about determining the number
12 that you were doing at the hospital?
13 A. I mean, it is pretty easy, because we do it at
14 the same time every day, so I mean, if you do one a
15 day, five days a week, or occasionally, two a day,
16 sometimes, it is pretty easy, give or take, a five or
17 ten percent mistake, a margin of error.
18 Q. And you know where you are doing the test,
19 right? I mean, you know whether you are doing them at
20 Bradford or someplace else?
21 A. Well, some tests may not be done at Bradford.
22 I mean, a lot of times we got tests from Hamot Medical
23 Center. There could be tests done there, that could

USA, et al., vs. BRMC., et al.
No. 04-186E

Case 1:04-cv-00186-MBC   Document 96-2   Filed 09/06/2007   Page 9 of 15
Multi-Page™

Peter Vaccaro, M.D.
August 9, 2007

Page 22

1   be sent there.
2   Q. But that was a small percentage of the tests
3   that you were performing, right?
4   A. I don't know what percentage it was.
5   Q. You just said it was easy to figure out much
6   you sent to the hospital?
7   A. That part.
8   Q. So it is not easy to figure out how many you
9   sent anywhere else?
10  A. Not as much.
11  Q. Really? How come?
12  A. Because --
13  Q. What is the difference?
14  A. The difference is then because then you left
15  up -- you left the decision to do the stress test up
16  to the cardiologist in that institution.
17  Q. But how is it easy to know when they are being
18  done in Bradford, but it is not as easy to know when
19  they are being done somewhere else?
20  A. Because I'm actually doing the ones at
21  Bradford.
22  Q. So all the ones you are not doing are being
23  done somewhere else?

Page 23

1       MR. RYCHCIK: Objection as to the form of
2       the question.
3   A. Yes.
4   Q. What percentage of them were you doing?
5   A. Approximately 80 percent or so, probably.
6   Q. Did Dr. Saleh do any of the tests at Bradford?
7   A. Yes, he did.
8   Q. So you weren't the only one doing it at
9   Bradford, then?
10  A. Correct.
11  Q. I thought you just said that you did -- that
12  all of the ones done at Bradford were done by you?
13  A. No. That is not what I said.
14  Q. You are saying all the ones that you did were
15  done at Bradford?
16  A. I was speaking for myself.
17  Q. Did you do more than Dr. Saleh, or did he do
18  more than you?
19  A. I think I probably did a little bit more than
20  him.
21      MR. RYCHCIK: I do want to caution you. I
22      don't want you to be guessing. It is the same
23      kind of thing as Mr. Simpson instructed Dr.

Page 24

1       Saleh, if you are able to make a reasonable
2       estimate, that is one thing. I don't want you
3       to be guessing if you don't know.
4   Q. Now, in terms of non-nuclear tests, other kinds
5   of tests, MRIs and CT scans, and x-rays, a similar
6   question, is it fair to say that the majority of those
7   were done at Bradford?
8   A. Yes.
9   Q. We talked a minute ago about whether you
10  attempted to qualify the value of getting a new
11  camera. Did you come to a dollar figure that you
12  thought you would get for increased revenues or
13  increased profit?
14  A. I don't recall what we actually came up with at
15  that time.
16  Q. Would it have been in the hundreds or thousands
17  of dollars per year for you?
18  A. It could have been.
19  Q. Do you recall whether you looked at any other
20  cameras, other than the GE camera that you ended up
21  leasing?
22  A. I don't recall.
23  Q. After you got the camera, is it fair to say

Page 25

1   with the exception of nuclear imaging referrals, your
2   other referral patterns stayed the same?
3   A. Yes.
4   Q. And your nuclear imaging referrals changed in
5   that a lot of tests you were doing you were doing
6   in-house that you otherwise would have performed at
7   Bradford, correct?
8   A. Obviously, we weren't going to be performing
9   them in the office anymore, and Bradford would be one
10  of the choices that would be decided upon. There
11  could be several choices.
12  Q. You might have misunderstood my question.
13      MR. RYCHCIK: I was going to say, I think
14      he might have misunderstood the question.
15  Q. I am talking about during the period when you
16  had the new camera, when you leased it.
17  A. Oh, when I had the nuclear camera. I thought
18  you meant after.
19  Q. So with respect to nuclear imaging tests, your
20  referrals to Bradford went down, because a lot of the
21  tests that would have been done there, you were doing
22  in-house?
23  A. Correct.

USA, et al., vs. BRMC., et al.        Multi-Page™                    Peter Vaccaro, M.D.
No. 04-186E                                                          August 9, 2007

Page 26

1  Q. And correct me if I am wrong, I think Dr. Saleh
2  testified that a small number of the tests that you
3  were doing in your office might have been referred
4  from other sources; but the vast majority of them were
5  your own patients?
6  A. Yes.
7        MR. RYCHCIK: Are you asking him if that
8  is true, or if that is what Dr. Saleh said?
9        MR. SIMPSON: I am asking him if that is
10  true.
11  Q. That is true, correct?
12  A. That is true.
13  Q. And then as we discussed earlier at some point,
14  Bradford came to you with concerns about your nuclear
15  camera, correct?
16  A. Correct.
17  Q. Did you or Dr. Saleh take the lead in the
18  discussions with the hospital on that issue? This is
19  before you obtained -- retained counsel?
20  A. I don't recall.
21        MR. RYCHCIK: Objection as to the form of
22  the question.
23  A. I don't recall.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2              ERIE DIVISION

3

UNITED STATES OF AMERICA, ex rel. )
4    DILBAGH SINGH, M.D., PAUL KIRSCH, )
     M.D., V. RAO NADELLA, M.D., and  )
5    MARTIN JACOBS, M.D.,             )
                                      )
6              Relators,              )
                                      )    Civil Action
7         vs.                         )    No. 04-186E
                                      )
8    BRADFORD REGIONAL MEDICAL CENTER, )
     V&S MEDICAL ASSOCIATES, LLC,     )
9    PETER VACCARO, M.D., KAMRAN SALEH,)
     M.D., and DOES I through XX,     )
10                                    )
               Defendants.           )
11

12        DEPOSITION OF KAMRAN SALEH, M.D.

13          THURSDAY, AUGUST 9, 2007

14        Deposition of KAMRAN SALEH, M.D., called as a

15   witness by the Plaintiffs, taken pursuant to Notice of

16   Deposition and the Federal Rules of Civil Procedure,

17   by and before Joy A. Hartman, a Court Reporter and

18   Notary Public in and for the Commonwealth of

19   Pennsylvania, at the offices of Fox Rothschild, 625

20   Liberty Avenue, 29th Floor, Pittsburgh, Pennsylvania

21   commencing at 9:31 a.m. on the day and date above set

22   forth.

23

**EXHIBIT**

**6**

CONFIDENTIAL

JOHNSON and MIMLESS
(412) 765-0744



Page 17

1  A. Yes.

2  Q. What types of referrals would you make?

3  A. Like, if patients needed a cardiac

4  catheterization, we would send the patient for the

5  cardiac catheterization. Some patients need an

6  endocrine evaluation, so we would send them to an

7  endocrinologist or urologist. It was orthopedic

8  surgeons, so all kind of referrals, whatever the

9  patient's need is.

10  Q. Would you also refer patients to the hospital

11  to be admitted as inpatients?

12  A. Yes, we do.

13  Q. Is it fair to say that most of your referrals

14  to a hospital went to Bradford?

15       MR. RYCHCIK: Objection as to the form.

16  A. Well, we refer patients wherever the

17  opportunity was, wherever the need was. If there is

18  somebody who needed to be admitted to the hospital, we

19  admitted them to Bradford Hospital, yes.

20  Q. Did you admit very many inpatients to Olean

21  Hospital —

22  A. No.

23  Q. — or other hospitals other than Bradford?

USA, et al. v. BRMC, et al.
No. 04-186E

Multi-Page™   Filed 09/06/2007   Page 13 of 15

Kamran Saleh, M.D.
August 8, 2007

## Page 18

1   A. No.
2   Q. Outpatient referrals, they would -- would
3   outpatient referrals primarily be referrals to have
4   tests performed on somebody?
5   A. Tests, plus evaluation by the doctors.
6   Q. Were a portion of those outpatient referrals
7   referred to Bradford or any other hospital?
8   A. Part of it to Bradford, part of it to Hamot
9   Medical Center, some to Cleveland Clinic, and some to
10   UPMC, depending on the need.
11   Q. What would be your basis for distinguishing
12   which hospital you would refer somebody to for an
13   outpatient test?
14   A. For the testing?
15   Q. Yes.
16   A. That would be for whether the test is available
17   in that facility and what time frame they can get the
18   test done and what kind of reading and the quality of
19   the test performed.
20   Q. Were there certain types of services that could
21   be performed at multiple hospitals?
22   A. Yes.
23   Q. What types of services would those have been?

## Page 19

1   A. Like blood work, like chest x-ray.
2   Q. And if you had to refer people out for those
3   types of services, would it be your typical practice
4   to refer them over to Bradford?
5        MR. RYCHCIK: Objection as to the form.
6   A. Well, what we look at when we refer the patient
7   for the lab work or for the x-rays is for the
8   convenience of the patient. Most of our population is
9   elderly patients, and they actually -- even to come to
10   the doctor's office, they have to find a ride to come.
11   So to send them farther away is more difficult, so
12   they all usually prefer the closest possible testing
13   place.
14   Q. And that was Bradford, correct?
15   A. And that is Bradford.
16   Q. These other places you mentioned -- Hamot
17   Medical Center?
18   A. Yes.
19   Q. Where is that?
20   A. It is in Erie.
21   Q. How far away is that from Bradford?
22   A. An hour and a half.
23   Q. I cannot remember the name of the other medical

## Page 20

1   center or facility.
2   A. Olean General Hospital.
3   Q. I know you mentioned Olean, but I thought you
4   mentioned one other one.
5   A. UPMC.
6   Q. UPMC. What is that?
7   A. That is the University of Pittsburgh.
8   Q. How far away is Pittsburgh from Bradford?
9   A. About three and a half hours.
10   Q. During the same period that we have been
11   discussing before you got the camera, would you
12   describe yourself and Dr. Vaccaro as being a large
13   referral source for the hospital, Bradford Hospital?
14        MR. RYCHCIK: Objection as to the form of
15        the question.
16   A. I can't really tell you as to whether it is a
17   large referral source, but one of the referrals as for
18   all the community organization do. So we are a part
19   of them, one part of them.
20   Q. Do you have any knowledge of how you stacked up
21   to other physicians in terms of how much business was
22   referred to Bradford?
23   A. I didn't understand the question.

## Page 21

1   Q. I am trying to focus on how V&S compared to
2   other physicians in the amount of business that they
3   referred to Bradford. Did you all refer more or less
4   than other physicians in the area?
5        So my question is: During this time period, do
6   you have any information on which to compare your
7   referrals to other physicians' referrals?
8   A. I don't have any information on that.
9   Q. Do you have any belief?
10   A. Well, I mean we are a two-physician practice.
11   Most of the practices are solo practices, so that
12   increases the number of referrals; but Dr. Jamil and
13   Dr. Kirsch have significant referrals to the hospital.
14   Q. Did you ever have an occasion to attempt to
15   quantify the number or dollar value of your referrals
16   to Bradford during this period?
17   A. I don't recall it.
18   Q. Now, I want to talk a little bit about your
19   decision to lease this nuclear camera. First off,
20   describe for me what the camera was.
21   A. It is a GE nuclear camera, and the nuclear
22   camera provides the nuclear testing, and the testing
23   done is like cardiac stress testing, bone scan,

Page 25

1  the hospital.

2      At that time, the hospital had only one nuclear

3  camera and the wait time and the scheduling for the

4  nuclear camera was pretty significant, close to two to

5  three weeks.  If you needed somebody to have an urgent

6  test, it was difficult to get it in a timely fashion.

7    Q. Are there any other facilities other than

8  Bradford at this time that — and I say facilities, I

9  mean, in the area that you could be sending patients

10  to that had a nuclear camera?

11      MR. RYCHCIK:  Again, you are talking about

12  the 2001 time frame?

13      MR. SIMPSON: Yeah.

14  Q. Right around the time you got the camera.  That

15  is the time period I am focusing on.  Were there any

16  other facilities other than the hospital that had --

17  A. In town?

18  Q. Within -- I want to focus on the geographic

19  area to which you would send your patients, whatever

20  that would be.  Okay?

21  A. (No response.)

22  Q. In other words, were there any other options

23  available for you to send your patients to if they

Page 26

1  needed a nuclear camera test?

2    A.  Well, there is a nuclear testing availability

3  in Olean General Hospital, but that is, as I mentioned

4  before, 20 miles away, and most of the patients do not

5  like to travel that much to get the test done.  So

6  apart from that, there was nothing else available.

7    Q.  So pretty much all of your patients that needed

8  a test, you would be sending them to Bradford for that

9  before you got your camera?

10    A.  Most of them.

11    Q.  You said "most of them."  Is that "most" 51

12  percent, or is that "most" 80 percent?

13    A.  I can't tell you.  I mean, "most" means it is

14  definitely more than 50 percent.

15    Q.  Would you characterize the number that you sent

16  to Olean as a small percentage?

17    A.  Yes.

18    Q.  Now, in addition to patient convenience, did

19  having the nuclear camera on site also allow you to

20  bill for things that you wouldn't bill for before?

21    A.  That's true.

22    Q.  What kind of billings were you able to do once

23  you got the nuclear camera that you didn't do before?