IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* DILBAGH SINGH, M.D., et al., | ) ) ) |
| Plaintiffs, | ) CIVIL ACTION NO. 04-186-E ) |
| v. | ) JUDGE COHILL ) ) |
| BRADFORD REGIONAL MEDICAL CENTER, et al., | ) ) ) |
| Defendants. | ) ) |

**PLAINTIFF'S RESPONSE TO
DEFENDANTS' JOINT MOTION TO COMPEL**

On May 31, 2007, this Court denied Defendant Bradford Regional Medical Center's earlier motion to compel, which sought to require Relators to provide information regarding their personal business practices and other personal information. In denying that motion, the Court specifically held that "Relators' conduct is not an issue in this case," and that "[t]o permit such discovery would tend to shift the focus of this action to the Relators' irrelevant conduct, and we see no basis upon which to allow that to happen." May 31, 2007 Order (hereinafter "Order"), Docket No. 69, p. 7. Undeterred, Defendants have filed yet another motion to compel, seeking to require Relators to provide, by way of deposition, the same type of personal information the Court previously recognized was irrelevant and undiscoverable. It appears that the Defendants are determined to try to turn this case into a trial of the Relators, regardless of what this Court says. Because the Court properly recognized that such information is beyond the scope of permissible discovery, the motion should be denied.

1.   Factual background

In order to understand why the information sought by Defendants is irrelevant, it is helpful to describe briefly the factual background of this case. Drs. Vaccaro and Saleh are the owners of V&S Medical Associates, L.L.C., a medical practice. Saleh Dep., p. 6 (attached as Exhibit 1). Prior to 2001, they were a significant source of referrals to BRMC, both for inpatient admissions and for outpatient tests, including diagnostic tests performed on a nuclear imaging camera located at BRMC. The vast majority of V&S's referrals were to BRMC. Vaccaro Dep., p. 18-20, 24 (attached as Exhibit 2); Saleh Dep., p. 17-22; BRMC Dep., p. 97, 129, 175 (attached as Exhibit 3). In 2001, however, V&S decided to lease its own nuclear camera from General Electric. Rather than referring patients to BRMC for nuclear imaging tests as they had done previously, Drs. Vaccaro and Saleh began to perform such tests in their own office, thus decreasing their referrals to BRMC. Saleh Dep., p. 37; Vaccaro Dep., p. 25; BRMC Dep., p. 128 (agreeing that V&S's imaging was having a negative impact on the hospital).

BRMC objected to the fact that Drs. Vaccaro and Saleh were competing with the hospital, and began to put pressure on them to get out of the nuclear imaging business, threatening to revoke their staff privileges if they did not agree to a resolution of the issue. Saleh Dep., p. 43-45; Vaccaro Dep., p. 42. Through their attorneys, Drs. Vaccaro and Saleh objected to BRMC's pressure, claiming that BRMC was illegally seeking to extract referrals from V&S, in violation of the Stark and Anti-Kickback statutes. *See* Saleh Dep., p. 70-71 and Ex. 7 ("We know of no case that more clearly establishes a hospital's attempt to extract an exclusive referral stream from a physician.").

Ultimately, in 2003, the parties resolved their dispute by entering into an Equipment Sublease, pursuant to which BRMC agreed to sublease the nuclear camera from V&S. Under the sublease agreement, BRMC agreed to make monthly payments to V&S in the amount of $30,200. Of this amount, only $6,545 was for the actual sublease of the nuclear camera. The remaining $23,655 – i.e., the overwhelming majority of the lease payments – constituted payment for a purported "non-compete" agreement by V&S and Drs. Vaccaro and Saleh, prohibiting them from competing with BRMC in the nuclear imaging area. BRMC Dep., p. 142-143, 183-185 and Exhibit 20. After the execution of the sublease, Drs. Vaccaro and Saleh reverted to their prior referral patterns, referring the vast majority of their nuclear camera tests to BRMC. Saleh Dep., p. 54 (after lease, the equipment was used "[a]s frequently as it was being used before. But since we signed the lease agreement, the sublease agreement now, the payments that were going was the income for the hospital"); *id.*, p.74-75 ("It would go to the prior pattern of referral. . . . Most of the tests were done in Bradford.").

BRMC acknowledges that the purpose of the sublease was not simply to acquire a piece of equipment, but that it also hoped to get V&S's referral business as a result. Indeed, BRMC's 30(b)(6) designee, Glen Washington, admitted that "[t]he GE camera was an older model with some limited technology," and that "we did not feel that it would meet our future needs." BRMC Dep., p. 74. Mr. Washington testified that "[w]e informed [V&S] that that would not meet our future needs, because of the older technology and because of its nuclear cardiology limitations." *Id.*, p. 76. George Leonhardt, BRMC's president and CEO, agreed that the sublease arrangement was a "fairly cumbersome way to go out and acquire a piece of equipment," stating "Yes, if that was the only thing we were trying to accomplish. Obviously, it wasn't the only thing we were trying to accomplish." *Id.*, p. 140. Mr. Leonhardt admitted that

BRMC hoped to get V&S's referral business as a result of the sublease. *Id.*, p. 146 ("Q. Did you expect that you would get the referral business from V&S as a result of this agreement? A. We hoped that we would."). Indeed, in evaluating the fair market value of the lease payments, BRMC ran projections estimating the expected impact on referrals under various scenarios. *Id.*, p. 154-157.

Moreover, although the sublease stated that the nuclear camera would be delivered to BRMC's facility, BRMC did not, in fact, ever take possession of the camera. Rather, BRMC left the camera in V&S's offices. BRMC Dep., p. 74-75. Indeed, BRMC paid V&S $2,500 per month in rent, as well as payments for secretarial expenses (on top of the sublease payments), to keep the camera at V&S's office, where it had always been. Saleh Dep., p. 152-58. This rental arrangement, with its substantial additional compensation, was not set forth in any written agreement signed by the parties. Thus, BRMC agreed to pay approximately $30,000 per month to get a piece of equipment it did not particularly need, and then paid an <u>additional</u> $2,500 per month to leave the equipment where it was already located.

In addition to these payments, BRMC essentially subcontracted with V&S to perform and bill for tests on the nuclear camera that was now "leased" to BRMC. Basically, V&S continued to perform tests on the machine for their own patients, and sometimes for patients sent over by BRMC. When a test would be performed with the camera, V&S would handle the billing on behalf of BRMC, and would be paid a 10% billing fee for these services. Saleh Dep., p. 152-154. This arrangement, which established a <u>third</u> revenue stream from BRMC to V&S, is not set forth in any written agreement signed by the parties. The practical effect of this arrangement – which left the camera in V&S's office, although now "leased" to BRMC – was that whenever

4

V&S had to perform a nuclear imaging test for one of their patients, they would do so on BRMC's camera in their own office, thus resulting in a referral to BRMC.

Relators filed this action on behalf of the United States pursuant to the False Claims Act, 31 U.S.C. § 3729 *et seq.* Relators contend that the arrangement between BRMC and Drs. Vaccaro and Saleh constitutes a "financial relationship" pursuant to the Stark statute, 42 U.S.C. § 1395nn, thus prohibiting BRMC from submitting Medicare claims based on referrals from such physicians. Relators also contend that the payments from BRMC to V&S violate the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), since they were intended to induce Drs. Vaccaro and Saleh to refer patients to BRMC. Although Relators filed this action on behalf of the United States, none of the Relators is affiliated with V&S, and none of the Relators was involved in the negotiation, execution, or implementation of the sublease.

2.  The Court should deny the motion to compel

A motion to compel answers to deposition questions "should be granted if the questions are relevant and proper and denied if the questions call for privileged information or if an answer is otherwise unnecessary." 8A Charles Alan Wright *et al.*, Federal Practice and Procedure § 2286 (1994), *quoted in Cabana v. Forcier*, 200 F.R.D. 9, 17 (D. Mass. 2001). "A district court may deny a motion to compel further deposition questioning when the court determines that the questions are irrelevant." *Commercial Union Ins. Co. v. Westrope*, 730 F.2d 729, 732 (11th Cir. 1984), *citing Fowkes v. Dravo Corp.*, 7 F.R.D. 291 (E.D. Pa. 1947).

Defendants' suggestion that Relators were required to file a motion for protective order, rather than raise this Court's prior discovery ruling at the depositions, is erroneous. Fed. R. Civ. P. 30(c)(2) states that a witness may be instructed not to answer a question "to enforce a limitation ordered by the court." Nor does it matter that the limitation occurred in an earlier

5

order dealing with written discovery. Indeed, courts have denied motions to compel on the grounds that the deposition questions were substantially similar to ones the court had previously held were objectionable in interrogatories. *See Unilectric, Inc. v. Holwin Corp.*, 243 F.2d 393, 400 (7th Cir. 1957) (noting that "the court undoubtedly had reason to be perplexed by the insistent conduct of counsel in the discovery proceedings contrary to the court's repeated rulings"). Accordingly, Relators were entitled to raise the Court's prior ruling as grounds for objecting to Defendants' improper deposition questions.

    A.    <u>Defendants have failed to clearly identify or discuss the specific questions and responses at issue</u>

Local Rule 37.2 states that:

> Any discovery motion filed pursuant to Fed.R.Civ.P. 26 through 37 shall include, in the motion itself or in an attached memorandum, a verbatim recitation of each interrogatory, request, answer, response, and objection which is the subject of the motion or a copy of the actual discovery document which is the subject of the motion.

Clearly, the purpose of this rule is to require a movant, in the motion or brief, to address its arguments to the <u>specific</u> questions and answers at issue, rather than arguing in vague generalities about <u>types</u> of issues that the movant believes it should be allowed to address. Indeed, the fact that a motion to compel must be addressed to <u>specific</u> deposition questions and responses, rather than to general subject matter areas, is reflected in Fed. R. Civ. P. 37(a)(3)(B)(i), which authorizes a motion to compel if "a deponent <u>fails to answer a question</u> asked under Rule 30." (Emphasis added); *see* James Wm. Moore, 7 Moore's Federal Practice § 37.05[5] (3rd ed.) ("A motion to compel discovery or disclosure should both identify specifically the portions of the responses that are inadequate, and explain, at least briefly, what is missing or what kind of information would be necessary to make the responses adequate."), *cited in Design Basics, Inc. v. Granite Ridge Builders, Inc.*, 2007 U.S. Dist. LEXIS 45798 (D. Ind. June 21,

6

2007) (noting that "the burden is on [movant] to explain how the discovery responses … are inadequate, incomplete or unresponsive").

In neither the motion to compel nor in the accompanying brief do Defendants even identify, much less set forth verbatim, the specific answers and objections they contend are at issue, as required by Local Rule 37.2. Rather, Defendants discuss four general "categories" of issues they believe Relators should be required to address: "Referral Patterns of Physicians," "Non-compete Covenants," "Disclosure Statement Provided to the Government," and "Relators' Motivations." Brief in Support of Joint Motion to Compel ("Defendant's Brief"), p. 5-11. However, in their discussion of these categories, Defendants do not identify specific questions to which one or more of the Relators refused to provide an answer, nor do they explain how Relators' responses to specific questions were inadequate. Thus, Defendants have completely failed to satisfy either the letter or spirit of Local Rule 37.2.

Instead of discussing specific questions and responses in their motion or brief, Defendants simply attach as exhibits to the motion 128 pages from the transcripts of Relators' depositions. Defendants do not, however, explain which questions they believe correspond to the various "categories" discussed in their brief, nor do they discuss how particular responses are allegedly inadequate. Apparently, Defendants expect the Court and Relators to sift through the exhibits and guess at how the various questions, answers, and objections fit into the various categories discussed in Defendants' brief.

Moreover, although Defendants do not mention this in their brief, in many of the exchanges included by Defendants in the exhibits to their motion, Relator's counsel raised an objection, but did <u>not</u> instruct the witness not to answer. In some cases, after a discussion of the objection, the witness provided a response. In other cases, Defendants' counsel moved on to

another question without requiring an answer. In some cases, Relators counsel withdrew the original objection after discussion with Defendants' counsel. In none of these instances can the witness be said to have refused to answer a question put to him by Defendants' counsel. *See* Fed. R. Civ. P. 30(c)(2) (noting that "the examination still proceeds" following an objection, and that "the testimony is taken subject to any objection"). Nevertheless, Defendants have for some reason included these exchanges in the 128 pages of exhibits, making it extremely difficult to determine which responses it alleges were inadequate (much less why they might be inadequate).

For example, on pages 31-33 of Dr. Jacobs' deposition, BRMC's counsel, Mr. Mulholland, asked whether Dr. Jacobs would like to see a new management board for the hospital. Relators' counsel, Mr. Stone, objected to BRMC's attempt to use sworn deposition testimony as a vehicle to learn what the parties might consider in settlement, but <u>did not</u> instruct the witness not to answer. After some discussion, Mr. Mulholland said, "I think it has lots of relevance, but let's move on." For some reason, Defendants included this exchange in the attachments to the motion, even though this question clearly cannot form the basis of the motion to compel. The exhibits contain numerous similar instances where the witness was not, in fact, instructed not to answer a question.

Of course, Defendants do not identify (or even acknowledge) these instances, but simply lump them together in the 128 pages included in the exhibits. This is important because it shows that simply attaching a bunch of pages of deposition transcripts does not focus attention on specific questions and answers that are alleged to have been inadequate, much less identify how particular responses are inadequate. Defendants apparently want the Court and Relators to wade through the mish-mash of deposition pages, guess which questions go with which category, try to understand what the alleged inadequacy is with respect to each response, weed out those

exchanges where the witness did not refuse to answer, and then rebut the guessed-at inadequacy. In short, Defendants want Relators to <u>make</u> Defendants' arguments for them and then <u>rebut</u> those arguments. This does not comply with the letter or spirit of Local Rule 37.2, and the Court should deny the motion on this ground alone.

B.    "Relators' Motivations"

Defendants state that "Relators' counsel improperly shielded their clients from answering [questions] focused on the Relators' motivations for filing the suit." Defendants' Brief, p. 10. Naturally, Defendants do not bother to tell the Court exactly <u>which</u> questions regarding their motivations the Relators were allegedly prevented from answering, or how specific responses were inadequate, apparently expecting the Court and Relators to wade through the exhibits and guess at these matters. As discussed above, this approach does not comply with either the letter or the spirit of Local Rule 37.2, and makes it extremely difficult for Relators to frame a meaningful response.

More fundamentally, this Court has already established that questions regarding Relators' motivations for filing suit are completely and utterly irrelevant to this case. As Defendants acknowledge, the only possible reason for wanting to question Relators' motivations is to raise an issue as to Relators' credibility. *See* Defendants' Brief, p. 10 ("All of these matters are relevant since they go to the fact finder's ability to assess the credibility of the Relators' assertions"). However, this Court clearly held in its prior order that Relators' credibility was irrelevant and undiscoverable. As this Court expressly held:

> [t]he <u>Relators' credibility is irrelevant</u> as to whether the equipment lease arrangement between BRMC and Drs. Vaccaro and Saleh violates the Anti-kickback statute or the Stark Law. Again, the motion to compel appears solely aimed at punishing the Relators for bringing a *qui tam* action against BRMC. Accordingly, we will deny BRMC's motion to compel this information.

9

Order, p. 8 (emphasis added). The Court noted that allowing discovery into these matters "would be to remove any limits on civil discovery and leave any civil party's life wide open to inquiry during discovery." *Id.*

Notwithstanding the Court's emphatic ruling, Defendants continue to want to relitigate this issue, and to turn this case into a trial of the Relators. Moreover, Defendants do not even make any serious argument that Relators's credibility is relevant, relying instead on blanket assertions that directly contradict this Court's prior ruling. Having already ruled that this case is not about the Relators, the Court should deny Defendants' attempts to relitigate this issue.

C.   "Disclosure Statement to Government"

In its prior order, this Court held that Relators' disclosure statement to the government was, at a minimum, entitled to protection as factual work product, and that Defendants could not obtain the disclosure without demonstrating substantial need and an inability to obtain the substantial equivalent without undue hardship.[1] Order, p. 4. Defendants have completely failed to make either showing in their current motion.

Amazingly, Defendants do not even <u>assert</u>, much less argue, that they have a "substantial need" for the disclosure statement – indeed, the words "substantial need" do not even appear in their brief. Rather, Defendants simply assert, without authority, that they are entitled to obtain a

---

[1] In their response to Defendants' previous motion to compel, Relators also argued that the disclosure statement is protected as opinion work product, as well as by the common-interest privilege. *See* Memorandum in Opposition to Defendant Bradford Regional Medical Center's Motion to Compel, Docket No. 62, p. 2-6. The Court did not address these issues in its prior order, holding that Defendants had not demonstrated a need for the disclosure even if it only constituted factual work product. In their current motion, Defendants make no attempt to argue that the opinion work product and common-interest privileges do not apply. Even if Defendants could demonstrate "substantial need" and "undue hardship," they would still need to address Relators' alternate grounds for privilege. Since Defendants do raise such issues in their present motion, Relators will not repeat their previous arguments at length, but refer the Court to their prior brief.

10

copy of the disclosure "in order to determine if the facts alleged by the Relators in that disclosure are true and/or consistent with the allegations made in their Complaint and their deposition testimony." Defendants' Brief, p. 9. However, a party is not entitled to rummage through another party's work product simply to see if it can find something to use for impeachment – if that were the case, then <u>every</u> item of work product would be discoverable as a matter of course. Because Defendants have not even attempted to make a showing of substantial need, the Court should deny the motion.

Moreover, under the facts of this case, it is difficult to imagine <u>any</u> scenario under which the Defendants could have a "substantial need" for the factual information contained in Relators' disclosure statement. As this Court emphatically recognized in its prior ruling, this case is not about Relators, but is about the relationship between BRMC and V&S. Relators were not a party to the lease arrangement between BRMC and V&S, and were not involved in the negotiations leading to the lease agreement. Relators were not involved in the submission of claims by BRMC based on referrals from V&S. All of the relevant documents demonstrating the nature of the parties' relationship – including correspondence, memoranda, and contractual agreements – were created by, and are in the possession of, Defendants or their counsel. All of the documents relating to claims submitted to the government were created by, and are in the possession of, Defendants and/or the government. Relators are not even the victims of Defendants' actions, but are simply suing on behalf of the United States, which remains the real party in interest. Order, p. 7.

Defendants' liability thus will not turn on anything the Relators say or do, much less on anything that may have been said in the disclosure statement prepared by their counsel, but will turn on whether the relationship between BRMC and V&S violates the Stark or Anti-Kickback

11

Statutes. If Defendants were to obtain a copy of Relators' disclosure statement, they might gain some insight into the thinking of Relators' counsel at the time the complaint was filed, but that is precisely what the work product doctrine is intended to protect. Defendants cannot show, and indeed have not even <u>attempted</u> to show, that they have a substantial need for the disclosure statement.

Nor have Defendants shown that they cannot obtain the substantial equivalent of the factual information contained in the disclosure statement. The disclosure statement, which was prepared by counsel for Relators in anticipation of this specific litigation, was submitted to the government pursuant to 31 U.S.C. § 3730(b)(2), which requires relators to serve the government with "a written disclosure of substantially all material evidence and information" in their possession. Defendants have had the opportunity, through both written discovery and depositions, to determine what evidence Relators have regarding the arrangement between BRMC and V&S, and where they obtained such evidence. Indeed, in their initial disclosures, Relators identified witnesses with knowledge of discoverable information, and identified documents supporting their claim, which documents have been produced in discovery. And moreover, as discussed above, the material information and evidence demonstrating Defendants' liability consists of documents prepared by Defendants themselves, not by Relators.

The only thing Defendants have not been able to discover is what Relators, through their counsel, <u>said</u> to the government in their disclosure statement. And that is something Defendants are not entitled to discover. For example, if Relator told the government that "The light was green," Defendants would not be able to ask, "What color did you tell the government the light was?", but would be able to ask, "What color was the light?" It is the <u>communication</u> to the government that is privileged, not the underlying information. Defendants have had a full

12

opportunity to discover the underlying information – which, after all, is information regarding Defendants' <u>own</u> relationship – and have not demonstrated any necessity whatsoever for determining exactly what Relators, through their counsel, told the government.

D.  "Referral patterns of the Relators"

In their brief, Defendants contend that Relators should be required to answer deposition questions regarding their own referral patterns.  Naturally, however, Defendants do not point to or discuss a <u>single</u> question or response that they contend was inadequate, nor do they explain <u>how</u> any particular response was inadequate.  Rather, they simply argue in generalities that they should be allowed to ask about Relators' referral patterns. Defendants' Brief, p. 5-8.[2]  As discussed above, this is insufficient to satisfy either the letter or spirit of Local Rule 37.2.

This failure to discuss specific questions and responses is material, since even a cursory review of the exhibits to Defendants' motion shows that Relators in fact answered numerous questions dealing with referral patterns.  Indeed, although Defendants complain that such questions are necessary to establish "what alternatives exist in the community for nuclear cardiology and other diagnostic testing," Defendants' Brief, p. 6, Relators' counsel expressly agreed during the depositions to allow Defendants to ask questions about what alternatives exist in the community.  *See* Singh Dep., p. 136-137, 147-148; Jacobs Dep., p. 6; *see also* Nadella

---

[2] The only portion of Relators' deposition transcripts even mentioned in this part of Defendants' brief is page 8 of Dr. Nadella's deposition, which Defendants' appear to mischaracterize as an instruction not to answer questions regarding referral patterns. Defendants' Brief, p. 7.  In fact, this citation is nothing more than Relator's counsel stating, at the beginning of the deposition, that "we are asking that the questioning be limited to the allegations and subject matter of the complaint and that it not be a wide ranging deposition on the plaintiff in this case, Dr. Nadella." Nadella Dep., p. 7-8.  Nowhere in their brief do Defendants discuss an actual instance where a Relator was instructed to refuse to answer a specific question regarding referral practices.  Apparently, Defendants believe that the Court and Relator should fly-speck the attached exhibits and guess which questions Defendants are talking about, and why particular responses to particular questions are inadequate.

Dep., p. 23-24, 170. Thus, to the extent that Defendants are contending that Relators' testimony is necessary to establish what alternatives were available to Drs. Vaccaro and Saleh in referring their own patients (a dubious contention at best), that subject was explored in Relators' depositions.

In actuality, however, Defendants seek to do far more than simply understand what alternative facilities are available to V&S for nuclear and diagnostic testing – after all, they know full well what alternatives are available. What they are trying to do is delve into how Relators refer their own patients – in particular, whether they refer them to entities with which they might have a financial relationship.[3] And this is <u>exactly</u> what the Court previously held was irrelevant and undiscoverable:

> BRMC seeks to compel information regarding Relators' financial relationships with entities (specifically Tri-County) to which they refer patients. . . .
>
> It is transparent that BRMC seeks to compel this information in order to argue that the Relators engaged in the same conduct as Defendants did, and thus further argue that either (1) the Relators are opportunistic hypocrites that engaged in the same illegal conduct that Defendants did, or (2) if the Relators conduct is legal, then so is the Defendants. But that is not what is at issue here.
>
> As recognized by Defendants, what *is* relevant here is the intent of the *Defendants*. … The Relators' financial relationship with Tri-County <u>has no relevance</u> as to whether *Defendants* perpetrated a scheme arising out of the equipment lease wherein *Defendants* presented false or fraudulent claims for payment or approval to the government seeking reimbursement for services rendered to patients unlawfully referred to BRMC….
>
> The information sought by BRMC has no relevance as to the intent of Defendants. A fact-finder <u>cannot find the intent of Defendants based on financial arrangements of parties not involved in the equipment lease at issue</u>. In other words, none of the financial information BRMC seeks is "relevant to the claim or defense of any party."

---

[3] This is made even more clear in footnote 4 of Defendants' brief, where they state that, if they are allowed to delve into Relators' referral practices, they "should be given latitude to explore the issue of how Relators' financial relationship with Tri-County impacted their referral practices." Defendants' Brief, p. 8 fn 4. This is exactly the issue the Court has already held is off-limits.

14

>Fed.R.Civ.P.26(b)(1). To permit such discovery would tend to shift the focus of this action to the Relators' irrelevant conduct, and we see no basis upon which to allow that to happen. The <u>Relators' conduct is not an issue in this case</u> and BRMC's motion to compel this information appears solely aimed at punishing the Relators for bringing this *qui tam* action.

Order, p. 5-7 (underlining added; italics in original). Thus, the Court expressly held that "Relator's conduct is not an issue," particularly Relators' conduct regarding referrals to entities with whom they may or may not have a financial relationship.[4]

Defendants' continued attempt to delve into Relators' business practices is a clear violation of this Court's holding that "Relator's conduct is not an issue in this case." Defendants make no serious argument that Relators' referral patterns have any relevance whatsoever to the issue of whether BRMC's relationship with V&S violates the Stark and Anti-Kickback statutes. As the Court correctly recognized in its prior order, Defendants are simply trying to turn this case into a trial of the Relators, in order to deflect attention from the question of their own conduct. The Court should not allow Defendants to do so, and should deny the motion to compel.

---

[4] Defendants' suggestion that Relators "opened the door" to this avenue of inquiry by asking questions about V&S's referrals borders on the ludicrous. This case is <u>about</u> V&S's referrals (but not about Relators' referrals), and it would be strange indeed if Relators were not to ask about such referrals in Defendants' depositions. Indeed, there does not even appear to be any debate about V&S's referral patterns – they acknowledge that (i) before they acquired their own nuclear camera, they referred the vast majority of their nuclear imaging patients to BRMC, (ii) when they acquired their own camera, they reduced their nuclear imaging referrals to BRMC, instead performing the nuclear tests in-house, and (iii) after entering into the equipment sublease, they reverted to their prior referral patterns, sending the vast majority of their referrals to BRMC. BRMC admits that it hoped and expected to regain this referral business after entering into the sublease, and that this was a factor in entering into the sublease for a piece of equipment that did not otherwise meet their needs. Relators fail to see how Defendants' intent in entering into the sublease could in any way be affected by where Relators send their own patients.

E.    "Non-Compete Covenants"

Defendants assert that "Relators' counsel instructed Relators not to answer questions about whether they were bound by any non-compete covenants, or whether they tried to impose such covenants on others." Defendants' Brief, p. 8. Once again, Defendants do not bother identifying any specific questions that Relators allegedly refused to answer, nor do they explain how any specific responses were inadequate, apparently expecting the Court and Relators to wade through the exhibits and guess. As discussed above, this failure is particularly troublesome, since Defendants have included in the exhibits numerous exchanges where the witness did in fact answer the question, or where Defendants moved on even though there was no instruction not to answer. This approach does not comply with the letter or spirit of Local Rule 37.2, and makes it very difficult for Relators to frame an appropriate response.

Moreover, Defendants completely fail to show how delving into Relators' business practices is relevant, particularly in light of the Court's prior ruling that "Relators' conduct is not an issue in this case." Defendants blandly assert that this type of discovery is necessary because "Relators have contended that a non-compete covenant implicitly requires the party bound by it to refer to the other party." Defendants' Brief, p. 8. To put it bluntly, Relators contend no such thing. Relators do not contend that the non-compete covenant contained in the equipment sublease required V&S to refer nuclear imaging patients to BRMC. What Relators contend is that (i) all parties expected and understood that, after entering into the equipment sublease, V&S would in fact refer the vast majority of their nuclear patients for tests on BRMC's nuclear cameras, and (ii) the parties took that expectation and understanding into account in setting and evaluating the payments to be made. Indeed, BRMC's own president and 30(b)(6) witness acknowledged that the sublease arrangement was intended to accomplish more than simply

16

obtaining a piece of equipment that didn't particularly suit the hospital's needs, and that BRMC hoped and expected to gain V&S's referral business as a result of the agreement. Moreover, BRMC ensured that it would capture V&S's nuclear imaging referrals by paying V&S an <u>additional</u> amount to keep the camera in their own office, and by paying V&S a 10% billing fee for each test performed on such camera – arrangements that were <u>not</u> set forth in any written agreement signed by the parties. Thus, Relators contend that the various payments to V&S acted as an <u>inducement</u> to V&S to refer patients to BRMC, not that the non-compete provision <u>required</u> such referrals.

<u>Conclusion</u>

It is increasingly clear that Defendants are not seeking to discover facts that will support any defense to liability, but are continuing their efforts to turn this into a trial of the Relators, notwithstanding the Court's prior ruling. The Court should once again reject these efforts, and deny Defendants' motion to compel. Additionally, the Court should award Relators their reasonable attorneys' fees and expenses for responding to this motion.

This 22nd day of January, 2008.

Respectfully submitted,

<u>Andrew M. Stone</u>
Andrew M. Stone
(Pa. #35176)
Stone Law Firm, LLC
1400 Allegheny Bldg.
429 Forbes Avenue
Pittsburgh, Pa. 15219
Phone: (412) 391-2005
Fax: (412) 391-0853
astone@stones2.com

<u>G. Mark Simpson</u>
G. Mark Simpson
Georgia Bar No. 647725
Simpson Law Firm, LLC
165 North Main Street
Jonesboro, Georgia 30236
Phone: (678) 610-1994
Fax: (678) 302-8721
<u>mark@marksimpsonlaw.com</u>
Attorneys for Plaintiffs

Certificate of Service

I hereby certify that January 22, 2008, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to the following attorneys of record:

       Daniel M. Mulholland, III
       Carl J. Rychcik
       Paul E. Skirtich

This 22nd day of January, 2008.

                            G. Mark Simpson
                            G. Mark Simpson
                            Georgia Bar No. 647725
                            Simpson Law Firm, LLC
                            165 North Main Street
                            Jonesboro, Georgia 30236
                            Phone: (678) 610-1994
                            Fax: (678) 302-8721
                            mark@marksimpsonlaw.com
                            Attorneys for Plaintiffs