CONFIDENTIAL – PROTECTED HEALTH INFORMATION

1

```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2                     ERIE DIVISION

 3
    UNITED STATES OF AMERICA, ex rel. )
 4  DILBAGH SINGH, M.D., PAUL KIRSCH, )
    M.D., V. RAO NADELLA, M.D., and   )
 5  MARTIN JACOBS, M.D.,              )
                                      )
 6              Relators,             )
                                      ) Civil Action
 7        vs.                         ) No. 04-186E
                                      )
 8  BRADFORD REGIONAL MEDICAL CENTER, )
    V&S MEDICAL ASSOCIATES, LLC,      )
 9  PETER VACCARO, M.D., KAMRAN SALEH,)
    M.D., and DOES I through XX,      )
10                                    )
                Defendants.           )
11

12           DEPOSITION OF KAMRAN SALEH, M.D.

13              THURSDAY, AUGUST 9, 2007

14       Deposition of KAMRAN SALEH, M.D., called as a

15  witness by the Plaintiffs, taken pursuant to Notice of

16  Deposition and the Federal Rules of Civil Procedure,

17  by and before Joy A. Hartman, a Court Reporter and

18  Notary Public in and for the Commonwealth of

19  Pennsylvania, at the offices of Fox Rothschild, 625

20  Liberty Avenue, 29th Floor, Pittsburgh, Pennsylvania

21  commencing at 9:31 a.m. on the day and date above set

22  forth.

23
```

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

6

1   V&S Associates?

2   A.   Well, V&S is what I own.  I am part owner in

3   that.

4   Q.   It still exists?

5   A.   Yes.

6   Q.   When did you form V&S?

7   A.   Excuse me?

8   Q.   When did you form V&S?

9   A.   2000.  It was April of 2000.

10   Q.   And V&S is a corporation, correct?

11   A.   That's right, L.L.C.

12   Q.   L.L.C., and it's full name is V&S Associates

13   L.L.C.?

14   A.   V&S Medical Associates, L.L.C.

15   Q.   Who were the original shareholders or members

16   of the company?

17   A.   Me, Dr. Saleh, and Dr. Vaccaro.

18   Q.   Is the ownership the same today?

19   A.   Yes.

20   Q.   Have you ever had any other owners?

21   A.   No.

22   Q.   Do you own it 50-50?

23   A.   Yes.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

17

1    A.    Yes.

2    Q.    What types of referrals would you make?

3    A.    Like, if patients needed a cardiac

4 catheterization, we would send the patient for the

5 cardiac catheterization.  Some patients need an

6 endocrine evaluation, so we would send them to an

7 endocrinologist or urologist.  It was orthopedic

8 surgeons, so all kind of referrals, whatever the

9 patient's need is.

10   Q.    Would you also refer patients to the hospital

11 to be admitted as inpatients?

12   A.    Yes, we do.

13   Q.    Is it fair to say that most of your referrals

14 to a hospital went to Bradford?

15         MR. RYCHCIK:   Objection as to the form.

16   A.    Well, we refer patients wherever the

17 opportunity was, wherever the need was.  If there is

18 somebody who needed to be admitted to the hospital, we

19 admitted them to Bradford Hospital, yes.

20   Q.    Did you admit very many inpatients to Olean

21 Hospital --

22   A.    No.

23   Q.    -- or other hospitals other than Bradford?

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

18

1    A.    No.

2    Q.    Outpatient referrals, they would -- would

3    outpatient referrals primarily be referrals to have

4    tests performed on somebody?

5    A.    Tests, plus evaluation by the doctors.

6    Q.    Were a portion of those outpatient referrals

7    referred to Bradford or any other hospital?

8    A.    Part of it to Bradford, part of it to Hamot

9    Medical Center, some to Cleveland Clinic, and some to

10   UPMC, depending on the need.

11   Q.    What would be your basis for distinguishing

12   which hospital you would refer somebody to for an

13   outpatient test?

14   A.    For the testing?

15   Q.    Yes.

16   A.    That would be for whether the test is available

17   in that facility and what time frame they can get the

18   test done and what kind of reading and the quality of

19   the test performed.

20   Q.    Were there certain types of services that could

21   be performed at multiple hospitals?

22   A.    Yes.

23   Q.    What types of services would those have been?

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

19

1    A.    Like blood work, like chest x-ray.

2    Q.    And if you had to refer people out for those

3    types of services, would it be your typical practice

4    to refer them over to Bradford?

5              MR. RYCHCIK:  Objection as to the form.

6    A.    Well, what we look at when we refer the patient

7    for the lab work or for the x-rays is for the

8    convenience of the patient.  Most of our population is

9    elderly patients, and they actually -- even to come to

10   the doctor's office, they have to find a ride to come.

11   So to send them farther away is more difficult, so

12   they all usually prefer the closest possible testing

13   place.

14   Q.    And that was Bradford, correct?

15   A.    And that is Bradford.

16   Q.    These other places you mentioned -- Hamot

17   Medical Center?

18   A.    Yes.

19   Q.    Where is that?

20   A.    It is in Erie.

21   Q.    How far away is that from Bradford?

22   A.    An hour and a half.

23   Q.    I cannot remember the name of the other medical

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

20

1   center or facility.

2       A.   Olean General Hospital.

3       Q.   I know you mentioned Olean, but I thought you

4   mentioned one other one.

5       A.   UPMC.

6       Q.   UPMC.  What is that?

7       A.   That is the University of Pittsburgh.

8       Q.   How far away is Pittsburgh from Bradford?

9       A.   About three and a half hours.

10      Q.   During the same period that we have been

11  discussing before you got the camera, would you

12  describe yourself and Dr. Vaccaro as being a large

13  referral source for the hospital, Bradford Hospital?

14          MR. RYCHCIK:  Objection as to the form of

15      the question.

16      A.   I can't really tell you as to whether it is a

17  large referral source, but one of the referrals as for

18  all the community organization do.  So we are a part

19  of them, one part of them.

20      Q.   Do you have any knowledge of how you stacked up

21  to other physicians in terms of how much business was

22  referred to Bradford?

23      A.   I didn't understand the question.

JOHNSON and MIMLESS
(412) 765-0744

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

21

1    Q.    I am trying to focus on how V&S compared to

2    other physicians in the amount of business that they

3    referred to Bradford.  Did you all refer more or less

4    than other physicians in the area?

5        So my question is:  During this time period, do

6    you have any information on which to compare your

7    referrals to other physicians' referrals?

8    A.    I don't have any information on that.

9    Q.    Do you have any belief?

10   A.    Well, I mean we are a two-physician practice.

11   Most of the practices are solo practices, so that

12   increases the number of referrals; but Dr. Jamil and

13   Dr. Kirsch have significant referrals to the hospital.

14   Q.    Did you ever have an occasion to attempt to

15   quantify the number or dollar value of your referrals

16   to Bradford during this period?

17   A.    I don't recall it.

18   Q.    Now, I want to talk a little bit about your

19   decision to lease this nuclear camera.  First off,

20   describe for me what the camera was.

21   A.    It is a GE nuclear camera, and the nuclear

22   camera provides the nuclear testing, and the testing

23   done is like cardiac stress testing, bone scan,

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

22

1   thyroid scan.  It is those kind of tests that are

2   considered specialized x-ray testing.

3     Q.   Is this nuclear testing similar to or different

4   from MRIs and CT scans?

5     A.   It is different.

6     Q.   How is it different?

7     A.   Because the indications are different, and the

8   tests are different.

9     Q.   Are there certain types of tests that --

10   actually, I'm sorry.  I want to rephrase this.  You

11   perform a test in order to learn something about a

12   patient, correct?

13     A.   That's right.

14     Q.   Are there ever circumstances where you could

15   either go with a nuclear camera or with a CT scan or

16   an MRI?

17     A.   Uncommon.

18     Q.   Uncommon?

19     A.   Yes.

20     Q.   So, typically, the type of information you are

21   seeking to acquire would lead you to pick one or the

22   other?

23     A.   That's true.

CONFIDENTIAL – PROTECTED HEALTH INFORMATION

37

1    Bradford?

2      A.    Most of the time, that would have been

3    Bradford.

4      Q.    After you got your nuclear camera, your

5    referrals to Bradford for nuclear tests would have

6    reduced, because you were doing a large number of them

7    in your own office, correct?

8      A.    Yes.

9      Q.    Other than that, do you believe there was any

10   change in your referral patterns during the period

11   that you owned or leased the nuclear camera?

12            MR. RYCHCIK:  Are you talking about just

13        nuclear camera referral patterns?

14            MR. SIMPSON:  Other than nuclear camera.

15     Q.    Nuclear camera referrals went down because you

16   were doing them in your own office.  Were there any

17   other types of referrals that you had been doing

18   previously that your referral patterns changed after

19   you got the camera?

20     A.    No.

21     Q.    Now, at some point, you were approached by

22   Bradford with some concerns they had about the fact

23   that you had leased this camera, correct?

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

43

1   A.   Yes, we did.

2   Q.   And who was it that you hired as the first

3   attorney you hired to represent you in discussions

4   with the hospital relating to the camera issue?

5   A.   Ed Kabala.

6   Q.   And did you also work with Marc Raspanti?

7   A.   Yes.

8   Q.   But Mr. Kabala came first, I guess?

9   A.   That's true.

10  Q.   At some point, did the hospital come to you

11  with concerns that by getting this nuclear camera that

12  you would be violating a hospital policy on

13  non-competition?

14  A.   Yes.

15  Q.   Was that Mr. Leonhardt that came to you?

16  A.   I don't recall.

17  Q.   Did he do that -- do you recall whether he

18  spoke with you orally about it or whether he wrote you

19  a letter?

20  A.   Both were done.  Orally, and then a letter was

21  sent, too.

22  Q.   I will go through some documents later, but I

23  just want to kind of walk through the general stages

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

44

1   first.  You all had a bunch of back and forth about

2   whether this policy was legal, correct?

3      A.   That's true.

4      Q.   And you took the position that the hospital's

5   attempt to enforce this policy was an illegal attempt

6   to economic credentialing; is that correct?

7            MR. RYCHCIK:  Objection as to the form.

8         You are asking him for a legal conclusion.

9            MR. SIMPSON:  I am not asking him for a

10        conclusion.

11     Q.   I am saying you took that position with the

12   hospital, didn't you?

13     A.   Initially, when the hospital did that, we

14   thought that economic credentialing was the way to

15   stop our privileges for referrals.  That was the

16   initial thinking.  That is why we were concerned, and

17   we wanted a legal opinion on that.  But after several

18   discussions later, it became more clear as to the

19   basis for what the reason was.

20     Q.   And was it your understanding that -- let me

21   put it this way:  Do you believe the hospital ever had

22   any intention of actually denying you staff privileges

23   at the hospital?

CONFIDENTIAL – PROTECTED HEALTH INFORMATION

45

1    A.    Yes.

2    Q.    So you didn't see it as a mere bluff?

3    A.    That's true.

4    Q.    Basically, what the hospital was telling you

5    was that if you are in a business that is in

6    competition with the hospital, you are not entitled to

7    have staff privileges with the hospital, correct?

8    A.    That's true.

9          MR. MULHOLLAND:   Objection to the

10         characterization of what the hospital may or

11         may not have told him.

12   Q.    That was your understanding of what the

13   hospital position was, correct?

14   A.    That's true.

15   Q.    Now, you stated you didn't believe it was a

16   bluff; but did it also become apparent to you that the

17   hospital would rather not terminate your privileges,

18   but would rather work out some kind of arrangement

19   with you?

20   A.    That started appearing later in the course,

21   much later in the course.  Initially, it was not

22   obvious.

23   Q.    Who made the first proposal that you and the

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

54

1      equipment?

2          MR. SIMPSON:  I'm sorry.

3      Q.   Did the hospital pay you rent to keep the

4  camera on your premises?

5      A.   Yes.

6      Q.   And that was in addition to all of the payments

7  under the sublease?

8      A.   That's true.

9      Q.   While the old camera was at your premises, was

10  it being used --

11      A.   Yes.

12      Q.   -- or was it sitting idle?

13      A.   No.  It was being used.

14      Q.   How frequently was it being used?

15      A.   As frequently as it was being used before.  But

16  since we signed the lease agreement, the sublease

17  agreement now, the payments that were going was the

18  income for the hospital.

19      Q.   The patients for whom it was being used, were

20  they still your patients, or did the hospital send

21  over other patients that were not your patients to

22  have tests done?

23      A.   There were sometimes, yes.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

70

1          MR. RYCHCIK:  I am going to object to the

2          extent I don't want you to divulge any types of

3          communications you might have had with Mr.

4          Raspanti or any of your counsel, for that

5          matter, and I am going to instruct you not to

6          answer to the extent that is what you are

7          asking.

8    Q.   All I am asking is -- well, would you typically

9    be sent a draft of the letter before he would send the

10   final copy out to opposing counsel?

11         MR. SIMPSON:  I am not sure whether that

12         is objectionable or not.

13         MR. RYCHCIK:  I still think that is.  I

14         still think it is asking whether or not there

15         was a communication, and I don't think I want

16         him to answer that question.  You could ask him

17         another question, but --

18         MR. SIMPSON:  Well, I have already asked

19         whether he recalled seeing this letter.

20   Q.   Let me ask you this question:  Flip to page

21   159, please, the last full paragraph.  The last full

22   paragraph starts out by saying, "We know of no case

23   that more clearly establishes a hospital's attempt to

JOHNSON and MIMLESS
(412) 765-0744

CONFIDENTIAL – PROTECTED HEALTH INFORMATION

71

1    extract an exclusive referral stream from a

2    physician."

3        My question to you is:  At that time, was it

4    your belief that the hospital was trying to extract a

5    referral stream from you by invoking the non-compete

6    clause?

7    A.    Yes.  When initially we found out that there is

8    a non-compete clause, that was our understanding that

9    the hospital is trying to get referrals and making it

10   tied to our hospital privileges.  That is why you can

11   see, initially, we were concerned, and we hired the

12   counsel, and we advised them to get the counsel, too,

13   to make sure that that is not the reason why this

14   economic credentialing was based on.

15       As you can see, after several months, almost

16   two years of discussion, it was clear that that was

17   not the basis for all of this; but initially, yes,

18   that was the concern.

19   Q.    It was your belief that the hospital was trying

20   to get the referrals back that it had lost by you

21   doing them in your office?

22       MR. RYCHCIK:  Objection as to the form of

23       the question.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

151

1    month.

2        Q.   Is this one of the documents that comes out at

3    the end-of-the-the-month report?

4            MR. RYCHCIK:  Are you talking about this

5            time period or these dates?

6            MR. SIMPSON:  Yes.  The time period when

7            these date are.

8        Q.   I am trying to figure out if this is a

9    routinely printed document printed at that time or was

10   this printed out for a special reason?

11       A.   I don't think it was a routinely printed out

12   document, so it must have been prepared to get some

13   information.

14       Q.   You don't know how you used that information?

15       A.   That is right.  It could just be for our own

16   purposes.

17       Q.   I'm going to mark as Exhibit 30 all the

18   documents you handed to us this morning.

19            (Saleh Deposition Exhibit No. 30 was

20   marked for identification.)

21       Q.   Exhibit 30 is Bates labeled 3154 through 3170.

22   The first page is a statement of October 2003.  Is

23   this a statement for -- what is this first page?

JOHNSON and MIMLESS
(412) 765-0744

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

152

1    A.    This is a statement that we sent to the

2    hospital when the hospital was using the nuclear

3    camera at our facility.

4    Q.    So the $4,879.84 is your bill to the hospital

5    for the rent --

6    A.    The cost.

7    Q.    -- the cost of keeping the camera on your site?

8    A.    Not just the cost.  It includes the running of

9    the camera, too.

10    Q.    But it is payments that they are making to you

11    for keeping the camera at your facility instead of at

12    the hospital, right?

13    A.    Yes.

14    Q.    And those payments are in addition to the other

15    payments that would be under the sublease?

16    A.    That's true.

17    Q.    And the next page is a copy of their check to

18    you for that amount, it looks like?

19    A.    Yes.

20    Q.    And the next page 3156 is a similar statement

21    for November of 2003, correct?

22    A.    Yes, sir.

23    Q.    Then the next page, it says, "Receipts," and

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

153

1  there is no date on it, though, that I can see.  Is

2  this a -- how can you tell what period this is for?

3     A.   It is after November, because it says November

4  rental statement.

5     Q.   Oh, I see.  Okay.  So this is, basically, your

6  receipt for the payment that you received, and you

7  received a total -- the top line is "Total receipts,

8  $24,922.31."  What is that payment?  What is that?

9     A.   That is the payment received by use of the

10 nuclear camera.

11    Q.   Is that the sublease payment?

12    A.   No.  The way it was handled initially was after

13 it came into the contract with the hospital for

14 sublease, then the camera stayed at our facility for

15 several months, and then used in our facility; and

16 when it was used, we continued to provide the

17 services, but the income that was generated from that

18 date on was the hospital's money.

19        So this is the income brought in from that day

20 on, and then you can see that there are expenses that

21 are deducted.  So whatever it was less was there, and

22 then their rental statement, and then the actual

23 payment to BRMC was made of this much dollars.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

154

1    Q.    So this was a payment made by you to BRMC?

2    A.    Yes.

3    Q.    So the 424,922 is payments that you received

4    from --

5    A.    That's right.

6    Q.    -- from --

7    A.    The operation of the nuclear camera.

8    Q.    At that point, were you billing for the tests?

9    A.    Yes.

10   Q.    So you were billing for them, and then you were

11   collecting --

12   A.    Right.

13   Q.    So the camera had been subleased to Bradford at

14   that time?

15   A.    Right.

16   Q.    But Bradford wasn't billing for the tests?

17   A.    That's true.

18   Q.    You were billing -- you would collect payment

19   from insurers or whoever, and then you would subtract

20   out a 10 percent billing charge, correct?

21   A.    Yes.

22   Q.    And then you would also subtract out a 24

23   percent reading charge for Dr. O'Donnell?

JOHNSON and MIMLESS
(412) 765-0744

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

155

1    A.   Yes.

2    Q.   Now, is that 24 percent reading charge, is that

3    a pass-through charge?

4    A.   Yes.  It goes to Dr. O'Donnell.

5    Q.   You weren't making any profit on that number?

6    A.   I don't remember exactly.

7    Q.   And then there is something for medication

8    receipts.  What is that?

9    A.   Like Cardiolite and all the medication that is

10   used, you buy the medication, and then the insurance

11   company pays you for that.

12   Q.   So that would be for medication, would you have

13   any profit on that number?

14   A.   No.

15   Q.   So that is your actual cost of purchasing the

16   medication that was used in the test that you are

17   performing for Bradford?

18   A.   That's true.

19   Q.   So when you subtract out that, you come to the

20   9,180.76, and then you subtract out the rental payment

21   that they owed you, and you come to 4,593.94, which

22   you paid to them?

23   A.   That's true.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

156

1    Q.   And then the next two pages show the same stuff

2    for December of 2003?

3    A.   Uh-huh.

4    Q.   And then the next page shows a statement for

5    January of 2004, but I don't see any receipts page, a

6    similar receipts page for January of 2004, and did you

7    think that was omitted, or did they cheat you that

8    month?  No offense.

9    A.   No.  I think maybe the receipt was not enough

10   to go along with that in that month.  So, therefore,

11   it was totaled with the February statement.  After the

12   February statement, you can see.

13   Q.   So you got the February statement on page 3161,

14   and then on 3162, you have the February receipts page,

15   just like we discussed before, which reflects that you

16   all ended up making a payment to Bradford of 7652?

17   A.   That's true.

18   Q.   And then that includes -- does that include --

19   is this, like, a two-month type page?  Does that

20   include January and February?

21   A.   No.  It just saves that February statement, so

22   that did not include a January statement.  So if you

23   go farther, you can see --

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

157

1    Q.   But your total receipts for that period are

2   42,000 plus, which is substantially more than the

3   27,000?

4    A.   Because this is probably two months.

5    Q.   So it is two months of receipts, less two

6   months of expenses?

7    A.   Yes.

8    Q.   And then you have the same thing the next

9   couple of pages for March of 2004, and then the next

10   two pages are the same thing for April of 2004; and

11   then you have a statement from May of 2004, correct?

12    A.   That is true.

13    Q.   But there is no separate receipts page?

14    A.   That's right.

15    Q.   And then a statement for June and then a

16   receipts page following that, which looks like it

17   includes monies from several months.

18    A.   Yes.

19    Q.   But if you take all of these receipts pages,

20   they cover that whole period that the statements refer

21   to?

22    A.   Right.

23    Q.   And in the last couple of months there, say,

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

158

1    May -- in May, there is a rent charge of 2,500 and a

2    secretarial support of 1,000, and then in June, there

3    is a 25 rent, and no secretarial support.  There are a

4    lot of things that were included in previous months

5    that aren't included in those months?

6        A.   They stopped doing the stress test at that

7    time, so there is no fee for secretarial support or

8    other support.

9        Q.   So at this time, the equipment was in your

10   office, but it wasn't being used?

11       A.   That particular month.

12       Q.   So in April it was not used?

13       A.   April?

14       Q.   Page 3165?

15       A.   April, right.

16       Q.   And then for May, it was not used, correct?

17       A.   Correct.

18       Q.   And then in June it was also not used?

19       A.   Right.

20       Q.   So let's say in April, May, and June, it wasn't

21   being used?

22       A.   That is right.

23       Q.   Do you know if the hospital -- had you gotten

JOHNSON and MIMLESS
(412) 765-0744

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

159

1   the new equipment at that time, the new camera by that

2   time?

3       A.   I don't know for sure if that is the time

4   period.

5       Q.   Let me ask you this:  Did you return the old

6   camera at the same time you got the new camera, or was

7   there an overlap?

8       A.   There was an overlap.

9       Q.   There was an overlap of time when you had the

10  old camera and Bradford had the new camera?

11      A.   Yes.

12      Q.   Let's look at the very last page of this

13  exhibit, 3170.  This is another vendor QuickReport

14  like the ones we had talked about before.

15      A.   Yes.

16      Q.   So is that yet one more page?

17      A.   This is just to show the amount that we have

18  talked about in those statements, those are being paid

19  to the hospital, so all the --

20      Q.   These are not receipts by you?  These are

21  payments by you?

22      A.   Yes.

23      Q.   I understood they were --