CONFIDENTIAL - PROTECTED HEALTH INFORMATION

1

1            IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2                     ERIE DIVISION

3
     UNITED STATES OF AMERICA, ex rel. )
4    DILBAGH SINGH, M.D., PAUL KIRSCH, )
     M.D., V. RAO NADELLA, M.D., and   )
5    MARTIN JACOBS, M.D.,              )
                                       )
6                 Plaintiffs,          )
                                       )  Civil Action
7        vs.                           )  No. 04-186E
                                       )
8    BRADFORD REGIONAL MEDICAL CENTER, )
     V&S MEDICAL ASSOCIATES, LLC,      )
9    PETER VACCARO, M.D., KAMRAN SALEH,)
     M.D., and DOES I through XX,      )
10                                     )
                  Defendants.          )
11

12          DEPOSITION OF CORPORATE DESIGNEE OF

13            BRADFORD REGIONAL MEDICAL CENTER

14               THURSDAY, JULY 26, 2007

15          Deposition of CORPORATE DESIGNEE OF BRADFORD

16    REGIONAL MEDICAL CENTER, called as a witness by the

17    Plaintiffs, taken pursuant to Notice of Deposition and

18    the Federal Rules of Civil Procedure, by and before

19    Joy A. Hartman, a Court Reporter and Notary Public in

20    and for the Commonwealth of Pennsylvania, at the

21    offices of Horty Springer, 4614 Fifth Avenue, First

22    Floor, Pittsburgh, Pennsylvania, commencing at 10:03

23    a.m. on the day and date above set forth.


                    JOHNSON and MIMLESS
                      (412) 765-0744

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

74

1    A.    That would have been based on the scheduling,

2    the availability of the Axis Camera.  We actually had

3    enough demand for two cameras, and so depending on the

4    availability of the Axis Camera and the urgency -- the

5    degree of urgency for the test, we might have done

6    that, done that there.

7    Q.    Was the camera at V&S used on a daily basis?

8    A.    I do not know the answer to that.

9    Q.    Was there a reason why the hospital did not

10   move the camera from the V&S location to the hospital?

11   A.    Yes.

12   Q.    What was the reason?

13   A.    We wanted to replace the Sophie camera, and we

14   were in the process of embarking on cardiology

15   services at the Medical Center, so we were looking for

16   specific capabilities in our second nuclear camera.

17   We were looking for a camera that specifically was

18   strong in doing nuclear cardiology procedures.

19        The GE camera was an older model with some

20   limited technology, so we opted not to have that

21   camera moved, because we did not feel that it would

22   meet our future needs.

23   Q.    And so you thought it had limitations that

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

75

1    would not meet the needs of the hospital; is that it?

2        A.   It would not meet our future needs.

3        Q.   Now, when you left it at V&S, did that involve

4    having to pay V&S for the space that it occupied?

5        A.   I don't really know the answer to that.  The

6    specificity of that, I'm not familiar with.

7        Q.   But as far as the location is concerned, that

8    camera was used by the hospital, but it was never

9    actually moved to the hospital facility?

10       A.   That's correct.

11       Q.   And, eventually, what happened to that camera?

12   Was it turned back to GE -- was the GE camera turned

13   back to GE?

14       A.   When we were leasing the camera from V&S, we

15   let them know that we did not want that to be the

16   camera ultimately, for the reasons I just outlined;

17   and so they replaced that camera with the Philips

18   CardioMD.  Then --

19       Q.   Excuse me.  Can you go back?

20       A.   Yes.

21       Q.   Who did you tell that you -- who knew that you

22   didn't want that camera?

23       A.   V&S.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

76

1    Q.   V&S knew that you didn't want that camera?

2    A.   Yes.

3    Q.   Okay.

4    A.   We informed them that that would not meet our

5    future needs, because of the older technology and

6    because of its nuclear cardiology limitations.

7    Q.   So that was known at the time?

8    A.   That was known, yes.  Well, at which time?

9    Q.   At the time that you entered into the sublease

10   agreement.

11   A.   I'm not sure of the exact date of those

12   discussions with them and the date of the lease

13   agreement.

14        MR. STONE:  I don't have any further

15        questions for this witness.

16        MR. MULHOLLAND:  Okay.  I guess you are

17        free to go then.

18        THE WITNESS:  All right.

19        (Discussion off the record.)

20        (Testimony of Mr. Washington ended at

21        12:09 p.m., and testimony of Mr. Leonhardt

22        began at 12:10 p.m. this date.)

23                    - - -


JOHNSON and MIMLESS
(412) 765-0744

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

97

1    because the referring physician would only have a

2    financial incentive to only use their service as

3    opposed to any real kind of real competition, which

4    would, essentially, mean the cardiologist would be

5    blocked out.

6        Q.    Well, there were other physicians in the

7    community that would refer patients to a cardiology

8    program, right?

9        A.    It is a very small community.

10       Q.    Well, are you saying then that Dr. Saleh and

11   Dr. Vaccaro had a substantial part of the patient

12   population as their clients or patients?

13       A.    Yes.

14       Q.    Is this the reason why the hospital determined

15   that it would have a significant impact on the

16   cardiology program if they were permitted to go

17   forward with their plan to develop an imaging

18   facility?

19       A.    Yes.

20       Q.    Prior to April of 2001, were Dr. Saleh and Dr.

21   Vaccaro, were they referring their nuclear imaging

22   business to the hospital?

23       A.    I know they were referring some of their

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

128

1   of 2003, and you still have this problem?

2       A.   Uh-huh.

3       Q.   And at this point, Dr. Saleh and Dr. Vaccaro

4   are operating their imaging facility; is that right?

5       A.   Yes.

6       Q.   And it is having a negative impact on the

7   hospital, I assume?

8       A.   Yes, we believe so.

9       Q.   I think the previous May, it looks like there

10  was a determination made by the Board of Directors

11  that Dr. Saleh and Dr. Vaccaro were covered persons

12  within the meaning of the policy against competing

13  financial interests?

14      A.   Uh-huh.

15      Q.   This letter refers to what I was talking about

16  a few minutes ago, about a buy-out that Saleh and

17  Vaccaro were proposing.  If you look down to the third

18  paragraph, that is where the number 1.8 million is

19  discussed --

20      A.   Right.

21      Q.   -- as a proposal, I guess, coming from them; is

22  that right?

23      A.   That's correct.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

129

1    Q.   If you go down to the next paragraph, that is

2    the flip side, that is the other option, which is that

3    you enforce the policy; is that right?

4    A.   Correct.

5    Q.   So it looks like you are going back between

6    these two alternatives, in other words, to work with

7    Saleh and Vaccaro in some kind of a buy-out or a

8    venture and the other option is to enforce the policy;

9    is that right?

10   A.   Yes.

11   Q.   Now, if you enforce the policy, I assume you

12   have the problem that you might be driving away

13   referrals because if these guys don't have privileges,

14   they may start referring patients to another hospital;

15   is that right?

16   A.   That is among the issues, yes.

17   Q.   Was that a concern to you that if they are off

18   the staff, then they might have other alternatives,

19   and these guys are a pretty big referral source,

20   right?

21   A.   That was among the concerns, yes.

22   Q.   In fact, you were aware at this point that they

23   had -- at least one of them had applied for staff

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

140

1   this equipment that apparently had limited

2   capabilities from V&S?

3     A.   The agreement that we worked out with V&S to

4   sublease that equipment had as a condition of it that

5   we be free to direct them to acquire a different piece

6   of equipment of our choosing with a lease that had to

7   satisfy -- with conditions that had to satisfy us.

8     Q.   Okay.

9     A.   So --

10    Q.   Are you done?

11    A.   Yes.

12    Q.   Well, Mr. Leonhardt, that is a fairly

13  cumbersome way to go out and acquire a piece of

14  equipment, wouldn't you agree?

15    A.   Yes, if that was the only thing that we were

16  trying to accomplish.  Obviously, it wasn't the only

17  thing that we were trying to accomplish.

18    Q.   Let's say that, hypothetically, that the

19  hospital determined that they had a need to get a

20  camera.

21    A.   Yes.

22    Q.   You would probably go to the vendor or a lessor

23  of equipment; is that right?

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

141

1    A.    In many circumstances, yes.

2    Q.    When you got your Axis camera back in 1999, did

3    you contact an equipment vendor at that time to get

4    that equipment?

5    A.    I'm sure we did.

6    Q.    Now, in 2003, if you were interested in looking

7    at equipment, you would normally go to the equipment

8    vendor, right?

9    A.    Yes.  We were all -- yes.

10   Q.    If there were no other part of this, in other

11   words, if there was nothing else to be accomplished?

12   A.    Correct.

13   Q.    I think that is what you said, if that were the

14   only consideration?

15   A.    Yes.

16   Q.    Isn't it true that the real consideration here

17   was how to pay V&S some money in order to get their

18   business; isn't that right?

19          MR. MULHOLLAND:  Objection to the form of

20          the question; but you can answer.

21   A.    No.

22   Q.    Excuse me?

23   A.    No.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

142

1    Q.   Well, what was the real purpose of that

2    agreement?

3    A.   As I have said before, the real purpose of the

4    agreement was to get us into a situation where we had

5    a level field to compete in.  We certainly -- we

6    certainly wanted to have the opportunity to compete

7    for V&S' business based on quality, based on the level

8    of service that we could provide to them and their

9    patients.

10    Q.   Well, in order to compete for V&S' business,

11    you entered into an agreement where you would pay them

12    a certain amount a month; isn't that right?

13    A.   We entered into a lease and a non-competition

14    agreement, yes.

15    Q.   What was the amount that you agreed to pay them

16    each month, pursuant to that agreement?  You can refer

17    to the document.

18    A.   We agreed to pay them the pass-through cost of

19    the lease for the equipment and a specific amount for

20    the non-compete agreement and the other

21    considerations.

22    Q.   And what was the -- do you -- if you want to

23    refer to the agreement, I would like you to identify

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

143

 1    what the number was and how you arrived at the number.

 2      A.    The number here is $29,250 per month.  This

 3    does not split those into the components that I was

 4    talking about.

 5      Q.    But you said that it was to actually pay for

 6    the pass-through cost to the equipment?

 7      A.    Correct.

 8      Q.    And also to pay for these other issues, I

 9    guess, the non-compete?

10      A.    Correct.

11      Q.    Was it paying for anything else?

12      A.    No.

13      Q.    Now, did you evaluate whether the equipment

14    that you were paying for as a pass-through under this

15    agreement was equipment that could be used by the

16    hospital?

17      A.    Yes.

18      Q.    And did you make any kind of evaluation or

19    determination that this was a good value for the

20    rental payments that you were making here?

21      A.    Yes.  It was a good usable piece of equipment.

22    It didn't fit into our long-range plans, but it was a

23    good usable piece of equipment.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

144

1    Q.   I guess, aside from not fitting into the

2    long-range plans, if you just take the equipment

3    itself, this is now in April of 2003 --

4    A.   Correct.

5    Q.   -- how old is this piece of equipment at the

6    time that you entered into the sublease agreement?

7    A.   I don't know the answer to that.

8    Q.   They were a couple of years into their lease,

9    right?

10   A.   They would have been at that point almost two

11   years into the lease, yes.

12   Q.   Did you do any kind of evaluation to determine

13   if you went into the marketplace whether you could do

14   better than what you were paying under this agreement?

15   A.   We had our technical director look at the

16   equipment and make sure that it was useful; and, yeah,

17   we had a general feeling about whether that was a

18   competitive lease or not.

19   Q.   Well, I guess, since you already knew that it

20   wouldn't fit into a longer term plan, then it seems to

21   me that there would be pieces of equipment out there

22   that you could lease or buy that would be more

23   suitable to your long-range plan?

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

145

1    A.    More suitable to the long-range plan, yes; and

2    that is why we had, as part of the agreement, a

3    requirement that they seek another piece of equipment

4    of our choosing.

5    Q.    But I guess by doing it the way you did it,

6    wasn't that a more expensive way to get that

7    equipment --

8    A.    No.

9    Q.    -- by then having to buy out --

10   A.    No.

11   Q.    Didn't you have to buy out the other lease?

12   A.    Oh, yes.  You would have to buy out the other

13   lease.

14   Q.    So if in 2003, you simply wanted to get

15   yourself a second camera, you could probably have at

16   least a second camera or bought a used camera for less

17   money than subleasing this equipment and entering into

18   a subsequent lease with Philips?

19        MR. MULHOLLAND:  Object to the form.  He

20        can answer.

21   A.    There is an economic cost to terminating a

22   lease early; and, yes, in demanding that the lease be

23   terminated early, we created that additional cost.  We

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

146

1    saw that as good value to us in developing the program

2    that we were trying to develop.

3      Q.    And that is because you were able to, at the

4    same time, get the non-compete?  Is that what your

5    rationale was?

6      A.    We were able to put the whole package together,

7    yes.

8      Q.    And when you got the non-compete, you were

9    essentially buying the business from V&S; isn't that

10   right?

11           MR. MULHOLLAND:  Objection to form.

12     A.    No.

13     Q.    Did you expect that you would get the referral

14   business from V&S as a result of this agreement?

15     A.    We hoped that we would.

16     Q.    Let me give you another exhibit here, and see

17   if you can identify this document.

18           (Deposition Exhibit No. 14 was marked for

19   identification.)

20     A.    Yes.

21     Q.    What is this document?

22     A.    This is an independent valuation of the lease

23   and non-compete agreement.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

147

1    Q.    Who is Mr. Day?

2    A.    Mr. Day is an accountant and an attorney who

3    does this kind of work, as well as other work.

4    Q.    Is he related to Stroudwater in any way?

5    A.    No.

6    Q.    So he is another consultant that you had assist

7    you with this --

8    A.    Yes.

9    Q.    -- this problem?

10   A.    Yes.

11   Q.    First of all, I guess, I don't think this

12   report is dated.  Do you know when this report was

13   prepared or what time frame?

14   A.    I don't know precisely when without the cover

15   letter that went with it.  It was, you know, right

16   before we entered into the agreement.

17   Q.    Was this prepared in connection with entering

18   into the sublease agreement?

19   A.    Yes.

20   Q.    What was the purpose of obtaining this report

21   at that time?

22   A.    We felt very strongly that the agreement that

23   we were entering into was appropriate, that the value

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

148

1    that we were receiving was commensurate with what we

2    were paying, but we did want an independent opinion to

3    that effect.

4        Q.   What was the assignment or the scope that you

5    gave to Mr. Day when you hired him to prepare this

6    report?

7        A.   We gave him a letter of engagement, and I don't

8    remember everything that was in it; but, essentially,

9    it was to evaluate the arrangement and give us an

10   opinion as to whether or not the lease and non-compete

11   were fair market value.

12       Q.   And when you say "fair market value," that

13   would require evaluating the lease arrangement for the

14   equipment?

15       A.   Correct.

16       Q.   But also valuing the other parts of the

17   agreement?

18       A.   Correct.

19       Q.   And, essentially, we are talking about

20   non-compete?

21       A.   Correct.

22       Q.   What you call the non-compete?

23       A.   Correct.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

149

1    Q.   Is that how you arrived at the amount that V&S

2   would pay under the agreement?

3    A.   No.  We arrived at that amount through

4   negotiations.

5    Q.   Okay.

6    A.   We had a proposed negotiated and agreed upon

7   amount.  We wanted an independent opinion as to

8   whether or not that was fair market value.

9    Q.   You knew what the pass-through cost of the

10   equipment lease was, right?

11    A.   That's right.

12    Q.   So that amount didn't change at all?

13    A.   No.

14    Q.   Now, in the negotiations, explain to me how you

15   arrived at the number for the portion of the agreement

16   that covers the non-compete?

17    A.   Through a long and sometimes arduous

18   negotiation.

19    Q.   What was the value that the hospital placed on

20   the non-compete?

21    A.   I don't know.  If you are asking me where we

22   started, I don't remember.

23    Q.   Do you recall what V&S put on it?

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

150

1    A.   At a beginning point, no, I don't.

2    Q.   Do you recall how you justified the numbers

3    that you were proposing?  What did you base that on?

4    A.   We based that on a series of things.  What the

5    venture was costing us, what other alternatives, what

6    impact all the other alternatives might have on us.

7    Q.   So you were looking at numbers that reflected

8    the projected loss of business to the hospital?

9    A.   The cost of additional recruiting, the

10   rebuilding of, you know, primary care practices in the

11   community, how we would have people who lived in that

12   community who depended on those physicians for their

13   care, how we were going to care for them.

14   Q.   How did you put a number on that, on those

15   issues you have just identified?

16   A.   Some of those issues were very difficult to put

17   a number on.

18   Q.   Did you do any evaluation of what this meant to

19   V&S in terms of giving up their new enterprise?

20   A.   I believe they did.  We did not, no.

21   Q.   Was there any discussion about that?

22   A.   Certainly, there was.

23   Q.   Do you recall what it was that they thought

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

151

1    that they were going to lose by way of stream of

2    revenues?

3      A.   No, I do not.

4      Q.   I will show you a document we will mark as

5    Exhibit 15.

6            (Deposition Exhibit No. 15 was marked for

7    identification.)

8      Q.   Mr. Leonhardt, this is a letter that appears to

9    be from the hospital's counsel to Ms. Jodeen Hobbs at

10   the law firm of Miller, Alfano & Raspanti, and you are

11   copied on it.  Is this letter familiar to you?

12     A.   Let me finish reading it.  It has been a long

13   time.

14     Q.   Oh, sure.  Go ahead.

15     A.   Okay.

16     Q.   This letter is dated March 14, 2003; so I guess

17   in reading the letter, it appears that the

18   negotiations for the lease agreement had been going on

19   at least prior to this date?

20     A.   Uh-huh.

21     Q.   I would like you to turn to the second page, if

22   you could, and the second bullet point there talks

23   about a value that is placed on the rental payments

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

152

1   under the sublease, proposed sublease?

2   A.   Right.

3   Q.   Do you see that?

4   A.   Yes, I do.

5   Q.   And "From information provided by Vaccaro and

6   Saleh, we understand that the profit from the nuclear

7   camera services is approximately $240,000 annually."

8   Do you see that?

9   A.   Yes, I do.

10   Q.   Does that refresh your recollection?

11   A.   Yes, it does.

12   Q.   I don't know whether your analysis agrees with

13   their analysis of those same figures; but for the

14   purposes of discussion today, that is, obviously, a

15   number that the hospital put on that venture at that

16   time, $240,000 annually in terms of profit.  Okay?

17   A.   Okay.

18   Q.   Now, if you look at the next --

19   A.   It is actually a number that Vaccaro and Saleh

20   put on it, but --

21   Q.   Okay.  I'm not sure, but, apparently, for the

22   purposes of discussion, that number was accepted.

23   Then the next sentence says, "By the Medical Center's

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

153

1    subleasing proposal, annual rental payments would

2    total $312,000 with a final profit to V&S of $229,000

3    annually."  Do you see that?

4    A.    Yes.

5    Q.    I am assuming that the difference between 312

6    and the 229 is the amount of those pass-through

7    payments for the equipment.  Is that right?

8    A.    I would assume the same thing.

9    Q.    So it looks like the amount of the payments is

10   very close to what the projected profit was for V&S?

11   A.    Uh-huh.

12   Q.    Is that your understanding of what happened

13   here?

14   A.    It looks like they are about $11,000 less.

15   Q.    Now, if we go back to Exhibit No. 14, the

16   report that was prepared by Mr. Day, he actually does

17   an analysis and tries to put a fair market value on

18   the non-compete; is that right?

19   A.    Yes.

20   Q.    Isn't that the point of this?

21   A.    Yes.

22   Q.    And if you would turn to page 13, he discusses

23   what he calls the competitive business valuation

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

154

1   method.  Do you see that?

2       A.   Around the middle of the page, yes.

3       Q.   Sort of there, yes.

4       A.   Okay.

5       Q.   I guess Stroudwater had talked about that, as

6   well, in an exhibit that they prepared.  Now, I don't

7   have a copy of the exhibit attached to this report,

8   but if you would go down to the next paragraph, it

9   talks about how the competitive business valuation

10  method is calculated, how the valuation is calculated.

11          It calls for a two-step process.  The first

12  step is to generate an estimated projection of the

13  prospective cash flow from the hospital's provision of

14  nuclear cardiology diagnostic and integrally related

15  services with the covenant not to compete in place.

16  Okay?

17      A.   Okay.

18      Q.   In other words, to analyze the cash flow where

19  there is a covenant not to compete?

20      A.   Uh-huh.

21      Q.   In other words, whatever that value is to the

22  hospital's bottom line by having that agreement, and

23  then the second step is to estimate cash flows without

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

155

1    the covenant in place?

2    A.   Okay.

3    Q.   It seems fairly logical; and then you subtract

4    the difference.  Is that right?  Is that your

5    understanding of how this works?

6    A.   That would be my understanding.

7    Q.   He goes on to say, "When there is a positive

8    difference between the two cash streams, it is

9    evidence that competition would do economic damage to

10   the hospital and its mission.  Thus, the use of a

11   covenant not to compete is warranted."

12        So, obviously, it makes good economic sense for

13   the hospital to have this in place, because they

14   benefit from it, right?

15   A.   Yes.

16   Q.   Now, the value -- it goes on in the next

17   paragraph and it says, "The valuation analysis,

18   however, is then completed by comparing the present

19   value of the benefits of the non-competition agreement

20   with the present value of the payments required under

21   the non-compete agreement.  The generation by this

22   present value process of a positive differential

23   provides two conclusions from the valuation

CONFIDENTIAL – PROTECTED HEALTH INFORMATION

156

1   perspective.  The first is that a reasonable amount

2   has been paid.  The second is that if there was no

3   compulsion to act and an arm's length negotiation

4   process occurred, the amount paid for the covenant

5   represents its fair market value."

6        In other words, Mr. Day is relating the value

7   that you are paying here to the benefit that the

8   hospital is receiving from having the covenant not to

9   compete; isn't that right?

10   A.   Yes.

11   Q.   And that is based on the additional business

12   that the hospital has; isn't that right?

13        MR. MULHOLLAND:  Objection.  Assumes facts

14        not in the record.  You can answer.

15   A.   It is based on the opportunity for that

16   additional business, yes.

17   Q.   The expectation?

18   A.   The hope.

19   Q.   Well --

20   A.   The hope.

21   Q.   Well, according to this, the projection of the

22   prospective cash flow?

23   A.   Yes.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

157

1    Q.   In fact, if you go to page 17, I think there is

2    actually an application of this in the table at the

3    bottom; isn't that correct?

4    A.   I'm sorry.  An application of what?

5    Q.   An application of what he just explained in

6    terms of the projected revenues, and then he shows the

7    cost of the covenant each year, and then net benefit

8    from the covenant each year going out for a period of

9    five years?

10   A.   Correct.

11   Q.   Now, in fact, during this whole process where

12   you were trying to work this out with V&S over a

13   couple of years, the hospital actually prepared a

14   number of studies or evaluations of the impact on the

15   hospital revenues.  I think you had some rough notes

16   in your own notes in April of 2001, and I'm going to

17   show you some other documents, and maybe you could

18   identify them for us.

19        This does not have a date on it; but perhaps

20   you can identify it.

21            (Deposition Exhibit No. 16 was marked for

22   identification.)

23   Q.   Mr. Leonhardt, do you know what this document

JOHNSON and MIMLESS
(412) 765-0744

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

175

1    A.    I believe Mr. Fisher prepared this.

2    Q.    And he would have been the CFO at that time?

3    A.    Yes.

4    Q.    And can you explain what this analysis shows?

5    A.    It shows that -- and I can't tell you what time

6    period, but I am sure that this is for a year, but

7    which year, I don't know.  750 admissions, 550 of

8    which were Medicare.  That would be from Vaccaro and

9    Saleh combined.  9,000 outpatient episode, 75 home

10   health referrals.  We attributed 2.7 million in

11   inpatient revenue, and so on.

12   Q.    Is this analysis, as far as you know,

13   consistent with the analysis that was done by Mr. Day

14   and Stroudwater?

15   A.    No.  I think that was much more complete.

16   Q.    Okay.  But is it consistent?

17   A.    I believe it is consistent, yeah.

18   Q.    Now, if you would turn a couple of pages until

19   you get to 4046, this is a document that says,

20   "Bradford Regional Medical Center, V&S Impact

21   Analysis."  Can you tell -- well, it looks like at the

22   bottom it says prepared by Bob Fisher and Bruce

23   Weddell.  Is that who prepared this?

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

183

1   proceeded with their planned imaging facility that

2   the -- that you would be unable to develop your

3   cardiology program?

4       A.   Yes.

5       Q.   And I guess my question is:  On a general

6   level, have you addressed that in the sense of have

7   you been able to develop a cardiology program?

8       A.   Yes.  In fact, we have.

9       Q.   And I think I asked you this question earlier,

10  but I want to make sure we are clear on this, have you

11  been able to develop your Under Arrangements Joint

12  Venture with the medical staff?

13      A.   No.

14      Q.   Is that program currently inactive?  In other

15  words, have you abandoned that, or is that still in

16  the works?

17      A.   It is not active at this point.

18      Q.   Okay.  I'm going to show you what we will mark

19  as Exhibit 20.

20               (Deposition Exhibit No. 20 was marked for

21  identification.)

22      Q.   This is a document that is entitled "Equipment

23  Sublease," and this agreement is -- it appears to be

JOHNSON and MIMLESS
(412) 765-0744

CONFIDENTIAL – PROTECTED HEALTH INFORMATION

184

1    dated -- the signatures are dated 9-22-03.  I think on

2    the front page it is dated as of October 1st, 2003.

3        A.    Correct.

4        Q.    How does this agreement relate to the prior

5    agreement which we marked as Deposition Exhibit No.

6    13?

7        A.    13 was simply a preliminary agreement.

8        Q.    This is the same subject matter as the earlier

9    one?  It is just more comprehensive?  Is that it?

10       A.    Yes; and it, in fact, is the one that was

11   executed.

12       Q.    Well, the other one we looked at was executed,

13   as well; is that right?

14       A.    It was signed, yes.  I'm sorry.

15       Q.    Are you saying that this is the agreement that

16   is actually in place right now?

17       A.    Yes.

18       Q.    And your signature appears on the signature

19   page?

20       A.    Yes.

21       Q.    If you would look at page 3 of this document --

22   actually, beginning on page 2, under Section 2,

23   Subsection (d)(i), the agreement shows the breakdown

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

185

1   of the rental payment that is due under the agreement,

2   and we talked about that a little bit earlier.

3       A.   Uh-huh.

4       Q.   Could you identify the different components of

5   the rental agreement from the agreement?

6       A.   It identifies $6,545 for the hard costs of

7   subleasing the equipment.  It as a pass-through of the

8   rental and the maintenance fee paid to GE.  Then

9   $23,655 per month for all other rights and duties for

10  sublease.

11      Q.   And that is for the first rental period?

12      A.   Yes.

13      Q.   So that would be through September 30th, 2006?

14      A.   Correct.

15      Q.   So have, in fact, those payments been made for

16  that period of time, since we are beyond September

17  30th, 2006?

18      A.   Beginning October 1st of 2003, yes.

19      Q.   So all the payments were made up through

20  September 30, 2006?

21      A.   That's right.

22      Q.   At the rate of $30,200 per month?

23      A.   Until February of 2004, when the new equipment