# EXHIBIT A

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
ERIE DIVISION

UNITED STATES OF AMERICA, ex rel.    )
DILBAGH SINGH, M.D., PAUL KIRSCH,    )
M.D., V. RAO NADELLA, M.D., and      )
MARTIN JACOBS, M.D.,                 )
                                     )
            Relators,                )
                                     )  Civil Action
    vs.                              )  No. 04-186E
                                     )
BRADFORD REGIONAL MEDICAL CENTER,    )
V&S MEDICAL ASSOCIATES, LLC,         )
PETER VACCARO, M.D., KAMRAN SALEH,   )
M.D., and DOES I through XX,         )
                                     )
            Defendants.              )

DEPOSITION OF KAMRAN SALEH, M.D.

THURSDAY, AUGUST 9, 2007

Deposition of KAMRAN SALEH, M.D., called as a witness by the Plaintiffs, taken pursuant to Notice of Deposition and the Federal Rules of Civil Procedure, by and before Joy A. Hartman, a Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania, at the offices of Fox Rothschild, 625 Liberty Avenue, 29th Floor, Pittsburgh, Pennsylvania commencing at 9:31 a.m. on the day and date above set forth.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

17

1   A.   Yes.

2   Q.   What types of referrals would you make?

3   A.   Like, if patients needed a cardiac
4   catheterization, we would send the patient for the
5   cardiac catheterization.  Some patients need an
6   endocrine evaluation, so we would send them to an
7   endocrinologist or urologist.  It was orthopedic
8   surgeons, so all kind of referrals, whatever the
9   patient's need is.

10   Q.   Would you also refer patients to the hospital
11   to be admitted as inpatients?

12   A.   Yes, we do.

13   Q.   Is it fair to say that most of your referrals
14   to a hospital went to Bradford?

15              MR. RYCHCIK:  Objection as to the form.
16   A.   Well, we refer patients wherever the
17   opportunity was, wherever the need was.  If there is
18   somebody who needed to be admitted to the hospital, we
19   admitted them to Bradford Hospital, yes.

20   Q.   Did you admit very many inpatients to Olean
21   Hospital --

22   A.   No.

23   Q.   -- or other hospitals other than Bradford?

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

18

1   A.   No.

2   Q.   Outpatient referrals, they would -- would

3   outpatient referrals primarily be referrals to have

4   tests performed on somebody?

5   A.   Tests, plus evaluation by the doctors.

6   Q.   Were a portion of those outpatient referrals

7   referred to Bradford or any other hospital?

8   A.   Part of it to Bradford, part of it to Hamot

9   Medical Center, some to Cleveland Clinic, and some to

10  UPMC, depending on the need.

11  Q.   What would be your basis for distinguishing

12  which hospital you would refer somebody to for an

13  outpatient test?

14  A.   For the testing?

15  Q.   Yes.

16  A.   That would be for whether the test is available

17  in that facility and what time frame they can get the

18  test done and what kind of reading and the quality of

19  the test performed.

20  Q.   Were there certain types of services that could

21  be performed at multiple hospitals?

22  A.   Yes.

23  Q.   What types of services would those have been?

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

19

1   A.   Like blood work, like chest x-ray.

2   Q.   And if you had to refer people out for those

3   types of services, would it be your typical practice

4   to refer them over to Bradford?

5         MR. RYCHCIK:   Objection as to the form.

6   A.   Well, what we look at when we refer the patient

7   for the lab work or for the x-rays is for the

8   convenience of the patient.  Most of our population is

9   elderly patients, and they actually -- even to come to

10  the doctor's office, they have to find a ride to come.

11  So to send them farther away is more difficult, so

12  they all usually prefer the closest possible testing

13  place.

14  Q.   And that was Bradford, correct?

15  A.   And that is Bradford.

16  Q.   These other places you mentioned -- Hamot

17  Medical Center?

18  A.   Yes.

19  Q.   Where is that?

20  A.   It is in Erie.

21  Q.   How far away is that from Bradford?

22  A.   An hour and a half.

23  Q.   I cannot remember the name of the other medical

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

35

1   frequent as it was before.
2       Q.   What would be the reason you would refer
3   somebody to, say, Bradford rather than doing it in
4   your own office?
5       A.   Sometimes it is the patient's preference. That
6   is always a factor in the decision where the patient
7   goes.
8       Q.   Would there ever be times when your camera was
9   just too busy and you didn't have -- you couldn't
10  squeeze another patient in, and you would refer them
11  over to Bradford?
12      A.   It could be.  I don't recall.  But sometimes if
13  you have to have an emergent test done, it is
14  possible.
15      Q.   But would you say the vast majority of nuclear
16  tests were done in your office?
17              MR. RYCHCIK:  Objection as to the form.
18      A.   Yes.  Most of them were done in our office when
19  we had the camera.
20      Q.   Now, in addition to the tests that would be
21  done on your nuclear camera, I assume you would also
22  have, you know, patients who would need other types of
23  tests like MRIs or CT scans, correct?

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

36

1   A.   That's true.
2   Q.   Did you have facilities in your office to
3   perform those tests?
4   A.   No.
5   Q.   Have you ever had facilities in your office to
6   perform those kind of tests?
7   A.   No.
8   Q.   Are there any other kind of diagnostic tests
9   that you have performed in your office?
10  A.   We do perform procedures in our office like
11  EKG, halter monitoring, lung function testing and
12  ultrasound testing; but not x-ray-related.
13  Q.   Do you have just a regular x-ray machine in
14  your office?
15  A.   No.
16  Q.   Similar to with the nuclear camera, would you
17  have generally referred your patients to Bradford for
18  those types of tests?
19  A.   For which types?
20  Q.   MRIs, CT scans, x-rays.
21  A.   Yes.  We would refer the patients out where it
22  was more convenient for the patients.
23  Q.   And most of the time, that would have been

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

37

1   Bradford?
2   A.   Most of the time, that would have been
3   Bradford.
4   Q.   After you got your nuclear camera, your
5   referrals to Bradford for nuclear tests would have
6   reduced, because you were doing a large number of them
7   in your own office, correct?
8   A.   Yes.
9   Q.   Other than that, do you believe there was any
10  change in your referral patterns during the period
11  that you owned or leased the nuclear camera?
12           MR. RYCHCIK:   Are you talking about just
13       nuclear camera referral patterns?
14           MR. SIMPSON:   Other than nuclear camera.
15  Q.   Nuclear camera referrals went down because you
16  were doing them in your own office.  Were there any
17  other types of referrals that you had been doing
18  previously that your referral patterns changed after
19  you got the camera?
20  A.   No.
21  Q.   Now, at some point, you were approached by
22  Bradford with some concerns they had about the fact
23  that you had leased this camera, correct?

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

74

1  Q.   When you say it came out, how did it come?

2  A.   What?

3  Q.   You say it came out. How --

4       MR. SIMPSON: Could you read back the

5  portion of his testimony where he said it came

6  out something?

7       (Previous answer read back.)

8  Q.   And when you are talking about the pure

9  competition, that is the competition on the nuclear

10 camera, correct?

11 A.   That's true.

12 Q.   So the only revenue stream that the hospital

13 was losing as a result of the competition was for the

14 nuclear camera tests that you were doing, correct?

15 A.   The tests that we used to do in the hospital,

16 yes.

17 Q.   And was it your belief that the hospital was

18 wanting you to do those tests in the hospital, instead

19 of in your office?

20 A.   No. They wanted us not to do them in the

21 office. Anywhere else, it didn't matter to them.

22 Q.   But they expected that given your prior

23 referral patterns, most of those tests would be done

1   at their facility?
2          MR. RYCHCIK:  Objection as to the form of
3      the question.
4          MR. MULHOLLAND:  Same objection.
5   A.   It would go to the pattern prior of referral.
6   Q.   And as you previously testified, most of them
7   would go to Bradford?
8   A.   Yes.  Most of the tests were done in Bradford.
9   Q.   Did you ever threaten to take your nuclear
10  camera referrals away from Bradford and send them all
11  to Olean or someplace else?
12  A.   I don't recall.
13         MR. MULHOLLAND:  Before you go on to the
14     next exhibit, Mr. Simpson, I just want to state
15     that the fact that this document was produced
16     and does have some references to peer review
17     information doesn't constitute a waiver by the
18     hospital where a peer review privilege may
19     attach to that information.
20         MR. RYCHCIK:  I was going to say that I
21     think, quite frankly, this was inadvertently
22     produced without redactions from the standpoint
23     of peer review privileges.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

83

1  would, solely in the spirit of compromise, be willing
2  to discuss a true and equal joint venture on the
3  nuclear camera if your attorneys can come up with a
4  proposal that they think is legal in today's
5  environment (and our attorneys agree)."
6    A.   Yes.
7    Q.   What were you talking about when you referred
8  to a true and equal joint venture and underlined the
9  word "equal"?
10   A.   I don't remember what it meant at that time.
11   Q.   And when you referred to "solely in the spirit
12 of compromise," what was the issue you were intending
13 to compromise on?
14   A.   Well, our thought was, you know, that we have
15 opened up a nuclear camera, and that's the business we
16 wanted to do.  We didn't want to do anything else at
17 that point.  We were thinking about further expansion.
18 So the economic credentialing issue came up because of
19 the nuclear camera, and then we have been fighting for
20 some time between the legal advice from both sides,
21 and as you know, it becomes very expensive and tiring,
22 so we really didn't want to continue going in that
23 direction and to the point of litigation and go

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

84

1  through the expense of that. So that we wanted to
2  come up with something that is more compromising for
3  both of us.
4      Q.  And the issue that you all were compromising on
5  was the economic credentialing issue, correct? I
6  mean, that is what was driving the dispute?
7      A.  That's right.
8      Q.  Now, did you say you -- did you just say you
9  were or were not intending to expand the practice
10 farther?
11     A.  We were.
12     Q.  You were? Can you flip back to the previous
13 page, the first page of Exhibit 10?
14     A.  Yes.
15     Q.  In the next-to-the-last paragraph, it starts
16 off by saying, "We do want the Board to understand, as
17 we hope we made you understand, that it is not the
18 intent of Dr. Vaccaro and myself to expand the
19 ancillary services provided by our office."
20         How is that statement consistent with what you
21 just said about that you were wanting to expand?
22     A.  Well, we definitely were wanting to expand, but
23 maybe at this point because of our discussion with the

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

104

1  most of the tests would go to Bradford?
2              MR. RYCHCIK:  Objection as to the form of
3      the question.
4              MR. MULHOLLAND:  Same objection.
5      Q.   You didn't tell Bradford, "We are going to do
6  this lease, and then I'm going to stop referring to
7  you, and I'm going to send them to Olean," did you?
8      A.   No, I didn't.
9              MR. RYCHCIK:  Objection.
10     A.   I didn't tell them that we are going to get
11 into this lease and start referring the patients to
12 you, either.
13     Q.   But your expectation was that you were going to
14 go back to the way you were doing it before?
15             MR. RYCHCIK:  Objection as to the form of
16     the question.
17     Q.   Correct?
18     A.   Yes.
19     Q.   And in point of fact, it wouldn't make much
20 sense for Bradford to enter into this arrangement if
21 you were going to refer all of your patients to
22 Bradford, correct?
23             MR. RYCHCIK:  Objection as to the form --

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

180

1        C E R T I F I C A T E

2   COMMONWEALTH OF PENNSYLVANIA    :
                                    : SS.:
3   COUNTY OF ALLEGHENY             :

4        I, Joy A. Hartman, a Notary Public in and for the Commonwealth of Pennsylvania, do hereby certify
5   that before me personally appeared KAMRAN SALEH, M.D., the witness herein, who then was by me first duly
6   cautioned and sworn to testify the truth, the whole truth and nothing but the truth in the taking of his
7   oral deposition in the cause aforesaid; that the testimony then given by him as above set forth was
8   reduced to stenotypy by me, in the presence of said witness, and afterwards transcribed by computer-aided
9   transcription under my direction.

10       I do further certify that this deposition was taken at the time and place specified in the foregoing
11  caption, and signature was not waived.

12       I do further certify that I am not a relative of or counsel or attorney for any party hereto, nor am
13  I otherwise interested in the event of this action.

14       IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Pittsburgh,
15  Pennsylvania, on this 14th day of August, 2007.

16       The foregoing certification does not apply to any reproduction of this transcript in any respect
17  unless under the direct control and/or direction of the certifying reporter.

18

19

20                          _____
                            Joy A. Hartman, Notary Public
21                          in and for the Commonwealth of
                            Pennsylvania
22

[NOTARIAL SEAL: Commonwealth of Pennsylvania, NOTARIAL SEAL, JOY A. HARTMAN, Notary Public, City of Pittsburgh, County of Allegheny, My Commission Expires May 9, 2010]

23  My commission expires May 9, 2010.

JOHNSON and MIMLESS
(412) 765-0744