# EXHIBIT

# D

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

1

1    IN THE UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2                    ERIE DIVISION

3

    UNITED STATES OF AMERICA, ex rel. )
4   DILBAGH SINGH, M.D., PAUL KIRSCH, )
    M.D., V. RAO NADELLA, M.D., and   )
5   MARTIN JACOBS, M.D.,              )
                                      )
6              Relators,              )
                                      )   Civil Action
7       vs.                           )   No. 04-186E
                                      )
8   BRADFORD REGIONAL MEDICAL CENTER, )
    V&S MEDICAL ASSOCIATES, LLC,      )
9   PETER VACCARO, M.D., KAMRAN SALEH,)
    M.D., and DOES I through XX,      )
10                                    )
               Defendants.            )
11

12      DEPOSITION OF DILBAGH SINGH, M.D.

13       TUESDAY, AUGUST 21, 2007

14      Deposition of DILBAGH SINGH, M.D., called as a

15   witness by the Defendant Bradford Regional Medical

16   Center, taken pursuant to Notice of Deposition and the

17   Federal Rules of Civil Procedure, by and before Joy A.

18   Hartman, a Court Reporter and Notary Public in and for

19   the Commonwealth of Pennsylvania, at the offices of

20   Stone Law Office, 1400 Allegheny Building, Pittsburgh,

21   Pennsylvania, commencing at 10:10 a.m. on the day and

22   date above set forth.

                              **CONFIDENTIAL**

23



CONFIDENTIAL - PROTECTED HEALTH INFORMATION

8

1    year.   Probably in the '80s sometime.

2       Q.    Do you presently have a license to practice

3    medicine in Pennsylvania?

4       A.    Yes, I do.

5       Q.    Do you also have a medical license in New York?

6       A.    That's right.

7       Q.    Are there any restrictions and limitations on

8    your license?

9       A.    None that I know of.

10              MR. MULHOLLAND:   Before we go any further,

11           Andy, I was neglecting to mention that I was

12           going to propose we enter into the same

13           stipulation that we did for Dr. Kirsch's

14           deposition.

15              What that has to do with, for you two

16           gentlemen, is that Mr. Stone had objected to a

17           number of questions that Mr. Rychcik and I had

18           asked Dr. Nadella and Dr. Kirsch yesterday and

19           instructed them not to answer.

20              We took exception with those instructions,

21           and we have asked the court reporter to mark

22           certain pages from their depositions for

23           further review, and we may take it up with the

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

9

1    Court as to whether or not those questions

2    should have been answered.

3         So I believe what we stipulated to

4    yesterday is to the extent I asked or Mr.

5    Rychcik asked questions of either Dr. Kirsch or

6    Dr. Nadella yesterday, and Mr. Stone objected

7    and instructed them not to answer, that we

8    would assume that we would ask you and in Dr.

9    Jacobs' deposition, Dr. Jacobs, the same

10   questions, and that he would object in the same

11   manner.

12        Is that okay with you, Andy?

13        MR. STONE:  Yes.  That is correct.  I

14   think it is fair to say that if the same

15   questions were asked of Dr. Singh and of Dr.

16   Jacobs that you asked to Dr. Nadella, I would

17   have the same objection and make the same

18   arguments; and, of course, you would take the

19   same exception to that, to my instruction to

20   the witness not to answer.

21        MR. MULHOLLAND:  Thus, we would reserve

22   the right to ask the Court to allow us to ask

23   the same questions of Dr. Singh and Dr. Jacobs.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

10

1          MR. STONE:  Yes. I think that would be

2      correct.

3          MR. RYCHCIK:  I join in the stipulation on

4      behalf of V&S and Dr. Vaccaro and Dr. Saleh.

5          MR. MULHOLLAND:  Thank you.

6   Q.   Doctor, are you specializing in any particular

7   type of medical practice today?

8   A.   No.  I do general practice.

9   Q.   General practice?

10  A.   General medicine, general practice.

11  Q.   Are you Board certified by any specialty board?

12  A.   No, I am not.

13  Q.   Did you ever take a Board certification exam

14  and fail to pass?

15  A.   No, I didn't take any.

16  Q.   Doctor, can you please briefly describe your

17  education, starting with the your college education,

18  moving on through medical school, and then any

19  residency programs or internships that you may have

20  participated in?

21  A.   Oh, that will take you backward then now from

22  my time of graduation?

23  Q.   Yes.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

27

1    one criteria that you would use to decide where to

2    refer some patients.  What other criteria, if any, do

3    you use when you decide to refer a patient for needed

4    medical services?

5        A.    That is the main thing.  The main thing is

6    choice and also the convenience for the family and the

7    patient, where they can transport easily and all of

8    that, yes.  It does play a lot of role in that.  In

9    any practice, it will.

10       Q.    Does any financial relationship that you have

11   with an entity to which you refer patients that would

12   influence your decision to refer?

13               MR. STONE:  I'm going to object to

14          questions along this line to refer for reasons

15          that Judge Cohill has previously indicated that

16          the business practices and professional

17          practices of the Plaintiffs is not an issue in

18          the case, and, therefore, it is not relevant

19          and discoverable, and I am going to instruct

20          the witness not to answer.

21               MR. MULHOLLAND:  And we take exception

22          with that objection and ask that it please be

23          certified for review by the Court.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

54

1    the Medical Center to the Government that you would

2    consider false, any specific statement?

3        A.    I don't have any.  None has been provided to

4    me.

5        Q.    Doctor, are you aware of any claim for payment

6    submitted by the Medical Center to any third-party

7    payor for unnecessary services?

8        A.    Not has been provided to me.  I don't know.

9        Q.    Are you aware of any claim submitted to the

10   Medical Center submitted to any third-party payor for

11   any services that were not provided by the Medical

12   Center?

13       A.    I have no idea about those things.

14       Q.    Doctor, if you could take a look at paragraph

15   11 in the Complaint, and let me know when you are

16   ready to answer some questions about it.

17       A.    Okay.

18       Q.    Doctor, this paragraph refers to a statement of

19   material evidence that you and the other Relators

20   filed with the Government around the time you filed

21   the Complaint.

22            Have you ever seen the statement of material

23   evidence that is referred to in this paragraph?

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

55

1          MR. STONE:  I'm going to object to any

2     questions with regard to the so-called

3     disclosure statement that was filed in this

4     case, because, again, this is the subject of a

5     prior order by Judge Cohill.

6          I believe the order and opinion are clear

7     that the Defendants at this stage are not

8     entitled to that statement, and I believe,

9     also, that they are not entitled to the

10    contents of that statement by questioning the

11    witness, the witnesses, the Relators in this

12    case.

13         I would agree that the Defendants are free

14    to question Dr. Singh and any of the other

15    Relators with regard to any material evidence

16    that supports the Complaint in this case, and,

17    certainly, you have the opportunity to ask

18    those questions here today, as you did with the

19    other Relators in this case.

20         MR. MULHOLLAND:  Let me just suggest that

21    I was asking him if he had ever seen a copy of

22    the statement of the material evidence.  I

23    hadn't got to the subject matter of that

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

56

1      statement.

2           I know we went through this yesterday, and

3      I presumed our stipulation would cover those

4      questions and objections.

5           I just wanted to know to lay the

6      foundation for a question that I think even

7      you, Mr. Stone, would admit to be valid, and

8      that is a question about the subject matter of

9      the statement that I could ask him.

10          If he hasn't seen the statement, there is

11     no use to ask any other questions about it.

12          MR. STONE:  I think -- my only point is I

13     don't think you are entitled to know what that

14     communication was.

15          I think what you are entitled to know is

16     the material evidence that supports the

17     Complaint in this case.  I think you have been

18     asking those questions, and you are entitled to

19     continue asking those questions.

20          But I think the Order is clear that the

21     disclosure statement itself is a communica-

22     tion with the Government that we believe is

23     privileged, and the Court has ruled that it is

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

57

1          not discoverable at this stage.

2              So just as the statement itself is not

3          discoverable in terms of producing that

4          statement, I think the questions about what is

5          in that statement are equally off limits.

6              MR. MULHOLLAND:  Well, I haven't even

7          gotten to those questions.  I just wanted to

8          know if he saw a copy of the statement of

9          material evidence.  If he didn't see one, then

10         he, obviously, can't answer questions about it.

11             MR. STONE:  You can ask him the question

12         if he remembers seeing it or not; but anything

13         further than that, anything about the

14         communication, what was in the communication, I

15         think are off limits.

16     Q.    Doctor, do you remember seeing a copy of the

17     statement of material evidence that was referred to in

18     paragraph 11 of your Complaint.

19     A.    The statement regarding what?

20     Q.    There is a reference to something called a

21     statement of material evidence in paragraph 11 of your

22     complaint.

23     A.    Can you explain to me what is the statement of

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

66

1    Q.    10 to 15 or 15 to 20 to buy the camera or to

2    lease it?

3    A.    For the buy -- for buying the camera, for that

4    kind of a camera, buying, not leasing, buying it.  A

5    lease would run into, maybe, a few hundred dollars per

6    month if we take it for three years or five years, and

7    if you have a calculator, I could calculate for you

8    how much it would cost with interest.  It is not that

9    difficult.

10    Q.    Aside from your experience as a physician who

11    has occasion to lease equipment, do you have any other

12    special expertise in valuing medical equipment?

13    A.    Not expertise.  I am not in that business; but

14    looking at the equipment and getting a couple or three

15    quotes from different vendors, one has to make up

16    their mind what is available in the market and what

17    they are charging.

18    Q.    Do you have a nuclear camera in your office?

19    A.    No.

20    Q.    Do you have any plans to put a nuclear camera

21    in your office?

22         MR. STONE:  I am going to object to any

23         questions about Dr. Singh's practice and his

67

1          plans, because it is irrelevant, and it is the

2          subject of a prior order, and I direct the

3          doctor not to answer.

4              MR. MULHOLLAND:  Again, I will ask that

5          that be marked for certification to the Court;

6          but I will say that in response, his prior

7          testimony immediately before that question, I

8          think made it relevant in terms of his

9          knowledge or expertise relative to the value of

10         equipment.

11             MR. STONE:  Well, I think we can argue

12         about that when we argue the issue to Judge

13         Cohill.

14             (Question certified for later discussion.)

15     Q.  Doctor, just let ask you another question on

16     the lines of trying to again probe your knowledge of

17     the value of the equipment.  I believe you stated you

18     have an investment interest in Tri-County Diagnostics?

19             MR. STONE:  I'm also going to object to

20         that question and direct him not to answer.

21             (Question certified for later discussion.)

22     Q.  Did you play any role in terms of selecting

23     equipment for Tri-County Diagnostics?

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

75

1    is what administration wants to do and not go around

2    it, and then do only with one or two physicians,

3    preferentially, just select them because of volume or

4    because of their practices or whatever it is, and that

5    others are left out in the cold, and they have

6    supported the institution for so many years.  Many of

7    us have been there for almost 25 years.

8        Q.    Is it your understanding that this policy on

9    physicians with significantly competing relationships

10   is still in effect at the hospital?

11       A.    I do not know whether it is or it is not, but

12   it has not been implemented.  That, I know.

13       Q.    How do you know that?

14       A.    Because of whatever has gone on between Vaccaro

15   and Saleh and the hospital.  Whatever arrangements

16   they have privately now going on, which most of the

17   people know it, that they have arrangements with them,

18   that they are getting paid for some equipment, some

19   money here and some money there.

20           What kind of monies they are paying them and

21   why they are paying them, we don't know that as to

22   what kind of arrangement they have with them.

23       Q.    Did the hospital ever send any communication to

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

76

1    you or to Dr. Nadella about whether or not your

2    interest in Tri-County would violate this policy?

3              MR. STONE:  I will object and direct you

4         not to answer.

5              MR. MULHOLLAND:  Again, I'm asking about

6         the policy, which I think is directly relevant,

7         based on allegations made in the Complaint

8         about it not being applied to Drs. Vaccaro and

9         Saleh.

10             MR. STONE:  To the extent that you are

11        focusing on Dr. Singh and Dr. Nadella's

12        practice, I think it is irrelevant.

13             Again, you can ask him whether he knows

14        whether it is currently in effect, and whether

15        it is applied to anybody else.  Again, getting

16        into his conduct, I think is irrelevant.

17             MR. MULHOLLAND:  Well, again, I will take

18        exception to that objection and ask that that

19        page be marked and certified to the Court.

20             (Question certified for later discussion.)

21    Q.   Let me ask you a different question, Doctor:

22    Has the Medical Center ever made an inquiry to you

23    about interests that you have with competing entities

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

77

1    for the purpose of applying the policy?

2         MR. STONE:   Again, I will object and

3         direct him not to answer.

4              (Question certified for later discussion.)

5    Q.   Doctor, in the third paragraph of the letter

6    that you have in front of you --

7         MR. MULHOLLAND:   By the way, please mark

8         that objection, as well.

9    Q.   Doctor, in the third paragraph of the letter

10   you have in front of you, you seem to express concern

11   over how the Medical Center uses its charitable

12   resources; is that correct?

13   A.   That is what it says.

14   Q.   What, specifically, were your concerns about

15   the Medical Center's use of its charitable resources

16   that you voiced in this letter?

17   A.   See, it is a very broad thing, because the

18   hospital is supported by communities.  Okay?  And

19   every time there is money required for certain things

20   to be done in the hospital, renovations or new

21   equipment they want to buy, they do expect some

22   community members or some community people or some

23   businesses to keep on supporting them.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

112

1    Onderdonk?

2        A.    Yes.

3        Q.    Do you recall who Mr. Onderdonk is?

4        A.    I don't remember the name, particularly, but

5    that is where the call came from.

6        Q.    This letter seems to suggest that he works for

7    Philips Medical Systems?

8        A.    That is what it says on the letterhead, yes.

9        Q.    In the first paragraph, he is thanking you for

10   the opportunity -- "Thank you for the opportunity to

11   propose a Philips' solution for your nuclear medicine

12   project in Bradford."

13       A.    As I said, we do ask for different modalities

14   at different times from our office, not only for the

15   camera, but for other things, too, and this happens to

16   be a camera.

17       Q.    He references a nuclear medicine project in

18   Bradford.

19       A.    Yes.

20       Q.    At this time period, was there a nuclear

21   medicine project in Bradford you were considering?

22       A.    We were considering in our own office, yes --

23             MR. STONE:    I'm going to object to any

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

113

1    testimony regarding Dr. Singh's business plan

2    or ventures, again, as being the subject of

3    Judge Cohill's prior order, and I direct him

4    not to answer any questions about the project.

5         However, this is a letter that was

6    produced with regard to the discovery in this

7    case, and he can answer whatever questions he

8    knows about the contents of the letter and,

9    generally, the circumstances; but I'm not going

10   to let him get into any venture he may have

11   been considering.

12        MR. RYCHCIK:  Again, I disagree.  I think

13   to the extent that he is relying on the

14   information in here, that is relevant as to

15   whether or not this was solely intended just to

16   gather information regarding the lease, the

17   sublease at issue; but if you are instructing

18   the witness not to answer --

19        MR. STONE:  I am instructing him not to

20   answer with regard to any plans that he may

21   have had to do any kind of a business venture.

22        But, obviously, to the extent that it is

23   relevant to the claims in the case, which is

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

114

1    the value of this particular equipment, I think

2    you can ask him about it, and he can answer

3    those questions.

4        MR. MULHOLLAND:  I think any letter that

5    was produced in discovery and which is subject

6    to the witness' testimony today would allow for

7    questions about the meaning of terms in the

8    letter.  So I think the question about what is

9    meant by a nuclear medicine project is a fair

10   question, notwithstanding your objection, but

11   with which we would take an exception.

12       MR. STONE:  I mean, is there a question on

13   the table?  Maybe we should go back.  I think I

14   already instructed him not to answer.  Do you

15   want to check?

16       (Previous question and answer read back as

17   follows:

18       "Question:  At this time period, was there

19   a nuclear medicine project in Bradford you were

20   considering?

21       "Answer:  We were considering in our own

22   office, yes --")

23       MR. STONE:  Again, I will direct him not

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

115

1    to answer with regard to any questions about

2    any business venture or plans that he had for a

3    business venture, because I don't think it is

4    germane to this case, and --

5         MR. RYCHCIK:  I don't think you can have

6    your cake and eat it, too, and ask for or rely

7    upon a document for specific information, as

8    Mr. Mulholland said, and not permit us to ask

9    questions about the terms.

10        If you could note this page, as well.

11        (Question certified for later discussion.)

12        THE WITNESS:  Do you want me to answer the

13    single-head camera thing that they had and that

14    is what the lease is?

15        MR. STONE:  Doctor, let him ask the

16    questions.

17        THE WITNESS:  I'm sorry.

18    Q.    Doctor, let me ask you this:  You clearly, from

19    this letter, approached a Philips Medical Systems

20    representative to get information regarding various

21    nuclear cameras, correct?

22    A.    Whatever information they could send, yes.

23    Q.    Well, you were asking for information about --

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

152

1    Q.    Do you know if they offer the same types of

2    services?

3    A.    That is the same -- it is the same kind of

4    services are offered, nuclear imaging, yes.

5    Q.    Do you know if the camera at BRMC is newer than

6    the camera located at Tri-County?

7    A.    I cannot predict that.  I don't know.

8    Q.    Have you ever been subject to a non-compete

9    agreement?

10            MR. STONE:  I'm going to object to this

11        question, and I instruct him not to answer for

12        the reasons stated in Judge Cohill's order.

13            MR. RYCHCIK:  Again, I would like to note

14        this page for purposes of providing it to Judge

15        Cohill.

16            (Question certified for later discussion.)

17    Q.    Have you ever required a non-compete agreement

18    of any of your employees?

19            MR. STONE:  Again, I'll object to the

20        question for the same reason.

21            MR. RYCHCIK:  One of the things that --

22            MR. STONE:  And I instruct him not to

23        answer.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

153

1        MR. RYCHCIK:  One of the things that has

2    been testified to is the non-compete portion of

3    the sublease agreement between V&S and BRMC;

4    and because of that, once again, I think we are

5    entitled to refute allegations regarding the

6    non-compete portion of the sublease and the

7    value of the non-compete portion of the

8    sublease with respect to what is being alleged

9    here by the Relators in their Complaint.

10       MR. STONE:  The value of the non-compete

11   or the value of the lease, it seems to me, is

12   an element of a defense that you have the

13   burden of proving.  Now, I don't think you have

14   a right to cross-examine this witness to try to

15   make him an expert so that you can somehow

16   establish an element in a defense that you are

17   trying to establish.

18       You have asked this witness and other

19   witnesses their opinion about it, but that has

20   nothing to do with whether you have met your

21   burden to establish an element of the

22   exception.

23       It seems to me that if you have to prove

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

154

1     that there was fair market value for this

2     particular part of the agreement, that is

3     something that you have to do independent of

4     what this witness thinks about it.

5          And so, therefore, I don't understand why

6     his opinion on what a non-compete should be has

7     anything to do with your defense in this case.

8          MR. RYCHCIK:  Well, the allegations came

9     from him in this Complaint, and the allegations

10    regarding the non-compete came from him; and as

11    a result of that, we are entitled to refute

12    those allegations and to understand the basis

13    for the allegations and the basis for the

14    conclusions that he and his fellow Relators

15    made prior to making those allegations.

16         MR. MULHOLLAND:  Or the lack of

17    information about the same.

18         MR. STONE:  The allegations about the

19    non-compete and the value of the non-compete

20    didn't come from us.  We have alleged that

21    those are kickbacks, that the payments that

22    were made pursuant to that lease were for the

23    purpose of inducing referrals.  Your defense is

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

155

1    that somehow this is related to the fair market

2    value of a non-compete.

3         This witness isn't, you know, going to be

4    the determination of whether that is fair

5    market value for that particular service that

6    you are alleging that you purchased through

7    this lease agreement.

8         MR. RYCHCIK:  I think, quite frankly,

9    there has been testimony over the course of the

10   last two days regarding the value of the other

11   services portion of the sublease; and with

12   respect to those allegations, I think we are

13   entitled to explore those issues and to explore

14   the basis for the testimony that has been given

15   by the Relators as to those values.

16        MR. STONE:  Well, in this case, these

17   witnesses are not -- if the value of that

18   particular part of the contract is an issue,

19   these witnesses are not going to be the

20   witnesses that are going to testify that that

21   is not a proper value.

22        MR. RYCHCIK:  But that still doesn't give

23   you the basis to instruct him not to answer

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

156

1     these questions.

2         MR. MULHOLLAND:  Because we can put them

3     on the stand to establish that they have no

4     knowledge of that, which then goes to the

5     credibility of their allegations, and,

6     secondly, it narrows down who can testify about

7     it.

8         I just note for the record that in the

9     Complaint, you alleged in paragraph 82, that

10    $23,655 a month was paid under the lease for

11    all other rights and duties including a

12    covenant not to compete.

13        In paragraph 85, you say that the hospital

14    has no need for the non-compete because of the

15    policy on competing relationships.  Then you

16    say, assuming a need, the amount is

17    commercially unreasonable.

18        You also say in 87 that the sublease

19    agreement is a sham, which I understand that to

20    be your argument, which we would reject; but in

21    88, you say the purpose of the sublease

22    prohibits them from competing, and then the

23    primary purpose is to give a substantial

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

157

1    financial incentive.

2        All of it makes any of these Relators

3    information about non-competes that they have

4    been party to, their understanding of the

5    non-compete, absolutely relevant to our

6    defense.

7        MR. STONE:  Well, it is not relevant,

8    because what they have done in their own

9    practices is not before the Court.  That

10   doesn't justify anything that V&S and BRMC have

11   done.  It is not a defense.  It is not an

12   exception to the Stark Law, and it is not a

13   safe harbor to the Anti-kickback.

14       So these doctors could have all kinds of

15   different arrangements, and what they have done

16   in their own practices is not relevant to what

17   V&S and BRMC has done and whether that is

18   legal.

19       MR. MULHOLLAND:  Well, we think it is

20   absolutely relevant, and we also think it is

21   relevant to establish whether or not they know

22   what they are talking about when they make

23   these kind of allegations against our clients.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

158

1           At this point, I will say let's leave it

2       to the Judge.

3           MR. STONE:  Again, the Court will

4       determine whether they know what they are

5       talking about when they made these allegations.

6           I mean, there is certainly sufficient

7       evidence that we have obtained directly from

8       the Defendants about what the Defendants are

9       doing.

10          So the opinion that Dr. Singh has on

11      whether it is a good non-compete or a properly

12      valued non-compete may be irrelevant to whether

13      what you have done is legal or illegal.

14          MR. MULHOLLAND:  We don't think it is; but

15      at this point, I would just join in the

16      exception that Mr. Rychcik made to your

17      objection and ask that we continue, so that Dr.

18      Jacobs can have his say today.

19          MR. STONE:  I'm trying to remember where

20      we were.

21  BY MR. RYCHCIK:

22      Q.   I asked you if you required a non-compete

23  agreement of any of your employees?

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

159

1          MR. STONE:  And I'm going to object that
2      and instruct him not to answer for the same
3      reasons that we have argued over and over and
4      over.
5          (Question certified for later discussion.)
6    Q.  You testified earlier you wished that you would
7  have been able to have Dr. Saleh have a non-compete
8  agreement.  Do you recall that?
9    A.  Not wish to have, but I think we didn't have
10  because of the visa and all that being there.  So if
11  it was not there, it was not there.  I didn't care.
12    Q.  Would you agree that if it is enforceable, a
13  non-compete agreement can provide value?
14    A.  I don't know.  I have never had a chance to go
15  that route.  I don't know.
16    Q.  Why was it that you thought it would be nice to
17  have a non-compete with Dr. Saleh?
18    A.  I think it serves, basically, only the purpose
19  that if somebody stays with you in an area for more
20  than a few years, then if they open up their own shop
21  next to you, you end up losing your business to this
22  guy whom you hired first and hoped to be kind of
23  continuing the services, then for that reason only, I

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

170

1    A.    From Bradford Hospital, CT and MRI?

2    Q.    Yes.  Are there services available in Bradford

3    for CT and MRI at any place other than the Medical

4    Center?

5    A.    Not that I know of, not in Bradford area.  But

6    in adjoining area, yes.  Olean, yes.  Olean is only

7    under 20 miles, maybe 15, 18 miles from Bradford.

8    Q.    If you were to refer a patient for a nuclear

9    cardiology test, did you ever consider the type of

10   equipment needed to do the test?

11            MR. STONE:  Again, I will object to the

12        extent that you are asking Dr. Singh about his

13        practices with regard to making referrals.

14            I think it is -- I don't know if you

15        wanted to rephrase that in a different way that

16        is sort of gets at your discussion earlier,

17        maybe it can be asked a different way.

18            MR. MULHOLLAND:  Again, I will take

19        exception to your objection, but I will ask

20        another question.

21            (Question certified for later discussion.)

22   Q.    Doctor, do physicians when they are asking

23   where to send the patient for a nuclear cardiology

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

171

1    test ever consider the type of equipment needed for

2    that test?

3      A.    I think it depends on the individual physician,

4    how they are looking at what kind of results they get

5    from there, and what kind of equipment is being used.

6          Whatever information they have, they have to

7    take a decision on that, and in medical technology,

8    the kind of ongoing new equipment, new devices, new

9    things, do keep on coming and one keeps on looking for

10   upgrading to provide better services to each and

11   everybody.

12     Q.    Do you know if the equipment, the nuclear

13   cardiology equipment presently in place at Bradford

14   Regional Medical Center is newer than that available

15   at Tri-County?

16     A.    I don't know.  I don't know.

17     Q.    Do you refer to both Tri-County and Bradford

18   Regional Medical Center?

19          MR. STONE:  Again, I will object to the

20          extent that it asks questions about Dr. Singh's

21          business and his referral relationships that

22          are not relevant.

23          (Question marked for later discussion.)

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

173

1                    C E R T I F I C A T E

2    COMMONWEALTH OF PENNSYLVANIA      :
                                        :   SS.:
3    COUNTY OF ALLEGHENY               :

4         I, Joy A. Hartman, a Notary Public in and for
     the Commonwealth of Pennsylvania, do hereby certify
5    that before me personally appeared DILBAGH SINGH,
     M.D., the witness herein, who then was by me first
6    duly cautioned and sworn to testify the truth, the
     whole truth and nothing but the truth in the taking of
7    his oral deposition in the cause aforesaid; that the
     testimony then given by him as above set forth was
8    reduced to stenotypy by me, in the presence of said
     witness, and afterwards transcribed by computer-aided
9    transcription under my direction.

10        I do further certify that this deposition was
     taken at the time and place specified in the foregoing
11   caption, and signature was not waived.

12        I do further certify that I am not a relative
     of or counsel or attorney for any party hereto, nor am
13   I otherwise interested in the event of this action.

14        IN WITNESS WHEREOF, I have hereunto set my hand
     and affixed my seal of office at Pittsburgh,
15   Pennsylvania, on this 26th day of August, 2007.

16        The foregoing certification does not apply to
     any reproduction of this transcript in any respect
17   unless under the direct control and/or direction of
     the certifying reporter.

18

19

20                          _____
     Commonwealth of Pennsylvania
           NOTARIAL SEAL
21   JOY A. HARTMAN, Notary Public     Joy A. Hartman, Notary Public
     City of Pittsburgh, County of Allegheny   in and for the Commonwealth of
     My Commission Expires May 9, 2010
22                                      Pennsylvania

23   My commission expires May 9, 2010.