# EXHIBIT E

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

1

1   IN THE UNITED STATES DISTRICT COURT

2        FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3             ERIE DIVISION

4

5   UNITED STATES OF AMERICA, ex rel. )
    DILBAGH SINGH, M.D., PAUL KIRSCH, )
    M.D., V. RAO NADELLA, M.D., and   )
6   MARTIN JACOBS, M.D.,              )
                                      )
7             Relators,              )
                                      )   Civil Action
8        vs.                          )   No. 04-186E
                                      )
9   BRADFORD REGIONAL MEDICAL CENTER, )
    V&S MEDICAL ASSOCIATES, LLC,      )
10  PETER VACCARO, M.D., KAMRAN SALEH,)
    M.D., and DOES I through XX,      )
11                                    )
              Defendants.             )
12

13        DEPOSITION OF V. RAO NADELLA, M.D.

14        MONDAY, AUGUST 20, 2007

15        Deposition of V. RAO NADELLA, M.D., called as a

16  witness by the Defendant Bradford Regional Medical

17  Center, taken pursuant to Notice of Deposition and the

18  Federal Rules of Civil Procedure, by and before Joy A.

19  Hartman, a Court Reporter and Notary Public in and for

20  the Commonwealth of Pennsylvania, at the offices of

21  Stone Law Firm, 1400 Allegheny Building, Pittsburgh,

22  Pennsylvania, commencing at 10:03 a.m. on the day and

23  date above set forth.

CONFIDENTIAL



JOHNSON and MIMLESS
(412) 765-0744

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

37

1    questions about it.

2        A.    Okay.

3        Q.    Doctor, this paragraph 11 of the Complaint

4    refers to a statement of material evidence that you

5    and the other Relators filed with the Government

6    around the time you filed the Complaint.  Have you

7    ever seen this statement of material evidence?

8                MR. STONE:  I'm going to object to any

9            questions with regard to the disclosure

10           statement itself.  Again, I have no objection

11           to your asking questions about the factual

12           basis for the complaint, and I think that that

13           is what the intent of your questioning is.

14               But to the extent that you are asking

15           specifically about the disclosure statement, we

16           believe that that is a privileged document, and

17           a privileged communication with the Federal

18           Government, and that the Defendants are not

19           entitled to that under the terms of the Judge's

20           previous order.

21               MR. MULHOLLAND:  Well, my recollection of

22           the Judge's previous order on this matter -- it

23           was a different order than the one you had

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

38

1    introduced as an exhibit at this deposition --

2    were that the Defendants could ask the Relators

3    information regarding factual statements that

4    may have appeared in that statement of material

5    evidence prior to the Judge making a decision

6    as to whether he would allow us to have a copy

7    of that statement or portions of that

8    statement.

9        That is the question that I am asking

10   today, as to, you know, his recollection, if he

11   has seen the statement.

12       If he hasn't seen the statement, then that

13   answers that question.  If he has seen the

14   statement and can recall facts that were

15   alleged in the statement, I think I have the

16   right to ask him that.  If he says no, then we

17   will go back to the Judge.

18       MR. STONE:  I don't think you have a right

19   to know what is in the statement.  I think you

20   do have a right to know the factual basis for

21   the Complaint and the facts that underlie the

22   case.

23       So you can ask him questions about the

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

39

1        facts of the case, but I don't think that you

2        have the right to inquire about the content of

3        the disclosure statement.

4            MR. MULHOLLAND:  Well, I certainly could

5        ask him whether he has seen the disclosure

6        statement.  That is not asking about the

7        contents.

8            If he says no to that, then I don't have

9        much more to ask him.  If he has seen the

10       disclosure statement, then I think that I can

11       ask him the factual information that was

12       subject to disclosure to the Government.

13           MR. STONE:  Well, that is the facts of the

14       case, and I think you can ask him the facts of

15       the case.

16           I don't think you can ask him about the

17       communication to the Government.

18           MR. MULHOLLAND:  The reading -- and Mr.

19       Rychcik was just kind enough to give me a copy

20       of the Judge's order, and it was Document 69

21       filed in this case.

22           The Judge says that, "BRMC will certainly

23       have the opportunity to ask the Relators

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

40

1      directly about the factual information that was

2      the subject of the disclosure to the United

3      States."

4          I think that that puts the general factual

5      background about the case into the context of

6      what might have been disclosed to the

7      Government.  Again, not work product, but

8      facts.

9          MR. STONE:  No.  My point is that the

10     factual basis for the case is something that

11     you have right to question him about.

12         What you don't have a right to question

13     him about is the disclosure to the Government;

14     and I don't see any need why at this point in

15     time you can't just ask him about the facts of

16     the case, and why it is necessary to ask him

17     specifically about the disclosure to the

18     Government.

19         MR. MULHOLLAND:  That is not how I read

20     the Judge's order.  I read it the same.  We can

21     ask for factual information that may have been

22     in the disclosure statement, and if we can't

23     get it on deposition, we can then ask the Court

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

41

1    again for the ability to see the disclosure

2    statement.

3        MR. RYCHCIK:   Again, the next sentence

4    goes on to say, "Until the depositions are

5    taken and other factual discovery is completed,

6    BRMC cannot show that they cannot obtain a

7    substantial equivalent of the disclosure

8    statement without undue hardship."

9        I mean, the Judge is contemplating that

10   the factual information contained in the

11   disclosure statement, and this is the subject

12   of the disclosure to the United States, is

13   something that is relevant for counsel to ask

14   about it.

15       MR. STONE:   Let me take a look at that.

16       Referring, specifically, to the Judge's

17   opinion, I don't think it says that the factual

18   information that was contained in the

19   disclosure statement.

20       It merely says, "The factual information

21   that was the subject of the disclosure to the

22   United States," which, again, is the facts

23   underlying the case.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

42

1    Your questioning today is regarding the

2    facts underlying the case, and I don't have a

3    problem with your asking about any of the facts

4    in the case, any of the allegations in the

5    Complaint.

6    The problem I have is where you are asking

7    specifically of this witness questions about

8    the disclosure to the Government; and that, I

9    think, is not contemplated by this Order.

10    I am going to instruct the witness not to

11    answer any questions with regard to communica-

12    tions with the Government, and, specifically,

13    the disclosure statement.

14    MR. MULHOLLAND:  Well, we would certainly

15    take issue with that; and if you would please

16    mark this portion of the record, as well.

17    MR. RYCHCIK:  Again, like I said, in the

18    next sentence is the issue, and that is the one

19    you didn't focus on, Mr. Stone; and that is the

20    fact that the Judge contemplated the parties

21    being able to obtain the substantial equivalent

22    of the disclosure statement.

23    MR. STONE:  And my response to that is by

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

43

1          being able to ask factual questions with regard

2          to the allegations in the Complaint and the

3          facts underlying the Complaint, I think that is

4          the substantial equivalent that the Judge is

5          referring to, and so I don't see any need at

6          this point in time -- if you can ask all the

7          questions you want about the Complaint and the

8          facts underlying the Complaint, I don't see any

9          reason for you to be able to inquire about the

10          communications with the Government.

11              (Question certified for later discussion.)

12      BY MR. MULHOLLAND:

13      Q.   Subject to that objection and our exception to

14      the objection, let me ask you a different question

15      straight from the Judge's order:  Dr. Nadella, do you

16      recall the factual information that was the subject of

17      the disclosure to the United States?

18      A.   Can you clarify?  I'm not understanding your

19      question, you know.

20      Q.   The Judge said that we are allowed about the

21      factual information that was the subject of your

22      disclosure to the United States Government.

23      A.   Okay.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

44

1    Q.    My question is:  Do you recall what that

2    factual information was, which was the subject of your

3    disclosure to the Government?

4    A.    Okay.  Right.  As I understand -- you know, I

5    still didn't understand the question that well, but

6    I'm going to answer, and if my answer is not correct,

7    you ask me again.

8         The way I understand that is is that the

9    agreement that they had, that V&S had with BRMC was

10   part of the factual disclosure, and that was the

11   center of the, you know, the allegation.

12   Q.    Was the agreement that you just referred to the

13   same written agreement which is attached to your

14   Complaint?

15   A.    Yes, sir.

16   Q.    So you are saying you gave a copy of that

17   written agreement to the Government?

18        MR. STONE:  Again, I'm going to object to

19        communications that he had with the Government.

20        If you want to ask him whether that was the

21        factual basis for the Complaint, I think you

22        can ask that.

23        MR. MULHOLLAND:  I think I can ask him if

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

45

1          he disclosed to the Government, but let me ask

2          that second question, then.

3                (Question certified for later discussion.)

4     Q.   Doctor, was the actual agreement that you

5     attached to the Complaint part of the subject of the

6     factual information?

7     A.   Yes.  Yes.

8     Q.   Now, again, I'm going to ask you these

9     questions.  I anticipate your attorney may object, but

10    I want to get them on the record for future use, as

11    needed.

12    A.   Okay.

13    Q.   Doctor, did you ever speak or meet with Special

14    Agent Connie Murray from the Office of Inspector

15    General?

16               MR. STONE:  I'm going to object to the

17          question.

18               MR. MULHOLLAND:  Are you instructing him

19          not to answer?

20               MR. STONE:  I'm instructing him not to

21          answer.

22               MR. MULHOLLAND:  Again, any time where the

23          Relators' attorney is instructing his clients

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

46

1              not to answer, I would ask that you mark that

2              for future reference.

3                     (Question certified for later discussion.)

4       Q.    Did any of the other Relators ever tell you

5    that they spoke to any Government agents or attorneys

6    about the facts alleged in the Complaint, outside the

7    presence of your counsel?

8                     MR. STONE:  I'm going to object to any

9              communications with regard to the Government,

10             and I'm going to instruct the witness not to

11             answer.

12                    (Question certified for later discussion.)

13      Q.    Doctor, if you could turn to paragraph 83 in

14   the complaint --

15      A.    Which page, please?

16      Q.    It is on page 21.

17      A.    21, okay.

18      Q.    Let me know when you are ready to answer a

19   couple of questions about it.

20      A.    Okay.  Yes.

21      Q.    Doctor, here you say that BRMC has no actual

22   need for the leased property.  Is the leased property

23   you are referring to in this paragraph the same

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

97

1    A.    Yes.

2    Q.    Correct?

3    A.    I do know that the lease was in effect, but the

4    lease talked about the GE camera.

5    Q.    I see.

6    A.    The GE camera, we know, was never at the BRMC

7    location, so we presumed that the lease ended there,

8    and the camera that was placed at BRMC, I presumed all

9    along, was a lease owned by BRMC.

10    Q.    When did you first receive a copy of the lease,

11    the one that you said was put in your mailbox?

12    A.    I think around it was around November of 2003.

13    Q.    So from that point on, from November of 2003

14    on, did you have any occasion to refer patients to the

15    hospital for diagnostic nuclear cardiology tests?

16    A.    Yes.

17    Q.    Again, in your interrogatory answers, you

18    mentioned that you had an investment interest in the

19    Tri-County Diagnostic facility, correct?

20    A.    Yes.

21            MR. STONE:  I will object to any questions

22        relating to his investment interest as being

23        the subject of Judge Cohill's prior order and

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

98

1    not relevant to this case, and I'm going to

2    direct him not to answer any questions about

3    that.

4        MR. MULHOLLAND:  I am just asking a

5    question to confirm that, in fact, that was his

6    answer, and I believe that it was, to his

7    interrogatories, that he had an investment

8    interest.  I haven't asked any questions yet

9    about the nature of that interest.

10        I think it is already established for the

11    record that he had an interest.

12        MR. STONE:  The answers to the interroga-

13    tories, part of the answers to interrogatories

14    and those were provided, and those are

15    verified, and I don't think there is any need

16    to question any further about any those.

17        MR. RYCHCIK:  Judge Cohill didn't indicate

18    in his order that any reference to Tri-County

19    was off limits.

20        What Judge Cohill ruled was providing any

21    further information about the particulars of

22    the financial relationship was something that

23    wasn't relevant.  That was specifically in

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

99

1      response to the Motion to Compel.

2          Now, we already have on the record the

3      fact that there is a financial relationship,

4      and for purposes of asking questions, we can

5      reference the financial relationship, as long

6      as we don't delve into additional particulars.

7          MR. STONE:  My problem is that Judge

8      Cohill recognized, in his decision, questioning

9      the Relators about their own financial

10     relationships and their own practices was

11     nothing more than harassment of the Relators

12     for bringing this lawsuit.

13         Unless you can articulate some basis for

14     why it is relevant to the relationship that V&S

15     has with BRMC, I don't see that there is any

16     reason for us to go any further with regard to

17     any investment interest that these doctors have

18     with anybody.

19         MR. RYCHCIK:  Certainly, their referral

20     practices are relevant when they are making

21     allegations regarding the fact that referral

22     numbers increased over a period of time.

23     Issues relating to the referral practices and

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

100

1    the referral decisions are certainly relevant.

2    If they are going to make allegations that

3    referrals are being done in some fashion that

4    is based upon an agreement, understanding the

5    context in which referral decisions are being

6    made is something that is clearly relevant.

7    This isn't --

8         MR. MULHOLLAND:  Let me just --

9         MR. STONE:  How Dr. Nadella refers his

10   patients is not relevant to how Dr. Vaccaro or

11   Dr. Saleh refer their patients.

12        MR. RYCHCIK:  It is if there is an

13   implied -- if there is an implication that is

14   being made that merely changes in referral

15   numbers support an agreement to referral.

16        MR. STONE:  That is not what is being made

17   here.  I mean, the Complaint speaks for itself.

18        MR. MULHOLLAND:  And it does.

19        MR. STONE:  This isn't simply about

20   numbers going up and down.  This is about a

21   sham agreement, and that is a part of the

22   record, and that is a part of the Complaint,

23   and that has been a part of the testimony so

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

101

1    far.

2         That has nothing do with Dr. Nadella's

3    referrals or business relationships, and I'm

4    going to instruct him not to answer any

5    questions with regard to his arrangements with

6    any other entity other than BRMC.

7         I have allowed him to answer questions

8    related to BRMC, although I'm not convinced

9    that those issues are relevant to the case,

10   either, but I have allowed some latitude,

11   because it is the context, and I think that is

12   what you are arguing is that you have some

13   ability to get into the context, but we have

14   done that; and I don't see any questioning

15   about Dr. Nadella's relationship with some

16   other entity that would have any relevance to

17   this case.

18        MR. MULHOLLAND:  Let me just give you two

19   other reasons, which hopefully will change your

20   mind.  If not, we will take it up with the

21   Judge.

22        No. 1, last week when you deposed Dr.

23   Saleh and Dr. Vaccaro, you asked them fairly

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

102

1    extensive questions about their referral

2    patterns and their criteria that they used to

3    determine where people would go.

4        I think I have the right to ask that to

5    Dr. Nadella and the other Relators to determine

6    the extent to which the testimony given by Dr.

7    Saleh and Dr. Vaccaro is typical of physicians

8    in their position or not.

9        The second reason is that to the extent

10   that the Relators have alleged, which they have

11   because Dr. Nadella talked about that earlier

12   this morning, that there was no need for the

13   additional camera, I think I have a right to

14   ask what kind of camera and what kind of

15   facilities Tri-County has, regardless of

16   whether he has an investment interest or not,

17   in terms of nuclear cardiology, and the extent

18   to which he and any other doctors refer to

19   Tri-County separate and apart from any

20   restriction in Judge Cohill's order about our

21   ability to ask about the nature of the

22   relationship he has with Tri-County.

23       MR. STONE:  I think it is your right.  You

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

103

1     can ask questions about other facilities that

2     might have this same service, but I don't think

3     you have any right to ask Dr. Nadella about any

4     relationship that he has with that facility or

5     any other facility.

6          MR. MULHOLLAND:  And we think we do, and I

7     think we can take that up with the Judge at an

8     appropriate time; but let me continue with this

9     line of questioning regarding the other

10    facilities --

11         MR. STONE:  Go ahead and ask the

12    questions.

13         MR. MULHOLLAND:  -- and his referrals to

14    them, separate and apart from any financial

15    relationship he may have, reserving the right,

16    of course, to follow up with the Judge about

17    asking about those relationships.

18         MR. STONE:  Okay.

19  Q.   Doctor, you are familiar with the Tri-County

20  Diagnostic in Bradford, are you not?

21  A.   Yes.

22  Q.   Do you refer patients there?

23         MR. STONE:  I'm going to object to any

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

104

1    other questions about his relationship with

2    Tri-County or with any other facility to the

3    extent it has nothing to do with Drs. Vaccaro

4    and Saleh and their relationship to BRMC.

5       MR. RYCHCIK:  You know, you can't expect,

6    Andy, that these gentlemen can come forward in

7    a qui tam action and make allegations asserted

8    at my clients regarding referral practices and

9    make implications regarding those referral

10   practices and have them sit here and somehow

11   because this is a qui tam action, that they are

12   allowed to make allegations, but they are not

13   required to give some context to the basis for

14   these allegations that they are making.

15       Now, Mr. Mulholland did not ask a question

16   about the relationship that Dr. Nadella had

17   with Tri-County.  He asked a simple question

18   about whether or not he refers patients to

19   Tri-County, which is a completely relevant

20   question for purposes of this litigation.

21       MR. STONE:  It has no relevance, because

22   it has nothing to do with Dr. Vaccaro's and Dr.

23   Saleh's referrals.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

105

1        MR. RYCHCIK:  It does if it lays a

2    foundation.

3        MR. STONE:  This case is about the

4    financial relationship between Dr. Vaccaro and

5    Dr. Saleh and BRMC, and that is the extent of

6    what this case is about --

7        MR. RYCHCIK:  And, quite frankly --

8        MR. STONE:  -- whether that is illegal and

9    whether the hospital can bill for referrals as

10   a result from that.

11       MR. RYCHCIK:  And, quite frankly, it is

12   also about these gentlemen bringing litigation

13   against the hospital and against my clients,

14   filing litigation.

15       We are entitled to understand the

16   rationale behind their motivations, the facts

17   that they had when they brought the litigation

18   and what was motivating them, quite frankly.

19   Because if it turns out that this lawsuit was a

20   frivolous action, if it turns out that they had

21   improper motives, that there is an abuse of

22   process, if they alternate reasons for doing

23   this, we are entitled to determine if we have

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

106

1     claims against these individuals.  So we are

2     allowed to explore these types of issues.

3          This is a discovery deposition.  You are

4     taking a ruling in a Motion to Compel where

5     Judge Cohill ruled that the hospital, BRMC, was

6     not entitled to certain information, and you

7     are trying to stretch it to prevent us from

8     taking a discovery deposition here, which is

9     what we are trying to do, and we are entitled

10    to ask questions about relevant information and

11    information that may lead to discoverable

12    information.

13         You cannot use this opinion and sit here

14    and take it and take it into directions that it

15    clearly does not state and instruct a witness

16    not to answer.  I mean, we can go through this

17    exercise, but we will be calling him back, and

18    we will be going through these issues after a

19    ruling from the Judge.

20         MR. MULHOLLAND:  Does your objection still

21    stand to the question I asked?

22         MR. STONE:  The objection is -- what is

23    the question that is on the table?

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

107

1          (Previous question read back.)

2          MR. STONE:  My objection still stands, and

3     actually, we should take a break at this point,

4     and then we can get back to this.

5          MR. MULHOLLAND:  Do you mean, do you want

6     to take a lunch break?

7          MR. STONE:  Yeah.

8          MR. MULHOLLAND:  Okay.  Afterwards, what I

9     propose to do is just get my questions about

10    that on the record, subject to whatever

11    objection you want to interpose; and then, you

12    know, we will see about taking it up with the

13    Judge.

14         What do you want for lunch?

15         MR. STONE:  An hour.

16         MR. MULHOLLAND:  An hour is fine.

17         (Discussion off the record.)

18         (Recess for lunch taken at 12:10 p.m., and

19    testimony resumed at 1:20 p.m. this date.)

20              - - -

21         MR. STONE:  At this point in time, we have

22    designated a couple of areas of questioning

23    that we felt were objectionable, and I directed

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

111

1        other matter with which you intend to withdraw

2        your instruction not to answer?

3            MR. STONE:  No.  Actually, with regard to

4        the other areas, we are going to insist that if

5        you want to pursue them, that we take it up

6        with the Judge based on the prior order that

7        the Judge had issued with regard to the

8        Defendants' prior Motion to Compel.

9            MR. MULHOLLAND:  For the record, I'm going

10        to ask some questions, additional questions

11        along the lines of what you had objected to

12        before and instructed him not to answer.

13            If you want to just interpose an

14        objection, unless you state otherwise, I will

15        assume at this point you are telling him not to

16        answer if that is okay, or just say, "Instruct

17        not to answer."

18            MR. STONE:  I will just instruct him at

19        the time.

20            MR. MULHOLLAND:  Fine.

21    Q.  Are you familiar with the nuclear cardiology

22    testing equipment owned by Tri-County Diagnostics?

23            MR. STONE:  I will object and instruct him

JOHNSON and MIMLESS
(412) 765-0744

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

112

1          not to answer.

2                    (Question certified for later discussion.)

3     Q.    Do you have occasion to refer patients for

4     nuclear cardiology tests to Tri-County Diagnostics?

5                    MR. STONE:   I'm going to object and

6               instruct him not to answer.

7                    (Question certified for later discussion.)

8     Q.    If you are familiar with any diagnostic

9     equipment and nuclear cardiology presently operated by

10    Tri-County Diagnostics, what kind of equipment is it?

11                   MR. STONE:   Again, I'll object and

12              instruct him not to answer.

13                   (Question certified for later discussion.)

14    Q.    How many nuclear cameras does Tri-County have

15    in operation at the present time?

16                   MR. STONE:   I'll object and instruct him

17              not to answer.

18                   (Question certified for later discussion.)

19    Q.    Besides Tri-County and Bradford Regional

20    Medical Center and Olean Medical Center, where else do

21    you refer patients for nuclear cardiology tests?

22                   MR. STONE:   I'll object and instruct him

23              not to answer.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

113

1          (Question certified for later discussion.)

2     Q.   What percentage of your patients who require

3    nuclear cardiology tests are referred to Bradford

4    Regional Medical Center?

5               MR. STONE:  I'll object and instruct him

6          not to answer.

7               (Question certified for later discussion.)

8     Q.   The same question with respect to Tri-County.

9    What percentage of tests for patients needing nuclear

10   cardiology studies are referred to Tri-County?

11              MR. STONE:  I'll object and instruct him

12         not to answer.

13              (Question certified for later discussion.)

14    Q.   Before you invested in Tri-County, did you

15   refer most of your patients who needed nuclear

16   cardiology tests to Bradford Regional Medical Center?

17              MR. STONE:  I'll object and instruct him

18         not to answer.

19              (Question certified for later discussion.)

20    Q.   When there was a nuclear camera -- I think I

21   asked that, but I will ask it again, just in case.

22         When there was a nuclear camera in the offices

23   of V&s Medical Associates, did you ever refer patients

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

114

1    to V&S for nuclear cardiology tests?

2              MR. STONE:  Again, I will object, and

3         instruct him not to answer.

4              (Question certified for later discussion.)

5    Q.    Do you believe that Tri-County addresses an

6    unmet need for nuclear cardiology tests in Bradford

7    that would not otherwise be met if Tri-County did not

8    offer nuclear cardiology testing?

9              MR. STONE:  I'll object and instruct him

10        not to answer.

11             (Question certified for later discussion.)

12   Q.    Given the fact that Tri-County operates a

13   nuclear camera and Bradford Regional Medical Center

14   does the same, would you consider Tri-County to be in

15   competition with Bradford Regional Medical Center?

16   A.    I couldn't say.  Both of them provide services,

17   similar services, so you could call it competition or

18   you can call both of them providing similar services.

19   Q.    Given that you have an investment interest in

20   Tri-County, would you then consider yourself to be in

21   competition with Bradford Regional Medical Center

22   since you both offer similar services?

23             MR. STONE:  I will object and instruct him

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

115

1       not to answer.

2               (Question certified for later discussion.)

3    Q.    Are you subject to any agreement not to compete

4    with Tri-County or the investors in Tri-County?

5               MR. STONE:  I'm going to object and

6           instruct him not to answer.

7               (Question certified for later discussion.)

8    Q.    If the answer to that question were yes, what

9    consideration, if any, did Tri-County give you in

10   return for the noncompete agreement?

11              MR. STONE:  I'll object and instruct him

12          not to answer.

13              (Question certified for later discussion.)

14   Q.    Again, if the answer regarding non-competes

15   with Tri-County was yes, by virtue of that noncompete

16   agreement, are you prohibited from referring patients

17   who need nuclear cardiology tests anywhere other than

18   Tri-County?

19              MR. STONE:  I'll object and instruct him

20          not to answer.

21              (Question certified for later discussion.)

22   Q.    Do you have any present plans to offer nuclear

23   cardiology or other imaging services in your office or

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

116

1    in an office in Olean, New York?

2                    MR. STONE:  I'll object and instruct him

3          not to answer.

4                    (Question certified for later discussion.)

5    Q.    If the answer to the previous question was yes,

6    are Drs. Kirsch and/or Horsley involved in this

7    venture?

8                    MR. STONE:  I'll object and instruct him

9          not to answer.

10                   (Question certified for later discussion.)

11   Q.    Do you recall discussions with Bradford

12   Regional Medical Center during the time period 2002

13   and 2003 regarding a proposed joint venture between

14   the Medical Center and members of its medical staff to

15   offer imaging services under what has been termed an

16   under arrangements model?

17                   MR. STONE:  I'll object and instruct him

18          not to answer.

19                   MR. MULHOLLAND:  Let me just ask you for a

20          clarification on that, Andy, because I don't

21          think that this would be subject to the same

22          kind of rationale that you are advancing to the

23          other objections.

CONFIDENTIAL – PROTECTED HEALTH INFORMATION

121

1   V&S Medical Associates and BRMC?

2       A.    Well, you know, it is, like you said earlier,

3   do we have any competition with V&S?  You know, we

4   have an office, and they have an office.  We are both

5   in the same block, and even though we both provide

6   services, we provide similar services, I looked at it

7   as V&S, the hospital has taken sides in supporting one

8   group of physicians against another group of

9   physicians, and putting us at a complete disadvantage.

10          At the time when this arrangement took place

11  between BRMC and V&S, we are a three-group physician,

12  and they are a two-group physician.  As a result, they

13  become economically more stronger, the hospital, in a

14  certain amount, and we become economically more

15  weaker, and as a result, we lost a physician to whom

16  we are unable to pay acceptable salary, and he ended

17  up relocating to another place.  So from a three-

18  physician group, we shrunk into a two-physician group,

19  so I believe we have been damaged.

20      Q.    Was that other physician Dr. Aziz?

21      A.    Yes.

22      Q.    Given you felt that the V&S/BRMC equipment

23  lease put you at a competitive disadvantage, did you

122

1   try to address or balance out that competitive

2   disadvantage by investing in Tri-County?

3   A.    That was not the --

4           MR. STONE:  I'm going to object to that

5       question to the extent that it is contrary to

6       Judge Cohill's prior order, and I am going to

7       instruct him not to answer.

8           (Question certified for later discussion.)

9   Q.   Dr. Nadella, did Singh & Nadella previously

10  lease office space to BRMC in its offices on North

11  Center Street in Bradford?

12  A.    Yes.

13          MR. STONE:  Again, I am going to object to

14      any questions along this line to the extent it

15      involves business relationships of Dr. Nadella

16      and/or Dr. Singh that are not relevant to the

17      case.

18          MR. MULHOLLAND:  Again, you know, I think

19      this is of a different nature than the other

20      questions I was asking, because it also would

21      go to their motive in filing the suit to the

22      extent that they have any dispute relative to

23      that lease that was in effect, and that was my

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

127

1          case, which is a lease agreement between V&S

2          and BRMC.

3                  Unless you can demonstrate to the Court

4          that somehow these relationships would either

5          make the V&S relationship legal or provide some

6          other kind of defense, I don't see how it is

7          relevant to the claim in the case.

8                  MR. MULHOLLAND:  Let me ask the rest of

9          the questions along this line of this

10         questioning, and then you can object as needed.

11                 MR. STONE:  I will object as they come up.

12     Q.   Is the lease between BRMC and Singh & Nadella

13 still in effect?

14                 MR. STONE:  Again, I'm going to object to

15         any further questions along this line and

16         instruct him not to answer.

17                 (Question certified for later discussion.)

18     Q.   While the lease was still in effect, did you

19 and Dr. Singh refer patients to BRMC?

20                 MR. STONE:  I'm going to object and

21         instruct the witness not to answer.

22                 (Question certified for later discussion.)

23     Q.   Did you believe the lease between Singh &

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

128

1    Nadella and BRMC to be violation of either the Stark

2    law or the Anti-kickback law?

3                    MR. STONE:  I am going to object and

4            instruct the witness not to answer.

5                    (Question certified for later discussion.)

6    Q.   If the answer to that question is no, why not?

7                    MR. STONE:  I object and instruct him not

8            to answer.

9                    (Question certified for later discussion.)

10   Q.   Is there currently a dispute between BRMC and

11   Singh & Nadella about monies allegedly owed by BRMC to

12   Singh & Nadella for the lease?

13                   MR. STONE:  I'm going to object and

14           instruct him not to answer.

15                   (Question certified for later discussion.)

16                   MR. MULHOLLAND:  I don't have any of other

17           questions at this time.  Carl?

18                   MR. RYCHCIK:  Yes, I have questions.

19                           - - -

20                          EXAMINATION

21   BY MR. RYCHCIK:

22   Q.   Doctor, my name is Carl Rychcik, and I

23   represent Drs. Vaccaro and Saleh, as well as V&S

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

170

1    far as a public point, BRMC has been the only

2    institution that has the local physicians.

3            If the patient needed additional expertise than

4    what I can provide, if they need to a see a

5    cardiologist and so on and so forth, they did go to

6    other places, like Erie and Olean and so on and so

7    forth.  They had been going down there, also.

8            But, you know, if the patient is stable enough,

9    we are going to investigate this further locally, and

10   the only option at that time was Bradford Regional

11   Medical Center.

12   Q.    So you would say that the majority of your

13   patients who needed nuclear camera testing, you would

14   send them to Bradford?

15   A.    I would say Bradford.

16   Q.    Did you have any arrangement with Bradford to

17   exclusively refer patients to them?

18   A.    Absolutely not.

19   Q.    Would the same apply for other types of

20   diagnostic testing, such as CT and MRI?

21           MR. STONE:  I'm going to object to any

22           further questioning with regard to Dr.

23           Nadella's or Dr. Singh's arrangements for

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

171

1    referring patients.

2         It has nothing to do with this case, and,

3    again, it gets into their business and

4    professional relationships which are not at

5    issue in this case and are not relevant to the

6    case, and the Judge has already ruled that they

7    are not discoverable.  I'm going to direct him

8    not to answer.

9         MR. RYCHCIK:  He has already answered

10   that, and you waived that objection.

11        MR. STONE:  I'm not going to have him

12   answer any more of those questions.  I have

13   given you a little bit of leeway, by way of

14   context, but we are not going to go through all

15   of their business relationships.

16        MR. RYCHCIK:  Again, we will mark that

17   portion of the transcript to discuss with the

18   Judge.

19        (Question certified for later discussion.)

20        MR. RYCHCIK:  I would like this marked as

21   Exhibit No. 12.

22        (Relators' Deposition Exhibit No. 12 was

23   marked for identification.)

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

179

1                          C E R T I F I C A T E

2    COMMONWEALTH OF PENNSYLVANIA      :
                                       :  SS.:
3    COUNTY OF ALLEGHENY               :

4          I, Joy A. Hartman, a Notary Public in and for
     the Commonwealth of Pennsylvania, do hereby certify
5    that before me personally appeared V. RAO NADELLA,
     M.D., the witness herein, who then was by me first
6    duly cautioned and sworn to testify the truth, the
     whole truth and nothing but the truth in the taking of
7    his oral deposition in the cause aforesaid; that the
     testimony then given by him as above set forth was
8    reduced to stenotypy by me, in the presence of said
     witness, and afterwards transcribed by computer-aided
9    transcription under my direction.

10         I do further certify that this deposition was
     taken at the time and place specified in the foregoing
11   caption, and signature was not waived.

12         I do further certify that I am not a relative
     of or counsel or attorney for any party hereto, nor am
13   I otherwise interested in the event of this action.

14         IN WITNESS WHEREOF, I have hereunto set my hand
     and affixed my seal of office at Pittsburgh,
15   Pennsylvania, on this 23rd day of August, 2007.

16         The foregoing certification does not apply to
     any reproduction of this transcript in any respect
17   unless under the direct control and/or direction of
     the certifying reporter.

18

19

20         _____ _Joy A. Hartman)_____

21                                  Joy A. Hartman, Notary Public
                                    in and for the Commonwealth of
22                                  Pennsylvania

23   My commission expires May 9, 2010.

Commonwealth of Pennsylvania
NOTARIAL SEAL
JOY A. HARTMAN, Notary Public
City of Pittsburgh, County of Allegheny
My Commission Expires May 9, 2010