# EXHIBIT G

**CONFIDENTIAL - PROTECTED HEALTH INFORMATION**

1

```
          IN THE UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF PENNSYLVANIA
                     ERIE DIVISION


UNITED STATES OF AMERICA, ex rel. )
DILBAGH SINGH, M.D., PAUL KIRSCH, )
M.D., V. RAO NADELLA, M.D., and   )
MARTIN JACOBS, M.D.,              )
                                  )
            Plaintiffs,           )
                                  )  Civil Action
      vs.                         )  No. 04-186E
                                  )
BRADFORD REGIONAL MEDICAL CENTER, )
V&S MEDICAL ASSOCIATES, LLC,      )
PETER VACCARO, M.D., KAMRAN SALEH,)
M.D., and DOES I through XX,      )
                                  )
            Defendants.           )
```

DEPOSITION OF CORPORATE DESIGNEE OF

BRADFORD REGIONAL MEDICAL CENTER

THURSDAY, JULY 26, 2007

Deposition of CORPORATE DESIGNEE OF BRADFORD REGIONAL MEDICAL CENTER, called as a witness by the Plaintiffs, taken pursuant to Notice of Deposition and the Federal Rules of Civil Procedure, by and before Joy A. Hartman, a Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania, at the offices of Horty Springer, 4614 Fifth Avenue, First Floor, Pittsburgh, Pennsylvania, commencing at 10:03 a.m. on the day and date above set forth.

JOHNSON and MIMLESS
(412) 765-0744

COPY

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

84

1       We had seen several instances, certainly,
2   across the country, where hospitals were finding
3   themselves in a position where they had to deal with
4   that kind of a situation and had seen several locally.
5   Q.  Was there a particular concern, a particular
6   concern, a particular competing interest that the
7   hospital was worried about at that time?
8   A.  As we talked about this?
9   Q.  Yes.
10  A.  Yes. There had been a local hospital that had
11  been significantly damaged by an ambulatory surgical
12  center established by a group of surgeons on the
13  staff.
14  Q.  Again, if you could, can you articulate
15  precisely what the concern was on the part of the
16  Board?
17  A.  Sure. It is a general concern, I think, in the
18  health care world. The concern is that there are
19  certain kinds of competition that make the playing
20  field so unlevel that it is virtually impossible to
21  compete on a level basis with them; and, you know, we
22  had, frankly a great deal of discussion about the
23  impact that that surgical center was having on a

1  neighboring community hospital.
2      In that instance, in those kinds of instances,
3  the hospital finds itself -- the community hospital
4  finds itself in the position where it has to provide
5  stand-by services, it has to continue to find a way to
6  provide the most economically unattractive services,
7  and yet can have the people using its services
8  electively choosing where to send the most
9  predictable, the most financially advantageous
10 services.
11    Q.   I am going to show you what we will mark as
12 Deposition Exhibit No. 8.
13         (Deposition Exhibit No. 8 was marked for
14 identification.)
15    Q.   This document actually consists of two
16 documents.  It is really the Resolution of the Board
17 of Directors, and then there is attached to it the
18 Procedures that I am assuming accompanied the Board
19 Resolution.
20    A.   Yes.
21    Q.   But maybe rather than me describe it, why don't
22 you take a look at this document and identify it, if
23 you can.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

96

1  A.   Approximately, yes.
2  Q.   So, I guess, maybe it would be fair to say you
3  were in the process of establishing a cardiology
4  service then; is that right?
5  A.   Yes.  We were in the process of establishing a
6  cardiology service.  We were actively trying to
7  recruit a cardiologist.
8  Q.   Is there any reason why you would need to have
9  a monopoly on the imaging services related to
10  cardiology?
11  A.   No.  You don't need to have a monopoly on the
12  imaging services.
13  Q.   So the fact that somebody else was putting in
14  diagnostic equipment or utilizing their own diagnostic
15  equipment for their own patients, there is no reason
16  why that would prevent you from developing your own
17  cardiology program, right?
18  A.   In that kind of situation, it would certainly
19  make it much more difficult.
20  Q.   Well, it would make it competitive; isn't that
21  true?
22  A.   No.  I don't believe it would make it
23  competitive.  It would not make it competitive,

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

97

1  because the referring physician would only have a
2  financial incentive to only use their service as
3  opposed to any real kind of real competition, which
4  would, essentially, mean the cardiologist would be
5  blocked out.
6      Q.   Well, there were other physicians in the
7  community that would refer patients to a cardiology
8  program, right?
9      A.   It is a very small community.
10     Q.   Well, are you saying then that Dr. Saleh and
11 Dr. Vaccaro had a substantial part of the patient
12 population as their clients or patients?
13     A.   Yes.
14     Q.   Is this the reason why the hospital determined
15 that it would have a significant impact on the
16 cardiology program if they were permitted to go
17 forward with their plan to develop an imaging
18 facility?
19     A.   Yes.
20     Q.   Prior to April of 2001, were Dr. Saleh and Dr.
21 Vaccaro, were they referring their nuclear imaging
22 business to the hospital?
23     A.   I know they were referring some of their

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

139

1   Do you recognize your signature on there on behalf of
2   Bradford Regional Medical Center?
3     A.   Yes, I do.
4     Q.   Now, when I was asking you questions about the
5   January proposal by V&S that you buy out the imaging
6   business and the fact that that was rejected by the
7   hospital, apparently, but that you then shortly
8   thereafter came up with a lease proposal, someone came
9   up with a lease proposal -- and I guess I don't know
10  whether April 16th is shortly thereafter; but in any
11  case, by April 16th, you had an agreement here that
12  deals with the sublease of certain equipment from V&S.
13    A.   Yes.
14    Q.   So I guess my question is:  How did the
15  sublease proposal come about?
16    A.   I don't remember.
17    Q.   Now, you heard Mr. Washington testify earlier
18  that the equipment that V&S had really wasn't -- it
19  didn't really fit into the hospital's future plans --
20    A.   Correct.
21    Q.   -- for its imaging needs; is that right?
22    A.   Correct.
23    Q.   Now, why was it that you wanted to sublease

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

140

1  this equipment that apparently had limited
2  capabilities from V&S?
3     A.   The agreement that we worked out with V&S to
4  sublease that equipment had as a condition of it that
5  we be free to direct them to acquire a different piece
6  of equipment of our choosing with a lease that had to
7  satisfy -- with conditions that had to satisfy us.
8     Q.   Okay.
9     A.   So --
10    Q.   Are you done?
11    A.   Yes.
12    Q.   Well, Mr. Leonhardt, that is a fairly
13 cumbersome way to go out and acquire a piece of
14 equipment, wouldn't you agree?
15    A.   Yes, if that was the only thing that we were
16 trying to accomplish.  Obviously, it wasn't the only
17 thing that we were trying to accomplish.
18    Q.   Let's say that, hypothetically, that the
19 hospital determined that they had a need to get a
20 camera.
21    A.   Yes.
22    Q.   You would probably go to the vendor or a lessor
23 of equipment; is that right?

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

142

1   Q.   Well, what was the real purpose of that
2   agreement?
3   A.   As I have said before, the real purpose of the
4   agreement was to get us into a situation where we had
5   a level field to compete in.  We certainly -- we
6   certainly wanted to have the opportunity to compete
7   for V&S' business based on quality, based on the level
8   of service that we could provide to them and their
9   patients.
10  Q.   Well, in order to compete for V&S' business,
11  you entered into an agreement where you would pay them
12  a certain amount a month; isn't that right?
13  A.   We entered into a lease and a non-competition
14  agreement, yes.
15  Q.   What was the amount that you agreed to pay them
16  each month, pursuant to that agreement?  You can refer
17  to the document.
18  A.   We agreed to pay them the pass-through cost of
19  the lease for the equipment and a specific amount for
20  the non-compete agreement and the other
21  considerations.
22  Q.   And what was the -- do you -- if you want to
23  refer to the agreement, I would like you to identify

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

143

1  what the number was and how you arrived at the number.
2      A.    The number here is $29,250 per month.  This
3  does not split those into the components that I was
4  talking about.
5      Q.    But you said that it was to actually pay for
6  the pass-through cost to the equipment?
7      A.    Correct.
8      Q.    And also to pay for these other issues, I
9  guess, the non-compete?
10     A.    Correct.
11     Q.    Was it paying for anything else?
12     A.    No.
13     Q.    Now, did you evaluate whether the equipment
14 that you were paying for as a pass-through under this
15 agreement was equipment that could be used by the
16 hospital?
17     A.    Yes.
18     Q.    And did you make any kind of evaluation or
19 determination that this was a good value for the
20 rental payments that you were making here?
21     A.    Yes.  It was a good usable piece of equipment.
22 It didn't fit into our long-range plans, but it was a
23 good usable piece of equipment.

JOHNSON and MIMLESS
(412) 765-0744

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

146

1  saw that as good value to us in developing the program
2  that we were trying to develop.
3      Q.   And that is because you were able to, at the
4  same time, get the non-compete?  Is that what your
5  rationale was?
6      A.   We were able to put the whole package together,
7  yes.
8      Q.   And when you got the non-compete, you were
9  essentially buying the business from V&S; isn't that
10 right?
11          MR. MULHOLLAND:  Objection to form.
12     A.   No.
13     Q.   Did you expect that you would get the referral
14 business from V&S as a result of this agreement?
15     A.   We hoped that we would.
16     Q.   Let me give you another exhibit here, and see
17 if you can identify this document.
18          (Deposition Exhibit No. 14 was marked for
19 identification.)
20     A.   Yes.
21     Q.   What is this document?
22     A.   This is an independent valuation of the lease
23 and non-compete agreement.

JOHNSON and MIMLESS
(412) 765-0744

1    A.    At a beginning point, no, I don't.

2    Q.    Do you recall how you justified the numbers
3 that you were proposing? What did you base that on?

4    A.    We based that on a series of things. What the
5 venture was costing us, what other alternatives, what
6 impact all the other alternatives might have on us.

7    Q.    So you were looking at numbers that reflected
8 the projected loss of business to the hospital?

9    A.    The cost of additional recruiting, the
10 rebuilding of, you know, primary care practices in the
11 community, how we would have people who lived in that
12 community who depended on those physicians for their
13 care, how we were going to care for them.

14   Q.    How did you put a number on that, on those
15 issues you have just identified?

16   A.    Some of those issues were very difficult to put
17 a number on.

18   Q.    Did you do any evaluation of what this meant to
19 V&S in terms of giving up their new enterprise?

20   A.    I believe they did. We did not, no.

21   Q.    Was there any discussion about that?

22   A.    Certainly, there was.

23   Q.    Do you recall what it was that they thought

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

185

1  of the rental payment that is due under the agreement,
2  and we talked about that a little bit earlier.
3     A.   Uh-huh.
4     Q.   Could you identify the different components of
5  the rental agreement from the agreement?
6     A.   It identifies $6,545 for the hard costs of
7  subleasing the equipment. It as a pass-through of the
8  rental and the maintenance fee paid to GE. Then
9  $23,655 per month for all other rights and duties for
10 sublease.
11    Q.   And that is for the first rental period?
12    A.   Yes.
13    Q.   So that would be through September 30th, 2006?
14    A.   Correct.
15    Q.   So have, in fact, those payments been made for
16 that period of time, since we are beyond September
17 30th, 2006?
18    A.   Beginning October 1st of 2003, yes.
19    Q.   So all the payments were made up through
20 September 30, 2006?
21    A.   That's right.
22    Q.   At the rate of $30,200 per month?
23    A.   Until February of 2004, when the new equipment

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

186

1 arrived.
2 Q. Well, that is what I want you to explain to me
3 next.
4 A. Okay.
5 Q. So the payments then were made in this amount
6 up through February of 2004?
7 A. Correct.
8 Q. And what happened in February of 2004?
9 A. This piece of equipment was replaced with the
10 new Philips CardioMD equipment that Mr. Washington
11 described earlier today.
12 Q. Okay. And?
13 A. And the lease pass-through from GE was replaced
14 with a lease pass-through from Philips, and that was a
15 slightly different amount.
16 Q. Who is the lessee on the lease with Philips?
17 A. Vaccaro and Saleh.
18 Q. So Vaccaro and Saleh -- so V&S continues to be
19 the lessee and the Bradford Hospital or BRMC continues
20 to be the sublessee?
21 A. Yes.
22 Q. And you said that there was a change in the
23 amount. Was it more or less?

(412) 765-0744

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

216

C E R T I F I C A T E

COMMONWEALTH OF PENNSYLVANIA    :
                                : SS.:
COUNTY OF ALLEGHENY             :

I, Joy A. Hartman, a Notary Public in and for the Commonwealth of Pennsylvania, do hereby certify that before me personally appeared TINA MARIE HANNAHS, GLEN ALAN WASHINGTON, and GEORGE LEONHARDT, the witnesses herein, who then were by me first duly cautioned and sworn to testify the truth, the whole truth and nothing but the truth in the taking of their oral deposition in the cause aforesaid; that the testimony then given by them as above set forth was reduced to stenotypy by me, in the presence of said witness, and afterwards transcribed by computer-aided transcription under my direction.

I do further certify that this deposition was taken at the time and place specified in the foregoing caption, and signature was not waived.

I do further certify that I am not a relative of or counsel or attorney for any party hereto, nor am I otherwise interested in the event of this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Pittsburgh, Pennsylvania, on this 31st day of July, 2007.

The foregoing certification does not apply to any reproduction of this transcript in any respect unless under the direct control and/or direction of the certifying reporter.

Commonwealth of Pennsylvania
NOTARIAL SEAL
JOY A. HARTMAN, Notary Public
City of Pittsburgh, County of Allegheny
My Commission Expires May 9, 2010

_____
Joy A. Hartman, Notary Public
in and for the Commonwealth of
Pennsylvania

My commission expires May 9, 2010.