# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | |
| **UNITED STATES OF AMERICA,** *ex rel.* | : | |
| **DILBAGH SINGH, M.D.,** | : | |
| **PAUL KIRSCH, M.D.,** | : | |
| **V. RAO NADELLA, M.D., and** | : | |
| **MARTIN JACOBS, M.D.,** | : | |
| | : | |
| Relators, | : | |
| | : | |
| v. | : | **Civil Action No. 04-186E** |
| | : | |
| **BRADFORD REGIONAL** | : | |
| **  MEDICAL CENTER,** | : | |
| **V & S MEDICAL ASSOCIATES, LLC,** | : | |
| **PETER VACCARO, M.D.,** | : | |
| **KAMRAN SALEH, M.D.,** | : | |
| **and DOES I through XX,** | : | |
| | : | |
| Defendants. | : | |
| | : | |

# APPENDIX TO

# CONCISE STATEMENT OF MATERIAL FACTS

# IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

174196.1

# TABLE OF CONTENTS

| NO. | DOCUMENT | APPENDIX PAGES |
|---|---|---|
| 1. | Saleh Deposition Excerpts | 1-13 |
| 2. | Vaccaro Deposition Excerpts | 14-18 |
| 3. | Singh Deposition Excerpts | 19-23 |
| 4. | Kirsch Deposition Excerpts | 24-27 |
| 5. | Nadella Deposition Excerpts | 28-35 |
| 6. | Jacobs Deposition Excerpts | 36-40 |
| 7. | BRMC 30(b)(6) Deposition Excerpts | 41-58 |
| 8. | Leonhardt Deposition Excerpts | 59-67 |
| 9. | Barbera Deposition Excerpts | 68-72 |
| 10. | Policy on Physicians with Competing Financial Interests | 73-86 |
| 11. | January 2, 2002 letter to Dr. Saleh from George Leonhardt | 87-88 |
| 12. | January 28, 2002 Letter to Dr. Vaccaro from George Leonhardt | 89-90 |
| 13. | May 20, 2002 Letter to Dr. Saleh from Richard McDowell | 91-94 |
| 14. | Outline of Proposal | 95-96 |
| 15. | Agreement between BRMC and V&S Medical Associates | 97-101 |
| 16. | Report of Charles T. Day | 102-120 |
| 17. | Equipment Sublease | 121-140 |

| 18. | Master Lease Agreement | 141-154 |
| 19. | September 28, 2004 Letter to Dr. Saleh from Weston Felldin | 155-156 |
| 20. | January 20, 2005 Letter to Dr. Vaccaro from Weston Felldin | 157-158 |
| 21. | V&S Statement for October 2003 | 159-160 |
| 22. | October 2, 2003 Letter to George Leonhardt from Drs. Saleh and Vaccaro | 161-162 |
| 23. | Dr. Singh's Responses and Objections to BRMC's First Set of Interrogatories | 163-167 |
| 24. | Dr. Nadella's Responses and Objections to BRMC's First Set of Interrogatories | 168-172 |
| 25. | Dr. Kirsch's Responses and Objections to BRMC's First Set of Interrogatories | 173-177 |
| 26. | Expert Report of James H. Jordon | 178-261 |
| 27 | Expert Report of Sal Barbera | 262-267 |
| 28. | Medical Assistance Report | 268-271 |
| 29. | CHAMPUS Report | 272-273 |
| 30. | CMS Forms UB-92 and UB-04 | 274-279 |

# 1.  SALEH DEPOSITION EXCERPTS

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

1

1          IN THE UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2                      ERIE DIVISION

3

UNITED STATES OF AMERICA, ex rel. )
4  DILBAGH SINGH, M.D., PAUL KIRSCH, )
   M.D., V. RAO NADELLA, M.D., and  )
5  MARTIN JACOBS, M.D.,             )
                                    )
6               Relators,           )
                                    )   Civil Action
7       vs.                         )   No. 04-186E
                                    )
8  BRADFORD REGIONAL MEDICAL CENTER,)
   V&S MEDICAL ASSOCIATES, LLC,     )
9  PETER VACCARO, M.D., KAMRAN SALEH,)
   M.D., and DOES I through XX,     )
10                                  )
                Defendants.         )
11

12          DEPOSITION OF KAMRAN SALEH, M.D.

13            THURSDAY, AUGUST 9, 2007

14          Deposition of KAMRAN SALEH, M.D., called as a

15  witness by the Plaintiffs, taken pursuant to Notice of

16  Deposition and the Federal Rules of Civil Procedure,

17  by and before Joy A. Hartman, a Court Reporter and

18  Notary Public in and for the Commonwealth of

19  Pennsylvania, at the offices of Fox Rothschild, 625

20  Liberty Avenue, 29th Floor, Pittsburgh, Pennsylvania

21  commencing at 9:31 a.m. on the day and date above set

22  forth.

23

CONFIDENTIAL

                    JOHNSON and MIMLESS
                       (412) 765-0744



Case 1:04-cv-00186-MBC     Document 116     Filed 09/10/2008     Page 6 of 43
USA, et al., vs. BRMC., et al.          Multi-Page™          Kamran Saleh, M.D.
No. 04-186E                                                   August 8, 2007

Page 2

1  APPEARANCES:

2  On behalf of the Relators:

3        Stone Law Firm
         Andrew M. Stone, Esquire
4        1400 Allegheny Building
         Pittsburgh, Pennsylvania  15219
5             -and-
         Simpson Law Firm
6        G. Mark Simpson, Esquire
         165 North Main Street
7        Jonesboro, Georgia  30236

8  On behalf of the Defendant Bradford Regional Medical
   Center:
9
         Horty Springer
10       Dan Mulholland, Esquire
         4614 Fifth Avenue
11       Pittsburgh, Pennsylvania  15213

12  On behalf of the Defendants V&S Medical Associates,
    LLC, Peter Vaccaro, M.D. and Kamran Saleh, M.D.:
13
         Fox Rothschild
14       Carl J. Rychcik, Esquire
         625 Liberty Avenue, 29th Floor
15       Pittsburgh, Pennsylvania  15222

16  ALSO PRESENT:

17       John Rice, Horty Springer

18       Peter Vaccaro, M.D.

19            - - -

20            INDEX

21  WITNESS:                    PAGE:

22  KAMRAN SALEH, M.D.

23       Examination by Mr. Simpson        4

Page 3

1  EXHIBITS:            PAGE:

2      Saleh Deposition Exhibit No. 1      4
       Saleh Deposition Exhibit No. 2      4
3      Saleh Deposition Exhibit No. 3      59
       Saleh Deposition Exhibit No. 4      61
4      Saleh Deposition Exhibit No. 5      63
       Saleh Deposition Exhibit No. 6      67
5      Saleh Deposition Exhibit No. 7      69
       Saleh Deposition Exhibit No. 8      77
6      Saleh Deposition Exhibit No. 9      79
       Saleh Deposition Exhibit No. 10     80
7      Saleh Deposition Exhibit No. 11     87
       Saleh Deposition Exhibit No. 12     94
8      Saleh Deposition Exhibit No. 13     96
       Saleh Deposition Exhibit No. 14     97
9      Saleh Deposition Exhibit No. 15     98
       Saleh Deposition Exhibit No. 16     99
10     Saleh Deposition Exhibit No. 17     102
       Saleh Deposition Exhibit No. 18     110
11     Saleh Deposition Exhibit No. 19     110
       Saleh Deposition Exhibit No. 20     115
12     Saleh Deposition Exhibit No. 21     116
       Saleh Deposition Exhibit No. 22     120
13     Saleh Deposition Exhibit No. 23     122
       Saleh Deposition Exhibit No. 24     128
14     Saleh Deposition Exhibit No. 25     139
       Saleh Deposition Exhibit No. 26     141
15     Saleh Deposition Exhibit No. 27     143
       Saleh Deposition Exhibit No. 28     146
16     Saleh Deposition Exhibit No. 29     148
       Saleh Deposition Exhibit No. 30     151
17     Saleh Deposition Exhibit No. 31     160
       Saleh Deposition Exhibit No. 32     162
18     Saleh Deposition Exhibit No. 33     164
       Saleh Deposition Exhibit No. 34     165
19     Saleh Deposition Exhibit No. 35     165
       Saleh Deposition Exhibit No. 36     167
20     Saleh Deposition Exhibit No. 37     168
       Saleh Deposition Exhibit No. 38     170
21     Saleh Deposition Exhibit No. 39     170
       Saleh Deposition Exhibit No. 40     175
22     Saleh Deposition Exhibit No. 41     175

23

Page 4

1          P R O C E E D I N G S

2               - - -

3       (Saleh Deposition Exhibit Nos. 1 and 2

4  were marked for identification.)

5               - - -

6       KAMRAN SALEH, M.D.,

7  called as a witness by the Relators, being first duly

8  cautioned and sworn, as hereinafter certified, was

9  deposed and said as follows:

10          EXAMINATION

11  BY MR. SIMPSON:

12  Q. Dr. Saleh, could you please state your name for

13  the record?

14  A. Kamran Saleh.

15  Q. Dr. Saleh, my name is Mark Simpson, and I'm

16  sure your attorneys probably explained this to you,

17  but I will be asking you a bunch of questions today.

18      If there is anything that you don't understand,

19  please ask me to restate it or slow down or whatever,

20  and I will be happy to oblige.

21      Have you ever given a deposition before?

22  A. No.

23  Q. Have you ever been involved in a lawsuit as a

Page 5

1  plaintiff or defendant before?

2  A. No.

3       MR. RYCHCIK:  Mark, before we get started,

4  I just wanted to mention about the --

5       MR. SIMPSON:  I'm sorry.  I forgot.  Let's

6  go ahead and put into the record as exhibits,

7  Exhibit 1, a copy of a Protective Order

8  Governing Confidentiality of Documents to be

9  Produced and Information Obtained in Discovery,

10  and as Exhibit 2, a Qualified Protective Order

11  Governing Confidentiality of Protected Health

12  Information, both of which have previously been

13  entered in this case.

14       MR. RYCHCIK:  As we discussed in the

15  event, as I anticipate, there will be

16  confidential materials discussed during the

17  deposition and possibly documents, we want to

18  designate the deposition as Confidential in

19  accordance with those Protective Orders.

20  Q. Dr. Saleh, who are your currently employed

21  with?

22  A. I am self-employed.

23  Q. Self-employed.  Are you currently employed with

Case 1:04-cv-00186-MBC    Document 116    Filed 09/10/2008    Page 7 of 43
USA, et al., vs. BRMC., et al.                Multi-Page™                    Kamran Saleh, M.D.
No. 04-186E                                                                  August 8, 2007

Page 6

1 V&S Associates?
2 A. Well, V&S is what I own. I am part owner in
3 that.
4 Q. It still exists?
5 A. Yes.
6 Q. When did you form V&S?
7 A. Excuse me?
8 Q. When did you form V&S?
9 A. 2000. It was April of 2000.
10 Q. And V&S is a corporation, correct?
11 A. That's right, L.L.C.
12 Q. L.L.C., and it's full name is V&S Associates
13 L.L.C.?
14 A. V&S Medical Associates, L.L.C.
15 Q. Who were the original shareholders or members
16 of the company?
17 A. Me, Dr. Saleh, and Dr. Vaccaro.
18 Q. Is the ownership the same today?
19 A. Yes.
20 Q. Have you ever had any other owners?
21 A. No.
22 Q. Do you own it 50-50?
23 A. Yes.

Page 7

1 Q. Have you had other doctor employees in the
2 company?
3 A. We had ones for less than a year.
4 Q. Just one?
5 A. Just one.
6 Q. Who was that?
7 A. Dr. Khan.
8 Q. What is his first name?
9 A. Amir, A-m-i-r.
10 Q. And when did he work for you?
11 A. I can't tell you exact dates.
12 Q. Do you have the year, approximately?
13 A. Approximately 2003.
14 Q. Was there a Dr. Jamil?
15 A. He's renting the space from us.
16 Q. But he has never been employed by you?
17 A. No.
18 Q. Is he currently renting space from you?
19 A. Yes.
20 Q. How long has he been renting space?
21 A. Since 2000.
22 Q. What is his first name?
23 A. Qazi, Q-a-z-i.

Page 8

1 Q. What space does he rent from you?
2 A. Office space.
3 Q. It is like -- what kind of space? Is it like a
4 one-office room or what does he rent?
5 A. No. He uses, like, six exam rooms and then the
6 space for the secretary and the computer, the nurse's
7 station, and part of the waiting room.
8 Q. Is this space that is jointly used by him and
9 by you and Dr. Vaccaro?
10 A. Well, it is kind of separate. The office is
11 one, but his space is on one side, and ours is on the
12 other side.
13 Q. So his space is dedicated to him?
14 A. Yes.
15 Q. I want to go back to before you formed V&S.
16 Actually, let's go back a little farther.
17    Where did you go to medical school?
18 A. I went to medical school in Karachi, Pakistan.
19 Q. When did you graduate?
20 A. '88.
21 Q. And when did you come to America?
22 A. In '91.
23 Q. Are you a citizen of the United States?

Page 9

1 A. Yes.
2 Q. When did you become a citizen?
3 A. I can't tell you exactly.
4 Q. Has it been more than ten years?
5 A. Approximately ten years.
6 Q. After graduating medical school, have you had
7 any other formal medical education?
8 A. Residency training.
9 Q. Where did you do your residency?
10 A. University of Buffalo.
11 Q. Was that a general residency, or did you have
12 any specialization?
13 A. Internal medicine.
14 Q. Did you complete the residency?
15 A. Yes.
16 Q. When did you complete it?
17 A. '91 to '94.
18 Q. Any other formal medical training?
19 A. No.
20 Q. Do you have any board certifications?
21 A. Yes.
22 Q. What would that be in?
23 A. Internal medicine.

APP-4

Case 1:04-cv-00186-MBC    Document 116    Filed 09/10/2008    Page 8 of 43
USA, et al., vs. BRMC., et al.              Multi-Page™              Kamran Saleh, M.D.
No. 04-186E                                                          August 8, 2007

Page 10

1    Q. When did you receive that?
2    A. In '94, and then I just -- since that expires
3 in ten years, I just renewed that.
4    Q. Is that your only board certification?
5    A. Yes.
6    Q. Have you always practiced in internal medicine?
7    A. Yes.
8    Q. Could you tell me briefly what internal
9 medicine involves?
10    A. Internal medicine involves taking care of
11 patients both in the office and the hospital, and
12 usually it deals with adult medicine and all the
13 common diseases that you see, like high blood
14 pressure, diabetes, heart disease, they are dealt
15 with. If there are certain areas where you need
16 subspecialists, then you refer the patients to the
17 subspecialist.
18    Q. Within the field of internal medicine, do you
19 specialize in any area?
20    A. No. I do have an interest in cardiology.
21    Q. With respect to cardiology, what would an
22 internal physician do?
23    A. Like, you take care of patients in the

Page 11

1 intensive care unit, and most -- if you go into the
2 bigger hospitals, most of the internists are not
3 allowed to take care of patients in the critical care
4 unit when they are having a heart attack or heart
5 failure, congestive heart failure. We do all that.
6    Q. Does cardiology make up a substantial
7 percentage of your work, would you say?
8          MR. RYCHCIK: Objection as to form.
9    A. Well, it does make up some part of it. I can't
10 tell you how much.
11    Q. Where do you currently have hospital
12 privileges?
13    A. Excuse me?
14    Q. I'm sorry. Where do you currently have
15 hospital privileges?
16    A. I have hospital privileges at Bradford Regional
17 Medical Center, and I have courtesy privileges in
18 Olean General Hospital.
19    Q. I'm sorry. I didn't understand the last one.
20    A. Olean General Hospital.
21    Q. Oh, Olean, O-l-e-a-n?
22    A. Yes.
23    Q. In the last ten years, have you had privileges

Page 12

1 at any other hospital?
2    A. Other than these two?
3    Q. Other than these two.
4    A. No.
5    Q. When did you first get your privileges at
6 Bradford?
7    A. After my residency. Towards the end of '94.
8    Q. What about Olean?
9    A. At the same time.
10    Q. Has V&S' office been located in the same place
11 since you formed it?
12    A. Yes.
13    Q. Where is its office?
14    A. It is 24 West Washington Street in Bradford.
15    Q. In Bradford?
16    A. Yes.
17    Q. How far is it from Bradford Regional Medical
18 Center?
19    A. It is about less than a mile.
20    Q. How far is it from the Olean Hospital?
21    A. It is about, roughly, 20 miles.
22    Q. I would like to focus, for a minute, on the
23 time period before you bought the nuclear camera that

Page 13

1 is sort of at issue in this litigation. I said
2 "bought." I should say "leased."
3          Do you recall when you leased that camera?
4    A. I don't know the exact dates, but it was around
5 2001.
6    Q. Now, in the period before you leased the
7 camera, could you briefly describe to me the nature of
8 your practice?
9    A. Well, we are a two-physician group practice,
10 and we see patients in the office, and if there is
11 somebody who gets sick and needs to go to the
12 hospital, we admit them in the hospital and take care
13 of them in the hospital.
14    Q. At this period of time that we are talking
15 about, how did most of your patients come to you?
16          MR. RYCHCIK: Again, just to be clear, at
17    this period of time, we are talking pre2001?
18          MR. SIMPSON: Right.
19    A. Pre2001?
20    Q. Pre2001, before you got the camera, basically.
21    A. They were mostly our patients that we acquired
22 when we bought the practice from the hospital, and the
23 new patients are patients that come on the basis of

APP-5

Case 1:04-cv-00186-MBC   Document 116   Filed 09/10/2008   Page 9 of 43
USA, et al., vs. BRMC., et al.                Multi-Page™                     Kamran Saleh, M.D.
No. 04-186E                                                                    August 8, 2007

Page 14

1 patient referrals or through the ads, the Yellow
2 Pages.
3   Q. I guess I meant to ask this before, but I will
4 ask it now: You referred to buying the practice from
5 the hospital. At some point, you were employed by
6 Bradford Regional Medical Center; is that correct?
7   A. That's true.
8   Q. Was the same true for Dr. Vaccaro?
9   A. Yes.
10   Q. What was the nature of that employment? Were
11 you employed as a fulltime hospital-based physician?
12   A. Yes. Yes.
13   Q. During what period of time were you employed by
14 the hospital?
15   A. Well, up until 2000 and before, maybe, we were
16 employed for maybe a couple of years. I don't know
17 exactly.
18   Q. And while you were employed by the hospital, is
19 that when you came up with the idea to form V&S?
20   A. (The witness nods his head.)
21       MR. RYCHCIK: Objection as to the form.
22   A. We came up with the idea towards the end of the
23 employment, yes.

Page 15

1   Q. You mentioned buying out the practice from the
2 hospital. How did that work?
3   A. Well, we had a contract with the hospital that
4 had a non-compete clause in it, and we had -- to stay
5 in Bradford, we had to pay the amount that was
6 specified in our contract, so that is what we paid.
7   Q. Did the non-compete provide that you couldn't
8 compete with Bradford for a certain period of time
9 after you left?
10   A. That's right. Two years.
11   Q. Two years. Do you recall how much you had to
12 pay to get out of that agreement?
13   A. I think it was $300,000 for both of us, plus
14 goodwill.
15   Q. Do you know how much you paid for the goodwill?
16   A. I don't know what the exact number is. It is
17 probably around $50,000.
18       MR. RYCHCIK: Again, I don't at any point
19    in time want you to guess during the
20    deposition, Doctor. If you have got an
21    understanding or a knowledge, that's fine.
22       THE WITNESS: Okay.
23       MR. RYCHCIK: But no one here wants you to

Page 16

1    try to guess.
2       MR. SIMPSON: Well, that's not exactly
3    true. I might want you to --
4       MR. RYCHCIK: He might want you to try --
5       MR. SIMPSON: I would like you to
6    estimate. If you think you know that you paid
7    about 350, but you can't remember if it was 351
8    or 349, then it is perfectly fine for you to
9    estimate, say that it is around 350, knowing
10    that you are not giving me an exact number.
11       MR. RYCHCIK: I don't want you to guess.
12       MR. SIMPSON: I don't want you to guess,
13    but if you have a basis for estimating, you can
14    estimate.
15   Q. So it was sometime in 2000 that you bought out
16 the practice?
17   A. Yes, sir.
18   Q. So going back now to the time period when you
19 are with V&S before you bought the nuclear camera, you
20 had mentioned that when patients needed services, you
21 would refer them out to someone --
22   A. That's right.
23   Q. -- in a lot of instances?

Page 17

1   A. Yes.
2   Q. What types of referrals would you make?
3   A. Like, if patients needed a cardiac
4 catheterization, we would send the patient for the
5 cardiac catheterization. Some patients need an
6 endocrine evaluation, so we would send them to an
7 endocrinologist or urologist. It was orthopedic
8 surgeons, so all kind of referrals, whatever the
9 patient's need is.
10   Q. Would you also refer patients to the hospital
11 to be admitted as inpatients?
12   A. Yes, we do.
13   Q. Is it fair to say that most of your referrals
14 to a hospital went to Bradford?
15       MR. RYCHCIK: Objection as to the form.
16   A. Well, we refer patients wherever the
17 opportunity was, wherever the need was. If there is
18 somebody who needed to be admitted to the hospital, we
19 admitted them to Bradford Hospital, yes.
20   Q. Did you admit very many inpatients to Olean
21 Hospital --
22   A. No.
23   Q. -- or other hospitals other than Bradford?

APP-6

Case 1:04-cv-00186-MBC    Document 116    Filed 09/10/2008    Page 10 of 43
USA, et al., vs. BRMC., et al.                  Multi-Page™                        Kamran Saleh, M.D.
No. 04-186E                                                                        August 8, 2007

Page 66

1  statute?
2  A. No.
3  Q. Do you know whether you had any discussions
4  about those issues?
5  A. I can't tell you that. I don't know. I don't
6  remember.
7  Q. If you will flip over to Bates Nos. 00138 and
8  139, under question 4, it purports to list
9  examinations that the nuclear camera was capable of
10 performing. If you will look that over those, does
11 that look like an accurate list of procedures that the
12 camera could perform?
13 A. Yes.
14 Q. Do you know if that is a comprehensive list or
15 is it a partial list?
16 A. I can't tell you. I mean, there may be some
17 others that are left out.
18 Q. Let me ask you as a general question: Were you
19 generally copied on correspondence that your attorney
20 sent to Bradford's attorney or received from
21 Bradford's attorney?
22 A. Yes.
23 Q. When you would get those letters, would you

Page 67

1  generally read them?
2  A. Yes.
3  Q. Would you discuss them with Dr. Vaccaro?
4  A. Yes.
5        MR. SIMPSON: I will have this marked as
6        Exhibit 6, please.
7        (Saleh Deposition Exhibit No. 6 was marked
8  for identification.)
9  Q. Exhibit 6 purports to be a letter, a fax of a
10 letter, from Alan Steinberg to Marc Raspanti dated
11 February 6, 2002, and I guess my first question is:
12 Do you recall receiving this letter?
13 A. I don't recall.
14 Q. Have you had a chance to look it over?
15 A. No.
16 Q. Have you had a chance to look it over?
17 A. Yes.
18 Q. Does that change your testimony? Do you recall
19 receiving it?
20 A. I don't recall receiving it, no.
21 Q. I would like you to flip to page 00167 of this,
22 the next-to-the-last paragraph starting with "The
23 Medical Center." It says, "The Medical Center would

Page 68

1  not be depriving the Bradford community of services
2  that Dr. Saleh can perform with the nuclear cardiology
3  equipment in his office. Dr. Saleh has been and
4  always will be able to provide his own office-based
5  services of this kind."
6        Now, after signing the sublease agreement with
7  the hospital, you are prohibited from providing those
8  types of services, correct?
9        MR. RYCHCIK: I don't know if you have
10       read through the entire page here. I mean, you
11       said you didn't remember the letter, and you
12       stopped reading when Mr. Simpson asked
13       questions. I want to make sure that you are
14       comfortable answering questions about the
15       document.
16 Q. I am not asking you actually about the
17 document. I am asking you after -- this document was
18 before you signed the sublease. After you signed the
19 sublease, the sublease precludes you from performing
20 nuclear cardiology tests in your office, correct?
21 A. That's true.
22       MR. SIMPSON: I would like to mark this as
23       Exhibit 7, please.

Page 69

1        (Saleh Deposition Exhibit No. 7 was marked
2  for identification.)
3  Q. All right. I have handed you Exhibit 7, which
4  purports to be a February 15, 2002 letter from Marc
5  Raspanti to George Leonhardt, and I would ask you to
6  look at that, and let me know if you have seen this
7  letter.
8        Can you state whether you have seen this letter
9  or not?
10 A. I don't remember seeing it.
11 Q. If you turn to page 157, towards the bottom, it
12 says, "The nuclear camera was installed at V&S in
13 August of 2001."
14       Does that refresh your recollection of when
15 exactly the camera was installed?
16 A. No.
17 Q. But August of 2001 sounds right?
18 A. Yes.
19 Q. In general, when Mr. Raspanti would send a
20 letter, would he send it to you -- and listen for -- I
21 don't know if you are going to get an objection or
22 not, but would he send it to you for your review
23 before he would send it to opposing counsel?

APP-7

Case 1:04-cv-00186-MBC    Document 116    Filed 09/10/2008    Page 11 of 43
USA, et al., vs. BRMC., et al.    Multi-Page™    Kamran Saleh, M.D.
No. 04-186E    August 8, 2007

Page 78

1  for identification.)
2    Q. I have shown you Exhibit 8, which is a May 20,
3  2002 letter to you from Richard McDowell, Chairman of
4  the Board of Directors, and I would ask if you recall
5  receiving this letter?
6    A. No, I don't recall.
7    Q. Have you looked over the letter?
8    A. I am looking now.
9    Q. Have you had a chance to look at this letter?
10   A. Yes.
11   Q. Do you recall receiving it?
12   A. No.
13   Q. That was a no?
14   A. No.
15   Q. If you go to the last paragraph on the first
16  page, it says, "Data collected by the Medical Center
17  shows that you have significantly changed your
18  practice pattern in terms of your usage of the Medical
19  Center's equipment. We understand that is because you
20  are now using the V&S equipment in its place."
21       Irrespective of the fact that you don't recall
22  receiving this letter, is that a true statement?
23   A. I never saw the data, so I can't tell.

Page 79

1    Q. But it is a true statement that you
2  significantly changed your practice patterns, because
3  you were using the V&S equipment?
4       MR. RYCHCIK: Objection as to the form of
5    the question.
6    A. We were using V&S equipment more, yes.
7    Q. You will note in the second paragraph, the
8  first page, that Mr. McDowell says that, "The next
9  step is for you, Dr. Vaccaro, and the Board to meet."
10      Do you recall a request from Mr. McDowell that
11  you all have a meeting in this time period?
12   A. Yes.
13   Q. Did you respond that you were willing to meet
14  with the committee?
15   A. Yes.
16   Q. I will show you Exhibit 9, then.
17       (Saleh Deposition Exhibit No. 9 was marked
18  for identification.)
19   Q. Exhibit No. 9 is a June 11th, 2002 letter from
20  George Leonhardt to you and Dr. Vaccaro, and it
21  purports to talk about, "The purpose of our meeting
22  tomorrow." Do you recall whether you had a meeting on
23  or around June 12th, 2002?

Page 80

1    A. I can't tell you the dates, no.
2    Q. But it would have been around that time period?
3    A. (No response.)
4    Q. Actually, in order to help you answer that
5  question I will go ahead and show you Exhibit 10.
6       (Saleh Deposition Exhibit No. 10 was
7  marked for identification.)
8    Q. Exhibit 10 purports to be a letter from you to
9  Richard McDowell dated June 25th, 2002, and in this
10  letter, you discuss a June 12th meeting. So, first of
11  all, do you recall sending Exhibit 10, that letter to
12  Mr. McDowell?
13   A. I don't recall sending the letter, no.
14   Q. Is that your signature?
15   A. Yes.
16   Q. Did you routinely send copies of your letters
17  that you sent to Mr. McDowell to your attorney to be
18  kept in their files?
19       MR. RYCHCIK: I'm going to object, again,
20    the same objection we had before. I don't know
21    that I want to have him testifying as to his
22    practice of communicating with his attorney,
23    which would include commenting on him sending

Page 81

1    copies of things.
2       MR. SIMPSON: I don't think that impli-
3    cates attorney-client privilege at all. We
4    have got a copy of a letter signed by him that
5    was produced by his attorneys, and he says he
6    doesn't remember. I have got to have some way
7    of authenticating it.
8       MR. RYCHCIK: So your question is what his
9    practice of communication was with his
10    attorney.
11       MR. SIMPSON: Which I don't anticipate
12    that you are going to deny the authenticity of
13    this letter.
14       MR. RYCHCIK: Like I said, I think we can
15    stipulate to the authenticity of the letter. I
16    don't want him to get into the attorney-client
17    communications, though.
18       MR. SIMPSON: That is fine with me, as
19    long as you don't have any authenticity
20    objections to these letters.
21   Q. First, does that refresh your recollection as
22  to whether you had a meeting on June 12th?
23   A. We had a meeting.

APP-8

Case 1:04-cv-00186-MBC    Document 116    Filed 09/10/2008    Page 12 of 43
USA, et al., vs. BRMC., et al.    Multi-Page™    Kamran Saleh, M.D.
No. 04-186E    August 8, 2007

Page 150

1 A. Yes.
2 Q. You are looking at Cardiolite resting. So it
3 looks like the 52 is the adding up of the Adenosine
4 and the treadmill?
5 A. That's right.
6 Q. Do you know why he would be separating those
7 out for the handwriting at the bottom? What is
8 significant about that?
9 A. That is just the calculation for the stress
10 testing, and that is not my writing.
11 Q. That is not yours. Do you know whose it is?
12 A. I don't know whose writing that is.
13 Q. Was this a document that you provided to
14 Bradford?
15 A. I don't recall.
16 Q. Do you recall whether you generated this
17 document in the context of your negotiations with
18 Bradford over the under arrangements or the lease
19 agreement?
20 A. I don't recall that, either.
21 Q. Do you routinely print out these documents
22 every month?
23 A. We print out an end-of-the-month report every

Page 151

1 month.
2 Q. Is this one of the documents that comes out at
3 the end-of-the-the-month report?
4     MR. RYCHCIK: Are you talking about this
5     time period or these dates?
6     MR. SIMPSON: Yes. The time period when
7     these date are.
8 Q. I am trying to figure out if this is a
9 routinely printed document printed at that time or was
10 this printed out for a special reason?
11 A. I don't think it was a routinely printed out
12 document, so it must have been prepared to get some
13 information.
14 Q. You don't know how you used that information?
15 A. That is right. It could just be for our own
16 purposes.
17 Q. I'm going to mark as Exhibit 30 all the
18 documents you handed to us this morning.
19     (Saleh Deposition Exhibit No. 30 was
20 marked for identification.)
21 Q. Exhibit 30 is Bates labeled 3154 through 3170.
22 The first page is a statement of October 2003. Is
23 this a statement for -- what is this first page?

Page 152

1 A. This is a statement that we sent to the
2 hospital when the hospital was using the nuclear
3 camera at our facility.
4 Q. So the $4,879.84 is your bill to the hospital
5 for the rent --
6 A. The cost.
7 Q. -- the cost of keeping the camera on your site?
8 A. Not just the cost. It includes the running of
9 the camera, too.
10 Q. But it is payments that they are making to you
11 for keeping the camera at your facility instead of at
12 the hospital, right?
13 A. Yes.
14 Q. And those payments are in addition to the other
15 payments that would be under the sublease?
16 A. That's true.
17 Q. And the next page is a copy of their check to
18 you for that amount, it looks like?
19 A. Yes.
20 Q. And the next page 3156 is a similar statement
21 for November of 2003, correct?
22 A. Yes, sir.
23 Q. Then the next page, it says, "Receipts," and

Page 153

1 there is no date on it, though, that I can see. Is
2 this a -- how can you tell what period this is for?
3 A. It is after November, because it says November
4 rental statement.
5 Q. Oh, I see. Okay. So this is, basically, your
6 receipt for the payment that you received, and you
7 received a total -- the top line is "Total receipts,
8 $24,922.31." What is that payment? What is that?
9 A. That is the payment received by use of the
10 nuclear camera.
11 Q. Is that the sublease payment?
12 A. No. The way it was handled initially was after
13 it came into the contract with the hospital for
14 sublease, then the camera stayed at our facility for
15 several months, and then used in our facility; and
16 when it was used, we continued to provide the
17 services, but the income that was generated from that
18 date on was the hospital's money.
19     So this is the income brought in from that day
20 on, and then you can see that there are expenses that
21 are deducted. So whatever it was less was there, and
22 then their rental statement, and then the actual
23 payment to BRMC was made of this much dollars.

APP-9

Case 1:04-cv-00186-MBC    Document 116    Filed 09/10/2008    Page 13 of 43
USA, et al., vs. BRMC., et al.                Multi-Page™                    Kamran Saleh, M.D.
No. 04-186E                                                                  August 8, 2007

**Page 154**

1 Q. So this was a payment made by you to BRMC?
2 A. Yes.
3 Q. So the 424,922 is payments that you received
4 from --
5 A. That's right.
6 Q. -- from --
7 A. The operation of the nuclear camera.
8 Q. At that point, were you billing for the tests?
9 A. Yes.
10 Q. So you were billing for them, and then you were
11 collecting --
12 A. Right.
13 Q. So the camera had been subleased to Bradford at
14 that time?
15 A. Right.
16 Q. But Bradford wasn't billing for the tests?
17 A. That's true.
18 Q. You were billing -- you would collect payment
19 from insurers or whoever, and then you would subtract
20 out a 10 percent billing charge, correct?
21 A. Yes.
22 Q. And then you would also subtract out a 24
23 percent reading charge for Dr. O'Donnell?

**Page 155**

1 A. Yes.
2 Q. Now, is that 24 percent reading charge, is that
3 a pass-through charge?
4 A. Yes. It goes to Dr. O'Donnell.
5 Q. You weren't making any profit on that number?
6 A. I don't remember exactly.
7 Q. And then here is something for medication
8 receipts. What is that?
9 A. Like Cardiolite and all the medication that is
10 used, you buy the medication, and then the insurance
11 company pays you for that.
12 Q. So that would be for medication, would you have
13 any profit on that number?
14 A. No.
15 Q. So that is your actual cost of purchasing the
16 medication that was used in the test that you are
17 performing for Bradford?
18 A. That's true.
19 Q. So when you subtract out that, you come to the
20 9,180.76, and then you subtract out the rental payment
21 that they owed you, and you come to 4,593.94, which
22 you paid to them?
23 A. That's true.

**Page 156**

1 Q. And then the next two pages show the same stuff
2 for December of 2003?
3 A. Uh-huh.
4 Q. And then the next page shows a statement for
5 January of 2004, but I don't see any receipts page, a
6 similar receipts page for January of 2004, and did you
7 think that was omitted, or did they cheat you that
8 month? No offense.
9 A. No. I think maybe the receipt was not enough
10 to go along with that in that month. So, therefore,
11 it was totaled with the February statement. After the
12 February statement, you can see.
13 Q. So you got the February statement on page 3161,
14 and then on 3162, you have the February receipts page,
15 just like we discussed before, which reflects that you
16 all ended up making a payment to Bradford of 7652?
17 A. That's true.
18 Q. And then that includes -- does that include --
19 is this, like, a two-month type page? Does that
20 include January and February?
21 A. No. It just saves that February statement, so
22 that did not include a January statement. So if you
23 go farther, you can see --

**Page 157**

1 Q. But your total receipts for that period are
2 42,000 plus, which is substantially more than the
3 27,000?
4 A. Because this is probably two months.
5 Q. So it is two months of receipts, less two
6 months of expenses?
7 A. Yes.
8 Q. And then you have the same thing the next
9 couple of pages for March of 2004, and then the next
10 two pages are the same thing for April of 2004; and
11 then you have a statement from May of 2004, correct?
12 A. That is true.
13 Q. But there is no separate receipts page?
14 A. That's right.
15 Q. And then a statement for June and then a
16 receipts page following that, which looks like it
17 includes monies from several months.
18 A. Yes.
19 Q. But if you take all of these receipts pages,
20 they cover that whole period that the statements refer
21 to?
22 A. Right.
23 Q. And in the last couple of months there, say,

APP-10

Page 158

1  May -- in May, there is a rent charge of 2,500 and a
2  secretarial support of 1,000, and then in June, there
3  is a 25 rent, and no secretarial support. There are a
4  lot of things that were included in previous months
5  that aren't included in those months?
6   A. They stopped doing the stress test at that
7  time, so there is no fee for secretarial support or
8  other support.
9   Q. So at this time, the equipment was in your
10 office, but it wasn't being used?
11  A. That particular month.
12  Q. So in April it was not used?
13  A. April?
14  Q. Page 3165?
15  A. April, right.
16  Q. And then for May, it was not used, correct?
17  A. Correct.
18  Q. And then in June it was also not used?
19  A. Right.
20  Q. So let's say in April, May, and June, it wasn't
21 being used?
22  A. That is right.
23  Q. Do you know if the hospital -- had you gotten

Page 159

1  the new equipment at that time, the new camera by that
2  time?
3   A. I don't know for sure if that is the time
4  period.
5   Q. Let me ask you this: Did you return the old
6  camera at the same time you got the new camera, or was
7  there an overlap?
8   A. There was an overlap.
9   Q. There was an overlap of time when you had the
10 old camera and Bradford had the new camera?
11  A. Yes.
12  Q. Let's look at the very last page of this
13 exhibit, 3170. This is another vendor QuickReport
14 like the ones we had talked about before.
15  A. Yes.
16  Q. So is that yet one more page?
17  A. This is just to show the amount that we have
18 talked about in those statements, those are being paid
19 to the hospital, so all the --
20  Q. These are not receipts by you? These are
21 payments by you?
22  A. Yes.
23  Q. I understood they were --

Page 160

1   A. These are payments by us to the hospital.
2   Q. All right. I understand.
3   A. Right.
4       MR. RYCHCIK: Can we go off the record a
5  second?
6       (Discussion off the record.)
7       (Saleh Deposition Exhibit No. 31 was
8  marked for identification.)
9   Q. I have shown you Exhibit 31 is an agreement
10 dated April 16, 2003. The last two pages appear to be
11 out of order, but that is just the way they were
12 produced to us, but I think they are just out of
13 order. Is this a copy of an agreement that V&S and
14 Bradford signed?
15  A. Yes.
16  Q. And on Bates No. 0664, you and Dr. Vaccaro also
17 signed agreeing to be bound by the terms and
18 conditions of the agreement?
19  A. That's true.
20  Q. And this agreement, is it sort of fair to
21 characterize this agreement as an agreement to enter
22 into the lease agreement?
23      MR. RYCHCIK: Objection as to the form of

Page 161

1       the question and to the extent you are calling
2       for a legal conclusion.
3   Q. Let me put it to you this way, paragraph one,
4  in the middle, it says, "The equipment will be
5  subleased to the Medical Center pursuant to a sublease
6  between the parties."
7   A. Where is that?
8   Q. In the middle of paragraph 1.
9       MR. RYCHCIK: Paragraph numbered 1?
10      MR. SIMPSON: Paragraph numbered 1.
11      MR. RYCHCIK: As opposed to the first
12      paragraph, Doctor.
13  Q. As opposed to the first paragraph of the
14 document, Doctor.
15  A. This is paragraph No. 1?
16  Q. Where it says, "The equipment will be subleased
17 to the Medical Center pursuant to a sublease between
18 the parties."
19  A. Yes, that's what it says.
20  Q. The actual sublease was not executed until
21 sometime later, correct?
22  A. That's true.
23  Q. Did the sublease begin upon the execution of

Page 162

1  this agreement, or upon the execution of the
2  subsequent agreement?
3  A. No. The subsequent agreement.
4  Q. After you executed this agreement, you still
5  kept the camera and operated it as your own?
6  A. That's true.
7  Q. No rights passed to the hospital with respect
8  to the equipment under this lease --
9  A. Yes.
10  Q. -- under this agreement?
11  A. That's true.
12       (Saleh Deposition Exhibit No. 32 was
13  marked for identification.)
14  Q. I am showing you Exhibit 32, and is this a copy
15  of the actual Equipment Sublease that was executed?
16  A. Yes.
17  Q. And was it executed on October 1, 2003?
18  A. That is what the date says.
19  Q. I'm sorry. Actually, will you flip over to
20  page 17 which is Bates labeled 0316?
21  A. It was signed 9-22-03.
22  Q. But it was effective as of October 1st?
23  A. October 1st.

Page 163

1  Q. So October 1st was the date that the sublease
2  went into effect?
3  A. Yes.
4  Q. And at the bottom of page 17, that is your
5  signature and Dr. Vaccaro's signature, correct?
6  A. Yes.
7  Q. It says at the bottom of page 17, it says,
8  "Kamran Saleh, M.D., and Peter Vaccaro, M.D., as
9  individuals residing in the Commonwealth of
10  Pennsylvania, also agree to be bound by the terms and
11  conditions of Section 14 of this sublease"?
12  A. Yes.
13  Q. What do you understand -- I know you are not a
14  lawyer, but what do you understand you were verbally
15  literally agreeing to there?
16  A. My understanding --
17       MR. RYCHCIK: I want to formally object to
18       the extent you are asking for a legal
19       conclusion.
20  A. My understanding of this is that this was a
21  covenant not to compete and not to enter into any
22  ventures including the nuclear camera and the MRI or
23  CT scan; and if we do, then talk to the hospital and

Page 164

1  give them first right of refusal.
2  Q. So by individually agreeing to that paragraph
3  14, are you agreeing that you individually can't go
4  out and open up, you know, The Medical Associates
5  L.L.C., a separate company, to try and get around the
6  non-compete? Is that your understanding?
7       MR. RYCHCIK: Again, objection to the
8       extent you are seeking a legal conclusion.
9       MR. SIMPSON: I am asking his
10       understanding.
11  A. My understanding is as a person, also, not only
12  as a part of V&S. As a person, Kamran Saleh cannot go
13  and do that.
14  Q. And there has never been a subsequent lease
15  agreement entered into between V&S and Bradford,
16  correct?
17  A. That's correct.
18       MR. SIMPSON: This will be quick. I just
19       want to show this to you and have you look at
20       it.
21       (Saleh Deposition Exhibit No. 33 was
22  marked for identification.)
23  Q. I'm showing you Exhibit 33, and it is entitled

Page 165

1  on the first page, MaxiService Schedule, dated as of
2  6-6-01 to Master Lease Agreement dated as of 6-6-01.
3       Then if you flip over a couple of pages, there
4  is a document entitled, "Early Buyout Option."
5       Then if you flip over another couple of other
6  pages, there is a document entitled, "Non-GE Equipment
7  Addendum to Master Lease Equipment."
8       Then if you flip over another couple of pages,
9  there is another document, "GE Addendum to Master
10  Lease Agreement," and I want to ask, are these all
11  documents relating to your original lease of the first
12  camera?
13  A. Yes.
14  Q. And then let me show you what will be 34.
15       (Saleh Deposition Exhibit No. 34 was
16  marked for identification.)
17       MR. SIMPSON: While I'm at it, this will
18       be 35.
19       (Saleh Deposition Exhibit No. 35 was
20  marked for identification.)
21  Q. I have shown you Exhibits 34 and 35. You can
22  look through them, but my question is are these all
23  documents relating to the subsequent lease with the

JAH – August 9, 2007

In re:  **USA et al., vs. BRMC et al.

_____
    **Kamran Saleh, M.D.


        Sworn to and subscribed before me this
_4th_ day of _September_____, 2007.




_____
              NOTARY PUBLIC


My commission expires: ___2/24/2010_____.

NOTARIAL SEAL
MARYELLEN TROUTMAN, NOTARY PUBLIC
BRADFORD, McKEAN COUNTY, PA.
MY COMMISSION EXPIRES FEBRUARY 24, 2010

# 2.  VACCARO DEPOSITION EXCERPTS

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

1

1          IN THE UNITED STATES DISTRICT COURT
      FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2                  ERIE DIVISION

3

UNITED STATES OF AMERICA, ex rel. )
4  DILBAGH SINGH, M.D., PAUL KIRSCH, )
   M.D., V. RAO NADELLA, M.D., and  )
5  MARTIN JACOBS, M.D.,             )
                                    )
6            Relators,              )
                                    )  Civil Action
7      vs.                          )  No. 04-186E
                                    )
8  BRADFORD REGIONAL MEDICAL CENTER, )
   V&S MEDICAL ASSOCIATES, LLC,     )
9  PETER VACCARO, M.D., KAMRAN SALEH,)
   M.D., and DOES I through XX,     )
10                                  )
             Defendants.            )
11

12          DEPOSITION OF PETER VACCARO, M.D.

13            THURSDAY, AUGUST 9, 2007

14         Deposition of PETER VACCARO, M.D., called as a

15   witness by the Plaintiffs, taken pursuant to Notice of

16   Deposition and the Federal Rules of Civil Procedure,

17   by and before Joy A. Hartman, a Court Reporter and

18   Notary Public in and for the Commonwealth of

19   Pennsylvania, at the offices of Fox Rothschild, 625

20   Liberty Avenue, 29th Floor, Pittsburgh, Pennsylvania,

21   commencing at 2:56 p.m. on the day and date above set

22   forth.

23

CONFIDENTIAL

USA, et al., vs. BRMC., et al.                    Multi-Page™                    Peter Vaccaro, M.D.
No. 04-186E                                                                        August 9, 2007

|  | Page 14 |
|---|---|
| 1 | EXCERPTED PORTION FOR ATTORNEYS' EYES ONLY |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |

**Page 15**

1    (EXAMINATION RESUMED AFTER "ATTORNEYS'
2 EYES ONLY" EXCERPT OF DEPOSITION OF DR. VACCARO WITH
3 EXAMINATION RESUMED BY ATTORNEY SIMPSON.)
4          - - -
5          EXAMINATION
6 BY MR. SIMPSON:
7    Q. Where do you currently have privileges,
8 hospital privilegeS?
9    A. I have privileges at two hospitals. My first
10 hospital privileges were Bradford Regional Medical
11 Center.
12    Q. And when did you get those?
13    A. In 1994.
14    Q. And you have had those since then?
15    A. Yes, I have.
16    Q. And where else?
17    A. At Olean General Medical Center.
18    Q. And when did you get those?
19    A. I don't recall, sir.  Sometime in 2001 or 2 or
20 3, within those times.
21    Q. Five years, plus or minus ago?
22    A. Yes.
23    Q. Have you ever had privileges at any other

**Page 16**

1 hospitals?
2    A. No.
3    Q. Have you ever been denied privileges at any
4 other hospital?
5    A. No.
6    Q. In Dr. Saleh's deposition, I asked him several
7 questions about the formation of V&S Medical
8 Associates.  Were you paying attention during that
9 questioning?
10          MR. RYCHCIK:  Objection.
11    A. Yes.
12          MR. RYCHCIK:  Objection to the form of the
13    question.
14    Q. I didn't mean that insultingly.  I meant --
15          MR. RYCHCIK:  Go ahead.  I withdraw the
16    question.
17    A. Yes, I was.
18    Q. Do you have any disagreement with Dr. Saleh's
19 testimony about the formation of V&S?
20          MR. RYCHCIK:  Objection as to the form of
21    the question.  Go ahead.  You can answer.
22    A. No.
23    Q. As far as you could tell, his testimony was

**Page 17**

1 accurate?
2    A. Yes, it was.
3    Q. About how V&S was formed?
4    A. Yes.
5    Q. And you understand, I'm asking it this way,
6 because I'm trying to move things along?
7    A. I understand.
8          MR. RYCHCIK:  Just for the record, Mark, I
9    don't have a problem with trying to move things
10    along.
11          MR. SIMPSON:  I understand.
12          MR. RYCHCIK:  I do want to proceed
13    carefully --
14          MR. SIMPSON:  I understand.
15          MR. RYCHCIK:  -- though, because if you
16    are just going to group all the testimony
17    together, I do think that is going to be a
18    problem.
19          MR. SIMPSON:  No.  I'm not grouping it all
20    together.  I understand.
21    Q. I also asked Dr. Saleh a question about V&S'
22 practice before you acquired the nuclear camera.  Was
23 there anything that he testified about the nature of

Case 1:04-cv-00186-MBC   Document 116   Filed 09/10/2008   Page 20 of 43

USA, et al., vs. BRMC., et al.          Multi-Page™                    Peter Vaccaro, M.D.
No. 04-186E                                                            August 9, 2007

**Page 22**

1  be sent there.
2  Q. But that was a small percentage of the tests
3  that you were performing, right?
4  A. I don't know what percentage it was.
5  Q. You just said it was easy to figure out much
6  you sent to the hospital?
7  A. That part.
8  Q. So it is not easy to figure out how many you
9  sent anywhere else?
10  A. Not as much.
11  Q. Really? How come?
12  A. Because --
13  Q. What is the difference?
14  A. The difference is then because then you left
15  up -- you left the decision to do the stress test up
16  to the cardiologist in that institution.
17  Q. But how is it easy to know when they are being
18  done in Bradford, but it is not as easy to know when
19  they are being done somewhere else?
20  A. Because I'm actually doing the ones at
21  Bradford.
22  Q. So all the ones you are not doing are being
23  done somewhere else?

**Page 23**

1       MR. RYCHCIK: Objection as to the form of
2    the question.
3  A. Yes.
4  Q. What percentage of them were you doing?
5  A. Approximately 80 percent or so, probably.
6  Q. Did Dr. Saleh do any of the tests at Bradford?
7  A. Yes, he did.
8  Q. So you weren't the only one doing it at
9  Bradford, then?
10  A. Correct.
11  Q. I thought you just said that you did -- that
12  all of the ones done at Bradford were done by you?
13  A. No. That is not what I said.
14  Q. You are saying all the ones that you did were
15  done at Bradford?
16  A. I was speaking for myself.
17  Q. Did you do more than Dr. Saleh, or did he do
18  more than you?
19  A. I think I probably did a little bit more than
20  him.
21       MR. RYCHCIK: I do want to caution you. I
22    don't want you to be guessing. It is the same
23    kind of thing as Mr. Simpson instructed Dr.

**Page 24**

1       Saleh, if you are able to make a reasonable
2    estimate, that is one thing. I don't want you
3    to be guessing if you don't know.
4  Q. Now, in terms of non-nuclear tests, other kinds
5  of tests, MRIs and CT scans, and x-rays, a similar
6  question, is it fair to say that the majority of those
7  were done at Bradford?
8  A. Yes.
9  Q. We talked a minute ago about whether you
10  attempted to qualify the value of getting a new
11  camera. Did you come to a dollar figure that you
12  thought you would get for increased revenues or
13  increased profit?
14  A. I don't recall what we actually came up with at
15  that time.
16  Q. Would it have been in the hundreds or thousands
17  of dollars per year for you?
18  A. It could have been.
19  Q. Do you recall whether you looked at any other
20  cameras, other than the GE camera that you ended up
21  leasing?
22  A. I don't recall.
23  Q. After you got the camera, is it fair to say

**Page 25**

1  with the exception of nuclear imaging referrals, your
2  other referral patterns stayed the same?
3  A. Yes.
4  Q. And your nuclear imaging referrals changed in
5  that a lot of tests you were doing you were doing
6  in-house that you otherwise would have performed at
7  Bradford, correct?
8  A. Obviously, we weren't going to be performing
9  them in the office anymore, and Bradford would be one
10  of the choices that would be decided upon. There
11  could be several choices.
12  Q. You might have misunderstood my question.
13       MR. RYCHCIK: I was going to say, I think
14    he might have misunderstood the question.
15  Q. I am talking about during the period when you
16  had the new camera, when you leased it.
17  A. Oh, when I had the nuclear camera. I thought
18  you meant after.
19  Q. So with respect to nuclear imaging tests, your
20  referrals to Bradford went down, because a lot of the
21  tests that would have been done there, you were doing
22  in-house?
23  A. Correct.

APP-17

JAH ~ August 9, 2007

In re:  **USA et al., vs. BRMC et al.

**Peter Vaccaro, M.D.

Sworn to and subscribed before me this
11th day of September , 2007.

NOTARY PUBLIC

My commission expires: 2/24/2010

```
NOTARIAL SEAL
MARYELLEN TROUTMAN, NOTARY PUBLIC
BRADFORD, McKEAN COUNTY, PA
MY COMMISSION EXPIRES FEBRUARY 24, 2010
```

TOTAL P.03

APP-18

# 3.  SINGH DEPOSITION EXCERPTS

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

1

1           IN THE UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2                      ERIE DIVISION


3

UNITED STATES OF AMERICA, ex rel. )
4   DILBAGH SINGH, M.D., PAUL KIRSCH, )
M.D., V. RAO NADELLA, M.D., and   )
5   MARTIN JACOBS, M.D.,              )
                                     )
6              Relators,             )
                                     )  Civil Action
7        vs.                         )  No. 04-186E
                                     )
8   BRADFORD REGIONAL MEDICAL CENTER, )
V&S MEDICAL ASSOCIATES, LLC,      )
9   PETER VACCARO, M.D., KAMRAN SALEH,)
M.D., and DOES I through XX,      )
10                                     )
               Defendants.           )
11

12            DEPOSITION OF DILBAGH SINGH, M.D.

13               TUESDAY, AUGUST 21, 2007

14        Deposition of DILBAGH SINGH, M.D., called as a

15   witness by the Defendant Bradford Regional Medical

16   Center, taken pursuant to Notice of Deposition and the

17   Federal Rules of Civil Procedure, by and before Joy A.

18   Hartman, a Court Reporter and Notary Public in and for

19   the Commonwealth of Pennsylvania, at the offices of

20   Stone Law Office, 1400 Allegheny Building, Pittsburgh,

21   Pennsylvania, commencing at 10:10 a.m. on the day and

22   date above set forth.

23

CONFIDENTIAL

JOHNSON and MIMLESS
(412) 765-0744

ORIGINAL

USA et al., vs. BRMC, et al.                      Multi-Page                      Dilbagh Singh, M.D.
No. 04-186E                                                                       August 21, 2007

Page 22

1  Q. Is it also your understanding that the Stark
2  rules allow for certain exceptions, certain
3  transactions that might be okay?
4  A. I don't know, but I think that I was told that
5  there are certain areas where if it is done properly,
6  with proper guidelines from OIG or the Attorney
7  General's office or from the responsible parties to
8  get permission from them, that whether that falls into
9  that category, yes, one could probably attempt to do
10  those kind of things, and those are only under
11  privileged places somewhere in the country where the
12  services may not be available for those things.
13      But this is not a very broad brush you are talking.
14  I don't know. There are many, many stages in that,
15  also, which I am not privy to, and I think there are
16  those more than me who are more privy to those things.
17  Q. Is it your understanding that one of those
18  areas that might be covered by an exception would
19  include an equipment lease?
20  A. I don't know. I don't know if that would cover
21  it or not.
22  Q. Doctor, what is your general understanding of
23  the Medicare Anti-kickback Law?

Page 23

1  A. I think I understand -- I don't -- it is the
2  same -- if you give me something to read, I can read
3  that, because I don't have, generally a very thorough
4  kind of information on these things.
5      But, generally, I believe that it is the same
6  thing that if you refer some cases and you get money
7  for that, it would be a kickback type of situation.
8  That is how I understand it.
9  Q. Again, with respect to the kickback law, is it
10  your understanding that there are any so-called safe
11  harbors that allow some transactions in a manner
12  similar to what you described for the Stark Law
13  exceptions?
14  A. I don't know now. I would have to read up on
15  those things to talk about it.
16  Q. Doctor, you mentioned earlier that you were
17  never employed by Bradford Regional Medical Center.
18  Did you ever perform personal services for the Medical
19  Center for which you were compensated by the Medical
20  Center?
21      MR. STONE: I'm going to object to ques-
22      tions about Dr. Singh's business relationships
23      with various entities. Again, this is the

Page 24

1  subject that was pursued in a Motion to Compel
2  several months ago and the subject of Judge
3  Cohill's order, and we believe that the
4  Plaintiffs' business relationships and
5  professional relationships and conduct in this
6  case is irrelevant to the issues in the case,
7  the claims, and the defenses, and, therefore,
8  I'm going to instruct the doctor not to answer
9  any questions.
10      MR. MULHOLLAND: And we will ask the court
11  reporter to please mark that page for
12  certification to the Court.
13      (Question certified for later discussion.)
14      MR. MULHOLLAND: Let me ask a follow-up
15  question that I anticipate to the same
16  objection, but it is different than the
17  questions I asked Dr. Nadella yesterday.
18  Q. Dr. Singh, did you ever request financial
19  assistance from Bradford Regional Medical Center to
20  recruit a new member or members of your practice?
21      MR. STONE: I'm going to object, and I
22  instruct the witness not to answer.
23      (Question certified for later discussion.)

Page 25

1  Q. Have you ever receive any financial assistance
2  from Bradford Regional Medical Center respect to
3  recruiting new physicians to your practice?
4      MR. STONE: Again, I will object and
5  instruct the witness not to answer.
6      (Question certified for later discussion.)
7  Q. Do you perform any kind of case review or
8  utilization review services for Bradford Regional
9  Medical Center?
10      MR. STONE: Again, I will object and
11  instruct the witness not to answer.
12      (Question certified for later discussion.)
13  Q. Dr. Singh, are you presently appointed to the
14  medical staff of any hospital other than Bradford
15  Regional Medical Center?
16  A. Yes. I am continuing my privileges in Olean
17  General Hospital, which is a neighboring state
18  hospital, and that has been going on for, I guess,
19  almost -- I don't remember when I started there, but,
20  you know, it's a good 15 to 20 years. It is ongoing,
21  and I am renewing my privileges, although I have cut
22  down a lot of my work on that.
23  Q. That is in Olean, New York?

JOHNSON and MIMLESS
(412) 765-0744

Page 22 - Page 25

USA et al., vs. BRMC, et al.
No. 04-186E

Case 1:04-cv-00186-MBC    Document 116    Filed 09/10/2008    Page 25 of 43

Multi-Page

Dilbagh Singh, M.D.
August 21, 2007

Page 94

1  Mr. Mulholland's questions. The same instructions
2  apply, and I think at any point in time, as Mr.
3  Mulholland said, if you need a break, please let me
4  know.
5      You have talked about the fact that you
6  currently practice at a practice known as Singh &
7  Nadella; is that correct?
8  A. That's right.
9  Q. What type of services do you provide at your
10  practice?
11  A. It is a general medical practice for mostly
12  adult and some pediatric age group. We have some
13  cut-off limits there.
14  Q. Are you familiar with V&S Medical Associates?
15  A. Yes.
16  Q. First, let me ask you. Do you have an office
17  of Singh & Nadella in Bradford, Pennsylvania?
18  A. Yes, we do.
19  Q. How far is your Bradford office from V&S
20  Medical Associates?
21  A. It is not that far. It is maybe within a block
22  or so.
23  Q. Are you familiar with what types of services

Page 95

1  V&S Medical Associates provides?
2  A. I'm not familiar with all the services, but
3  they also provide medical services. What they do in
4  their offices, I'm not sure what kind of more things
5  they do in the office, but they provide adult medical
6  care, internal medicine.
7  Q. For the most part, it is similar services to
8  the services Singh & Nadella provides?
9  A. For most of the part, yes.
10  Q. How would you describe your relationship with
11  Drs. Vaccaro and Saleh?
12  A. They are just colleagues in the medical staff
13  there as any other medical -- as all the medical staff
14  members are there.
15  Q. When your relationship or the employment of Dr.
16  Saleh terminated at Singh & Nadella, was that a
17  contentious ending to the employment relationship?
18  A. I don't think so.
19  Q. Did any patients who Dr. Saleh treated while he
20  was employed at Singh & Nadella leave the practice and
21  treat with Dr. Saleh?
22  A. I don't remember details of those things. Some
23  of them might have. I don't remember all the cases.

Page 96

1  Q. But were there some patients who left and now
2  treat with Dr. Saleh?
3  A. There might be. I don't know. I don't
4  remember.
5  Q. Now, you have testified about the sublease that
6  someone placed in your mailbox at the hospital. Do
7  you recall that testimony?
8  A. Yes.
9  Q. And you don't know who placed that copy of that
10  sublease between V&S and BRMC in your mailbox,
11  correct?
12  A. That is correct.
13  Q. Do you routinely get copies of contracts of
14  which you are not a party placed in your mailbox by
15  unknown individuals?
16  A. I don't know. Whatever comes in the mailbox, I
17  look at it, whether those are contracts, whether those
18  are memos, whether those are letters, whether those
19  are reports. Whatever is in my mailbox, I look at it.
20  Q. Do you recall any other instances when someone
21  placed a contract between other parties in your
22  mailbox?
23  A. I don't remember contracts, but some letters to

Page 97

1  some effects of that probably comes through the mail
2  and are there.
3  Q. I am just asking, specifically, about
4  contracts, though, contracts between other parties
5  that you are not a party to.
6  A. I don't know. I can't answer you that. I
7  don't remember. There might have been some cases, but
8  I don't remember.
9  Q. Do you recall ever receiving a copy of a
10  contract or a lease between V&S Medical Associates and
11  GE Financial Services?
12  A. That was also found in the same manner there,
13  some copies of that.
14  Q. Do you recall when you received a copy of the
15  V&S/GE lease?
16  A. I don't remember the time frame, no.
17  Q. Was it at the same time as you received a copy
18  of the sublease that we have talked about here today
19  between V&S and BRMC?
20  A. I really don't remember. I would have to look
21  back and see what happened at that time.
22  Q. Do you recall if it was in the same envelope or
23  if it was at the exact same time?

Margaret Koenig Mimless
Maureen T. McCall
Joy A. Hartman

*Johnson and Mimless*
Court Reporters

1334 Fifth Avenue, Pittsburgh, PA 15219-6214

Phone:
412–765–0744

Fax:
412–765–3539

COMMONWEALTH OF PENNSYLVANIA )
                                         )
COUNTY OF ALLEGHENY                )

USA, et al., vs. BRMC, et al.

I, Joy Hartman, a Notary Public in and for the Commonwealth of Pennsylvania, do hereby certify that the witnesses (Martin David Jacobs, M.D., V. Rao Nadella, Dilbagh Singh, M.D., Paul Kirsch and Sal A. Barbera), was duly sworn and that the deposition is a true record of the testimony given by the witnesses. A copy of the transcript of the deposition was submitted to the witnesses for inspection and signing.

The deposition was not signed by the witness within thirty days of its submission to the witness and, therefore, my signature below constitutes my signature of the deposition in accordance with Pa.R.C.P. 4017©.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this 4th day of September, 2008.

*Joy A. Hartman*
Joy A. Hartman

CC:   Andrew M. Stone, Esquire
       Daniel M. Mulholland, III, Esquire
       Carl J. Rychcik, Esquire

Commonwealth of Pennsylvania
NOTARIAL SEAL
JOY A. HARTMAN, Notary Public
City of Pittsburgh, County of Allegheny
My Commission Expires May 9, 2010

# 4.  KIRSCH DEPOSITION EXCERPTS

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

1

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2                   ERIE DIVISION

3

UNITED STATES OF AMERICA, ex rel. )
4   DILBAGH SINGH, M.D., PAUL KIRSCH, )
    M.D., V. RAO NADELLA, M.D., and  )
5   MARTIN JACOBS, M.D.,             )
                                     )
6                Relators,           )
                                     )   Civil Action
7        vs.                         )   No. 04-186E
                                     )
8   BRADFORD REGIONAL MEDICAL CENTER, ,
    V&S MEDICAL ASSOCIATES, LLC,     )
9   PETER VACCARO, M.D., KAMRAN SALEH,)
    M.D., and DOES I through XX,     )
10                                   )
                 Defendants.         )
11

12        DEPOSITION OF PAUL B. KIRSCH, M.D.

13          MONDAY, AUGUST 20, 2007

14        Deposition of PAUL B. KIRSCH, M.D., called as a

15   witness by the Defendant Bradford Regional Medical

16   Center, taken pursuant to Notice of Deposition and the

17   Federal Rules of Civil Procedure, by and before Joy A.

18   Hartman, a Court Reporter and Notary Public in and for

19   the Commonwealth of Pennsylvania, at the offices of

20   Stone Law Firm, 1400 Allegheny Building, Pittsburgh,

21   Pennsylvania, commencing at 2:50 p.m. on the day and

22   date above set forth.

23                                    CONFIDENTIAL

Case 1:04-cv-00186-MBC    Document 116    Filed 09/10/2008    Page 29 of 43
USA, et al., vs. BRMC, et al.                Multi-Page™                    Paul B. Kirsch, M.D.
No. 04-186E                                                                     August 20, 2007

Page 17

1    instruct him not to answer.
2         (Question certified for later discussion.)
3    Q. Was there a dispute between you and Bradford
4    Regional Medical Center over the termination of any
5    agreement that you may have had regarding Dr. Ali?
6         MR. STONE: Again, I will object and
7         instruct him not to answer.
8         (Question certified for later discussion.)
9    Q. Dr. Kirsch, at the present time, do you
10   consider yourself to be a competitor of Dr. Saleh or
11   Dr. Vaccaro?
12   A. No.
13   Q. Is it your understanding that they practice
14   internal medicine in Bradford just as you do?
15   A. That's correct.
16   Q. And you don't view yourself as a competitor?
17   A. No.
18   Q. Why not?
19   A. Because I, basically, have a full practice, and
20   I'm as busy as I want to be, and I don't think they
21   take my patients, and I'm not looking to take their
22   patients, so I don't feel there is any competition
23   whatsoever.

Page 18

1    Q. If Dr. Saleh and Dr. Vaccaro were to close
2    their practice in Bradford, would you financially
3    benefit?
4    A. I don't know if I could say that one way or the
5    other.
6    Q. Do you consider yourself to be a competitor of
7    Drs. Jacobs, Singh or Nadella?
8    A. No.
9    Q. And, again, would that be for the same reason
10   you expressed with respect to Drs. Saleh and Vaccaro?
11   A. That's correct.
12   Q. I forgot to ask this question at the outset,
13   but you sat through Dr. Nadella's deposition, at least
14   most of the deposition, did you not?
15   A. I did.
16   Q. Doctor, are you presently appointed to the
17   medical staff of any hospital, other than Bradford
18   Regional Medical Center?
19   A. Olean General hospital.
20   Q. Do you have clinical privileges at Olean
21   General Hospital?
22   A. Yes.
23   Q. Are you appointed to the active staff at Olean

Page 19

1    General or some other category of the staff?
2    A. Courtesy.
3    Q. Do your courtesy staff privileges at Olean
4    General permit you to refer patients to Olean General
5    for diagnostic tests?
6    A. I am able to refer patients to any accredited
7    diagnostic facility in the United States by virtue of
8    me being a physician. You don't need privileges at
9    any particular institution to be able to refer.
10   Q. And you refer patients to Bradford Regional
11   Medical Center for nuclear cardiology studies?
12   A. Yes, I do.
13   Q. Do you refer patients to Olean General for
14   nuclear cardiology studies?
15   A. Yes, I do.
16   Q. Do you refer patients to Tri-County Diagnostic
17   for nuclear cardiology studies?
18   A. Yes.
19   Q. Do you refer patients anywhere else for nuclear
20   cardiology studies?
21        MR. STONE: You can go ahead and answer.
22   A. Yes.
23   Q. Can you mention some of the facilities?

Page 20

1    A. Hamot Medical Center, Erie, Pennsylvania; St.
2    Vincent's Hospital, Erie, Pennsylvania; University of
3    Pittsburgh Medical Center, Pittsburgh; Buffalo General
4    Hospital, Buffalo, New York; Millard Fillmore
5    Hospital, Buffalo, New York; Strong Memorial Hospital,
6    Rochester, New York; Cleveland Clinic, Cleveland. I
7    think that is about it.
8    Q. What criteria, if any, do you use to decide
9    where to refer a patient for nuclear cardiology
10   studies?
11        MR. STONE: I'm going to object to any
12        further question with regard to Dr. Kirsch's
13        business relationships with any entities as
14        again being irrelevant and subject to Judge
15        Cohill's order.
16        MR. MULHOLLAND: I wasn't asking for
17        business relationships. I was asking for
18        criteria that he uses as to where a patient
19        should go.
20        MR. STONE: Again, it is not relevant to
21        the case because this is about V&S and an
22        illegal arrangement that V&S had with BRMC, and
23        what Dr. Kirsch does is irrelevant to this

Margaret Koenig Mimless
Maureen T. McCall
Joy A. Hartman

*Johnson and Mimless*
Court Reporters

1334 Fifth Avenue, Pittsburgh, PA 15219-6214

Phone:
412–765–0744

Fax:
412-765-3539

COMMONWEALTH OF PENNSYLVANIA )
                                                          )
COUNTY OF ALLEGHENY              )


USA, et al., vs. BRMC, et al.


I, Joy Hartman, a Notary Public in and for the Commonwealth of Pennsylvania, do hereby certify that the witnesses (Martin David Jacobs, M.D., V. Rao Nadella, Dilbagh Singh, M.D., Paul Kirsch and Sal A. Barbera), was duly sworn and that the deposition is a true record of the testimony given by the witnesses. A copy of the transcript of the deposition was submitted to the witnesses for inspection and signing.

The deposition was not signed by the witness within thirty days of its submission to the witness and, therefore, my signature below constitutes my signature of the deposition in accordance with Pa.R.C.P. 4017©.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this 4th day of September, 2008.


*Joy A. Hartman*
Joy A. Hartman


CC:   Andrew M. Stone, Esquire
        Daniel M. Mulholland, III, Esquire
        Carl J. Rychcik, Esquire

Commonwealth of Pennsylvania
NOTARIAL SEAL
JOY A. HARTMAN, Notary Public
City of Pittsburgh, County of Allegheny
My Commission Expires May 9, 2010

# 5.  NADELLA DEPOSITION EXCERPTS

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

1

1   IN THE UNITED STATES DISTRICT COURT

2       FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3              ERIE DIVISION

4

UNITED STATES OF AMERICA, ex rel. )
5   DILBAGH SINGH, M.D., PAUL KIRSCH, )
    M.D., V. RAO NADELLA, M.D., and  )
6   MARTIN JACOBS, M.D.,             )
                                     )
7            Relators,              )
                                     )   Civil Action
8        vs.                         )   No. 04-186E
                                     )
9   BRADFORD REGIONAL MEDICAL CENTER, )
    V&S MEDICAL ASSOCIATES, LLC,     )
10  PETER VACCARO, M.D., KAMRAN SALEH,)
    M.D., and DOES I through XX,     )
11                                    )
             Defendants.            )
12

13       DEPOSITION OF V. RAO NADELLA, M.D.

14         MONDAY, AUGUST 20, 2007

15      Deposition of V. RAO NADELLA, M.D., called as a

16  witness by the Defendant Bradford Regional Medical

17  Center, taken pursuant to Notice of Deposition and the

18  Federal Rules of Civil Procedure, by and before Joy A.

19  Hartman, a Court Reporter and Notary Public in and for

20  the Commonwealth of Pennsylvania, at the offices of

21  Stone Law Firm, 1400 Allegheny Building, Pittsburgh,

22  Pennsylvania, commencing at 10:03 a.m. on the day and

23  date above set forth.

JOHNSON and MIMLESS
(412) 765-0744



CONFIDENTIAL

USA et al., vs. BRMC, et al.  Multi-Page™  V. Rao Nadella, M.D.
No. 04-186E  August 20, 2007

Page 22

1 accommodate any more people than whom I am seeing, so
2 it will not benefit me one bit.
3  Q. Doctor, are you presently appointed to any
4 hospital medical staff other than Bradford Regional
5 Medical Center?
6  A. Yes.
7  Q. And at what hospitals?
8  A. I am on as courtesy staff privileges at Olean
9 General Hospital.
10  Q. And any other hospital besides Olean General?
11  A. No.
12  Q. Do your clinical privileges at Olean General
13 allow you to refer patients there for diagnostic
14 imaging tests?
15  A. Well, as far as referring for diagnostic
16 imaging tests, you can refer them even to a hospital
17 where you don't have privileges, you know. I refer
18 them even to the other hospitals where I don't have
19 privileges.
20  So it really -- you don't need to have
21 privileges to refer for diagnostic testing to have
22 privileges, and I do refer certain cases to Olean
23 General.

Page 23

1  Q. So, basically, you can refer patients anywhere
2 you wanted for diagnostic imaging, correct?
3  A. That is correct, provided it is convenient to
4 the patient, provided that service is available at
5 that particular facility.
6  Q. Do you know if Olean General has a nuclear
7 camera?
8  A. I do, and they do have.
9  Q. Do you ever refer patients to Olean General for
10 nuclear cardiology tests?
11  A. Yes.
12  MR. STONE: I'm going to object to the
13  question. It is completely irrelevant what Dr.
14  Nadella -- where Dr. Nadella refers his
15  patients and on what basis, and it is not
16  relevant to what V&S does with regard to
17  Bradford Regional Medical Center.
18  MR. MULHOLLAND: I think it is relevant
19  relative to any alternatives that are available
20  in the region for patients needing nuclear
21  cardiology tests, because the Relators at one
22  point had raised some questions about whether
23  or not a second camera was needed by the

Page 24

1 hospital.
2  I don't know, are you instructing him not
3 to answer, or just interposing an objection?
4  MR. STONE: I think he can answer that
5  question. Go ahead.
6  A. Yes. I now refer cases to Olean General on
7 numerous occasions for nuclear camera; but they will
8 not go under my name, because I do not perform the
9 tests in Olean General.
10  So most of the time when I refer cases to Olean
11 General for nuclear testing, it is referred to a local
12 cardiologist. Olean General has at least three
13 cardiologists on staff, and they have many internists
14 who do nuclear testing.
15  So, usually, when I refer a case for nuclear
16 testing to Olean General, it is referred to one of
17 these physicians, and I have referred a number of
18 cases to them.
19  Q. Dr. Nadella, are you a participating physician
20 in the Federal Medicare Program?
21  A. Yes.
22  Q. Are you a participating physician in the
23 Pennsylvania Medical Assistance Program?

Page 25

1  A. Yes.
2  Q. I'm going to show you a document, Doctor, and I
3 will ask that it first be marked as Exhibit 2, I
4 guess.
5  (Relators' Deposition Exhibit No. 2 was
6  marked for identification.)
7  Q. Doctor, I will represent to you that this is a
8 copy of the Complaint that you and the other Relators
9 filed in this lawsuit. I'm going to ask some
10 questions about it; but I just wanted to make sure
11 that it was your understanding that this was a copy of
12 the Complaint?
13  MR. STONE: Take a minute and look through
14  it.
15  Q. Certainly, Doctor, take as much time and let me
16 know when you are ready to respond to some specific
17 questions.
18  A. Yes.
19  Q. Doctor, if you could just please turn to the
20 second page of the document you have in front of you.
21 It is the page before that. It is an unnumbered page,
22 which is the second page in the document you have in
23 front of you.

Case 1:04-cv-00186-MBC    Document 116    Filed 09/10/2008    Page 34 of 43
USA et al., vs. BRMC, et al.          Multi-Page™                    V. Rao Nadella, M.D.
No. 04-186E                                                        August 20, 2007

Page 50

1    THE WITNESS: Yes. I saw it.
2    Q. Doctor, do you have any information that would
3 lead you to believe that this cost report was filed at
4 some other time other than March 25, 2005?
5    A. No, I don't.
6    Q. Doctor, if you could please read the paragraph
7 under the words "Certification by Officer or
8 Administrator of Providers," and let me know when you
9 are ready to answer any questions about that?
10   A. Which one?
11   Q. This is it, in the middle of the form.
12   A. Okay. This one?
13   Q. Yes. Do you see where I am referring?
14   A. Yes. Yes, I do.
15      Okay. Go ahead.
16   Q. Is there anything in this certification,
17 Doctor, that is in front of you today that says that
18 the Medical Center's claims are not infected by a
19 kickback?
20   A. Actually, this is something I'm seeing here for
21 the first time. I have not seen this one before, and
22 I have no knowledge one way or the other whether you
23 know -- you know, I couldn't tell you one way or the

Page 51

1 other, yes or no.
2    Q. Is there any reference in the paragraph that is
3 in front of you now to the Medicare Anti-kickback
4 Statute that you can see on that form?
5       MR. STONE: Again, I will object to the
6    extent that Dr. Nadella is not a legal expert
7    in the field; and to the extent that it
8    requires some kind of a legal analysis, I will
9    object to it on that basis. But, certainly, he
10   can answer as a lay witness.
11   A. Can you repeat the question, please?
12      MR. MULHOLLAND: Could you read the
13   question back to him, please?
14      (Previous question read back.)
15   A. No.
16      MR. STONE: Are you referring just to the
17   one paragraph or the paragraph above it?
18      MR. MULHOLLAND: I was referring just to
19   the one paragraph, right.
20      MR. STONE: But you are not asking him
21   about the rest of the document? Just the one
22   paragraph?
23      MR. MULHOLLAND: That's right, to that one

Page 52

1    paragraph, that certification.
2    A. To the Certification by Officer or
3 Administrator?
4    Q. Certification by Officer of Administrator of
5 Providers, that's correct. Right.
6    A. Yes.
7    Q. Is there anything in this paragraph that refers
8 to the Stark law?
9    A. I don't see it here.
10   Q. Doctor, in the paragraph that your attorney
11 just mentioned under, "Part I, Certification," if you
12 could take a moment and review that?
13   A. Okay.
14   Q. Doctor, is there any reference to the Stark law
15 in that paragraph?
16   A. It does say Federal law. I presume the Stark
17 law is the Federal law.
18   Q. I see. But it refers to misrepresentation
19 being subject to penalties under Federal law, correct?
20   A. That is correct.
21   Q. But is there any specific reference to the
22 Stark law in that paragraph?
23   A. It does not mention Stark law, but it states

Page 53

1 Federal law.
2       MR. MULHOLLAND: Doctor, I'm going to ask
3    that this next document be marked as Exhibit 4.
4       MR. STONE: Before we move on, also, I
5    want to state on the record that the paragraphs
6    that have been referred to in the questioning
7    of Dr. Nadella speak for themselves, and so Dr.
8    Nadella's interpretation of what is on the page
9    should not be construed as a statement of what
10   is on the page.
11      That was not actually read into the
12   record. It is referred to as an exhibit, and I
13   would direct attention to the exhibit that
14   speaks for itself.
15      (Relators' Deposition Exhibit No. 4
16 was marked for identification.)
17   Q. Doctor, let me know when you are ready to
18 answer a question about this document.
19   A. Well, this is a pretty long document. It takes
20 me quite a bit of time to study the whole thing, but
21 if you can ask me which part of the document you are
22 going to ask me about --
23      MR. STONE: Doctor, take your time and

Case 1:04-cv-00186-MBC    Document 116    Filed 09/10/2008    Page 35 of 43
USA et al., vs. BRMC, et al.                Multi-Page™                V. Rao Nadella, M.D.
No. 04-186E                                                          August 20, 2007

Page 54

1    read the document through, and then you can let
2    him know.
3    Q. Doctor, please do, and then let me know when
4  you are ready to answer questions about it.
5    A. Okay. Yeah. Go ahead.
6    Q. Doctor, I will represent to you that this is a
7  copy of a document produced in discovery to the
8  Relators by Bradford Regional Medical Center, which is
9  the certification made of the Medicaid Cost Report
10  filed by the Medical Center for the fiscal year ended
11  June 30, 2004.
12      If you look on the second page of the document
13  in front of you, which you have in front of you right
14  now, you will see above the line where it asks for the
15  address of preparer, there is a date 12-15-04.
16      Do you see where I am talking about?
17    A. Yes.
18    Q. Doctor, do you have any information that this
19  Medicaid Cost Report would have been filed on any date
20  other than December 15, 2004?
21    A. I don't.
22    Q. Now, Doctor, there is a Certification by
23  Officer or Administrator of Providers in the middle of

Page 55

1  that form. Do you see where I am referring to?
2    A. Which part?
3    Q. It is in the middle of that page, right here.
4    A. This paragraph?
5    Q. Yes. That is it.
6    A. Yes.
7    Q. Could you read that aloud into the record,
8  please?
9    A. Yes: "I hereby certify that I have read the
10  above statement and have examined the accompanying
11  Cost Report and supporting schedules, which present
12  true, correct, and complete cost/charge statements
13  prepared from the books and records of the providers
14  in accordance with applicable instructions except as
15  specifically noted. I agree to immediately notify the
16  Department of any errors related to the attached
17  information as soon as it is discovered and to provide
18  corrected information as soon as possible.
19      "I also agree that to the extent the informa-
20  tion on the accompanying Cost Report and supporting
21  schedules is used for rate setting purposes, the
22  Department is under no obligation to use any amended
23  information submitted by me once the Cost Report has

Page 56

1  been reviewed and the data entered into the
2  Department's computer system."
3    Q. Thank you, Doctor. Is there anything in the
4  paragraph that you just read that mentions either the
5  Stark law or the Anti-kickback law?
6    A. No.
7    Q. Is there anything in the paragraph that you
8  just read that says anything about the hospital being
9  in compliance with the law?
10      MR. STONE: Again, I'm going to object.
11      The document speaks for itself; and, again, Dr.
12      Nadella is not a legal expert.
13      To the extent that he has a lay
14      understanding of the form, of course, he can
15      answer.
16      THE WITNESS: Can you repeat the question,
17      please?
18      (Previous question read back.)
19    A. It states that it is in compliance, because it
20  says this misrepresentation or falsification of any
21  information contained in this report may be punishable
22  by fine and/or imprisonment under State or Federal
23  law.

Page 57

1    Q. But there is nothing that affirmatively
2  represents that the hospital is in compliance with any
3  law?
4    A. Not in this paragraph.
5    Q. Not in this paragraph. Thank you.
6      Now, Doctor, I'm going to show you another
7  document that I will asked be marked as Exhibit 5.
8    A. Okay.
9      (Relators' Deposition Exhibit No. 5 was
10  marked for identification.)
11    Q. Doctor, I'm going to represent to you that this
12  is a copy of a document that was produced to the
13  Relators in discovery, which is the signature page
14  from the hospital's CHAMPUS Cost Report that was filed
15  for the year ended June 30, 2004. If you could please
16  look at line 12 of that form. Do you see where I am
17  referring to?
18    A. Yes, sir.
19    Q. On that line 12, it indicates that the
20  reporting date was November 30, 2004. Do you have any
21  information that would lead you to believe that this
22  CHAMPUS cost report was filed at any time other than
23  November 30, 2004?

Case 1:04-cv-00186-MBC    Document 116    Filed 09/10/2008    Page 36 of 43
USA et al., vs. BRMC, et al.              Multi-Page™              V. Rao Nadella, M.D.
No. 04-186E                                                        August 20, 2007

Page 58

1   A. I don't.
2   Q. And then, Doctor, if you could please read
3   aloud into the record the paragraph below reporting
4   date which begins, "I certify the above information"?
5   A. Sure. "I certify the above information is
6   accurate and based upon the Hospital's Medicaid Cost
7   Report submitted to HCFA. The Cost Reports filed,
8   together with any documentation are true, correct, and
9   complete based upon the books and records of the
10  hospital.
11      "Misrepresentation or falsification of any of
12  the information in the Cost Reports is punishable by
13  fine and/or imprisonment. Any changes which are a
14  result of a desk review, audit or appeal of the
15  Hospital's Medicare Cost Report must be reported to
16  the TRICARE/CHAMPUS contractor within 30 days of the
17  date the hospital is notified of the change.
18      "Failure to report the changes can be con-
19  sidered fraudulent, which may result in criminal/civil
20  penalties or administrative sanctions of suspension or
21  exclusion as an authorized provider."
22  Q. Thank you, Doctor. Is there anything in the
23  paragraph which you just read which specifically

Page 59

1   refers to either the Stark law or the Anti-kickback
2   law?
3   A. No.
4       MR. STONE: Again, I'm going to object to
5       the question on the basis that Dr. Nadella is
6       not a legal expert and the document speaks for
7       itself. To the extent that Dr. Nadella has a
8       lay understanding of what is in the document,
9       he can, of course, answer.
10  Q. Dr. Nadella, is there anything in the paragraph
11  that you just read which constitutes a certification
12  on the part of the hospital that it is in compliance
13  with the law?
14      THE WITNESS: Can you repeat the question,
15      please?
16      (Previous question read back.)
17      MR. STONE: Again, I will object on the
18      basis that it calls for a legal conclusion.
19      You can answer if you understand.
20  A. I don't believe, you know, I have the legal
21  expertise to answer this particular question.
22  Q. But I am not asking for a legal conclusion,
23  Doctor. I am asking you for your understanding of

Page 60

1   what that paragraph says, and whether there is
2   anything in the paragraph that certifies that the
3   hospital is in compliance with the law.
4   A. That the hospital is in compliance or not in
5   compliance?
6   Q. Either way.
7   A. Either way. It does state, "misrepresentation
8   or falsification of any of the information in the Cost
9   Report is punishable by fine and/or imprisonment.
10  Q. But does that say that the hospital is in
11  compliance with the law?
12  A. I cannot answer.
13  Q. Doctor, at various places in the Complaint you
14  allege that Bradford Regional Medical Center submitted
15  claims for payment to Medicare, Medicaid, and CHAMPUS.
16  Have you seen any of those claims that were filed for
17  payment?
18  A. No.
19  Q. Are you familiar with the Medicare form called
20  the UB-92 claim form used by hospitals to bill for
21  their services?
22  A. No.
23  Q. Now, Doctor, attached to the Complaint, several

Page 61

1   pages back after the actual Complaint itself, is a
2   document that was marked as Exhibit A to the
3   Complaint. It follows page 27 in the document you
4   have in front of you. If you could look at that for a
5   moment, and let me know when you are ready to answer
6   questions about it.
7   A. Okay. Yeah. Sure.
8   Q. Doctor, have you seen this document before,
9   this Exhibit A?
10  A. Yes, sir.
11  Q. Is this the arrangement between Bradford
12  Regional Medical Center and V&S Medical Associates
13  that you contend constitutes a violation of the Stark
14  law and the Anti-kickback law?
15  A. Yes.
16  Q. Had you read this document before you filed the
17  Complaint?
18  A. Yes.
19  Q. Now, in the response that you gave to the
20  hospital's interrogatories, you said that a copy of
21  this document was left in your mailbox in November of
22  2003. Do you recall that?
23  A. Yes, I do.

Case 1:04-cv-00186-MBC   Document 116   Filed 09/10/2008   Page 37 of 43
USA et al., vs. BRMC, et al.                Multi-Page™              V. Rao Nadella, M.D.
No. 04-186E                                                          August 20, 2007

Page 126

1   Q. Did BRMC pay Singh & Nadella approximately
2   $8,000 a month for that leased space?
3   A. I don't believe that amount is correct.  You
4   know, actually, we bought myself -- both myself and
5   Dr. Singh are partners in the real estate.  We own the
6   building together, and BRMC had occupied about 6500
7   square foot, roughly, approximately 6500 square foot
8   in our building.  You know, Dr. Singh typically has
9   handled these rental things, the rental side of the
10  business, which I know we have rented it to BRMC.  I
11  couldn't tell you the exact amount, but I don't
12  remember -- but I remember it being between six and
13  seven thousand.
14  Q. Six and seven thousand per month?
15  A. That is my approximate recollection, but Dr.
16  Singh has handled these matters more than I did.
17        MR. STONE:  Again, I'm going to object to
18     any further questioning along this line,
19     because, again, it gets into the business
20     relationship of this plaintiff and other
21     plaintiffs in this case, and the Judge has
22     already ruled that those are relationships that
23     are not relevant to the subject matter of this

Page 127

1      case, which is a lease agreement between V&S
2      and BRMC.
3            Unless you can demonstrate to the Court
4      that somehow these relationships would either
5      make the V&S relationship legal or provide some
6      other kind of defense, I don't see how it is
7      relevant to the claim in the case.
8            MR. MULHOLLAND:  Let me ask the rest of
9      the questions along this line of this
10     questioning, and then you can object as needed.
11           MR. STONE:  I will object as they come up.
12  Q. Is the lease between BRMC and Singh & Nadella
13  still in effect?
14           MR. STONE:  Again, I'm going to object to
15     any further questions along this line and
16     instruct him not to answer.
17           (Question certified for later discussion.)
18  Q. While the lease was still in effect, did you
19  and Dr. Singh refer patients to BRMC?
20           MR. STONE:  I'm going to object and
21     instruct the witness not to answer.
22           (Question certified for later discussion.)
23  Q. Did you believe the lease between Singh &

Page 128

1   Nadella and BRMC to be violation of either the Stark
2   law or the Anti-kickback law?
3        MR. STONE:  I am going to object and
4     instruct the witness not to answer.
5        (Question certified for later discussion.)
6   Q. If the answer to that question is no, why not?
7        MR. STONE:  I object and instruct him not
8     to answer.
9        (Question certified for later discussion.)
10  Q. Is there currently a dispute between BRMC and
11  Singh & Nadella about monies allegedly owed by BRMC to
12  Singh & Nadella for the lease?
13       MR. STONE:  I'm going to object and
14     instruct him not to answer.
15       (Question certified for later discussion.)
16       MR. MULHOLLAND:  I don't have any of other
17     questions at this time.  Carl?
18       MR. RYCHCIK:  Yes, I have questions.
19              - - -
20            EXAMINATION
21  BY MR. RYCHCIK:
22   Q. Doctor, my name is Carl Rychcik, and I
23  represent Drs. Vaccaro and Saleh, as well as V&S

Page 129

1   Medical Associates in this matter.  I'm going to be
2   asking you some additional questions.  You will have
3   to excuse me.  Obviously, Mr. Mulholland has asked you
4   a number of questions.  I will try not to duplicate
5   too much, but I will skip around a little bit and ask
6   some follow-ups that I feel are necessary.
7   A. Okay.
8   Q. I believe you testified that V&S Medical
9   Associates offers similar types of services to your
10  practice, Singh & Nadella; is that correct?
11  A. Yes, that is correct.
12  Q. And in your Bradford office, how far is that
13  V&S Medical Associates?
14  A. Probably about one block.
15  Q. One block?
16  A. Yes.
17  Q. You also testified that you were unaware who
18  placed a copy of the sublease at issue in this case in
19  your mailbox; is that correct?
20  A. That is correct.
21  Q. Sitting here today, do you have any suspicion
22  who may have placed that in your mailbox?
23       MR. STONE:  I'm going to instruct the

APP-34

Margaret Koenig Mimless
Maureen T. McCall
Joy A. Hartman

*Johnson and Mimless*
Court Reporters

1334 Fifth Avenue, Pittsburgh, PA 15219-6214

Phone:
412–765–0744

Fax:
412-765-3539

COMMONWEALTH OF PENNSYLVANIA )
                                                                )
COUNTY OF ALLEGHENY                      )


USA, et al., vs. BRMC, et al.


I, Joy Hartman, a Notary Public in and for the Commonwealth of Pennsylvania, do hereby certify that the witnesses (Martin David Jacobs, M.D., V. Rao Nadella, Dilbagh Singh, M.D., Paul Kirsch and Sal A. Barbera), was duly sworn and that the deposition is a true record of the testimony given by the witnesses. A copy of the transcript of the deposition was submitted to the witnesses for inspection and signing.

The deposition was not signed by the witness within thirty days of its submission to the witness and, therefore, my signature below constitutes my signature of the deposition in accordance with Pa.R.C.P. 4017©.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this 4th day of September, 2008.


*Joy A. Hartman*
Joy A. Hartman


CC:   Andrew M. Stone, Esquire
        Daniel M. Mulholland, III, Esquire
        Carl J. Rychcik, Esquire

Commonwealth of Pennsylvania
NOTARIAL SEAL
JOY A. HARTMAN, Notary Public
City of Pittsburgh, County of Allegheny
My Commission Expires May 9, 2010

# 6.   JACOBS DEPOSITION EXCERPTS

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

1

1        IN THE UNITED STATES DISTRICT COURT
     FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2                  ERIE DIVISION

3   UNITED STATES OF AMERICA, ex rel. )
    DILBAGH SINGH, M.D., PAUL KIRSCH, )
4   M.D., V. RAO NADELLA, M.D., and   )
    MARTIN JACOBS, M.D.,              )
5                                     )
                 Relators,            )
6                                     )   Civil Action
         vs.                          )   No. 04-186E
7                                     )
    BRADFORD REGIONAL MEDICAL CENTER, )
8   V&S MEDICAL ASSOCIATES, LLC,      )
    PETER VACCARO, M.D., KAMRAN SALEH,)
9   M.D., and DOES I through XX,      )
                                      )
10               Defendants.          )

11

12       DEPOSITION OF MARTIN DAVID JACOBS, M.D.

13            TUESDAY, AUGUST 21, 2007

14       Deposition of MARTIN DAVID JACOBS, M.D., called

15   as a witness by the Defendant Bradford Regional

16   Medical Center, taken pursuant to Notice of Deposition

17   and the Federal Rules of Civil Procedure, by and

18   before Joy A. Hartman, a Court Reporter and Notary

19   Public in and for the Commonwealth of Pennsylvania, at

20   the offices of Stone Law Firm, 1400 Allegheny

21   Building, Pittsburgh, Pennsylvania, commencing at 3:08

22   p.m. on the day and date above set forth.

23

CONFIDENTIAL

JOHNSON and MIMLESS
(412) 765-0744

ORIGINAL

Case 1:04-cv-00186-MBC    Document 116    Filed 09/10/2008    Page 41 of 43
USA et al., vs. BRMC, et al.                Multi-Page™                Martin David Jacobs, M.D.
No. 04-186E                                                            August 21, 2007

Page 9

1  relevant. I'm going to instruct the witness
2  not to answer for the reasons stated in Judge
3  Cohill's previous order.
4       MR. MULHOLLAND: We will certainly take
5  exception with that and ask you to mark that
6  page.
7       (Question certified for later discussion.)
8  Q. The guilty plea is a matter of public record,
9  and the question I had in connection with the guilty
10 plea is whether or not you ever informed the Court or
11 the U.S. Attorney's office of your interest in this
12 lawsuit?
13      MR. STONE: Again, I'm going to object to
14      that question for the reasons that I just
15      articulated, and any other questions about any
16      cases that Dr. Jacobs is involved with with
17      regard to any alleged criminal matters.
18      (Question certified for later discussion.)
19 Q. Have you ever filed for bankruptcy protection,
20 Doctor?
21 A. No.
22 Q. Have you assigned any right that you might have
23 to any share of a recovery in a settlement or a

Page 10

1  judgment of this case to any third party?
2  A. No.
3       MR. MULHOLLAND: Again, we will take
4       exception with your other objection.
5  Q. Have you spoken to anyone other than your
6  attorneys about your testimony today at this
7  deposition?
8  A. No.
9  Q. Did you bring any documents with you today to
10 the deposition?
11 A. No. Well -- I didn't bring them. I got this,
12 the Complaint, from my lawyer.
13      MR. STONE: He just has a copy of the
14      Complaint.
15 Q. A copy of the Complaint, fine.
16      Are you licensed to practice medicine in
17 Pennsylvania?
18 A. Yes.
19 Q. Are you licensed to practice medicine in New
20 York?
21 A. Yes.
22 Q. Do you have privileges at Olean General
23 Hospital?

Page 11

1  A. No.
2  Q. Do you have privileges at anywhere other than
3  Bradford Regional Medical Center?
4  A. No.
5  Q. Do you specialize in any particular type of
6  medical practice?
7  A. Internal medicine.
8  Q. Are you Board certified in internal medicine?
9  A. No.
10 Q. Have you ever taken the Board certification
11 exam previously?
12 A. No.
13 Q. Doctor, can you please describe your education
14 starting with your college education moving forward
15 through medical school and residency programs?
16 A. I went to college in New York City. I can't
17 remember the exact year I graduated. The easiest way
18 for me is to count backwards from when I got to
19 Bradford.
20      So I got to Bradford in about 1980. Before I
21 got here, I worked for about two years in a medical
22 office in New York City, independent practice; and
23 before that, I was a resident in internal medicine at

Page 12

1  the Bronx VA Hospital. Before that, one year of
2  straight medical internship at Cumberland Medical
3  Center.
4       Before that, five years of medical school in
5  the Universit de Montpellier, Montpellier, France.
6  Before that, I worked for about a year and a half as a
7  chemist. I was a chemistry major in college, and
8  before that, I graduated.
9  Q. Where did you go to college? Hunter College?
10 A. Hunter College.
11 Q. Did you complete the residency program?
12 A. Yes.
13 Q. Have you ever attended law school or received
14 any legal training?
15 A. No.
16 Q. Even though you are not a lawyer, Doctor, what
17 is your general understanding of what the Stark Law
18 prohibits?
19 A. I believe the Stark Law prohibits self-
20 referral, which means you can't refer patients to any
21 entity in which you have a financial interest.
22 Q. Do you understand there to be certain
23 exceptions for relationships that -- with entities to

Case 1:04-cv-00186-MBC    Document 116    Filed 09/10/2008    Page 42 of 43
USA et al., vs. BRMC, et al.                Multi-Page™                Martin David Jacobs, M.D.
No. 04-186E                                                            August 21, 2007

Page 41

1    direct him not to answer.
2          (Question certified for later discussion.)
3    Q. Do you receive compensation from Tri-County for
4    supervising tests at the Tri-County facility?
5          MR. STONE:  Again, I will object and
6          direct him not to answer.
7          (Question certified for later discussion.)
8    Q. Are you compensated by Tri-County for
9    supervising tests on patients that you refer to
10   Tri-County?
11         MR. STONE:  Object and direct him not to
12         answer.
13         (Question certified for later discussion.)
14   Q. How is your compensation determined from
15   Tri-County?
16         MR. STONE:  I will object and direct him
17         not to answer.
18         (Question certified for later discussion.)
19   Q. Do you get paid on a per test basis by
20   Tri-County?
21         MR. STONE:  I'll object and direct him not
22         to answer.
23         MR. MULHOLLAND:  Again, we will take

Page 42

1    exception to those objections and ask that this
2    be marked for certification to the Court.
3          (Question certified for later discussion.)
4          MR. MULHOLLAND:  Subject to all the
5          stipulations and reservations that we have
6          discussed at this and the previous Relators'
7          depositions, I don't have any other questions
8          for Dr. Jacobs at this time.
9          MR. RYCHCIK:  If we could take just a
10         five-minute break, that would be helpful.
11         MR. STONE:  Sure.
12         (Recess taken at 3:56 p.m., and testimony
13         resumed at 4:03 p.m. this date.)
14                - - -
15              EXAMINATION
16   BY MR. RYCHCIK:
17   Q. Dr. Jacobs, as I believe you heard previously,
18   my name is Carl Rychcik, and I represent Drs. Vaccaro
19   and Saleh, as well as V&S Medical Associates in this
20   action, and I will be asking you some questions in
21   follow-up to Mr. Mulholland.
22         You testified earlier that you are in private
23   practice in Bradford; is that correct?

Page 43

1    A. Correct.
2    Q. What type of services do you provide in your
3    practice?
4    A. Internal medicine, does that answer your
5    question?
6    Q. Well, let me ask you the next question.  Are
7    you familiar with V&S Medical Associates?
8    A. Yes.
9    Q. Are you familiar with the types of practice
10   they have?
11   A. As far as I know, they are both internists and
12   they provide internal medicine services?
13   Q. Similar to the type that you provide?
14   A. I think they provided more detail.  Well, the
15   difference between them and me is that they have
16   procedures they do in their office, whereas, I usually
17   refer procedures out.
18         As a solo practitioner, it doesn't pay
19   economically for me to buy a lot of different machines
20   and do stuff in the office; but, basically, you can
21   get the same diagnostic and treatment services from
22   both of us.
23   Q. Where is their office located in relation to

Page 44

1    yours?
2    A. Half a mile away?  Maybe less.
3    Q. How would you describe your relationship with
4    Drs. Vaccaro and Saleh?
5    A. We say hello to each other in the hall, and we
6    go to medical meetings together, medical staff
7    meetings, committee meetings.
8    Q. Now, we have talked about you receiving a copy
9    of the sublease agreement between BRMC and V&S.  Do
10   you recall that testimony?
11   A. Yes.
12   Q. I believe you said that you thought you got a
13   copy of the lease from either Dr. Singh and/or Dr.
14   Nadella?
15   A. Yes.
16   Q. Do you know why they provided a copy of the
17   sublease to you, specifically?
18   A. You would have to ask them why.
19   Q. Do you have any understanding?
20   A. It is my understanding that they thought that
21   this was improper, and they wanted my opinion on it.
22   Q. And did you provide, subsequently, a copy of
23   the sublease to anyone in particular?

Margaret Koenig Mimless
Maureen T. McCall
Joy A. Hartman

*Johnson and Mimless*

Court Reporters

1334 Fifth Avenue, Pittsburgh, PA 15219-6214

Phone:
412-765-0744

Fax:
412-765-3539

COMMONWEALTH OF PENNSYLVANIA )
                                       )

COUNTY OF ALLEGHENY                 )

USA, et al., vs. BRMC, et al.

I, Joy Hartman, a Notary Public in and for the Commonwealth of Pennsylvania, do hereby certify that the witnesses (Martin David Jacobs, M.D., V. Rao Nadella, Dilbagh Singh, M.D., Paul Kirsch and Sal A. Barbera), was duly sworn and that the deposition is a true record of the testimony given by the witnesses. A copy of the transcript of the deposition was submitted to the witnesses for inspection and signing.

The deposition was not signed by the witness within thirty days of its submission to the witness and, therefore, my signature below constitutes my signature of the deposition in accordance with Pa.R.C.P. 4017©.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this 4th day of September, 2008.

_Joy A. Hartman_
Joy A. Hartman

CC:   Andrew M. Stone, Esquire
       Daniel M. Mulholland, III, Esquire
       Carl J. Rychcik, Esquire

Commonwealth of Pennsylvania
NOTARIAL SEAL
JOY A. HARTMAN, Notary Public
City of Pittsburgh, County of Allegheny
My Commission Expires May 9, 2010