1

1

1            IN THE UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2                    ERIE DIVISION

3                      - - -

4    UNITED STATES OF AMERICA, ex rel.    )
     DILBAGH SINGH, M.D., PAUL KIRSCH,    )
5    M.D., V. RAO NADELLA, M.D.,          )
     and MARTIN JACOBS, M.D.,             )
6                                         )
                Relators,                 )    Civil Action
7                                         )    No. 0-4-186E
          vs.                             )
8                                         )
     BRADFORD REGIONAL MEDICAL CENTER,    )
9    V&S MEDICAL ASSOCIATES, LLC,         )
     PETER VACCARO, M.D., KAMRAN SALEH,   )
10   M.D., and DOES I through XX,         )
                                          )
11              Defendants.               )

12                     - - -

13          DEPOSITION OF GEORGE LEONHARDT
               TUESDAY, APRIL 1, 2008
14

15        Deposition of GEORGE LEONHARDT, called as a

16   witness by the Relators, taken pursuant to Notice of

17   Deposition and the Federal Rules of Civil Procedure,

18   by and before Carla L. Lennartz, a Court Reporter and

19   a Notary Public in and for the Commonwealth of

20   Pennsylvania, at the offices of Horty Sprinter, 4614

21   Fifth Avenue, Pittsburgh, Pennsylvania, commencing at

22   10:00 a.m. on the day and date above set forth.

23                     - - -

1    APPEARANCES:

2    On behalf of the Relators:

3         Simpson Law Firm, LLC
          G. Mark Simpson, Esquire
4         165 North Main Street
          Jonesboro, Georgia  30236
5
               and
6
          Stone Law Firm
7         Andrew M. Stone, Esquire
          1400 Allegheny Building
8         Pittsburgh, Pennsylvania  15219

9    On behalf of the Defendant Bradford Regional Medical
     Center:
10
          Horty Springer
11        Dan Mulholland, Esquire
          4614 Fifth Avenue
12        Pittsburgh, Pennsylvania  15213

13   On behalf of the Defendants V&S Medical Associates,
     LLC, Peter Vaccaro, M.D. and Kamran Saleh, M.D.:
14
          Fox Rothschild
15        Carl J. Rychcik, Esquire
          625 Liberty Avenue
16        Pittsburgh, Pennsylvania  15222

17   ALSO PRESENT:

18        Ian M. Donaldson

19

20                    -  -  -

21

22

23

2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
ERIE DIVISION

- - -

UNITED STATES OF AMERICA, ex rel. )
DILBAGH SINGH, M.D., PAUL KIRSCH, )
M.D., V. RAO NADELLA, M.D., )
and MARTIN JACOBS, M.D., )
                              )
      Relators,        )   Civil Action
                            )   No. 0-4-186E
  vs.                )
                            )
BRADFORD REGIONAL MEDICAL CENTER, )
V&S MEDICAL ASSOCIATES, LLC, )
PETER VACCARO, M.D., KAMRAN SALEH, )
M.D., and DOES I through XX, )
                              )
      Defendants.     )

- - -

DEPOSITION OF GEORGE LEONHARDT
TUESDAY, APRIL 1, 2008

Deposition of GEORGE LEONHARDT, called as a

witness by the Relators, taken pursuant to Notice of

Deposition and the Federal Rules of Civil Procedure,

by and before Carla L. Lennartz, a Court Reporter and

a Notary Public in and for the Commonwealth of

Pennsylvania, at the offices of Horty Sprinter, 4614

Fifth Avenue, Pittsburgh, Pennsylvania, commencing at

10:00 a.m. on the day and date above set forth.

- - -

---

APPEARANCES:

On behalf of the Relators:

    Simpson Law Firm, LLC
    G. Mark Simpson, Esquire
    165 North Main Street
    Jonesboro, Georgia  30236

        and

    Stone Law Firm
    Andrew M. Stone, Esquire
    1400 Allegheny Building
    Pittsburgh, Pennsylvania  15219

On behalf of the Defendant Bradford Regional Medical
Center:

    Horty Springer
    Dan Mulholland, Esquire
    4614 Fifth Avenue
    Pittsburgh, Pennsylvania  15213

On behalf of the Defendants V&S Medical Associates,
LLC, Peter Vaccaro, M.D. and Kamran Saleh, M.D.:

    Fox Rothschild
    Carl J. Rychcik, Esquire
    625 Liberty Avenue
    Pittsburgh, Pennsylvania  15222

ALSO PRESENT:

    Ian M. Donaldson

- - -

---

3

INDEX

WITNESS:                            PAGE:

GEORGE LEONHARDT

    Examination by Mr. Simpson       3

EXHIBITS:

    Leonhardt Deposition Exhibit No. 1       23
    Leonhardt Deposition Exhibit No. 2       37
    Leonhardt Deposition Exhibit No. 3       41
    Leonhardt Deposition Exhibit No. 4       54
    Leonhardt Deposition Exhibit No. 5       66
    Leonhardt Deposition Exhibit No. 6       76
    Leonhardt Deposition Exhibit No. 7       82
    Leonhardt Deposition Exhibit No. 8       91
    Leonhardt Deposition Exhibit No. 9       92
    Leonhardt Deposition Exhibit No. 10      94
    Leonhardt Deposition Exhibit No. 11      95
    Leonhardt Deposition Exhibit No. 12      97
    Leonhardt Deposition Exhibit No. 13      98
    Leonhardt Deposition Exhibit No. 14      99
    Leonhardt Deposition Exhibit No. 15     101

- - -

P R O C E E D I N G S

- - -

GEORGE LEONHARDT,

called as a witness by the Relators, being first duly

cautioned and sworn, as hereinafter certified, was

deposed and said as follows:

EXAMINATION

BY MR. SIMPSON:

    Q.   Mr. Leonhardt, my name is Mark Simpson. I

---

4

realize you've already given a 30(b)(6) deposition in

this case so I imagine you're familiar with the

procedures here; correct?

    A.   Yes, I am.

    Q.   If anything I say is hard to understand or if

you have any questions about my questions, please feel

free to let me know; and even though today is April

1st, you still have to tell the truth.

    I'm going to try not to duplicate a lot of

stuff that was gone over the last time; but if I do a

little bit, bear with me.

    When did you first become concerned about the

possibility of V&S installing a nuclear camera at

their facility?

    A.   I believe it was early in April of 2001.

    Q.   And you might have mentioned this before; but

do you know how it was you first became aware that

they were considering that?

    A.   Somebody told me. I honestly don't remember

who.

    Q.   And was that before they actually got the

camera?

    A.   Yes, it was sometime before they got the

5

1  camera.

2  Q.  What were your primary concerns with V&S

3  getting a nuclear camera?

4  A.  I've gone over this before, but the impact that

5  that would have on the hospital's plans to develop a

6  full-time cardiology service.

7  Q.  And maybe let me see if I can summarize it and

8  then you could tell me if there's any more concerns.

9       One concern you had was with the impact on

10  developing a cardiology practice?

11  A.  Yes.

12  Q.  Would another concern be just a loss of the

13  nuclear medicine revenues that previously -- that the

14  hospital previously had gotten from V&S referrals?

15       MR. MULHOLLAND:  Just object to the

16           characterization to the extent it doesn't

17           reflect what's already in the record; but he

18           can answer the question.

19  A.  Well, sure, there was some concern about that;

20  but the major concern was the impact on our plans to

21  develop that service.

22  Q.  Were you also concerned with the loss of other

23  diagnostic tests that might go along with a test

6

1  performed on a nuclear camera, follow-up tests, things

2  like that?

3  A.  Yeah, probably to some extent.

4  Q.  What was it about V&S's establishment of the

5  nuclear camera that you believed would impact your

6  ability to establish a cardiology program?

7  A.  Well, nuclear cardiology is a key portion of

8  any diagnostic cardiology service; and if a key

9  practice in the community is going to have a financial

10  incentive not to use the community cardiology service,

11  it's going to have an impact and especially an impact

12  if we're only just trying to establish that and, you

13  know, trying to convince a cardiologist this is a good

14  place to come and work.

15  Q.  Well, would the impact extend farther than

16  simply the nuclear business that let's say V&S is

17  taking away from the hospital?

18  A.  I'm not sure I understand where you're trying

19  to take that question.

20  Q.  Previously, before they got the nuclear camera,

21  V&S had been referring a great deal of nuclear

22  cardiology business to the hospital; correct?

23  A.  Correct.

7

1  Q.  After they established the camera, all or a

2  significant portion of that business was no longer

3  going to the hospital; correct?

4  A.  Correct.

5  Q.  Because they were doing it in-house?

6  A.  Correct.

7  Q.  So the hospital was losing that business, that

8  discrete set of business; correct?

9  A.  That's correct.

10  Q.  When you were talking about the impact on

11  establishing a cardiology program, is that impact more

12  than simply the fact that you have lost this nuclear

13  cardiology business?

14  A.  I'm really sorry.  Are you asking -- well --

15  Q.  The loss of that nuclear cardiology business,

16  is that the negative impact you're talking about on

17  the cardiology program?

18  A.  Yes; and the question and the concern we had

19  was would that be the kind of barrier that would

20  actually prevent us from establishing a cardiology

21  program which would have a much broader impact on the

22  community.

23  Q.  What is involved in establishing a cardiology

8

1  program at a hospital, at your hospital in particular?

2  A.  Well, at our hospital in particular, at that

3  point in time we did not have a full-time

4  cardiologist.  We did have a visiting cardiologist

5  coming from Erie, which is about 90 miles away, a

6  couple of days a month and essentially operating a

7  clinic.  Not having a full-time cardiology service had

8  an impact on the quality of diagnostics that we could

9  offer the patients in that community.  It had an

10  impact on the quality and the type of care that

11  patients in that community would receive if they had

12  an acute cardiac problem.  It had an impact on the

13  overall service to people with high blood pressure,

14  cardiac disease.

15       The introduction of an expert, a specialist, in

16  an area of medicine in a community like that has a

17  very broad impact on the kind of care that people

18  receive, even if it's care that they receive from a

19  physician other than the cardiologist simply because

20  it just raises the bar for everybody.

21  Q.  Setting up a cardiology practice in a hospital,

22  does that primarily involve hiring a full-time

23  cardiologist or is there more to it?

10

1    A.    There's more to it.

2    Q.    But is hiring a full-time cardiologist the

3    principal step in establishing a cardiology practice?

4    A.    Yes.

5    Q.    What other steps are there?

6    A.    Obtaining staff with the expertise to support

7    the cardiologist's services; building the practice

8    itself; building the diagnostic capabilities that a

9    cardiologist is going to need in order to practice his

10   profession or her profession; building the support

11   systems so that the individuals, patients, can be

12   taken care of when they're unavailable or on vacation.

13   Q.    Where generally do cardiology patients come

14   from?  Do they come from referrals from other

15   physicians in the community or do they come from

16   hospital inpatients?

17   A.    Some combination of all those things.

18   Self-referrals, referrals from family members,

19   referrals from physicians in the community.

20   Q.    Is it fair to say that your primary concern

21   about the impact of V&S's nuclear camera is that it

22   would make it more difficult for you to hire a

23   full-time cardiologist?

1    A.    That was a primary concern, yes.

2    Q.    Why did you believe that it would be more

3    difficult to hire a full-time cardiologist if V&S had

4    their nuclear camera?

5    A.    If we're trying to convince a full-time

6    cardiologist to come to that community, that

7    individual is going to have a series of questions, you

8    know, can you support the practice, where are the

9    patients going to come from, are the physicians in the

10   community going to support the development of this

11   practice; and to the extent that a key practice has a

12   financial reason not to support the development of

13   that service, that's going to make it more difficult.

14   Q.    So basically if V&S is not referring patients

15   to the hospital, the concern is that a cardiologist

16   would not believe that the hospital would be able to

17   have enough business to make it worth his while?

18   A.    It's not even whether V&S is referring patients

19   to the hospital.  It's whether V&S or any practice

20   would have a reason to not refer patients to the

21   cardiologist.

22   Q.    But we're only talking about V&S here; right?

23   A.    Yeah, we're talking about V&S here.

11

1    Q.    Were there other practices that were in the

2    area that would otherwise refer to the hospital who

3    were establishing their own nuclear cardiology

4    practice?

5    A.    There were other practices in the area that

6    were pretty much saying that if V&S continued this

7    they would do it as a matter of making their practices

8    equally attractive to patients.

9    Q.    Who were those?  Who was saying that?

10   A.    Dr. Singh, Dr. Nadella, Dr. Kirsch.  I believe

11   Dr. Armani (phonetic) talked about it, also.

12   Q.    Did any of those actually establish -- did any

13   of those actually obtain their own nuclear cameras?

14   A.    In conjunction with another regional hospital,

15   yes.

16   Q.    At the time when V&S was deciding whether to

17   acquire this nuclear camera or during the period when

18   they actually had it, was the hospital in discussions

19   with any particular cardiologist about joining the

20   hospital?

21   A.    Yes, we were in discussions with a number of

22   recruits.

23   Q.    Okay.  Can you give me the names of all the

12

1    ones you can remember?

2    A.    I can't remember their names now.  I could look

3    them up for you.

4    Q.    Can you remember any of their names?

5    A.    Other than the one we ultimately got, I'm

6    sorry, no.

7    Q.    Who did you ultimately get?

8    A.    Steven Herman.

9    Q.    When did you hire him?

10   A.    December of 2005, I believe.

11   Q.    So you didn't have a full-time cardiologist

12   until December of 2005?

13   A.    That's correct.

14   Q.    That was more than two years after you entered

15   into the sublease agreement with V&S; is that right?

16   A.    That's right.

17   Q.    Why did it take that long to hire a

18   cardiologist?

19   A.    I think a combination of reasons.  One is it's

20   a relatively small, rural community.  We had to find

21   someone who met our standards as far as setting up a

22   program and looking for someone who was particularly

23   qualified.  In addition, we had to find someone who

13

1  liked the idea of being the first cardiologist in a
2  community, having to establish all the services and
3  programs. That's really quite a challenge; and it was
4  not easy to find that combination of desire to live in
5  a small town, desire to be the first one to build
6  something as opposed to coming into an established
7  practice, a willingness to come into a community and
8  not have three or four other people in the same
9  specialty supporting what you were doing, sharing call
10  with you. So it was not easy to find someone.
11    Q.  So it's fair to say that even without the
12  concern of a practice having their own nuclear imaging
13  business that it is still very difficult to find a
14  full-time cardiologist and set up a cardiology program
15  at your hospital?
16    A.  Yeah. We were looking at what we thought was
17  going to be a significant challenge under the best
18  circumstances.
19    Q.  And when you say the best of circumstances,
20  that includes V&S not being in the nuclear cardiology
21  business?
22    A.  That's correct.
23    Q.  What was your understanding of how V&S was

14

1  using its nuclear camera? They were using it for
2  their own patients; correct?
3    A.  Correct.
4    Q.  Was V&S a large enough referral source to the
5  hospital that the loss of their business alone you
6  believed constituted a serious impediment to getting a
7  full-time cardiologist onboard?
8    A.  They were a significant referral source; and
9  so, yes, given everything else I've said, I thought it
10  was a significant impediment.
11    Q.  Now, once V&S got their camera in place, your
12  nuclear cardiology referrals from V&S went down;
13  correct?
14    A.  Yes, they did.
15    Q.  Did your referrals from other physicians stay
16  unaffected?
17    A.  They stayed pretty much the same, I believe.
18    Q.  Now, at some point you started discussions with
19  V&S about the possibility of entering into some kind
20  of an Under Arrangements venture; is that correct?
21    A.  We started discussions with essentially the
22  whole medical staff about entering into some kind of
23  Under Arrangements discussion.

15

1    Q.  But those discussions were triggered by the
2  hospital's dispute with V&S; correct?
3    A.  Not really. They were contemporaneous and they
4  certainly involved our dispute and discussions with
5  V&S.
6    Q.  Would you have had those same discussions if
7  V&S had not installed their own nuclear camera?
8    A.  I believe we would have had discussions along
9  those lines because we were very interested in, you
10  know, finding ways to align incentives with the
11  medical staff to the building of diagnostic services
12  and the cardiology program in particular and had
13  actually started conversations about that before we
14  knew what V&S was doing.
15    Q.  You had started conversations?
16    A.  Internally about what would -- what kind of
17  alternatives would there be, what kinds of
18  opportunities for joint ventures might there be that
19  could align particularly the department of medicine
20  with some of the developmental programs that we wanted
21  to start, cardiology being a key one.
22    Q.  Do you know a Dr. Jamil?
23    A.  Yes, I do.

16

1    Q.  And he at some point became affiliated with
2  V&S; is that correct?
3    A.  He at some point began to rent space in V&S's
4  office, yes.
5    Q.  Was he a significant referral source to the
6  hospital as well?
7    A.  Yes, he was.
8    Q.  And you were concerned, were you not, that if
9  you lost V&S's business you would also lose Dr.
10  Jamil's business?
11    A.  I entertained that concern, yes.
12    Q.  Before V&S installed the nuclear camera, did
13  you have discussions with Dr. Jamil about your desire
14  to keep V&S out of the diagnostic business?
15    A.  I had discussions with Dr. Jamil about the
16  impact that I thought that would have on our ability
17  to develop a cardiology program. So I don't believe
18  it was before I knew about what V&S was doing.
19    Q.  Did you try to enlist Dr. Jamil as an ally to
20  convince V&S not to get into the diagnostic business?
21    A.  Dr. Jamil offered himself as not an ally but a
22  go-between.
23    Q.  Were Drs. Vaccaro and Saleh aware of your

18

discussions with Dr. Jamil in this regard?

A.  From what he told me they were, yes.

Q.  You didn't raise the issue with Vaccaro and Saleh?  You didn't inform Drs. Vaccaro and Saleh that you having those kinds of discussions with Dr. Jamil; correct?

A.  Not before I had them.  They became aware of that when he spoke to them.

Q.  Now, the hospital's dispute with V&S involved a hospital policy against -- or a hospital policy regarding physicians having competing interests with the hospital; correct?

A.  Correct.

Q.  And one of the hospital's options under that policy -- or, excuse me.  Is it fair to describe the policy as essentially saying that the hospital could deny privileges to physicians who had competing interests?

A.  No.  The policy laid out a number of possibilities; and the ultimate outcome could have been -- if it was determined that that competing interest was significant and doing significant damage to the hospital's ability to maintain its mission,

could have been denial of privileges.

Q.  Under that policy, would the hospital have discretion to essentially ignore the issue and allow the doctors to retain their privileges?

A.  In fact, the policy makes it pretty clear that unless the competition was damaging to the hospital's ability to maintain its mission, that's exactly what would happen.

Q.  But if the competition is determined to be damaging to the hospital, does the policy require the loss of privileges or is that discretionary with the hospital?

A.  It's discretionary with the board of directors of the hospital.

Q.  Okay.  Now, Drs. Vaccaro and Saleh were not simply -- they didn't simply refer patients to the hospital for nuclear tests, they also referred inpatients and other outpatient tests; is that correct?

A.  That's correct.

Q.  And they were a significant source of referrals to the hospital in those areas, too; correct?

A.  That's correct.

19

Q.  Did you ever intend to actually follow through on a threat to revoke Dr. Vaccaro's and Saleh's privileges or was that simply a negotiating tactic?

MR. MULHOLLAND:  Just object to the form of the question as compound.

Q.  Do you understand the question?

MR. MULHOLLAND:  Maybe if you ask it separately.

A.  Yeah.

Q.  You informed Drs. Vaccaro and Saleh that they were subject to losing their privileges because of their competition with the hospital; correct?

A.  We informed them that they were subject to that policy.

Q.  Did you intend to make them believe that if push came to shove the hospital would actually invoke the policy and rescind their privileges?

A.  We never got to the point of having to make that decision.  I think you're asking me to speculate as to whether we would have done that or not; and the answer to that is that we took the policy very seriously and we were very seriously considering that as a possible outcome.

20

Q.  I'm not asking to you speculate.  I'm asking about your intent.

Was it your intention to convey to the doctors that this was not simply an empty threat but that you actually might follow through with it and revoke their privileges?

A.  You're talking not about the hospital's intention or the board's intention, you're talking about my individual --

Q.  I'll start with your intention.

A.  My intention was that it was a very serious possibility.  I did not view it as a negotiating tactic or an empty threat.

Q.  Do you have any knowledge that the board viewed it otherwise?

A.  No, I have no knowledge that any individual on the board viewed it otherwise.

Q.  Do you have any knowledge that any other decision-makers at the hospital viewed it otherwise?

A.  No.

Q.  Did you ever acknowledge that it would be suicidal to actually invoke the policy and terminate the physicians' privileges?

21

1   A.   I certainly acknowledged that it would be
2   damaging and very damaging.  I don't know that I ever
3   thought of it as suicidal.
4   Q.   If you actually terminated their privileges,
5   you would probably lose all of their outpatient
6   referrals or a significant portion of the outpatient
7   referrals; correct?
8   A.   That's correct.
9   Q.   And you would lose all of their inpatient
10  referrals; correct?
11  A.   That's correct.
12  Q.   And you acknowledge that the results of such
13  action would be extremely damaging to the hospital;
14  correct?
15  A.   That's correct.  We, in fact, analyzed that
16  pretty carefully and thought that we could recover
17  from it but it would probably take us four or five
18  years.
19  Q.   Did Dr. Vaccaro and Saleh's attorneys ever take
20  the position with you that the hospital's actions were
21  attempts to extort an exclusive referral stream?
22  A.   There were a number of letters back and forth
23  between the hospital's attorneys and attorneys for

22

1   Drs. Vaccaro and Saleh.  I think in some of their
2   letters they did take that kind of position.
3   Q.   Did you think they were sincere in taking that
4   position?
5   A.   I didn't agree that that was what was
6   happening.  So no.
7   Q.   I understand that you didn't -- that you're
8   saying you didn't agree that that was what was
9   happening; but did you believe that Drs. Vaccaro and
10  Saleh and their attorneys believed that the hospital
11  was trying to extort an exclusive referral stream?
12          MR. MULHOLLAND:  I'll just object to the
13      extent you're asking him to testify about
14      somebody else's state of mind.
15  Q.   I'm asking you to testify as to what you
16  believed about their state of mind.
17          MR. MULHOLLAND:  Again, same objection.
18      But you can answer if you're able to.
19  A.   I don't know the answer to that.
20  Q.   Did you think they were blowing smoke or did
21  you think that they meant it?
22  A.   During that whole period of time there were any
23  number of times when I didn't know whether they were

23

1   blowing smoke or whether they meant it on any number
2   of issues.
3   Q.   Was that an accusation that you took seriously?
4   A.   I didn't believe that that's what we were
5   doing, no.
6   Q.   Did you take the accusation seriously?
7          MR. MULHOLLAND:  Which accusation are you
8      talking about?
9          MR. SIMPSON:  The accusation that the
10     hospital was trying to extort an exclusive
11     referral stream.
12  A.   Sure.  Yes.
13  Q.   Did that accusation cause you to change in any
14  way your approach with the physicians?
15  A.   No.
16          (Leonhardt Deposition Exhibit No. 1 was
17  marked for identification.)
18  Q.   Mr. Leonhardt, I've shown you what's been
19  marked as Exhibit 1; and I'll ask you to look at that
20  document and let me know if you recognize it.
21          Have you had a chance to look at the document?
22  A.   Yeah.  I'm sorry, I'm finishing reading it.
23  Q.   Do you recognize this document?

24

1   A.   Yes, I do.
2   Q.   Is this a document that you prepared?
3   A.   Yes, it is.
4   Q.   Did you prepare it on October 11th, 2001?
5   A.   Probably a little before that.
6   Q.   Around that time?
7   A.   Around that time.
8   Q.   What was the purpose of this document?
9   A.   It was to put my thoughts together for a
10  meeting with the board executive committee.
11  Q.   Did you routinely prepare documents like this
12  before you would have board meetings?
13  A.   On occasion if I thought the issue was a
14  complex one and it was a combination of trying to
15  organize my own thinking and provide the individual I
16  was talking with with an outline, a background.
17  Q.   Now, did you say this was done in preparation
18  for a board meeting or a committee meeting?
19  A.   It was done in preparation for a committee
20  meeting.
21  Q.   Do you know which committee?
22  A.   The board executive committee.
23  Q.   What was the purpose of that meeting or what

25

1 was to be discussed at that meeting?
2   A.   There would have been any number of issues
3 discussed at that meeting, but this would have been
4 one of them.
5   Q.   I guess I'm asking what is "this" when you say
6 "this"?
7   A.   Our prior discussions with Dr. Jamil, his
8 relationship with Drs. Vaccaro and Saleh, the extent
9 to which that was impacting or could impact either
10 positively or negatively our attempts to address that
11 situation with Vaccaro and Saleh.
12   Q.   When did they add the nuclear camera; do you
13 know?
14   A.   Spring or summer of 2001.
15   Q.   If you could look in the middle of the first
16 page where it says, "We discussed the impact on the
17 hospital should they try to add diagnostics,
18 especially with his volume."  When you say
19 "diagnostics," are you talking about the nuclear
20 camera or are you talking about something else?
21   A.   This was referring to conversations I had had
22 with Dr. Jamil more than a year prior to that and I
23 wasn't aware of any specific diagnostics.  That just

26

1 was an overall concern.
2   Q.   So that sentence that I just read is referring
3 to discussions that had taken place a year earlier
4 than when you prepared this memo; correct?
5   A.   Yeah, or sometime earlier than when I prepared
6 this memo.
7   Q.   And those discussions were before V&S actually
8 got their nuclear camera?
9   A.   Yes.
10   Q.   And were those discussions before you became
11 aware of their interest in getting a nuclear camera?
12   A.   Yes.
13   Q.   So even before you heard scuttlebutt about them
14 getting a nuclear camera, you were concerned about V&S
15 adding diagnostics; correct?
16   A.   Correct.
17   Q.   The next sentence says, "He assured me that
18 this wouldn't happen.  He understood the negative
19 impact and would prevent it."
20       What did you mean by Jamil saying that he would
21 prevent it?
22   A.   He told me he would have influence with them
23 and would prevent that from happening.

27

1   Q.   Was there any quid pro quo that you offered or
2 the hospital offered to Dr. Jamil for that?
3   A.   No.
4   Q.   Do you know his reasons for wanting to prevent
5 it?
6   A.   He thought it would be damaging to the hospital
7 and to the development of clinical services.
8   Q.   Now, over time as the -- I guess as the dispute
9 between the hospital and V&S ripened, did Dr. Jamil
10 come more to take V&S's side in the dispute?
11   A.   No, I don't really believe so.  I think he came
12 to kind of withdraw from it, didn't want to be in the
13 middle of the conflict.
14   Q.   If you could look at the second page under the
15 heading saying Approach.  It says, "With that as
16 background, the risk that Dr. Jamil will decide to
17 formally become a business partner of V&S - if he
18 hasn't already - and therefore make it suicidal for
19 the Medical Center to enforce its Policy regarding
20 competition by denial of privileges is significant."
21       Now, in that paragraph are you recognizing that
22 enforcing the policy by denying privileges would be
23 suicidal for the hospital?

28

1   A.   Well, I think what I say here is that if Dr.
2 Jamil decides to become formally a business partner of
3 V&S, which we didn't know whether he had or hadn't,
4 that makes it even more damaging.  I did use the word
5 suicidal.
6   Q.   It was always your assumption that Dr.  Jamil
7 would follow V&S essentially and if you lost their
8 referrals that his referrals would follow?
9   A.   No, it wasn't my assumption.  It was always my
10 opinion that we had to consider that as a possibility.
11   Q.   Did you consider that that was a likely result
12 or an unlikely result?
13   A.   I didn't know how to evaluate how likely or
14 unlikely that was.  I considered it a risk.
15   Q.   Now, at the bottom of page two and then
16 following on page three, it looks like you're
17 discussing two possible approaches to take with Dr.
18 Jamil; is that correct?
19   A.   Yeah.
20   Q.   And is it fair to state that the direct
21 approach would be to tell him that you're interested
22 in purchasing his practice?
23   A.   No, I don't think so.

29

1  Q.  A direct approach?

2  A.  I'm sorry?

3  Q.  Under number one at the bottom of page two, it

4  says, "A direct approach stating that we remain

5  interested in purchasing his practice and bringing in

6  a high quality replacement."

7  A.  We actually had never expressed an interest in

8  purchasing his practice.  We had expressed an interest

9  in assisting someone who would replace him in

10  purchasing a practice.

11  Q.  But here you are discussing the idea of telling

12  him that you're interested in purchasing his practice?

13  A.  Yes, but I say "we remain interested"; and what

14  we had been interested in historically is acting as --

15  in role as assisting a physician coming in to acquire

16  his practice.  So my guess is I just wasn't precise.

17  Q.  Is it fair to state that the end result you

18  were looking for in either this direct approach or the

19  indirect approach is to prevent Dr. Jamil from

20  becoming a business partner with V&S?

21  A.  Correct.

22  Q.  And you wanted to do that because if V&S added

23  the -- well, at this point they already had.  You

30

1  wanted to avoid the result of losing Dr. Jamil's

2  business as well as V&S's business?

3           MR. MULHOLLAND:  Just for clarification,

4       when you're asking him questions directed to

5       him as "you," you're asking George Leonhardt as

6       an individual; correct?

7           MR. SIMPSON:  Yes.

8  Q.  I'm asking you as CEO of the hospital and an

9  individual.  I'm not asking -- unless I say, I'm not

10  asking about what other people on the board might have

11  thought.

12           MR. MULHOLLAND:  You're not asking him for

13       what the corporation's opinions are as opposed

14       to asking him as an individual who happens to

15       be CEO of the hospital?

16           MR. SIMPSON:  Well, who happens to be CEO

17       of the hospital and taking actions in that

18       capacity.

19           MR. MULHOLLAND:  I just want to clarify

20       this is an individual deposition.

21           MR. SIMPSON:  I'm not taking a 30(b)(6)

22       deposition.

23           MR. MULHOLLAND:  Go ahead.

31

1  A.  I forgot the question.

2  Q.  I did, too.  Actually, I think I remember.  I

3  think I asked you the end result of either one of

4  these approaches that you were hoping to get out of

5  these approaches was to prevent him from formally

6  partnering up with V&S because you didn't want to lose

7  his business as well as theirs?

8  A.  That's correct.

9  Q.  If you could look at the I guess first full

10  paragraph at the top of page three, still talking

11  about the direct approach; and it says, "The risk here

12  is obvious, we are asking him to reverse and while he

13  may be unhappy, he may be unwilling to do that.

14  Should he be unwilling, we will have immediately given

15  V&S a road map to our greatest worry (one they

16  probably already have.)"

17      First, what are you referring to there as your

18  greatest worry?

19  A.  Exactly what you referred to a moment ago, that

20  the dispute would suddenly become one not just with

21  Vaccaro and Saleh but with Vaccaro, Saleh and Jamil.

22  Q.  And then in paragraph two you say, "A more

23  indirect approach."  Then it says, "We do not wish to

32

1  have to invoke the Policy but our overtures to V&S are

2  ignored or responded to by threats of full diagnostic

3  centers, surgery centers, etc"; and then it goes on.

4      What were you talking about in that paragraph

5  as an indirect approach?  What were you proposing to

6  do?

7  A.  I think I go on to say that, ask him if he has

8  any influence and can he exert any influence.

9  Q.  Is it fair to describe the indirect approach as

10  raising the possibility of invoking the policy by

11  excluding privileges but you recognize that it would

12  be suicidal to do so but you don't want V&S to know

13  that you recognize it as being suicidal?

14  A.  No.  I think more simply than that it's, you

15  know, does he feel he's in a position to influence and

16  help to resolve this dispute.

17  Q.  What you were talking about there is using the

18  threat to invoke the policy as leverage to obtain some

19  other resolution?

20  A.  Again, I think what I'm talking about is trying

21  to determine if Dr. Jamil feels he has any ability to

22  influence or, if he has an ability, any willingness to

23  try to influence this situation.

33

1    Q.  And then it says, "This is an initially less
2  risky approach but gets very tricky if he responds
3  indicating he would want to mediate."
4        Why would it get tricky if he says he does want
5  to mediate?
6    A.  You're just introducing another party.
7    Q.  But that's what you were hoping to achieve;
8  wasn't it?
9    A.  What I was doing was laying out what I saw as
10  possible courses of action.  It doesn't mean that they
11  were the right courses.  It doesn't mean they were the
12  ones chosen but --
13    Q.  In the very last paragraph it says, "My
14  conclusion from all of this is that I should approach
15  Dr. Jamil, the approach should be indirect."
16        So your I guess recommendation is to take this
17  indirect approach to Dr. Jamil; correct?
18    A.  Correct.
19    Q.  So were you wanting -- did you want him to
20  respond, yes, I'll mediate, or, no, I don't want to
21  mediate?
22    A.  I wouldn't have asked him if I didn't want him
23  to respond that yes, he would.

34

1    Q.  So when you say it gets very tricky, you're not
2  saying that's an undesirable result?
3    A.  No, just a complex one.
4    Q.  Okay.  I know you discussed this in your prior
5  deposition so I don't want to go into detail; but over
6  a course of a period of time, you had discussions with
7  V&S about the possibility of an Under Arrangements
8  venture; correct?
9    A.  That's correct.
10    Q.  And what were the primary sticking points to
11  those negotiations?
12    A.  With V&S or with all the physicians involved?
13    Q.  Whatever sticking points would prevent the
14  Under Arrangements concept from being finalized.
15    A.  There were discussions about how to evaluate
16  the kinds of returns that investors might receive in
17  this kind of an arrangement.  There were discussions
18  about how many investors would be invited, who they
19  would be.  At one point or another, all those issues
20  were to one degree or another sticking points.
21    Q.  Did V&S have any particular sticking points?
22    A.  We ended up with an agreement with V&S that
23  they would participate in that kind of an arrangement;

35

1  but during the negotiations, there were sticking
2  points about what the return would be, how returns to
3  individual investors would be determined, the size of
4  investment opportunities that would be available to
5  various investors and who the participants would be.
6    Q.  All of these -- I guess all of these are issues
7  that you and V&S were discussing not involving other
8  physicians?
9    A.  I was having those same discussions with mostly
10  the same issues with any number of other physicians.
11    Q.  But for whatever reason, the Under Arrangements
12  concept never came about?
13    A.  At the end of the day, the final sticking
14  point, the one that didn't go away, was on behalf of
15  -- or was a sticking point with physicians other than
16  V&S in that they wouldn't participate in an
17  arrangement that V&S was part of.
18    Q.  So was it your opinion that except for that one
19  sticking point you would have had a final deal with
20  V&S, that V&S would have been onboard with the Under
21  Arrangements concept?
22    A.  Yes.
23    Q.  Did you ever have a dispute with V&S about how

36

1  much credit they should get for the contribution of
2  their nuclear camera to the Under Arrangements
3  venture?
4    A.  We had negotiations with them about that, yeah.
5    Q.  Did you ever come to a final number on that
6  issue?
7    A.  I don't remember the answer to that.  I'm
8  sorry.
9    Q.  But if you didn't, then it's not really fair to
10  state that V&S was onboard except for the other
11  sticking point; is it?
12    A.  Well, in the lease agreement, V&S agreed to
13  participate in an Under Arrangements venture if it
14  came about.
15    Q.  We'll get to the lease agreement later.  I'm
16  talking about your discussions before you decided to
17  go with a lease route.
18        V&S had never said, I'm willing to sign this
19  Under Arrangements venture if you can get the other
20  doctors to sign; correct?
21    A.  Not before the lease agreement, no.
22    Q.  Okay.  Now, at some point the parties decided
23  to go the sublease route; correct?

37

1    A.    Correct.
2    Q.    Do you know when the sublease concept was first
3    raised?
4    A.    It was early in 2003.  I don't know the exact
5    meeting that that occurred at.
6    Q.    Let me show you this.
7              (Leonhardt Deposition Exhibit No. 2 was
8    marked for identification.)
9    Q.    I've shown you Exhibit 2 which is a February
10    11th, 2003 letter from Edward Kabala to Alan
11    Steinberg.
12         Have you seen this letter before?
13    A.    Let me look at it.
14    Q.    Oh, okay.
15    A.    I expect I probably have but -- okay.
16    Q.    Do you recognize the letter, first off?
17    A.    I remember receiving the letter now, yeah, a
18    copy of the letter.
19    Q.    The first paragraph references a February 10th
20    meeting.  Do you know whether you were present at a
21    February 10th, 2003 meeting?
22    A.    I believe I was.
23    Q.    Who else was present?

38

1    A.    I believe Drs. Vaccaro and Saleh and Mr.
2    Kabala, Mr. Steinberg; and I don't remember whether
3    Mr. Mulholland was there or not.
4    Q.    That first paragraph says that the February
5    10th meeting concluded with Drs.  Vaccaro and Saleh
6    offering to engage in a leasing agreement for the
7    nuclear camera.
8         Do you recall that issue coming up in that
9    meeting?
10    A.    Apparently it did, yes.
11    Q.    Do you have any specific recollection of that
12    meeting?
13    A.    I do not.
14    Q.    All right.  Do you have a recollection of a
15    meeting at this time where Drs. Vaccaro and Saleh
16    offered to enter into a lease arrangement?
17    A.    I have recollection that we discussed any
18    number of alternatives and that leasing is one of the
19    alternatives that came up and ultimately got hammered
20    through.  I don't have any specific recollection, you
21    know, even seeing this letter, that a meeting ended
22    with them making that proposal or who initially
23    brought that idea up at the meeting.

39

1    Q.    Assuming that the meeting is accurately
2    described here, do you believe that that was the first
3    time this lease proposal was broached?
4    A.    I can't honestly answer that.  It might have
5    been broached earlier, also.
6    Q.    But you don't have any specific recollection of
7    it being broached earlier?
8    A.    I do not.
9    Q.    If you'd flip over to the second page, please.
10    The third paragraph says, "It would be expected that
11    the hospital would operate the facility in the current
12    location."  Do you see that sentence?
13    A.    Yes, I do.
14    Q.    Do you recall that issue being discussed at a
15    meeting around this time?
16    A.    Yes.
17    Q.    Do you think that was this meeting?
18    A.    Apparently it was, but I don't have any
19    specific recollection.
20    Q.    As best you can remember, can you tell me how
21    that discussion went?
22    A.    There was a point in time when it was Vaccaro
23    and Saleh's interest in continuing to operate the

40

1    camera on the site of their practice and they were
2    proposing this kind of leasing arrangement.
3         From the hospital's point of view, we were not
4    interested in operating the camera on the site of
5    their practice if we were leasing it.
6    Q.    Why would the hospital have not been interested
7    in operating it at their office?
8    A.    If we were going to be involved in the
9    operation of a nuclear camera, we wanted it to be in a
10    location that would be attractive for any number of
11    physicians on the medical staff to refer patients to.
12    We didn't believe that any other physicians would want
13    to have their patients have diagnostic work done at
14    Vaccaro and Saleh's office whether the hospital was
15    the ultimate provider of that service or not.
16    Q.    Then it says, "My clients have indicated that
17    all of their Nuclear Medicine Studies can be
18    accommodated by a combination of their current camera
19    and those at BRMC."  Do you recall any discussion of
20    that issue?
21    A.    Not specifically, no.
22    Q.    It says "those at BRMC."  BRMC only had one
23    camera; correct?

1    A.    At that point in time.
2    Q.    Do you know -- after this February 10th meeting
3    that we assume happened, do you know when the next
4    time you had any kind of face-to-face meeting with
5    Drs. Vaccaro or Saleh regarding a lease arrangement?
6    A.    I believe it was in March.
7    Q.    Do you recall a March 8th meeting discussing
8    the lease arrangement?
9    A.    I recall a March meeting.  You know, I looked
10    back at my records and it was on MArch 8th.
11    Q.    I'll show you this.
12          MR. STIMPSON:  If we could mark this as
13          Exhibit 3, please.
14          (Leonhardt Deposition Exhibit No. 3 was
15    marked for identification.)
16    Q.    I'm showing you what's marked as Exhibit 3,
17    which is a March 20th, 2003 letter to Alan Steinberg
18    from Jodeen Hobbs.
19          First I'll ask you if you recall seeing that
20    letter?
21    A.    Okay.
22    Q.    Do you recall reading this letter at around the
23    time it was sent?

1    A.    I don't have any specific recollection of it,
2    no.
3    Q.    Did you routinely read correspondence from
4    opposing counsel?
5    A.    Yes.
6    Q.    So it's likely you did read this letter?
7    A.    It's very likely I did.  I just don't have a
8    specific recollection of it.
9    Q.    Do you have a specific recollection of this
10    March 8th meeting that's discussed in the letter?
11    A.    Yes, I have a recollection of the March 8th
12    meeting.
13    Q.    And it says that Drs. Vaccaro and Saleh, Mr.
14    Kabala, Mr. Mulholland, Mr.  Steinberg and you were at
15    the meeting.  Is that right?
16    A.    Yes, I believe so.
17    Q.    And is it true that the discussions focused
18    primarily on the details of a proposed lease
19    agreement?
20    A.    Yes, they did.
21    Q.    Do you know who suggested the meeting or who
22    proposed having this meeting?  Was it you or them?
23    A.    Prior to these meetings, we agreed to meet on

1    several occasions over a period of a couple of months
2    to try to resolve this issue.  The March 8th meeting
3    was one of those meetings.
4    Q.    So it might have been scheduled previously?
5    A.    It might have been scheduled previously.
6    Q.    But by the time of this meeting, you were
7    focusing on the lease concept as opposed to the Under
8    Arrangements concept; correct?
9    A.    No, we were focusing on the lease concept as
10    something that we could get done to resolve this
11    dispute at this point in time while we continued to
12    work on the Under Arrangements.
13    Q.    When you say as a means to resolve this
14    dispute, I just want to back up one second.  One
15    possible means of resolving the dispute was simply for
16    the hospital to say, keep your camera, we're not going
17    to revoke your privileges.  That was an option of the
18    hospital; wasn't it?
19    A.    Sure it was.
20    Q.    And to your knowledge, that option would have
21    been acceptable to Drs. Vaccaro and Saleh?
22    A.    I expect it would have been.
23    Q.    At the time of this meeting, was the hospital

1    resistant to the idea of doing a lease or was the
2    hospital open to the idea of doing a lease or was the
3    hospital pushing the idea of doing a lease, if you
4    understand?
5          MR. MULHOLLAND:  I just object to the
6          form; but he can answer to the extent he can.
7    A.    If I was asked to describe it, I would say we
8    were open to the idea of pursuing a lease.
9    Q.    V&S, would you describe them as being open to
10    the idea, resistant to it or pushing it?
11          MR. MULHOLLAND:  Same objection to form.
12          But you can answer.
13    A.    I don't know how to answer that.
14    Q.    I suppose the point I'm trying to get at is:
15    Which side was the one who was the advocate for the
16    lease idea?
17    A.    My impression was that both sides saw it as a
18    potential way to resolve their dispute and that
19    neither side saw it as perfect or, you know, what they
20    ultimately wanted.  It was a way to compromise.
21    Q.    Now, at this meeting, is it correct that V&S
22    initially proposed a five-year 2,000 dollar per day
23    lease?

1    A.    That's what the letter says and I have no
2  reason to believe that wasn't true.
3    Q.    Do you have any specific recollection of that
4  issue being discussed at the meeting?
5    A.    I have recollection of V&S being interested in
6  a lease that was on a per diem basis, the hospital not
7  being interested in a per diem lease and any number of
8  discussions about various lease prices.
9    Q.    Tell me what discussions there were about lease
10  prices.
11    A.    Vaccaro and Saleh wanted a higher price than we
12  were willing to pay and we wanted a lower price than
13  they said they were willing to accept.
14    Q.    Presumably neither one of you were pulling
15  these numbers out of thin air; correct?
16    A.    I know we weren't pulling numbers out of thin
17  air.  I don't believe they were.
18    Q.    What did the hospital base its numbers on?  I
19  guess let me back up a second.
20        At some point the hospital -- at some point
21  during this meeting, did the hospital make any
22  proposal as to a dollar figure for a lease?
23    A.    Yes, we did.  I don't remember exactly what it

1  was and it's not outlined in this letter.  It might be
2  in Mr. Steinberg's letter which he refers to of March
3  14th.
4    Q.    Presumably it was something less than $1500 a
5  day; right?
6    A.    Presumably it was, yes.
7    Q.    Do you know if the hospital -- the proposal
8  made by the hospital, was it a per diem rate?
9    A.    No.
10    Q.    Do you know what kind of proposal the hospital
11  made?
12    A.    It was monthly.
13    Q.    Monthly?  Okay.  I guess is there a difference
14  between a per diem rate and a monthly rate other than
15  the monthly rate is 30 times larger?
16    A.    Yeah.  Number one, it wasn't 30 times larger
17  than the per diem rate.  Number two is we didn't want
18  to get into arguments about -- as the letter starts to
19  do about whether we had used the machine on a Saturday
20  or a Sunday or a holiday.  We were unwilling to
21  certainly pay a per diem for Saturdays, Sundays and
22  holidays when we know that while the machine might be
23  used it's not going to be used, you know, with any

47

1  great volume on those days.
2    Q.    When V&S was making their per diem proposals,
3  was that a seven-day-a-week per diem or a
4  five-day-a-week per diem?
5    A.    As the sheet says, they initially talked about
6  a three-day-a-week per diem, then a five-day; and then
7  she points out that our response was not to their
8  liking because it raised the possibility that we could
9  use it for seven days.
10    Q.    Now, at this meeting, were you all discussing
11  leaving the camera at V&S or bringing it to the
12  hospital?
13    A.    I don't know whether we discussed that or not.
14  I know the hospital's position was that we wanted the
15  camera at the hospital or we wanted a camera at the
16  hospital.
17    Q.    You had a camera at the hospital; correct?
18    A.    Yeah.  We wanted another camera at the
19  hospital.
20    Q.    At this time, was the hospital exploring the
21  possibility of getting a camera, a second camera, from
22  somewhere other than V&S?
23    A.    We were seeing the need for a second camera.

48

1    Q.    Had you identified any specific vendors or
2  cameras to meet that need other than the V&S one?
3    A.    I can't answer whether that occurred in March
4  of 2003 or not; but very close to that time we were
5  evaluating the options as far as kind of camera, the
6  kind of capabilities that we wanted and needed and who
7  that was available from.
8    Q.    Now, your initial agreement with V&S was signed
9  in April of 2003; correct?
10    A.    I believe there was a -- I'm not sure I'm
11  describing this correctly; but I believe the April
12  agreement was an agreement to agree.
13    Q.    So when you say the hospital was exploring the
14  options of other cameras, was it doing that before it
15  entered into the April agreement or afterwards?
16    A.    I honestly can't answer some of that because
17  some of that exploration was going on by department
18  managers and people in charge of the diagnostic area
19  who were out there exploring things, you know, prior
20  to my knowing about them.
21    Q.    Prior to you entering into the lease with V&S,
22  did anyone ever present to you a proposal to acquire a
23  specific camera?

50

1    A.    No.

2    Q.    Prior to entering into the lease with V&S, did

3    you ever evaluate any specific cameras?

4    A.    Did I ever personally?

5    Q.    Yes.

6    A.    No.

7    Q.    Did anyone on your orders do that?

8    A.    Not on my orders, no.

9    Q.    All right.  Is there someone who did?

10   A.    I'm not trying to be vague.  What happened was

11   that at the time that I made the director of

12   diagnostic imaging aware of the fact that we were

13   going to enter into a lease with V&S about this

14   camera, he produced for me some research he had done

15   about the kind of camera we needed.

16   Q.    Who was that?

17   A.    Tim Brown.

18   Q.    And the research he gave you described a camera

19   that was different from the one that V&S had; correct?

20   A.    Yeah.  We were aware that this was not going to

21   be the camera we ultimately wanted.

22   Q.    So you had one and you were looking at getting

23   another one?

1    A.    Correct.

2    Q.    You didn't want three?

3    A.    No.

4    Q.    Going back to this March 8th meeting, you said

5    the hospital was proposing a monthly figure, you can't

6    remember how much a month; is that correct?

7    A.    I know where we ended up.  I don't really know

8    where we started.

9    Q.    I'm talking this negotiating session.

10   A.    Right.

11   Q.    You don't know what that number was, what the

12   hospital's number was at the negotiating session?

13   A.    No, I do not.

14   Q.    Do you know how you arrived at that number?

15   A.    Yes, I do.

16   Q.    How did you arrive at it?

17   A.    We arrived at that number based upon what we

18   thought -- a combination of what we thought the pass

19   through cost was for the actual lease of a camera and

20   our evaluation of what a fair price was for Vaccaro

21   and Saleh to get out of the business.

22   Q.    And how did you evaluate what a fair price to

23   Vaccaro and Saleh would be?

51

1    A.    Over this period of time, we had been asking

2    for information about their costs, the revenue that

3    was generated from the camera to the practice.

4    Q.    So are you telling me that the numbers proposed

5    by the hospital had nothing to do with how much the

6    hospital figured it could make by using the machine?

7    A.    No, they did not.  They had everything to do

8    with what we thought was a fair price to get them out

9    of the business.

10   Q.    Is it typical for a hospital in deciding how

11   much it wants to pay for a piece of machinery to

12   ignore how much revenue it can obtain by using the

13   machinery?

14   A.    Oh, no; and believe me, we had a pretty good

15   idea what kind of revenue we could generate from this;

16   but the relevant -- in this negotiation, we believed

17   that the relevant issue was what a fair price to pay

18   Vaccaro and Saleh to get out of the business was.

19   Q.    So you were trying to give them a good deal,

20   not the hospital?

21   A.    A fair deal.

22   Q.    Regardless of whether that was a fair deal to

23   the hospital?

52

1    A.    Oh, we certainly wouldn't have done that if it

2    wasn't a fair deal for the hospital.  We weren't

3    interested in paying them based upon how much we

4    thought we might profit.  We were interested in ---

5    because, frankly, that number in our mind was too

6    large.  What we were interested in was what was a fair

7    price to pay them to get out of this business.

8    Q.    Did you compare that number to what it would

9    cost you to get a machine elsewhere?

10   A.    The piece of that that we would compare to what

11   it would cost us was lease pass through.

12   Q.    But you paid a great deal more than the lease

13   pass through?

14   A.    Yeah; and I'm telling you that the rest of what

15   we paid for was the noncompete; and we looked at the

16   noncompete as being a fair price for them to get out

17   of the business.

18   Q.    What was your expectation of what Vaccaro and

19   Saleh would do with their nuclear camera patients if

20   they subleased the camera to you?

21   A.    Well, we hoped that they would refer them to

22   us.

23   Q.    You projected that they would refer them to

53

1   you; correct?
2   A.   We evaluated; but, no, we hoped that they would
3   refer them to us.
4   Q.   You expected they would refer them to you;
5   correct?
6   A.   I've said we hoped that they would refer them
7   to us.  We thought that we could satisfy them.  We
8   thought we could satisfy their patients.
9   Q.   If you knew that they would not refer them to
10  you, would you have still done the same deal?
11  A.   If we knew?
12  Q.   Yes.
13         MR. MULHOLLAND:  Objection.  You're asking
14         for speculation.  He can answer to the extent
15         he's able to.
16  A.   You know, I really don't know how to answer
17  that.  I can't imagine how we would know one way or
18  the other; but if somehow we magically knew that no
19  patients would be referred to us, no, I don't suppose
20  we would have done this.
21  Q.   You were not trying to be charitable to V&S;
22  were you?  That wasn't your goal?
23  A.   No.  This was a business arrangement.

54

1   Q.   It was a business arrangement for the hospital,
2   you were looking out for the hospital's interests;
3   correct?
4   A.   And they were looking out for their interests
5   and we expected them to.  You know, we wanted this to
6   be a fair deal.
7         MR. SIMPSON:  Mark this as Exhibit 4.
8         (Leonhardt Deposition Exhibit No. 4 was
9   marked for identification.)
10  Q.   What is this document, I guess?
11  A.   This is an evaluation of the sublease agreement
12  with Vaccaro and Saleh, an independent evaluation.
13  Q.   And it was prepared by Charles T. Day?
14  A.   That's correct.
15  Q.   For the hospital?
16  A.   Yes.
17  Q.   At your direction?
18  A.   I don't know whether it was prepared at my
19  direction or at the direction of Horty & Springer.
20  Q.   But it was for the hospital?  It was prepared
21  for the hospital to evaluate the fair market value of
22  the arrangement — the lease arrangement with V&S;
23  correct?

55

1   A.   That's correct.
2   Q.   And you considered it in that context; correct?
3   A.   Absolutely, prior to signing the agreement.
4   Q.   Prior to signing the --
5   A.   Final lease agreement.
6   Q.   Final October lease agreement?
7   A.   That's correct.
8   Q.   But after the agreement to agree?
9   A.   Yes.
10  Q.   If you'd turn to page 17, please, the last full
11  paragraph.  It says that the "table shows the expected
12  quantitative revenues that would accrue to the
13  hospital with a noncompetition agreement in place and
14  a comparison of those benefits to the amounts payable
15  under the noncompetition agreement.  This is based on
16  the assumption that the physicians would likely refer
17  this business to the hospital in the absence of a
18  financial interest in their own facilities or
19  services, although they are not required to do so by
20  virtue of any of the covenants contained in the
21  Agreements or otherwise."
22         Am I reading that right?
23  A.   Yes.

56

1   Q.   So this agreement is evaluating the expected
2   revenues from entering into the lease agreement and
3   it's based on the assumption that V&S is likely going
4   to refer that business to the hospital; is that
5   correct?
6   A.   That's how I read it, yes.
7   Q.   And you relied upon that in evaluating fair
8   market value -- in evaluating whether the price you
9   were paying to V&S was a fair market value?
10  A.   Yes.
11  Q.   And it is true, is it not, that the purpose of
12  the covenant not to compete was to protect that
13  revenue stream for the hospital?
14         MR. MULHOLLAND:  Object to the
15         characterization as something that he hasn't
16         testified about.
17         But if you're able to answer that
18         question, you can.
19  A.   Would you repeat it?
20  Q.   It's fair to say that the purpose of the
21  noncompete agreement was to protect that revenue
22  stream?
23  A.   The purpose of the noncompete, from my point of

1  view, was to make sure that Drs. Vaccaro and Saleh
2  didn't have a financial incentive to refer away from
3  the hospital.
4      Q.  Because if they didn't have a financial
5  incentive to refer away, they would refer it to you?
6      A.  We could hope that they would, yes.
7      Q.  You did more than hope.  You expected they
8  would refer to you?
9      A.  Expected they would refer a good bit of it to
10  us, yeah.
11     Q.  If you could turn to page 14.  In the middle
12  under paragraph number one it says, "There are three
13  revenue streams that the Board felt would be severely
14  impacted if physicians had financial interests that
15  would induce them to direct business away from the
16  hospital and that needed to be protected by
17  associating a covenant not to compete with the
18  sublease.  These are CT and MRI net revenues,
19  inpatient net revenues and outpatient net revenues
20  (excluding the aforementioned CT and MRI net
21  revenues)."
22         Is that an accurate statement?
23     A.  Yes, I believe so.

58

1      Q.  I'm not asking if I read it right.  That is
2  factually accurate?
3      A.  I believe so.
4      Q.  Okay.  Going back to Exhibit 3, which was the
5  March 20th letter.  It says that at the end of the
6  meeting the doctors agreed to a five-year, 1500 dollar
7  per day lease.
8      A.  I'm sorry, where?
9      Q.  I'm sorry.  It's at the bottom of the first
10  page.
11     A.  Okay.
12     Q.  Do you recall whether at the end of the day the
13  doctors, in fact, agreed to that amount?
14     A.  I don't have any specific recollection of that,
15  no.
16     Q.  Okay.  Could you flip over to the next page?
17  In the next-to-last paragraph it says, "Please
18  consider that the numbers as discussed at the March
19  8th meeting only contemplated the use of the camera
20  five days per week."
21         In light of that statement, isn't it fair to
22  say that the numbers that were discussed at the
23  meeting were not simply numbers about a fair value to

59

1  V&S but were numbers that took into account the
2  expected usage of the equipment at the hospital?
3      A.  You asked me earlier what the hospital based
4  its offers on and I explained that to you.  You know,
5  it says in the letter that the physicians were basing
6  their demands on the number of days per week that the
7  camera might be used.
8      Q.  Is it your testimony that the hospital's
9  numbers did not take into account the expected usage
10  of the machine at the hospital?
11     A.  The number of days that it would be used.
12     Q.  Is it your testimony that in making the
13  hospital's counterproposals the hospital did not take
14  into account the volume of business it would be able
15  to use the machine for at its facility?
16         MR. MULHOLLAND:  Object to the extent
17         you're asking him for a legal conclusion; but
18         he can answer as to his understanding of the
19         question.
20     A.  You know, prior to an independent evaluation
21  being done, the hospital's view of how a price could
22  be determined was based upon what we thought a fair
23  price was for Vaccaro and Saleh to get out of the

60

1  business.  Now, that certainly was within the context
2  of "and if we pay that kind of price, is it a rational
3  business deal for the hospital."
4      Q.  And it would only be a rational business deal
5  for the hospital if the business was there for the
6  hospital?
7         MR. MULHOLLAND:  Object to the form of the
8         question; but he can answer.
9      Q.  It would only be a rational business deal for
10  the hospital if the hospital could generate sufficient
11  revenues from the machine; correct?
12         MR. MULHOLLAND:  Same objection; but he
13         can answer if he can.
14     A.  Yeah, to the extent that, you know, if somehow
15  the hospital desired that they get out of that
16  business but it was generating so much income for them
17  that for us to pay a fair price for them to do so for
18  some reason we couldn't generate sufficient income to
19  cover it.
20     Q.  It is also true, is it not, that the hospital
21  feared that if it did not do a deal with Vaccaro and
22  Saleh the hospital could lose not simply the nuclear
23  medicine referrals but also the inpatient referrals

1  and other outpatient referrals; correct?

2  A.  No.  I don't believe so, no.  I don't see the

3  connection between the two.  If the hospital took

4  action to revoke Vaccaro and Saleh's privileges, we

5  would face that risk.

6  Q.  Well, you've said that that was not an empty

7  threat.

8  A.  That's correct; but it didn't require doing a

9  lease.

10  Q.  At this March 8th meeting, do you recall there

11  being any discussion of the Stark Statute or the

12  Anti-Kickback Statute?

13  A.  Not with all parties present.

14  Q.  All right.  I'm not asking about your

15  discussions with your own attorney; but if there were

16  discussions, you know, between the parties, that would

17  not be privileged.

18  A.  I recall discussions but not with all the

19  parties present, only with my attorneys.

20  Q.  Okay.  So any discussions would have been

21  between you and your attorneys without any other

22  parties present; is that correct?

23  A.  Any that I recall, yes.

1  Q.  All right.  At any of the meetings you had with

2  V&S or their attorneys regarding the lease

3  arrangement, do you recall their being discussions of

4  the Stark or Anti-Kickback Statute?

5  A.  Only to the extent that all parties believed

6  that the lease was within the guidelines of both Stark

7  and Anti-Kickback.

8  Q.  Let me explore that.  Were there discussions

9  where one side said to the other, this lease complies

10  with Stark and Anti-Kickback Statutes?

11  A.  Only to the extent that, you know, this lease

12  is appropriate.

13  Q.  I'm not sure what you're saying when you say

14  "to the extent."  Was it simply an assumption in the

15  air that we thought this was a good lease or was the

16  word Stark or Anti-Kickback ever used in the meetings?

17  A.  I don't recall those words ever being used when

18  all the parties were present.

19  Q.  Okay.  When you say "all the parties were

20  present," you're talking about just you and your

21  attorneys?

22  A.  Correct.

23  Q.  They don't all have to be present.

63

1  A.  Right.

2       MR. MULHOLLAND:  I'm just wondering about

3       timing, if you wanted to schedule a lunch break

4       at some point.

5       MR. SIMPSON:  Let me go a few more minutes

6       and then we can take a lunch break.

7  Q.  Were you ever present during discussions

8  between your attorney and V&S's attorney where Stark

9  or Anti-Kickback were discussed?

10  A.  Not that I remember.

11  Q.  Did either party ever give the other party an

12  assurance that the lease complied with either the

13  Stark Statute or the Anti-Kickback Statute?

14       MR. MULHOLLAND:  Object to the extent the

15       lease speaks for itself; but he can talk about

16       any assurance that he's aware of.

17  A.  I'm not aware of any.

18  Q.  You didn't rely on any assurance from V&S as to

19  the legality of the arrangement; did you?

20  A.  No.

21       MR. SIMPSON:  We'll stop here.  I'm done

22       with that letter so I guess we can stop and

23       take a lunch break.

64

1       (Lunch recess from 11:30 a.m.  Until 12:05

2  p.m.)

3  Q.  We just had been talking about this March 8th,

4  2003 meeting.  Mr. Leonhardt, do you recall how the

5  discussions proceeded after that meeting in terms of

6  negotiating a dollar figure for payments under the

7  lease?

8  A.  I recall that there was a significant amount of

9  back and forth between the attorneys and being

10  involved in discussions with probably mostly Mr.

11  Steinberg after that about the various iterations.

12  Q.  Were you intimately involved in figuring out

13  what dollar figure to use for lease payments?

14  A.  As involved as anybody was, yes.

15  Q.  How did the parties ultimately arrive at the

16  numbers that were put in the lease?

17  A.  By coming to I believe some kind of an

18  agreement about what a fair price was for Vaccaro and

19  Saleh to give up that line of business.

20  Q.  Was it just a gut feeling or was there --

21  A.  No.  It was based on information back and

22  forth.  You know, we based our offers on information

23  about the revenue that that was producing for them.

1  On a couple of occasions they -- you know, we were
2  reminding them that there were costs involved in that
3  also and were literally asking for information about
4  what is the cost of the drug, how much are you paying
5  to have radioactive waste taken away, what's your
6  license costing you.
7      Q.   Did you view the amount that Vaccaro and Saleh
8  were making by using the machine as a proxy for what
9  the hospital could make?
10     A.   No.  Hospitals and physician practices are paid
11  differently for those services.  They aren't paid
12  exactly the same.
13     Q.   The hospitals are paid more; is that correct?
14     A.   That's correct.
15     Q.   Do you know how much more?
16     A.   That's correct in most instances.  That's a
17  generally true statement.  I don't remember exactly
18  how much more.
19     Q.   At some point this April agreement to agree was
20  entered into and then in October the final lease
21  agreement was entered into; right?
22     A.   That's correct.
23     Q.   Did you have to go to the boards to get

1  approval for the lease arrangement?
2      A.   Oh, yes.
3      Q.   Did you do that before the April agreement?
4      A.   The board was aware that we were trying to
5  reach an agreement and, you know, might well agree to
6  agree based on final approval from the board.
7      Q.   Okay.  Let me show you this.
8           MR. SIMPSON:  Mark this as Exhibit 5,
9       please.
10          (Leonhardt Deposition Exhibit No. 5 was
11  marked for identification.)
12     Q.   Now, do you recognize Exhibit 5?
13     A.   Yeah.  Could I read it, please?
14     Q.   Sure.
15     A.   Okay.
16     Q.   Do you recognize this document?  Actually,
17  before I ask that question, I should ask:  Is this one
18  document?  There's three pages and I don't know if
19  it's one document or more.
20     A.   I believe pages one and two are one document.
21     Q.   And so the third page is not part of the
22  document you don't believe?
23     A.   I don't believe so.

67

1      Q.   Well, let's talk about the first two pages
2  then.  What are these first two pages?
3      A.   It's a summary of those discussions with V&S
4  and how we ended up with a proposed lease agreement.
5      Q.   And this was prepared by you?
6      A.   Largely I believe so, yes.
7      Q.   When you say "largely" --
8      A.   I probably had some help with this from
9  Stroudwater Associates and probably had some input
10  from Mr. Steinberg.
11     Q.   When I say "prepared," I mean you wrote the
12  document?
13     A.   Yeah.
14     Q.   Okay.  You typed it out yourself?
15     A.   No, I didn't type it out myself.
16     Q.   You dictated it or --
17     A.   Yes.
18     Q.   Stroudwater's input would have been on the
19  numbers, coming to the numbers?
20     A.   Correct.
21     Q.   On the bottom of the second page, do you see
22  the -- I guess the D/Administration/George, all of
23  that?

68

1      A.   That indicates it was typed for me.
2      Q.   And so was this, in fact, a summary for the
3  board of directors?
4      A.   Yes.
5      Q.   Prepared on or about April 3rd, would you say?
6      A.   Yeah, that's what it says.
7      Q.   Was there a board meeting that this was
8  prepared for?
9      A.   It would have been later that month or the end
10  of April.
11     Q.   All right.  In the middle paragraph of the
12  first page it says that "V&S Medical Associates made a
13  counter proposal that the Medical Center lease the
14  equipment in their office as an immediate resolution
15  of the dispute."  Do you see that sentence?
16     A.   Yes, I do.
17     Q.   Does that refresh your recollection as to it
18  was V&S who made the first proposal to lease?
19     A.   Honestly, it doesn't; but from reading that,
20  apparently that's what happened.
21     Q.   That paragraph goes on to state that "Their
22  stated reasons for this counter proposal were that it
23  would resolve the dispute in a manner that wasn't

70

1  dependent upon the participation of other physicians
2  or the ultimate approval of regulatory agencies."
3       Do you know what they're talking about about
4  the ultimate approval of regulatory agencies?
5  A.  They're talking about the Under Arrangements
6  proposal.
7  Q.  It had always been contemplated that before
8  going through with an Under Arrangements venture you
9  would get an approval letter from OIG; is that
10 correct?
11 A.  That's correct.
12 Q.  Is there a reason why you didn't go through
13 that same process before entering into the lease
14 agreement?
15 A.  Well, lease agreements are much more common and
16 they're -- it's ground that's well trod.  People know
17 what they can and can't do.
18 Q.  You did recognize, however, that whether the
19 arrangement was structured as an Under Arrangements
20 venture or a lease it would still have to comply with
21 the Stark Statute and the Anti-Kickback Statute;
22 correct?
23 A.  Yes.

1  Q.  If you look at the bottom paragraph of that
2  page, it talks about a modification of V&S's original
3  lease proposal and it says, "These modifications were
4  reviewed at the March Executive Committee and Board
5  meetings."  Do you recall those meetings?
6  A.  I don't particularly recall them individually,
7  but apparently that's what happened.
8  Q.  Okay.  And it says, "At these meetings it was
9  determined that we should seek a lease arrangement
10 with the following terms."  You don't recall a board
11 meeting determining that you should seek a lease
12 arrangement with specific terms?
13 A.  I don't specifically recall it, no.
14 Q.  Flipping over to the next page it says "Page
15 Two" and then "Financial Background" but it doesn't
16 really say what the terms of the lease are.  Do you
17 have an explanation for that?
18 A.  I do not.  I wondered the same thing when I
19 read it.  The thing that confused me most was it's
20 listed as page two.
21 Q.  Do you know if there's a page missing from
22 this?
23 A.  I don't know that but --

71

1  Q.  Do you recall creating this document?
2  A.  Specifically, no, I don't.
3  Q.  However, page two, as we can tell from the
4  identification line at the bottom, is a summary of the
5  lease for the board, correct, or it's part of the
6  summary for the board?
7  A.  Yes.
8  Q.  Do you see where it says "Adding a portion of
9  V&S volume to BRMC's current volumes"?  That's talking
10 about the expectation that at least a portion of V&S's
11 business is going to be coming to the hospital;
12 correct?
13 A.  That's correct.
14 Q.  And then it says, "Lease of V&S equipment, BRMC
15 Profit, 402,000, V&S Profit 268,000."  Is that the
16 expected profit to Bradford from entering into this
17 lease agreement?
18 A.  I would expect that's the profit that we
19 assumed from that volume of services, yes.
20 Q.  From adding a portion of V&S's volume?
21 A.  Yeah.
22 Q.  Underneath that it says, "When finalized, the
23 Under Arrangements Model" and then it gives different

72

1  profit figures.  So are you comparing the expected
2  profit from the lease versus what you expected from
3  the Under Arrangements Model?
4  A.  Yes.
5  Q.  So from these numbers it looks like the lease
6  is more profitable to Bradford; correct?
7  A.  Yes; but the Under Arrangements Model had many
8  more components than just nuclear cardiology.
9  Q.  Correct.  But here you're just comparing that
10 component?
11 A.  Here we're only comparing that component.
12 Q.  Could you flip over to the third page?
13 A.  Sure.
14 Q.  Actually, I'm sorry, let's go back before we go
15 to the third page.
16      Do you recall making a presentation to the
17 board about these issues on pages one and two that we
18 just went over?
19 A.  I know I did.  I don't recall it.
20 Q.  Did you get formal board approval to enter into
21 the final lease?
22 A.  Yes.
23 Q.  Do you know when you got that?

74

1    A.    It would have been at that meeting or the next
2    one.
3    Q.    And the terms did not fundamentally change
4    between the execution of the April agreement to agree
5    and the October final lease agreement; correct?
6    A.    I believe some of the financial agreements
7    changed but the outline of the terms didn't change
8    fundamentally.
9    Q.    Now let's go to the third page, please. It's
10   entitled Impact of Six Leaving Under Arrangements.
11   Can you explain what this document is?
12   A.    Yeah. This was an analysis that we did and
13   there would have been more pages to this analysis. We
14   did this based upon a set of assumptions: If everyone
15   in the department of medicine participates, here's
16   what it looks like; if three people don't, here's what
17   it looks like; if six leave and don't participate,
18   here's what it looks like.
19   Q.    Is this document discussing the Under
20   Arrangements venture or the lease agreement?
21   A.    This is discussing the Under Arrangements
22   venture because it's looking at MRI, CT and nuclear.
23   Q.    And the six that are referred to there, is that

1    referring to any six particular physicians?
2    A.    The six that said they wouldn't participate if
3    Vaccaro and Saleh were partners.
4    Q.    Okay. So I guess the top half of this page
5    then is saying if those six physicians don't
6    participate for MRI BRMC's profit goes down from 388
7    to 266. Is that essentially what's it's saying?
8    A.    Yeah. It's a fairly gross analysis, too, as
9    you understand.
10   Q.    Right. I'm just trying to understand what this
11   is trying to say.
12        And then the bottom half says "Comparable
13   Impact of V&S Pulling Out of Same Services." Now, is
14   this -- what are the assumptions on this bottom half?
15   Is that an assumption of having an Under Arrangements
16   venture that V&S doesn't participate in?
17   A.    Yes.
18   Q.    So you would have an Under Arrangements venture
19   where all the other physicians are involved but
20   there's no V&S; is that correct?
21   A.    That's correct.
22   Q.    And under that scenario, for example, you
23   anticipate that for MRI Bradford's profit goes from

75

1    388 to 220?
2    A.    Ah-huh.
3    Q.    And you said there would probably be other
4    pages that go along with this?
5    A.    Yeah. Again, with different levels of "what
6    if" scenarios.
7    Q.    And who prepared this?
8    A.    This would have -- you know, I may have written
9    this down; but these numbers would have been done by a
10   combination of our finance department and Stroudwater.
11   Q.    Was this document or this kind of an analysis
12   used to justify entering into a lease agreement?
13   A.    No.
14   Q.    Or was it just totally independent?
15   A.    It was used to evaluate what was going on with
16   the Under Arrangements and what the scenarios were
17   there.
18   Q.    So it's totally unconnected to the previous two
19   pages of this exhibit?
20   A.    I believe it is, yeah.
21   Q.    All right. I really just want to get this into
22   record. I don't really want to ask you any questions
23   about it.

76

1         MR. SIMPSON: But you can mark this as
2         Exhibit 6.
3         (Leonhardt Deposition Exhibit No. 6 was
4         marked for identification.)
5    Q.    Exhibit 6 is a February 15th, 2002 letter to
6    George Leonhardt from Mark Raspanti, who was an
7    attorney for Vaccaro and Saleh I believe.
8         Do you recall receiving this letter, Mr.
9    Leonhardt?
10        MR. MULHOLLAND: Just for the record,
11        we'll interpose whatever objections we had
12        interposed before relative to the Peer Review
13        Protection Act possibly applying to this; but I
14        think you can ask him the question. I just
15        wanted to preserve that same objection to the
16        extent it was made I think on Dr. Vaccaro's
17        deposition.
18   A.    Yes, I do remember receiving this.
19   Q.    If you'll flip over to page five, the second
20   paragraph starts off saying, "We know of no case that
21   more clearly establishes a hospital's attempt to
22   extract an exclusive referral stream from a
23   physician."

1    And we had discussed that issue previously and
2  I think you had mentioned that you were aware that
3  V&S's attorneys had made that accusation.  And this is
4  the letter where they do make that accusation;
5  correct?
6    A.  Right.
7    Q.  Now, ultimately you entered into a lease
8  agreement and executed a final agreement in October;
9  correct?
10   A.  Correct.
11   Q.  After you entered into that agreement, what
12 happened to the nuclear camera?
13   A.  For a period of time it continued to operate at
14 Vaccaro and Saleh's office.
15   Q.  I just wanted to ask some questions about that,
16 but if you wanted to keep going -- were you finished
17 with that answer?
18   A.  Until such time as we were able to get the
19 camera that we desired from Philips in place at the
20 hospital.
21   Q.  Now, you had previously testified that you
22 didn't think it was a good idea for Bradford to lease
23 a camera and then leave it at V&S's office; correct?

1    A.  Correct.
2    Q.  So why did you ultimately decide to do that?
3    A.  Because we couldn't get the camera from Philips
4  that we had wanted at the time that the lease was
5  entered into.  It took us longer to get that than we
6  expected it to.
7    Q.  All right.  You had said that one of the
8  problems with doing it that way would be that other
9  physicians -- it wouldn't be as easy for them to refer
10 patients to tests to be performed on a camera at
11 V&S's office; correct?
12   A.  That's correct.
13   Q.  So for a period of -- do you know how long the
14 camera was at V&S's office?
15   A.  I believe almost until March.
16   Q.  So four or five months?
17   A.  About four or five months.
18   Q.  How was the camera used during that time?
19   A.  It was used essentially by V&S's patients.
20   Q.  Okay.  It was used by V&S's patients but it was
21 Bradford's camera because you had subleased it?
22   A.  We were leasing it at that point, yes.
23   Q.  Did Bradford submit claims for tests performed

79

1  on that camera during that period of time?
2    A.  No.  V&S continued to submit the claims and
3  then provided us with an accounting and the revenue
4  from that.
5    Q.  Did V&S submit the claims under their provider
6  number or under the hospital's?
7    A.  I don't know the answer to that.
8    Q.  How did the hospital make money off of the
9  camera during that period of time?
10   A.  V&S provided us with the revenue.
11   Q.  And did the hospital pay V&S a billing fee?
12   A.  Yes.
13   Q.  Was it ten percent?
14   A.  Yes.
15   Q.  Did the hospital pay V&S rent to keep the
16 equipment at their facility?
17   A.  And to use the space, yes.
18   Q.  Was that $2500 a month?
19   A.  Yes, it was.
20   Q.  Did the hospital make any other payments to V&S
21 in connection with the equipment during that four or
22 five-month period?
23   A.  I believe there were also expense offsets from

80

1  their revenue for the interpretation fees that they
2  were paying and for the cost of the drugs and for the
3  disposal of the nuclear waste.
4    Q.  All right.  What happened at the end of that
5  four or five-month period?
6    A.  When we were able to get the camera from
7  Philips?
8    Q.  Yes.
9    A.  We began to operate the camera at the hospital.
10   Q.  The Philips camera?
11   A.  The Philips camera.
12   Q.  I'm sorry.  I wasn't very clear.  What happened
13 to the GE camera, the old camera, after you got the
14 Philips camera?
15   A.  There was a period of a couple of months where
16 Philips was trying to decide whether they wanted the
17 camera.  The agreement with Philips was they would buy
18 the GE lease out early and their lease payment to
19 Vaccaro and Saleh would reflect that expenditure.
20   Q.  Their lease payment from Vaccaro and Saleh?
21   A.  From Vaccaro and Saleh.  I'm sorry.
22   Q.  What physically happened to the camera?
23   A.  It stayed at Vaccaro and Saleh's office for a

1   couple of months and then was disposed of.
2   Q.  Disposed of in what way?
3   A.  I don't know.
4   Q.  It wasn't sold?
5   A.  No, it wasn't sold. It was --
6   Q.  Gotten rid of?
7   A.  -- gotten rid of.
8   Q.  Did Bradford pay for the early termination of
9   the GE lease?
10   A.  The cost of the early termination of the GE
11   lease was folded into the Philips lease.
12   Q.  And that was paid by who?
13   A.  It was passed through from -- it was paid by
14   Vaccaro and Saleh and then we reimbursed Vaccaro and
15   Saleh for that.
16   Q.  Okay. So essentially Philips paid off GE. The
17   amount of that payoff was folded into the Philips
18   rental, I suppose?
19   A.  Correct.
20   Q.  Paid by Vaccaro and Saleh and then you --
21   A.  Passed through to us.
22   Q.  You reimbursed them?
23   A.  Right.

1   Q.  And are those payments still being made to this
2   day?
3   A.  Yes, they are.
4   Q.  Do you know what the buyout -- the total buyout
5   amount was?
6   A.  I'm sure I did at the time. I do not know now.
7   Q.  Let me show you Exhibit 7.
8     (Leonhardt Deposition Exhibit No. 7 was
9   marked for identification.)
10   Q.  I've shown you what's marked as Exhibit 7 which
11   I'll tell you is what I believe to be the various
12   documents governing the lease with Philips and the
13   Philips camera. So I would ask you to look at that,
14   please.
15     If you don't mind, I'll ask this -- the first
16   several pages are a document titled Master Lease
17   Agreement dated April 6, 2004; and I guess my question
18   to you is: Is this the Master Lease Agreement between
19   Philips and V&S for the Philips camera?
20   A.  I believe it is, yeah.
21   Q.  All right. And then immediately after that is
22   a document titled Master Lease Schedule No. 01, which
23   is also dated April 6, 2004.

83

1   A.  Okay.
2   Q.  And if you go down to the next-to-the-last
3   paragraph of that first page it requires 60 monthly
4   payments of $4,450.40?
5   A.  Yes.
6   Q.  Then flip over another couple of pages -- I'm
7   sorry.
8     And this Master Lease Schedule No. 01 is the
9   lease for the new -- it reflects the lease payments
10   for the new camera itself; correct?
11   A.  That's what it says, yes.
12   Q.  All right. Flip over a couple of pages to the
13   document entitled Master Lease Schedule No. 02. If
14   you look at No. 1, System Description, it identifies
15   this as the -- as for the buyout of the GE camera;
16   correct?
17   A.  Correct.
18   Q.  Based on an estimated cost of $200,000; is that
19   right?
20   A.  That's what it says, yes.
21   Q.  So the buyout of the GE was $200,000? That's a
22   yes?
23   A.  Yes. I'm sorry.

84

1   Q.  She doesn't hear ah-huh very easily or it
2   doesn't translate very well.
3   A.  I apologize.
4   Q.  Then if you go down to paragraph 5(a) it calls
5   for 60 equal consecutive monthly payments of
6   $3,958.13; and so that's what you were referring to
7   about folding in the buyout in the lease; correct?
8   A.  Correct.
9   Q.  So there's two separate schedules, one of which
10   deals with the buyout and one of which deals with the
11   cost for the lease of the new camera?
12   A.  Correct.
13   Q.  And both of them are being passed through to
14   Bradford?
15   A.  That's right.
16   Q.  Then if you flip over a couple of pages to a
17   document entitled Guaranty dated April 6th.
18   A.  Correct.
19   Q.  And that is signed by you, correct, on behalf
20   of Bradford Hospital?
21   A.  That's right.
22   Q.  So this is Bradford guaranteeing the
23   obligations of V&S; correct?

A.    That's correct.

Q.    Then flip over a couple of pages more and there's another document entitled Addendum to Guaranty which is another document signed by you on behalf of Bradford; correct?

A.    That's correct.

Q.    And then if you'll flip over one more page there's a letter dated September 28th, 2004 which adjusts the payments under Schedule 1 of the Master Lease because of changes in treasury notes.

A.    Okay.

Q.    Correct?

A.    Correct.

Q.    And the last page is a similar letter dated January 20th, 2005 adjusting the payments under Schedule 2; correct?

A.    Correct.

Q.    All right.  To your knowledge, has V&S made all required payments to Philips?

A.    Yes.

Q.    And has the hospital reimbursed all of those payments to V&S?

A.    To my knowledge, yes.

Q.    Now, you said before that the old camera, the GE camera, was used for about four or five months; correct?

A.    Approximately.

Q.    Did the hospital refer any non V&S patients over to V&S for tests to be performed?

A.    I don't know the answer to that.

Q.    But to your understanding, primarily it was used by V&S for their own patients?

A.    Yes.

Q.    As they had used it previously?

A.    Correct.

Q.    So the total costs that Bradford paid for that four-month -- for the use of that -- or for a piece of equipment that was used for four or five months, it paid the pass through rents for -- it paid the pass through rents to GE?

A.    Correct.

Q.    It paid the noncompete payments to V&S?

A.    No -- well, yes.  I'm sorry.  Yes.

Q.    It paid $2500 a month rental to V&S?

A.    Correct.

Q.    Paid a ten percent reading fee?

87

A.    Billing fee.

Q.    Or billing fee.  Associated other costs for minor things, clerical things like that I think you had said?

A.    Yes.

Q.    And then it paid $200,000 to terminate the lease early; correct?

A.    Not until the Philips camera arrived and then that would have been part of the lease payments.

Q.    But you did pay that?

A.    Ultimately, yes.

Q.    Well, the Philips camera had its own lease payments; correct?

A.    Yes, but those didn't begin -- the reason that the camera continued to operate in Vaccaro and Saleh's office is that the Philips camera and the arrangement between Philips and GE took longer to accomplish than any of us anticipated.  At that point in time, if we had shut the GE camera down, we didn't have the capacity to accept and do the diagnostic work on Vaccaro and Saleh's patients with only one camera.

Q.    You could have waited four or five more months before entering into the lease agreement.

88

A.    Had we known it was going to take Philips four or five months longer than they said it was going to take them to deliver the camera, that's likely what we would have done.  Those decisions were essentially being made every month with Philips saying it will be here next week or the week after that or the week after that.

Q.    Well, if the Philips camera had gotten there after one month, you still would have had to terminate the GE lease early?

A.    Oh, absolutely.  Yeah.

Q.    That's a big obligation that the hospital saddled itself with; don't you agree?

A.    Yeah.  $200,000 to terminate the lease early, you know, that was the agreement that Vaccaro and Saleh had with GE, but that was a hefty price.

Q.    And that was in addition to your noncompete payments and it was in addition to the pass through payments for each of the two leases?

A.    Yes.  You do understand that there were no payments to Philips either for the pass through or for the termination until they delivered their equipment and we began to use it.

89

1    Q.   Well, I wouldn't expect there to be any
2  payments for a camera that hadn't been delivered.
3    A.   Based on the question you asked, you implied
4  that all three of those were going on at the same
5  time.
6    Q.   Your buyout payments are still being made to
7  this day; correct?
8    A.   As is outlined in the lease agreement, yes.
9    Q.   So essentially you're paying for three cameras
10  right now, correct, the one that you have always had,
11  Vaccaro and Saleh's old camera and Vaccaro and Saleh's
12  new camera?
13    A.   The buyout of the GE camera was financed
14  through the Philips lease.  So, yeah, those payments
15  continue to go on.
16    Q.   Does Bradford have a separate sublease with V&S
17  that specifically identifies the new Philips camera?
18    A.   No.  The original sublease identified
19  Bradford's ability to specify which piece of equipment
20  it would be.
21    Q.   But you weren't changing the camera, you were
22  adding another camera essentially because you're still
23  paying off the old one?

90

1    A.   We were changing the camera; and in order to
2  change the camera, there had to be a buyout of the
3  existing lease.
4    Q.   Why didn't you just lease the Philips camera
5  directly from Philips?  Why did you go through putting
6  it in V&S's name and then subleasing it from them?
7    A.   To accomplish all the goals that we've talked
8  about all along.
9    Q.   But those goals had been accomplished by
10  entering into the original sublease.
11    A.   Correct.
12    Q.   Why couldn't the hospital just get its own
13  camera several months later and not go through V&S?
14    A.   Do you mean end the lease with V&S?
15    Q.   Well, you're no longer leasing their camera if
16  you've early terminated the lease; correct?
17    A.   I don't know if it could have been accomplished
18  that way.
19    Q.   How has Bradford accounted for the buyout, the
20  early termination payments on its cost reports?
21    A.   As just that.
22    Q.   As early termination payments?
23         MR. MULHOLLAND:  If you know.

91

1    A.   I don't know for sure.
2         (Leonhardt Deposition Exhibit No. 8 was
3  marked for identification.)
4    Q.   I'm showing you Exhibit 8 which is an October
5  2nd, 2003 letter to you from Drs. Saleh and Vaccaro.
6  Do you recall receiving this letter?
7    A.   Yes.
8    Q.   Does it accurately reflect those additional
9  charges that we had discussed previously in connection
10  with keeping the old camera at V&S's property?
11    A.   Yeah, I believe so.
12    Q.   Are you aware of any other situation where a
13  hospital has entered into a sublease of a piece of
14  equipment that it intends to use only for a few months
15  and thereby incurred an obligation to pay $200,000 to
16  terminate the lease early?
17         MR. MULHOLLAND:  You're asking for his
18         personal awareness, not expert testimony;
19         correct?
20    Q.   I'm asking if you're aware.
21    A.   No, I'm not aware of any arrangements like
22  that.
23    Q.   The equipment sublease provides that the

92

1  equipment will remain -- the old GE camera will be
2  transferred to the hospital; correct?
3    A.   I'd have to look at it to see that but --
4    Q.   I'll show it to you.
5         MR. SIMPSON:  This will be Exhibit 9.
6         (Leonhardt Deposition Exhibit No. 9 was
7  marked for identification.)
8    Q.   I'm showing you Exhibit 9 which is a copy of
9  the Equipment Sublease.  If you could turn to page
10  four, Section 4, Equipment Location.  It says,
11  "Subsequent to the execution of this Sublease, the
12  Equipment will be moved to the Sublessee."  The
13  sublessee is Bradford; correct?
14    A.   Correct.
15    Q.   So this agreement does not accurately describe
16  the state of affairs in the four or five-month period
17  after the agreement was executed; correct?
18    A.   That's correct.
19    Q.   Did you ever give any thoughts to ending the
20  agreement?
21    A.   No.
22    Q.   When you signed this agreement, were you aware
23  that you would be incurring a 200,000 dollar

1  obligation to terminate the GE lease early?
2     A.  We would have, yes.  We would have reviewed the
3  GE lease prior to signing this agreement and we knew
4  what the termination clauses were.
5     Q.  Is it fair to say that the hospital both before
6  and after entering into the sublease arrangement
7  closely tracked the referrals of Drs. Vaccaro and
8  Saleh and Jamil?
9     A.  We did a series of evaluations that I've talked
10  to you about.  We didn't more closely track their
11  referrals on a regular basis than we did anyone
12  else's.
13    Q.  So you're saying you didn't track them any more
14  than you tracked anybody else?
15    A.  Other than those evaluations that I've talked
16  to you about.
17    Q.  In your prior deposition do you mean?
18    A.  And today.
19    Q.  And today.  Did you do any evaluations of their
20  referral patterns in connection with entering the
21  Equipment Sublease or evaluating the Under
22  Arrangements venture?
23    A.  We did a series of evaluations as we went

94

1  through the Under Arrangements.
2           MR. SIMPSON:  Mark Exhibit 10.
3           (Leonhardt Deposition Exhibit No. 10 was
4  marked for identification.)
5     Q.  I've shown you Exhibit 10 which appears to be a
6  series of e-mails and I'll ask if you -- do you
7  recognize these e-mails?
8     A.  Yes.
9     Q.  These are e-mails to you -- all of these are
10  e-mails to you; correct?
11    A.  Yes, they are.
12    Q.  The first one from Glen Washington discusses
13  nuclear medicine revenues as a percentage of total
14  radiology revenues and he says, "I'm still working on
15  Jamil and V&S percentages."
16          And then the second one, which is a little
17  later the same day, says, "V, S and J" -- which I
18  suppose is Vaccaro, Saleh and Jamil -- "order 42 and a
19  half percent of our nuclear studies."
20          And then the third one is -- it doesn't
21  specifically reference them.
22          The fourth page purports to give annual volumes
23  for V, S and J.

95

1           So are you saying you did this kind of targeted
2  review of all physicians?
3     A.  These are -- if you look at the dates of these,
4  what this says to me is that sometime on March 14th I
5  asked Glen Washington probably for information about
6  that question, you know, what percentage of our total
7  revenues are nuclear medicine and how much is Vaccaro,
8  Saleh and Jamil referring to us.  What it says to me
9  is that that's probably the day that someone said to
10  me they're going to start doing nuclear medicine and I
11  was asking the question what kind of impact could that
12  have on us.
13    Q.  So you paid closer attention to them because
14  they were --
15    A.  At that particular point in time.  On a regular
16  basis, no; but had someone come to me and said that,
17  you know, another physician on the staff is going to
18  open an MRI, I would have asked what kind of impact
19  might that have on us.
20    Q.  I'm going to show you one more document I
21  think.
22          (Leonhardt Deposition Exhibit No. 11 was
23  marked for identification.)

96

1     Q.  I've shown you Exhibit 11, which appears to me
2  to be a PowerPoint presentation, and ask if you
3  recognize it?
4     A.  Yes, I do.
5     Q.  Is this a presentation that was made -- is this
6  PowerPoint for a presentation made to the doctors or
7  is it an internal presentation?
8     A.  Presentation made to the medical staff.
9     Q.  Okay.  So if you'll turn over to page four,
10  page four refers to a Penalty Strategy and a Reward
11  Strategy.  So you were using phrases like "penalty
12  strategy" to the physicians that you were wanting to
13  recruit into an Under Arrangements venture?
14    A.  Apparently so.
15    Q.  Do you know whether this was a presentation
16  made to the doctors or are you just assuming?
17    A.  A presentation very similar to this was made to
18  the doctors.  Could this have been an earlier draft
19  and the word "penalty" changed at a later time,
20  perhaps.
21    Q.  It says "Draft No. 1" on it.  So you don't know
22  whether this precise one was used with the doctors?
23    A.  I don't know whether this precise one was used.

97

1  Something very similar to this was used.
2    Q.  All right.
3        MR. SIMPSON:  Let's take two minutes.
4        MR. MULHOLLAND:  Sure.
5        (Brief recess.)
6    Q.  Mr. Leonhardt, I just have a few more things
7  and we'll be done.
8        MR. SIMPSON:  Mark this as Exhibit 12,
9    please.
10       (Leonhardt Deposition Exhibit No. 12 was
11  marked for identification.)
12   Q.  All right.  I've handed you Exhibit 12 which is
13 a March 25th, 2003 memorandum from you to Drs. Saleh
14 and Vaccaro; and I'd just ask, do you recall sending
15 this document?
16   A.  I don't recall it, no.
17   Q.  That's your signature, though?
18   A.  Yes, it is.
19   Q.  Do you recall in 2003 Drs. Vaccaro and Saleh
20 asking about their current volumes of MRI and CT tests
21 and how they compare to others?
22   A.  Apparently they did, but I don't have any
23 independent recollection of that conversation.

98

1    Q.  Okay.  You have no reason to dispute that this
2  is your document, though?
3    A.  No.  No, I just don't --
4    Q.  You don't specifically remember it.  All right.
5  Let me show you Exhibit 13.
6        (Leonhardt Deposition Exhibit No. 13 was
7  marked for identification.)
8    Q.  All right.  Exhibit 13, the first page is a
9  handwritten document entitled "Top 15 Referral
10 Sources"; and then the following pages appear to be
11 computer printouts supporting this list.
12   A.  From which this list would have been generated.
13   Q.  Does that appear to be what it is to you?
14   A.  Yes, it does.
15   Q.  Is this your handwriting on the first page?
16   A.  Yes, it is.
17   Q.  Do you recall making this document?
18   A.  Yeah.
19   Q.  So it's ranking referral sources for CT, MRI
20 and nuclear medicine?
21   A.  Yes.
22   Q.  Do you know where that was drawn from?  I mean,
23 how did you identify somebody as being a referring

99

1  physician?
2    A.  This is information that we have in our
3  diagnostic services area available --
4    Q.  So you can --
5    A.  -- at anytime.
6    Q.  So at anytime you can identify claims where a
7  particular physician was a referring physician for
8  these things?
9    A.  Yes.
10   Q.  It's not hard?
11   A.  Not to get this kind of data, no.
12   Q.  It wouldn't be hard to get the actual claims
13 either, would it, because that's where this
14 information had been drawn from; correct?
15   A.  This is not hard to get.  I'd have to ask
16 someone how.
17   Q.  All right.
18       (Leonhardt Deposition Exhibit No. 14 was
19 marked for identification.)
20   Q.  All right.  Exhibit 14 appears to be something
21 similar to the last one.  It says "Top 15 Referral
22 Sources" for January through December '03 and the same
23 three categories, although the first page here is not

100

1  handwritten, it's in a slightly different format; but
2  does this appear to be --
3    A.  It appears to be pretty much the same thing.
4    Q.  Did you prepare or have this document prepared?
5    A.  I don't know the answer to that.
6    Q.  Does this document ring a bell?
7    A.  Yes, it does.
8    Q.  Do you know for what purpose it was prepared?
9    A.  To evaluate the Under Arrangements proposals.
10   Q.  All right.  But this would have been prepared
11 after you had already entered into the lease
12 agreement?
13   A.  Yeah, it would have had to have been most
14 likely.
15   Q.  At the top, that handwritten -- there's an
16 arrow and it says "4/5/04, George."  Whose handwriting
17 is that; do you know?
18   A.  That looks to me -- I can't be positive, but it
19 looks to me to be Glen Washington's handwriting.
20   Q.  Does that maybe mean he gave it to you on that
21 date?
22   A.  That very easily could be the case.
23   Q.  Were you still trying to put together an Under

101

1  Arrangements venture at that time?
2  A.    Yes, we were.
3  Q.    Then probably the last one is Exhibit 15.
4        (Leonhardt Deposition Exhibit No. 15 was
5  marked for identification.)
6  Q.    All right. Exhibit 15 appears to be an e-mail
7  from you to Tim Brown on August 31st, '04 asking him
8  to providing you with 18 months nuclear medicine
9  volumes by referring physician.  Do you recall this
10 document?
11 A.    No, I don't but --
12 Q.    Do you recall asking Mr. Brown to give you such
13 a list at the end of August '04?
14 A.    I don't have any particular recollection of
15 that, but obviously I did.
16 Q.    Do you know what purpose or why you would have
17 asked him for that?
18 A.    Again, for the same purpose, to evaluate and
19 have information to evaluate a possible Under
20 Arrangements.
21 Q.    When was the last time that the hospital had
22 active, serious discussions with the physicians about
23 an Under Arrangements venture involving nuclear

102

1  medicine?
2  A.    Probably 2004.
3  Q.    So the last three, three and a half years it's
4  been off the table?
5  A.    Pretty much so, yeah.
6  Q.    After entering into the lease agreement with
7  V&S, did V&S show any interest in negotiating towards
8  an Under Arrangement venture?
9  A.    Yes.
10 Q.    What actions did you take with V&S in that
11 regard after the execution of the lease agreement?
12 A.    We continued to review it with them and tried
13 to refine our proposal.  We continued to try to meet
14 with and talk to other physicians on the staff.  On a
15 number of occasions, V&S had conversations with other
16 physicians on the staff explaining why they thought it
17 was a good idea, why they were interested in
18 proceeding.
19 Q.    Did it ever get to the point where draft Under
20 Arrangement documents were being circulated?
21 A.    Do you mean as far as actual agreements?
22 Q.    Yes.
23 A.    No.

103

1  Q.    On that point, on the Equipment Sublease, did
2  you have various drafts going back and forth between
3  the parties on the Equipment Sublease?
4  A.    We had various proposals going back and forth
5  and negotiations going on.  I don't know that there
6  were various drafts.
7  Q.    Okay.
8  A.    I'm sure at some point there were, but I don't
9  have any independent memory of them.
10 Q.    You don't recall marking up any drafts?
11 A.    No.
12         MR. SIMPSON:  That's all I have.
13         THE WITNESS:  Okay.
14         MR. MULHOLLAND:  We'll reserve the right
15   to read and sign unless you had any questions,
16   Carl.
17         MR. RYCHCIK:  No, I don't.
18         (Whereupon, the deposition was concluded
19   at 1:10 p.m. and signature was not waived.)
20            - - -
21
22
23

104

1         C E R T I F I C A T E
2  COMMONWEALTH OF PENNSYLVANIA    :
                                   : SS.:
3  COUNTY OF ALLEGHENY             :
4         I, Carla L. Lennartz, a Notary Public in and
   for the Commonwealth of Pennsylvania, do hereby
5  certify that before me personally appeared GEORGE
   LEONHARDT, the witness herein, who then was by me
6  first duly cautioned and sworn to testify the truth,
   the whole truth and nothing but the truth in the
7  taking of his oral deposition in the cause aforesaid;
   that the testimony then given by him as above set
8  forth was reduced to stenotypy by me, in the presence
   of said witness, and afterwards transcribed by
9  computer-aided transcription under my direction.
10        I do further certify that this deposition was
   taken at the time and place specified in the foregoing
11 caption, signature was not waived.
12        I do further certify that I am not a relative
   of or counsel or attorney for any party hereto, nor am
13 I otherwise interested in the event of this action.
14        IN WITNESS WHEREOF, I have hereunto set my
   hand and affixed my seal of office at Pittsburgh,
15 Pennsylvania, on this 10th of April, 2008.
16        The foregoing certification does not apply to
   any reproduction of this transcript in any respect
17 unless under the direct control and/or direction of
   the certifying reporter.
18
19
20        _____
          Carla L. Lennartz, Notary Public
21        in and for the Commonwealth of
          Pennsylvania
22
23 My commission expires October 29, 2011.