**2**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
ERIE DIVISION


UNITED STATES OF AMERICA, ex rel. )
DILBAGH SINGH, M.D., PAUL KIRSCH, )
M.D., V. RAO NADELLA, M.D., and  )
MARTIN JACOBS, M.D.,          )
                            )
         Plaintiffs,    )
                            )  Civil Action
      vs.                  )  No. 04-186E
                            )
BRADFORD REGIONAL MEDICAL CENTER, )
V&S MEDICAL ASSOCIATES, LLC,    )
PETER VACCARO, M.D., KAMRAN SALEH,)
M.D., and DOES I through XX,    )
                            )
         Defendants.     )


DEPOSITION OF CORPORATE DESIGNEE OF

BRADFORD REGIONAL MEDICAL CENTER

THURSDAY, JULY 26, 2007

Deposition of CORPORATE DESIGNEE OF BRADFORD

REGIONAL MEDICAL CENTER, called as a witness by the

Plaintiffs, taken pursuant to Notice of Deposition and

the Federal Rules of Civil Procedure, by and before

Joy A. Hartman, a Court Reporter and Notary Public in

and for the Commonwealth of Pennsylvania, at the

offices of Horty Springer, 4614 Fifth Avenue, First

Floor, Pittsburgh, Pennsylvania, commencing at 10:03

a.m. on the day and date above set forth.

USA, et al. vs. Bradford, et al.    Document 117-3    Filed 09/10/2008    Page 3 of 56

Case 1:04-cv-00186-MBC    Multi-Page    Corp. Designee BRMC

No. 04-186E    July 26, 2007

Page 2

1  APPEARANCES:

2  On behalf of the Plaintiffs:

3       Stone Law Firm
        Andrew M. Stone, Esquire
4       1400 Allegheny Building
        Pittsburgh, Pennsylvania  15219
5
   On behalf of the Defendant Bradford Regional Medical
6  Center:

7       Horty Springer
        Dan Mulholland, Esquire
8       4614 Fifth Avenue
        Pittsburgh, Pennsylvania  15213
9
   On behalf of the Defendants V&S Medical Associates,
10 LLC, Peter Vaccaro, M.D. and Kamran Saleh, M.D.:

11      Fox Rothschild
        Carl J. Rychcik, Esquire
12      625 Liberty Avenue, 29th Floor
        Pittsburgh, Pennsylvania  15222
13
   ALSO PRESENT:
14
15      John Rice, Horty Springer

16      Ian Donaldson, Horty Springer

17      Tina Marie Hannahs

18      Glen Alan Washington

19      George Leonhardt

20              - -

21

22

23

Page 3

1               INDEX

2  WITNESS:                       PAGE:

3  DEPOSITION OF CORPORATE DESIGNEE OF
   BRADFORD REGIONAL MEDICAL CENTER BY:
4     TINA MARIE HANNAHS

5     Examination by Mr. Stone      4 to 65

6     GLEN ALAN WASHINGTON

7     Examination by Mr. Stone      65 to 76

8     GEORGE LEONHARDT

9     Examination by Mr. Stone      77 to 215

10 EXHIBITS:

11    Deposition Exhibit No. 1        4
      Deposition Exhibit No. 2        4
12    Deposition Exhibit No. 3        15
      Deposition Exhibit No. 4        28
13    Deposition Exhibit No. 5        28
      Deposition Exhibit No. 6        28
14    Deposition Exhibit No. 7        28
      Deposition Exhibit No. 8        85
15    Deposition Exhibit No. 9        98
      Deposition Exhibit No. 10       127
16    Deposition Exhibit No. 11       134
      Deposition Exhibit No. 12       135
17    Deposition Exhibit No. 13       138
      Deposition Exhibit No. 14       146
18    Deposition Exhibit No. 15       151
      Deposition Exhibit No. 16       157
19    Deposition Exhibit No. 17       159
      Deposition Exhibit No. 18       168
20    Deposition Exhibit No. 19       173
      Deposition Exhibit No. 20       183
21    Deposition Exhibit No. 21       195
      Deposition Exhibit No. 22       198
22    Deposition Exhibit No. 23       200
      Deposition Exhibit No. 24       201
23    Deposition Exhibit No. 25       204

Page 4

```
1              PROCEEDINGS
2                  - - -
3     CORPORATE DESIGNEE DEPOSITION OF
4    BRADFORD REGIONAL MEDICAL CENTER BY
5          TINA MARIE HANNAHS
6          GLEN ALAN WASHINGTON
7                  AND
8          GEORGE LEONHARDT
9                  - - -
10    (Deposition Exhibit Nos. 1 and 2 were
11 marked for identification.)
12                 - - -
13          TINA MARIE HANNAHS,
14 called as a witness by the Plaintiffs, being first
15 duly cautioned and sworn, as hereinafter certified,
16 was deposed and said as follows:
17              EXAMINATION
18 BY MR. STONE:
19    Q. Ms. Hannahs, my name is Andrew Stone.  I
20 represent the plaintiffs in this case that is brought
21 under the Federal False Claims Act in the Federal
22 Court for the Western District of Pennsylvania.
23      I am going to be asking you a series of
```

Page 5

```
1  questions today relating to financial and billing
2  matters at the Bradford Regional Medical Center.
3      Am I correct in understanding that you have
4  been designated as the person at the hospital that is
5  knowledgeable with regard to billing matters and
6  financial reports?
7          MR. MULHOLLAND:  Yeah, I think we have
8      designated Ms. Hannahs to answer questions
9      concerning the claims spreadsheets that were
10     part of the Notice of Deposition.
11         I don't know that she has full knowledge
12     of all the financial matters, but that would
13     be, as I understood the notice, that would be
14     beyond the scope of the deposition notice.
15         MR. STONE:  Then the understanding is that
16     consistent with the notice, she is the witness
17     that is provided to testify with regard to the
18     spreadsheets?
19         MR. MULHOLLAND:  That's correct.  Yes.
20     She prepared the spreadsheets, and she can
21     answer questions about the spreadsheets and
22     what is on them.
23         Mr. Stone, before we get going, we just
```

Page 6

1    might want to put on the record we have agreed
2    to have Plaintiffs' Exhibits 1 and 2 made part
3    of the record.
4        Those are copies of the Protective Orders
5    that are currently in effect in this case. Is
6    that correct?
7        MR. STONE: Yes. That's stipulated to by
8    the Plaintiffs, and that is fine.
9        MR. MULHOLLAND: Carl, that is okay with
10    you?
11        MR. RYCHCIK: Yes.
12    Q. Ms. Hannahs, could you please state your full
13    name for the record?
14    A. Tina Marie Hannahs.
15    Q. A couple of preliminary matters: Have you ever
16    been deposed before?
17    A. No.
18    Q. Well, let me just tell you up front that if at
19    any time you do not hear my question or if you don't
20    understand it, please stop me, and I will be happy to
21    repeat or rephrase the question so that you understand
22    it.
23        Also, I would like you to respond to the

Page 7

1    questions verbally, because it is very difficult for
2    the court reporter to take down a nod of the head or a
3    gesture. Do you understand that?
4    A. Yes.
5    Q. Ms. Hannahs, what is your job title?
6    A. I am the Director of Revenue Management.
7    Q. And your employer is the Bradford Regional
8    Medical Center; is that correct?
9    A. Yes.
10    Q. How long have you been in that position at
11    Bradford?
12    A. Four years.
13    Q. Prior to that, did you hold any other position
14    at the Bradford Regional Medical Center?
15    A. Yes.
16    Q. What position was that?
17    A. I was the Director of Patient Accounting.
18    Q. How long had you held that position?
19    A. I don't know what the exact -- the title change
20    time frame, I don't know when that was.
21    Q. I don't need exact dates.
22    A. Yeah.
23    Q. I am just trying to get a sense of your

Page 8

1    history, your work history at the hospital. Did you
2    hold any other positions at the hospital?
3    A. Yes.
4    Q. Why don't you start with when did you first
5    start working there?
6    A. Okay. February of 1991.
7    Q. What was the position you started in?
8    A. I was a clerical person then in the Patient
9    Accounting Office.
10    Q. And did you move up from there?
11    A. Yes.
12    Q. What was your next position?
13    A. I was a Supervisor in the Patient Accounting
14    Office.
15    Q. Okay.
16    A. And then the Director of the Patient Accounting
17    Office, and then the Director of Revenue Management.
18    Q. Then as you testified, that was approximately
19    four years ago?
20    A. Yes.
21    Q. Now, as the Director of Revenue Management, can
22    you describe for us what your duties are and your
23    responsibilities?

Page 9

1    A. My primary duty is to oversee the processes
2    involved in the revenue cycle of the services that we
3    provide from the time that the patient is registered
4    until the time that we send the bill to the third
5    party.
6    Q. So you would have experience and knowledge with
7    regard to everything from patient billing to
8    collections and everything else; is that right?
9    A. Yes.
10    Q. Before taking employment with the hospital, had
11    you worked anyplace else?
12    A. Yes.
13    Q. Where did you work before you worked at the
14    hospital?
15    A. I worked at Siegel Management, Siegel Shoes
16    Management in Olean, New York.
17    Q. What did you do there?
18    A. I was a bookkeeper.
19    Q. And how long did you work at that job?
20    A. Two years.
21    Q. Prior to that?
22    A. Wow. Oh, I'm just thinking of how -- prior to
23    that?

Page 10

1  Q. Yes.
2  A. I worked at Bradford Regional again.  There was
3  a time that I worked there before.
4  Q. What did you do the first time you worked
5  there?
6  A. I worked in the IT Department.
7  Q. What is your educational background, Ms.
8  Hannahs?
9  A. I have an Associate's in Computer Programming.
10 Q. Where is that from?
11 A. The University of Pittsburgh at Bradford.
12 Q. What year did you graduate?
13 A. 1986.
14 Q. And do you have any other training or education
15 that is post undergraduate?
16 A. No.
17 Q. Any other degrees or certificates other than
18 associate's degree?
19 A. No.
20    (Whereupon, Mr. Glen Washington left the
21 conference room.)
22 Q. Could you explain to us the process for
23 submission of claims at Bradford Regional to, let's

Page 11

1  say, the Medicare program?  Can you explain to us how
2  the bills are generated and submitted to the Medicare
3  intermediary?
4     MR. MULHOLLAND:  I just object to the
5     extent this goes beyond what she has been
6     designated to testify about, mainly, the
7     explanation of the claims spreadsheets produced
8     by BRMC.  But to the extent your question has
9     to do with those spreadsheets and the extent to
10    which any claims processing would be reflected
11    on the claim sheets, I think she can answer.
12 Q. Do you understand my question?
13 A. Nope.
14    MR. STONE:  Do you want to read back the
15    question?
16    (Previous question read back.)
17 A. There's -- at what point in time?  There is --
18 when the patient presents?
19 Q. Yeah.  Start from the beginning.
20 A. When the patient presents at that facility?
21 Q. Yes.
22 A. The patient would present themselves at the
23 facility with a physician order for a specific test.

Page 12

1  At that point in time, the registration staff will
2  take the demographic information from the patient and
3  create an account number that includes the ordering
4  physician, the reason for exam, and the patient's
5  insurance.
6     The patient then goes to the department, has
7  the services performed.  The department then charges
8  for the specific services that they have been given.
9     There is a five-day type of hold between that
10 time; and when the charges are posted in the
11 information system, the coding staff assigns the
12 appropriate ICD-9 code that is reflected on the
13 physician order.
14    A bill drops from that system into our billing
15 system.  Through that billing system, we create what
16 is called a UB-92 claim form.  Those claims forms are
17 then batch filed, created in a batch file, and put
18 through our billing vendor, and then sent off to the
19 appropriate third party for payment.
20 Q. Now, you have described a process that starts
21 with the original intake information.
22 A. Yes.
23 Q. And then ends with the electronic submission of

Page 13

1  a bill in a batch form --
2  A. Uh-huh.
3  Q. -- to the intermediary.
4  A. Yes.
5  Q. It sounds to me like there are a couple of
6  points in that process where information is entered
7  into some kind of a database; is that correct?
8  A. Yes.
9  Q. Is it a single database that would cover the
10 patient intake information and also the coded billing
11 information?  Is that all a single program or system
12 that you use?
13 A. No.
14 Q. Are these more than one system that are somehow
15 tied together?
16 A. Yes.
17 Q. Can you explain to us the systems that are
18 involved, the different software programs or systems
19 that are involved?
20 A. Okay.  Again, there is a clarification that
21 needs to occur, because there is a time when prior to
22 3-1 of 2005, there is a different system.  After
23 3-1-05, there is a difference.

Page 14

1   Q. I was going to ask you currently, and then I
2   was going to ask you whether that has changed.
3   A. Oh, okay.
4   Q. But that is fine. If you want to explain the
5   difference as you go along, that would be fine.
6   A. Uh-huh.
7   Q. So you can just explain it, as best you can,
8   noting the differences in the period before March of
9   2005 to the system that is currently in place.
10  A. Currently, we use Meditech for our hospital
11  information system, and it is a fully integrated
12  system with regards to the ancillary department
13  charging and the coding aspect of the claim and the
14  billing, the bar part of Meditech.
15      We transfer that batch file into a different
16  claim submission system which is called Premise.
17  Q. So it gets transferred to the Premise system
18  for the actual bill?
19  A. Yes.
20  Q. Now, prior to March of 2005, I am assuming you
21  had a system different from Meditech; is that right?
22  A. Yes.
23  Q. What was the name of that system?

Page 15

1   A. A4 Health Systems.
2   Q. A4 Health Systems?
3   A. Yes.
4   Q. A as in apple with the number 4 after it?
5   A. Yes.
6   Q. How did that program differ from the Meditech
7   program?
8   A. Exactly the same process.
9   Q. So it was the same process? It was just a
10  different vendor or a different product?
11  A. Yes.
12  Q. Again, the information was then transferred or
13  the data was transferred to the Premise system for the
14  actual generation of the bills?
15  A. Yes.
16  Q. Now, you referred to the form UB-92 form that
17  is prepared in connection with the bill; is that
18  right?
19  A. Yes.
20  Q. I am going to show you a document which we will
21  mark as Exhibit No. 3.
22      (Deposition Exhibit No. 3 was marked for
23  identification.)

Page 16

1   Q. I am going to ask you if you could identify
2   that particular form as something that you have worked
3   with?
4   A. Yes.
5   Q. That is what is known as a UB-92 form?
6   A. Yes.
7   Q. And is this used in connection with billing the
8   Medicare program?
9   A. Yes.
10  Q. What about other programs, other government
11  programs or other payors?
12  A. Yes.
13  Q. So it is a standardized form that is used
14  generally in the industry for billing of hospital
15  services?
16  A. Yes.
17  Q. Would this be used for billing Part A, as well
18  as Part B services?
19  A. Yes.
20  Q. In the case of Medicare, this would be
21  submitted to an intermediary; is that right?
22  A. Yes.
23  Q. Who is the Medicare intermediary for Bradford

Page 17

1   Regional Medical Center?
2   A. Veritus Medicare.
3   Q. And is that intermediary the same, regardless
4   of whether they are Part A claims or Part B claims?
5   A. Yes.
6   Q. So Veritus is the Part A intermediary, but Part
7   B claims are submitted, if they are submitted by the
8   hospital, also to Veritus?
9   A. Yes.
10  Q. Now, am I correct that the UB-92 has several
11  fields that are identified with particular numbers; is
12  that right?
13  A. Yes.
14  Q. And who completes the UB-92 form?
15  A. Back to the process, the data is entered as the
16  patient moves through -- from the time of point of
17  service.
18  Q. Well, let me ask you: Is information entered
19  on this form at the time that the patient first comes
20  to the hospital; in other words, the intake
21  information and --
22  A. Yes.
23  Q. -- and the demographic information is received?

Page 18

1   A. Yes.
2   Q. So the patient's name would be entered at that
3   point?
4   A. Yes.
5   Q. Is that right?
6   A. Yes.
7   Q. Address, insurance, whoever the insurance
8   company is?
9   A. Yes.
10  Q. If there is no insurance, that would be noted;
11  is that right?
12  A. Yes.
13  Q. Would there be, I guess, information about the
14  admitting physician that would be input at that time?
15  A. Yes.
16  Q. Would that be in field 82; is that right?
17  A. Yes.
18  Q. It says "Attending Physician." Is that the
19  same thing as admitting physician?
20  A. Yes.
21  Q. Under block number 83, there is a field for
22  "Other Physician." What does that indicate? What
23  information goes in there?

Page 19

1   A. I would need to give you an example of how that
2   would --
3   Q. Okay. Give me an example.
4   A. If we have a patient who comes in for a
5   medical/surgical reason, and his doctor is Dr. Smith,
6   and during that same time frame, he had a minor
7   procedure done, an EGD, for example, the physician who
8   performed the EGD would appear on line 83.
9   Q. So if there is a service that is, I guess,
10  ancillary to the main service, it would be identified?
11  A. No.
12  Q. Okay. Maybe I am misunderstanding.
13  A. It would be only if it was something that that
14  original physician did not order or perform himself.
15  Q. So if there was a second physician that
16  performed services, that would be identified in block
17  83?
18  A. Yes.
19  Q. Is there any place to indicate a referring
20  surgeon, a referring physician?
21  A. (No response.)
22  Q. In other words, if a patient is admitted to the
23  hospital for a surgical procedure and was referred

Page 20

1   from, let's say, a family doctor or an internist for a
2   procedure that was going to be done by a surgeon,
3   whose name would appear on line 82?
4   A. The surgeon.
5   Q. The surgeon? Not the family doctor that
6   referred the patient in in the first place?
7   A. No.
8   Q. No?
9   A. No.
10  Q. In the case of a diagnostic test, how would the
11  physician performing the diagnostic test be
12  identified?
13  A. Are you referring to the physician who ordered
14  the diagnostic test?
15  Q. Well, two questions. I guess it would be the
16  same physician, but if there was a physician that
17  ordered the test, and then a separate physician that
18  actually performed the test, would both of those
19  physicians be identified on the form?
20  A. The ordering physician.
21  Q. The ordering physician. Would the physician
22  that performed the test, would they be identified
23  anywhere on the form?

Page 21

1   A. You need to clarify that question.
2   Q. Okay. We will come back to that.
3       Now, in the case of a Part A claim, would the
4   provider number for the hospital be identified on this
5   form?
6   A. Yes.
7   Q. And which field is that?
8   A. Field 51A.
9   Q. And do you know the provider number for the
10  Bradford Regional Medical Center?
11  A. Yes.
12  Q. What is it?
13  A. 390118.
14  Q. 290 --
15  A. 390.
16  Q. 390 --
17  A. -- 118.
18  Q. And that is for Medicare; is that right?
19  A. Yes.
20  Q. Is that the same number that is used for the
21  Medicaid program and other --
22  A. No.
23  Q. What is the provider number for the Medicaid

Page 22

1 program?
2   A. I don't know that offhand.
3   Q. You don't know. Okay.
4      Now, you described a process where some of the
5 information that ends up on the UB-92 is actually --
6 it actually comes at the beginning of the process when
7 the patient presents at the hospital for the first
8 time. You also indicated that after the procedure is
9 performed at the hospital, information about what
10 tests were performed would then get entered into the
11 system; is that right?
12  A. Yes.
13  Q. What is the process by which that information
14 gets into the program?
15  A. The department that is performing the service,
16 the test, they enter their charge for that exam into
17 the system.
18  Q. And would that be the information that shows up
19 in the middle part of the UB-92?
20  A. Yes.
21  Q. So there would be a description of the service?
22  A. Yes.
23  Q. And then, I guess, there would be the code in

Page 23

1 field No. 44, the HCPCS code; is that right?
2   A. Yes.
3   Q. That number, I guess, is similar to a CPT code?
4 Is that right?
5   A. Yes.
6   Q. Is it the same as the CPT code, or is this a
7 separate, a different number?
8   A. There is certain different levels of coding.
9 This is the HCPCS code, and then there is the CPT code
10 and there is also Level 2 codes. That just designates
11 whether it is five numbers only, five units, and a
12 letter, or a three-digit.
13  Q. And it would also indicate in those middle
14 fields the date of the service and the charges, right?
15  A. Yes.
16  Q. And then any uncovered charges?
17  A. Yes.
18  Q. Now, is all of that information provided by the
19 department that is performing the test, or is some of
20 that information actually put in by somebody else?
21  A. The actual -- that information -- the charging
22 department has a charged number that they put in
23 there, and they also enter the service date, and the

Page 24

1 charge itself is then linked on my billing side to say
2 if I charge a single view chest x-ray, I print revenue
3 center X, I print code X, and this is the amount I
4 charge.
5   Q. The amount is automatically calculated in the
6 program? Is that what you are saying?
7   A. It is in the bar side. It is a standard
8 amount.
9   Q. Now, we are talking about this information
10 coming in and ending up on the UB-92. I am assuming
11 that the data entry is coming in through the Meditech
12 system; is that right?
13  A. Yes.
14  Q. Or I guess, previously, it was the prior system
15 that was, I think you said the A4 Health Systems; is
16 that right?
17  A. Yes.
18  Q. And so all of that information that is coming
19 into the system is coming in through those particular
20 programs, right, either the Meditech or the A4 Health
21 Systems?
22  A. Yes.
23  Q. And the UB-92 is actually something that is

Page 25

1 generated from all of the data that is being put in;
2 is that right?
3   A. Yes.
4   Q. Is there information that is going in that is
5 not necessarily showing up on the UB-92, or does the
6 UB-92 pretty much reflect all of the information that
7 is going in?
8   A. (No response.)
9   Q. Do you understand what I am saying? Is there
10 data that is going into the system that is not related
11 to the UB-92? Is there other data that is tracked in
12 the system?
13  A. We print out on the UB-92 what is required to
14 submit a claim to a third-party payor.
15  Q. I understand that. I am just asking whether
16 there is other information that you collect, other
17 data?
18  A. I don't know.
19  Q. Well, it is all really geared towards
20 generating a bill; is that right?
21  A. (No response.)
22  Q. Generating the UB-92, is that sort of the end
23 result of your process?

Page 26

1    A. Of my process, yes.
2    Q. Now, the fields that you are — the fields that
3  you are working with on the UB-92, this data is stored
4  within the system; is that right?
5    A. Yes.
6    Q. In other words, it doesn't go away, once the
7  bill is submitted to the intermediary?
8    A. No.
9    Q. So it is stored within the database. Is that
10  right?
11    A. Yes.
12    Q. My assumption is that you are submitting your
13  claims electronically. Is that right?
14    A. Yes.
15    Q. Do you also generate a hard copy of the UB-92?
16    A. No.
17    Q. How long are you required to maintain the
18  information that ends up in the UB-92?
19    A. Ten years.
20    Q. So, presumably, you have information at this
21  point going back to at least 1997?
22    A. Yes.
23    Q. Now, you were identified, I believe, in

Page 27

1  interrogatories as a person who assisted in preparing
2  answers in connection with this lawsuit; is that
3  right?
4    A. Yes.
5    Q. And do you recall being asked to put together a
6  certain spreadsheet or a compilation in connection
7  with this lawsuit?
8    A. Yes.
9    Q. What were you asked to do?
10        MR. MULHOLLAND: Object to the extent that
11      it gets into any discussions with counsel. If
12      you want to phrase it differently in terms of
13      what she did relative to the spreadsheet,
14      rather than what she was asked to do, that
15      might be a different issue.
16        MR. STONE: Okay. That is fine.
17    Q. What did you do in connection with your
18  preparation of the spreadsheet?
19    A. I ran reports for doctor-referred services from
20  Dr. Vaccaro or Dr. Saleh for a specific time frame.
21    Q. What was the time frame that you ran it for?
22    A. I don't --
23    Q. I can show you the documents, and you can refer

Page 28

1  to them if you want. These were documents that were
2  printed from a disc that your counsel provided a
3  couple of months ago, and we printed them out in a
4  hard copy so that we could refer to them in the
5  deposition.
6        MR. MULHOLLAND: Are these identical
7      copies, or are these two different things?
8        MR. STONE: Well, it looks like -- I think
9      these are two different things here. I will
10      take this one back.
11        MR. RYCHCIK: Are we marking these as
12      exhibits?
13        MR. STONE: Yeah. We are on Exhibit 4 and
14      5.
15        MR. MULHOLLAND: Which one is 4 and which
16      one is 5?
17        MR. STONE: Let's make this one 4 and this
18      one 5, and we'll mark these others, as well, as
19      6 and 7.
20        (Deposition Exhibit Nos. 4, 5, 6, and 7
21  were marked for identification.)
22        MR. MULHOLLAND: Before we get into the
23      questions on this, I note that these documents

Page 29

1    do contain information about patients and would
2    be considered Protected Health Information
3    under the Protective Order.
4        MR. STONE: Oh, I agree with that, and I
5      don't have any problem with that.
6    Q. Ms. Hannahs, if you would look at these
7  spreadsheets, I guess look at -- let's start with 4 or
8  5 or 6 or 7, whichever one you want to review. I
9  guess my question had to do with what time period you
10  prepared these spreadsheets for.
11    A. These specific -- this Exhibit 4 was for dates
12  of service 3-1-05 through 12-31-2005.
13    Q. Is there a reason why you prepared these
14  spreadsheets for that particular time period?
15    A. Yes.
16    Q. What was the reason?
17    A. 3-1-2005 was the date that we switched to
18  Meditech.
19    Q. And prior to March of 2005, you would have been
20  on the A4 Health Systems; is that right?
21    A. Yes.
22    Q. Is that a system that you cannot generate a
23  spreadsheet from?

USA et al., vs. Bradford, et al.
No. 04-186E

Case 1:04-cv-00186-MBC   Document 117-3   Filed 09/10/2008   Page 10 of 56

Multi-Page™

Corp. Designee BRMC
July 26, 2007

Page 30

1  A. No.
2  Q. So the information that you produced from the
3  Meditech system is information you can produce from
4  the A4 Health Systems program?
5  A. There is an explanation that goes along with
6  that.
7  Q. Okay.
8  A. The A4 Health Systems, the data elements that
9  are in this specific -- that would match with this
10  specific report out of Meditech are stored in a
11  separate system that is called Dataview.
12  Q. Do you have access to Dataview?
13  A. I only -- yes.
14  Q. And if you accessed Dataview, would you be able
15  to generate the same kind of a spreadsheet?
16  A. No.
17  Q. Why not?
18  A. The reporting function within Dataview is
19  something that I cannot do.
20  Q. And why is it that you can't do it?
21  A. I don't know if that is our --
22  Q. Are you not competent technically? Is that the
23  problem, or is it that the information is not

Page 31

1  accessible by anybody?
2  A. It would be that I -- yeah. I technically
3  cannot do it.
4  Q. Is there somebody at the hospital that can
5  prepare that spreadsheet that is technically competent
6  to do that?
7  A. I don't know.
8  Q. Well, I guess in the period before you took
9  this position, I guess, four years ago, was there
10  somebody that was in this position that worked with
11  the A4 Health Systems that could prepare that report?
12  A. Yes.
13  Q. And who is that?
14  A. It would be someone in our IT Department.
15  Q. Are they still there?
16  A. Yes.
17  Q. Did you make any inquiry whether somebody could
18  help you prepare that spreadsheet?
19  A. The -- again, there is an explanation to that.
20  Q. Okay.
21  A. We can produce the data, but it is in
22  different -- I can give you a report that gives only
23  the account number. I can give you a report that

Page 32

1  gives you certain data elements that look similar to
2  this report. Well, I can't, but the person in the IT
3  Department can.
4  Q. Well, let me ask you: When you were preparing
5  this, did you look at the actual request that we had
6  provided to your attorney? Did you actually look at
7  the request?
8      MR. MULHOLLAND: Maybe if you showed her
9      the request, she might remember.
10      MR. STONE: Yeah, I'm going to.
11  Q. Do you remember seeing that?
12  A. Yes.
13  Q. Do you want to read through it?
14  A. Yes.
15  Q. Have you read it? Do you understand the
16  request?
17  A. Yes.
18      MR. RYCHCIK: Would you identify for the
19      record what she is reading?
20      MR. MULHOLLAND: Yes.
21      MR. STONE: Maybe the easiest thing for
22      her would be for her to maybe read the question
23      into the record.

Page 33

1  Q. Do you want to just read that question into the
2  record?
3  A. This whole section (indicating)?
4  Q. Yes.
5  A. "Identify all claims submitted by or on behalf
6  of the BRMC to Medicare, Medicaid, TRICARE, CHAMPUS,
7  any other Federally funded health care program, for
8  dates of service from January 1, 2000 to the present,
9  where such claims involved a referral by V&S
10  personnel.
11      "In identifying such claims, please provide the
12  patient name, the health record number, and any other
13  patient-identifying billing numbers, the date of the
14  service for which the payment was sought, the date the
15  claim was submitted, (and if the claim is a
16  resubmission, the date of all other submissions
17  relating to the same service), the entity to whom the
18  claim was submitted, the service provided, the CPT,
19  DRG, or other billing codes associated with the claim,
20  the amount of the claim, the date payment was
21  received, the amount of payment, the name and provider
22  number of the physician or other provider providing
23  the service, and the name and provider number of the

USA, et al. vs. Bradford, et al.    Multi-Page    Corp. Designee BRMC
No. 04-186E                                        July 26, 2007

Case 1:04-cv-00186-MBC   Document 117-3   Filed 09/10/2008   Page 11 of 56

**Page 34**

1  referring physician or provider."
2    Q. Now, I would like you to look at the spread-
3  sheets that you did produce, okay? We can start with
4  4. If you would take a look at that and if you could
5  start with the beginning and explain how this
6  particular spreadsheet is responsive to that request.
7  Okay?
8      Just go through, I guess, if you probably go to
9  the second or third page, I guess that is probably
10  where the data is.
11    A. Correct.
12    Q. You don't have to -- you know, I'm not asking
13  you to go through all of it.
14    A. Uh-huh.
15    Q. Just give me an example that would illustrate
16  how that information is contained on the spreadsheet.
17    A. This spreadsheet contains the patient name, the
18  health record number, the patient account number, it
19  identifies the date of service, it identifies the
20  referring physician, it supplies the total amount of
21  the claim, and it also includes the amount of the
22  payment.
23      This report only -- it doesn't include all

**Page 35**

1  these different elements that are required here, which
2  is the issue with getting the same data out of the A4
3  Health Systems, because it would end up being a manual
4  process. We could identify certain things to identify
5  a specific patient, and then have to go into our
6  claims system to look at the image of the UB-92 to get
7  all of the rest of the information that is requested.
8      This report does not include CPT, DRG billing
9  codes. It does not include any resubmission date.
10  That is -- we have to go to a different system in
11  order to get that data.
12    Q. Let's talk about this, and if you would look at
13  page two of the first document, Exhibit No. 4, at the
14  top of the page, it says -- it identifies, Medicare
15  Part B, right?
16    A. Yes.
17    Q. Now, as I go through the rest of the document,
18  they are in -- the claims seem to be in alphabetical
19  order, and then when you get to the last entry, it
20  starts over again, and I think it is because we are in
21  a new payor --
22    A. Yes.
23    Q. -- so I think it is Medicaid comes next; is

**Page 36**

1  that right?
2    A. Yes.
3    Q. Then after that, there seem to be some other
4  payors that are in this group.
5    A. Yes.
6    Q. The requests seem to be -- I think the requests
7  seem to be confined to Government payors, I think, if
8  you look at that?
9    A. Yes.
10    Q. Is there a reason why the self-pay category was
11  included in this report? I am assuming that that
12  would not be a -- I am assuming that those claims
13  would not be Government -- would not be submitted to
14  the Government, right?
15    A. Yes.
16    Q. So those really shouldn't be in there, and
17  there may be some private insurance carriers that are
18  also in there, some Workers' Compensation ones; is
19  that right?
20    A. Yes.
21    Q. So those really shouldn't be part of this
22  report?
23    A. Yes.

**Page 37**

1    Q. Now, going back to page two, if you would just
2  go across the page, starting, you know, at the top
3  column and identify the different columns of
4  information that are here?
5    A. Column 1 is the Bradford Regional Medical
6  Center, the patient account number. Column 2 is the
7  patient's name. Column 3 is the medical record
8  number, and the next column is the patient's age, and
9  the patient's sex, what type of account.
10    Q. What do you mean by the type of account?
11    A. CLI means that it is an outpatient account.
12    Q. Okay.
13    A. The abstract status, whether it be final or
14  not. Again, the patient account type, the discharge
15  date, the referring physician, the admission date, the
16  patient's length of stay, the total amount of charges,
17  and the reimbursement, and then the expected DRG
18  column is if this was an inpatient.
19    Q. But this particular report is for outpatients,
20  so there shouldn't be anything in that column, right?
21    A. With the exception of the I&O claims.
22    Q. What is an I&O?
23    A. It is an outpatient observation claim.

USA et al., vs. Bradford, et al.
No. 04-186E

Case 1:04-cv-00186-MBC    Document 117-3    Filed 09/10/2008    Page 12 of 56

Multi-Page

Corp. Designee BRMC
July 26, 2007

Page 38

1  Q. So there is a DRG charge that goes along with
2  those?
3  A. No.
4  Q. No?
5  A. No.
6  Q. Explain that to me.
7  A. Internally -- in the way that we code
8  observation claims, our coding staff groups it as if
9  it were an inpatient claim, but we don't send any DRG
10 information on the claim, because we don't for
11 outpatients.
12 Q. Now, the reimbursement, if these are all
13 Medicare claims, is the reimbursement only monies that
14 are actually received from the program? Is that
15 right? There wouldn't be any secondary insurance that
16 would be included in that amount, or would there?
17 A. There may be.
18 Q. There may be?
19 A. Uh-huh.
20 Q. So the reimbursement is not necessarily monies
21 received from the Medicare program?
22 A. Yes.
23 Q. Do you keep track of the payment that is

Page 39

1  received from the Medicare program? Is that in your
2  database?
3  A. Individually on each account, yes.
4  Q. Now, let's talk for a minute about where this
5  information on this report came from. Did this come
6  from the Meditech program?
7  A. Yes.
8  Q. And in order to get this particular
9  information, did you request that certain fields that
10 would correspond to a UB-92 field, were those
11 requested when you put together this report?
12 A. Yes. Like — yes. Such as, the time frame and
13 the referring physician.
14 Q. Let's start with the patient number that is
15 assigned. That would be information that was
16 originally assigned to the patient when they
17 presented, right?
18 A. Yes.
19 Q. And that would go into the Meditech system
20 along with the patient name and address, right?
21 A. Yes.
22 Q. And other demographic information?
23 A. Yes.

Page 40

1  Q. And that would include the patient's sex and
2  age; is that right?
3  A. Yes.
4  Q. And what is this -- what is the unit number?
5  What does that refer to?
6  A. The medical record number.
7  Q. Would that be assigned at the time the patient
8  presented initially?
9  A. No.
10 Q. That would come later?
11 A. If you are a new patient, if you have never
12 been to the Medical Center before, then it assign you
13 a unit number. If I have been a patient there prior
14 to, I already have an existing medical record number.
15 Q. Oh, okay. I see. So that is like an account
16 number for the patient, regardless of which procedure
17 they are coming in for?
18 A. Yes.
19 Q. We talked about the patient's status and
20 patient class. That would be the designation of the
21 outpatient. Would that be information that was
22 entered into the Meditech program early on at the time
23 the patient presented?

Page 41

1  A. Yes.
2  Q. What about the referring physician? Where
3  would that information have come from?
4  A. At the time when the patient presents.
5  Q. And that is the same information that would be
6  in field 82?
7  A. Yes.
8  Q. Obviously, the date of discharge comes at a
9  later time, right? That is not necessarily entered at
10 the time the patient presents, right?
11 A. If it is an outpatient, it is.
12 Q. It would be?
13 A. Yes, because it is the same day.
14 Q. So all of this information is from this
15 original intake?
16 A. Yes.
17 Q. Except for the charges, of course? Those would
18 be added at a later time?
19 A. Yes.
20 Q. And the reimbursement would be added at a later
21 time?
22 A. Yes.
23 Q. Now, is there any reason why when you -- well,

Page 42

1  when you put together this report, did you actually
2  specify which information you wanted to generate this
3  report?
4  A. This particular report is a standard report
5  within Meditech.
6  Q. So it is an existing report that you would
7  generate?
8  A. Yes.
9  Q. You didn't have to request particular fields or
10  anything like that?
11  A. I requested specific fields, who the referring
12  physician was and the time frame and the referring
13  physician.
14  Q. So you specified the time frame and the
15  particular referring physician?
16  A. Uh-huh. Yes.
17  Q. Now, one thing I had a question about was the
18  referring physicians that were requested were Vaccaro
19  and Saleh.
20  MR. RYCHCIK: Saleh.
21  MR. STONE: Saleh.
22  Q. And yet when you look at the column under
23  physician, every once in a while, there is a different

Page 43

1  name there. What would be the reason why, let's say,
2  about halfway down, it looks like there is Jobe? Do
3  you see that?
4  A. Yes.
5  Q. Why would that be included within the sort?
6  A. On page one?
7  Q. Yes.
8  A. You will see on No. 4, we identified any
9  physician of Dr. Vaccaro there.
10  Q. So when you say any physician of Dr. Vaccaro,
11  in other words, Dr. Jobe is employed by Dr. Vaccaro?
12  A. No. Dr. Jobe is an orthopedic physician, and
13  Dr. Vaccaro is most likely this patient's PCP or
14  regular health physician.
15  Q. So the service would have been performed by Dr.
16  Jobe, but would have been ordered by Dr. Vaccaro?
17  A. No. The ordering physician was Dr. Jobe --
18  Q. The referring physician?
19  A. At the time of intake -- this probably warrants
20  an explanation.
21  Q. Okay.
22  A. At the time of intake, the ordering physician
23  is Dr. Jobe. They want -- within their admission

Page 44

1  screening, there is a place to put who my family
2  doctor is, and that is entered there, and that is for
3  internal purposes. Sometimes they want --
4  Q. Tracking referrals within the --
5  A. Not tracking referrals. It is actually getting
6  patient reports back to the primary physician, that
7  the patient wants that to occur.
8  Q. Now, is that -- this gets back to a question I
9  had about the UB-92. Does the information about the
10  PCP or the family physician show up anywhere on the
11  UB-92?
12  A. No, not if he is not the ordering physician.
13  Q. Now, getting back to the report, is this report
14  that you generated, you said it was sort of a
15  standardized report, but you did request it specific
16  to Drs. Vaccaro and Saleh and also you had it specific
17  to Medicare Part B claims, right?
18  A. Yes.
19  Q. For a particular time frame?
20  A. Yes.
21  Q. Is there a way for you to actually -- what is
22  the name of that report? Does that report have a
23  name? Is there a particular way you refer to this

Page 45

1  report?
2  A. The report format?
3  Q. Yes. Does it have a designation or a name that
4  you refer to this type of a report by?
5  A. It is a compiled report.
6  Q. Anything more specific than that?
7  A. I would call it an abstracting report, because
8  that is the database that I would get the information
9  out of.
10  Q. Have you ever had to generate this kind of a
11  report before?
12  A. (No response.)
13  Q. Is this the first time you have ever done this?
14  A. No.
15  Q. What would be the purpose? Why would you
16  generate this kind a report? What would it be used
17  for, other than to give it to me?
18  A. I would generate this report to do -- to look
19  at specific insurance accounts through time frame
20  periods to ensure that the payment that I expected was
21  the payment that I received.
22  Q. And in this case, you customized it so that it
23  was specific to these doctors?

USA, et al., vs. Bradford, et al.
No. 04-186E

Case 1:04-cv-00186-MBC    Document 117-3    Filed 09/10/2008    Page 14 of 56

Multi-Page

Corp. Designee BRMC
July 26, 2007

Page 46

1   A. Yes.
2   Q. For these time frames?
3   A. Yes.
4   Q. Now, is there a way, when you generate that
5   report, to add an additional element in there? Is
6   there a way to generate a report that would also
7   include a CPT code?
8   A. No.
9   Q. So you couldn't customize this report? You
10  could customize it to identify the doctors, but you
11  could not customize it to indicate for these services
12  what the CPT code was?
13  A. Not off a standard.
14  Q. I am not talking about off a standard. I am
15  asking you whether you could customize a report that
16  would give you the CPT code for each one of these
17  charges?
18  A. I don't know that. I wouldn't do that myself.
19  Q. I understand it might not be useful to you.
20  A. Right.
21  Q. I am just asking you if I asked you to do that,
22  whether that is something that this Meditech system
23  could do?

Page 47

1   A. Yes.
2   Q. And how long would it take you to enter that
3   additional specification in the report?
4   A. I don't know. That would be an IT programming
5   thing. I wouldn't know.
6   Q. Now, you worked in the IT Department for a
7   while?
8   A. Yes.
9   Q. I assume you have some technical background?
10  A. Yes.
11  Q. Have you ever customized a report out of the
12  Meditech system for any other purpose?
13  A. No.
14  Q. So you have only used the standardized reports
15  that they have?
16  A. Yes.
17  Q. Who else is familiar with the reporting coming
18  out of the Meditech system? Who else in your
19  department or other departments could generate a
20  report?
21  A. Our IT Department.
22  Q. Your IT people?
23  A. Yes.

Page 48

1   Q. Who is currently in your IT Department? Is
2   there a director or a supervisor?
3   A. There is a director.
4   Q. Who is that?
5   A. Carol Frigo.
6   Q. Carol -- What?
7   A. F-r-i-g-o.
8   Q. And her title is director of IT?
9   A. Yes.
10  Q. Now, when you got this request and started to
11  compile these reports, you realized at that time you
12  couldn't provide this information on the standard
13  report; is that right?
14  A. Yes.
15  Q. Did you make any inquiry of Carol Frigo or
16  anybody else at the hospital about whether you could
17  generate that report?
18  A. No.
19  Q. You said that the same general information that
20  is in the Meditech system is also in your prior
21  system, the A4 Health Systems; is that right?
22  A. Yes.
23  Q. But you are not as familiar with that program?

Page 49

1   A. Yes.
2   Q. And there is, I guess, a Dataview aspect to
3   that, or part of that --
4   A. Yes.
5   Q. -- which is where you would have to get that?
6   A. Yes.
7   Q. Did you make any inquiry with Carol Frigo or
8   anybody in the IT Department about how to get that
9   same information from the A4 Health Systems?
10  A. No.
11  Q. Did you actually -- aside from possibly
12  discussing this with your counsel, is there anybody
13  else that you discussed this with; in other words, how
14  to get this information?
15  A. No.
16  Q. At one point, you testified that you would have
17  to go through the individual records and compile this
18  information by hand, by reviewing individual records;
19  is that right?
20  A. Yes.
21  Q. Is it your opinion that that is the only way
22  that this information could be tracked, the
23  information that we have requested?

USA, et al. vs. Bradford, et al.
No. 04-186E

Case 1:04-cv-00186-MBC    Document 117-8    Filed 09/10/2008    Page 15 of 56

Multi-Page

Corp. Designee BRMC
July 26, 2007

Page 50

1  A. Yes.
2  Q. And that is without having talked to Carol
3  Frigo or anybody in the IT Department?
4  A. Yes.
5  Q. Did you make any inquiry of the vendor of this
6  software, either Meditech or A4 Health Systems?
7  A. No.
8  Q. Why did you assume that you could not generate
9  these reports by going to talk to some of these
10 technical people?
11  A. Because my understanding was that all these
12 data elements needed to be represented for each
13 patient that was seen, and these data elements are not
14 all in a field that you can produce and pull together
15 on one report.
16  Q. Well, on that standard report, right?
17  A. Correct.
18  Q. But they are in the database, right?
19  A. Yes.
20  Q. I mean, all the ones that we have asked for,
21 they are all in the database?
22  A. Yes.
23  Q. Now, if you read below that, there is an answer

Page 51

1  below the question, and would you read that into the
2  record?
3  A. "Objection. The interrogatory is vague, over-
4  broad, and unduly burdensome. Subject to this
5  objection, BRMC will provide Relators with certain
6  information that may be partially responsive to this
7  interrogatory that may be readily available from
8  BRMC's current information system."
9  Q. Now, the statement that it is burdensome, is
10 that based on your assessment that it would have to be
11 put together by hand, rather than by generating a
12 report from the computer?
13  A. Yes.
14  Q. Did you make any assessment of how long it
15 would take you to put together that information by
16 hand?
17  A. Yes.
18  Q. And what did you determine?
19  A. I would need to see --
20      MR. MULHOLLAND: Speak up.
21      THE WITNESS: What?
22      MR. MULHOLLAND: I just can't hear you.
23  You can answer his question.

Page 52

1  Q. You would need to see what?
2  A. Oh, yeah. I don't have that information right
3  with me.
4  Q. Did you do a calculation of the man-hours, for
5  example, that it would take to review that
6  information --
7  A. Yes.
8  Q. -- and put it together?
9  A. Yes.
10  Q. Can you give me an approximation of how many
11 man-hours that would take?
12  A. An approximation, I believe, it was like
13 20,000-plus hours.
14  Q. Do you recall how you came up with the number?
15 Again, I don't need the exact calculation, but how you
16 went about calculating the number of man-hours it
17 would take?
18  A. I took that we would identify the patients from
19 a report, and then take that report, look the patient
20 up in the billing system, print out the billing form;
21 and then from the billing form, we would get a
22 majority of the information that was asked for. The
23 payment dates and the payment amount would then have

Page 53

1  to be retrieved from each individual patient account.
2  Q. When you say the billing form, are you talking
3  about you would actually go to the UB-92s; is that
4  right?
5  A. Yes.
6  Q. So you would have to go through each UB-92
7  where you could get most of the information; is that
8  right?
9  A. Yes.
10  Q. And then, I guess, payment information would be
11 separate?
12  A. Yes.
13  Q. Did you assign a particular time frame it would
14 take to go through each billing statement?
15  A. Yes.
16  Q. What was that?
17  A. I don't recall.
18  Q. You don't remember?
19  A. Yeah, I don't recall what exactly it was.
20  Q. If you could provide that to your counsel -- do
21 you have that calculation somewhere?
22  A. Yes.
23  Q. If you could provide that to your counsel, so

Page 54

1  that we can take a look at that.
2        MR. MULHOLLAND:  We will take that under
3     advisement.
4        MR. STONE:  Okay.
5   Q.  Now, you said that this standard report was
6  customized to the extent that you identified time
7  frames and the particular physicians and the
8  outpatient service.  Is there any other information
9  that could be customized in this or could be changed
10  or modified in this standard report?
11   A.  Yes.
12   Q.  What other information would be available in
13  this standard report?
14   A.  There is a huge -- there is a Meditech listing.
15  I don't know what they specifically are.
16   Q.  So for -- so Meditech actually tells you the
17  type of information you can get in a standard report;
18  is that right?
19   A.  Yes.
20   Q.  And they identify different fields that you can
21  specify.
22   A.  To select --
23   Q.  To select?

Page 55

1   A.  -- accounts.  Not to present on the report.
2   Q.  When you say "to select," what do you mean?
3   A.  (The witness indicates.)
4   Q.  These are all the fields?  Is that what you are
5  saying?
6   A.  Yes.  These are the fields on the standard
7  report.
8   Q.  I guess there are a couple of columns here that
9  are not filled in, and those would be ones that you
10  could select, is that what you are saying, and were
11  not selected?
12   A.  On this, they are not there, because they are
13  not relative to these patients.
14   Q.  Oh, okay.  What other fields would be available
15  that we haven't gone through?
16   A.  There are some that you can pick from.
17   Q.  That aren't on here?
18   A.  Yes.
19   Q.  Well, for example, I asked you previously
20  whether it is possible to distinguish the
21  reimbursement amount between different payors that
22  have paid.  Could you get that information under that
23  Meditech report --

Page 56

1   A.  No.
2   Q.  -- the Medicare payment, as opposed to
3  reimbursement?
4   A.  No.
5   Q.  I think you said that CPT code was not
6  available?  You could not get that on that standard
7  report?
8   A.  No.
9   Q.  What about there is a column here that says
10  DRG.  Could you get a DRG if this was an inpatient
11  claim?
12   A.  Yes.
13   Q.  So that billing code you could get?
14   A.  Yes.
15   Q.  What does the "ST" stand for in that same
16  column?
17   A.  It is called status, and it means that it is --
18  it is the final DRG assignment.
19   Q.  And what about, could you get a description of
20  the service provided?
21   A.  I don't know.
22   Q.  You don't know whether that is a field that you
23  could get?

Page 57

1   A.  Correct.
2   Q.  Well, certainly, if it were an inpatient
3  procedure, the DRG would actually identify the service
4  provided, wouldn't it, the DRG number?
5   A.  Yes.
6   Q.  What about the date the claim was submitted?
7  Is that something that would be available?
8   A.  No.
9   Q.  No.  This has date of discharge.  In the case
10  of an outpatient, that would be the same as the date
11  of service; is that right?
12   A.  Yes.
13   Q.  You have identified the physician, is there a
14  way to select the provider number of the physician?
15   A.  Yes.
16   Q.  That is something that you could put in there?
17   A.  You can select it.
18   Q.  So if I asked you to rerun this report with the
19  physician's provider number, you could do that?
20   A.  Yes.
21   Q.  Let's look at No. 5, Exhibit No. 5.  Can you
22  explain how this report differs from the previous
23  report that we just discussed?

Page 58

1  A. The time frame is different.
2  Q. And I think you said that the time frame for
3  the other was 3-5 to 12-1, is that right, of '05?
4  A. 3-1-05 through 12-31-05.
5  Q. And this one is from what time frame?
6  A. 1-1-06 through 12-31-06.
7  Q. But otherwise, it is the same as the previous
8  one in terms of information?
9  A. Yes.
10  Q. Now, I think we have marked the other two
11  exhibits as 6 and 7, and let's do 7 first. What
12  information did you provide with regard to Exhibit No.
13  7?
14  A. Exhibit No. 7 is an inpatient report from
15  3-1-05 to 12-31-06 for Dr. Saleh.
16  Q. Dr. Saleh, or Dr. Saleh and Dr. Vaccaro?
17  A. It is Dr. Saleh only.
18  Q. Dr. Saleh only. So on this report, again, he
19  would have Medicare patients, Medicare submissions; is
20  that right?
21  A. Yes.
22  Q. And at the end of the Medicare list, you have
23  Medicaid; is that right?

Page 59

1  A. Yes.
2  Q. And that is divided into New York Medical
3  Assistance and Pennsylvania Medical Assistance?
4  A. Yes.
5  Q. Then it looks like there is Veterans Affairs,
6  and then there is SP, one patient, which is a
7  self-pay, which, again, is not really responsive to
8  the request. So that shouldn't be in there, right?
9  A. Yes.
10  Q. Now, with regard to this report, is this
11  essentially the same report, the same standard report
12  that you provided in Exhibits 4 and 5, but for
13  inpatient as opposed to outpatient?
14  A. Yes.
15  Q. Is that right?
16  A. Yes.
17  Q. In this case, you actually have DRGs, because
18  they are inpatient procedures; is that right?
19  A. Yes.
20  Q. Now, on this report, you actually have
21  admission date and discharge date; is that right?
22  A. Yes.
23  Q. And if we look at this list, there are some

Page 60

1  names, other than Dr. Saleh on here, and we talked
2  about that in connection with the previous reports.
3  Would that be the same situation that Dr. Saleh would
4  be the -- they would come under his name simply
5  because he was the family physician that was listed at
6  the time of admission?
7  A. Yes.
8  Q. And the admitting physician would be the
9  physician that is identified in that column; is that
10  right?
11  A. Yes.
12  Q. Now, again, I'm assuming the same is true with
13  regard to not being able to produce a report -- your
14  opinion that you could not produce a report that was
15  responsive to the question that we had asked; is that
16  right?
17  A. Yes.
18  Q. So that the information -- so that all of the
19  information that we requested was not available in
20  this report?
21  A. Yes.
22  Q. Again, am I correct that you didn't make any
23  inquiry of the IT Department or of anybody else at the

Page 61

1  hospital about whether that report could be generated
2  from the database?
3  A. Correct. Yes.
4  Q. You made no inquiry of the software vendor --
5  A. No.
6  Q. -- or anybody else?
7  A. No.
8  Q. And, again, you made a determination, I am
9  assuming, that the man-hours that you indicated -- I
10  think you said -- was it 20,000 man-hours?
11  A. Yes.
12  Q. That would include looking for these records,
13  as well?
14  A. Yes.
15  Q. Now, the next report, which is, I guess, we are
16  on 8 --
17      MR. MULHOLLAND: We only have 6 and 7.
18      MR. STONE: Oh, 6 and 7. Did we do 7
19  first?
20      MR. MULHOLLAND: You were asking questions
21  about 7 first.
22  Q. We will go back to 6 then. Describe for me
23  what 6 is.

USA, et al., vs. Bradford, et al.
No. 04-186E

Multi-Page

Corp. Designee BRMC
July 26, 2007

Page 62

1    A. Exhibit 6 is an inpatient report from 3-1-05
2  through 12-31-05, inpatient report for Dr. Vaccaro.
3    Q. What we just went through with Deposition
4  Exhibit No. 7, I assume, applies to Deposition Exhibit
5  No. 6, with the exception we are talking about a
6  different physician? The same information?
7    A. Yes.
8    Q. Again, the request is for Medicare patients,
9  Part A patients?
10   A. Yes.
11   Q. Inpatient?
12   A. Yes.
13   Q. With some Medical Assistance for Medicaid
14  patients?
15   A. Yes.
16   Q. And it looks like some self-pays at the end
17  there, which probably should not be in there?
18   A. Yes.
19   Q. And, again, the timeframe is similar to the
20  previous report, which is 3-1-2005 to 12-31-2005?
21   A. Yes.
22   Q. Is there a reason why these reports only go up
23  through 12-31-05, and the other reports actually

Page 63

1  include the following year? Is there a reason why you
2  didn't include the following year?
3    A. No.
4    Q. Is that information available?
5    A. Yes.
6    Q. I would ask that you provide those reports,
7  again, to your counsel.
8       MR. MULHOLLAND: Are you sure it wasn't on
9  the disc that was provided? I know that these
10  reports that were printed out don't include
11  them.
12      MR. STONE: I mean, I printed out what I
13  had, but I mean, it is possible. So I guess
14  you and I, we can talk about that.
15      MR. MULHOLLAND: We can talk about that.
16      MR. STONE: We can follow up as necessary.
17  It is possible I could have printed out less
18  than the full amount.
19   Q. Ms. Hannahs, were you at all involved with
20  preparing any kind of analyses or reports of how a
21  certain venture by Drs. Vaccaro and Saleh would impact
22  on the hospital's revenues?
23      MR. MULHOLLAND: Objection to the extent

Page 64

1  it goes beyond the Notice of Deposition. She
2  can answer.
3    A. No.
4    Q. No?
5    A. No.
6       MR. STONE: Just so it is clear -- and
7  this is directed at you, Mr. Mulholland -- I
8  think we noticed a 30(b)(6) deposition, which
9  contained a number of different areas, and I
10  don't think we noticed Ms. Hannahs specifically
11  for specific items.
12      I think it was your designation to produce
13  her for certain areas; and so, you know, to the
14  extent that somebody else can respond to those
15  questions, I think they are covered by the
16  Notice of Deposition.
17      You are just saying that this witness
18  doesn't have information that would be
19  responsive to those particular areas of
20  inquiry?
21      MR. MULHOLLAND: Well, that is correct. I
22  mean, No. 2 talks about referrals to the
23  hospital by V&S, Dr. Vaccaro, and Dr. Saleh.

Page 65

1  It doesn't specify anything about analyses of
2  those referrals.
3       Ms. Hannahs was only designated to respond
4  to questions about the spreadsheet.
5       MR. STONE: That is fine. We'll take it
6  up with the other witness, then. Okay?
7       I think that is all the questions I have
8  for Ms. Hannahs.
9       MR. MULHOLLAND: Thank you. We are going
10  to read on all the witnesses today.
11      (Recess taken at 11:35 a.m. Testimony of
12  Tina Marie Hannahs was concluded at 11:35 a.m.
13  The designee deposition resumed at 11:54 a.m.
14  this date with the testimony of Glen Alan
15  Washington.)
16           - - -
17      GLEN ALAN WASHINGTON,
18  called as a witness by the Plaintiffs, being first
19  duly cautioned and sworn, as hereinafter certified,
20  was deposed and said as follows:
21      EXAMINATION
22  BY MR. STONE:
23   Q. Mr. Washington, my name is Andrew Stone. I

Page 66

1 represent the Plaintiffs in this case that was filed
2 under the Federal False Claims Act in the District
3 Court for the United States District Court for the
4 Western District of Pennsylvania.
5     I have got some questions that I want to ask
6 you today, and I understand that you have been
7 designated under Rule 30(b)(6) to testify with regard
8 to certain matters relating to the location of certain
9 equipment which is at issue in this lawsuit.
10     Am I correct that you are here on behalf of
11 Bradford Regional Medical Center --
12  A. Yes.
13  Q. -- pursuant to our request?
14  A. Yes.
15  Q. Could you state your full name?
16  A. Glen Alan Washington.
17  Q. You sat through the prior deposition, but just
18 let me repeat for you that if you do not understand or
19 hear any of the questions that I ask, that you please
20 stop me, and I will be happy to repeat or rephrase the
21 question, so that you have understood it; and further,
22 that you respond verbally to any of my questions,
23 because the court reporter has to reflect your

Page 67

1 response on the record, and a gesture or a nod of the
2 head is difficult to do that. Do you understand?
3  A. Yes.
4  Q. Mr. Washington, what is your position at the
5 hospital?
6  A. I am the Senior Vice President of Operations.
7  Q. How long have you held that position?
8  A. Eight years.
9  Q. Prior to that, were you employed at the
10 hospital?
11  A. No, I was not.
12  Q. Where were you employed?
13  A. Northeast Georgia Medical Center.
14  Q. What position did you hold there?
15  A. I was Vice President of Professional and
16 Operation Services.
17  Q. Is that a similar position with which you hold
18 at this hospital?
19  A. Yes, similar.
20  Q. It is my understanding that you have some
21 information or knowledge about the location of certain
22 nuclear medicine imaging equipment at the Bradford
23 Regional Medical Center?

Page 68

1  A. Yes.
2  Q. What is the equipment that the Medical Center
3 currently has?
4  A. You are asking about the nuclear equipment?
5  Q. Yes.
6  A. We currently have two cameras. We have a
7 Philips Axis Camera, and we have a Philips CardioMD
8 Nuclear Camera.
9  Q. The Philips Axis Camera, is that a camera that
10 the hospital owns or leases?
11  A. We lease it from Philips.
12  Q. How long have you had that camera?
13  A. Seven years.
14  Q. So was this camera originally obtained in 1999?
15  A. Yes.
16  Q. Prior to that, was there equipment, a nuclear
17 camera, that the hospital had?
18  A. Yes.
19  Q. Was that replaced with the Philips Axis Camera?
20  A. No. The Philips Axis Camera was in addition to
21 what we had prior.
22  Q. So when you got the Philips Axis Camera, then
23 you had two cameras; is that right?

Page 69

1  A. We had two at that point.
2  Q. Where is the Philips Axis Camera currently
3 located?
4  A. It is in our nuclear medicine department.
5  Q. Where is that?
6  A. That is in the Radiology Department of the
7 hospital.
8  Q. Is that in the main facility?
9  A. Yes.
10  Q. The other camera that you referred to at the
11 time that you had the Philips -- at the time that you
12 acquired the Philips Axis Camera, what happened to
13 that camera?
14  A. It eventually broke down, and we had difficulty
15 getting parts, and we eventually -- I'm sorry. Ask me
16 again your question.
17  Q. You said when you got the Philips Axis, you
18 already had a camera.
19  A. Right.
20  Q. And I am asking what happened to that camera?
21  A. We continued to operate that camera for a
22 while.
23  Q. When did you stop using that camera?

Page 70

1  A. It was in early 2003.
2  Q. What was that camera? Do you remember what
3  the --
4  A. Yes. That was the Sophie.
5  Q. Okay.
6  A. I believe the spelling is S-o-p-h-i-e.
7  Q. So in early 2003, you stopped using it?
8  A. Yes.
9  Q. And the reason that you stopped using it?
10  A. It broke down.
11  Q. And is it currently operational?
12  A. No.
13  Q. Is it currently at the hospital?
14  A. No.
15  Q. Is it still there?
16  A. No, it is not there.
17  Q. Was that equipment leased?
18  A. I don't know the answer to that. It would have
19  been leased or owned, I'm not sure which.
20  Q. Now, in addition to the Philips Axis Camera,
21  you said you have another camera?
22  A. Yes.
23  Q. What is the other camera that you currently

Page 71

1  have?
2  A. That is the Philips CardioMD.
3  Q. Is that also in the same general location in
4  the hospital as the Philips Axis?
5  A. Yes. It is in the adjoining room.
6  Q. Is that camera currently operational?
7  A. Yes, it is.
8  Q. And when did you acquire that camera?
9  A. That is the camera that was acquired through
10  the V&S lease, and that was in February of '04.
11  Q. And when you refer to the V&S lease, do you
12  currently have a sublease for this equipment, or do
13  you have a direct lease arrangement with Philips?
14  A. I'm not completely clear on the lease
15  arrangement, whether that is a sublease.
16       MR. MULHOLLAND: I think Mr. Leonhardt may
17  be able to answer that. It goes beyond what we
18  designated Mr. Washington to testify about.
19       MR. STONE: Okay.
20  Q. Prior to February of 2004, you said that you
21  had the Sophie camera until early 2003; is that right?
22  A. Correct.
23  Q. So from early 2003 to February of 2004, did the

Page 72

1  hospital have a second camera, in other words, a
2  camera other than the Philips Axis?
3  A. No, not in the hospital.
4  Q. Let's talk about the V&S sublease arrangement.
5  Are you aware of a sublease arrangement whereby the
6  hospital subleased equipment from V&S?
7  A. Yes.
8  Q. And what was the equipment that the hospital
9  subleased from V&S?
10  A. What we are subleasing from them is that
11  Philips CardioMD.
12  Q. But that is a replacement camera for another
13  camera; is that right?
14  A. (No response.)
15  Q. Was there a prior camera that you leased from
16  V&S?
17  A. It actually -- yes. There actually were two
18  cameras that that ultimately replaced. It replaced
19  the Sophie, because we needed two cameras within our
20  department, and it replaced the old GE camera that V&S
21  had in their office.
22  Q. The old GE camera that V&S had in their office,
23  that was the subject of the lease agreement with V&S,

Page 73

1  the sublease agreement; is that right?
2  A. Yes.
3  Q. Pursuant to that sublease agreement, did the
4  hospital take physical possession of the GE camera?
5  A. That camera was never -- it was never
6  physically at Bradford Regional Medical Center. It
7  remained at the V&S office.
8  Q. From October of 2003 to February of 2004, did
9  the hospital use the GE camera?
10  A. Yes, we did.
11  Q. And in what way did the hospital use the GE
12  camera?
13  A. We did procedures there out of the V&S office.
14  We provided the nuclear tech and operated the camera
15  with the nuclear tech, and then billed for those
16  procedures.
17  Q. And that would have been done at the V&S
18  medical office; is that right?
19  A. That was at that site, correct.
20  Q. What is the location of that office?
21  A. It is on West Washington Street.
22  Q. Now, under what circumstances would you use the
23  GE camera as opposed to the Philips Axis Camera?

Page 74

1   A. That would have been based on the scheduling,
2   the availability of the Axis Camera. We actually had
3   enough demand for two cameras, and so depending on the
4   availability of the Axis Camera and the urgency -- the
5   degree of urgency for the test, we might have done
6   that, done that there.
7   Q. Was the camera at V&S used on a daily basis?
8   A. I do not know the answer to that.
9   Q. Was there a reason why the hospital did not
10  move the camera from the V&S location to the hospital?
11  A. Yes.
12  Q. What was the reason?
13  A. We wanted to replace the Sophie camera, and we
14  were in the process of embarking on cardiology
15  services at the Medical Center, so we were looking for
16  specific capabilities in our second nuclear camera.
17  We were looking for a camera that specifically was
18  strong in doing nuclear cardiology procedures.
19      The GE camera was an older model with some
20  limited technology, so we opted not to have that
21  camera moved, because we did not feel that it would
22  meet our future needs.
23  Q. And so you thought it had limitations that

Page 75

1   would not meet the needs of the hospital; is that it?
2   A. It would not meet our future needs.
3   Q. Now, when you left it at V&S, did that involve
4   having to pay V&S for the space that it occupied?
5   A. I don't really know the answer to that. The
6   specificity of that, I'm not familiar with.
7   Q. But as far as the location is concerned, that
8   camera was used by the hospital, but it was never
9   actually moved to the hospital facility?
10  A. That's correct.
11  Q. And, eventually, what happened to that camera?
12  Was it turned back to GE -- was the GE camera turned
13  back to GE?
14  A. When we were leasing the camera from V&S, we
15  let them know that we did not want that to be the
16  camera ultimately, for the reasons I just outlined;
17  and so they replaced that camera with the Philips
18  CardioMD. Then --
19  Q. Excuse me. Can you go back?
20  A. Yes.
21  Q. Who did you tell that you -- who knew that you
22  didn't want that camera?
23  A. V&S.

Page 76

1   Q. V&S knew that you didn't want that camera?
2   A. Yes.
3   Q. Okay.
4   A. We informed them that that would not meet our
5   future needs, because of the older technology and
6   because of its nuclear cardiology limitations.
7   Q. So that was known at the time?
8   A. That was known, yes. Well, at which time?
9   Q. At the time that you entered into the sublease
10  agreement.
11  A. I'm not sure of the exact date of those
12  discussions with them and the date of the lease
13  agreement.
14      MR. STONE: I don't have any further
15  questions for this witness.
16      MR. MULHOLLAND: Okay. I guess you are
17  free to go then.
18      THE WITNESS: All right.
19      (Discussion off the record.)
20      (Testimony of Mr. Washington ended at
21  12:09 p.m., and testimony of Mr. Leonhardt
22  began at 12:10 p.m. this date.)
23          - - -

Page 77

1       GEORGE LEONHARDT,
2   called as a witness by the Plaintiffs, being first
3   duly cautioned and sworn, as hereinafter certified,
4   was deposed and said as follows:
5       EXAMINATION
6   BY MR. STONE:
7   Q. Mr. Leonhardt, my name is Andrew Stone. I
8   represent the plaintiffs in a case that was filed
9   under the Federal False Claims Act here in the Western
10  District of Pennsylvania.
11      Am I correct that you have been designated as
12  the person knowledgeable with regard to certain
13  information that we requested from the hospital by way
14  of testimony at a deposition under Rule 30(b)(6) --
15  A. Yes.
16  Q. -- under the Federal Rules of Civil Procedure?
17  A. Yes.
18      MR. MULHOLLAND: Subject to the global
19  objections that I put in my June 6 letter to
20  you, Mr. Stone.
21      MR. STONE: Okay. Fair enough.
22  Q. Mr. Leonhardt, I'm going to be asking you a
23  series of questions related to that Notice of

USA, et al. vs. Bradford, et al.    Document 117-3    Filed 09/10/2008    Page 22 of 56
No. 04-186E

Case 1:04-cv-00186-MBC    Multi-Page    Corp. Designee BRMC
July 26, 2007

**Page 78**

1  Deposition. If at any time you do not hear my
2  question or you do not understand it, please stop me,
3  and I will repeat it or rephrase it, so that you have
4  understood it.
5      If you respond, we will assume that you have
6  heard and understood the question. Do you understand
7  that?
8    A. Yes.
9    Q. All of your responses should be verbalized,
10 because, again, it is difficult for the court reporter
11 to note a nod of the head or a gesture. Do you
12 understand that?
13   A. Yes.
14   Q. What is your current position at the hospital?
15   A. I am the President and Chief Executive Officer.
16   Q. And how long have you held that position?
17   A. For a little over 14 years.
18   Q. So when would you have started? Approximately
19 1993? Is that —
20   A. October of 1992.
21   Q. Has your title always been the same?
22   A. Yes, it has.
23   Q. Have you always had the same position?

**Page 79**

1    A. Yes.
2    Q. Prior to working at the Bradford Regional
3  Medical Center, were you employed someplace else?
4    A. Yes, I was.
5    Q. Why don't we start with your education and then
6  we will go through your employment history? So if you
7  could start by telling us where you went to school and
8  the level of education you attained?
9    A. Okay. I have a bachelor's degree in psychology
10 from St. Vincent College in Latrobe, Pennsylvania, a
11 master's degree in social work from West Virginia
12 University, and a master's degree in business
13 administration from the University of Pittsburgh.
14   Q. Were you employed at the time that you got your
15 degrees or --
16   A. I was employed for two years after my
17 bachelor's degree as a caseworker, a year for the
18 Pennsylvania Department of Public Assistance, working
19 in McKeesport, and a year at Latrobe Area Hospital
20 working at the Community Mental Health Center.
21      I then took two years for graduate school at
22 the West Virginia University, and took a job again at
23 that same Community Mental Health Center in Latrobe,

**Page 80**

1  and I worked there from 1974. I took a series of
2  different positions, gradually some management
3  positions; and I attended the University of
4  Pittsburgh's Executive M.B.A. Program while I worked
5  full time at Latrobe from 1982 to 1984.
6    Q. So you graduated from the University of
7  Pittsburgh's M.B.A. program --
8    A. In 1984.
9    Q. -- in 1984?
10   A. Yes.
11   Q. From 1984 on, can you tell us the positions
12 that you have held and where you have been employed?
13   A. From 1984 until 1992, I held four or five
14 different management positions at Latrobe Area
15 Hospital, ending as the Associate Director of the
16 hospital, from 1988 until 1992.
17   Q. So you have been at two hospitals since you got
18 your M.B.A.?
19   A. Yes, I have.
20   Q. That would be Latrobe, and then you went to
21 Bradford?
22   A. That's correct.
23   Q. At Bradford from 1992 on, you have held the

**Page 81**

1  same position?
2    A. That's correct.
3    Q. Do you have any particular training or
4  certifications in compliance, Medicare compliance,
5  anything relating to compliance issues?
6    A. No particular training or certifications.
7    Q. Do you belong to any professional associations?
8    A. Yes.
9    Q. Which professional associations?
10   A. The American College of Health Care Executives.
11   Q. Is that the only one?
12   A. Hospital Association of Pennsylvania and the
13 American Hospital Association.
14   Q. Through any of those organizations, have you
15 attended any conferences or seminars dealing with
16 compliance issues?
17   A. Yes.
18   Q. Is that something that you do on a regular
19 basis?
20   A. On a periodic basis, yes.
21   Q. At the hospital, do you have somebody that is
22 designated as a compliance officer?
23   A. Yes, we do.

**Page 82**

1  Q. Who is that?
2  A. James Tarasovitch.
3  Q. Does he hold any other position at the
4  hospital?
5  A. Chief Financial Officer.
6  Q. So would that be part of the duties of the
7  chief financial officer, or is it considered a
8  separate position?
9  A. It is a separate position or separate duties.
10  Q. Has he held that position during the entire
11  time you have been at the hospital, or have there been
12  other people in that position?
13  A. There have been other people in that position
14  during that time.  He has been at the hospital
15  approximately three years.
16  Q. Who was there before Mr. Tarasovitch?
17  A. Robert Fisher was the Chief Financial Officer
18  and also the compliance officer.
19  Q. Do you know where Mr. Fisher is today?
20  A. Yes.  He is the President and CEO of Brookville
21  Hospital.
22  Q. How long did he work at Bradford as the CFO?
23  A. He was there approximately two years prior to

**Page 83**

1  my arrival, and he left about three years ago to
2  accept that position.
3  Q. Going back over the last ten years, has the
4  hospital been subject to any Medicare audits?
5  A. No, I don't believe so.
6  Q. How about Medicaid?
7  A. No.
8  Q. Now, Mr. Leonhardt -- let me see if I can find
9  the document here.  In May of 2001, the Board for the
10  record passed a -- the Board for the hospital passed a
11  resolution dealing with physicians with competing
12  financial interests.
13      Do you recall that particular resolution, that
14  policy that was passed by the Board?
15  A. Yes, I do.
16  Q. What were the circumstances, if you recall,
17  behind passing that particular policy or resolution by
18  the Board?
19  A. Sure.  It was the combination of several months
20  of discussion on the part of the Board with respect to
21  whether or not the Board needed to take a position
22  statement and have capabilities to deal with
23  competition that was damaging to the hospital.

**Page 84**

1      We had seen several instances, certainly,
2  across the country, where hospitals were finding
3  themselves in a position where they had to deal with
4  that kind of a situation and had seen several locally.
5  Q. Was there a particular concern, a particular
6  concern, a particular competing interest that the
7  hospital was worried about at that time?
8  A. As we talked about this?
9  Q. Yes.
10  A. Yes.  There had been a local hospital that had
11  been significantly damaged by an ambulatory surgical
12  center established by a group of surgeons on the
13  staff.
14  Q. Again, if you could, can you articulate
15  precisely what the concern was on the part of the
16  Board?
17  A. Sure.  It is a general concern, I think, in the
18  health care world.  The concern is that there are
19  certain kinds of competition that make the playing
20  field so unlevel that it is virtually impossible to
21  compete on a level basis with them; and, you know, we
22  had, frankly a great deal of discussion about the
23  impact that that surgical center was having on a

**Page 85**

1  neighboring community hospital.
2      In that instance, in those kinds of instances,
3  the hospital finds itself -- the community hospital
4  finds itself in the position where it has to provide
5  stand-by services, it has to continue to find a way to
6  provide the most economically unattractive services,
7  and yet can have the people using its services
8  electively choosing where to send the most
9  predictable, the most financially advantageous
10  services.
11  Q. I am going to show you what we will mark as
12  Deposition Exhibit No. 8.
13      (Deposition Exhibit No. 8 was marked for
14  identification.)
15  Q. This document actually consists of two
16  documents.  It is really the Resolution of the Board
17  of Directors, and then there is attached to it the
18  Procedures that I am assuming accompanied the Board
19  Resolution.
20  A. Yes.
21  Q. But maybe rather than me describe it, why don't
22  you take a look at this document and identify it, if
23  you can.

Page 86

1   A. Yes. That is what it is.
2   Q. This is the Board resolution you were talking
3 about; is that right?
4   A. That's correct.
5   Q. And attached to it is part of the same document
6 or the procedures that were implemented to govern the
7 implementation of the policy; is that right?
8   A. Correct.
9   Q. And some of the issues that you have just
10 discussed are actually reflected in the preamble here;
11 is that right? If you look down there it says,
12 "Facing increasing competition of other health care
13 entities." Do you see where I am talking about, sort
14 of the preamble or the preface to the resolution.
15 There are several "whereas" paragraphs.
16   A. Yes. I was looking for that particular one,
17 but, yes.
18   Q. Now, am I correct that this would allow the
19 hospital to deny or not renew privileges for a
20 physician that the Board determined had a competing
21 financial interest; is that right? Is that the --
22   A. Yes, assuming that we went through all the
23 procedures.

Page 87

1   Q. If you would look at the third page under the
2 introduction section, it says that, "The Board was
3 concerned that covered practitioners would have an
4 incentive to direct their patients away from the
5 services and facilities available at the Medical
6 Center and toward the competing entity for reasons
7 unrelated to patient preference, medical necessity, or
8 third-party requirements."
9   A. Correct.
10   Q. Was this a concern that physicians might have
11 financial incentives to not use the hospital facility?
12   A. Yes.
13   Q. That would be a situation where a physician or
14 a physician's group might actually offer a diagnostic
15 service that the hospital offered. Is that right?
16   A. Yes.
17   Q. So they would be able to bill, not only for
18 their professional services, but also for technical
19 services that, again, the hospital would otherwise be
20 able to bill for?
21   A. Yes.
22   Q. Would it be fair to say that the hospital
23 didn't want any competition to the hospital?

Page 88

1      MR. MULHOLLAND: Objection. Leading. You
2 can answer.
3   A. No. The hospital --
4   Q. Were you trying to eliminate competition --
5   A. No.
6   Q. -- for diagnostic services?
7   A. No. We were trying to be in a position where
8 if we were faced with competition that was
9 significantly damaging to the hospital, we could
10 compete on a level playing field. We didn't have to
11 provide other services to support that competition.
12   Q. So when you say "other services," that would
13 mean staff privileges?
14   A. Staff privileges, access to the emergency
15 department for their patients.
16      The issue isn't and there was never a feeling
17 on the part of the Board that they could eliminate
18 competition; but there was a feeling and a clear
19 understanding that in the face of competition, we
20 could compete on a level playing field. We didn't
21 have to provide that competition with a series of
22 services, making it easier for them to compete with
23 us.

Page 89

1   Q. There is a footnote at the bottom of that page,
2 No. 4, and I would like you to look at that for a
3 second. You said that you were responding to a
4 situation that had occurred at another hospital that
5 you knew of where there was a surgicenter that went in
6 and that that damaged the hospital in that community;
7 is that right?
8   A. Yes.
9   Q. Do you remember what community that was?
10   A. St. Marys.
11   Q. Now, if you would look at footnote No. 4, it
12 says, "At the time of its adoption of the resolution,
13 based upon the information known to it at that time,
14 the Board was not aware of any existing services being
15 provided by any member of the Medical Center's medical
16 staff that would constitute a significant impact
17 detrimental to the ability of the Medical Center to
18 fulfill its mission." Right?
19   A. Right.
20   Q. So you are saying that -- I am assuming that
21 what this was meant to show was that this was not in
22 response to a particular entity that you were trying
23 to --

USA et al., vs. Bradford, et al.
No. 04-186E
Multi-Page
Document 117-2    Filed 09/10/2008    Page 25 of 56
Case 1:04-cv-00186-MBC
Corp. Designee BRMC
July 26, 2007

Page 90

1  A. Correct.
2  Q. -- deal with. Is that right?
3  A. That's right.
4  Q. You are saying that that is a true statement?
5  A. That is a true statement.
6  Q. If you look at page 2, of the procedures --
7  actually, it is page 4 of the exhibit -- and the first
8  sentence in the top there, it says, "In this way,
9  covered practitioners would use the Medical Center's
10  resources as a means to develop a patient base only to
11  divert those patients to the competing entity."
12      I want you to apply this now to the situation
13  that arose with V&S in 2001.
14  A. Uh-huh.
15  Q. Okay? Explain to me how this policy was then
16  raised in connection with an imaging facility that V&S
17  was developing.
18  A. This policy was used as background, and these
19  procedures were used as we developed information about
20  what it was V&S was doing and the impact it would have
21  on us. It was the use of these procedures and this
22  policy that guided that whole process with V&S.
23  Q. Did the Board make a determination at some

Page 91

1  point that V&S -- before we get there, strike that.
2      What is V&S? Explain to me, if you could, what
3  your understanding of V&S is?
4  A. My understanding is it is a professional
5  corporation consisting of Dr. Vaccaro and Dr. Saleh.
6  Q. And what did they do? What business were they
7  in?
8  A. The practice of medicine.
9  Q. What was the affiliation with the hospital,
10  let's say, at the beginning of January of 2001?
11  A. They were members of the medical staff.
12  Q. In what fields did they practice?
13  A. Internal medicine.
14  Q. Had they previously been employed by the
15  hospital?
16  A. Yes.
17  Q. When were they employed by the hospital?
18  A. They were employed by the hospital when the
19  hospital acquired practice where they were employed
20  physicians owned by Dr. Russell Weintraub, and that
21  was several years before that. I am sorry. I am
22  having a hard time picking the exact date out.
23  Q. And so they became employees of the hospital,

Page 92

1  right?
2  A. Right.
3  Q. And the hospital owned that practice?
4  A. That's correct.
5  Q. At some point, did they go on their own?
6  A. Yes, they did.
7  Q. Did they buy a practice from the hospital?
8  A. Yes, they did.
9  Q. Was that the same practice that --
10  A. Yes.
11  Q. -- that they had sold to the hospital?
12  A. They had not sold it to the hospital.
13  Q. They were employees.
14  A. They were employees.
15  Q. And then the hospital sold the practice back to
16  them at some point?
17  A. That's correct.
18  Q. When did that occur?
19  A. I believe it was early in 2000.
20  Q. Now, in the spring of 2001, did the hospital
21  become aware of an ancillary venture that Drs. Vaccaro
22  and Saleh were developing?
23  A. We became aware in approximately April of 2001

Page 93

1  that they were considering an ancillary venture in
2  nuclear medicine.
3  Q. How did you become aware of that?
4  A. Someone told me in the hall, so I called them
5  and asked them.
6  Q. What did you hear? Tell me exactly what you
7  remember about your first hearing about this.
8  A. Other than the general -- I don't remember
9  exactly what I first heard, other than the general
10  statement that they were going to become involved in
11  offering nuclear medical services.
12  Q. Diagnostic services?
13  A. Diagnostic services.
14  Q. Do you remember who it was that you heard it
15  from?
16  A. I can't be sure of that.
17  Q. And you said you followed up?
18  A. Yes.
19  Q. And you said you followed up, and you actually
20  asked them about it?
21  A. Yes, I did.
22  Q. When did you first talk to Dr. Vaccaro and Dr.
23  Saleh about this?

Page 94

1  A. Sometime approximately in the middle of April.
2  Q. Did they confirm that for you?
3  A. They told me that they were considering the
4  establishment of diagnostic services in nuclear
5  medicine, but they hadn't made a final decision.
6  Q. Were you concerned about that, and why?
7  A. Yes, I was concerned about it. I was concerned
8  about it, essentially, because I thought it would have
9  a very detrimental impact on our attempt to establish
10  a cardiology service in that community.
11  Q. When you say establish a cardiology service,
12  wouldn't the hospital have already had a cardiology
13  service --
14  A. No.
15  Q. -- in 2001?
16  A. No. We did not have a fulltime cardiologist in
17  Bradford at that time.
18  Q. Okay.
19  A. We had a visiting cardiologist from Hamot
20  Medical Center in Erie that came one day a week.
21  Q. I think Mr. Washington testified about imaging
22  facilities that you had starting, I guess, in 19 --
23  well, I guess, actually, it started before 1999; but

Page 95

1  he talked about imaging equipment that the hospital
2  owned, at least as far back as 1999; is that right?
3  A. That's correct.
4  Q. Do you agree with his -- were you present for
5  his testimony?
6  A. Yes, I was.
7  Q. Is it correct that the hospital had imaging
8  equipment as far back as 1999?
9  A. Yes. I do think you need to understand that
10  nuclear imaging equipment has many uses, not just
11  cardiology. One of the other things I believe he told
12  you was about our desire to dramatically improve the
13  cardiac diagnostic capabilities of that nuclear
14  imaging equipment. That was part of our interest in
15  developing a fulltime cardiology service in the
16  community.
17  Q. In fact, isn't it true that you had actually
18  entered into an agreement with Hamot Medical Center to
19  that end; is that right?
20  A. Yes. They had agreed to -- they had formally
21  agreed to attempt to help us attempt to develop a
22  fulltime cardiology service.
23  Q. And that would have been in 1999 or 2000?

Page 96

1  A. Approximately, yes.
2  Q. So, I guess, maybe it would be fair to say you
3  were in the process of establishing a cardiology
4  service then; is that right?
5  A. Yes. We were in the process of establishing a
6  cardiology service. We were actively trying to
7  recruit a cardiologist.
8  Q. Is there any reason why you would need to have
9  a monopoly on the imaging services related to
10  cardiology?
11  A. No. You don't need to have a monopoly on the
12  imaging services.
13  Q. So the fact that somebody else was putting in
14  diagnostic equipment or utilizing their own diagnostic
15  equipment for their own patients, there is no reason
16  why that would prevent you from developing your own
17  cardiology program, right?
18  A. In that kind of situation, it would certainly
19  make it much more difficult.
20  Q. Well, it would make it competitive; isn't that
21  true?
22  A. No. I don't believe it would make it
23  competitive. It would not make it competitive,

Page 97

1  because the referring physician would only have a
2  financial incentive to only use their service as
3  opposed to any real kind of real competition, which
4  would, essentially, mean the cardiologist would be
5  blocked out.
6  Q. Well, there were other physicians in the
7  community that would refer patients to a cardiology
8  program, right?
9  A. It is a very small community.
10  Q. Well, are you saying then that Dr. Saleh and
11  Dr. Vaccaro had a substantial part of the patient
12  population as their clients or patients?
13  A. Yes.
14  Q. Is this the reason why the hospital determined
15  that it would have a significant impact on the
16  cardiology program if they were permitted to go
17  forward with their plan to develop an imaging
18  facility?
19  A. Yes.
20  Q. Prior to April of 2001, were Dr. Saleh and Dr.
21  Vaccaro, were they referring their nuclear imaging
22  business to the hospital?
23  A. I know they were referring some of their

USA, et al., vs. Bradford, et al.    Document 117-3    Filed 09/10/2008    Page 27 of 56
No. 04-186E

Case 1:04-cv-00186-MBC    Document 117-3    Filed 09/10/2008    Page 27 of 56
Corp. Designee BRMC
July 26, 2007

Page 98

1  patients to the hospital. I don't know if they were
2  referring them all or not.
3  Q. Was there another nuclear imaging facility in
4  the community?
5  A. Within the town limits, no. But just outside,
6  yes.
7  Q. And who operated the nuclear imaging facility
8  outside the town limits?
9  A. There were competing nuclear imaging facilities
10  in Olean, New York, Warren, Pennsylvania, St. Marys,
11  as I mentioned before, Kane, and Coudersport.
12  Q. How far away are those various facilities?
13  A. They range from about 12 miles to 25 or 30.
14  Q. What is 12 miles away?
15  A. Olean.
16  Q. And what is the hospital in Olean?
17  A. Olean General Hospital. In addition, to the
18  hospital in Olean, there also was a free-standing
19  diagnostic center that had those capabilities.
20  Q. I am going to ask you to take a look at a
21  document that we will mark as Exhibit 9.
22        (Deposition Exhibit No. 9 was marked for
23  identification.)

Page 99

1  Q. You can take a minute to look through those.
2  A. Yes.
3  Q. Mr. Leonhardt, these are a number of pages,
4  handwritten pages, that appear to be notes, somebody's
5  notes. Actually, there are a couple of pages that
6  appear to be different handwriting in the middle of
7  this packet.
8  A. Yes.
9  Q. But let me ask you if this document is familiar
10  to you?
11  A. Yes, it is.
12  Q. Is the handwriting something that you
13  recognize?
14  A. Yes.
15  Q. Is it your handwriting?
16  A. Yes, it is.
17  Q. As you said, the majority of it?
18  A. Yes.
19  Q. I think actually on Bates stamp No. 4413, it
20  looks like that is different handwriting.
21  A. Yes, it is.
22  Q. Do you recognize that handwriting?
23  A. I do not.

Page 100

1  Q. What do these notes represent, at least the
2  ones that are in your handwriting?
3  A. Most of these notes represent notes to myself
4  to try to keep me from forgetting.
5  Q. Does it deal with a chronology involving V&S?
6  A. Yes, I think there are other discussions in
7  here that I am making notes about, though, too. These
8  are notes about discussions with Dr. McClelland, Dr.
9  Petrella, who are cardiologists, were cardiologists at
10  Hamot at that time, and were working with us to try to
11  develop a program.
12        There are notes that I made to myself before
13  some meetings with Dr. Singh, Dr. Kirsch, Dr. Nadella
14  Dr. Jacobs. There are notes that I made to myself
15  after a couple of conversations with different Board
16  members.
17  Q. But do they relate, generally, to this issue of
18  the development of your cardiology program?
19  A. Yes, they do.
20  Q. And can you tell from looking at these, the
21  time frame that we are talking about?
22  A. As I look at each one, they are not all in the
23  same time frame.

Page 101

1  Q. In fact, I think it looks like there are some
2  that are dated later at the front of the packet, and
3  then there are some earlier ones, actually, at the
4  back.
5        I would actually like you to refer first to
6  Bates stamp No. 4425 --
7  A. Okay.
8  Q. -- which appears to me of the dated notes, it
9  appears to be the earliest of the notes that are
10  dated. If you would look at that page, does this
11  refresh your recollection about when you first learned
12  about the V&S venture?
13  A. Yes. Yes, it does.
14  Q. Now, the first part of that note deals with a
15  meeting that you had with V&S; is that right?
16  A. Yes. That is what I was referring to when I
17  said I met with them and talked with them about that.
18  Q. So sometime prior to April 3rd, you learned
19  about this plan?
20  A. Uh-huh.
21  Q. And so they told you that they had purchased a
22  camera and signed a contract with a cardiologist as of
23  April 3rd, 2001?

USA, et al., vs. Bradford, et al.                      Multi-Page                      Corp. Designee BRMC
No. 04-186E                                                                            July 26, 2007

Page 102

1   A. That's correct.
2   Q. At the bottom of that, there is a discussion,
3  generally, I guess, of the issue, and then at the
4  bottom, there is a sentence that says, "V&S went on to
5  say that they had told Petrella cath referrals were at
6  risk if Medicor didn't read."
7        What does that mean?  I am not sure I
8  understand.  This was your summary of what V&S told
9  you?
10   A. Right.  What that would mean would be that they
11  were referring patients for cardiac caths.
12   Q. To Dr. Petrella.
13   A. To the Medicor physicians to, the Medicor
14  group.
15   Q. And how is Dr. Petrella related to Medicor?
16   A. He is one of the physicians in Medicor.
17   Q. Is he an owner or an employee or --
18   A. I don't know the answer to that.
19   Q. And Medicor is -- do they provide -- did they
20  actually do the reads of the test?  Is that what the
21  referral was for?
22   A. (No response.)
23   Q. What is the referral?  Were they reading the

Page 103

1  test results or --
2   A. Are you talking about the cardiac
3  catheterizations?
4   Q. Yeah.  What role did Medicor play?
5   A. They were performing them and interpreting
6  them.
7   Q. So they were actually performing the tests and
8  then reading the tests?
9   A. Uh-huh.
10   Q. And would it have been necessary for V&S to
11  have a contract with Medicor in order to proceed with
12  their venture?
13   A. No.
14   Q. What was the connection between Medicor and
15  V&S, as you understood it, from your conversation with
16  V&S at that time?
17   A. V&S were referring patients to Medicor.
18  Medicor was providing services.  That is where
19  the cardiologist -- when I talked about the
20  cardiologist coming one day a week?
21   Q. Yes.
22   A. Medicor was working with -- Medicor and Hamot
23  were working with Bradford Regional Medical Center to

Page 104

1  try to help us develop a fulltime cardiology service.
2   Q. Were there other cardiologists that V&S could
3  use to read the tests?
4   A. Oh, I'm sure there were.
5   Q. Were there other cardiologists that had
6  connection to Bradford Regional Medical Center?
7   A. No, not at that time.
8   Q. If the cath referrals were at risk, how would
9  that impact the hospital?
10   A. The Bradford Hospital?
11   Q. Yes.
12   A. Not at all.
13   Q. So this was not a particular concern to you in
14  terms of what you were talking about before?
15   A. No.
16   Q. Now, it looks like the next note is from
17  4-4-01, and it says that you made calls to Dr.
18  McClelland and John Malone.  What was the purpose of
19  those calls, and how did they relate to what V&S was
20  doing?
21   A. John Malone is the CEO at Hamot, and Dr.
22  McClelland was at that point CEO of Medicor.  What I
23  was discussing with them was the impact that this

Page 105

1  would have on our plans to develop a fulltime
2  cardiology service.
3   Q. And what did you think the impact was going to
4  be?
5   A. I thought the impact would be significantly
6  detrimental.
7   Q. In what way?
8   A. The opportunity to have a fulltime cardiologist
9  in Bradford would have been, I think, diminished
10  considerably if a key cardiac diagnostic service was
11  going to be developed in the offices of internists
12  and, therefore, would be not available to support that
13  cardiologist and to support the work that he was
14  doing.
15   Q. Why could that diagnostic service have not just
16  been split off?  In other words, why couldn't the
17  imaging service be performed at V&S' facilities and
18  then other cardiology procedures performed at the
19  hospital?  Why was it necessary to have the imaging
20  tied to the other services?
21   A. I'm not understanding your question.  I'm
22  sorry.
23   Q. I don't understand why you felt that the fact

Page 106

1  that somebody else was performing and billing the
2  imaging services, why that would prevent a
3  cardiologist from being on the staff and performing
4  procedures at the hospital?
5     A. This is a considerable portion of the work any
6  cardiologist does.
7     Q. Okay. Why couldn't they -- why couldn't a
8  cardiologist enter into an arrangement with V&S?
9     A. A cardiologist could enter into an arrangement
10 with V&S.
11    Q. Okay.
12    A. Whether they were interested in that was a
13 whole different question.
14    Q. Why does that affect the hospital?
15    A. If you look through -- let me try to put this
16 in context, if I can, for you. You probably noticed
17 that one of the notes that I wrote after that meeting
18 with Vaccaro and Saleh is that I talked to them about
19 the impact that I thought this would have on our
20 ability to develop a cardiology service, and I
21 reminded them that one of the things -- because in
22 context, the decision to develop the cardiology
23 service, and the decision that it was a key portion --

Page 107

1  a key issue for the community and the hospital was one
2  that was reached jointly by the hospital and the
3  medical staff.
4        The majority of the staff saw very clearly that
5  this was a service that their patients needed, that
6  they would benefit from very significantly, and that
7  it was a pretty basic service to not have available,
8  and we were talking about people who other than one
9  day a week didn't have access to a cardiologist within
10 100 miles.
11       One of the key points in having a successful
12 cardiology program that the staff had come to and that
13 we had absolutely agreed with is that that cardiolo-
14 gist could not be identified too closely with any
15 individual practice.
16       The level of competition between the physicians
17 in the Department of Medicine is such that being
18 associated too closely with one means that the others
19 aren't going to refer.
20       It is very difficult to bring a specialist into
21 that kind of an environment when you are working very
22 hard to accomplish that in a way that would be the --
23 that would not immediately involve that key specialist

Page 108

1  in that battle.
2     Q. Okay. Going on with that same note, it says
3  that you had a discussion with Dr. Furr, F-u-r-r.
4     A. Yes.
5     Q. Who is Dr. Furr and why were you discussing
6  this with him?
7     A. Dr. Furr is another one of the Medicor
8  cardiologists. He was a senior guy there, and he had
9  known all of the players for a lot of years. I was,
10 frankly, looking for some advice or some suggestions.
11    Q. Now, he says -- it says, "He commented that it
12 was driven by money and was a problem, but didn't feel
13 he knew of a way he could effectively respond. I told
14 him there were possibilities."
15       What were you thinking at that time when you
16 said there were possibilities? What was going through
17 your mind about what the possibilities were about how
18 to respond?
19    A. We were trying to develop a cardiology service
20 that would be useful to the community and would be
21 accepted as noncompetitive, you know, not aligned with
22 one faction or another, and what I was thinking about
23 was the possibility of joint ventures.

Page 109

1     Q. So at this point in time, you were thinking
2  about joint ventures? You weren't thinking about
3  excluding them from the hospital staff; is that right?
4     A. That possibility had occurred to me, but I was
5  certainly looking for more than one option in dealing
6  with this situation, and joint ventures -- in some
7  fashion, trying to figure a way to get a cardiology
8  service into that community that wasn't immediately
9  folding to the competition and the animosity between
10 the competing members of the Department of Medicine.
11    Q. Well, wasn't this the same time frame that the
12 Board was considering their policy on --
13    A. Yes, it was.
14    Q. -- on competitive services?
15    A. Yes. The Board discussions about that had
16 started in December of 2000, and, you know, by April
17 of 2001, it was clear we were on a final draft that
18 probably was going to be approved either at that
19 meeting or at the next meeting.
20    Q. So was that one of the possibilities that was
21 being considered when you said that there were
22 possibilities to respond? Was one of the possibili-
23 ties that you would invoke this policy?

USA, et al., vs. Bradford, et al.                                    Corp. Designee BRMC
No. 04-186E                                                          July 26, 2007

---

Page 110

1   A. At the end of the very long road, I suppose,
2 yes, that was one of the possibilities.
3   Q. When you say "at the end of a very long road,"
4 that is exactly what happened within a month, right?
5   A. The policy was adopted. We didn't -- we
6 certainly didn't invoke the policy.
7   Q. When was the first time that you invoked the
8 policy?
9   A. I believe, approximately, December, and -- I'm
10 sorry. I believe it was December of 2002.
11   Q. So at the end of a very long road, it would be
12 within a year?
13   A. Oh, that is almost 18 months, but --
14   Q. Okay. The other possibility that you mentioned
15 was a joint venture of some kind; is that right?
16   A. Uh-huh.
17   Q. And, obviously, that would be the preferable
18 way to handle this, right --
19   A. Yes.
20   Q. -- because you would hold on to the business?
21   A. The ultimate goal was to try to create an
22 environment where we could have a cardiology service
23 that would serve the whole community, could be used by

---

Page 111

1 physicians if they chose to, but that had not been
2 drawn into that competition and animosity.
3   Q. And that would have the benefit that you would
4 -- that the business would stay with the hospital,
5 right?
6   A. Well, if you are going to do a joint venture,
7 you are willing to give up some of the business,
8 obviously?
9   Q. Right. Some of the business, but --
10   A. Right.
11   Q. Some of the business, but you would hold on to
12 some of the business?
13   A. Some of the business.
14   Q. In fact, you would have a relationship with the
15 physicians who were in your joint venture, which would
16 be a good thing for the hospital to nurture those
17 relationships, right?
18   A. Right; and in this situation, I think a very
19 good thing for the community, because it is in that
20 kind of situation that you are able to develop that
21 kind of service.
22   Q. So the objective wasn't to drive V&S out of the
23 hospital?

---

Page 112

1   A. The objective from day one was to develop a
2 viable high quality cardiology service and program for
3 that community.
4   Q. We were talking about when the policy was
5 invoked, and I would like you to look at the next item
6 down, item No. III.
7   A. Uh-huh.
8   Q. This was the very following day on April 5th,
9 2001. It says that you reviewed with Dr. McDowell as
10 an agenda item for the upcoming Executive Committee
11 meeting, the 4-11-01 Executive Committee meeting.
12   A. Right.
13   Q. I assume when you say reviewed as an agenda
14 item, that you are referring to the situation with
15 V&S?
16   A. Yes, the whole situation.
17   Q. Then the next note says, "Next reappointment
18 date is 10-31 for both of them." The reappointment
19 date that you are referring to there is the
20 reappointment of their staff privileges?
21   A. Sure.
22   Q. How would that be relevant to this issue unless
23 you were contemplating invoking that new policy?

---

Page 113

1   A. I told you earlier that that was a
2 possibility.
3   Q. But you said that that was only a possibility
4 at the end of a very long process.
5   A. Exactly.
6   Q. But, in fact, it was a consideration that you
7 had right at that time, because the very next day, you
8 discussed that as a possibility with Dr. McDowell.
9   A. It was no more than a possibility the next day.
10 You know, I gathered information about lots of things.
11   Q. The following note is from 4-6-01 --
12   A. Uh-huh.
13   Q. -- it notes a phone conference with John Malone
14 and Joe McClelland again, and those are the two
15 individuals you spoke to before?
16   A. Correct.
17   Q. It says, "Unsure of where they will land. Very
18 concerned, especially about their referrals from V&S."
19 What does that mean?
20   A. Uh-huh.
21   Q. I mean, what were you trying to say there?
22   A. I'm not sure what I was trying to say when I
23 said, "Unsure of where they will land."

---

USA et al., vs. Bradford, et al.
No. 04-186E

Case 1:04-cv-00186-MBC   Document 117-3   Filed 09/10/2008   Page 31 of 56

Multi-Page

Corp. Designee BRMC
July 26, 2007

Page 114

1  Q. Were you referring to V&S?
2  A. I don't know.
3  Q. When you say "very concerned," was this to say
4  you were very concerned or that Malone and McClelland
5  were very concerned?
6  A. I believe that what I was trying to say was
7  that they were very concerned.
8  Q. "Especially about their referrals from V&S."
9  Did you understand that there were substantial
10 referrals from V&S to -- I guess, is that Hamot?
11 A. That would be Medicor.
12 Q. Medicor. Did you understand that there were at
13 that time substantial referrals from V&S to Medicor?
14 A. I'm not sure what you mean by "substantial."
15 Q. They said they were very concerned about their
16 referrals.
17 A. I said they were very concerned, especially
18 about their referrals. So to me that means they were
19 very concerned about a number of things. Yes, they
20 were concerned about their referrals.
21 Q. Now, if you go a couple of pages further, there
22 is an undated note, which starts with "Issue: Nuclear
23 Cardiology."

Page 115

1      MR. MULHOLLAND: What is the Bates page?
2      MR. STONE: It is 4428.
3      MR. MULHOLLAND: Thank you.
4  Q. This note does not appear to be dated anywhere.
5  Do you have any recollection now where this fits in in
6  terms of the chronology of the notes in this?
7  A. I am just not sure. I can tell you what it is.
8  Q. Okay.
9  A. And it is simply, occasionally, I'll sit down
10 and try to organize my thoughts by writing out notes,
11 and that is really what this is.
12 Q. Would it have been in the same time frame,
13 meaning, the period of time before they started their
14 business, and I guess the time from when you first
15 learned that they were going to do this, and the time
16 that they actually started their business?
17 A. I can't answer that.
18 Q. Well, let's go down -- let's go down about
19 halfway down the page, and if you would refer to the
20 paragraph that starts, "Should they do this," what is
21 "Should they do this?" Does that refer to something
22 above?
23 A. I think what that refers to is should they go

Page 116

1  through and do the nuclear cardiology service?
2  Q. And then it says, "and also be able to control
3  Dr. Jamil's referrals?" How is Dr. Jamil related to
4  V&S, and why did you think that they would control his
5  referrals?
6  A. He shares office space with them. Beyond that,
7  I don't know what his business relationship is.
8  Q. So there was a concern that they -- obviously,
9  enough of a concern that they had some influence over
10 him --
11 A. Yes.
12 Q. -- and his referrals that you factored it into
13 your thinking here?
14 A. Uh-huh.
15 Q. Is that right?
16 A. That's right.
17 Q. It says, "The most profitable piece of our
18 cardiology program is negatively impacted by between
19 $130,000 and $170,000 annually."
20 A. That's right.
21 Q. Is that really what you were trying to say
22 earlier when you said that it would be difficult for
23 you to develop your cardiology program?

Page 117

1  A. For that and the other reasons that I talked
2  about, yes.
3  Q. So certain parts of the program are more
4  profitable than others?
5  A. Absolutely.
6  Q. Is it fair to say that you considered the
7  imaging part of the cardiology business a way to
8  underwrite, perhaps, less profitable areas?
9  A. Sure.
10 Q. Or cross-subsidize?
11 A. Cross-subsidize.
12 Q. Now, the numbers that you use here, between
13 $130,000 and $170,000 annually, how did you come up
14 with that information? I mean, how did you come up
15 with those numbers?
16 A. That is just an estimate.
17 Q. Based on? Based upon what we thought the
18 volumes would be and what the revenue is for those
19 kind of services?
20 A. You know, it is the back of an envelope, rather
21 than a study.
22 Q. Okay. During this time frame, did you do any
23 analyses or more in-depth studies of the situation?

Case 1:04-cv-00186-MBC    Document 117-3    Filed 09/10/2008    Page 32 of 56

USA, et al., vs. Bradford, et al.                    Multi-Page™                    Corp. Designee BRMC
No. 04-186E                                                                          July 26, 2007

Page 118

1  A. Yes. Later. Later in the process, as we were
2  trying to develop an approach, a joint venture, we
3  analyzed any number of alternatives.
4  Q. And, in fact, you did quite a bit of analysis
5  on this, right?
6  A. Sure, we did.
7  Q. I mean, did you actually engage outside
8  consultants?
9  A. Yes, we did.
10  Q. Did you have people internally that were
11  running reports for you?
12  A. Actually, we had people internally gathering
13  information. The reports that were run were run more
14  by the outside consultants.
15  Q. Okay. Go down to the bottom of that page.
16  There is a note, again, starting with the word
17  "Should," and it says, "Should Medicor agree,
18  physician revenue at Medicor will be protected, V&S
19  will win big. BRMC," I assume referring to the
20  hospital, "will lose on both nuclear and other
21  diagnostics." Explain to me each part of that
22  analysis. In other words, how is Medicor protected,
23  first?

Page 119

1  A. Okay. And this is -- I don't know whether to
2  call it speculation or just a little rumination about
3  if this happens, then what?
4      What this is referring to is if Medicor would
5  agree to support the nuclear cardiology service that
6  Vaccaro and Saleh were putting in their office by
7  reading the tests and providing them the technician
8  and lending them their nuclear license, then that
9  would protect the revenue sources from Vaccaro and
10  Saleh for Medicor. That is what that means.
11  Q. In other words, Medicor could enter into the
12  same arrangement with V&S that it has with BRMC?
13  A. Medicor doesn't have that kind of arrangement
14  with BRMC. They don't read any diagnostics there.
15  They come in and provide clinic services.
16  Q. But they get business from working with BRMC?
17  A. Like any other specialist, they actually get
18  business not from working with the hospital, but from
19  referrals from other physicians.
20  Q. Okay. It doesn't matter to them — I guess, if
21  the physicians -- V&S are referring their patients to
22  Medicor now, that wouldn't change? In other words,
23  Medicor could still receive referrals from V&S; is

Page 120

1  that right?
2  A. They could.
3  Q. So why is Medicor involved in this at all?
4  Wouldn't they still be doing the same work for V&S,
5  whether V&S had its own imaging, or whether the
6  imaging was done at the hospital?
7  A. They could be. But I'm sure that at the time,
8  and what I was thinking about was their concern -- V&S
9  said on a couple of occasions, although I don't
10  believe that they did it -- on a couple of occasions,
11  they said that they were contracting with, quote, a
12  cardiologist. If they are contracting with a
13  cardiologist to read those tests, as opposed to
14  reading them themselves, that can change their
15  referral relationship on other cardiology services.
16  Q. So that could cut Medicor out of some of that
17  business?
18  A. It could.
19  Q. It could.
20  A. Whether or not it would is yet to be seen, but
21  these are the kind of things everybody worries about.
22  Q. So part of the concern was that unless Medicor
23  agreed to read, they would enter into a contract with

Page 121

1  somebody else and lose other business?
2  A. At least that was speculated about.
3  Q. Now, "V&S will win big," what was your thinking
4  there? What was the analysis about how V&S would
5  benefit from this new arrangement where they would
6  have the imaging in their own office?
7  A. If there is a significant amount of revenue
8  attached, what I was thinking about here was if
9  Medicor aligns themselves with that service, it
10  suddenly gives the service a great deal of
11  credibility.
12  Q. And "BRMC will lose on both nuclear and other
13  diagnostics." Obviously, on the nuclear if the
14  diagnostics are being performed at V&S, BRMC isn't
15  doing them and, therefore, not billing them, right?
16  A. Right.
17  Q. What about the other diagnostics? Why would
18  they lose on the other diagnostics?
19  A. They are generally, depending on what the
20  result of the nuclear test is, there are follow-up
21  tests. If the nuclear test is being done elsewhere,
22  being read by somebody else, those follow-up tests
23  tend to go along their referral patterns, not the

Page 122

1  traditional ones.
2   Q. So in your analysis about the impact of this,
3  you are not just looking at the nuclear tests? You
4  are also looking at the effect of losing an MRI and CT
5  scan possibly? What other diagnostics?
6   A. Other diagnostics, after nuclear medicine, are
7  not generally MRIs or CT scans. It is the cardiac
8  cath, the referral for cardiac rehab, those kind of
9  things.
10  Q. What about were you concerned about losing any
11  inpatient admissions as a result of this? Probably
12  not, right?
13  A. No.
14  Q. Now, let's go to another step, and I don't --
15      THE WITNESS: Excuse me, Mr. Stone. Would
16  you mind if I stopped for the men's room for a
17  moment?
18      MR. STONE: You know, actually, we should
19  probably break here, and we'll take lunch. How
20  about 45 minutes?
21      MR. MULHOLLAND: Sure. What time is it?
22      MR. STONE: Be back here about 2:15?
23      MR. MULHOLLAND: 2:15 is fine.

Page 123

1      (Recess taken for lunch at 1:25 p.m., and
2  testimony resumed at 2:15 p.m. this date.)
3      MR. STONE: Do you want to read back where
4  we were?
5      (Previous two questions and answers were
6  read back.)
7                  - - -
8      EXAMINATION (RESUMED)
9  BY MR. STONE:
10  Q. I would like you to turn to the next page after
11  that, which is 4429, and there are two notes at the
12  top of the page. Could you look at those two?
13      The first one talks about impacting the ability
14  to develop cardiology service, and the second one
15  talks about the ability to recruit a cardiologist.
16  Can you explain exactly what the concern was there?
17  A. Yes. Pretty much the same things I have
18  mentioned already. This would make it very difficult
19  to attract a fulltime cardiologist if this kind of
20  competing service was going to be there. It would
21  really make it difficult to develop a cardiology
22  service that was kind of seen as above the fray, and,
23  therefore, acceptable to the majority of the people on

Page 124

1  the medical staff.
2   Q. You go on a little further down to say, "We
3  feel strongly enough about that to tell you that we
4  would like to work with you to find another way to
5  address whatever issues you were trying to address.
6  What are those issues, what impact will doing or not
7  doing this have on your practice?"
8      Did you ask V&S what their issues were, what
9  they needed to have addressed?
10  A. Yes.
11  Q. When?
12  A. I don't know exactly when. I know I had
13  discussions with them. One of the things I was doing
14  here was to try and remind myself to make sure that I
15  tried to understand what it was that was interesting
16  them in doing this, what they were trying to
17  accomplish.
18      If we were going to find a way to work
19  together, I needed to understand what they were trying
20  to do.
21  Q. Well, in January -- well, at least by January
22  of 2002, following January, they told you that they
23  wanted to be paid some money; isn't that right?

Page 125

1  A. (No response.)
2  Q. Didn't they make a proposal where you buy out
3  their practice or you buy out this imaging part of it?
4  A. Yes, I believe they did.
5  Q. So they told you they wanted money? Is that
6  where it ends up?
7  A. I think what they were telling me is that they
8  were willing to consider selling out the practice or
9  selling the service.
10  Q. Didn't they tell you that they had invested a
11  certain amount of money, they had money committed,
12  they were expecting a return on investment, and that
13  they actually planned to make a lot of money at this
14  business; isn't that right?
15  A. Yes.
16  Q. So at least by the next January, they told
17  you -- they actually, I think, put a number of $1.8
18  million to buy out the imaging part of the practice;
19  is that right?
20  A. I remember the number of $1.8 million. I don't
21  remember whether it was to buy the imaging part of the
22  practice or the practice.
23  Q. Now, you didn't pay them to buy the business,

Page 126

1  right?
2     A. No.
3     Q. And you didn't buy out their practices, right?
4     A. No.
5     Q. But shortly after that, you began negotiations
6  and came up with a lease arrangement with V&S; isn't
7  that right?
8     A. Yes.
9     Q. And that --
10    A. Excuse me.
11    Q. And that sublease agreement --
12    A. Excuse me. When you say "shortly after that,"
13 we came up with the lease agreement sometime
14 approaching September of 2003, so it really wasn't
15 shortly after that. It took another year.
16    Q. Well, yeah; but, let's -- we know that somebody
17 came up with the idea of entering into a sublease
18 arrangement with V&S?
19    A. Oh, sure. I was just trying to say it wasn't
20 shortly after January.
21    Q. I know. We'll take it, you know, one -- we
22 will sort of do this sequentially, and see if we can
23 get there. Do you know who came up with the idea of

Page 127

1  doing the sublease?
2     A. I honestly don't. There were so many
3  discussions among all of us at that time looking for
4  alternatives, I don't know whose original idea that
5  was.
6     Q. Do you recall when it was that that first came
7  up?
8     A. Sometime around the spring of 2003 or the early
9  summer.
10    Q. Let me show you a document which we will
11 identify as Deposition Exhibit No. 10.
12       (Deposition Exhibit No. 10 was marked for
13 identification.)
14    Q. Now, Mr. Leonhardt, this is a letter which
15 looks like it is from you to Dr. Saleh and Dr. Vaccaro
16 dated January 10th, 2003.
17    A. Correct.
18    Q. Is that accurate? I mean, is that your letter?
19    A. Yes, it is.
20    Q. Does it look familiar to you?
21    A. Yes.
22    Q. And it looks like, following your notes and
23 some discussions back and forth, you end up in January

Page 128

1  of 2003, and you still have this problem?
2     A. Uh-huh.
3     Q. And at this point, Dr. Saleh and Dr. Vaccaro
4  are operating their imaging facility; is that right?
5     A. Yes.
6     Q. And it is having a negative impact on the
7  hospital, I assume?
8     A. Yes, we believe so.
9     Q. I think the previous May, it looks like there
10 was a determination made by the Board of Directors
11 that Dr. Saleh and Dr. Vaccaro were covered persons
12 within the meaning of the policy against competing
13 financial interests?
14    A. Uh-huh.
15    Q. This letter refers to what I was talking about
16 a few minutes ago, about a buy-out that Saleh and
17 Vaccaro were proposing. If you look down to the third
18 paragraph, that is where the number 1.8 million is
19 discussed --
20    A. Right.
21    Q. -- as a proposal, I guess, coming from them; is
22 that right?
23    A. That's correct.

Page 129

1     Q. If you go down to the next paragraph, that is
2  the flip side, that is the other option, which is that
3  you enforce the policy; is that right?
4     A. Correct.
5     Q. So it looks like you are going back between
6  these two alternatives, in other words, to work with
7  Saleh and Vaccaro in some kind of a buy-out or a
8  venture and the other option is to enforce the policy;
9  is that right?
10    A. Yes.
11    Q. Now, if you enforce the policy, I assume you
12 have the problem that you might be driving away
13 referrals because if these guys don't have privileges,
14 they may start referring patients to another hospital;
15 is that right?
16    A. That is among the issues, yes.
17    Q. Was that a concern to you that if they are off
18 the staff, then they might have other alternatives,
19 and these guys are a pretty big referral source,
20 right?
21    A. That was among the concerns, yes.
22    Q. In fact, you were aware at this point that they
23 had -- at least one of them had applied for staff

Case 1:04-cv-00186-MBC    Document 117-3    Filed 09/10/2008    Page 35 of 56
USA, et al., vs. Bradford, et al.        Multi-Page        Corp. Designee BRMC
No. 04-186E                                                July 26, 2007

Page 130

1 privileges at another hospital; isn't that right?
2 A. I had heard rumors to that effect. I don't
3 know that I knew that.
4 Q. Didn't the hospital get a request?
5 A. No, we did not.
6 Q. Typically, you would get --
7 A. Typically you would get --
8 Q. Typically, you would get a letter from the
9 other hospital asking about their privileges?
10 A. Exactly. Typically, you would. So while there
11 were rumors floating around to that effect, that
12 hadn't happened.
13 Q. And you said Olean Hospital is only about 12
14 miles away; is that right?
15 A. The hospital itself is only about 15, but yes.
16 Q. Before we get too far away from Exhibit 9, I
17 want you to look at a couple of the other entries in
18 this document.
19     In particular, I want you to look at -- if you
20 look at page 4416, that is a note dated April 23rd,
21 2001, and I guess this was a meeting that you had at
22 Hamot, and you indicate that the persons in attendance
23 were John Malone, Dr. McClelland, Gary Morris, Dr.

Page 131

1 Petrella, Dr. Godfrey, Glen Washington, and yourself?
2 A. Yes.
3 Q. Apparently, there were many issues discussed,
4 but then you refer to a consensus on a couple of
5 things, and one was that "Nuclear is most profitable
6 piece," is that right?
7 A. Yes.
8 Q. That is what you were saying earlier that that
9 is actually a very profitable business.
10     "If Jamil goes to them, they currently control
11 50 percent of referrals." Again, your concern was
12 that Jamil has a relationship with V&S; is that right?
13 A. Yes.
14 Q. So you were, I guess, in this scenario assuming
15 that that was a possibility, that Jamil's referrals
16 would go with them?
17 A. You needed to explore the possibility, yes.
18 Q. And that is 50 percent of the referrals. What
19 are you talking about when you are talking about the
20 referrals there, 50 percent of what?
21 A. Nuclear cardiology.
22 Q. And then you get down to -- and you talk about
23 the profit being reduced by 150,000 to 200,000? Is

Page 132

1 that what you are --
2 A. It is cut off, but I am assuming that, yes.
3 Q. And that is similar to -- that was similar to
4 what you had said in one of your other notes?
5 A. Yes.
6 Q. Now, if you go back to page 4413, this is the
7 page that has somebody else's handwriting. Do you
8 know what this calculation is? I assume it has to do
9 with the referrals?
10 A. Let me look at it for a minute.
11     I can only tell you what it says. These are
12 projected exams for fiscal year '02, and I'm sorry, I
13 don't recognize the handwriting.
14     Then it goes through CT scans, inpatient and
15 outpatient, ultrasound, echo cardiograms only,
16 carotid, nuclear medicine, and MRI.
17 Q. Now, are these all possible impacts on
18 different services that somebody was projecting was
19 going to be impacted by this?
20 A. I don't know. I can only tell you what it
21 says. Again, I don't recognize the handwriting.
22 Q. I mean, this was produced as part of a group of
23 your notes. Do you know whether it was originally

Page 133

1 maintained with your notes?
2 A. I don't believe that it was maintained with my
3 notes, but it might have been.
4 Q. If you look at the previous page, maybe that
5 will give you some assistance. That is 4412. Does
6 that in any way relate to the next page?
7 A. I don't think so. I can tell what this is.
8 This was -- these were just some scratches that I did
9 trying to figure out what I thought it was going to
10 cost them to get into this business and what I thought
11 the revenue might be.
12 Q. Going forward, again, from the back forward,
13 the pages that precede 4412, they would be 4411 and
14 4410, are these all similar calculations relating to
15 the projects for the V&S business?
16 A. The 4410 again those are notes I did. I don't
17 know whether those are about V&S business or what
18 joint venture might look like that might be available
19 for us to propose to all the physicians. Some of
20 those are actually questions to myself if you see the
21 way they are --
22 Q. Yes.
23 A. And pretty much the same thing with 4411.

USA, et al., vs. Bradford, et al.          Multi-Page™          Corp. Designee BRMC
No. 04-186E                                                      July 26, 2007

Page 134

1  Q. Now, getting back to some more documents, I'm
2  going to show you what we'll mark as Exhibit 11.
3        (Deposition Exhibit No. 11 was marked for
4  identification.)
5  Q. This is appears to be a letter from you to Drs.
6  Vaccaro and Saleh dated June 26, 2002. In that first
7  paragraph and continuing into the second, you refer to
8  the possibility of setting up a joint venture as an
9  under arrangements proposal, and you refer to
10 something called the Stark Law.
11 A. Correct.
12 Q. At this point in time, June 26th, 2002, did you
13 have any experience or knowledge about the Stark Law?
14 A. No more than anyone else working in the kind of
15 position that I would.
16 Q. So you were aware that there was a law out
17 there --
18 A. Right.
19 Q. -- that impacted on physician-hospital
20 relations?
21 A. Any kind of business ventures, yes.
22 Q. Had you had any classes or training or any kind
23 of --

Page 135

1  A. I had attended --
2  Q. -- or any kind of experience with Stark Law at
3  that time?
4  A. No formal classes. I had certainly attended
5  seminars and educational sessions where it was
6  discussed.
7  Q. And at this point in time, you were exploring
8  the possibility of an Under Arrangements Joint Venture
9  as a possible resolution with V&S?
10 A. Not just with V&S. It would have been a
11 possible joint venture that could have included any
12 interested physician on the staff.
13 Q. I'm going to show you a document which we will
14 mark as Exhibit 12.
15       (Deposition Exhibit No. 12 was marked for
16 identification.)
17 Q. Does this document look familiar to you?
18 A. Wait. I'm sorry. Let me finish, okay?
19 Q. Oh, sure.
20 A. Yes, it does.
21 Q. Okay. What is it?
22 A. It is an outline of a proposal that I was
23 presenting to all physicians on the medical staff at

Page 136

1  around this same time.
2  Q. Do you know who prepared this document?
3  A. I had some help from a consulting firm.
4  Q. And who is that?
5  A. The name of the consulting firm is the
6  Northland Health Group. Their name has since changed
7  to Stroudwater, excuse me.
8  Q. And at that point, you had engaged them for
9  what purpose?
10 A. To try to help us come up with a solution that
11 would allow us to develop a community-based cardiology
12 service.
13 Q. So this Under Arrangements Joint Venture was
14 something that they were engaged to assist you with in
15 terms of developing that? Is that --
16 A. Actually, their engagement was broader than
17 that. It was to come up with good ideas and good ways
18 to resolve that issue, and this was one of them.
19 Q. When did you first contact them about that?
20 A. I believe I talked to the principal of that
21 firm several hours after I had my first discussion
22 with Drs. Vaccaro and Saleh.
23 Q. So you engaged them in the context of trying to

Page 137

1  deal with that situation?
2  A. "Help me solve this problem."
3  Q. And the problem was V&S getting the imaging
4  equipment?
5  A. The threat that that was to the development of
6  that service; and the reason for engaging them so
7  quickly is that they had worked with us very closely
8  on the strategic plan that clearly identified the need
9  for that cardiology service in that community and how
10 important that was to the development of the hospital.
11 Q. If you would look at item No. 6, this seems to
12 address a concern about the legality of the
13 arrangement. It talks about jeopardizing -- the risk
14 of jeopardizing your tax exempt status and also
15 regulatory compliance with HHS requirements. Was this
16 something that Stroudwater suggested?
17 A. It was something that we discussed. Again,
18 there were so many discussions about it, I don't know
19 whether they suggested this or whether I did.
20 Q. Did they tell you that this was a -- did they
21 tell you that this was a risky area or a gray area
22 or --
23 A. No. They told me it was a relatively new area.

Case 1:04-cv-00186-MBC    Document 117-3    Filed 09/10/2008    Page 37 of 56
USA, et al., vs. Bradford, et al.                    Multi-Page™                    Corp. Designee BRMC
No. 04-186E                                                                              July 26, 2007

Page 138

1  Q. So this idea that you would seek an advisory
2  opinion from HHS, from the Office of Inspector
3  General, was something that was an essential part of
4  developing this venture; is that right?
5  A. Yes.
6  Q. Do you know whether anyone -- did the hospital
7  ever get an advisory opinion from HHS?
8  A. No.
9  Q. Did anyone ever request one?
10  A. No.  We never got a body of physicians
11  sufficiently interested to even venture that far.
12  Q. So no request was ever made, and there has been
13  no advisory opinion received from HHS?
14  A. No.
15  Q. I'm going to show you another document that we
16  will mark as Exhibit 13.
17        (Deposition Exhibit No. 13 was marked for
18  identification.)
19  Q. Did you have a chance to look at that?
20  A. Uh-huh.
21  Q. This is an agreement that is dated -- it
22  appears to be dated April 16th, 2003, between Bradford
23  Regional Medical Center and V&S Medical Associates.

Page 139

1  Do you recognize your signature on there on behalf of
2  Bradford Regional Medical Center?
3  A. Yes, I do.
4  Q. Now, when I was asking you questions about the
5  January proposal by V&S that you buy out the imaging
6  business and the fact that that was rejected by the
7  hospital, apparently, but that you then shortly
8  thereafter came up with a lease proposal, someone came
9  up with a lease proposal -- and I guess I don't know
10  whether April 16th is shortly thereafter; but in any
11  case, by April 16th, you had an agreement here that
12  deals with the sublease of certain equipment from V&S.
13  A. Yes.
14  Q. So I guess my question is:  How did the
15  sublease proposal come about?
16  A. I don't remember.
17  Q. Now, you heard Mr. Washington testify earlier
18  that the equipment that V&S had really wasn't -- it
19  didn't really fit into the hospital's future plans --
20  A. Correct.
21  Q. -- for its imaging needs; is that right?
22  A. Correct.
23  Q. Now, why was it that you wanted to sublease

Page 140

1  this equipment that apparently had limited
2  capabilities from V&S?
3  A. The agreement that we worked out with V&S to
4  sublease that equipment had as a condition of it that
5  we be free to direct them to acquire a different piece
6  of equipment of our choosing with a lease that had to
7  satisfy -- with conditions that had to satisfy us.
8  Q. Okay.
9  A. So --
10  Q. Are you done?
11  A. Yes.
12  Q. Well, Mr. Leonhardt, that is a fairly
13  cumbersome way to go out and acquire a piece of
14  equipment, wouldn't you agree?
15  A. Yes, if that was the only thing that we were
16  trying to accomplish.  Obviously, it wasn't the only
17  thing that we were trying to accomplish.
18  Q. Let's say that, hypothetically, that the
19  hospital determined that they had a need to get a
20  camera.
21  A. Yes.
22  Q. You would probably go to the vendor or a lessor
23  of equipment; is that right?

Page 141

1  A. In many circumstances, yes.
2  Q. When you got your Axis camera back in 1999, did
3  you contact an equipment vendor at that time to get
4  that equipment?
5  A. I'm sure we did.
6  Q. Now, in 2003, if you were interested in looking
7  at equipment, you would normally go to the equipment
8  vendor, right?
9  A. Yes.  We were all -- yes.
10  Q. If there were no other part of this, in other
11  words, if there was nothing else to be accomplished?
12  A. Correct.
13  Q. I think that is what you said, if that were the
14  only consideration?
15  A. Yes.
16  Q. Isn't it true that the real consideration here
17  was how to pay V&S some money in order to get their
18  business; isn't that right?
19        MR. MULHOLLAND:  Objection to the form of
20      the question; but you can answer.
21  A. No.
22  Q. Excuse me?
23  A. No.

Case 1:04-cv-00186-MBC    Document 117-3    Filed 09/10/2008    Page 38 of 56

USA, et al., vs. Bradford, et al.                                    Corp. Designee BRMC
No. 04-186E                          Multi-Page                      July 26, 2007

Page 142

1   Q. Well, what was the real purpose of that
2   agreement?
3   A. As I have said before, the real purpose of the
4   agreement was to get us into a situation where we had
5   a level field to compete in. We certainly -- we
6   certainly wanted to have the opportunity to compete
7   for V&S' business based on quality, based on the level
8   of service that we could provide to them and their
9   patients.
10  Q. Well, in order to compete for V&S' business,
11  you entered into an agreement where you would pay them
12  a certain amount a month; isn't that right?
13  A. We entered into a lease and a non-competition
14  agreement, yes.
15  Q. What was the amount that you agreed to pay them
16  each month, pursuant to that agreement? You can refer
17  to the document.
18  A. We agreed to pay them the pass-through cost of
19  the lease for the equipment and a specific amount for
20  the non-compete agreement and the other
21  considerations.
22  Q. And what was the -- do you -- if you want to
23  refer to the agreement, I would like you to identify

Page 143

1   what the number was and how you arrived at the number.
2   A. The number here is $29,250 per month. This
3   does not split those into the components that I was
4   talking about.
5   Q. But you said that it was to actually pay for
6   the pass-through cost to the equipment?
7   A. Correct.
8   Q. And also to pay for these other issues, I
9   guess, the non-compete?
10  A. Correct.
11  Q. Was it paying for anything else?
12  A. No.
13  Q. Now, did you evaluate whether the equipment
14  that you were paying for as a pass-through under this
15  agreement was equipment that could be used by the
16  hospital?
17  A. Yes.
18  Q. And did you make any kind of evaluation or
19  determination that this was a good value for the
20  rental payments that you were making here?
21  A. Yes. It was a good usable piece of equipment.
22  It didn't fit into our long-range plans, but it was a
23  good usable piece of equipment.

Page 144

1   Q. I guess, aside from not fitting into the
2   long-range plans, if you just take the equipment
3   itself, this is now in April of 2003 --
4   A. Correct.
5   Q. -- how old is this piece of equipment at the
6   time that you entered into the sublease agreement?
7   A. I don't know the answer to that.
8   Q. They were a couple of years into their lease,
9   right?
10  A. They would have been at that point almost two
11  years into the lease, yes.
12  Q. Did you do any kind of evaluation to determine
13  if you went into the marketplace whether you could do
14  better than what you were paying under this agreement?
15  A. We had our technical director look at the
16  equipment and make sure that it was useful; and, yeah,
17  we had a general feeling about whether that was a
18  competitive lease or not.
19  Q. Well, I guess, since you already knew that it
20  wouldn't fit into a longer term plan, then it seems to
21  me that there would be pieces of equipment out there
22  that you could lease or buy that would be more
23  suitable to your long-range plan?

Page 145

1   A. More suitable to the long-range plan, yes; and
2   that is why we had, as part of the agreement, a
3   requirement that they seek another piece of equipment
4   of our choosing.
5   Q. But I guess by doing it the way you did it,
6   wasn't that a more expensive way to get that
7   equipment —
8   A. No.
9   Q. -- by then having to buy out --
10  A. No.
11  Q. Didn't you have to buy out the other lease?
12  A. Oh, yes. You would have to buy out the other
13  lease.
14  Q. So if in 2003, you simply wanted to get
15  yourself a second camera, you could probably have at
16  least a second camera or bought a used camera for less
17  money than subleasing this equipment and entering into
18  a subsequent lease with Philips?
19      MR. MULHOLLAND: Object to the form. He
20  can answer.
21  A. There is an economic cost to terminating a
22  lease early; and, yes, in demanding that the lease be
23  terminated early, we created that additional cost. We

Page 146

1 saw that as good value to us in developing the program
2 that we were trying to develop.
3    Q. And that is because you were able to, at the
4 same time, get the non-compete? Is that what your
5 rationale was?
6    A. We were able to put the whole package together,
7 yes.
8    Q. And when you got the non-compete, you were
9 essentially buying the business from V&S; isn't that
10 right?
11        MR. MULHOLLAND: Objection to form.
12    A. No.
13    Q. Did you expect that you would get the referral
14 business from V&S as a result of this agreement?
15    A. We hoped that we would.
16    Q. Let me give you another exhibit here, and see
17 if you can identify this document.
18        (Deposition Exhibit No. 14 was marked for
19 identification.)
20    A. Yes.
21    Q. What is this document?
22    A. This is an independent valuation of the lease
23 and non-compete agreement.

Page 147

1    Q. Who is Mr. Day?
2    A. Mr. Day is an accountant and an attorney who
3 does this kind of work, as well as other work.
4    Q. Is he related to Stroudwater in any way?
5    A. No.
6    Q. So he is another consultant that you had assist
7 you with this --
8    A. Yes.
9    Q. -- this problem?
10    A. Yes.
11    Q. First of all, I guess, I don't think this
12 report is dated. Do you know when this report was
13 prepared or what time frame?
14    A. I don't know precisely when without the cover
15 letter that went with it. It was, you know, right
16 before we entered into the agreement.
17    Q. Was this prepared in connection with entering
18 into the sublease agreement?
19    A. Yes.
20    Q. What was the purpose of obtaining this report
21 at that time?
22    A. We felt very strongly that the agreement that
23 we were entering into was appropriate, that the value

Page 148

1 that we were receiving was commensurate with what we
2 were paying, but we did want an independent opinion to
3 that effect.
4    Q. What was the assignment or the scope that you
5 gave to Mr. Day when you hired him to prepare this
6 report?
7    A. We gave him a letter of engagement, and I don't
8 remember everything that was in it; but, essentially,
9 it was to evaluate the arrangement and give us an
10 opinion as to whether or not the lease and non-compete
11 were fair market value.
12    Q. And when you say "fair market value," that
13 would require evaluating the lease arrangement for the
14 equipment?
15    A. Correct.
16    Q. But also valuing the other parts of the
17 agreement?
18    A. Correct.
19    Q. And, essentially, we are talking about
20 non-compete?
21    A. Correct.
22    Q. What you call the non-compete?
23    A. Correct.

Page 149

1    Q. Is that how you arrived at the amount that V&S
2 would pay under the agreement?
3    A. No. We arrived at that amount through
4 negotiations.
5    Q. Okay.
6    A. We had a proposed negotiated and agreed upon
7 amount. We wanted an independent opinion as to
8 whether or not that was fair market value.
9    Q. You knew what the pass-through cost of the
10 equipment lease was, right?
11    A. That's right.
12    Q. So that amount didn't change at all?
13    A. No.
14    Q. Now, in the negotiations, explain to me how you
15 arrived at the number for the portion of the agreement
16 that covers the non-compete?
17    A. Through a long and sometimes arduous
18 negotiation.
19    Q. What was the value that the hospital placed on
20 the non-compete?
21    A. I don't know. If you are asking me where we
22 started, I don't remember.
23    Q. Do you recall what V&S put on it?

Page 150

1   A. At a beginning point, no, I don't.
2   Q. Do you recall how you justified the numbers
3 that you were proposing? What did you base that on?
4   A. We based that on a series of things. What the
5 venture was costing us, what other alternatives, what
6 impact all the other alternatives might have on us.
7   Q. So you were looking at numbers that reflected
8 the projected loss of business to the hospital?
9   A. The cost of additional recruiting, the
10 rebuilding of, you know, primary care practices in the
11 community, how we would have people who lived in that
12 community who depended on those physicians for their
13 care, how we were going to care for them.
14   Q. How did you put a number on that, on those
15 issues you have just identified?
16   A. Some of those issues were very difficult to put
17 a number on.
18   Q. Did you do any evaluation of what this meant to
19 V&S in terms of giving up their new enterprise?
20   A. I believe they did. We did not, no.
21   Q. Was there any discussion about that?
22   A. Certainly, there was.
23   Q. Do you recall what it was that they thought

Page 151

1 that they were going to lose by way of stream of
2 revenues?
3   A. No, I do not.
4   Q. I will show you a document we will mark as
5 Exhibit 15.
6      (Deposition Exhibit No. 15 was marked for
7 identification.)
8   Q. Mr. Leonhardt, this is a letter that appears to
9 be from the hospital's counsel to Ms. Jodeen Hobbs at
10 the law firm of Miller, Alfano & Raspanti, and you are
11 copied on it. Is this letter familiar to you?
12   A. Let me finish reading it. It has been a long
13 time.
14   Q. Oh, sure. Go ahead.
15   A. Okay.
16   Q. This letter is dated March 14, 2003; so I guess
17 in reading the letter, it appears that the
18 negotiations for the lease agreement had been going on
19 at least prior to this date?
20   A. Uh-huh.
21   Q. I would like you to turn to the second page, if
22 you could, and the second bullet point there talks
23 about a value that is placed on the rental payments

Page 152

1 under the sublease, proposed sublease?
2   A. Right.
3   Q. Do you see that?
4   A. Yes, I do.
5   Q. And "From information provided by Vaccaro and
6 Saleh, we understand that the profit from the nuclear
7 camera services is approximately $240,000 annually."
8 Do you see that?
9   A. Yes, I do.
10   Q. Does that refresh your recollection?
11   A. Yes, it does.
12   Q. I don't know whether your analysis agrees with
13 their analysis of those same figures; but for the
14 purposes of discussion today, that is, obviously, a
15 number that the hospital put on that venture at that
16 time, $240,000 annually in terms of profit. Okay?
17   A. Okay.
18   Q. Now, if you look at the next --
19   A. It is actually a number that Vaccaro and Saleh
20 put on it, but --
21   Q. Okay. I'm not sure, but, apparently, for the
22 purposes of discussion, that number was accepted.
23 Then the next sentence says, "By the Medical Center's

Page 153

1 subleasing proposal, annual rental payments would
2 total $312,000 with a final profit to V&S of $229,000
3 annually." Do you see that?
4   A. Yes.
5   Q. I am assuming that the difference between 312
6 and the 229 is the amount of those pass-through
7 payments for the equipment. Is that right?
8   A. I would assume the same thing.
9   Q. So it looks like the amount of the payments is
10 very close to what the projected profit was for V&S?
11   A. Uh-huh.
12   Q. Is that your understanding of what happened
13 here?
14   A. It looks like they are about $11,000 less.
15   Q. Now, if we go back to Exhibit No. 14, the
16 report that was prepared by Mr. Day, he actually does
17 an analysis and tries to put a fair market value on
18 the non-compete; is that right?
19   A. Yes.
20   Q. Isn't that the point of this?
21   A. Yes.
22   Q. And if you would turn to page 13, he discusses
23 what he calls the competitive business valuation

Case 1:04-cv-00186-MBC    Document 117-3    Filed 09/10/2008    Page 41 of 56

USA, et al., vs. Bradford, et al.          Multi-Page™          Corp. Designee BRMC
No. 04-186E                                                     July 26, 2007

Page 154

1  method. Do you see that?
2  A. Around the middle of the page, yes.
3  Q. Sort of there, yes.
4  A. Okay.
5  Q. I guess Stroudwater had talked about that, as
6  well, in an exhibit that they prepared. Now, I don't
7  have a copy of the exhibit attached to this report,
8  but if you would go down to the next paragraph, it
9  talks about how the competitive business valuation
10 method is calculated, how the valuation is calculated.
11    It calls for a two-step process. The first
12 step is to generate an estimated projection of the
13 prospective cash flow from the hospital's provision of
14 nuclear cardiology diagnostic and integrally related
15 services with the covenant not to compete in place.
16 Okay?
17 A. Okay.
18 Q. In other words, to analyze the cash flow where
19 there is a covenant not to compete?
20 A. Uh-huh.
21 Q. In other words, whatever that value is to the
22 hospital's bottom line by having that agreement, and
23 then the second step is to estimate cash flows without

Page 155

1  the covenant in place?
2  A. Okay.
3  Q. It seems fairly logical; and then you subtract
4  the difference. Is that right? Is that your
5  understanding of how this works?
6  A. That would be my understanding.
7  Q. He goes on to say, "When there is a positive
8  difference between the two cash streams, it is
9  evidence that competition would do economic damage to
10 the hospital and its mission. Thus, the use of a
11 covenant not to compete is warranted."
12    So, obviously, it makes good economic sense for
13 the hospital to have this in place, because they
14 benefit from it, right?
15 A. Yes.
16 Q. Now, the value -- it goes on in the next
17 paragraph and it says, "The valuation analysis,
18 however, is then completed by comparing the present
19 value of the benefits of the non-competition agreement
20 with the present value of the payments required under
21 the non-compete agreement. The generation by this
22 present value process of a positive differential
23 provides two conclusions from the valuation

Page 156

1  perspective. The first is that a reasonable amount
2  has been paid. The second is that if there was no
3  compulsion to act and an arm's length negotiation
4  process occurred, the amount paid for the covenant
5  represents its fair market value."
6     In other words, Mr. Day is relating the value
7  that you are paying here to the benefit that the
8  hospital is receiving from having the covenant not to
9  compete; isn't that right?
10 A. Yes.
11 Q. And that is based on the additional business
12 that the hospital has; isn't that right?
13    MR. MULHOLLAND: Objection. Assumes facts
14 not in the record. You can answer.
15 A. It is based on the opportunity for that
16 additional business, yes.
17 Q. The expectation?
18 A. The hope.
19 Q. Well --
20 A. The hope.
21 Q. Well, according to this, the projection of the
22 prospective cash flow?
23 A. Yes.

Page 157

1  Q. In fact, if you go to page 17, I think there is
2  actually an application of this in the table at the
3  bottom; isn't that correct?
4  A. I'm sorry. An application of what?
5  Q. An application of what he just explained in
6  terms of the projected revenues, and then he shows the
7  cost of the covenant each year, and then net benefit
8  from the covenant each year going out for a period of
9  five years?
10 A. Correct.
11 Q. Now, in fact, during this whole process where
12 you were trying to work this out with V&S over a
13 couple of years, the hospital actually prepared a
14 number of studies or evaluations of the impact on the
15 hospital revenues. I think you had some rough notes
16 in your own notes in April of 2001, and I'm going to
17 show you some other documents, and maybe you could
18 identify them for us.
19    This does not have a date on it; but perhaps
20 you can identify it.
21    (Deposition Exhibit No. 16 was marked for
22 identification.)
23 Q. Mr. Leonhardt, do you know what this document

Case 1:04-cv-00186-MBC    Document 117-3    Filed 09/10/2008    Page 42 of 56

USA, et al., vs. Bradford, et al.                Corp. Designee BRMC
No. 04-186E                                       July 26, 2007

Page 158

1  represents, these graphs?
2   A. It is a graph of nuclear cardiology referrals.
3  The first page is a total of referrals V&S is
4  referring to the Vaccaro and Saleh, and one of the
5  bars indicates January through June, and the other bar
6  indicates July through December. I'm sorry. I don't
7  know which year this is measuring.
8   Q. Okay.
9   A. The second page is the same information, that
10 is for Dr. Jamil; and the third page is an individual
11 of Dr. Saleh, and the fourth is an individual, Dr.
12 Vaccaro.
13  Q. In looking at these graphs, it looks like there
14 is a drop-off in referrals on each one from the July
15 to December period from the January to June period.
16  A. Yes. A pretty clear drop-off with relation to
17 Drs. Vaccaro and Saleh and frankly, not very clear at
18 all with Dr. Jamil given the fact that there are
19 always going to be variations.
20  Q. Now, with regard to V&S, with Vaccaro and
21 Saleh, seeing the drop-off here, does that refresh
22 your recollection as to what time frame this would
23 refer to?

Page 159

1   A. I can't tell you what time frame this is.
2   Q. But this was something that you requested?
3   A. I don't know whether I requested it, or whether
4  it was requested as part of the information to give
5  the consultants.
6   Q. Again, can we assume that you were monitoring
7  the referrals and the impact of the new imaging
8  operation that V&S had?
9   A. Yes.
10     (Deposition Exhibit No. 17 was marked for
11 identification.)
12  Q. Next, I'm going to show you another document.
13 This document, Mr. Leonhardt is identified, and it has
14 Stroudwater Associates at the bottom, so, presumably,
15 they prepared this document at your request or to
16 assist you?
17  A. Yes.
18  Q. Have you seen this document before?
19  A. I am sure I have. I don't remember this
20 particular document, though.
21  Q. At the top it says, "BRMC Non-Compete Analysis
22 Summary."
23  A. Correct.

Page 160

1   Q. And there are a number of parts to it. Maybe
2  you can explain it to us, if you can.
3   A. I don't think I can completely. It does look
4  to me like it might well have been prepared for Mr.
5  Day.
6   Q. Is that because it refers to the non-compete
7  analysis?
8   A. Yes, it does.
9   Q. And I see that it refers to Dr. Saleh as Dr.
10 S-u-l-l-y. I assume that should be S-a-l-e-h?
11  A. Yeah. That is clearly a typo.
12  Q. Now, if you look under Assumption No. 1 -- and
13 it is like after the initial calculation, there are a
14 series of assumptions that are articulated.
15     Under assumption No. 1, it says, "Revenue
16 stream loss is the estimate of BRMC Board and
17 Management of CT and MRI net revenue expected to be
18 lost without the approval of the sublease."
19     So I guess this is the situation where there is
20 no sublease, and V&S continues with their business,
21 right? This is the losses that would occur as a
22 result of the CT and MRI?
23  A. Yes.

Page 161

1   Q. The loss of that business?
2   A. Yes.
3   Q. Now, are these tests that are actually
4  performed by V&S, or Vaccaro or Saleh?
5   A. No. They don't do CTs or MRIs.
6   Q. These would be referred?
7   A. These would be referred.
8   Q. And performed by somebody else?
9   A. Correct.
10  Q. Under No. 2, it says, "Revenue stream loss is
11 the estimate of the amount of inpatient revenue of
12 BRMC Board and Management expected to be lost without
13 the approval of the sublease."
14     So in this case, we are not talking about
15 tests. We are talking about in-patient referrals; is
16 that right?
17  A. That is right.
18  Q. These would be inpatients that were referred in
19 by either Vaccaro or Saleh or V&S? I am assuming that
20 is Vaccaro and Saleh?
21  A. That is just Vaccaro and Saleh.
22  Q. Okay. The third one is for outpatient revenue
23 not including the CT and MRI tests, which are covered

USA, et al., vs. Bradford, et al.     **Multi-Page™**     Corp. Designee BRMC
No. 04-186E     July 26, 2007

---

Page 162

1  in Assumption No. 1.
2      So what additional outpatient revenue would
3  this include?
4    A. This would include referrals for laboratory
5  work, other diagnostic work, physical therapy,
6  occupational therapy, all the outpatient services that
7  we offer.
8    Q. So in each one of the cases, this is revenue
9  that you would expect to be referred by the -- the
10 revenue is generated by the referrals from V&S?
11   A. Correct.
12   Q. I know this was generated by Stroudwater
13 Associates, but what information did the hospital
14 provide to come up with these numbers?  In other
15 words, what data were they using?
16   A. We would have provided data about utilization
17 of inpatient and outpatient services, by patients
18 referred by Drs. Vaccaro and Saleh.
19   Q. You were present for the deposition of Ms.
20 Hannahs earlier?
21   A. Uh-huh.
22   Q. And she talked about the database that
23 generates the bills and the UB-92s and, I guess, the

---

Page 163

1  reports that we had requested.  Would the data that
2  Stroudwater used in their analysis come from that same
3  database?
4    A. No.  This analysis, remember, was done prior to
5  instituting the Meditech system.  We would have been
6  using the old A4 system.
7    Q. So it would have come from that database?
8    A. It would have come from a series of different
9  databases.  The A4 system was not an integrated
10 hospital-wide system.  It was simply a financial
11 system.  So information about utilization in the
12 various diagnostic areas or the outpatient departments
13 didn't exist in that system.  We had to go around and
14 collect it individually from place to place.
15   Q. Let's say, for example, with the inpatient
16 revenue, Assumption No. 2, would that data have come
17 from the A4 system?
18   A. It is very likely, yes, it would.
19   Q. So you are saying possibly, now, some of this
20 outpatient data might have come from a different
21 system?
22   A. It would have come from a different system.
23   Q. What system was in place, other than the A4

---

Page 164

1  system?  What systems were there?
2    A. It was a combination of manual and various
3  computer systems.  The system in the diagnostic
4  imaging department and radiology was manual at the
5  time.  The system in the laboratory was computer-
6  based.  It think we would have been going around the
7  hospital in that kind of a manner getting the
8  information from the individual departments.
9    Q. Which, apparently, Stroudwater did to get the
10 information to compile this report?
11   A. Right.
12   Q. Well, in the time frame of 2000 to 2005, would
13 it have been possible to put together a report --
14 well, during that time frame, were claims for
15 outpatient services submitted to the Medicare program
16 electronically?
17   A. Yes.  Not at the beginning of that time frame,
18 but before the end of it.
19   Q. So at what point did the outpatient department
20 begin submitting their claims electronically?
21   A. Around 2002; but let me explain that.  It is
22 not the outpatient department.  The billing department
23 developed the ability to submit those claims

---

Page 165

1  electronically around 2002.  We were still gathering
2  the information that was going to the billing
3  department.  It was still being gathered department by
4  department.
5    Q. In 2002, did you submit UB-92 forms --
6    A. Oh, yes.
7    Q. -- for outpatient services?
8    A. Yes.
9    Q. And were those forms being submitted
10 electronically?
11   A. By 2002, they were being submitted
12 electronically.
13   Q. So in 2002, you had electronic claims being
14 submitted on UB-92s?
15   A. That is correct.
16   Q. So before those claims were submitted, somebody
17 had to input the data for each one of those fields?
18   A. That's correct.
19   Q. What is the database where that information is
20 stored?
21   A. I don't know.
22   Q. Is there a database on which that information
23 is stored?

---

USA, et al., vs. Bradford, et al.    Multi-Page™    Corp. Designee BRMC
No. 04-186E                                                    July 26, 2007

Page 166

1  A. Prior to 2002, I don't know the answer to that
2  question.
3  Q. After 2002?
4  A. Yes.
5  Q. So if you can generate a UB-92 from 2002 on for
6  outpatient services, you should be able to generate a
7  report, or am I wrong about that?
8  A. You are going to have to ask our Information
9  Technology people that question.
10 Q. Okay. Now, if we look at the revenue stream
11 for Assumption No. 1, which is the CT and the MRI, are
12 those outpatient services that would be billed on the
13 UB-92 under the system we just talked about, or is
14 that a different system?
15 A. I don't know whether the revenue for CT and MRI
16 is outpatient only or not.
17 Q. Okay. But, again, Stroudwater apparently had
18 access to the data so that they could compile this
19 report --
20 A. Correct.
21 Q. -- for Mr. Day?
22 A. Uh-huh.
23 Q. Now, do you know who in the IT Department would

Page 167

1  be knowledgeable about this? In other words, who did
2  you direct Stroudwater to in order to get this
3  information?
4  A. I told them to go to the director --
5  Stroudwater would have dealt individually with each
6  department.
7  Q. Okay.
8  A. But in answer to your question, they would have
9  gone to the director of the department and asked that
10 person, who's knowledgeable, has it?
11 Q. Well, pretend I'm Stroudwater. I want to know
12 the different people I need to go to and get this
13 information.
14 A. "Pick up the phone and call Carol Frigo and ask
15 her."
16 Q. Okay.
17       MR. MULHOLLAND: Through counsel, of
18       course.
19 A. I meant, that is what I would have told you or
20 them.
21       MR. STONE: I will have Mr. Mulholland
22       pick up the phone and call Carol Frigo.
23       MR. MULHOLLAND: We can discuss that

Page 168

1  matter afterwards.
2        THE WITNESS: I was answering what I would
3  have told Stroudwater.
4        MR. STONE: As you might have guessed, Mr.
5  Mulholland, I am interested in getting this
6  information.
7  Q. I'm going to ask you to take a look at another
8  document which I will mark as Exhibit 18.
9        (Deposition Exhibit No. 18 was marked for
10 identification.)
11 Q. Is this a document you have seen previously?
12 A. Yes.
13 Q. What is it?
14 A. It is simply a compilation of the calendar year
15 2001 admissions and the estimated net revenue from
16 those admissions of Dr. Jamil, Dr. Vaccaro, and Dr.
17 Saleh.
18 Q. Now these would be inpatients?
19 A. These would be inpatient admissions.
20 Q. And it is for the calendar year 2001; is that
21 correct?
22 A. Yes.
23 Q. It was during the course of 2001 that V&S

Page 169

1  started their imaging facility; is that right?
2  A. I think it was July of 2001, if I remember
3  correctly.
4  Q. Now, at the bottom of this page, there is an
5  asterisk, which references some of the numbers above,
6  and it says, "Both admissions and revenue for Drs.
7  Vaccaro and Saleh are down 17 percent from the prior
8  year."
9  A. Yes.
10 Q. Did you attribute the drop in revenue to the
11 starting up of their imaging facility?
12 A. No.
13 Q. No?
14 A. No. These were inpatient admissions, and there
15 is really no connection between their diagnostic
16 center and the inpatient admissions. I had no
17 explanation for that. I was just noting a difference.
18 Q. Well, I guess my question is: You, obviously,
19 asked for this analysis to be done --
20 A. Yes. I am sure I did.
21 Q. -- because you wouldn't do this on all
22 physicians, right? I mean, you didn't do this
23 regularly on all physicians?

Case 1:04-cv-00186-MBC   Document 117-3   Filed 09/10/2008   Page 45 of 56
USA, et al., vs. Bradford, et al.        Multi-Page™                 Corp. Designee BRMC
No. 04-186E                                                          July 26, 2007

Page 170

1  A. Periodically, sure, you did.
2  Q. Well, in this case, you did it because of the
3  problems you were having with V&S; is that right?
4      MR. MULHOLLAND: Objection to the form.
5  You can answer.
6  A. I am sure that the timing of this was connected
7  to the fact that we were having a dispute with them;
8  but, yes, we regularly look at -- you know, these are
9  our customers. Are they using our services as much as
10 they did the year before? Is their practice growing
11 or shrinking? These are the pieces of information we
12 are interested in.
13 Q. This sort of ties into my earlier line of
14 questioning, Mr. Leonhardt; and that is, that you
15 know, I am looking for data from your system on
16 referrals and billings; and you, obviously, have the
17 ability to do some tracking of referrals and business
18 and volumes and various payors and -- you have a lot
19 of tracking ability, don't you?
20 A. We have some tracking ability, yes.
21 Q. And that is part of your job is to track this
22 stuff, because as you point out, these are your
23 customers?

Page 171

1  A. Right.
2  Q. Now, getting back to the drop in revenue, you
3  say you didn't attribute it to, necessarily, to
4  anything with regard to the imaging?
5  A. I couldn't see a connection between a change in
6  inpatient utilization and an imaging facility.
7  Q. Well, at the very time that this analysis --
8  well, let me ask you: When was this analysis done?
9  A. It would have had to have been sometime after
10 the calendar year of 2001, or we wouldn't have had the
11 information.
12 Q. Okay. So it would have been after Saleh and
13 Vaccaro had gotten notice that their privileges were
14 in jeopardy?
15 A. It would have been -- the best answer I can
16 give you is it would have had to have been sometime
17 after the calendar year of 2001, or we wouldn't have
18 had the data. If it had been after 2002, I would have
19 been looking at the most recent data.
20 Q. And, of course, if it had been after 2003, at
21 that point, they weren't in jeopardy anymore, because
22 they had a new lease agreement with you, right?
23     So it would have had to have been sometime

Page 172

1  after they were notified that their privileges were in
2  jeopardy, which was December of 2001, right, and 2003,
3  when the lease agreement was signed?
4  A. Wasn't that December -- excuse me, but wasn't
5  that December of 2002?
6  Q. I don't know. You are the witness. If that is
7  what your recollection is --
8  A. That is my recollection.
9      MR. MULHOLLAND: I think his prior
10     testimony will speak for itself.
11 Q. I guess my point is that at the time the
12 revenue is dropping, the hospital was engaged in a bit
13 of a confrontation with V&S; is that correct?
14 A. Yes.
15 Q. Were you concerned that V&S would be utilizing
16 another hospital facility?
17 A. Yes.
18     MR. RYCHCIK: Andy, when you have an
19     opportunity, whenever it is convenient, if we
20     can just take a five-minute break, whenever it
21     is convenient.
22     MR. STONE: We can take it now.
23     (Recess taken at 3:48 p.m., and testimony

Page 173

1      was resumed at 3:56 p.m. this date.)
2      MR. STONE: Back on the record. I will
3      give you another document, and we will mark
4      this as 19.
5      (Deposition Exhibit No. 19 was marked for
6  identification.)
7  Q. Mr. Leonhardt, this is a multiple-page document
8  which has on its first page a background and time line
9  summary, and then behind it, which I think gives us
10 some context we were talking about dates and maybe
11 that will help refresh your recollection as to the
12 chronology here. I am assuming that you prepared this
13 or had somebody prepare it for you?
14 A. I prepared this, I'm sure.
15 Q. And then, of course, behind it there are
16 several documents which are numbered sequentially, but
17 I don't know that they were part of the original
18 document or not?
19 A. They were not.
20 Q. Okay. Then we will discuss them separately or
21 not. Does this help refresh your recollection with
22 regard to when the action was taken against Drs. Saleh
23 and Vaccaro with regard to their staff privileges?

Page 174

1   A. Yes, it does.

2   Q. And that was in December of 2001; is that

3 right?

4   A. That's correct.

5   Q. Now, do you know approximately when -- can you

6 tell from looking at this document when this summary

7 was prepared?

8   A. I believe this summary was prepared prior to a

9 Board meeting that was held in either April or May of

10 2002.

11   Q. Well, that would probably make sense, because I

12 think the last entry here refers to some

13 correspondence that occurred earlier in 2002.

14   A. Yes.

15   Q. If you would look at the second page, again,

16 this appears to be an analysis document that was

17 prepared, I am assuming, with regard to the impact of

18 the V&S venture; is that right?

19   A. It looks like it was prepared with regard to

20 the -- not so much the impact of the venture, as the

21 volume of services from V&S.

22   Q. I mean, did you prepare this, or did somebody

23 else prepare it?

Page 175

1   A. I believe Mr. Fisher prepared this.

2   Q. And he would have been the CFO at that time?

3   A. Yes.

4   Q. And can you explain what this analysis shows?

5   A. It shows that -- and I can't tell you what time

6 period, but I am sure that this is for a year, but

7 which year, I don't know. 750 admissions, 550 of

8 which were Medicare. That would be from Vaccaro and

9 Saleh combined. 9,000 outpatient episode, 75 home

10 health referrals. We attributed 2.7 million in

11 inpatient revenue, and so on.

12   Q. Is this analysis, as far as you know,

13 consistent with the analysis that was done by Mr. Day

14 and Stroudwater?

15   A. No. I think that was much more complete.

16   Q. Okay. But is it consistent?

17   A. I believe it is consistent, yeah.

18   Q. Now, if you would turn a couple of pages until

19 you get to 4046, this is a document that says,

20 "Bradford Regional Medical Center, V&S Impact

21 Analysis." Can you tell -- well, it looks like at the

22 bottom it says prepared by Bob Fisher and Bruce

23 Weddell. Is that who prepared this?

Page 176

1   A. I am sure it is.

2   Q. And it looks like it is dated April 9th, 2002.

3 Does that seem right to you?

4   A. Yes, it does.

5   Q. Do you recall requesting this report or

6 analysis?

7   A. I don't recall requesting this particular

8 report.

9   Q. It looks like there are three pages, and then

10 there are a couple of pages after that that say "Pro

11 Forma Assumptions Continued" at the top. Are these

12 pages all related, or are we talking about unrelated

13 documents?

14   A. I'm sorry. The first -- the pages "V&S Impact

15 Analysis," year 1, 2, and 3, are clearly related. I

16 haven't had a chance to look at the rest.

17   Q. Okay.

18   A. Yeah. The next page is related. Those are

19 just assumptions.

20   Q. Do you understand this analysis?

21   A. Sure.

22   Q. Can you explain what is going on here?

23   A. Sure.

Page 177

1   Q. Go ahead.

2   A. Yeah. Basically, I can. I'm not sure I have

3 looked closely enough at the last two pages close

4 enough to tell you if it is related to this, but let

5 me try to answer your question.

6      It is a scenario analysis, one of the scenarios

7 being let's analyze what Bradford Regional Medical

8 Center looks like if, in fact, the dispute with Drs.

9 Vaccaro and Saleh results in their losing their

10 privileges.

11      Scenario No. 2 says, essentially, what do we

12 look like if that doesn't happen. Oh, Scenario No. 2,

13 what do we look like if the reaction from Drs. Vaccaro

14 and Saleh -- if they lose their privileges is to

15 continue in outpatient practice and refer all their

16 inpatients to Dr. Jamil and continue to have them

17 admitted to Bradford Regional Medical Center. I'm

18 sorry. I needed to look at this.

19   Q. So that would be if -- in both cases, this

20 contemplates the termination of their privileges?

21   A. Yes.

22   Q. In one case, it contemplates continuing to

23 practice, but referring to Dr. Jamil to admit their

USA, et al., vs. Bradford, et al.          Multi-Page™                    Corp. Designee BRMC
No. 04-186E                                                              July 26, 2007

Page 178

1  patients to the hospital; is that right?
2    A. Yes.
3    Q. The second scenario is they take all their
4  referrals, and they go somewhere else?
5    A. They go somewhere else.
6    Q. Which is what I was asking you about before.
7  That was a concern of yours --
8    A. Sure, it was.
9    Q. -- is that all of their referrals, inpatient,
10 outpatient, all their imaging referrals would go
11 someplace else?
12   A. Yes.
13   Q. And this is the scenario that is in Scenario 1?
14   A. Uh-huh.
15   Q. And I am assuming from the hospital's point of
16 view, that would be the worst case scenario of this
17 whole thing?
18   A. Then you will notice, though, we don't assume
19 that. We don't respond to that. That is why you are
20 looking at year 2 and 3. That is why when I say this
21 analysis was done more completely by Stroudwater, you
22 saw that, also.
23   Q. So as you get further out, obviously, you have

Page 179

1  done things to adjust to that?
2    A. Correct. How long -- you know, what is our
3  best guess on how long that would take?
4    Q. So, again, in Mr. Day's valuation of the
5  covenant not to compete, implicit in that is the
6  consideration of what the loss of business is to the
7  hospital if you don't have the non-compete?
8    A. Correct. As you look at that analysis that Mr.
9  Day did, though, you also see that he makes
10 assumptions that we take actions to adjust to that
11 situation.
12   Q. Now, if you go back beyond the pages that
13 discuss the pro forma assumptions, there are two pages
14 after that, and I would like you to look at the one
15 that is marked Bates No. 4051. This looks like a
16 table of admissions over several years --
17   A. Yes.
18   Q. -- for V&S; is that right?
19   A. That is what it says, yes.
20   Q. And then it is broken out by payor.
21   A. Yes.
22   Q. Well, if you just look at the totals at the
23 bottom, I am interested in the numbers here, the

Page 180

1  volume of admissions.
2    A. Yes.
3    Q. It looks like the admissions were increasing
4  from 1998 to '99 to 2000, and then they drop in 2001,
5  and then it is projected that they drop further in
6  2002. Why were you projecting that the volumes would
7  drop in 2002?
8    A. This was done sometime during that fiscal year
9  from July 1st of 2001 until June 30th of 2002, and
10 that projection was based on the actual numbers up to
11 that point in time, and then just projecting those
12 forward.
13   Q. So the drop in 2001 was an actual?
14   A. Right.
15   Q. And I'm assuming that is consistent with that
16 document that we looked at which was, I think, No. 18,
17 with the financial impact data?
18   A. Yes.
19   Q. And that shows a drop there?
20   A. (The witness nods his head.)
21   Q. This appears to be the same information
22 because, again, this is admissions, right?
23   A. Uh-huh.

Page 181

1    Q. And this shows the same drop as in this
2  financial impact data; is that right?
3    A. I don't know if it is the same drop. Both of
4  them show a drop in the financial impact data. There
5  is not a number of admissions that is listed. It just
6  says that there is a 17 percent drop. I haven't
7  measured or calculated to see if that is the same.
8    Q. But the fact that you were projecting a further
9  drop, did that suggest that you were expecting that is
10 as a result of your difficulty with V&S?
11   A. No. I don't believe so.
12   Q. It was just a trending analysis at that point?
13   A. It was a trending, yes, at that point.
14   Q. Now, do you know whether, in fact, the
15 admissions dropped in 2002?
16   A. Yes, they did. I don't know whether they hit
17 that projection or not.
18   Q. And do you know whether they dropped in 2003?
19   A. I do not.
20   Q. Do you know whether they have recovered since
21 you entered into your lease arrangement with -- in
22 other words, has the trend changed since you entered
23 into your lease arrangement with V&S?

USA, et al., vs. Bradford, et al.    **Multi-Page™**    Corp. Designee BRMC
No. 04-186E    July 26, 2007

Page 182

1   A. The admissions have stabilized.
2   Q. When you say "stabilized," do you know whether
3 they have increased over the level in 2001, which is
4 your last actual on this chart?
5   A. I do not know that.
6   Q. Well, Mr. Leonhardt, do you believe that you
7 have been successful in addressing the concerns that
8 were brought to your attention in April of 2001?
9   A. Yes, I do.
10   Q. And in what sense have you addressed those
11 concerns?
12   A. Well, those were concerns with respect to
13 utilization of outpatient diagnostic services, there
14 were scheduling concerns, and concerns regarding the
15 level of qualifications of the individual reading some
16 of those tests. We have addressed both of those
17 concerns.
18   Q. Well, I thought you had expressed some concerns
19 about not being able to develop your cardiology
20 program at the hospital.
21   A. I'm sorry. I misunderstood your question,
22 then.
23   Q. You had some general concerns that if V&S

Page 183

1 proceeded with their planned imaging facility that
2 the -- that you would be unable to develop your
3 cardiology program?
4   A. Yes.
5   Q. And I guess my question is: On a general
6 level, have you addressed that in the sense of have
7 you been able to develop a cardiology program?
8   A. Yes. In fact, we have.
9   Q. And I think I asked you this question earlier,
10 but I want to make sure we are clear on this, have you
11 been able to develop your Under Arrangements Joint
12 Venture with the medical staff?
13   A. No.
14   Q. Is that program currently inactive? In other
15 words, have you abandoned that, or is that still in
16 the works?
17   A. It is not active at this point.
18   Q. Okay. I'm going to show you what we will mark
19 as Exhibit 20.
20       (Deposition Exhibit No. 20 was marked for
21 identification.)
22   Q. This is a document that is entitled "Equipment
23 Sublease," and this agreement is -- it appears to be

Page 184

1 dated -- the signatures are dated 9-22-03. I think on
2 the front page it is dated as of October 1st, 2003.
3   A. Correct.
4   Q. How does this agreement relate to the prior
5 agreement which we marked as Deposition Exhibit No.
6 13?
7   A. 13 was simply a preliminary agreement.
8   Q. This is the same subject matter as the earlier
9 one? It is just more comprehensive? Is that it?
10   A. Yes; and it, in fact, is the one that was
11 executed.
12   Q. Well, the other one we looked at was executed,
13 as well; is that right?
14   A. It was signed, yes. I'm sorry.
15   Q. Are you saying that this is the agreement that
16 is actually in place right now?
17   A. Yes.
18   Q. And your signature appears on the signature
19 page?
20   A. Yes.
21   Q. If you would look at page 3 of this document --
22 actually, beginning on page 2, under Section 2,
23 Subsection (d)(i), the agreement shows the breakdown

Page 185

1 of the rental payment that is due under the agreement,
2 and we talked about that a little bit earlier.
3   A. Uh-huh.
4   Q. Could you identify the different components of
5 the rental agreement from the agreement?
6   A. It identifies $6,545 for the hard costs of
7 subleasing the equipment. It as a pass-through of the
8 rental and the maintenance fee paid to GE. Then
9 $23,655 per month for all other rights and duties for
10 sublease.
11   Q. And that is for the first rental period?
12   A. Yes.
13   Q. So that would be through September 30th, 2006?
14   A. Correct.
15   Q. So have, in fact, those payments been made for
16 that period of time, since we are beyond September
17 30th, 2006?
18   A. Beginning October 1st of 2003, yes.
19   Q. So all the payments were made up through
20 September 30, 2006?
21   A. That's right.
22   Q. At the rate of $30,200 per month?
23   A. Until February of 2004, when the new equipment

Page 186

1  arrived.
2   Q. Well, that is what I want you to explain to me
3  next.
4   A. Okay.
5   Q. So the payments then were made in this amount
6  up through February of 2004?
7   A. Correct.
8   Q. And what happened in February of 2004?
9   A. This piece of equipment was replaced with the
10  new Philips CardioMD equipment that Mr. Washington
11  described earlier today.
12  Q. Okay. And?
13  A. And the lease pass-through from GE was replaced
14  with a lease pass-through from Philips, and that was a
15  slightly different amount.
16  Q. Who is the lessee on the lease with Philips?
17  A. Vaccaro and Saleh.
18  Q. So Vaccaro and Saleh -- so V&S continues to be
19  the lessee and the Bradford Hospital or BRMC continues
20  to be the sublessee?
21  A. Yes.
22  Q. And you said that there was a change in the
23  amount. Was it more or less?

Page 187

1   A. It was a little bit more. I can't remember
2  exactly what the difference is right now.
3   Q. So the amount that was paid to V&S then
4  increased as a result of that change in the lease?
5   A. Yes.
6   Q. So they are actually being paid slightly more
7  than the $30,200?
8   A. Yes.
9   Q. Is the only part of it that changed the
10  pass-through amount?
11  A. Yes.
12  Q. Do you know whether V&S has made all of the
13  payments to Philips or to GE prior to that?
14  A. I don't have independent knowledge of that, no.
15  Q. Have you been notified that they are in -- that
16  they have at any time been in default --
17  A. No.
18  Q. -- at any time under the lease agreement with
19  either GE or Philips?
20  A. No.
21  Q. Now, beginning in October of 2006, I assume the
22  second rental period began; is that right?
23  A. The second rental period that was discussed in

Page 188

1  this original lease, the amount changed because the GE
2  equipment would have reached the point where the
3  maintenance payment was no longer necessary. It was
4  simply a pure pass-through of the hard costs. I don't
5  know that we have reached that point with the Philips
6  lease.
7   Q. So the pass-through amount is higher than it
8  was originally contemplated --
9   A. Yes.
10  Q. -- because the maintenance agreement is
11  extending for a longer period of time?
12  A. On a brand new piece of equipment, yes.
13  Q. Do you know what the monthly amount is that you
14  paid to V&S?
15  A. Not without looking at it.
16  Q. Was there an addendum or modification to this
17  agreement?
18  A. No. Actually, if you look at Section 5 of the
19  agreement, it contemplated that kind of change and
20  spelled out how it would be handled.
21  Q. And is it being handled in accordance with
22  Section 5?
23  A. Yes.

Page 189

1   Q. And so the adjustments or changes are a
2  reflection of the substitute of new equipment and a
3  new lease?
4   A. Right.
5   Q. In all other respects, the agreement is the
6  same?
7   A. Exactly.
8   Q. So the amount that is being paid for the
9  non-compete has remained the same in both of the
10  rental periods?
11  A. Yes.
12  Q. Now, on page five under Section 7, this is the
13  section that is Representations, Warranties, Covenants
14  of Sublessee, it says that under (c) that by entering
15  into this sublease, the sublessee is not in violation
16  of any of the laws or agreements applicable to a
17  sublessee. Do you believe that that is still the
18  case?
19  A. Yes.
20  Q. Do you believe that you have any obligation to
21  indemnify V&S if that's not the case?
22  A. No.
23  Q. Have you entered into any agreements since this

Case 1:04-cv-00186-MBC    Document 117-3    Filed 09/10/2008    Page 50 of 56
USA, et al., vs. Bradford, et al.                    Multi-Page™                    Corp. Designee BRMC
No. 04-186E                                                                          July 26, 2007

Page 190

1 litigation came to light with regard to the cost of
2 defending this lawsuit?
3    A. No.
4    Q. What about any liability that would result from
5 this lawsuit?
6    A. No.
7    Q. If you would look at page 8, under Section 13,
8 Section (a), Subsection (a), this deals with the Under
9 Arrangements Venture, it says, "Should the Under
10 Arrangements Venture be implemented, which must
11 include appropriate regulatory approval for the model
12 and Physician NewCo in the form of an advisory opinion
13 from the Office of HHS, Office of Inspector General,
14 the assumption of GE lease and its terms as described
15 in the Under Arrangements Venture will commence, and
16 this sublease will expire."
17       Am I correct that that has never come about,
18 the Under Arrangements Venture?
19    A. That's correct.
20    Q. We have discussed that, and, of course, you
21 have told us that there has been no advisory opinion
22 on it?
23    A. That's correct.

Page 191

1    Q. Did you ever seek -- did the hospital ever seek
2 an advisory opinion with regard to this lease
3 arrangement?
4    A. No.
5    Q. Did you ever consider that as something you
6 should check into?
7    A. Beyond the standard checking that we did, no.
8    Q. Did you obtain any advice from Stroudwater
9 Associates with regard to entering into this lease?
10    A. We obtained assistance in evaluating the lease,
11 the alternatives, but we didn't get any legal advice
12 from Stroudwater.
13    Q. Now, if you look at page 10, and subparagraph
14 (b) at the bottom of the page -- well, actually, let's
15 go back to page 9. I think we will start there.
16 Section 14, is this the section that deals with the
17 subject of non-compete, not to compete?
18    A. (No response.)
19    Q. Do you want to take a few minutes to look at
20 it?
21    A. Yes, if I could.
22       Yes, I believe so.
23    Q. What was the objective in trying to eliminate

Page 192

1 this competition? I mean, what were you trying to
2 accomplish?
3       MR. MULHOLLAND: Objection to the form.
4    A. What we were trying to accomplish was -- and I
5 think if you take a look at this, it is clear that one
6 of our real objectives here was to have an agreement
7 with Vaccaro and Saleh that assisted us in being able
8 to offer an under arrangements proposal to the full
9 medical staff.
10       If you go back through early documents, it is
11 pretty clear, and I think you will see in some of the
12 letters and exchanges, that they were expressing an
13 interest in a joint venture with the hospital, but not
14 one that included other physicians.
15       Simultaneously, we were meeting with the other
16 physicians on the staff who were expressing an
17 interest in a joint venture with the hospital, as long
18 as Vaccaro and Saleh were excluded.
19       So we found ourselves in the middle of that,
20 very much needing to have some kind of accommodation
21 by everybody to the development of the cardiology
22 program.
23       So that is why you see these covenants that

Page 193

1 really require Vaccaro and Saleh to cooperate and to
2 assist us in trying to develop a program that would be
3 attractive not just to them, but to the other
4 physicians on staff.
5    Q. But you have made it clear that the Under
6 Arrangements Venture that the hospital was interested
7 in would have to be more inclusive?
8    A. Yes.
9    Q. You have made that clear a couple of times
10 today.
11    A. Uh-huh.
12    Q. And from the documents that we have reviewed,
13 it also seems clear that from January of 2003 on, it
14 seems clear that V&S did not want to be part of any
15 venture with any other physicians?
16    A. An alternative --
17       MR. MULHOLLAND: Objection to the form.
18       You can answer.
19    Q. So I guess you entered into this agreement, but
20 was there any realistic prospect of that occurring?
21    A. From V&S' approach or position, yes, there was.
22 What we ended up -- the effort failed, based on the
23 fact that a number of other physicians on the staff

Case 1:04-cv-00186-MBC    Document 117-3    Filed 09/10/2008    Page 51 of 56
USA, et al., vs. Bradford, et al.    Multi-Page™    Corp. Designee BRMC
No. 04-186E    July 26, 2007

Page 194

1  refused to participate as long as V&S was involved.
2    Q.  Well, if you were paying V&S 23 or 24 thousand
3  dollars a month to essentially do nothing, what would
4  be their incentive to get into this Under Arrangements
5  Venture?
6    A.  They were required to.
7    Q.  Is there anything in here that requires them to
8  get into a venture with you?
9    A.  Yes.
10   Q.  Maybe you can point that out.
11   A.  Let's see here.  You know, the -- "required to"
12  is probably too strong; but their role in much of
13  that and what would happen with this lease if that
14  venture went through, I think, is laid out pretty
15  clearly here.
16   Q.  But there is no requirement that within a
17  certain period of time that they enter into a
18  particular joint venture arrangement with you?
19   A.  Only if we can put one together.
20   Q.  But that would require an agreement by not only
21  V&S, but also the rest of the medical staff?
22   A.  Absolutely, yes.
23   Q.  I will show you a document which we will mark

Page 195

1  as 21.
2         (Deposition Exhibit No. 21 was marked for
3  identification.)
4    Q.  Is this document familiar to you?  It is
5  addressed to you as president of the hospital?
6    A.  Yes, it is.
7    Q.  And it seems to provide for a rental payment of
8  $2,500 a month, and then it looks like perhaps some
9  other charges.  Is this money that was charged for
10  keeping the equipment at V&S?
11   A.  I don't know that we ever did this.
12   Q.  Do you know whether the hospital has paid V&S
13  anything for keeping the equipment at their facility?
14   A.  I do not believe that we have.
15   Q.  So you are saying this is a demand by V&S, but
16  not necessarily an agreement to pay it?
17   A.  That's correct.
18   Q.  And you don't think you have paid it?
19   A.  I questioned the Finance Department about
20  whether or not there were any additional payments
21  beyond the monthly lease amount in the last few days,
22  and I was told that there were not.
23   Q.  While we are on that subject, does the hospital

Page 196

1  have any other arrangements with V&S, other than the
2  lease agreement that we just talked about, Exhibit 20,
3  any other financial arrangements with V&S or
4  individually with Vaccaro and Saleh?
5    A.  I believe that Dr. Saleh receives some payments
6  in return for some utilization review work that he
7  does, he along with a couple of other physicians, and
8  that is it.
9    Q.  And that would be in the nature of a medical
10  director's position or --
11   A.  That would be in payment for review of charts
12  for utilization review.
13   Q.  Has the hospital entered into any arrangements
14  whereby they pay the same doctors for not doing other
15  things?  In other words, are there any other
16  non-competes --
17   A.  No.
18   Q.  -- that are paid for by way of other testing?
19   A.  No.
20   Q.  Oh, one thing I wanted to ask you about, Mr.
21  Leonhardt, we had talked about the policy on
22  physicians competing with financial interests; and as
23  part of that, I had asked you some questions about the

Page 197

1  attached procedures, and the note that says, "At the
2  time of the adoption of the resolution, based upon the
3  information known at that time, the Board was not
4  aware of any existing services being provided by any
5  member of the Medical Center's medical staff that
6  would constitute a significant impact detrimental to
7  the ability the Medical Center to fulfill its
8  mission."
9    A.  Uh-huh.
10   Q.  And this document refers to May 23, 2001, this
11  being the time period that the Board was enacting this
12  resolution.
13   A.  Correct.
14   Q.  And I guess that statement is really not true,
15  in light of your meetings with V&S during the month of
16  April?
17         MR. MULHOLLAND:  Object to the form.
18   A.  I believe that that was drafted prior to those
19  meetings.  As I said to you, we began drafting that
20  policy in December of 2001.
21   Q.  So this may have -- this paper work --
22   A.  May have followed.
23   Q.  So this may have just referred to an earlier

Case 1:04-cv-00186-MBC    Document 117-3    Filed 09/10/2008    Page 52 of 56
USA, et al., vs. Bradford, et al.                    Multi-Page™                         Corp. Designee BRMC
No. 04-186E                                                                                           July 26, 2007

Page 198

1 period --
2   A. Yes.
3   Q. -- and may not have changed in light of the
4 changing circumstances?
5   A. Yes.
6   Q. Okay. I just wanted to get that clear.
7     I'm going to show you --
8       MR. STONE: Actually, I'm going to give
9     you guys a set of these documents, and these
10     are individual documents, but I sort of grouped
11     them together, because they are just a group of
12     correspondence I wanted to ask Mr. Leonhardt
13     about.
14       You can mark that one first.
15       (Deposition Exhibit No. 22 was marked for
16 identification.)
17   Q. Does this refresh your recollection with regard
18 to the replacement of the GE camera? I had asked you
19 a couple of questions, one having to do with whether
20 they were delinquent in their payments, and this seems
21 to suggest that there was a problem?
22   A. No. What this is referring to, and Mr.
23 Washington could give you more detail about it, is a

Page 199

1 delay on Philips' part, that Philips claimed V&S were
2 responsible for in getting all the lease arrangements
3 straight; and until they were, Philips was not paid,
4 nor were Vaccaro and Saleh, since Philips wasn't being
5 paid.
6     You will notice that he --
7   Q. So V&S was not paying Philips?
8   A. Because Philips had not completed all of their
9 arrangements. Part of their requirement was to take
10 over the GE lease, and they never completed that, and
11 I shouldn't say "never."
12   Q. And they blamed it on V&S?
13   A. And they blamed it on V&S or on GE. You will
14 notice that he says in his email, "They will not
15 budge," meaning Philips, "on paying us the damages
16 that I have claimed."
17   Q. Except that you said you weren't paying V&S, so
18 how were you damaged?
19   A. We were damaged --
20   Q. Because you didn't have the machine?
21   A. No. The machine was there. We simply said
22 they were screwing us up so much by simply taking this
23 long to straighten this out, threatening to destroy

Page 200

1 the relationship.
2   Q. And then I think Mr. Washington wasn't sure
3 about what happened to the GE camera, and this seems
4 to suggest that it was dismantled.
5   A. It was dismantled. Yes. That is what that
6 says. I don't have any independent knowledge of that.
7   Q. The next document I want to show you is 23.
8 This is, again, an email correspondence, and this is
9 from Tim Brown to Glen Washington, and we will mark
10 this as Exhibit 23.
11   A. Okay.
12       (Deposition Exhibit No. 23 was marked for
13 identification.)
14   Q. Who is Tim Brown?
15   A. Tim Brown is the manager of diagnostic imaging.
16   Q. At the hospital?
17   A. Yes.
18   Q. And this looks like he is providing a report to
19 Mr. Washington about the number of procedures he had
20 on --
21   A. Right. Nuclear.
22   Q. -- on nuclear patients. Do you want to look at
23 the bottom line there? This relates to my question a

Page 201

1 little while ago regarding the numbers.
2   A. He says, 206 inpatients, 1292 outpatients, 31
3 from the ER, for a total of 1529, and these are last
4 calendar year.
5   Q. So from --
6   A. The numbers have increased by 20 percent in
7 this calendar year compared to last year at this time.
8   Q. Okay. So this was -- so this memo is dated
9 October 15, 2004, which would cover a period of one
10 year from the time you entered into the lease
11 agreement?
12   A. Correct.
13   Q. So it would indicate with regard to the imaging
14 numbers, at least, those numbers are up over 20
15 percent?
16   A. That is what it says, correct.
17   Q. This next one I will show you we will mark
18 Exhibit No. 24.
19       (Deposition Exhibit No. 24 was marked for
20 identification.)
21   Q. Again, this is an email correspondence from Tim
22 Brown to Mr. Washington. It appears that Mr.
23 Washington was monitoring performance on the new

Case 1:04-cv-00186-MBC    Document 117-3    Filed 09/10/2008    Page 53 of 56
USA, et al., vs. Bradford, et al.                    Multi-Page™                    Corp. Designee BRMC
No. 04-186E                                                                                    July 26, 2007

Page 202

1  arrangement with Vaccaro and Saleh; is that right?
2        MR. MULHOLLAND: Object to the
3     characterization of the document. You can
4     answer.
5  A. This is a report of what the volumes were.
6  Q. Right. Had you asked Mr. Washington to monitor
7  the performance of these numbers?
8  A. No, I don't believe that I did.
9  Q. Was that part of his job?
10  A. Part of his job is to monitor everything in the
11  Diagnostic Imaging Department, so, yes.
12  Q. The reference is "Nuc Stats."
13  A. Yes.
14  Q. So this would be something that he would
15  normally be concerned with?
16  A. Sure.
17  Q. And it talks about under arrangements, and that
18  is not really a correct terminology; is that right?
19  A. No. It is not correct terminology.
20  Q. But he is referring to the sublease arrangement
21  with Vaccaro and Saleh; is that right?
22  A. That is what I would think it would mean, yes.
23  Q. And, of course, this memo is dated April 16th,

Page 203

1  and it refers to a prior email that was sent on April
2  15th?
3  A. Correct.
4  Q. Isn't that right?
5  A. Yes.
6  Q. This indicates a significant increase. This is
7  actually before the October email, and as of April of
8  2004, it does indicate that there was an increase in
9  the volume at that point in April?
10  A. Yes, it does.
11  Q. Fairly significant?
12  A. Yes.
13  Q. So previously, Vaccaro averaged 16 stresses a
14  month, or last month, I guess, and he was comparing it
15  to the month of March, and it says he did 83. That is
16  well above his previous average.
17  A. Yes; and had I seen this, I would have asked a
18  question about that. I don't think you can do 83 in a
19  month. My guess is is that is a typo.
20  Q. Okay. Dr. Saleh did 30 compared to 14?
21  A. Right.
22  Q. And it says Jamil stood consistent with about
23  20.

Page 204

1  A. Yes.
2  Q. Again, this would indicate that the volumes
3  were up, right?
4  A. The volumes were up, yes.
5  Q. I will show you another document, and we will
6  mark this as Exhibit 25.
7  A. Okay.
8        (Deposition Exhibit No. 25 was marked for
9  identification.)
10  Q. Mr. Leonhardt --
11        MR. RYCHCIK: Which document are we
12     looking at now?
13        MR. STONE: This is the email from Tim
14     Brown to George Leonhardt.
15        MR. RYCHCIK: Bates 8039?
16        MR. STONE: Yes.
17  Q. Mr. Leonhardt, this looks like it is a
18  correspondence from Mr. Brown, again, regarding the
19  purchase of the V&S imaging equipment.
20  A. Or the lease of it, yes.
21  Q. Sorry. Yeah, the lease of it. Had you asked
22  Mr. Brown to check into the particular camera and do
23  some due diligence on this?

Page 205

1  A. Yes. I am sure I had, as I mentioned before.
2  Q. And, again, I think he states in here that he
3  talked to somebody up in Buffalo --
4  A. Uh-huh.
5  Q. -- about the camera, and they would not
6  recommend this particular camera for cardiac?
7  A. Yeah. It looks like he is telling me a couple
8  of things. One is that at around 5800 to 6000 exams,
9  he is saying we need two cameras, and that is about
10  average for two cameras, and that is about the volume
11  of services we were doing, and that this particular
12  type of camera would not fit into our long-term plans.
13  Q. It says, "It is obsolete and will not be
14  serviceable in about a year or so," and then in
15  parentheses, it says, "which we already know," so you
16  knew already that at the time. Apparently, that
17  wasn't the point of the transaction?
18  A. As we have spoken a couple of times, the
19  transaction had -- there were series of things we were
20  trying to accomplish, which we have reviewed, and we
21  did not feel that camera met our long-term needs, and
22  we did have a need for another camera.
23  Q. This next document is a memorandum with two

Page 206

1  pages attached, and we will mark this as Exhibit 26,
2  the three-page document.
3    A. Okay.
4        (Deposition Exhibit No. 26 was marked for
5  identification.)
6    Q. Mr. Leonhardt, does this document look familiar
7  to you?  Have you seen this before?
8    A. I am sure I have.
9    Q. It appears to be a memo from Bruce Weddell to
10  Robert Fisher, who I guess we have already discussed
11  was the CFO at the time in October of 2001?
12    A. Right.
13    Q. Again, it looks like it was an analysis of the
14  V&S Financial Impact.  Now, given the time frame of
15  this in October of 2001, this memorandum and the
16  reports that are attached would have been after you
17  learned that V&S was going into this imaging venture
18  and, in fact, after they received the equipment; isn't
19  that right?
20    A. That's correct.
21    Q. And it seems to analyze, I guess, the fiscal
22  year 2000 to fiscal year 2001, so that would be from
23  July 1st, 2000 to July 1st, 2001?

Page 207

1    A. Actually, I think it has both fiscal 2000 and
2  fiscal 2001.
3    Q. So that would be from July 1st of 1999 to June
4  30th of 2000, right?  That would be the first period?
5    A. That would be the first page.
6    Q. And then the second would be for the following
7  year, and this would be the period before they
8  actually started their operations then?
9    A. Yes.
10    Q. Now, what is your understanding of what this
11  analysis shows?
12    A. Inpatient and outpatient charges and net
13  revenue from patients referred by those physicians in
14  those two fiscal years.
15    Q. And why would Mr. Fisher have been interested
16  in this information?  Would this have been, again,
17  trying to assess the impact if V&S were to take the
18  referral someplace else?  Is that the --
19    A. I'm sure.
20        MR. STONE:  If we take a couple of
21    minutes, I'm going to have a last round of
22    questions, but it shouldn't be too much longer.
23    So we could probably break for five minutes,

Page 208

1    and let me collect my stuff together.
2        MR. MULHOLLAND:  Okay.
3        (Recess taken at 5:04 p.m., and testimony
4    was resumed at 5:11 p.m. this date.)
5  BY MR. STONE:
6    Q. Mr. Leonhardt, I think you were present when we
7  were asking Ms. Hannahs some questions regarding the
8  spreadsheets that have been produced, and I'm going to
9  ask you some follow-up questions on the same subject,
10  since it appeared that you supervised collecting some
11  of this information for the response.  Is that right?
12    A. I asked people to collect the information, yes.
13    Q. Very simply, I just want to ask you whether you
14  made any inquiry of anybody in the IT Department with
15  regard to producing these reports in a more customized
16  fashion, as opposed to the standard report that she
17  produced?
18    A. No, I did not.
19    Q. Did you make any effort to collect that claims
20  information, other than to ask Ms. Hannahs to do what
21  she testified to?
22    A. I asked Mr. Tarasovitch, the Chief Financial
23  Officer, and Tina to collect that information, and if

Page 209

1  they had difficulty collecting it, to explain to me
2  what the difficulty was and what it would take to get
3  it done.
4        I received the same explanation, essentially,
5  that you did, that, yes, the data exists, but the only
6  way to get it all is to individually go through one
7  electronic document after another.
8        So while the data exists electronically, it
9  cannot be compiled in the manner you asked for
10  electronically.  Someone would have to go through
11  manually to those documents and put it together that
12  is how it was explained to me.
13    Q. So the explanation she gave this morning was
14  the same one she had given you?
15    A. Yes.
16    Q. Is there any reason why you couldn't produce,
17  let's say, all of the UB-92 forms?
18    A. I would have to ask someone that.  I know of no
19  reason, but I am not the person to ask that.
20    Q. But it sounds like that is what they would do
21  in order to go through and collect this information?
22    A. It sounded to me like they would have to go to
23  those forms and then several other places.

USA, et al., vs. Bradford, et al.          **Multi-Page**          Corp. Designee BRMC
No. 04-186E                                                        July 26, 2007

---

Page 210

1   Q. On the payment information?
2   A. Right.
3   Q. Next, I want to ask you some questions about --
4   did you review the answer that the Medical Center
5   filed in this case --
6   A. Yes.
7   Q. -- with your counsel?
8   A. Yes.
9   Q. One of the defenses that the Medical Center has
10  raised is that the Relators, or the Plaintiffs in this
11  case, the doctors, lack standing to bring this action.
12  Do you have any information -- I realize that some of
13  this is legal issues, but do you have any information
14  to support the defense that the Relators lack
15  standing?
16      MR. MULHOLLAND: I just object to the
17      extent that you are asking for a legal
18      conclusion; but he can answer as to his
19      understanding of any facts that might relate to
20      that.
21  A. I will probably show my limited understanding
22  of what "standing" means, but they are not parties to
23  the agreement, they are not affected by the agreement,

---

Page 211

1   in any detrimental manner at all.
2   Q. So you don't believe that the plaintiffs are
3   proper parties to this case; is that right?
4   A. That's right.
5   Q. And that is because they don't have anything to
6   do with the agreement, and they haven't been damaged?
7   Is that what you mean?
8   A. They haven't been impacted by the agreement.
9   Q. Also, in the hospital's defenses, the hospital
10  asserts that the relationship between BRMC and V&S
11  Medical Associates fits within a Safe Harbor or within
12  the Safe Harbor Regulations for the Medicare
13  Antikickback Statute. What information do you have or
14  do you know of that would indicate that there is a
15  Safe Harbor that applies to this agreement?
16  A. (No response.)
17  Q. Again, this is based on your --
18  A. I believe that is information I have received
19  from counsel.
20  Q. The same question with regard to the fifth
21  defense which is an exception to the Stark
22  Self-Referral Statute. Are you aware of anything
23  that -- is there anything in particular that you are

---

Page 212

1   saying why this shouldn't be subject to this Stark
2   Self-Referral Law?
3       MR. MULHOLLAND: Just for the record, I
4       think our answers to interrogatories indicated
5       both the specifics of both Safe Harbor and
6       Stark Self-Referral exception defenses we were
7       raising, at least with respect to the answers
8       to interrogatories in both of those.
9       MR. STONE: Okay.
10  Q. Have you reviewed the responses? Was it in the
11  supplemental?
12      MR. MULHOLLAND: I believe it was in the
13      original responses to your interrogatories?
14  Q. The original responses to the interrogatories,
15  did you review those?
16  A. Yes.
17  Q. And the exceptions and the Safe Harbors that
18  are referred to in there, it is your understanding
19  that those would bar or provide a defense in this
20  case?
21  A. Yes.
22  Q. And there is also a defense in here that the
23  certifications that are on the front of the cost

---

Page 213

1   reports that the hospital files, that those
2   certifications are not a condition of payment for the
3   Medicare program. Do you believe that to be true?
4   A. From the information I have received, yes.
5   Q. Is that from your own understanding of the
6   regulations, or is that, you know, based on relying on
7   your lawyers?
8       MR. MULHOLLAND: Object to any answer
9       regarding communications from counsel. You can
10      answer as to your own understanding.
11  A. My own understanding from, you know, what I
12  know and also from conversations from our accounting
13  firm and CFO.
14  Q. Finally, there is a defense that the Court
15  lacks subject matter jurisdiction over this case. Do
16  you have any information that would explain what you
17  mean by that, what the hospital means by that?
18  A. I do not, no.
19  Q. One of the interrogatories that were sent out
20  to your counsel was, "If BRMC's defenses includes
21  reliance on advice of counsel, identify all
22  communications to or from counsel regarding BRMC's
23  relationship with V&S, Vaccaro and Saleh, providing

---

Case 1:04-cv-00186-MBC    Document 117-3    Filed 09/10/2008    Page 56 of 56

USA, et al., vs. Bradford, et al.                    Multi-Page                    Corp. Designee BRMC
No. 04-186E                                                                        July 26, 2007

Page 214

1  the date of the communication, participants in the
2  communication, the form of communication, whether by
3  letter, email, memorandum, telephone, face to face, or
4  otherwise, and a detailed description of the subject
5  matter of the communication."
6        The response that was provided was that in
7  addition to some objections, it says, "To the extent
8  that BRMC subsequently determines to argue reliance on
9  advice of counsel as part of its defense of good
10  faith, BRMC shall supplement this response."
11       At this point in time, is the hospital
12  asserting a defense of good faith which would
13  incorporate an advice of counsel defense?
14  A.  No.
15       MR. MULHOLLAND:  We are asserting a good
16  faith defense, but not based on advice of
17  counsel.
18       MR. STONE:  Mr. Leonhardt, it has been a
19  long day for you, I'm sure.  It has been a long
20  day for all of us.  I appreciate your coming
21  in.
22       Does anybody else have any other
23  questions?

Page 215

1        MR. RYCHCIK:  No.
2        MR. MULHOLLAND:  No questions.  We will
3  reserve the right on behalf of the corporation
4  to have the deponents read and sign.
5        (Whereupon, the deposition was concluded
6  at 5:24 p.m., and signature was not waived.)
7                      - - -
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 216

1              C E R T I F I C A T E
2  COMMONWEALTH OF PENNSYLVANIA    :
                                   :  SS.:
3  COUNTY OF ALLEGHENY             :

4        I, Joy A. Bartman, a Notary Public in and for
   the Commonwealth of Pennsylvania, do hereby certify
5  that before me personally appeared TINA MARIE BARBANE,
   GLEN ALAN WASHINGTON, and GEORGE LEONHARDT, the
6  witnesses herein, who then were by me first duly
   cautioned and sworn to testify the truth, the whole
7  truth and nothing but the truth in the taking of their
   oral deposition in the cause aforesaid; that the
8  testimony then given by them as above set forth was
   reduced to stenotypy by me, in the presence of said
9  witness, and afterwards transcribed by computer-aided
   transcription under my direction.
10
         I do further certify that this deposition was
11  taken at the time and place specified in the foregoing
    caption, and signature was not waived.
12
         I do further certify that I am not a relative
13  of or counsel or attorney for any party hereto, nor am
    I otherwise interested in the event of this action.
14
         IN WITNESS WHEREOF, I have hereunto set my hand
15  and affixed my seal of office at Pittsburgh,
    Pennsylvania, on this 31st day of July, 2007.
16
         The foregoing certification does not apply to
17  any reproduction of this transcript in any respect
    unless under the direct control and/or direction of
18  the certifying reporter.
19
20
21                      Joy A. Bartman, Notary Public
                        in and for the Commonwealth of
22                      Pennsylvania

23  My commission expires May 9, 2010.