**3**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
ERIE DIVISION


UNITED STATES OF AMERICA, ex rel. )
DILBAGH SINGH, M.D., PAUL KIRSCH, )
M.D., V. RAO NADELLA, M.D., and   )
MARTIN JACOBS, M.D.,              )
                                 )
            Relators,            )
                                 )  Civil Action
     vs.                         )  No. 04-186E
                                 )
BRADFORD REGIONAL MEDICAL CENTER, )
V&S MEDICAL ASSOCIATES, LLC,      )
PETER VACCARO, M.D., KAMRAN SALEH,)
M.D., and DOES I through XX,      )
                                 )
            Defendants.          )


DEPOSITION OF KAMRAN SALEH, M.D.

THURSDAY, AUGUST 9, 2007

Deposition of KAMRAN SALEH, M.D., called as a

witness by the Plaintiffs, taken pursuant to Notice of

Deposition and the Federal Rules of Civil Procedure,

by and before Joy A. Hartman, a Court Reporter and

Notary Public in and for the Commonwealth of

Pennsylvania, at the offices of Fox Rothschild, 625

Liberty Avenue, 29th Floor, Pittsburgh, Pennsylvania

commencing at 9:31 a.m. on the day and date above set

forth.

CONFIDENTIAL

USA, et al., vs. BRMC, et al.
No. 04-186E
Case 1:04-cv-00186-MBC    Document 117-48    Filed 09/10/2008    Page 3 of 47
Kamran Saleh, M.D.
August 8, 2007

**Page 2**

1  APPEARANCES:

2  On behalf of the Relators:

3      Stone Law Firm
       Andrew M. Stone, Esquire
4      1400 Allegheny Building
       Pittsburgh, Pennsylvania  15219
5          -and-
       Simpson Law Firm
6      G. Mark Simpson, Esquire
       165 North Main Street
7      Jonesboro, Georgia  30236

8  On behalf of the Defendant Bradford Regional Medical
   Center:
9
       Horty Springer
10     Dan Mulholland, Esquire
       4614 Fifth Avenue
11     Pittsburgh, Pennsylvania  15213

12 On behalf of the Defendants V&S Medical Associates,
   LLC, Peter Vaccaro, M.D. and Kamran Saleh, M.D.:
13
       Fox Rothschild
14     Carl J. Rychcik, Esquire
       625 Liberty Avenue, 29th Floor
15     Pittsburgh, Pennsylvania  15222

16 ALSO PRESENT:

17     John Rice, Horty Springer

18     Peter Vaccaro, M.D.

19             - - -

20             INDEX

21 WITNESS:                    PAGE:

22 KAMRAN SALEH, M.D.

23     Examination by Mr. Simpson        4

**Page 3**

1  EXHIBITS:              PAGE:

2   Saleh Deposition Exhibit No. 1      4
    Saleh Deposition Exhibit No. 2      4
3   Saleh Deposition Exhibit No. 3      59
    Saleh Deposition Exhibit No. 4      61
4   Saleh Deposition Exhibit No. 5      63
    Saleh Deposition Exhibit No. 6      67
5   Saleh Deposition Exhibit No. 7      69
    Saleh Deposition Exhibit No. 8      79
6   Saleh Deposition Exhibit No. 9      79
    Saleh Deposition Exhibit No. 10     80
7   Saleh Deposition Exhibit No. 11     87
    Saleh Deposition Exhibit No. 12     94
8   Saleh Deposition Exhibit No. 13     96
    Saleh Deposition Exhibit No. 14     97
9   Saleh Deposition Exhibit No. 15     98
    Saleh Deposition Exhibit No. 16     99
10  Saleh Deposition Exhibit No. 17     102
    Saleh Deposition Exhibit No. 18     110
11  Saleh Deposition Exhibit No. 19     110
    Saleh Deposition Exhibit No. 20     115
12  Saleh Deposition Exhibit No. 21     116
    Saleh Deposition Exhibit No. 22     120
13  Saleh Deposition Exhibit No. 23     122
    Saleh Deposition Exhibit No. 24     128
14  Saleh Deposition Exhibit No. 25     139
    Saleh Deposition Exhibit No. 26     141
15  Saleh Deposition Exhibit No. 27     143
    Saleh Deposition Exhibit No. 28     146
16  Saleh Deposition Exhibit No. 29     148
    Saleh Deposition Exhibit No. 30     151
17  Saleh Deposition Exhibit No. 31     160
    Saleh Deposition Exhibit No. 32     162
18  Saleh Deposition Exhibit No. 33     164
    Saleh Deposition Exhibit No. 34     165
19  Saleh Deposition Exhibit No. 35     165
    Saleh Deposition Exhibit No. 36     167
20  Saleh Deposition Exhibit No. 37     168
    Saleh Deposition Exhibit No. 38     170
21  Saleh Deposition Exhibit No. 39     170
    Saleh Deposition Exhibit No. 40     175
22  Saleh Deposition Exhibit No. 41     175

23

**Page 4**

1              P R O C E E D I N G S

2                  - - -

3      (Saleh Deposition Exhibit Nos. 1 and 2

4  were marked for identification.)

5                  - - -

6          KAMRAN SALEH, M.D.,

7  called as a witness by the Relators, being first duly

8  cautioned and sworn, as hereinafter certified, was

9  deposed and said as follows:

10             EXAMINATION

11 BY MR. SIMPSON:

12     Q. Dr. Saleh, could you please state your name for

13 the record?

14     A. Kamran Saleh.

15     Q. Dr. Saleh, my name is Mark Simpson, and I'm

16 sure your attorneys probably explained this to you,

17 but I will be asking you a bunch of questions today.

18     If there is anything that you don't understand,

19 please ask me to restate it or slow down or whatever,

20 and I will be happy to oblige.

21     Have you ever given a deposition before?

22     A. No.

23     Q. Have you ever been involved in a lawsuit as a

**Page 5**

1  plaintiff or defendant before?

2      A. No.

3          MR. RYCHCIK:  Mark, before we get started,

4  I just wanted to mention about the --

5          MR. SIMPSON:  I'm sorry.  I forgot.  Let's

6  go ahead and put into the record as exhibits,

7  Exhibit 1, a copy of a Protective Order

8  Governing Confidentiality of Documents to be

9  Produced and Information Obtained in Discovery,

10 and as Exhibit 2, a Qualified Protective Order

11 Governing Confidentiality of Protected Health

12 Information, both of which have previously been

13 entered in this case.

14         MR. RYCHCIK:  As we discussed in the

15 event, as I anticipate, there will be

16 confidential materials discussed during the

17 deposition and possibly documents, we want to

18 designate the deposition as Confidential in

19 accordance with those Protective Orders.

20     Q. Dr. Saleh, who are your currently employed

21 with?

22     A. I am self-employed.

23     Q. Self-employed.  Are you currently employed with

USA, et al. vs. BRMC, et al.
No. 04-186E

Class 1 BRMC 04-186-MBC    Document 47-46    Filed 09/10/2008    Page 4 of 47

Multi-Page ™

Kamran Saleh, M.D.
August 8, 2007

**Page 6**

1 V&S Associates?
2 A. Well, V&S is what I own. I am part owner in
3 that.
4 Q. It still exists?
5 A. Yes.
6 Q. When did you form V&S?
7 A. Excuse me?
8 Q. When did you form V&S?
9 A. 2000. It was April of 2000.
10 Q. And V&S is a corporation, correct?
11 A. That's right, L.L.C.
12 Q. L.L.C., and it's full name is V&S Associates
13 L.L.C.?
14 A. V&S Medical Associates, L.L.C.
15 Q. Who were the original shareholders or members
16 of the company?
17 A. Me, Dr. Saleh, and Dr. Vaccaro.
18 Q. Is the ownership the same today?
19 A. Yes.
20 Q. Have you ever had any other owners?
21 A. No.
22 Q. Do you own it 50-50?
23 A. Yes.

**Page 7**

1 Q. Have you had other doctor employees in the
2 company?
3 A. We had ones for less than a year.
4 Q. Just one?
5 A. Just one.
6 Q. Who was that?
7 A. Dr. Khan.
8 Q. What is his first name?
9 A. Amir, A-m-i-r.
10 Q. And when did he work for you?
11 A. I can't tell you exact dates.
12 Q. Do you have the year, approximately?
13 A. Approximately 2003.
14 Q. Was there a Dr. Jamil?
15 A. He's renting the space from us.
16 Q. But he has never been employed by you?
17 A. No.
18 Q. Is he currently renting space from you?
19 A. Yes.
20 Q. How long has he been renting space?
21 A. Since 2000.
22 Q. What is his first name?
23 A. Qazi, Q-a-z-i.

**Page 8**

1 Q. What space does he rent from you?
2 A. Office space.
3 Q. It is like -- what kind of space? Is it like a
4 one-office room or what does he rent?
5 A. No. He uses, like, six exam rooms and then the
6 space for the secretary and the computer, the nurse's
7 station, and part of the waiting room.
8 Q. Is this space that is jointly used by him and
9 by you and Dr. Vaccaro?
10 A. Well, it is kind of separate. The office is
11 one, but his space is on one side, and ours is on the
12 other side.
13 Q. So his space is dedicated to him?
14 A. Yes.
15 Q. I want to go back to before you formed V&S.
16 Actually, let's go back a little farther.
17     Where did you go to medical school?
18 A. I went to medical school in Karachi, Pakistan.
19 Q. When did you graduate?
20 A. '88.
21 Q. And when did you come to America?
22 A. In '91.
23 Q. Are you a citizen of the United States?

**Page 9**

1 A. Yes.
2 Q. When did you become a citizen?
3 A. I can't tell you exactly.
4 Q. Has it been more than ten years?
5 A. Approximately ten years.
6 Q. After graduating medical school, have you had
7 any other formal medical education?
8 A. Residency training.
9 Q. Where did you do your residency?
10 A. University of Buffalo.
11 Q. Was that a general residency, or did you have
12 any specialization?
13 A. Internal medicine.
14 Q. Did you complete the residency?
15 A. Yes.
16 Q. When did you complete it?
17 A. '91 to '94.
18 Q. Any other formal medical training?
19 A. No.
20 Q. Do you have any board certifications?
21 A. Yes.
22 Q. What would that be in?
23 A. Internal medicine.

USA, et al., vs. BRMC., et al.                Multi-Page™                Kamran Saleh, M.D.
No. 04-186E                                                              August 8, 2007

---

Page 10

1   Q. When did you receive that?
2   A. In '94, and then I just -- since that expires
3   in ten years, I just renewed that.
4   Q. Is that your only board certification?
5   A. Yes.
6   Q. Have you always practiced in internal medicine?
7   A. Yes.
8   Q. Could you tell me briefly what internal
9   medicine involves?
10  A. Internal medicine involves taking care of
11  patients both in the office and the hospital, and
12  usually it deals with adult medicine and all the
13  common diseases that you see, like high blood
14  pressure, diabetes, heart disease, they are dealt
15  with. If there are certain areas where you need
16  subspecialists, then you refer the patients to the
17  subspecialist.
18  Q. Within the field of internal medicine, do you
19  specialize in any area?
20  A. No. I do have an interest in cardiology.
21  Q. With respect to cardiology, what would an
22  internal physician do?
23  A. Like, you take care of patients in the

---

Page 11

1   intensive care unit, and most -- if you go into the
2   bigger hospitals, most of the internists are not
3   allowed to take care of patients in the critical care
4   unit when they are having a heart attack or heart
5   failure, congestive heart failure. We do all that.
6   Q. Does cardiology make up a substantial
7   percentage of your work, would you say?
8       MR. RYCHCIK: Objection as to form.
9   A. Well, it does make up some part of it. I can't
10  tell you how much.
11  Q. Where do you currently have hospital
12  privileges?
13  A. Excuse me?
14  Q. I'm sorry. Where do you currently have
15  hospital privileges?
16  A. I have hospital privileges at Bradford Regional
17  Medical Center, and I have courtesy privileges in
18  Olean General Hospital.
19  Q. I'm sorry. I didn't understand the last one.
20  A. Olean General Hospital.
21  Q. Oh, Olean, O-l-e-a-n?
22  A. Yes.
23  Q. In the last ten years, have you had privileges

---

Page 12

1   at any other hospital?
2   A. Other than these two?
3   Q. Other than these two.
4   A. No.
5   Q. When did you first get your privileges at
6   Bradford?
7   A. After my residency. Towards the end of '94.
8   Q. What about Olean?
9   A. At the same time.
10  Q. Has V&S' office been located in the same place
11  since you formed it?
12  A. Yes.
13  Q. Where is its office?
14  A. It is 24 West Washington Street in Bradford.
15  Q. In Bradford?
16  A. Yes.
17  Q. How far is it from Bradford Regional Medical
18  Center?
19  A. It is about less than a mile.
20  Q. How far is it from the Olean Hospital?
21  A. It is about, roughly, 20 miles.
22  Q. I would like to focus, for a minute, on the
23  time period before you bought the nuclear camera that

---

Page 13

1   is sort of at issue in this litigation. I said
2   "bought." I should say "leased."
3       Do you recall when you leased that camera?
4   A. I don't know the exact dates, but it was around
5   2001.
6   Q. Now, in the period before you leased the
7   camera, could you briefly describe to me the nature of
8   your practice?
9   A. Well, we are a two-physician group practice,
10  and we see patients in the office, and if there is
11  somebody who gets sick and needs to go to the
12  hospital, we admit them in the hospital and take care
13  of them in the hospital.
14  Q. At this period of time that we are talking
15  about, how did most of your patients come to you?
16      MR. RYCHCIK: Again, just to be clear, at
17      this period of time, we are talking pre2001?
18      MR. SIMPSON: Right.
19  A. Pre2001?
20  Q. Pre2001, before you got the camera, basically.
21  A. They were mostly our patients that we acquired
22  when we bought the practice from the hospital, and the
23  new patients are patients that come on the basis of

---

JOHNSON and MIMLESS
(412) 765-0744

Page 14

1  patient referrals or through the ads, the Yellow
2  Pages.
3      Q. I guess I meant to ask this before, but I will
4  ask it now: You referred to buying the practice from
5  the hospital. At some point, you were employed by
6  Bradford Regional Medical Center; is that correct?
7      A. That's true.
8      Q. Was the same true for Dr. Vaccaro?
9      A. Yes.
10     Q. What was the nature of that employment? Were
11  you employed as a fulltime hospital-based physician?
12     A. Yes. Yes.
13     Q. During what period of time were you employed by
14  the hospital?
15     A. Well, up until 2000 and before, maybe, we were
16  employed for maybe a couple of years. I don't know
17  exactly.
18     Q. And while you were employed by the hospital, is
19  that when you came up with the idea to form V&S?
20     A. (The witness nods his head.)
21         MR. RYCHCIK: Objection as to the form.
22     A. We came up with the idea towards the end of the
23  employment, yes.

Page 15

1      Q. You mentioned buying out the practice from the
2  hospital. How did that work?
3      A. Well, we had a contract with the hospital that
4  had a non-compete clause in it, and we had -- to stay
5  in Bradford, we had to pay the amount that was
6  specified in our contract, so that is what we paid.
7      Q. Did the non-compete provide that you couldn't
8  compete with Bradford for a certain period of time
9  after you left?
10     A. That's right. Two years.
11     Q. Two years. Do you recall how much you had to
12  pay to get out of that agreement?
13     A. I think it was $300,000 for both of us, plus
14  goodwill.
15     Q. Do you know how much you paid for the goodwill?
16     A. I don't know what the exact number is. It is
17  probably around $50,000.
18         MR. RYCHCIK: Again, I don't at any point
19      in time want you to guess during the
20      deposition, Doctor. If you have got an
21      understanding or a knowledge, that's fine.
22         THE WITNESS: Okay.
23         MR. RYCHCIK: But no one here wants you to

Page 16

1  try to guess.
2         MR. SIMPSON: Well, that's not exactly
3  true. I might want you to --
4         MR. RYCHCIK: He might want you to try --
5         MR. SIMPSON: I would like you to
6  estimate. If you think you know that you paid
7  about 350, but you can't remember if it was 351
8  or 349, then it is perfectly fine for you to
9  estimate, say that it is around 350, knowing
10  that you are not giving me an exact number.
11         MR. RYCHCIK: I don't want you to guess.
12         MR. SIMPSON: I don't want you to guess,
13  but if you have a basis for estimating, you can
14  estimate.
15     Q. So it was sometime in 2000 that you bought out
16  the practice?
17     A. Yes, sir.
18     Q. So going back now to the time period when you
19  are with V&S before you bought the nuclear camera, you
20  had mentioned that when patients needed services, you
21  would refer them out to someone --
22     A. That's right.
23     Q. -- in a lot of instances?

Page 17

1      A. Yes.
2      Q. What types of referrals would you make?
3      A. Like, if patients needed a cardiac
4  catheterization, we would send the patient for the
5  cardiac catheterization. Some patients need an
6  endocrine evaluation, so we would send them to an
7  endocrinologist or urologist. It was orthopedic
8  surgeons, so all kind of referrals, whatever the
9  patient's need is.
10     Q. Would you also refer patients to the hospital
11  to be admitted as inpatients?
12     A. Yes, we do.
13     Q. Is it fair to say that most of your referrals
14  to a hospital went to Bradford?
15         MR. RYCHCIK: Objection as to the form.
16     A. Well, we refer patients wherever the
17  opportunity was, wherever the need was. If there is
18  somebody who needed to be admitted to the hospital, we
19  admitted them to Bradford Hospital, yes.
20     Q. Did you admit very many inpatients to Olean
21  Hospital --
22     A. No.
23     Q. -- or other hospitals other than Bradford?

Page 18

1   A. No.
2   Q. Outpatient referrals, they would -- would
3   outpatient referrals primarily be referrals to have
4   tests performed on somebody?
5   A. Tests, plus evaluation by the doctors.
6   Q. Were a portion of those outpatient referrals
7   referred to Bradford or any other hospital?
8   A. Part of it to Bradford, part of it to Hamot
9   Medical Center, some to Cleveland Clinic, and some to
10  UPMC, depending on the need.
11  Q. What would be your basis for distinguishing
12  which hospital you would refer somebody to for an
13  outpatient test?
14  A. For the testing?
15  Q. Yes.
16  A. That would be for whether the test is available
17  in that facility and what time frame they can get the
18  test done and what kind of reading and the quality of
19  the test performed.
20  Q. Were there certain types of services that could
21  be performed at multiple hospitals?
22  A. Yes.
23  Q. What types of services would those have been?

Page 19

1   A. Like blood work, like chest x-ray.
2   Q. And if you had to refer people out for those
3   types of services, would it be your typical practice
4   to refer them over to Bradford?
5       MR. RYCHCIK: Objection as to the form.
6   A. Well, what we look at when we refer the patient
7   for the lab work or for the x-rays is for the
8   convenience of the patient. Most of our population is
9   elderly patients, and they actually -- even to come to
10  the doctor's office, they have to find a ride to come.
11  So to send them farther away is more difficult, so
12  they all usually prefer the closest possible testing
13  place.
14  Q. And that was Bradford, correct?
15  A. And that is Bradford.
16  Q. These other places you mentioned -- Hamot
17  Medical Center?
18  A. Yes.
19  Q. Where is that?
20  A. It is in Erie.
21  Q. How far away is that from Bradford?
22  A. An hour and a half.
23  Q. I cannot remember the name of the other medical

Page 20

1   center or facility.
2   A. Olean General Hospital.
3   Q. I know you mentioned Olean, but I thought you
4   mentioned one other one.
5   A. UPMC.
6   Q. UPMC. What is that?
7   A. That is the University of Pittsburgh.
8   Q. How far away is Pittsburgh from Bradford?
9   A. About three and a half hours.
10  Q. During the same period that we have been
11  discussing before you got the camera, would you
12  describe yourself and Dr. Vaccaro as being a large
13  referral source for the hospital, Bradford Hospital?
14      MR. RYCHCIK: Objection as to the form of
15      the question.
16  A. I can't really tell you as to whether it is a
17  large referral source, but one of the referrals as for
18  all the community organization do. So we are a part
19  of them, one part of them.
20  Q. Do you have any knowledge of how you stacked up
21  to other physicians in terms of how much business was
22  referred to Bradford?
23  A. I didn't understand the question.

Page 21

1   Q. I am trying to focus on how V&S compared to
2   other physicians in the amount of business that they
3   referred to Bradford. Did you all refer more or less
4   than other physicians in the area?
5       So my question is: During this time period, do
6   you have any information on which to compare your
7   referrals to other physicians' referrals?
8   A. I don't have any information on that.
9   Q. Do you have any belief?
10  A. Well, I mean we are a two-physician practice.
11  Most of the practices are solo practices, so that
12  increases the number of referrals; but Dr. Jamil and
13  Dr. Kirsch have significant referrals to the hospital.
14  Q. Did you ever have an occasion to attempt to
15  quantify the number or dollar value of your referrals
16  to Bradford during this period?
17  A. I don't recall it.
18  Q. Now, I want to talk a little bit about your
19  decision to lease this nuclear camera. First off,
20  describe for me what the camera was.
21  A. It is a GE nuclear camera, and the nuclear
22  camera provides the nuclear testing, and the testing
23  done is like cardiac stress testing, bone scan,

USA, et al. v. BRMC, et al.    Document 117      Filed 09/10/2008    Page 8 of 47
No. 04-186E

Kamran Saleh, M.D.
August 8, 2007

## Page 22

1 thyroid scan. It is those kind of tests that are
2 considered specialized x-ray testing.
3   Q. Is this nuclear testing similar to or different
4 from MRIs and CT scans?
5   A. It is different.
6   Q. How is it different?
7   A. Because the indications are different, and the
8 tests are different.
9   Q. Are there certain types of tests that --
10 actually, I'm sorry. I want to rephrase this. You
11 perform a test in order to learn something about a
12 patient, correct?
13   A. That's right.
14   Q. Are there ever circumstances where you could
15 either go with a nuclear camera or with a CT scan or
16 an MRI?
17   A. Uncommon.
18   Q. Uncommon?
19   A. Yes.
20   Q. So, typically, the type of information you are
21 seeking to acquire would lead you to pick one or the
22 other?
23   A. That's true.

## Page 23

1   Q. Usually, you wouldn't have a choice? I mean,
2 usually, there wouldn't be a gamut of options you
3 could pick; is that correct?
4   A. The CT scan tests different parts of the body
5 and different kind of testing, and the nuclear camera
6 does different -- the information we receive is
7 different.
8   Q. Now you mentioned stress tests and bone scans
9 and thyroid scans are things that are done with the
10 nuclear camera, correct?
11   A. That is true, among some others.
12   Q. Can you give me some other examples of types of
13 tests that would be done by that nuclear camera?
14   A. Hepatobiliary scan.
15   Q. I'm sorry?
16   A. Hepatobiliary scan.
17   Q. What is that?
18   A. That is the gallbladder scan.
19   Q. Any others?
20   A. That is all I can remember at this time.
21   Q. What do you recall when you started thinking
22 about acquiring a nuclear camera for your practice?
23   A. I don't recall.

## Page 24

1   Q. Do you know how long it was before you actually
2 acquired it?
3   A. (No response.)
4   Q. I'm sorry. That might not have been clear. Do
5 you know how long you were thinking about it before
6 you actually went ahead and got it?
7   A. Several months.
8   Q. Did you look around at different vendors?
9   A. Yes.
10   Q. You ultimately ended up acquiring it from GE;
11 is that correct?
12   A. That's true.
13   Q. Who else did you approach to shop around?
14   A. I don't recall.
15   Q. Do you know if it was, you know, more than one
16 other vendor?
17   A. I don't recall.
18   Q. What was it that made you desirous of acquiring
19 this camera?
20   A. There were certain issues. One of them was
21 patient convenience. We can do the test right in the
22 office, and they don't have to wait for the
23 registration and all of that that they had to do in

## Page 25

1 the hospital.
2       At that time, the hospital had only one nuclear
3 camera and the wait time and the scheduling for the
4 nuclear camera was pretty significant, close to two to
5 three weeks. If you needed somebody to have an urgent
6 test, it was difficult to get it in a timely fashion.
7   Q. Are there any other facilities other than
8 Bradford at this time that -- and I say facilities, I
9 mean, in the area that you could be sending patients
10 to that had a nuclear camera?
11       MR. RYCHCIK: Again, you are talking about
12   the 2001 time frame?
13       MR. SIMPSON: Yeah.
14   Q. Right around the time you got the camera. That
15 is the time period I am focusing on. Were there any
16 other facilities other than the hospital that had --
17   A. In town?
18   Q. Within -- I want to focus on the geographic
19 area to which you would send your patients, whatever
20 that would be. Okay?
21   A. (No response.)
22   Q. In other words, were there any other options
23 available for you to send your patients to if they

Page 26

1 needed a nuclear camera test?
2   A. Well, there is a nuclear testing availability
3 in Olean General Hospital, but that is, as I mentioned
4 before, 20 miles away, and most of the patients do not
5 like to travel that much to get the test done. So
6 apart from that, there was nothing else available.
7   Q. So pretty much all of your patients that needed
8 a test, you would be sending them to Bradford for that
9 before you got your camera?
10   A. Most of them.
11   Q. You said "most of them." Is that "most" 51
12 percent, or is that "most" 80 percent?
13   A. I can't tell you. I mean, "most" means it is
14 definitely more than 50 percent.
15   Q. Would you characterize the number that you sent
16 to Olean as a small percentage?
17   A. Yes.
18   Q. Now, in addition to patient convenience, did
19 having the nuclear camera on site also allow you to
20 bill for things that you wouldn't bill for before?
21   A. That's true.
22   Q. What kind of billings were you able to do once
23 you got the nuclear camera that you didn't do before?

Page 27

1   A. Well, the billing is mainly the technical
2 component of the test performed, which we couldn't do
3 before if the test is performed elsewhere.
4   Q. In addition to billing for the technical
5 component of these tests, were there any other things
6 that you were able to bill for by virtue of having the
7 nuclear camera?
8   A. We billed for the stress testing performance
9 ourselves, too.
10   Q. How is that different from the technical
11 component?
12   A. When we go to do a stress test for a nuclear
13 camera, there are two components to it. The first
14 component is you take the pictures of the heart, and
15 then they either walk on a treadmill, or they get a
16 medicine to stimulate the heart; and at that --
17   Q. And when you -- I'm sorry.
18   A. And at that point, the physician is present, so
19 that is the professional part of the stress test. So
20 we were able to bill for that professional part
21 before.
22   Q. So you were able to bill for the professional
23 part -- that professional component before you got the

Page 28

1 camera?
2   A. Yes. We could do that before, because we were
3 present and performing the test.
4   Q. At Bradford?
5   A. At Bradford.
6   Q. So before you got the camera, you were present
7 doing the test at Bradford?
8   A. That's right.
9   Q. So really, the only thing additional that you
10 are able to bill for by virtue of having the camera is
11 the technical component of the test?
12   A. That's true.
13   Q. Do the tests that you perform on the nuclear
14 camera, do they require interpretation?
15   A. Yes.
16   Q. Is that something that you would do?
17   A. No.
18   Q. Are there any tests that you would do the
19 interpretation for?
20   A. No.
21   Q. So you would always have to have some
22 specialist interpret the tests?
23   A. Yes.

Page 29

1   Q. And they would bill for their professional
2 component of interpreting?
3   A. Yes. That's true.
4   Q. What types of specialists would be doing this
5 interpreting for you?
6   A. A radiologist, there is a nuclear medicine
7 subspecialist, a cardiologist.
8   Q. Any others that you can think of?
9   A. That is all I can think of right now.
10   Q. Now, to step back a second, before you got the
11 camera, when you were doing the tests at Bradford,
12 would you make the decision as to which specialist
13 would be interpreting the test?
14   A. We would do --
15       MR. RYCHCIK: Objection. You are talking
16    about just when he did testing at Bradford, or
17    when he did testing at any other facility? He
18    said he did a portion at other places.
19       MR. SIMPSON: Right. I am talking about
20    at Bradford right now.
21   Q. Who decides which radiologist is going to
22 interpret the test?
23   A. The Radiology Department at Bradford.

USA, et al. vs. BRMC, et al.
No. 04-186E

Case 1:04-cv-00186-MBC    Document 117    Filed 09/10/2008    Page 10 of 47

Multi-Page™

Kamran Saleh, M.D.
August 8, 2007

**Page 30**

1  Q. At Bradford?
2  A. At Bradford.
3  Q. So did you have any input into that?
4  A. (No response.)
5  Q. I mean, could you say, "I want this test to be
6  interpreted by Joe Smith, Dr. Joe Smith"?
7  A. I could, but we never really did.
8  Q. So while you were performing the tests at
9  Bradford's decision as to who reads
10  the test, essentially, right?
11  A. Their Radiology Department.
12  Q. You also said that cardiologists sometimes read
13  the tests?
14  A. That's true.
15  Q. So would that be a decision made by the
16  Cardiology Department at Bradford?
17  A. Well, they didn't have a Cardiology Department
18  at that time.
19  Q. So if you had a cardiology -- well, would you
20  have ever had tests done at Bradford that were of the
21  type that needed to be interpreted by a cardiologist?
22  A. I don't understand your question.
23  Q. What type of test that would be done on a

**Page 31**

1  nuclear camera would you want to have a cardiologist
2  read?
3  A. The stress testing is the only test that the
4  cardiologist reads, as per my knowledge.
5  Q. So since Bradford didn't have a Cardiology
6  Department at that time, before you got your camera,
7  who would read those tests?
8  A. The radiologist.
9  Q. The radiologist would read it?
10  A. Yes.
11  Q. You said that there are some doctors who were
12  nuclear medicine specialists?
13  A. That's true.
14  Q. Did Bradford have any of those?
15  A. No.
16  Q. So, really, all the tests back then were being
17  read by a radiologist?
18  A. That's true.
19  Q. Now after you got your camera and you are
20  performing tests in your own office, would it be your
21  decision then as to who you asked to read the test?
22  A. Yes.
23  Q. Generally, when I say "you," I mean, I am

**Page 32**

1  referring to V&S, you and Dr. Vaccaro. If there is
2  any time when you did things differently than him, you
3  know, point it out, but I just wanted to make that
4  clear. It might also help smooth things along for the
5  next deposition.
6  A. Okay.
7  Q. Once you got your camera, did you enter into
8  any arrangements with any radiologist or cardiologist
9  or other specialist to do the reading?
10  A. That's true.
11  Q. And were these set forth in written contracts?
12  A. Yes.
13  Q. So who did you enter into these agreements
14  with?
15  A. Dr. O'Donnell.
16  Q. Dr. O'Donnell?
17  A. Yes.
18  Q. Was it him individually or a practice that he
19  was involved in?
20  A. He is involved in a practice, but he was the
21  main person that we had a contract with.
22  Q. Was there anybody else you had a contract with?
23  A. For reading?

**Page 33**

1  Q. For reading.
2  A. No.
3  Q. Did you have contracts with anybody else
4  relating to any aspect of the nuclear testing?
5  A. We had a nuclear physicist.
6  Q. What did the nuclear physicist do?
7  A. They come and calibrate the camera.
8  Q. Was that a company or a person?
9  A. A person.
10  Q. And do you know who that was?
11  A. Mr. Giomuso.
12  Q. Could you spell that for her, because I know
13  how to spell it?
14  A. G-i-o-m-u-s-o.
15  Q. Do you know his first name?
16  A. No.
17  Q. Have you used anybody other than Dr. O'Donnell
18  to read tests performed on your nuclear camera?
19  A. If Dr. O'Donnell was not available, his group
20  that was covering for him would read the stress test
21  for us.
22  Q. What is the name of his group?
23  A. I don't know.

USA, et al. v. BRMC, et al.     Document 117     Filed 09/10/2008     Page 11 of 47

Kamran Salch, M.D.
August 8, 2007

No. 04-186E

Page 34

1  Q. Does that arrangement continue to this day?

2  A. Up until this day?

3  Q. Yes.

4  A. No.

5  Q. When did that stop?

6  A. It stopped when we stopped doing the stress

7  tests in our office.

8  Q. That was when you leased the camera or

9  subleased the camera to the hospital?

10  A. That's true.

11  Q. Just so I am clear here, during the period when

12  you were performing the tests in your office on your

13  nuclear camera, it was either Dr. O'Donnell or someone

14  in his office that was reading the tests at all times?

15  A. (The witness nods his head.)

16  Q. Correct?

17  A. That is as far as I remember.

18  Q. While you had the camera in your office, did

19  you ever refer patients to Bradford or Olean or

20  anywhere else to have nuclear camera tests done?

21  A. Yes.

22  Q. How frequent of an occurrence is that?

23  A. It is occasionally. Not on as -- not as

Page 35

1  frequent as it was before.

2  Q. What would be the reason you would refer

3  somebody to, say, Bradford rather than doing it in

4  your own office?

5  A. Sometimes it is the patient's preference. That

6  is always a factor in the decision where the patient

7  goes.

8  Q. Would there ever be times when your camera was

9  just too busy and you didn't have -- you couldn't

10  squeeze another patient in, and you would refer them

11  over to Bradford?

12  A. It could be. I don't recall. But sometimes if

13  you have to have an emergent test done, it is

14  possible.

15  Q. But would you say the vast majority of nuclear

16  tests were done in your office?

17      MR. RYCHCIK: Objection as to the form.

18  A. Yes. Most of them were done in our office when

19  we had the camera.

20  Q. Now, in addition to the tests that would be

21  done on your nuclear camera, I assume you would also

22  have, you know, patients who would need other types of

23  tests like MRIs or CT scans, correct?

Page 36

1  A. That's true.

2  Q. Did you have facilities in your office to

3  perform those tests?

4  A. No.

5  Q. Have you ever had facilities in your office to

6  perform those kind of tests?

7  A. No.

8  Q. Are there any other kind of diagnostic tests

9  that you have performed in your office?

10  A. We do perform procedures in our office like

11  EKG, halter monitoring, lung function testing and

12  ultrasound testing; but not x-ray-related.

13  Q. Do you have just a regular x-ray machine in

14  your office?

15  A. No.

16  Q. Similar to with the nuclear camera, would you

17  have generally referred your patients to Bradford for

18  those types of tests?

19  A. For which types?

20  Q. MRIs, CT scans, x-rays.

21  A. Yes. We would refer the patients out where it

22  was more convenient for the patients.

23  Q. And most of the time, that would have been

Page 37

1  Bradford?

2  A. Most of the time, that would have been

3  Bradford.

4  Q. After you got your nuclear camera, your

5  referrals to Bradford for nuclear tests would have

6  reduced, because you were doing a large number of them

7  in your own office, correct?

8  A. Yes.

9  Q. Other than that, do you believe there was any

10  change in your referral patterns during the period

11  that you owned or leased the nuclear camera?

12      MR. RYCHCIK: Are you talking about just

13     nuclear camera referral patterns?

14      MR. SIMPSON: Other than nuclear camera.

15  Q. Nuclear camera referrals went down because you

16  were doing them in your own office. Were there any

17  other types of referrals that you had been doing

18  previously that your referral patterns changed after

19  you got the camera?

20  A. No.

21  Q. Now, at some point, you were approached by

22  Bradford with some concerns they had about the fact

23  that you had leased this camera, correct?

Page 38

1  A. That's true.

2  Q. Tell me how you were first approached.

3  A. It happened, like four or five years ago, but

4  what happened is Mr. Leonhardt called us in the office

5  and asked us about our plan for the nuclear camera,

6  and we told him that we are thinking about getting

7  one, and that was the first, how we knew about it.

8  Q. That was the discussion that you had before you

9  actually got the camera?

10  A. I can't tell you that for sure.

11  Q. But you said he told you that he had heard you

12  were getting one?

13  A. Yes.

14  Q. So that was probably before you actually got

15  it?

16  A. Yes.

17  Q. Do you know how he heard?

18  A. He told us that he heard rumors.

19  Q. Do you have any idea where those rumors came

20  from?

21  A. No.

22  Q. What concerns did he express to you?

23  A. He said that it would affect the recruitment of

Page 39

1  cardiologists and a fulltime person in Bradford

2  Hospital, and that it would negatively impact the

3  financial position.

4  Q. Do you think he was correct that it would

5  negatively impact their ability to recruit a

6  cardiologist?

7  A. I don't know the answer.

8  Q. Do you know whether Bradford at the time was

9  trying to establish a cardiology department?

10  A. Yes.

11  Q. Yes, they were?

12  A. Yes, they were.

13  Q. Did you know that at the time?

14  A. Yes.

15  Q. Have they ever hired a cardiologist, or did

16  they ever hire a cardiologist?

17  A. Now they have a cardiologist.

18  Q. And do you know who that is?

19  A. Dr. Herman, Steve Herman.

20  Q. Did they hire him after they subleased the

21  camera from you?

22  A. Yes.

23  Q. What did you do after Mr. Leonhardt came to you

Page 40

1  with these concerns?

2  A. We didn't do anything. We kept our plan as it

3  was planned before, because we had already at that

4  point decided we were going to get the nuclear camera.

5  Q. As you were making the decision about getting

6  the nuclear camera, did you prepare any kind of

7  projections as to how acquiring the camera would

8  affect your revenues?

9  A. Rough estimates.

10  Q. Were any of those committed to writing?

11  A. I don't recall.

12  Q. Have you seen any of them recently?

13  A. No.

14  Q. Who prepared those?

15  A. Prepared what?

16  Q. The estimates. Was it you or was it Dr.

17  Vaccaro, or did you both --

18  A. We both just sat down together and kind of

19  brainstormed it.

20  Q. Kind of a back of the envelope kind of thing?

21  A. That's it.

22  Q. Did you come up with a number for how you

23  thought it would affect your bottom line?

Page 41

1  A. Not really.

2  Q. So did you have any understanding of how it

3  would increase your profits?

4  A. Yes, we did.

5  Q. What was your expectation?

6  A. I don't recall what the expectation was at that

7  time.

8  Q. While you had the camera, after you leased it

9  and before you subleased it to the hospital, do you

10  know about how many tests you would run on it in a

11  week, in an average week?

12  A. It would be guessing.

13       MR. RYCHCIK: I don't want you to guess.

14  Q. Don't guess, but if you could estimate. I

15  don't expect you to know the exact number.

16  A. I would have to look at the numbers. I don't

17  know how much we did.

18  Q. Would you do more than one a day?

19  A. Sometimes.

20  Q. Would you do as many as ten in a day?

21  A. No.

22  Q. So probably somewhere between one and ten per

23  day?

Page 42

1  A. Yes.
2  Q. Do you know what your -- do you know how much
3  you would receive in payment for the technical
4  component of the various tests that you would perform
5  in a nuclear camera?
6  A. I don't know the numbers.
7  Q. Would it be in the hundreds per test?
8  A. Yes.
9  Q. So we have had Mr. Leonhardt come to you on
10 this first occasion to tell you some concerns, and
11 then you said you didn't change anything at that
12 point. At some point, did Mr. Leonhardt or anybody
13 from the hospital come back to you with more concerns?
14 A. I mean, there were several discussions at that
15 point; but I don't really recall how many and when,
16 but there were several discussions between the
17 hospital and us at that point.
18 Q. Before you leased the camera, did you have an
19 attorney representing you in any negotiations with the
20 hospital?
21 A. I don't recall.
22 Q. At some point, you hired an attorney, correct,
23 to represent you?

Page 43

1  A. Yes, we did.
2  Q. And who was it that you hired as the first
3  attorney you hired to represent you in discussions
4  with the hospital relating to the camera issue?
5  A. Ed Kabala.
6  Q. And did you also work with Marc Raspanti?
7  A. Yes.
8  Q. But Mr. Kabala came first, I guess?
9  A. That's true.
10 Q. At some point, did the hospital come to you
11 with concerns that by getting this nuclear camera that
12 you would be violating a hospital policy on
13 non-competition?
14 A. Yes.
15 Q. Was that Mr. Leonhardt that came to you?
16 A. I don't recall.
17 Q. Did he do that -- do you recall whether he
18 spoke with you orally about it or whether he wrote you
19 a letter?
20 A. Both were done. Orally, and then a letter was
21 sent, too.
22 Q. I will go through some documents later, but I
23 just want to kind of walk through the general stages

Page 44

1  first. You all had a bunch of back and forth about
2  whether this policy was legal, correct?
3  A. That's true.
4  Q. And you took the position that the hospital's
5  attempt to enforce this policy was an illegal attempt
6  to economic credentialing; is that correct?
7      MR. RYCHCIK: Objection as to the form.
8  You are asking him for a legal conclusion.
9      MR. SIMPSON: I am not asking him for a
10     conclusion.
11 Q. I am saying you took that position with the
12 hospital, didn't you?
13 A. Initially, when the hospital did that, we
14 thought that economic credentialing was the way to
15 stop our privileges for referrals. That was the
16 initial thinking. That is why we were concerned, and
17 we wanted a legal opinion on that. But after several
18 discussions later, it became more clear as to the
19 basis for what the reason was.
20 Q. And was it your understanding that -- let me
21 put it this way: Do you believe the hospital ever had
22 any intention of actually denying you staff privileges
23 at the hospital?

Page 45

1  A. Yes.
2  Q. So you didn't see it as a mere bluff?
3  A. That's true.
4  Q. Basically, what the hospital was telling you
5  was that if you are in a business that is in
6  competition with the hospital, you are not entitled to
7  have staff privileges with the hospital, correct?
8  A. That's true.
9      MR. MULHOLLAND: Objection to the
10     characterization of what the hospital may or
11     may not have told him.
12 Q. That was your understanding of what the
13 hospital position was, correct?
14 A. That's true.
15 Q. Now, you stated you didn't believe it was a
16 bluff; but did it also become apparent to you that the
17 hospital would rather not terminate your privileges,
18 but would rather work out some kind of arrangement
19 with you?
20 A. That started appearing later in the course,
21 much later in the course. Initially, it was not
22 obvious.
23 Q. Who made the first proposal that you and the

Page 46

1 hospital enter into some kind of arrangement regarding
2 the camera, whether it be an under arrangements, a
3 joint venture, or a sublease? Was it the hospital, or
4 was it V&S that initially made that proposal?
5    A. Well, the under arrangements was offered by the
6 hospital. That was brought in by the hospital, and
7 the sublease was discussed at the hospital attorney's
8 office, but who brought it up, I don't recall.
9    Q. Initially, the discussions between you and the
10 hospital focused on an under arrangements venture; is
11 that right?
12    A. That's true.
13    Q. What was your understanding of what this under
14 arrangements venture would entail?
15    A. The under arrangements model, as far as I
16 remember, would entail -- it would be a group of
17 physicians who would buy the radiology services
18 machines and then lease it to the hospital, and the
19 hospital would perform the test and pay the group the
20 amount of the lease.
21    Q. And it was envisioned, I suppose, that you and
22 Dr. Vaccaro and other physicians on the medical staff
23 at the hospital would be involved in this under

Page 47

1 arrangements venture, correct?
2    A. That's true.
3    Q. Was the purpose of the anticipated venture or
4 the scope of the venture limited to the use of nuclear
5 imaging equipment, or was it broader than that?
6    A. It was broader than that.
7    Q. What else did it entail?
8    A. CT scans and MRIs.
9    Q. So, basically, all different kinds of radiology
10 tests would be done through this under arrangements
11 venture; is that correct?
12    A. I don't know any more, but CT scan, MRI, and
13 nuclear camera.
14    Q. Right, Doctor. I am just trying to get a
15 picture of what you all were talking about at the
16 time, because I understand, it never actually came to
17 pass, did it?
18    A. No.
19    Q. Now, the hospital wanted you guys to contribute
20 your nuclear camera as part of the venture, correct?
21    A. Say that again.
22    Q. The hospital wanted you, V&S, to contract your
23 nuclear camera to be used as part of this under

Page 48

1 arrangements venture, correct?
2    A. I don't recall what went on in that regard.
3    Q. But was there -- did you guys take the position
4 at some point that under the proposal, you all were
5 getting -- you all were, basically, getting a raw
6 deal, because if there were 25 positions, each of you
7 would have 1/25th, but that you were also contributing
8 the nuclear camera?
9    A. I don't recall that discussion.
10    Q. But for one reason or another, the discussions
11 regarding the under arrangements venture never came to
12 fruition, correct?
13    A. That is true.
14    Q. Is it fair to say that the hospital was the one
15 really pushing the under arrangements venture, and you
16 guys were the ones who weren't really sold on it?
17       MR. RYCHCIK: Objection as to the form of
18    the question.
19       MR. MULHOLLAND: Same objection.
20    A. No. We actually took the position to promote
21 the joint venture and actually we talked to other
22 physicians to come join us; but most of the physicians
23 said, "If you are in it, we are not going to join it."

Page 49

1 So it is because of lack of cooperation from the staff
2 that it didn't go through.
3    Q. Then do you recall who initiated the proposal
4 that instead of doing an under arrangements venture,
5 you instead entered into a sublease arrangement with
6 the hospital?
7    A. As I said before, I don't recall who actually
8 proposed it, but it was in a meeting.
9    Q. Was this sublease proposal something that was
10 sort of raised at the end of the day, or was it
11 something that you all had been talking about for a
12 long time?
13    A. I didn't understand your question.
14    Q. Was the sublease proposal something that was
15 sort of thrown out at the end of the day after the
16 under arrangements venture talks kind of stalled, or
17 was it something that you had been contemplating all
18 along as an alternative?
19    A. No.
20    Q. No to which part of that?
21    A. No. It was something that was brought up
22 towards the end of the day.
23    Q. And were you looking to get, sort of, the same

Page 50

1 return whether it was done as an under arrangements or
2 as a sublease?
3    A. I don't understand that.
4    Q. Were you at V&S, in discussing the sublease
5 proposal, were you essentially attempting to replicate
6 your expected returns that you would have gotten if
7 the under arrangements venture had gone through to
8 your satisfaction?
9    A. The sublease discussion did not really start
10 when we were doing the under arrangements venture, so
11 the expectations could not be there.
12    Q. Did you have a face-to-face meeting -- between
13 you guys and the hospital and the attorneys that was
14 dedicated to a discussion of the lease arrangement at
15 some point?
16    A. I don't recall.
17    Q. But at some point, you ended up entering into a
18 sublease arrangement with the hospital whereby you
19 subleased the nuclear camera to the hospital, correct?
20    A. That's true.
21    Q. And as part of that lease arrangement, the
22 payments to you consisted of really two things: One,
23 a pass-through payment for the rent that you were

Page 51

1 paying to GE --
2    A. Uh-huh.
3    Q. And then a second component for all other
4 promises under the sublease arrangement, correct?
5    A. That's true.
6    Q. And one of those promises was a non-compete
7 agreement that you agreed, essentially, not to compete
8 with the hospital in this nuclear imaging area?
9    A. I believe so.
10    Q. Now, at some point after you entered into the
11 sublease, did you change cameras?
12    A. Yes.
13    Q. And do you know how long it was after you
14 entered into the lease, entered into the sublease,
15 that you changed cameras?
16    A. I don't know the exact date.
17    Q. Did you have to buy out the remaining term of
18 the original camera?
19    A. Yes.
20    Q. So do you know how much you paid GE for that?
21    A. No.
22    Q. But some of that was paid to GE?
23    A. That's true.

Page 52

1    Q. Was that paid by you or by the hospital?
2    A. The hospital pays us, and then we paid GE.
3    Q. And then you, V&S, entered into a new lease
4 with GE for a new camera, correct?
5    A. It is not GE. It is Phillips now.
6    Q. I'm sorry, Phillips.
7    A. That's true.
8    Q. Did you enter into a new sublease with the
9 hospital?
10    A. No.
11    Q. The old camera, the first camera, did that
12 camera ever make its way over to the hospital, or did
13 it stay in your office?
14    A. It stayed in our office.
15    Q. The new camera, did it stay in your office, or
16 did it go to the hospital?
17    A. It went to the hospital.
18    Q. Did it go to the hospital immediately or --
19    A. Immediately.
20    Q. So there was never any period of time where it
21 was at your office?
22    A. That's true.
23    Q. And there is no new lease agreement, sublease

Page 53

1 agreement, between the hospital and you relating to
2 the new camera?
3    A. That's true. The reason is that when we signed
4 the sublease, there was a provision in there that
5 would upgrade the camera, and that sublease covered
6 the new camera.
7    Q. The payments from the hospital to you under the
8 sublease, did they go up after you got the new camera?
9    A. It went up after we got the new camera, because
10 the cost of subleasing went up.
11    Q. Essentially, the new camera was more expensive
12 to lease for you, so the pass-through cost to the
13 hospital --
14    A. The pass-through cost went up.
15    Q. -- went up accordingly?
16    A. Yes.
17    Q. Now, while the old camera -- the old camera,
18 you said, stayed on your premises. Did the hospital
19 pay you any rent to keep that hospital on your
20 premises?
21        MR. RYCHCIK: Keep that hospital?
22        MR. SIMPSON: I'm sorry.
23        MR. RYCHCIK: Do you mean to keep the

Page 54

1 equipment?
2    MR. SIMPSON: I'm sorry.
3 Q. Did the hospital pay you rent to keep the
4 camera on your premises?
5 A. Yes.
6 Q. And that was in addition to all of the payments
7 under the sublease?
8 A. That's true.
9 Q. While the old camera was at your premises, was
10 it being used --
11 A. Yes.
12 Q. -- or was it sitting idle?
13 A. No. It was being used.
14 Q. How frequently was it being used?
15 A. As frequently as it was being used before. But
16 since we signed the lease agreement, the sublease
17 agreement now, the payments that were going was the
18 income for the hospital.
19 Q. The patients for whom it was being used, were
20 they still your patients, or did the hospital send
21 over other patients that were not your patients to
22 have tests done?
23 A. There were sometimes, yes.

Page 55

1 Q. Most of the time, was it your own patients
2 though?
3 A. Yes.
4 Q. You had mentioned before that you had a nuclear
5 technician who would service the machine?
6 A. A physicist.
7 Q. I'm sorry. A physicist. Did you also have
8 somebody who operated the machine?
9 A. Yes.
10 Q. And was that -- before the sublease, was that
11 an employee of V&S?
12 A. Yes.
13 Q. What was his or her name?
14 A. Scott Truman.
15 Q. I'm sorry?
16 A. Scott Truman.
17 Q. Scott Truman?
18 A. Yes.
19 Q. And after you subleased the machine to the
20 hospital, did you continue to employ that person?
21 A. No.
22 Q. Did the hospital employ him?
23 A. Well, he actually left before so we had another

Page 56

1 technician before the sublease was signed, and we had
2 the understanding that the hospital will hire that
3 person according to the hospital need.
4 Q. Who was that?
5 A. I don't remember her name.
6 Q. But so the hospital hired her, and then she was
7 an employee of the hospital, and not of V&S, correct?
8 A. Well, she was never hired by the hospital. I
9 mean, at the end of the lease, the understanding was
10 that she would get escorted by the hospital, but
11 the --
12 Q. At the end of the lease?
13 A. I mean, at the beginning of the lease. So she
14 chose not to join the hospital.
15 Q. So during the period when it was still on your
16 property, but you had subleased it to the hospital,
17 who was the technician that was actually operating the
18 machine for the tests?
19 A. I don't remember whether the lady continued for
20 some period of time and then the hospital technicians
21 would come and do the testing, one or the other.
22 Q. The hospital technicians that would come and do
23 the testing, they would just come over from the

Page 57

1 hospital and do the tests?
2 A. Uh-huh.
3 Q. They wouldn't otherwise be at your office; is
4 that correct?
5 A. That's true.
6 Q. And that was the hospital was paying for all of
7 that?
8 A. That's true.
9 Q. Now, you said this lady who was the technician
10 who stayed on for a period of time, was she performing
11 the tests for the hospital while she was there?
12    MR. RYCHCIK: Object to the character --
13 A. I don't remember.
14    MR. RYCHCIK: Wait a minute. Hold on. I
15    was going to object to the characterization. I
16    don't know if he knew that she stayed on for a
17    period of time; but go ahead.
18 Q. Did I -- there was a lady who was working for
19 you, and then you said, I thought, that she stayed on
20 for a period of time after you subleased the equipment
21 to the hospital; is that correct?
22 A. I don't remember if that is really true.
23 Q. All right.

Page 58

1  A. But somebody was doing the testing.
2  Q. Was there ever a period of time when the person
3  doing the testing was a V&S employee after you
4  subleased it back to the hospital?
5  A. I don't remember that.
6       THE WITNESS: Can we take a break?
7       MR. SIMPSON: Yeah. Sure. This would be
8  a good time. Let's take a short one?
9       THE WITNESS: Sure.
10      MR. SIMPSON: Five-ten minutes?
11      THE WITNESS: Ten minutes.
12      (Recess taken at 10:32 a.m., and testimony
13      was resumed at 10:47 a.m. this date.)
14 BY MR. SIMPSON:
15 Q. Do you own or rent your current building?
16 A. I own it.
17 Q. Is it owned by you personally or V&S?
18 A. Personally, between me and Dr. Vaccaro.
19 Q. Have you always owned it, or did you ever lease
20 it?
21 A. No. We always owned it.
22 Q. Do you know how much you pay per month? I
23 assume you have a mortgage on it?

Page 59

1  A. Yes, but I don't remember.
2  Q. Is it in the thousands?
3  A. Yes.
4  Q. Would it be more than 5,000?
5  A. Yes.
6  Q. More than 10,000?
7  A. I can't tell you that.
8  Q. I'm going to show you some documents. I
9  probably won't ask you questions on all of them, but I
10 want to just at least have you authenticate them. So
11 the first one, I guess, will be Exhibit 3.
12      (Saleh Deposition Exhibit No. 3 was marked
13 for identification.)
14 Q. Exhibit No. 3 is a letter that is dated July
15 25th, 2001, and it is signed by you and Dr. Vaccaro.
16 Do you recognize this letter?
17 A. Yes.
18 Q. Is this a letter you sent to George Leonhardt?
19      MR. RYCHCIK: I want to be careful here.
20      I mean, if you are going to be showing him -- I
21      mean, I am sure we can reach some stipulation
22      as to authenticity. I mean, if you are going
23      to be showing him, though, one after another of

Page 60

1  documents, he is going to need to take the time
2  to familiarize himself with the document.
3       I don't want you to just jump into it.
4  Take a look at the letter, read it, and then
5  you can go on with your questions.
6  Q. I will stipulate or I will tell you that
7  everything that is stamped with a V&S at the bottom is
8  a document you produced to us or your attorneys
9  produced to us. So do you recall sending this letter?
10 A. Let me read it, please. Yes.
11 Q. So this is a copy of a letter you sent to
12 George Leonhardt, correct?
13 A. Uh-huh.
14      MR. RYCHCIK: I got to caution you, if you
15      could say "yes" or "no," as opposed to
16      "uh-huh," because it is harder for the court
17      reporter to take down.
18 Q. So that was a yes?
19 A. Yes.
20 Q. I don't have any particular questions about
21 that one. I do want to show you another letter and
22 ask you a couple of questions about it.
23      MR. SIMPSON: Could you mark this as

Page 61

1  Exhibit 4?
2       (Saleh Deposition Exhibit No. 4 was marked
3  for identification.)
4  Q. I would like to ask you to look over that.
5  This is a letter dated July 30, 2001, and it purports
6  to be from George Leonhardt to you and Dr. Vaccaro.
7  If you could look over it, and then let me know if you
8  recall receiving this letter.
9       Have you had a chance to look over the letter?
10 A. Yes.
11 Q. Do you remember receiving this?
12 A. Yes.
13 Q. Now, you will notice in the first paragraph of
14 this letter, it mentions an April 3rd meeting in Mr.
15 Leonhardt's office. Does that refresh your
16 recollection of when you had your first meeting with
17 him about the nuclear camera issue?
18 A. No.
19 Q. Does April 3rd sound about right?
20 A. It states here, April 3rd, so --
21 Q. Do you have any reason to disagree with that?
22 A. No.
23 Q. And then it goes on to say that, "between April

USA, et al. v. BRMC, et al.  Document 117-4  Filed 09/10/2008  Page 18 of 47
No. 04-186E

Kamran Saleh, M.D.
August 8, 2007

Page 62

1  3rd and June 1st, we met on five subsequent
2  occasions." Is that true?
3  A. We met several times.
4  Q. And during those meetings, you didn't have an
5  attorney present, did you?
6  A. No.
7  Q. Now, in the third paragraph, if you can look
8  down to the third paragraph, it says that, "We did
9  have several discussions about the possible
10 development of a Joint Venture within the Safe Harbors
11 to Stark II."
12 A. Yes.
13 Q. Do you remember any discussions with Mr.
14 Leonhardt about the Safe Harbor discussions to Stark
15 II?
16 A. I don't recall.
17 Q. At that time, did you have any understanding of
18 what the Stark II statute was?
19 A. Yes. I do understand that this is based on
20 referrals, and if there is any payment made for
21 referral, that is against the law.
22 Q. I am asking you at the time, July 2001 --
23 A. I don't recall.

Page 63

1  Q. You don't -- let me finish the question first.
2  At that time in July of 2001, did you know anything
3  about the Stark statute at that time?
4  A. I don't know.
5  Q. You don't specifically recall any discussions
6  about the Stark statute with Mr. Leonhardt as
7  discussed in this letter; is that correct?
8  A. I don't recall any.
9  Q. I'm going to show you a document I would like
10 to have marked as Exhibit 5, please.
11      (Saleh Deposition Exhibit No. 5 was marked
12 for identification.)
13 Q. While you are looking at it, I will describe
14 it. This purports to be a fax from Marc Raspanti to
15 Dr. Saleh enclosing a letter from Mr. Raspanti to
16 George Leonhardt, which itself purports to enclose a
17 couple of other exhibits. After you have had a chance
18 to look at this, I want to ask you if you recall
19 receiving this from Mr. Raspanti.
20      MR. RYCHCIK: Do you intend on asking him
21 specific questions about the document itself?
22      MR. SIMPSON: I don't intend to ask --
23 yeah, a couple of -- a few questions.

Page 64

1  Q. First off, I want to ask if you remember
2  receiving this fax?
3  A. I don't remember receiving it.
4  Q. At that time in January of 2002, you had hired
5  Mr. Raspanti, correct?
6  A. I don't remember the exact date.
7  Q. Assuming this is authentic, you know, then you
8  would have hired him by that date, correct?
9  A. Yes.
10 Q. At some point, you hired him?
11 A. Yes.
12 Q. You will notice if you flip over to the second
13 page, which is the first page of Mr. Raspanti's
14 January 22nd, 2002 letter to Mr. Leonhardt, it says
15 that -- in the second paragraph, Mr. Raspanti says
16 that he is attaching a copy of a letter that he
17 understands was hand-delivered to Richard McDowell,
18 the Chairman of the Board, by Dr. Vaccaro. Then that
19 letter is attached beginning at page 00132 of this
20 exhibit.
21      My question to you is: Do you recall ever
22 seeing the letter, the December 4th, 2001 letter that
23 is attached beginning at 00132 of the exhibit? It is

Page 65

1  addressed to Dr. Vaccaro, but I just wanted to know if
2  you recalled seeing this letter?
3  A. I don't recall receiving this letter.
4  Q. Do you recall whether this letter was, in fact,
5  handed by Dr. Vaccaro to Richard McDowell?
6  A. No.
7  Q. If you will look in this December 4th, 2001
8  letter, on the first page of the letter, which is
9  Bates No. 00132, it states, "We do not believe this
10 type of economic credentialing policy is legal," and
11 then if you flip over to the next page in the middle
12 it mentions the Federal anti-kickback statute, and
13 then if you flip over to the third page of that
14 letter, it also mentions the Stark Law.
15      Does that refresh your recollection about
16 whether you actually ever saw this letter?
17 A. I don't remember seeing this letter, but it is
18 here.
19 Q. You don't deny that you saw the letter? You
20 just don't remember it, correct?
21 A. I don't remember it, yeah.
22 Q. Do you recall any discussions you had with Dr.
23 Vaccaro regarding the Stark Law or anti-kickback

USA, et al. v. BRMC, et al.
No. 04-186E

Case 1:04-mc-00186-MBC    Document 7    Multi-Page™    Filed 09/10/2008    Page 19 of 47

Kamran Saleh, M.D.
August 8, 2007

Page 66

1 statute?
2 A. No.
3 Q. Do you know whether you had any discussions
4 about those issues?
5 A. I can't tell you that. I don't know. I don't
6 remember.
7 Q. If you will flip over to Bates Nos. 00138 and
8 139, under question 4, it purports to list
9 examinations that the nuclear camera was capable of
10 performing. If you will look that over those, does
11 that look like an accurate list of procedures that the
12 camera could perform?
13 A. Yes.
14 Q. Do you know if that is a comprehensive list or
15 is it a partial list?
16 A. I can't tell you. I mean, there may be some
17 others that are left out.
18 Q. Let me ask you as a general question: Were you
19 generally copied on correspondence that your attorney
20 sent to Bradford's attorney or received from
21 Bradford's attorney?
22 A. Yes.
23 Q. When you would get those letters, would you

Page 67

1 generally read them?
2 A. Yes.
3 Q. Would you discuss them with Dr. Vaccaro?
4 A. Yes.
5 MR. SIMPSON: I will have this marked as
6 Exhibit 6, please.
7 (Saleh Deposition Exhibit No. 6 was marked
8 for identification.)
9 Q. Exhibit 6 purports to be a letter, a fax of a
10 letter, from Alan Steinberg to Marc Raspanti dated
11 February 6, 2002, and I guess my first question is:
12 Do you recall receiving this letter?
13 A. I don't recall.
14 Q. Have you had a chance to look it over?
15 A. No.
16 Q. Have you had a chance to look it over?
17 A. Yes.
18 Q. Does that change your testimony? Do you recall
19 receiving it?
20 A. I don't recall receiving it, no.
21 Q. I would like you to flip to page 00167 of this,
22 the next-to-the-last paragraph starting with "The
23 Medical Center." It says, "The Medical Center would

Page 68

1 not be depriving the Bradford community of services
2 that Dr. Saleh can perform with the nuclear cardiology
3 equipment in his office. Dr. Saleh has been and
4 always will be able to provide his own office-based
5 services of this kind."
6 Now, after signing the sublease agreement with
7 the hospital, you are prohibited from providing those
8 types of services, correct?
9 MR. RYCHCIK: I don't know if you have
10 read through the entire page here. I mean, you
11 said you didn't remember the letter, and you
12 stopped reading when Mr. Simpson asked
13 questions. I want to make sure that you are
14 comfortable answering questions about the
15 document.
16 Q. I am not asking you actually about the
17 document. I am asking you after -- this document was
18 before you signed the sublease. After you signed the
19 sublease, the sublease precludes you from performing
20 nuclear cardiology tests in your office, correct?
21 A. That's true.
22 MR. SIMPSON: I would like to mark this as
23 Exhibit 7, please.

Page 69

1 (Saleh Deposition Exhibit No. 7 was marked
2 for identification.)
3 Q. All right. I have handed you Exhibit 7, which
4 purports to be a February 15, 2002 letter from Marc
5 Raspanti to George Leonhardt, and I would ask you to
6 look at that, and let me know if you have seen this
7 letter.
8 Can you state whether you have seen this letter
9 or not?
10 A. I don't remember seeing it.
11 Q. If you turn to page 157, towards the bottom, it
12 says, "The nuclear camera was installed at V&S in
13 August of 2001."
14 Does that refresh your recollection of when
15 exactly the camera was installed?
16 A. No.
17 Q. But August of 2001 sounds right?
18 A. Yes.
19 Q. In general, when Mr. Raspanti would send a
20 letter, would he send it to you -- and listen for -- I
21 don't know if you are going to get an objection or
22 not, but would he send it to you for your review
23 before he would send it to opposing counsel?

USA, ct al. vs. BRMC, et al.
No. 04-186E

Case 1:04-cv-00186-MBC    Document 117-7    Filed 09/10/2008    Page 20 of 47

Multi-Page™

Kamran Saleh, M.D.
August 8, 2007

Page 70

1    MR. RYCHCIK: I am going to object to the
2  extent I don't want you to divulge any types of
3  communications you might have had with Mr.
4  Raspanti or any of your counsel, for that
5  matter, and I am going to instruct you not to
6  answer to the extent that is what you are
7  asking.
8  Q. All I am asking is -- well, would you typically
9  be sent a draft of the letter before he would send the
10 final copy out to opposing counsel?
11      MR. SIMPSON: I am not sure whether that
12  is objectionable or not.
13      MR. RYCHCIK: I still think that is. I
14  still think it is asking whether or not there
15  was a communication, and I don't think I want
16  him to answer that question. You could ask him
17  another question, but --
18      MR. SIMPSON: Well, I have already asked
19  whether he recalled seeing this letter.
20 Q. Let me ask you this question: Flip to page
21 159, please, the last full paragraph. The last full
22 paragraph starts out by saying, "We know of no case
23 that more clearly establishes a hospital's attempt to

Page 71

1  extract an exclusive referral stream from a
2  physician."
3      My question to you is: At that time, was it
4  your belief that the hospital was trying to extract a
5  referral stream from you by invoking the non-compete
6  clause?
7  A. Yes. When initially we found out that there is
8  a non-compete clause, that was our understanding that
9  the hospital is trying to get referrals and making it
10 tied to our hospital privileges. That is why you can
11 see, initially, we were concerned, and we hired the
12 counsel, and we advised them to get the counsel, too,
13 to make sure that that is not the reason why this
14 economic credentialing was based on.
15      As you can see, after several months, almost
16 two years of discussion, it was clear that that was
17 not the basis for all of this; but initially, yes,
18 that was the concern.
19 Q. It was your belief that the hospital was trying
20 to get the referrals back that it had lost by you
21 doing them in your office?
22      MR. RYCHCIK: Objection as to the form of
23      the question.

Page 72

1      MR. MULHOLLAND: Same objection.
2  Q. Do you understand the question?
3  A. No.
4  Q. You testified that at that time, you did think
5  the hospital was trying to extract a referral stream.
6  So my question to you is: The referral stream that
7  you thought they were trying to get was the referral
8  stream for those nuclear tests that otherwise would
9  have been performed at the hospital, but that you were
10 doing in your own office?
11      MR. RYCHCIK: Same objection.
12  A. No. We were thinking that it was not the
13 nuclear tests, but it was related to our privileges.
14 So the competition with the privileges, if we refer
15 patients, whether to the hospital or elsewhere, it
16 didn't matter at that time.
17 Q. But the only competition that you were even
18 allegedly involved in with the hospital was involving
19 the nuclear camera, correct?
20  A. That's true.
21 Q. And the only referrals -- you said before that
22 your referral pattern stayed the same, except for the
23 nuclear camera tests, correct?

Page 73

1  A. That's true.
2  Q. So the only referrals that the hospital was
3  losing at that time was your nuclear camera, the
4  nuclear camera tests you were doing in your own
5  office, correct?
6  A. Yes.
7  Q. So that was the referral stream you thought
8  they were trying to coerce back to the hospital by
9  raising the specter of this economic credentialing
10 policy?
11  A. No. No. That was actually even before that
12 when they initially started the economic credentialing
13 policy and tied our privileges to the economic
14 credentialing saying that we are in competition. That
15 is when we thought that what they are saying is that
16 you refer all the patients to the hospital for all the
17 tests, all the admissions, and whatever was included,
18 or we will take the privileges away.
19      That was the initial assumption that we had and
20 the initial understanding; and after several
21 discussions, it came out that it was because of the
22 pure competition, and that was not related to the
23 referrals to the hospital at that point.

Page 74

1 Q. When you say it came out, how did it come?

2 A. What?

3 Q. You say it came out. How --

4    MR. SIMPSON: Could you read back the

5    portion of his testimony where he said it came

6    out something?

7       (Previous answer read back.)

8 Q. And when you are talking about the pure

9 competition, that is the competition on the nuclear

10 camera, correct?

11 A. That's true.

12 Q. So the only revenue stream that the hospital

13 was losing as a result of the competition was for the

14 nuclear camera tests that you were doing, correct?

15 A. The tests that we used to do in the hospital,

16 yes.

17 Q. And was it your belief that the hospital was

18 wanting you to do those tests in the hospital, instead

19 of in your office?

20 A. No. They wanted us not to do them in the

21 office. Anywhere else, it didn't matter to them.

22 Q. But they expected that given your prior

23 referral patterns, most of those tests would be done

Page 75

1 at their facility?

2    MR. RYCHCIK: Objection as to the form of

3    the question.

4    MR. MULHOLLAND: Same objection.

5 A. It would go to the pattern prior of referral.

6 Q. And as you previously testified, most of them

7 would go to Bradford?

8 A. Yes. Most of the tests were done in Bradford.

9 Q. Did you ever threaten to take your nuclear

10 camera referrals away from Bradford and send them all

11 to Olean or someplace else?

12 A. I don't recall.

13    MR. MULHOLLAND: Before you go on to the

14    next exhibit, Mr. Simpson, I just want to state

15    that the fact that this document was produced

16    and does have some references to peer review

17    information doesn't constitute a waiver by the

18    hospital where a peer review privilege may

19    attach to that information.

20    MR. RYCHCIK: I was going to say that I

21    think, quite frankly, this was inadvertently

22    produced without redactions from the standpoint

23    of peer review privileges.

Page 76

1    My intention after the deposition is over

2 is to potentially look into whether or not we

3 need to have that information redacted.

4    MR. MULHOLLAND: And to the extent that it

5 is not redacted, we will probably ask that it

6 be designated as confidential under the

7 Protective Order.

8    MR. SIMPSON: I mean, I don't see the

9 purpose of redacting it if it is protected by

10 the Protective Order.

11    MR. MULHOLLAND: Well, we have had that

12 discussion with Mr. Stone; but I just wanted to

13 make it clear that the fact that this was

14 produced by V&S doesn't mean that the hospital

15 has waived any right to assert a peer review

16 privilege with respect to this.

17    MR. RYCHCIK: And we certainly did not

18 intend to waive that privilege either; and if

19 it is something that needs to be redacted, we

20 will take the appropriate steps.

21    MR. SIMPSON: I don't think it is even

22 possible -- we can go into this elsewhere; but

23 the alleged peer review information is directly

Page 77

1 related to things that V&S was saying was

2 retaliatory pressure put on them by the

3 hospital, so I think it is directly relevant.

4    MR. RYCHCIK: I don't think that is

5 substantive information.

6    MR. SIMPSON: If this is the kind of stuff

7 you are going to be redacting, then I would

8 want to actually know about, and --

9    MR. RYCHCIK: I don't think that -- go

10 ahead. I'm sorry.

11    MR. SIMPSON: I would be upset to find out

12 that things that are clearly relevant to the

13 dispute between the parties are being redacted,

14 and we have no way of knowing that relevant

15 stuff has been redacted.

16    MR. MULHOLLAND: If it is privileged and

17 relevant, then we can redact it, because

18 privilege trumps relevance. I think we can

19 argue that later. I just wanted to make the

20 hospital's position clear.

21    MR. SIMPSON: That is fine. We can

22 discuss it later.

23       (Saleh Deposition Exhibit No. 8 was marked

USA, et al. v. BRMC, et al. Case 1:04-cv-00186-MBC Document 74-12 Filed 09/10/2008 Page 22 of 47

No. 04-186E

Kamran Saleh, M.D.
August 8, 2007

Page 78

1 for identification.)

2 Q. I have shown you Exhibit 8, which is a May 20,

3 2002 letter to you from Richard McDowell, Chairman of

4 the Board of Directors, and I would ask if you recall

5 receiving this letter?

6 A. No, I don't recall.

7 Q. Have you looked over the letter?

8 A. I am looking now.

9 Q. Have you had a chance to look at this letter?

10 A. Yes.

11 Q. Do you recall receiving it?

12 A. No.

13 Q. That was a no?

14 A. No.

15 Q. If you go to the last paragraph on the first

16 page, it says, "Data collected by the Medical Center

17 shows that you have significantly changed your

18 practice pattern in terms of your usage of the Medical

19 Center's equipment. We understand that is because you

20 are now using the V&S equipment in its place."

21    Irrespective of the fact that you don't recall

22 receiving this letter, is that a true statement?

23 A. I never saw the data, so I can't tell.

Page 79

1  Q. But it is a true statement that you

2 significantly changed your practice patterns, because

3 you were using the V&S equipment?

4    MR. RYCHCIK: Objection as to the form of

5    the question.

6 A. We were using V&S equipment more, yes.

7 Q. You will note in the second paragraph, the

8 first page, that Mr. McDowell says that, "The next

9 step is for you, Dr. Vaccaro, and the Board to meet."

10    Do you recall a request from Mr. McDowell that

11 you all have a meeting in this time period?

12 A. Yes.

13 Q. Did you respond that you were willing to meet

14 with the committee?

15 A. Yes.

16 Q. I will show you Exhibit 9, then.

17    (Saleh Deposition Exhibit No. 9 was marked

18 for identification.)

19 Q. Exhibit No. 9 is a June 11th, 2002 letter from

20 George Leonhardt to you and Dr. Vaccaro, and it

21 purports to talk about, "The purpose of our meeting

22 tomorrow." Do you recall whether you had a meeting on

23 or around June 12th, 2002?

Page 80

1 A. I can't tell you the dates, no.

2 Q. But it would have been around that time period?

3 A. (No response.)

4 Q. Actually, in order to help you answer that

5 question I will go ahead and show you Exhibit 10.

6    (Saleh Deposition Exhibit No. 10 was

7 marked for identification.)

8 Q. Exhibit 10 purports to be a letter from you to

9 Richard McDowell dated June 25th, 2002, and in this

10 letter, you discuss a June 12th meeting. So, first of

11 all, do you recall sending Exhibit 10, that letter to

12 Mr. McDowell?

13 A. I don't recall sending the letter, no.

14 Q. Is that your signature?

15 A. Yes.

16 Q. Did you routinely send copies of your letters

17 that you sent to Mr. McDowell to your attorney to be

18 kept in their files?

19    MR. RYCHCIK: I'm going to object, again,

20    the same objection we had before. I don't know

21    that I want to have him testifying as to his

22    practice of communicating with his attorney,

23    which would include commenting on him sending

Page 81

1 copies of things.

2    MR. SIMPSON: I don't think that impli-

3    cates attorney-client privilege at all. We

4    have got a copy of a letter signed by him that

5    was produced by his attorneys, and he says he

6    doesn't remember. I have got to have some way

7    of authenticating it.

8    MR. RYCHCIK: So your question is what his

9    practice of communication was with his

10    attorney.

11    MR. SIMPSON: Which I don't anticipate

12    that you are going to deny the authenticity of

13    this letter.

14    MR. RYCHCIK: Like I said, I think we can

15    stipulate to the authenticity of the letter. I

16    don't want him to get into the attorney-client

17    communications, though.

18    MR. SIMPSON: That is fine with me, as

19    long as you don't have any authenticity

20    objections to these letters.

21 Q. First, does that refresh your recollection as

22 to whether you had a meeting on June 12th?

23 A. We had a meeting.

Page 82

1  Q. Now, if you can go back to Exhibit 9, in
2  Exhibit 9, Mr. Leonhardt says his thoughts about the
3  agenda for the meeting, and one of the things he says
4  should be on the agenda is whether there is any
5  interest in working together through a joint venture
6  or other appropriate means with regard to the nuclear
7  camera, correct?
8  A. Uh-huh.
9  Q. Now, was that actually a topic that was
10 discussed at the meeting?
11 A. The joint venture?
12 Q. Yes.
13 A. Yes.
14 Q. Do you know if a lease option was raised during
15 that meeting?
16 A. No.
17 Q. That would have come later on in the process?
18 A. Much later, yes.
19 Q. If you could flip to the second page of Exhibit
20 10, please, in the top paragraph, you state that, "We
21 also advised you that we would be willing to discuss a
22 true joint venture with the hospital on any expansion
23 that it wants to make, and we further advised that we

Page 83

1  would, solely in the spirit of compromise, be willing
2  to discuss a true and equal joint venture on the
3  nuclear camera if your attorneys can come up with a
4  proposal that they think is legal in today's
5  environment (and our attorneys agree)."
6  A. Yes.
7  Q. What were you talking about when you referred
8  to a true and equal joint venture and underlined the
9  word "equal"?
10 A. I don't remember what it meant at that time.
11 Q. And when you referred to "solely in the spirit
12 of compromise," what was the issue you were intending
13 to compromise on?
14 A. Well, our thought was, you know, that we have
15 opened up a nuclear camera, and that's the business we
16 wanted to do. We didn't want to do anything else at
17 that point. We were thinking about further expansion.
18 So the economic credentialing issue came up because of
19 the nuclear camera, and then we have been fighting for
20 some time between the legal advice from both sides,
21 and as you know, it becomes very expensive and tiring,
22 so we really didn't want to continue going in that
23 direction and to the point of litigation and go

Page 84

1  through the expense of that. So that we wanted to
2  come up with something that is more compromising for
3  both of us.
4  Q. And the issue that you all were compromising on
5  was the economic credentialing issue, correct?  I
6  mean, that is what was driving the dispute?
7  A. That's right.
8  Q. Now, did you say you -- did you just say you
9  were or were not intending to expand the practice
10 farther?
11 A. We were.
12 Q. You were?  Can you flip back to the previous
13 page, the first page of Exhibit 10?
14 A. Yes.
15 Q. In the next-to-the-last paragraph, it starts
16 off by saying, "We do want the Board to understand, as
17 we hope we made you understand, that it is not the
18 intent of Dr. Vaccaro and myself to expand the
19 ancillary services provided by our office."
20      How is that statement consistent with what you
21 just said about that you were wanting to expand?
22 A. Well, we definitely were wanting to expand, but
23 maybe at this point because of our discussion with the

Page 85

1  hospital, we might have changed that.
2  Q. What types of things were you thinking about
3  expanding into?
4  A. MRI and CT scans.
5  Q. Anything else?
6  A. Not right now, I can't think of anything else.
7  Q. Other than the discussions over the under
8  arrangements venture, did you ever have any
9  discussions with the hospital about MRI and the CT
10 scans?
11 A. Other than the joint venture?
12 Q. Other than --
13 A. Not that I can recall.
14 Q. When you say joint venture, you are using that
15 interchangeably with this under arrangements?
16 A. That's correct.
17 Q. Going back to the paragraph on the second page
18 of Exhibit 10 that we had just discussed, you talked
19 about a proposal that they think is legal in today's
20 environment and our attorneys agree.
21      So you realized at that time that any
22 resolution you had, you were going to do, would have
23 to be evaluated to see whether it is legal, correct?

USA, et al., et al. BRMC00686-MBC    Document Multi-Page™    Filed 09/10/2008    Page 24 of 47

Kamran Saleh, M.D.
August 8, 2007

No. 04-186E

Page 86

1  A. By the legal counsel, yes.

2  Q. Without telling me anything your attorneys told

3  you, apart from advice that you might have received

4  from the counsel, did you have any independent

5  knowledge about legal requirements relating to Stark

6  or the anti-kickback statute?

7  A. Yes. We had the basic understanding.

8  Q. And how did you have that understanding?

9  A. From reading the articles and discussion among

10  the colleagues.

11  Q. Is that something you had done before this

12  issue ever arose, or was that work that you did after

13  the issue arose, because you were trying to

14  familiarize yourself with it?

15  A. I can't tell you the time frame.

16  Q. What was your basic understanding as to what

17  the anti-kickback statute provided?

18  A. The statute -- you know, you cannot get paid

19  for any kind of referrals, and any arrangement that

20  goes along should be a fair market value arrangement.

21  Q. And does your understanding or did your

22  understanding at the time of the Stark statute differ

23  from that in any way?

Page 87

1  A. No.

2  Q. I will show you Exhibit 11, please.

3  (Saleh Deposition Exhibit No. 11 was

4  marked for identification.)

5  Q. Exhibit 11 is a June 26th, 2002 letter from

6  George Leonhardt to you and Dr. Vaccaro. I guess,

7  first, of course, I want to ask if you recall

8  receiving this letter from Mr. Leonhardt?

9  A. No.

10  Q. Do you recall receiving any communications from

11  Mr. Leonhardt discussing the Stark law?

12  MR. RYCHCIK: When you are done reading

13  why don't you repeat the question for the

14  doctor?

15  Q. Do you recall Mr. Leonhardt ever communicating

16  with you about the Stark law?

17  A. Well, we had discussions regarding the Stark

18  law, yes.

19  Q. And were these discussions with or without the

20  presence of counsel?

21  A. With and without, both.

22  Q. What did Mr. Leonhardt tell you about the Stark

23  law?

Page 88

1  A. I don't remember the exact --

2  MR. RYCHCIK: Again, the -- okay.

3  A. I don't remember the exact statement, the

4  discussion that was done.

5  Q. Did he reassure you that any proposed venture

6  would satisfy the Stark law?

7  A. Well, what we talked about is any venture that

8  is going to go through should qualify through the

9  Stark law.

10  Q. So you discussed the need to qualify with the

11  Stark law, but did you ever have discussions with him

12  about whether any proposed arrangement actually

13  complied with the Stark law?

14  A. I don't recall that.

15  Q. Now, you will agree that this letter, this

16  letter talks about structuring an under arrangements

17  deal to comply with the Stark law, correct?

18  A. Yes.

19  Q. Did you ever receive a similar communication

20  from Bradford about the need for the sublease

21  arrangement to comply with the Stark law?

22  A. I don't recall.

23  Q. Do you recall any communication from Bradford

Page 89

1  about the need for the sublease arrangement to comply

2  with the anti-kickback statutes?

3  A. Well, we had several discussions between

4  counsel and ourselves, and several letters have been

5  sent back and forth regarding the anti-kickback and

6  the Stark law to make sure it complies with that.

7  Q. Yeah. I am asking specifically the sublease

8  arrangement and not the under arrangements venture.

9  Did you have those discussions with respect to the

10  sublease arrangement?

11  MR. RYCHCIK: Again, you are talking about

12  conversations not with his counsel?

13  Q. I am not asking about your conversations with

14  your own attorney unless Bradford was present. But I

15  am asking about any discussions you had with Bradford

16  or with your attorneys and Bradford participating,

17  dealing with the sublease complying with the Stark

18  statute.

19  A. Yes, I remember discussions where we did talk

20  about it.

21  Q. And were those discussions along the lines of,

22  "It needs to comply with the Stark statute," or were

23  they along the lines of, "This arrangement does in

USA, et al. v. BRMC, et al.    Document 117    Filed 09/10/2008    Page 25 of 47
No. 04-186E

Kamran Saleh, M.D.
August 8, 2007

Page 90

1  fact comply with the Stark statute"?
2  A. Both.
3  Q. Both?
4  A. Yes.
5  Q. Tell me what discussions you had with Bradford
6  or with your attorneys with Bradford participating
7  where anybody told you that the proposed sublease
8  arrangement complied with the Stark statute?
9  A. Can you repeat the question?
10  Q. Yes. I want you to describe for me any
11  conversations you had or discussions or communications
12  that you had with Bradford or that you had with your
13  attorneys while Bradford was participating in the
14  discussion where anybody told you that the proposed
15  sublease arrangement, in fact, did comply with the
16  Stark statute?
17  A. I don't remember any such particular discussion
18  that I can --
19  Q. When you say you don't remember it, do you
20  mean, "I don't know if that has occurred," or, "I know
21  it occurred, but I just can't remember the specifics"?
22  A. That's right.
23  Q. The latter one?

Page 91

1  A. The latter one.
2  Q. Who would have been telling you that it did
3  comply? Would that have been your attorneys or
4  Bradford?
5  A. The counsel. I can't tell you which one.
6  Q. You don't know which one?
7  A. I don't know.
8  Q. I'm going to ask you a question and your
9  attorney is going to object, but I'm going to ask it
10  anyway to give him the chance to object. Okay? So
11  don't answer it, because he is going to tell you not
12  to.
13  A. Okay.
14  Q. Did your attorneys ever advise you that the
15  sublease arrangement as it was actually entered into,
16  in fact, did comply with the Stark statute?
17       MR. RYCHCIK: Objection. I'm going to ask
18       you not to -- I'm going to advise you not to
19       testify regarding communications with your
20       counsel.
21  Q. Now I want to follow up the question by asking
22  you this: Is it your contention -- do you contend in
23  this lawsuit that you relied on the advice of your

Page 92

1  counsel in entering into this sublease arrangement?
2  A. Is it that --
3       MR. RYCHCIK: Objection as to the form of
4       the question.
5  Q. Is it your contention -- are you contending in
6  this lawsuit that you relied on the advice of your
7  counsel that the sublease arrangement did, in fact,
8  comply with the Stark statute?
9       MR. RYCHCIK: Are you asking him if he is
10       asserting the advice of counsel defense?
11       MR. SIMPSON: Yes.
12  A. No.
13  Q. Are you going to -- I don't know how I can even
14  ask this question: But are you going to change -- are
15  we going to get to trial and you are going to raise
16  the advice of counsel defense at a later time? Do you
17  have any intention to at a later time change that
18  answer and, in fact, raise the advice of counsel
19  defense?
20  A. Not at this time.
21       MR. RYCHCIK: You are asking for a legal
22       conclusion, and to that extent, I object; but
23       go ahead.

Page 93

1  Q. Your answer was that --
2  A. Not at this time, no.
3  Q. Is it your contention that you relied upon
4  Bradford's assurance that the sublease arrangement
5  complied with the Stark statute?
6  A. What is the question again?
7  Q. I just asked you whether you were relying upon
8  your own attorney's advice. Now, I am asking you did
9  you rely -- in entering into the sublease agreement,
10  did you rely upon Bradford's assurances that the
11  arrangement complied with the Stark statute?
12       MR. MULHOLLAND: Objection to the form in
13       that it assumes any assurances were made.
14       MR. RYCHCIK: Same objection.
15  Q. I don't think it assumes that. That is part of
16  the question. I will do it this way.
17       Did Bradford ever assure you that the sublease
18  arrangement complied with the Stark statute?
19  A. Not in so many words; but when we have the
20  advice of counsel there and both sides are present and
21  they are talking about the Stark law and the
22  anti-kickback statutes, it is our assumption when we
23  entered into the lease that it is complying with the

Page 94

1 laws.

2 Q. Because, otherwise, they would have told you

3 differently?

4 A. They would have told us not to do that.

5 Q. Does the same answer go for the anti-kickback

6 statute?

7 A. Yes.

8 Q. Let me show you Exhibit 12.

9 (Saleh Deposition Exhibit No. 12 was

10 marked for identification.)

11 Q. I'm showing you Exhibit 12, which is a July 30,

12 2002 letter from George Leonhardt, and one is

13 addressed to Dr. Vaccaro, however, on the second and

14 subsequent pages, the letter says,

15 "Letter to Medical Staff." Do you recall ever seeing

16 this letter?

17 MR. RYCHCIK: Why don't you take a look at

18 it first?

19 Q. Do you know whether you had received this

20 letter?

21 A. Yes.

22 Q. Did you receive a separate copy of the letter

23 addressed to you, or did you just see the one that was

Page 95

1 sent to Dr. Vaccaro?

2 A. I don't recall. If it is sent to the whole

3 medical staff, then --

4 Q. This looks like a letter from Bradford to the

5 whole medical staff, talking about trying to put

6 together an under arrangements venture; is that

7 correct?

8 A. That's true.

9 Q. And that would be the radiology venture that we

10 have been talking about, correct?

11 A. That's true.

12 Q. Now, if you take a look at the top paragraph,

13 it says that BRMC has engaged legal counsel and

14 business consultants "to help define a set of

15 available options that are compliant with Stark,

16 Medicare Fraud and Abuse, IRS, and other statutory and

17 regulatory mandates," correct?

18 A. Yes.

19 Q. So you agree that at that time, it was

20 understood that whatever options were going to be

21 considered, had to comply with those provisions,

22 correct?

23 A. That's true.

Page 96

1 Q. At some point, did you propose to the hospital

2 that they buy out your practice?

3 A. Yes.

4 Q. Did you give them the figure of $1.8 million?

5 A. I don't remember the figure.

6 Q. Let me show you Exhibit 13.

7 (Saleh Deposition Exhibit No. 13 was

8 marked for identification.)

9 Q. Exhibit 13 is a letter from George Leonhardt to

10 you and Dr. Vaccaro dated January 10th, 2003. While

11 you are looking at the letter, I will read the third

12 paragraph, which says, "In the meeting of January 6th,

13 you two told me that you had chosen not to participate

14 in the venture unless the Medical Center purchased

15 your diagnostic equipment and business for $1.8

16 million. An alternative was that the Medical Center

17 purchase your entire practice and employ you."

18 Does that refresh your recollection about the

19 $1.8 million figure?

20 MR. RYCHCIK: Why don't you go ahead and

21 finish reading?

22 Q. Have you had a chance to read this?

23 A. Just a couple more paragraphs. Okay.

Page 97

1 Q. Do you recall receiving this letter, I guess,

2 first?

3 A. No, I don't recall receiving it.

4 Q. After reading the letter, does it refresh your

5 recollection as to whether you had ever made a

6 proposal that the hospital purchase your diagnostic

7 equipment and business for 1.8 million?

8 A. I don't recall the number, but we had

9 discussions regarding the purchase.

10 Q. Did you ever propose as another alternative

11 that they purchase your entire practice and employ

12 you?

13 A. Yes.

14 MR. SIMPSON: Now I would like to have

15 marked Exhibit 14.

16 (Saleh Deposition Exhibit No. 14 was

17 marked for identification.)

18 Q. Exhibit 14 is a fax from Alan Steinberg to Ed

19 Kabala enclosing various letters. I guess my first

20 question is Ed Kabala was your attorney, correct?

21 A. Yes.

22 Q. So my second question is: Did you ever receive

23 this document?

USA, ct al., v. DRMC, et al.
No. 04-186E

Kamran Saleh, M.D.
August 8, 2007

## Page 98

1  A. I don't remember it.

2  Q. Do you need to look at it more to know whether

3  you did?

4  A. Yes.

5  Q. Do you need more time?

6  A. Yes. It is a lot of legal language.

7  Q. I am really just asking if you recall receiving

8  the letter?

9  A. I don't really recall receiving it, no.

10  Q. But you did testify earlier that you were

11  copied on correspondence to and from your counsel,

12  right?

13  A. Yes.

14      MR. SIMPSON: Let me mark Exhibit 15.

15      (Saleh Deposition Exhibit No. 15 was

16  marked for identification.)

17  Q. Exhibit 15 is a January 17, 2003 letter to Alan

18  Steinberg from Marc Raspanti. First, I want to ask

19  you, as usual, if you recall receiving this letter,

20  and then I want to ask you something else about it.

21      Do you need more time to tell whether you

22  recall receiving the letter?

23  A. No. I don't recall receiving the letter.

## Page 99

1  Q. If you flip over to page 562, which is, I

2  guess, the third page of the letter, in the middle,

3  Mr. Raspanti requests that Drs. Vaccaro and Saleh be

4  provided with the following information, and one of

5  the things he asks for is "All opinions concerning the

6  legality of the nuclear camera venture."

7      My question to you is: Did you ever receive

8  from Bradford any opinions concerning the legality of

9  the nuclear camera venture?

10  A. Opinions from whom?

11  Q. Bradford or their attorneys.

12  A. I don't recall seeing any.

13  Q. In your discussions with the hospital or in

14  your negotiations with the hospital, did you provide

15  the hospital with numbers on the volume of tests you

16  did with the nuclear camera?

17  A. I don't recall doing that.

18  Q. Let me show you Exhibit 16.

19      (Saleh Deposition Exhibit No. 16 was

20  marked for identification.)

21  Q. Exhibit 16 is a February 5, 2003, to Alan

22  Steinberg from Edward Kabala and on the last page it

23  says bcc. you and Dr. Vaccaro, among others, so I

## Page 100

1  guess, first, I will ask if you recall receiving that

2  letter?

3      Can you tell yet whether you received that

4  letter?

5  A. I can't remember.

6  Q. Well, could you look at the first page, then,

7  the second paragraph where it says, "We have provided

8  you with the annual volume for the nuclear camera"?

9  Does that refresh your recollection as to whether you

10  actually did provide volume information to the

11  hospital?

12  A. No.

13  Q. And then the last full paragraph of that page

14  says that you, the hospital, "You have provided us

15  with some estimates of profitability, which based on

16  our discussions and the fact that both the hospital

17  and the V&S practice volumes together are fully 50

18  percent to 60 percent higher than the estimates are

19  undoubtedly conservative."

20      Do you recall Bradford providing us with

21  profitability estimates?

22  A. No, I don't.

23  Q. And you don't recall whether the hospital's

## Page 101

1  estimates of the nuclear camera volume or whatever was

2  being provided were conservative?

3  A. No.

4  Q. Could you flip over to page 1642, I guess the

5  second full paragraph starting "Mr. Mulholland," and

6  in the middle of that paragraph, it says, "While the

7  under arrangements process may be entirely legal, we

8  would want to be sure that we will get an

9  unconditional opinion or an advisory opinion from the

10  Office of the Inspector General to the effect that the

11  final arrangement and the process that led to it would

12  not be deemed inappropriate."

13      My question is: Do you recall wanting to get

14  an advisory opinion from the Office of the Inspector

15  General?

16  A. For the Physician NUCO, yes.

17  Q. Was there a possibility of getting an opinion

18  for the sublease arrangement?

19  A. I don't recall.

20  Q. And you never did get an advisory opinion for

21  the under arrangements venture, correct?

22  A. No, we didn't.

23  Q. The next letter I am going to show you is to

USA, ct al. vs. BRMC, et al.    Document 17    Filed 09/10/2008    Page 28 of 47
No. 04-186E

Kamran Saleh, M.D.
August 8, 2007

Multi-Page™

---

**Page 102**

1 try to help figure out the timing of the leasing
2 proposals, so I'm going to have this marked Exhibit
3 17.
4        (Saleh Deposition Exhibit No. 17 was
5 marked for identification.)
6    Q. Exhibit 17 is a February 11, 2003 letter to
7 Alan Steinberg from Ed Kabala.  I guess my first
8 question, of course, as usual is:  Do you remember
9 receiving this letter?
10   A. (No response.)
11   Q. Do you recall receiving this letter, Dr. Saleh?
12   A. I don't recall.
13   Q. You will notice in the first paragraph there is
14 a February 10th meeting, and you will see that it says
15 that the meeting "concluded with Dr. Vaccaro and Dr.
16 Saleh offering to engage in a leasing arrangement for
17 the nuclear camera operation currently located in
18 their office."
19      Do you recall the meeting where that issue
20 first came up?
21   A. I can't recall the meeting itself, but I know
22 that it came up around that time.
23   Q. The last paragraph on that first page says, "It

---

**Page 103**

1 is not expected that the per diem would be a mere cost
2 pass-through, but it would be set to provide a fair
3 allocation of the risks and the rewards of the
4 arrangement between BRMC and my clients."
5      To your understanding, what would be the
6 rewards to Bradford of a leasing arrangement?
7    A. What are the rewards to Bradford?
8    Q. Uh-huh.
9    A. Well, I think the rewards for both the parties
10 would be to end the conflict which has lasted almost
11 two years and the legal fight that we have entered,
12 which has cost a significant amount of money on both
13 parties, so that would be the reward for both parties.
14   Q. Wouldn't another reward for Bradford be that
15 the tests that you were doing in your office, you
16 wouldn't be doing them in your office anymore, so they
17 would get more of that business?
18      MR. RYCHCIK:  Objection to the form of
19    that question.
20   A. Another reward would be that the tests would be
21 done not in our office, and we wouldn't be in
22 competition anymore.
23   Q. Right.  And per your usual referring patterns,

---

**Page 104**

1 most of the tests would go to Bradford?
2       MR. RYCHCIK:  Objection as to the form of
3    the question.
4       MR. MULHOLLAND:  Same objection.
5    Q. You didn't tell Bradford, "We are going to do
6 this lease, and then I'm going to stop referring to
7 you, and I'm going to send them to Olean," did you?
8    A. No, I didn't.
9       MR. RYCHCIK:  Objection.
10   A. I didn't tell them that we are going to get
11 into this lease and start referring the patients to
12 you, either.
13   Q. But your expectation was that you were going to
14 go back to the way you were doing it before?
15      MR. RYCHCIK:  Objection as to the form of
16    the question.
17   Q. Correct?
18   A. Yes.
19   Q. And in point of fact, it wouldn't make much
20 sense for Bradford to enter into this arrangement if
21 you were going to refer all of your patients to
22 Bradford, correct?
23      MR. RYCHCIK:  Objection as to the form --

---

**Page 105**

1    A. I wouldn't know what it would --
2       MR. RYCHCIK:  Wait a minute.  Objection as
3    to the form of the question and lack of
4    foundation.
5       MR. MULHOLLAND:  The same.
6    Q. You can answer.
7    A. I wouldn't know what they were thinking.
8    Q. If you can go to page 1629, the second
9 paragraph, "We understand that the advantage to BRMC
10 is that the lease proposal requires less lead time and
11 cost and results in an earlier profit realization to
12 BRMC," correct?
13   A. That is what it says here.
14   Q. Now, as you have testified previously, the only
15 business that Bradford had not been getting, because
16 of your nuclear camera, was the nuclear camera tests
17 that had previously been done at Bradford, but were
18 now being done in your office, correct?
19      MR. RYCHCIK:  Objection.  I think that
20    mischaracterizes his testimony.
21      MR. MULHOLLAND:  Same objection.
22   Q. Well, you testified that your other referral
23 pattern stayed the same, right?

---

Page 106

1      MR. RYCHCIK: He didn't testify that that
2   was the only business Bradford wasn't getting.
3   I think that mischaracterizes his testimony.
4      MR. SIMPSON: I don't think it
5   mischaracterizes, but I will ask --
6   Q. You did testify that your other referral
7   patterns remained the same after you got the camera?
8   A. Other referral pattern everywhere else. That
9   would include either Bradford Hospital or Hamot
10  Hospital or University of Pittsburgh.
11  Q. So the only things that Bradford was missing
12  out on that it would have otherwise gotten were the
13  referrals that it would have gotten from you for the
14  nuclear camera tests, correct?
15     MR. RYCHCIK: Objection as to the form of
16  the question.
17     MR. MULHOLLAND: The same.
18  A. Yes. They would have gotten the nuclear camera
19  tests.
20  Q. So the earlier profit realization that you are
21  talking about in that letter means that you will be
22  getting those tests done in your hospital earlier than
23  you would if you waited for the under arrangements

Page 107

1   venture to go forward, correct?
2      MR. RYCHCIK: Objection as to the form of
3   the question.
4      MR. MULHOLLAND: The same.
5   A. Yes. That would help them start some kind of
6   arrangement before the joint venture actually came
7   into place.
8   Q. If you could go to --
9      MR. RYCHCIK: Mark, I'm sorry, I was going
10     to say when you are finished with this line or
11     questioning, if we could take another break.
12     MR. SIMPSON: That is fine. Let me finish
13     this document.
14  Q. If you could look to the next paragraph, which
15  is the third paragraph on that page, the last sentence
16  says, "My clients have indicated that all of their
17  nuclear medicine studies can be accommodated by a
18  combination of their current camera and those at
19  BRMC." Is that correct?
20  A. That is what it says.
21  Q. Go down a couple more paragraphs to the one
22  that says, "We understand." It says, "We understand
23  that, whether the ultimate arrangement on the nuclear

Page 108

1   medicine modality is through this leasing arrangement
2   or under arrangements model, it is the intention of
3   BRMC to do other similar proposals on other
4   modalities."
5      Do you know what other similar proposals
6   BRMC -- that you expected BRMC had the intention of
7   doing?
8   A. I believe it meant CT scan and MRI.
9   Q. So did you anticipate -- I think you mentioned
10  before if you did the under arrangements things, it
11  would encompass those?
12  A. Sublease, right.
13  Q. Now, the lease agreement doesn't encompass
14  those, correct?
15  A. That's true.
16  Q. So was it your understanding that if you did
17  the lease arrangement, that you would have some
18  subsequent arrangement with Bradford on the CT and MRI
19  issues?
20  A. No. According to our sublease, it would be
21  better to -- under the agreement, that the sublease
22  with the nuclear camera would end.
23  Q. Right. But I am saying was it your expectation

Page 109

1   that if you didn't do -- if you did do the under
2   arrangement, it would involve not just the nuclear
3   camera, but it would also involve MRI scans and the CT
4   scans and the like?
5   A. Yes.
6   Q. This letter says, "Whether we do the leasing
7   arrangement or the under arrangements, we understand
8   that Bradford's intention is to do other similar
9   proposals on other modalities."
10     So does that mean, if you do the lease
11  arrangement and the not under arrangements deal, you
12  expected that Bradford would want to do some kind of
13  arrangement on the MRIs and CTs?
14     MR. RYCHCIK: Objection.
15  A. Under arrangements simply means a combination
16  of all three modalities from the beginning. So if we
17  go into our under arrangements, that would include
18  nuclear medicine, CT, and MRI.
19  Q. But I am saying if you don't go the under
20  arrangements route, if you just go the leasing route,
21  it was your expectation that you do the arrangement on
22  the nuclear camera, and then down the road, there
23  would be some deal done on the remaining radiology

USA, ct al. vs. BRMC, et al.
No. 04-186E
Document 117-17 Filed 09/10/2008 Page 30 of 47
Kamran Saleh, M.D.
August 8, 2007
Multi-Page™

Page 110

1  tests?

2  A. No.

3  Q. Is that correct?

4  A. No.

5  Q. Then do you know what this sentence means?

6  A. I can't tell you what it means; but our

7  understanding was that we would go into an arrangement

8  that would include the MRI and CT scan, and then when

9  we go under the lease agreement, then we will try to

10 promote the under arrangement, and then if the under

11 arrangement goes through, then the lease arrangement

12 will end. That is what my understanding is.

13     MR. SIMPSON: Okay. Let's take a little

14     break here. It is 12:20.

15     MR. STONE: One o'clock?

16     MR. SIMPSON: Yeah. Let's be back at one

17     o'clock and get started. We will get a bite

18     and not be too long.

19     (Recess taken for lunch at 12:20 p.m., and

20     testimony was resumed at 1:05 p.m. this date.)

21     (Saleh Deposition Exhibit Nos. 18 and 19

22 were marked for identification.)

23          - - -

Page 111

1

2     EXAMINATION (RESUMED)

3  BY MR. SIMPSON:

4  Q. Dr. Saleh, I have handed you two documents

5  labeled Exhibits 18 and 19, which appear to be

6  printouts from V&S Medical's general ledger or

7  something like that. Do you recognize these?

8  A. Yes.

9  Q. Could you tell me, briefly, what 18 is?

10     MR. MULHOLLAND: Which one is 18?

11     MR. SIMPSON: Oh, I'm sorry. Exhibit 18

12     is the Transactions by Account, and 19 is the

13     Account QuickReport.

14 A. Exhibit 18 is the reports for deposits made by

15 BRMC in our account.

16 Q. Do these reflect payments by BRMC to V&S?

17 A. Yes.

18 Q. And so the amount would be the amount of the

19 payment and the date would be the date you received

20 the payment?

21 A. That's true.

22 Q. And this is printed out from your --

23 A. Quick Book.

Page 112

1  Q. Quick Book?

2  A. Yes.

3  Q. So to your knowledge, are these numbers

4  accurate?

5     MR. RYCHCIK: I would like the record to

6     show that this week we supplemented the

7     materials there --

8     MR. SIMPSON: I got them.

9     MR. RYCHCIK: -- with a determination that

10    there were some payments that were missing,

11    some deposits that had been missing from that

12    amount, and that was what was supplemented

13    earlier this week.

14    MR. SIMPSON: I will find that. I brought

15    that.

16 Q. So subject to any corrections you made, these

17 would be correct, subject to any corrections you later

18 made in your later production?

19 A. That's right.

20 Q. What is the difference between 18 and 19? Do

21 you know?

22 A. (No response.)

23 Q. Are they just subsets of each other? There are

Page 113

1  some that are on 19 that are on 18, and there are some

2  that are on both of them?

3  A. That's true.

4  Q. One way or the other, both of these represent

5  deposits or payments by Bradford to you?

6  A. That's true.

7  Q. If you could flip to Exhibit 19, the third

8  page, 1048. Most of them under the memo column, they

9  say deposit, but a couple of them say, "Phillips" and

10 a couple of them say, "Sublease Rights"?

11 A. Yeah. That was because it so happened that

12 during the transition from GE to Phillips, there

13 was -- the payment was increased for the hard cost of

14 the Phillips, and these were not -- we were not

15 getting it up to the amount that Phillips needed the

16 money.

17    So for the initial part of this, we tried to

18 make sure that we are getting the exact amount

19 $9,953.29 due that we owed to Phillips.

20    So this was done for several months, and then

21 after that, since the payment was consistent, we

22 didn't have to do that anymore.

23 Q. On 19, or on the first page of Exhibit 19, it

Page 114

1 says, "Rental Income," and it has "Deposit," and it
2 has got the amount of "$4,879.84."
3 A. That's right.
4 Q. Is that a payment under the sublease, or is
5 that a payment for --
6 A. Operation of the camera and the rental.
7 Q. That is for them leasing the space in your
8 office to keep the camera there?
9 A. That's right.
10 Q. Are any of the other payments identified here,
11 those type of payments on either of these?
12 A. No.
13 Q. I will probably come back to this later when I
14 dig out the stuff that you just produced. Actually, I
15 may have it.
16     MR. SIMPSON: You are talking about the
17     stuff you emailed to us?
18     MR. RYCHCIK: Correct.
19     MR. SIMPSON: I think I probably have it,
20     but I don't have two copies of it. Maybe we
21     can get by with just this copy for now, and
22     let's look at it.
23     I have got four pages, Bates numbered 3150

Page 115

1     through 3153, which are similar in format, and
2     they are all entitled Account QuickReport. I
3     don't have any copies, but let me get this
4     marked as Exhibit 20. I don't have any copies.
5     Did you get a copy of these?
6     MR. MULHOLLAND: This morning? Yes. Was
7     that what you --
8     MR. RYCHCIK: No. That is what I sent it
9     by email earlier this week.
10     (Discussion off the record.)
11     (Salch Deposition Exhibit No. 20 was
12 marked for identification.)
13 Q. Now, I'll show you Exhibit 20, and is Exhibit
14 20 a supplement, I guess, to Exhibit 19, or is it just
15 a completed version of 19, a more complete version?
16 A. Yes. It is in more detail and a more complete
17 version.
18 Q. So if there is a payment that is listed on
19 Exhibit 20 that is not on Exhibit 19, Exhibit 20 is
20 the correct one to look at?
21 A. That's true.
22 Q. Otherwise, they are the same type document?
23 A. That's right.

Page 116

1     MR. SIMPSON: Let's mark this as Exhibit
2     21.
3     (Salch Deposition Exhibit No. 21 was
4 marked for identification.)
5 Q. Exhibit 21 is a letter from Jodeen Hobbs to
6 Alan J. Steinberg dated March 20, 2003. Is Jodeen
7 Hobbs another one of your attorneys?
8 A. Yes, associated with Marc Raspanti.
9 Q. Yeah. She works with Marc Raspanti's firm,
10 right?
11 A. Correct.
12 Q. Do you recall receiving this letter, or do you
13 remember receiving this letter, I should say?
14 A. I don't remember receiving it, but I must have
15 received it.
16 Q. The letter talks about a March 8th meeting
17 between you and Dr. Vaccaro and Mr. Kabala and Mr.
18 Mulholland and Mr. Leonhardt that lasted for over
19 three hours. Do you recall that meeting?
20 A. I recall that we met for several hours.
21 Q. Does that second paragraph accurately describe
22 what happened at that meeting?
23     MR. RYCHCIK: Objection as to the form of

Page 117

1     the question.
2 A. I don't remember the numbers. I mean, I
3 remember there were a lot of numbers being thrown out
4 at that meeting, a lot of brainstorming going on to
5 come to some kind of mutual numbers.
6 Q. Was the purpose of that meeting to discuss the
7 details of the lease arrangement?
8 A. I don't recall that.
9 Q. Do you know whether at that time you had
10 already decided the lease arrangement was the way to
11 go, as opposed to the under arrangements venture?
12 A. No. There was no time during our discussion it
13 was decided that the lease was the preferred way as
14 opposed to the under arrangements. Under arrangements
15 was always on the table, and since the under
16 arrangements was taking so much time and needed the
17 approval of OIG, in the interim, the lease was being
18 made as an alternative.
19 Q. I guess I should rephrase that. At the time of
20 this meeting, had it been decided to go forward with
21 the lease arrangement now instead of the under
22 arrangements venture, and then to try to continue to
23 see if the under arrangements venture would be worked

Page 118

1 out?
2 A. It was decided that we could look into it in
3 more detail at this time.
4 Q. Now, the letter says that you initially
5 proposed a five-year $2,000 per day lease. Is it your
6 testimony you don't know whether that number is
7 accurate?
8 A. I don't recall the numbers.
9 Q. So you also don't recall whether at the end of
10 the day you agreed to a $1,500 per day lease over five
11 years?
12 A. (The witness shakes his head.)
13 Q. You have to --
14 A. No, I don't recall.
15 Q. Do you recall that at the end of the day you
16 did come to what you thought was an agreement on some
17 number?
18 A. I don't recall that, either, whether we made a
19 deal on that day or not.
20 Q. Do you recall what went in to your number,
21 whatever it was, or how you arrived at whatever number
22 you arrived at?
23 A. Yeah. That is based on certain facts that was

Page 119

1 the amount of income that we were generating from the
2 nuclear camera business, the up-front cost of the
3 nuclear camera itself, and the costs that we will
4 continue to incur as part of the lease that we have to
5 pay to GE, and the fact that we are going to lose our
6 ability to complete the further expansion of MRI and
7 CT scans, so those were all factored in to come to
8 some kind of a number.
9 Q. But the lease agreement -- did the lease
10 agreement prevent you from competing on MRIs and CT
11 scans or only from nuclear imaging?
12 A. It prevents us from competing on nuclear
13 medicine, and it asks us for right of first refusal
14 for MRI and CT scan.
15 Q. Do you recall what the hospital's position was
16 at this meeting about the per diem numbers that you
17 had proposed?
18 A. I don't recall that.
19 Q. You don't recall what the hospital's reason was
20 for saying your number was too much?
21 A. No, I don't recall.
22      MR. SIMPSON: We will make that Exhibit
23 22.

Page 120

1      (Saleh Deposition Exhibit No. 22 was
2 marked for identification.)
3 Q. I am showing you a document that is marked
4 Exhibit 22, which is entitled Practice Statistics. Do
5 you recall ever being presented with this document?
6 A. I don't recall.
7 Q. Look at the number, Patient Volume Statistics,
8 and it says "Admissions 750, 550 Medicare," and then
9 it says, "Outpatient episodes, 9,000," and then, "Home
10 health referrals, 75."
11      Do you recognize those numbers?
12 A. I mean, admissions, I can tell that this is
13 probably what we do in a year between me and Dr.
14 Vaccaro. There is no date on this.
15 Q. If you look at the bottom, it says -- I mean,
16 the title says, "6-12-02" at the bottom. Does that
17 help you refresh your recollection as to when you
18 might have seen this?
19 A. Oh, okay. Around that year, okay.
20 Q. So the number of admissions sounds about right?
21 A. It sounds about right.
22 Q. Does the number of outpatient episodes sound
23 about right?

Page 121

1 A. There is no way for me to know that.
2 Q. But you can't reject that as being incorrect?
3      MR. RYCHCIK: Objection as to the form of
4      the question.
5 A. I don't have the information available to
6 accept or reject that.
7 Q. And when it says home health referrals, what
8 keep of home health referrals would you ever make?
9 A. Like when the patient gets discharged from the
10 hospital home, and they need the visiting nurses to
11 check the wound or check their vitals, or do the
12 physical therapy at home, those are the referrals for
13 home health.
14 Q. Does it sound about right, one or two a week on
15 average?
16 A. One or two a week on average, yes.
17 Q. Now, the numbers there for revenue attributed,
18 it says, "Inpatient revenue, 2.7 million," and
19 "Outpatient revenue 900,000," and "Outpatient revenue,
20 170,000." Do you recall ever discussing whether you
21 thought those numbers were correct?
22 A. I don't recall that.
23 Q. And how about the other numbers at the bottom,

Page 122

1 the 600,000 and 95,000 that appear there?

2  A. No.

3  Q. You don't have any recollection of considering

4 those figures?

5  A. No.

6     MR. SIMPSON: I will now show you Exhibit

7    23, please.

8     (Saleh Deposition Exhibit No. 23 was

9 marked for identification.)

10  Q. Exhibit 23 is two pages. The first page is

11 mostly typewritten, and then it has handwritten

12 comments at the bottom that go over on to the next

13 page. First off, do you recognize the handwriting?

14  A. Yes.

15  Q. Is that yours?

16  A. Yes.

17  Q. All of the handwriting appears to be yours? Is

18 there any that looks like Dr. Vaccaro's?

19  A. No.

20  Q. Do you recall creating this document?

21  A. I don't recall creating it, but this is my

22 writing.

23  Q. And do you see in the middle of it, the typed

Page 123

1 part, it says, "Inpatient admission," and it looks

2 like it says here, "I believe your estimate of 2.7

3 million is projected and not," and then it has

4 "profit" up above, "and not the gross income." Then

5 it says "Would amount to 4.5 million."

6     That 2.7 number, that appears to correlate to

7 the 2.7 million dollars on Exhibit 22 that we just

8 looked at, correct?

9  A. Yes.

10  Q. So it looks like you were reviewing this

11 document; is that correct?

12  A. It looks like it, yes.

13  Q. And it looks like you are saying that the 2.7

14 million only reflects profit and not gross revenues to

15 the hospital from your referrals?

16  A. That's right.

17  Q. Then, going down, it says, "Outpatient

18 referrals," and No. 1 says, "Outpatient," and then

19 does that handwriting say, "Laboratory Services"?

20  A. Yes.

21  Q. "Outpatient laboratory service has close to2

22 million." Do you know what that means, or what you

23 were thinking then?

Page 124

1  A. That is for referrals made to the hospital for

2 lab draws and the lab work.

3  Q. And then No. 2, "Outpatient CT scan and MRI are

4 greater than 85 percent coming from V&S." Does that

5 mean that all the CTs and MRIs that the hospital is

6 doing, 85 percent of those are coming from V&S?

7  A. That is what this statement says.

8  Q. Does that sound right to you now?

9  A. No.

10  Q. You don't think that it was actually 85 percent

11 at that time?

12  A. I can't tell if it was 85 percent at that time.

13 I know that it is not 85 percent at this time.

14  Q. The next line says, "The amount of money lost

15 there would be phenomenal," and then it looks like

16 there is a line drawn through it. Do you know what

17 you were thinking when you wrote that?

18  A. I don't recall.

19  Q. Actually, go up to the paragraph, the full

20 paragraph before all of these, where it says, "After

21 thought process, not discussed in meeting from our

22 part, but the rough estimate of losses the hospital

23 will incur from going ahead with the economic

Page 125

1 credentialing process are," so does this look like

2 this is discussing revenue the hospital would lose if

3 it takes away your credentials?

4  A. Yes.

5  Q. No. 3 says, "Cardiac caths greater than 50

6 percent," are you saying there that 50 percent of the

7 cardiac catheterizations done at the hospital are from

8 V&S?

9  A. That is what this statement says.

10  Q. Okay. The next one says "All elective

11 surgeries can be directed elsewhere," and then "can be

12 directed elsewhere," is crossed through, and

13 handwritten it says, "ordered by V&S."

14     First of all, do you recall striking through

15 "can be directed elsewhere"?

16  A. I don't recall, but I did it. I crossed it off

17 "can be ordered by V&S."

18  Q. Are you basically saying here that all of the

19 elective surgeries that you can refer out, that they

20 don't have to be done here, that they don't have to be

21 done at the hospital, they can be done somewhere else?

22  A. That is the true statement any time. All the

23 elective surgeries can be done anywhere where the

USA, et al. vs. BRMC, et al.
No. 04-186E

Multi-Page™

Kamran Saleh, M.D.
August 8, 2007

## Page 126

1 patients choose or anywhere the convenience factors
2 are and anywhere the subspecialist's ability is there.
3   Q. Do you see at the bottom, it says, "Thanks,
4 Kamran Saleh, M.D.," but there is no signature. Does
5 this look like a draft of a letter you were preparing
6 for the hospital?
7   A. It looks like I was just sitting down and
8 thinking about all of this. That is what it looks
9 like.
10   Q. Do you know whether you ever sent a letter
11 along these lines?
12   A. I don't remember ever sending anything like
13 this (indicating).
14   Q. I want to try to go through some of these
15 handwritten comments. At the bottom of the first
16 page, there is something about discussions with Jerry
17 Jenkins about opening up outpatient transfusion
18 services at our facility.
19   A. Uh-huh.
20   Q. What is that referring to?
21   A. We were thinking about setting up a service to
22 provide transfusion in the office, and there was some
23 discussion going on that Jerry Jenkins, who is the man

## Page 127

1 in charge, and it never went anywhere because of
2 regulations and all that, and, therefore, it ended up
3 with nothing.
4   Q. If you flip over to the next page, it is like,
5 I guess, the second handwritten paragraph, it looks
6 like it starts out, "Also worth mentioning G.
7 Washington's comments to Dr." -- do you know who that
8 is, Dr. who?
9   A. Dr. Gatty.
10   Q. "Dr. Gatty at the time of his interview,
11 January '01, that, quote, 'We are going to close this
12 V&S med practice,'" I think it says, "'because they
13 are trying to buy nuclear camera.'"?
14   A. Yes.
15   Q. What were you trying to say there or what was
16 your purpose in writing that down, or what were you
17 referring to?
18   A. I think it is just a memory. I think Dr. Gatty
19 was somebody who came in for an interview at that
20 point, and he came to talk to us, too, and he must
21 have mentioned these words, and I just jotted this
22 down to keep some kind of a record.
23   Q. Who is G. Washington?

## Page 128

1   A. He is the senior vice president.
2   Q. Of the hospital?
3   A. Of the hospital.
4   Q. What does the G stand for? Do you know?
5   A. Glen. Glen Washington.
6   Q. At the bottom, you say, "Please note some of
7 the facts mentioned here were not discussed in the
8 meeting, but we would like the Board members aware of
9 them."
10     Do you know what meeting you were talking
11 about?
12   A. It must have been the meeting before when they
13 gave us these numbers (indicating).
14   Q. This was not the meeting discussing the lease
15 arrangement in 2003. This was some meeting in 2002,
16 probably?
17   A. That is what the date says.
18   Q. Let me show you another set of handwritten
19 documents, and we will mark these as Exhibit 24.
20     (Saleh Deposition Exhibit No. 24 was
21 marked for identification.)
22   Q. I have shown you another set of handwritten
23 documents marked as Exhibit 24, and is this also your

## Page 129

1 handwriting?
2   A. Yes.
3   Q. Do you remember creating this document?
4   A. No.
5   Q. Correct me if I read your handwriting wrong.
6 It looks like it has "Loss assessment now with the
7 nuclear camera."
8   A. Uh-huh.
9   Q. And then No. 2 says, "Loss assessment if we
10 lose privileges, so-called severing the relationship."
11   A. Uh-huh.
12   Q. Tell me what you are referring to there between
13 1 and 2. What are those referring to?
14   A. I think I was just brainstorming and thinking
15 about different options because of the discussions we
16 had going on with the hospital. So I jotted down
17 these notes. I don't know whether this happened
18 before this meeting or after the meeting (indicating).
19   Q. But does it look like you are trying to -- the
20 topic is the loss, so probably the loss suffered by
21 the hospital under two different scenarios?
22   A. Yes.
23   Q. The first one is now with the nuclear camera,

USA, et al., vs. BRMC, et al.
No. 04-186E

Case 1:04-cv-00186-MBC    Document 117-48    Filed 09/10/2008    Page 35 of 47

Kamran Saleh, M.D.
August 8, 2007

Page 130

1 whatever that means, and the second one is if they cut
2 your privileges?
3   A. Uh-huh.
4   Q. And then under No. 2, there is a bunch of sub
5 things that, first of all, it says labs, two million a
6 year, ADM, what is that?
7   A. Admissions.
8   Q. Admissions, three to four million each person?
9 Is that what it means?
10   A. That is what it says.
11   Q. Is a person you and Dr. Vaccaro?
12   A. That's true.
13   Q. That doesn't mean per patient?
14   A. No.
15   Q. Then 3 says, "Outpatient radiology services,"
16 and then it says, "CT scans and MRIs," and it has "85
17 percent" off to the side. It looks like these numbers
18 are -- could this document be sort of a rough draft of
19 the typed version that we just looked at as Exhibit
20 23?
21   A. That is what it looks like.
22   Q. Going on down in sort of the lower middle,
23 "letter for QA." Do you know what QA is?

Page 131

1   A. Quality assurance.
2   Q. What are you referring to there?
3   A. There were some issues with the quality of care
4 in the Department of Medicine.
5   Q. Having to do with you?
6   A. With me and Dr. Vaccaro.
7   Q. Was the hospital claiming there were problems
8 with your quality of care?
9   A. No. It wasn't the hospital. It was the
10 doctors in the Department of Medicine, and because the
11 fight was going on at that time, we thought that it
12 could be the hospital putting more pressure on us, and
13 they resolved the issue by getting an independent
14 evaluation from outside quality care evaluation, and
15 that problem was resolved.
16   Q. So you were thinking because these other
17 doctors were, I guess, making complaints about you,
18 you thought that the hospital was using that as
19 additional leverage over you in this dispute that they
20 were having about the economic credentialing?
21   A. Yes, initially that was thought.
22       MR. MULHOLLAND: The same statement as
23     before relevant to the hospital not waiving any

Page 132

1 peer review privilege by virtue of Dr. Saleh
2 answering those questions.
3       MR. SIMPSON: Okay.
4   Q. I guess if we go down a little bit, there is a
5 line, and it says, "Done because of poor radiology
6 services," exclamation point, and then below that,
7 "Patient's ease and comfort," exclamation point. It
8 sounds almost like you are writing that sarcastically,
9 like, "I can't believe somebody is saying this"?
10   A. No. What it sounds like is I am thinking what
11 are the points to discuss with them, like why are we
12 doing this nuclear camera? It is because of the
13 patient's ease and comfort and because they are
14 relatively unhappy with the radiology services.
15   Q. So those comments related to the nuclear
16 camera. They don't relate to the other comments that
17 people were making about your quality of care?
18   A. That's right.
19   Q. Right below that it says, when somebody left,
20 and I don't know what that says.
21   A. Weintraub.
22   Q. Weintraub?
23   A. Yes.

Page 133

1   Q. "When Weintraub left, paid something money."
2   A. "X amount of money."
3   Q. "X amount of money to guy" --
4   A. "To buy the practice."
5   Q. -- "to buy the practice. Was paid off from
6 your income/profit."
7   A. Yes.
8   Q. Somebody was paid off from your profit, your
9 income?
10   A. That is what my thinking was. When Dr.
11 Weintraub left, you know, we were employed by Dr.
12 Weintraub for a couple of years, and then Dr.
13 Weintraub sold his practice to the hospital and got
14 paid some money for that; and at that point, we became
15 an employee of the hospital, and we had an incentive
16 system. We had an incentive bonus type of contract,
17 and we thought that the expense was originally at
18 around 50 percent, which more than it should be, and
19 we wanted the expense to be cut down to 45 to 42
20 percent. So we think that the extra expense that has
21 been put on us was actually paid off on some of the
22 amount that he was paid.
23   Q. So that was an expense dispute that was long

USA, et al, vs. BRMC et al
No. 04-186E

Document 117-4 Filed 09/10/2008 Page 36 of 47

Kamran Saleh, M.D.
August 8, 2007

Page 134

1 before the nuclear camera?

2 A. That's right.

3 Q. You are just brainstorming and tossing down

4 everything you can think of in this thing?

5 A. Yes.

6 Q. On the next page at the top, it starts out,

7 "Hospital did not care about the total money." What

8 are you talking about in this paragraph here? Is that

9 the same Weintraub thing, or is that a different

10 subject matter?

11 A. No. This is about when we got separated from

12 the hospital, so we had to pay for the non-compete, so

13 that is referring to that, that we had to pay for the

14 non-compete, plus $50,000 for the goodwill, and now we

15 had to go through this competition problem.

16 Q. And so you saying, we had to pay all of this

17 money to get out of this non-compete, and now you are

18 telling us --

19 A. That we can't do it, otherwise, we can't get

20 the privileges.

21 Q. Down in the middle, there is something that

22 starts with "Kim Berkowski"?

23 A. Yes.

Page 135

1 Q. You say "Dr. Kirsch girlfriend"?

2 A. Yes.

3 Q. "Writing inapp." -- is that inappropriate?

4 A. Yes.

5 Q. "Stuff up"? What does that mean?

6 A. Yes.

7 Q. What does that mean?

8 A. It means that Kim Berkowski was a case manager,

9 and she is Dr. Kirsch's girlfriend, and he was one of

10 the persons who had, you know -- were not happy with

11 our arrangement and what was going on with the

12 hospital, and Kim Berkowski, while she was reviewing

13 the charts would write inappropriate comments in the

14 chart, which was not appropriate, which I was just

15 reminding myself to discuss about that if need be.

16 Q. Again, going down a couple of points, it says

17 "buy it from us, 1.5 million." Does that relate to

18 your suggestion that the hospital buy out all or part

19 of your practice?

20 A. That's true.

21 Q. And then it says, "if not," and I can't read

22 what that word is down below?

23 A. "Still."

Page 136

1 Q. "Still lose the same money." So I guess are

2 you saying you are going to lose the same money if you

3 either buy the practice for a million and a half or if

4 you deny us privileges, you are going to be losing the

5 same amount of money anyway?

6 A. Well, if they deny our privileges, we are not

7 going to be able to admit the patients, so as you can

8 see the numbers, they are making a lot of money.

9 Q. So you are saying, one way or the other, unless

10 we work things out, the hospital is going to be losing

11 a lot of money?

12 A. (The witness nods his head.)

13 Q. That's correct?

14 A. Yes.

15 Q. At the very end, is that a plus sign or just a

16 mark?

17 A. Plus.

18 Q. "Plus we do not" -- Is that own or owed?

19 A. "Own that."

20 Q. "Own that." What does that mean?

21 A. We did not own the camera I guess. We lease

22 it.

23 Q. And then it says, "economic credentialing

Page 137

1 doesn't hold." So you are saying their economic

2 credentialing doesn't have any merit? Is that what

3 you are saying?

4 A. That's right.

5 Q. And the next page, there is three bullet

6 points, "improved quality of care," are you referring

7 to --

8 A. Our camera.

9 Q. -- ease of patient care or anything like that?

10 A. Yes, it helps. We always heard the comments,

11 "Doctor, it is so easy, I come here, and I walk next

12 door, and I'm there for the testing."

13      When they have to go to the hospital, they

14 would have to go through the admission process and go

15 through administration, and so it becomes a little

16 difficult for them. so that really was appreciated by

17 our patients.

18 Q. On that topic, when you were using the nuclear

19 camera at your office, would it always be for your own

20 patients, or would you ever have other people refer

21 their patients to you for their tests?

22 A. Rarely.

23 Q. Rarely?

USA, et al., et al.: BRMC et al. MBC   Document 174 Multi-Page™   Filed 09/10/2008   Page 37 of 47
No. 04-186E

Kamran Saleh, M.D.
August 8, 2007

Page 138

1   A. Yes.
2   Q. Now, going back to this document, the next
3  bullet point says, "Backlog" --
4   A. "Reduced."
5   Q. What is that? A backlog of nuclear tests need
6  to be done?
7   A. Yes. As we talked before, that there was a
8  difficulty in scheduling the patients, because there
9  was the one camera in the hospital, so the schedule
10  would take three to four weeks sometimes. So once we
11  opened it up, it just reduced the backlog, and the
12  test would be done in a timely fashion.
13   Q. And the last one looks like it says, "Increased
14  c. cath"?
15   A. Increased cardiac catheterization.
16   Q. And what does that mean?
17   A. If the stress test is abnormal, then you have
18  to check it with cardiac catheterization. So if your
19  reading is more appropriate as it should be, then the
20  chances of having an abnormal stress test are more,
21  and then you get more cardiac catheterization.
22       MR. SIMPSON: Mark this as Exhibit 25,
23    please.

Page 139

1       (Saleh Deposition Exhibit No. 25 was
2  marked for identification.)
3   Q. I have handed you Exhibit 25, which is three
4  pages of bar charts entitled Outpatient Referral
5  Impact, Dr. Saleh, Outpatient Referral Impact, Dr.
6  Vaccaro, and Outpatient Referral Impact, Total V&S.
7  Have you seen this document before?
8   A. Yes.
9   Q. Is this a document that was prepared by the
10  hospital?
11   A. Yes.
12   Q. And provided to you guys?
13   A. Yes.
14   Q. Do you know when -- do you know at what point
15  during the process you got this document?
16   A. I can't remember that.
17   Q. But it was at some point during your
18  negotiations with the hospital over a resolution of
19  the whole issue?
20   A. That's right.
21   Q. It is kind of hard to tell the shading, but do
22  you know whether the 2001 is the number to the left or
23  to the right?

Page 140

1       MR. RYCHCIK: If you know.
2   Q. If you know?
3   A. I don't know.
4   Q. Did your outpatient referrals decrease or
5  increase from 2001 to 2002?
6   A. I can't tell which one is 2001 and which one is
7  2002, so I can't really comment on that, but it seems
8  like in one year, it was 432, and the next year it was
9  12. In the one year, the ultrasound was 477, and the
10  next year, it was 201. So it varied from one year to
11  another. Which one is 2001 and which one is 2002, I
12  don't know.
13   Q. You don't know whether the referrals were
14  increasing or decreasing during this time period?
15   A. I don't recall that.
16   Q. Do you recall having discussions about this
17  particular document with Bradford?
18   A. I don't recall the discussion, no.
19   Q. Was the point of this document to try to help
20  the parties arrive at some dollar figure for either
21  the under arrangements venture or the lease?
22   A. I think this was to show that with our nuclear
23  camera, there was an economic insult to the hospital.

Page 141

1   Q. What was that? What was that? Economic what?
2   A. Insult.
3   Q. Insult? Okay. That is what I thought you
4  said.
5       I'm going to show you what I'm going to mark as
6  Exhibit 26.
7       (Saleh Deposition Exhibit No. 26 was
8  marked for identification.)
9   Q. This is a document entitled Procedure Analysis
10  By EOD. Do you recognize this document?
11   A. No.
12   Q. Do you know if this was a document that was
13  prepared by you or by the hospital?
14   A. No.
15   Q. Have you ever seen this format before?
16   A. I don't remember.
17   Q. Do you know what EOD means?
18   A. No.
19   Q. Do you recognize any of the handwriting?
20   A. Yes.
21   Q. The one that says, "Estimated actual payment
22  from third parties," whose handwriting is that?
23   A. That is Dr. Vaccaro's?

USA, et al., vs. BRMC, et al.
Case 1:04-cv-00186-MBC    Document 174    Multi-Page™    Filed 09/10/2008    Page 38 of 47
No. 04-186E
Kamran Saleh, M.D.
August 8, 2007

Page 142

1  Q. The same with the "AR 230,000"?
2  A. Yes.
3  Q. What about the rest of the handwriting?
4  A. There is one that is mine. "Month and profit,
5  expiration," so this one is my writing.
6  Q. All of the handwriting at the bottom middle is
7  yours?
8  A. Yes.
9  Q. Do you recall writing that?
10 A. No.
11 Q. Does that help you figure out whether this is
12 your document or the hospital's document?
13 A. No.
14 Q. What were you saying in the handwriting that
15 you were writing down there?
16 A. This seems like it is a calculation to see what
17 the month's profit is, and the expense for the month,
18 so the net per month is $15,079.66, and then there is
19 a calculation for a net per year $180,948. That is
20 what it looks like.
21 Q. Is that the net profit for the procedures that
22 are identified above?
23 A. That is what it seems like.

Page 143

1  Q. And the procedures that are listed, are those
2  procedures that are done on a nuclear camera?
3  A. That's right.
4  Q. And does it look like what is showing, is it
5  showing the charges -- showing the number of
6  procedures, the total charges, and the payments for --
7  A. Yes.
8  Q. -- for each of the procedures for 11-01-2001 to
9  10-31-2002?
10 A. Yes.
11 Q. And that was a period of time when you had the
12 nuclear camera, correct?
13 A. Correct.
14 Q. So it looks like this is a V&S document that is
15 showing the payments you received during that period
16 for four of these procedures, correct?
17     MR. RYCHCIK: Objection as to the form of
18     the question.
19 A. I mean, it doesn't say V&S anywhere, so I can't
20 really tell whether it is our document, but it looks
21 like it.
22     MR. SIMPSON: 27, please.
23     (Saleh Deposition Exhibit No. 27 was

Page 144

1  marked for identification.)
2  Q. All right. I'm showing you Exhibit 27, which
3  is a document entitled -- it looks like it says,
4  "NucMed Analysis," and it lists revenue, expenses and
5  volume and reimbursement information. Do you
6  recognize this document?
7  A. Uh-huh. Yes, I do.
8  Q. Is this a document you prepared or V&S
9  prepared?
10 A. V&S prepared.
11 Q. It looks insurance revenue, 576,093, and if you
12 go to the prior document and look down to the combined
13 plan payment, it is 576,092.74.
14 A. Uh-huh.
15 Q. Then similarly, patient revenue is 10,347 on
16 both of them, so it looks like both documents relate
17 to the same thing, don't they?
18 A. Yes.
19 Q. Where it says "Expenses" there, and it has got
20 a lot of subcategories, are those the entire expenses
21 for the practice, or are they limited to the camera?
22 A. Just the camera.
23 Q. And did you come to these numbers by some sort

Page 145

1  of allocation? Like, did you allocate a certain
2  percent of the salaries to the camera, or how did you
3  decide what salaries are allocated to the camera or
4  something else?
5  A. We had two people working for the camera, one
6  secretary and one nuclear technician, so they are
7  salaries.
8  Q. And no portion -- and, that is right, you had
9  another doctor, Dr. Khan, working for you?
10 A. Yes.
11 Q. Would a portion of his salary be attributed to
12 this?
13 A. No.
14 Q. Just the technicians?
15 A. Yes.
16 Q. I see. Purchased labor, what is that?
17 A. That is a reading.
18 Q. Is that an expense for you, though, or did you
19 pay people to read?
20 A. Yes.
21 Q. They didn't just bill it themselves to the
22 payors?
23 A. No. So we did the global billing, and we paid

Page 146

1  them, whoever we had the contract with.
2     Q. Down at the bottom, Volume and Reimbursement
3  Information, it just refers to the CPT codes, but they
4  look by and large to be the same CPT codes on the
5  other ones, on Exhibit 26?
6     A. Yeah, by and large.
7     Q. And the numbers are, I would say, about $10,000
8  difference, but they are roughly the same?
9     A. Yes.
10    Q. So it looks like these are just -- actually, it
11 looks like these two documents are different versions
12 of essentially the same information?
13    A. Yes.
14    Q. And, in fact, your handwritten notes on Exhibit
15 26 are very similar to the net income numbers in the
16 middle of 27?
17    A. Yes.
18       MR. SIMPSON: Real quickly, I'm going to
19    go through 28.
20       (Saleh Deposition Exhibit No. 28 was
21 marked for identification.)
22    Q. Exhibit 28 is a handwritten document entitled
23 "Expense." Is this your handwriting?

Page 147

1     A. No. Well, it is my -- it has my writing, too,
2  in there.
3     Q. The entries, the "Expense" and monthly payments
4  and the expenses and all the numbers --
5     A. That is not --
6     Q. -- that is not your handwriting?
7     A. No.
8     Q. Do you know whose it is?
9     A. No.
10    Q. But up at the top where it says, "Monthly
11 expense for camera" that is yours?
12    A. No.
13    Q. That is not yours?
14    A. No.
15    Q. Which handwriting is yours then?
16    A. I think the numbers are.
17    Q. You think the numbers are yours?
18    A. Yes.
19    Q. Have you seen this document before?
20    A. No. I don't recall seeing this.
21    Q. Can you recall what this document appears to
22 be?
23    A. It seems like they are trying to get the

Page 148

1  expenses for the nuclear camera.
2       MR. SIMPSON: Here's 29.
3       (Saleh Deposition Exhibit No. 29 was
4  marked for identification.)
5     Q. I'm showing you Exhibit 29, which is a bunch of
6  documents entitled "V&S Patient Totals," and they have
7  varying report dates, and each looks like a bunch of
8  months, and you will see the Bates numbers. It starts
9  at 337 and then it jumps to 351, and there was a bunch
10 of stuff between here, but I pulled out all the ones
11 in this format to put them together in this exhibit.
12       Do you recognize these documents?
13    A. I don't remember them, but I can see what it is
14 about.
15    Q. Does it look like a report that V&S printed
16 out, or does it look like a Bradford Medical report?
17    A. It says the Nuclear Medicine Department, V&S
18 Medical.
19    Q. So this is a V&S document?
20    A. Yes. It looks like it.
21    Q. Does it appear to show the number of procedures
22 you did for any given month as listed?
23    A. That's correct.

Page 149

1     Q. Let's look at the first page. It has a bunch
2  of numbers, and at the bottom it has "52 - stress
3  tests." What does the "52 - stress tests" mean? Is
4  that just an entry, or is that -- it doesn't look like
5  a summation of all of the other ones.
6     A. No. It is not a summation. I don't know what
7  it means, 52 stress tests.
8     Q. All of the procedures that are listed, these
9  are all various procedures done with the nuclear
10 camera, correct?
11    A. That is correct.
12    Q. One of them is entitled "Treadmill stress
13 test," correct?
14    A. Yes.
15    Q. Are there any other stress tests, other than a
16 treadmill stress test?
17    A. Yeah, a Cardiolite stress test. Okay. Yeah,
18 maybe it is.
19       Cardiolite stress is 23 and treadmill is 29, so
20 that is --
21    Q. That doesn't come out right. 43 and 29 is 72.
22    A. No. 23 and 29.
23    Q. Oh, Adenosine?

USA, et al. vs. BRMC, et al. Document 172-4 Filed 09/10/2008 Page 40 of 47
No. 04-186E

Kamran Saleh, M.D.
August 8, 2007

Page 150

1  A. Yes.
2  Q. You are looking at Cardiolite resting. So it
3  looks like the 52 is the adding up of the Adenosine
4  and the treadmill?
5  A. That's right.
6  Q. Do you know why he would be separating those
7  out for the handwriting at the bottom? What is
8  significant about that?
9  A. That is just the calculation for the stress
10 testing, and that is not my writing.
11 Q. That is not yours. Do you know whose it is?
12 A. I don't know whose writing that is.
13 Q. Was this a document that you provided to
14 Bradford?
15 A. I don't recall.
16 Q. Do you recall whether you generated this
17 document in the context of your negotiations with
18 Bradford over the under arrangements or the lease
19 agreement?
20 A. I don't recall that, either.
21 Q. Do you routinely print out these documents
22 every month?
23 A. We print out an end-of-the-month report every

Page 151

1  month.
2  Q. Is this one of the documents that comes out at
3  the end-of-the-the-month report?
4       MR. RYCHCIK: Are you talking about this
5       time period or these dates?
6       MR. SIMPSON: Yes. The time period when
7       these date are.
8  Q. I am trying to figure out if this is a
9  routinely printed document printed at that time or was
10 this printed out for a special reason?
11 A. I don't think it was a routinely printed out
12 document, so it must have been prepared to get some
13 information.
14 Q. You don't know how you used that information?
15 A. That is right. It could just be for our own
16 purposes.
17 Q. I'm going to mark as Exhibit 30 all the
18 documents you handed to us this morning.
19      (Saleh Deposition Exhibit No. 30 was
20 marked for identification.)
21 Q. Exhibit 30 is Bates labeled 3154 through 3170.
22 The first page is a statement of October 2003. Is
23 this a statement for -- what is this first page?

Page 152

1  A. This is a statement that we sent to the
2  hospital when the hospital was using the nuclear
3  camera at our facility.
4  Q. So the $4,879.84 is your bill to the hospital
5  for the rent --
6  A. The cost.
7  Q. -- the cost of keeping the camera on your site?
8  A. Not just the cost. It includes the running of
9  the camera, too.
10 Q. But it is payments that they are making to you
11 for keeping the camera at your facility instead of at
12 the hospital, right?
13 A. Yes.
14 Q. And those payments are in addition to the other
15 payments that would be under the sublease?
16 A. That's true.
17 Q. And the next page is a copy of their check to
18 you for that amount, it looks like?
19 A. Yes.
20 Q. And the next page 3156 is a similar statement
21 for November of 2003, correct?
22 A. Yes, sir.
23 Q. Then the next page, it says, "Receipts," and

Page 153

1  there is no date on it, though, that I can see. Is
2  this a -- how can you tell what period this is for?
3  A. It is after November, because it says November
4  rental statement.
5  Q. Oh, I see. Okay. So this is, basically, your
6  receipt for the payment that you received, and you
7  received a total -- the top line is "Total receipts,
8  $24,922.31." What is that payment? What is that?
9  A. That is the payment received by use of the
10 nuclear camera.
11 Q. Is that the sublease payment?
12 A. No. The way it was handled initially was after
13 it came into the contract with the hospital for
14 sublease, then the camera stayed at our facility for
15 several months, and then used in our facility; and
16 when it was used, we continued to provide the
17 services, but the income that was generated from that
18 date on was the hospital's money.
19      So this is the income brought in from that day
20 on, and then you can see that there are expenses that
21 are deducted. So whatever it was less was there, and
22 then their rental statement, and then the actual
23 payment to BRMC was made of this much dollars.

Page 154

1  Q. So this was a payment made by you to BRMC?
2  A. Yes.
3  Q. So the 424,922 is payments that you received
4  from --
5  A. That's right.
6  Q. -- from --
7  A. The operation of the nuclear camera.
8  Q. At that point, were you billing for the tests?
9  A. Yes.
10  Q. So you were billing for them, and then you were
11  collecting --
12  A. Right.
13  Q. So the camera had been subleased to Bradford at
14  that time?
15  A. Right.
16  Q. But Bradford wasn't billing for the tests?
17  A. That's true.
18  Q. You were billing -- you would collect payment
19  from insurers or whoever, and then you would subtract
20  out a 10 percent billing charge, correct?
21  A. Yes.
22  Q. And then you would also subtract out a 24
23  percent reading charge for Dr. O'Donnell?

Page 155

1  A. Yes.
2  Q. Now, is that 24 percent reading charge, is that
3  a pass-through charge?
4  A. Yes. It goes to Dr. O'Donnell.
5  Q. You weren't making any profit on that number?
6  A. I don't remember exactly.
7  Q. And then there is something for medication
8  receipts. What is that?
9  A. Like Cardiolite and all the medication that is
10  used, you buy the medication, and then the insurance
11  company pays you for that.
12  Q. So that would be for medication, would you have
13  any profit on that number?
14  A. No.
15  Q. So that is your actual cost of purchasing the
16  medication that was used in the test that you are
17  performing for Bradford?
18  A. That's true.
19  Q. So when you subtract out that, you come to the
20  9,180.76, and then you subtract out the rental payment
21  that they owed you, and you come to 4,593.94, which
22  you paid to them?
23  A. That's true.

Page 156

1  Q. And then the next two pages show the same stuff
2  for December of 2003?
3  A. Uh-huh.
4  Q. And then the next page shows a statement for
5  January of 2004, but I don't see any receipts page, a
6  similar receipts page for January of 2004, and did you
7  think that was omitted, or did they cheat you that
8  month? No offense.
9  A. No. I think maybe the receipt was not enough
10  to go along with that in that month. So, therefore,
11  it was totaled with the February statement. After the
12  February statement, you can see.
13  Q. So you got the February statement on page 3161,
14  and then on 3162, you have the February receipts page,
15  just like we discussed before, which reflects that you
16  all ended up making a payment to Bradford of 7652?
17  A. That's true.
18  Q. And then that includes -- does that include --
19  is this, like, a two-month type page? Does that
20  include January and February?
21  A. No. It just saves that February statement, so
22  that did not include a January statement. So if you
23  go farther, you can see --

Page 157

1  Q. But your total receipts for that period are
2  42,000 plus, which is substantially more than
3  27,000?
4  A. Because this is probably two months.
5  Q. So it is two months of receipts, less two
6  months of expenses?
7  A. Yes.
8  Q. And then you have the same thing the next
9  couple of pages for March of 2004, and then the next
10  two pages are the same thing for April of 2004; and
11  then you have a statement from May of 2004, correct?
12  A. That is true.
13  Q. But there is no separate receipts page?
14  A. That's right.
15  Q. And then a statement for June and then a
16  receipts page following that, which looks like it
17  includes monies from several months.
18  A. Yes.
19  Q. But if you take all of these receipts pages,
20  they cover that whole period that the statements refer
21  to?
22  A. Right.
23  Q. And in the last couple of months there, say,

USA, et al. v. BRMC, et al.    Multi-Page™    Kamran Saleh, M.D.
Case 1:04-cv-00186-MBC    Document 17-4    Filed 09/10/2008    Page 42 of 47    August 8, 2007
No. 04-186E

Page 158

1 May -- in May, there is a rent charge of 2,500 and a
2 secretarial support of 1,000, and then in June, there
3 is a 25 rent, and no secretarial support. There are a
4 lot of things that were included in previous months
5 that aren't included in those months?
6 A. They stopped doing the stress test at that
7 time, so there is no fee for secretarial support or
8 other support.
9 Q. So at this time, the equipment was in your
10 office, but it wasn't being used?
11 A. That particular month.
12 Q. So in April it was not used?
13 A. April?
14 Q. Page 3165?
15 A. April, right.
16 Q. And then for May, it was not used, correct?
17 A. Correct.
18 Q. And then in June it was also not used?
19 A. Right.
20 Q. So let's say in April, May, and June, it wasn't
21 being used?
22 A. That is right.
23 Q. Do you know if the hospital -- had you gotten

Page 159

1 the new equipment at that time, the new camera by that
2 time?
3 A. I don't know for sure if that is the time
4 period.
5 Q. Let me ask you this: Did you return the old
6 camera at the same time you got the new camera, or was
7 there an overlap?
8 A. There was an overlap.
9 Q. There was an overlap of time when you had the
10 old camera and Bradford had the new camera?
11 A. Yes.
12 Q. Let's look at the very last page of this
13 exhibit, 3170. This is another vendor QuickReport
14 like the ones we had talked about before.
15 A. Yes.
16 Q. So is that yet one more page?
17 A. This is just to show the amount that we have
18 talked about in those statements, those are being paid
19 to the hospital, so all the --
20 Q. These are not receipts by you? These are
21 payments by you?
22 A. Yes.
23 Q. I understood they were --

Page 160

1 A. These are payments by us to the hospital.
2 Q. All right. I understand.
3 A. Right.
4     MR. RYCHCIK: Can we go off the record a
5 second?
6     (Discussion off the record.)
7     (Saleh Deposition Exhibit No. 31 was
8 marked for identification.)
9 Q. I have shown you Exhibit 31 is an agreement
10 dated April 16, 2003. The last two pages appear to be
11 out of order, but that is just the way they were
12 produced to us, but I think they are just out of
13 order. Is this a copy of an agreement that V&S and
14 Bradford signed?
15 A. Yes.
16 Q. And on Bates No. 0664, you and Dr. Vaccaro also
17 signed agreeing to be bound by the terms and
18 conditions of the agreement?
19 A. That's true.
20 Q. And this agreement, is it sort of fair to
21 characterize this agreement as an agreement to enter
22 into the lease agreement?
23     MR. RYCHCIK: Objection as to the form of

Page 161

1     the question and to the extent you are calling
2     for a legal conclusion.
3 Q. Let me put it to you this way, paragraph one,
4 in the middle, it says, "The equipment will be
5 subleased to the Medical Center pursuant to a sublease
6 between the parties."
7 A. Where is that?
8 Q. In the middle of paragraph 1.
9     MR. RYCHCIK: Paragraph numbered 1?
10     MR. SIMPSON: Paragraph numbered 1.
11     MR. RYCHCIK: As opposed to the first
12     paragraph, Doctor.
13 Q. As opposed to the first paragraph of the
14 document, Doctor.
15 A. This is paragraph No. 1?
16 Q. Where it says, "The equipment will be subleased
17 to the Medical Center pursuant to a sublease between
18 the parties."
19 A. Yes, that's what it says.
20 Q. The actual sublease was not executed until
21 sometime later, correct?
22 A. That's true.
23 Q. Did the sublease begin upon the execution of

USA, et al, vs. BRMC, et al. Case 1:04-cv-00186-MBC    Document 47-7    Filed 09/10/2008    Page 43 of 47

Kamran Saleh, M.D.
August 8, 2007

No. 04-186E

Page 162

1 this agreement, or upon the execution of the
2 subsequent agreement?
3 A. No. The subsequent agreement.
4 Q. After you executed this agreement, you still
5 kept the camera and operated it as your own?
6 A. That's true.
7 Q. No rights passed to the hospital with respect
8 to the equipment under this lease --
9 A. Yes.
10 Q. -- under this agreement?
11 A. That's true.
12 (Saleh Deposition Exhibit No. 32 was
13 marked for identification.)
14 Q. I am showing you Exhibit 32, and is this a copy
15 of the actual Equipment Sublease that was executed?
16 A. Yes.
17 Q. And was it executed on October 1, 2003?
18 A. That is what the date says.
19 Q. I'm sorry. Actually, will you flip over to
20 page 17 which is Bates labeled 0316?
21 A. It was signed 9-22-03.
22 Q. But it was effective as of October 1st?
23 A. October 1st.

Page 163

1 Q. So October 1st was the date that the sublease
2 went into effect?
3 A. Yes.
4 Q. And at the bottom of page 17, that is your
5 signature and Dr. Vaccaro's signature, correct?
6 A. Yes.
7 Q. It says at the bottom of page 17, it says,
8 "Kamran Saleh, M.D., and Peter Vaccaro, M.D., as
9 individuals residing in the Commonwealth of
10 Pennsylvania, also agree to be bound by the terms and
11 conditions of Section 14 of this sublease"?
12 A. Yes.
13 Q. What do you understand -- I know you are not a
14 lawyer, but what do you understand you were verbally
15 literally agreeing to there?
16 A. My understanding --
17 MR. RYCHCIK: I want to formally object to
18 the extent you are asking for a legal
19 conclusion.
20 A. My understanding of this is that this was a
21 covenant not to compete and not to enter into any
22 ventures including the nuclear camera and the MRI or
23 CT scan; and if we do, then talk to the hospital and

Page 164

1 give them first right of refusal.
2 Q. So by individually agreeing to that paragraph
3 14, are you agreeing that you individually can't go
4 out and open up, you know, The Medical Associates
5 L.L.C., a separate company, to try and get around the
6 non-compete? Is that your understanding?
7 MR. RYCHCIK: Again, objection to the
8 extent you are seeking a legal conclusion.
9 MR. SIMPSON: I am asking his
10 understanding.
11 A. My understanding is as a person, also, not only
12 as a part of V&S. As a person, Kamran Saleh cannot go
13 and do that.
14 Q. And there has never been a subsequent lease
15 agreement entered into between V&S and Bradford,
16 correct?
17 A. That's correct.
18 MR. SIMPSON: This will be quick. I just
19 want to show this to you and have you look at
20 it.
21 (Saleh Deposition Exhibit No. 33 was
22 marked for identification.)
23 Q. I'm showing you Exhibit 33, and it is entitled

Page 165

1 on the first page, MaxiService Schedule, dated as of
2 6-6-01 to Master Lease Agreement dated as of 6-6-01.
3 Then if you flip over a couple of pages, there
4 is a document entitled, "Early Buyout Option."
5 Then if you flip over another couple of other
6 pages, there is a document entitled, "Non-GE Equipment
7 Addendum to Master Lease Equipment."
8 Then if you flip over another couple of pages,
9 there is another document, "GE Addendum to Master
10 Lease Agreement," and I want to ask, are these all
11 documents relating to your original lease of the first
12 camera?
13 A. Yes.
14 Q. And then let me show you what will be 34.
15 (Saleh Deposition Exhibit No. 34 was
16 marked for identification.)
17 MR. SIMPSON: While I'm at it, this will
18 be 35.
19 (Saleh Deposition Exhibit No. 35 was
20 marked for identification.)
21 Q. I have shown you Exhibits 34 and 35. You can
22 look through them, but my question is are these all
23 documents relating to the subsequent lease with the

USA, et al. vs. BRMC, et al.
No. 04-186E

Multi-Page™

Kamran Saleh, M.D.
August 8, 2007

Page 166

1 second camera?

2 A. This Phillips, Exhibit 34 is.

3 Q. And it refers to a master lease dated April 6,

4 2004. Does that sound about right for the time when

5 you got the -- when you leased the replacement camera?

6 A. I don't see the date. Oh, the Master Lease

7 Agreement there, yeah.

8 Q. That is a yes?

9 A. Yes.

10 Q. And then if you flip over, let's see --

11     MR. RYCHCIK: You are still on Exhibit 34?

12     MR. SIMPSON: Yes.

13 Q. And 35 should have been included with Exhibit

14 34. It is Master Lease Schedule 02 relating to the

15 same subsequent lease, correct?

16 A. This is related to it. It talks about the GE

17 buyout of the nuclear camera.

18 Q. Now, if you flip over to Exhibit No. 34, if you

19 flip over to page 1061, Bradford executed a guaranty

20 of that lease, did it not?

21 A. Yes.

22     MR. SIMPSON: All right. Thank you. This

23     will be 36.

Page 167

1     (Saleh Deposition Exhibit No. 36 was

2 marked for identification.)

3 Q. Exhibit 36 is a copy of two letters from

4 Phillips to V&S, one dated September 28th, 2004, and

5 another one dated January 20th, 2005. These letters

6 inform you of an adjustment in the rent under that

7 lease; correct?

8 A. That's true.

9 Q. At some point during your negotiations with the

10 hospital, were you presented with any reports prepared

11 by Stroudwater Associates?

12 A. For joint venture?

13 Q. At any point, but --

14 A. Yes.

15 Q. -- but specifically, for the joint venture?

16 A. Yes.

17 Q. Were you ever presented with any reports by

18 Stroudwater with the lease agreement?

19 A. No.

20 Q. Did you review those reports when you got them?

21 A. Which reports are you talking about?

22 Q. The Stroudwater reports.

23 A. For -- regarding the joint venture.

Page 168

1 Q. I thought you said you only got reports dealing

2 with the joint venture.

3 A. Yes.

4 Q. Did you review them when they came in?

5 A. Yes.

6 Q. Let me show you something here, and this will

7 be 37.

8     (Saleh Deposition Exhibit No. 37 was

9 marked for identification.)

10 Q. I have shown you Exhibit 37 which is -- it

11 looks like a fax, and then it appears to have attached

12 to it various sensitivity analyses that were prepared

13 by Stroudwater, and that is what I was -- those

14 analyses start at Bates No. 1141. Are these copies of

15 the documents that you -- are these the Stroudwater

16 reports that you recall reviewing?

17 A. Yes.

18 Q. What was your reaction when you reviewed them?

19     MR. RYCHCIK: Objection as to the form of

20     the question.

21 A. I don't recall what my reaction was. I haven't

22 even reviewed it now.

23 Q. Well, do you recall whether you agreed or

Page 169

1 disagreed with the sensitivity analysis performed by

2 Stroudwater?

3 A. I don't recall the discussions after this

4 report was received.

5 Q. Do you recall whether you had any problems with

6 their analysis or any disagreements with it?

7 A. I don't recall that.

8 Q. If you will go towards the end of it starting

9 with Bates No. 1196 and continuing through the end,

10 that looks to me like a power point presentation or

11 something like that?

12 A. Uh-huh.

13 Q. Do you recall seeing any power point

14 presentation like this?

15 A. Yes.

16 Q. Is this the one you saw?

17 A. It looks like it.

18 Q. And it looks like they prepared their models

19 based on three different scenarios, they called them

20 three different modalities, CT, MRI and nuclear

21 medicine, because those were the three topics you all

22 were discussing at the time?

23 A. Yes.

Page 170

1  Q. But you never saw an analysis done for the
2  sublease arrangement?
3  A. No.
4      MR. RYCHCIK: If you are at a --
5      MR. SIMPSON: Let's take a short break,
6  and then I'm going to -- we are getting to the
7  end. Let's take a short break, and then we can
8  see if we can wrap up.
9      (Recess taken at 2:31 p.m., and testimony
10     was resumed 2:42 p.m. this date.)
11  Q. Dr. Saleh, we before talked about a lady who
12  was a technician for you and you couldn't remember her
13  name. Was it Sue Hartman?
14  A. Yes.
15  Q. And to your knowledge, did she ever actually go
16  to work for Bradford?
17  A. To my knowledge, after us, no.
18  Q. They offered her employment, and she didn't
19  take it; is that basically it?
20  A. Yes.
21      (Saleh Deposition Exhibit Nos. 38 and 39
22  were marked for identification.)
23  Q. Dr. Saleh, I have shown you Exhibits 38 and 39.

Page 171

1  Exhibit 38 is entitled Contract for Internal Medicine
2  Services for Bradford Recovery Systems, and 39 is
3  entitled Agreement for Case Management Medical
4  Director.
5  A. Yes.
6  Q. Are both of these contracts between you and
7  Bradford Regional Medical Center?
8  A. That's true.
9  Q. The first one, Contract for Internal Medicine
10  Services, not as a lawyer, but what essentially are
11  you agreeing to provide under this contract?
12  A. Well, there is a Psychiatric Unit and Bradford
13  Recovery Systems, which deal with patients for drug
14  and alcohol rehab, and most of these patients come
15  from out of state, and they may have New York,
16  Medicaid, and other insurances that most of the
17  physicians do not participate in.
18      So it has been a problem for them to get the
19  medical consultation if there is any medical problem
20  that arises. So they had -- initially, they had done
21  once-a-week rotation for a physician to deal with it,
22  but, obviously, most of those services are provided
23  without any payment.

Page 172

1      Therefore, the hospital came up with this idea
2  that they can offer it to whoever is entrusted to
3  provide the services for a flat fee or a fee for
4  service.
5  Q. And paragraph 3 of that agreement on the second
6  page, does that accurately describe the payments that
7  you receive under this agreement?
8  A. Yes.
9  Q. You haven't received any other payments for
10  these internal medicine services?
11  A. Other than what is this one.
12  Q. Other than what is here?
13  A. Yes.
14  Q. This agreement is dated March 1, 2006, correct?
15  A. That's true.
16  Q. Did you have a similar agreement prior to that
17  time?
18  A. I don't recall.
19  Q. And did you start March 1, 2006, as a --
20  A. Starting date?
21  Q. -- under this contract or this type of
22  contract?
23  A. I might have a time before the contract. I

Page 173

1  don't know the exact date when it started.
2  Q. Let's look at Exhibit 39, which is entitled
3  Agreement for Case Management and Medical Director.
4  What are you agreeing to do under this agreement?
5  A. Under this agreement, this is mainly for
6  utilization of services by the hospital, because
7  sometimes what happens is that the patient stays
8  longer than the medical need. They might have some
9  social needs, some family needs that may delay their
10  discharge, and the hospital is paid just a plain DRG,
11  depending on the diagnosis, so any extra day that the
12  patient stays that is cutting down from the net profit
13  and bottom line from the hospital.
14      So what this is is this is an agreement that if
15  there is an overstay or a stay over four to five days
16  for any patient, you review the chart, and you see as
17  a doctor if the patient really needs to stay. If
18  there is any questions that we need to address, we
19  call the attending physician and discuss the case with
20  them to see if there is anything we can do to expedite
21  their discharge.
22  Q. About how much time per month do you spend
23  performing duties under this agreement?

## Page 174

1   A. On a working day when I am here, anything

2 varies from two to five reviews every day. Then there

3 is a meeting once a month; and then Dr. Kirsch, who

4 has the other half of the contract, if he is not

5 available, then those numbers double up.

6       Then there is reviews that we have to do with

7 Medicaid, that if Medicaid denies any claims, then we

8 have to get on the phone with them and review the

9 chart and talk to the physician, the two physicians,

10 to see if we can approve the admissions.

11   Q. Can you estimate the amount of time per month

12 you would spend on all those duties? How much would

13 you spend on an average review?

14   A. Average review would take somewhere between

15 three and ten minutes.

16   Q. And paragraph 3 says here, "Paid 2,000 per

17 month"; is that correct?

18   A. That's true.

19   Q. Did you have a similar agreement for any

20 earlier periods?

21   A. (No response.)

22   Q. This agreement is dated effective January 1,

23 2006, right?

## Page 175

1   A. Yes.

2   Q. Did you have any similar agreement for prior

3 periods?

4   A. Yes.

5   Q. Going how far back?

6   A. I can't remember that.

7   Q. Have you -- was there ever -- I mean, has it

8 been more than five years?

9   A. No. Less than five years.

10   Q. Have you, since the time you started this Case

11 Management Medical Director, have you consistently

12 stayed, or was there ever a period when you were not

13 serving?

14   A. No. I consistently stayed.

15       (Saleh Deposition Exhibit Nos. 40 and 41

16 were marked for identification.)

17   Q. I wanted to show you Exhibits 40 and 41, which

18 I only have one copy because these are the ones I

19 recently just got, or I would have made copies. They

20 appear to be similar agreements for next year, and I

21 will show them to you.

22   A. All right.

23   Q. I have shown you Exhibits 40 and 41. Are those

## Page 176

1 essentially renewals of the last two contracts we

2 looked at?

3   A. Yes.

4   Q. So, therefore, the same types of services we

5 just talked about?

6   A. Yes.

7   Q. Are those the contracts that are currently in

8 effect?

9   A. Yes.

10   Q. Have you received any payments from Bradford

11 other than as set forth in these two contracts, or

12 other than any payments we have discussed today?

13   A. No.

14   Q. Are you aware that your attorneys produced to

15 us a privilege log previously?

16   A. What is a privilege log?

17   Q. I will show it to you. I won't introduce it as

18 an exhibit. It is a document that looks like this.

19   A. (No response.)

20   Q. It is a document listing documents that you all

21 claim are privileged one way or the other. Are you

22 aware your attorney produced us that document?

23   A. (The witness nods his head.)

## Page 177

1   Q. Did you have any input into the preparation of

2 this document?

3   A. Not that I recall.

4   Q. You didn't identify any documents as

5 privileged?

6   A. No.

7   Q. Do you know which documents have been

8 designated as privileged?

9   A. Not unless I see them.

10   Q. I mean, you haven't seen this document? You

11 haven't reviewed this document, have you?

12   A. I don't remember reviewing it yet, no.

13   Q. You are aware that your attorney has produced

14 documents to us in response to requests for production

15 previously, correct?

16   A. That is true.

17   Q. And almost all of the documents -- well, all of

18 the documents we have looked at today are from that.

19 Did you review those documents before they were

20 produced to us?

21   A. All of them, no.

22   Q. Do you know which ones you did review?

23   A. Well, what we did is we had reviewed them

Page 178

1 before when it was going on in the correspondence; but

2 at this particular point when the request was made,

3 what we did is make a copy of all the documents and

4 presented it to our counsel to forward it to you guys.

5 Q. So the documents would have come from your

6 offices?

7 A. (The witness nods his head.)

8 Q. Did you do any search of your own personal

9 files to see if there were any responsive documents?

10 A. Any that we could take in the office.

11 Q. What documents did you review in preparation

12 for your deposition today?

13     MR. RYCHCIK: I'm going to object to the

14     extent I don't want you to get into any

15     particular communications that we had.

16 Q. Don't say anything your attorney told you. I

17 am just asking what pieces of paper you looked at and

18 not letters from your lawyer or anything like that,

19 but what, you know, documents, what V&S documents did

20 you look at?

21 A. I looked at the agreement, the sublease

22 agreement, and I looked at the deposition from the

23 CEO, Mr. Leonhardt.

Page 179

1 Q. Did you look at any of the documents we have

2 discussed today, any of the exhibits?

3 A. I had looked at some of them.

4 Q. Well, the lease agreement, I guess?

5 A. Yes. Yes.

6 Q. Did you look at any of the correspondence that

7 we discussed?

8 A. Not that I remember, no.

9     MR. SIMPSON: Are you planning to stick

10     around for Dr. Vaccaro's deposition?

11     THE WITNESS: Yes.

12     MR. SIMPSON: I'm done, but if I think of

13     another question while they are both still

14     here, can I put him back on just for a

15     follow-up or something? I don't think I will,

16     but just to move on to Dr. Vaccaro --

17     MR. RYCHCIK: Like I said, we will keep it

18     open for the time being, sure.

19     MR. SIMPSON: For now, that is all I have.

20     Thank you very much.

21     (Whereupon, the deposition was concluded

22 at 2:54 p.m., and signature was not waived.)

23     - - -

Page 180

1          C E R T I F I C A T E

2 COMMONWEALTH OF PENNSYLVANIA   :
                                 : SS.:
3 COUNTY OF ALLEGHENY            :

4     I, Joy A. Hartman, a Notary Public in and for
   the Commonwealth of Pennsylvania, do hereby certify
5 that before me personally appeared KAMRAN SALEH, M.D.,
   the witness herein, who then was by me first duly
6 cautioned and sworn to testify the truth, the whole
   truth and nothing but the truth in the taking of his
7 oral deposition in the cause aforesaid; that the
   testimony then given by him as above set forth was
8 reduced to stenotypy by me, in the presence of said
   witness, and afterwards transcribed by computer-aided
9 transcription under my direction.

10     I do further certify that this deposition was
   taken at the time and place specified in the foregoing
11 caption, and signature was not waived.

12     I do further certify that I am not a relative
   of or counsel or attorney for any party hereto, nor am
13 I otherwise interested in the event of this action.

14     IN WITNESS WHEREOF, I have hereunto set my hand
   and affixed my seal of office at Pittsburgh,
15 Pennsylvania, on this 14th day of August, 2007.

16     The foregoing certification does not apply to
   any reproduction of this transcript in any respect
17 unless under the direct control and/or direction of
   the certifying reporter.

18

19

20     _____

21          Joy A. Hartman, Notary Public
             in and for the Commonwealth of
22           Pennsylvania

23 My commission expires May 9, 2010.