**4**

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

1

```
1              IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2                     ERIE DIVISION

3

    UNITED STATES OF AMERICA, ex rel. )
4   DILBAGH SINGH, M.D., PAUL KIRSCH, )
    M.D., V. RAO NADELLA, M.D., and   )
5   MARTIN JACOBS, M.D.,              )
                                      )
6              Relators,             )
                                      )  Civil Action
7       vs.                           )  No. 04-186E
                                      )
8   BRADFORD REGIONAL MEDICAL CENTER, )
    V&S MEDICAL ASSOCIATES, LLC,      )
9   PETER VACCARO, M.D., KAMRAN SALEH,)
    M.D., and DOES I through XX,      )
10                                    )
               Defendants.           )
11

12          DEPOSITION OF PETER VACCARO, M.D.

13              THURSDAY, AUGUST 9, 2007

14          Deposition of PETER VACCARO, M.D., called as a

15   witness by the Plaintiffs, taken pursuant to Notice of

16   Deposition and the Federal Rules of Civil Procedure,

17   by and before Joy A. Hartman, a Court Reporter and

18   Notary Public in and for the Commonwealth of

19   Pennsylvania, at the offices of Fox Rothschild, 625

20   Liberty Avenue, 29th Floor, Pittsburgh, Pennsylvania,

21   commencing at 2:56 p.m. on the day and date above set

22   forth.

23
```

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

2

```
 1   APPEARANCES:

 2   On behalf of the Relators:

 3        Stone Law Firm
          Andrew M. Stone, Esquire
 4        1400 Allegheny Building
          Pittsburgh, Pennsylvania  15219
 5             -and-
          Simpson Law Firm, LLC
 6        G. Mark Simpson, Esquire
          165 North Main Street
 7        Jonesboro, Georgia  30236

 8   On behalf of the Defendant Bradford Regional Medical
     Center:
 9
          Horty Springer
10        Dan Mulholland, Esquire
          4614 Fifth Avenue
11        Pittsburgh, Pennsylvania  15213

12   On behalf of the Defendants V&S Medical Associates,
     LLC, Peter Vaccaro, M.D. and Kamran Saleh, M.D.:
13
          Fox Rothschild
14        Carl J. Rychcik, Esquire
          625 Liberty Avenue, 29th Floor
15        Pittsburgh, Pennsylvania  15222

16   ALSO PRESENT:

17        John Rice, Horty Springer

18        Kamran Saleh, M.D.

19                  - - -

20                  INDEX

21   WITNESS:                          PAGE:

22     PETER VACCARO, M.D.

23        Examination by Mr. Simpson          6
```

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

3

1  EXHIBITS:                                          PAGE:

2       Saleh Deposition Exhibit No. 1           4

3       Saleh Deposition Exhibit No. 2           4

4       Saleh Deposition Exhibit No. 4          34

5       Saleh Deposition Exhibit No. 5          36

6       Saleh Deposition Exhibit No. 8          37

7       Saleh Deposition Exhibit No. 10         37

8       Saleh Deposition Exhibit No. 11         39

9       Saleh Deposition Exhibit No. 21         43

10      Saleh Deposition Exhibit No. 22         45

11      Saleh Deposition Exhibit No. 23         45

12      Saleh Deposition Exhibit No. 24         45

13      Saleh Deposition Exhibit No. 25         46

14      Saleh Deposition Exhibit No. 26         47

15      Saleh Deposition Exhibit No. 27         48

16      Saleh Deposition Exhibit No. 31         49

17      Saleh Deposition Exhibit No. 32         49

18      Vaccaro Deposition Exhibit No. 42       50

19      Vaccaro Deposition Exhibit No. 43       50

20      Vaccaro Deposition Exhibit No. 44       53

21 FOR ATTORNEYS' EYES ONLY EXCERPT:

22      PAGE 10 LINE 1 THROUGH PAGE 14 LINE 23

23

JOHNSON and MIMLESS
(412) 765-0744

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

4

```
 1                P R O C E E D I N G S
 2                        - - -
 3            (Deposition Exhibit Nos. 1 and 2 were
 4     marked for identification.)
 5                        - - -
 6            MR. SIMPSON:  This will be the deposition
 7        of Dr. Peter Vaccaro, and it immediately
 8        follows the deposition of Dr. Kamran Saleh, and
 9        we had previously introduced a bunch of
10        exhibits in Dr. Saleh's deposition, and we are
11        going to reference the exact same exhibits in
12        this deposition.
13            So whenever I refer to any exhibit number,
14        it will be the same exhibit that was introduced
15        in Dr. Saleh's deposition, and the first two
16        exhibits are the copies of the Protective
17        Orders that have been entered into this case,
18        and just so that all parties can understand
19        what we are referring to.
20            MR. RYCHCIK:  And, again, given that the
21        documents in Dr. Saleh's deposition included a
22        number of confidential documents that fall
23        within the Protective Order, we designated that
```

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

5

1           deposition as confidential, and we would like

2           to do the same for Dr. Vaccaro's deposition.

3               I would also ask that to the extent we use

4           exhibits from Dr. Saleh's deposition, I don't

5           have a problem with referencing them, using

6           them; but I would request that we attach -- I

7           would request we have duplicates, obviously, so

8           that Dr. Saleh's deposition has all of the

9           exhibits and that we have got a copy for Dr.

10          Vaccaro contained therein.

11              MR. MULHOLLAND:  Just by way of not

12          delaying the deposition anymore, the hospital

13          has the same statement with respect to any

14          documents or communications that had been

15          discussed during Dr. Saleh's deposition, that

16          may have contained privileged information and

17          peer review, attorney-client or otherwise; and

18          by that information being on the record, the

19          hospital is not waiving any privilege that it

20          might assert with respect to those documents or

21          communications.

22                          - - -

23

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

6

```
1                    PETER VACCARO, M.D.,

2    called as a witness by the Relators, being first duly

3    cautioned and sworn, as hereinafter certified, was

4    deposed and said as follows:

5                         EXAMINATION

6    BY MR. SIMPSON:

7      Q.   Could you please state your name for the

8    record?

9      A.   Peter Vaccaro.

10     Q.   Dr. Vaccaro, you were here for Dr. Saleh's

11   deposition, correct?

12     A.   Excuse me?

13     Q.   You were present for --

14     A.   I was here throughout the whole thing.

15     Q.   Throughout the whole deposition?

16     A.   Throughout the whole thing.

17     Q.   And I'm going to try to move yours along a

18   little bit faster, so that we don't have to go over

19   everything again.  There probably will be some

20   duplication, but we will try to avoid it as much as

21   possible.

22                    MR. RYCHCIK:  Off the record.

23                    (Discussion off the record.)
```

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

7

1    Q.    Where did you graduate from medical school?

2    A.    University of Guadalajara, Mexico.

3    Q.    When did you graduate?

4    A.    1985.

5    Q.    After graduating -- well, I guess, are you an

6    American citizen?

7    A.    Yes, I am.

8    Q.    Have you always been?

9    A.    I was born in Brooklyn, New York.

10    Q.    After graduating from medical school, have you

11    had any further formal medical education, including

12    residency programs?

13    A.    Other than residency programs?

14    Q.    Including residency programs.

15    A.    Residency in internal medicine.

16    Q.    And where did you do that residency?

17    A.    I had to do a Fifth Pathway, which is --

18    Q.    What is that?

19    A.    A Fifth Pathway coming from a Mexican school is

20    one of the agreements that the University of Mexico

21    has to get us into the mainstream again to apply for a

22    residency in the United States.

23    Q.    And what does a Fifth Pathway involve?

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

8

1    A.    It is almost like a repeat of your fourth year

2  clinical rotations.

3    Q.    And where did you do that?

4    A.    I did that at New York Medical College.

5    Q.    Was that immediately after you graduated

6  school?

7    A.    About six months later.

8    Q.    Then after that, did you go into a residency

9  program?

10    A.    I went into a residency program, yes.

11    Q.    In internal medicine?

12    A.    In internal medicine.

13    Q.    Where did you do that?

14    A.    I did my first year in St. Francis in New

15  Haven, and my second year in Monmouth Medical Center,

16  and my third year in St. Francis in Trenton, New

17  Jersey.

18    Q.    Was there any reason you did it in different

19  places each year?

20          MR. RYCHCIK:   Objection as to relevancy.

21    Q.    You can answer.

22          (THE NEXT PORTION OF TESTIMONY, PAGE 10 LINE 1

23  THROUGH PAGE 14 LINE 23, WAS EXCERPTED PER REQUEST OF

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

9

1    ATTORNEY CARL RYCHCIK AS "ATTORNEYS' EYES ONLY" AND

2    SEPARATED FROM THE TRANSCRIPT AND PLACED IN A SEALED

3    ENVELOPE.)

4                          - - -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

10

1          EXCERPTED PORTION FOR ATTORNEYS' EYES ONLY

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

11

1          EXCERPTED PORTION FOR ATTORNEYS' EYES ONLY

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

12

1          EXCERPTED PORTION FOR ATTORNEYS' EYES ONLY

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

13

1          EXCERPTED PORTION FOR ATTORNEYS' EYES ONLY

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

14

1          EXCERPTED PORTION FOR ATTORNEYS' EYES ONLY

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

                                                          15

1                 (EXAMINATION RESUMED AFTER "ATTORNEYS'

2    EYES ONLY" EXCERPT OF DEPOSITION OF DR. VACCARO WITH

3    EXAMINATION RESUMED BY ATTORNEY SIMPSON.)

4                          - - -

5                        EXAMINATION

6    BY MR. SIMPSON:

7       Q.   Where do you currently have privileges,

8    hospital privilegeS?

9       A.   I have privileges at two hospitals.  My first

10   hospital privileges were Bradford Regional Medical

11   Center.

12      Q.   And when did you get those?

13      A.   In 1994.

14      Q.   And you have had those since then?

15      A.   Yes, I have.

16      Q.   And where else?

17      A.   At Olean General Medical Center.

18      Q.   And when did you get those?

19      A.   I don't recall, sir.  Sometime in 2001 or 2 or

20   3, within those times.

21      Q.   Five years, plus or minus ago?

22      A.   Yes.

23      Q.   Have you ever had privileges at any other

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

16

1   hospitals?

2   A.   No.

3   Q.   Have you ever been denied privileges at any

4   other hospital?

5   A.   No.

6   Q.   In Dr. Saleh's deposition, I asked him several

7   questions about the formation of V&S Medical

8   Associates.  Were you paying attention during that

9   questioning?

10          MR. RYCHCIK:  Objection.

11  A.   Yes.

12          MR. RYCHCIK:  Objection to the form of the

13      question.

14  Q.   I didn't mean that insultingly.  I meant --

15          MR. RYCHCIK:  Go ahead.  I withdraw the

16      question.

17  A.   Yes, I was.

18  Q.   Do you have any disagreement with Dr. Saleh's

19  testimony about the formation of V&S?

20          MR. RYCHCIK:  Objection as to the form of

21      the question.  Go ahead.  You can answer.

22  A.   No.

23  Q.   As far as you could tell, his testimony was

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

17

1   accurate?

2   A.   Yes, it was.

3   Q.   About how V&S was formed?

4   A.   Yes.

5   Q.   And you understand, I'm asking it this way,

6   because I'm trying to move things along?

7   A.   I understand.

8        MR. RYCHCIK:  Just for the record, Mark, I

9        don't have a problem with trying to move things

10       along.

11       MR. SIMPSON:  I understand.

12       MR. RYCHCIK:  I do want to proceed

13       carefully --

14       MR. SIMPSON:  I understand.

15       MR. RYCHCIK:  -- though, because if you

16       are just going to group all the testimony

17       together, I do think that is going to be a

18       problem.

19       MR. SIMPSON:  No.  I'm not grouping it all

20       together.  I understand.

21  Q.   I also asked Dr. Saleh a question about V&S'

22  practice before you acquired the nuclear camera.  Was

23  there anything that he testified about the nature of

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

18

1    V&S' practice before you acquired the nuclear camera

2    that you disagreed with?

3            MR. RYCHCIK:   Objection as to form of the

4        question.

5    A.   I feel like I'm here to confirm Dr. Saleh's

6    testimony, and I thought you were going to get my

7    testimony.

8    Q.   I am.  I am.  I am just trying -- I'm first

9    going to ask you if there was anything in his

10   testimony that you disagreed with.

11   A.   No.  His testimony in describing the practice

12   as it works was very accurate.

13   Q.   During that period of time, is it fair to say

14   that the vast majority of your inpatient referrals

15   were made to Bradford Medical Center?

16           MR. RYCHCIK:   Objection as to form.

17   A.   During what period OF time?

18   Q.   During the period of time before you acquired

19   the nuclear camera.

20           MR. RYCHCIK:   Objection as to the form of

21       the question.  Go ahead.  You can answer.

22   A.   Could you repeat the question, please?

23   Q.   Is it fair to say that during that period of

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

19

1    time before you got the nuclear camera, that the vast

2    majority of your inpatient referrals were to Bradford

3    regional Medical Center?

4            MR. RYCHCIK:  Same objection.  Go ahead

5        and answer.

6    A.   The inpatient referrals were based on a very

7    sensitive issue of where the patients wanted to go and

8    what was accessible, depending on their problem; and,

9    you know, there could be multiple places they could

10   go, but, you know, most of the time they would pick

11   the most convenient, which would be Bradford Medical

12   Center.

13   Q.   So is the answer to my question, then, yes?

14   A.   Yes, according to all the potential options

15   that were available.

16   Q.   The same question for outpatient referrals.  Is

17   it fair to say that most of your outpatient referrals

18   were to Bradford Regional Medical Center?

19           MR. RYCHCIK:  Objection as to the form of

20       the question.  You can answer.

21   A.   Again, Bradford Regional Medical Center was one

22   of the options; and most of the time, the patient

23   wanted to go to Bradford Regional Medical Center, and

JOHNSON and MIMLESS
(412) 765-0744

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

20

1    if that is what they wanted, that is where they went.

2       Q.    I understand there might have been good reasons

3    to send them there.  I am just asking you for just the

4    simple facts.  It is true that most of the outpatient

5    referrals were to Bradford as opposed to somewhere

6    else?

7       A.    I just wanted to make sure that it is

8    understood that it is not just an automatic thing all

9    the time, that most of the time, it is because of

10   patient choices.

11      Q.    My question is not about the reasons.  My

12   question is about the simple fact.  It is a fact, is

13   it not, that most of the outpatient referrals were to

14   Bradford?

15      A.    Yes, they were.

16      Q.    Now, after you leased the nuclear camera --

17   well, let me ask you this:  In the period when you

18   were deciding whether or not to lease the nuclear

19   camera, do you recall doing any projections about the

20   amount of additional income that you would receive?

21      A.    There could have been some discussions.

22      Q.    Do you recall any specific discussions?

23      A.    No.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

21

1    Q.   Do you recall any specific quantification of

2   dollar amounts, estimates?

3    A.   Obviously, we knew the number we were doing at

4   the hospital, and that doesn't take much mathematical

5   skills to figure that one out.

6    Q.   How did you go about determining the number

7   of -- when you say the number we were doing at the

8   hospital, you are talking about nuclear imaging tests,

9   right?

10    A.   Yes.

11    Q.   How did you go about determining the number

12   that you were doing at the hospital?

13    A.   I mean, it is pretty easy, because we do it at

14   the same time every day, so I mean, if you do one a

15   day, five days a week, or occasionally, two a day,

16   sometimes, it is pretty easy, give or take, a five or

17   ten percent mistake, a margin of error.

18    Q.   And you know where you are doing the test,

19   right?  I mean, you know whether you are doing them at

20   Bradford or someplace else?

21    A.   Well, some tests may not be done at Bradford.

22   I mean, a lot of times we got tests from Hamot Medical

23   Center.  There could be tests done there, that could

JOHNSON and MIMLESS
(412) 765-0744

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

22

1   be sent there.

2      Q.   But that was a small percentage of the tests

3   that you were performing, right?

4      A.   I don't know what percentage it was.

5      Q.   You just said it was easy to figure out much

6   you sent to the hospital?

7      A.   That part.

8      Q.   So it is not easy to figure out how many you

9   sent anywhere else?

10      A.   Not as much.

11      Q.   Really?  How come?

12      A.   Because --

13      Q.   What is the difference?

14      A.   The difference is then because then you left

15   up -- you left the decision to do the stress test up

16   to the cardiologist in that institution.

17      Q.   But how is it easy to know when they are being

18   done in Bradford, but it is not as easy to know when

19   they are being done somewhere else?

20      A.   Because I'm actually doing the ones at

21   Bradford.

22      Q.   So all the ones you are not doing are being

23   done somewhere else?

JOHNSON and MIMLESS
(412) 765-0744

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

23

1           MR. RYCHCIK:  Objection as to the form of

2        the question.

3    A.    Yes.

4    Q.    What percentage of them were you doing?

5    A.    Approximately 80 percent or so, probably.

6    Q.    Did Dr. Saleh do any of the tests at Bradford?

7    A.    Yes, he did.

8    Q.    So you weren't the only one doing it at

9    Bradford, then?

10   A.    Correct.

11   Q.    I thought you just said that you did -- that

12   all of the ones done at Bradford were done by you?

13   A.    No.  That is not what I said.

14   Q.    You are saying all the ones that you did were

15   done at Bradford?

16   A.    I was speaking for myself.

17   Q.    Did you do more than Dr. Saleh, or did he do

18   more than you?

19   A.    I think I probably did a little bit more than

20   him.

21           MR. RYCHCIK:  I do want to caution you.  I

22        don't want you to be guessing.  It is the same

23        kind of thing as Mr. Simpson instructed Dr.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

24

1          Saleh, if you are able to make a reasonable

2          estimate, that is one thing.  I don't want you

3          to be guessing if you don't know.

4     Q.   Now, in terms of non-nuclear tests, other kinds

5     of tests, MRIs and CT scans, and x-rays, a similar

6     question, is it fair to say that the majority of those

7     were done at Bradford?

8     A.   Yes.

9     Q.   We talked a minute ago about whether you

10    attempted to qualify the value of getting a new

11    camera.  Did you come to a dollar figure that you

12    thought you would get for increased revenues or

13    increased profit?

14    A.   I don't recall what we actually came up with at

15    that time.

16    Q.   Would it have been in the hundreds or thousands

17    of dollars per year for you?

18    A.   It could have been.

19    Q.   Do you recall whether you looked at any other

20    cameras, other than the GE camera that you ended up

21    leasing?

22    A.   I don't recall.

23    Q.   After you got the camera, is it fair to say

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

25

1  with the exception of nuclear imaging referrals, your

2  other referral patterns stayed the same?

3   A.   Yes.

4   Q.   And your nuclear imaging referrals changed in

5  that a lot of tests you were doing you were doing

6  in-house that you otherwise would have performed at

7  Bradford, correct?

8   A.   Obviously, we weren't going to be performing

9  them in the office anymore, and Bradford would be one

10  of the choices that would be decided upon.   There

11  could be several choices.

12   Q.   You might have misunderstood my question.

13       MR. RYCHCIK:  I was going to say, I think

14       he might have misunderstood the question.

15   Q.   I am talking about during the period when you

16  had the new camera, when you leased it.

17   A.   Oh, when I had the nuclear camera.  I thought

18  you meant after.

19   Q.   So with respect to nuclear imaging tests, your

20  referrals to Bradford went down, because a lot of the

21  tests that would have been done there, you were doing

22  in-house?

23   A.   Correct.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

26

1    Q.    And correct me if I am wrong, I think Dr. Saleh

2    testified that a small number of the tests that you

3    were doing in your office might have been referred

4    from other sources; but the vast majority of them were

5    your own patients?

6    A.    Yes.

7            MR. RYCHCIK:  Are you asking him if that

8        is true, or if that is what Dr. Saleh said?

9            MR. SIMPSON:  I am asking him if that is

10        true.

11    Q.    That is true, correct?

12    A.    That is true.

13    Q.    And then as we discussed earlier at some point,

14    Bradford came to you with concerns about your nuclear

15    camera, correct?

16    A.    Correct.

17    Q.    Did you or Dr. Saleh take the lead in the

18    discussions with the hospital on that issue?  This is

19    before you obtained -- retained counsel?

20    A.    I don't recall.

21            MR. RYCHCIK:  Objection as to the form of

22        the question.

23    A.    I don't recall.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION
27

1      Q.    Was there one of you who was more involved in

2    discussion on that than the other?

3      A.    As I recall, it was even.

4      Q.    Were both of you present at all meetings with

5    Bradford?

6      A.    Yes.

7      Q.    And as I understand it, you had several

8    meetings with Bradford before you retained counsel,

9    correct?

10     A.    Yes.

11     Q.    And at those meetings, was Bradford ever

12   represented by counsel?

13     A.    They may have been, but I don't know.

14     Q.    Basically, I am asking you:  Did they ever have

15   lawyers there when you didn't?

16     A.    No.

17     Q.    Was George Leonhardt the one you were always

18   dealing with?

19     A.    The first time we met, me and Dr. Saleh met

20   with Mr. Leonhardt in April of 2001.

21     Q.    And did you ever meet with other people in

22   Bradford -- I'm talking about before you got the

23   lawyers involved.  Did you ever meet with other people

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

28

1    at Bradford besides Mr. Leonhardt?

2    A.    I don't recall.

3    Q.    Did you ever meet with the Board?

4    A.    I don't recall.

5    Q.    Now, at some point, you retained Ed Kabala to

6    represent you, right?

7    A.    Yes.

8    Q.    And then at some point, you also got Marc

9    Raspanti, his firm, to represent you?

10   A.    Yes, we did.

11   Q.    Was that at the same time, did you start out

12   with Mr. Kabala, and then move on to Mr. Raspanti?

13   A.    Correct.

14   Q.    Do you recall whether it was you, meaning V&S

15   or Bradford, that first made the suggestion that,

16   "Let's try to work out some resolution, you know,

17   rather than having to enforce the non-compete policy"?

18   A.    I don't recall.

19   Q.    Do you know who first brought up the proposal

20   of doing a joint venture?

21   A.    Under arrangements?

22   Q.    If I use "joint venture" or "under

23   arrangements," I'm using them interchangeably.  Do you

JOHNSON and MIMLESS
(412) 765-0744

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

29

1   know if that was something that was initially proposed

2   by the hospital or by you guys?

3       A.   It was proposed by the hospital.

4       Q.   What was your initial reaction when you raised

5   that issue?  Did you view it favorably or unfavorably?

6       A.   I viewed it as unfavorably, because we were

7   already operating our nuclear camera.

8       Q.   Now, after you had been operating the nuclear

9   camera for some time, did you get an understanding for

10  how your profits had increased?

11      A.   Yes.

12      Q.   Can you quantify that?

13      A.   I don't know the exact number.  I don't

14  remember the exact number.

15      Q.   Would that have been somewhere like 250 or 300

16  thousand dollars a year?

17      A.   It was approximately 200,000.

18      Q.   So you thought that keeping things the way they

19  were was a better deal for you than entering into an

20  under arrangements venture with the hospital, was that

21  correct?

22      A.   Correct.

23      Q.   Was it your understanding that the hospital was

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

30

1   essentially warning you guys to contribute your

2   nuclear camera as part of the under arrangements

3   venture?  First off, is that your understanding of one

4   of the things they were wanting you to do?

5       A.   Repeat the question, please.

6       Q.   As part of the under arrangements venture, was

7   the hospital expecting V&S to contribute their nuclear

8   camera to the venture?

9       A.   I don't recall.

10      Q.   And was it your position that you were being

11  asked to contribute a lot more than the other doctors

12  who were going to be invited into the joint venture?

13      A.   Well, we already had an established business

14  that had a certain amount of equity and earning

15  ability, and, therefore, we didn't think it was a fair

16  deal for us.

17      Q.   Did Dr. Saleh express the same opinions to you?

18      A.   Yes, he did.

19      Q.   Before the lawyers got involved, do you recall

20  any discussions or communications with Mr. Leonhardt

21  or anybody at the hospital relating to the Stark law

22  or the anti-kickback statute?

23      A.   I don't recall.

JOHNSON and MIMLESS
(412) 765-0744

CONFIDENTIAL - PROTECTED HEALTH INFORMATION
                                                    31

1    Q.   At that time, did you have any independent

2    knowledge of what the Stark Law or the anti-kickback

3    statutes involved?

4    A.   Of course, I am not a legal expert, but I was

5    somewhat familiar with the basic concept.

6    Q.   How had you acquired that basic familiarity?

7    A.   The basic familiarity of that is that you

8    cannot go into --

9         MR. RYCHCIK:  I don't know if you heard

10        his question.

11   Q.   I am asking how you got that knowledge.

12   A.   Oh, how?  I thought you were asking me what it

13   was.  Okay.

14        Oh, how?  Through various discussions with

15   other physicians and some seminars in the past, CME

16   programs with magazines, and there could be other

17   various sources that I may be leaving out at this

18   point.

19   Q.   So you had been to CMEs or seminars at which

20   the Stark and anti-kickback statutes were discussed?

21   A.   Yes.

22   Q.   So now I will ask the question:  At that time,

23   as you were starting your discussions with the

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

32

1  hospital, what was your understanding about what the

2  anti-kickback statute said?

3      A.   That you cannot go into an arrangement that

4  gives you economic benefit for referral of patients.

5      Q.   And what was your understanding as to what the

6  Stark statute involved?

7      A.   What was the first -- what did I answer?

8      Q.   Anti-kickback statute was my first question.

9  Now, I am asking about do you have any different

10  understanding, or did you have any different

11  understanding about what the Stark statute involved?

12     A.   I'm not sure.

13     Q.   Did you sort of join the two in your mind?

14     A.   Kind of, yes.

15     Q.   During your discussions with the hospital,

16  however, you were aware that the Stark statute and the

17  anti-kickback statute were issues that would need to

18  be addressed, correct?

19     A.   Absolutely.

20     Q.   As you continued on with the negotiations with

21  the hospital, even after you got the lawyers involved

22  over the under arrangements venture, was there ever a

23  time when you saw the under arrangements venture as

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

33

1   something that you thought might really work out, or

2   were you always skeptical?

3     A.   As time progressed, and the burden of

4   continuing the dispute, we decided, we and I decided

5   that maybe we should look into it, and at least inform

6   ourselves of what it would be.

7     Q.   But you were never sold on it?  Is that fair to

8   say?

9          MR. RYCHCIK:  Objection as to the form.

10         Go ahead.

11    A.   Not really.

12    Q.   Was there ever a time when you told the

13  hospital or you asked the hospital to buy out all or

14  part of your practice for $1.8 million?

15    A.   Yes, there was.

16    Q.   How did you arrive at that figure?

17    A.   I mean, again, there was no great mathematical

18  genius.  The prior physician had gotten a certain

19  amount, and we, basically, doubled that, because it

20  was two of us.

21    Q.   Did you engage in any kind of, you know -- in

22  reaching that 1.8 figure, did you base it on the

23  specific amount of tests that you would be performing,

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

34

1   the specific amount of income that you would be losing

2   by selling the practice to the hospital, or was it

3   just a number that you though sounded or felt right?

4       A.   The number felt right, and I thought it was a

5   bargain.

6       Q.   For them or for you?

7       A.   For both of us.

8       Q.   I'm sure it can't be a bargain for both of you.

9            Let me show you some, but not all of these

10  letters that we discussed.  Did you have a chance to

11  look through most of the letters as we were doing Dr.

12  Saleh's deposition?

13      A.   Quickly.

14      Q.   All right.  I want to show you Exhibit 4, and

15  it should be in here somewhere.  Do you recall this

16  letter first?

17           MR. RYCHCIK:  I am assuming you are asking

18           him independently as to when he read it

19           earlier?

20      Q.   I hope you recognize it from earlier today.  If

21  I ask you if you recognize any letter, I mean

22  independently of what you saw today.

23      A.   I do remember receiving an initial letter.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

35

1   This is one of the initial letters that we received.

2   Q.   If you look down at the third paragraph, the

3   first sentence, you know, the first sentence points

4   out or says that "We did have several discussions

5   about the possible development of a Joint Venture

6   within the Safe Harbor exceptions to Stark II," and

7   that is consistent with what you said before that you

8   did have discussions with the hospital about the Stark

9   statute?

10  A.   Uh-huh.

11       MR. RYCHCIK:  Try to say "yes" or "no."

12  A.   Yes.

13  Q.   And it goes on to say that, "At that time, you

14  told me," and I'm not sure if "you" refers to you or

15  Dr. Saleh, "You told me that you expected to generate

16  additional revenue between $550,000 and $700,000

17  annually from the nuclear camera, and that your annual

18  expenses would be approximately $150,000."

19       Do you recall making statements along those

20  lines to the hospital?

21  A.   No, I do not.  I don't remember.

22  Q.   Do you know whether Dr. Saleh made statements

23  like that?

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

36

1   A.   I don't remember.

2   Q.   You don't remember not making those statements?

3  I mean, you are not denying that he has accurately

4  described your conversations?  You are just saying you

5  don't remember, correct?

6        MR. RYCHCIK:   Objection as to form.

7   A.   I do not remember.  Really, I do not remember.

8   Q.   Okay.  Now, I want to show you Exhibit 5, and

9  specifically, on the second page of this exhibit,

10  which is the first page of the February 22nd letter,

11  it says, "We attach for your review a copy of the

12  letter that we understand was hand delivered to Mr.

13  Richard McDowell by Dr. Peter Vaccaro."

14       Do you recall hand delivering a letter to Mr.

15  McDowell?

16   A.   No, I do not.

17   Q.   If you will flip over to page Bates No. 132,

18  which is a December 4 letter to you, do you remember

19  giving a copy of this letter to Mr. McDowell?

20   A.   I don't remember.

21   Q.   Do you remember receiving this letter yourself?

22   A.   I vaguely remember getting the letter, but I

23  don't remember giving it to anybody.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

37

1    Q.    Let's go forward to Exhibit 8.  Exhibit 8 is a

2    May 20, 2002 letter to Dr. Saleh from Richard McDowell

3    and before today, had you seen this letter?

4            MR. RYCHCIK:  Go ahead.  Take a look at

5            it.  I know you were still looking at the other

6            exhibit.

7    A.    Again, it has been a long time, and I vaguely

8    remember the contents, obviously, but I --

9    Q.    You vaguely remember it?

10   A.    (The witness nods his head.)

11   Q.    I couldn't tell whether that was a yes motion

12   or --

13   A.    The contents are familiar, but I don't remember

14   actually receiving the letter.

15   Q.    If you look at the last paragraph on the first

16   page, is that a true statement that "you significantly

17   changed your practice pattern," and that, "We

18   understand that is because you are now using the V&S

19   equipment in its place"?

20   A.    Yes.

21   Q.    Quickly, I will ask you to look at Exhibit 10.

22   Well, you can look at it as long as you want, but I

23   will ask you a quick question about it.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

38

1        My first question, as usual is -- this letter

2    was purportedly sent by Dr. Saleh, but do you recall

3    seeing this letter, the one that was sent?

4    A.   Again, I don't mean to sound like I don't --

5    like I didn't participate, but this was a long time

6    ago, five years ago, more than five years ago.  The

7    contents seem familiar, and I don't remember the

8    actual letter.

9    Q.   Typically, would you and Dr. Saleh have

10    consulted with each other before sending letters like

11    this to Bradford?

12    A.   I would just like to finish reading this real

13    fast, please.

14    Q.   Okay.

15    A.   What was your question again?

16    Q.   Would you and Dr. Saleh typically have

17    consulted with each other before one of you sent a

18    letter like this to Bradford since it dealt with

19    issues concerning both of you?

20    A.   Yes, we would.

21    Q.   And on the second page, that top paragraph, it

22    refers to a true and equal joint venture, with "equal"

23    being underlined.  Do you recall what you were

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

39

1   thinking when you described an acceptable joint

2   venture as being true and equal?

3   A.   We were already involved in a nuclear medicine

4   business, and our feeling was that whatever agreement

5   we came to with the hospital should be -- it should

6   represent what we already had, since we were going to

7   give it up.

8   Q.   Okay.  And then that sentence goes on to talk

9   about, "If your attorneys can come up with a proposal

10  that they think is legal in today's environment, and

11  our attorneys agree," and I think you might have said

12  this earlier, you recognized that it was --

13  A.   We recognized --

14  Q.   You recognized that any kind of an issue you

15  came up with had to be a legal agreement, correct?

16  A.   Correct.

17  Q.   I will show you Exhibit 11.  This is a June 26

18  letter to you and Dr. Saleh from George Leonhardt

19  mentioning the Stark law in the context of an under

20  arrangements venture, and I will ask you if you recall

21  receiving this letter?

22  A.   I don't actually remember receiving the letter,

23  but I remember the contents of what they are talking

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

40

1    about.  They are exploring the possibilities of a

2    joint venture.

3      Q.   Do you recall any communications from Bradford

4    discussing these same issues with respect to the

5    sublease arrangement, as opposed to the under

6    arrangements?

7      A.   Are you referring to the Stark laws?

8      Q.   Yes.  This letter, basically, says an under

9    arrangements venture, these comply with the Stark law?

10   Do you recall getting any similar letter dealing with

11   the application of Stark law to a sublease

12   arrangement?

13     A.   No, I don't recall.

14     Q.   Do you recall having any discussions with

15   Bradford being in any meeting where Bradford was

16   participating with you and your attorneys, any

17   statements about whether or not the sublease

18   arrangement as proposed, in fact, satisfied the Stark

19   statute?

20     A.   Well, I seem to have acquired, you know, the

21   knowledge that a sublease agreement had to be based on

22   a fair market value, and, most likely, have a

23   non-compete associated with that.  We knew that that

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

41

1    would probably -- that that would satisfy the Stark

2    law.

3        Q.   Was that based -- you said we knew that.  Was

4    that based on anything that Bradford told you?

5        A.   It could have been.  I don't recall.

6        Q.   Was it based on anything your attorneys stated

7    in anything that Bradford was present at?

8        A.   I don't remember exactly where.

9        Q.   So you have no recollection of any specific

10   such instance where anybody told you, yes, this

11   satisfies Stark?

12            MR. RYCHCIK:  Objection.  Again, I am

13        assuming that you are not asking for

14        attorney-client --

15       Q.   I am not asking for a conversation just between

16   you and your attorney.  I am asking for anything where

17   Bradford was involved.

18       A.   I am sure they must have mentioned that, but I

19   don't remember, because we were always worried about

20   violating Stark or an anti-kickback.

21       Q.   I want to ask you the same question I asked Dr.

22   Saleh.  Are you basing your defense in this case in

23   whole or in part upon a claim that your attorneys

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

42

1    advised you that the lease arrangement satisfied the

2    Stark statute?

3        A.    We are not giving up our -- I don't remember

4    the exact, but we are not giving up our attorney-

5    client privilege, no.

6        Q.    So you are not saying -- you are not saying, "I

7    thought this was okay, because my attorneys told me

8    this was okay"?

9        A.    Correct.

10       Q.    Did you think that the hospital was bluffing

11   when they threatened to revoke your privileges?

12       A.    No, I did not.

13       Q.    Did you have a legitimate belief that if you

14   didn't come to a resolution, they actually would

15   revoke your privileges?

16       A.    Yes, I did.

17       Q.    I think I might be asking it a little different

18   way, but I think you might have already answered it:

19   Did you ever receive any opinions, any written

20   opinions from Bradford, on the legality of your

21   proposed arrangement?

22       A.    I don't remember.

23       Q.    During your negotiations with the hospital, do

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

43

1  you recall providing the hospital with, you know,

2  numbers about the volume of tests that you did with

3  the nuclear camera and the dollar figures associated

4  with those tests?

5    A.   Well, I have heard a lot of the information

6  here today, so it is hard to differentiate now where

7  that memory came from.  From what I heard today, we

8  started going into some numbers under the under

9  arrangements potential scenario.

10   Q.   But you don't have any specific recollections

11 providing any of --

12   A.   No, I do not.

13        MR. RYCHCIK:  You got to let him finish

14        his question before you answer.  You both can't

15        be talking at the same time, so let him finish

16        his question before you answer, please.

17   Q.   And the answer to that question was no, you

18 don't have any specific recollection?

19   A.   Correct.

20   Q.   I want to show you Exhibit 21, which is a March

21 20th, 2003 letter to Alan Steinberg from Jodeen Hobbs.

22 We had talked about this earlier in Dr. Saleh's

23 deposition.  Do you recall seeing this letter

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

44

1    previously?

2      A.   No, I do not.

3      Q.   If you look at the second paragraph of the

4    first page -- well, first of all, do you recall the

5    March 8th meeting that she refers to in the second

6    paragraph?

7      A.   I know she is referring to the meeting that

8    possibly a lease agreement came up, but I don't

9    remember the actual meeting.

10     Q.   Do you remember having any meeting that lasted

11   for over three hours that --

12     A.   Most of them did.

13     Q.   Oh, most of them did?

14     A.   Yes.

15     Q.   They were all pretty long meetings?

16     A.   Yes.

17     Q.   Do you recall a very long meeting where you

18   specifically discussed the numbers on the sublease

19   arrangement?

20     A.   There could have been some numbers being

21   discussed.  It was very preliminary, but I don't

22   have -- I have a very vague recollection.

23     Q.   Do you recall making an initial proposal for a

JOHNSON and MIMLESS
(412) 765-0744

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

45

1   five-year $2,000-per-day lease?

2      A.   No, I do not.

3      Q.   Do you recall leaving the meeting with an

4   agreement -- with what you thought was an agreement

5   for a five-year $1,500-a-day lease?

6      A.   No, I do not.

7      Q.   Do you recall Bradford coming back to you with

8   a proposal for a three-year $1,200-per-day lease?

9      A.   No, I do not.

10     Q.   Let me show you Exhibit 22, which is a document

11  that Dr. Saleh looked at earlier entitled Practice

12  Statistics, did you remember seeing this document

13  before today?

14     A.   No.

15     Q.   So you don't recall this document being used as

16  part of your discussions with the hospital?

17     A.   No.

18     Q.   Do you know whether this was a document

19  prepared by V&S or by the hospital?

20     A.   No.  It looks like it would be prepared by the

21  hospital.

22     Q.   I will show you Exhibit 23 and 24 together

23  since we talked about them together with Dr. Saleh.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

46

1   Exhibit 23 was the partially typewritten and partially

2   handwritten document that was apparently handwritten

3   by Dr. Saleh, and Exhibit 24 is a totally handwritten

4   document prepared by Dr. Saleh.

5        Had you ever seen these documents prior to

6   today?

7   A.   I don't recall.

8   Q.   Do you recall discussions with Dr. Saleh about

9   the various numbers that are mentioned in these

10  documents?

11  A.   Vaguely.

12  Q.   Do you recall discussing with him whether the

13  hospital's estimate of 2.7 million dollars for

14  inpatient admissions was profit and not gross income?

15  A.   I don't remember.

16  Q.   Do you recall whether outpatient CT scans and

17  MRIs were greater than 85 percent coming from V&S at

18  the time?

19  A.   I don't recall.

20  Q.   Did you assist in the preparation of either of

21  these documents?

22  A.   I don't remember.

23  Q.   I will show you Exhibit 25, which was the three

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

47

1   bar charts for Outpatient Referral Impacts for Dr.

2   Saleh, you, and Total V&S.  Do you recall seeing these

3   documents during the time you were negotiating with

4   the hospital?

5       A.   No.

6       Q.   Do you recall seeing them at any time before

7   today?

8       A.   No.

9       Q.   Do you know if this was prepared by V&S or by

10  the hospital?

11      A.   It seems like it would be prepared by the

12  hospital.

13      Q.   Do you recall discussing with the hospital the

14  numbers that are reflected in these charts?

15      A.   No.

16      Q.   I will show you Exhibit 26, then.  Where it

17  says in the handwritten part in the middle right,

18  where it says "AR 230,000" and then it says "Estimated

19  actual payment from third parties," is that your

20  writing?

21      A.   Yes, it is.

22      Q.   Do you remember writing that?

23      A.   I don't remember writing that.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

48

1    Q.    Do you remember seeing this document before?

2    A.    Vaguely.

3    Q.    Do you think it was something that you all --

4    that you or Dr. Saleh prepared to use in your

5    discussions with the hospital?

6    A.    What is the date on this?  October?

7    Q.    Up on the top, it says --

8    A.    We were already operating for about a year, so

9    most of the time, we liked to see year to year, so

10   this is our first full year.  Whether it was meant to

11   see what we were generating for that year, I'm not

12   sure why we created it, but it is always good to see

13   what your yearly trends are.

14   Q.    Do you know whether these numbers were passed

15   along to the hospital?

16   A.    I don't remember.

17   Q.    I want you to ask you, essentially, the same

18   questions for Exhibit 27.  Have you seen this

19   document, and do you recall whether the numbers were

20   used in your discussions with the hospital?

21   A.    This one, I don't remember.

22   Q.    Is any of that your handwriting?

23   A.    No.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

49

1    Q.   I will show you Exhibit 31, which is a copy of

2    the April 16th, 2003 Agreement.  This was the first

3    agreement relating to the sublease issue that you

4    executed with Bradford, correct?

5    A.   Correct.

6    Q.   And that is your signature on the last two

7    pages of this document, correct?

8    A.   Correct.

9    Q.   Again, the last two pages are -- they appear to

10   be out of order, but that is the complete document,

11   right?

12   A.   (No response.)

13   Q.   It goes 1, 2, 4, 3, correct, in our copies?

14   A.   Yes.

15   Q.   And Exhibit 32, this is a copy of the actual

16   sublease that was subsequently executed, correct?

17   A.   Correct.

18   Q.   And that is your signature in two places on

19   Bates No. 0316?

20   A.   Correct.

21   Q.   I have a couple of documents that we did not

22   use in Dr. Saleh's deposition, so I guess we will

23   label the first one 42.  You might as well mark this

JOHNSON and MIMLESS
(412) 765-0744

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

50

1    one, too.

2              (Vaccaro Deposition Exhibit Nos. 42 and 43

3    were marked for identification.)

4    Q.    I have shown you Exhibits 42 and 43, which

5    Exhibit 42 was a Contract for Internal Medicine

6    Services for Bradford Recovery Systems dated March 1,

7    2006, and 43 is another contract that looks similar

8    with the same name, dated 2007.  Is that correct?

9    A.    Correct.

10   Q.    Now, these are copies of agreements between you

11   and Bradford Regional Medical Center, correct?

12   A.    Correct.

13   Q.    And that is your signature on both of the

14   documents?

15   A.    Correct.

16   Q.    Can you describe to me what you were doing for

17   Bradford pursuant to these contracts?

18   A.    Okay.  Well, the Recovery Unit in Bradford

19   Regional Medical Center has an inpatient unit, and

20   sometimes they are there most of the time about 28

21   days, and in that 28 days, medical issues may arise,

22   some minor, some severe, and most of these patients

23   are either Medicaid or self-pay patients.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

51

1        According to our bylaws, we are required to

2    take service call, which means you take care of a

3    patient on a rotational basis from the emergency room

4    that does not have a physician assigned to him, so the

5    patient can have appropriate medical care.

6        That is not a binding requirement.  From the

7    emergency room, most of those patients have insurance.

8    These patients, the majority do not.

9        So it became a burden on the house staff to be

10   able to provide medical care and not get paid.  There

11   was a delay.  If there was a consultation, they would

12   try and tap into the service coverage, but there was a

13   lot of problems associated with that, delays in

14   physicians seeing the patients.

15       There -- sometimes nobody would show up, and

16   therefore, the head of the psychiatric department at

17   approximately a year and a half ago met with the

18   administration on how to resolve that situation, and

19   they left it up to him to contract somebody that would

20   be willing for a flat fee to see the patients that the

21   psychiatrist deemed needed a medical consultation, and

22   he chose me.

23   Q.   And how much time would you spend doing those

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

52

1  duties, average, say, per month?

2    A.   I see -- it goes in spurts, on and off.  I see

3  three to five patients a week on the average.

4  Sometimes I see ten one week and none the other; but

5  on the average, three to five patients a week, each

6  one about an hour.

7    Q.   And on the second page, paragraph three says

8  that you are paid $2,000 per month; is that correct?

9    A.   Yes.  Initially, it was -- yes, it is.  Which

10  one?

11    Q.   Well, that was the first contract, 2006.  Did

12  the number change for 2007?

13    A.   No, it did not.  It has been 2,000.

14    Q.   Did you have a similar agreement before March

15  1, 2006?

16    A.   No.  I don't recall if it was one year prior or

17  not.  I'm not sure.

18    Q.   So you have had it at least two years, and you

19  don't know whether you had it in 2005?

20    A.   Correct.

21    Q.   But are you sure you didn't have it in 2004?

22    A.   Pretty sure.

23    Q.   And do you have any other agreements with

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

53

1   Bradford, other than this agreement and the lease

2   agreements --

3      A.   No.

4      Q.   -- and the lease agreements we have talked

5   about?  No?

6      A.   No.

7      Q.   Dr. Saleh had an agreement for a Case

8   Management Medical Director.  Did you have a similar

9   agreement?

10     A.   No, I did not.

11          MR. SIMPSON:  Five-minute break, and then

12          we might be close to wrapping up?

13          MR. RYCHCIK:  Sure.

14          (Recess taken at 4:07 p.m., and testimony

15          was resumed at 4:13 p.m. this date.)

16          (Vaccaro Deposition Exhibit No. 44 was

17   marked for identification.)

18   BY MR. SIMPSON:

19     Q.   Very quickly, Dr. Vaccaro, I want to show you a

20   copy of your interrogatory responses that you

21   previously served on us.  Do you recall preparing

22   these interrogatory responses or seeing them prepared?

23     A.   Yes.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

54

1   Q.   Looking towards the end, I see that Dr. Saleh

2   did a verification, but I don't see a verification by

3   you.  Are these interrogatories responses true and

4   correct to the best of your knowledge, information,

5   and belief?

6   A.   Yes, they are.

7   Q.   Do you recall I showed Dr. Saleh a privilege

8   log that you all had produced to us?  I can show it to

9   you again if you would like.

10   A.   I did not see it.

11   Q.   Did you ever see this privilege log before it

12   was produced to us?

13   A.   No.

14   Q.   Did you identify any specific documents that

15   should be included in this log as being privileged?

16   A.   I don't know.

17        MR. SIMPSON:  That is all I have.

18        MR. RYCHCIK:  I would like to designate

19        the portion of Dr. Vaccaro's testimony dealing

20        with any substance abuse issues as

21        Confidential, Attorneys' Eyes Only.

22        MR. SIMPSON:  I mean, I don't think it

23        qualifies, but you can designate it.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

55

1          MR. RYCHCIK:  We can designate it.

2          MR. SIMPSON:  You can designate it.

3          MR. RYCHCIK:  We can certainly work that

4     out after the fact.  So that portion of the

5     testimony will be so designated.

6          MR. SIMPSON:  We will look it over and see

7     if we want to challenge it.

8          Does anybody else have any questions?

9          MR. MULHOLLAND:  No questions.

10         MR. SIMPSON:  I want to bring Dr. Saleh

11    back for another hour.

12         (Discussion off the record.)

13         MR. RYCHCIK:  I would like to have both of

14    them read, please.

15         (Whereupon, the deposition was concluded

16   at 4:20 p.m., and signature was not waived.)

17                   - - -

18

19

20

21

22

23

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

56

1               C E R T I F I C A T E

2    COMMONWEALTH OF PENNSYLVANIA      :
                                       :  SS.:
3    COUNTY OF ALLEGHENY               :

4          I, Joy A. Hartman, a Notary Public in and for
     the Commonwealth of Pennsylvania, do hereby certify
5    that before me personally appeared PETER VACCARO,
     M.D., the witness herein, who then was by me first
6    duly cautioned and sworn to testify the truth, the
     whole truth and nothing but the truth in the taking of
7    HIS oral deposition in the cause aforesaid; that the
     testimony then given by him as above set forth was
8    reduced to stenotypy by me, in the presence of said
     witness, and afterwards transcribed by computer-aided
9    transcription under my direction.

10         I do further certify that this deposition was
     taken at the time and place specified in the foregoing
11   caption, and signature was not waived.

12         I do further certify that I am not a relative
     of or counsel or attorney for any party hereto, nor am
13   I otherwise interested in the event of this action.

14         IN WITNESS WHEREOF, I have hereunto set my hand
     and affixed my seal of office at Pittsburgh,
15   Pennsylvania, on this 14th day of August, 2007.

16         The foregoing certification does not apply to
     any reproduction of this transcript in any respect
17   unless under the direct control and/or direction of
     the certifying reporter.

18

19

20                      _____

21                      Joy A. Hartman, Notary Public
                        in and for the Commonwealth of
22                      Pennsylvania

23   My commission expires May 9, 2010.


                   JOHNSON and MIMLESS
                    (412) 765-0744

**5**

1

1       IN THE UNITED STATES DISTRICT COURT
      FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2               ERIE DIVISION

3          - - - - -

4    UNITED STATES OF AMERICA,  )
    ex rel., DILBAGH SINGH,    )
5    M.D., PAUL KIRSCH, M.D.,   )
    V. ROA NADELLA, M.D., and  )
6    MARTIN JACOBS, M.D.,      ) Civil Action
                        ) No. 04-186E
7         Relators,       )
                        )
8           vs.          )
                        )
9    BRADFORD REGIONAL MEDICAL  )
    CENTER, V&S MEDICAL       )
10   ASSOCIATES, LLC, PETER   )
    VACCARO, M.D., KAMRAN     )
11   SALEH, M.D., and DOES I   )
    through XX,            )
12                    )
         Defendants.     )
13
        DEPOSITION OF EDWARD KABALA
14       THURSDAY, APRIL 3, 2008

15  Deposition of Edward Kabala, called as a witness by

16  the Relators, taken pursuant to Notice of Deposition

17  and the Federal Rules of Civil Procedure, by and

18  before Constance Lee, a Court Reporter and Notary

19  Public in and for the Commonwealth of Pennsylvania,

20  at the offices of Fox Rothschild, 625 Liberty Avenue,

21  29th Floor, Pittsburgh, Pennsylvania, commencing at

22  11:23 a.m. on the day and date above set forth.

23              -----

JOHNSON and MIMLESS
(412) 765-0744

2

1    APPEARANCES:

2    On behalf of the Relators:

3        Stone Law Firm
         Andrew M. Stone, Esquire
4        1400 Allegheny Building
         Pittsburgh, Pennsylvania 15219
5
     On behalf of the Defendant, Bradford Regional Medical
6    Center:

7        Dan Mulholland, Esquire
         4614 Fifth Avenue
8        Pittsburgh, Pennsylvania 15213

9    On behalf of the Defendants, V&S Medical Associates,
     LLC, Peter Vaccaro, M.D. and Kamran Saleh, M.D.:
10
         Fox Rothschild
11       Carl J. Rychcik, Esquire
         625 Liberty Avenue, 29th Floor
12       Pittsburgh, Pennsylvania 15222

13   ALSO PRESENT:

14       Alan Steinberg

15
16
17
18
19
20
21
22
23
                    JOHNSON and MIMLESS
                       (412) 765-0744

3

1                   I N D E X

2                   -----

3    WITNESS:                        PAGE:

4    EDWARD KABALA

5    Examination by Mr. Stone        4

6    EXHIBITS:

7    Deposition Exhibit Nos. 1 and 2    21

8    Deposition Exhibit No. 3           31

9    Deposition Exhibit No. 4           35

10   Deposition Exhibit No. 5           36

11   Deposition Exhibit No. 6           38

12
13
14
15
16
17
18
19
20
21
22
23
                    JOHNSON and MIMLESS
                       (412) 765-0744

4

1                   P R O C E E D I N G S

2                   -----

3                   EDWARD KABALA

4    called as a witness by the Relators, being first duly

5    cautioned and sworn, as hereinafter certified, was

6    deposed and said as follows:

7                   EXAMINATION

8    BY MR. STONE:

9        Q.    Mr. Kabala, as you know, I represent the

10   Plaintiffs in a case that's been filed in the Federal

11   Court for the Western District of Pennsylvania which

12   is a qui tam case against -- the case is filed

13   against Drs. Vaccaro, Saleh, V&S and Bradford

14   Regional Medical Center.

15       I will be asking you some questions today

16   with regard to your knowledge about a dispute between

17   the Defendants that occurred a few years ago, and if

18   at any time I venture into an area that is a

19   privileged area, I don't mean to be poking into areas

20   that we're not entitled to question on. I'm going to

21   try to focus my questioning on those areas in which

22   you were -- you participated along with parties other

23   than your clients. If at any time you think I've

                    JOHNSON and MIMLESS
                       (412) 765-0744

5

1    gotten off that track, I'm sure you or your attorney

2    will let me know.

3        Let me just, I guess, maybe clarify for the

4    record, are you being represented by anybody here

5    today for the purposes of the deposition?

6                   MR. RYCHCIK: I'm representing

7    Mr. Kabala for the purposes of the deposition

8    as well.

9        Just so we're clear, Andy, I think what

10   you've said from the standpoint of the

11   attorney-client communications, I do want to

12   be clear that we also are taking the position

13   that any mental impressions, legal theories,

14   conclusions and opinions are also things that

15   are going to be off limits for purposes of the

16   deposition.

17       The deposition, to my understanding, is

18   going to be limited to the non-privileged,

19   non-protected communications with outside

20   parties and these meetings.

21                  MR. STONE: That is my intention. If I

22   get into another area, stop me, and I'll

23   rephrase it, and we'll get at it a different

                    JOHNSON and MIMLESS
                       (412) 765-0744

6

1    way.
2    BY MR. STONE:
3    **Q.**    Mr. Kabala, I guess -- how did you come to be
4    involved in a -- in representing Drs. Vaccaro and
5    Saleh back in 2001, 2000, that timeframe?
6          MR. RYCHCIK: I'm going to object to
7          that. I think you're going to be asking him
8          attorney-client communications, and I'm going
9          to instruct him not to answer those
10         attorney-client communications.
11         MR. STONE: This may be a little
12         difficult.
13   **Q.**    Maybe the best way to ask the question would
14   be, Mr. Kabala, do you remember attending meetings
15   with Dr. Vaccaro and Dr. Saleh involving the Bradford
16   Regional Medical Center in 2003?
17   **A.    Yes.**
18   **Q.**    Do you remember when you attended meetings
19   with your clients and other parties?
20   **A.    Not offhand, but I would think it would be**
21   **around December of '02 and early part of '03.**
22   **Q.**    Do you recall meeting with the Bradford
23   Hospital or the Bradford Regional Medical Center to

JOHNSON and MIMLESS
(412) 765-0744

7

1    negotiate the terms of a lease agreement?
2    **A.    Yes.**
3          MR. RYCHCIK: When you say "Bradford
4          Regional Medical Center," you're talking about
5          representatives of the hospital?
6          MR. STONE: That's right.
7    **Q.**    And what were the purpose -- or what was
8    the -- were the substance of those meetings with
9    Bradford relating to a lease agreement?
10         MR. RYCHCIK: Objection as to the form
11         of the question. Are you asking him about the
12         particulars, what was discussed? I mean, the
13         substance is kind of broad.
14   **Q.**    Let's start -- were your clients invited to
15   meet with the hospital in early 2003?
16   **A.    Yes.**
17   **Q.**    And how was that communicated to you or your
18   clients?
19   **A.    Probably had discussions with Mr. Steinberg.**
20   **Q.**    And did you understand that Mr. Steinberg
21   represented the hospital or the hospital
22   administration?
23   **A.    Yes.**

JOHNSON and MIMLESS
(412) 765-0744

8

1          MR. RYCHCIK: I want to be careful, Ed.
2          Your understandings -- I don't want you to get
3          into your opinions, your conclusions, those
4          types of areas. Certainly if he communicated
5          that to you, that's fine. I would like to try
6          to limit it to what it was communicated and
7          those communications back and forth.
8    **Q.**    Did Mr. Steinberg tell you that he was
9    representing the hospital and the administration?
10   **A.    He was representing the hospital, yes.**
11   **Q.**    And did he tell you why he wanted to meet
12   with you and your clients?
13         MR. MULHOLLAND: I'll object to the
14         extent that that gets into anything that might
15         constitute work product on behalf of Alan, but
16         I can't instruct him not to answer.
17   **Q.**    Did he tell you why he wanted to meet with
18   you?
19   **A.    Yes.**
20   **Q.**    What did he tell you?
21   **A.    That the parties had a dispute, and they**
22   **wanted to talk about ways of seeing if it could be**
23   **resolved.**

JOHNSON and MIMLESS
(412) 765-0744

9

1    **Q.**    Pursuant to those discussions, did you attend
2    a meeting with your clients and with representatives
3    of the hospital?
4    **A.    I attended several, yes.**
5    **Q.**    When do you think the first one occurred?
6    **A.    Probably December of '02.**
7    **Q.**    And what did the hospital communicate to --
8    to you and your clients at that meeting?
9    **A.    We discussed the conflict, the hospital's**
10   **conflict of interest policy, that they had such, and**
11   **we discussed the circumstances with respect to some**
12   **other issues, medical issues that the hospital and**
13   **the doctors were involved in, and whether they were**
14   **going to continue or whether we could try to resolve**
15   **some of those.**
16   **Q.**    At that first meeting did the hospital at any
17   time propose an equipment lease agreement?
18   **A.    No.**
19   **Q.**    At that meeting did your clients propose to
20   the hospital any kind of an equipment lease
21   agreement?
22   **A.    I don't recall when that came up. The first**
23   **meeting was primarily, as I recall, an attempt to**

JOHNSON and MIMLESS
(412) 765-0744

10

1  dispense with what the hospital said was not part of
2  the dispute, which were some issues between
3  Drs. Vaccaro and Saleh and other members of the
4  medical staff on some QA matters.
5    Q.   Did the hospital relate that those matters
6  were somehow an issue with regard to continuing staff
7  privileges at the hospital? Is that the --
8    A.   No. The hospital basically related that
9  those issues were separate and apart from anything
10 with respect to the conflict of interest policy, and
11 I believe our position was that let's get rid of
12 them, that they were occurring at the same time, and
13 we took the position that they were involved with the
14 conflict of interest policy. And I believe that
15 Mr. Leonhardt had resolved that matter by getting
16 outside consultants, whether it was the first meeting
17 or after the first meeting or somewhere along those
18 lines.
19   Q.   Now, you said that there were several
20 meetings. What was the -- what happened at the next
21 meeting, and approximately how long after the first
22 meeting did that occur?
23        MR. RYCHCIK: Objection as to form of
                JOHNSON and MIMLESS
                   (412) 765-0744

11

1       the question. Compound. Do you want to try
2       to break it down?
3    Q.   Do you recall when you next met with the
4  hospital?
5    A.   It would have been early '03. I don't recall
6  the dates.
7    Q.   Do you recall who was in attendance at that
8  meeting?
9    A.   Probably Mr. Steinberg and Mr. Leonhardt,
10 Drs. Vaccaro and Saleh and myself.
11   Q.   Those were the same parties that were at the
12 first meeting?
13   A.   Yes. Mr. Mulholland may have stopped in once
14 or twice, but I don't recall whether -- which
15 meetings it was. Of the two or three meetings, I
16 think he was there once.
17   Q.   Did these meetings occur in your office here
18 in Pittsburgh or in Mr. Steinberg's office?
19   A.   Mr. Steinberg's office.
20   Q.   At the second meeting did the hospital
21 communicate or tell you about any issues relating to
22 a lease agreement? Did they make a proposal for a
23 lease agreement?
                JOHNSON and MIMLESS
                   (412) 765-0744

12

1    A.   Not that I can recall.
2    Q.   Do you know whether -- do you remember
3  whether the doctors, your clients, proposed anything
4  with regard to a lease agreement in that second
5  meeting?
6    A.   Probably, but I don't recall specifically
7  when.
8    Q.   Did the parties discuss a -- the possibility
9  of a buyout of the doctors' practice or a portion of
10 the doctors' practice?
11   A.   No.
12   Q.   What was the lease proposal that the doctors
13 made to the hospital at that second meeting?
14   A.   Don't know if there was a specific proposal.
15 The original concept was to discuss how the parties
16 could back off from the precipes that they -- the
17 deadlock, the fight that they were involved in, and
18 whether there were legal ways to resolve the issue.
19      I think a number of things were discussed. I
20 don't know that anything was specifically proposed.
21 There were some concepts raised. I think at one point
22 we probably said did they want to buy the camera
23 business, the nuclear camera business, and the
                JOHNSON and MIMLESS
                   (412) 765-0744

13

1  hospital said they did not, and then we looked at
2  other alternatives.
3    Q.   Did the hospital relate to you at either the
4  first or second meeting what their concerns were with
5  regard to V&S operating this nuclear imaging part of
6  their practice?
7    A.   Well, the concerns had been raised in prior
8  correspondence.
9    Q.   Did they relate to you at the first or second
10 meeting that their business was -- the volume of
11 their business with regard to nuclear imaging and
12 cardiology was being impacted by your clients'
13 business?
14       MR. RYCHCIK: Objection as to the form
15       of the question. You're asking if that's what
16       was communicated in one of these letters?
17       MR. STONE: No. I'm asking whether that
18       was communicated in either one of the
19       meetings.
20   A.   I don't recall that being a topic of
21 discussion at the meetings.
22   Q.   At either of these meetings did the hospital
23 present any information with regard to the volume of
                JOHNSON and MIMLESS
                   (412) 765-0744

14

1   referrals or the decline in referrals that was
2   resulting from the V&S imaging practice?
3   A.   No.
4          MR. RYCHCIK: I just want to be clear.
5   You're talking about the first two meetings?
6          MR. STONE: Yes.
7          MR. RYCHCIK: In the event there were
8   subsequent meetings --
9          MR. STONE: We will get to those.
10  Q.   By the time you got to the end of the second
11  meeting, had the parties reached any agreement with
12  regard to a lease arrangement?
13  A.   Not that I recall.
14  Q.   Was there an agreement or consensus to meet
15  again?
16  A.   I believe there was a thought that we would
17  meet again, but I don't know that anybody had any
18  particular agreement on it.
19  Q.   How long after that do you think you met?
20  A.   Another month maybe.
21  Q.   So that would be possibly early February?
22  A.   Early February, I guess.
23  Q.   And at that time did the hospital request an

JOHNSON and MIMLESS
(412) 765-0744

16

1   hospital and medical staff. That was primarily the
2   topic. And other things were probably discussed at
3   the same time, but --
4   Q.   Was there any further discussion regarding
5   the hospital purchasing the imaging practice?
6   A.   Not that I recall.
7   Q.   And you said that you think primarily the
8   discussions involved the under arrangements venture?
9   A.   Yes.
10  Q.   Was there any discussion about the lease at
11  that point that you remember?
12  A.   As I recall there was, and I don't think it
13  went very far. I don't think the hospital wanted to
14  do it at that time.
15  Q.   Did the hospital tell you why they were not
16  interested in the lease arrangement?
17  A.   No.
18  Q.   I want to show you a set of documents that --
19  I apologize. I notice that the copies, when they
20  were copied, the Bates stamp number at the bottom was
21  sort of cut off, so we may have to work around that a
22  little bit. We'll try to direct you to the right
23  place in the packet.

JOHNSON and MIMLESS
(412) 765-0744

15

1   additional meeting?
2   A.   There was a meeting after -- there was a
3   subsequent meeting in March. I don't know who
4   requested what.
5   Q.   No. To get from the January meeting to the
6   February meeting, had somebody requested the February
7   meeting --
8   A.   Obviously, but I couldn't tell you --
9   Q.   -- either the hospital or your clients?
10  A.   Yes. I couldn't tell you who.
11  Q.   Again, did that occur at Mr. Steinberg's
12  office?
13  A.   I believe so.
14  Q.   And who were in attendance at that meeting?
15  A.   Probably same people. At one meeting there
16  was a gentleman from Mr. Voyvodich from Stroudwater,
17  but I don't recall which one.
18  Q.   At the February meeting, was the proposal --
19  was the concept of a lease arrangement, was that
20  discussed?
21  A.   I think the February meeting primarily
22  discussed what was called an under arrangements
23  model, which is a form of joint venture between a

JOHNSON and MIMLESS
(412) 765-0744

17

1          MR. MULHOLLAND: Is this all one
2   exhibit, Andy?
3          MR. STONE: I believe it is, because the
4   cover fax says it's nine pages, and I think it
5   appears to be nine pages.
6   Q.   Mr. Kabala, this appears to be a facsimile
7   transmission of a series of letters relating to
8   meetings that Bradford Hospital and the doctors were
9   having in early 2003. Can you identify this packet
10  as something that's familiar to you?
11  A.   First one is a letter dated March 14, 2003
12  from Alan J. Steinberg to Jodeen Hobbs who was
13  working with me in representing Drs. Vaccaro and
14  Saleh and V&S. The second one is a letter dated
15  March 12, 2003 from Mr. Steinberg to me. And the
16  third one is March 11, 2003, from Mr. Steinberg to
17  me.
18         MR. RYCHCIK: I'm assuming --
19  A.   The fax cover page --
20         MR. RYCHCIK: I want to say I'm
21  assuming, and maybe I shouldn't assume, are
22  you going to ask him questions about the
23  content of the letters? If so, I would like

JOHNSON and MIMLESS
(412) 765-0744

18

1   the witness to take the opportunity to read
2   through the letters in their entirety. If
3   you're asking him just has he recognized them,
4   that's one thing. If you're going to ask him
5   specific questions, I would like to give him
6   the opportunity to read through the entire
7   exhibit.
8       MR. STONE: Let's give him a couple
9   minutes, however long it will take him to read
10  through this. I think it will go faster if
11  he's familiarized himself with the document.
12      MR. RYCHCIK: Again, with the
13  understanding, certainly, that he can testify
14  what that document says, but if you're getting
15  into interpretation other than what was
16  communicated to counsel back and forth, I
17  think that's going to be the limit of what
18  he's going to be able to talk about.
19      MR. STONE: I agree. I don't have any
20  intention, again, of getting off the path that
21  we talked about earlier. I want to try to
22  focus his attention on certain aspects of
23  these meetings, and I think these letters will

JOHNSON and MIMLESS
(412) 765-0744

20

1   you have a recollection of receiving it, you
2   can testify to that. If you don't have a
3   recollection of receiving it, then --
4   A.  Yeah, I got it eventually, sure.
5   Q.  And this series of correspondence appears to
6   relate to a meeting that occurred in early March of
7   2003?
8   A.  **Probably March 8th, the Saturday before.**
9   **This one is the 11th, and I think that prior Saturday**
10  **was March 8th.**
11  Q.  Would the March 8th meeting, that was a
12  meeting that you attended?
13  A.  **It was.**
14  Q.  Was that a follow up to the earlier meetings
15  that you previously testified about?
16  A.  **Yes.**
17  Q.  You remember whether there was anything in
18  between the February meeting and this meeting, or is
19  this the next one in the sequence?
20  A.  **No. There probably would have been some**
21  **correspondence, and there may have been some**
22  **discussions between Mr. Steinberg and myself.**
23  Q.  Okay. Now, I'm going to show you -- I think

JOHNSON and MIMLESS
(412) 765-0744

19

1   help me do that.
2       MR. MULHOLLAND: For the record, would
3   you have any objection if I handed a copy to
4   Mr. Steinberg? He can review them now. You
5   may be asking him some questions about them.
6       MR. STONE: I think that will probably
7   save us some time.
8       (Witness reviews document.)
9   A.  Okay.
10  Q.  Looking at the first page, the fax
11  transmittal, this appears to have been directed to
12  you. Can you acknowledge having received these
13  letters around -- approximately around this time?
14  Does that --
15      MR. RYCHCIK: If you recall.
16  A.  **I would have received them later. Actually,**
17  **I probably received some of them earlier and some of**
18  **them later. I believe I was on vacation for part of**
19  **that time.**
20      MR. RYCHCIK: I think he's asking about
21  this whole entire fax that appears to have
22  been -- there's nine pages, and all the
23  letters were sent at the same time. Again, if

JOHNSON and MIMLESS
(412) 765-0744

21

1   we will mark this one as Deposition Exhibit No. 1.
2       This next one we will mark as Deposition
3   Exhibit 2?
4       (Kabala Exhibit Nos. 1 and 2 were marked
5   for identification.)
6       MR. RYCHCIK: Take your time to read
7   through this one as well.
8       THE WITNESS: Uh-huh.
9       (Witness reviews document.)
10  A.  Okay.
11  Q.  Is this letter familiar to you?
12  A.  It is.
13  Q.  Have you previously received it?
14  A.  I have.
15  Q.  And I think you testified that Ms. Hobbs was
16  working with you; is that correct?
17  A.  That's correct.
18  Q.  Now, both Exhibit 1 and 2 refer to this
19  meeting on March 8th, 2003.
20  A.  Yes.
21  Q.  Is it your recollection that that meeting was
22  largely about or substantially about the lease
23  arrangement?

JOHNSON and MIMLESS
(412) 765-0744

22

1   A.   No. It was -- it was -- the lease

2   arrangement was discussed. It was also about the

3   under arrangements model and the hospital's desire to

4   have Drs. Vaccaro and Saleh participate in that.

5   Q.   Okay. Do you recall where that meeting took

6   place?

7   A.   I think it's in Mr. Steinberg's office.

8   Q.   And Ms. Hobbs' letter refers to Drs. Vaccaro

9   and Saleh being present, yourself, Mr. Steinberg and

10  Mr. Mulholland and Mr. Leonard. Is that what you

11  remember?

12  A.   As I recall, Mr. Steinberg had some other

13  issues, and he was in and out, but yes.

14  Q.   So those persons would have attended at least

15  some part of that meeting?

16  A.   I believe so.

17  Q.   Do you remember whether the hospital

18  requested this meeting or whether this was a meeting

19  that was requested by your clients?

20  A.   I don't recall whether -- who actually

21  requested it. I mean --

22  Q.   Do you remember how long this meeting lasted?

23  A.   Pretty much all morning.

JOHNSON and MIMLESS

(412) 765-0744

23

1   Q.   And what do you remember about the

2   discussions involving the lease?

3        MR. RYCHCIK: Objection as to the form

4        of the question.

5        You can go ahead and answer.

6        Are you looking to just in general what

7        he remembered, every discussion that took

8        place? It's a broad area.

9   Q.   Well, I'm certainly not asking you about what

10  you advised your clients out of the presence of other

11  parties, but I'm talking about the discussions

12  between the parties and the lawyers involving the

13  lease. What do you remember about those discussions?

14  A.   At this stage the concept was to have

15  Drs. Vaccaro and Saleh eventually join in to

16  something called an under arrangements model. We

17  were discussing whether the parties would wait for

18  the under arrangements model to be implemented or

19  whether there was a way that we could legally develop

20  some methodology for the hospital to take over the

21  nuclear camera and the nuclear camera business at an

22  earlier stage because it would take some time for the

23  under arrangements model to be implemented.

JOHNSON and MIMLESS

(412) 765-0744

24

1   Q.   You said at the early meetings the hospital

2   did not seem to be interested in a lease arrangement?

3   A.   That's correct.

4   Q.   At this meeting in March did they express or

5   relate to you that they were now interested in the

6   proposal?

7   A.   At the beginning of the meeting, as I recall,

8   they said they were interested in talking about it

9   further, that they had originally said they were not

10  interested, and they were interested in seeing if one

11  could be worked out by the parties in a way that

12  would be satisfactory to the lawyers and the clients.

13  Q.   Who made the first proposal with regard to

14  the amount of the lease payment?

15  A.   Probably me.

16  Q.   And did you relate to the hospital why the

17  doctors felt that it was worth a certain amount in

18  terms of a per diem charge or a monthly charge?

19  A.   I'm sure I did.

20  Q.   And what did you tell -- what did you tell

21  the hospital about what the basis for that proposal

22  was?

23  A.   I told the hospital that although it was just

JOHNSON and MIMLESS

(412) 765-0744

25

1   basically in its first year, the doctors were making

2   a substantial number of dollars and would anticipate

3   making additional dollars over the period as the

4   business grew, and that if they were to put at some

5   point through the under arrangements model, then

6   that -- that plus some other ventures would be there.

7        But if we were going to be talking about

8   something before the under arrangements model, then I

9   had proposed, I think, something in the area of

10  $2,000 per day as a sublease.

11  Q.   And did you relate to the hospital that it

12  was -- that whatever arrangement was agreed upon

13  would have to compensate the physicians for the loss

14  of the business opportunity or the loss of the

15  profit? Is that what you were --

16  A.   They were giving up some profit of $240,000

17  initially and then more later, so my proposal was

18  that they compensate the doctors for the camera, the

19  cost of the camera and basically for a noncompete.

20  The form, whether we did it as a sublease or a

21  sublease and a noncompete or whatever, all those

22  things were talked about, and it basically got down

23  to one document.

JOHNSON and MIMLESS

(412) 765-0744

26

1    Q.    Well, was it the hospital that requested the
2    noncompete, or was it the doctors that proposed the
3    noncompete?
4    A.    I don't know that -- I think probably that I
5    proposed the noncompete. Again, we had been looking
6    for an appropriate methodology that was satisfactory
7    to the government, that was satisfactory to the
8    lawyers and satisfactory to the clients, and that was
9    one that was basically in use in many, many
10   transactions that were ongoing in the '90s and early
11   2000s and still today.
12   Q.    Did the hospital counter your proposal, which
13   was, I guess, the $2,000 plus these other elements
14   that you talked about?
15   A.    The hospital, as I recall, simply said no to
16   the original number, and by the end of the day I
17   believe we had gotten down to where the -- they would
18   at least look at a $1,500 number, but they hadn't
19   agreed to anything.
20   Q.    And did the hospital, during the course of
21   those discussions, did the hospital relate to you a
22   reason or justification for their position that they
23   were willing to pay something, but not as much as you

JOHNSON and MIMLESS
(412) 765-0744

27

1    were looking for?
2    A.    Well, the hospital wanted to -- if the
3    hospital wanted to take it over, then they are to be
4    certain that they were paying was fair market
5    value. They thought the original number wasn't, or
6    even if it was, they weren't ready to pay it. So
7    they were going to consider what they thought was
8    fair market value for taking over this business and
9    for the noncompete.
10   Q.    When you say "fair market value for taking
11   over the business," at this point the sale of the
12   business was off the table. Is that true? Is that
13   correct?
14   A.    Well, there was no purchase of the business.
15   Q.    Okay.
16   A.    But the doctors would give up the business
17   pursuant to the noncompete. So the hospital would be
18   taking over the tech, the camera, moving it to the
19   hospital, and integrating it into their department
20   initially and ultimately into the under arrangements
21   model, if that took off and went anywhere.
22   Q.    Did the hospital indicate to you that they
23   were evaluating the lease payments based on the --

JOHNSON and MIMLESS
(412) 765-0744

28

1    the fair market value of the business then?
2    A.    I don't know that the hospital said that, how
3    they were evaluating it. I just think that we got to
4    a point where we had gone as far as we could that
5    day, we understood the general concepts, and they
6    wanted to look at what their position would be and
7    whether they wanted to go any further with it.
8    Q.    Did the hospital, at that point or at any
9    previous point, request any information from your
10   clients relating to the volume of the business?
11   A.    I think what they requested and what
12   Dr. Saleh eventually gave them was the gross
13   collections and the expenses of the business.
14   Q.    Did the hospital share with you or your
15   clients any information regarding referral rates or
16   business volume from their records?
17          MR. RYCHCIK: Are you talking about at
18          any time related to a sublease, or are you
19          talking about at this particular meeting?
20   Q.    I'm talking about first this particular
21   meeting, and then I'll ask you a follow-up question.
22   A.    The only information that we ever received
23   from the hospital was information generally at some

JOHNSON and MIMLESS
(412) 765-0744

29

1    point on the under arrangements model. There was
2    never any question of referrals.
3    Q.    And at this meeting in March of 2003, was the
4    lease discussed in the context of an ultimate under
5    arrangements venture?
6    A.    There were two phases basically, actually
7    three phases. An initial phase where the parties
8    would generally have a concept, a period of time
9    where the hospital would obtain a fair market value
10   opinion or the noncompete, and then presumably if the
11   under arrangements model was ready at that time,
12   would it go there. If it wasn't, then there would be
13   an interim phase if the parties reached an agreement,
14   there would be a takeover before the under
15   arrangements model.
16   Q.    So the discussions involved the terms of this
17   interim arrangement or lease as well as the ultimate
18   under arrangements venture; is that right?
19   A.    It was very limited as to the under
20   arrangements model. They had to get all of their
21   materials together. They had to see what -- the
22   hospital's intent as they expressed it to the doctors
23   and to me was to find some mechanism for solidifying

JOHNSON and MIMLESS
(412) 765-0744

30

1  the medical staff, for protecting the -- from putting
2  everybody in a venture where they would cooperate,
3  the physicians would cooperate with each other and
4  to -- to do what was best for the community.
5      So we talked about the under arrangements
6  model in a very preliminary sense. It had to be
7  fleshed out. It had to be submitted to the Office of
8  Inspector General for approval, and I had not worked
9  with an under arrangements model, so I did not
10 know --
11     MR. RYCHCIK: I want to stop you. One
12     thing I want you to be careful of, I don't
13     want you to get into particulars about your
14     experience or your thoughts or anything along
15     those lines, just what was communicated.
16 A.  I hadn't worked with one.
17 Q.  Did the hospital tell you that they would
18 seek approval from HHS on the lease arrangement?
19 A.  No.
20 Q.  Did you tell the hospital that you would seek
21 approval of the -- preliminary approval of the lease
22 arrangement?
23 A.  No.

JOHNSON and MIMLESS
(412) 765-0744

31

1  Q.  I'm going to show you a third document which
2  we'll mark as Exhibit 3.
3      (Kabala Exhibit No. 3 was marked for
4      identification.)
5      MR. STONE: Off the record for a second.
6      (Discussion held off the record.)
7      (Witness reviews document.)
8  A.  Okay.
9  Q.  If you would look at that document and
10 identify that for us. Does that document look
11 familiar to you?
12 A.  It is. It's a letter I wrote.
13 Q.  It's authored by you?
14 A.  It is.
15 Q.  It's directed to Mr. Steinberg?
16 A.  It is.
17 Q.  In the first sentence it references a meeting
18 on January 31st.
19 A.  Okay.
20 Q.  Is it possible that that was the meeting that
21 you were referring to when you said early February?
22 A.  Probably, yeah.
23 Q.  In the second paragraph -- it indicates that

JOHNSON and MIMLESS
(412) 765-0744

32

1  there was some information that was provided
2  regarding the volume of the nuclear camera. Is this
3  what you were referring to before?
4  A.  The second paragraph says, "You therefore
5  know, at this stage, the income of the practice at
6  this stage and that there is a, at a minimum,
7  $250,000 in costs to abandon the project. The actual
8  number is $244,000 plus 6 percent sales tax just for
9  the lease." That was to abandon the lease just as it
10 stood. There was no issue of --
11 Q.  I was actually referring to the paragraph
12 right above that, I think.
13 A.  "We have provided you with the annual volume
14 for the nuclear camera." As I believe, after the
15 earlier meeting the doctors provided Mr. Voyvodich
16 and Stroudwater some volumes in order to do projects
17 to do the under arrangements model.
18 Q.  That would be important in terms of
19 evaluating the contribution to the under arrangements
20 model?
21     MR. RYCHCIK: I'm going to object to
22     that question. You're asking him, it would be
23     important. I'm going to instruct him not to

JOHNSON and MIMLESS
(412) 765-0744

33

1      answer that question.
2      MR. STONE: I'll rephrase it.
3  Q.  You had testified earlier that discussions
4  that you had and information that you provided on the
5  volumes had to do with the under arrangements
6  venture.
7  A.  That's right. At this stage there was no
8  lease issue.
9  Q.  I just wanted to clarify that that's what
10 that was referring to. If you would look at, I
11 guess, the fourth page of that document, the second
12 full paragraph starts with the reference to
13 Mr. Mulholland.
14 A.  Okay.
15 Q.  Again, this relates to, again, your statement
16 that one of the issues that was in discussion in
17 March had to do with giving up a very profitable
18 business and somehow compensate them for that. In
19 this letter, I'm assuming that the lease isn't on the
20 table at this point; this is really relating to the
21 under arrangements?
22 A.  This is relating to the under arrangements
23 and stop being a separate business.

JOHNSON and MIMLESS
(412) 765-0744

34

1  **Q.**  Was this concern or were these issues also

2  relevant to your -- were these also part of your

3  discussions in March relating to the lease agreement?

4       MR. MULHOLLAND: Objection as to the form

5  of the question. When you say "these issues,"

6  what are you talking about?

7       MR. STONE: The two issues that I

8  referred to in this letter. One having to do

9  with the volume of the nuclear camera, and the

10  second one being the giving up of a

11  functioning, profitable business.

12  **Q.**  In this letter in the context of the under

13  arrangements model or the proposed under arrangements

14  model, my question is simply, were those

15  considerations also part of your discussions in March

16  as related to the lease?

17  **A.**  **The cost of taking over the equipment was a**

18  **consideration in the sublease. The fact that they**

19  **were giving up a business and that they were signing**

20  **a noncompete in my mind determined --**

21       MR. RYCHCIK: I want to be careful, in

22  your mind. Why don't we take a step back.

23  **A.**  **Then I can't answer that.**

JOHNSON and MIMLESS

(412) 765-0744

35

1       MR. RYCHCIK: I'm going to instruct you

2  not to answer anything relating --

3  **Q.**  Was this information discussed with BRMC?

4       MR. RYCHCIK: I don't want you to be

5  getting into anything that was in your mind.

6  I want to limit it to what was discussed and

7  communicated.

8  **A.**  **No, it was not discussed.**

9  **Q.**  Let me show you a fourth exhibit.

10       (Kabala Exhibit No. 4 was marked for

11  identification.)

12       MR. STONE: Off the record.

13       MR. RYCHCIK: I do want to -- for the

14  record.

15       MR. STONE: He can read them if he

16  wants.

17       MR. RYCHCIK: I want you to read it, and

18  I want to note for the record that Exhibit 4

19  needs to be designated as confidential, and

20  that needs to be maintained as a confidential

21  document for purposes of the deposition. It

22  contains peer review information within the

23  confidentiality order stipulation that's in

JOHNSON and MIMLESS

(412) 765-0744

36

1  place in this case.

2       MR. MULHOLLAND: For the record, the

3  hospital will also designate it also as

4  confidential.

5       (Witness reviews document.)

6  **A.**  **Okay.**

7  **Q.**  Mr. Kabala, is this a document that is

8  familiar to you?

9  **A.**  **It is.**

10  **Q.**  Can you identify what it is.

11  **A.**  **The cover page is from Mr. Steinberg to**

12  **Mark S. Raspanti, who is in the same firm as Jodeen**

13  **Hobbs. The first one, two, three, four, five, six**

14  **pages is a letter from Mr. Steinberg to Mr. Raspanti**

15  **dated February 26th, 2002. The next two pages, or**

16  **the last two pages, are a letter dated July 30, 2001**

17  **from Mr. Leonhardt, president/CEO of Bradford**

18  **Regional Medical Center to Dr. Peter Vaccaro and**

19  **Dr. Kamran Saleh.**

20  **Q.**  The next one is -- we'll mark this as

21  Exhibit 5, I guess.

22       (Kabala Exhibit No. 5 was marked for

23  identification.)

JOHNSON and MIMLESS

(412) 765-0744

37

1       MR. RYCHCIK: Same designation as to

2  made with Exhibit 4.

3       MR. MULHOLLAND: And the hospital also

4  so designates it as confidential.

5       MR. STONE: You probably know which ones

6  are together and which ones aren't. That's

7  one letter, so I think we can do that.

8       MR. RYCHCIK: Okay.

9       MR. STONE: And then I have this as

10  being four pages. Is that right?

11       MR. RYCHCIK: I believe so. Again,

12  without reference to what I sent, I can't

13  confirm that.

14       (Witness reviews document.)

15       MR. RYCHCIK: I'm sorry, I didn't -- was

16  there a question that was on the table?

17  **Q.**  Mr. Kabala, again, is this document familiar

18  to you?

19  **A.**  **In general the document is familiar. It's**

20  **pages two through eight of a fax of a letter from**

21  **Mr. Mark Raspanti to Mr. George Leonhardt, so**

22  **obviously there was a Page 1, probably a cover page**

23  **of a fax. There is some handwriting on there that I**

JOHNSON and MIMLESS

(412) 765-0744

38

1  don't recognize and don't know that I've seen.

2  Q.    And then we'll mark this last one as

3  Exhibit 6.

4           (Kabala Exhibit No. 6 was marked for

5  identification.)

6           MR. RYCHCIK: Same designation for

7  Exhibit 6 as the prior two exhibits. It's the

8  confidentiality.

9           MR. MULHOLLAND: The hospital will also

10  designate it as confidential.

11  A.    This is four pages. The first two are a

12  letter that I wrote November 19, 2003 to

13  Mr. Steinberg. Page 3 is a fax transmittal, and

14  Page 1 is a fax transmittal.

15           MR. RYCHCIK: Well, for purposes of the

16  exhibit, I think you mean the final page. The

17  fax transmittal final pages, I believe, were

18  tagged on at the end. You're looking at the

19  last page of the exhibit.

20  A.    Bates 3189 and 3190 which are behind 3187 and

21  88. It's just in a different form.

22  Q.    Okay.

23           MR. STONE: I don't have any further

JOHNSON and MIMLESS

(412) 765-0744

39

1  questions of Mr. Kabala at this time. So

2  anybody else?

3           MR. MULHOLLAND: I have no questions.

4           MR. RYCHCIK: We would like to read.

5           (Whereupon, the deposition was concluded

6  at 12:13 p.m., and signature was not waived.)

7           - - -

JOHNSON and MIMLESS

(412) 765-0744

40

1           C E R T I F I C A T E

2  UNITED STATES DISTRICT COURT )
   WESTERN DISTRICT OF PA - ERIE) SS:

3

4           I, Constance Lee, a Notary Public in and
   for the Commonwealth of Pennsylvania, do hereby
   certify that before me personally appeared EDWARD

5  KABALA, the witness herein, who then was by me first
   duly cautioned and sworn to testify the truth, the

6  whole truth and nothing but the truth in the taking
   of his oral deposition in the cause aforesaid; that

7  the testimony then given by him as above set forth
   was reduced to stenotypy by me, in the presence of

8  said witness, and afterwards transcribed by
   computer-aided transcription under my direction.

9

10           I do further certify that this
   deposition was taken at the time and place specified
   in the foregoing caption, signature was not waived.

11

12           I do further certify that I am not a
   relative of or counsel or attorney for any party
   hereto, nor am I otherwise interested in the event of

13  this action.

14           IN WITNESS WHEREOF, I have hereunto set
   my hand and affixed my seal of office at Pittsburgh,

15  Pennsylvania, on this 7th day of April, 2008.

16           The foregoing certification does not
   apply to any reproduction of this transcript in any

17  respect unless under the direct control and/or
   direction of the certifying reporter.

18

19           ---------------------------

20

21           Constance Lee, Notary Public in
           and for the Commonwealth of

22           Pennsylvania

23

JOHNSON and MIMLESS
(412) 765-0744

**6**

1

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2                  ERIE DIVISION

3              - - - - -

4      UNITED STATES OF AMERICA,        )
       ex rel., DILBAGH SINGH,          )
5      M.D., PAUL KIRSCH, M.D.,         )
       V. ROA NADELLA, M.D., and        )
6      MARTIN JACOBS, M.D.,             )  Civil Action
                                        )  No. 04-186E
7              Relators,                )
                                        )
8              vs.                      )
                                        )
9      BRADFORD REGIONAL MEDICAL        )
       CENTER, V&S MEDICAL              )
10     ASSOCIATES, LLC, PETER           )
       VACCARO, M.D., KAMRAN            )
11     SALEH, M.D., and DOES I          )
       through XX,                      )
12                                      )
               Defendants.             )
13
                DEPOSITION OF ALAN STEINBERG
14                 THURSDAY, APRIL 3, 2008

15     Deposition of Alan Steinberg, called as a witness by

16     the Relators, taken pursuant to Notice of Deposition

17     and the Federal Rules of Civil Procedure, by and

18     before Constance Lee, a Court Reporter and Notary

19     Public in and for the Commonwealth of Pennsylvania,

20     at the offices of Fox Rothschild, 625 Liberty Avenue,

21     29th Floor, Pittsburgh, Pennsylvania, commencing at

22     12:33 p.m. on the day and date above set forth.

23                  -----

JOHNSON and MIMLESS
(412) 765-0744

**Page 2**

APPEARANCES:

2    On behalf of the Relators:

3       Stone Law Firm
        Andrew M. Stone, Esquire
4       1400 Allegheny Building
        Pittsburgh, Pennsylvania 15219
5

    On behalf of the Defendant, Bradford Regional Medical
6   Center:

7       Dan Mulholland, Esquire
        4614 Fifth Avenue
8       Pittsburgh, Pennsylvania 15213

9   On behalf of the Defendants, V&S Medical Associates,
    LLC, Peter Vaccaro, M.D. and Kamran Saleh, M.D.:
10
        Fox Rothschild
11      Carl J. Rychcik, Esquire
        625 Liberty Avenue, 29th Floor
12      Pittsburgh, Pennsylvania 15222

13
14
15
16
17
18
19
20
21
22
23

JOHNSON and MIMLESS
(412) 765-0744

**Page 3**

1           I N D E X

2           -----

3   WITNESS:                    PAGE:

4   Alan Steinberg

5       Examination by Mr. Stone        4

6   EXHIBITS:

7       Deposition Exhibit No. 1        21

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

JOHNSON and MIMLESS
(412) 765-0744

**Page 4**

1                   P R O C E E D I N G S

2                   -----

3                   ALAN STEINBERG

4   Called as a witness by the Relators, being first duly

5   cautioned and sworn, as hereinafter certified, was

6   deposed and said as follows:

7                   EXAMINATION

8   BY MR. STONE:

9       Q.   Mr. Steinberg, you were here for the earlier

10  deposition, so I won't repeat everything. But again,

11  I'm going to be trying to ask you some questions

12  about knowledge that you have regarding a lease

13  negotiation with V&S Medical Associates in early

14  2003. I will try to stay away from matters that are

15  privileged in any way, and if I get into some areas,

16  I'm sure Mr. Mulholland will interpose an objection,

17  or you can stop me, and I'll try to rephrase it so

18  that we don't get into any area we're not supposed to

19  be in.

20          Let me start by asking you, did there come a

21  time where you met with representatives from V&S

22  Medical Associates in early 2003 regarding a possible

23  lease arrange -- equipment lease arrangement?

JOHNSON and MIMLESS
(412) 765-0744

**Page 5**

1       A.   We met early 2003. I'm not sure when the

2   lease arrangement discussion arose.

3       Q.   Okay. What was the first time that you

4   recall discussing a lease arrangement with

5   representatives of V&S?

6       A.   I don't recall what was the first time.

7       Q.   Okay. You said you recall meeting with V&S

8   in early 2003.

9       A.   Uh-huh.

10      Q.   Do you remember what was discussed at your

11  meeting in early 2003?

12      A.   Whether we could resolve the conflict between

13  S & V (sic) Corporation and the Medical Center. I

14  believe perhaps -- I believe also the under

15  arrangements model. That's what I recall.

16      Q.   Okay. And the discussions that you had

17  regarding the under arrangements model involved V&S

18  and other practices at the hospital; is that right?

19      A.   Yes.

20      Q.   Do you recall whether the hospital made a

21  proposal to V&S regarding a purchase of their medical

22  practice or a portion of their medical practice?

23      A.   No, I don't recall that.

JOHNSON and MIMLESS
(412) 765-0744

6

2      you recall V&S making a proposal to the
3   hospital involving the sale or purchase of their
4   imaging business?
5      A.   Yes.
6      Q.   And do you recall when that occurred?
7      A.   Shortly before -- I don't recall with
8   certainty when that was done.
9      Q.   Do you recall what that proposal was?
10     A.   An amount of money. That's all I recall.
11     Q.   And did the hospital respond to V&S with
12  regard to that proposal?
13     A.   Yes.
14     Q.   And what was the position that the hospital
15  conveyed to V&S?
16     A.   Not accept the offer.
17     Q.   So the hospital conveyed to V&S or their
18  representative that it was something that the
19  hospital was not interested in?
20     A.   Correct.
21     Q.   Okay. Now, you were here for Mr. Kabala's
22  deposition, and he testified to a series of meetings
23  that involved discussions regarding either an under
    arrangements venture or a lease or both. Do you

JOHNSON and MIMLESS
(412) 765-0744

8

1      Q.   And Mr. Leonhardt also attended on behalf of
2   the hospital?
3      A.   Correct.
4      Q.   I'm going to ask you to look at what we've
5   marked in Mr. Kabala's deposition as Exhibit No. 3
6   and ask you to take a look at that document.
7           (Witness reviews document.)
8      Q.   Can you identify this as a document that's
9   familiar to you?
10     A.   Yes.
11     Q.   What is it?
12     A.   It's a letter dated February 5, 2003 from Ed
13  Kabala to myself regarding Drs. Vaccaro and Saleh and
14  Bradford Regional Medical Center.
15     Q.   It references a follow up to a meeting on
16  January 31st --
17     A.   Correct.
18     Q.   -- 2003; is that right?
19     A.   Correct.
20     Q.   Do you recall any discussion at that
21  January 31st meeting regarding a proposed lease
22  arrangement?
23     A.   I don't have present recall of that.

JOHNSON and MIMLESS
(412) 765-0744

7

1   recall that?
2      A.   His testimony?
3      Q.   Yes.
4      A.   Yes.
5      Q.   Okay. Do you agree with his recollection
6   that there was a series of meetings involving those
7   two subjects?
8      A.   There were a series of meetings, yes.
9      Q.   And those meetings occurred at your office;
10  is that right?
11     A.   Yes.
12     Q.   Who attended those meetings? And if they
13  were the same person -- the same parties at each
14  meeting, you can simply tell me who was there at all
15  of them. If there was some difference or change,
16  please indicate whether -- when that -- what the
17  difference was between the meetings and who attended.
18     A.   Okay. The main players, the main people I
19  should list, Drs. Saleh and Vaccaro, Ed Kabala, their
20  counsel, George Leonhardt, myself was the core. I
21  don't recall, though, who else at different meetings.
22  Dan Mulholland attended, but I don't recall which
23  ones, though he attended, as I recall.

JOHNSON and MIMLESS
(412) 765-0744

9

1      Q.   Do you recall whether the hospital at some
2   point proposed a lease arrangement or whether the
3   proposal came from V&S?
4           MR. MULHOLLAND: Are you asking for his
5       recollection in the context of discussions or
6       communications between the parties?
7           MR. STONE: Yeah.
8      A.   Could you repeat that, please.
9      Q.   Do you recall whether the hospital at any
10  point proposed a lease arrangement as a way to
11  resolve the dispute between the parties?
12     A.   I'm trying to recall a moment. Discussions
13  began with under arrangements. I don't recall when
14  the lease came in and by whom. That's why I was
15  delaying. I was trying to recall.
16     Q.   So if I asked you the question, do you recall
17  the doctors making a proposal, your answer would be
18  the same; you're not sure who proposed it?
19     A.   I believe they began with the proposal of the
20  lease.
21     Q.   Do you recall whether the hospital conveyed a
22  position initially of rejecting a lease arrangement?
23  Did the hospital ever say to V&S or their

JOHNSON and MIMLESS
(412) 765-0744

10

1   representative that they were not interested in a

2   lease arrangement?

3   A.   I don't recall.

4   Q.   I'm going to ask you to take a look at

5   Exhibit Nos. 1 and 2, if you could. Again, these

6   were previously marked in Mr. Kabala's deposition.

7        (Witness reviews document.)

8   A.   Uh-huh. Yes.

9   Q.   Okay. Let's start with Deposition Exhibit

10  No. 1. And I apologize that the Bates stamp numbers

11  are cut off at the bottom there, but you can take a

12  look at this. This is essentially a group documents

13  that's a series of correspondence and ask you if it's

14  familiar to you.

15       (Witness reviews document.)

16  A.   Yes, it does look familiar.

17  Q.   And can you describe what's contained in this

18  group exhibit?

19  A.   It begins with a fax cover sheet from myself

20  to Ed Kabala dated March 14, 2003. Nine pages. The

21  first document is dated March 14, 2003 from myself to

22  Jodeen Hobbs, Esquire, regarding the Medical Center's

23  Drs. Vaccaro and Saleh. The next one is a March 12,

JOHNSON and MIMLESS

(412) 765-0744

11

1   2003 letter from myself to Ed Kabala regarding the

2   same matter. And then lastly a March 11th, 2003

3   letter from myself to Ed Kabala, same matter.

4   Q.   If you would look at Exhibit No. 2 in

5   Mr. Kabala's deposition.

6        (Witness reviews document.)

7   Q.   Again, is this document familiar to you, and

8   can you identify it?

9   A.   Yes. It's a letter to me from Jodeen Hobbs

10  dated March 20, 2003 regarding V&S Medical

11  Associates.

12  Q.   Okay. Exhibits 1 and 2 seem to refer to a

13  meeting that took place apparently on March 8th,

14  2003; is that correct?

15  A.   I'm sorry, I was reading. Say it again,

16  please. I apologize.

17  Q.   Exhibits 1 and 2 that you just looked at and

18  identified seem to refer to discussions that were

19  held at a meeting on March 8th, 2003.

20  A.   Correct.

21  Q.   And am I correct that those discussions were

22  at a meeting that took place between the hospital and

23  its representatives and V&S and its representatives?

JOHNSON and MIMLESS

(412) 765-0744

12

1   A.   Uh-huh, that meeting on March 8th, yes.

2   Q.   And the Jodeen Hobbs letter of March 20th,

3   that would be Exhibit No. 2.

4   A.   Uh-huh.

5   Q.   Says in the second paragraph that the

6   discussions focused primarily on the details of a

7   proposed lease agreement between the Medical Center

8   and V&S Medical for the nuclear camera. Is that your

9   recollection of that meeting?

10  A.   I thought it was about a lease and the under

11  arrangements model, is my recollection. Not --

12  Q.   Well, was the lease agreement -- do you

13  recall the lease -- proposed lease agreement being

14  discussed at that meeting?

15  A.   That sounds correct that it was discussed.

16  Q.   And in the letter she also indicates that in

17  attendance were Drs. Vaccaro and Saleh, Mr. Kabala,

18  you, meaning yourself --

19  A.   Uh-huh.

20  Q.   -- and Mr. Mulholland and Mr. Leonhardt.

21  Does that sound familiar to you as well? Do you

22  recall that?

23  A.   Yes.

JOHNSON and MIMLESS

(412) 765-0744

13

1   Q.   Now, what do you recall being the position of

2   the hospital as related -- as it was relayed or

3   related to V&S on the lease agreement? What do you

4   recall the position was that the hospital took in

5   that meeting?

6   A.   It was a meeting more than five years ago. I

7   see in here -- it says the lease concept had been

8   rejected by the hospital. I don't recall specifics

9   of the five-year-old meeting of what occurred.

10  Q.   Okay. Do you recall that the hospital agreed

11  at some point to enter into a lease arrangement with

12  V&S?

13  A.   Yes.

14  Q.   Okay. And do you recall whether that was the

15  result of these various meetings?

16  A.   Yes.

17  Q.   Do you recall whether the rate to be paid

18  under that lease agreement was a matter that was

19  negotiated between the parties at the March 8th

20  meeting?

21  A.   There were ongoing negotiations on that rate.

22  I don't recall if that was part of the March 8th

23  meeting.

JOHNSON and MIMLESS

(412) 765-0744

14

Q.   Do you recall whether the doctors ever

2   related to you a position with regard to how they

3   were valuing the lease agreement?

4   A.   **Specifically the doctors to me?**

5   Q.   Well, at that meeting the doctors or their

6   attorney would have related to you a position,

7   presumably, if it was being negotiated, on how they

8   were valuing the lease?

9   A.   **That had occurred. I don't recall**

10   **specifically if it was that meeting or not, but there**

11   **had been that information provided, yes.**

12   Q.   What was the position that the doctors

13   related to the hospital in terms of putting a value

14   on the lease agreement?

15   A.   **They wanted -- I don't know -- hearing this**

16   **from Ed Kabala or not. They wanted payments of**

17   **around, I think, $2,000 a day. I think. Then there**

18   **may have been more to it. That's what I recall.**

19   Q.   And do you remember them telling you why they

20   wanted $2,000 as opposed $10,000 a day?

21   A.   **No, I don't.**

22   Q.   Or $1,000 a day?

23   A.   **No.**

JOHNSON and MIMLESS

(412) 765-0744

15

1   Q.   Do you recall what the position of the

2   hospital was in terms of responding to that proposal,

3   why the hospital thought it should be less?

4   MR. MULHOLLAND: I'll object to the

5   extent you're asking him information that

6   would have been communicated to him in the

7   confidential attorney-client communication or

8   that you're asking for work product. But if

9   you're asking what the hospital asked or

10   communicated at the meeting, maybe you could

11   rephrase it that way.

12   MR. STONE: Sure.

13   Q.   And that's really what I was trying to ask

14   you, Mr. Steinberg. What was the position that the

15   hospital related to V&S as to why they didn't want to

16   pay the $2,000 a day?

17   A.   **My recollection is that it was just too high**

18   **an amount. I don't recall --**

19   Q.   They never told V&S why they thought it was

20   too high; is that what you're saying?

21   A.   **I don't recall if that was part of the**

22   **discussion or just a simple, that's too much.**

23   Q.   Do you recall whether there was any

JOHNSON and MIMLESS

(412) 765-0744

16

1   discussion of a noncompete agreement at that

2   March 8th meeting, and if you do, what that involved,

3   what the discussion was?

4   A.   **I believe there was discussion, but again,**

5   **that's just the gist of what I recall. It was part**

6   **of the negotiation.**

7   Q.   Did the hospital take the position or tell

8   V&S that they would -- that the hospital was

9   requiring a noncompete if they were going to sublet

10   the equipment? In other words, was it a position

11   that was represented to V&S?

12   A.   **I believe so, yes.**

13   Q.   Did the hospital request V&S, either at the

14   March 8th meeting or at some point before that

15   meeting or some time after, did the hospital request

16   financial information about the operation of the

17   imaging business by V&S?

18   A.   **I don't recall if the hospital requested it**

19   **or it was just provided.**

20   Q.   But the hospital did receive financial

21   information from V&S regarding the imaging business?

22   A.   **I believe so, yes.**

23   Q.   And do you remember whether that was before

JOHNSON and MIMLESS

(412) 765-0744

17

1   or after the March 8th meeting?

2   A.   **I don't.**

3   Q.   Or at the March 8th meeting?

4   A.   **I don't remember at what stage; sorry.**

5   Q.   Do you recall whether the hospital provided

6   any information to V&S with regard to referrals or

7   the imaging business at the hospital?

8   A.   **When you say "referrals," what do you mean by**

9   **"referrals"?**

10   Q.   Well, let's -- I'll rephrase it this way.

11   Did the hospital provide any information to V&S

12   related to the negotiation over the lease?

13   A.   **I'm sorry. One more time.**

14   Q.   Did the hospital provide to V&S any

15   information related to the negotiation of the lease

16   agreement?

17   A.   **Uh-huh, yeah.**

18   Q.   What information do you recall that the

19   hospital provided to V&S?

20   A.   **I'm not remembering the specifics. I mean,**

21   **we negotiated over the lease terms, so there would be**

22   **us providing here's provisions we want in the lease.**

23   **Them -- I mean, them reacting back, thus saying that**

JOHNSON and MIMLESS

(412) 765-0744

18

1  works or doesn't work. The ongoing nature of how to
2  negotiate out a lease, the covenant of the
3  noncompete.
4      Q.    I'm not asking about exchanging drafts of
5  language, for example, the first draft of a contract
6  that would be marked up or something like that.  What
7  I'm asking is, is there any information that was
8  provided in the negotiation of the valuation or the
9  terms, meaning the rental to be paid under the terms
10 of the lease or the value of the noncompete?
11     A.    I don't recall if it happened for the lease
12 or not.
13     Q.    Do you recall whether that information was
14 exchanged in connection with the under arrangements
15 venture?
16     A.    I believe -- that's what I recall, for the
17 under arrangements, that there was.  I just don't
18 recall for the lease.
19     Q.    I'm going to ask you to take a look at
20 Exhibits 4, 5 and 6 for a few minutes and see if you
21 can review those.
22     A.    Okay.
23          (Witness reviews document.)

JOHNSON and MIMLESS
(412) 765-0744

19

1          MR. RYCHCIK:  Are you talking about --
2  is there a 4, 5, and 6?
3          MR. MULHOLLAND:  Those are the copies
4  that you had given me.  Those are the ones you
5  just said you had printed out.
6          MR. RYCHCIK:  Again, on behalf of
7  Drs. Vaccaro and Saleh and V&S for the
8  purposes of this transcript as well, we want
9  to designate those exhibits as confidential.
10         MR. MULHOLLAND:  And the same for the
11 hospital, of course.
12     A.    Ready.
13     Q.    I guess the first document, 4, if you
14 could -- is this a document that's familiar to you
15 that you've seen before?
16     A.    Yes.
17     Q.    Can you identify what it is.
18     A.    It's a letter from myself to Mark Raspanti,
19 R-A-S-P-A-N-T-I, dated February 26, 2002, concerning
20 Dr. Peter Vaccaro's reappointment to the medical
21 staff at Bradford Regional Medical Center.
22     Q.    Could you go to Exhibit No. 5.
23     A.    Uh-huh.

JOHNSON and MIMLESS
(412) 765-0744

20

1      Q.    And can you take a look at that and see if
2  that document is familiar.
3      A.    Yes, it is.
4      Q.    Can you identify it, please.
5      A.    It's a letter from Mark Raspanti to George
6  Leonhardt dated February 15, 2002, regarding
7  Dr. Peter Vaccaro's reappointment to the medical
8  staff.
9      Q.    And Exhibit No. 6.
10     A.    Yes.  It's a letter from Ed Kabala to myself
11 dated November 19, 2003, concerning Drs. Vaccaro and
12 Saleh and Bradford Regional Medical Center.
13     Q.    And I'm going to give you a document which
14 we'll mark as -- should we just mark --
15         MR. STONE:  You guys want to -- is this
16 all going to be part of one transcript, or do
17 you want to have them separate?
18         MR. MULHOLLAND:  You can refer to them.
19 I don't think you have to duplicate them.
20         MR. RYCHCIK:  I do think we will have
21 two separate transcripts.
22         MR. STONE:  If we're going to keep it
23 separate, this was not referred to in the

JOHNSON and MIMLESS
(412) 765-0744

21

1  earlier exhibits, so we will mark this as
2  Deposition Exhibit No. 1 in Mr. Steinberg's
3  deposition.
4      Q.    And I'm going to ask you to take a look at
5  that.
6          (Steinberg Exhibit No. 1 was marked for
7  identification.)
8          (Witness reviews document.)
9      A.    Uh-huh.
10     Q.    Can you tell me whether this document is
11 familiar to you?
12     A.    Yes, it is.
13     Q.    And can you identify this document, please.
14     A.    It is a letter from Mark Raspanti to myself,
15 dated March 20, 2002, regarding Dr. Kamran Saleh's
16 reappointment and Dr. Peter Vaccaro's reappointment.
17         MR. RYCHCIK:  I'd like to designate this
18 as confidential as well, please.
19         MR. MULHOLLAND:  The hospital will also
20 designate it as confidential.
21         MR. STONE:  Okay.  I don't think I have
22 any further questions, Mr. Steinberg, at this
23 time.

JOHNSON and MIMLESS
(412) 765-0744

MR. MULHOLLAND:   carry

2        MR. RYCHCIK: No.

3        MR. MULHOLLAND:  No questions.  We

4    reserve the right to read and sign, please.

5        (Whereupon, the deposition was concluded

6    at 1:05 p.m., and signature was not waived.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

JOHNSON and MIMLESS

(412) 765-0744

---

23

1            C E R T I F I C A T E

2    UNITED STATES DISTRICT COURT )
     WESTERN DISTRICT OF PA - ERIE) SS:
3

4            I, Constance Lee, a Notary Public in and
     for the Commonwealth of Pennsylvania, do hereby
     certify that before me personally appeared ALAN
5    STEINBERG, the witness herein, who then was by me
     first duly cautioned and sworn to testify the truth,
6    the whole truth and nothing but the truth in the
     taking of his oral deposition in the cause aforesaid;
7    that the testimony then given by him as above set
     forth was reduced to stenotypy by me, in the presence
8    of said witness, and afterwards transcribed by
     computer-aided transcription under my direction.
9

10           I do further certify that this
     deposition was taken at the time and place specified
11   in the foregoing caption, signature was not waived.

12           I do further certify that I am not a
     relative of or counsel or attorney for any party
13   hereto, nor am I otherwise interested in the event of
     this action.

14           IN WITNESS WHEREOF, I have hereunto set
     my hand and affixed my seal of office at Pittsburgh,
15   Pennsylvania, on this 7th day of April, 2008.

16           The foregoing certification does not
     apply to any reproduction of this transcript in any
17   respect unless under the direct control and/or
     direction of the certifying reporter.

18

19

20           ----------------------------

21           Constance Lee, Notary Public in
             and for the Commonwealth of
22           Pennsylvania
23

JOHNSON and MIMLESS
(412) 765-0744