*7*



Executive Summary Of This Report

Bradford Regional Medical Center (the "Hospital") has entered into an agreement with V&S Medical Associates, a limited liability company ("V&S") comprised of two physicians on its medical staff, involving V&S offering diagnostic imaging services through the use of nuclear cardiology imaging equipment (the "Equipment") leased from an affiliate of General Electric.   The agreement calls for good faith negotiations (which the record shows have been ongoing for some time) to occur with the goal of executing a further leasing agreement and a non-competition covenant.

Considerable time, effort and expense have been focused on negotiating the arrangement by the Hospital Board (the "Board") and Management and V&S along with their collective and respective lawyers and consultants.  The result was that in April, 2003, and after careful analysis by the Hospital, the Parties (i.e. the Hospital and V&S) entered into an agreement that contemplates that it will be followed by the negotiation and execution of a series of further agreements, collectively referred to herein as "the Arrangement".

In general terms, the Arrangement will consist of either a sublease of the Equipment under the Lease between General Electric Healthcare Financial Services ("GE") and V&S dated June 6, 2001 or assignment to the Hospital of the Lease will be executed in the near future.  The subleasing relationship, regardless of whether it is a sublease or an assignment of the Lease, will have the potential to extend through August, 2008. Embedded in the sublease will also be an enforceable non-competition covenant.

Thus, the scope of the Arrangement embraces (i) the immediate execution of a sublease for the Equipment (with a duration to be described below), and (ii) the immediate execution of a non-competition agreement for a term that is contemplated to run parallel to the duration of the sublease.  The parties will also commit to explore the creation and implementation of what is commonly referred to as an "under arrangements" model for the provision of imaging services.  It is further provided that a condition for launching the "under arrangements" model is a favorable Advisory Opinion from the HHS Office of Inspector General.  In the event an "under arrangements" venture is formed and a favorable Advisory Opinion is received, the sublease will cease and the lease for the GE Equipment will be assigned to the Hospital.  In that event the non-competition agreement will extend through August 31, 2008.

The April 2003 agreement (as well as the Arrangement) accordingly provides for an alternative structure for the relationship between the Parties in the event the "under arrangements" model is not implemented by December 31, 2003.  In that event (i) the sublease will remain in effect, (ii) the Hospital will commit to extend the subleasing arrangement beyond the initial sublease which expires August 31, 2006 for 24 additional months (i.e. through August 31, 2008), (iii) the non-competition provision will remain in effect during the term of the sublease, and (iv) V&S will agree to offer the Hospital the opportunity to work with V&S in any venture involving V&S for the provision of imaging services during the period of the sublease.

1

DEPOSITION EXHIBIT
Leonhardt
#4

DEPOSITION EXHIBIT
14

HOSP 0007431

The sublease provides that the monthly payments through August 31, 2006 will be $ 30,200 per month. The sublease clearly identifies this total amount as consisting of $ 6,545 representing a pass through of the rent due under the Lease and $ 23,655 associated with aforementioned non-competition provision embedded in the Lease. During the possible extension of the sublease through August 31, 2008, the total monthly payment is $ 26,700 per month, and the respective elements are $ 3,045 for the rent of the Equipment and $ 23,655 as associated with the non-competition provisions.

Once the subleasing agreement is in effect the Parties have also agreed that the GE Equipment will be relocated to the Hospital campus. The cost of such relocation will approximate $ 30,000 and will be paid to third parties. Apart from representing an upgrade to, and expansion of, existing facilities in the Bradford area, this centralization of resources will facilitate the delivery of a broad range of diagnostic imaging services in a more integrated and efficient manner.

The record shows that the Board regards the capital costs relating to upgrading the location on the campus as an investment in providing imaging services over both the term of the Arrangement as well as in the future periods that follow. The record also shows that these upgrade costs are to be incurred regardless of whether any or all of the agreements contemplated by the Arrangement are executed.

From the perspective of the Hospital, the sole purpose of this non-competition covenant is to strengthen its charitable community service mission. The covenant is supported by a recitation of separate consideration and other appropriate provisions to support its enforceability.

These agreements will, when taken together, address the aforementioned concerns and enhance the Hospital's ability to pursue its mission and meet the medical needs of its particularly vulnerable populations. In addition, the Board has determined that the Hospital will be better able to serve patients and the community at large by having the Equipment located on its campus in a location resulting in a wider range of centralized imaging services supplementing the existing range of services offered by the Hospital.

It is our view, for the reasons discussed in more detail in the balance of this Report, that the amounts paid as rent in the sublease (or in the event the lease is assigned to the Hospital) reflect the fair market value for the use of the Equipment. It is also our opinion that the amounts associated with the covenant not to compete reflect a fair market value amount for the rights acquired under the non-competition agreement.

HOSP 0007432

## Overview Of The Structure Of This Report

In order to present the sequence of logic supporting the conclusions of this Report, the Report is structured as follows:

> Discussion Of The Background Facts
>
> An Overview Of The Relevant Portions Of The Arrangement
>
> The Applicability Of The Fair Market Value Standard To The Economic Elements Of The Overall Sublease Relationship
>
> Concluding Thoughts

## Discussion Of The Background Facts

Bradford Regional Medical Center (the "Hospital") is a sole community provider located in Bradford, McKean County, Pennsylvania. This is a rural and rugged area of northwestern Pennsylvania. Its status as a "sole community provider" indicates that it is the only hospital facility located in the community. In addition, the Hospital also functions as a referral medical center for a larger region that reflects a high proportion of Medicare and Medicaid populations.

The Hospital is a Pennsylvania nonprofit corporation recognized as a tax-exempt charitable organization under Sec. 501(c)(3) of the Internal Revenue Code. As such, and presented in general terms, maintenance of its tax exemption calls for it to pursue its charitable mission in a manner that allows it to serve and meet the medical needs of its community (reasonably defined to embrace McKean County and surrounding areas) through the provision of a wide variety of medical services and without allowing its assets unduly inure to or benefit private individuals.

In addition, general principles of charitable stewardship require that it pursue this mission through the delivery of a broad range of medical services in a manner that is both financially and medically appropriate. Finally, the health care regulatory environment mandates that the Hospital's charitable mission be pursued with due regard to the nature and substance of the Hospital's relationships with parties in a position to influence or profit from the manner in which it pursues its mission.

A required element of the pursuit of its charitable mission mandates that the Hospital promote, maintain and work with a high quality medical staff available in a manner that is consistent with its mission, the principles of stewardship and, in particular, the applicable healthcare regulatory environment. One manifestation of the Hospital's commitment to these operational principles is found in resolutions adopted by its Board in May and December of 2001. These resolutions address (in general) the issue of identifying and imposing consequences for physicians who either are on, or seek appointment to, the medical staff of the Hospital and who have a financial relationship with entities or services that compete with the Hospital in a manner that could have a

3

HOSP 0007433

significant negative impact on the ability of the Hospital to fulfill its charitable community service mission.

At the time that the initial resolution was adopted, the Board was not aware of any arrangements that would be reached by the policy evidenced by the resolution.

The situation addressed by the Board in these resolutions concerned the potential emergence in its service area of a trend that is increasingly visible in communities throughout the United States. This trend involves staff physicians using the resources of the hospital with which they are affiliated to develop a patient base and then divert those patients to a competing facility or service in which they (i.e. the physicians) have a financial interest. The Board recognized, by observing developments in other communities, that if such conduct were disregarded or if guidelines were not developed to deal with these concerns, there could well be detrimental qualitative and quantitative (i.e. financial) implications on the near and long term ability of the Hospital to fulfill its charitable mission.

Accordingly, the Board provided that any practitioner deemed by the Board to be competing with the Hospital in a manner that would impair its ability to fulfill its charitable mission would, among other potential consequences, be at the discretion of the Board deemed ineligible for both medical staff appointment (initial and continued) and clinical privileges.

It should also be noted that the Board, in recognition that such competing circumstances would inevitably arise, also adopted in its initial May 2001 resolution a policy that committed the institution to use its best efforts to foster cooperative relationships with physicians so long as such relationships were consistent with legal standards.

Subsequent to the adoption of the aforementioned policies concerning competing activities by staff physicians, the Board became aware of a nuclear cardiology imaging service owned and operated by a professional medical entity trading as V & S Medical Associates, LLC (hereinafter "V&S"). The owners of V&S are Dr. Kamren Saleh and Dr. Peter Vaccaro, two physicians who enjoy active staff privileges at the Hospital and who are also referred to from time to time herein as the "Physicians".

The V&S service was and has been operating pursuant to a series of lease related documents between V&S and GE Healthcare Financial Services ("GE") whereby a nuclear camera (as previously noted, referred to hereinafter as the "Equipment") is operated to provide cardiac diagnostic imaging services to the community. Insofar as is relevant to the matter at hand, the GE arrangement (which was effective in June, 2001) initially calls for monthly lease payments in the amount of $ 6,545 (characterized in the lease as having $ 4,890 attributable to equipment rental and $ 1,655 attributable to equipment service).

4

HOSP 0007434

Payments by V&S under the lease began in September, 2001 and will continue at least until August 31, 2006. At that time V&S has three options. The first is it can notify GE that the lease has terminated. The second is it can renew the lease for up to 24 months at a rate to be negotiated. The final option is V&S can purchase the Equipment for $ 56,023 (an amount stipulated in the lease to be the best "prediction" of the fair market value of the Equipment at the end of the 60 month base term for the lease).

The ownership and operation of the V&S service by V&S was an activity that in the opinion of the Board implicated the aforementioned anti-competitive policies. This, in turn, invoked the concomitant responsibilities on the part of the Hospital to explore both the application of the consequences prescribed therein as well as the potential to find a cooperative basis to resolve the matter.

As might be expected, the record indicates that a long and drawn out process ensued in pursuit of these responsibilities. During this period the existence of a competing enterprise was verified and the viability of the Hospital to either impose the consequences called for by its policies or find a basis for either a competitive response or compromise was thoroughly and carefully considered. This resulted in an on-going and occasionally disruptive dispute between the Hospital and V&S wherein both sides remained committed to the merits of their respective positions. The duration and severity of the dispute was particularly noted by other members of the medical staff.

From the outset the Board was concerned that the dispute should be resolved in a manner that would not create current or future jeopardy to the effective pursuit of its charitable mission as well as not polarize and alienate the Hospital medical staff. Eventually, and for a variety of reasons that need not be recounted in this Report but that are apparent in the record, these objectives evolved to a need for a negotiated settlement that could also be viewed as compliant with the applicable legal framework.

The record shows that there was extensive involvement by an independent, nationally recognized consulting firm (Stroudwater Associates) as well as legal counsel in developing, analyzing and negotiating the elements of the Arrangement. That record also indicates that the reason for the extensive involvement of such experts was to arrive at a solution that would be viewed as in compliance with the extensive and complex body of rules and regulations that would apply to the Arrangement (as described herein) while at the same time providing quantitative (i.e. financially viable) and qualitative support for the furtherance of the charitable mission of the Hospital.

### An Overview Of The Relevant Portions Of The Arrangement

On April 16, 2003 the Parties reached an agreement (referred to herein as the "Arrangement" and a copy of which is attached hereto as Exhibit A) concerning this matter. The Arrangement calls for the execution of documents relating to four significant economic relationships. When finalized, these relationships (which remain to one degree or another the subject of current negotiations) will enable the Hospital to obtain greater control over the quality and the value of a variety of diagnostic services delivered to the

5

community. Both this control and the Arrangement are also viewed as collaterally providing a number of enhancements to the ability of the Hospital to fulfill its charitable mission.

The four significant relationships which will emerge from the implementation of the Arrangement are (i) a sublease for the use of the Equipment by the Hospital, (ii) an enforceable non-competition covenant relating to the conduct of V&S after the sublease is created and extending through August 31, 2008, (iii) a form of right-of-first refusal which supplements the non-competition covenant in the event an "under arrangements" model is not implemented and (iv) and the subsequent formation of an "under arrangements" model for the provision of diagnostic services by V&S, subject to OIG approval.

As requested, this Report addresses the application of the "fair market value/arms length" standard to the consideration embodied in the sublease and non-competition covenant.

A Description Of The Sublease Relationship

The first relationship contemplated by the Arrangement begins as a subleasing structure between the Hospital and V&S for the use and control of the Equipment by the Hospital. The sublease structure will remain in effect so long as an "under arrangements" model is not implemented. In the event the "under arrangements" model is implemented, the sublease will cease to exist as the GE Lease will be assigned to the Hospital.

For ease of reference, and since the differences between the sublease and the GE lease will be apparent from the discussion which follows, the Equipment use relationship involved will continue to be referred to as a sublease.

The sublease is in the final stages of negotiation. It contemplates (because of the need on the part of the Hospital to protect its charitable and public service mission) three different scenarios depending on the state of the implementation of the "under arrangements" model. However, regardless of which structure is in effect, once the sublease begins and as soon as the consent of GE is obtained, the Hospital will incur the costs to both move the Equipment from the Facility to the Hospital's campus and to upgrade the location of the Hospital's imaging center.

It should be noted that the Hospital is committed to an upgrade of its imaging facilities regardless of whether the sublease is executed. This is because an upgrade will enhance its ability to provide such services to the community and, in the event the sublease is not executed, form the basis of the competitive strategy which will be undertaken by the Hospital to protect its mission.

As determined by the Board after considerable study, the mission-related benefits accruing from these expenditures include being able to more effectively integrate the use of the Equipment into the operations of the Hospital, causing an upgrade to the level of equipment used by the Hospital, making a capital investment in the campus location

6

HOSP 0007436

which is expected to provide an enhanced clinical asset well after the conclusion of the potential non-compete arrangement and, finally, providing a level of protection to its diagnostic revenue stream.

It should be noted that whenever a sublease structure is in effect (i.e. the first and third scenarios described below) V&S will retain the obligation to make all payments required for the maintenance of the Equipment. As will be pointed out below in connection with the "third scenario", this appears to be a significant element of economic risk assumed by V&S and which is avoided by the Hospital.

With that introduction to the notion of the "sublease", the three "sublease" scenarios involved are now presented.

The first scenario contemplated relates to the period prior to receipt of approval from the regulatory authority for the "under arrangements" model. It will begin with the execution of the sublease and is expected to extend to a time no later than the end of 2003. During this period the Hospital will be a sublessee of V&S and will make the aforementioned monthly payments to V&S for the use of the Equipment in the amount of $ 6,545.

The second scenario contemplated under the sublease becomes operative as soon as the "under arrangements" model is implemented. In this event it is the intention of the Parties for the sublease to terminate and for the GE lease to be assigned to the Hospital. Accordingly, the Hospital will "step into the shoes" of V&S and will operate under the lease terms summarized in the previous section (see <u>Discussion Of The Background Facts</u>) of this Report.

The third scenario contemplated under the sublease will operate in the event the "under arrangements" model is not implemented by December 31, 2003. In this case the sublease calls for rent to be paid attributable to two distinct periods of time that in the aggregate cover 5 years. These are the "First Rental Period" which extends to August 31, 2006 and the "Second Rental Period" which covers the 24-month period subsequent to the "First Rental Period". The "Second Rental Period" coincides with the maximum renewal terms under the GE lease.

During the former period the monthly rental will be $ 6,545 (the amount otherwise owed by V&S) and will consist of the aforementioned equipment rental component (i.e. $ 4,890) and the service component (i.e. $ 1,655). During the Second Rental Period (during which it is presumed that V&S will have acquired the Equipment for $ 56,023 since the sublease calls for the Parties to negotiate a renewal of the sublease following the conclusion of the Second Rental Period) the Parties have agreed to a monthly payment of $ 3,045, with V&S remaining responsible for the full cost of all equipment maintenance services.

While it is unclear how much of the monthly payment during the Second Rental Period will be associated with equipment use and the provision of service, it should be noted that V&S has the obligation (and economic exposure) to provide such service during the

7

HOSP 0007437

Second Rental Period. Thus, it is possible that the monthly payment in the Second Rental Period will be insufficient to cover the obligation incurred by V&S to provide service to the Equipment.

A Description Of The Non-Competition Relationship

The second relationship contemplated by the Arrangement is a tightly constructed, enforceable, non-competition covenant. Because it is inextricably associated with the subleasing relationship it is embedded in the sublease rather than embodied in a separate agreement.

At its core the non-competition covenant effectively limits the ability of V&S to provide a competing service within 30 miles of the Hospital for so long as any of the scenarios described in connection with the subleasing relationship are operating. It should also be noted that the non-competition covenants, reflective of their nature and purpose, will terminate in the event V&S ceases to exist and its two owners (Drs. Saleh and Vaccaro) die.

The consideration for this covenant will be paid on a monthly basis in the amount of $23,655.

The Hospital has negotiated additional protection for itself for the period after December 31, 2003 in the event there might not be an "under arrangements" model in effect. In this situation (i.e. where the interests of the Parties are not as closely aligned as they would be when the "under arrangements" model is operating) the Parties have also agreed that V&S will first present the Hospital with the opportunity to participate in any diagnostic service that is outside the scope of the non-competition provision. No additional consideration is provided for this valuable right.

The record shows that the terms of, and amounts to be paid in connection with, the non-competition provisions of the Arrangement were the subject of great focus. In particular, extensive economic analyses were performed on behalf of the Hospital by Stroudwater Associates to assist in structuring this outcome. These efforts were reviewed and utilized in connection with the preparation of this letter.

The Stroudwater Associates efforts were integral to providing the Board with a basis for developing an overall strategy to deal with the competitive threat to its mission from the operation of the V&S service. This is because, on the one hand, it indicates that the economic outcome to the Hospital from this particular arrangement will be superior in the most reasonable of scenarios to that which would occur if the Arrangement were not entered into. The Stroudwater Associates efforts also indicate, however, that the Hospital may reasonably (but with some risk and not as successful a financial outcome) mount a competitive response to the V&S service. The analysis provides a reasonable expectation that in approximately five years and after recruiting physicians into the community to compete with the V&S service, the Hospital may be able to restore its revenues and restore a greater degree of control over its mission.

8

HOSP 0007438

### The Applicability Of The Fair Market Value Standard
### To The Economic Elements Of The Overall Sublease Relationship

#### Introductory Comments: The "Arms Length Standard/Fair Market Value" Rules Found In The Federal Tax Law

In an earlier section of this Report we described the structural elements of the agreements that will flow from the Arrangement. In this section we will address the propriety of the economic aspects of these relationships under arm's length reasonableness and/or fair market value standards. To do so, it is best to establish a framework for the appearance of these standards in the federal internal revenue code as it is generally acknowledged that a well-developed body of law exists there for making such determinations.

#### Introductory Comments:  An Overview Of Federal Tax Rules Relating To Determining The Fair Market Value Of Consideration Charged For The Use Of Property

A set of rules commonly referenced when it is necessary to analyze the reasonableness of consideration in a wide variety of on-going transactions against an arm's length reasonableness standard is found in Sec. 482 of the Internal Revenue Code. These rules have as their focus ascertaining the correctness of the income tax consequences flowing from many types of transactions between parties under common control. In particular, these rules apply to transactions including but not limited to sales, leases of property, cost sharing arrangements and the provision of services.

Sec. 482 is certainly not applicable by its terms in the context of the matters discussed in this Report. This is because parties under common control are not involved. However, it is worth noting that the approach embodied in Sec. 482 manifests a strong preference for being able to "benchmark" the consideration in a transaction under review to that which is found in a comparable uncontrolled transaction. That is why the rules underlying Sec. 482 are useful in connection with determining the commercial reasonableness of the sublease.

Regulation 1.482-2(c)(2)(i) provides the rule for testing whether the consideration involved in a particular lease represents arm's length consideration. In particular, the regulation provides:

> ...an arm's length rental charge shall be the amount which was...or would
> have been charged for the use of the same or similar property, during the time
> it was in use, in independent transactions with or between unrelated parties
> under similar circumstances considering...all other relevant facts

9

HOSP 0007439

Opinion As To The Fair Market Value Of The Consideration Called For In The
Arrangement For The Sublease/Lease Assignment Relating To The GE Equipment

The draft of the proposed sublease between V&S and the Hospital has been reviewed at
some length earlier in this Report. The sublease reflects a clear intention to place the
Hospital in the position of V&S vis-à-vis GE at the current time and in the event a
favorable advisory opinion for the "under arrangements" model is not received from the
OIG. It is even more apparent that this intent will be achieved in the event the favorable
advisory opinion obtained since at that point in time the Hospital will assume the GE
Lease.

It is clear that this Equipment use arrangement also provides the Hospital with the ability
to enhance the performance of its charitable mission. This occurs because the Equipment
can be moved to the Hospital campus as well as to upgrade the Equipment during the
term of the original GE Lease.

The consideration called for in the sublease totals $ 30,200 per month through August
31, 2006. The draft of the sublease identifies this amount as relating to the
$ 6,545 base rent obligation articulated in the GE lease with the balance ($ 23,655) being
attributable to the non-competition provisions reflected in section 14 of the sublease that
will be binding on V&S. The provisions of section 14 are addressed in other parts of this
letter.

The term of the sublease reflects two circumstances. In the event that the "under
arrangements" model for the rendition of services to the Hospital is implemented, the
sublease will essentially be converted to an assignment of the lease so that the Hospital
will be in direct privity with GE insofar as the payments for the use of the Equipment are
concerned. In that event, the lease will initially terminate on August 31, 2006 and the
Hospital will have the opportunity to either acquire the Equipment for a price stipulated
in the GE lease or extend the lease for either 12 or 24 months at the then fair market
value.

However, in the event the "under arrangements" services/reimbursement model is not
implemented so that the sublease stays in effect, the Hospital has agreed to extend the
sublease arrangement for 24 additional months to August 31, 2008 at a total monthly rate
of $ 26,700 per month. This amount is identified as relating to the use and maintenance
of the Equipment (in the amount of $ 3,045 per month) and the continuation of the
covenant not to compete as well as the aforementioned right of first refusal (in the
monthly amount of $ 23,655).

From an arms length reasonableness perspective, and given the fact that the Hospital is
stepping into the position of V&S under the GE lease during the period ending August
31, 2006, it is clear that the monthly consideration intended to be paid to either V&S or
GE for the use and maintenance of the equipment during the remaining base term of the
GE lease represents the fair market value both for the use of the equipment and for
purposes of the sublease. This statement specifically applies to the $ 6,545 monthly

10

HOSP 0007440

payments and reflects the fact that the Hospital is simply stepping into the place of V&S as either the lessee or the sublessee (as the case may be).

In addition, since the record indicates that the reason(s) for the <u>24 month extension</u> of the sublease term (in the event a favorable advisory opinion is not received) to September 30, 2008 relate to mission furtherance (as noted above) or other reasons, we believe that the portion (i.e. $ 3,045) of the total amount (i.e. $ 26,700) allocated to the lease of the equipment during the additional period will reflect a fair market value rent. This is especially so because V&S (and indirectly V&S) must acquire the Equipment (for $ 56,023) and bear the responsibility to provide service for the Equipment during the extension period.

The final circumstance to address is the arms length nature of the potential consideration between GE and the Hospital following the conclusion of the remaining lease term. This involves the circumstance where the "under arrangements" model is approved and the lease between V&S and GE is assigned to the Hospital. Regardless of whether the Hospital agrees to continue the GE lease for 12 or 24 months (under terms as provided for in the lease) or elects to purchase the Equipment (under terms as provided for in the lease) or elects to not extend the lease (as is permitted in the lease) it is clear that an arms length outcome is involved. This is because the Hospital will be exercising its rights under a lease that the record indicates was the subject of arms length bargaining between GE and V&S. Thus, any consideration flowing to GE from the Hospital for either the purchase of the Equipment or its lease will satisfy an arms length standard.

Accordingly, for the reasons noted, it is our opinion that it is appropriate to use the rule of Sec. 482 to test the consideration involved in the sublease of the GE Equipment between V&S and the Hospital against an arm's length/fair market value standard. This is because under these circumstances (i.e. a sublease essentially being assumed/assigned by the Hospital) there is no better transaction against which to test the commercial reasonableness of the sublease.

It is our further opinion that the consideration involved in the sublease between V&S and the Hospital represents a fair market value rental for the Equipment. We reach this conclusion because (i) the lease between GE and V&S was negotiated in 2001 with neither the knowledge or involvement of the Hospital nor an expectation that a sublease arrangement would subsequently emerge between the Parties, (ii) the circumstances involved at that time provide no indication that it was not an arm's length negotiation and outcome, (iii) the Hospital has for all material purposes simply "stepped into the shoes" of V&S under the GE lease through August 31, 2006 and (iv) as it relates to the potential extension of the sublease through August 31, 2008 there is every indication that the consideration contemplated meets an arm's length standard.

<u>Introductory Comments:  Transactions Invoking The Need For A Valuation Of Property (Applicable To Testing The Reasonableness Of The Consideration Relating To The Covenant Not To Compete And The Right Of First Refusal)</u>

11

HOSP 0007441

Absent an agreement to the contrary, from a business perspective V&S has the right to use their professional talents as they please. A wide and varied body of law, including the federal internal revenue rules, recognize this right as an asset.

As might be expected, the federal tax law also contains a body of rules to test the reasonableness of the value of an asset/property right at the time a transaction relating to such right is entered into. The general rule for applying these various means to test the arm's length/fair market value reasonableness standard is found in Revenue Ruling 59-60:

> Fair market value is the price on which a willing buyer and a willing seller would agree, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts.

In discussing the application of this standard, Rev. Rul. 59-60 provides that, where possible, comparable independent transactions entered into at a time proximate to the property transfer transaction to be tested should be used to satisfy its standard. In cases where reference transactions are not available the body of tax rules invoked by Rev. Rul. 59-60 calls for the use of expert valuations for the subject property transfer using approved metrics and approaches.

Where expert opinions are called for and the property or property right is associated with a stream of cash flows developments since the promulgation of Rev. Rul. 59-60 indicate the IRS strongly prefers that the "discounted cash flow" method be used. This is a valuation methodology well accepted in the appraisal community whereby the value of cash flows estimated to be generated by property over a period of time extending into perpetuity is discounted to a present value using an appropriate discount rate. The theory of this methodology is the value of property (or a property right) at any point in time is equal to the present value of its cash flows.

The IRS has specifically endorsed (through extensive discussions in recent editions of its Continuing Professional Education Manuals and in a variety of public forums and announcements) the use of the "discounted cash flow" method to evaluate the reasonableness of consideration in transactions between tax-exempt hospitals and physicians.

Introductory Comments: The "Competitive Business Valuation Method" Is The Appropriate Method For Determining The Benefit Of A Non Competition Agreement

An approach to testing the arms length reasonableness/fair market value of a covenant not to compete which has strong support from the valuation community is described in Valuing Intangible Assets, Reilly & Schweihs, Irwin Library of Investment & Finance at pages 288 through 292. In addition, and as will be discussed below on connection with a certain Coordinated Issues Paper, this method is also frequently used by the IRS to develop its own ascertainment of the economic value of what the purchaser of the

12

covenant has acquired for comparison to that which was paid for the covenant. This approach is known as the "competitive business valuation method" and happens to align very closely with the discounted cash flow valuation approach noted above that is strongly preferred by the IRS when property transfers between physicians and tax-exempt hospitals are at issue.

In general terms, the issue being addressed under the "competitive business valuation method" is whether, in the totality of the circumstances, a reasonable amount has been paid for the protection of a continued level of profitability of the purchaser's business from the covenantor's hostile use of his/its position in the market.

This quantitative perspective of the value of the non-competition agreement can be augmented by a qualitative consideration of its value as well. That is to say, in this particular instance it is also very reasonable to regard this analysis as providing a measure of an amount that the Board of the Hospital was willing to pay to provide a level of protection against an erosion of its ability to prudently pursue its charitable mission brought about by a financial interest that would induce physicians to refer to their own facilities or services.

As it happens, the record demonstrates to a great degree that a derivative of the "competitive business valuation method" was used by the Board and Stroudwater Associates when examining the threat posed to its mission and developing the approach reflected in the Arrangement. A summary from one of the relevant analyses prepared by Stroudwater Associates is attached hereto as Exhibit B and will be discussed in further detail below.

In its most complete application (and as essentially occurred in this instance) the "competitive business valuation method" calls for a two-step process. The first step is to generate an estimated projection of the prospective cash flows from the Hospital's provision of nuclear cardiology diagnostic and other integrally related services with the covenant not to compete in place. The second step is to estimate such cash flows without the covenant in place and in the most likely competitive scenario. As noted, Exhibit B reflects the outcome of this two-part analysis.

When there is a positive difference between the two cash streams (as is illustrated by Exhibit B) it is evidence that competition would do economic damage to the Hospital and its mission. Thus, the use of a covenant not to compete is warranted.

The valuation analysis, however, is then completed by comparing the present value (using an appropriate weighted average cost of capital as the discount rate) of the benefits of the non-competition agreement with the present value of the payments required under the non-compete agreement. The generation by this present value process of a positive differential provides two conclusions from a valuation perspective.

13

HOSP 0007443

The first is that a reasonable amount has been paid. The second is that, if there was no compulsion to act and an arms length negotiation process occurred, the amount paid for the covenant represents its fair market value. In this instance, the duration or the negotiation process and the content of the record relating to that negotiation process show that there was no compulsion driving the Hospital to execute the non-competition agreement and that an arms length process did occur.

Our analysis, which is explained in more detail in the sections which follow, adopts this methodology.

Introductory Comments: An Overview Of The Stroudwater Associates Analysis Of The Benefit Of The Non-Compete Agreement

Reflecting the principles underlying the "competitive business valuation method", Stroudwater Associates prepared analyses addressing the financial benefit of a non-competition agreement to the Hospital. As noted, a summary from the final analysis in this regard is attached hereto as Exhibit B. That analysis reflects the following points:

1. There are three revenue streams that the Board felt would be severely impacted if physicians had financial interests that would induce them to direct business away from the Hospital and that needed to be protected by associating a covenant not to compete with the sublease. These are CT and MRI net revenues, inpatient net revenues and outpatient net revenues (excluding the aforementioned CT and MRI net revenues).

2. While a certain amount of variable costs are associated with these revenue streams, they are rather minimal (estimated by Stroudwater Associates to be on the order of 10% of the net revenues from MRI services and 23% of net revenues from CT services) and are in the nature of supplies and drugs. Thus, for the most part, the costs associated with producing these revenue streams are fixed in nature and would neither be avoided with competition nor increased with the protection of the covenant.

3. The Board and the management of the Hospital had developed and were fully prepared to implement an alternative plan of action in the event a non competition agreement could not be executed with V&S. It was to recruit and support physicians for the purpose of substantially restoring by the end of a 60-month period the revenue streams impacted by the competing financial interests of V&S and the Physicians. This is why the execution of the non competition agreement causes certain physician related costs shown on Exhibit B to be reflected as being avoided and why the revenue streams being protected are shown as reducing over the period of the analysis.

4. These newly recruited physicians would be utilizing enhanced diagnostic facilities that the Hospital planned to operate without regard to the competing financial interests presented by V&S and the Physicians. The costs to recruit

14

these physicians, that are avoided by the sublease and non-competition compromise, are estimated to be $ 150,000.

5.   Assuming that a non-competition agreement could not be executed, once the recruitment effort was successfully completed it was contemplated by the Hospital that additional recruitment related subsidies would be required to support the new physicians until their practices became self sustaining. Such subsidies, which are especially common in rural areas such as McKean county, are in the nature of working capital subsidies. Stroudwater Associates estimated these costs, which are avoided by the sublease and non-competition outcome, would approximate $ 200,000.

Introductory Comments:  An Overview Of Federal Tax Rules Relating To Determining The Substantive Character Of A Non-Competition Agreement And The Fair Market Value Of The Consideration Relating To The Non-Compete And Limited Right Of First Refusal Provisions.

As was previously noted in this Report, section 14 ("Covenants of Sublessor") of the draft Equipment sublease provides for a substantial and enforceable non-compete agreement (and a limited right of first refusal in the event the "under arrangements model" is not implemented).

It is commonly understood that an agreement by a party to refrain from competing with another creates a valuable intangible asset. Such an agreement is referred to as a "covenant not to compete" or a "non-competition" agreement. Such agreements should contain, in exchange for consideration, restrictions on the ability of the covenantor to compete in a defined enterprise for a specified period of time within a defined geographic area.

Both the substantive and enforcement provisions of the non-compete reflect a clear intent to enter into a valid non-compete agreement beginning with the execution of the sublease and extending through its termination (whether it continues as a sublease or an assigned agreement).  In addition, it is the opinion of Hospital counsel that this agreement will be enforceable under Pennsylvania law.

The income tax law reflects well-established rules that should be employed in situations such as this to ascertain if the amounts allocated to a separately bargained for a covenant not to compete reflect an arms length reasonable amount.  These rules, which seek to ascertain if the separately bargained for covenant has "economic reality", are discussed in various parts of the highly regarded treatise, Tax Management Portfolio 533-2[nd] (Amortization of Intangibles), and in some detail at pages A-35 through A-37.  In essence, the discussion in this treatise expands upon the lengthy views provided by the IRS in "Coordinated Issue Paper, (All Industries) Covenants Not To Compete" (the "CIP") published on March 8, 1996.

HOSP 0007445

Of particular relevance to the situation at hand, and using the principal criteria addressed by the IRS in the CIP, is the amounts allocated to a non-compete covenant will be viewed as having economic reality if the following (somewhat overlapping) tests are satisfied:

1. It is clear that the parties intended that the covenant was a valuable part of the transaction (i.e. that it has "independent economic significance"),

2. The covenant is genuine, and

3. The covenant has been properly valued.

As to the first requirement, there is ample evidence in the record (stemming from the desire of the Board to protect the qualitative and quantitative features of the charitable mission of the Hospital) that the parties viewed the covenant as a valuable part of the transaction.

The tax law provides (in Rev. Rul. 77-403 which is a prominent element of the discussion in the CIP), however, that a determination of whether the second requirement has been satisfied in a situation such as this requires a close review of the attendant circumstances for applicability of a variety of factors. In addition, when examining the circumstances for the existence of these factors the ruling indicates that it is important to keep two points in mind. First, the weight to be accorded any given factor is a function of its criticality under the particular circumstances. Second, it is not the number of factors in support of the existence of a valid covenant that is as critical as is the relative importance of the particular factors in favor of a valid covenant.

Thus, the circumstances that Rev. Rul. 77-403 requires be examined may generally be summarized as follows:

- The grantor of the covenant (i.e. the Physicians, and V&S) having expertise evidencing a capability to compete;
- The grantor of the covenant having the economic resources to compete;
- The legal enforceability of the covenant under state law;
- The grantor's legal capacity to compete;
- That the covenant has sufficient breadth in scope to assure non-competition without overreaching;
- The age of the grantors;
- The health of the grantors;
- Noncontractual restrictions, if any, that would clearly have prohibited the grantor from competing in the absence of the covenant;
- The willingness, capability and actual efforts on the part of the purchaser of the covenant to police it;
- Structuring the payments under the covenant to occur over time and to cease upon breach of the covenant or the death of the grantor(s);
- Vigorous negotiations over the covenant and negotiations over its value;
- A detailed, specific, and carefully drafted covenant; and

16

HOSP 0007446

- An independent appraisal of the covenant.

A review of the record indicates that at the current time, with only one exception, all the circumstances noted above are in place. The one exception that must be addressed (and which is subject of this Report) is the appraisal of the covenant.

## An Appraisal Of The Covenant

As noted above, the valuation rules developed under the Internal Revenue laws provide that a determination that arm's length/fair market value amounts are being paid under the non-competition agreement requires an estimate of the benefits of the agreement to the payor of the consideration, present valuing those benefits, present valuing the amounts payable under the non-competition agreement and a comparison of the present value amounts. Where the present value of the benefits exceeds the present value of the payments under the covenant and the various conditions discussed above in connection with Rev. Rul. 77-403 are otherwise satisfied (as is the case here), the conclusion reached is that fair market value consideration is provided for in the non-competition agreement.

Exhibit B provides the key information for applying the "competitive business valuation" method to determine the benefits to the Hospital of the covenant. When modified to reflect the aforementioned incremental/variable costs for providing the MRI and CT services the following table shows the expected quantitative revenues (000's omitted) that would accrue to the Hospital with the non-competition agreement in place and a comparison of those benefits to the amounts payable under the non-competition agreement. This is based on the assumption that the Physicians would likely refer this business to the Hospital in the absence of a financial interest in their own facilities or services, although they are not required to do so by virtue of any of the covenants contained in the Agreements or otherwise.

|  | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| (a) CT/MRI | 634 | 423 | 317 | 211 | 106 |
| Less expenses (17% On average) | -114 | -76 | -57 | -38 | -19 |
|  | 520 | 347 | 260 | 173 | 87 |
| (b) Inpatient | 1,450 | 870 | 580 | 290 | -0- |
| (c) Outpatient | 466 | 312 | 218 | 114 | -0- |
| (d) Avoided physician recruitment costs | -0- | 150 | 133 | 67 | -0- |
| Total economic benefits from the non-compete agreement | 2,436 | 1,679 | 1,191 | 644 | 87 |
| Amounts due under the covenant not to compete | -275 | -275 | -275 | -275 | -275 |

17

| Net benefit (loss) from Covenant | **2,161** | **1,404** | **916** | **369** | **-188** |
|---|---|---|---|---|---|
| Present value (18%) Of net benefits | **1,982** | **1,091** | **604** | **206** | **-89** |

As can be seen, the present value of the net benefits of the non-competition agreement, using an 18% discount rate (as would be required by the Internal Revenue Service pursuant to the aforementioned guidelines in its totals Continuing Professional Education manuals) is $ 3,794,000. Since the analysis is in accordance with the valuation methodologies prescribed by the internal revenue rules, it is concluded that the consideration reflected in the non-competition agreement reflects an arms length amount.

Concluding Thoughts

The conduct of V&S and the enterprise they own (V&S) has challenged legitimate policies adopted by the Board of the Hospital. These policies are intended to protect the ability (from both a quantitative and qualitative perspective) of the Hospital to fulfill its charitable community service mission and provide high quality medical services to the community it serves. In this instance, the "community" is regional in scope and is characterized by high levels of Medicare and Medicaid populations.

The Board, with assistance of a variety of advisors, analyzed over a considerable period of time a number of alternatives to deal with this threat. In the end, the Board pursued a path that contemplates the creation of two separate relationships. One is the implementation, if regulatory approval can be obtained, of an "under arrangements" model for the provision of services by V&S. The other relationship, which will be executed in any event, is a sublease for the use of the Equipment employed by V&S in the competitive activity with an associated non-competition agreement embedded therein.

It is our opinion, for the reasons stated in this Report, that the consideration reflected in the sublease for both the use of the Equipment and the non-competition agreement reflect arms length amounts.

Please feel free to contact me with any questions or comments.

Very Truly Yours,

Charles T. Day, CPA

18

HOSP 0007448

**8**

CONFIDENTIAL

## Summary

Attached is a copy of the Agreement to enter into a lease for nuclear medicine equipment entered into with V&S Medical Associates. Enclosed with it is a letter from Horty & Springer outlining the terms of the Confidentiality Agreement entered into by V&S Medical Associates and the Medical Center. The terms of the Agreement and the accompanying background material are without question covered by that Confidentiality Agreement.

### Background:

Following several months of stalled discussions with a broad group of physicians regarding our interest in establishing an "Under Arrangements" contract to provide Outpatient Diagnostic Services, the Board of Directors at its January meeting made a prelminary determination that Dr. Khan was a covered practitioner under the Policy & Procedures and extended his temporary privileges.

At the same time, the Board instructed management and legal counsel to attempt to reach a business resolution to the dispute. Immediately following that, discussions began with V&S Medical Associates.

While significant progress was made in negotiations regarding the "Under Arrangements" proposal, V&S Medical Associates made a counter proposal that the Medical Center lease the equipment in their office as an immediate resolution of the dispute while efforts continued to develop the large model. Their stated reasons for this counter proposal were that it would resolve the dispute in a manner that wasn't dependent upon the participation of other physicians or the ultimate approval of regulatory agencies.

The counter proposal was reviewed at the Executive Committee and the full Board meetings in February, along with the progress in negotiations on the "Under Arrangements" Model. While the counter proposal had the advantage of simplicity and accomplishing the financial goals established for the Medical Center and physicians in the "Under Arrangements" Model, it was determined that it did nothing for the larger strategic goal of aligning the interests of a broad group of physicians with each other and the Medical Center, as it kept the equipment in the offices of V&S Medical Associates, and was therefore, rejected.

During March, further negotiations occurred with them and the attorneys resulting in a variation of the lease proposal. This new proposal included transferring the equipment to the Medical Center under a similar lease arrangement while agreeing to continue to pursue the larger "Under Arrangements" model. These modifications were reviewed at the March Executive Committee and Board meetings. At these meetings it was determined that we should seek a lease arrangement with the following terms:

DEPOSITION
EXHIBIT
Leonhardt
#5

HOSP 0008381



PAGE TWO

### Financial Background:

- BRMC's current margin on Nuclear Medicine is $132,000.
- Adding a portion of V&S volume to BRMC's current volumes:

        Lease of V&S Equipment:
            BRMC Profit:          $402,000
            V&S Profit:           $268,000

        When finalized, the Under Arrangements Model:
            BRMC Profit:          $372,000
            Physician Newco Profit:   $282,000

D:\Administration\George\Vaccaro-Saleh\V&S Lease Summary for Board 4-03.wpd

HOSP 0008382



### BRADFORD REGIONAL MEDICAL CENTER
Bradford, Pennsylvania

### Impact of Six Leaving Under Arrangements

**FOR MRI**

BRMC Profit down from:        $388,000 to $266,000
For NewCo Profit down from:   $206,000 to $181,000 (309 Referrals)

**FOR CT:**

BRMC Profit down from:        $654,000 to $528,000
For NewCo Profit down from:   $408,000 to $365,000 (668 Referrals)

**FOR NUCLEAR:**

BRMC Profit down from:        $351,000 to $212,000
For NewCo Profit down from:   $282,000 to $223,000 (1,258 Referrals)

### Comparable Impact of V&S Pulling Out of Same Services

**FOR MRI:**

BRMC Profit down from:        $388,000 to $220,000
NewCo Profit down from:       $206,000 to $172,000 (447 Referrals)

**FOR CT:**

BRMC Profit down from:        $654,000 to $434,000
NewCo Profit down from:       $408,000 to $330,000 (1,166 Referrals)

**FOR NUCLEAR:**

BRMC Profit down from:        $351,000 to $75,000
NewCo Profit down from:       $282,000 to $165,000 (2,500 Referrals)

HOSP 0008383

**9**

LAW OFFICES

# MILLER, ALFANO & RASPANTI, P.C.

SUITE 3402

1818 MARKET STREET

PHILADELPHIA, PENNSYLVANIA 19103

(215) 972-6400

FEB 2002

AFFILIATED
NEW JERSEY OFFICE
25 CHESTNUT STREET, SUITE 105
HADDONFIELD, NEW JERSEY 08033
(856) 354-0955

PENNSYLVANIA FAX: (215) 981-0082
NEW JERSEY FAX: (856) 354-0918

REPLY TO: Pennsylvania

February 15, 2002

<u>VIA FEDERAL EXPRESS</u>

CONFIDENTIAL

George E. Leonhardt, President/CEO
Bradford Regional Medical Center
116 Interstate Parkway
P.O. Box 0218
Bradford, PA 16701-0218

    Re:  <u>Dr. Peter Vaccaro's Reappointment to the Medical Staff</u>

Dear Mr. Leonhardt:

On January 28, 2002, our client, Dr. Peter Vaccaro received your letter which was identical to the one that was sent to his partner at V&S Medical Associates, Dr. Kamran Saleh. On January 22, 2002, we responded extensively and substantively on behalf of Dr. Saleh to the first request and, therefore, refer you to that letter. Our legal position has not changed.

We add, however, that on January 7, 2002, the United States Supreme Court declined to review a case that held that the anti-kickback laws are violated even where only "one purpose" of a payment or exchange is to induce referrals. <u>See</u> <u>United States v. LaHue</u>, 261 F.3d 993, 1003 (10th Cir. 2001), <u>cert. denied</u>, 122 S. Ct. 818 (2002). Thus, the "one purpose" analysis continues to be good law and our position that it is an illegal kickback to trade hospital privileges for exclusive referrals is even stronger.

In the <u>LaHue</u> case, the circuit court concluded that "the evidence produced at trial clearly demonstrated defendants negotiated and entered 'consulting' contracts in an attempt to camouflage an underlying agreement to exchange remuneration for patient referrals." <u>Id.</u> at 1005. The court further upheld the constitutionality of the Anti-Kickback Act concluding that it is not unconstitutionally vague and does not promote arbitrary or discriminatory enforcement. <u>Id.</u> at 1007.

---

DEPOSITION
EXHIBIT

*Leonhardt*
*# 6*

HOSP 0003769

MILLER, ALFANO & RASPANTI, P.C.

George E. Leonhardt, President/CEO          **CONFIDENTIAL**
Bradford Regional Medical Center
February 15, 2002
Page 2

Even further, we draw your attention to a Virginia State Court
case in which a hospital attempted to extract "practice management
fees" from a radiology group that had a contract with the hospital.
See Virginia Radiology Associates, P.C. v. Culpepper Memorial
Hospital, Inc., No. 90L172, slip op. at 4 (4th Judicial Cir. Ct. Va.
Dec. 29, 1995). Counsel to the radiology group advised that the
substantial practice management fees sought by the hospital would
be considered "subterfuge" for a kickback in violation of federal
law. Id. The hospital, nonetheless, ignored the implications of
the anti-kickback statute and cancelled the radiology group's
contract and revoked their privileges. The radiology group sued
the hospital and won.

The trial court, which granted summary judgment, expressly
noted that the hospital's attempt to trade management fees for
admitting privileges "most certainly" violated the anti-kickback
laws. Id. at 12. It further recognized that "even a 'peppercorn'
offered or accepted for patient referral would be a violation" of
the Anti-Kickback Act. Id. We further note that the radiology
group obtained a multi-million dollar verdict against the hospital
for losses sustained due to the significant harm caused by the loss
of hospital privileges.

Given the foregoing, we cannot understand how the Medical
Center can persist in its pursuit of information from Dr. Vaccaro
that is wholly related to his referrals. We cannot find a legal
basis to respond to your detailed requests for information such as
"[a] listing of procedures [relating to the nuclear camera]
referred out of your office by date, procedure, payer and entity
receiving the referral." See January 28, 2002 letter from George
E. Leonhardt to Dr. Peter Vaccaro at ¶ 8. This request alone, on
its face, can be used for no other purpose but assessing
Dr. Vaccaro's referral patterns.[1]

As you know, Dr. Vaccaro came to the Bradford Community in
1994, after being recruited to work as a physician at the Bradford

---

[1]     As an aside, we note that Dr. Vaccaro's referrals with
respect to the nuclear camera and all other procedures have always
been based upon his reasoned medical judgments and the needs or
preference of the patient.

MILLER, ALFANO & RASPANTI, P.C.

CONFIDENTIAL

George E. Leonhardt, President/CEO
Bradford Regional Medical Center
February 15, 2002
Page 3

Regional Medical Center.  For eight years, Dr. Vaccaro has served the local community and the Medical Center.  He established himself as a competent and devoted physician and earned the respect of his thousands of local patients.

In the Spring of 2000, he and Dr. Saleh purchased the assets of a medical practice owned at the time by the Medical Center.  The doctors paid a premium for the practice and for the release from non-compete clauses that were included in the contracts with the Medical Center.  Both Drs. Vaccaro and Saleh contemplated a long, productive and amicable working relationship with the Medical Center.  Both also anticipated that they would be able to develop their new practice as they saw fit -- especially as the Medical Center placed no restrictions on the terms surrounding the purchase of the practice.

*[handwritten margin note: what about their Comments was a response to our recent ing?]*

In early 2001, the doctors began to research the possibility of installing a state-of-the-art nuclear camera in their office for the benefit and convenience of their patients.  Even when the doctors decided to proceed, they were open to the possibility of a joint venture with the Medical Center with respect to the installation of the camera.  It is our understanding that the discussions regarding the joint venture possibility broke down when the Medical Center was unable to negotiate a satisfactory arrangement for a joint venture.

*[handwritten margin note: Is this an indication that they want to respel discussions?]*

The nuclear camera was installed at V&S Medical in August of 2001.  Since that time, Dr. Vaccaro has been subjected to the following:

MILLER, ALFANO & RASPANTI, P.C.

CONFIDENTIAL

George E. Leonhardt, President/CEO
Bradford Regional Medical Center
February 15, 2002
Page 4

HOSP 0003772

MILLER, ALFANO & RASPANTI, P.C.

CONFIDENTIAL

George E. Leonhardt, President/CEO
Bradford Regional Medical Center
February 15, 2002
Page 5

    We also find it more than curious that, since July of 2001,
the only cases that have been presented at the Department of
Medicine meetings are ones handled by Drs. Vaccaro and Saleh.
Given the past pattern of case reviews, we cannot comprehend how
no other physician presented a case that was subject to a review.
Such harassment of physicians who are perceived as having a
financial conflict of interest is an absolute abuse of the peer
review process.  Even further, such abuse potentially exposes the
Medical Center to liability.

    We know of no case that more clearly establishes a hospital's
attempt to extract an exclusive referral stream from a physician.
The Medical Center has been explicit that the purpose of the
Economic Credentialing Resolution is to eliminate privileges for
any physician who poses a financial threat to the Medical Center.
It has even been reported that the Medical Center has defined a
significant threat to be any purported revenue loss of $300,000 or
greater.  It is unfathomable how such an arbitrary and financially
motivated condition can be interpreted as anything other than an
exchange for referrals.

*[handwritten margin notes: untrue, was resought by someone, it isn't Cap + never adopted]*

    Besides being illegal, we draw your attention to the
fundamental unfairness associated with the Medical Center's concern
with physicians who may be deemed to have "competing financial

HOSP 0003773

MILLER, ALFANO & RASPANTI, P.C.

CONFIDENTIAL

George E. Leonhardt, President/CEO
Bradford Regional Medical Center
February 15, 2002
Page 6

interests" while at the same time the Medical Center is recruiting
new physicians to the area. This recruitment is occurring despite
the representation to V&S Medical Associates when it purchased its
medical practice that the Medical Center had no immediate plans to
bring additional doctors into the area. Despite this assurance,
three new physicians have been hired by the Medical Center -- all
of whom compete directly with the practices of Drs. Vaccaro and
Saleh. In light of this, we cannot fathom how the Medical Center
can complain about competing interests.

*[handwritten margin note: This is true. is the issue.]*

Drs. Vaccaro and Saleh are not the only physicians in Bradford
to perform additional services in their office or refer procedures
elsewhere. We understand that Dr. Ross Horsley operates an MRI
Center within 30 miles of the Medical Center; that Dr. Kirsch uses
a dexamachine in his office to evaluate bone density; that
Dr. Godfrey performs biopsies in his own office and then sends the
biopsies to an outside laboratory (not the Medical Center's) for
review; and that Drs. Singh and Nadella have a contract for
cardiology services and procedures with cardiologists at
St. Vincent's Hospital in Erie, Pennsylvania. All of these
services can readily be defined as "competing financial interests,"
yet we know of no other physician or practice that has been
targeted for an extensive referral audit.

The Medical Center's actions are shortsighted and ignore that
the Nuclear Medicine Department and the staff at V&S Medical
Associates -- if left alone -- could develop a cooperative and
productive working relationship that would clearly benefit the
Bradford area. It is our understanding, for example, that not long
after the nuclear camera was installed, the V&S Medical staff
received a call that the Medical Center's nuclear camera was not
working. The caller explained that a patient who had been in a
serious accident needed to be imaged prior to treatment. The staff
worked out an arrangement whereby the patient was injected at the
Medical Center but sent to the V&S offices for the imaging. The
V&S Medical staff then took the necessary images and sent the film
and a corresponding floppy disk back to the Medical Center. In
another example of staff cooperation, an 80 year old post-quadruple
bypass patient received a bone scan at no charge by V&S Medical
when the Medical Center was unable to provide this service. In
each of these instances, the Nuclear Medicine Department and the

CONFIDENTIAL

MILLER, ALFANO & RASPANTI, P.C.

George E. Leonhardt, President/CEO
Bradford Regional Medical Center
February 15, 2002
Page 7

V&S Medical staff put patient needs in front of any disputes over referrals. It is unfortunate that we have since learned that the Nuclear Medicine Department has been instructed not to refer patients to V&S Medical under any circumstance.

We ask that the Medical Center withdraw its request for referral information and approve, unconditionally, the Medical Staff privileges for both Drs. Saleh and Vaccaro. In this way, the doctors and the Medical Center will be able to return their focus to the health and well-being of the members of the Bradford Community.

Very truly yours,

MARC S. RASPANTI

MSR/gh
F:\PBL\JMH\V&S Medical\gh000016.ltr.wpd

cc:  Edward J. Kabala, Esquire
     Jodeen M. Hobbs, Esquire

HOSP 0003775