**18**

 

*DEDICATED TO IMPROVING THE HEALTH OF OUR COMMUNITY*

July 30, 2001

Dr. Peter Vaccaro
Dr. Kamran Saleh
V&S Medical Services
24 W. Washington Street
Bradford, PA 16701

Dear Peter & Kamran:

Thank you for your letter of July 25th. I was pleased to receive it. As you mentioned, we first met at my request to discuss rumors I had heard about your intentions to install a nuclear camera. You confirmed that you were installing the camera, and at that time you said it would be operational on July 6th or thereabouts. That meeting occurred on April 3, 2001 in my office.

Between April 3rd and June 1st, we met on 5 subsequent occasions. During those meetings we discussed a series of issues related to your plans. Among those were the fact that since January of 2001, the Board of Directors had been developing a policy position concerning Medical Staff members who develop competing enterprises to those of the Medical Center. We discussed the Medical Center's view of the negative impact that the addition of this camera would have on not only revenue but on our ability to develop high quality Cardiology Services for our community. You discussed your need and desire to develop additional revenue from your practice.

As you pointed out in your recent letter, we did have several discussions about the possible development of a Joint Venture within the Safe Harbor exceptions to Stark II. Our last discussion of this possibility occurred on June 1st. At that time you told me that you expected to generate additional revenue of between $550,000 and $700,000 annually from the nuclear camera, and that your annual expenses would be approximately $150,000. I told you that while I believed we could develop a Joint Venture within the legal rules and exceptions that would provide a reasonably attractive return, there was no enterprise within my knowledge that will ever approach the returns you were projecting. I believe your response was that in that case you would proceed with the installation of the nuclear camera.

As we discussed during those meetings, the Medical Center remains interested in the development of a Joint Venture opportunity with physician investors that serves to support and strengthen the ability of both the Medical Center and physician practices in this community to develop the broad range of high quality services to which we are all committed. We have proceeded with that and are preparing an invitation to a meeting to determine the level of interest in proceeding. I will be sure that you each receive an invitation.

*116 Interstate Parkway • P.O. Box 0218 • Bradford, Pennsylvania • 16701-0218 • (814) 368-4143 • www.brmc.com*

DEPOSITION
EXHIBIT
Saleh
8-9-07  4  Jah

Confidential
V&S 00008

ⓐ009

**JULY 30, 2001**
**PAGE TWO**

In addition, while I'm not aware of any enterprise to effect the type of returns you were projecting, we are more than ready to respond to any proposals you might have that will bring us closer to a favorable resolution of this issue and improve the quality of patient care in the Bradford region.

                                                    Very truly yours,

                                                    George E. Leonhardt,
                                                    President/CEO

GEL:cr

D:\Administration\George\V&SLtter-7-30-01.wpd

Confidential
V&S 00009

**19**

JAN-23-2002 WED 10:35 AM                FAX NO.                        P. 01

LAW OFFICES
## MILLER ALFANO & RASPANTI, P.C.
SUITE 3402
1818 MARKET STREET
PHILADELPHIA, PENNSYLVANIA 19103
(215) 972-6400

AFFILIATED                                    PENNSYLVANIA FAX: (215) 981-0082
NEW JERSEY OFFICE                             NEW JERSEY FAX: (609) 354-0918
SUITE 105
25 CHESTNUT STREET
HADDONFIELD, NEW JERSEY 08033
(609) 354-0955                                _____
                                              REPLY TO:  PENNSYLVANIA

## TELECOPY TRANSMITTAL COVER SHEET

Please deliver the following material          **DATE:**    January 23, 2002

**TO:**        Dr. Kamran Saleh

**FAX NO:**    (814) 368-1007

**FROM:**      Marc S. Raspanti, Esquire
               **MILLER, ALFANO & RASPANTI, P.C.**

**TOTAL NUMBER OF PAGES (including cover sheet):**  16

**Message:**

### ******CONFIDENTIALITY******

The documents accompanying this telecopy transmission contain information from the law firm of Miller, Alfano & Raspanti, P.C., which is confidential and/or legally privileged.  The information is intended only for the use of the individual or entity named on this transmission sheet.  If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this telecopied information is strictly prohibited, and that the documents should be returned to this firm immediately.  In this regard, if you have received this telecopy in error, please notify us by telephone so that we can arrange for the return of the original documents to us at no cost to you.

*******************************************************************************

Please notify us immediately if not properly received:          (215) 972-6400

DEPOSITION
EXHIBIT
Saleh
8-9-01 5 Jan

Confidential
V&S 00123

LAW OFFICES

## MILLER, ALFANO & RASPANTI, P.C.
SUITE 3402
1818 MARKET STREET
PHILADELPHIA, PENNSYLVANIA 19103
(215) 972-6400

AFFILIATED
NEW JERSEY OFFICE
25 CHESTNUT STREET, SUITE 105
HADDONFIELD, NEW JERSEY 08033
(856) 354-0955

PENNSYLVANIA FAX: (215) 981-0082
NEW JERSEY FAX: (856) 354-0918

REPLY TO:

Pennsylvania

January 22, 2002

VIA FEDERAL EXPRESS

George E. Leonhardt, President/CEO
Bradford Regional Medical Center
116 Interstate Parkway
P.O. Box 0218
Bradford, PA 16701-0218

Re:  Dr. Kamran Saleh's Reappointment to the Medical Staff

Dear Mr. Leonhardt:

We are in receipt of your December 14, 2001 letter regarding
the reappointment of Dr. Kamran Saleh to the Medical Staff at the
Bradford Regional Medical Center (the "Medical Center") and your
January 8, 2002 letter requesting additional information regarding
an alleged audit of Dr. Saleh and his practice, V&S Medical
Associates. As we understand it, the Medical Center is withholding
formal and complete approval of Dr. Saleh's application pending an
audit of his "referral" patterns.  It is both illegal and
inappropriate for the Medical Center to premise Dr. Saleh's
reappointment on his referral patterns.

We attach for your review a copy of the letter that we
understand was hand-delivered to Mr. Richard McDowell, Chairman of
the Board, by Dr. Peter Vaccaro at a December 6, 2001 meeting of
the Joint Conference Committee.  See Exhibit 1 (December 4, 2001
letter from Edward J. Kabala, Esquire to Dr. Peter Vaccaro).  As
you will see, this letter sets forth how the Board's May 23, 2001
Resolution relating to its Policy on Physicians With Competing
Financial Interest (the "Resolution") and the Joint Conference
Committee's related Procedures for Assessing Whether Practitioners
Have  Significant  Competing  Financial  Relationships  (the
"Procedures") adopted on December 6, 2001 violate federal law, in
particular, the federal anti-kickback criminal statute.

Confidential
V&S 00124

MILLER, ALFANO & RASPANTI, P.C.

George E. Leonhardt, President/CEO
Bradford Regional Medical Center
January 22, 2002
Page 2

   As you must know, federal law unconditionally prohibits
physicians from receiving remuneration, of any kind, intended to
induce referrals where a Medicare, Medicaid, or state health care
patient may be involved. See 42 U.S.C. § 1320a-7b(b)(1)(A). This
law has and is being broadly interpreted by courts all over the
country.   The law, moreover, prohibits the Medical Center from
linking medical reappointment to physician referrals.  Violations
of this law are felonies, punishable by imprisonment. In addition,
other federal laws -- including the Stark Laws and the Federal
False Claims Act -- proscribe harsh civil penalties for those who
enter into arrangements which compensate based upon referrals. See
42 U.S.C. § 1395nn, et seq. (relating to Stark) and 31 U.S.C. §
3729 et seq. (relating to the Federal False Claims Act).

   The Board's Resolution is explicit and not subject to multiple
interpretations.   It clearly states that physicians who have "a
financial relationship with or an ownership or investment interest
in, any competing health care entity or services that has or may
have a significant impact (as determined by the Board) upon the
Medical Center ... shall be ineligible for continued appointment
and clinical privileges."    See May 23, 2001 Resolution.    The
Medical Center is conditioning privileges on referrals streams.
This is precisely the type of arrangement that the anti-kickback
laws were intended to prevent.

   In addition to our concerns about the legality of the Board
Resolution, we question the delay and highly suspect timing of
Dr. Saleh's reappointment papers and the process under which he was
evaluated. From its inception, the process has violated the Bylaws
of the Medical Staff of the Bradford Regional Medical Center (the
"Bylaws").   Specifically, Dr. Saleh's reappointment application
papers were due on or about June 30, 2001 under Section 3.A of the
Policy on Appointment, Reappointment and Clinical Privileges
("Appointment Policy").  This Section requires that reapplication
papers be furnished at least four months prior to the expiration of
the appointee's current appointment period. See Appointment Policy
at Section 3.A.1(b).  Nonetheless, the reappointment application
was not supplied until early September, 2001. Interestingly, had
the papers been supplied on a timely basis, the reappointment

Confidential
V&S 00125

Confidential
V&S 00126

MILLER, ALFANO & RASPANTI, P.C.

George E. Leonhardt, President/CEO
Bradford Regional Medical Center
January 22, 2002
Page 3

review would have been over well before the adoption of the illegal
financial conflicts of interests procedures.[1]

Not wishing to delay his reappointment, Dr. Saleh completed
the papers and returned them by September 8, 2001. Following his
submission, Dr. Saleh was sent a letter on September 24, 2001 from
Dr. Ross Horsley, Chair of the Credentials Committee, delineating
a number of privileges for which the Committee sought additional
proof of competence. Dr. Saleh promptly scheduled a meeting for
October 11, 2001 regarding what, if any, additional proof would be
required. At the October 11, 2001 meeting, Dr. Horsley advised him
that there was no report from the department containing any reason
for the recommendation of changes.[2] Dr. Horsley further declined
to give Dr. Saleh, who has been a member of the Medical Staff since
1994, any documentation regarding the source of the recommendations
for changes.[3] Dr. Saleh documented the results of this meeting in
an October 17, 2001 letter to Dr. Horsley and set forth his
willingness to meet with the Credentials Committee if necessary.
Dr. Saleh has not been requested to provide anything further.

Rather than taking prompt and appropriate action, the Medical
Center again stalled Dr. Saleh's application. In a letter dated
October 31, 2001 you, on behalf of the Board of Directors (the

---

[1]    Other Bylaw deadlines were also missed. For example, the
Department Chair did not receive a timely notice of all department
appointees as required under Section 3.A.3(a), nor did the
Department Chair meet the 15 day time limit for the written report
concerning each individual seeking reappointment to the Credentials
Committee (Credentials) per Section 3.A.3(b).

[2]    Under 3.A.4 and 3.A.5, the Credentials Committee
("Credentials") is to review all reports and send the same to the
Quality Assessment Committee ("QA"). Where any change is
recommended, the reason is to be stated in writing.

[3]    Bylaw Section 3.A.7 specifically requires notice to
Dr. Saleh whenever there is a recommendation which would reduce his
privileges. Neither Credentials nor QA has done this nor have they
formally or informally requested a meeting (Credentials has, in
fact, ignored Dr. Saleh's offer to meet).

Confidential
V&S 00127

MILLER, ALFANO & RASPANTI, P.C.

George E. Leonhardt, President/CEO
Bradford Regional Medical Center
January 22, 2002
Page 4

"Board"), granted Dr. Saleh an "interim appointment to the Medical
Staff and interim clinical privileges until the Board of Directors
has acted on your application for reappointment." An entire month
and a half then passed with no comment or action by the Board.

On December 14, 2001, Dr. Saleh was sent a letter which
further delayed his reappointment. This time, his reappointment
was "conditioned" upon an economic review of his medical practice,
a review that is unrelated completely to Dr. Saleh's qualifications
for obtaining Medical Staff privileges. This letter was followed
on January 2, 2002 by a substantial and lengthy request for
information regarding the operation of a nuclear camera that V&S
Medical committed to in mid-February 2001, prior to the Board
Resolution, and had installed in July -- well prior to the adoption
of the December 6, 2001 Procedures.[4]

Holding Dr. Saleh's reappointment hostage pending the
economic review set forth in the January 2, 2002 letter flies in
the face of reason and belies the Medical Center's own Bylaws.
Absent an adverse report of either the Credentials Committee or the
QA Committee, the Bylaws do not provide any basis to table or defer
a decision on any privilege that Dr. Saleh currently holds. As you
must know, any Board action that reduces Dr. Saleh's clinical
privileges requires that he promptly be given notice of the reasons
and a hearing. See Sections 4.A.1 and 4.B.1. No such notice has
been given to him even though the December 14, 2001 letter makes it
obvious that there must have been such a recommendation. Even
further, the request to do an economic review of Dr. Saleh's
practice directly violates the Medical Center's Appointment Policy
which mandates that every applicant and appointee specifically
agree, among other things:

---

[4]    Interestingly, the Medical Center was amenable to the
installation of the nuclear camera as long as the Medical Center:
(1) was part of a joint venture; and (2) was the primary
beneficiary of the deal. See, e.g., July 30, 2001 correspondence
from George E. Leonhardt to Drs. Vaccaro and Saleh.

Confidential
V&S 00128

MILLER, ALFANO & RASPANTI, P.C.

> George E. Leonhardt, President/CEO
> Bradford Regional Medical Center
> January 22, 2002
> Page 5

> > j)    to refrain from illegal fee splitting or
> >       other illegal inducements relating to
> >       patient referral.

See Appointment Policy at Section 2.B.2(j).

There is simply no basis in the Bylaws, Dr. Saleh's history with the Medical Center or in his medical career which would warrant withholding or reducing his privileges. Rather, we believe that the Board intentionally withheld Dr. Saleh's privileges in the fall so that it could argue that he was subject to the Board's economic credentialing Resolution and its related Policies. Such a tactic is inappropriate and, as was stated in the December 4, 2001 letter to Mr. McDowell, illegal.

The Board Resolution and related Policies stand in contradiction of the Medical Center's purported mission of providing quality care to the people of its region regardless of their ability to pay. The additional services that have been developed by V&S Medical, in part by Dr. Saleh, and offered to the Bradford community have unquestionably expanded the type and quality of services available in the area.

As we understand it, patients have had access to earlier and more accurate testing and in many cases have been able to benefit from early detection of numerous life-threatening problems such as coronary artery disease, impending heart attack and cardiomyopathy. Our further understanding is that the Medical Center benefits directly from the early diagnostics as most, if not all, patients seek medical intervention at the hospital.

Withholding or abrogating Dr. Saleh's privileges will directly and adversely affect the Bradford community and Dr. Saleh's practice. As you know, Dr. Saleh has been a dedicated, competent, and contributing member of the Bradford medical community for nearly eight (8) years. He has worked diligently and caringly with hundreds of patients who depend on him to administer, direct, and oversee their medical care. If you remove any part of Dr. Saleh's privileges, it will only harm the community which has great difficulty recruiting a physician of Dr. Saleh's competence and loyalty to the area. Diminishing the types of medical services

Confidential
V&S 00129

JAN-23-2002 WED 10:39 AM                    FAX NO.                        P. 07

MILLER, ALFANO & RASPANTI, P.C.

George E. Leonhardt, President/CEO
Bradford Regional Medical Center
January 22, 2002
Page 6

that Dr. Saleh may provide will also irreparably damage the
doctor's practice.

     We also remind the Medical Board that Drs. Vaccaro and Saleh
purchased the practice which is now V&S Medical Associates in 2000
from the Medical Center.   At that time, there were extensive
discussions regarding the Asset Purchase Agreement and the doctors'
Severance Agreements.  As you are well aware, the doctors paid a
substantial sum for the assets of the practice and for the release
from the non-compete clauses in their Employment Agreements.   No
limitation on how the doctors could run their practice was ever
discussed at that time nor were any restrictions placed on the
doctors in the asset purchase or severance agreements.   We,
therefore, cannot understand the Medical Center's current attempt
to reimpose contract restrictions that the doctors paid handsomely
to have removed.

     As a practical matter, we see no legal problems with requiring
the information requested in Paragraphs 2, 3 and 4.   This
information is publicly available and does not attempt to assess
improperly referral patterns.   This information is, therefore,
enclosed for your review.  See Exhibit 2.   We believe that this
information should sufficiently permit the Medical Center to
evaluate V&S Medical's operations without running afoul of federal
law.  We further believe that this is all of the information we can
legally supply, especially in the absence of any formal position by
your counsel.

     With this information, we ask that the Medical Board
immediately reappoint Dr. Saleh to the Medical Staff without any
restrictions.

                                    Very truly yours,

                                    MARC S. RASPANTI

MSR/gh
F:\PBL\MR\V&S Medical\jmk00002.ltr.wpd

cc:  Dr. Kamran Saleh
     Edward J. Kabala, Esquire
     Jodeen M. Hobbs, Esquire

Confidential
V&S 00130

**EXHIBIT 1**

Confidential
V&S 00131

625 LIBERTY AVENUE, 29TH FLOOR
PITTSBURGH, PA 15222-3115
412.391.1334
FAX 412.391.6984
www.kglawpgh.com

EDWARD J. KABALA
ekabala@kglawpgh.com

December 4, 2001

Dr. Peter Vaccaro
3035 West Washington Street
Bradford, PA  16701

> Re:   Economic Credentialing Issues
>        Our File Number:  6169

Dear Peter:

At your request following your receipt of the September 9, 2001 letter from Mr. Richard McDowell, we have had the opportunity to review the "Procedures for Assessing Whether Practitioners Have Significant Competing Financial Relationships (the "Procedures")". As we understand it, these procedures were developed to implement a resolution passed on May 23, 2001 by the Board of Directors of the Bradford Regional Medical Center ("Medical Center") relating to its "Policy on Physicians With competing Financial Interests." It is our further understanding that the procedures and the resolution are intended to prevent a physician from obtaining or retaining admitting privileges to the BRMC if that physician has any financial interest in any entity that is alleged to have a significant impact upon the Medical Center.

For the reasons set forth below, we do not believe that this type of "economic credentialing" policy is legal. We, therefore, cannot advise you, or your practice, or for that matter any other physician, to participate in the implementation of the resolution or the procedures.

**KABALA**
**GEESEMAN**
A PROFESSIONAL CORPORATION
ATTORNEYS-AT-LAW

Confidential
V&S 00132

JAN-23-2002 WED 10:40 AM                    FAX NO.                    P. 10

Peter Vaccaro, M.D.
December 4, 2001
Page 2


In our opinion, the Board's resolution improperly conditions admitting privileges on an exclusive referral agreement. Our opinion is based upon a straightforward reading of the federal anti-kickback statute. The statute explicitly states that:

>   (1)    Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind --
>
>   (A)    in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under subchapter XVIII of this chapter or a state health care program,
>
>                           ***
>
>   Shall be guilty of a felony and upon conviction thereof shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 Section 1320a-7b(b)(1)(A).  Thus, the federal anti-kickback statute is broad and far-reaching and easily governs the type of exchange called for in the resolution and in the procedures.

The fact that no money is exchanged in the admitting privileges for referral transactions is irrelevant for the purposes of this statue as it covers any type of remuneration given in exchange for a referral. Zimmer, Inc. v. Nu Tech Medical, 54 F. Supp. 2d 850, 861-62 (N.D. Ind. 1999). This is regardless of whether the remuneration is direct, indirect, overt, covert, in cash or in kind.

In addition to the plain language of the statute, our view is supported concretely in the federal courts' case law.  In particular, the Third Circuit, the circuit governing this matter, broadly construes and enforces the anti-kickback laws.  The Third Circuit case law is clear that the anti-kickback laws are violated even if only one purpose of the transaction is to induce referrals.  See United States v. Greber, 760 F.2d 68, 69 (3d Cir. 1985).

Confidential
V&S 00133

Peter Vaccaro, M.D.
December 4, 2001
Page 3

Please also be advised that the case that is often touted by some counsel as support for an economic credentialing policy does not address the Anti-Kickback Act. See Mahan v. Avera St. Luke's, 621 N.W. 2d 150 (S.D. 2001). This case from South Dakota deals only with contractual issues and, therefore, cannot be used to refute the applicability of existing federal law.

In addition to being illegal under the Anti-Kickback Act, we believe that the Medical Center's position may be actionable under Stark. See 42 U.S.C. Section 1395nn, et seq. The Stark law prohibits referrals by physicians to an entity with whom they have any "compensation arrangement" which is also broadly defined to cover any type of remuneration.[1]

There is also reason to believe that due to the large volume of Medicare and Medicaid patients involved, the type of arrangement mandated by the Medical Center would be subject to very close scrutiny under the Federal False Claims Act. 31 U.S.C. Section 3729, et seq. See, e.g., United States ex rel. Thompson v. Columbia / HCA Healthcare Corp., 20 F. Supp. 2d 1017 (S.D. Tex. 1998); and United States ex rel. Pogue v. American Healthcorp, Inc., 914 F. Supp. 1507 (M.D. Tenn. 1996).

Even further, the Policy seems to include Medical Center affiliates and perhaps independent physicians or entities and the coordinated efforts of the Board of Directors and the Joint Conference Committee alone or with others likely violate antitrust provisions. Section I of the Sherman Act, the principal federal antitrust statute provides that "[e] very contract, combination in the form of the trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations is declared to be illegal." 15. U.S.C. Section 1 (1997). The Supreme Court has interpreted this section to prohibit those restrictive practices that unreasonably restrain competition. See e.g., NCAA v. Board of Regents, 465 U.S. 85, 98 (1984). The resolution and the related procedures may reasonably be viewed as unreasonably restraining competition through the use of illegal tying arrangements, a group boycott and/or a conspiracy to monopolize.

---

[1] In our opinion, neither the resolution nor the procedures for implementation fall within any of the "safe harbors" related to the Stark law. In fact, a reading of the safe harbor provisions provides support for our position that the required referrals are illegal. For example, one of the "safe harbors" to the Stark law deals with physician recruitment. Hospital remuneration to a physician that it is recruiting is only protected if the "physician is not required to refer patients to the hospital." See 42 U.S.C. Section 1395nn(e)(5).

Confidential
V&S 00134

JAN-23-2002 WED 10:42 AM                    FAX NO.                    P. 12

Peter Vaccaro, M.D.
December 4, 2001
Page 4

The resolution and the procedures also may violate the Pennsylvania Code relating to obtaining hospital staff privileges and BRMC's own Bylaws. Title 28 Section 107.3 of the Pennsylvania Code states:

> "No applicant shall be denied medical staff privileges on the basis of sex, race, creed, color, or national origin or on the basis of any other criteria lacking professional or ethical justification, including association with a prepaid group practice."

28 pa. Code Section 107.3 (c). Thus, this section precludes the analysis of referral rates in determining whether an applicant may obtain hospital staff privileges.

Additionally, the Medical Staff Bylaws set forth a detailed policy regarding the qualifications required to be appointed to the Medical Staff. See Medical Staff Bylaws of Bradford Regional Medical Center, Policy on Appointment, Reappointment and Clinical Privileges (Staff Bylaws). Adding the economic credentialing to the list of factors that qualifies a doctor for admitting privileges substantially alters the terms of the Staff Bylaws. Thus, to be effective, its implementation must follow the procedures set forth in Articles 8 (Rules and Regulations of the Medical Staff) and 9 (Amendments) of the Staff Bylaws. It is our understanding that the Board unilaterally implemented the resolution.

In conclusion, we cannot recommend that you endorse a resolution or procedures that exposes you or your practice to significant civil, criminal, or administrative liability. We are concerned with how the Justice Department would view such an arrangement that conditions privileges on referrals. We also cannot advise you to rely upon verbal reassurances that you are not exposed to any liability because it is becoming "common" for community hospitals across the country to take into account financial conflicts of interest in evaluating eligibility for medical staff appointments and clinical privileges. To the contrary, we believe that the more "common" happening is the vigorous enforcement of the anti-kickback and Stark laws.

If the Joint Conference Committee is determined to move forward, we suggest that it seek an independent written legal evaluation of the Board Resolution before any endorsement of or other action upon the Procedures or the Resolution, including a vote to approve or reject the Procedures. Additionally, we recommend that you seek and receive an agreement in writing from the Medical Center that it will indemnify and defend you and your practice in the event that the federal government chooses to pursue this case criminally, civilly or both. Of course, no indemnification will protect you from criminal prosecution.

Confidential
V&S 00135

Peter Vaccaro, M.D.
December 4, 2001
Page 5


We note that the changes from the first draft to the second draft of the Procedures make abundantly clear
the intent of the Board of Directors to apply this to existing medical staff members. Since there is no
indication that the Board seeks a Staff Bylaw Amendment and there is substantial doubt that privileges
may be legally withdrawn from a medical staff member without full compliance with the Staff Bylaws,
we would advise you to also request that the legal evaluation deal with the implications.

Please let me know if you have any questions regarding this letter.

Very truly yours,

EDWARD J. KABALA

EJK/dv

cc:     Marc S. Raspanti, Esquire
        Miller, Alfano & Raspanti, P.C.

N:\06000-06999\06100-06199\06160\06166-LTR\021-EJK-DV

Confidential
V&S 00136

EXHIBIT 2

Confidential
V&S 00137

JAN-23-2002 WED 10:43 AM                    FAX NO.                    P. 15

QUESTION 2

    Partners/Business Associates:

        V&S Medical
            Kamran Saleh, M.D.
            Peter Vaccaro, M.D.

QUESTION 3

    Manufacturer of the Equipment and Specific Model:

        General Electric Gamma Camera - Model DXXI

QUESTION 4

    A listing of examinations the equipment is capable of performing:

| PROCEDURE GROUP | PROCEDURE | COMPONENT |
|---|---|---|
| Bone Scan | Whole Body Bone | MDP Injection<br>Return for Scan |
| | Spect Bone | MDP Injection<br>Return for Scan |
| | 3 Phase Bone | MDP Injection<br>Return for Scan |
| Liver/Spleen | Hemangioma Study | Ultra Tag RBC Injection |
| Hepatobiliary Study | Hepatobiliary Study | Choletec Injection |
| | Hepatobiliary W/S.F. | Choletec Injection<br>Hepatolite Injection |
| | Hepatobiliary W/Ejection Fraction | Hepatolite Injection |
| Thyroid Study | TC-99M Thyroid Study | 99MTC04-Injection |
| Infection Scan | Ceratec WBC Study Limited | Ceretec WBC Injection |

Confidential
V&S 00138

| PROCEDURE GROUP | PROCEDURE | COMPONENT |
|---|---|---|
| Cardiac | Muga Study | Cold PYP<br>TC99M Sodium Pertechnetate |
| | Cardiolite Resting | Cardiolite Injection |
| | Adenosine Stress W/TL-201 | Adenosine Infusion<br>TL-201 Injection |
| | TL-201 Stress Test | TL-201 Injection |
| | TL-201 Resting Reinjection | TL-201 Injection |
| | TL-201 Resting Study | TL-201 Injection |
| | Treadmill Stress Test | Cardiolite Injection |
| | Adenosine Stress Test | Adenosine Infusion<br>Cardiolite Injection |

2

Confidential
V&S 00139

**20**

*Penal*

LAW OFFICES

## MILLER, ALFANO & RASPANTI, P.C.
SUITE 3402
1818 MARKET STREET
PHILADELPHIA, PENNSYLVANIA 19103
(215) 972-6400

AFFILIATED
NEW JERSEY OFFICE
23 CHESTNUT STREET, SUITE 105
HADDONFIELD, NEW JERSEY 08033
(856) 354-0955

PENNSYLVANIA FAX: (215) 981-0082
NEW JERSEY FAX: (856) 354-0918

REPLY TO Pennsylvania

February 15, 2002

**VIA FEDERAL EXPRESS**

George E. Leonhardt, President/CEO
Bradford Regional Medical Center
116 Interstate Parkway
P.O. Box 0218
Bradford, PA 16701-0218

        Re: <u>Dr. Peter Vaccaro's Reappointment to the Medical Staff</u>

Dear Mr. Leonhardt:

        On January 28, 2002, our client, Dr. Peter Vaccaro received your letter which was identical to the one that was sent to his partner at V&S Medical Associates, Dr. Kamran Saleh. On January 22, 2002, we responded extensively and substantively on behalf of Dr. Saleh to the first request and, therefore, refer you to that letter. Our legal position has not changed.

        We add, however, that on January 7, 2002, the United States Supreme Court declined to review a case that held that the anti-kickback laws are violated even where only "one purpose" of a payment or exchange is to induce referrals. <u>See United States v. LaHue</u>, 261 F.3d 993, 1003 (10th Cir. 2001), <u>cert. denied</u>, 122 S. Ct. 818 (2002). Thus, the "one purpose" analysis continues to be good law and our position that it is an illegal kickback to trade hospital privileges for exclusive referrals is even stronger.

        In the <u>LaHue</u> case, the circuit court concluded that "the evidence produced at trial clearly demonstrated defendants negotiated and entered 'consulting' contracts in an attempt to camouflage an underlying agreement to exchange remuneration for patient referrals." <u>Id.</u> at 1005. The court further upheld the constitutionality of the Anti-Kickback Act concluding that it is not unconstitutionally vague and does not promote arbitrary or discriminatory enforcement. <u>Id.</u> at 1007.

DEPOSITION EXHIBIT
Saleh
9-9-07  jah

Confidential
V&S 00155

MILLER, ALFANO & RASPANTI, P.C.

George E. Leonhardt, President/CEO
Bradford Regional Medical Center
February 15, 2002
Page 2

Even further, we draw your attention to a Virginia State Court
case in which a hospital attempted to extract "practice management
fees" from a radiology group that had a contract with the hospital.
See Virginia Radiology Associates, P.C. v. Culpepper Memorial
Hospital, Inc., No. 90L172, slip op. at 4 (4th Judicial Cir. Ct. Va.
Dec. 29, 1995). Counsel to the radiology group advised that the
substantial practice management fees sought by the hospital would
be considered "subterfuge" for a kickback in violation of federal
law. Id. The hospital, nonetheless, ignored the implications of
the anti-kickback statute and cancelled the radiology group's
contract and revoked their privileges. The radiology group sued
the hospital and won.

The trial court, which granted summary judgment, expressly
noted that the hospital's attempt to trade management fees for
admitting privileges "most certainly" violated the anti-kickback
laws. Id. at 12. It further recognized that "even a 'peppercorn'
offered or accepted for patient referral would be a violation" of
the Anti-Kickback Act. Id. We further note that the radiology
group obtained a multi-million dollar verdict against the hospital
for losses sustained due to the significant harm caused by the loss
of hospital privileges.

Given the foregoing, we cannot understand how the Medical
Center can persist in its pursuit of information from Dr. Vaccaro
that is wholly related to his referrals. We cannot find a legal
basis to respond to your detailed requests for information such as
"[a] listing of procedures [relating to the nuclear camera]
referred out of your office by date, procedure, payer and entity
receiving the referral." See January 28, 2002 letter from George
E. Leonhardt to Dr. Peter Vaccaro at ¶ 8. This request alone, on
its face, can be used for no other purpose but assessing
Dr. Vaccaro's referral patterns.[1]

As you know, Dr. Vaccaro came to the Bradford Community in
1994, after being recruited to work as a physician at the Bradford

---

[1]      As an aside, we note that Dr. Vaccaro's referrals with
respect to the nuclear camera and all other procedures have always
been based upon his reasoned medical judgments and the needs or
preference of the patient.

Confidential
V&S 00156

FEB-18-2002 MON 11:04 AM                FAX NO.                    P. 04

MILLER, ALFANO & RASPANTI, P.C.

George E. Leonhardt, President/CEO
Bradford Regional Medical Center
February 15, 2002
Page 3

Regional Medical Center. For eight years, Dr. Vaccaro has served the local community and the Medical Center. He established himself as a competent and devoted physician and earned the respect of his thousands of local patients.

In the Spring of 2000, he and Dr. Saleh purchased the assets of a medical practice owned at the time by the Medical Center. The doctors paid a premium for the practice and for the release from non-compete clauses that were included in the contracts with the Medical Center. Both Drs. Vaccaro and Saleh contemplated a long, productive and amicable working relationship with the Medical Center. Both also anticipated that they would be able to develop their new practice as they saw fit -- especially as the Medical Center placed no restrictions on the terms surrounding the purchase of the practice.

In early 2001, the doctors began to research the possibility of installing a state-of-the-art nuclear camera in their office for the benefit and convenience of their patients. Even when the doctors decided to proceed, they were open to the possibility of a joint venture with the Medical Center with respect to the installation of the camera. It is our understanding that the discussions regarding the joint venture possibility broke down when the Medical Center was unable to negotiate a satisfactory arrangement for a joint venture.

# REDACTED

Confidential
V&S 00157

MILLER, ALFANO & RASPANTI, P.C.

George E. Leonhardt, President/CEO
Bradford Regional Medical Center
February 15, 2002
Page 4

REDACTED

Confidential
V&S 00158

MILLER, ALFANO & RASPANTI, P.C.

George E. Leonhardt, President/CEO
Bradford Regional Medical Center
February 15, 2002
Page 5



# REDACTED



  We also find it more than curious that, since July of 2001,
the only cases that have been presented at the Department of
Medicine meetings are ones handled by Drs. Vaccaro and Saleh.
Given the past pattern of case reviews, we cannot comprehend how
no other physician presented a case that was subject to a review.
Such harassment of physicians who are perceived as having a
financial conflict of interest is an absolute abuse of the peer
review process. Even further, such abuse potentially exposes the
Medical Center to liability.

  We know of no case that more clearly establishes a hospital's
attempt to extract an exclusive referral stream from a physician.
The Medical Center has been explicit that the purpose of the
Economic Credentialing Resolution is to eliminate privileges for
any physician who poses a financial threat to the Medical Center.
It has even been reported that the Medical Center has defined a
significant threat to be any purported revenue loss of $300,000 or
greater. It is unfathomable how such an arbitrary and financially
motivated condition can be interpreted as anything other than an
exchange for referrals.

  Besides being illegal, we draw your attention to the
fundamental unfairness associated with the Medical Center's concern
with physicians who may be deemed to have "competing financial

Confidential
V&S 00159

MILLER, ALFANO & RASPANTI, P.C.

George E. Leonhardt, President/CEO
Bradford Regional Medical Center
February 15, 2002
Page 6

interests" while at the same time the Medical Center is recruiting
new physicians to the area. This recruitment is occurring despite
the representation to V&S Medical Associates when it purchased its
medical practice that the Medical Center had no immediate plans to
bring additional doctors into the area. Despite this assurance,
three new physicians have been hired by the Medical Center -- all
of whom compete directly with the practices of Drs. Vaccaro and
Saleh. In light of this, we cannot fathom how the Medical Center
can complain about competing interests.

Drs. Vaccaro and Saleh are not the only physicians in Bradford
to perform additional services in their office or refer procedures
elsewhere. We understand that Dr. Ross Horsley operates an MRI
Center within 30 miles of the Medical Center; that Dr. Kirsch uses
a dexamachine in his office to evaluate bone density; that
Dr. Godfrey performs biopsies in his own office and then sends the
biopsies to an outside laboratory (not the Medical Center's) for
review; and that Drs. Singh and Nadella have a contract for
cardiology services and procedures with cardiologists at
St. Vincent's Hospital in Erie, Pennsylvania. All of these
services can readily be defined as "competing financial interests,"
yet we know of no other physician or practice that has been
targeted for an extensive referral audit.

The Medical Center's actions are shortsighted and ignore that
the Nuclear Medicine Department and the staff at V&S Medical
Associates -- if left alone -- could develop a cooperative and
productive working relationship that would clearly benefit the
Bradford area. It is our understanding, for example, that not long
after the nuclear camera was installed, the V&S Medical staff
received a call that the Medical Center's nuclear camera was not
working. The caller explained that a patient who had been in a
serious accident needed to be imaged prior to treatment. The staff
worked out an arrangement whereby the patient was injected at the
Medical Center but sent to the V&S offices for the imaging. The
V&S Medical staff then took the necessary images and sent the film
and a corresponding floppy disk back to the Medical Center. In
another example of staff cooperation, an 80 year old post-quadruple
bypass patient received a bone scan at no charge by V&S Medical
when the Medical Center was unable to provide this service. In
each of these instances, the Nuclear Medicine Department and the

Confidential
V&S 00160

MILLER, ALFANO & RASPANTI, P.C.

George E. Leonhardt, President/CEO
Bradford Regional Medical Center
February 15, 2002
Page 7

V&S Medical staff put patient needs in front of any disputes over referrals. It is unfortunate that we have since learned that the Nuclear Medicine Department has been instructed not to refer patients to V&S Medical under any circumstance.

We ask that the Medical Center withdraw its request for referral information and approve, unconditionally, the Medical Staff privileges for both Drs. Saleh and Vaccaro. In this way, the doctors and the Medical Center will be able to return their focus to the health and well-being of the members of the Bradford Community.

Very truly yours,

MARC S. RASPANTI

MSR/gh
F:\PBL\MH\V&S Medical\gh000016.ltr.wpd

cc:   Edward J. Kabala, Esquire
      Jodeen M. Hobbs, Esquire

Confidential
V&S 00161

**21**

 

*DEDICATED TO IMPROVING THE HEALTH OF OUR COMMUNITY*

**VIA HAND DELIVERY**

May 20, 2002

Kamran Saleh, MD
V&S Medical Associates
24 W. Washington Street
Bradford, PA 16701

Dear Dr. Saleh:

As you know, the Board of Directors of Bradford Regional Medical Center has previously adopted a Policy and Procedures for Assessing Whether Practitioners Have Significant Competing Financial Relationships (the "Policy" and the "Procedures"). This past Wednesday, the 15th, the Board met to discuss whether you are a covered practitioner with a significant competing financial relationship (a "Covered Practitioner") under the Policy and Procedures. (Copies of the Policy and Procedures are enclosed.)

At its meeting, the Board made a preliminary determination that you are a Covered Practitioner. As I will explain in more detail later in this letter, a next step to take is for you, Dr. Vaccaro and the Board to meet and, in good faith, discuss this situation and whether there are potential resolutions to it.

The reasons for why the Board made this preliminary determination include:

(1) We understand that your corporation, V&S Medical Associates, in which Dr. Peter Vaccaro is your partner, purchased or leased a General Electric Gamma Camera - Model DZZI sometime around July, 2001 (the "V&S equipment"). The V&S equipment is capable of performing the procedure group, procedures and components described in Attachment A to this letter. The Medical Center has similar equipment, Picker *Axis* Gamma Camera (the "Medical Center equipment"), which performs the same procedure group, procedures and components.

(2) Data collected by the Medical Center shows that you have significantly changed your practice pattern in terms of your usage of the Medical Center's equipment. We understand that is because you are now using the V&S equipment in its place.

---

*116 Interstate Parkway • P.O. Box 0218 • Bradford, Pennsylvania • 16701-0218 • (814) 368-4143 • www.brmc.com*

DEPOSITION EXHIBIT
Saleh
8901 8 Jan

Confidential
V&S 00060

LETTER TO:   KAMRAN SALEH, MD
MAY 20, 2002
PAGE TWO

(3)    Beginning with a letter dated February 2, 2002 to you, the Medical Center and its
       legal counsel have sent letters to you, Dr. Vaccaro and your legal counsel asking for
       further information concerning the V&S equipment. Those requests were made so
       that the Medical Center could make a decision on this matter based upon complete
       information provided by your office.

       Instead of providing that complete information, you limited your answers to the
       names of any partners or business associates, the manufacturer of the equipment, and
       a listing of the examinations that the equipment is capable of performing. By
       refusing to provide any more information, please understand that you have chosen
       to limit the information upon which the Board of Directors is able to make its
       decisions.

The Board of Directors fully recognizes your right, and that of V&S Medical Associates, to
compete with the Medical Center with equipment and services provided in your own office.
However, this Board also has its own responsibility to exercise reasonable care and skill in
preserving the fiscal integrity of the Medical Center, as well as in protecting patients. The Board
also has a responsibility to see that the Medical Center's mission to provide charitable or
uncompensated services to patients in the region can be accomplished.

       The Board's preliminary determination is that you have an ownership or investment interest
in competing health care services that have a significant financial impact upon the Medical Center.

       Pursuant to the Procedures, you have the right to request a meeting with the Board to discuss
this preliminary determination. We think such a meeting would be a worthwhile step to take for both
you and the Medical Center. The Board has its fiduciary responsibilities to exercise and fulfill, as
described above, but it also feels that a meaningful discussion of potential resolutions to this
situation could be constructive.

       Should you wish to meet with the Board, please let George Leonhardt know this in writing
within fifteen (15) business days from your receipt of this letter. Thank you.

                                                    Sincerely,

                                                    Richard McDowell, Ph.D.
                                                    Chairman, Board of Directors

/cr
Enclosures

D:\Administration\George\Saleh-BoardDecisionLetter 5-20-02.wpd

Confidential
V&S 00061

**BRADFORD REGIONAL MEDICAL CENTER**
**Bradford, Pennsylvania**

**ATTACHMENT A**

| PROCEDURE GROUP | PROCEDURE | COMPONENT |
|---|---|---|
| Bone Scan | Whole Body Bone | MDP Injection<br>Return for Scan |
| | Spect Bone | MDP Injection<br>Return for Scan |
| | 3 Phase Bone | MDP Injection<br>Return for Scan |
| Liver/Spleen | Hemangioma Study | Ultra Tag RBC Injection |
| Hepatobiliary Study | Hepatobiliary Study | Choletec Injection |
| | Hepatobiliary W/E.F. | Choletec Injection<br>Hepatolite Injection |
| | Hepatobiliary W/Ejection Fraction | Hepatolite Injection |
| Thyroid Study | TC-99M Thyroid Study | 99MTCO4-Injection |
| Infection Scan | Ceretec WBC Study Limited | Ceretec WBC Injection |

**Confidential**
**V&S 00062**

**22**

 

*DEDICATED TO IMPROVING THE HEALTH OF OUR COMMUNITY*

June 11, 2002

Peter Vaccaro, MD
Kamran Saleh, MD
V&S Medical Associates
24 West Washington Street
Bradford, PA 16701

Dear Drs. Vaccaro and Saleh:

I am in receipt of your letter of June 10, 2002. The purpose of our meeting tomorrow is to discuss matters in connection with the Board's preliminary decision that you have an ownership or investment interest in competing health care services that have a significant financial impact upon the Medical Center. That preliminary determination was made by the Board pursuant to its Policies and Procedures for Assessing Whether Practitioners Have Significant Competing Financial Relationships (the "Policy" and the "Procedures"). Pursuant to the Procedures, both of you were invited to come and meet with representatives of the Board to discuss that preliminary determination.

We were pleased that you wanted to meet to discuss that issue. By your joint letter to me of May 21st, you stated your willingness to meet with a Board Committee concerning the Board's preliminary determination and the possibility of a joint venture.

Our thoughts on the agenda for this meeting are that the following should be covered:

1.  The opportunity for you to provide any other information you think would be worthwhile to the Board for it to make its final determination pursuant to the Procedures; and

2.  Whether there is interest on the part of both the Medical Center and V&S Medical Associates in working together in regard to the equipment and services in question, be it through a joint venture or other appropriate means.

Given the fact that the Board's determination is preliminary in nature, we feel it will be most useful to focus on these two issues at tomorrow evening's meeting.

We look forward to meeting with you on Wednesday, June 12, 2002 at 5:30 p.m. in the ground floor Assembly Room. Present, in addition to me, will be Dr. McDowell, Mr. Cahill, and Mr. McCune. Mr. Digel will be out of town and unable to attend.

Sincerely,

George E. Leonhardt,
President/CEO

GEL:cr

*116 Interstate Parkway • P.O. Box 0218 • Bradford, Pennsylvania • 16701-0218 • (814) 368-4143 • www.brmc.com*

**DEPOSITION EXHIBIT**
Saleh
8-9-07    9    jah

Confidential
V&S 00096

**23**





*DEDICATED TO IMPROVING THE HEALTH OF OUR COMMUNITY*

June 26, 2002

Peter Vaccaro, MD
Kamran Saleh, MD
V&S Medical Associates
24 W. Washington Street
Bradford, PA 16701

*CONFIDENTIAL*

RE:    **POTENTIAL DIAGNOSTIC CENTER**

Dear Drs. Vaccaro & Saleh:

The purpose of this letter to outline a possible opportunity for Bradford Regional Medical Center to enter into a relationship with an entity owned by physicians to provide diagnostic services to the community and also ascertain your willingness to explore this option further. It may be possible to structure a relationship whereby diagnostic services could be provided by the hospital "under arrangement" with an entity owned by physicians. It is our understanding that, if properly structured, it could be possible for the hospital to pay the physician entity for diagnostic tests on a per use basis, without violating the so-called "Stark Law" which places restrictions on physician ownership of certain diagnostic services outside of their offices, thus serving as an impediment to traditional hospital-physician joint ventures.

Regulations implementing the Stark Law passed last year exclude from the definition of prohibited ownership and investment interests contracts between hospitals and entities owned by one or more physicians (or a group of physicians) providing diagnostic services covered by Stark "under arrangements" to the hospital. Therefore, an entity owned by physicians on the medical staff (with or without hospital ownership participation) could own or lease the space, equipment and personnel needed to provide diagnostic tests, that is, a diagnostic center. The hospital would then enter into a contract with the diagnostic center to pay an agreed-upon fair market price each time a diagnostic test was furnished to patients of the hospital. The hospital -- not the diagnostic center-- would bill the patient or third party payors for those services. It may well be, depending on the service in question, that the physician-owned entity and the hospital could both have beneficial revenue opportunities under such an arrangement. Thus, revenue opportunities could be present for both the hospital and the physicians.

This is only a rough outline of how this arrangement might work. Further analysis from both a financial and legal perspective will obviously be required. I just wanted to outline this concept for you to see if you had any interest in pursuing this idea further. If you have any questions, please call.

Sincerely,

George Leonhardt,
President/CEO

GEL:cr

**DEPOSITION EXHIBIT**

11

HOSP 0004370

24

 **BRADFORD REGIONAL MEDICAL CENTER**



DEDICATED TO IMPROVING THE HEALTH OF OUR COMMUNITY

January 10, 2003

Kamran Saleh, M.D.
Peter Vaccaro, M.D.
V&S Medical Associates
24 W. Washington Street
Bradford, PA 16701

**CONFIDENTIAL**

Dear Drs. Saleh and Vaccaro:

As you know, last May 15, the Board of Directors of the Medical Center made a preliminary determination that you are both Covered Practitioners with significant competing financial interests to the Medical Center under the Board's Policy on Physicians With Competing Financial Interests (the "Policy") and its Procedures for Assessing Whether Practitioners Have Significant Competing Relationships (the "Procedures"). You were both provided with written notice of this preliminary determination, and you subsequently met with Board representatives on June 12, 2002 to discuss the matter. At that meeting, we agreed it was in all parties' interests to see if a resolution could be achieved regarding these concerns. Accordingly, the Board decided not to make a final decision concerning its preliminary determination and determined to revisit the matter at a later time.

As you know, since our June meeting, the Medical Center has put a considerable amount of time and energy into developing and proposing what we have generally described as the "under arrangements model" venture. We have had several meetings to describe this venture, and have offered participation in it to a number of physicians on the Medical Staff, including yourselves. In addition to these meetings, the three of us have met on several occasions to discuss your interest in the venture. The most recent o those meetings occurred on January 6th.

In the meeting of January 6th, you two told me that you had chosen not to participate in the venture unless the Medical Center purchased your diagnostic equipment and business for $1.8 million. An alternative was that the Medical Center purchase your entire practice and employ you.

The Medical Center declines to accept either of these options. Given the status of these affairs, it appears to us to be an appropriate time for the Board of Directors to revisit its preliminary determination that you are Covered Practitioners with significant competing financial interests to the Medical Center, and come to a final determination, all as described under the Procedures and Policy. This matter has been scheduled for the Board's meeting on the 22nd of this month.

You also informed me at our meeting earlier this week that V&S Medical Associates has purchased the practice of Dr. Qazi Jamil. We take you at your word, and so believe your description to be true and accurate. That description also is confirmed in the advertisement your practice ran in the January 6, 2003 edition of *The Bradford Era*.

**DEPOSITION EXHIBIT**
**10**
1-26-07    Jah

HOSP 0004366

**LETTER TO: DRS. VACCARO & SALEH**
**JANUARY 10, 2003**
**PAGE TWO**

As you know, Dr. Amer Y. Khan has applied for medical staff appointment at the Medical Center. In his application materials, Dr. Khan stated that he would be employed by Dr. Jamil, and work out of a Port Allegany office.

From what you have described to me, and from what is described in your advertisement, we understand that Dr. Khan is now employed by the practice of V&S Medical Associates. The advertisement states that Dr. Khan has joined your practice. It also advertises the very diagnostic services which the Board previously decided, in its preliminary determination, are significant competing services with the Medical Center.

The Board has a variety of options available to it when final determinations are made under the Policy and Procedures. One option is to determine that the physician(s) involved are no longer eligible to remain on the medical staff. Another option is to determine that any medical staff applicant who becomes employed by, or joins with, such competing physician(s) is ineligible to be appointed to the medical staff. These are clearly options that you are aware of as confirmed by your letter of June 10, 2002.

I thought it was appropriate for me to advise you that the Executive Committee of the Board has directed me to request information from Dr. Khan in accordance with the Procedures. Dr. Khan has been requested to provide certain information and materials to the Medical Center by Monday, January 20, that the Board will consider at its meeting on the 22nd. It is our intention for the Board to consider the issue of a preliminary determination concerning Dr. Khan at that Board meeting.

While these next actions will be taken in accordance with the Policy and Procedures, we continue to believe that the best outcome that can be achieved for all parties is to come to an agreeable resolution. We, once again, offer our proposal to you concerning the "under arrangements model" venture, and again request that you respond to our proposal in writing. We continue to believe that the venture can serve as the basis for an equitable outcome for all the physicians involved, the Medical Center and the community which we all serve.

If you have any questions or would like to discuss this further, please contact me.

Sincerely,

George E. Leonhardt,
President/CEO

cc:    Dan Mulholland, Esquire
       Alan Steinberg, Esquire
       Edward Kabala, Esquire

HOSP 0004367

**25**

01/13/2003 18:55 FAX                                                        ☑001

# HORTY, SPRINGER & MATTERN

A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
4614 FIFTH AVENUE, PITTSBURGH, PA 15213
TELEPHONE: (412) 687-7677
Facsimile: (412) 687-7692
www.hortyspringer.com

JOHN HORTY
LINDA HADDAD
BARBARA A. BLACKMOND
DANIEL M. MULHOLLAND III
CHARLOTTE S. JEFFERIES
HENRY M. CASALE
PAUL A. VERARDI
ALAN J. STEINBERG
SUSAN M. LAPENTA
LAUREN M. MASSUCCI
NICHOLAS J. CALABRESE
LEEANNE MITCHELL O'BRIEN
MONICA J. HANELOVAN
RACHEL E. REMALEY
PHILIP W. ZARONE

ERIC W. SPRINGER (OF COUNSEL)

CLARA L. MATTERN (1951-1981)

## FACSIMILE COVER PAGE

### IMPORTANT NOTICE

*This message is intended only for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential and exempt from disclosure under law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, and return the original message to us at the above address via the United States Postal Service. Thank you.*

TO:          Ed Kabala, Esquire

NAME OF HOSPITAL/FIRM:  Fox Rothschild

FROM:        Alan Steinberg

DATE:        January 13, 2003

TIME:        6:00 p.m.

NUMBER OF PAGES (Including this Page):

                                    SENT BY: Alan

NOTES:  Bradford Regional Medical Center

Ed:

To give you some information as to the legality of the under arrangements model, Dan asked that I send you the letters he has previously sent to George Leonhardt. Also attached is a letter we prepared to be sent to the physicians which briefly discusses the venture. (Sharing these letters with you is in no way a waiver of the confidentiality rights and protections we have with Bradford.)

If you think it would be helpful for you to see the slides used by the consultant on this project, Stroudwater Associates out of Portland, ME, I can get them to you. (These are the slides used at the meeting with interested medical staff physicians.) Just let me know.

IF THERE ARE ANY PROBLEMS WITH THIS TRANSMISSION
PLEASE CALL 412-687-7677

DEPOSITION EXHIBIT
Saleh
8-9-07  14  jah

Confidential
V&S 01381

☑002

 **HORTYSPRINGER**                    THE FIRST HEALTH LAW FIRM

*HORTY, SPRINGER & MATTERN, P.C.*
*4614 FIFTH AVENUE PITTSBURGH, PENNSYLVANIA 15213*
*(800) 245-1205 ❖ FAX (412) 687-7692*
*WWW.HORTYSPRINGER.COM*

**VIA FACSIMILE**

June 12, 2002

George Leonhardt
President
Bradford Regional Medical Center
116 Interstate Parkway
Bradford, PA 16701-0218

                                    Re:    Diagnostic    Services Provided "Under
                                           Arrangement"

Dear George:

This letter will briefly outline a concept whereby diagnostic services could be purchased by the
Medical Center "under arrangement" with an entity owned by physicians who are in a position
to refer patients to the Medical Center for those services.  Properly structured, it could be
possible for the Medical Center to pay the physician entity for diagnostic tests on a per use basis,
without violating the so-called "Stark Law" which places restrictions on physician ownership
of certain diagnostic services.

The Stark Law, at 42 U.S.C.§1395nn, generally provides that a physician cannot (1) refer
patients to an entity (2) for the furnishing of "designated health services" ("DHS") specified in
the law and regulations thereunder (3) if there is a financial relationship between the physician
(of an immediate family member) and the entity (4) unless the financial relationship fits within
a specific exception in the Stark Law or regulations.  While there are no direct penalties for
violating this law, entities are prohibited from billing Medicare or Medicaid for any services
furnished under a prohibited referral.

Regulations implementing the Stark Law promulgated on January 4, 2001 exclude from the
definition of prohibited ownership and investment interests "an 'under arrangements' contract

**Confidential**
**V&S 01382**

George Leonhart
June 12, 2002
Page 2

between a hospital and an entity owned by one or more physicians (or a group of physicians) providing DHS 'under arrangements' to the hospital."

According to Section 2118 of the Medicare Provider Reimbursement Manual, the term "under arrangements" refers to a manner of furnishing services by a provider in which payment to the provider for the services with respect to which the individual is entitled to have payment made by the program discharges the individual's liability to pay for the services. Providers may furnish services under arrangements with outside suppliers, including other providers. The amount charged by the supplying organization and paid by the provider for the services rendered then becomes a cost to the provider. This amount is includable in the provider's allowable cost for Medicare purposes to the extent that the costs of such purchased services are determined to be reasonable. The reasonableness of the amount is determined by the going rate charged to others for such services within the general community. The services are treated as though they were furnished directly to the provider.

In the context that we discussed this morning, an entity owned by physicians on the medical staff would own or lease the space, equipment and personnel needed to provide the diagnostic tests in question. The Medical Center would enter into a contract with the physician entity to pay an agreed-upon fair market price each time that a diagnostic test was furnished to patients of the Medical Center. The Medical Center would then bill the patient or third party payors for those services. It may well be, depending on the service in question, that the amount of payment per service could be greater than the amount that the physician-owned entity would receive from certain payors such as Medicare if it provided this service directly as an Independent Diagnostic Testing Facility.

This is only a rough outline of how this "under arrangements" concept could work. Further analysis will be required to make sure that the physicians' ownership interests would not present problems under the Medicare anti-kickback law, and whether the Medical Center could own a piece of the entity providing services to it under arrangements. I just wanted to get this to you for your meetings today. If you have any questions, please call.

Sincerely,


Daniel M. Mulholland III

DMM/
116836.01

HORTY, SPRINGER & MATTERN, P.C.

Confidential
V&S 01383



**THE FIRST HEALTH LAW FIRM**

HORTY, SPRINGER & MATTERN, P.C.
4614 FIFTH AVENUE PITTSBURGH, PENNSYLVANIA 15213
(800) 245-1205 ✢ FAX (412) 687-7692
WWW.HORTYSPRINGER.COM

**VIA FACSIMILE**

October 29, 2002

George Leonhardt
President
Bradford Regional Medical Center
116 Interstate Parkway
Bradford, PA 16701-0218

> Re: Diagnostic     Services Provided "Under Arrangement"

Dear George:

As a follow-up to our meeting last Thursday, this letter will briefly outline how diagnostic services could be purchased by the Medical Center "under arrangement" with an entity owned by physicians on the medical staff. Properly structured, it could be possible for the Medical Center to pay the physician entity for diagnostic tests on a per use basis, without violating the so-called "Stark Law" which places restrictions on physician ownership of certain diagnostic services.

The Stark Law, at 42 U.S.C.§1395nn, generally provides that a physician cannot (1) refer patients to an entity (2) for the furnishing of "designated health services" ("DHS") specified in the law and regulations thereunder (3) if there is a financial relationship between the physician (of an immediate family member) and the entity (4) unless the financial relationship fits within a specific exception in the Stark Law or regulations. While there are no direct penalties for violating this law, entities are prohibited from billing Medicare or Medicaid for any services furnished under a prohibited referral.

Regulations implementing the Stark Law promulgated on January 4, 2001 exclude from the definition of prohibited ownership and investment interests "an 'under arrangements' contract

**Confidential
V&S 01384**

01/13/2003 18:56 FAX                                                    ☑005

George Leonhart
October 29, 2002
Page 2

between a hospital and an entity owned by one or more physicians (or a group of physicians) providing DHS 'under arrangements' to the hospital."

According to Section 2118 of the Medicare Provider Reimbursement Manual, the term "under arrangements" refers to a manner of furnishing services by a provider in which payment to the provider for the services with respect to which the individual is entitled to have payment made by the program discharges the individual's liability to pay for the services. Providers may furnish services under arrangements with outside suppliers, including other providers. The amount charged by the supplying organization and paid by the provider for the services rendered then becomes a cost to the provider. The services are treated as though they were furnished directly to the provider.

In the context that we discussed, an entity owned by physicians on the medical staff would lease from the Medical Center the space, equipment and personnel needed to provide the diagnostic tests in question. The Medical Center would enter into a contract with the physician entity to pay an agreed-upon fair market price each time that a diagnostic test was furnished to patients of the Medical Center. The Medical Center would then bill the patient or third party payors for those services.

This is only a rough outline of how this "under arrangements" concept could work. If you have any questions, please call.

Sincerely,


Daniel M. Mulholland III

DMM/
122595.01

Confidential
V&S 01385

Re:   Potential Diagnostic Center

Dear Doctor:

The purpose of this letter to outline a possible opportunity for Bradford Regional Medical Center to enter into a relationship with an entity owned by physicians to provide diagnostic services to the community and also ascertain your willingness to explore this option further.  It may be possible to structure a relationship whereby diagnostic services could be provided by the hospital "under arrangement" with an entity owned by physicians.  It is our understanding that, if properly structured, it could be possible for the hospital to pay the physician entity for diagnostic tests on a per use basis, without violating the so-called "Stark Law" which places restrictions on physician ownership of certain diagnostic services outside of their offices, thus serving as an impediment to traditional hospital-physician joint ventures.

Regulations implementing the Stark Law passed last year exclude from the definition of prohibited ownership and investment interests contracts between hospitals and entities owned by one or more physicians (or a group of physicians) providing diagnostic services covered by Stark "under arrangements" to the hospital.  Therefore, an entity owned by physicians on the medical staff (with or without hospital ownership participation) could own or lease the space, equipment and personnel needed to provide diagnostic tests, that is, a diagnostic center.  The hospital would then enter into a contract with the diagnostic center to pay an agreed-upon fair market price each time a diagnostic test was furnished to patients of the hospital.  The hospital -- not the diagnostic center--would bill the patient or third party payors for those services.  It may well be, depending on the service in question, that the amount of payment per service could be greater than the amount that the physicians would receive from certain payors such as Medicare if they provided this service in their office, and yet still enable the hospital to make a profit on the procedures as well.  Thus, revenue opportunities could be present for both the hospital and the physicians.

This is only a rough outline of how this arrangement might work.  Further analysis from both a financial and legal perspective will obviously be required.  I just wanted to outline this concept for you to see if you had any interest in pursuing this idea further.  If you have any questions, please call.

Sincerely,

George Leonhardt
President

119118 01

Confidential
V&S 01386

**26**

LAW OFFICES

## MILLER, ALFANO & RASPANTI, P.C.
SUITE 3402
1818 MARKET STREET
PHILADELPHIA, PENNSYLVANIA 19103
(215) 972-6400

AFFILIATED
NEW JERSEY OFFICE
25 CHESTNUT STREET, SUITE 105
HADDONFIELD, NEW JERSEY 08033
(856) 354-0955

PENNSYLVANIA FAX: (215) 981-0082
NEW JERSEY FAX: (856) 354-0918

REPLY TO:
Pennsylvania

January 17, 2003

Alan J. Steinberg, Esquire
Horty, Springer & Mattern, P.C.
4614 Fifth Avenue
Pittsburgh, PA 15213

Re:    V&S Medical Associates

Dear Mr. Steinberg:

Enclosed please find a letter dated January 10, 2003 from George E. Leonhardt of the Bradford Regional Medical Center ("Medical Center") to Drs. Kamran Saleh and Peter Vaccaro (the "doctors") of V&S Medical Associates ("V&S Medical"). In the letter, the Medical Center directly threatens to revoke the medical staff privileges of Drs. Saleh and Vaccaro based upon their refusal to be coerced into a poor medical, and even worse business, decision.

This renewed threat to revoke the doctors' privileges arises from the Medical Center's preliminary determination that the doctors are in violation of the Medical Center's Policy on Physicians With Competing Financial Interests ("the Policy") and its Procedures For Assessing Whether Practitioners Have Significant Competing Relationships ("Procedures"). The Medical Center reached this determination after the doctors installed a nuclear camera in their office in the summer of 2001.

It is our understanding that the Medical Center and the doctors had been engaging in good faith discussions regarding ways to amicably resolve the conflict over the nuclear camera. It was the hope that these discussions would lead to a solution that was agreeable to both the Medical Center and the doctors and, perhaps most importantly, put the needs of the community first. Once Drs. Saleh and Vaccaro agreed to enter into discussions with the Medical Center about an "under arrangement" proposal concerning the nuclear camera service ("nuclear camera venture"), the Medical Center agreed to delay actions under its exclusive credentialing policy. Apparently, however, when the Medical Center presented its



DEPOSITION
EXHIBIT
Saleh
2901 15 jan

Confidential
V&S 00560

MILLER, ALFANO & RASPANTI, P.C.

Alan J. Steinberg, Esquire
January 17, 2003
Page 2

unrealistic ideas about how the doctors were to finance the
venture, the discussions broke down.

As we understand it, the "under arrangement" proposal dated
November 18, 2002 by the Medical Center would create a new
corporation which would be owned jointly by the Medical Center and
its 25 doctors, including Drs. Vaccaro and Saleh. The proposal
essentially requires Drs. Vaccaro and Saleh to donate both a
nuclear camera and their nuclear camera practice, in which they
have a significant capital investment, to the nuclear camera
venture.[1] In return, Drs. Vaccaro and Saleh would each receive
1/25th of the profit of the nuclear camera venture, along with the
other 23 doctors -- who would contribute neither capital nor
equipment.

Given these terms, it is not surprising that Drs. Vaccaro and
Saleh preliminarily rejected the Medical Center's proposal on
January 10, 2003,[2] correctly pointing out that the capitalization
was wholly inequitable. What is surprising, however, is the
Medical Center's immediate threat to once again revoke the doctors'
privileges pursuant to its Policy and Procedures. The Medical
Center's conduct is shocking, disappointing and, quite frankly,
economic blackmail. The Medical Center's transparent attempt to
coerce the doctors to donate the nuclear camera and its associated
practice to the Medical Center is the poster child for exclusive
credentialing run amok.[3]

---

[1]    The "under arrangement" proposal assumes that the cost
for establishing the nuclear camera venture would be $50,000. This
assumption tellingly reveals the Medical Center's expectations that
it can obtain the V&S Medical nuclear camera and practice for
little or no cost. This unrealistic and inequitable expectation
can only be based on the Medical Center's belief that it can coerce
V&S Medical into joining the nuclear camera venture by threatening
the revocation of Drs. Saleh's and Vaccaro's privileges.

[2]    At none of the meetings discussing this "venture" were
the doctors represented by counsel.

[3]    The Office of the Inspector General ("OIG") currently is
accepting comments in preparation for its promulgation of federal
regulations concerning the legality of this type of economic
credentialing. We fully expect these OIG regulations to find
conduct similar to the Medical Center's illegal.

Confidential
V&S 00564

MILLER, ALFANO & RASPANTI, P.C.

Alan J. Steinberg, Esquire
January 17, 2003
Page 3

Despite this history, Drs. Vaccaro and Saleh still believe
that it is in the best interest of all of the parties and the
community to continue rational and reasoned discussions about a
nuclear camera venture. We believe that the Medical Center, despite
its veiled threats, believes the same.  While the doctors are not
interested in selling their equipment or practice at a substantial
loss, they believe that an equitable solution may be negotiated.
Thus, in the spirit of cooperation, we ask that the Medical Center
set reasonable time frames for our client to adequately consider
the information provided to us as recently as January 14, 2003.
There is no way that this can be done prior to the Medical Center's
meeting on January 22, 2003.  We suggest that the Medical Center
postpone any scheduled discussion of whether Drs. Saleh and Vaccaro
are in violation of its Policy and Procedures until the doctors
have been afforded a fair opportunity to review the Medical
Center's proposal.  This is a fair request and we trust that the
Medical Center will not find it objectionable.

So that a proper evaluation of the Medical Center's proposal
may be made, we request that Drs. Vaccaro and Saleh be provided
with the following information:

1.    All opinions concerning the legality[4] of the nuclear
      camera venture contemplated between the Medical Center,
      Drs. Saleh and Vaccaro, and the other 23 physicians
      currently employed by the Medical Center; and

2.    A business plan specific to the nuclear camera venture,
      including all financial analyses conducted in support of
      this business plan.

We believe that, at a minimum, this information is necessary
if the proposal is to be given proper consideration.

Please contact us immediately to confirm that you will be
removing the review of Drs. Vaccaro's and Saleh's admitting
privileges from the Board's January 22, 2003 meeting so that we may
have time to continue negotiations.  Our clients firmly believe
that a nuclear camera venture is still possible so long as both
sides agree to pursue an equitable outcome for all parties.

---

[4]    I am sure that we can all agree that neither party wishes
to become involved in a business venture which is in violation of
federal or state law.

Confidential

MILLER, ALFANO & RASPANTI, P.C.

Alan J. Steinberg, Esquire
January 17, 2003
Page 4

If you have any questions, or would like to discuss this further, please do not hesitate to contact either myself or Mr. Kabala.

Very truly yours,

MARC S. RASPANTI

MSR/gh
F:\PBL\JMH\V&S Medical\gh000053.ltr.wpd

cc:  Edward J. Kabala, Esquire
     Dr. Peter Vaccaro
     Dr. Kamran Saleh

Confidential
V&S 00563

27

# ᴦOX • ROTHSCHILD
## O'BRIEN & FRANKEL ᴸᴸᴾ
### ATTORNEYS AT LAW

625 Liberty Avenue • 29th Floor • Pittsburgh, PA 15222-3115
412-391-1334 • Fax 312-391-6984 • www.frof.com

Edward J. Kabala
Direct Dial. (412) 394-5599
Internet Address ekabala@frof.com

February 5, 2003

**VIA FACSIMILE: 412-687-7692**
**AND FIRST CLASS MAIL**

Alan Jay Steinberg, Esquire
Horty, Springer & Mattern, P.C.
4614 Fifth Avenue
Pittsburgh, PA 15213-3663

> Re:   Drs. Vaccaro and Saleh
>       Bradford Regional Medical Center
>       Our File No. 63129-00001

Dear Alan:

I am writing as a follow-up to our meeting on January 31st.

At your request and under the Confidentiality Agreement, we have provided you with the annual volume for the nuclear camera, a copy of the lease, the up-to-date calculation of the buy-out of the equipment and our calculations of the overhead to which should be added the medicines cost.

You therefore know, at this stage, the income of the Practice at this stage and that there is (at a minimum) $250,000 in costs to abandon the project. The actual number is $244,000 plus 6% sales tax just for the lease. Added to that, as Mark Voyvodich and his staff will undoubtedly see, is the termination cost for any technicians.

As we understand the proposal, the "under arrangements" model is such that the hospital can essentially provide certain equipment and staff, at least those to a physician owned operation which will provide medical services, initially, only in the field of nuclear medicine, and then the hospital will buy the data back from the physicians.

You have provided us with some estimates of profitability which, based on our discussions and the fact that both the hospital and the V&S Practice volumes, together, are fully 50% to 60% higher than the estimates and are undoubtedly conservative. Your volumes are now ten percent (10%) above the hospital levels at the time the V&S camera started while the V&S volume is higher than Mark Voyvodich's figures.

As you know, Drs. Vaccaro and Saleh have significant issues which need to be resolved

*formerly Kabala & Geeseman*

PENNSYLVANIA • NEW JERSEY • DELAWARE

PT1 88683v1 02/06/03

---

**DEPOSITION EXHIBIT**

Saleh

89-07 16 jan

**Confidential**
**V&S 01639**

Alan Jay Steinberg, Esquire
February 5, 2003
Page 3

example, would immediately want to contract with their own organization, and NUCO is
most likely going to be requiring that radiologists, like cardiologists, make the pricing
structure attractive.

Mr. Leonhardt talked about NUCO essentially establishing its own Board and its own
entry requirements as well as its own operational rules and regulations. While we believe
that to be very attractive, there has to be some requirements that the hospital will want to
impose and, given the arbitrary time frame, we need that information sooner rather than
later.

We also talked about the capacity of the hospital's equipment given the increased
volumes and its reliability as they seem to be inoperable a little more than anyone would
like (I understand that both hospital cameras have been inoperable for a week). The other
area of concern was the scheduling in that Mr. Leonhardt was concerned that if each
physician wanted to read all of their stress tests, well then, the 8:00 to 9:30 a.m. range in
the morning, because of convenience and their own practices, it would leave the
equipment non-functioning or at least under-functioning for the rest of the day.

We understand that and there are a couple of alternatives along those line, especially
since it was quite clear that pooled supervision by primary care physicians might not be
acceptable to the various physicians. One option discussed was the employment of the
cardiologist (that we know the hospital would like to recruit) to do that function and
NUCO could do so. Another option would be, based on the possible option of leaving
the equipment in its current location, having some physicians able to use the hospital's
equipment and some physicians able to use the current V&S equipment, although,
obviously, all would be under the NUCO banner at that stage.

Certainly the hospital will need to commit to this process for some extended period of
time and will need also to commit not to compete with NUCO once it fosters its
operations.

We would also want to know when, or if, the hospital contemplates the addition of MRI
and CT as a NUCO function rather than an outside the hospital or other department
function.

Those issues are ones that we will all need to deal with and Drs. Vaccaro, Saleh and I
discussed some of them.

With respect to which physicians would participate, we would suggest that, as you
acknowledged, the physicians would have to be staff members of BRMC. We would
suggest that ineligible candidates would include emergency physicians, anesthesiology,

FOX · ROTHSCHILD
O'BRIEN & FRANKEL,,,

PT1 88683v1 02/06/03

Confidential
V&S 01641

Alan Jay Steinberg, Esquire
February 5, 2003
Page 4

radiology, and any hospital employed physicians, at least until such time as they are in
private practice. We would further believe that any physician that does not have
admitting privileges to BRMC would not be eligible.

Since we believe that NUCO or the hospital, or both of them, will need to take over the
lease payments and address the costs of Drs. Vaccaro and Saleh giving up the business,
we would expect that Drs. Vaccaro and Saleh would be made whole on the rent and other
matters for some period of time.

Mr. Mulholland, yourself and I will also need to wrestle with the fact that you are asking
Drs. Vaccaro an Saleh to give up a functioning and very profitable business to join what
purports to be a legal arrangement. While the "under arrangements" process may be
entirely legal, we would want to be sure that we will get an unconditional opinion or an
advisory opinion from the Office of the Inspector General, to the effect that the final
arrangement and the process that led to it would not be deemed inappropriate.

Given the value of the current business, we would suggest that the hospital consider, as
we mentioned at the meeting, and respond to the fact that Drs. Vaccaro and Saleh would
be given substantial capital credit as part of their entry and that they be given an
opportunity to acquire more units than might otherwise be acquired on a one physician,
one unit basis.

While this letter may be redundant, in view of the dearth of time prior to the BRMC
Board of Directors arbitrary deadline, we felt it appropriate to reiterate the concerns and
give some initial thoughts on how the BRMC "under arrangements" proposal could be
structured in such a way that Drs. Vaccaro and Saleh would be able to evaluate the same
and appropriately decide on a course of action.

I would also ask that the hospital address the other question of ownership, i.e., the
ownership being the physician entities such as V&S (What would the proposal
contemplate what would happen to those units, since there would be significant capital
infusion upon death, disability or retirement by a physician? What also would happen of
the physician went to a part-time status when in fact they are currently full-time?)

As to the future schedule, I will look forward to hearing from you as soon as you have
had a chance to talk to Mr. Mulholland and once again urge you to be mindful that the
best day for the Doctors, since they essentially need to close their practice, would be
Fridays. We also proposed some Saturdays (including this Saturday) but have not heard
from you.

FOX · ROTHSCHILD
O'BRIEN & FRANKEL LLP

PTI 88683v1 02/06/03

**Confidential
V&S 01642**

Alan Jay Steinberg, Esquire
February 5, 2003
Page 5

Once again, we look forward to hearing from you.

Very truly yours,

Edward J. Kabala

EJK:mm

FOX · ROTHSCHILD
O'BRIEN & FRANKEL LLP

Confidential
V&S 01643

Alan Jay Steinberg, Esquire
February 5, 2003
Page 6

bcc:    Dr. Peter Vaccaro
        Dr. Kamran Saleh
        Jodeen M. Hobbs, Esquire
        Marc S. Raspanti, Esquire

PTI 88683v1 02/06/03

FOX • ROTHSCHILD
O'BRIEN & FRANKEL...

Confidential
V&S 01644

**28**

# HORTY, SPRINGER & MATTERN
## ATTORNEYS AT LAW
### A PROFESSIONAL CORPORATION

JOHN HORTY
LINDA HADDAD
BARBARA A. BLACKMOND
DANIEL M. MULHOLLAND III
CHARLOTTE S. JEFFERIES
HENRY M. CASALE
PAUL A. VERARDI
ALAN J. STEINBERG
SUSAN M. LAPENTA
LAUREN M. MASSUCCI
NICHOLAS J. CALABRESE
LEEANNE MITCHELL O'BRIEN
MONICA J. HANSLOVAN
RACHEL E. REMALEY
PHILIP W. ZARONE

4614 Fifth Avenue, Pittsburgh, PA 15213
Telephone: (412) 687-7677
Facsimile: (412) 687-7692
www.hortyspringer.com

ERIC W. SPRINGER (OF COUNSEL)
CLARA L. MATTERN (1931-1981)

## CONFIDENTIAL

**VIA FACSIMILE
AND U.S. MAIL**

March 14, 2003

Jodeen M. Hobbs, Esquire
Miller, Alfano & Raspanti, P.C.
Suite 3402
1818 Market Street
Philadelphia, PA 19103

CONFIDENTIAL

> Re:    Bradford Regional Medical Center/
>        Drs. Vaccaro and Saleh

Dear Jodie:

With Ed Kabala on vacation, he asked that we work with you in his absence. As you know, the parties have been negotiating a possible resolution to this matter. By a letter dated March 12, 2003, I sent to Ed the Medical Center's counteroffer of the key points by which the Medical Center would propose to sublease from V&S Medical Associates the equipment under its Lease with GE Healthcare Financial Services. To make sure you have a copy of that letter, I thought it best to fax it to you today. I am also including a copy of my March 11, 2003 letter to Ed, which summarizes the offer from V&S Medical Associates as we understood it.

From my last conversation with Ed before he went on vacation, it sounds as though there has been a miscommunication or misunderstanding between the parties as to the original key points offered for this subleasing. We think it is best to simply pick up with those key points as they


DEPOSITION
EXHIBIT
15

HOSP 0004290

Jodeen M. Hobbs, Esquire
March 14, 2003
Page 2



are now described in our March 12 counteroffer. We believe they are fair and provide a good
faith offer, particularly considering the following points:

* At the request of Drs. Vaccaro and Saleh, the Medical Center agreed not to have their
  ultrasound procedures be a part of these resolution discussions. Because of the Medical
  Center's agreement to that request, the revenues from those procedures will stay entirely
  with V&S Medical Associates.

* From information provided by Drs. Vaccaro and Saleh, we understand that their total
  profit from their nuclear camera services is approximately $240,000 annually. By the
  Medical Center's subleasing proposal, annual rental payments made would total
  $312,000, with a final profit to V&S Medical Associates of $229,000 annually.

  Most importantly, that is a revenue stream free of all risks. It is not dependent upon the
  actual volume of services V&S Medical Associates is able to provide in connection with
  the camera. There will be no employment costs (including benefits) from a technician
  supporting the services, etc. The subleasing payments will be a known and constant
  monthly amount. We do believe this combination makes for a generous, good faith offer.

* Both parties have worked hard to see if this matter can be resolved. I believe that has
  been in the spirit of not only seeing if this dispute can be settled, but, as importantly,
  whether the parties can work together on an Under Arrangements model venture that can
  do much good not only for the parties involved, but also for the greater Medical Center
  community and the City of Bradford and its community.

  Subleasing the GE Lease through the remainder of its term fits in that approach. There
  is still more than three years left on that Lease term. It is rare for hospitals in this day and
  fiscal climate to contract for even a three year period on any equipment, product or
  service.

  Having the sublease expire and fold into an Under Arrangements venture that would
  involve nuclear, CT, and MRI services also fits in that approach. (This, of course, is
  based upon a good faith effort by both parties to make the Under Arrangements model
  work. If it does not, the sublease would stay on its own terms.)

  That is the approach we feel is the best way not only to resolve this particular concern,
  but also to accomplish all the outcomes both parties have discussed and seek.

HORTY, SPRINGER & MATTERN, P.C.

HOSP 0004291

Jodeen M. Hobbs, Esquire
March 14, 2003
Page 3


CONFIDENTIAL

With the Board of Directors' meeting on March 26, we informed Ed and your clients that time does not allow this matter to sit while he is on vacation. Thank you for being available to move this forward in Ed's absence. We do need to hear back from you directly in order to work within our limited time frame. I also need to speak with you about a final, related point. The Under Arrangements model last proposed by the Medical Center had V&S Medical Associates being a 40% owner of Physician NewCo, based on the four physicians associated with V&S Medical Associates. I would like to discuss how the concept of those four involved physicians applies to the counteroffer made by the Medical Center. Thank you.

Very truly yours,

Alan J. Steinberg

AJS/avs

Enclosures

cc:    George Leonhardt
       Edward Kabala, Esquire

126089.01

HORTY, SPRINGER & MATTERN, P.C.

HOSP 0004292

**29**

1818 Market Street          25 C       nut Street        www.mar-law.com
Suite 3402                  Suite   J
Philadelphia, PA 19103      Haddonfield, NJ 08033        REPLY TO:
215.972 6400 TEL            856 354.0955 TEL             Pennsylvania
215 981.0082 FAX            856 354.0918 FAX


**MA&R**

**MILLER ALFANO & RASPANTI P.C.**

**FOR DISCUSSION PURPOSES ONLY**

March 20, 2003

**BY FAX and FIRST CLASS MAIL**

Alan J. Steinberg, Esquire
Horty, Springer & Mattern, P.C.
4614 Fifth Avenue
Pittsburgh, PA 15213

        Re:  **V&S Medical Associates**

Dear Mr. Steinberg:

        Thank you for your March 14, 2003 letter and your update
during our conversation of March 18, 2003. As you know, Mr. Kabala
has been your primary contact in the discussions regarding the V&S
Medical Associates' nuclear camera. In his absence, I am happy to
provide you with some preliminary reactions to the Medical Center's
counterproposal. Given that I have not been a party to any of the
meetings, however, I renew my request for your patience in awaiting
his return for final resolution of these matters. Given the spirit
of cooperation that I am pleased to see now exists between the
parties, I am hopeful that this will not be a problem.

        It is my understanding that on Saturday, March 8, 2003,
Drs. Vaccaro and Saleh and Mr. Kabala met with you, Mr. Mulholland
and Mr. Leonhardt for over three hours. The discussions focused
primarily on the details of a proposed lease agreement between the
Medical Center and V&S Medical for the nuclear camera. This was
after the lease concept had been rejected by the hospital. It is
my further understanding that the deal as initially posed by my
clients was a 5 year/$2,000 per day lease in which the nuclear
camera would be moved from the V&S offices to the Medical Center.
By the end of the meeting, the doctors agreed to a 5 year/$1,500
per day lease. Thus, the Medical Center's current proposal of a 3
year/$1,200 per day lease is for a substantially shorter period of
time and for an amount significantly lower than the initial
proposal.

DEPOSITION
EXHIBIT
Saleh
8901  21  jan

**Confidential**

Alan J. Steinberg, Esquire                          Page 2

**MA&R**
MILLER ALFANO & RASPANTI P.C.

In arriving at the lease proposal, please consider what the doctors have agreed to forego. First is convenience. The doctors currently can order a test, have it performed and obtain accurate, thorough results within six to eight hours. As you may know, one of the reasons the doctors pursued installing the nuclear camera was a concern about the time delays and accuracy of the Medical Center nuclear reports. While the doctors fully expect that those problems will be resolved, there is no doubt that having tests performed on-site is more convenient for both the doctors and the patients.

Second, the doctors are losing the significant up-front costs that were involved with installing the nuclear camera. The doctors secured additional space and paid for the renovations necessary for the camera.

Third, the doctors have also agreed, at least in principle, to provide the hospital with the right of first refusal for future ventures such as CT, MRI or other diagnostic imaging services. While the doctors believe that it is in both the Medical Center's and their best interest to work cooperatively on any such venture, there is little doubt that the financial benefit will inure to the hospital.

Fourth, please consider that the numbers as discussed at the March 8th meeting only contemplated the use of the camera five (5) days per week. Given that the nuclear camera would be moved to the hospital, there is no reason that it could not be utilized seven (7) days a week. Thus, the hospital is basing its payments on a five (5) day per week model, when it is very probable that services would be provided over seven (7) days. These extra days of usage have not heretofore been factored into the negotiations.

Finally, during the term of the sublease, the doctors will agree not to compete the services provided in connection with the subleased equipment or invest in any entity that chooses to do so. Thus, a five year sublease benefits both parties. I know that it is your position that a five year lease is out of the ordinary for hospitals. I believe, however, the circumstances surrounding this arrangement fit squarely into the out of the ordinary category.

**Confidential**

Alan J. Steinberg, Esquire                              Page 3



For these reasons, we believe that the offer as initially
negotiated is reasonable and fair. It was certainly made in good
faith and in the spirit of cooperation.

The lease arrangement appears to be the optimal solution for
both sides. If, however, it is not possible to agree to terms, the
doctors still are interested in pursuing the under arrangements
model. To that end, our accountants have requested additional
information for their analysis. I will provide their request under
separate cover.

In your letter, you also raised the issue of how the lease
arrangement impacts the position of the four physicians associated
with V&S Medical with respect to the Physician New Co. The lease
would not affect the status of those discussions. The doctors
still anticipate taking the lead in developing and maintaining the
primary role in the Physician New Co. We will need to address the
issues that were raised by both parties before the discussions were
tabled in favor of the lease arrangement.

As I mentioned, we ask that the Medical Center discontinue the
practice of raising the V&S ultrasound procedures as if they are
relevant to the present discussions. It is disconcerting to the
doctors and not applicable as (1) several other physician offices
either perform or plan to perform ultrasound procedures and have
not been subject to Board scrutiny; and (2) in the procedures for
assessing competing financial relationships, the Board expressly
acknowledges that as of May 23, 2001 (well after the ultrasound was
installed at V&S Medical) no services were being offered by any
member of the Medical Staff that were perceived to be competing
financial relationships. It is my understanding that this
statement was included to make it clear that physician-based
ultrasound procedures were excluded.

Thank you for your diligence. I am happy to see that this
matter is being resolved in a noncontentious process. I firmly
believe that both our clients benefit from an amicable solution and
that we are close to reaching one. While I understand the Board's
desire to finally resolve this matter, I hope that they will view

**Confidential**

Alan J. Steinberg, Esquire                                Page 4



the progress in March as substantial and refrain from taking any
action until after Mr. Kabala has returned from his scheduled
vacation.

                              Very truly yours,

                              JODEEN M. HOBBS

JMH/gh
F \PBL\JMH\V&S Medical\gh000054.ltr.wpd

**Confidential**

**30**



# Nuclear Cardiology Referrals
## Total V & S

Referrals

Payers

- Self — 1010, 164
- BC Indemni — 50
- Commercial — 42, 12
- WC — 2, 2
- CHAMPUS — 2, 2
- Liability — 2, 2
- PAMA — 24 18
- Medicare — 456, 22
- BC Manage — 108 02
- Comm. Man — 16 8

Legend: ■ Jan - June  ■ July - DecB

CONFIDENTIAL

DEPOSITION
EXHIBIT
16
7-26-07   Jan

HOSP 0004388



Nuclear Cardiology Referrals

Dr. Jamil

■ Jan - June
▨ July - Dec

Referrals

Payers

Self: 2, 2
BC Indem: 52, 34
Comm: 14, 6
WC: 2, 0
CHAMPUS: 2, 0
Liability: 0, 0
PAMA: 0, 4
Medicare: 166, 14
BC Manage: 50, 48
Comm. Man: 8, 4

CONFIDENTIAL

HOSP 0004389





**Nuclear Cardiology Referrals**
**Dr. Vaccaro**

Referrals

CONFIDENTIAL

Payers

Legend: ■ Jan - June   ▨ July - Dec

Self: 4, 8
BC Indemn: 8, 56
Commerci: 4, 20
WC: 0, 2
CHAMPUS: 0, 2
Liability: 0, 2
PAMA: 12, 10
Medicare: 66, 185
BC Manag: 43, 38
Comm. Ma: 0, 4

**31**

**BRMC Non-Compete Analysis**
Summary

Exhibit B

| | Year Standstill (8/2002) | Sublease starts (8/2003) | | | | |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | TOTAL |
| **Estimated Net Revenue Stream Losses Avoided:** | | | | | | |
| #1 | $634,078 | $422,719 | $317,039 | $211,359 | $105,680 | $1,690,875 |
| #2 | $1,450,000 | $870,000 | $580,000 | $290,000 | $0 | $3,190,000 |
| #3 | $466,480 | $311,592 | $218,296 | $114,432 | $0 | $1,110,801 |
| **Total Revenue** | $2,550,559 | $1,604,311 | $1,115,335 | $615,791 | $105,680 | $5,991,676 |
| | | | | | | |
| **Estimated Expenses Avoided:** | | | | | | |
| #4 | $0 | $150,000 | $0 | $0 | $0 | $150,000 |
| #5 | $0 | $0 | $133,333 | $66,667 | 0 | $200,000 |
| **Total Expenses** | $0 | $150,000 | $133,333 | $66,667 | $0 | $350,000 |
| | | | | | | |
| **TOTAL** | $2,550,559 | $1,754,311 | $1,248,669 | $682,458 | $105,680 | $6,341,676 |

Assumptions:

#1 Revenue stream loss is the estimate of BRMC Board and Management of CT and MRI net revenue expected to be lost without the approval of the sublease.

| Modality | # of tests | Net Revenue |
|---|---|---|
| CT (2002): | 3,833 | $1,082,895 |
| MRI (2002): | 1,823 | $1,030,699 |
| Total | | $2,113,594 |

| | % lost |
|---|---|
| Year 1 | 30% |
| Year 2 | 20% |
| Year 3 | 15% |
| Year 4 | 10% |
| Year 5 | 5% |

Net revenue is based on BRMC's 2002 payer mix and payer reimbursement per test

#2 Revenue stream loss is the estimate amount of inpatient net revenue of BRMC Board and Management expected to be lost without the approval of the sublease.

2002 net IP revenue generated by Sully & Vacaro[1]     $5,800,000

| | % lost |
|---|---|
| Year 1 | 25% |
| Year 2 | 15% |
| Year 3 | 10% |
| Year 4 | 5% |
| Year 5 | 0% |

#3 Revenue stream loss is the estimate amount of outpatient net revenue of BRMC Board and Management less CT & MRI net revenue (calculated in #1) expected to be lost without the approval of the sublease.

2002 net OP revenue generated by Sully & Vacaro[1]     $2,500,000

| | % lost |
|---|---|
| Year 1 | 25% |
| Year 2 | 15% |
| Year 3 | 10% |
| Year 4 | 5% |
| Year 5 | 0% |

HOSP 0004040



DEPOSITION EXHIBIT
17
1-26-07   Jan

Stroudwater Associates

**BRMC Non-Compete Analysis**
Summary

#4 Physician recruitment and relocation costs
The revenue stream losses calculated above assumed that BRMC will be successful in recruiting and retaining physicians to replace services previously provided by Sully & Vacaro.
Estimated cost (2 physicians)[2]                    $150,000

#5 Working capital investment costs
It is assumed that BRMC will incur ramp-up costs associated with the successful recruitment and retainment of 2 new physicians in BRMC's service area.[2]
Estimated costs of $100,000 per physician over an 18 month period
1st year                    $133,333
2nd year                    $66,667

1) Amount provided by Hospital Administration according to 2002 volumes.
2) Amount estimated by Stroudwater Associates based on recent experience in physician recruiting

HOSP 0004041

Stroudwater Associates

**32**

**BRADFORD REGIONAL MEDICAL CENTER**
**Bradford, Pennsylvania**



### FINANCIAL IMPACT DATA

Calendar Year 2001 Admissions and Estimated Net Revenue

Dr. Jamil

    523 Admissions

    $2,732,817    Estimated Net Revenue

Dr. Vaccaro

    437 Admissions

    $2,249,680    Estimated Net Revenue

Dr. Saleh

    367 Admissions

    $1,292,518    Estimated Net Revenue

Dr. Vaccaro and Dr. Saleh (Combined)

    *804 Admissions (17% of our admissions)

    *$3,542,198    Estimated Net Revenue (17% of inpatient revenue)

*Both admissions and revenue for Drs. Vaccaro and Saleh are down 17% from the prior year.



DEPOSITION
EXHIBIT
18
7-26-07     Jan

HOSP 0004188

**33**



### BRADFORD REGIONAL MEDICAL CENTER
Bradford, Pennsylvania

## BACKGROUND AND TIME-LINE OF CURRENT ISSUE
## WITH DRS. VACCARO AND SALEH

- Following the initiation of the development of a Policy on Credentialing Physicians with Competing Interests, I was told in early April that Drs. Vaccaro and Saleh were planning to add Nuclear Cardiology Services to their office.

- On April 3rd I met with Drs. Vaccaro and Saleh who confirmed for me that they would be installing a nuclear camera and expected to do so by July. I explained that this was a far-reaching decision by them, impacting Hospital revenue significantly but also adversely impacting our ability to develop a Cardiology Service. Discussion went on at some length during which they told me they had ambitions to develop a full cardiology service as part of their practice.

- Throughout April and May we met on five (5) subsequent occasions and reviewed the impact of their decision on the Medical Center, the development of the Board Policy and reviewed any opportunity of a Joint Venture on diagnostic equipment. I explained to them that there was interest in participating in the Joint Venture on the part of Medicor, Radiologic Associates, and various members of the Department of Medicine, but their participation was key. They gave two (2) reasons for rejecting the idea.

   (1)  They did not want participation by other members of the Department of Medicine
   (2)  They were expecting an annual ROI from the nuclear camera of more than 300%. (See attached letters of July 25th and July 30th.)

- During the months of August through November contact with Drs. Vaccaro and Saleh regarding this issue was limited to discussions at the Joint Conference Committee. (See attached correspondence from Dr. McDowell to Dr. Vaccaro [10-9-01] and from Dr. Vaccaro to Dr. McDowell [12-5-01] along with Horty & Springers December 11, 2001 response to the 12-5-01 correspondence.)

- At the December Board of Directors' meeting Dr. Saleh's appointment came before the Board for action. (Dr. Vaccaro's was delayed because of an ongoing QA Review.) Dr. Saleh was re-appointed for two (2) years conditioned upon the outcome of a review by the Board. (See attached December 14, 2001 letter to Dr. Saleh.) A Fact-Finding Committee was appointed and a request for information drafted. (See attached letter of January 2, 2002 to Dr. Saleh.)

- At the January 23rd meeting of the Board of Directors, Dr. Vaccaro's re-appointment came up. The Board took identical action. (See January 28th letters to Dr. Vaccaro.)

- Also attached is the correspondence from Miller, Alfano & Raspanti, P.C. representing Drs. Vaccaro and Saleh, (See letters of January 22, 2002 and February 15, 2002.) along with February 6 and February 20th responses from Horty and Springer.



DEPOSITION
EXHIBIT

7-26-07  19  jon

HOSP 0004042

# BRADFORD REGIONAL MEDICAL CENTER
## Bradford, Pennsylvania

### PRACTICE STATISTICS

**Patient Volume Statistics:**

| | |
|---|---|
| Admissions | 750   (550 Medicare) |
| Outpatient Episodes | 9,000 |
| Home Health Referrals | 75 |

**Revenue Attributed:**

| | |
|---|---|
| Inpatient Revenue | $ 2,700,000 |
| Outpatient Revenue | $   900,000 |
| Home Health Revenue | $   170,000 |

**Historic Net Revenue From Diagnostic Services Now Offered by the Practice:** $   600,000

**Projected Net Revenue From Same Diagnostic Services:** $    95,000

D:\Administration\George\Vaccaro-Saleh Practice Statistics 6-12-02.wpd

HOSP 0004043

CONFIDENTIAL

### saleh

| yr | heart | bone | lung | hida | renal | thy 99 | thy123 | muga | nn stress | neotec | price/yr | price/month |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2002op | 12 | 3 | 3 | 0 | 1 | 1 | 2 | 0 | | 3 | | |
| 2002ip | 8 | 6 | 6 | 5 | 2 | 0 | 2 | 0 | | 0 | | |
| tot | 20 | 9 | 9 | 5 | 3 | 1 | 2 | 0 | | | | |
| price | 2900 | 480 ua | 480 ua | | 969 373+ | 185 | 185 | 285 | 760 ua | | 65970 | 14660 |
| total | 58000 | 4320 | 4320 | | 2907 | 373 | 370 | 285 | 760 | | 175920 proj (projected2002) 175920 | |
| 2001op | 196 | 7 | 7 | 0 | 6 | 1 | 18 | 16 | 1 | 3 | | |
| 2001ip | 23 | 6 | 6 | 5 | 2 | 0 | 11 | 2 | 0 | 1 | | |
| tot | 219 | 17 | 17 | 1 | 8 | 1 | 18 | 1 | 4 | 0 | | |
| price | 2900 | 480 ua | 480 ua | | 969 373+ | 185 | 185 | 285 | 760 ua | 1 | | |
| total | 635100 | 8160 | 8160 | | 7752 | 3330 | 29 | 4560 | 760 | | 660035 | 55002.9 |
| 2000op | 13 | 6 | 6 | 2 | 5 | 4 | 11 | 2 | 0 | | | |
| 2000ip | 109 | 15 | 15 | 1 | 5 | 3 | 18 | 1 | 4 | | | |
| tot | 122 | 21 | 21 | 1 | 7 | 7 | 29 | 3 | 7 | 1 | | |
| price | 2900 | 480 ua | 480 ua | | 969 373+ | 185 | 185 | 285 | 760 ua | | 382534 | 31877.8 |
| total | 353800 | 10080 | 10080 | | 6783 | 2611 | 5365 | 855 | 3040 | | | |

*(handwritten annotations: "2001", "2000")*

### vaccaro

| yr | heart | bone | lung | hida | renal | thy 99 | thy123 | muga | nn stress | neotec | price/yr |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2002op | 7 | 7 | 7 | 1 | 5 | 4 | 40 | | | | 2 |
| 2002ip | 40 | 2 | 2 | 4 | 7 | 4 | 0 | | | | |
| tot | 47 | 9 | 9 | 5 | 12 | 8 | 40 | | | | 2 |
| price | 2900 | 480 ua | 480 ua | | 969 373+ | 185 | 285 | | 760 ua | | 167742 |
| total | 136300 | 4320 | 4320 | | 11628 | 2984 | 11400 | 63 | | | 37276 proj / 447312 prol 2002 |
| 2001op | 29 | 7 | 7 | 0 | 9 | 3 | 3 | 66 | | | 3 |
| 2001ip | 160 | 13 | 13 | 5 | 5 | 1 | 3 | 15 | | | 0 |
| tot | 189 | 20 | 20 | 5 | 14 | 4 | 66 | 22 | | | 3 |
| tot | 174 | 18 | 18 | 18 | 9 | 2 | 15 | 4 | | | 4 |
| tot | 192 | 31 | 31 | 36 | 16 | 2 | 22 | 13 | | | 4 |
| 2000op | 19 | 12 | 12 | 2 | 11 | 0 | 4 | 17 | | | 591564 / 49297 |
| 2000ip | 116 | 17 | 17 | 8 | 22 | 6 | 13 | | | | |
| tot | 135 | 29 | 29 | 10 | 33 | 6 | 17 | 285 | 760 ua | | 444480 |
| price | 2900 | 480 ua | 480 ua | | 969 373+ | 185 | 285 | | | | 37040 |
| total | 391500 | 13920 | 13920 | | 31977 | 2238 | 4845 | | | | |

*(handwritten annotations: "2001", "2000")*

### jamil

| yr | heart | bone | lung | hida | renal | thy 99 | thy123 | muga | nn stress |
|---|---|---|---|---|---|---|---|---|---|
| 2002op | 99 | 8 | 8 | 2 | 3 | 1 | 14 | | 1 |
| 2002ip | 13 | 12 | 12 | 13 | 0 | 0 | 1 | | 0 |
| tot | 112 | 20 | 20 | 15 | 3 | 1 | 15 | | 1 |
| price | 2900 | 480 ua | 480 ua | | 969 373+ | 185 | 285 | 760 | |
| total | 324800 | 9600 | 9600 | 0 | 2907 | 185 | 4275 | | 4 |
| 2001op | 156 | 5 | 5 | | 2 | 0 | 8 | | |

CONFIDENTIAL

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **2001ip** | 18 | 13 | 18 | 7 | 0 | 2 | 7 | | 0 | | |
| **tot** | 174 | 18 | 18 | 9 | 2 | 2 | 15 | | 4 | | |
| **price** | 2900 | 480 ua | | 969 | 373+ | 185 | 285 | | | 525852 | 43821 |
| | 504600 | 8640 | | 8721 | 746 | 370 | 2775 | 760 | | | |
| **2000op** | 15 | 4 | 1 | 1 | 2 | | 2 | | 1 | | |
| **2000ip** | 83 | 31 | 13 | 8 | 0 | | 1 | | 0 | | |
| **tot** | 98 | 35 | 14 | 9 | 2 | 185 | 3 | | 1 | | |
| **price** | 2900 | 480 ua | | 969 | 373+ | | 285 | | | 311322 | 25943 |
| | 284200 | 16800 | | 8721 | 746 | | 855 | 760 | | | |

HOSP 0004045

**BRADFORD REGIONAL MEDICAL CENTER**
V & S Impact Analysis

|  | Year 1 | |
|---|---|---|
|  | Scenario 1 * | Scenario 2 * |
| **Patient Volume Statistics:** | | |
| Total Inpatient Admissions | 757 | 757 |
| Medicare Inpatient Admissions | 551 | 551 |
| Lost Inpatient Admissions | (530) | 0 |
| Outpatients | (9,000) | (9,000) |
| Home Health Referrals | (75) | (75) |
| | | |
| **Patient Revenue:** | | |
| Net Inpatient Revenue | (2,700,000) | 0 |
| Net Outpatient Revenue | (900,000) | (900,000) |
| Home Health Revenue | (170,000) | (170,000) |
| Total Net Patient Revenue Impact | (3,770,000) | (1,070,000) |
| | | |
| **Expense Reductions:** | | |
| Closing of 3 South | 1,050,000 | 1,050,000 |
| Staff Reductions (10 FTEs year 1, 6 FTEs year 3) | 350,000 | 0 |
| Other Direct Costs | 750,000 | 250,000 |
| Total Expense Reductions | 2,150,000 | 1,300,000 |
| | | |
| **BRMS Impact:** | | |
| Additional Physician Office Revenue (existing) | 100,000 | 100,000 |
| Additional Physician Practice Subsidy &Costs | (226,000) | (226,000) |
| Total BRMS Impact | (126,000) | (126,000) |
| | | |
| Overall Impact | (1,746,000) | 104,000 |

CONFIDENTIAL

\* Assumptions Attached
Scenario 1 - V & S take as many patients as they can

Scenario 2 - V & S refer their inpatients to Dr. Jamil.

**BRADFORD REGIONAL MEDICAL CENTER**
V & S Impact Analysis

|  | Year 2 | |
|---|---|---|
|  | Scenario 1 * | Scenario 2 * |
| **Patient Volume Statistics:** | | |
| Total Inpatient Admissions | 757 | 757 |
| Medicare Inpatient Admissions | 551 | 551 |
| Lost Inpatient Admissions | (265) | 0 |
| Outpatients | (4,500) | (4,500) |
| Home Health Referrals | (38) | (38) |
| **Patient Revenue:** | | |
| Net Inpatient Revenue | (1,350,000) | 0 |
| Net Outpatient Revenue | (450,000) | (450,000) |
| Home Health Revenue | (85,000) | (85,000) |
| Total Net Patient Revenue Impact | (1,885,000) | (535,000) |
| **Expense Reductions:** | | |
| Closing of 3 South | 1,050,000 | 1,050,000 |
| Staff Reductions (10 FTEs year 1, 6 FTEs year 3) | 350,000 | 0 |
| Other Direct Costs | 375,000 | 125,000 |
| Total Expense Reductions | 1,775,000 | 1,175,000 |
| **BRMS Impact:** | | |
| Additional Physician Office Revenue (existing) | 100,000 | 100,000 |
| Additional Physician Practice Subsidy &Costs | (100,000) | (100,000) |
| Total BRMS Impact | 0 | 0 |
| Overall Impact | (110,000) | 640,000 |

CONFIDENTIAL

\* Assumptions Attached
Scenario 1  - V & S take as many patients as they can

Scenario 2  - V & S refer their inpatients to Dr. Jamil.

c:\lotus\123\v & s impact analysis 4-2-2002.123          04/09/2002          Prepared by:  Bob Fisher & Bruce Weddell

HOSP 0004047

**BRADFORD REGIONAL MEDICAL CENTER**
V & S Impact Analysis

|  | Year 3 | |
|---|---|---|
|  | Scenario 1 * | Scenario 2 * |
| **Patient Volume Statistics:** | | |
| Total Inpatient Admissions | 757 | 757 |
| Medicare Inpatient Admissions | 551 | 551 |
| Lost Inpatient Admissions | (132) | 0 |
| Outpatients | (2,250) | (2,250) |
| Home Health Referrals | (19) | (19) |
| **Patient Revenue:** | | |
| Net Inpatient Revenue | (675,000) | 0 |
| Net Outpatient Revenue | (225,000) | (225,000) |
| Home Health Revenue | (43,000) | (43,000) |
| Total Net Patient Revenue Impact | (943,000) | (268,000) |
| **Expense Reductions:** | | |
| Closing of 3 South | 1,050,000 | 1,050,000 |
| Staff Reductions (10 FTEs year 1, 6 FTEs year 3) | 184,000 | 0 |
| Other Direct Costs | 188,000 | 63,000 |
| Total Expense Reductions | 1,422,000 | 1,113,000 |
| **BRMS Impact:** | | |
| Additional Physician Office Revenue (existing) | 100,000 | 100,000 |
| Additional Physician Practice Subsidy &Costs | 0 | 0 |
| Total BRMS Impact | 100,000 | 100,000 |
| Overall Impact | 579,000 | 945,000 |

CONFIDENTIAL

\* Assumptions Attached
Scenario 1 - V & S take as many patients as they can

Scenario 2 - V & S refer their inpatients to Dr. Jamil.



**Pro-Forma Assumptions, continued**

Scenario 2 - V & S refer all their inpatients to Dr. Jamil

<u>Patient Volume Statistics:</u>

There would be no loss of inpatient volume. However, we would still anticipate losing 70% of their outpatient volume, and recover 50% the second year and another 25% the third year. We will more than likely not regain any volume after the third year.

<u>Patient Revenue:</u>

There would be no loss of inpatient revenue, and we would lose outpatient revenue equal to Scenario 1.

<u>Expense Reductions:</u>

Since our inpatient volume would be unaffected it would not be feasible to reduce staff. Other Direct Variable Costs would be reduced to a lesser degree than Scenario 1 because inpatients utilize more supplies than outpatients.

<u>BRMC Impact:</u>

Same assumptions as Scenario 1.

HOSP 0004050

**Pro-forma Assumptions** 

Scenario 1 - V & S leave and take as many patients as they can

Patient Volume Statistics:

This scenario assumes that we would lose about 70% of the V&S admissions in the first fiscal year as well as 50% of the remaining outpatient volume and about 75 Home Health Referrals. The bulk of the losses would be in Medicare volume which accounts for about 75% of their inpatient admissions and 56% of their Outpatient referrals.

Patient Revenue:

The loss of their volume translates to approximately $2,700,000 of net inpatient revenue, $900,000 of net outpatient revenue and $170,000 of home health revenue during the first year. We believe that we can regain 50% of the lost volume in the second year and an additional 25% in the third year. We will more than likely not regain any volume after the third year.

Expense Reductions:

The Closing of 3 South will result in the reduction of 25 FTEs and will save the hospital approximately $1 million in salaries and benefits. Other staff reductions we could make include a Home Health RN, a Pharmacist, a Rad Tech, a Case Manager, a Lab Tech and five support positions throughout the Hospital. Other Direct (Variable) Costs include reductions that will be realized in the area of Chemicals & Reagents, Xray Film, Blood, Drugs, Med-Surg Supplies, Laundry, Food and Other Supplies.

Reducing FTEs and expense any further would adversely impact our ability to provide the services that generate the remaining revenue compromise our ability to provide quality healthcare to our patients.

BRMS Impact:

Additional physician revenue would be realized from our existing practices seeing new patients. The additional practice costs would be due to bringing in a new primary care physician to help shoulder the work load and enable us to recoup patient volume. There would be additional revenue from this new physician, but we would be subsidizing the practice during the first year and second years, while breaking even in the third year..

Funding the Losses:

Losses generated by scenario 1 would need to be funded by accessing reserves.


Note: No inflation for revenue and expense was assumed in the pro-forma.

HOSP 0004049

**BRADFORD REGIONAL MEDICAL CENTER**
V & S Admissions
Fiscal Year 1998, 1999, 2000 & 2002 Projected

| | Projected FY 2002 | | FY 2001 | | FY 2000 | | FY 1999 | | FY 1998 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Highmark | 100 | 15% | 127 | 17% | 151 | 17% | 160 | 19% | 105 | 15% |
| Medicare | 497 | 73% | 551 | 73% | 601 | 68% | 519 | 63% | 498 | 72% |
| Medical Assistance | 31 | 4% | 28 | 4% | 78 | 9% | 87 | 11% | 41 | 6% |
| Commercial | 37 | 5% | 38 | 4% | 51 | 5% | 49 | 6% | 48 | 7% |
| Self Pay | 19 | 3% | 15 | 2% | 8 | 1% | 9 | 1% | 5 | 1% |
| | 684 | | 757 | | 889 | | 824 | | 693 | |



CONFIDENTIAL

HOSP 0004051

**BRADFORD REGIONAL MEDICAL CENTER**
**Bradford, Pennsylvania**

<u>**OVERALL IMPACT OF PRACTICE**</u>

CONFIDENTIAL

**Patient Volume Statistics:**

| | |
|---|---|
| Lost Admissions | (      530) |
| Outpatient Episodes | (   9,000) |
| Home Health Referrals | (      75) |

**Patient Revenue:**

| | |
|---|---|
| Net Inpatient Revenue | (2,700,000) |
| Net Outpatient Revenue | (   900,000) |
| Home Health Revenue | (   170,000) |
| Total Net Patient Revenue | (3,770,000) |

**Possible Expense Reductions:**            2,150,000

**OVERALL IMPACT:**            **(1,620,000)**

D:\Administration\Board\SpecialMay15thMeeting-FinancialImpact.wpd

HOSP 0004052

**34**

**From:**      Tim Brown
**To:**        Glen Washington
**Date:**      Friday, October 15, 2004 4:12:42 PM
**Subject:**   Nuclear patients

Glen, these numbers reflect nuclear patients.

CONFIDENTIAL

Inpatient-     206

Outpatient-   1292

ER-            31

Total-        1529

You might want to mention these numbers are last calender year.  Our numbers have increase by almost 20% in this calender year compared to last year at this time.

DEPOSITION
EXHIBIT

23

HOSP 0008065

**35**

**From:**     Tim Brown
**To:**       Glen Washington
**Date:**     Friday, April 16, 2004 12:18:55 PM
**Subject:**  Re: Nuc stats

It is about $39,000 in extra revenue

>>> Glen Washington 04/16/04 11:05AM >>>
what does that represent in  net per case?

Glen

>>> Tim Brown 4/15/04 7:58:26 AM >>>
Glen, though you and George might want to know that before the under arrangements Vaccaro averaged
about 16 stresses a month and Saleh did about 14.  Last month Vaccaro did 83 and Saleh did 30.  Jamel
stood consistent with about 20.
I think that speaks to a lot of the past doubts!

DEPOSITION
EXHIBIT

HOSP 0008060

36



## MEMORANDUM

**To:**       Robert E. Fisher, Sr, V.P./C.F.O.

**From:**     Bruce B. Weddell  *Bruce*
              Controller

**Date:**     October 29, 2001                    CONFIDENTIAL

**Subject:**   V & S financial impact


Per your request, here is the analysis of the financial impact of
V & S Medical Services for Fiscal Years 2001 and 2000.  While the
impact is considerably less that I initially indicated to George
a couple of weeks ago, it has been verified by running reports
from two sources.

You will note that we have seen a reduction in net revenue of
about $1.25 Million in FY 2001 from FY 2000.

Let me know if you need any additional analysis.


cc:  George Leonhardt



DEPOSITION
EXHIBIT
26

BRADFORD REGIONAL MEDICAL CENTER
Analysis of V & S Financial Impact
Fiscal Year 2000



|  |  | Cases | Charges | Net Revenue |
|---|---|---|---|---|
| Jamil |  |  |  |  |
|  | Inpatient | 531 | $5,612,294 | $2,435,648 |
|  | Outpatient | 5,397 | 1,234,564 | 575,086 |
|  | ER | 15 | 22,290 | 8,821 |
|  |  |  | $6,869,147 | $3,019,555 |
|  |  |  |  | 3,019,555 |
| Vaccaro |  |  |  |  |
|  | Inpatient | 472 | $4,969,297 | $2,451,303 |
|  | Outpatient | 7,062 | 2,570,607 | 1,011,368 |
|  | ER | 41 | 69,170 | 28,880 |
|  |  |  | $7,609,074 | $3,491,552 |
|  |  |  |  | 3,491,552 |
| Saleh |  |  |  |  |
|  | Inpatient | 468 | $4,336,095 | $2,018,536 |
|  | Outpatient | 6,272 | 1,815,075 | 686,239 |
|  | ER | 38 | 109,332 | 34,736 |
|  |  |  | $6,260,502 | $2,739,511 |
| Totals |  | 14,353 |  |  |
|  | Inpatient | 1,471 | $14,917,686 | $6,905,488 |
|  | Outpatient | 18,731 | 5,620,245 | 2,272,693 |
|  | ER | 94 | 200,791 | 72,437 |
|  |  |  | $20,738,723 | $9,250,618 |

HOSP 0003865

BRADFORD REGIONAL MEDICAL CENTER
Analysis of V & S Financial Impact
Fiscal Year 2001



|  |  | Cases | Charges | Net Revenue |
|---|---|---|---|---|
| **Jamil** | | | | |
| | Inpatient | 493 | $5,193,061 | $2,128,271 |
| | Outpatient | 5,327 | 1,379,457 | 578,606 |
| | ER | 12 | 20,028 | 10,551 |
| | | | $6,592,545 | $2,717,428 |
| **Vaccaro** | | | | |
| | Inpatient | 480 | $4,699,674 | $2,170,465 |
| | Outpatient | 6,316 | 2,111,964 | 821,557 |
| | ER | 11 | 22,082 | 6,423 |
| | | | $6,833,720 | $2,998,445 |
| **Saleh** | | | | |
| | Inpatient | 388 | $3,394,804 | $1,558,286 |
| | Outpatient | 5,984 | 1,805,428 | 719,698 |
| | ER | 16 | 26,223 | 9,296 |
| | | | $5,226,455 | $2,287,279 |
| **Totals** | | 13,195 | | |
| | Inpatient | 1,361 | $13,287,539 | $5,857,021 |
| | Outpatient | 17,627 | 5,296,848 | 2,119,861 |
| | ER | 39 | 68,333 | 26,269 |
| | | | $18,652,721 | $8,003,151 |

HOSP 0003864

37

# AGREEMENT

**THIS AGREEMENT** dated as of April 16, 2003 by and between Bradford Regional Medical Center, a nonprofit corporation existing under the laws of the Commonwealth of Pennsylvania (the "Medical Center") and V&S Medical Associates, LLC, a limited liability company existing under the laws of the Commonwealth of Pennsylvania ("V&S Medical Associates").

## WITNESSETH:

**WHEREAS,** the parties hereto have entered into good faith negotiations to determine if a dispute concerning nuclear cardiology imaging tests can be resolved through a leasing arrangement and the creation and implementation of what is called an "under arrangements" model; and

**WHEREAS,** the parties have reached an agreement concerning terms for a proposed lease of nuclear cardiology imaging equipment from V&S Medical Associates to the Medical Center and the principles pursuant to which they will work together to develop, create and implement the under arrangements model and a physician entity referred to herein as "Physician NewCo."

**NOW THEREFORE,** intending to be legally bound hereby, the parties hereto agree as follows:

(1)    V&S Medical Associates leases nuclear cardiology imaging equipment (the "Equipment") from GE Healthcare Financial Services ("GE") pursuant to a Lease dated as of June 6, 2001 between V&S Medical Associates and GE (the "GE Lease"). The Equipment will be subleased to the Medical Center pursuant to a Sublease between the parties (the "Sublease") for the remaining term of the GE Lease, i.e., until August 31, 2007, at the price of $29,250 per month. This subleasing of the Equipment through the Sublease is contingent upon the approval of GE. The Sublease shall contain such other terms and conditions agreed upon by the parties which are usual and customary for medical equipment leases.

(2)    Subsequent to the execution of the Sublease, the Equipment will be moved to the Medical Center. The Medical Center will be responsible for the moving of the Equipment, both in terms of all moving costs and the risks to the Equipment associated with the move.

(3)    V&S Medical Associates will be responsible for payment of the maintenance of the Equipment through the remainder of the GE Lease term. This includes payment of the current maintenance agreement with GE and a new or replacement maintenance agreement once the current maintenance agreement expires if the Medical Center thereafter leases the Equipment pursuant to Paragraph (8) hereof.

(4)    The Medical Center will offer employment to the V&S Medical Associates nuclear technician at the Medical Center's standard rate and terms for similar technicians at the Medical Center.

(5)    The parties will continue good faith efforts to develop an under arrangements ("UA") model pursuant to which other diagnostic facilities, equipment and personnel will be leased by the Medical Center to Physician

-1-



**DEPOSITION EXHIBIT**
Saleh
84-01 31

**Confidential
V&S 00662**

NewCo and diagnostic services will be sold by Physician NewCo to the Medical Center. If UA model terms can be mutually agreed upon by the Medical Center and V&S Medical Associates, V&S Medical Associates will take the lead in developing and starting up Physician NewCo. Should a UA venture be implemented (which must include appropriate regulatory approval for the model and Physician NewCo in the form of an Advisory Opinion from the HHS Office of Inspector General), the assumption of the GE Lease and its terms as described in the UA model will commence and the Medical Center's Sublease will expire.

(6)     During the term of the GE Lease, the Medical Center will have the ability to change or upgrade the Equipment from GE should either the need or the opportunity for such a change occur, at the Medical Center's discretion. Should the Medical Center make such an equipment change, the change will not detrimentally affect V&S Medical Associates under the Sublease terms (i.e., no higher maintenance fees, etc.) The Medical Center and V&S Medical Associates will work through any new issues or document provisions that require mutual understanding or cooperation with any such new equipment.

(7)     (a)     V&S Medical Associates will execute a covenant not to compete, agreeing not to provide the services furnished in connection with the Sublease's Equipment in its offices or invest in any other entity that provides such services during the term of the Sublease.

        (b)     In order to allow the UA venture to move forward, V&S Medical Associates will not provide other outpatient diagnostic imaging services in its office or invest in any other entity that provides such services while the UA venture is in development and attempted start-up. This covenant shall expire as of December 31, 2003 if Physician NewCo has not commenced organization by that date.

        (c)     Should the UA venture not be implemented, in the event that V&S Medical Associates considers offering CT, MRI or other diagnostic imaging services excluding ultrasound in its office or investing in a facility that provides the same, it must first present the opportunity to the Medical Center, which shall have 45 days to present a proposal to give V&S Medical Associates an opportunity to participate in a venture with the Medical Center to provide those services. If such a proposal is offered, V&S Medical Associates will not offer or invest in the service in question unless the proposed venture is not finalized within 120 days. V&S Medical Associates also agrees to discuss the possibility of ventures with the Medical Center for other non-diagnostic outpatient services prior to pursuing them on its own.

(8)     If the UA venture is not successfully implemented, the Medical Center agrees to extend the leasing arrangement with V&S Medical Associates beyond the expiration of the GE Lease, such that the entire sublease/lease term will be for a five-year period ending September 30, 2008; the price for the equipment rental for this period will be $26,000 per month. In addition, the parties agree that during any such additional rental time period: (i) the Medical Center will retain its right to change or upgrade the Equipment as described in Paragraph (6) hereof, and (ii) parts (a) and (c) of Paragraph (7) hereof shall apply. At the end of this period the parties shall enter into negotiations to renew this lease.

(9)     The parties shall diligently pursue and use their best efforts in cooperation with one another to implement all of the terms of this Agreement.

-2-

Confidential
V&S 00663

Kamran Saleh, M.D. and Peter Vaccaro, M.D., as individuals residing in the Commonwealth of Pennsylvania, also agree to be bound by the terms and conditions of this Agreement.

Witness: _Joan M. Washburn_                        _[signature]_
                                                            Kamran Saleh, M.D.

Witness: _Joan M. Washburn_                        _[signature] M.D._
                                                            Peter Vaccaro, M.D.

-4-

Confidential
V&S 00664

(10)    The parties agree that time is of the essence to complete the transactions described in this Agreement and shall proceed with due diligence to further describe and implement the transactions described herein pursuant to (a) a sublease, (b) the UA contracts, and (c) any and all other documents or instruments needed.

(11)    This Agreement shall be construed and enforced under and in accordance with the laws of the Commonwealth of Pennsylvania, with exclusive venue for resolution of disputes in McKean County.

(12)    The obligations of the parties hereunder shall be contingent upon the analysis of the financial and legal implications of the Sublease and the UA model, as presently proposed by the Medical Center. If, after consulting with their respective financial advisors and attorneys, either party is not reasonably satisfied with the financial or legal implications of the arrangements described above, they shall so inform the other party and terminate this Agreement and V&S Medical Associates shall not be required to participate in the "UA" venture. If such notice is not given prior to May 31, 2003, then this Agreement shall be final and the parties shall use their good faith efforts to negotiate and execute a final Sublease and determine the initial structure of Physician NewCo on or before June 30, 2003.

    **IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the date first written above.

WITNESS/ATTEST:                    **BRADFORD REGIONAL MEDICAL CENTER**

_Joan M. Washburn_                 By: _____
                                       George Leonhardt
                                       President & Chief Executive Officer

WITNESS/ATTEST:                    **V&S MEDICAL ASSOCIATES, LLC**

_Joan M. Washburn_                 By: _____  4/16/03
_Joan M. Washburn_                     Kamran Saleh, M.D.

                                   By: _____
                                       Peter Vaccaro, M.D.

-3-

**Confidential
V&S 00665**