# 7.  BRMC 30(b)(6) DEPOSITION EXCERPTS

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

216

1              C E R T I F I C A T E

2    COMMONWEALTH OF PENNSYLVANIA     :
                                      :  SS.:
3    COUNTY OF ALLEGHENY              :

4          I, Joy A. Hartman, a Notary Public in and for
     the Commonwealth of Pennsylvania, do hereby certify
5    that before me personally appeared TINA MARIE HANNAHS,
     GLEN ALAN WASHINGTON, and GEORGE LEONHARDT, the
6    witnesses herein, who then were by me first duly
     cautioned and sworn to testify the truth, the whole
7    truth and nothing but the truth in the taking of their
     oral deposition in the cause aforesaid; that the
8    testimony then given by them as above set forth was
     reduced to stenotypy by me, in the presence of said
9    witness, and afterwards transcribed by computer-aided
     transcription under my direction.
10
           I do further certify that this deposition was
11   taken at the time and place specified in the foregoing
     caption, and signature was not waived.
12
           I do further certify that I am not a relative
13   of or counsel or attorney for any party hereto, nor am
     I otherwise interested in the event of this action.
14
           IN WITNESS WHEREOF, I have hereunto set my hand
15   and affixed my seal of office at Pittsburgh,
     Pennsylvania, on this 31st day of July, 2007.
16
           The foregoing certification does not apply to
17   any reproduction of this transcript in any respect
     unless under the direct control and/or direction of
18   the certifying reporter.

19
                              _Joy A. Hartman_____
20   Commonwealth of Pennsylvania
        NOTARIAL SEAL
21   JOY A. HARTMAN, Notary Public     Joy A. Hartman, Notary Public
     City of Pittsburgh, County of Allegheny   in and for the Commonwealth of
     My Commission Expires May 9, 2010    Pennsylvania
22

23   My commission expires May 9, 2010.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

1

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2                       ERIE DIVISION

3

UNITED STATES OF AMERICA, ex rel. )
4   DILBAGH SINGH, M.D., PAUL KIRSCH, )
    M.D., V. RAO NADELLA, M.D., and   )
5   MARTIN JACOBS, M.D.,              )
                                      )
6                   Plaintiffs,       )
                                      )   Civil Action
7        vs.                          )   No. 04-186E
                                      )
8   BRADFORD REGIONAL MEDICAL CENTER, )
    V&S MEDICAL ASSOCIATES, LLC,      )
9   PETER VACCARO, M.D., KAMRAN SALEH,)
    M.D., and DOES I through XX,      )
10                                    )
                    Defendants.       )
11

12        DEPOSITION OF CORPORATE DESIGNEE OF

13        BRADFORD REGIONAL MEDICAL CENTER

14             THURSDAY, JULY 26, 2007

15        Deposition of CORPORATE DESIGNEE OF BRADFORD

16   REGIONAL MEDICAL CENTER, called as a witness by the

17   Plaintiffs, taken pursuant to Notice of Deposition and

18   the Federal Rules of Civil Procedure, by and before

19   Joy A. Hartman, a Court Reporter and Notary Public in

20   and for the Commonwealth of Pennsylvania, at the

21   offices of Horty Springer, 4614 Fifth Avenue, First

22   Floor, Pittsburgh, Pennsylvania, commencing at 10:03

23   a.m. on the day and date above set forth.

JOHNSON and MIMLESS
(412) 765-0744



APP-43

Page 82

1  Q. Who is that?
2  A. James Tarasovitch.
3  Q. Does he hold any other position at the
4  hospital?
5  A. Chief Financial Officer.
6  Q. So would that be part of the duties of the
7  chief financial officer, or is it considered a
8  separate position?
9  A. It is a separate position or separate duties.
10  Q. Has he held that position during the entire
11  time you have been at the hospital, or have there been
12  other people in that position?
13  A. There have been other people in that position
14  during that time. He has been at the hospital
15  approximately three years.
16  Q. Who was there before Mr. Tarasovitch?
17  A. Robert Fisher was the Chief Financial Officer
18  and also the compliance officer.
19  Q. Do you know where Mr. Fisher is today?
20  A. Yes. He is the President and CEO of Brookville
21  Hospital.
22  Q. How long did he work at Bradford as the CFO?
23  A. He was there approximately two years prior to

Page 83

1  my arrival, and he left about three years ago to
2  accept that position.
3  Q. Going back over the last ten years, has the
4  hospital been subject to any Medicare audits?
5  A. No, I don't believe so.
6  Q. How about Medicaid?
7  A. No.
8  Q. Now, Mr. Leonhardt -- let me see if I can find
9  the document here. In May of 2001, the Board for the
10  record passed a -- the Board for the hospital passed a
11  resolution dealing with physicians with competing
12  financial interests.
13      Do you recall that particular resolution, that
14  policy that was passed by the Board?
15  A. Yes, I do.
16  Q. What were the circumstances, if you recall,
17  behind passing that particular policy or resolution by
18  the Board?
19  A. Sure. It was the combination of several months
20  of discussion on the part of the Board with respect to
21  whether or not the Board needed to take a position
22  statement and have capabilities to deal with
23  competition that was damaging to the hospital.

Page 84

1      We had seen several instances, certainly,
2  across the country, where hospitals were finding
3  themselves in a position where they had to deal with
4  that kind of a situation and had seen several locally.
5  Q. Was there a particular concern, a particular
6  concern, a particular competing interest that the
7  hospital was worried about at that time?
8  A. As we talked about this?
9  Q. Yes.
10  A. Yes. There had been a local hospital that had
11  been significantly damaged by an ambulatory surgical
12  center established by a group of surgeons on the
13  staff.
14  Q. Again, if you could, can you articulate
15  precisely what the concern was on the part of the
16  Board?
17  A. Sure. It is a general concern, I think, in the
18  health care world. The concern is that there are
19  certain kinds of competition that make the playing
20  field so unlevel that it is virtually impossible to
21  compete on a level basis with them; and, you know, we
22  had, frankly a great deal of discussion about the
23  impact that that surgical center was having on a

Page 85

1  neighboring community hospital.
2      In that instance, in those kinds of instances,
3  the hospital finds itself -- the community hospital
4  finds itself in the position where it has to provide
5  stand-by services, it has to continue to find a way to
6  provide the most economically unattractive services,
7  and yet can have the people using its services
8  electively choosing where to send the most
9  predictable, the most financially advantageous
10  services.
11  Q. I am going to show you what we will mark as
12  Deposition Exhibit No. 8.
13      (Deposition Exhibit No. 8 was marked for
14  identification.)
15  Q. This document actually consists of two
16  documents. It is really the Resolution of the Board
17  of Directors, and then there is attached to it the
18  Procedures that I am assuming accompanied the Board
19  Resolution.
20  A. Yes.
21  Q. But maybe rather than me describe it, why don't
22  you take a look at this document and identify it, if
23  you can.

USA, et al., vs. Bradford, et al.  Multi-Page™  Corp. Designee BRMC
No. 04-186E  July 26, 2007

Page 98

1 patients to the hospital. I don't know if they were
2 referring them all or not.
3 Q. Was there another nuclear imaging facility in
4 the community?
5 A. Within the town limits, no. But just outside,
6 yes.
7 Q. And who operated the nuclear imaging facility
8 outside the town limits?
9 A. There were competing nuclear imaging facilities
10 in Olean, New York, Warren, Pennsylvania, St. Marys,
11 as I mentioned before, Kane, and Coudersport.
12 Q. How far away are those various facilities?
13 A. They range from about 12 miles to 25 or 30.
14 Q. What is 12 miles away?
15 A. Olean.
16 Q. And what is the hospital in Olean?
17 A. Olean General Hospital. In addition, to the
18 hospital in Olean, there also was a free-standing
19 diagnostic center that had those capabilities.
20 Q. I am going to ask you to take a look at a
21 document that we will mark as Exhibit 9.
22     (Deposition Exhibit No. 9 was marked for
23 identification.)

Page 99

1 Q. You can take a minute to look through those.
2 A. Yes.
3 Q. Mr. Leonhardt, these are a number of pages,
4 handwritten pages, that appear to be notes, somebody's
5 notes. Actually, there are a couple of pages that
6 appear to be different handwriting in the middle of
7 this packet.
8 A. Yes.
9 Q. But let me ask you if this document is familiar
10 to you?
11 A. Yes, it is.
12 Q. Is the handwriting something that you
13 recognize?
14 A. Yes.
15 Q. Is it your handwriting?
16 A. Yes, it is.
17 Q. As you said, the majority of it?
18 A. Yes.
19 Q. I think actually on Bates stamp No. 4413, it
20 looks like that is different handwriting.
21 A. Yes, it is.
22 Q. Do you recognize that handwriting?
23 A. I do not.

Page 100

1 Q. What do these notes represent, at least the
2 ones that are in your handwriting?
3 A. Most of these notes represent notes to myself
4 to try to keep me from forgetting.
5 Q. Does it deal with a chronology involving V&S?
6 A. Yes, I think there are other discussions in
7 here that I am making notes about, though, too. These
8 are notes about discussions with Dr. McClelland, Dr.
9 Petrella, who are cardiologists, were cardiologists at
10 Hamot at that time, and were working with us to try to
11 develop a program.
12     There are notes that I made to myself before
13 some meetings with Dr. Singh, Dr. Kirsch, Dr. Nadella
14 Dr. Jacobs. There are notes that I made to myself
15 after a couple of conversations with different Board
16 members.
17 Q. But do they relate, generally, to this issue of
18 the development of your cardiology program?
19 A. Yes, they do.
20 Q. And can you tell from looking at these, the
21 time frame that we are talking about?
22 A. As I look at each one, they are not all in the
23 same time frame.

Page 101

1 Q. In fact, I think it looks like there are some
2 that are dated later at the front of the packet, and
3 then there are some earlier ones, actually, at the
4 back.
5     I would actually like you to refer first to
6 Bates stamp No. 4425 --
7 A. Okay.
8 Q. -- which appears to me of the dated notes, it
9 appears to be the earliest of the notes that are
10 dated. If you would look at that page, does this
11 refresh your recollection about when you first learned
12 about the V&S venture?
13 A. Yes. Yes, it does.
14 Q. Now, the first part of that note deals with a
15 meeting that you had with V&S; is that right?
16 A. Yes. That is what I was referring to when I
17 said I met with them and talked with them about that.
18 Q. So sometime prior to April 3rd, you learned
19 about this plan?
20 A. Uh-huh.
21 Q. And so they told you that they had purchased a
22 camera and signed a contract with a cardiologist as of
23 April 3rd, 2001?

Page 102

1  A. That's correct.

2  Q. At the bottom of that, there is a discussion,

3 generally, I guess, of the issue, and then at the

4 bottom, there is a sentence that says, "V&S went on to

5 say that they had told Petrella cath referrals were at

6 risk if Medicor didn't read."

7      What does that mean?  I am not sure I

8 understand.  This was your summary of what V&S told

9 you?

10  A. Right.  What that would mean would be that they

11 were referring patients for cardiac caths.

12  Q. To Dr. Petrella.

13  A. To the Medicor physicians to, the Medicor

14 group.

15  Q. And how is Dr. Petrella related to Medicor?

16  A. He is one of the physicians in Medicor.

17  Q. Is he an owner or an employee or --

18  A. I don't know the answer to that.

19  Q. And Medicor is -- do they provide -- did they

20 actually do the reads of the test?  Is that what the

21 referral was for?

22  A. (No response.)

23  Q. What is the referral?  Were they reading the

Page 103

1 test results or --

2  A. Are you talking about the cardiac

3 catheterizations?

4  Q. Yeah.  What role did Medicor play?

5  A. They were performing them and interpreting

6 them.

7  Q. So they were actually performing the tests and

8 then reading the tests?

9  A. Uh-huh.

10  Q. And would it have been necessary for V&S to

11 have a contract with Medicor in order to proceed with

12 their venture?

13  A. No.

14  Q. What was the connection between Medicor and

15 V&S, as you understood it, from your conversation with

16 V&S at that time?

17  A. V&S were referring patients to Medicor.

18 Medicor was providing services.  That is where

19 the cardiologist -- when I talked about the

20 cardiologist coming one day a week?

21  Q. Yes.

22  A. Medicor was working with -- Medicor and Hamot

23 were working with Bradford Regional Medical Center to

Page 104

1 try to help us develop a fulltime cardiology service.

2  Q. Were there other cardiologists that V&S could

3 use to read the tests?

4  A. Oh, I'm sure there were.

5  Q. Were there other cardiologists that had

6 connection to Bradford Regional Medical Center?

7  A. No, not at that time.

8  Q. If the cath referrals were at risk, how would

9 that impact the hospital?

10  A. The Bradford Hospital?

11  Q. Yes.

12  A. Not at all.

13  Q. So this was not a particular concern to you in

14 terms of what you were talking about before?

15  A. No.

16  Q. Now, it looks like the next note is from

17 4-4-01, and it says that you made calls to Dr.

18 McClelland and John Malone.  What was the purpose of

19 those calls, and how did they relate to what V&S was

20 doing?

21  A. John Malone is the CEO at Hamot, and Dr.

22 McClelland was at that point CEO of Medicor.  What I

23 was discussing with them was the impact that this

Page 105

1 would have on our plans to develop a fulltime

2 cardiology service.

3  Q. And what did you think the impact was going to

4 be?

5  A. I thought the impact would be significantly

6 detrimental.

7  Q. In what way?

8  A. The opportunity to have a fulltime cardiologist

9 in Bradford would have been, I think, diminished

10 considerably if a key cardiac diagnostic service was

11 going to be developed in the offices of internists

12 and, therefore, would be not available to support that

13 cardiologist and to support the work that he was

14 doing.

15  Q. Why could that diagnostic service have not just

16 been split off?  In other words, why couldn't the

17 imaging service be performed at V&S' facilities and

18 then other cardiology procedures performed at the

19 hospital?  Why was it necessary to have the imaging

20 tied to the other services?

21  A. I'm not understanding your question.  I'm

22 sorry.

23  Q. I don't understand why you felt that the fact

USA, et al., vs. Bradford, et al.
No. 04-186E

Multi-Page™

Corp. Designee BRMC
July 26, 2007

Page 106

1 that somebody else was performing and billing the
2 imaging services, why that would prevent a
3 cardiologist from being on the staff and performing
4 procedures at the hospital?
5    A. This is a considerable portion of the work any
6 cardiologist does.
7    Q. Okay. Why couldn't they -- why couldn't a
8 cardiologist enter into an arrangement with V&S?
9    A. A cardiologist could enter into an arrangement
10 with V&S.
11   Q. Okay.
12   A. Whether they were interested in that was a
13 whole different question.
14   Q. Why does that affect the hospital?
15   A. If you look through -- let me try to put this
16 in context, if I can, for you. You probably noticed
17 that one of the notes that I wrote after that meeting
18 with Vaccaro and Saleh is that I talked to them about
19 the impact that I thought this would have on our
20 ability to develop a cardiology service, and I
21 reminded them that one of the things -- because in
22 context, the decision to develop the cardiology
23 service, and the decision that it was a key portion --

Page 107

1 a key issue for the community and the hospital was one
2 that was reached jointly by the hospital and the
3 medical staff.
4       The majority of the staff saw very clearly that
5 this was a service that their patients needed, that
6 they would benefit from very significantly, and that
7 it was a pretty basic service to not have available,
8 and we were talking about people who other than one
9 day a week didn't have access to a cardiologist within
10 100 miles.
11      One of the key points in having a successful
12 cardiology program that the staff had come to and that
13 we had absolutely agreed with is that that cardiolo-
14 gist could not be identified too closely with any
15 individual practice.
16      The level of competition between the physicians
17 in the Department of Medicine is such that being
18 associated too closely with one means that the others
19 aren't going to refer.
20      It is very difficult to bring a specialist into
21 that kind of an environment when you are working very
22 hard to accomplish that in a way that would be the --
23 that would not immediately involve that key specialist

Page 108

1 in that battle.
2    Q. Okay. Going on with that same note, it says
3 that you had a discussion with Dr. Furr, F-u-r-r.
4    A. Yes.
5    Q. Who is Dr. Furr and why were you discussing
6 this with him?
7    A. Dr. Furr is another one of the Medicor
8 cardiologists. He was a senior guy there, and he had
9 known all of the players for a lot of years. I was,
10 frankly, looking for some advice or some suggestions.
11   Q. Now, he says -- it says, "He commented that it
12 was driven by money and was a problem, but didn't feel
13 he knew of a way he could effectively respond. I told
14 him there were possibilities."
15      What were you thinking at that time when you
16 said there were possibilities? What was going through
17 your mind about what the possibilities were about how
18 to respond?
19   A. We were trying to develop a cardiology service
20 that would be useful to the community and would be
21 accepted as noncompetitive, you know, not aligned with
22 one faction or another, and what I was thinking about
23 was the possibility of joint ventures.

Page 109

1    Q. So at this point in time, you were thinking
2 about joint ventures? You weren't thinking about
3 excluding them from the hospital staff, is that right?
4    A. That possibility had occurred to me, but I was
5 certainly looking for more than one option in dealing
6 with this situation, and joint ventures -- in some
7 fashion, trying to figure a way to get a cardiology
8 service into that community that wasn't immediately
9 folding to the competition and the animosity between
10 the competing members of the Department of Medicine.
11   Q. Well, wasn't this the same time frame that the
12 Board was considering their policy on --
13   A. Yes, it was.
14   Q. -- on competitive services?
15   A. Yes. The Board discussions about that had
16 started in December of 2000, and, you know, by April
17 of 2001, it was clear we were on a final draft that
18 probably was going to be approved either at that
19 meeting or at the next meeting.
20   Q. So was that one of the possibilities that was
21 being considered when you said that there were
22 possibilities to respond? Was one of the possibili-
23 ties that you would invoke this policy?

JOHNSON and MIMLESS
(412) 765-0744

APP-47

USA, et al., vs. Bradford, et al.                    Multi-Page™                    Corp. Designee BRMC
No. 04-186E                                                                              July 26, 2007

---

Page 126

1  right?
2  A. No.
3  Q. And you didn't buy out their practices, right?
4  A. No.
5  Q. But shortly after that, you began negotiations
6  and came up with a lease arrangement with V&S; isn't
7  that right?
8  A. Yes.
9  Q. And that --
10  A. Excuse me.
11  Q. And that sublease agreement --
12  A. Excuse me. When you say "shortly after that,"
13  we came up with the lease agreement sometime
14  approaching September of 2003, so it really wasn't
15  shortly after that. It took another year.
16  Q. Well, yeah; but, let's -- we know that somebody
17  came up with the idea of entering into a sublease
18  arrangement with V&S?
19  A. Oh, sure. I was just trying to say it wasn't
20  shortly after January.
21  Q. I know. We'll take it, you know, one -- we
22  will sort of do this sequentially, and see if we can
23  get there. Do you know who came up with the idea of

Page 127

1  doing the sublease?
2  A. I honestly don't. There were so many
3  discussions among all of us at that time looking for
4  alternatives, I don't know whose original idea that
5  was.
6  Q. Do you recall when it was that that first came
7  up?
8  A. Sometime around the spring of 2003 or the early
9  summer.
10  Q. Let me show you a document which we will
11  identify as Deposition Exhibit No. 10.
12      (Deposition Exhibit No. 10 was marked for
13  identification.)
14  Q. Now, Mr. Leonhardt, this is a letter which
15  looks like it is from you to Dr. Saleh and Dr. Vaccaro
16  dated January 10th, 2003.
17  A. Correct.
18  Q. Is that accurate? I mean, is that your letter?
19  A. Yes, it is.
20  Q. Does it look familiar to you?
21  A. Yes.
22  Q. And it looks like, following your notes and
23  some discussions back and forth, you end up in January

Page 128

1  of 2003, and you still have this problem?
2  A. Uh-huh.
3  Q. And at this point, Dr. Saleh and Dr. Vaccaro
4  are operating their imaging facility; is that right?
5  A. Yes.
6  Q. And it is having a negative impact on the
7  hospital, I assume?
8  A. Yes, we believe so.
9  Q. I think the previous May, it looks like there
10  was a determination made by the Board of Directors
11  that Dr. Saleh and Dr. Vaccaro were covered persons
12  within the meaning of the policy against competing
13  financial interests?
14  A. Uh-huh.
15  Q. This letter refers to what I was talking about
16  a few minutes ago, about a buy-out that Saleh and
17  Vaccaro were proposing. If you look down to the third
18  paragraph, that is where the number 1.8 million is
19  discussed --
20  A. Right.
21  Q. -- as a proposal, I guess, coming from them; is
22  that right?
23  A. That's correct.

Page 129

1  Q. If you go down to the next paragraph, that is
2  the flip side, that is the other option, which is that
3  you enforce the policy; is that right?
4  A. Correct.
5  Q. So it looks like you are going back between
6  these two alternatives, in other words, to work with
7  Saleh and Vaccaro in some kind of a buy-out or a
8  venture and the other option is to enforce the policy;
9  is that right?
10  A. Yes.
11  Q. Now, if you enforce the policy, I assume you
12  have the problem that you might be driving away
13  referrals because if these guys don't have privileges,
14  they may start referring patients to another hospital;
15  is that right?
16  A. That is among the issues, yes.
17  Q. Was that a concern to you that if they are off
18  the staff, then they might have other alternatives,
19  and these guys are a pretty big referral source,
20  right?
21  A. That was among the concerns, yes.
22  Q. In fact, you were aware at this point that they
23  had -- at least one of them had applied for staff

---

JOHNSON and MIMLESS
(412) 765-0744

Page 126 - Page 129

Case 1:04-cv-00186-MBC    Document 118    Filed 09/10/2008    Page 9 of 46
USA, et al., vs. Bradford, et al.    Multi-Page™    Corp. Designee BRMC
No. 04-186E    July 26, 2007

Page 134

1  Q. Now, getting back to some more documents, I'm
2  going to show you what we'll mark as Exhibit 11.
3      (Deposition Exhibit No. 11 was marked for
4  identification.)
5  Q. This is appears to be a letter from you to Drs.
6  Vaccaro and Saleh dated June 26, 2002. In that first
7  paragraph and continuing into the second, you refer to
8  the possibility of setting up a joint venture as an
9  under arrangements proposal, and you refer to
10  something called the Stark Law.
11  A. Correct.
12  Q. At this point in time, June 26th, 2002, did you
13  have any experience or knowledge about the Stark Law?
14  A. No more than anyone else working in the kind of
15  position that I would.
16  Q. So you were aware that there was a law out
17  there --
18  A. Right.
19  Q. -- that impacted on physician-hospital
20  relations?
21  A. Any kind of business ventures, yes.
22  Q. Had you had any classes or training or any kind
23  of --

Page 135

1  A. I had attended --
2  Q. -- or any kind of experience with Stark Law at
3  that time?
4  A. No formal classes. I had certainly attended
5  seminars and educational sessions where it was
6  discussed.
7  Q. And at this point in time, you were exploring
8  the possibility of an Under Arrangements Joint Venture
9  as a possible resolution with V&S?
10  A. Not just with V&S. It would have been a
11  possible joint venture that could have included any
12  interested physician on the staff.
13  Q. I'm going to show you a document which we will
14  mark as Exhibit 12.
15      (Deposition Exhibit No. 12 was marked for
16  identification.)
17  Q. Does this document look familiar to you?
18  A. Wait. I'm sorry. Let me finish, okay?
19  Q. Oh, sure.
20  A. Yes, it does.
21  Q. Okay. What is it?
22  A. It is an outline of a proposal that I was
23  presenting to all physicians on the medical staff at

Page 136

1  around this same time.
2  Q. Do you know who prepared this document?
3  A. I had some help from a consulting firm.
4  Q. And who is that?
5  A. The name of the consulting firm is the
6  Northland Health Group. Their name has since changed
7  to Stroudwater, excuse me.
8  Q. And at that point, you had engaged them for
9  what purpose?
10  A. To try to help us come up with a solution that
11  would allow us to develop a community-based cardiology
12  service.
13  Q. So this Under Arrangements Joint Venture was
14  something that they were engaged to assist you with in
15  terms of developing that? Is that --
16  A. Actually, their engagement was broader than
17  that. It was to come up with good ideas and good ways
18  to resolve that issue, and this was one of them.
19  Q. When did you first contact them about that?
20  A. I believe I talked to the principal of that
21  firm several hours after I had my first discussion
22  with Drs. Vaccaro and Saleh.
23  Q. So you engaged them in the context of trying to

Page 137

1  deal with that situation?
2  A. "Help me solve this problem."
3  Q. And the problem was V&S getting the imaging
4  equipment?
5  A. The threat that that was to the development of
6  that service; and the reason for engaging them so
7  quickly is that they had worked with us very closely
8  on the strategic plan that clearly identified the need
9  for that cardiology service in that community and how
10  important that was to the development of the hospital.
11  Q. If you would look at item No. 6, this seems to
12  address a concern about the legality of the
13  arrangement. It talks about jeopardizing -- the risk
14  of jeopardizing your tax exempt status and also
15  regulatory compliance with HHS requirements. Was this
16  something that Stroudwater suggested?
17  A. It was something that we discussed. Again,
18  there were so many discussions about it, I don't know
19  whether they suggested this or whether I did.
20  Q. Did they tell you that this was a -- did they
21  tell you that this was a risky area or a gray area
22  or --
23  A. No. They told me it was a relatively new area.

Case 1:04-cv-00186-MBC    Document 118    Filed 09/10/2008    Page 10 of 46

USA, et al., vs. Bradford, et al.                 Multi-Page™              Corp. Designee BRMC
No. 04-186E                                                                  July 26, 2007

Page 138

1  Q. So this idea that you would seek an advisory
2  opinion from HHS, from the Office of Inspector
3  General, was something that was an essential part of
4  developing this venture; is that right?
5  A. Yes.
6  Q. Do you know whether anyone -- did the hospital
7  ever get an advisory opinion from HHS?
8  A. No.
9  Q. Did anyone ever request one?
10  A. No. We never got a body of physicians
11  sufficiently interested to even venture that far.
12  Q. So no request was ever made, and there has been
13  no advisory opinion received from HHS?
14  A. No.
15  Q. I'm going to show you another document that we
16  will mark as Exhibit 13.
17       (Deposition Exhibit No. 13 was marked for
18  identification.)
19  Q. Did you have a chance to look at that?
20  A. Uh-huh.
21  Q. This is an agreement that is dated -- it
22  appears to be dated April 16th, 2003, between Bradford
23  Regional Medical Center and V&S Medical Associates.

Page 139

1  Do you recognize your signature on there on behalf of
2  Bradford Regional Medical Center?
3  A. Yes, I do.
4  Q. Now, when I was asking you questions about the
5  January proposal by V&S that you buy out the imaging
6  business and the fact that that was rejected by the
7  hospital, apparently, but that you then shortly
8  thereafter came up with a lease proposal, someone came
9  up with a lease proposal -- and I guess I don't know
10  whether April 16th is shortly thereafter; but in any
11  case, by April 16th, you had an agreement here that
12  deals with the sublease of certain equipment from V&S.
13  A. Yes.
14  Q. So I guess my question is: How did the
15  sublease proposal come about?
16  A. I don't remember.
17  Q. Now, you heard Mr. Washington testify earlier
18  that the equipment that V&S had really wasn't -- it
19  didn't really fit into the hospital's future plans --
20  A. Correct.
21  Q. -- for its imaging needs; is that right?
22  A. Correct.
23  Q. Now, why was it that you wanted to sublease

Page 140

1  this equipment that apparently had limited
2  capabilities from V&S?
3  A. The agreement that we worked out with V&S to
4  sublease that equipment had as a condition of it that
5  we be free to direct them to acquire a different piece
6  of equipment of our choosing with a lease that had to
7  satisfy -- with conditions that had to satisfy us.
8  Q. Okay.
9  A. So --
10  Q. Are you done?
11  A. Yes.
12  Q. Well, Mr. Leonhardt, that is a fairly
13  cumbersome way to go out and acquire a piece of
14  equipment, wouldn't you agree?
15  A. Yes, if that was the only thing that we were
16  trying to accomplish. Obviously, it wasn't the only
17  thing that we were trying to accomplish.
18  Q. Let's say that, hypothetically, that the
19  hospital determined that they had a need to get a
20  camera.
21  A. Yes.
22  Q. You would probably go to the vendor or a lessor
23  of equipment; is that right?

Page 141

1  A. In many circumstances, yes.
2  Q. When you got your Axis camera back in 1999, did
3  you contact an equipment vendor at that time to get
4  that equipment?
5  A. I'm sure we did.
6  Q. Now, in 2003, if you were interested in looking
7  at equipment, you would normally go to the equipment
8  vendor, right?
9  A. Yes. We were all -- yes.
10  Q. If there were no other part of this, in other
11  words, if there was nothing else to be accomplished?
12  A. Correct.
13  Q. I think that is what you said, if that were the
14  only consideration?
15  A. Yes.
16  Q. Isn't it true that the real consideration here
17  was how to pay V&S some money in order to get their
18  business; isn't that right?
19       MR. MULHOLLAND: Objection to the form of
20       the question; but you can answer.
21  A. No.
22  Q. Excuse me?
23  A. No.

USA, et al., vs. Bradford, et al.                                Corp. Designee BRMC
No. 04-186E                                                      July 26, 2007

---

Page 146

1 saw that as good value to us in developing the program
2 that we were trying to develop.
3    Q. And that is because you were able to, at the
4 same time, get the non-compete? Is that what your
5 rationale was?
6    A. We were able to put the whole package together,
7 yes.
8    Q. And when you got the non-compete, you were
9 essentially buying the business from V&S; isn't that
10 right?
11        MR. MULHOLLAND: Objection to form.
12    A. No.
13    Q. Did you expect that you would get the referral
14 business from V&S as a result of this agreement?
15    A. We hoped that we would.
16    Q. Let me give you another exhibit here, and see
17 if you can identify this document.
18        (Deposition Exhibit No. 14 was marked for
19 identification.)
20    A. Yes.
21    Q. What is this document?
22    A. This is an independent valuation of the lease
23 and non-compete agreement.

---

Page 147

1    Q. Who is Mr. Day?
2    A. Mr. Day is an accountant and an attorney who
3 does this kind of work, as well as other work.
4    Q. Is he related to Stroudwater in any way?
5    A. No.
6    Q. So he is another consultant that you had assist
7 you with this --
8    A. Yes.
9    Q. -- this problem?
10    A. Yes.
11    Q. First of all, I guess, I don't think this
12 report is dated. Do you know when this report was
13 prepared or what time frame?
14    A. I don't know precisely when without the cover
15 letter that went with it. It was, you know, right
16 before we entered into the agreement.
17    Q. Was this prepared in connection with entering
18 into the sublease agreement?
19    A. Yes.
20    Q. What was the purpose of obtaining this report
21 at that time?
22    A. We felt very strongly that the agreement that
23 we were entering into was appropriate, that the value

---

Page 148

1 that we were receiving was commensurate with what we
2 were paying, but we did want an independent opinion to
3 that effect.
4    Q. What was the assignment or the scope that you
5 gave to Mr. Day when you hired him to prepare this
6 report?
7    A. We gave him a letter of engagement, and I don't
8 remember everything that was in it; but, essentially,
9 it was to evaluate the arrangement and give us an
10 opinion as to whether or not the lease and non-compete
11 were fair market value.
12    Q. And when you say "fair market value," that
13 would require evaluating the lease arrangement for the
14 equipment?
15    A. Correct.
16    Q. But also valuing the other parts of the
17 agreement?
18    A. Correct.
19    Q. And, essentially, we are talking about
20 non-compete?
21    A. Correct.
22    Q. What you call the non-compete?
23    A. Correct.

---

Page 149

1    Q. Is that how you arrived at the amount that V&S
2 would pay under the agreement?
3    A. No. We arrived at that amount through
4 negotiations.
5    Q. Okay.
6    A. We had a proposed negotiated and agreed upon
7 amount. We wanted an independent opinion as to
8 whether or not that was fair market value.
9    Q. You knew what the pass-through cost of the
10 equipment lease was, right?
11    A. That's right.
12    Q. So that amount didn't change at all?
13    A. No.
14    Q. Now, in the negotiations, explain to me how you
15 arrived at the number for the portion of the agreement
16 that covers the non-compete?
17    A. Through a long and sometimes arduous
18 negotiation.
19    Q. What was the value that the hospital placed on
20 the non-compete?
21    A. I don't know. If you are asking me where we
22 started, I don't remember.
23    Q. Do you recall what V&S put on it?

---

JOHNSON and MIMLESS                              Page 146 - Page 149
(412) 765-0744

Case 1:04-cv-00186-MBC    Document 118    Filed 09/10/2008    Page 12 of 46
USA, et al., vs. Bradford, et al.    Multi-Page™    Corp. Designee BRMC
No. 04-186E    July 26, 2007

Page 182

1  A. The admissions have stabilized.
2  Q. When you say "stabilized," do you know whether
3  they have increased over the level in 2001, which is
4  your last actual on this chart?
5  A. I do not know that.
6  Q. Well, Mr. Leonhardt, do you believe that you
7  have been successful in addressing the concerns that
8  were brought to your attention in April of 2001?
9  A. Yes, I do.
10  Q. And in what sense have you addressed those
11  concerns?
12  A. Well, those were concerns with respect to
13  utilization of outpatient diagnostic services, there
14  were scheduling concerns, and concerns regarding the
15  level of qualifications of the individual reading some
16  of those tests. We have addressed both of those
17  concerns.
18  Q. Well, I thought you had expressed some concerns
19  about not being able to develop your cardiology
20  program at the hospital.
21  A. I'm sorry. I misunderstood your question,
22  then.
23  Q. You had some general concerns that if V&S

Page 183

1  proceeded with their planned imaging facility that
2  the -- that you would be unable to develop your
3  cardiology program?
4  A. Yes.
5  Q. And I guess my question is: On a general
6  level, have you addressed that in the sense of have
7  you been able to develop a cardiology program?
8  A. Yes. In fact, we have.
9  Q. And I think I asked you this question earlier,
10  but I want to make sure we are clear on this, have you
11  been able to develop your Under Arrangements Joint
12  Venture with the medical staff?
13  A. No.
14  Q. Is that program currently inactive? In other
15  words, have you abandoned that, or is that still in
16  the works?
17  A. It is not active at this point.
18  Q. Okay. I'm going to show you what we will mark
19  as Exhibit 20.
20    (Deposition Exhibit No. 20 was marked for
21  identification.)
22  Q. This is a document that is entitled "Equipment
23  Sublease," and this agreement is -- it appears to be

Page 184

1  dated -- the signatures are dated 9-22-03. I think on
2  the front page it is dated as of October 1st, 2003.
3  A. Correct.
4  Q. How does this agreement relate to the prior
5  agreement which we marked as Deposition Exhibit No.
6  13?
7  A. 13 was simply a preliminary agreement.
8  Q. This is the same subject matter as the earlier
9  one? It is just more comprehensive? Is that it?
10  A. Yes; and it, in fact, is the one that was
11  executed.
12  Q. Well, the other one we looked at was executed,
13  as well; is that right?
14  A. It was signed, yes. I'm sorry.
15  Q. Are you saying that this is the agreement that
16  is actually in place right now?
17  A. Yes.
18  Q. And your signature appears on the signature
19  page?
20  A. Yes.
21  Q. If you would look at page 3 of this document --
22  actually, beginning on page 2, under Section 2,
23  Subsection (d)(i), the agreement shows the breakdown

Page 185

1  of the rental payment that is due under the agreement,
2  and we talked about that a little bit earlier.
3  A. Uh-huh.
4  Q. Could you identify the different components of
5  the rental agreement from the agreement?
6  A. It identifies $6,545 for the hard costs of
7  subleasing the equipment. It as a pass-through of the
8  rental and the maintenance fee paid to GE. Then
9  $23,655 per month for all other rights and duties for
10  sublease.
11  Q. And that is for the first rental period?
12  A. Yes.
13  Q. So that would be through September 30th, 2006?
14  A. Correct.
15  Q. So have, in fact, those payments been made for
16  that period of time, since we are beyond September
17  30th, 2006?
18  A. Beginning October 1st of 2003, yes.
19  Q. So all the payments were made up through
20  September 30, 2006?
21  A. That's right.
22  Q. At the rate of $30,200 per month?
23  A. Until February of 2004, when the new equipment

APP-52

Case 1:04-cv-00186-MBC    Document 118    Filed 09/10/2008    Page 13 of 46
USA, et al., vs. Bradford, et al.                Multi-Page™                Corp. Designee BRMC
No. 04-186E                                                                        July 26, 2007

Page 186

1 arrived.
2   Q. Well, that is what I want you to explain to me
3 next.
4   A. Okay.
5   Q. So the payments then were made in this amount
6 up through February of 2004?
7   A. Correct.
8   Q. And what happened in February of 2004?
9   A. This piece of equipment was replaced with the
10 new Philips CardioMD equipment that Mr. Washington
11 described earlier today.
12   Q. Okay. And?
13   A. And the lease pass-through from GE was replaced
14 with a lease pass-through from Philips, and that was a
15 slightly different amount.
16   Q. Who is the lessee on the lease with Philips?
17   A. Vaccaro and Saleh.
18   Q. So Vaccaro and Saleh -- so V&S continues to be
19 the lessee and the Bradford Hospital or BRMC continues
20 to be the sublessee?
21   A. Yes.
22   Q. And you said that there was a change in the
23 amount. Was it more or less?

Page 187

1   A. It was a little bit more. I can't remember
2 exactly what the difference is right now.
3   Q. So the amount that was paid to V&S then
4 increased as a result of that change in the lease?
5   A. Yes.
6   Q. So they are actually being paid slightly more
7 than the $30,200?
8   A. Yes.
9   Q. Is the only part of it that changed the
10 pass-through amount?
11   A. Yes.
12   Q. Do you know whether V&S has made all of the
13 payments to Philips or to GE prior to that?
14   A. I don't have independent knowledge of that, no.
15   Q. Have you been notified that they are in -- that
16 they have at any time been in default --
17   A. No.
18   Q. -- at any time under the lease agreement with
19 either GE or Philips?
20   A. No.
21   Q. Now, beginning in October of 2006, I assume the
22 second rental period began; is that right?
23   A. The second rental period that was discussed in

Page 188

1 this original lease, the amount changed because the GE
2 equipment would have reached the point where the
3 maintenance payment was no longer necessary. It was
4 simply a pure pass-through of the hard costs. I don't
5 know that we have reached that point with the Philips
6 lease.
7   Q. So the pass-through amount is higher than it
8 was originally contemplated --
9   A. Yes.
10   Q. -- because the maintenance agreement is
11 extending for a longer period of time?
12   A. On a brand new piece of equipment, yes.
13   Q. Do you know what the monthly amount is that you
14 paid to V&S?
15   A. Not without looking at it.
16   Q. Was there an addendum or modification to this
17 agreement?
18   A. No. Actually, if you look at Section 5 of the
19 agreement, it contemplated that kind of change and
20 spelled out how it would be handled.
21   Q. And is it being handled in accordance with
22 Section 5?
23   A. Yes.

Page 189

1   Q. And so the adjustments or changes are a
2 reflection of the substitute of new equipment and a
3 new lease?
4   A. Right.
5   Q. In all other respects, the agreement is the
6 same?
7   A. Exactly.
8   Q. So the amount that is being paid for the
9 non-compete has remained the same in both of the
10 rental periods?
11   A. Yes.
12   Q. Now, on page five under Section 7, this is the
13 section that is Representations, Warranties, Covenants
14 of Sublessee, it says that under (c) that by entering
15 into this sublease, the sublessee is not in violation
16 of any of the laws or agreements applicable to a
17 sublessee. Do you believe that that is still the
18 case?
19   A. Yes.
20   Q. Do you believe that you have any obligation to
21 indemnify V&S if that's not the case?
22   A. No.
23   Q. Have you entered into any agreements since this

Case 1:04-cv-00186-MBC    Document 118    Filed 09/10/2008    Page 14 of 46
USA, et al., vs. Bradford, et al.                    Multi-Page™                    Corp. Designee BRMC
No. 04-186E                                                                          July 26, 2007

Page 190

1 litigation came to light with regard to the cost of
2 defending this lawsuit?
3    A. No.
4    Q. What about any liability that would result from
5 this lawsuit?
6    A. No.
7    Q. If you would look at page 8, under Section 13,
8 Section (a), Subsection (a), this deals with the Under
9 Arrangements Venture, it says, "Should the Under
10 Arrangements Venture be implemented, which must
11 include appropriate regulatory approval for the model
12 and Physician NewCo in the form of an advisory opinion
13 from the Office of HHS, Office of Inspector General,
14 the assumption of GE lease and its terms as described
15 in the Under Arrangements Venture will commence, and
16 this sublease will expire."
17    Am I correct that that has never come about,
18 the Under Arrangements Venture?
19    A. That's correct.
20    Q. We have discussed that, and, of course, you
21 have told us that there has been no advisory opinion
22 on it?
23    A. That's correct.

Page 191

1    Q. Did you ever seek -- did the hospital ever seek
2 an advisory opinion with regard to this lease
3 arrangement?
4    A. No.
5    Q. Did you ever consider that as something you
6 should check into?
7    A. Beyond the standard checking that we did, no.
8    Q. Did you obtain any advice from Stroudwater
9 Associates with regard to entering into this lease?
10    A. We obtained assistance in evaluating the lease,
11 the alternatives, but we didn't get any legal advice
12 from Stroudwater.
13    Q. Now, if you look at page 10, and subparagraph
14 (b) at the bottom of the page -- well, actually, let's
15 go back to page 9. I think we will start there.
16 Section 14, is this the section that deals with the
17 subject of non-compete, not to compete?
18    A. (No response.)
19    Q. Do you want to take a few minutes to look at
20 it?
21    A. Yes, if I could.
22    Yes, I believe so.
23    Q. What was the objective in trying to eliminate

Page 192

1 this competition? I mean, what were you trying to
2 accomplish?
3        MR. MULHOLLAND: Objection to the form.
4    A. What we were trying to accomplish was -- and I
5 think if you take a look at this, it is clear that one
6 of our real objectives here was to have an agreement
7 with Vaccaro and Saleh that assisted us in being able
8 to offer an under arrangements proposal to the full
9 medical staff.
10    If you go back through early documents, it is
11 pretty clear, and I think you will see in some of the
12 letters and exchanges, that they were expressing an
13 interest in a joint venture with the hospital, but not
14 one that included other physicians.
15    Simultaneously, we were meeting with the other
16 physicians on the staff who were expressing an
17 interest in a joint venture with the hospital, as long
18 as Vaccaro and Saleh were excluded.
19    So we found ourselves in the middle of that,
20 very much needing to have some kind of accommodation
21 by everybody to the development of the cardiology
22 program.
23    So that is why you see these covenants that

Page 193

1 really require Vaccaro and Saleh to cooperate and to
2 assist us in trying to develop a program that would be
3 attractive not just to them, but to the other
4 physicians on staff.
5    Q. But you have made it clear that the Under
6 Arrangements Venture that the hospital was interested
7 in would have to be more inclusive?
8    A. Yes.
9    Q. You have made that clear a couple of times
10 today.
11    A. Uh-huh.
12    Q. And from the documents that we have reviewed,
13 it also seems clear that from January of 2003 on, it
14 seems clear that V&S did not want to be part of any
15 venture with any other physicians?
16    A. An alternative --
17        MR. MULHOLLAND: Objection to the form.
18    You can answer.
19    Q. So I guess you entered into this agreement, but
20 was there any realistic prospect of that occurring?
21    A. From V&S' approach or position, yes, there was.
22 What we ended up -- the effort failed, based on the
23 fact that a number of other physicians on the staff

Page 194

1   refused to participate as long as V&S was involved.
2       Q. Well, if you were paying V&S 23 or 24 thousand
3   dollars a month to essentially do nothing, what would
4   be their incentive to get into this Under Arrangements
5   Venture?
6       A. They were required to.
7       Q. Is there anything in here that requires them to
8   get into a venture with you?
9       A. Yes.
10      Q. Maybe you can point that out.
11      A. Let's see here.  You know, the -- "required to"
12  is probably too strong; but their role in much of
13  that and what would happen with this lease if that
14  venture went through, I think, is laid out pretty
15  clearly here.
16      Q. But there is no requirement that within a
17  certain period of time that they enter into a
18  particular joint venture arrangement with you?
19      A. Only if we can put one together.
20      Q. But that would require an agreement by not only
21  V&S, but also the rest of the medical staff?
22      A. Absolutely, yes.
23      Q. I will show you a document which we will mark

Page 195

1   as 21.
2           (Deposition Exhibit No. 21 was marked for
3   identification.)
4       Q. Is this document familiar to you?  It is
5   addressed to you as president of the hospital?
6       A. Yes, it is.
7       Q. And it seems to provide for a rental payment of
8   $2,500 a month, and then it looks like perhaps some
9   other charges.  Is this money that was charged for
10  keeping the equipment at V&S?
11      A. I don't know that we ever did this.
12      Q. Do you know whether the hospital has paid V&S
13  anything for keeping the equipment at their facility?
14      A. I do not believe that we have.
15      Q. So you are saying this is a demand by V&S, but
16  not necessarily an agreement to pay it?
17      A. That's correct.
18      Q. And you don't think you have paid it?
19      A. I questioned the Finance Department about
20  whether or not there were any additional payments
21  beyond the monthly lease amount in the last few days,
22  and I was told that there were not.
23      Q. While we are on that subject, does the hospital

Page 196

1   have any other arrangements with V&S, other than the
2   lease agreement that we just talked about, Exhibit 20,
3   any other financial arrangements with V&S or
4   individually with Vaccaro and Saleh?
5       A. I believe that Dr. Saleh receives some payments
6   in return for some utilization review work that he
7   does, he along with a couple of other physicians, and
8   that is it.
9       Q. And that would be in the nature of a medical
10  director's position or --
11      A. That would be in payment for review of charts
12  for utilization review.
13      Q. Has the hospital entered into any arrangements
14  whereby they pay the same doctors for not doing other
15  things?  In other words, are there any other
16  non-competes --
17      A. No.
18      Q. -- that are paid for by way of other testing?
19      A. No.
20      Q. Oh, one thing I wanted to ask you about, Mr.
21  Leonhardt, we had talked about the policy on
22  physicians competing with financial interests; and as
23  part of that, I had asked you some questions about the

Page 197

1   attached procedures, and the note that says, "At the
2   time of the adoption of the resolution, based upon the
3   information known at that time, the Board was not
4   aware of any existing services being provided by any
5   member of the Medical Center's medical staff that
6   would constitute a significant impact detrimental to
7   the ability the Medical Center to fulfill its
8   mission."
9       A. Uh-huh.
10      Q. And this document refers to May 23, 2001, this
11  being the time period that the Board was enacting this
12  resolution.
13      A. Correct.
14      Q. And I guess that statement is really not true,
15  in light of your meetings with V&S during the month of
16  April?
17          MR. MULHOLLAND: Object to the form.
18      A. I believe that that was drafted prior to those
19  meetings.  As I said to you, we began drafting that
20  policy in December of 2001.
21      Q. So this may have -- this paper work --
22      A. May have followed.
23      Q. So this may have just referred to an earlier

JAH – July 26, 2007

In re:  **USA, et al., vs. BRMC, et al.

**George Leonhardt

Sworn to and subscribed before me this

15th day of August , 2007.

NOTARY PUBLIC

My commission expires: 2/24/2010 .

```
           NOTARIAL SEAL
MARYELLEN TROUTMAN, NOTARY PUBLIC
  BRADFORD, McKEAN COUNTY, PA
MY COMMISSION EXPIRES FEBRUARY 24, 2010
```

JAH - July 26, 2007

In re:  **USA, et al., vs. BRMC, et al.

_____
          **Glen Alan Washington

Sworn to and subscribed before me this
_15th_ day of _August_____, 2007.

_____
          NOTARY PUBLIC

My commission expires: _2/24/2010_____.

NOTARIAL SEAL
MARYELLEN TROUTMAN, NOTARY PUBLIC
BRADFORD, McKEAN COUNTY, PA
MY COMMISSION EXPIRES FEBRUARY 24, 2010

APP-57

JAH - July 26, 2007

In re:  **USA, et al., vs. BRMC, et al.

*Tina Marie Hannahs*

**Tina Marie Hannahs

Sworn to and subscribed before me this

*15th* day of *August*, 2007.

*Maryellen Troutman*

NOTARY PUBLIC

My commission expires: *2/04/2010*

NOTARIAL SEAL
MARYELLEN TROUTMAN, NOTARY PUBLIC
BRADFORD, McKEAN COUNTY, PA
MY COMMISSION EXPIRES FEBRUARY 24, 2010

# 8. LEONHARDT DEPOSITION EXCERPTS

1

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2                      ERIE DIVISION

3                       - - -

4    UNITED STATES OF AMERICA, ex rel.    )
     DILBAGH SINGH, M.D., PAUL KIRSCH,    )
5    M.D., V. RAO NADELLA, M.D.,          )
     and MARTIN JACOBS, M.D.,             )
6                                         )
7              Relators,                  )    Civil Action
                                          )    No. 0-4-186E
8         vs.                             )
                                          )
     BRADFORD REGIONAL MEDICAL CENTER,    )
9    V&S MEDICAL ASSOCIATES, LLC,         )
     PETER VACCARO, M.D., KAMRAN SALEH,   )
10   M.D., and DOES I through XX,         )
                                          )
11            Defendants.                 )

12                      - - -

13          DEPOSITION OF GEORGE LEONHARDT
               TUESDAY, APRIL 1, 2008

14

15        Deposition of GEORGE LEONHARDT, called as a

16   witness by the Relators, taken pursuant to Notice of

17   Deposition and the Federal Rules of Civil Procedure,

18   by and before Carla L. Lennartz, a Court Reporter and

19   a Notary Public in and for the Commonwealth of

20   Pennsylvania, at the offices of Horty Sprinter, 4614

21   Fifth Avenue, Pittsburgh, Pennsylvania, commencing at

22   10:00 a.m. on the day and date above set forth.

23                      - - -

5

1  camera.

2    Q.  What were your primary concerns with V&S

3  getting a nuclear camera?

4    A.  I've gone over this before, but the impact that

5  that would have on the hospital's plans to develop a

6  full-time cardiology service.

7    Q.  And maybe let me see if I can summarize it and

8  then you could tell me if there's any more concerns.

9        One concern you had was with the impact on

10  developing a cardiology practice?

11    A.  Yes.

12    Q.  Would another concern be just a loss of the

13  nuclear medicine revenues that previously -- that the

14  hospital previously had gotten from V&S referrals?

15        MR. MULHOLLAND:  Just object to the

16        characterization to the extent it doesn't

17        reflect what's already in the record; but he

18        can answer the question.

19    A.  Well, sure, there was some concern about that;

20  but the major concern was the impact on our plans to

21  develop that service.

22    Q.  Were you also concerned with the loss of other

23  diagnostic tests that might go along with a test

6

1  performed on a nuclear camera, follow-up tests, things

2  like that?

3    A.  Yeah, probably to some extent.

4    Q.  What was it about V&S's establishment of the

5  nuclear camera that you believed would impact your

6  ability to establish a cardiology program?

7    A.  Well, nuclear cardiology is a key portion of

8  any diagnostic cardiology service; and if a key

9  practice in the community is going to have a financial

10  incentive not to use the community cardiology service,

11  it's going to have an impact and especially an impact

12  if we're only just trying to establish that and, you

13  know, trying to convince a cardiologist this is a good

14  place to come and work.

15    Q.  Well, would the impact extend farther than

16  simply the nuclear business that let's say V&S is

17  taking away from the hospital?

18    A.  I'm not sure I understand where you're trying

19  to take that question.

20    Q.  Previously, before they got the nuclear camera,

21  V&S had been referring a great deal of nuclear

22  cardiology business to the hospital; correct?

23    A.  Correct.

7

1    Q.  After they established the camera, all or a

2  significant portion of that business was no longer

3  going to the hospital; correct?

4    A.  Correct.

5    Q.  Because they were doing it in-house?

6    A.  Correct.

7    Q.  So the hospital was losing that business, that

8  discrete set of business; correct?

9    A.  That's correct.

10    Q.  When you were talking about the impact on

11  establishing a cardiology program, is that impact more

12  than simply the fact that you have lost this nuclear

13  cardiology business?

14    A.  I'm really sorry.  Are you asking -- well --

15    Q.  The loss of that nuclear cardiology business,

16  is that the negative impact you're talking about on

17  the cardiology program?

18    A.  Yes; and the question and the concern we had

19  was would that be the kind of barrier that would

20  actually prevent us from establishing a cardiology

21  program which would have a much broader impact on the

22  community.

23    Q.  What is involved in establishing a cardiology

8

1  program at a hospital, at your hospital in particular?

2    A.  Well, at our hospital in particular, at that

3  point in time we did not have a full-time

4  cardiologist.  We did have a visiting cardiologist

5  coming from Erie, which is about 90 miles away, a

6  couple of days a month and essentially operating a

7  clinic.  Not having a full-time cardiology service had

8  an impact on the quality of diagnostics that we could

9  offer the patients in that community.  It had an

10  impact on the quality and the type of care that

11  patients in that community would receive if they had

12  an acute cardiac problem.  It had an impact on the

13  overall service to people with high blood pressure,

14  cardiac disease.

15        The introduction of an expert, a specialist, in

16  an area of medicine in a community like that has a

17  very broad impact on the kind of care that people

18  receive, even if it's care that they receive from a

19  physician other than the cardiologist simply because

20  it just raises the bar for everybody.

21    Q.  Setting up a cardiology practice in a hospital,

22  does that primarily involve hiring a full-time

23  cardiologist or is there more to it?

37

1    A.    Correct.
2    Q.    Do you know when the sublease concept was first
3    raised?
4    A.    It was early in 2003.  I don't know the exact
5    meeting that that occurred at.
6    Q.    Let me show you this.
7          (Leonhardt Deposition Exhibit No. 2 was
8    marked for identification.)
9    Q.    I've shown you Exhibit 2 which is a February
10   11th, 2003 letter from Edward Kabala to Alan
11   Steinberg.
12         Have you seen this letter before?
13   A.    Let me look at it.
14   Q.    Oh, okay.
15   A.    I expect I probably have but -- okay.
16   Q.    Do you recognize the letter, first off?
17   A.    I remember receiving the letter now, yeah, a
18   copy of the letter.
19   Q.    The first paragraph references a February 10th
20   meeting.  Do you know whether you were present at a
21   February 10th, 2003 meeting?
22   A.    I believe I was.
23   Q.    Who else was present?

38

1    A.    I believe Drs. Vaccaro and Saleh and Mr.
2    Kabala, Mr. Steinberg; and I don't remember whether
3    Mr. Mulholland was there or not.
4    Q.    That first paragraph says that the February
5    10th meeting concluded with Drs.  Vaccaro and Saleh
6    offering to engage in a leasing agreement for the
7    nuclear camera.
8          Do you recall that issue coming up in that
9    meeting?
10   A.    Apparently it did, yes.
11   Q.    Do you have any specific recollection of that
12   meeting?
13   A.    I do not.
14   Q.    All right.  Do you have a recollection of a
15   meeting at this time where Drs. Vaccaro and Saleh
16   offered to enter into a lease arrangement?
17   A.    I have recollection that we discussed any
18   number of alternatives and that leasing is one of the
19   alternatives that came up and ultimately got hammered
20   through.  I don't have any specific recollection, you
21   know, even seeing this letter, that a meeting ended
22   with them making that proposal or who initially
23   brought that idea up at the meeting.

39

1    Q.    Assuming that the meeting is accurately
2    described here, do you believe that that was the first
3    time this lease proposal was broached?
4    A.    I can't honestly answer that.  It might have
5    been broached earlier, also.
6    Q.    But you don't have any specific recollection of
7    it being broached earlier?
8    A.    I do not.
9    Q.    If you'd flip over to the second page, please.
10   The third paragraph says, "It would be expected that
11   the hospital would operate the facility in the current
12   location."  Do you see that sentence?
13   A.    Yes, I do.
14   Q.    Do you recall that issue being discussed at a
15   meeting around this time?
16   A.    Yes.
17   Q.    Do you think that was this meeting?
18   A.    Apparently it was, but I don't have any
19   specific recollection.
20   Q.    As best you can remember, can you tell me how
21   that discussion went?
22   A.    There was a point in time when it was Vaccaro
23   and Saleh's interest in continuing to operate the

40

1    camera on the site of their practice and they were
2    proposing this kind of leasing arrangement.
3          From the hospital's point of view, we were not
4    interested in operating the camera on the site of
5    their practice if we were leasing it.
6    Q.    Why would the hospital have not been interested
7    in operating it at their office?
8    A.    If we were going to be involved in the
9    operation of a nuclear camera, we wanted it to be in a
10   location that would be attractive for any number of
11   physicians on the medical staff to refer patients to.
12   We didn't believe that any other physicians would want
13   to have their patients have diagnostic work done at
14   Vaccaro and Saleh's office whether the hospital was
15   the ultimate provider of that service or not.
16   Q.    Then it says, "My clients have indicated that
17   all of their Nuclear Medicine Studies can be
18   accommodated by a combination of their current camera
19   and those at BRMC."  Do you recall any discussion of
20   that issue?
21   A.    Not specifically, no.
22   Q.    It says "those at BRMC."  BRMC only had one
23   camera; correct?

41

1    A.   At that point in time.
2    Q.   Do you know -- after this February 10th meeting
3    that we assume happened, do you know when the next
4    time you had any kind of face-to-face meeting with
5    Drs. Vaccaro or Saleh regarding a lease arrangement?
6    A.   I believe it was in March.
7    Q.   Do you recall a March 8th meeting discussing
8    the lease arrangement?
9    A.   I recall a March meeting.  You know, I looked
10   back at my records and it was on MArch 8th.
11   Q.   I'll show you this.
12        MR. SIMPSON:  If we could mark this as
13        Exhibit 3, please.
14        (Leonhardt Deposition Exhibit No. 3 was
15   marked for identification.)
16   Q.   I'm showing you what's marked as Exhibit 3,
17   which is a March 20th, 2003 letter to Alan Steinberg
18   from Jodeen Hobbs.
19        First I'll ask you if you recall seeing that
20   letter?
21   A.   Okay.
22   Q.   Do you recall reading this letter at around the
23   time it was sent?

42

1    A.   I don't have any specific recollection of it,
2    no.
3    Q.   Did you routinely read correspondence from
4    opposing counsel?
5    A.   Yes.
6    Q.   So it's likely you did read this letter?
7    A.   It's very likely I did.  I just don't have a
8    specific recollection of it.
9    Q.   Do you have a specific recollection of this
10   March 8th meeting that's discussed in the letter?
11   A.   Yes, I have a recollection of the March 8th
12   meeting.
13   Q.   And it says that Drs. Vaccaro and Saleh, Mr.
14   Kabala, Mr. Mulholland, Mr. Steinberg and you were at
15   the meeting.  Is that right?
16   A.   Yes, I believe so.
17   Q.   And is it true that the discussions focused
18   primarily on the details of a proposed lease
19   agreement?
20   A.   Yes, they did.
21   Q.   Do you know who suggested the meeting or who
22   proposed having this meeting?  Was it you or them?
23   A.   Prior to these meetings, we agreed to meet on

43

1    several occasions over a period of a couple of months
2    to try to resolve this issue.  The March 8th meeting
3    was one of those meetings.
4    Q.   So it might have been scheduled previously?
5    A.   It might have been scheduled previously.
6    Q.   But by the time of this meeting, you were
7    focusing on the lease concept as opposed to the Under
8    Arrangements concept; correct?
9    A.   No, we were focusing on the lease concept as
10   something that we could get done to resolve this
11   dispute at this point in time while we continued to
12   work on the Under Arrangements.
13   Q.   When you say as a means to resolve this
14   dispute, I just want to back up one second.  One
15   possible means of resolving the dispute was simply for
16   the hospital to say, keep your camera, we're not going
17   to revoke your privileges.  That was an option of the
18   hospital; wasn't it?
19   A.   Sure it was.
20   Q.   And to your knowledge, that option would have
21   been acceptable to Drs. Vaccaro and Saleh?
22   A.   I expect it would have been.
23   Q.   At the time of this meeting, was the hospital

44

1    resistant to the idea of doing a lease or was the
2    hospital open to the idea of doing a lease or was the
3    hospital pushing the idea of doing a lease, if you
4    understand?
5        MR. MULHOLLAND:  I just object to the
6        form; but he can answer to the extent he can.
7    A.   If I was asked to describe it, I would say we
8    were open to the idea of pursuing a lease.
9    Q.   V&S, would you describe them as being open to
10   the idea, resistant to it or pushing it?
11       MR. MULHOLLAND:  Same objection to form.
12       But you can answer.
13   A.   I don't know how to answer that.
14   Q.   I suppose the point I'm trying to get at is:
15   Which side was the one who was the advocate for the
16   lease idea?
17   A.   My impression was that both sides saw it as a
18   potential way to resolve their dispute and that
19   neither side saw it as perfect or, you know, what they
20   ultimately wanted.  It was a way to compromise.
21   Q.   Now, at this meeting, is it correct that V&S
22   initially proposed a five-year 2,000 dollar per day
23   lease?

APP-63

77

1     And we had discussed that issue previously and
2  I think you had mentioned that you were aware that
3  V&S's attorneys had made that accusation.  And this is
4  the letter where they do make that accusation;
5  correct?
6     A.  Right.
7     Q.  Now, ultimately you entered into a lease
8  agreement and executed a final agreement in October;
9  correct?
10    A.  Correct.
11    Q.  After you entered into that agreement, what
12 happened to the nuclear camera?
13    A.  For a period of time it continued to operate at
14 Vaccaro and Saleh's office.
15    Q.  I just wanted to ask some questions about that,
16 but if you wanted to keep going -- were you finished
17 with that answer?
18    A.  Until such time as we were able to get the
19 camera that we desired from Philips in place at the
20 hospital.
21    Q.  Now, you had previously testified that you
22 didn't think it was a good idea for Bradford to lease
23 a camera and then leave it at V&S's office; correct?

78

1     A.  Correct.
2     Q.  So why did you ultimately decide to do that?
3     A.  Because we couldn't get the camera from Philips
4  that we had wanted at the time that the lease was
5  entered into.  It took us longer to get that than we
6  expected it to.
7     Q.  All right.  You had said that one of the
8  problems with doing it that way would be that other
9  physicians -- it wouldn't be as easy for them to refer
10 patients for tests to be performed on a camera at
11 V&S's office; correct?
12    A.  That's correct.
13    Q.  So for a period of -- do you know how long the
14 camera was at V&S's office?
15    A.  I believe almost until March.
16    Q.  So four or five months?
17    A.  About four or five months.
18    Q.  How was the camera used during that time?
19    A.  It was used essentially by V&S's patients.
20    Q.  Okay.  It was used by V&S's patients but it was
21 Bradford's camera because you had subleased it?
22    A.  We were leasing it at that point, yes.
23    Q.  Did Bradford submit claims for tests performed

79

1  on that camera during that period of time?
2     A.  No.  V&S continued to submit the claims and
3  then provided us with an accounting and the revenue
4  from that.
5     Q.  Did V&S submit the claims under their provider
6  number or under the hospital's?
7     A.  I don't know the answer to that.
8     Q.  How did the hospital make money off of the
9  camera during that period of time?
10    A.  V&S provided us with the revenue.
11    Q.  And did the hospital pay V&S a billing fee?
12    A.  Yes.
13    Q.  Was it ten percent?
14    A.  Yes.
15    Q.  Did the hospital pay V&S rent to keep the
16 equipment at their facility?
17    A.  And to use the space, yes.
18    Q.  Was that $2500 a month?
19    A.  Yes, it was.
20    Q.  Did the hospital make any other payments to V&S
21 in connection with the equipment during that four or
22 five-month period?
23    A.  I believe there were also expense offsets from

80

1  their revenue for the interpretation fees that they
2  were paying and for the cost of the drugs and for the
3  disposal of the nuclear waste.
4     Q.  All right.  What happened at the end of that
5  four or five-month period?
6     A.  When we were able to get the camera from
7  Philips?
8     Q.  Yes.
9     A.  We began to operate the camera at the hospital.
10    Q.  The Philips camera?
11    A.  The Philips camera.
12    Q.  I'm sorry.  I wasn't very clear.  What happened
13 to the GE camera, the old camera, after you got the
14 Philips camera?
15    A.  There was a period of a couple of months where
16 Philips was trying to decide whether they wanted the
17 camera.  The agreement with Philips was they would buy
18 the GE lease out early and their lease payment to
19 Vaccaro and Saleh would reflect that expenditure.
20    Q.  Their lease payment from Vaccaro and Saleh?
21    A.  From Vaccaro and Saleh.  I'm sorry.
22    Q.  What physically happened to the camera?
23    A.  It stayed at Vaccaro and Saleh's office for a

81

1  couple of months and then was disposed of.
2  Q.  Disposed of in what way?
3  A.  I don't know.
4  Q.  It wasn't sold?
5  A.  No, it wasn't sold.  It was --
6  Q.  Gotten rid of?
7  A.  -- gotten rid of.
8  Q.  Did Bradford pay for the early termination of
9  the GE lease?
10  A.  The cost of the early termination of the GE
11  lease was folded into the Philips lease.
12  Q.  And that was paid by who?
13  A.  It was passed through from -- it was paid by
14  Vaccaro and Saleh and then we reimbursed Vaccaro and
15  Saleh for that.
16  Q.  Okay.  So essentially Philips paid off GE.  The
17  amount of that payoff was folded into the Philips
18  rental, I suppose?
19  A.  Correct.
20  Q.  Paid by Vaccaro and Saleh and then you --
21  A.  Passed through to us.
22  Q.  You reimbursed them?
23  A.  Right.

82

1  Q.  And are those payments still being made to this
2  day?
3  A.  Yes, they are.
4  Q.  Do you know what the buyout -- the total buyout
5  amount was?
6  A.  I'm sure I did at the time.  I do not know now.
7  Q.  Let me show you Exhibit 7.
8      (Leonhardt Deposition Exhibit No. 7 was
9  marked for identification.)
10  Q.  I've shown you what's marked as Exhibit 7 which
11  I'll tell you is what I believe to be the various
12  documents governing the lease with Philips or the
13  Philips camera.  So I would ask you to look at that,
14  please.
15      If you don't mind, I'll ask this -- the first
16  several pages are a document titled Master Lease
17  Agreement dated April 6, 2004; and I guess my question
18  to you is:  Is this the Master Lease Agreement between
19  Philips and V&S for the Philips camera?
20  A.  I believe it is, yeah.
21  Q.  All right.  And then immediately after that is
22  a document titled Master Lease Schedule No. 01, which
23  is also dated April 6, 2004.

83

1  A.  Okay.
2  Q.  And if you go down to the next-to-the-last
3  paragraph of that first page it requires 60 monthly
4  payments of $4,450.40?
5  A.  Yes.
6  Q.  Then flip over another couple of pages -- I'm
7  sorry.
8      And this Master Lease Schedule No. 01 is the
9  lease for the new -- it reflects the lease payments
10  for the new camera itself; correct?
11  A.  That's what it says, yes.
12  Q.  All right.  Flip over a couple of pages to the
13  document entitled Master Lease Schedule No. 02.  If
14  you look at No. 1, System Description, it identifies
15  this as the -- as for the buyout of the GE camera;
16  correct?
17  A.  Correct.
18  Q.  Based on an estimated cost of $200,000; is that
19  right?
20  A.  That's what it says, yes.
21  Q.  So the buyout of the GE was $200,000?  That's a
22  yes?
23  A.  Yes.  I'm sorry.

84

1  Q.  She doesn't hear ah-huh very easily or it
2  doesn't translate very well.
3  A.  I apologize.
4  Q.  Then if you go down to paragraph 5(a) it calls
5  for 60 equal consecutive monthly payments of
6  $3,958.13; and so that's what you were referring to
7  about folding in the buyout in the lease; correct?
8  A.  Correct.
9  Q.  So there's two separate schedules, one of which
10  deals with the buyout and one of which deals with the
11  cost for the lease of the new camera?
12  A.  Correct.
13  Q.  And both of them are being passed through to
14  Bradford?
15  A.  That's right.
16  Q.  Then if you flip over a couple of pages to a
17  document entitled Guaranty dated April 6th.
18  A.  Correct.
19  Q.  And that is signed by you, correct, on behalf
20  of Bradford Hospital?
21  A.  That's right.
22  Q.  So this is Bradford guaranteeing the
23  obligations of V&S; correct?

101

1  Arrangements venture at that time?
2      A.  Yes, we were.
3      Q.  Then probably the last one is Exhibit 15.
4          (Leonhardt Deposition Exhibit No. 15 was
5  marked for identification.)
6      Q.  All right.  Exhibit 15 appears to be an e-mail
7  from you to Tim Brown on August 31st, '04 asking him
8  to providing you with 18 months nuclear medicine
9  volumes by referring physician.  Do you recall this
10 document?
11     A.  No, I don't but --
12     Q.  Do you recall asking Mr. Brown to give you such
13 a list at the end of August '04?
14     A.  I don't have any particular recollection of
15 that, but obviously I did.
16     Q.  Do you know what purpose or why you would have
17 asked him for that?
18     A.  Again, for the same purpose, to evaluate and
19 have information to evaluate a possible Under
20 Arrangements.
21     Q.  When was the last time that the hospital had
22 active, serious discussions with the physicians about
23 an Under Arrangements venture involving nuclear

102

1  medicine?
2      A.  Probably 2004.
3      Q.  So the last three, three and a half years it's
4  been off the table?
5      A.  Pretty much so, yeah.
6      Q.  After entering into the lease agreement with
7  V&S, did V&S show any interest in negotiating towards
8  an Under Arrangement venture?
9      A.  Yes.
10     Q.  What actions did you take with V&S in that
11 regard after the execution of the lease agreement?
12     A.  We continued to review it with them and tried
13 to refine our proposal.  We continued to try to meet
14 with and talk to other physicians on the staff.  On a
15 number of occasions, V&S had conversations with other
16 physicians on the staff explaining why they thought it
17 was a good idea, why they were interested in
18 proceeding.
19     Q.  Did it ever get to the point where draft Under
20 Arrangement documents were being circulated?
21     A.  Do you mean as far as actual agreements?
22     Q.  Yes.
23     A.  No.

103

1      Q.  On that point, on the Equipment Sublease, did
2  you have various drafts going back and forth between
3  the parties on the Equipment Sublease?
4      A.  We had various proposals going back and forth
5  and negotiations going on.  I don't know that there
6  were various drafts.
7      Q.  Okay.
8      A.  I'm sure at some point there were, but I don't
9  have any independent memory of them.
10     Q.  You don't recall marking up any drafts?
11     A.  No.
12          MR. SIMPSON:  That's all I have.
13          THE WITNESS:  Okay.
14          MR. MULHOLLAND:  We'll reserve the right
15     to read and sign unless you had any questions,
16     Carl.
17          MR. RYCHCIK:  No, I don't.
18          (Whereupon, the deposition was concluded
19 at 1:10 p.m. and signature was not waived.)
20          - - -
21
22
23

104

1            C E R T I F I C A T E
2  COMMONWEALTH OF PENNSYLVANIA    :
                                   : SS.:
3  COUNTY OF ALLEGHENY             :
4       I, Carla L. Lennartz, a Notary Public in and
   for the Commonwealth of Pennsylvania, do hereby
5  certify that before me personally appeared GEORGE
   LEONHARDT, the witness herein, who then was by me
6  first duly cautioned and sworn to testify the truth,
   the whole truth and nothing but the truth in the
7  taking of his oral deposition in the cause aforesaid;
   that the testimony then given by him as above set
8  forth was reduced to stenotypy by me, in the presence
   of said witness, and afterwards transcribed by
9  computer-aided transcription under my direction.
10      I do further certify that this deposition was
   taken at the time and place specified in the foregoing
11 caption, signature was not waived.
12      I do further certify that I am not a relative
   of or counsel or attorney for any party hereto, nor am
13 I otherwise interested in the event of this action.
14      IN WITNESS WHEREOF, I have hereunto set my
   hand and affixed my seal of office at Pittsburgh,
15 Pennsylvania, on this 10th of April, 2008.
16      The foregoing certification does not apply to
   any reproduction of this transcript in any respect
17 unless under the direct control and/or direction of
   the certifying reporter.
18
19
20                    _____
                      Carla L. Lennartz, Notary Public
21                    in and for the Commonwealth of
                      Pennsylvania
22
   My commission expires October 29, 2011.
23

APP-66

CLL – April 1, 2008

In re:  **USA, et al., vs. BRMC, et al.

*/George Leonhardt

Sworn to and subscribed before me this

13th day of May , 2008.

NOTARY PUBLIC

My commission expires: 2/24/2010 .

NOTARIAL SEAL
MARYELLEN TROUTMAN, NOTARY PUBLIC
BRADFORD, McKEAN COUNTY, PA
MY COMMISSION EXPIRES FEBRUARY 24, 2010

# 9.  BARBERA DEPOSITION EXCERPTS

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

1

1          IN THE UNITED STATES DISTRICT COURT
2       FOR THE WESTERN DISTRICT OF PENNSYLVANIA
                    ERIE DIVISION
3

4   UNITED STATES OF AMERICA, ex rel. )
    DILBAGH SINGH, M.D., PAUL KIRSCH, )
    M.D., V. RAO NADELLA, M.D., and   )
5   MARTIN JACOBS, M.D.,              )
                                      )
6            Relators,                )
                                      )  Civil Action
7       vs.                           )  No. 04-186E
                                      )
8   BRADFORD REGIONAL MEDICAL CENTER, )
    V&S MEDICAL ASSOCIATES, LLC,      )
9   PETER VACCARO, M.D., KAMRAN SALEH,)
    M.D., and DOES I through XX,      )
10                                    )
             Defendants.              )
11

12          DEPOSITION OF SAL A. BARBERA

13             TUESDAY, JULY 1, 2008

14       Deposition of SAL A. BARBERA, called as a
15   witness by the Defendants, taken pursuant to Notice of
16   Deposition and the Federal Rules of Civil Procedure,
17   by and before Joy A. Hartman, a Court Reporter and
18   Notary Public in and for the Commonwealth of
19   Pennsylvania, at the offices of Horty Springer, 4614
20   Fifth Avenue, First Floor, Pittsburgh, Pennsylvania,
21   commencing at 9:15 a.m. on the day and date above set
22   forth.

23

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

81

1    A.   I am not aware of anyone else having use of it.

2    Q.   Is it your understanding that this equipment

3  sublease was for a term of at least one year?

4    A.   I believe it was -- I believe it did have a

5  term, yes.

6    Q.   Now, do you have any opinion about whether the

7  rental payments described in the sublease are

8  consistent with fair market value?

9    A.   I believe that the payments were -- I believe

10  that the rental payments were just a direct

11  pass-through from the payments that were -- from the

12  payments that V&S was paying to GE.

13        I can't render an opinion about fair market

14  value.   That is not what I am here to do.

15   Q.   Would you be qualified to render any opinion

16  about fair market value?

17   A.   No.

18   Q.   Now aside from the pass-through payments for

19  the machine, I believe there are also payments for a

20  noncompete clause and certain other considerations

21  under the lease; is that your understanding?

22   A.   Correct.

23   Q.   And I believe your report indicates that in

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

82

1  your opinion, the noncompete payment under the

2  sublease was determined by or took into account the

3  volume or value of referrals from V&S to the Medical

4  Center; is that correct?

5    A.   Yes.

6    Q.   Can you specifically tell me what facts or

7  assumptions you base this opinion on?

8    A.   The opinion again?   Can you repeat the opinion?

9    Q.   Yes.   The opinion that the noncompete payment

10  under the sublease was directly determined by or

11  clearly took into account the volume or value of

12  referrals from V&S to BRMC, BRMC being the Medical

13  Center and V&S being V&S Medical Associates?

14   A.   Okay.   There was a board summary which

15  discloses on the second page profits that would be

16  generated by use of the equipment.   Those profits,

17  obviously, in my opinion, means that it has to do with

18  referrals.

19   Q.   Could you just refer to the document number at

20  the bottom of the Board summary?   I mean you have it

21  in front of you?

22   A.   Yes.   It is 004221.

23   Q.   And it has "HOSP" in front of that number?

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

83

1    A.   Yes.   I believe this document, HSOP 0004040 has

2  a -- it summarizes various revenue projections that

3  are driven by referrals.

4    Q.   The document you just referred to, do you

5  understand what this document was prepared for?

6    A.   Yes.   It was a noncompete analysis.

7    Q.   Were you aware of a proposed transaction that

8  never took place between the Medical Center and

9  doctors on its medical staff that was referred to as

10  an under-arrangements transaction?

11   A.   I read about that, and I was aware that it was

12  discussed, correct.

13   Q.   Do you know if this document that you just

14  referred to had to do with the under-arrangements

15  transaction or specifically with the equipment

16  sublease?

17   A.   I don't know.   I don't know what it referred

18  to.

19   Q.   Now, Mr. Barbera, a couple of minutes ago, you

20  just referred to another set of notes, I believe,

21  which were different than the notes that you just

22  turned over through your counsel; is that correct?

23   A.   These are probably similar, if not the same.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

84

1    Q.   I see.   Were these notes that you relied upon

2  in the preparation of your report?

3    A.   No.

4    Q.   What purpose did you write these notes for?

5    A.   They were just notes I took, based on my

6  report.

7    Q.   After you prepared the report?

8    A.   Yes.

9    Q.   Why did you make those notes after you prepared

10  the report?   Was it in preparation of your deposition

11  today?

12   A.   Just for easy reference.

13        MR. MULHOLLAND:   We would like to make a

14        request for those notes, as well.   I think if

15        he is referring to them in his testimony, we

16        are entitled to them.

17        MR. SIMPSON:   If he is referring to them

18        in his testimony, then I don't have any

19        objection to you looking at them, but -- hold

20        it, before you look at them.

21        If he is referring to them in his

22        testimony, then I don't have any objection to

23        you looking at them.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

121

1    Q.   And if you could please turn to the second page

2   of this exhibit, and in the upper right-hand quadrant,

3   there is a portion of the transcript from page 72.  If

4   you could just read aloud lines 15 through 21 of that

5   page 72.

6    A.   "Question:  Was there a prior camera that you

7   leased from V&S?

8         "Answer:  It actually -- yes.  There actually

9   were two cameras that that ultimately replaced.  It

10   replaced the Sophie, because we needed two cameras

11   within our department, and it replaced the old GE

12   camera that V&S had in their office.

13         "Question:  The old GE camera that V&S had in

14   their office, that was the subject of the lease

15   agreement with V&S" --

16    Q.   Do you recall reviewing that part of the

17   transcript when you read this prior to preparing your

18   report?

19    A.   No, I don't recall.

20    Q.   Reading this today, does this change your

21   opinion as to whether the hospital believed there was

22   a need for the equipment at the time?

23    A.   No, it does not.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

122

1    Q.   Why not?

2    A.   Because what I was asked to do was to give an

3   opinion as the commercial reasonableness of the

4   arrangement between the hospital and those physicians.

5    Q.   Well, wouldn't the need for an additional piece

6   of equipment be part of what you would need to

7   consider in determining whether the arrangement was

8   commercially reasonable?

9    A.   Not necessarily, because the arrangement was

10   clearly, in my opinion, based on referrals.  There was

11   no other way it could have been not based on

12   referrals.

13    Q.   I believe at some point in your report you

14   stated that the sole purpose of this arrangement was

15   to obtain referrals; is that correct?

16    A.   Correct.

17    Q.   Did you consider whether there may be any other

18   reason why the hospital would have chosen to enter

19   into the sublease with Drs. Saleh and Vaccaro?

20    A.   There might have been other reasons, but,

21   clearly, that was the sole reason.

22    Q.   Can you think of any of those other reasons --

23    A.   No.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

123

1    Q.   -- as you sit here today?

2    A.   No.

3    Q.   I think on page five of your report, Mr.

4   Barbera, if you can turn back to that -- that was

5   Exhibit 1 that we introduced earlier in your

6   deposition?  I'm sorry.  It is paragraph No. 5, not

7   page five.  It is on page three of your report.

8    A.   Okay.

9    Q.   I believe at that part in your report, you

10   mention BRMC paid $2,500 a month to lease the space in

11   the offices that V&S Medical Associates used to house

12   the equipment; is that correct?

13    A.   Yes.

14    Q.   Have you ever seen the space in question in the

15   offices of V&S Medical Associates where the machine

16   was housed at the beginning of the sublease?

17    A.   No.

18    Q.   Have you ever been to Bradford, Pennsylvania?

19    A.   No.

20    Q.   Do you have any opinion as to what the fair

21   market rental value of that space was or is?

22    A.   No.

23    Q.   Your report also questions why a space rental

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

124

1   fee was paid when the camera was generating revenue

2   for the hospital; is that correct?

3    A.   I had a question as to that, as to the billing

4   arrangement possibility there, and that was it.

5    Q.   And what was the question?

6    A.   Well, I wasn't sure, based on the arrangement,

7   whether that -- whether those procedures that were

8   done in that physicians' office, even though the

9   equipment was leased by the hospital, if they were

10   billed under the hospital's provider number or if they

11   were billed under the physician's provider number,

12   because there is, obviously, issues with how it was

13   being billed.

14    Q.   Do you know how it was being billed at that

15   time?

16    A.   No.

17    Q.   You don't have any information as to whether it

18   was billed under the hospital's provider number or the

19   physician's provider number; is that correct?

20    A.   Correct.

21    Q.   If we assume for the purposes of your

22   discussion today that the hospital was billing for

23   those services under its provider number, would it be

Margaret Koenig Mimless
Maureen T. McCall
Joy A. Hartman

## *Johnson and Mimless*
### Court Reporters

1334 Fifth Avenue, Pittsburgh, PA 15219-6214

Phone:
412–765–0744

Fax:
412-765-3539

COMMONWEALTH OF PENNSYLVANIA )
                                            )

COUNTY OF ALLEGHENY             )

USA, et al., vs. BRMC, et al.

I, Joy Hartman, a Notary Public in and for the Commonwealth of Pennsylvania, do hereby certify that the witnesses (Martin David Jacobs, M.D., V. Rao Nadella, Dilbagh Singh, M.D., Paul Kirsch and Sal A. Barbera), was duly sworn and that the deposition is a true record of the testimony given by the witnesses. A copy of the transcript of the deposition was submitted to the witnesses for inspection and signing.

The deposition was not signed by the witness within thirty days of its submission to the witness and, therefore, my signature below constitutes my signature of the deposition in accordance with Pa.R.C.P. 4017©.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this 4th day of September, 2008.

*Joy A. Hartman*
Joy A. Hartman

CC:   Andrew M. Stone, Esquire
        Daniel M. Mulholland, III, Esquire
        Carl J. Rychcik, Esquire

Commonwealth of Pennsylvania
NOTARIAL SEAL
JOY A. HARTMAN, Notary Public
City of Pittsburgh, County of Allegheny
My Commission Expires May 9, 2010

# 10. POLICY ON PHYSICIANS WITH COMPETING FINANCIAL INTERESTS



# BRADFORD REGIONAL MEDICAL CENTER
## RESOLUTION OF THE BOARD OF DIRECTORS

### POLICY ON PHYSICIANS WITH COMPETING FINANCIAL INTERESTS

**WHEREAS,** Bradford Regional Medical Center (the "Medical Center"), through its Board of Directors, reaffirms its mission to provide quality care to the people in its region regardless of their ability to pay; and

**WHEREAS,** it is the continuing desire of the Board to provide a broad range of services within its facilities at a reasonable cost; and

**WHEREAS,** it is the responsibility of the Board to exercise reasonable care and skill in preserving the fiscal integrity of the Medical Center and in protecting patients; and

**WHEREAS,** in accordance with its legal and ethical responsibilities, the Board of the Medical Center has a fiduciary duty to facilitate the efficient and effective management and operation of its services and facilities; and

**WHEREAS,** the Medical Center is facing increasing competition from other health care entities, which may not share the same commitment to providing quality, comprehensive health care services, including charitable or uncompensated services to patients in the region; and

**WHEREAS,** the Board has determined that proper management of the assets of the Medical Center and sound professional practice require that certain steps be taken to further its mission.

**NOW BE IT RESOLVED THAT** a practitioner who has a financial relationship with, or an ownership or investment interest in, any competing health care entity or services that has or may have a significant impact (as determined by the Board) upon the Medical Center: (i) shall be ineligible to be granted appointment (initial or reappointment) or clinical privileges to practice at the Medical Center and its facilities, and (ii) shall be ineligible for continued appointment and clinical privileges if the practitioner currently has an appointment to the Medical

-1-

DEPOSITION
EXHIBIT
8
7-26-07    Jah

HOSP 0004321

Staff and/or clinical privileges to practice at the Medical Center. For the purpose of this Resolution, "financial relationship" shall include, but not be limited to, ownership or investment interests and compensation arrangements. An ownership or investment interest may be through equity, debt, or other means. A compensation arrangement shall include, but not be limited to, arrangement pursuant to which remuneration or an economic benefit is received, directly or indirectly, by the practitioner from the entity.

**BE IT FURTHER RESOLVED THAT** the Medical Center, consistent with legal standards, will use its best efforts to foster cooperative relationships with practitioners to facilitate the provision of health care services in the region so that high quality care can be provided in the most cost-effective manner.

**BE IT FURTHER RESOLVED THAT** action by the Medical Center determining a practitioner to be ineligible for initial appointment, continued appointment, reappointment and/or clinical privileges, as set forth in this Resolution, shall not constitute a professional review action, and thus shall not trigger any rights to a hearing or appeal under the Medical Center's Policy on Appointment, Reappointment and Clinical Privileges, nor shall such determination be reportable to the National Practitioner Data Bank or the Pennsylvania State Board of Medicine.

**BE IT FURTHER RESOLVED THAT** the Management of the Medical Center shall provide notice of this Resolution and Policy as soon as possible after its adoption to all Medical Staff members and other interested parties.

**BE IT FURTHER RESOLVED THAT** the Management of the Medical Center is authorized and directed to develop a protocol or procedures to implement this Board Resolution and Policy and its principles.

ADOPTED this 23rd day of May , 2001.

Secretary, Board of Directors

D:\Administration\Board\CompetingInterests-BoardResolution&Policy.wpd

-2-

HOSP 0004322

APP-75

BRADFORD REGIONAL MEDICAL CENTER

PROCEDURES FOR ASSESSING WHETHER PRACTITIONERS
HAVE SIGNIFICANT COMPETING FINANCIAL RELATIONSHIPS

I.     INTRODUCTION

On May 23, 2001, the Board of Directors (the "Board") of Bradford Regional Medical Center
(the "Medical Center") adopted a resolution which addressed the issue of practitioners ("Covered
Practitioners")[1] who have a financial relationship[2] with, concerning, or investment interest in,
a competing health care entity or services ("Competing Entity")[3] that have or may have a
significant impact (as determined by the Board) detrimental to the ability of the Medical Center
to fulfill its mission.[4]  In adopting the resolution, the Board was concerned that Covered
Practitioners would have an incentive to direct their patients away from the services and facilities
available at the Medical Center and toward the Competing Entity for reasons unrelated to patient
preference, medical necessity, or third-party payor requirements.

---

[1]     Covered Practitioner as used herein includes a corporation or business entity owned by the
practitioner, or the practitioner's spouse, sibling, child or other relative who has or holds the
financial relationship with or concerning the Competing Entity.

[2]     As used in these Procedures, the term "financial relationship" shall include ownership or
investment interests and compensation agreements. An ownership or investment interest may
be through equity, debt, or other means.  A financial relationship shall also include any
arrangement pursuant to which remuneration is paid directly or indirectly from the entity to the
individual in question.

[3]     As used in these Procedures, the Competing Entity also must to be located within 30 miles of
the Medical Center. A Competing Entity as used in these Procedures may be either (i) a distinct
health care entity, or (ii) health care services that the Covered Practitioner provides in his or her
practice.  When the matter in question concerns (ii), the term Competing Entity and the
provisions in which it is used will be understood accordingly.

[4]     At the time of its adoption of the resolution, based upon the information known to it at that time,
the Board was not aware of any existing services being provided by any member of the Medical
Center's Medical Staff that would constitute a significant impact detrimental to the ability of the
Medical Center to fulfill its mission.

-1-

HOSP 0004323

In this way, Covered Practitioners would use the Medical Center's resources as a means to develop a patient base only to divert those patients to the Competing Entity. This use of the Medical Center's facilities would be inconsistent with the Medical Center's mission and would compromise the Medical Center's long-term viability. Thus, the resolution reflected a decision by the Board to deem Covered Practitioners ineligible both for initial appointment and clinical privileges, and reappointment and renewal of clinical privileges.

The Procedures will outline the process to be followed by the Board in determining whether initial applicants and members of the Medical Staff are Covered Practitioners.

-2-

HOSP 0004324

APP-77

II.    **PROCESS FOR REVIEWING INDIVIDUALS WHO MAY BE "COVERED PRACTITIONERS"**

There are some similarities in these Procedures concerning how initial applicants and current Medical Staff members are to be addressed. However, the differences are important enough that initial applicants and current members are addressed in separate sections of these Procedures. The final section of these Procedures will address procedural standards that are applicable to both initial applicants and Medical Staff members.

A.    **Initial Applicants Who Have a Financial Relationship With, Concerning, or Investment Interest in, a Competing Entity.**

1.    During the pre-application or initial application process, a copy of these Procedures shall be provided to each applicant and they will be asked to indicate whether or not they have a financial relationship with, concerning, or investment interest in, a Competing Entity. If the Board learns that an initial applicant has a financial relationship concerning or with, or investment interest in, a Competing Entity, the individual will be required to supply information to the Board. The purpose of the information will be to assist the Board in determining whether the financial relationship or investment interest is significant and is inconsistent with, or detrimental to, the interests of the Medical Center.

2.    The following information illustrates the type of information the Board may require:

   (a)    a copy of any agreement with or concerning the Competing Entity;

   (b)    a copy of any and all policies and procedures of or concerning the Competing Entity that in any way impact on referrals, utilization of services, and incentive compensation;

-3-

HOSP 0004325

(c)    a complete disclosure of the individual's financial, investment or business relationship in, with or concerning the Competing Entity, including any return on investment which in any way is related to referrals;

(d)    an interview with the individual and/or a representative of the Competing Entity; and

(e)    other information deemed relevant by Board to the assessment of this issue.

3.    At the direction of the Board, the CEO shall gather the above information and organize it for review.

4.    The Board, or a designated subcommittee, shall review the information prepared by the CEO of the Medical Center and make a preliminary recommendation.  If the Board or the subcommittee's preliminary recommendation is that the individual is a Covered Practitioner, the individual shall be notified, in writing, with information concerning the reasons for this preliminary recommendation. The individual may request a meeting with the Board, or a designated subcommittee, to discuss the recommendation. Any request for a meeting must be in writing, directed to the CEO of the Medical Center, and received within 15 business days of the individual's receipt of the preliminary recommendation.

5.    After a Board or subcommittee meeting with the individual, or if no meeting is requested, the Board shall make a final decision as to whether the individual is a Covered Practitioner. The effect that such a decision would have upon the services provided to the community which the Medical Center serves will also be considered by the Board in its

-4-

HOSP 0004326

decision-making. The Board will make its determination either (a) on the same day it has met with the individual (or has learned that the individual does not desire to meet with the Board), or (b) by the next regularly scheduled Board meeting. A determination by the Board that the individual is a Covered Practitioner requires a 2/3 vote of Board Members present and voting at a duly constituted meeting.

6.   If the Board concludes that an initial applicant does not have a financial relationship or investment interest that is significant and is inconsistent with, or detrimental to, the interests of the Medical Center, the individual will be eligible to seek initial appointment and clinical privileges, consistent with other Medical Center policies, and pursuant to the Policy on Appointment, Reappointment and Clinical Privileges of the Medical Center (the "Appointment Policy").

7.   If the Board concludes that an initial applicant is a Covered Practitioner and is, therefore, ineligible to seek initial appointment and clinical privileges, notice shall be sent to the individual. The notice shall advise the initial applicant that he or she is ineligible for appointment and clinical privileges.

8.   If the Board is unable to determine if the financial relationship or investment interest is significant and is inconsistent with, or detrimental to, the interests of the Medical Center, it may determine that the individual is eligible to seek initial appointment and clinical privileges, consistent with other Medical Center policies, and pursuant to the Appointment Policy, but that appointment and clinical privileges be conditioned on an agreement that the individual will:

-5-

HOSP 0004327

(a)  provide the Board with a copy of any subsequent amendments to the agreement with or concerning the Competing Entity within 10 business days of their effective date;

(b)  provide the Board with a copy of any relevant policies within 10 business days of their effective date;

(c)  inform the patient of services that are available at the Medical Center when they are needed by the patient.

9.  The Board may determine that an initial applicant who refuses to agree to abide by any of the above conditions is ineligible for initial appointment and/or clinical privileges. The Board may further provide that any violation of the above conditions will be deemed to be a voluntary resignation of appointment and clinical privileges.

-6-

HOSP 0004328

APP-81

**B.**  **Medical Staff Members Who Have a Financial Relationship With, Concerning, or Investment Interest in, a Competing Entity.**

1.  Members of the Medical Staff who have a financial relationship with, concerning, or investment interest in, a Competing Entity will be subject to an audit, the purpose of which will be to determine if the arrangement or interest is significant and whether their practice patterns are inconsistent with, or detrimental to, the interests of the Medical Center.

2.  At the direction of the Board, the CEO or his designee will be responsible for conducting the audit and may request any relevant information, including information listed in Section II.A.2 above and any information pertaining to the member's referral patterns and utilization rates concerning the Competing Entity.

3.  At the direction of the Board, the CEO shall gather the above information and organize it for review.

4.  The Board, or a designated subcommittee, shall review the information prepared by the CEO of the Medical Center and make a preliminary recommendation. If the Board or subcommittee's preliminary recommendation is that the member is a Covered Practitioner, the member shall be notified, in writing, with information concerning the reasons for this preliminary recommendation. The member may request a meeting with the Board, or a designated subcommittee, to discuss the recommendation. Any request for a meeting must be in writing, directed to the CEO of the Medical Center, and received within 15 business days of the individual's receipt of the preliminary recommendations.

-7-

HOSP 0004329

APP-82

5.  After a Board or subcommittee meeting with the member, or if no meeting is requested, the Board shall make a final decision as to whether the member is a Covered Practitioner. The effect that such a decision would have upon the services provided to the community which the Medical Center serves will also be considered by the Board in its decision-making. The Board will make its determination either (a) on the same day it has met with the individual (or has learned that the individual does not desire to meet with the Board), or (b) by the next regularly scheduled Board meeting. A determination by the Board that the individual is a Covered Practitioner requires a 2/3 vote of Board Members present and voting at a duly constituted meeting.

6.  If the Board concludes that the member of the Medical Staff does not have a financial relationship or investment interest that is significant and is inconsistent with, or detrimental to, the interests of the Medical Center, no further action will be taken.

7.  If the Board concludes that the member of the Medical Staff is a Covered Practitioner, it may deem the member ineligible for continued appointment and privileges and notice shall be sent. In the alternative, the Board at its sole discretion may allow the member to continue to practice until the expiration of the member's current appointment period.

8.  If the Board is unable to determine if the financial relationship or investment interest is significant and is inconsistent with, or detrimental to, the interests of the Medical Center, it may determine that the member is eligible to continue appointment and clinical privileges conditioned on an agreement that the member will:

-8-

HOSP 0004330

(a)   provide the Board with a copy of any subsequent amendments to the agreement with or concerning the Competing Entity within 10 business days of their effective date;

(b)   provide the Board with a copy of any relevant policies within 10 business days of their effective date;

(c)   inform the patient of services that are available at the Medical Center when they are needed by the patient.

(d)   not change referral rates as a result of a financial relationship with or concerning, or investment interest in, the Competing Entity;

(e)   permit the Board to audit, on a quarterly basis, the individual's referrals.

9.   The Board may determine that a member of the Medical Staff who refuses to agree to abide by any of the above conditions is ineligible for continued appointment, reappointment and/or clinical privileges.

10.   Before a Medical Staff member invests in what could be determined to be a Competing Entity, the physician may provide the Board with a letter of intent that describes the potential venture or investment. The Board will review the letter of intent and provide the Medical Staff member with a response as to whether a Competing Entity would be involved, based upon the information provided in the letter of intent. (The Board can also request further information about the potential venture or investment in order to provide the individual with a well-informed response.) The individual can request that he or she meet with the Board either before it delivers its response or within 10 days after receiving the Board's response. The intent of this provision is to provide good faith information to the physician so that he or she can make a well-informed investment

-9-

HOSP 0004331

decision. Absent new, material information about the potential venture or investment not previously shared with the Board, once the Board has made its determination, no further review will be conducted so that the physician can make his or her informed investment decision.

-10-

HOSP 0004332

C.    **Procedural Standards.**

1.    The Board's determination that an initial applicant or member of the Medical Staff is a Covered Practitioner, and is not eligible for initial appointment, continued appointment, or reappointment, shall be final. The meeting of the Board or subcommittee prior to this determination, as set forth in Sections II.A.4 and II.B.4 above, shall be the sole and exclusive remedy available to the applicant or member.

2.    An initial applicant or member of the Medical Staff who is determined by the Board to be a Covered Practitioner may seek reconsideration if there is a material change in their financial relationship with or investment interest in the Competing Entity.

3.    The Board's determination that an initial applicant or Medical Staff member is not eligible for initial appointment, continued appointment or reappointment does not constitute an adverse professional review action, does not trigger the hearing and appeal provisions set forth in the Appointment Policy, and is not reportable to the State Board or to the National Practitioner Data Bank.

4.    Failure of an initial applicant to provide relevant information to the Medical Center so that a full and complete audit of the issue of whether the applicant has a financial relationship with, concerning, or investment interest in, a Competing Entity that is significant and is inconsistent with, or detrimental to, the interests of the Medical Center, will result in the application being deemed incomplete. An incomplete application will not be processed.

-11-

HOSP 0004333