# 11. JANUARY 2, 2002 LETTER TO DR. SALEH FROM GEORGE LEONHARDT

 

**BRADFORD REGIONAL MEDICAL CENTER**

*DEDICATED TO IMPROVING THE HEALTH OF OUR COMMUNITY*

January 2, 2002

Kamran Saleh, MD
V&S Medical Services
24 W. Washington Street
Bradford, PA 16701

**CONFIDENTIAL
PEER REVIEW**

Dear Dr. Saleh:

At its December 12th meeting, the Board of Directors appointed a Fact Finding Committee to compile and then organize information for review by the full Board as they determine whether or not you are a covered practitioner as described by the Policy on Physicians With Competing Financial Interests.

The Committee requests that you provide the following information with respect to the operation of the nuclear camera located in your office:

1. Copies of any leases, contracts (including employment contracts) or other agreements relating to your acquisition and use of the nuclear camera.

2. The names of any partners or business associates.

3. The manufacturer of the equipment and the specific model of the equipment.

4. A listing of all examinations the equipment is capable of performing.

5. A listing of which of those specific examinations you are now utilizing and which you may utilize in the future.

6. Please identify by name and professional background all physicians providing interpretations of the examinations being performed.

7. A listing of all procedures and examinations performed from the date of installation until the present (no patient names are to be included). The list should include the date of the procedure and identification of the source of payment.

8. A listing of procedures referred out of your office by date, procedure, payer and entity receiving the referral.

9. A copy of your business plan, including projections for volume of procedures or modalities to be performed over the next three years by procedure or modality. Also including plans to add procedures or modalities.

10. Any information that you disclose to patients regarding your ownership or related interest in the diagnostic equipment.

Thank you for your understanding and cooperation. We would appreciate a response by January 23rd.

Very truly yours,

George E. Leonhardt,
President/CEO

GEL:cr

*116 Interstate Parkway • P.O. Box 0218 • Bradford, Pennsylvania • 16701-0218 • (814) 368-4143 • www.brmc.com*

HOSP 0003939

APP-88

# 12. JANUARY 28, 2002 LETTER TO DR. VACCARO FROM GEORGE LEONHARDT





*DEDICATED TO IMPROVING THE HEALTH OF OUR COMMUNITY*

January 28, 2002

Peter Vaccaro, M.D.
V & S Medical Services
24 West Washington Street
Bradford, PA 16701

**CONFIDENTIAL
PEER REVIEW**

*CONFIDENTIAL*

Dear Dr. Vaccaro:

The Board of Directors has appointed a Fact-Finding Committee to compile and then organize information for review by the full Board as it determines whether or not you are a covered practitioner as described by the Policy on Physicians with Competing Financial Interests. The Committee requests that you provide the following information with respect to the operation of the nuclear camera located in your office:

1.  Copies of any leases, contracts (including employment contracts) or other agreements relating to your acquisition and use of the nuclear camera.

2.  The names of any partners or business associates.

3.  The manufacturer of the equipment and the specific model of the equipment.

4.  A listing of all examinations the equipment is capable of performing.

5.  A listing of which of those specific examinations you are now utilizing and which you may utilize in the future.

6.  Please identify by name and professional background all physicians providing interpretations of the examinations being performed.

7.  A listing of all procedures and examinations performed from the date of installation until the present (no patient names are to be included). The list should include the date of the procedure and identification of the source of payment.

8.  A listing of procedures referred out of your office by date, procedure, payer and entity receiving the referral.

9.  A copy of your business plan, including projections for volume of procedures or modalities to be performed over the next three years by procedure or modality. Also including plans to add procedures or modalities.

10. Any information that you disclose to patients regarding your ownership or related interest in the diagnostic equipment.

Thank you for your understanding and cooperation. We would appreciate a response by February 18, 2002.

Sincerely,

George E. Leonhardt,
President/CEO

GEL:cr

116 Interstate Parkway • P.O. Box 0218 • Bradford, Pennsylvania • 16701-0218 • (814) 368-4143 • www.brmc.com

HOSP 0003991

APP-90

# 13. MAY 20, 2002 LETTER TO DR. SALEH FROM RICHARD MCDOWELL

 **BRADFORD REGIONAL MEDICAL CENTER**



*DEDICATED TO IMPROVING THE HEALTH OF OUR COMMUNITY*

**VIA HAND DELIVERY**

May 20, 2002

Kamran Saleh, MD
V&S Medical Associates
24 W. Washington Street
Bradford, PA 16701

Dear Dr. Saleh:

As you know, the Board of Directors of Bradford Regional Medical Center has previously adopted a Policy and Procedures for Assessing Whether Practitioners Have Significant Competing Financial Relationships (the "Policy" and the "Procedures"). This past Wednesday, the 15th, the Board met to discuss whether you are a covered practitioner with a significant competing financial relationship (a "Covered Practitioner") under the Policy and Procedures. (Copies of the Policy and Procedures are enclosed.)

At its meeting, the Board made a preliminary determination that you are a Covered Practitioner. As I will explain in more detail later in this letter, a next step to take is for you, Dr. Vaccaro and the Board to meet and, in good faith, discuss this situation and whether there are potential resolutions to it.

The reasons for why the Board made this preliminary determination include:

(1)     We understand that your corporation, V&S Medical Associates, in which Dr. Peter Vaccaro is your partner, purchased or leased a General Electric Gamma Camera - Model DZZI sometime around July, 2001 (the "V&S equipment"). The V&S equipment is capable of performing the procedure group, procedures and components described in Attachment A to this letter. The Medical Center has similar equipment, Picker *Axis* Gamma Camera (the "Medical Center equipment"), which performs the same procedure group, procedures and components.

(2)     Data collected by the Medical Center shows that you have significantly changed your practice pattern in terms of your usage of the Medical Center's equipment. We understand that is because you are now using the V&S equipment in its place.

DEPOSITION
EXHIBIT
Saleh
8907 8 Jan

**Confidential
V&S 00060**

APP-92

LETTER TO:  KAMRAN SALEH, MD
MAY 20, 2002
PAGE TWO

(3)     Beginning with a letter dated February 2, 2002 to you, the Medical Center and its legal counsel have sent letters to you, Dr. Vaccaro and your legal counsel asking for further information concerning the V&S equipment. Those requests were made so that the Medical Center could make a decision on this matter based upon complete information provided by your office.

Instead of providing that complete information, you limited your answers to the names of any partners or business associates, the manufacturer of the equipment, and a listing of the examinations that the equipment is capable of performing. By refusing to provide any more information, please understand that you have chosen to limit the information upon which the Board of Directors is able to make its decisions.

The Board of Directors fully recognizes your right, and that of V&S Medical Associates, to compete with the Medical Center with equipment and services provided in your own office. However, this Board also has its own responsibility to exercise reasonable care and skill in preserving the fiscal integrity of the Medical Center, as well as in protecting patients. The Board also has a responsibility to see that the Medical Center's mission to provide charitable or uncompensated services to patients in the region can be accomplished.

The Board's preliminary determination is that you have an ownership or investment interest in competing health care services that have a significant financial impact upon the Medical Center.

Pursuant to the Procedures, you have the right to request a meeting with the Board to discuss this preliminary determination. We think such a meeting would be a worthwhile step to take for both you and the Medical Center. The Board has its fiduciary responsibilities to exercise and fulfill, as described above, but it also feels that a meaningful discussion of potential resolutions to this situation could be constructive.

Should you wish to meet with the Board, please let George Leonhardt know this in writing within fifteen (15) business days from your receipt of this letter. Thank you.

Sincerely,

Richard McDowell, Ph.D.
Chairman, Board of Directors

/er
Enclosures

D:\Administration\George Saleh-BoardDecisionLetter 5-20-02.wpd

Confidential
V&S 00061

APP-93

**BRADFORD REGIONAL MEDICAL CENTER**
Bradford, Pennsylvania

<u>ATTACHMENT A</u>

| PROCEDURE GROUP | PROCEDURE | COMPONENT |
|---|---|---|
| Bone Scan | Whole Body Bone | MDP Injection<br>Return for Scan |
| | Spect Bone | MDP Injection<br>Return for Scan |
| | 3 Phase Bone | MDP Injection<br>Return for Scan |
| | | |
| Liver/Spleen | Hemangioma Study | Ultra Tag RBC Injection |
| | | |
| Hepatobiliary Study | Hepatobiliary Study | Choletec Injection |
| | Hepatobiliary W/E.F. | Choletec Injection<br>Hepatolite Injection |
| | Hepatobiliary W/Ejection Fraction | Hepatolite Injection |
| | | |
| Thyroid Study | TC-99M Thyroid Study | 99MTCO4-Injection |
| | | |
| Infection Scan | Ceretec WBC Study Limited | Ceretec WBC Injection |

Confidential
V&S 00062

# 14. OUTLINE OF PROPOSAL



CONFIDENTIAL

<u>OUTLINE OF PROPOSAL</u>

1.  An entity owned by physicians on the medical staff will be formed to enter into the following transaction with the Medical Center. Investor participation will be open to any interested physician on the medical staff.

2.  The entity will lease space, equipment and personnel from the Medical Center as needed to provide nuclear cardiology imaging tests (but not ultrasound testing). The Medical Center contracts with this entity to pay an agreed-upon fair market price each time a diagnostic test is furnished to hospital patients. The Medical Center – not the entity – bills the patient or third-party payors for those services "under arrangements".

3.  The entity and all physician-investors will execute a covenant not to compete agreeing not to provide the services furnished by the entity in their offices or invest in any other entity that provides such services, while they are investors and while the entity furnishes these services under arrangement to the Medical Center, and for two years thereafter.

4.  The physician-investors would also grant the entity a right of first refusal with respect to providing outpatient diagnostic imaging services. They would also agree to discuss the possibility of joint ventures for other non-diagnostic outpatient services with the Medical Center prior to pursuing them on their own.

5.  Pro forms illustrating the estimated financial performance of the arrangement will be directly sent. These are only estimates and are in no way to be considered guarantees of actual financial performance.

6.  The arrangement as finally negotiated would comply with all applicable laws and regulations and not jeopardize the Medical Center's tax-exempt status, and, if advised by counsel, the parties would seek appropriate regulatory guidance including an Advisory Opinion from the HHS Office of the Inspector General.



DEPOSITION
EXHIBIT

HOSP 0004357

APP-96

# 15. AGREEMENT BETWEEN BRMC AND V&S MEDICAL ASSOCIATES

# AGREEMENT



THIS AGREEMENT dated as of April 16, 2003 by and between Bradford Regional Medical Center, a nonprofit corporation existing under the laws of the Commonwealth of Pennsylvania (the "Medical Center") and V&S Medical Associates, LLC, a limited liability company existing under the laws of the Commonwealth of Pennsylvania ("V&S Medical Associates").

## WITNESSETH:

WHEREAS, the parties hereto have entered into good faith negotiations to determine if a dispute concerning nuclear cardiology imaging tests can be resolved through a leasing arrangement and the creation and implementation of what is called an "under arrangements" model; and

WHEREAS, the parties have reached an agreement concerning terms for a proposed lease of nuclear cardiology imaging equipment from V&S Medical Associates to the Medical Center and the principles pursuant to which they will work together to develop, create and implement the under arrangements model and a physician entity referred to herein as "Physician NewCo."

NOW THEREFORE, intending to be legally bound hereby, the parties hereto agree as follows:

(1)     V&S Medical Associates leases nuclear cardiology imaging equipment (the "Equipment") from GE Healthcare Financial Services ("GE") pursuant to a Lease dated as of June 6, 2001 between V&S Medical Associates and GE (the "GE Lease"). The Equipment will be subleased to the Medical Center pursuant to a Sublease between the parties (the "Sublease") for the remaining term of the GE Lease, i.e., until August 31, 2007, at the price of $29,250 per month. This subleasing of the Equipment through the Sublease is contingent upon the approval of GE. The Sublease shall contain such other terms and conditions agreed upon by the parties which are usual and customary for medical equipment leases.

(2)     Subsequent to the execution of the Sublease, the Equipment will be moved to the Medical Center. The Medical Center will be responsible for the moving of the Equipment, both in terms of all moving costs and the risks to the Equipment associated with the move.

(3)     V&S Medical Associates will be responsible for payment of the maintenance of the Equipment through the remainder of the GE Lease term. This includes payment of the current maintenance agreement with GE and a new or replacement maintenance agreement once the current maintenance agreement expires if the Medical Center thereafter leases the Equipment pursuant to Paragraph (8) hereof.

(4)     The Medical Center will offer employment to the V&S Medical Associates nuclear technician at the Medical Center's standard rate and terms for similar technicians at the Medical Center.

(5)     The parties will continue good faith efforts to develop an under arrangements ("UA") model pursuant to which other diagnostic facilities, equipment and personnel will be leased by the Medical Center to Physician

-1-

DEPOSITION
EXHIBIT

13 jah

HOSP 0003690

APP-98

NewCo and diagnostic services will be sold by Physician NewCo to the Medical Center. If UA model terms can be mutually agreed upon by the Medical Center and V&S Medical Associates, V&S Medical Associates will take the lead in developing and starting up Physician NewCo. Should a UA venture be implemented (which must include appropriate regulatory approval for the model and Physician NewCo in the form of an Advisory Opinion from the HHS Office of Inspector General), the assumption of the GE Lease and its terms as described in the UA model will commence and the Medical Center's Sublease will expire.

(6)     During the term of the GE Lease, the Medical Center will have the ability to change or upgrade the Equipment from GE should either the need or the opportunity for such a change occur, at the Medical Center's discretion. Should the Medical Center make such an equipment change, the change will not detrimentally affect V&S Medical Associates under the Sublease terms (i.e., no higher maintenance fees, etc.) The Medical Center and V&S Medical Associates will work through any new issues or document provisions that require mutual understanding or cooperation with any such new equipment.

(7)     (a)     V&S Medical Associates will execute a covenant not to compete, agreeing not to provide the services furnished in connection with the Sublease's Equipment in its offices or invest in any other entity that provides such services during the term of the Sublease.

        (b)     In order to allow the UA venture to move forward, V&S Medical Associates will not provide other outpatient diagnostic imaging services in its office or invest in any other entity that provides such services while the UA venture is in development and attempted start-up. This covenant shall expire as of December 31, 2003 if Physician NewCo has not commenced organization by that date.

        (c)     Should the UA venture not be implemented, in the event that V&S Medical Associates considers offering CT, MRI or other diagnostic imaging services excluding ultrasound in its office or investing in a facility that provides the same, it must first present the opportunity to the Medical Center, which shall have 45 days to present a proposal to give V&S Medical Associates an opportunity to participate in a venture with the Medical Center to provide those services. If such a proposal is offered, V&S Medical Associates will not offer or invest in the service in question unless the proposed venture is not finalized within 120 days. V&S Medical Associates also agrees to discuss the possibility of ventures with the Medical Center for other non-diagnostic outpatient services prior to pursuing them on its own.

(8)     If the UA venture is not successfully implemented, the Medical Center agrees to extend the leasing arrangement with V&S Medical Associates beyond the expiration of the GE Lease, such that the entire sublease/lease term will be for a five-year period ending September 30, 2008; the price for the equipment rental for this period will be $26,000 per month. In addition, the parties agree that during any such additional rental time period: (i) the Medical Center will retain its right to change or upgrade the Equipment as described in Paragraph (6) hereof, and (ii) parts (a) and (c) of Paragraph (7) hereof shall apply. At the end of this period the parties shall enter into negotiations to renew this lease.

(9)     The parties shall diligently pursue and use their best efforts in cooperation with one another to implement all of the terms of this Agreement.

-2-

HOSP 0003691

APP-99

(10)  The parties agree that time is of the essence to complete the transactions described in this Agreement and shall proceed with due diligence to further describe and implement the transactions described herein pursuant to (a) a sublease, (b) the UA contracts, and (c) any and all other documents or instruments needed.

(11)  This Agreement shall be construed and enforced under and in accordance with the laws of the Commonwealth of Pennsylvania, with exclusive venue for resolution of disputes in McKean County.

(12)  The obligations of the parties hereunder shall be contingent upon the analysis of the financial and legal implications of the Sublease and the UA model, as presently proposed by the Medical Center. If, after consulting with their respective financial advisors and attorneys, either party is not reasonably satisfied with the financial or legal implications of the arrangements described above, they shall so inform the other party and terminate this Agreement and V&S Medical Associates shall not be required to participate in the "UA" venture. If such notice is not given prior to May 31, 2003, then this Agreement shall be final and the parties shall use their good faith efforts to negotiate and execute a final Sublease and determine the initial structure of Physician NewCo on or before June 30, 2003.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the date first written above.

WITNESS/ATTEST:

_Joan M. Washburn_

BRADFORD REGIONAL MEDICAL CENTER

By: _George Leonhardt_
     George Leonhardt
     President & Chief Executive Officer

WITNESS/ATTEST:

_Joan M. Washburn_

_Joan M. Washburn_

V&S MEDICAL ASSOCIATES, LLC

By: _____
     Kamran Saleh, M.D.

By: _____
     Peter Vaccaro, M.D.

-3-

HOSP 0003692

APP-100

Kamran Saleh, M.D. and Peter Vaccaro, M.D., as individuals residing in the Commonwealth of Pennsylvania, also agree to be bound by the terms and conditions of this Agreement.

Witness: _Joan M. Washburn_                     _____
                                             Kamran Saleh, M.D.

Witness: _Joan M. Washburn_                     _____
                                             Peter Vaccaro, M.D.

CONFIDENTIAL

-4-

HOSP 0003693

# 16. REPORT OF CHARLES T. DAY



<u>Executive Summary Of This Report</u>

Bradford Regional Medical Center (the "Hospital") has entered into an agreement with V&S Medical Associates, a limited liability company ("V&S") comprised of two physicians on its medical staff, involving V&S offering diagnostic imaging services through the use of nuclear cardiology imaging equipment (the "Equipment") leased from an affiliate of General Electric.   The agreement calls for good faith negotiations (which the record shows have been ongoing for some time) to occur with the goal of executing a further leasing agreement and a non-competition covenant.

Considerable time, effort and expense have been focused on negotiating the arrangement by the Hospital Board (the "Board") and Management and V&S along with their collective and respective lawyers and consultants.  The result was that in April, 2003, and after careful analysis by the Hospital, the Parties (i.e. the Hospital and V&S) entered into an agreement that contemplates that it will be followed by the negotiation and execution of a series of further agreements, collectively referred to herein as "the Arrangement".

In general terms, the Arrangement will consist of either a sublease of the Equipment under the Lease between General Electric Healthcare Financial Services ("GE") and V&S dated June 6, 2001 or assignment to the Hospital of the Lease will be executed in the near future.  The subleasing relationship, regardless of whether it is a sublease or an assignment of the Lease, will have the potential to extend through August, 2008. Embedded in the sublease will also be an enforceable non-competition covenant.

Thus, the scope of the Arrangement embraces (i) the immediate execution of a sublease for the Equipment (with a duration to be described below), and (ii) the immediate execution of a non-competition agreement for a term that is contemplated to run parallel to the duration of the sublease.  The parties will also commit to explore the creation and implementation of what is commonly referred to as an "under arrangements" model for the provision of imaging services.  It is further provided that a condition for launching the "under arrangements" model is a favorable Advisory Opinion from the HHS Office of Inspector General.  In the event an "under arrangements" venture is formed and a favorable Advisory Opinion is received, the sublease will cease and the lease for the GE Equipment will be assigned to the Hospital.  In that event the non-competition agreement will extend through August 31, 2008.

The April 2003 agreement (as well as the Arrangement) accordingly provides for an alternative structure for the relationship between the Parties in the event the "under arrangements" model is not implemented by December 31, 2003.  In that event (i) the sublease will remain in effect, (ii) the Hospital will commit to extend the subleasing arrangement beyond the initial sublease which expires August 31, 2006 for 24 additional months (i.e. through August 31, 2008), (iii) the non-competition provision will remain in effect during the term of the sublease, and (iv) V&S will agree to offer the Hospital the opportunity to work with V&S in any venture involving V&S for the provision of imaging services during the period of the sublease.

1

DEPOSITION
EXHIBIT

14

HOSP 0007431

APP-103

The sublease provides that the monthly payments through August 31, 2006 will be
$ 30,200 per month. The sublease clearly identifies this total amount as consisting of
$ 6,545 representing a pass through of the rent due under the Lease and $ 23,655
associated with aforementioned non-competition provision embedded in the Lease.
During the possible extension of the sublease through August 31, 2008, the total monthly
payment is $ 26,700 per month, and the respective elements are $ 3,045 for the rent of the
Equipment and $ 23,655 as associated with the non-competition provisions.

Once the subleasing agreement is in effect the Parties have also agreed that the GE
Equipment will be relocated to the Hospital campus. The cost of such relocation will
approximate $ 30,000 and will be paid to third parties. Apart from representing an
upgrade to, and expansion of, existing facilities in the Bradford area, this centralization of
resources will facilitate the delivery of a broad range of diagnostic imaging services in a
more integrated and efficient manner.

The record shows that the Board regards the capital costs relating to upgrading the
location on the campus as an investment in providing imaging services over both the term
of the Arrangement as well as in the future periods that follow. The record also shows
that these upgrade costs are to be incurred regardless of whether any or all of the
agreements contemplated by the Arrangement are executed.

From the perspective of the Hospital, the sole purpose of this non-competition covenant
is to strengthen its charitable community service mission. The covenant is supported by a
recitation of separate consideration and other appropriate provisions to support its
enforceability.

These agreements will, when taken together, address the aforementioned concerns and
enhance the Hospital's ability to pursue its mission and meet the medical needs of its
particularly vulnerable populations. In addition, the Board has determined that the
Hospital will be better able to serve patients and the community at large by having the
Equipment located on its campus in a location resulting in a wider range of centralized
imaging services supplementing the existing range of services offered by the Hospital.

It is our view, for the reasons discussed in more detail in the balance of this Report, that
the amounts paid as rent in the sublease (or in the event the lease is assigned to the
Hospital) reflect the fair market value for the use of the Equipment. It is also our opinion
that the amounts associated with the covenant not to compete reflect a fair market value
amount for the rights acquired under the non-competition agreement.

2

HOSP 0007432

<u>Overview Of The Structure Of This Report</u>

In order to present the sequence of logic supporting the conclusions of this Report, the Report is structured as follows:

> Discussion Of The Background Facts
>
> An Overview Of The Relevant Portions Of The Arrangement
>
> The Applicability Of The Fair Market Value Standard To The Economic Elements Of The Overall Sublease Relationship
>
> Concluding Thoughts

<u>Discussion Of The Background Facts</u>

Bradford Regional Medical Center (the "Hospital") is a sole community provider located in Bradford, McKean County, Pennsylvania. This is a rural and rugged area of northwestern Pennsylvania. Its status as a "sole community provider" indicates that it is the only hospital facility located in the community. In addition, the Hospital also functions as a referral medical center for a larger region that reflects a high proportion of Medicare and Medicaid populations.

The Hospital is a Pennsylvania nonprofit corporation recognized as a tax-exempt charitable organization under Sec. 501(c)(3) of the Internal Revenue Code. As such, and presented in general terms, maintenance of its tax exemption calls for it to pursue its charitable mission in a manner that allows it to serve and meet the medical needs of its community (reasonably defined to embrace McKean County and surrounding areas) through the provision of a wide variety of medical services and without allowing its assets unduly inure to or benefit private individuals.

In addition, general principles of charitable stewardship require that it pursue this mission through the delivery of a broad range of medical services in a manner that is both financially and medically appropriate. Finally, the health care regulatory environment mandates that the Hospital's charitable mission be pursued with due regard to the nature and substance of the Hospital's relationships with parties in a position to influence or profit from the manner in which it pursues its mission.

A required element of the pursuit of its charitable mission mandates that the Hospital promote, maintain and work with a high quality medical staff available in a manner that is consistent with its mission, the principles of stewardship and, in particular, the applicable healthcare regulatory environment. One manifestation of the Hospital's commitment to these operational principles is found in resolutions adopted by its Board in May and December of 2001. These resolutions address (in general) the issue of identifying and imposing consequences for physicians who either are on, or seek appointment to, the medical staff of the Hospital and who have a financial relationship with entities or services that compete with the Hospital in a manner that could have a

3

HOSP 0007433

significant negative impact on the ability of the Hospital to fulfill its charitable community service mission.

At the time that the initial resolution was adopted, the Board was not aware of any arrangements that would be reached by the policy evidenced by the resolution.

The situation addressed by the Board in these resolutions concerned the potential emergence in its service area of a trend that is increasingly visible in communities throughout the United States. This trend involves staff physicians using the resources of the hospital with which they are affiliated to develop a patient base and then divert those patients to a competing facility or service in which they (i.e. the physicians) have a financial interest. The Board recognized, by observing developments in other communities, that if such conduct were disregarded or if guidelines were not developed to deal with these concerns, there could well be detrimental qualitative and quantitative (i.e. financial) implications on the near and long term ability of the Hospital to fulfill its charitable mission.

Accordingly, the Board provided that any practitioner deemed by the Board to be competing with the Hospital in a manner that would impair its ability to fulfill its charitable mission would, among other potential consequences, be at the discretion of the Board deemed ineligible for both medical staff appointment (initial and continued) and clinical privileges.

It should also be noted that the Board, in recognition that such competing circumstances would inevitably arise, also adopted in its initial May 2001 resolution a policy that committed the institution to use its best efforts to foster cooperative relationships with physicians so long as such relationships were consistent with legal standards.

Subsequent to the adoption of the aforementioned policies concerning competing activities by staff physicians, the Board became aware of a nuclear cardiology imaging service owned and operated by a professional medical entity trading as V & S Medical Associates, LLC (hereinafter "V&S"). The owners of V&S are Dr. Kamren Saleh and Dr. Peter Vaccaro, two physicians who enjoy active staff privileges at the Hospital and who are also referred to from time to time herein as the "Physicians".

The V&S service was and has been operating pursuant to a series of lease related documents between V&S and GE Healthcare Financial Services ("GE") whereby a nuclear camera (as previously noted, referred to hereinafter as the "Equipment") is operated to provide cardiac diagnostic imaging services to the community. Insofar as is relevant to the matter at hand, the GE arrangement (which was effective in June, 2001) initially calls for monthly lease payments in the amount of $ 6,545 (characterized in the lease as having $ 4,890 attributable to equipment rental and $ 1,655 attributable to equipment service).

4

HOSP 0007434

Payments by V&S under the lease began in September, 2001 and will continue at least until August 31, 2006. At that time V&S has three options. The first is it can notify GE that the lease has terminated. The second is it can renew the lease for up to 24 months at a rate to be negotiated. The final option is V&S can purchase the Equipment for $ 56,023 (an amount stipulated in the lease to be the best "prediction" of the fair market value of the Equipment at the end of the 60 month base term for the lease).

The ownership and operation of the V&S service by V&S was an activity that in the opinion of the Board implicated the aforementioned anti-competitive policies. This, in turn, invoked the concomitant responsibilities on the part of the Hospital to explore both the application of the consequences prescribed therein as well as the potential to find a cooperative basis to resolve the matter.

As might be expected, the record indicates that a long and drawn out process ensued in pursuit of these responsibilities. During this period the existence of a competing enterprise was verified and the viability of the Hospital to either impose the consequences called for by its policies or find a basis for either a competitive response or compromise was thoroughly and carefully considered. This resulted in an on-going and occasionally disruptive dispute between the Hospital and V&S wherein both sides remained committed to the merits of their respective positions. The duration and severity of the dispute was particularly noted by other members of the medical staff.

From the outset the Board was concerned that the dispute should be resolved in a manner that would not create current or future jeopardy to the effective pursuit of its charitable mission as well as not polarize and alienate the Hospital medical staff. Eventually, and for a variety of reasons that need not be recounted in this Report but that are apparent in the record, these objectives evolved to a need for a negotiated settlement that could also be viewed as compliant with the applicable legal framework.

The record shows that there was extensive involvement by an independent, nationally recognized consulting firm (Stroudwater Associates) as well as legal counsel in developing, analyzing and negotiating the elements of the Arrangement. That record also indicates that the reason for the extensive involvement of such experts was to arrive at a solution that would be viewed as in compliance with the extensive and complex body of rules and regulations that would apply to the Arrangement (as described herein) while at the same time providing quantitative (i.e. financially viable) and qualitative support for the furtherance of the charitable mission of the Hospital.

<u>An Overview Of The Relevant Portions Of The Arrangement</u>

On April 16, 2003 the Parties reached an agreement (referred to herein as the "Arrangement" and a copy of which is attached hereto as Exhibit A) concerning this matter. The Arrangement calls for the execution of documents relating to four significant economic relationships. When finalized, these relationships (which remain to one degree or another the subject of current negotiations) will enable the Hospital to obtain greater control over the quality and the value of a variety of diagnostic services delivered to the

5

HOSP 0007435

APP-107

community. Both this control and the Arrangement are also viewed as collaterally providing a number of enhancements to the ability of the Hospital to fulfill its charitable mission.

The four significant relationships which will emerge from the implementation of the Arrangement are (i) a sublease for the use of the Equipment by the Hospital, (ii) an enforceable non-competition covenant relating to the conduct of V&S after the sublease is created and extending through August 31, 2008, (iii) a form of right-of-first refusal which supplements the non-competition covenant in the event an "under arrangements" model is not implemented and (iv) and the subsequent formation of an "under arrangements" model for the provision of diagnostic services by V&S, subject to OIG approval.

As requested, this Report addresses the application of the "fair market value/arms length" standard to the consideration embodied in the sublease and non-competition covenant.

A Description Of The Sublease Relationship

The first relationship contemplated by the Arrangement begins as a subleasing structure between the Hospital and V&S for the use and control of the Equipment by the Hospital. The sublease structure will remain in effect so long as an "under arrangements" model is not implemented. In the event the "under arrangements" model is implemented, the sublease will cease to exist as the GE Lease will be assigned to the Hospital.

For ease of reference, and since the differences between the sublease and the GE lease will be apparent from the discussion which follows, the Equipment use relationship involved will continue to be referred to as a sublease.

The sublease is in the final stages of negotiation. It contemplates (because of the need on the part of the Hospital to protect its charitable and public service mission) three different scenarios depending on the state of the implementation of the "under arrangements" model. However, regardless of which structure is in effect, once the sublease begins and as soon as the consent of GE is obtained, the Hospital will incur the costs to both move the Equipment from the Facility to the Hospital's campus and to upgrade the location of the Hospital's imaging center.

It should be noted that the Hospital is committed to an upgrade of its imaging facilities regardless of whether the sublease is executed. This is because an upgrade will enhance its ability to provide such services to the community and, in the event the sublease is not executed, form the basis of the competitive strategy which will be undertaken by the Hospital to protect its mission.

As determined by the Board after considerable study, the mission-related benefits accruing from these expenditures include being able to more effectively integrate the use of the Equipment into the operations of the Hospital, causing an upgrade to the level of equipment used by the Hospital, making a capital investment in the campus location

6

HOSP 0007436

which is expected to provide an enhanced clinical asset well after the conclusion of the potential non-compete arrangement and, finally, providing a level of protection to its diagnostic revenue stream.

It should be noted that whenever a sublease structure is in effect (i.e. the first and third scenarios described below) V&S will retain the obligation to make all payments required for the maintenance of the Equipment. As will be pointed out below in connection with the "third scenario", this appears to be a significant element of economic risk assumed by V&S and which is avoided by the Hospital.

With that introduction to the notion of the "sublease", the three "sublease" scenarios involved are now presented.

The first scenario contemplated relates to the period prior to receipt of approval from the regulatory authority for the "under arrangements" model. It will begin with the execution of the sublease and is expected to extend to a time no later than the end of 2003. During this period the Hospital will be a sublessee of V&S and will make the aforementioned monthly payments to V&S for the use of the Equipment in the amount of $ 6,545.

The second scenario contemplated under the sublease becomes operative as soon as the "under arrangements" model is implemented. In this event it is the intention of the Parties for the sublease to terminate and for the GE lease to be assigned to the Hospital. Accordingly, the Hospital will "step into the shoes" of V&S and will operate under the lease terms summarized in the previous section (see <u>Discussion Of The Background Facts</u>) of this Report.

The third scenario contemplated under the sublease will operate in the event the "under arrangements" model is not implemented by December 31, 2003. In this case the sublease calls for rent to be paid attributable to two distinct periods of time that in the aggregate cover 5 years. These are the "First Rental Period" which extends to August 31, 2006 and the "Second Rental Period" which covers the 24-month period subsequent to the "First Rental Period". The "Second Rental Period" coincides with the maximum renewal terms under the GE lease.

During the former period the monthly rental will be $ 6,545 (the amount otherwise owed by V&S) and will consist of the aforementioned equipment rental component (i.e. $ 4,890) and the service component (i.e. $ 1,655). During the Second Rental Period (during which it is presumed that V&S will have acquired the Equipment for $ 56,023 since the sublease calls for the Parties to negotiate a renewal of the sublease following the conclusion of the Second Rental Period) the Parties have agreed to a monthly payment of $ 3,045, with V&S remaining responsible for the full cost of all equipment maintenance services.

While it is unclear how much of the monthly payment during the Second Rental Period will be associated with equipment use and the provision of service, it should be noted that V&S has the obligation (and economic exposure) to provide such service during the

HOSP 0007437

APP-109

Second Rental Period. Thus, it is possible that the monthly payment in the Second Rental Period will be insufficient to cover the obligation incurred by V&S to provide service to the Equipment.

<u>A Description Of The Non-Competition Relationship</u>

The second relationship contemplated by the Arrangement is a tightly constructed, enforceable, non-competition covenant. Because it is inextricably associated with the subleasing relationship it is embedded in the sublease rather than embodied in a separate agreement.

At its core the non-competition covenant effectively limits the ability of V&S to provide a competing service within 30 miles of the Hospital for so long as any of the scenarios described in connection with the subleasing relationship are operating. It should also be noted that the non-competition covenants, reflective of their nature and purpose, will terminate in the event V&S ceases to exist and its two owners (Drs. Saleh and Vaccaro) die.

The consideration for this covenant will be paid on a monthly basis in the amount of $ 23,655.

The Hospital has negotiated additional protection for itself for the period after December 31, 2003 in the event there might not be an "under arrangements" model in effect. In this situation (i.e. where the interests of the Parties are not as closely aligned as they would be when the "under arrangements" model is operating) the Parties have also agreed that V&S will first present the Hospital with the opportunity to participate in any diagnostic service that is outside the scope of the non-competition provision. No additional consideration is provided for this valuable right.

The record shows that the terms of, and amounts to be paid in connection with, the non-competition provisions of the Arrangement were the subject of great focus. In particular, extensive economic analyses were performed on behalf of the Hospital by Stroudwater Associates to assist in structuring this outcome. These efforts were reviewed and utilized in connection with the preparation of this letter.

The Stroudwater Associates efforts were integral to providing the Board with a basis for developing an overall strategy to deal with the competitive threat to its mission from the operation of the V&S service. This is because, on the one hand, it indicates that the economic outcome to the Hospital from this particular arrangement will be superior in the most reasonable of scenarios to that which would occur if the Arrangement were not entered into. The Stroudwater Associates efforts also indicate, however, that the Hospital may reasonably (but with some risk and not as successful a financial outcome) mount a competitive response to the V&S service. The analysis provides a reasonable expectation that in approximately five years and after recruiting physicians into the community to compete with the V&S service, the Hospital may be able to restore its revenues and restore a greater degree of control over its mission.

8

HOSP 0007438

APP-110

<u>The Applicability Of The Fair Market Value Standard</u>
<u>To The Economic Elements Of The Overall Sublease Relationship</u>

<u>Introductory Comments: The "Arms Length Standard/Fair Market Value" Rules Found In</u>
<u>The Federal Tax Law</u>

In an earlier section of this Report we described the structural elements of the agreements that will flow from the Arrangement. In this section we will address the propriety of the economic aspects of these relationships under arm's length reasonableness and/or fair market value standards. To do so, it is best to establish a framework for the appearance of these standards in the federal internal revenue code as it is generally acknowledged that a well-developed body of law exists there for making such determinations.

<u>Introductory Comments: An Overview Of Federal Tax Rules Relating To Determining</u>
<u>The Fair Market Value Of Consideration Charged For The Use Of Property</u>

A set of rules commonly referenced when it is necessary to analyze the reasonableness of consideration in a wide variety of on-going transactions against an arm's length reasonableness standard is found in Sec. 482 of the Internal Revenue Code. These rules have as their focus ascertaining the correctness of the income tax consequences flowing from many types of transactions between parties under common control. In particular, these rules apply to transactions including but not limited to sales, leases of property, cost sharing arrangements and the provision of services.

Sec. 482 is certainly not applicable by its terms in the context of the matters discussed in this Report. This is because parties under common control are not involved. However, it is worth noting that the approach embodied in Sec. 482 manifests a strong preference for being able to "benchmark" the consideration in a transaction under review to that which is found in a comparable uncontrolled transaction. That is why the rules underlying Sec. 482 are useful in connection with determining the commercial reasonableness of the sublease.

Regulation 1.482-2(c)(2)(i) provides the rule for testing whether the consideration involved in a particular lease represents arm's length consideration. In particular, the regulation provides:

> ...an arm's length rental charge shall be the amount which was...or would have been charged for the use of the same or similar property, during the time it was in use, in independent transactions with or between unrelated parties under similar circumstances considering...all other relevant facts

9

HOSP 0007439

APP-111

<u>Opinion As To The Fair Market Value Of The Consideration Called For In The
Arrangement For The Sublease/Lease Assignment Relating To The GE Equipment</u>

The draft of the proposed sublease between V&S and the Hospital has been reviewed at
some length earlier in this Report. The sublease reflects a clear intention to place the
Hospital in the position of V&S vis-à-vis GE at the current time and in the event a
favorable advisory opinion for the "under arrangements" model is not received from the
OIG. It is even more apparent that this intent will be achieved in the event the favorable
advisory opinion obtained since at that point in time the Hospital will assume the GE
Lease.

It is clear that this Equipment use arrangement also provides the Hospital with the ability
to enhance the performance of its charitable mission. This occurs because the Equipment
can be moved to the Hospital campus as well as to upgrade the Equipment during the
term of the original GE Lease.

The consideration called for in the sublease totals $ 30,200 per month through August
31, 2006. The draft of the sublease identifies this amount as relating to the
$ 6,545 base rent obligation articulated in the GE lease with the balance ($ 23,655) being
attributable to the non-competition provisions reflected in section 14 of the sublease that
will be binding on V&S. The provisions of section 14 are addressed in other parts of this
letter.

The term of the sublease reflects two circumstances. In the event that the "under
arrangements" model for the rendition of services to the Hospital is implemented, the
sublease will essentially be converted to an assignment of the lease so that the Hospital
will be in direct privity with GE insofar as the payments for the use of the Equipment are
concerned. In that event, the lease will initially terminate on August 31, 2006 and the
Hospital will have the opportunity to either acquire the Equipment for a price stipulated
in the GE lease or extend the lease for either 12 or 24 months at the then fair market
value.

However, in the event the "under arrangements" services/reimbursement model is not
implemented so that the sublease stays in effect, the Hospital has agreed to extend the
sublease arrangement for 24 additional months to August 31, 2008 at a total monthly rate
of $ 26,700 per month. This amount is identified as relating to the use and maintenance
of the Equipment (in the amount of $ 3,045 per month) and the continuation of the
covenant not to compete as well as the aforementioned right of first refusal (in the
monthly amount of $ 23,655).

From an arms length reasonableness perspective, and given the fact that the Hospital is
stepping into the position of V&S under the GE lease during the period ending August
31, 2006, it is clear that the monthly consideration intended to be paid to either V&S or
GE for the use and maintenance of the equipment during the <u>remaining base term</u> of the
GE lease represents the fair market value both for the use of the equipment and for
purposes of the sublease. This statement specifically applies to the $ 6,545 monthly

10

HOSP 0007440

payments and reflects the fact that the Hospital is simply stepping into the place of V&S as either the lessee or the sublessee (as the case may be).

In addition, since the record indicates that the reason(s) for the 24 month extension of the sublease term (in the event a favorable advisory opinion is not received) to September 30, 2008 relate to mission furtherance (as noted above) or other reasons, we believe that the portion (i.e. $ 3,045) of the total amount (i.e. $ 26,700) allocated to the lease of the equipment during the additional period will reflect a fair market value rent. This is especially so because V&S (and indirectly V&S) must acquire the Equipment (for $ 56,023) and bear the responsibility to provide service for the Equipment during the extension period.

The final circumstance to address is the arms length nature of the potential consideration between GE and the Hospital following the conclusion of the remaining lease term. This involves the circumstance where the "under arrangements" model is approved and the lease between V&S and GE is assigned to the Hospital. Regardless of whether the Hospital agrees to continue the GE lease for 12 or 24 months (under terms as provided for in the lease) or elects to purchase the Equipment (under terms as provided for in the lease) or elects to not extend the lease (as is permitted in the lease) it is clear that an arms length outcome is involved. This is because the Hospital will be exercising its rights under a lease that the record indicates was the subject of arms length bargaining between GE and V&S. Thus, any consideration flowing to GE from the Hospital for either the purchase of the Equipment or its lease will satisfy an arms length standard.

Accordingly, for the reasons noted, it is our opinion that it is appropriate to use the rule of Sec. 482 to test the consideration involved in the sublease of the GE Equipment between V&S and the Hospital against an arm's length/fair market value standard. This is because under these circumstances (i.e. a sublease essentially being assumed/assigned by the Hospital) there is no better transaction against which to test the commercial reasonableness of the sublease.

It is our further opinion that the consideration involved in the sublease between V&S and the Hospital represents a fair market value rental for the Equipment. We reach this conclusion because (i) the lease between GE and V&S was negotiated in 2001 with neither the knowledge or involvement of the Hospital nor an expectation that a sublease arrangement would subsequently emerge between the Parties, (ii) the circumstances involved at that time provide no indication that it was not an arm's length negotiation and outcome, (iii) the Hospital has for all material purposes simply "stepped into the shoes" of V&S under the GE lease through August 31, 2006 and (iv) as it relates to the potential extension of the sublease through August 31, 2008 there is every indication that the consideration contemplated meets an arm's length standard.

Introductory Comments:  Transactions Invoking The Need For A Valuation Of Property (Applicable To Testing The Reasonableness Of The Consideration Relating To The Covenant Not To Compete And The Right Of First Refusal)

11

HOSP 0007441

APP-113

Absent an agreement to the contrary, from a business perspective V&S has the right to use their professional talents as they please. A wide and varied body of law, including the federal internal revenue rules, recognize this right as an asset.

As might be expected, the federal tax law also contains a body of rules to test the reasonableness of the value of an asset/property right at the time a transaction relating to such right is entered into. The general rule for applying these various means to test the arm's length/fair market value reasonableness standard is found in Revenue Ruling 59-60:

> Fair market value is the price on which a willing buyer and a willing seller would agree, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts.

In discussing the application of this standard, Rev. Rul. 59-60 provides that, where possible, comparable independent transactions entered into at a time proximate to the property transfer transaction to be tested should be used to satisfy its standard. In cases where reference transactions are not available the body of tax rules invoked by Rev. Rul. 59-60 calls for the use of expert valuations for the subject property transfer using approved metrics and approaches.

Where expert opinions are called for and the property or property right is associated with a stream of cash flows developments since the promulgation of Rev. Rul. 59-60 indicate the IRS strongly prefers that the "discounted cash flow" method be used. This is a valuation methodology well accepted in the appraisal community whereby the value of cash flows estimated to be generated by property over a period of time extending into perpetuity is discounted to a present value using an appropriate discount rate. The theory of this methodology is the value of property (or a property right) at any point in time is equal to the present value of its cash flows.

The IRS has specifically endorsed (through extensive discussions in recent editions of its <u>Continuing Professional Education Manuals</u> and in a variety of public forums and announcements) the use of the "discounted cash flow" method to evaluate the reasonableness of consideration in transactions between tax-exempt hospitals and physicians.

<u>Introductory Comments:  The "Competitive Business Valuation Method" Is The Appropriate Method For Determining The Benefit Of A Non Competition Agreement</u>

An approach to testing the arms length reasonableness/fair market value of a covenant not to compete which has strong support from the valuation community is described in <u>Valuing Intangible Assets</u>, Reilly & Schweihs, Irwin Library of Investment & Finance at pages 288 through 292. In addition, and as will be discussed below on connection with a certain Coordinated Issues Paper, this method is also frequently used by the IRS to develop its own ascertainment of the economic value of what the purchaser of the

12

HOSP 0007442

APP-114

covenant has acquired for comparison to that which was paid for the covenant. This approach is known as the "competitive business valuation method" and happens to align very closely with the discounted cash flow valuation approach noted above that is strongly preferred by the IRS when property transfers between physicians and tax-exempt hospitals are at issue.

In general terms, the issue being addressed under the "competitive business valuation method" is whether, in the totality of the circumstances, a reasonable amount has been paid for the protection of a continued level of profitability of the purchaser's business from the covenantor's hostile use of his/its position in the market.

This quantitative perspective of the value of the non-competition agreement can be augmented by a qualitative consideration of its value as well. That is to say, in this particular instance it is also very reasonable to regard this analysis as providing a measure of an amount that the Board of the Hospital was willing to pay to provide a level of protection against an erosion of its ability to prudently pursue its charitable mission brought about by a financial interest that would induce physicians to refer to their own facilities or services.

As it happens, the record demonstrates to a great degree that a derivative of the "competitive business valuation method" was used by the Board and Stroudwater Associates when examining the threat posed to its mission and developing the approach reflected in the Arrangement. A summary from one of the relevant analyses prepared by Stroudwater Associates is attached hereto as Exhibit B and will be discussed in further detail below.

In its most complete application (and as essentially occurred in this instance) the "competitive business valuation method" calls for a two-step process.   The first step is to generate an estimated projection of the prospective cash flows from the Hospital's provision of nuclear cardiology diagnostic and other integrally related services with the covenant not to compete in place. The second step is to estimate such cash flows without the covenant in place and in the most likely competitive scenario.   As noted, Exhibit B reflects the outcome of this two-part analysis.

When there is a positive difference between the two cash streams (as is illustrated by Exhibit B) it is evidence that competition would do economic damage to the Hospital and its mission. Thus, the use of a covenant not to compete is warranted.

The valuation analysis, however, is then completed by comparing the present value (using an appropriate weighted average cost of capital as the discount rate) of the benefits of the non-competition agreement with the present value of the payments required under the non-compete agreement. The generation by this present value process of a positive differential provides two conclusions from a valuation perspective.

13

HOSP 0007443

APP-115

The first is that a reasonable amount has been paid. The second is that, if there was no compulsion to act and an arms length negotiation process occurred, the amount paid for the covenant represents its fair market value. In this instance, the duration or the negotiation process and the content of the record relating to that negotiation process show that there was no compulsion driving the Hospital to execute the non-competition agreement and that an arms length process did occur.

Our analysis, which is explained in more detail in the sections which follow, adopts this methodology.

Introductory Comments:  An Overview Of The Stroudwater Associates Analysis Of The
Benefit Of The Non-Compete Agreement

Reflecting the principles underlying the "competitive business valuation method", Stroudwater Associates prepared analyses addressing the financial benefit of a non-competition agreement to the Hospital. As noted, a summary from the final analysis in this regard is attached hereto as Exhibit B.  That analysis reflects the following points:

1: There are three revenue streams that the Board felt would be severely impacted if physicians had financial interests that would induce them to direct business away from the Hospital and that needed to be protected by associating a covenant not to compete with the sublease. These are CT and MRI net revenues, inpatient net revenues and outpatient net revenues (excluding the aforementioned CT and MRI net revenues).

2. While a certain amount of variable costs are associated with these revenue streams, they are rather minimal (estimated by Stroudwater Associates to be on the order of 10% of the net revenues from MRI services and 23% of net revenues from CT services) and are in the nature of supplies and drugs. Thus, for the most part, the costs associated with producing these revenue streams are fixed in nature and would neither be avoided with competition nor increased with the protection of the covenant.

3. The Board and the management of the Hospital had developed and were fully prepared to implement an alternative plan of action in the event a non competition agreement could not be executed with V&S. It was to recruit and support physicians for the purpose of substantially restoring by the end of a 60-month period the revenue streams impacted by the competing financial interests of V&S and the Physicians. This is why the execution of the non competition agreement causes certain physician related costs shown on Exhibit B to be reflected as being avoided and why the revenue streams being protected are shown as reducing over the period of the analysis.

4. These newly recruited physicians would be utilizing enhanced diagnostic facilities that the Hospital planned to operate without regard to the  competing financial interests presented by V&S and the Physicians. The costs to recruit

14

HOSP 0007444

APP-116

these physicians, that are avoided by the sublease and non-competition compromise, are estimated to be $ 150,000.

5. Assuming that a non-competition agreement could not be executed, once the recruitment effort was successfully completed it was contemplated by the Hospital that additional recruitment related subsidies would be required to support the new physicians until their practices became self sustaining. Such subsidies, which are especially common in rural areas such as McKean county, are in the nature of working capital subsidies. Stroudwater Associates estimated these costs, which are avoided by the sublease and non-competition outcome, would approximate $ 200,000.

Introductory Comments: An Overview Of Federal Tax Rules Relating To Determining The Substantive Character Of A Non-Competition Agreement And The Fair Market Value Of The Consideration Relating To The Non-Compete And Limited Right Of First Refusal Provisions.

As was previously noted in this Report, section 14 ("Covenants of Sublessor") of the draft Equipment sublease provides for a substantial and enforceable non-compete agreement (and a limited right of first refusal in the event the "under arrangements model" is not implemented).

It is commonly understood that an agreement by a party to refrain from competing with another creates a valuable intangible asset. Such an agreement is referred to as a "covenant not to compete" or a "non-competition" agreement. Such agreements should contain, in exchange for consideration, restrictions on the ability of the covenantor to compete in a defined enterprise for a specified period of time within a defined geographic area.

Both the substantive and enforcement provisions of the non-compete reflect a clear intent to enter into a valid non-compete agreement beginning with the execution of the sublease and extending through its termination (whether it continues as a sublease or an assigned agreement). In addition, it is the opinion of Hospital counsel that this agreement will be enforceable under Pennsylvania law.

The income tax law reflects well-established rules that should be employed in situations such as this to ascertain if the amounts allocated to a separately bargained for a covenant not to compete reflect an arms length reasonable amount. These rules, which seek to ascertain if the separately bargained for covenant has "economic reality", are discussed in various parts of the highly regarded treatise, Tax Management Portfolio 533-2nd (Amortization of Intangibles), and in some detail at pages A-35 through A-37. In essence, the discussion in this treatise expands upon the lengthy views provided by the IRS in "Coordinated Issue Paper, (All Industries) Covenants Not To Compete" (the "CIP") published on March 8, 1996.

15

HOSP 0007445

APP-117

Of particular relevance to the situation at hand, and using the principal criteria addressed by the IRS in the CIP, is the amounts allocated to a non-compete covenant will be viewed as having economic reality if the following (somewhat overlapping) tests are satisfied:

1. It is clear that the parties intended that the covenant was a valuable part of the transaction (i.e. that it has "independent economic significance"),

2. The covenant is genuine, and

3. The covenant has been properly valued.

As to the first requirement, there is ample evidence in the record (stemming from the desire of the Board to protect the qualitative and quantitative features of the charitable mission of the Hospital) that the parties viewed the covenant as a valuable part of the transaction.

The tax law provides (in Rev. Rul. 77-403 which is a prominent element of the discussion in the CIP), however, that a determination of whether the second requirement has been satisfied in a situation such as this requires a close review of the attendant circumstances for applicability of a variety of factors. In addition, when examining the circumstances for the existence of these factors the ruling indicates that it is important to keep two points in mind. First, the weight to be accorded any given factor is a function of its criticality under the particular circumstances. Second, it is not the number of factors in support of the existence of a valid covenant that is as critical as is the relative importance of the particular factors in favor of a valid covenant.

Thus, the circumstances that Rev. Rul. 77-403 requires be examined may generally be summarized as follows:

- The grantor of the covenant (i.e. the Physicians, and V&S) having expertise evidencing a capability to compete;
- The grantor of the covenant having the economic resources to compete;
- The legal enforceability of the covenant under state law;
- The grantor's legal capacity to compete;
- That the covenant has sufficient breadth in scope to assure non-competition without overreaching;
- The age of the grantors;
- The health of the grantors;
- Noncontractual restrictions, if any, that would clearly have prohibited the grantor from competing in the absence of the covenant;
- The willingness, capability and actual efforts on the part of the purchaser of the covenant to police it;
- Structuring the payments under the covenant to occur over time and to cease upon breach of the covenant or the death of the grantor(s);
- Vigorous negotiations over the covenant and negotiations over its value;
- A detailed, specific, and carefully drafted covenant; and

HOSP 0007446

APP-118

- An independent appraisal of the covenant.

A review of the record indicates that at the current time, with only one exception, all the circumstances noted above are in place. The one exception that must be addressed (and which is subject of this Report) is the appraisal of the covenant.

<u>An Appraisal Of The Covenant</u>

As noted above, the valuation rules developed under the Internal Revenue laws provide that a determination that arm's length/fair market value amounts are being paid under the non-competition agreement requires an estimate of the benefits of the agreement to the payor of the consideration, present valuing those benefits, present valuing the amounts payable under the non-competition agreement and a comparison of the present value amounts. Where the present value of the benefits exceeds the present value of the payments under the covenant and the various conditions discussed above in connection with Rev. Rul. 77-403 are otherwise satisfied (as is the case here), the conclusion reached is that fair market value consideration is provided for in the non-competition agreement.

Exhibit B provides the key information for applying the "competitive business valuation" method to determine the benefits to the Hospital of the covenant. When modified to reflect the aforementioned incremental/variable costs for providing the MRI and CT services the following table shows the expected quantitative revenues (000's omitted) that would accrue to the Hospital with the non-competition agreement in place and a comparison of those benefits to the amounts payable under the non-competition agreement. This is based on the assumption that the Physicians would likely refer this business to the Hospital in the absence of a financial interest in their own facilities or services, although they are not required to do so by virtue of any of the covenants contained in the Agreements or otherwise.

|  | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| (a) CT/MRI | 634 | 423 | 317 | 211 | 106 |
| Less expenses (17% On average) | <u>-114</u> | <u>-76</u> | <u>-57</u> | <u>-38</u> | <u>-19</u> |
|  | 520 | 347 | 260 | 173 | 87 |
| (b) Inpatient | 1,450 | 870 | 580 | 290 | -0- |
| (c) Outpatient | 466 | 312 | 218 | 114 | -0- |
| (d) Avoided physician recruitment costs | <u>-0-</u> | <u>150</u> | <u>133</u> | <u>67</u> | <u>-0-</u> |
| Total economic benefits from the non-compete agreement | 2,436 | 1,679 | 1,191 | 644 | 87 |
| Amounts due under the covenant not to compete | <u>-275</u> | <u>-275</u> | <u>-275</u> | <u>-275</u> | <u>-275</u> |

17

HOSP 0007447

APP-119

| | | | | |
|---|---|---|---|---|
| Net benefit (loss) from Covenant | 2,161 | 1,404 | 916 | 369 | -188 |
| Present value (18%) Of net benefits | 1,982 | 1,091 | 604 | 206 | -89 |

As can be seen, the present value of the net benefits of the non-competition agreement, using an 18% discount rate (as would be required by the Internal Revenue Service pursuant to the aforementioned guidelines in its totals Continuing Professional Education manuals) is $ 3,794,000. Since the analysis is in accordance with the valuation methodologies prescribed by the internal revenue rules, it is concluded that the consideration reflected in the non-competition agreement reflects an arms length amount.

### Concluding Thoughts

The conduct of V&S and the enterprise they own (V&S) has challenged legitimate policies adopted by the Board of the Hospital. These policies are intended to protect the ability (from both a quantitative and qualitative perspective) of the Hospital to fulfill its charitable community service mission and provide high quality medical services to the community it serves. In this instance, the "community" is regional in scope and is characterized by high levels of Medicare and Medicaid populations.

The Board, with assistance of a variety of advisors, analyzed over a considerable period of time a number of alternatives to deal with this threat. In the end, the Board pursued a path that contemplates the creation of two separate relationships. One is the implementation, if regulatory approval can be obtained, of an "under arrangements" model for the provision of services by V&S. The other relationship, which will be executed in any event, is a sublease for the use of the Equipment employed by V&S in the competitive activity with an associated non-competition agreement embedded therein.

It is our opinion, for the reasons stated in this Report, that the consideration reflected in the sublease for both the use of the Equipment and the non-competition agreement reflect arms length amounts.

Please feel free to contact me with any questions or comments.

Very Truly Yours,

Charles T. Day, CPA

18

HOSP 0007448

APP-120