# 17. EQUIPMENT SUBLEASE

## EQUIPMENT SUBLEASE

THIS SUBLEASE dated as of October 1, 2003 by and between V&S Medical Associates, LLC, a limited liability company existing under the laws of the Commonwealth of Pennsylvania (the "Sublessor"), and Bradford Regional Medical Center, a nonprofit corporation existing under the laws of the Commonwealth of Pennsylvania (the "Sublessee").

### WITNESSETH:

WHEREAS, Sublessor leases nuclear cardiology imaging equipment (the "Equipment") from GE Healthcare Financial Services ("GE") pursuant to a Lease dated as of June 6, 2001 between Sublessor and GE (the "GE Lease"); and

WHEREAS, the Equipment is to be subleased to the Sublessee pursuant to the terms of this Sublease.

NOW THEREFORE, intending to be legally bound hereby, the parties hereto agree as follows:

Section 1.  Sublease

    (a)    The Sublessor has leased from GE the Equipment listed on Attachment A, which is attached hereto and incorporated by reference herein. The consent of GE to enter into this Sublease has or shall be obtained. If Sublessor has obtained such GE written consent, it is to be attached hereto as Attachment B, which is incorporated herein by reference. If GE's written consent has not yet been obtained, Sublessor shall promptly proceed to obtain such consent.

    (b)    Sublessor hereby subleases the Equipment to Sublessee subject to the terms and conditions of this Sublease. The parties hereto acknowledge and represent for themselves that:

-1-



DEPOSITION
EXHIBIT
Saleh
32
8-9-07    Jah

Confidential
V&S 00300

APP-122

      (i)     the Sublease has been executed and delivered by an authorized representative within his or her legal authority; and

      (ii)    the Sublease is a legal and binding document enforceable in accordance with its terms.

### Section 2.  Payment and Term

(a)    This Sublease shall commence on October 1, 2003 (the "Commencement Date") and shall remain in effect for five years (the "Term"), except as otherwise provided in this Sublease. There are two potential rental periods within the five-year Term:

      (i)     the First Rental Period, which starts on the Commencement Date and concludes on September 30, 2006; and

      (ii)    the Second Rental Period, which starts on October 1, 2006 and concludes on September 30, 2008.

(b)    If the UA Venture (as hereinafter defined) is not successfully implemented as is described in Section 13 hereof, the Sublessee agrees to a leasing arrangement with Sublessor beyond the expiration of the GE Lease, such that the entire sublease/lease term will be for a five-year period, as described above. At the end of the five-year Term, the parties shall enter into negotiations to renew this Sublease.

(c)    If the UA Venture is successfully implemented as is further described in Section 13 hereof, this Sublease shall automatically terminate and expire upon such implementation; provided that, if this occurs while the GE Lease is still in effect, the Sublessee shall be responsible for the payment of the rentals due under the GE Lease (as per the UA Venture contracts), such that Sublessor shall not have to make any such payments to GE.

(d)    (i)    During the First Rental Period, the rent shall be $30,200 per month, which consists of: (1) $6,545 for the hard costs of subleasing the Equipment (i.e., a pass through

-2-

Confidential
V&S 00301

of the rental due under the GE Lease), and (2) $23,655 per month for all other rights and duties under this Sublease, including, but not limited to, Section 14 hereof; and

(ii)    During the Second Rental Period, the rent shall be $26,700 per month, which consists of: (1) $3,045 for the hard costs of leasing the Equipment, and (2) $23,655 for all other rights and duties under this Sublease, including, but not limited to, Section 14 hereof.

(iii)    The payments required under (d)(i)(2) and (d)(ii)(2) herein shall cease should, during this Sublease's Term: (1) Sublessor ceases to exist, and (2) Kamren Saleh, M.D. and Peter Vaccaro, M.D. both die. Drs. Saleh and Vaccaro, as Sublessor's owners, are also each bound by Section 14 hereof on an individual basis.

(e)    The monthly rental payment is due on the first day of each calendar month beginning with October 1, 2003, provided that, in the event this Sublease commences or terminates prior to a first day of a calendar month, the Sublessee shall pay a pro rata share of the monthly rental in advance.

Section 3.  Warranty and Maintenance

The warranties provided under the GE Lease shall continue as per under the GE Lease, and shall either run directly to the Sublessee or, should they need to remain with Sublessor, be enforced by the Sublessor at the direction of the Sublessee. Sublessor will be responsible for payment for the maintenance of the Equipment. This includes (i) payment of Sublessee's current maintenance agreement with GE through the remainder of the GE Lease term, and (ii) a new or replacement maintenance agreement (of the same coverage and scope as the existing maintenance agreement) once the current maintenance agreement expires if the Sublessee thereafter leases the Equipment pursuant to Section 2(b) hereof.

-3-

Confidential
V&S 00302

Section 4.  Equipment Location

Subsequent to the execution of this Sublease, the Equipment will be moved to the Sublessee.  The Sublessee will be responsible for the moving of the Equipment, both in terms of all moving costs and the risks to the Equipment associated with the move.  In moving the Equipment, Sublessee shall be responsible to leave the space in which the Equipment had been kept in good "broom clean" condition.  Sublessee shall repair any damage to Sublessor's premises resulting from the Equipment's removal.

Section 5.  Equipment Change or Upgrade

(a)     During the term of the GE Lease, the Sublessee will have the ability to change or upgrade the Equipment from GE or to change equipment vendor should either the need or the opportunity for such a change occur, at the Sublessee's discretion.  Should the Sublessee make such an equipment or vendor change, such change will be done under two principles: (i) the change will not detrimentally affect the Sublessor under this Sublease's terms (i.e., no higher rental costs or fees, etc.), and (ii) the Sublessor shall materially be in the same position as to the Equipment at the end of the Sublease as the Sublessor now stands to the GE Equipment at the end of this Sublease.

(b)     As to (ii) above, presently the Sublessor will own the GE Equipment at the end of the Sublease.  The parties also understand and agree that it may not be in the interest of the Sublessee and/or the Sublessor for changed Equipment (be it by a new vendor or a GE upgrade) to be leased to Sublessor for a new five-year term (i.e., the term of this Sublease).  Instead, a shorter lease term or a different lease term (a further upgrading of Equipment with the then current vendor within the stated lease term occurs, with a potential, corresponding revised lease term) may be in the interest of Sublessee and/or Sublessor.

-4-

Confidential
V&S 00303

In accordance with this Section 5, the Sublessee and the Sublessor have a good faith requirement to work through any issues and/or document provisions that require mutual understanding or cooperation with any such changed Equipment.

(c)     Should the change in vendor or equipment result in a lower cost of leasing the Equipment, this lower cost shall be passed through to the Sublessee, and the parties shall amend Section 2 hereof to correspondingly reduce the rental hard costs described under Section 2(d)(i) and 2(d)(ii) hereof.

### Section 6.  Title

No right, title or interest in the Equipment shall pass to Sublessee other than those rights expressly set forth herein.  Sublessee shall at all times keep the Equipment free from any legal process and/or encumbrances whatsoever, including but not limited to liens, attachments, levies and executions, and Sublessee shall give Sublessor immediate written notice thereof and shall indemnify Sublessor for any loss caused by the failure of Sublessee to take action as provided herein.  Upon reasonable notice to Sublessee, Sublessor shall have the right to enter upon the premises where the Equipment is located for the purpose of confirming its existence, condition, and proper maintenance.

### Section 7.  Representations, Warranties, and Covenants of Sublessee

Sublessee represents, warrants, and/or covenants to Sublessor that:

(a)     the Equipment will be used by Sublessee in the manner for which it was intended, in accordance with all applicable manuals and instructions, and in compliance with all applicable laws and regulations;

(b)     the person executing this Sublease on behalf of Sublessee has been duly authorized and has all required corporate approvals;

-5-

Confidential
V&S 00304

APP-126

(c)     by entering into this Sublease Sublessee is not in violation of any laws or agreements applicable to Sublessee; and

(d)     Sublessee shall not modify, alter, or add to the Equipment (other than the use of normal operating accessories or controls) without the prior written consent of Sublessor.

## Section 8.  Insurance

Sublessee shall, at its cost, keep the Equipment insured by a rated insurance company acceptable to Sublessor, against theft and all risk of loss, destruction, or damage, from every case whatsoever, for not less than the full replacement cost (when new) of the Equipment.  Sublessee will name Sublessor and GE as loss payees and as additional insured parties on Sublessee's property insurance policy.  Sublessee shall ensure that each insurer agrees that it will provide Sublessor and GE with 30 days' prior written notice of any alteration or cancellation of such policy.

## Section 9.  Loss or Damage

In the event of loss or destruction of or damage to the Equipment, Sublessee shall notify Sublessor in writing.  If loss, destruction or damage occurs, and is not the fault of the Sublessor, then, at the option of Sublessor, Sublessee shall at Sublessee's expense restore the Equipment to good condition and working order (eligible for manufacturer's certification).  Sublessee's insurance proceeds received by Sublessor with respect to the Equipment shall be applied to reduce any unpaid obligation of Sublessee to Sublessor.

## Section 10.  Default and Termination

(a)     Any of the following events or conditions shall constitute an event of default by Sublessee under this Sublease: (i) Sublessor has not received any rental payment or other payment, in full, within five (5) days after its due date; or (ii) Sublessee becomes insolvent, is

-6-

Confidential
V&S 00305

APP-127

liquidated or dissolved, stops doing business or assigns its rights or property for the benefit

of creditors; or (iii) a petition is filed by or against Sublessee or any guarantor under any

section or chapter of the United States Bankruptcy Code or any successor or similar law;

or (iv) without Sublessor's consent, Sublessee attempts to sell, transfer, encumber, part

with possession of, or sublet any Equipment; or (v) Sublessee violates any other term of

this Sublease and fails to correct such violation within 30 days after written notice from

Sublessor.

(b)     Sublessor shall be in default if it violates any term of this Agreement or fails to perform any

obligation hereunder.

(c)     This Sublease shall also terminate (i) pursuant to Section 2(c) hereof, and (ii) pursuant to

Section 17(b) hereof.


## Section 11.  Remedies

Upon the occurrence of an event of default by the other party, either party may exercise any and/or

all of the following remedies:  (a) terminate this Sublease, and/or (b) pursue any other remedy at

law or in equity.  All rights and remedies hereunder are cumulative and may be enforced separately

or concurrently and from time to time.  The exercise of any one remedy shall not be deemed to be

an election of such remedy or to preclude the exercise of any other remedy.


## Section 12.  Return of Equipment Upon Expiration/Termination

Unless otherwise agreed to by the parties, upon expiration or earlier termination of this Sublease,

Sublessee, at its own expense, shall immediately return the Equipment complete, and in good

working order and condition (normal wear and tear excepted), to Sublessor.  In returning the

Equipment, Sublessee shall re-install and re-calibrate the Equipment and leave the Sublessor's

premises in good "broom clean" condition following such reinstallation.  In the event Sublessee fails

-7-

Confidential
V&S 00306

to return the Equipment upon expiration or earlier termination of this Sublease, Sublessor or its designee may enter upon the premises where the Equipment is located, with or without demand or legal process, and peacefully repossess the Equipment, free from all claims by Sublessee and without liability for trespass, conversion, refund, or damages.

Section 13. Under Arrangements Venture

(a)     The parties will continue good faith efforts to develop an under arrangements venture (the "UA Venture") pursuant to which other diagnostic facilities, equipment and personnel will be leased by the Sublessee to a physician entity referred to herein as "Physician NewCo," and diagnostic services will be sold by Physician NewCo to the Sublessee. (Working drafts of the UA Venture have been developed by the parties before the date of this Sublease, and are incorporated herein by reference for further information and direction.) If UA Venture terms can be mutually agreed upon by the Sublessee and Sublessor, Sublessor will take the lead in developing and starting up Physician NewCo. Should the UA Venture be implemented (which must include appropriate regulatory approval for the model and Physician NewCo in the form of an Advisory Opinion from the HHS Office of Inspector General), the assumption of the GE Lease and its terms as described in the UA Venture will commence and this Sublease will expire. See also Section 2(c) hereof regarding rental payments under the GE Lease.

(b)     Sublessor and its accountants have reviewed studies and projections dated April 2, 2003 (the "Initial Study and Projections") developed by Stroudwater Associates ("Stroudwater") concerning revenues to be generated by the UA Venture and Physician NewCo. In the development of Physician NewCo, there will be a time designated by which medical staff physicians are to indicate their interest in participating in Physician NewCo and buying shares in NewCo. (This designated time will be agreed upon by the Sublessee and

-8-

Confidential
V&S 00307

APP-129

Sublessor in advance, as part of the development plan of the UA Venture and V&S Medical Associates.)

(c)    At that time, Stroudwater will develop the same studies and projections based upon the data and information known at that time. If the results from those studies and projections after review by knowledgeable individuals selected by Sublessor are such that Sublessor's ownership percentages will generate for Sublessor an amount equal to $26,000 per month plus a reasonable return on any additional invested capital (not less than 8% per annum) for the period between the establishment of Physician NewCo and September 30, 2008, then Sublessor shall join the UA Venture and the provisions of Paragraph 13(a) will apply. If these terms are not satisfied but Sublessor chooses to become a part of the UA Venture, the provisions of Paragraph 13(a) will apply. In all other events, this Sublease shall not expire and will continue pursuant to its stated terms.

Section 14.  Covenants of Sublessor

(a)    (i)    Sublessor shall not (1) acquire, purchase or lease nuclear cardiology imaging equipment for its office or for any office or facility that is within 30 miles of Sublessee, or invest in any office, venture or facility that has such equipment or wishes to obtain such equipment to perform diagnostic procedures within 30 miles of Sublessee, (2) perform diagnostic tests in its office or for any venture or facility that is within 30 miles of Sublessee that competes with the testing to be performed by the Medical Center with the Equipment, for such time as this Sublease is in effect as described in Section 2 hereof.

(ii)    Sublessor hereby agrees that the geographic area covered by this covenant and the period and nature of such restrictions are reasonable and necessary for the protection of the Sublessee, its successors and assigns. If any provision or part

-9-

Confidential
V&S 00308

APP-130

of Section 14 shall be invalidated, the remainder of Section 14 shall nevertheless continue to be valid and fully enforceable. If any claim of invalidity or unenforceability shall be predicated upon the length of the term of, or the geographical area covered by, any covenant, such provision shall not be deemed invalid or unenforceable but shall be deemed to be modified (so as to be valid and enforceable) to the maximum area and the maximum term or duration as may be determined to be reasonable and equitable.

(iii)    This covenant shall be construed as an agreement independent of any other provision of this Agreement, and the existence of any claim or cause of action of the Sublessor, whether predicated in this Agreement or otherwise, shall not constitute a defense to the enforcement of this covenant by the Sublessee.

(iv)    The Sublessor hereby agrees that a violation of the terms and conditions of this restrictive covenant in the prohibited area herein above specified during the time period specified in this covenant shall result in irreparable and incalculable damage to the Sublessee, and the Sublessor therefore agrees that, if the Sublessor takes any action in violation of this restrictive covenant, the Sublessee shall be entitled to receive injunctive relief restraining the Sublessor in connection with such violation.

(b)    In order to allow the UA Venture to move forward, Sublessor shall not provide other outpatient diagnostic imaging services in its office or in any office or facility that is within 30 miles of Sublessee, or invest in any office, venture or facility that provides or desires to provide such other outpatient diagnostic imaging services within 30 miles of Sublessee while the UA Venture is in development and attempted start-up. This covenant shall expire as of December 31, 2003 if Physician NewCo has not commenced organization by that date.

-10-

Confidential
V&S 00309

APP-131

(c)　　Should the UA Venture not be implemented, in the event that Sublessor considers offering CT, MRI or other diagnostic imaging services in its office or in any office or facility that is within 30 miles of Sublessee, or investing in any office, venture or facility that provides or desires to provide such services within 30 miles of Sublessee, Sublessor must first present the opportunity to the Sublessee, which shall have 45 days to present a proposal to give Sublessor an opportunity to participate in a venture with the Sublessee to provide those services. If such a proposal is offered, Sublessor will not offer or invest in the service in question unless the proposed venture is not finalized within 120 days. Sublessor also agrees to discuss the possibility of ventures with the Sublessee for other non-diagnostic outpatient services prior to pursuing them on its own.

(d)　　So long as the Sublessor meets all of the requirements under this Section 14, and even if the parties are unable to successfully negotiate a joint venture as is described in Section 14(c), the Sublessee's Policy on Physicians with Competing Financial Interests and its Procedures for Assessing Whether Practitioners Have Significant Competing Financial Relationships shall not apply to Sublessor in connection with the services specifically named in this Section 14.

Section 15.　Assignment

Sublessee may not assign this Sublease or its rights or obligations hereunder without the express written consent of the Sublessor. Notwithstanding the foregoing, nothing in this Agreement shall preclude Sublessee from entering into contracts with Physician NewCo for the purposes of the UA Venture.

-11-

Confidential
V&S 00310

APP-132

Section 16.  Confidentiality

The parties shall not disclose information relating to each other's operations or the terms and conditions of this Sublease to any third party other than GE (if requested for subleasing approval), unless both parties have given written consent for the release of information except as required by law or legal process.

Section 17.  Compliance with Law and Standards

(a)    The parties shall comply with all applicable statutes, rules, regulations and standards of any and all applicable governmental authorities and regulatory and accreditation bodies relating to the Equipment.

(b)    If either party reasonably believes that this Sublease violates the law or jeopardizes Sublessor's tax-exempt status, or causes any person to incur any excise tax or other monetary penalty, it shall inform the other party in writing of its belief. The parties will make a good faith effort to modify the terms of the Sublease to address the situation. If the parties are not able to do so within 30 days, either party may terminate the Sublease upon written notice to the other party.

Section 18.  Medicare Access to Books and Records

To the extent and only to the extent required by law, until the expiration of four years after the furnishing of the services provided under this Sublease, the parties will make available to the Secretary of the U.S. Department of Health and Human Services, the U.S. Comptroller General, and their representatives, this Sublease and all books, documents, and records necessary to certify the nature and extent of the costs of those services. If either party carries out its duties through a subcontract worth $10,000 or more over a 12-month period with a related organization, the subcontract will also contain an access clause to permit access by the Secretary, Comptroller

-12-

Confidential
V&S 00311

General, and their representatives to the related organization's books and records. The party receiving the request will notify the other party immediately of any such request.

## Section 19.  Independent Contractors

Sublessor and Sublessee are independent contractors. This Sublease shall not be construed to create a relationship of principal and agent, partnership or joint venture or of any association between the parties other than that of independent contractors.

## Section 20.  Indemnification

Each party shall indemnify, defend, and hold the other party harmless from all claims, loss, damage or injury of any kind or character (including, without limitation, attorneys' fees and costs of defense) to any person or property caused by or arising from any act or omission of the indemnifying party, its agents or employees which results in a breach of this Sublease.

## Section 21.  Cooperation in the Event of a Claim

(a)   In the event that either party becomes aware of any alleged injury arising out of the care or treatment of any patient provided services with the Equipment, each party has a duty to give the other party notice containing the particulars sufficient to identify the name and address of the allegedly injured person, place and circumstances of the alleged incident and the addresses of the available witnesses.

(b)   Subject to the terms of the respective professional liability and malpractice insurance policies, each of the parties hereto shall cooperate with the other and in the conduct of suits and enforcing any right of contribution or indemnity against any person or organization who may be liable to either of the parties because of injury with respect to which insurance is

-13-

Confidential
V&S 00312

APP-134

afforded, and each of the parties hereto shall attend the hearings and trials and assist in securing evidence and obtaining the attendance of witnesses.

## Section 22.  Strict Performance

No failure by either party to insist upon the strict performance of this Sublease or to exercise a right or remedy shall constitute a waiver. No waiver of any breach shall affect or alter this Sublease, but each and every term of this Sublease shall continue in full force and effect with respect to any other existing or subsequent breach.

## Section 23.  Entire Agreement

There are no other agreements or understandings, either oral or written, between the parties affecting the Equipment, except as otherwise specifically provided for or referred to herein.

## Section 24.  Invalidity or Unenforceability of Particular Provisions

The invalidity or unenforceability of any particular provision of this Sublease shall not affect the other provisions hereof.  This Sublease shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

## Section 25.  Governing Law

This Sublease shall be enforced and governed by and in accordance with the laws of Pennsylvania.

## Section 26.  No Third-Party Rights

Nothing in this Sublease shall be construed as creating or giving rise to any rights in any third parties or any persons other than the parties hereto, except for GE.

-14-

Confidential
V&S 00313

APP-135

### Section 27.  Force Majeure

If either party shall be delayed or prevented from the performance of any act required by this Sublease by reason of acts of God, strikes, lockouts, labor troubles, inability to procure materials, restrictive governmental laws, or regulations or other cause, without fault and beyond the reasonable control of the party obligated (financial inability excepted), performance of such act shall be excused for the period of the delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay.

### Section 28.  Amendments

This Sublease may be amended at any time by mutual written agreement of the parties.

### Section 29.  Notices

Any notice, demand, or communication required, permitted, or desired to be given hereunder shall be deemed effectively given when personally delivered or mailed by prepaid certified mail, return receipt requested, overnight carrier or personal delivery addressed as follows:

SUBLESSEE:                           SUBLESSOR:

Bradford Regional Medical Center     V&S Medical Associates
116 Interstate Parkway               24 West Washington Street
Bradford, PA  16701-0218             Bradford, PA  16701
Attn:  Chief Executive Officer       Attn:  President

or to such other address or facsimile number and to the attention of such other person(s) or officer(s) as either party may designate by written notice.

-15-

Confidential
V&S 00314

APP-136

Section 30.  Successors in Interest

Each and all of the terms and conditions of this Sublease shall inure to the benefit of and shall be binding upon the successors in interest of the parties.

Section 31.  Contract Interpretation

Each party hereto acknowledges that it has had ample opportunity to review and comment on this Sublease.  This Sublease shall be read and interpreted according to its plain meaning and an ambiguity shall not be construed against either party.  The headings contained herein are for reference only and are not a part of this Sublease and shall not be used in connection with the interpretation of this Sublease.

-16-

Confidential
V&S 00315

APP-137

IN WITNESS WHEREOF, the parties hereto have executed this Sublease as of the date first written above.

WITNESS/ATTEST:                         BRADFORD REGIONAL
                                        MEDICAL CENTER

                                        By: _____
                                            George Leonhardt
                                            President & Chief Executive Officer

WITNESS/ATTEST:                         V&S MEDICAL ASSOCIATES, LLC

                                        By: _____  9/22/03
                                            Kamren Saleh, M.D.

                                        By: _____
                                            Peter Vaccaro, M.D.

     Kamren Saleh, M.D. and Peter Vaccaro, M.D., as individuals residing in the Commonwealth of Pennsylvania, also agree to be bound by the terms and conditions of Section 14 of this Sublease.

_____               _____  9/22/03
Witness                                 Kamren Saleh, M.D.

_____               _____
Witness                                 Peter Vaccaro, M.D.

-17-

**Confidential**
**V&S 00316**

ATTACHMENT A

DESCRIPTION OF EQUIPMENT

General Electric SMV DSI Nuclear Camera

-18-

Confidential
V&S 00317

APP-139

## ATTACHMENT B

### GE'S CONSENT LETTER

To be provided.

-19-

Confidential
V&S 00318

APP-140

# 18. MASTER LEASE AGREEMENT

PHILIPS MEDICAL CAPITAL, LLC

<u>MASTER LEASE AGREEMENT</u>

This MASTER LEASE AGREEMENT (as amended, modified or supplemented from time to time in accordance with the terms hereof, this "Agreement"), dated as of April 6, 2004, is by and between Philips Medical Capital, LLC, a Delaware limited liability company, with offices located at 1111 Old Eagle School Road, Wayne, Pennsylvania, 19087-1453, (together with its successors and assigns, "Lessor") and V & S Medical Associates, LLC, a corporation organized under the laws of the State/Commonwealth of Pennsylvania (together with its successors and permitted assigns, "Lessee"). The parties hereto for good and valuable consideration and intending to be legally bound hereby agree as follows:

1.  LEASE OF SYSTEM: This Agreement establishes the general terms and conditions under which Lessor may, from time to time lease a System (as hereinafter defined) to Lessee as specified in a lease schedule to be entered into from time to time (each a "Lease"). Each Lease shall incorporate the terms and conditions of this Agreement and shall constitute a separate lease agreement as to a System. In the event of a conflict between the provisions of any Lease and the provisions of this Agreement, the provisions of the Lease shall prevail. As used in this Agreement, the terms "Software", "Equipment" and "Maintenance" shall mean all items of software, equipment and maintenance, respectively, specified on a Lease and all of the foregoing and all peripherals and items related thereto provided by Lessor shall be collectively referred to as a "System."

2.  TERM AND PAYMENTS: The lease term for each System shall be for the time period specified in the Lease (as it may be extended pursuant to the terms hereof or the Lease, the "Lease Term"), and each Lease Term shall commence on the date provided in the Lease (the "Commencement Date"). For the Lease Term, Lessee shall pay to Lessor the payments in the amount, number and in the manner specified in a Lease (each a "Payment" and collectively, "Payments"). If not specified in a Lease, the first Payment is due the first day of the first full month after the Commencement Date and the remaining Payments are due on the same day of each consecutive payment period thereafter for the duration of the Lease Term. A Lease may not be terminated or canceled for any reason whatsoever, except as expressly provided in the Lease. Whenever any sum due hereunder is not paid when due, Lessee agrees to pay to Lessor, on the next due date, a late charge equal to five percent (5%) of the amount of any late payment (but not less than $10.00), but only to the extent permitted by law. If any sum paid by Lessee shall be refused or rejected by the related obligor, Lessor may charge Lessee a returned-check or non-sufficient funds charge in the amount of $25.00 per check or electronic funds transfer to reimburse Lessor for the time and expense incurred with respect thereto. All sums paid by, or on behalf of, Lessee hereunder shall be non-refundable. All sums shall be delivered to Lessor at its address specified above (or such other place as Lessor, in writing, directs) without notice or demand therefore. LESSEE'S OBLIGATION TO MAKE THE PAYMENTS SHALL BE ABSOLUTE AND UNCONDITIONAL AND IS NOT SUBJECT TO ANY ABATEMENT, SET-OFF, DEFENSE OR COUNTERCLAIM FOR ANY REASON WHATSOEVER, INCLUDING, WITHOUT LIMITATION, ANY PRESENT OR FUTURE CLAIMS AGAINST THE LESSOR OR THE PROVIDER OF A SYSTEM. IN THE EVENT THE PAYMENTS INCLUDE THE COST OF MAINTENANCE AND/OR SERVICE BEING PROVIDED BY A MANUFACTURER OR SUPPLIER OF ALL OR A PART OF A SYSTEM AND/OR VENDOR OR PROVIDER OF ALL OR PART OF THE SYSTEM (EACH AND COLLECTIVELY, "PROVIDER"), LESSEE ACKNOWLEDGES THAT LESSOR IS MERELY COLLECTING SUCH AMOUNTS ON BEHALF OF A PROVIDER AND THAT LESSOR IS NOT RESPONSIBLE FOR PROVIDING ANY REQUIRED MAINTENANCE AND/OR SERVICE FOR THE SYSTEM AND LESSEE'S OBLIGATION TO MAKE ALL PAYMENTS SHALL REMAIN UNCONDITIONAL.

3.  INSTALLATION AND DELIVERY: The Lessee shall at its own expense provide a suitable environment for the System as specified or required by a Provider. Delivery and installation arrangements and costs, unless included in the cost of the System to Lessor, are the sole responsibility of Lessee. Lessee agrees to accept the System when Available for First Use (as defined in the Lease) and to immediately execute the Delivery and Acceptance Certificate supplied by Lessor as evidence thereof. If Lessee has entered into any purchase, licensing or maintenance agreements with a Provider (each an "Acquisition Agreement") covering the System or any portion thereof, Lessee transfers and assigns to Lessor all of Lessee's rights, but none of its obligations (except for Lessee's obligation to pay for the System upon Lessor's acceptance of the Lease) in and to any Acquisition Agreement and Lessee shall execute any documents, instruments or agreements reasonably necessary to effectuate such transfer or assignment. All proceeds of any warranty recovery by Lessee from a Provider shall first be used to repair, maintain, replace or upgrade the affected System and Lessee shall promptly notify Lessor of any such warranty recovery.

4.  USE, MAINTENANCE AND MODIFICATIONS: Lessee represents, warrants and covenants that the System will be used for solely business purposes and not for personal or household purposes. Lessee will not modify the System in any way without the prior written consent of Lessor except as required by a Provider or in any Acquisition Agreement. Lessee shall not incorporate any portion of the System in such a manner that it becomes or may be deemed to have become an accession to or a part of any other item of equipment or software. At its own expense, Lessee will cause the System to be used and maintained in: (a) a manner recommended by the Provider and/or in any Acquisition Agreement; (b) accordance with all laws, rules and regulations of all applicable governmental or quasi-governmental authorities; and (c) as good operating condition as when delivered to Lessee hereunder, ordinary wear and tear resulting from proper use alone excepted. All equipment, software, upgrades, parts and replacements for or which are added to or become attached to or a part of a System shall be deemed incorporated into the System and become the property of Lessor without further action on its part. Upon reasonable notice, Lessor shall have the right to inspect the System and all maintenance and business records related thereto during Lessee' normal business hours.

DEPOSITION
EXHIBIT
_Leonhardt_
#7

Confidential
V&S 01055

5.  DISCLAIMER OF WARRANTY: LESSEE ACKNOWLEDGES THAT LESSOR HAS NO EXPERTISE OR SPECIAL FAMILIARITY ABOUT OR WITH RESPECT TO THE SYSTEM. LESSEE AGREES THAT THE SYSTEM LEASED HEREUNDER IS LEASED "AS-IS" AND IS OF A SIZE, DESIGN AND CAPACITY SELECTED BY LESSEE AND IS SUITABLE FOR LESSEE'S PURPOSES AND THAT LESSOR HAS MADE NO REPRESENTATION OR WARRANTY WITH RESPECT THERETO, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. LESSOR FURTHER DISCLAIMS ANY LIABILITY FOR LOSS, DAMAGE OR INJURY TO LESSEE OR THIRD PARTIES AS A RESULT OF ANY DEFECTS, LATENT OR OTHERWISE, IN THE SYSTEM WHETHER ARISING FROM THE APPLICATION OF THE LAWS OF STRICT LIABILITY OR OTHERWISE. WITHOUT LIMITING THE FOREGOING, LESSEE HEREBY WAIVES ANY WARRANTIES CONTAINED IN SECTIONS 2A-210, 2A-211, 2A-212 AND 2A-213 OF THE APPLICABLE UNIFORM COMMERCIAL CODE ("UCC") AND ANY RIGHT TO DEEM LESSOR IN DEFAULT PURSUANT THERETO. LESSEE ALSO AGREES TO WAIVE SUCH WARRANTIES, RIGHTS AND REMEDIES OR OTHER APPLICABLE LAW WITH RESPECT TO THE SYSTEM, INCLUDING ITS FREEDOM FROM PATENT OR COPYRIGHT INFRINGEMENT, FREEDOM FROM LATENT DEFECTS (WHETHER OR NOT DISCOVERABLE), OR COMPLIANCE WITH APPLICABLE LAW  If the System is not properly installed, maintained, does not operate as represented or warranted by any Provider, or is unsatisfactory for any reason, Lessee shall make any claim on account thereof solely against the relevant Provider. So long as Lessee is not in breach or default of this Agreement or any Lease hereunder, Lessor hereby assigns to Lessee, solely for the purpose of making and prosecuting any such claim, any rights which Lessor may have against the Provider for breach of warranty or other representation respecting any item of the System and Lessee shall hold any proceeds of such claim in trust for application as required by this Agreement.

6.  TITLE, PERSONAL PROPERTY, LOCATION AND LIENS: The System is, and shall at all times be and remain the sole and exclusive property of Lessor, and Lessee, notwithstanding any trade-in or down payment made by Lessee or on its behalf with respect to the System, shall have no right, title or interest therein or thereto, except as to the use thereof subject to the terms and conditions of this Agreement and the related Lease. Notwithstanding the preceding sentence, for Leases with a $1.00 purchase option or where Lessee is required to purchase the System at the end of the Lease Term (a "Put Option"), Lessee shall be deemed to be the owner thereof. Lessee will not directly or indirectly create, incur, assume or allow to exist any lien, claim or encumbrance (each, a "Lien") on or with respect to the System, except such Liens as may arise through the acts or omissions of the Lessor. Lessee, at its own expense, will promptly pay, satisfy or otherwise take such actions as may be necessary to keep the System free and clear of any and all such Liens. The System is and shall at all times shall remain personal property notwithstanding how it or any item thereof may now be or hereafter become affixed, attached, imbedded in resting upon real property or any improvement thereof. If requested by Lessor, Lessee will promptly obtain and deliver to Lessor waivers of interest or Liens in form satisfactory to Lessor from all persons or entities claiming any interest in the real property or improvements where a System is installed or located. The System shall at all times during the Lease Term be kept at the address designated in each Lease and shall not be removed therefrom or released from the possession of the Lessee (except for maintenance by a Provider) without Lessor's prior written consent. Lessor may, at Lessee's expense, attach plates or markings to the System indicating the Lessor's ownership thereof.

7  ASSIGNMENT: LESSEE MAY NOT ASSIGN THIS AGREEMENT, ANY LEASE OR THE RIGHTS HEREUNDER, OR SUBLEASE OR LEND ANY SYSTEM OR ALLOW IT TO BE USED BY ANYONE OTHER THAN LESSEE'S EMPLOYEES WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR. No assignment or sublease shall relieve Lessee of its obligations hereunder or under any Lease and Lessee shall remain primarily liable for such obligations  Any sale, assignment, transfer, encumbrance, delegation or sublease by Lessee not consented to by Lessor shall be void ab initio. Lessor may, at any time assign all or part of any interest in any Lease and in each item of the System and monies to become due to Lessor hereunder or grant security interests in the System and/or the Lessor's rights in any Lease. In such events, all the provisions of such Lease for the benefit of Lessor shall inure to the benefit of and be exercised by or on behalf of such assignee, but the assignee shall not be liable for or be required to perform any of Lessor's obligations to Lessee and Lessor shall retain such obligations. Lessee agrees that (a) it will not assert any such defenses, set-offs, counterclaims and claims against any assignee of Lessor that Lessee may have against Lessor at any time; and (b) any such assignment shall not materially change Lessee's duties or obligations under a Lease nor materially increase Lessee's risks or burdens. Subject always to the foregoing, this Lease shall inure to the benefit of, and are binding upon, the successors and assigns of the parties hereto.

8  RETURN OF SYSTEM, STORAGE: At the end of the Lease Term Lessee shall, at its sole expense and in accordance with the Lessor's requirements and directions (which will be consistent with the Provider's), arrange for the System to be uninstalled, boxed and crated, shipped to a location designated by Lessor and properly insured while in transit. When an item of a System is surrendered to Lessor it shall be in the condition required in this Agreement. If Lessor reasonably determines that any item of a System is not returned in the condition required hereby, Lessor may take all actions necessary to cause the System to achieve such condition and upon demand, Lessee shall promptly reimburse Lessor for all costs reasonably incurred in connection with the foregoing. In addition, Lessee shall deliver to the Lessor with a System all documents related thereto, including any plans, operation manuals, warranties and copies of all Acquisition Agreements. If Lessee does not have an obligation to purchase the System at the end of the Lease Term, Lessee shall provide written notice to Lessor at least 180 days and not more than 270 days before the end of the Lease Term stating Lessee's commitment to: (a) return the System at the end of the Lease Term; (b) enter into a new lease for the System; or (c) purchase the System at its fair market value.  Failure to acquire or return the System as required hereunder shall result in the Lease Term extending on a quarterly basis on the terms and conditions then in effect.

2

Confidential
V&S 01056

APP-143

LOSS OR DAMAGE: Lessee hereby assumes and shall bear the entire risk of loss, destruction or damage to the System from any and every cause whatsoever ("Casualty"), whether or not insured, until the System is returned to Lessor in accordance with the provisions of Section 3 hereof. A Casualty shall not relieve Lessee from any obligation under this Agreement or any Lease. Lessee shall notify Lessor in writing of any Casualty within 5 days thereof and shall, at the option of Lessor: (a) place the System in good repair, condition and working order; (b) replace the System with a like System in a condition acceptable to Lessor and transfer clear title to or a right to use, as appropriate, such System to Lessor, whereupon such System shall be subject to the Lease and be deemed the System for purposes hereof; or (c) on the due date for the next Payment or upon the expiration of the Lease, whichever first occurs, pay to Lessor the "Accelerated Value" which shall equal: (1) the "Stipulated Loss Value" (as may be defined in a Lease, if any) plus all unpaid Payments and other sums then due; or (2) if the Lease does not provide for a Stipulated Loss Value, all unpaid Payments and other amounts then due, plus (A) the total of all future Payments for the entire Lease Term, plus (B) the greater of (i) the Lessor's original estimate of the value of the System at the end of the Lease Term or (ii) the fair market value of the System at the end of the originally scheduled Lease Term or the agreed upon purchase option price, if any. In calculating the Accelerated Value, all future Payments and end of Lease Term System values or purchase option prices shall be discounted at the Present Value Rate to the date of actual payment. The Present Value Rate shall be a per annum interest rate equal the lesser of (a) an interest rate equivalent to that of a U.S. Treasury constant maturity obligation (as reported by the U.S. Treasury) that would have a repayment term equal to the remaining Lease Term, all as reasonably determined by Lessor, or (b) three percent (3%). All proceeds of a Casualty received by Lessor shall, where applicable, be applied toward the replacement or repair of the System or the obligations of Lessee hereunder.

10. INSURANCE: Lessee shall at all times insure the System against all risks of loss or damage from every cause including, without limitation, loss by fire, "mysterious disappearance", natural disasters and such other risks of loss as are customarily insured against on the Equipment leased hereunder by businesses of the type in which Lessee is engaged and in an amount not less than the replacement cost of the System without deductible and without co–insurance. Lessee shall also obtain and maintain comprehensive public liability insurance (with tails) covering liability for bodily injury, including death, and property damage resulting from the use, operation or return of the System with a combined single limit of not less than Three Million Dollars ($3,000,000) per occurrence. If Lessee is a doctor, hospital or other health care provider, Lessee shall obtain and maintain professional liability insurance. All such insurance will be in a form, in an amount and with companies reasonably satisfactory to Lessor. Lessor, its successors or assigns, shall be the sole named lender loss payee (or equivalent) with respect to the property insurance for the System and shall be named as an additional insured on the public liability insurance. Lessee shall deliver to Lessor documents evidencing: (a) the insurance required hereby and (b) an endorsement to the policy or policies required hereunder requiring the related insurer to provide Lessor with not less than 30 days' prior written notice of the effective date of any material alteration, cancellation or non–renewal of a policy. Lessee hereby irrevocably appoints Lessor as Lessee's attorney–in–fact (which power shall be deemed coupled with an interest) to make claim for, receive payment of, and execute and endorse all documents, checks or drafts received in payment for loss or damage under any such insurance policy. If Lessee shall fail to procure, maintain, and pay for such insurance, Lessor shall, in addition to its other rights hereunder, have the right, but not the obligation, to obtain such insurance on behalf of and at the expense of Lessee and Lessor may charge Lessee an incremental fee which incremental fee may include a profit.

11. INDEMNITY FOR CLAIMS AND TAXES: Lessee assumes and agrees to indemnify, defend and keep harmless Lessor, its assignees, agents and employees (each, an "Indemnitee") from and against any and all losses, damages, injuries, claims, demands and expenses, including without limitation, legal expenses (other than such as may directly and proximately result from the gross negligence or willful misconduct of such Indemnitee), arising on account of the ownership, operation or return of the System or any portion thereof including, without limitation, any environmental, strict liability and infringement claims. Lessor shall give Lessee prompt notice of any claim or liability hereby indemnified against; provided, however, that the failure to deliver such prompt notice shall not release the Lessee from any of its obligations to indemnify hereunder. After the Lessee has provided a written acknowledgment of its obligation to indemnify hereunder, Lessee shall be entitled to control the defense of a claim with counsel consented to by Lessor, so long as no Event of Default (as hereinafter defined) is outstanding and such claim does not seek material relief against any Indemnitee or its property (other than the System). The obligations under this section shall survive termination of a Lease if it relates to any aspect of the System or its use during the related Lease Term. REGARDLESS OF CAUSE, LESSEE WILL NOT ASSERT ANY CLAIM WHATSOEVER AGAINST LESSOR FOR LOSS OF ANTICIPATORY PROFITS OR ANY OTHER INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES, NOR SHALL LESSOR BE RESPONSIBLE FOR ANY DAMAGES OR COSTS WHICH MAY BE ASSESSED AGAINST LESSEE IN ANY ACTION FOR INFRINGEMENT OF ANY TRADEMARK, PATENT OR COPYRIGHT. Lessee shall also be responsible for, as and when due, and shall indemnify and hold Lessor harmless from and against all present and future taxes and other governmental charges, or any increases therein (including, without limitation, sales, use, leasing and stamp taxes and license and registration fees) and amounts in lieu of such taxes and charges and any penalties or interest on any of the foregoing, imposed, levied upon, in connection with, or as a result of the purchase, ownership, delivery, leasing, possession or use of a System, or based upon or measured by the Payments or receipts with respect to this Agreement or any Lease hereunder. Lessee shall not, however, be obligated to pay any taxes on or measured by Lessor's net income or net worth. Lessee authorizes Lessor to add to the amount of each Payment any sales, use or other tax that may be imposed on or measured by such Payments. Lessee shall pay Lessor on demand as additional rent for each System: (i) the amount of the personal property tax required to be paid by Lessor as owner of such System, (ii) an administrative fee for processing tax returns, assessments and payments (currently an amount equal to ten percent (10%) of such tax, such amount not to be less than $6 or more than $125) and (iii) interest thereon at the highest legal rate allowed from the date due until fully paid. In the event Lessee does not pay all sums specified above, Lessor has the right, but not the obligation, to pay the same. If Lessor shall so pay any of the aforementioned, then the Lessee shall remit such amount with the next Payment. In addition, Lessor reserves the right to estimate any taxes to be paid hereunder and to invoice Lessee for said sum prior to such taxes being due to the appropriate authority.

master lease                                          3

Confidential
V&S 01057

12. TAX TREATMENT: Unless Lessee has a $1 purchase option or a Put Option, Lessee acknowledges, with respect to each Lease, that Lessor and the consolidated group of which Lessor is a member (all references to Lessor in this section include such consolidated group) intend: (a) to be treated for federal income tax purposes (and to the extent allowable, for state and local tax purposes) as the owner of each System on the relevant Commencement Date; (b) to claim (1) the maximum available accelerated cost recovery deductions for the cost (including installation and delivery) of the System over the number of years indicated on the related Lease by using initially the 200% declining balance method permitted under Section 168 of the Internal Revenue Code of 1986, as amended, and the related regulations ("Code") changing to the straight-line method at such time as will maximize deductions, and the half year convention and no salvage value, unless otherwise required by Code § 168(d)(3)(A); and (2) amortization deductions over the term of the Lease for Lessor's transaction expenses (collectively, "Recovery Deductions"); (c) to claim interest deductions as permitted by the Code on the aggregate interest paid to any lender which may be an assignee or secured party of or with respect to any Lease ("Interest Deductions"); (d) that it will not, under the Code, be required to include in its gross income, for federal income tax purposes, any amount with respect to any improvement, modification or addition made by Lessee to the System; and (e) that, for federal income tax purposes, all amounts included in the gross income of Lessor with respect to each item of the System will be treated as derived from or allocable to sources within the United States. The tax benefits described in this section shall be determined as to the System covered by a Lease based upon the Code (and any applicable state and local tax laws) in effect as of the date of such Lease. Lessee shall indemnify Lessor, its successors and assigns, promptly on demand, from and against any loss, disallowance, recapture, or unavailability of any Recovery Deductions or Interest Deductions claimed by Lessor with respect to any Lease including all interest, penalties, costs and reasonable attorneys' fees, or other damages arising out of or relating to any act or omission of Lessee that is inconsistent with Lessor's intention as set forth above. It is agreed that Lessor shall have sole control of any audit relating to such benefits and that Lessee may, to the extent permitted under applicable law, participate in any such audit, at its own expense, to the extent that any position it takes is not contrary or adverse to that of Lessor. LESSOR MAKES NO WARRANTY AS TO THE TREATMENT OF THIS AGREEMENT OR ANY LEASE HEREUNDER FOR TAX OR ACCOUNTING PURPOSES.

13. EVENTS OF DEFAULT: The term "Event of Default" shall mean any one or more of the following: (a) Lessee shall fail to pay any Payment or other sum when due and such failure is not cured within ten (10) days of such due date; (b) Lessee shall fail to perform or observe any of the covenants set forth in Section 10; (c) Lessee shall fail to perform or observe any other covenant, condition or agreement (not otherwise addressed in this Section 13) to be performed or observed by it hereunder or in any Lease and such failure is not cured within thirty (30) days after the date of notice thereof by Lessor to Lessee; (d) Lessee or any guarantor of Lessee's obligations or liabilities hereunder or under any Lease ("Guarantor") shall enter into any transaction of merger or consolidation in which it is not the surviving entity or sell, transfer or otherwise dispose of all or substantially all of its assets; (e) (1) Lessee or any Guarantor shall commence any action: (A) for relief under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors; or (B) seeking appointment of a receiver, custodian or other similar official for it or for its assets or making a general assignment for the benefit of its creditors; or (2) there shall be commenced against Lessee or Guarantor any action of a nature referred to in subsection 13(e)(1)(A) that results in the entry of an order for relief or any such other relief and remains undismissed or undischarged for a period of 30 days after the occurrence of such event; (f) Lessee or any Guarantor shall die or (if an entity) liquidate or dissolve itself or be liquidated, dissolved or terminated by statute or otherwise; (g) Any representation or warranty made by Lessee or any Guarantor or otherwise furnished Lessor in connection with this Agreement or any Lease hereunder shall prove at any time to have been untrue or misleading in any material respect; (h) Lessee or any Guarantor defaults on any indebtedness for borrowed money, lease, or installment sale obligation, in each case when any applicable grace period for such obligation has expired and regardless of whether such indebtedness has been accelerated by the applicable lender, lessor or creditor has commenced to exercise any remedy, but only if the indebtedness or other obligations, individually or in aggregate, is in an amount equal to or in excess of $50,000; or (i) Lessee shall be in default, after any grace or cure period, under any Acquisition Agreement or any loan, lease, guaranty, agreement or contract, of which Lessor or any of its affiliates, is a party or beneficiary.

14. REMEDIES: Upon the occurrence of any Event of Default, Lessor may exercise any one or more of the following remedies: (a) Declare the Accelerated Value immediately due and payable and similarly accelerate the balances due under any other Lease and agreements between Lessee and Lessor without notice or demand; (b) Charge Lessee interest on all monies due Lessor at the rate of eighteen percent (18%) per annum from the date of default until indefeasibly paid in full, but in no event more than the maximum rate permitted by law; (c) Require Lessee to assemble all or any part of the System at Lessee's expense, at a place reasonably designated by Lessor; (d) Remove and take possession of any or all items of System, without demand or notice, wherever some may be located, with or without any court order or pre-taking hearing or other process of law; and (e) exercise any other remedy available to Lessor at law or in equity.

Lessor may, at its option, use, ship, store or repair any or all items of the System so removed and shall sell, lease or otherwise dispose of any such System at a private or public sale. In the event Lessor disposes of the System, Lessor shall give Lessee credit for any sums received by Lessor from the sale or lease of the System after deduction of the expenses of sale or lease with such sums discounted at the implicit rate of interest, if appropriate. All remedies of Lessor hereunder are cumulative, are in addition to any other remedies provided for by law, and may, to the extent permitted by law, be exercised concurrently or separately. The exercise of any one remedy shall not be deemed to be an election of such remedy or to preclude the exercise of any other remedy. In addition, Lessee shall be responsible for all costs and expenses incurred by Lessor in the exercise of its remedies hereunder, including without limitation, reasonable attorneys' fees, removal costs and agrees to hold Lessor harmless from and against all claims except those resulting from the gross negligence or willful misconduct of Lessor. No failure on the part of the Lessor to exercise and no delay in exercising any right or remedy shall operate as a waiver thereof or modify the terms of this Agreement or any Lease hereunder. A waiver of default shall not be a waiver of any other or subsequent default. Lessor's recovery hereunder shall in no event exceed the maximum recovery permitted by law.

master lease

Confidential
V&S 01058

APP-145

15. UCC FILINGS AND FINANCIAL STATEMENTS: Lessee authorizes Lessor to file a financing statement or equivalent document (and any and all amendments thereto) without the signature of either the Lessee or the Lessor, and the Lessee hereby ratifies and affirms all such financing statements filed pursuant to this section. Lessee hereby appoints Lessor as Lessee's attorney-in-fact to do all acts or things which Lessor may deem necessary to protect Lessor's title and interest hereunder. Except for any Lease where the Lessee has a Put Option or a $1 purchase option, it is the intent of the parties that each Lease is a true lease under the UCC, and the filing of a financing statement under the UCC or other applicable law shall not be construed as evidence that any security interest was intended to be created, but only to give public notice of Lessor's ownership of the System. For any Lease where Lessee has a $1.00 purchase option or a Put Option or if this Agreement or any Lease hereunder is otherwise deemed at any time to be one intended as security, then Lessee grants Lessor a security interest in the System (and all accessions thereto and substitutions therefore) and the proceeds from the sale, lease or other disposition of the System.

16. LESSEE REPRESENTATIONS, WARRANTIES AND COVENANTS: Lessee hereby represents, warrants and covenants to Lessor the following with respect to this Agreement and each Lease as of the Commencement Date thereof that: (a) Lessee is organized and validly existing under the laws of the jurisdiction of its organization, with adequate power and capacity to enter into the Lease and any other documents, instrument or agreement related to a Lease or a System including, without limitation, any Acquisition Agreement (collectively, "Documents") and is duly qualified to do business wherever necessary to carry on its present business, including all states where the System is to be located; (b) all Documents have been duly authorized, executed and delivered by Lessee and constitute valid, legal and binding agreements, enforceable in accordance with their terms, except to the extent that the enforcement of remedies therein provided may be limited under applicable bankruptcy and insolvency laws; (c) no approval, consent or withholding of objections is required from any federal, state or local governmental authority or instrumentality with respect to the entry into or performance by Lessee of the Documents, except such as have already been obtained; (d) the entry into and performance by Lessee of its obligations under the Documents will not (1) violate any judgment, order, law, rule or regulation applicable to Lessee; or (2) result in any breach of, constitute a default under any agreement or contract to which Lessee is a party or result in the creation of any Lien (other than in favor of Lessor); (e) there are no suits or proceedings pending or threatened in court or before any regulatory commission, board or other administrative governmental agency against or affecting Lessee, which will have a material adverse effect on the ability of Lessee to fulfill its obligations and liabilities under the Documents; (f) under the laws of the state(s) in which the System is to be located, the System consists solely of personal property and not a fixture; (g) the Lessee is organized under the laws of the State set forth in the preamble to this Lease and its organization number is as set forth on the signature page to this Agreement; the address stated below the signature of Lessee is the chief place of business and chief executive office of Lessee and has been so for the last five years, and Lessee does not conduct business under a trade, assumed or fictitious name; (h) to provide Lessor with Lessee's financial statements or filed tax returns if its financial statements are unaudited, as soon as available, but not more than 120 days from its fiscal year end; (i) all financial statements furnished will be prepared in accordance with generally accepted accounting principles, consistently applied ("GAAP"); (j) no information contained in the Lease or any other documents or written materials furnished by or on behalf of the Lessee to the Lessor pursuant to the terms hereof or any Lease contains any untrue or inaccurate statement of a material fact or omits to state a material fact necessary to make the statement contained herein or therein not misleading in light of the circumstance under which made; and (k) the Lessee and its subsidiaries have filed all Federal, state and other material tax returns and reports required to be filed, and have paid all Federal, state and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those that are being contested in good faith by appropriate proceedings and for which adequate reserves have been provided in accordance with GAAP and there is no proposed tax assessment against the Lessee or any subsidiary that would, if made, have a material adverse effect on the Lessee or its ability to perform its obligations under this Agreement or a Lease.

17. MISCELLANEOUS: Any time that Lessor's consent is required under this Agreement such consent shall not be unreasonably withheld. All obligations of the Lessee, if more than one, shall be joint and several. All paragraph headings are inserted for reference purposes only and shall not affect the interpretation or meaning of this Agreement or any Lease hereunder. Lessee will promptly execute and deliver to Lessor such further documents, instruments and assurances and take such further action as Lessor from time to time may reasonably request in order to carry out the intent and purpose of this Agreement or any Lease and to establish and protect the rights and remedies created or intended to be created in favor of Lessor hereunder or thereunder. Lessee shall provide not less than 30 days advance written notice to Lessor of any change in its name, address of its chief executive office or its state of organization. Lessee acknowledges and agrees that Lessee, in executing this Agreement and each Lease hereunder, it has relied solely upon the terms, provisions and conditions contained herein and therein, and any other statements, warranties, or representations, if any, by the Provider, or any salesperson, employee, representative or agent of the Provider, have not been relied upon. Lessee irrevocably authorizes Lessor to fill in descriptive information in this Agreement (including Equipment serial numbers) that is left blank and to correct obvious errors in this Agreement or any Lease or any exhibit or attachment thereto.

18. NOTICES; CHANGES: Notices, requests or other communications required under the Lease to be sent to either party shall be in writing and shall be by: (a) United States first class mail, postage prepaid, and addressed to the other party at the address specified above (or to such other address as such party shall have designated by proper notice), (b) personal delivery, or (c) overnight delivery by a nationally recognized courier. Any such notice shall be effective when received.

19. STATUTORY FINANCE LEASES; PROVIDER WAIVERS: Lessor and Lessee agree that each Lease is a "Finance Lease" as that term is defined in Article 2A of the UCC. Lessee acknowledges that it selected the System and the Provider thereof, and Lessor has not selected, manufactured or supplied the System. LESSOR HEREBY NOTIFIES LESSEE THAT LESSEE MAY HAVE RIGHTS PURSUANT TO THE CONTRACT WITH THE PROVIDER AND THE LESSEE MAY CONTACT THE PROVIDER FOR A DESCRIPTION OF ANY RIGHTS OR WARRANTIES THAT LESSEE MAY HAVE UNDER SUCH CONTRACT. LESSEE HEREBY WAIVES ANY AND ALL RIGHTS AND REMEDIES GRANTED LESSEE BY SECTIONS 508 THROUGH 522 OF ARTICLE 2A OF THE UCC.

5

Confidential
V&S 01059

20. CHOICE OF LAW; WAIVER OF JURY TRIAL. This Agreement and each Lease hereunder shall be binding and effective when accepted by Lessor at its corporate office in Wayne, Pennsylvania, shall be deemed to have been made in Wayne, Pennsylvania and, except for local filing requirements and laws relating to the conflict of laws, shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania. Lessee hereby consents to and agrees to the non-exclusive jurisdiction of the courts of the Commonwealth of Pennsylvania or the Federal District Court for the Eastern District of Pennsylvania with respect to any provision or dispute arising under this Agreement or any Lease. Lessee agrees that service of process in any action or proceeding may be duly affected upon Lessee by mailing such process via certified mail, return receipt requested or as otherwise provided under applicable law. LESSOR AND LESSEE EACH AGREE TO WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY LITIGATION ARISING FROM OR RELATED IN ANY WAY TO THIS AGREEMENT, ANY LEASE OR ANY SYSTEM.

21. ENTIRE AGREEMENT, NON-WAIVER AND SEVERABILITY: This Agreement and each Lease contain the entire agreement and understanding between Lessee and Lessor relating to the subject matter thereof. No term or provision of this Agreement or any Lease may be modified unless set forth in writing and signed by both parties. LESSEE ACKNOWLEDGES THAT NO PROVIDER NOR ANY SALESPERSON, EMPLOYEE, REPRESENTATIVE OR AGENT OF A PROVIDER IS AN AGENT OR REPRESENTATIVE OF LESSOR, AND THAT NONE OF THE ABOVE IS AUTHORIZED TO WAIVE OR ALTER ANY TERM, PROVISION OR CONDITION OF THIS AGREEMENT OR ANY LEASE, OR MAKE ANY REPRESENTATION WITH RESPECT TO THIS AGREEMENT, ANY LEASE OR THE SYSTEM ON BEHALF OF LESSOR. Time is of the essence in this Agreement and each Lease hereunder. No waiver by Lessor of any breach or default shall constitute a waiver of any additional or subsequent breach or default by Lessor nor shall it be a waiver of any of Lessor's rights. Any provision of this Agreement or any Lease hereunder which for any reason may be held unenforceable in any one jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such unenforceability without invalidating the remaining provisions of this Agreement or any Lease hereunder, and any such unenforceability in any one jurisdiction shall not render such provision unenforceable in any other jurisdiction. This Agreement and all of the Leases may be executed in any number of counterparts and by different parties hereto or thereto on separate counterparts, each of which, when so executed and delivered, shall be an original, but all such counterparts shall together consist of but one and the same instrument; provided, however, that to the extent that any Lease would constitute chattel paper, as such term is defined in the UCC as in effect in any applicable jurisdiction, no security interest herein or therein may be created through the transfer or possession of this Agreement in and of itself without the transfer or possession of the original of such Leases and incorporating this Agreement by reference; and no security interest in a Lease may be created by the transfer or possession of any counterpart of such a Lease other than the original thereof, which shall be identified as the document marked "Original" and all other counterparts shall be marked "Duplicate".

IN WITNESS WHEREOF, the parties hereto have caused this Master Lease Agreement to be duly executed by their authorized representatives as of the date first above written.

Witness:

By: _Debra S Eschrich_

Print name: _Debra S Eschrich_

Title: _RN_

By: _K Kelly_

Print name: _Kim Kelly_

Title: _SSR_

Lessee: V & S Medical Associates, LLC

By: _Ken Saleh_

Print name: _Kannan Saleh_

Title: _Partner_

Address: _24 W. Washington Street_

_Bradford PA -16701_

Organization I.D #: _____

PHILIPS MEDICAL CAPITAL, LLC

By: _Julie W. Ward_

Print name: _JULIE D. WARD_

Title: _VP of Operations_

master lease                    6

Confidential
V&S 01060

APP-147

*PH004701*

## MASTER LEASE SCHEDULE No. 01

LESSEE:    V & S Medical Associates, LLC

This Master Lease Schedule No. 01("Lease Schedule"), dated April 6, 2004 , constitutes an independent lease incorporating the terms and conditions of the Master Lease Agreement ("Agreement"), dated April 6, 2004, by and between PHILIPS MEDICAL CAPITAL, LLC ("Lessor") and Lessee. All capitalized terms in this Lease Schedule shall have the meanings ascribed to them in the Agreement. To the extent that the terms of this Lease Schedule conflict with the terms of the Agreement, the terms of this Lease Schedule shall control.

Lessee hereby acknowledges and certifies that (i) the System and each item thereof described below or in any exhibit attached hereto was selected by the Lessee, (ii) the Lessee has reviewed and approved the purchase order, supply contract or purchase agreement covering each item of the System, (iii) as between the Lessor and the Lessee, each such item is of a size, design, capacity and manufacture acceptable to and suitable for Lessee's need; and (iv) as of the Commencement Date, each item of the System has been delivered and inspected by Lessee, is in good working order, repair and condition and that Lessee unconditionally and irrevocably accepts the System and each item thereof for lease hereunder.

**System Description:** Items of Equipment, Software and Maintenance: CardioMD Nuclear Camera

1. Provider Name & Address: _____
_____ (if blank, the Provider is Philips Medical Systems).

2. Equipment Location:   116 Interstate Pkwy., Bradford, PA 16701
_____ (only if different from address in Agreement).

3. Lease Term: 60 months starting the first day of the first full month after the "Commencement Date" (as defined below). Nevertheless, the Lease Term shall automatically renew for an additional 12 months upon payment terms then in effect unless Lessee notifies Lessor not less than one hundred and one hundred and eighty (180) days and not more than two hundred and seventy (270) days prior to the last day of the Lease Term ("Term Expiration Date") that it is going to return the Equipment and returns the Equipment on Term Expiration Date. Thereafter, the Lease Term shall extend for additional three (3) month periods until Lessee has returned or purchased the System as provided for hereunder. For the purposes of this Lease Schedule, the Commencement Date shall mean the earliest to occur of: (i) the date on which the System is Available for First Use (as hereinafter defined); (ii) the date on which the Lessor shall have received telephonic confirmation from the Lessee that the System has been accepted; or (iii) execution by Lessee of a Delivery and Acceptance Certificate. As used herein, "Available for First Use" shall mean that the System is available for first patient or clinical use. It is agreed that if the appropriate Provider represents to Lessor that a System has been installed and is available for first patient or clinical use, such representation shall, as between Lessor and Lessee, constitute a definitive determination that such System is "Available for First Use."

4. Payments:

(a) Payment: 60 equal consecutive monthly payments in the amount of $ 4,450.40 plus all applicable taxes due on the first day of each month during the Lease Term and the same day of each month thereafter with a final payment of all sums due and owing hereunder on the Term Expiration Date.

(b) Changes in Payment: The Payment amount is based on an interest rate equivalent to that of a U.S. Treasury constant maturity obligation (as reported by the U.S. Treasury) that would have a repayment term equivalent to the Lease Term, as reasonably determined by Lessor ("Treasury Rate") and on Lessor's estimated value of the System at the Term Expiration Date (the "Projected Value"). The Payment shall be

PM V Schedule.031804



DEPOSITION
EXHIBIT
34

Confidential
V&S 01053

APP-148

adjusted upward or downward by Lessor to reflect any change: (i) in the Treasury Rate set forth in the most recent proposal delivered by Lessor to Lessee and accepted by Lessee, and the Treasury Rate in effect on the Commencement Date; and (ii) in the Projected Value due to market conditions if the Commencement Date does not occur within ninety (90) days of the date first set forth above.

(c) **Advance Payment:** $ 4,450.40 plus all applicable taxes (1st Payment unless otherwise described in this subsection).

**5. Security Deposit and Fee:** Lessee will provide Lessor with a security deposit of 0.00 as security for its obligations hereunder and pay Lessor a processing fee of $500 for Lessor's documentation, UCC-1 financing statement filing and other administrative costs. Any security deposit is non-interest bearing and may be commingled by Lessor. Lessor may apply any security deposit upon an Event of Default and Lessee shall promptly restore any amount so applied. If Lessee is not in default on the Term Expiration Date, then Lessor shall return any security deposit not applied to Lessee without interest.

**6. Interim Rent:** If the Commencement Date is on a day other than the first day of the month, Lessee shall pay interim rent ("Interim Rent") equal to one-thirtieth (1/30) of the Payment for each day from and including the Commencement Date through and including the last day of the month prior to the beginning of the Lease Term. Interim Rent is due and payable concurrently with the first regularly scheduled Payment of the Lease Term. If the Payments are not level, then the calculation will be based on the weighted average of the Payments in excess of $0.

**.7. Fair Market Value Purchase Option:** So long as no Event of Default exists, Lessee may, not less than one hundred and eighty (180) days and not more than two hundred and seventy (270) days prior to the Term Expiration Date, elect to purchase all, but not less than all, of the System for a purchase price equal to the fair market value of the System as of the Term Expiration Date. For the purposes of this Lease Schedule, fair market value of the System will equal the price a willing buyer would pay and a willing seller would accept (neither buyer or seller being under compulsion to act) for the System as installed, giving due consideration to its replacement cost, as determined by Lessor in its sole discretion. Upon receipt by Lessor of the purchase price and all other sums due hereunder on or about the Term Expiration Date, Lessor shall convey title to the System to Lessee free and clear of all liens and encumbrances arising through Lessor but otherwise "As Is" and "Where Is" and without warranty of any kind, including the warranty of fitness for a particular purpose and of merchantability. Lessee shall pay all taxes attributable to any sale other than net income taxes imposed on any gain recognized by Lessor as a direct result of such sale.

In Witness Whereof, the parties hereto have executed this Master Lease Schedule No. 01 as of the date first set forth above.

Witness:                                    V & S Medical Associates, LLC

_Debra S Eschrich_                          By _Uni Seg_

Print Name: _Debra S'Eschrich_              Print Name: _Kamran Saleh_

                                            Title: _Partner_

Witness:                                    PHILIPS MEDICAL CAPITAL, LLC

_K Kelly_                                   By _Julie D. Ward_

Print Name: _Kim Kelly_                     Print Name: _JULIE D. WARD_

                                            Title: _VP of Operations_

FMV Schedule.031104

Confidential
V&S 01054

APP-149

Jul-22-04  11:22A William Schroeder                 508 721 3739              P.07

## MASTER LEASE SCHEDULE No. 02

**LESSEE:    V & S Medical Associates, LLC**

This Master Lease Schedule No.02 ("Lease"), dated April 16, 2004, constitutes an independent lease incorporating the terms and conditions of the Master Lease Agreement ("Agreement"), dated April 6, 2004, by and between PHILIPS MEDICAL CAPITAL, LLC ("Lessor") and Lessee. All capitalized terms in this Lease shall have the meanings ascribed to them in the Agreement. To the extent that the terms of this Lease conflict with the terms of the Agreement, the terms of this Lease shall control.

Lessee hereby acknowledges and certifies that: (i) the System and each item thereof described below or in any exhibit attached hereto was selected by the Lessee; (ii) the Lessee has reviewed and approved the purchase order, supply contract or purchase agreement covering each item of the System; (iii) as between the Lessor and the Lessee, each such item is of a size, design, capacity and manufacture acceptable to and suitable for Lessee's need; and (iv) as of the Commencement Date, each item of the System has been delivered and inspected by Lessee, is in good working order, repair and condition and that Lessee unconditionally and irrevocably accepts the System and each item thereof for lease hereunder.

**1. System Description:** Items of Equipment, Software and Maintenance: GE buyout of Nuclear Camera. Payments are based on the estimated cost of $200,000.00

**2. Provider Name & Address:**____GE_____
_____(if blank, the Provider is Philips Medical Systems).
**3. Equipment Location:**____116 Interstate Pkwy., Bradford, PA 16701_____
_____only if different from address in Agreement).

**4. Lease Term:** 60 months starting the first day of the first full month after the "Commencement Date" (as defined below). Nevertheless, the Lease Term shall automatically renew for an additional 12 months upon payment terms then in effect unless Lessee notifies Lessor not less than one hundred and one hundred and eighty (180) days and not more than two hundred and seventy (270) days prior to the last day of the Lease Term ("Term Expiration Date") that it is going to return the Equipment and returns the Equipment on Term Expiration Date. Thereafter, the Lease Term shall extend for additional three (3) month periods until Lessee has returned or purchased the System as provided for hereunder. For the purposes of this Lease, the Commencement Date shall mean the earliest to occur of: (i) the date on which the System is Available for First Use (as hereinafter defined); (ii) the date on which the Lessor shall have received telephonic confirmation from the Lessee that the System has been accepted; or (iii) execution by Lessee of a Delivery and Acceptance Certificate. As used herein, "Available for First Use" shall mean that the System is available for first patient or clinical use. It is agreed that if the appropriate Provider represents to Lessor that a System has been installed and is available for first patient or clinical use, such representation shall, as between Lessor and Lessee, constitute a definitive determination that such System is "Available for First Use".

**5. Payment:**
**(a) Payment:** 60 equal consecutive monthly payments in the amount of $3,958.13 plus applicable taxes due on the first day of each month during the Lease Term and the same day of each month thereafter with a final payment of all sums due and owing hereunder on the Term Expiration Date.

**(b) Changes in Payment:** The Payment amount is based on an interest rate equivalent to that of a U.S. Treasury constant maturity obligation (as reported by the U.S. Treasury) that would have a repayment term equivalent to the Lease Term, as reasonably determined by Lessor ("Treasury Rate"). The Payment


DEPOSITION EXHIBIT

Confidential
V&S 01076

APP-150

Jul-22-04  11:23A  William Schroeder          508 721 8799          P.02

shall be adjusted upward or downward by Lessor to reflect any change in the Treasury Rate set forth in the most recent proposal delivered by Lessor to Lessee and accepted by Lessee and the Treasury Rate in effect on the Commencement Date.

(e) **Advance Payment:** $ 3,958.13 plus applicable taxes (1st Payment unless otherwise described in this subsection).

**6. Security Deposit and Fee:** Lessee will provide Lessor with a security deposit of $0.00 as security for its obligations hereunder and pay Lessor a processing fee of $0.00 for Lessor's documentation, UCC-1 financing statement filing and other administrative costs. Any security deposit is non-interest bearing and may be commingled by Lessor. Lessor may apply any security deposit upon an Event of Default and Lessee shall promptly restore any amount so applied. If Lessee is not in default on the Term Expiration Date, then Lessor shall return any security deposit not applied to Lessee without interest.

**7. Interim Rent:** If the Commencement Date is on a day other than the first day of the month Lessee shall pay interim rent ("Interim Rent") equal to one-thirtieth (1/30) of the Payment for each day from and including the Commencement Date through and including the last day of the month prior to the beginning of the Lease Term. Interim Rent is due and payable concurrently with the first regularly scheduled Payment of the Lease Term. If the Payments are not level, then the calculation will be based on the weighted average of the Payments in excess of $0.

**8. Purchase Option:** So long as no Event of Default has occurred and is continuing as of the Term Expiration Date, Lessee may purchase all, but not less than all, of the System for a purchase price equal to $1. Upon receipt by Lessor of the purchase price and all other sums due hereunder on or before the Term Expiration Date, Lessor shall convey title to the System to Lessee free and clear of all liens and encumbrances arising through Lessor but otherwise "As Is" and "Where Is" and without warranty of any kind, including the warranty of fitness for a particular purpose and of merchantability. Lessee shall pay all taxes attributable to any sale other than net income taxes imposed on any gain recognized by Lessor as a direct result of such sale.

In Witness Whereof, the parties hereto have executed this Master Lease Schedule No. 02 as of the date first set forth above.

Witness:                                V & S Medical Associates, LLC

_____                 By: _____

Print Name: _____             Print Name: _Kamran Saleel_

                                         Title: _____

Witness.                                 PHILIPS MEDICAL CAPITAL, LLC

_____                 By _____

Print Name: _____             Print Name: _____

                                         Title: _____

51 out-sch 2

Confidential
V&S 01077

APP-151

## GUARANTY

Re: that certain Master Lease Agreement, dated April 6, 2004 by and between PMC and V & S Medical Associates, LLC ("Lease").

For valuable consideration, the receipt whereof is hereby acknowledged, and to induce Philips Medical Capital, LLC ("PMC") to make loans or advances, or extend credit or financial accommodations to V & S Medical Associates, LLC ("Obligor"), or to continue the same, but without requiring PMC to do so, the undersigned each hereby jointly and severally (each a "Guarantor") guarantees and promises to pay to PMC at its office at 1111 Old Eagle School Road, Wayne, PA 19087 or at such other place PMC, may from time to time advise in writing, on demand, in lawful money of the United States, the due and punctual payment and performance of any and all of the Obligations (as hereinafter defined) and liabilities of Obligor to PMC The word "Obligations" means any and all sums due and owing from Obligor to PMC arising out of or relating to the lease or purchase of equipment from PMC under the Lease described above and all related documents, instruments or agreements between PMC and Obligor (collectively "Agreement") whether voluntary or involuntary and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or underdetermined. The Guarantor's obligations hereunder shall be unconditional (and shall not be subject to any defense, setoff, counterclaim or recoupment whatsoever) irrespective of the genuineness, validity, regularity or enforceability of the Obligations or any conduct of the Obligor and/or PMC that might constitute a legal or equitable discharge of a surety, guarantor or guarantor or whether recovery upon such Obligations may be or hereafter become barred by any statute of limitations, or whether such Obligations may be or hereafter become otherwise unenforceable. This is a guaranty of payment and performance and not of collection.

This is a continuing guaranty relating to any Obligations, including that arising under successive transactions that shall either continue the Obligations or from time to time renew it after it has been satisfied or create new Obligations. The obligations of each Guarantor hereunder is independent of the obligations of Obligor or the obligations of any other person(s) or guarantor(s) who may be liable to PMC in whole or in part for the Obligations, and separate action or actions may be brought and prosecuted against each Guarantor, other obligors or any of them (if there be more than one) whether action is brought against Obligor alone or whether Obligor be joined in any such action or actions; and Guarantor waives the benefit of any statute of limitations affecting its liability hereunder or the enforcement thereof.

Guarantor authorizes PMC, without notice or consent and without affecting, impairing or discharging in whole or in part its liability hereunder, from time to time to (a) renew, modify, amend, compromise, extend, accelerate, discharge or otherwise change the time for payment of, or otherwise change the terms or provisions of the Obligations, the Agreement or any parts thereof, including increase or decrease of the rate of interest thereon; (b) take and hold security for the payment of this guaranty or the Obligations guaranteed, and exchange, enforce, waive and release any such security; (c) apply such security and direct the order or manner of sale thereof as PMC in its sole discretion may determine; and (d) release or substitute in whole or in part any one or more of the endorsers, Guarantor or anyone else who may be partially or wholly liable for any part of the Obligations. PMC may without notice assign this guaranty in whole or in part.

Guarantor waives any right to require PMC to (a) proceed with or exhaust remedies against Obligor; (b) proceed against or exhaust any security held from Obligor or Guarantor; (c) pursue any other remedy PMC may possess whether legal or equitable, or (d) proceed against any other person(s), entity or guarantor(s) who may be liable to PMC in whole or in part for the Obligations. Guarantor waives any defense arising by reason of any disability or other defense of Obligor or by reason of the cessation or modification from any cause whatsoever of the liability of Obligor. Until all Obligations shall have been indefeasibly paid in full, Guarantor shall have no right to subrogation, and waives any right to enforce any remedy which PMC now has or may hereafter have against Obligor, and waives any benefit of, and any right to participate in any security now or hereafter held by PMC. Guarantor waives diligence, all presentments, demands for performance, notices of non-performance, default, protests, notices of dishonor, notices of acceptance of this guaranty and of the existence, creation or incurring of new, changed, modified, increased or additional Obligations, all other notices of every and any kind and trial by jury in any action or proceeding arising out of, under, on or by reason of this guaranty or any other dispute between Guarantor and PMC.

Any obligations of Obligor now or hereafter held by or owing to Guarantor are hereby subordinated to the Obligations; and such obligations or liabilities of Obligor to Guarantor, if PMC so requests, shall be collected, enforced and received by Guarantor in trust for PMC and be paid over to PMC on account of the Obligations, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this guaranty. In the event of any distribution, division or application, partial or complete, voluntary or involuntary, by operation of law or otherwise, of all or any part of the assets of Obligor or the proceeds thereof to the creditors of Obligor, or upon any Obligations of Obligor, by reason of dissolution, liquidation or other winding up of Obligor or its business, or compromise or settlement with its creditors, or any sale, receivership, insolvency or bankruptcy proceeding or assignment for the benefit of creditors, or any proceeding by or against Obligor for any relief under any provisions of the United States Bankruptcy Code, as amended, then and in any such event any

Confidential
V&S 01061

payment or distribution of any kind or character, which shall be payable or deliverable with respect to any and all obligations or liabilities due to any Guarantor by Obligor, shall be paid or delivered directly to PMC for application on any Obligations, whether due or not due, of Obligor to PMC until such Obligations and obligations to PMC shall have first and fully been indefeasibly paid and satisfied. Guarantor hereby sells, assigns, transfers, and set over to PMC all of its rights to any and all such distributions.

Where any one or more of Obligors are corporations, limited liabilities entities or partnerships, it is not necessary for PMC to inquire into the powers of Obligor or the officers, directors, partners, or agents acting or purporting to act on their behalf, and any Obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed and be Obligations hereunder. Guarantor agrees to pay all attorneys' fees and all other costs and expenses incurred by PMC in connection with the exercise of its rights and remedies under this Guaranty.

Where there is but a single Obligor, or where a single Guarantor executes this guaranty, then all words used herein in the plural shall be deemed to have been used in the singular where the context and construction so require; and when there is more than one Obligor named herein, or when this guaranty is executed by more than one Guarantor, the words "Obligor" and "Guarantor" respectively shall mean all and any one or more of them, the obligations, waivers, promises and statements of Obligor and Guarantor hereunder being respectively joint and several. If any Guarantor is a corporation, by executing and delivering this guaranty, it and the officers thereof signing on its behalf and warrant that the execution and delivery of this guaranty has been duly authorized by all necessary and appropriate corporate and shareholder action.

This guaranty cannot be changed, modified, or terminated except in a writing signed by a Guarantor and a duly authorized officer of PMC and deemed delivered in, and shall be construed, interpreted and enforced in accordance with the internal laws of, the Commonwealth of Pennsylvania. The parties hereto consent to the non-exclusive jurisdiction of the state and federal courts located in the Commonwealth of Pennsylvania and waive any right to trial by jury that either of them may have arising out of or relating to this Guaranty. The obligations of Guarantor hereunder shall be binding upon its successors, representatives, estates and assigns and shall inure to the benefit of PMC's successors and assigns.

IN WITNESS WHEREOF, the undersigned Guarantor, and each of them (if there be more than one), has executed and delivered this Guaranty independent of each other and not relying upon or in consideration of the execution hereof by any other of them, as of this 8ᵗ day of June , 2004 .

Witness:                                   Bradford Hospital
                                           Entity Guarantor

Cathy Rauff                                BY: SSDhandt
Print Name: Cathy Rauff                    TITLE: President / CEO

V&S Medical Associates - Guaranty Page 2 of 2

Confidential
V&S 01062

5/12/2004 1:37 PM    PAGE    2/002    Fax Server

## ADDENDUM TO GUARANTY

This Addendum to Guaranty ("Addendum"), dated April 22, 2004 is by and between Bradford Hospital ("Guarantor") and Philips Medical Capital, LLC ("Lessor"). Lessor and V&S Medical Associates, LLC ("Lessee") are parties to that certain Master Lease Agreement dated April 6, 2004 (the "Agreement"). Guarantor executed and delivered to Lessor a Guaranty dated of even date herewith ("Guaranty") guarantying some or all of the obligations of Lessee to Lessor under the Agreement. Lessor and Guarantor desire to supplement the terms of the Agreement. Any capitalized terms not otherwise defined herein shall have the meaning given them in the Agreement.

NOW, THEREFORE, for good and valuable consideration, intending to be legally bound and pursuant to the terms and conditions hereof and the Agreement, it is hereby agreed as follows:

1.    The following sentences are added to the first full paragraph of the Guaranty: Notwithstanding any other provision contained in this Guaranty, the amount owed by Guarantor hereunder shall not exceed the sum of (X) all of the liabilities and obligations of Lessee arising under Schedule No.1 and Schedule No. 2 to the Agreement plus (Y) all expenses of obtaining or endeavoring to obtain payment or performance of Guarantor under this Guaranty, including reasonable attorneys' fees and other legal expenses.

2.    This Addendum supplements the Guaranty.  In the event of any conflict, inconsistency or incongruity between the provisions of this Addendum and any of the provisions of the Guaranty, the provisions of this Addendum shall in all respects govern and control.

3.    IN WITNESS WHEREOF, the parties have caused this Addendum To Guaranty to be executed on the date first set forth above.

Witness:

Print name: Cathy Knoff
Title: Administrative Assistant

Print name: Kimberly
Title: SSR

Bradford Hospital
By: _____
Print name: George E. Leonhardt
Title: President/CEO

PHILIPS MEDICAL CAPITAL, LLC

By: _____
Print name: Jace D. Ward
Title: VP of Operations

addendum to CG

Confidential
V&S 01063

APP-154

# 19. SEPTEMBER 28, 2004 LETTER TO DR. SALEH FROM WESTON FELLDIN

**Philips Medical Capital**

1111 Old Eagle School Road
Wayne, PA 19087
Ph 866-514-4762 x5521
Fax 866-516-4762

V & S Medical Associates, LLC
24 W Washington Street
Bradford, PA 16701

September 28, 2004

Dear Dr. Saleh:

This letter is an acknowledgement to the Master Lease dated April 6, 2004, Master Lease Schedule No. 01 dated April 6, 2004.

The terms of both the Financing Proposal and Lease documents provide that your monthly payment be adjusted for changes in similar term Treasury Notes. Sixty month Treasury Notes have increased from 3.08% when your proposal was signed to 3.37% at the commencement of your contract. As a result, your monthly payment will be adjusted as below

    1 payment of $4,450.40 including sales/use taxes (payment has been received) followed by
    59 payments of $4,240.35 plus all applicable taxes

All other terms and conditions of the lease will remain unaffected. This letter will serve as an addendum to the original lease agreement.

Please feel free to call with any questions that you may have concerning this letter.

Sincerely,

Weston Felldin
Sales Support Representative

DEPOSITION
EXHIBIT
Saleh
36
9-9-07    Jah

Confidential
V&S 01051

APP-156

# 20. JANUARY 20, 2005 LETTER TO DR. VACCARO FROM WESTON FELLDIN

**Philips Medical Capital**

1111 Old Eagle School Road
Wayne, PA 19087
Ph 866-514-4762 x5521
Fax 866-516-4762

V & S Medical Associates, LLC
24 W Washington Street
Bradford, PA 16701

January 20, 2005

Dear Dr. Vaccaro:

This letter is an acknowledgement to the Master Lease dated April 6, 2004, Master Lease Schedule No. 02 dated January 5, 2005.

The terms of both the Financing Proposal and Lease documents provide that your monthly payment be adjusted for changes in similar term Treasury Notes. Sixty month Treasury Notes have increased from 3.08% when your proposal was signed to 3.70% at the commencement of your contract. As a result, your monthly payment will be adjusted as below

     1 payment of $3,958.13 including sales/use taxes (payment has been received) followed by
     59 payments of $3,159.38 plus all applicable taxes

All other terms and conditions of the lease will remain unaffected. This letter will serve as an addendum to the original lease agreement.

Please feel free to call with any questions that you may have concerning this letter.

Sincerely,

Weston Felldin
Sales Support Representative

Confidential
V&S 01052

# 21. V&S STATEMENT FOR OCTOBER 2003

**V&S MEDICAL ASSOCIATES**
**24 WEST WASHINGTON STREET**
**BRADFORD, PA 16701**
**(814)368-1000**

25-1855052

S T A T E M E N T

October 2003

| | | |
|---|---|---:|
| Rent | | $ 2,500.00 |
| Internet Charges | | 24.00 |
| Secretarial Support | | 1,000.00 |
| Giamuso (Physicist) | | 440.00 |
| Laundry | | 70.00 |
| Telephone | | Pending |
| | | |
| Supplies per test: | | |
| Cardolite tests costs | 14 tests | 288.68 |
| Adenosine tests | 18 tests | 511.56 |
| Hepatobiliary | 1 test | 11.40 |
| Whole Body Bone | 3 tests | 34.20 |
| | | |
| Total | | $4,879.84 |

(Above testing does not include medicine. That total will be taken from the receipts as
the medicine is paid at cost by the insurer.)

No receipts as of this date.

**Payment due upon receipt.**

7240.405 - 845 84
7240.750 - 2500.00
7240.655 - 1534.00

CK #163855

DEPOSITION
EXHIBIT
Saleh
89-07 30 jan

**Confidential**
**V&S 03154**

# 22. OCTOBER 2, 2003 LETTER TO GEORGE LEONHARDT FROM DRS. SALEH AND VACCARO

# V & S MEDICAL ASSOCIATES

Peter Vaccaro, M.D.
Kamran Saleh, M.D.
Qazi Jamil, M.D.

24 WEST WASHINGTON STREET
BRADFORD, PENNSYLVANIA 16701-0797
Telephone (814) 368-1000

October 2, 2003

CONFIDENTIAL
CONFIDENTIAL

George Leonhardt, President/CEO
Bradford Regional Medical Center
116 Interstate Parkway
Bradford, PA 16701

RE: Summary of charges for Nuclear Outpatient Testing

Dear George:

This letter indicates the monthly charges for the nuclear facility while located at V&S Medical Associates:

| | |
|---|---|
| Rent | $2,500.00/month |
| Includes electric/cleaning/snow removal/garbage | |
| Billing | 10% of total receipts |
| Laundry | |
| Telephone | |
| Internet Charges (cable) | $24.00/month |
| Secretarial support | 20 hrs per week @ $10/hr |

The laundry and telephone charges would change monthly according to the charges from Verizon and Bradford Laundry. We would like to sell to the hospital the Archive system at a cost of $2,000.00 and the hot lab at a cost of $1,800.00. Please do not hesitate to contact us with any questions. The above monthly costs will be due on the 30th of each month.

Sincerely,

Kamran Saleh, MD

Peter Vaccaro, MD

KS:sp

DEPOSITION
EXHIBIT
2-26-07  21  Jan

HOSP 0004229

# 23. DR. SINGH'S RESPONSES AND OBJECTIONS TO BRMC'S FIRST SET OF INTERROGATORIES

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
ERIE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* | : | |
| DILBAGH SINGH, M.D., | : | |
| PAUL KIRSCH, M.D., | : | |
| V. RAO NADELLA, M.D., and | : | |
| MARTIN JACOBS, M.D., | : | |
| | : | |
| Relators, | : | |
| | : | |
| v. | : | Civil Action No. 04-186E |
| | : | |
| BRADFORD REGIONAL | : | |
| MEDICAL CENTER, | : | |
| V&S MEDICAL ASSOCIATES, LLC, | : | |
| PETER VACCARO, M.D., | : | |
| KAMRAN SALEH, M.D., | : | |
| and DOES I through XX, | : | |
| | : | |
| Defendants. | : | |
| | : | |

PLAINTIFF DILBAGH SINGH, M.D.'S REPONSES AND OBJECTIONS TO
BRADFORD REGIONAL MEDICAL CENTER'S
FIRST SET OF INTERROGATORIES

Pursuant to Fed. R. Civ. P. 33 ("Rule 33"), Plaintiff-Relator Dilbagh Singh, M.D. ("Relator Singh") serves the following responses and objections to Defendant Bradford Regional Medical Center's ("BRMC") First Set Interrogatories.

Interrogatories

1.    Identify every person or entity (other than individual patients) from which Dr. Singh derived any income, including the amount of income (on an annual basis) Dr. Singh derived from each such person or entity.

of Directors. At this meeting, Relators requested information about the proposed sublease agreement with V & S.

9.     Identify any professional corporation, partnership, limited liability company, limited liability partnership, or other entity through, or in affiliation with, which Dr. Singh practiced medicine, and with respect to each, identify: (a) the dates when Dr. Singh practiced through or in affiliation with such entity; (b) any other physicians who practiced through or in affiliation with such entity; (c) the location of any office(s) of any such entity; (d) the person(s) who have custody or control of the books and records of said entity; and (e) the amount and nature of any remuneration paid to Dr. Singh by said entity during each calendar year or part of a year in which he practiced through or in affiliation with such entity.

Response:

Relator Singh objects to this Interrogatory on the basis that it seeks information that is not relevant to the claims or defenses in this case. He also objects to this Interrogatory on the basis that it is vague, overly broad and unduly burdensome. Without waiving the foregoing objections, Relator Singh states that during the relevant time period he has practiced medicine through Singh & Nadella, 6 North Center Street, Bradford, Pa. 16701. In addition to Dr. Nadella, the partnership employed the following doctors: Dr. Saleh (1994-1996), Dr. Kantipudi (1997-2001), and Dr. Agig (2001-2004).

10.     Identify each and every hospital, health system, ambulatory surgery center, diagnostic imaging or testing facility or other health care facility or entity with which Dr. Singh had a Financial Relationship, and, with respect to each, identify: (a) the nature of the Financial Relationship; (b) the date on which it commenced and (if applicable) terminated; (c) the amount and nature of any remuneration paid to Dr. Singh as a result of said Financial Relationship during each calendar year or part of a year in which the Financial Relationship was in effect; (d) the number of patients referred to each such entity by Dr. Singh for Designated Health Services during each calendar year or part of a year when Dr. Singh had a Financial Relationship with the entity; (e) the number of claims submitted by said entity to, and the amount of money paid on said claims to said entity by, each and every Governmental Payor for said Designated Health Service(s) during each calendar year or part of a year in which the Designated Health Service was offered; (f) the location of the principal office of any such entity; and (g) the person(s) who have custody or control of the books and records of said entity.

6

APP-165

Response:

Relator Singh objects to this Interrogatory on the basis that it seeks information that is not relevant to the claims or defenses in this case. He also objects to this Interrogatory on the basis that it is vague, overly broad and unduly burdensome. Without waiving the foregoing objections, Relator Singh states that during the relevant time period he was a partner in Singh & Nadella partnerhip and he had an investment interest in TriCounty Diagnostic Testing and served as its Medical Director.

11. Identify each and every Designated Health Service offered by Dr. Singh through his medical practice or by any practice entity identified in response to Interrogatory 9, and, with respect to each, identify: (a) the nature of the Designated Health Service; (b) the date on which it commenced and (if applicable) terminated; (c) the amount and nature of any remuneration paid to Dr. Singh as a result of said Designated Health Service during each calendar year or part of a year in which the Designated Health Service was offered; and (d) the number of claims submitted to, and the amount of money paid on said claims by, each and every Governmental Payor for said Designated Health Service(s) during each calendar year or part of a year in which the Designated Health Service was offered.

Response:

Relator Singh objects to this Interrogatory on the basis that it seeks information that is not relevant to the claims or defenses in this case. He also objects to this Interrogatory on the basis that it is vague, overly broad, harassing and unduly burdensome.

12. State whether Dr. Singh had any communications with BRMC or any other person(s) about the possibility of any Financial Relationship with BRMC, and, with respect to any such communication, identify: (a) the date(s) of such communications; (b) whether such communications were in person, by telephone, in writing, or by other means; (c) the location where such communications took place; (d) any and all person(s) who were present at or who witnessed such communications; and (e) any documents relating or referring to such communications.

7

APP-166

FROM

## VERIFICATION

I, Dilbagh Singh, M.D. verify that the information set forth in the foregoing Responses and Objections to Bradford Regional Medical Center's First Set of Interrogatories are true and correct to the best of my knowledge, information and belief and are made subject to the penalties of 18 Pa. Con. Stat. Ann. Section 4904 relating to unsworn falsification to authorities.

Date: 3-5-07

Dilbagh Singh, M.D.

# 24. DR. NADELLA'S RESPONSES AND OBJECTIONS TO BRMC'S FIRST SET OF INTERROGATORIES

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA
## ERIE DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* | : | |
| DILBAGH SINGH, M.D., | : | |
| PAUL KIRSCH, M.D., | : | |
| V. RAO NADELLA, M.D., and | : | |
| MARTIN JACOBS, M.D., | : | |
| | : | |
| Relators, | : | |
| | : | |
| v. | : | Civil Action No. 04-186E |
| | : | |
| BRADFORD REGIONAL | : | |
|  MEDICAL CENTER, | : | |
| V&S MEDICAL ASSOCIATES, LLC, | : | |
| PETER VACCARO, M.D., | : | |
| KAMRAN SALEH, M.D., | : | |
| and DOES I through XX, | : | |
| | : | |
| Defendants. | : | |
| | : | |

### PLAINTIFF V. RAO NADELLA, M.D.'S REPONSES AND OBJECTIONS TO
### BRADFORD REGIONAL MEDICAL CENTER'S
### FIRST SET OF INTERROGATORIES

Pursuant to Fed. R. Civ. P. 33 ("Rule 33"), Plaintiff-Relator V. Rao Nadella, M.D. ("Relator Nadella") serves the following responses and objections to Defendant Bradford Regional Medical Center's ("BRMC") First Set Interrogatories.

<u>Interrogatories</u>

1.  Identify every person or entity (other than individual patients) from which Dr. Nadella derived any income, including the amount of income (on an annual basis) Dr. Nadella derived from each such person or entity.

A second meeting was held in July of 2003 with Mr. Leonhardt and representatives of the Board of Directors. At this meeting, Relators requested information about the proposed sublease agreement with V & S.

9.    Identify any professional corporation, partnership, limited liability company, limited liability partnership, or other entity through, or in affiliation with, which Dr. Nadella practiced medicine, and with respect to each, identify: (a) the dates when Dr. Nadella practiced through or in affiliation with such entity; (b) any other physicians who practiced through or in affiliation with such entity; (c) the location of any office(s) of any such entity; (d) the person(s) who have custody or control of the books and records of said entity; and (e) the amount and nature of any remuneration paid to Dr. Nadella by said entity during each calendar year or part of a year in which he practiced through or in affiliation with such entity.

Response:

Relator Nadella objects to this Interrogatory on the basis that it seeks information that is not relevant to the claims or defenses in this case. He also objects to this Interrogatory on the basis that it is vague, overly broad and unduly burdensome. Without waiving the foregoing objections, Relator Nadella states that during the relevant time period he has practiced medicine through Singh & Nadella, 6 North Center Street, Bradford, Pa. 16701. In addition to Dr. Singh, the partnership employed the following doctors: Dr. Saleh (1994-1996), Dr. Kantipudi (1997-2001), and Dr. Agig (2001-2004).

10.    Identify each and every hospital, health system, ambulatory surgery center, diagnostic imaging or testing facility or other health care facility or entity with which Dr. Nadella had a Financial Relationship, and, with respect to each, identify: (a) the nature of the Financial Relationship; (b) the date on which it commenced and (if applicable) terminated; (c) the amount and nature of any remuneration paid to Dr. Nadella as a result of said Financial Relationship during each calendar year or part of a year in which the Financial Relationship was in effect; (d) the number of patients referred to each such entity by Dr. Nadella for Designated Health Services during each calendar year or part of a year when Dr. Nadella had a Financial Relationship with the entity; (e) the number of claims submitted by said entity to, and the amount of money paid on said claims to said entity by, each and every Governmental Payor for said Designated Health Service(s) during each calendar year or part of a year in which the Designated Health Service was offered; (f) the location of the principal office of any such entity; and (g) the person(s) who have custody or control of the books and records of said entity.

APP-170

Response:

Relator Nadella objects to this Interrogatory on the basis that it seeks information that is not relevant to the claims or defenses in this case. He also objects to this Interrogatory on the basis that it is vague, overly broad and unduly burdensome. Without waiving the foregoing objections, Relator Nadella states that during the relevant time period he was a partner in Singh & Nadella partnerhip and he had an investment interest in TriCounty Diagnostic Testing.

11.    Identify each and every Designated Health Service offered by Dr. Nadella through his medical practice or by any practice entity identified in response to Interrogatory 9, and, with respect to each, identify: (a) the nature of the Designated Health Service; (b) the date on which it commenced and (if applicable) terminated; (c) the amount and nature of any remuneration paid to Dr. Nadella as a result of said Designated Health Service during each calendar year or part of a year in which the Designated Health Service was offered; and (d) the number of claims submitted to, and the amount of money paid on said claims by, each and every Governmental Payor for said Designated Health Service(s) during each calendar year or part of a year in which the Designated Health Service was offered.

Response:

Relator Nadella objects to this Interrogatory on the basis that it seeks information that is not relevant to the claims or defenses in this case. He also objects to this Interrogatory on the basis that it is vague, overly broad, harassing and unduly burdensome.

12.    State whether Dr. Nadella had any communications with BRMC or any other person(s) about the possibility of any Financial Relationship with BRMC, and, with respect to any such communication, identify: (a) the date(s) of such communications; (b) whether such communications were in person, by telephone, in writing, or by other means; (c) the location where such communications took place; (d) any and all person(s) who were present at or who witnessed such communications; and (e) any documents relating or referring to such communications.

7

## VERIFICATION

I, V. Rao Nadella, M.D. verify that the information set forth in the foregoing Responses

and Objections to Bradford Regional Medical Center's First Set of Interrogatories are true and

correct to the best of my knowledge, information and belief and are made subject to the penalties

of 18 Pa. Con. Stat. Ann. Section 4904 relating to unsworn falsification to authorities.


Date: 3/5/07                    _____
                                V. Rao Nadella, M.D.

# 25. DR. KIRSCH'S RESPONSES AND OBJECTIONS TO BRMC'S FIRST SET OF INTERROGATORIES

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
ERIE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* | : | |
| DILBAGH SINGH, M.D., | : | |
| PAUL KIRSCH, M.D., | : | |
| V. RAO NADELLA, M.D., and | : | |
| MARTIN JACOBS, M.D., | : | |
| | : | |
| Relators, | : | |
| | : | |
| v. | : | Civil Action No. 04-186E |
| | : | |
| BRADFORD REGIONAL | : | |
| MEDICAL CENTER, | : | |
| V&S MEDICAL ASSOCIATES, LLC, | : | |
| PETER VACCARO, M.D., | : | |
| KAMRAN SALEH, M.D., | : | |
| and DOES I through XX, | : | |
| | : | |
| Defendants. | : | |
| | : | |

PLAINTIFF PAUL KIRSCH, M.D.'S REPONSES AND OBJECTIONS TO
BRADFORD REGIONAL MEDICAL CENTER'S
FIRST SET OF INTERROGATORIES

Pursuant to Fed. R. Civ. P. 33 ("Rule 33"), Plaintiff-Relator Paul Kirsch, M.D. ("Relator Kirsch") serves the following responses and objections to Defendant Bradford Regional Medical Center's ("BRMC") First Set Interrogatories.

Interrogatories

1.    Identify every person or entity (other than individual patients) from which Dr. Kirsch derived any income, including the amount of income (on an annual basis) Dr. Kirsch derived from each such person or entity.

9.    Identify any professional corporation, partnership, limited liability company, limited liability partnership, or other entity through, or in affiliation with, which Dr. Kirsch practiced medicine, and with respect to each, identify: (a) the dates when Dr. Kirsch practiced through or in affiliation with such entity; (b) any other physicians who practiced through or in affiliation with such entity; (c) the location of any office(s) of any such entity; (d) the person(s) who have custody or control of the books and records of said entity; and (e) the amount and nature of any remuneration paid to Dr. Kirsch by said entity during each calendar year or part of a year in which he practiced through or in affiliation with such entity.

Response:

Relator Kirsch objects to this Interrogatory on the basis that it seeks information that is not relevant to the claims or defenses in this case. He also objects to this Interrogatory on the basis that it is vague, overly broad and unduly burdensome.    Without waiving the foregoing objections, Relator Kirsch states that during the relevant time period he has practiced medicine through Foster Brook Medical Associates, P.C., 1223 East Main Street, Bradford, Pa. 16701.

10.    Identify each and every hospital, health system, ambulatory surgery center, diagnostic imaging or testing facility or other health care facility or entity with which Dr. Kirsch had a Financial Relationship, and, with respect to each, identify: (a) the nature of the Financial Relationship; (b) the date on which it commenced and (if applicable) terminated; (c) the amount and nature of any remuneration paid to Dr. Kirsch as a result of said Financial Relationship during each calendar year or part of a year in which the Financial Relationship was in effect; (d) the number of patients referred to each such entity by Dr. Kirsch for Designated Health Services during each calendar year or part of a year when Dr. Kirsch had a Financial Relationship with the entity; (e) the number of claims submitted by said entity to, and the amount of money paid on said claims to said entity by, each and every Governmental Payor for said Designated Health Service(s) during each calendar year or part of a year in which the Designated Health Service was offered; (f) the location of the principal office of any such entity; and (g) the person(s) who have custody or control of the books and records of said entity.

Response:

Relator Kirsch objects to this Interrogatory on the basis that it seeks information that is not relevant to the claims or defenses in this case. He also objects to this Interrogatory on the

6

basis that it is vague, overly broad and unduly burdensome. Without waiving the foregoing objections, Relator Kirsch states that during the relevant time period he has worked as a consultant to St. Vincent Hospital, Bradford Regional Medical Center, and Summit Healthcare. Additionally, Dr. Kirsch has an investment interest in TriCounty Diagnostic Testing.

11.    Identify each and every Designated Health Service offered by Dr. Kirsch through his medical practice or by any practice entity identified in response to Interrogatory 9, and, with respect to each, identify: (a) the nature of the Designated Health Service; (b) the date on which it commenced and (if applicable) terminated; (c) the amount and nature of any remuneration paid to Dr. Kirsch as a result of said Designated Health Service during each calendar year or part of a year in which the Designated Health Service was offered; and (d) the number of claims submitted to, and the amount of money paid on said claims by, each and every Governmental Payor for said Designated Health Service(s) during each calendar year or part of a year in which the Designated Health Service was offered.

Response:

Relator Kirsch objects to this Interrogatory on the basis that it seeks information that is not relevant to the claims or defenses in this case. He also objects to this Interrogatory on the basis that it is vague, overly broad, harassing and unduly burdensome.

12.    State whether Dr. Kirsch had any communications with BRMC or any other person(s) about the possibility of any Financial Relationship with BRMC, and, with respect to any such communication, identify: (a) the date(s) of such communications; (b) whether such communications were in person, by telephone, in writing, or by other means; (c) the location where such communications took place; (d) any and all person(s) who were present at or who witnessed such communications; and (e) any documents relating or referring to such communications.

Response:

Relator Kirsch objects to this Interrogatory on the basis that it seeks information that is not relevant to the claims or defenses in this case. He also objects to this Interrogatory on the basis that it is vague, overly broad and unduly burdensome. Without waiving the foregoing objections,

7

APP-176

## VERIFICATION

I, Paul Kirsch, M.D. verify that the information set forth in the foregoing Responses and Objections to Bradford Regional Medical Center's First Set of Interrogatories are true and correct to the best of my knowledge, information and belief and are made subject to the penalties of 18 Pa. Con. Stat. Ann. Section 4904 relating to unsworn falsification to authorities.


Date: 3/2/07                        Paul B Kirsch M.D.
                                    Paul Kirsch, M.D.

APP-177