# 26. EXPERT REPORT OF JAMES H. JORDON

APP-178



DEPOSITION
EXHIBIT
Jordon
1 4/14/11

# Deloitte.

United States of America, ex, rel. Dilbagh Singh, MD, Paul Kirsch, MD, V. Rao Nadella, MD and Martin Jacobs, MD
Plaintiffs

vs.

Bradford Regional Medical Center, V & S Medical Associates, LLC, Peter Vaccaro, MD, Kamran Saleh, MD, et al.
Defendants

Civil Action No. 04-186E

Expert Report of James H. Jordon, CFA, ASA

# Deloitte.

Deloitte Financial Advisory Services LLP
333 Clay Street, Suite 2300
Houston, TX 77002-4196
Phone: +1 713 982 2966
Fax: +1 713 427 4916
www.deloitte.com

June 5, 2008

Daniel M. Mulholland, III, Esq.
Horty, Springer & Mattern, PC
4514 Fifth Avenue
Pittsburgh, PA 15213

Carl J. Rychcik, Esq.
Fox Rothschild LLP
625 Liberty Avenue, 29th Floor
Pittsburgh, PA 15222

Dear Mr. Mulholland and Mr. Rychcik:

Pursuant to your request, I, James H. Jordon, a Senior Manager of Deloitte Financial Advisory Services LLP ("Deloitte FAS"), have prepared an analysis with respect to the below referenced matter.

This expert report includes a brief description of the background, objective and scope of my analysis, as well as a summary of my overall conclusions. The attached valuation analysis presents a more detailed discussion and presentation of the valuation procedures and analyses performed.

## Background

Effective as of October 1, 2003, Bradford Regional Medical Center (the "Hospital") and V&S Medical Associates, LLC, ("V&S") entered into an arrangement (the "Arrangement") whereby the Hospital subleased an SMV SDI Nuclear Camera (the "GE Equipment") from V&S and V&S agreed to non-compete provisions related to certain diagnostic imaging services in the local area. I understand that the Hospital elected to upgrade the GE Equipment as provided for under the expressed terms of the sublease, and a Philips camera (the "Philips Equipment") was then subleased from V&S . The GE Equipment and Philips Equipment are collectively referred to as the ("Equipment").

Mr. Mulholland and Mr. Rychcik
June 5, 2008
Page 2

## Objective and Scope

I was engaged to provide an analysis of the Arrangement between the Hospital and V&S and the related valuation as of October 1, 2003 (the "Valuation Date") and January, 2005 as specifically related to the Philips Equipment. Further, I was engaged to prepare a rebuttal of the expert report prepared by Sal Barbera for the Plaintiffs.

For the purposes of this engagement, the term fair market value is defined pursuant to federal Stark regulations as quoted in Federal Register, Volume 72, No. 171 Pg. 51081 (42 CFR §411.351):

"...the value in arm's length transactions, consistent with the general market value. 'General market value' means the price that an asset would bring as the result of a bona fide bargaining between well-informed buyers and sellers who are not otherwise in a position to generate business for the other party... With respect to rentals and leases...'fair market value' means the value of rental property for general commercial purposes (not taking into account its intended use). In the case of a lease of space, this value may not be adjusted to reflect the additional value the prospective lessee or lessor would attribute to the proximity or convenience to the lessor when the lessor is a potential source of patient referrals to the lessee..."

In conducting this engagement, I considered the fair market value of payments made between the parties related to the following:

1) Non-compete provisions of the Arrangement
2) Sublease payment for the GE Equipment and the Philips Equipment

Further, I considered the following payment amounts for the period beginning October 1, 2003 through June 30, 2004 when the GE Equipment was being temporarily operated at V&S:

1) Rent for the real property space where the GE Equipment was functioning
2) A 10 percent billing and collection fee
3) Other miscellaneous pass-through costs

APP-181

Mr. Mulholland and Mr. Rychcik
June 5, 2008
Page 3

## Conclusions

Based upon my work to date, my conclusions are outlined as follows:

1. I understand that the Hospital had a policy stating that physicians with competing interests with the Hospital were subject to losing privileges at the Hospital, and the Hospital determined V&S was in violation of this policy. Both V&S and the Hospital were contemplating and discussing several scenarios of how this issue could be best resolved. It is my opinion that the Hospital and V&S, independent of each other, had vested business interests related to the provision of certain diagnostic imaging services and therefore were motivated to resolve these disputed issues by entering into the Arrangement.

2. It is my opinion that the payments made under the Arrangement reflect the fair market value of what was received in return.

3. It is my opinion that the payments between the parties were commercially reasonable even if no referrals were made between the parties.

4. It is my observation that the amounts paid pursuant to the Arrangement did not and do not take into account or vary with any referrals or other business generated between the parties.

5. In my opinion, a legitimate business purpose existed for the Arrangement and every component part thereof

6. In my opinion, the payments made pursuant to the Arrangement did not exceed that which was reasonable and necessary for the business purpose of the Arrangement.

7. It is my observation that the payments made pursuant to the Arrangement were set in advance.

8. As a part of this engagement, I was asked to critique and review the expert report submitted by Mr. Sal Barbera, and I disagree with the conclusions reached in his report. My specific critique and comments with respect to his report appear in section V. of this report.

My conclusions and opinions were in no way influenced by the fee paid for Deloitte FAS's services or by any future outcome of the case.

Mr. Mulholland and Mr. Rychcik
June 5, 2008
Page 4

The opinions and conclusions stated in this report are expressed with a reasonable degree of professional certainty. However, I reserve the right to change or amend my opinions or conclusions should I receive new facts, data, research or other information that may cause me to do so.

Best regards,

James H. Jordon, CFA, ASA
Senior Manager
Deloitte Financial Advisory Services LLP

# Contents

| Table of Content | Page Number |
|---|---|
| I.    Engagement Overview | 6 |
| • Objective and Scope | 7 |
| II.   Conclusions | 10 |
| • Non-Compete Provisions | 13 |
| • Equipment | 14 |
| • Interim Payments | 15 |
| III.  Background | 16 |
| IV.   Valuation Methodology | 26 |
| V.    Rebuttal of Expert Report Prepared by Sal Barbera | 28 |
| Appendix A   Valuation Analysis – Non-Compete Provisions | 34 |
| Appendix B   Valuation Analysis - Equipment | 45 |
| Appendix C   Valuation Analysis – Interim Payments | 52 |
| Appraisal Assumptions & Limiting Conditions | |
| Certification & Qualifications | |
| Data Received, Reviewed, and/or Relied Upon | |
| Exhibits | |

APP-184

6

# I. Engagement Overview

APP-185

# Objective and Scope

- I, James H. Jordon (the "Expert Witness"), was engaged to provide an analysis of the Arrangement between the Hospital and V&S and the related valuation as of October 1, 2003 (the "Valuation Date") and January, 2005 as specifically related to the Philips Equipment. Further, I was engaged to prepare a rebuttal of the expert report prepared by Sal Barbera for the Plaintiffs.

- Specifically, I was engaged to perform the following:

  1) Conduct an evaluation of the Arrangement and provide opinions thereto as previously stated;

  2) Determine the fair market value of the leased radiology Equipment, and evaluate the payments associated with the Equipment, real estate and other administrative costs;

  3) Determine the fair market value of the covenant not to compete arrangement and evaluate the related valuation as of October 1, 2003;

  4) Critique and respond to the expert report prepared by Mr. Sal Barbera, dated April 30, 2008; and,

  5) Provide an opinion on the Arrangement, as previously stated.

7

# Objective and Scope (cont.)

- Deloitte Financial Advisory Services LLP ("Deloitte FAS") is compensated for the services of its personnel on an hourly basis and is being reimbursed for out-of-pocket expenses. Deloitte FAS billing rates for this engagement, as agreed to in the engagement letter, are as follows:

| | |
|---|---|
| Partner, Principal, Director | $450 |
| Senior Manager | $375 |
| Manager | $300 |
| Senior Associate | $250 |
| Associate | $200 |

- The work performed on this engagement was performed by me, or by Deloitte FAS professionals under my project leadership ("we"). Where appropriate, I received assistance from Deloitte FAS specialists who have specific experience and knowledge related to tangible assets and real estate. Deloitte FAS professionals providing assistance with the engagement include John R. Boettiger, Jr., Principal; Kyle LeFevers, Director; Scott Pemberton, Senior Manager; Mark Davis, Senior Manager; John Valenta, Senior Manager; Missy Schrib, Manager; Tom Kiehl, Senior Associate; Rafiq Lalani, Senior Associate.

- As agreed, I am prepared to testify as to the work and opinions in the above-entitled matter. My resume is included in this report.

8

# Objective and Scope (cont.)

- For the purposes of this engagement, the term fair market value is defined pursuant to federal Stark regulations as quoted in the Federal Register, Volume 72, No. 171, Pg. 51081 (42 CFR §411.351):

  - "...the value in arm's length transactions, consistent with the general market value. 'General market value' means the price that an asset would bring as the result of a bona fide bargaining between well-informed buyers and sellers who are not otherwise in a position to generate business for the other party... With respect to rentals and leases... 'fair market value' means the value of rental property for general commercial purposes (not taking into account its intended use). In the case of a lease of space, this value may not be adjusted to reflect the additional value the prospective lessee or lessor would attribute to the proximity or convenience to the lessor when the lessor is a potential source of patient referrals to the lessee..."

- Further, we considered the term "commercially reasonable" as described in the Federal Register Vol. 69., No. 59, Pg. 16093 as follows:

  "An arrangement will be considered "commercially reasonable" in the absence of referrals if the arrangement would make commercial sense if entered into by a reasonable entity of similar type and size and a reasonable physician (or family member or group practice) of similar scope and specialty, even if there were no potential DHS referrals."

- Commercial reasonableness is further described in Federal Register Vol. 66, No. 3, Pg. 919 as follows:

  "With respect to determining what is "commercially reasonable," any reasonable method of valuation is acceptable, and the determination should be based upon the specific business in which the parties are involved, not business in general."

6

10

# II. Conclusions

# Conclusions

Based upon our analyses, my conclusions are outlined as follows:

1. I understand that the Hospital had a policy stating that physicians with competing interests with the Hospital were subject to losing privileges at the Hospital, and the Hospital determined V&S was in violation of this policy. Both V&S and the Hospital were contemplating and discussing several scenarios of how this issue could be best resolved. It is my opinion that the Hospital and V&S, independent of each other, had vested business interests related to the provision of certain diagnostic imaging services and therefore were motivated to resolve these disputed issues by entering into the Arrangement.

   ■ Prior to entering the Arrangement, the Hospital and V&S were in competition with each other with the provision of services using a nuclear camera.

   ■ The Hospital implemented a policy whereby physicians holding significant competing interests could lose privileges at the Hospital.

   ■ Litigation concerning the dispute between the Hospital and V&S regarding the Hospital's policy was possible.

2. It is my opinion that the payments made under the Arrangement reflect the fair market value of what was received in return.

   ■ The non-compete provisions between the Hospital and V&S were based on fair market value and were negotiated between arm's length parties.

   ■ The Equipment payments were pass-through payments based on contracts negotiated between arm's length third parties.

   ■ The rental rate paid for the real estate and other administrative expenses were based on market rates for similar arrangements.

3. It is my opinion that the payments between the parties were commercially reasonable even if no referrals were made between the parties.

11

# Conclusions

4. It is my observation that the amounts paid pursuant to the Arrangement did not and do not take into account or vary with any referrals or other business generated between the parties.

   ■ The level of and frequency of payments under the Arrangement remain fixed, and do not vary based on any level of activity such as referrals or other business.

5. In my opinion, a legitimate business purpose existed for the Arrangement and every component part thereof.

   ■ The Hospital fulfilled a need for an additional nuclear camera, which was necessary in its efforts towards providing cardiology services.

   ■ The Hospital resolved the issue of having to enforce the aforementioned policy by entering into the Arrangement.

   ■ V&S gave up the right to compete with the Hospital in certain defined areas and received a fair cash remuneration for doing so.

   ■ The Hospital and V&S were able to resolve their issues and avoid the time and expense associated with litigation.

6. In my opinion, the payments made pursuant to the Arrangement did not exceed that which was reasonable and necessary for the business purpose of the Arrangement.

7. It is my observation that the payments made pursuant to the Arrangement were set in advance.

8. As a part of this engagement, I was asked to critique and review the expert report submitted by Mr. Sal Barbera, and I disagree with the conclusions reached in his report. My specific critique and comments with respect to his report appear in section V. of this report.

12

# Conclusions: Non-Compete Provisions

Based on the analysis summarized below and presented in further detail in Appendix A, it is my opinion that the payments made for the non-compete provisions of the Arrangement were fair market value and were commercially reasonable.

The procedures performed were as follows:

- Determined the needs of McKean County, the service area of the Hospital and V&S, for Nuclear Medicine, CT, and MRI services;

- Estimated potential revenues and expenses for the Hospital with the non-compete provisions in place, which implies no competition from V&S in the Nuclear Medicine, CT, and MRI service lines;

- Estimated potential revenues and expenses for the Hospital without the non-compete provisions in place, which implies competition from V&S in Nuclear Medicine (V&S was competing before the non-compete was signed), CT, and MRI service lines (CT and MRI were service lines V&S was considering at the time the non-compete provisions were being negotiated);

- Calculated the difference in value for the Nuclear Medicine, CT, and MRI service lines with and without the non-compete provisions in place for the Hospital;

- Compared the difference in value with and without the non-compete provisions to the present value of the payments made to V&S under the Arrangement related to the non-compete provisions;

- Considered the present value of the cash flow stream provided by the non-compete provisions of the Arrangement as a multiple of V&S' prior year's estimated EBITDA from Nuclear Medicine and Stress Test modalities; and,

- Considered the opportunity cost for V&S with respect to giving up their right to compete with the Hospital.

See Appendix A for further detail regarding the analysis of the non-compete provisions of the Arrangement.

13

# Conclusions: Equipment

Based on the analysis summarized below and presented in further detail in Appendix B, it is my opinion that the payments made for the GE Equipment and the Philips Equipment under the Arrangement were fair market value and were commercially reasonable.

The procedures performed were as follows:

- Confirmed with industry professionals the typical lease arrangements for these types of imaging equipment;

- Confirmed that the lease agreements made between V&S and GE and V&S and Philips were typical lease arrangements and the prices were determined in an "arms length" manner;

- Analyzed the value of the Equipment by estimating the price of the Equipment new less deterioration of the Equipment based on estimated lives of similar equipment;

- Analyzed the net present value of the remaining contractual lease payments and the estimated residual value of the Equipment for both the GE and Philips Equipment; and,

- Confirmed the sublease costs and arrangements made between V&S and the Hospital were a direct pass through with no mark up or additional payments to V&S.

See Appendix B for a detailed analysis with regard to the GE Equipment and the Philips Equipment.

14

# Conclusions: Interim Payments

Based on the analysis summarized below and presented in further detail in Appendix C, it is my opinion that the payments made in the interim period for rental space in V&S' office and other miscellaneous expenses were fair market value and were commercially reasonable.

The procedures performed were as follows:

- Conducted research on the Bradford area real estate market concerning the rental rates of similar space in Bradford;

- Compared rental rates for similar space to the rental rate paid by the Hospital to V&S;

- Confirmed expenses related to internet charges, secretarial support, a physicist, laundry, telephone, reading charges, medication, and supplies were passed through to the Hospital without mark-up; and,

- Compared billing rates to industry data.

See Appendix C for a detailed analysis with regard to the interim payments.

15

16

# III. Background

# Background

## Description of the Hospital

- The Hospital is a 191-bed acute care hospital in northwest Pennsylvania serving McKean County and surrounding communities.

- The Hospital's service area is rural and is medically underserved, specifically with respect to cardiology services.

- The Hospital's primary services include mental health, oncology and hematology, cardiology, general and vascular surgery, and women's health.

- The Hospital is a non-profit corporation recognized as a charitable tax-exempt organization under Internal Revenue Code Section 501 (c)(3).

- The following table presents the number of beds and inpatient days by selected category:

| Hospital | Beds | Inpatient Days |
|----------|------|----------------|
| Routine Services | 91 | 19,527 |
| Special Care | 5 | 1,118 |
| Nursery | 0 | 646 |
| Total Hospital | 191 | 52,232 |

17

# Background (cont.)

**Description of V&S**

- Dr. Peter Vaccaro ("Dr. Vaccaro") and Dr. Kamran Saleh ("Dr. Saleh") (collectively the "Physicians") practice Internal Medicine in Bradford, Pennsylvania.

- Drs. Vaccaro and Saleh own and operate V&S Medical Associates, LLC. Drs. Vaccaro and Saleh are the sole members of V&S with an equal share ownership.

- Drs. Vaccaro and Saleh maintain hospital privileges at the Hospital. Additionally, each physician has courtesy privileges at Olean General Hospital.

18

# Background (cont.)

## Historical Timeline

| Date | Description |
|---|---|
| Prior to 2000 | The Physicians were employed by the Hospital. |
| February, 2000 through April 15, 2000 | The Physicians' employment with the Hospital was terminated by mutual agreement, and the Physicians formed V&S and entered an asset purchase agreement to, among other things, buy out the non-compete portion of their contract with the Hospital. The transaction included the buy-out and termination of the non-compete provisions of the Physicians' employment agreements. The Physicians continued practicing medicine through their private practice. We understand the buyout of the non-compete at this time was approximately $300,000. |
| January 2001 | The Board of Directors at the Hospital began developing a policy such that the Hospital could revoke privileges for physicians with significant competing financial interests to those of the Hospital. During this same time period, V&S independently explored the use of a nuclear camera in their office. |
| April 3, 2001 through June 1, 2001 | The Hospital and V&S held several meetings discussing the possibility that V&S might acquire a nuclear camera. The Hospital was concerned that this could negatively impact the Hospital by impairing the Hospital's ability to develop a quality cardiology service line. |
| May 2001 | The Board of Directors at the Hospital adopted an initial policy resolution such that medical staff members who develop an enterprise in competition with the Hospital could lose hospital privileges. The policy resolution also included provisions for the Hospital to use its best efforts to maintain relationships with physicians within legal parameters. |
| June 6, 2001 | V&S entered into a lease agreement with General Electric Healthcare Financial Services for the lease of a SMV SDI Nuclear Camera (the "GE Equipment"). |

19

# Background (cont.)

## Historical Timeline

| Date | Description |
|---|---|
| December 12, 2001 | The Hospital appointed a fact finding committee to determine if V&S was in violation of the aforementioned policy. |
| May 15, 2002 | The Hospital's Board made a preliminary determination that V&S was a physician group with competing interests. |
| August 2002 | The Hospital invited V&S and other physicians on the medical staff to discuss a potential "under arrangements" joint venture related to certain diagnostic imaging services. The Hospital engaged Stroudwater Associates ("Stroudwater") to perform analysis of the "under arrangements" joint venture proposal. |
| December 2002 – March 2003 | Several meetings were held between the Hospital, V&S and lawyers for each regarding the effect of the Hospital's policy on V&S; and meetings were held with the same parties to discuss the "under arrangements" model as a way to resolve the dispute. During these meetings, a possible sublease arrangement was also discussed and considered as a potential option for the parties to resolve the dispute while the under-arrangements joint venture proposal was under consideration. |
| April 2, 2003 | Stroudwater prepared a feasibility analysis (the "Stroudwater Report") concerning an under arrangements joint venture proposal between the Hospital and the Physicians, as well as other physicians that held privileges at the Hospital. |

20

# Background (cont.)

## Historical Timeline

| | |
|---|---|
| April 16, 2003 | The Hospital and V&S entered into an agreement whereby the parties agreed to execute document(s) related to an economic relationship. Potential economic arrangements discussed included the following:<br><br>1) An equipment sublease whereby the Hospital will utilize the GE Equipment subleased from V&S;<br><br>2) A non-compete agreement whereby V&S agrees to not enter into interests in competition with the Hospital;<br><br>3) A right of first refusal for the Hospital for interests contemplated by V&S;<br><br>4) An under-arrangement joint venture proposal for the provision of certain imaging services by V&S, subject to OIG approval. |
| April 2003 – September 2003 | The parties negotiated the specific terms of a sublease agreement. We note that it was the intention of the parties that the GE Equipment would be relocated to the Hospital's campus at the cost of the Hospital subsequent to the signing of the Arrangement. |
| September 10, 2003 | Charles T. Day, CPA prepared a report (the "Charles Day Report") relating to the features of a potential sublease relationship between the Hospital and V&S. This report was prepared for the Hospital. |
| October 2003 | The Hospital and V&S entered into the Arrangement whereby the Hospital subleased the Equipment and V&S agreed to non-compete provisions related to certain diagnostic imaging services in the local area. V&S agreed to give the Hospital a right of first refusal for other imaging services. |

21

# Background (cont.)

**Historical Timeline**

| | |
|---|---|
| October 1, 2003 through June 30, 2004 | Soon after finalizing the terms of the Arrangement, the Hospital elected to upgrade the GE Equipment to a new specialty cardiology camera; therefore, the GE Equipment was not relocated to the Hospital. However, there was a delay in obtaining the new Philips Equipment. Accordingly, the Hospital paid V&S for temporary use of space and services including the following:<br><br>1) Rent for the real property where the GE Equipment was functioning;<br><br>2) Charges related to billing and collecting technical revenue related to the GE Equipment;<br><br>3) Pass-through costs associated with reading the results generated by the GE Equipment, a physicist, and other administrative costs. |
| February 2004 | The Philips Equipment was delivered to the Hospital. |
| April 2004 – December 2004 | The Philips Equipment lease was signed on April 6, 2004. The terms of buyout of the GE Equipment lease were subsequently negotiated.<br><br>The temporary rent and related interim expenses as set forth between the Hospital and V&S continued through June 2004, to wind down the use of the GE Equipment, collect the remaining billing fees, and other related administrative matters. |
| Spring 2004 | The Hospital elected to not move forward with an under-arrangement joint venture proposal. |
| 2005 to date | The Hospital made payments for the Philips Equipment and the buyout of the GE Equipment. |

22

# Background (cont.)

## Description of the Arrangement

- According to the Arrangement, the Hospital subleased the GE Equipment from V&S. Additionally, the Arrangement allowed for the Hospital to upgrade the GE Equipment, should it elect to do so.

- Further, V&S agreed that it would not:

  1) Acquire, purchase or lease nuclear cardiology imaging equipment for its office or for any office or facility that is within 30 miles of the Hospital, or invest in any office, venture or facility that has such equipment or wishes to obtain such equipment to perform diagnostic procedures within 30 miles of the Hospital; and,

  2) Perform diagnostic tests in its office or for any venture or facility that is within 30 miles of the Hospital that competes with the testing to be performed by the Hospital with the Equipment, for such time as the Arrangement is in effect.

- If V&S contemplates offering other diagnostic imaging services, such as CT or MRI, within 30 miles of the Hospital, V&S agreed to present a proposal to the Hospital offering an opportunity to participate in a venture with V&S.

- The term of the Arrangement is five years. Within the term of the Arrangement, there were initially two rental periods for the GE Equipment:

  1) The first rental period started as of the date of the Arrangement and would have continued through September 30, 2006. During the first rental period, the monthly rent amount was $30,200, which consisted of $6,545 for the cost of renting the GE Equipment and $23,655 for all other rights and duties under the Arrangement, including the non-compete provisions of the Arrangement.

  2) The second rental period would have begun on October 1, 2006 and continued through September 30, 2008. During the second rental period, the monthly rent amount would have been $26,700, which consisted of $3,045 for the cost of renting the GE Equipment and $23,655 for all other rights and duties under the Arrangement, including the non-compete provisions of the Arrangement.

23

# Background (cont.)

## Description of the Arrangement – cont.

- From January 2005 forward, after the Hospital and V&S negotiated the terms of the buyout of the GE Equipment lease, the Hospital made monthly payments to Philips of $4,494.77 for the use of the Philips Equipment and $3,159.38 for the negotiated cost of the GE Equipment lease buyout, plus $23,655 for all other rights under the Arrangement, including the non-compete provisions.

- As a further part of the Arrangement, while the Hospital was upgrading to the Philips Equipment, the parties agreed for the Hospital to temporarily keep the GE Equipment on the V&S premises during which time the Hospital reimbursed V&S for the expenses related to the GE Equipment. The expenses were as follows:

  - ■ Rent expense - $2,500 per month

  - ■ Billing – 10% of total collections

  - ■ Laundry – Pass through cost equal to actual expense incurred by V&S

  - ■ Telephone – Pass through cost equal to actual expense incurred by V&S

  - ■ Internet Charges - $24 per month

  - ■ Secretarial Support – 20 hours per week @ $10/hour

  - ■ Other expenses related to performing the nuclear medicine procedures including but not limited to physicist expenses, medicine costs, and supply costs

24

# Background (cont.)

## Description of the Equipment

The GE Equipment was a SMV/GE DSXi single detector nuclear camera system with accessories. A further breakdown of what was included in the initial quote from GE Medical Systems revealed that the camera and system included the following:

- (1) DSXi Camera

- (1) POWERstation MPX

- (1) IVY Gate

- (1) Tektronics Printer

- (1) 10 mCi Co-57 Flood

- (3) days of Intermediate Applications Training

- (1) Hot Lab and Licensing including Acceptance Testing

- (1) Treadmill

The Philips Equipment consists of a Philips Medical Systems CardioMD compact system featuring a nuclear cardiology camera fixed at 90 degrees with supporting equipment.

APP-204

# IV. Valuation Methodology

APP-205

# Valuation Methodology

There are three traditional approaches employed in determining the value of an asset or a business. These are comprised of the income, market and cost approaches, each of which is briefly described in the following.

| | |
|---|---|
| **Income Approach** | This approach is a technique by which value is estimated based on the future available cash flows an asset or a business can be expected to generate over its remaining life. |
| **Market Approach** | This approach is a technique by which value is estimated based on arm's-length exchange prices in actual transactions and on asking prices for assets or businesses. |
| **Cost Approach** | This approach is a technique that uses the concept of replacement cost as an indicator of value. The premise of this approach is that a prudent investor would pay no more for an asset or a business than the amount for which the asset or business could be replaced. |

In estimating a range of fair market values for the payments made under the Arrangement for the non-compete provisions, we have relied on the DCF analysis, a variation of the Income Approach.

In estimating a range of fair market values for the Equipment, we have relied on both the Cost Approach and the Income Approach.

In assessing the reasonableness of market rental payments related to the real property, we have relied on the Market Approach, by collecting and analyzing independent research with local knowledgeable real estate participants.

In assessing the reasonableness of the other interim payments, we have relied on the Market Approach, by collecting and analyzing benchmark data.

27

28

# V. Rebuttal of Expert Report Prepared by Sal Barbera

# Rebuttal of Expert Report Prepared by Sal Barbera

As a part of the scope of work performed in this analysis, I have been asked to review and respond to the expert report prepared by Mr. Sal Barbera, dated April 30, 2008. My observations, critique, and opinions are summarized below.

1. Mr. Barbera spent an estimated 12 total hours reviewing documents and preparing his expert report. In my opinion, 12 hours is insufficient to adequately understand the historical facts in this case as well as the Arrangement.

2. Mr. Barbera reviewed selected documents in forming his opinions and did not appear to consider available documents including, but not limited to: Drs. Saleh's and Vaccaro's depositions and related exhibits, the Stroudwater Report, and volume data available from the Hospital and V&S.

   ■ Mr. Barbera did not perform a valuation analysis.

   ■ It does not appear that Mr. Barbera is a valuation expert.

3. Mr. Barbera expresses the opinion that the Arrangement between the two parties "has no plausible rationalization and makes no economic sense." For reasons stated in this report, I disagree with Mr. Barbera's statement. In making this statement, it does not appear that Mr. Barbera considered the following:

   ■ As described in Dr. Saleh's deposition, the Physicians were employed by the Hospital in the year 2000 and bought out the terms of the non-compete agreement between the Hospital and the Physicians to establish their own physician practice. This is an indication that precedent existed where the Hospital required physicians to enter into non-compete agreements.

29

APP-208

# Rebuttal of Expert Report Prepared by Sal Barbera

3. Con't.

- The parties had competing interests and were adverse to each other during much of the negotiation process related to the Arrangement. It appears that the parties conducted sufficient due diligence in reaching the Arrangement. Exhibits 3 through 17 to Dr. Saleh's deposition illustrate the negotiation process and the involvement of counsel throughout the process.

- The Hospital was in the process of recruiting a cardiologist to expand cardiology capabilities in the Hospital's geographic service area. Having V&S performing procedures with a nuclear camera had a detrimental impact on the Hospital's ability to recruit a cardiologist and expand these services. Mr. Barbera does not address the fact that the increased competition in the service area related to the nuclear camera negatively affected the Hospital's ability to fulfill its charitable community service mission of offering cardiology care in the service area.

- V&S were established physicians in the geographic service area, and developed an additional source of revenue by offering nuclear camera tests. V&S faced a loss of privileges at the Hospital if they continued to use the nuclear camera, which would have been very disruptive to their ability to see and monitor their patients.

- V&S also intended to begin offering CT and MRI related services as part of their practice.

- Mr. Barbera does not consider the fact that businesses involving nuclear medicine, CT and MRI involve a high level of fixed costs as a part of the overall cost structure. These costs include equipment, staffing, and maintenance. When volume is split between providers who bear these fixed costs, the services can quickly become unprofitable (i.e., costs are higher than revenue).

30

# Rebuttal of Expert Report Prepared by Sal Barbera

4. The Arrangement did make business sense and served business purposes for the Hospital and V&S, and included the following:

  ■ The Arrangement resolved an ongoing dispute between the Hospital and V&S in an amicable fashion, whereby additional costs incurred in resolving the dispute would be avoided.

  ■ From the Hospital's standpoint, the Arrangement enabled the Hospital to provide cardiology care and fulfill its charitable objectives.

5. It is Mr. Barbera's opinion that because there was discretion involved with the revocation of staff privileges, "this was not going to happen." Based upon my analysis of the documents he reviewed and the additional documents that I relied upon in conducting my analysis, I did not see any evidence that indicated that the Physicians' privileges would not be revoked. As Mr. Leonhardt indicated in his deposition, revocation of privileges was under consideration.

31

# Rebuttal of Expert Report Prepared by Sal Barbera

6. Mr. Barbera alleges that the Hospital had no intention of using the GE Equipment that was subleased from V&S.

- ■ I understand that the Hospital used the GE Equipment on site at the V&S offices as described above.

- ■ Historically, the Hospital maintained two general purpose nuclear cameras, one of which was toward the end of its useful life.

- ■ Around the same time as the sublease was negotiated, the older camera failed and the Hospital needed another camera to continue to maintain two cameras, as the Hospital did not have adequate capacity without two cameras.

- ■ After the Arrangement was reached, the Hospital elected to upgrade the GE camera with a new specialty camera that would better serve the cardiology needs of the community. The Hospital initially intended to move the GE Equipment from V&S offices to the Hospital.

- ■ It appears that the Hospital did intend to use the GE Equipment to meet the demand needs, but elected to upgrade the GE Equipment to offer higher quality cardiology care to the community.

32

33

# Rebuttal of Expert Report Prepared by Sal Barbera

7. It is Mr. Barbera's opinion that the temporary space rental and billing arrangement while the Philips Equipment upgrade was occurring violated the "set in advance" requirement for physician transactions. I disagree. Based upon the documents reviewed and my understanding of them, it is my opinion that:

■ The payment rates and terms were set in advance between the Hospital and V&S.

■ The Hospital and V&S negotiated at arm's length to reach the terms specified in this temporary arrangement.

■ V&S submitted invoices, which were approved in writing by the Hospital, and maintained billing records related to this temporary arrangement, as it pertained to the Hospital rent payment, billing fees and other expenses.

■ The Hospital and V&S both knew and understood that the arrangement pertaining to the real estate, billing fees and expenses was anticipated to be short term in nature, initially expected to last only a few months. In my opinion, it would be unreasonable for the parties to invest significant time and resources into developing a sophisticated lease agreement that was only expected to last for a few months.