# 27. EXPERT REPORT OF SAL BARBERA

APP-262

May 05 08 09:08a    Sherri Barbera                    9542551668              p.1

# EXPERT REPORT

### Sal A. Barbera, FACHE

### April 30, 2008

*UNITED STATES OF AMERICA ex rel. Dilbagh Singh, M.D., Paul Kirsch, M.D., V. Rao Nadella, M.D., and Martin Jacobs, M.D.*

*v.*

*Bradford Regional Medical Center, V&S Medical Associates, LLC, Peter Vaccaro, M.D., Kamran Saleh, M.D., et al.*

I have been requested to provide my expert opinion as to Bradford Regional Medical Center's subleasing of medical equipment from V&S Medical Associates and the relationship established with this physician group.

## DOCUMENTS REVIEWED AND CONSIDERED

In order to come to my opinion, I reviewed the following data and documents:

- Equipment Sublease between V&S Medical Associates, LLC, and Bradford Regional Medical Center
- Lease Summary for Board
- BRMC Non-Compete Analysis Summary
- Plaintiff's Response to Defendants' Joint Motion to Compel
- Deposition of George Leonhardt – April 1, 2008
- Corporate Designee Deposition of Bradford Regional Medical Center by Tina Marie Hannahs, Glen Alan Washington, and George Leonhardt

## OPINION

In reviewing the documents listed above, it is my opinion that the subleasing arrangement between the two parties, Bradford Regional Medical Center (BRMC) and V&S Medical Associates (V&S) has no plausible rationalization and makes no business sense. Based on the facts and testimony provided with regards to this case that I will summarize and outline, I believe this arrangement was entered into solely for the purpose of obtaining a flow of referrals as BRMC did not need the equipment leased, therefore, it had no legitimate business purpose. Furthermore, this arrangement was not commercially reasonable unless you account for the referrals.

My opinion is based on the following:

2

1. V&S was a significant source of referrals to BRMC, both inpatient and
   outpatient including diagnostic tests performed on a nuclear imaging camera
   based at BRMC. In 2001, V&S decided to lease its own imaging camera and
   began performing these procedures in their office. This resulted in a
   significant decrease in imaging referrals to BRMC. This decrease was
   clearly acknowledged by BRMC. In deposition, George Leonhardt, BRMC
   CEO, when asked if the V&S camera was having a negative impact on the
   hospital, responded, "Yes, we believe so." In a follow-up question about
   nuclear cardiology referrals from V&S going down, Mr. Leonhardt
   responded, "Yes, they did."

2. In response to this issue, BRMC threatened to invoke the hospital's policy
   and terminate the physicians' staff privileges at BRMC if they didn't get out
   of the nuclear cardiology business. V&S retained legal counsel who objected
   to this pressure claiming BRMC was seeking to extract a referral stream in
   violation of Stark and Anti-Kickback statutes. In a February 15, 2002 letter
   written by the attorney for V&S, he said, "We know of no case that more
   clearly establishes a hospital's attempt to extract an exclusive referral stream
   from a physician." If anything, this communication to Mr. Leonhardt should
   have heightened his awareness of the existing government regulations
   pertaining to physician/hospital relationships which was already elevated to a
   high level of understanding in the industry during this time period. To
   confirm that BRMC never considered the termination of medical staff
   privileges as a viable option, in Mr. Leonhardt's deposition when asked if it
   "would be suicidal to actually invoke the policy and terminate the physicians'
   privileges," he replied, "I acknowledged that it would be damaging and very
   damaging." Furthermore, he indicated "…thought we could recover from it
   but it would probably take us four or five years." Being that there was
   discretion involved with the revocation of staff privileges, this was not going
   to happen. Actually, there was an option available to resolve this dispute and
   that was to allow V&S to operate their camera and not revoke their
   privileges. This option also supports the discretionary nature of the decision
   to terminate privileges. In Mr. Leonhardt's deposition, he acknowledged this
   as an option and indicated, "I expect it would have been," when asked if this
   option would have been acceptable to Drs. Vaccaro and Saleh.

3. In 2003 this dispute was resolved when BRMC and V&S entered into an
   Equipment Sublease whereby BRMC agreed to sublease the nuclear camera
   from V&S who was leasing this equipment from GE. BRMC agreed to pay
   V&S $30,200.00 per month for this equipment of which $6545 was a "pass
   thru" amount based on the GE lease with V&S. The remaining $23,655.00
   per month was acknowledged as payment for a "non-compete" agreement
   with V&S. It is my opinion that this "non-compete" payment was directly
   determined by and clearly took into account the number and value of
   referrals generated by V&S to BRMC. To support this opinion, in Exhibit 5
   – Lease Summary for Board, on page two, there are profit numbers listed

APP-264

3

under "Adding a portion of V&S volume to BRMC's current volumes:" In his deposition, Mr. Leonhardt when asked "about the expectation that at least a portion of V&S's business is going to be coming to the hospital; correct?" he responded, "That's correct." He was then asked, "Lease of V&S equipment, BRMC Profit, $402,000, V&S Profit, $268,000. Is that the expected profit to Bradford from entering into this lease agreement?" Mr. Leonhardt responded, "I would expect that's the profit that we assumed from that volume of services, yes." When asked in his deposition, "If you knew that they would not refer them (patients) to you, would you have still done the same deal?" Mr. Leonhardt responded, "…no, I don't suppose we would have done this."

4. In my opinion, it is very obvious that BRMC subleased a piece of equipment from physicians (V&S) that they had no intention of using. Prior to executing a sublease for the camera, Mr. Leonhardt requested of Tim Brown, Director of Diagnostic Imaging, to research the kind of camera BRMC needed and it wasn't the camera V&S had in their office. In his deposition, Mr. Leonhardt testified, "Yeah we were aware that this was not going to be the camera we ultimately wanted." Glen Alan Washington, BRMC designee, in his deposition indicated the "GE camera was an older model with some limited technology…we did not feel that it would meet out future needs."

5. In addition to executing a sublease for a piece of equipment that BRMC never intended on using in the hospital, why indicate in the sublease that the equipment would be relocated to the hospital. It was known before the sublease was signed that this equipment was undesirable and not part of the future plans for the hospital. As a result of not being relocated to the hospital, BRMC agreed to compensate V&S $2500.00 per month to rent the space the equipment occupied. They also agreed to pay secretarial expenses. These payments were not in the sublease, in fact, there was nothing in writing to acknowledge this agreement and payment. How was it determined that $2500.00 represented fair market value for this space? In addition to this $2500 monthly payment that was not in writing, BRMC paid V&S a billing fee of 10%, plus expenses, for all the procedures performed with the imaging camera. As with the space rental fee, how was this amount determined? This billing fee was also not in writing and supported with documentation. If the camera was generating revenue why was there a space rental fee paid to the physicians? In this environment of heightened awareness of financial relationships with physicians, it is uncommon and not the standard operating procedure to have a financial relationship with physicians that is not fully documented and supported to insure payment is legitimate and based on a fair market value assessment. In my opinion, this agreement to pay for space rental and billing not documented and in writing violates the "set in advance" requirement for physician transactions. This subleased camera remained in the V&S office and was finally "disposed of," however, nobody knows to where. This occurred when BRMC was able to

May 05 08 09:09a     Sherri Barbera                      9542551668            p.4

4

"get the camera that we desired from Phillips in place at the hospital." This disposed of camera was now owned by V&S, had value and could have been additional remuneration to V&S. The new Phillips camera lease was with V&S and paid for by BRMC. In addition to the lease payment there was a payment schedule that amounted to $200,000 to cover the termination fee of the GE lease. Furthermore, BRMC guaranteed the obligations of V&S to Phillips for both payment schedules.

6.  BRMC discussed the development of an "Under Arrangement" concept with the medical staff that never materialized. This concept was the basis for the hospital's long range plan with the medical staff. This plan called for the establishment of a joint venture between the hospital and the medical staff that would provide all the diagnostic services to the hospital. In his deposition when asked why this concept never came about, Mr. Leonhardt responded, "...a sticking point with the physicians other than V&S in that they wouldn't participate in an arrangement that V&S was part of."

In summary, it is my opinion that this sublease arrangement between BRMC and V&S is a clear attempt with the sole motive of obtaining a referral stream from Drs. Vaccaro and Saleh. Why else would a hospital enter into an agreement to lease a piece of equipment that it never used and knew prior to the lease was not compatible with its future plans and within months agree to pay a $200,000 early lease termination penalty. This arrangement clearly has no legitimate business purpose, is not commercially reasonable unless referrals are considered, and was determined in a manner that takes into account the volume or value of referrals. Even the CEO for BRMC agreed the sublease arrangement was a "fairly cumbersome way to go out and acquire a piece of equipment." Furthermore, Mr. Leonhardt stated, "Yes, if that was the only thing we were trying to accomplish. Obviously, it wasn't the only thing we were trying to accomplish."

## QUALIFICATIONS OF THE EXPERT

Sal Barbera is a veteran hospital administrator with over 30 year's experience. He has served as a CEO for six (6) hospitals ranging in size from 95 beds to over 400 beds in both the for-profit and non-profit sector in Florida, Nevada, Louisiana, and Kentucky. During the early 90's while serving as the CEO for Methodist Evangelical Hospital in Louisville, Kentucky, Mr. Barbera was involved with creating and implementing an integrated delivery system for Alliant Health System, the largest non-profit system in the region. He became nationally recognized for his expertise in physician/hospital integration strategies and was frequently requested to speak on this topic at national healthcare conferences. As a result of this experience, Mr. Barbera was recruited to serve as the CEO for a physician practice management company for a national healthcare corporation based in Florida.

APP-266

5

In 1999, Mr. Barbera was selected to serve as the CEO for the first public/private partnership in the country. As the CEO for this state hospital in South Florida, Mr. Barbera directed this facility from the brink of closure to becoming the best state hospital in the nation through the development of clinical expertise and best practices. This privatization project of a government run facility received national attention and recognition for its overwhelming success resulting in the development of similar models being initiated in other states.

Mr. Barbera is a *Fellow* in the American College of Healthcare Executives, the highest professional designation in the healthcare profession. Mr. Barbera has a bachelor degree from Florida Atlantic University and a master's degree in healthcare administration from Florida International University, where he has recently returned as an adjunct instructor.

Mr. Barbera is a founding partner in EthicSolutions, LLC and serves as a consultant specializing in general hospital management, physician/hospital relationships, organizational structures, physician and hospital compliance with fraud and abuse regulations, and the outsourcing of government owned and operated healthcare treatment facilities. Mr. Barbera can be reached at sabarbera@aol.com.

**COMPENSATION**

The compensation for this report and any further testimony is based on an hourly rate of $250.00. A total of 12 hours have been recorded through the completion of this Expert Report.

Respectfully submitted,

Sal A. Barbera, FACHE

# 28. MEDICAL ASSISTANCE REPORT

**Bradford Regional Medical Center**  "Hospital Copy"

Provider Number:  1007507650005

Medical Assistance 336 Cost Report

Year Ended June 30, 2004



DEPOSITION
EXHIBIT
Relators'
8-20-07  4  Jah

HOSP 0001717

APP-269

FINANCIAL REPORT FOR HOSPITAL AND HOSPITAL-HEALTH CARE COMPLEX
UNDER THE MEDICAL ASSISTANCE PROGRAM OF
THE DEPARTMENT OF PUBLIC WELFARE, COMMONWEALTH OF PENNSYLVANIA

MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS REPORT
MAY BE PUNISHABLE BY FINE AND/OR IMPRISONMENT UNDER STATE OR FEDERAL LAW

*THIS REPORT MUST BE FILED WITH
THE DEPARTMENT OF PUBLIC WELFARE, OFFICE OF MEDICAL ASSISTANCE PROGRAMS,
BUREAU OF FEE-FOR-SERVICE PROGRAMS BY NOVEMBER 30 OF EACH YEAR*

PERIOD COVERED: FROM: 07/01/2003   TO:  06/30/2004

CERTIFICATION BY
OFFICER OR ADMINISTRATOR OF PROVIDER(S)

I HEREBY CERTIFY that I have read the above statement and have examined the
accompanying Cost Report and supporting schedules which present true, correct, and complete
cost/charge statements prepared from the books and records of the provider(s) in accordance with
applicable instructions, except as specifically noted. I agree to immediately notify the Department of
any errors related to the attached information as soon as it is discovered and to provide corrected
information as soon as possible. I also agree that to the extent the information on the accompanying
Cost Report and supporting schedules is used for rate setting purposes, the Department is under no
obligation to use any amended information submitted by me once the Cost Report has been reviewed
and the data entered into the Department's Computer System.

| | (814) 362-8216 |
|---|---|
| SIGNATURE (OFFICER OR ADMINISTRATOR OF PROVIDER(S) | TELEPHONE NUMBER |
| JAMES TARASOVITCH | SENIOR VP & CFO |
| OFFICER OR ADMINISTRATOR OF PROVIDER(S) | TITLE          DATE |
| BKD, LLP | (417) 865-8701 |
| PREPARER OTHER THAN PROVIDER | TELEPHONE NUMBER |
| 901 EAST ST. LOUIS STREET P.O. BOX 1190 SPRINGFIELD, MO 65801-1190 | 12-15-04 |
| ADDRESS OF PREPARER | DATE |
| Bradley K. Brotherton          (417) 865-8701  Ext 547 | |

NAME AND TELEPHONE NUMBER OF PERSON TO CONTACT FOR MORE INFORMATION

DELIVERY ADDRESS:

Commonwealth of Pennsylvania
Department of Public Welfare
Office of Medical Assistance Programs
Bureau of Fee-for-Service Programs
Division of Rate Setting
Bertolino Building, 3rd Floor
1401 North 7th Street
Harrisburg, PA  17102

HOSP 0001718

APP-270

MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS REPORT
MAY BE PUNISHABLE BY FINE AND/OR IMPRISONMENT UNDER STATE OR FEDERAL LAW

FINANCIAL REPORT FOR HOSPITAL AND HOSPITAL-HEALTH CARE COMPLEX
UNDER THE MEDICAL ASSISTANCE PROGRAM OF
THE DEPARTMENT OF PUBLIC WELFARE, COMMONWEALTH OF PENNSYLVANIA

*THIS REPORT MUST BE FILED WITH
THE DEPARTMENT OF PUBLIC WELFARE, OFFICE OF MEDICAL ASSISTANCE PROGRAMS,
BUREAU OF FEE-FOR-SERVICE PROGRAMS BY NOVEMBER 30 OF EACH YEAR*

| ──────── IDENTIFICATION DATA ──────── | | MED. ASSIST. PROVIDER # |
|---|---|---|
| FACILITY OR UNIT | ADDRESS | |
| **Hospital** | | |
| BRADFORD REGIONAL MEDICAL CENTER | 116 INTERSTATE PARKWAY<br>P.O. BOX 0218<br>BRADFORD, PA 16701-0218 | 10075076500 o5 |
| **Psychiatric Unit** | | |
| BRADFORD REGIONAL MEDICAL CENTER-PSYCH | 116 INTERSTATE PARKWAY<br>P.O. BOX 0218<br>BRADFORD, PA 16701-0218 | 10075076500 35 |
| **Drug and Alcohol Rehabilitation Unit** | | |
| | | |
| **Medical Rehabilitation Unit** | | |
| | | |
| **Other # 1** | | |
| | | |
| **Other # 2** | | |
| | | |

HOSP 0001719

APP-271

# 29. CHAMPUS REPORT



## TRICARE/CHAMPUS
### REQUEST FOR REIMBURSEMENT OF
### CAPITAL AND DIRECT MEDICAL EDUCATION COSTS

RETURN TO: PALMETTO GOVERNMENT BENEFITS ADMINISTRATORS
TRICARE FINANCE, I-20 AT ALPINE ROAD, AA-W61 COLUMBIA, SC 29219-0001

| | | |
|---|---|---|
| 1. | HOSPITAL NAME: | Bradford Regional Medical Center |
| 2. | HOSPITAL ADDRESS: | 116 Interstate Parkway |
| | | Bradford, PA 16701 |
| 3. | TRICARE/CHAMPUS PROVIDER NUMBER: | P008216 |
| 4. | MEDICARE PROVIDER NUMBER: | 39-0118 |
| 5. | PERIOD COVERED FROM/TO:<br>(Must correspond to Medicare cost-reporting period) | 7/1/03 to 6/30/04 |
| 6. | TOTAL INPATIENT DAYS:<br>(Provided to all patients in units subject to DRG-based payment) | 16,164 |
| 7. | TOTAL TRICARE/CHAMPUS INPATIENT DAYS FOR DEPENDENTS/RETIREE 111<br>(Provided in units subject to DRG-based payment. This is to be only days which were "allowed" for payment. Days which were paid entirely by other health insurance or which were determined to be not medically necessary are not be be included.) | |
| 7a. | TOTAL TRICARE/CHAMPUS INPATIENT DAYS FOR ACTIVE DUTY CLAIMS: | |
| 8. | TOTAL ALLOWABLE CAPITAL COSTS:<br>(Must correspond with the applicable pages from the Medicare Cost Report) | 4,182,563 |
| 9. | TOTAL ALLOWABLE DIRECT MEDICAL EDUCATION COSTS:<br>(Must correspond with the applicable pages from the Medicare Cost Report) | 0 |
| 10. | TOTAL FULL-TIME EQUIVALENTS FOR RESIDENTS: | 0.00 |
| | TOTAL FULL-TIME EQUIVALENTS FOR INTERNS: | 0 |
| 11. | TOTAL INPATIENT BEDS: | 71 |
| 12. | REPORTING DATE: | November 30, 2004 |

I CERTIFY THE ABOVE INFORMATION IS ACCURATE AND BASED UPON THE HOSPITAL'S MEDICARE COST REPORT SUBMITTED TO HCFA. THE COST REPORTS FILED, TOGETHER WITH ANY DOCUMENTATION ARE TRUE, CORRECT AND COMPLETE BASED UPON THE BOOKS AND RECORDS OF THE HOSPITAL. MISREPRESENTATION OR FALSIFICATION OF ANY OF THE INFORMATION IN THE COST REPORTS IS PUNISHABLE BY FINE AND/OR IMPRISONMENT. ANY CHANGES WHICH ARE THE RESULT OF A DESK REVIEW, AUDIT OR APPEAL OF THE HOSPITAL'S MEDICARE COST REPORT MUST BE REPORTED TO THE TRICARE/CHAMPUS CONTRACTOR WITHIN 30 DAYS OF THE DATE THE HOSPITAL IS NOTIFIED OF THE CHANGE. FAILURE TO REPORT THE CHANGES CAN BE CONSIDERED FRAUDULENT, WHICH MAY RESULT IN CRIMINAL/CIVIL PENALTIES OR ADMINISTRATIVE SANCTIONS OF SUSPENSION OR EXCLUSION AS AN AUTHORIZED PROVIDER.

HOSP 0000004

X - INITIAL REQUEST                          AMENDED REQUEST

SIGNATURE_____             TITLE: Senior Vice President/CFO

TYPED NAME: James Tarasovitch               PHONE NUMBER: (814) 362-8216

DATE_____

DEPOSITION
EXHIBIT
Relators'
8/2007  5  ja4

# 30. CMS FORMS UB-92 AND UB-04

Medicare Institutional Uniform Claim Forms
UB-92 and UB-04

Medicare Transmittal 1104
(November 3, 2006)

http://www.cms.hhs.gov/Transmittals/downloads/R1104CP.pdf

174249.1

APPROVED OMB NO. 0938-0279

| | 2 | | 3 PATIENT CONTROL NO. | 4 TYPE OF BILL |
|---|---|---|---|---|
| ST11843 I PLY UB-92 | | 5 FED. TAX NO. | 6 STATEMENT COVERS PERIOD FROM    THROUGH | 7 COV D. | 8 N-C D. | 9 C-I D. | 10 L-R D. | 11 |

| 12 PATIENT NAME | 13 PATIENT ADDRESS |
|---|---|

| 14 BIRTHDATE | 15 SEX | 16 MS | ADMISSION 17 DATE | 18 HR | 19 TYPE | 20 SRC | 21 D HR | 22 STAT | 23 MEDICAL RECORD NO. | CONDITION CODES 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| | 32 OCCURRENCE CODE DATE | 33 OCCURRENCE CODE DATE | 34 OCCURRENCE CODE DATE | 35 OCCURRENCE CODE DATE | 36 OCCURRENCE SPAN CODE FROM THROUGH | 37 | A | B | C | A B C |
|---|---|---|---|---|---|---|---|---|---|---|
| a | | | | | | | | | | |
| b | | | | | | | | | | |
| 38 | | | | | 39 VALUE CODES CODE AMOUNT | 40 VALUE CODES CODE AMOUNT | 41 VALUE CODES CODE AMOUNT | | | a b c d |

| 42 REV. CD. | 43 DESCRIPTION | 44 HCPCS / RATES | 45 SERV. DATE | 46 SERV. UNITS | 47 TOTAL CHARGES | 48 NON-COVERED CHARGES | 49 | |
|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | 1 |
| 2 | | | | | | | | 2 |
| 3 | | | | | | | | 3 |
| 4 | | | | | | | | 4 |
| 5 | | | | | | | | 5 |
| 6 | | | | | | | | 6 |
| 7 | | | | | | | | 7 |
| 8 | | | | | | | | 8 |
| 9 | | | | | | | | 9 |
| 10 | | | | | | | | 10 |
| 11 | | | | | | | | 11 |
| 12 | | | | | | | | 12 |
| 13 | | | | | | | | 13 |
| 14 | | | | | | | | 14 |
| 15 | | | | | | | | 15 |
| 16 | | | | | | | | 16 |
| 17 | | | | | | | | 17 |
| 18 | | | | | | | | 18 |
| 19 | | | | | | | | 19 |
| 20 | | | | | | | | 20 |
| 21 | | | | | | | | 21 |
| 22 | | | | | | | | 22 |
| 23 | | | | | | | | 23 |

| 50 PAYER | 51 PROVIDER NO. | 52 REL INFO | 53 ASG BEN | 54 PRIOR PAYMENTS | 55 EST. AMOUNT DUE | 56 | |
|---|---|---|---|---|---|---|---|
| A | | | | | | | A |
| B | | | | | | | B |
| C | | | | | | | C |
| 57 | DUE FROM PATIENT ▶ | | | $0.00 | $0.00 | | |

| 58 INSURED'S NAME | 59 P. REL | 60 CERT. - SSN - HIC. - ID NO. | 61 GROUP NAME | 62 INSURANCE GROUP NO. | |
|---|---|---|---|---|---|
| A | | | | | A |
| B | | | | | B |
| C | | | | | C |

| 63 TREATMENT AUTHORIZATION CODES | 64 ESC | 65 EMPLOYER NAME | 66 EMPLOYER LOCATION | |
|---|---|---|---|---|
| A | | | | A |
| B | | | | B |
| C | | | | C |

| 67 PRIN. DIAG. CD. | 68 CODE | 69 CODE | OTHER DIAG. CODES 70 CODE | 71 CODE | 72 CODE | 73 CODE | 74 CODE | 75 CODE | 76 ADM. DIAG. CD. | 77 E-CODE | 78 |
|---|---|---|---|---|---|---|---|---|---|---|---|

| 79 P.C. | 60 PRINCIPAL PROCEDURE CODE DATE | 81 OTHER PROCEDURE CODE DATE | OTHER PROCEDURE CODE DATE | 82 ATTENDING PHYS. ID | |
|---|---|---|---|---|---|
| | | A | B | | a |
| | OTHER PROCEDURE CODE DATE C | OTHER PROCEDURE CODE DATE D | OTHER PROCEDURE CODE DATE E | 83 OTHER PHYS. ID    A | a b |
| a | 84 REMARKS | | | OTHER PHYS. ID    B | a b |
| b | | | | | |
| c | | | | 85 PROVIDER REPRESENTATIVE    86 DATE | |
| d | | | | X | |

UB-92 HCFA-1450          OCR/ORIGINAL          I CERTIFY THE CERTIFICATIONS ON THE REVERSE APPLY TO THIS BILL AND ARE MADE A PART HEREOF.

APP-276

UNIFORM BILL:     **NOTICE: ANYONE WHO MISREPRESENTS OR FALSIFIES ESSENTIAL INFORMATION REQUESTED BY THIS FORM MAY UPON CONVICTION BE SUBJECT TO FINE AND IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW.**

Certifications relevant to the Bill and Information Shown on the Face Hereof:   Signatures on the face hereof incorporate the following certifications or verifications where pertinent to this Bill:

1. If third party benefits are indicated as being assigned or in participation status, on the face thereof, appropriate assignments by the insured/beneficiary and signature of patient or parent or legal guardian covering authorization to release information are on file. Determinations as to the release of medical and financial information should be guided by the particular terms of the release forms that were executed by the patient or the patient's legal representative. The hospital agrees to save harmless, indemnify and defend any insurer who makes payment in reliance upon this certification, from and against any claim to the insurance proceeds when in fact no valid assignment of benefits to the hospital was made.

2. If patient occupied a private room or required private nursing for medical necessity, any required certifications are on file.

3. Physician's certifications and re-certifications, if required by contract or Federal regulations, are on file.

4. For Christian Science Sanitoriums, verifications and if necessary re-verifications of the patient's need for sanitorium services are on file.

5. Signature of patient or his/her representative on certifications, authorization to release information, and payment request, as required be Federal law and regulations (42 USC 1935f, 42 CFR 424.36, 10 USC 1071 thru 1086, 32 CFR 199) and, any other applicable contract regulations, is on file.

6. This claim, to the best of my knowledge, is correct and complete and is in conformance with the Civil Rights Act of 1964 as amended. Records adequately disclosing services will be maintained and necessary information will be furnished to such governmental agencies as required by applicable law.

7. For Medicare purposes:

   If the patient has indicated that other health insurance or a state medical assistance agency will pay part of his/her medical expenses and he/she wants information about his/her claim released to them upon their request, necessary authorization is on file. The patient's signature on the provider's request to bill Medicare authorizes any holder of medical and non-medical information, including employment status, and whether the person has employer group health insurance, liability, no-fault, workers' compensation, or other insurance which is responsible to pay for the services for which this Medicare claim is made.

8. For Medicaid purposes:

   This is to certify that the foregoing information is true, accurate, and complete.
   I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State Laws.

9. For CHAMPUS purposes:

   This is to certify that:

   (a) the information submitted as part of this claim is true, accurate and complete. and, the services shown on this form were medically indicated and necessary for the health of the patient;

   (b) the patient has represented that by a reported residential address outside a military treatment center catchment area he or she does not live within a catchment area of a U.S. military or U.S. Public Health Service medical facility, or if the patient resides within a catchment area of such a facility, a copy of a Non-Availability Statement (DD Form 1251) is on file, or the physician has certified to a medical emergency in any assistance where a copy of a Non-Availability Statement is not on file;

   (c) the patient or the patient's parent or guardian has responded directly to the provider's request to identify all health insurance coverages, and that all such coverages are identified on the face the claim except those that are exclusively supplemental payments to CHAMPUS-determined benefits;

   (d) the amount billed to CHAMPUS has been billed after all such coverages have been billed and paid, excluding Medicaid, and the amount billed to CHAMPUS is that remaining claimed against CHAMPUS benefits;

   (e) the beneficiary's cost share has not been waived by consent or failure to exercise generally accepted billing and collection efforts; and,

   (f) any hospital-based physician under contract, the cost of whose services are allocated in the charges included in this bill, is not an employee or member of the Uniformed Services. For purposes of this certification, an employee of the Uniformed Services is an employee, appointed in civil service (refer to 5 USC 2105), including part-time or intermittent but excluding contract surgeons or other personnel employed by the Uniformed Services through personal service contracts. Similarly, member of the Uniformed Services does not apply to reserve members of the Uniformed Services not on active duty.

   (g) based on the Consolidated Omnibus Budget Reconciliation Act of 1986, all providers participating in Medicare must also participate in CHAMPUS for inpatient hospital services provided pursuant to admissions to hospitals occurring on or after January 1. 1987.

   (h) if CHAMPUS benefits are to be paid in a participating status, I agree to submit this claim to the appropriate CHAMPUS claims processor as a participating provider. I agree to accept the CHAMPUS-determined reasonable charge as the total charge for the medical services or supplies listed on the claim form. I will accept the CHAMPUS-determined reasonable charge even if it is less than the billed amount, and also agree to accept the amount paid by CHAMPUS, combined with the cost-share amount and deductible amount, if any, paid by or on behalf of the patient as full payment for the listed medical services or supplies. I will make no attempt to collect from the patient (or his or her parent or guardian) amounts over the CHAMPUS-determined reasonable charge. CHAMPUS will make any benefits payable directly to me, if I submit this claim as a participating provider.

ESTIMATED CONTRACT BENEFITS

APP-277



UB-04 NOTICE: THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRESENTATION OR
FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS
THE BASIS FOR CIVIL MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION
INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S).

Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts. The following certifications or verifications apply where pertinent to this Bill:

1. If third party benefits are indicated, the appropriate assignments by the insured /beneficiary and signature of the patient or parent or a legal guardian covering authorization to release information are on file. Determinations as to the release of medical and financial information should be guided by the patient or the patient's legal representative.

2. If patient occupied a private room or required private nursing for medical necessity, any required certifications are on file.

3. Physician's certifications and re-certifications, if required by contract or Federal regulations, are on file.

4. For Religious Non-Medical facilities, verifications and if necessary re-certifications of the patient's need for services are on file.

5. Signature of patient or his representative on certifications, authorization to release information, and payment request, as required by Federal Law and Regulations (42 USC 1935f, 42 CFR 424.36, 10 USC 1071 through 1086, 32 CFR 199) and any other applicable contract regulations, is on file.

6. The provider of care submitter acknowledges that the bill is in conformance with the Civil Rights Act of 1964 as amended. Records adequately describing services will be maintained and necessary information will be furnished to such governmental agencies as required by applicable law.

7. For Medicare Purposes: If the patient has indicated that other health insurance or a state medical assistance agency will pay part of his/her medical expenses and he/she wants information about his/her claim released to them upon request, necessary authorization is on file. The patient's signature on the provider's request to bill Medicare medical and non-medical information, including employment status, and whether the person has employer group health insurance which is responsible to pay for the services for which this Medicare claim is made.

8. For Medicaid purposes: The submitter understands that because payment and satisfaction of this claim will be from Federal and State funds, any false statements, documents, or concealment of a material fact are subject to prosecution under applicable Federal or State Laws.

9. For TRICARE Purposes:

(a) The information on the face of this claim is true, accurate and complete to the best of the submitter's knowledge and belief, and services were medically and appropriate for the health of the patient;

(b) The patient has represented that by a reported residential address outside a military medical treatment facility catchment area he or she does not live within the catchment area of a U.S. Public Health Service medical facility, or if the patient resides within a catchment area of such a facility, a copy of Non-Availability Statement (DD Form 1251) is on file, or the physician has certified to a medical emergency in any instance where a copy of a Non-Availability Statement is not on file;

(c) The patient or the patient's parent or guardian has responded directly to the provider's request to identify all health insurance coverage, and that all such coverage is identified on the face of the claim except that coverage which is exclusively supplemental payments to TRICARE-determined benefits;

(d) The amount billed to TRICARE has been billed after all such coverage have been billed and paid excluding Medicaid, and the amount billed to TRICARE is that remaining claimed against TRICARE benefits;

(e) The beneficiary's cost share has not been waived by consent or failure to exercise generally accepted billing and collection efforts; and,

(f) Any hospital-based physician under contract, the cost of whose services are allocated in the charges included in this bill, is not an employee or member of the Uniformed Services. For purposes of this certification, an employee of the Uniformed Services is an employee, appointed in civil service (refer to 5 USC 2105), including part-time or intermittent employees, but excluding contract surgeons or other personal service contracts. Similarly, member of the Uniformed Services does not apply to reserve members of the Uniformed Services not on active duty.

(g) Based on 42 United States Code 1395cc(a)(1)(j) all providers participating in Medicare must also participate in TRICARE for inpatient hospital services provided pursuant to admissions to hospitals occurring on or after January 1, 1987; and

(h) If TRICARE benefits are to be paid in a participating status, the submitter of this claim agrees to submit this claim to the appropriate TRICARE claims processor. The provider of care submitter also agrees to accept the TRICARE determined reasonable charge as the total charge for the medical services or supplies listed on the claim form. The provider of care will accept the TRICARE-determined reasonable charge even if it is less than the billed amount, and also agrees to accept the amount paid by TRICARE combined with the cost-share amount and deductible amount, if any, paid by or on behalf of the patient as full payment for the listed medical services or supplies. The provider of care submitter will not attempt to collect from the patient (or his or her parent or guardian) amounts over the TRICARE determined reasonable charge. TRICARE will make any benefits payable directly to the provider of care, if the provider of care a participating provider.