# UNPUBLISHED OPINIONS

Westlaw.

Not Reported in F.Supp.2d                                                              Page 1
Not Reported in F.Supp.2d, 2000 WL 1207162 (E.D.Pa.)

▷U.S. ex rel. Atkinson v. Pennsylvania Shipbuilding Co.
E.D.Pa.,2000.
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
UNITED STATES of America ex rel. Paul E.
ATKINSON,
v.
PENNSYLVANIA SHIPBUILDING COMPANY,
First Fidelity Bank, N.A., and Sun Ship, Inc.
**No. CIV. A. 94-7316.**

Aug. 24, 2000.

*MEMORANDUM AND ORDER*

YOHN
*1 The plaintiff has filed this qui tam [FN1] action, brought pursuant to the False Claims Act [FN2] ("FCA" or the "Act"), 31 U.S.C. §§ 3729-30, for the alleged submission of false claims to the United States Navy in connection with a Navy shipbuilding contract for the construction of oil tanker ships. Paul E. Atkinson ("plaintiff" or "relator") alleges that Sun Ship Inc. ("Sun Ship"), Pennsylvania Shipbuilding Co. ("Penn Ship"), and First Fidelity Bank, N.A. ("Fidelity"; collectively the "defendants"), conspired to defraud, and did defraud, the Navy by getting false claims and reverse false claims paid or allowed in connection with the Navy shipbuilding contract.

> FN1."Qui tam is short for the Latin phrase qui tam pro domino rege quam pro se ipso in hac parte sequitur, which means 'who pursues this action on our Lord the King's behalf as well as his own." *Vermont Agency of Natural Resources v. United States ex rel. Stevens,* 120 S.Ct. 1858, 1860 (2000); *see also Black's Law Dictionary,* 1251 (6th ed.1990). "Qui tam actions are 'brought on behalf of the government by a private party, who receives some part of the recovery awarded as compensation for his efforts.' " *United States Dept. of Housing & Urban Dev. ex rel. Givler v. Smith,* 775 F.Supp. 172, 174 n. 1 (E.D.Pa.1991) (citations omitted).

> FN2. The FCA "was passed in 1863 as a result of investigations of the fraudulent use of government funds during the Civil War,"*see United States v. Neifert-White Co.,* 390 U.S. 228, 232 (1968), and has been in existence, in one form or another, since that time. *See United States ex rel. Dunleavy v. County of Delaware,* 123 F .3d 734, 738 (3d Cir.1997). The FCA "sets out civil and criminal penalties for persons who knowingly submit false claims to the government."*Dunleavy,* 123 F.3d at 738. "Congress intended that the False Claims Act ... and its qui tam action would help the government uncover fraud and abuse by unleashing a 'posse of ad hoc deputies to uncover and prosecute frauds against the government.' " *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 784 (4th Cir.1999) (quoting *United States ex rel. Milam v. University of Tex. M.D. Anderson Cancer Ctr.,* 961 F.2d 46, 49 (4th Cir.1992)).

> Pursuant to the FCA, an action may be commenced against the alleged false claimant by the government itself, or, as in this case, by a private person in the form of a "qui tam civil action 'for the person and for the United States Government' against the alleged false claimant, 'in the name of the Government.' " *See Stevens,* 120 S.Ct. at 1860.

In total, Atkinson's second amended complaint ("Compl." or "complaint") alleges fourteen claims against the defendants. *See* Compl. ¶¶ 103-17.The plaintiff's first claim alleges that the defendants conspired to defraud the government through the submission of false claims and reverse false claims to the Navy. *See id.* ¶ 104.The remaining thirteen claims allege that the defendants directly violated the FCA by submitting, or causing to be submitted, false claims or reverse false claims to the Navy. *See id.* ¶¶ 105-17.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1207162 (E.D.Pa.)

Pending before the court are the defendants' motions to dismiss the plaintiff's complaint for failure to state a claim pursuant to <u>Federal Rule of Civil Procedure 12(b)(6)</u> and for failure to plead fraud with particularity as required by <u>Federal Rule of Civil Procedure 9(b)</u>.*See* Penn Ship Inc.'s Motion to Dismiss and Memorandum of Law (Doc. No. 85); Sun Ship Inc.'s Motion to Dismiss and Memorandum of Law (Doc. No. 84); First Fidelity Bank, N.A.'s Motion to Dismiss and Memorandum of Law (Doc. No. 83). This opinion addresses all of the motions to dismiss for failure to state a claim upon which relief can be granted filed by the defendants.<u>FN3</u>

> <u>FN3.</u> Unless otherwise noted, any reference throughout this opinion to the defendants' "motions to dismiss" refers to the defendants' motions to dismiss for failure to state a claim under <u>Rule 12(b)(6)</u>.

The court has carefully considered the motions to dismiss for failure to state a claim filed by Penn Ship, Sun Ship, and Fidelity, and the plaintiff's response in opposition to those motions, as well as the defendants' replies thereto. For the reasons stated below, the court will grant Sun Ship's and Fidelity's respective motions to dismiss the plaintiff's complaint in its entirety, and will grant in part and deny in part Penn Ship's motion to dismiss for failure to state a claim upon which relief can be granted. All of the claims dismissed are dismissed without prejudice, and the plaintiff is granted leave to amend those claims within twenty days of the date of the court's order assuming that he can do so within the confines of Rule 11.

## I. *BACKGROUND*

## A. FACTUAL BACKGROUND

According to the plaintiff's allegations set forth in his complaint, which I must accept as true for the purposes of deciding this motion, *see Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994), the facts of this case are as follows.

In late 1980, Sun Ship, which had previously been a leader in the shipbuilding industry, decided to abandon this line of business. *See* Compl. ¶¶ 17-19.In abandoning shipbuilding, Sun Ship's parent company, Sun Company ("Sun"), recorded a considerable loss

reserve in 1980 due to operating losses and the "permanent termination of ship construction." *See id.* ¶¶ 20-21.As a result of this loss reserve, Sun received substantial tax benefits. *See id.* ¶ 22.To maintain its tax write-off, however, Sun had to actually terminate its shipbuilding operations. *See id.* ¶ 23.Sun Ship had a backlog of shipbuilding obligations, however, which it could not discontinue without suffering severe financial obligations. *See id.* ¶ 24.Sun Ship decided, therefore, to continue building ships through other entities, which appeared to be independent, but were actually under the control of Sun Ship. *See id.* ¶ 25.

*2 In 1981, Sun Ship announced its intention to sell its shipbuilding facilities at the Chester Shipyard (the "Chester Yard").*See id.* ¶ 27.On November 21, 1981, Theodore A. Burtis, the Chairman of Sun at the time, announced that Sun Ship intended to sell the Chester Yard to Edward E. Paden. Paden was the Chairman of Levingston Shipbuilding Co. of Orange, Texas ("Levingston").*See id.* ¶ 28.This announcement did not reveal that Paden was financially unstable and was dependent upon, and subject to the control of, Sun Ship. *See id.* ¶ 31.

Prior to the announcement of the intended sale of the Chester Yard in November, 1981, Paden had sought Sun Ship's help in obtaining Navy work for Levingston. *See id.* ¶ 29.Sun Ship and Paden agreed that Sun Ship would assist Levingston in obtaining Navy work and that Paden would assume Sun Ship's shipbuilding operations and complete Sun Ship's backlog of shipbuilding obligations. *See id.*Pursuant to this agreement, the sale of the Chester Yard to the Paden-controlled companies took place on February 8, 1982. *See id.* ¶ 30.

The sale agreement provided that three separate Paden companies would receive title to a section of the Chester Yard.<u>FN4</u>*See id* . ¶¶ 32-34.The first Paden company to obtain part of the Chester Yard was Penn Ship, which received some of the "acreage, buildings and equipment, along with a huge floating crane or derrick known as the Sun 800."*See id.* ¶ 32.Another Paden company, Delaware Drydock & Ship Repair ("DDSR"), received the remainder of the buildings, equipment, and real estate, with the exception of the Chester Yard's floating drydock. *See id.* ¶ 33.A third Paden company, Maritime Offshore Equipment Leasing Co. ("MOEL"), purchased the floating

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1207162 (E.D.Pa.)

drydock. *See id.* ¶ 34.Upon the transfer of the drydock, MOEL immediately leased it to Levingston and gave Sun Ship a security interest in the drydock and the drydock lease to Levingston. *See id.*In return for all of this property, Sun Ship received promissory notes totaling eighteen million dollars from the three Paden companies. *See id.* ¶¶ 32-35.

> FN4. These Paden companies were all owned by one parent company, Paden, Inc., later known as Capital Marine Corporation ("CMC").*See* Compl. ¶ 30. CMC consisted of three groups of companies: (1) PSC and DDSR; (2) the Levingston group; and (3) MOEL. *See* Compl. ¶ 34 n. 3.

By the time of the sale of the Chester Yard to Paden in February, 1982, Levingston and Paden were in severe financial trouble. *See id.* ¶ 36.Recognizing that Levingston was in a dire financial situation and not wanting to get back its shipbuilding facilities, which could have jeopardized its tax write-off, Sun Ship placed restrictive covenants in the sale agreements which prohibited Penn Ship and its affiliates from: (1) guaranteeing the obligations of Levingston; (2) making loans to Levingston; or (3) investing in Levingston. *See id.*In the spring of 1984, Paden sold fifty-two percent of his share of ownership of CMC to City Capital Corp., which was controlled by Thomas C. Weller, Jr., Leland Moore, and Ronald J. Stevens (the "Weller Group").*See id.* ¶ 37.

In 1984, the Navy solicited bids for the construction of oil tanker ships ("Oilers" or "Tankers").*See id.* ¶ 38.Penn Ship sought this Navy contract (the "Oiler Contract").*See id.*In the course of Penn Ship's efforts to obtain this contract, "Sun [Ship] and [Penn Ship] deceived the Navy into concluding that [Penn Ship's] financial condition was better than it in fact was, and, in particular, concealed from the Navy the extent of Levingston's financial weakness and the consequences of that weakness to [Penn Ship]."*See id.* ¶ 39.Specifically, Sun Ship and Penn Ship concealed from the Navy, through the use of false financial statements, "the extent to which Sun [Ship], contrary to the express terms of restrictive covenants in the [Chester] Yard Sale, was permitting Paden to use [Penn Ship's] assets to prop up the failing Levingston long enough to forestall its bankruptcy until after the Oiler contract was awarded to [Penn Ship]."*See id.*

*3 The threat of a Levingston bankruptcy was important to whether the Navy would award the Oiler Contract to Penn Ship because Levingston held a lease on the floating drydock, a piece of equipment essential for the successful completion of the Oiler Contract at the Chester Yard.*FN5See id.* ¶ 41.Thus, if Levingston declared bankruptcy, there would be a "significant risk that the drydock would be transferred to a Levingston creditor and physically removed from the Chester Yard for use elsewhere, thereby rendering performance of Oiler construction by [Penn Ship] at the Chester Yard impossible."*See id.*Consequently, Paden and the Weller Group, with Sun Ship's consent, transferred ownership of the drydock to another Paden company that was not subject to the consequences of a Levingston bankruptcy. *See id.* ¶ 42.

> FN5. As explained above, another Paden company, MOEL, had leased the floating drydock to Levingston shortly after the transfer of the Chester Yard to the Paden companies in 1982. *See* Compl. ¶ 40.

Moreover, Penn Ship began, in secret, to infuse capital into Levingston "to avoid a [Levingston] bankruptcy which would have disclosed the financial insolvency of the Paden companies."*See id.* ¶ 43.Sun Ship and Penn Ship agreed "to prop up Levingston financially with [Penn Ship's] assets, in the hope that they could forestall a Levingston bankruptcy until the Oiler Contract was awarded to [Penn Ship]."*Id.* ¶ 45.In order to accomplish this, Sun Ship ignored the restrictive covenants in the Chester Yard sale agreements and permitted Penn Ship and CMC to infuse capital into Levingston. *See id.* ¶ 43.By September 30, 1984, Levingston owed Penn Ship $1,181,364 in long-term indebtedness, and Penn Ship's financial statement of that date reflects this indebtedness. *See id.* ¶¶ 43-44.This financial statement did not, however, provide for any loss allowance in respect of the receivable. *See id.*

In addition, documents that were executed on August 28, 1995, and backdated to December 31, 1984, indicate that Penn Ship guaranteed CMC's obligations to two insurance companies, Texas Employer's Insurance Association ("TEIA") and Employer's Casualty Company ("ECC").*See id.* ¶

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1207162 (E.D.Pa.)

47.These obligations involved the Workers' Compensation insurance premiums and other related expenses of Levingston. *See id.* ¶ 48.Penn Ship did not disclose its guarantees of Levingston's insurance debts on its financial statement of December 31, 1984. *See id.* ¶¶ 49-50.

Penn Ship submitted its bid to build ten ships for the Oiler Contract in the form of a Best and Final Offer to the Navy on December 21, 1984. *See id.* ¶ 38.In total, the Navy received five bids for the Oiler Contract. *See id.* ¶ 57.Penn Ship's bid was substantially lower than the other four bids submitted to the Navy. *See id.*Penn Ship's bid, however, did not include the cost of architectural and naval drawings necessary for the construction of the Oilers.[FN6]*See id.* ¶ 60.

> FN6. The next lowest bidder was Avondale Industries, Inc. ("Avondale"), which submitted a bid of over one hundred and fifty million dollars more than Penn Ship's target price. *See* Compl. ¶ 58. Avondale had already built four Oilers for the Navy under a different contract. *See id.*

Before awarding the contract to Penn Ship, the Navy requested security to protect it against reprocurement costs in the event of a default by Penn Ship. *See id.* ¶ 61.To address the Navy's concerns, the Chairman of Penn Ship, Thomas Weller ("Weller"), sent a letter on March 15, 1985, to a member of the team responsible for analyzing the contract bids for the Navy (the "Weller letter").*See id.* ¶ 64.In the letter, and the accompanying Trust Indenture, Weller proposed to secure the Navy through the creation of a trust, the beneficiary of which was to be the Navy. *See id.* ¶ 62.The trust assets were to be security interests in some of the Chester Yard properties, and Fidelity was to be appointed as the trustee. *See id.*Additionally, the Weller letter falsely stated that: (1) "significant cost overruns" were a "highly unlikely event"; (2) the Trust Indenture was "irrevocable"; and (3) the Trust assets would consist of a security interest in the entire Penn Ship facility at the Chester Yard. *See id.* ¶ 65.

*4 On March 26, 1985, the Navy accepted the Trust Indenture, which was signed by Penn Ship, DDSR, and MOEL. *See id.* ¶ 66.The Trust Indenture imposed on Penn Ship the task of recording the

security instruments comprising the res of the Trust. *See id.* ¶ 70.Penn Ship, however, never recorded those instruments. *See id.*In addition, Fidelity never insisted that Penn Ship record the instruments, did not record the instruments itself, and did not inform the Navy of Penn Ship's failure to record. *See id.*

On May 6, 1985, the Navy entered into the Oiler Contract with Penn Ship, but the Oiler Contract only required the construction and delivery of two Oilers to the Navy.[FN7]*See id.* ¶ 75.The Oiler Contract also gave the Navy the option of ordering two additional Oilers from Penn Ship. *See id.*Upon the award of the Oiler Contract to Penn Ship, the Trust Indenture became immediately effective. *See id.*

> FN7. As noted above, the original bid solicitation was for the construction of nine Oilers. The actual contract awarded to Penn Ship, however, was for the construction of only two ships.

In February, 1986, the Navy exercised its option to order a third Oiler from Penn Ship. *See id.* ¶ 76.One year later, the Navy exercised its option under the contract to order a fourth Oiler. *See id.* ¶ 77.

In late 1987, Penn Ship informed the Navy that it was having financial difficulties and that payments owed to subcontractors were overdue. *See id.* ¶ 78.On May 17, 1988, Penn Ship reported to the Navy that it had reached a tentative agreement with Avondale to transfer the two option Oilers to Avondale. *See id.* ¶ 79.On June 16, 1988, the Navy signed Modification P00005, which deleted the two option Oilers from the Oiler Contract. *See id.* ¶ 80.The Navy then entered a separate contract with Avondale to complete the option Oilers. *See id.*

On January 26, 1989, Penn Ship and the Navy entered into Modification P00011, which permitted the Navy to make advance payments to Penn Ship of up to seventeen million dollars and provided that the floating drydock would act as security for the reimbursement of the advance payments. *See id.* ¶ 83.

Shortly after Penn Ship and the Navy entered into Modification P00011, Penn Ship disclosed to the Navy that it was unable to complete work on the Oiler Contract. *See id.* ¶ 84.On August 24, 1989, the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 5
Not Reported in F.Supp.2d, 2000 WL 1207162 (E.D.Pa.)

Navy and Penn Ship signed Modification P00017 (the "Default Modification"). *See id.* ¶ 85. The Default Modification held Penn Ship in default and agreed that the contract would be transferred to another shipyard for completion. *See id.* Pursuant to the terms of the Default Modification, the Trust Indenture was terminated and Penn Ship was released from liability under the contract, with the exception of certain reprocurement costs and other liabilities for which Penn Ship was still responsible. *See id.* In exchange for the release of liability, the Default Modification provided that the Navy would receive an additional two million dollar security interest in the floating drydock, a subordinated mortgage on some of the real estate and buildings that had previously been mortgaged to Fidelity under the Trust Indenture, and a preferred ship mortgage on the floating derrick. *See id.* ¶¶ 86, 88. These security interests were meant to guarantee that Penn Ship would utilize its best efforts to sell the collateral so that a portion of the proceeds of the sale could be applied to the reprocurement costs incurred as a result of the default. *See id.*

**\*5** Penn Ship did not use its best efforts to sell the land and buildings or the floating derrick during the relevant thirteen-month period. *See id.* ¶ 89. Instead, on October 18, 1989, Weller and Penn Ship formed Maritime Capital Corp. ("MCC"). *See id.* Then, after the thirteen-month period expired, Penn Ship sold the floating derrick to MCC. *See id.* The bill of sale from Penn Ship to MCC, which was signed by Weller, represented that the "seller had good title free and clear of any liens and encumbrances." *See id.* ¶ 93. In fact, this was untrue due to the Navy's lien on the derrick. *See id.*

On July 25, 1991, MCC sold the derrick to Donjon Marine Co. Inc. ("Donjon"), a purchaser in good faith for value and without knowledge of the Navy's unrecorded lien on the derrick. *See id.* ¶ 94. The bill of sale to Donjon also contained a false warranty that MCC owned the derrick "free and clear of all liens and encumbrances, a representation which was false because of the Navy's continuing, though unrecorded lien, and a representation necessary to induce Donjon to buy the derrick." *See id.*

On January 13, 1992, Penn Ship and the Navy entered into Modification P00020 to the Oiler Contract. *See id.* ¶ 96. Pursuant to Modification

P00020, the Navy fully released Penn Ship of all contractual liabilities under the Oiler Contract. *See id.* The Oilers were never completed and are now worth only their scrap value, which is approximately two million dollars. *See id.* ¶ 97.

## B. PROCEDURAL HISTORY

In 1992, Atkinson and Eugene Schorsch brought their first qui tam action against Penn Ship and Fidelity for FCA violations. *See* Memo. of Law in Support of Defendant Sun Ship, Inc. to Dismiss the Second Amended Compl. ("Sun Ship's Memo.") at 2. This initial action was amended once and then dismissed without prejudice. *See id.*

On December 5, 1994, Atkinson and Schorsch filed under seal this second qui tam action against Penn Ship and Fidelity. *See* Compl. (Doc. No. 1). On February 23, 1995, the file was sealed for evaluation of the complaint by the United States Attorney General. *See* Court Order, Feb. 23, 1995 (Doc. No. 4). The government then requested, and received, 11 separate extensions of time within which to inform the court of its determination of whether to intervene in the action. *See* Court Orders (Doc. Nos.6, 8, 10, 12, 14, 16, 20, 22, 24, 26, 28). The final extension gave the United States until June 6, 1997, to inform the court of its decision of whether to intervene in the matter. *See* Court Order, May 13, 1997 (Doc. No. 28). On June 5, 1997, Atkinson and Schorsch filed an amended complaint, which was also under seal, and which added Sun Ship as a defendant. *See* Amended Compl. (Doc. No. 29). The next day, the government notified the court of its decision not to intervene in the action. *See* Notice of Election to Decline Intervention (Doc. No. 30).

**\*6** On October 21, 1997, the court ordered the amended complaint unsealed and served on all of the defendants. *See* Court Order, Oct. 21, 1997 (Doc. No. 41). The plaintiffs requested, and received, several extensions of time within which to serve the amended complaint on the defendants so they could obtain an attorney. *See* Court Orders (Doc. Nos.45, 47, 49). The court eventually ordered the plaintiff to effectuate service on the defendants on or before October 15, 1998. *See* Court Order, Sept. 17, 1998 (Doc. No. 49).[FN8]

FN8. The court also issued an order that the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                          Page 6
Not Reported in F.Supp.2d, 2000 WL 1207162 (E.D.Pa.)

court would, on its own initiative, dismiss the case without prejudice as to all defendants unless the plaintiffs showed good cause for their failure to serve the defendants by November 15, 1998. *See* Court Order, Oct. 28, 1998 (Doc. No. 50). The court did not, however, dismiss the action for failure to effect service.

Sun Ship and Fidelity each filed separate motions to dismiss the amended complaint.[FN8]*See* Motion by Sun Ship, Inc. to Dismiss Amended Complaint (Doc. No. 51); First Fidelity Bank's Motion to Dismiss Amended Complaint (Doc. No. 61). On December 14, 1998, the court placed this action in the special management track, denied the motions to dismiss without prejudice, and ordered the plaintiffs to file a second amended complaint by January 4, 1999. *See* Court Order, Dec. 14, 1998 (Doc. No. 73). Atkinson then timely filed a second amended complaint.[FN10]*See* Second Am. Compl (Doc. No. 77).

> FN9. The court granted an unopposed motion by Penn Ship which extended Penn Ship's time to respond to the amended complaint until 30 days after the court's order granting or denying the plaintiff's motion for leave to file a second amended complaint. *See* Court Order, November 5, 1998 (Doc. No. 54).

> FN10. Atkinson is the only plaintiff named in the second amended complaint. According to a Stipulation and Order dated June 21, 1999, Schorsch has officially withdrawn as a plaintiff/relator in this case. *See* Court Order, June 21, 1999 (Doc. No. 94).

The defendants all requested, and received, extensions on the time within which they were to file motions to dismiss. *See* Court Order, February 1, 1999 (Doc. No. 81). On or before March 5, 1999, all of the defendants named in the second amended complaint filed motions to dismiss the complaint for failure to state a claim and failure to plead fraud with particularity as required by Federal Rule of Civil Procedure 9(b).*See* Motion by First Fidelity to Dismiss Second Amended Complaint (Doc. No.83); Motion by Sun Ship to Dismiss Second Amended Complaint (Doc. No. 84); Motion by Penn Ship to

Dismiss the Second Amended Complaint (Doc. No. 85). While the motions were under consideration, the Supreme Court addressed the issue of whether a private citizen has standing to litigate claims of fraud upon the government. As a result the court placed this action in civil suspense awaiting a decision of the Supreme Court which might moot this action. After the Supreme Court decided that a private citizen does have standing in qui tam actions, this action was removed from civil suspense on July 17, 2000.[FN11]

> FN11. It should be noted that in addition to the motions to dismiss for failure to state a claim, all three defendants have also filed with the court separate motions to dismiss for lack of subject matter jurisdiction. *See* Sun Ship's Motion to Dismiss Second Amended Complaint (Doc. No. 102); First Fidelity's Motion to Dismiss (Doc. No. 104); Penn Ship's Motion to Dismiss (Doc. No. 105). Originally, pursuant to a stipulation approved by the court, the plaintiff had until December 1, 1999, to file a response to these motions and the defendants had until December 22, 1999, to file any memoranda in reply.

This past term, the Supreme Court granted certiorari in the case of *Vermont Agency of Natural Resources v. United States ex rel. Stevens,* to determine "whether a private individual may bring suit in federal court on behalf of the United States against a State (or state agency) under the False Claims Act, 31 U.S.C. §§ 3729-3733 ."*Stevens,* 120 S.Ct. at 1860. On November 19, 1999, the Supreme Court issued an order directing the parties in *Stevens* to file supplemental briefs addressing the additional question of whether a private citizen has standing under Article III to litigate claims of fraud upon the government. The Court held oral argument on these issues on November 29, 1999.

In light of the *Stevens* case pending before the Supreme Court, on December 6, 1999, I placed this matter into civil suspense. *See* Court Order, Dec. 6, 1999 (Doc. No. 107). On that same date, I denied the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1207162 (E.D.Pa.)

pending motions to dismiss for lack of subject matter jurisdiction without prejudice to the right of the parties to refile the same by letter request after the disposition of the Supreme Court case in *Stevens. See* Court Order, Dec. 6, 1999 (Doc. No. 106). In *Stevens,* the Supreme Court held, *inter alia,* that a private individual does have standing under Article III to sue in federal court on behalf of the United States under the FCA. *See Stevens,* 120 S.Ct. at 1865. Following the *Stevens* decision, therefore, I ordered the case removed from the civil suspense file and returned to the current docket for final disposition. *See* Court Order, July 17, 2000 (Doc. No. 109). On July 27, 2000, pursuant to a stipulation by the parties approved by the court, the plaintiff was given until August 18, 2000, to file a brief in opposition to the motions to dismiss for lack of subject matter jurisdiction. *See* Court Order, July 27, 2000 (Doc. No. 110). Thus, because the motions to dismiss for lack of subject matter jurisdiction are not yet fully briefed, this opinion addresses only the motions to dismiss the plaintiff's complaint for failure to state a claim pursuant to Rule 12(b)(6).

## II. *STANDARD OF REVIEW*

Pending before the court are motions to dismiss for failure to state claims upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The purpose of a Rule 12(b)(6) motion is to test the legal sufficiency of the complaint. *See Sturm v. Clark,* 835 F.2d 1009, 1011 (3d Cir.1987). In deciding a motion to dismiss, the court must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the [non-moving party]."*Jordan,* 20 F.3d at 1261. At this stage of the litigation, then, "[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."*Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984). In deciding a motion to dismiss, a district court also may consider exhibits attached to the complaint and matters of public record. *Pension*

*Benefit Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993), *cert. denied,*510 U.S. 1042 (1994). Moreover, "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."*Id.* (citations omitted).

## III. *DISCUSSION*

## A. FALSE CLAIMS ACT

*7 In his second amended complaint, the plaintiff has alleged violations of 31 U.S.C. §§ 3729(a)(2)-(4), (7). These statutory sections impose liability on a person or entity who does any of the following:

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the government;

(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

(4) has possession, custody, or control of property or money used, or to be used by the Government and, intending to defraud the Government or willfully to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person receives a certificate or receipt; [or]

....

(7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.

31 U.S.C. §§ 3729(a)(2)-(4), (7) (Supp.1999). If liability is found, the defendant is "liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person...."[FN12]*Id.*

> FN12. Penn Ship argues that a plaintiff is required to allege damages in order to state a claim under the FCA. *See* Memo. in Support of Motion of Defendant Pennsylvania

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                Page 8
Not Reported in F.Supp.2d, 2000 WL 1207162 (E.D.Pa.)

Shipbuilding Co. to Dismiss the Complaint ("Penn Ship's Memo.") at 11. Indeed several courts have agreed with Penn Ship's argument. *See United States ex rel. Showell v. Philadelphia AFL, CIO Hosp. Ass'n,* No. 98-1916, 2000 WL 424274, at *5-6 (E.D.Pa. Apr. 18, 2000) (citing *United States ex rel. Stinson, Lyons, Gerlin & Bustamante P.A. v. Provident Life & Accident Ins. Co.,* 721 F.Supp. 1247, 1259 (S.D.Fla.1989)); *Wilkins ex rel. United States v. Ohio,* 885 F.Supp. 1055, 1058 (S .D.Ohio 1995) (citing *Stinson,* 721 F.Supp. at 1259);*Stinson,* 721 F.Supp. at 1259;*Blusal Meats, Inc. v. United States,* 638 F.Supp. 824, 827 (S.D.N.Y.1986), *aff'd,*817 F.2d 1007 (2d Cir.1987). Controlling Supreme Court authority, however, makes it clear that a plaintiff need not allege damages in order to state a claim under the FCA. *See Rex Trailer Co. v. United States,* 350 U.S. 148, 154 (1956) (noting that, under the predecessor to the current FCA, "there is no requirement, statutory or judicial, that specific damages be shown" (citing *United States ex rel. Marcus v.. Hess,* 317 U.S. 537, 552 (1943)), *abrogated on other grounds as recognized by, United States v. Sanchez-Escareno,* 950 F.2d 193, 198 (5th Cir.1991), *cert. denied,*506 U.S. 841 (1992); *see also United States v. Kensington Hosp.,* 760 F.Supp. 1120, 1127-28 (E.D.Pa.1991) (examining *Rex Trailer* and *Hess* ). Thus, to state a claim for liability under the FCA, a plaintiff need not allege specific damages in his complaint.

As part of its argument that damages must be alleged in order to find a violation of the FCA, Penn Ship also contends that the FCA requires a plaintiff to allege loss causation. *See* Penn Ship's Memo. at 12. Penn Ship's contention is incorrect. It is true that a plaintiff must prove loss causation to recover damages under the FCA. *See United States v. Hibbs,* 568 F.2d 347, 350 (3d Cir.1977) ("To recover damages here, the United States must show these elements ... [a false statement] which has resulted in damages sustained by 'reason of' the [false statement]."); *United States v. Board of Educ.,* 697

F.Supp. 167, 172 (D.N.J.1988) ("The False Claims Act allows the United States to recover only damages for harm actually sustained due to defendants' fraudulent acts."). The FCA provides, however, for two separate civil remedies and the recovery of damages is only one of them. The other remedy is the imposition of a civil penalty of $5,000 to $10,000 per violation. *See*31 U.S.C. § 3729(a). This remedy is available regardless of whether the government suffered any actual injury. *See Rex Trailer Co.,* 350 U.S. at 154 (citing *Hess,* 317 U.S. at 552;*United States v. Rohleder,* 157 F.2d 126, 129 (3d Cir.1946)); *United States ex rel. Schwedt v. Planning Research Corp.,* 59 F.3d 196, 199 (D.C.Cir.1995); *Kensington Hosp.,* 760 F.Supp. at 1127-28. Accordingly, loss causation is not an element that must be pleaded in order to state a claim for a violation of the FCA.

Penn Ship also argues that materiality is an element of an FCA violation that must be pleaded. *See* Penn Ship's Memo. at 11-12. In a recent case, the Third Circuit expressly refused to decide whether the FCA contains a materiality requirement, noting that any fraud complained of in that case was material. *See United States ex rel. Cantekin v. University of Pittsburgh,* 192 F.3d 402, 415 (3d Cir.1999). I also refuse to decide whether the FCA contains a materiality requirement at this early stage of the proceedings.

To state a claim for a violation of section 3729(a)(2), known as a false statement violation, a plaintiff must demonstrate:

(1) that the defendant made, used, or caused to be made or used, a record or statement to get a claim against the United States paid or approved; (2) the record or statement and the claim were false or fraudulent; (3) the defendant knew that the record or statement and the claim were false or fraudulent....

*Stinson,* 721 F.Supp. at 1259;*see also United States v. Warning,* No. 93-4544, 1994 WL 396432, at *3

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 9
Not Reported in F.Supp.2d, 2000 WL 1207162 (E.D.Pa.)

(E.D.Pa. July 26, 1994).

To state a claim under the FCA for conspiracy, pursuant to section 3729(a)(3), a plaintiff must show: "(1) that the defendant conspired with one or more persons to get a false or fraudulent claim allowed or paid by the United States, and (2) that one or more conspirators performed any act to get a false or fraudulent claim allowed or paid."*United States v. Hill, 676 F.Supp. 1158, 1173 (N.D.Fla.1987)* (citing *Blusal Meats, 638 F.Supp. at 828*).

The elements of a claim brought pursuant to section 3729(a)(4) include: "(1) possession, custody, or control of property or money used, or to be used, by the government, (2) delivery of less property than the amount for which the person receives a certificate or receipt, (3) with intent to defraud or willfully to conceal the property."*United States v. Dyncorp, 136 F.3d 676, 681 (10th Cir.1998)*.

Finally, a claim under section 3729(a)(7), known as the "reverse false claims" provision of the statute, requires proof: "(1) that the defendant made, used, or caused to be used a record or statement to conceal, avoid, or decrease an obligation to the United States; (2) that the statement or record was false; [and] (3) that the defendant knew that the statement or record was false...."*Stinson, 721 F.Supp. at 1259*.

*8 Additionally, the plaintiff must demonstrate that the defendant acted knowingly for most section 3729 violations. To establish this element of knowledge, the plaintiff must show "that the defendant (1) had actual knowledge that it submitted a false or fraudulent claim for payment or approval, (2) acted in deliberate ignorance of the truth or falsity of its claim, or (3) acted in reckless disregard of the truth or falsity of its claim."*See United States v. The Parsons Co., 195 F.3d 457, 464 (9th Cir.1999)* (citing 31 U.S.C. § 3729(b) (West 1999); *Wang v. FMC Corp., 975 F.2d 1412, 1420 (9th Cir.1992)*). Moreover, the statute explicitly states that no proof of specific intent to defraud is necessary to establish knowledge. *See* 31 U.S.C. § 3729(b)."The gist of the violation is not an intent to deceive but the knowing presentation of a claim, record or statement that is either 'fraudulent' or 'false' and the requisite intent is the knowing presentation of what is 'known to be false' or 'a lie.'" *Wilkins*, 888 F.Supp. at 1059 (citing *Wang, 975 F.2d at 1421*). Thus, the scienter requirement

under the FCA is liberal. *See Gold v. Morrison Knudsen Co., 68 F.3d 1475, 1477 (2d Cir.1995)*, cert. denied, 517 U.S. 1213 (1996). The standard is not so liberal, however, that allegations of mere negligence or innocent mistake are sufficient to satisfy the element of knowledge for a violation of the FCA. *See Hindo v. University of Health Sciences, 65 F.3d 608, 613 (7th Cir.1995)*; *Showell, 2000 WL 424274*, at *6;*Plywood Prop. Assocs. v. National Flood Ins. Program, 928 F.Supp. 500, 509 (D.N.J.1996)*.

Finally, courts have interpreted the FCA broadly, finding that the Act was intended "to reach all types of fraud, without qualification, that might result in financial loss to the Government ."*Neifert White Co., 390 U.S. at 232*. As a result, courts have held that "when the contract or extension of government benefit was obtained originally through false statements or fraudulent conduct," there is liability for each claim submitted to the government under that contract. *Harrison, 176 F.3d at 787* (citing *United States ex rel. Marcus v. Hess, 317 U.S. 537, 543-44 (1943)*, as the "most prominent" case in which FCA liability was imposed for fraudulently inducing the government to enter into a contract). Therefore, under the FCA, a government contractor is liable for every claim submitted under a contract if the contract was fraudulently obtained, even if the work is performed to government specifications and at the agreed price. *See Harrison, 176 F.3d at 788*.

## B. FAILURE TO PLEAD WITH PARTICULARITY

### 1. *Federal Rule of Civil Procedure 9(b)*

Federal Rule of Civil Procedure 9(b) mandates that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."Fed.R.Civ.P. 9(b). In the Third Circuit, the Rule 9(b) standard, however, is "a generous one" that is applied by the courts with "some flexibility." *See Blue Line Coal Co. v. Equibank, 683 F.Supp. 493, 497 (E.D.Pa.1988)* (citations omitted); *see also Rolo v. City Investing Co. Liquidating Trust, 155 F.3d 644, 658 (3d Cir.1998)* (observing that courts in the Third Circuit apply Rule 9(b) with "some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants") (citing *Christidis v.*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 10
Not Reported in F.Supp.2d, 2000 WL 1207162 (E.D.Pa.)

*First Pennsylvania Mortgage Trust,* 717 F.2d 96, 100 (3d Cir.1983)). As the Third Circuit has explained, "focusing exclusively on [Rule 9(b)'s] 'particularity' language is 'too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules.'*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984), *cert. denied,*469 U.S. 1211 (1985) (citing *Christidis,* 717 F.2d at 100)). Instead, the court must read Rule 9(b) in conjunction with Federal Rule of Civil Procedure 8, which requires the plaintiff to allege a "short and plain statement of the claim," and which provides that averments in pleadings shall be "simple, concise, and direct." *See United States v. Metzinger,* No. 94-7520, 1996 WL 412811, at *4 (E.D.Pa. July 18, 1996) (citing Fed.R.Civ.P. 8(a)(2), (e); *In re Catanella and E.F. Hutton & Co., Inc. Sec. Litig.,* 583 F.Supp. 1388, 1397-98 (E.D.Pa.1984)). Therefore, in this circuit, to satisfy the particularity requirement for pleading fraud, the plaintiff must plead with particularity the "circumstances of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior."*See Seville,* 742 F.2d at 791.

**\*9** The Rule 9(b) pleading requirement certainly is satisfied if the plaintiff alleges the "date, place or time" of the allegedly fraudulent conduct. *See id.*The plaintiff need not plead the "date, place or time" of the fraud, however, if the plaintiff is able to "use alternative means of injecting precision and some measure of substantiation into their allegations of fraud."*See id.*

Moreover, although Rule 9(b) requires the circumstances constituting fraud to be stated with particularity, it also states that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally."Fed.R.Civ.P. 9(b). Thus, all elements of the plaintiff's FCA claims under sections 3729(a)(2) and (a)(7) must be pleaded with particularity except the knowledge with which a defendant is alleged to have committed the violative acts.[FN13]*See Gold,* 68 F.3d at 1477 (noting approvingly that to satisfy Rule 9(b) the plaintiff in an FCA action was not required to particularize the defendants' scienter but was required to plead "with particularity the specific statements or conduct giving rise to the fraud claim").

FN13. Penn Ship contends that, contrary to the clear language of Rule 9(b), the knowledge element of sections 3729(a)(2) and (a)(7) must also be alleged with particularity and cites as support for this proposition *In re Burlington Coat Factory Securities Litigation,* 114 F.3d 1410 (3d Cir.1997). In *Burlington Coat,* the Third Circuit required heightened pleading of scienter in the case of a securities fraud action. *See id.* at 1418 (explaining that in a securities fraud case "[w]hile state of mind may be averred generally, plaintiffs must still allege facts that show the court their basis for inferring that the defendants acted with 'scienter' "). Penn Ship now requests that the court extend the rationale of *Burlington Coat* to include pleadings of knowledge under the FCA. I decline to do so for two reasons. First, the rationale stated for the rule in *Burlington Coat* related specifically to securities fraud action. In explaining its holding, the court reasoned that "[p]ublic companies make large quantities of information available to the public ... [and][l]arge volumes of disclosure make for a high likelihood of at least a few negligent errors."*Id.* The court then explained that it was necessary to require the plaintiff to allege some facts to demonstrate their basis for alleging an intent to defraud because to hold otherwise would "allow plaintiffs and their attorneys to subject [public] companies to wasteful litigation based on the detection of a few negligently made errors found subsequent to a drop in stock price...."*Id.*That same rationale does not apply to this case brought under the FCA. Second, the scienter requirement under Section 10(b) of the Securities Exchange Act requires the plaintiff to show that the defendant acted with the intent to defraud. *See id.* at 1418-19;*see also Black's Law Dictionary,* 1345 (6th ed.1990) (explaining that "scienter" as applied under the Securities Exchange Act "refers to a mental state embracing intent to deceive, manipulate or defraud"). Intent to defraud, however, is not an element of the relevant sections of the FCA at issue here. *See United States v. DiBona,* 614 F.Supp. 40, 43

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:04-cv-00186-MBC    Document 125-2    Filed 09/10/2008    Page 12 of 70

Not Reported in F.Supp.2d                                                    Page 11
Not Reported in F.Supp.2d, 2000 WL 1207162 (E.D.Pa.)

(E.D.Pa.1984) (citing *United States v. Rohleder*, 157 F.2d 126 (3d Cir.1946)). Instead, under these sections of the FCA, the plaintiff need only plead that the defendant acted knowingly. *See id.* For these reasons, I decline to extend *Burlington Coat* 's heightened pleading standard to the pleading of knowledge under the FCA.

The requirement that the circumstances constituting the fraud be pleaded with particularity remains in effect even if one of the circumstances that must be pleaded with particularity-e.g., falsity-turns on a defendant's specific intent. For example, if a defendant is accused of making the false statement "I promise to perform under the contract," the only way such a statement could be false is if the defendant did not, in fact, intend to perform under the contract at the time he made the statement. *See United States ex rel. Lamers v. City of Green Bay*, 998 F.Supp. 971, 987 (E.D.Wisc.1998) ("Any promise to perform is not only a prediction but a statement of existing intent, and thus capable of misrepresentation"), *aff'd*, 168 F.3d 1013 (7th Cir.1999); *see generally United States ex rel. v. Shah*, 44 F.3d 285 (5th Cir.1995). If the falsity of a statement that was made to get a fraudulent claim approved turns on what a defendant intended, that intent-or facts giving rise to a strong inference of that intent-must be pleaded with sufficient particularity to satisfy the requirements of the first sentence of Rule 9(b). *See Bower v. Jones*, 978 F.2d 1004, 1012 (7th Cir.1992) (requiring allegations of objective manifestations of intent not to perform contract for a claim of promissory fraud to survive a motion to dismiss and recognizing that the absence of this requirement would allow every breach of contract action to become a fraud action); *cf. In re Burlington Coat*, 114 F.3d at 1418 (applying this particularity standard to allegations of scienter in a securities fraud case). To allow otherwise would be to allow plaintiffs to do an end run around Rule 9(b)'s particularity requirement-to allow plaintiffs to survive a motion to dismiss a claim of an FCA violation with nothing more than general allegations of intent not to perform and actual nonperformance of a government contract.[FN14]

> FN14. Note that the specific intent that is required to be pleaded with particularity is not the specific intent to defraud that the FCA makes clear need not be pleaded with

particularity nor even proved. *See* 31 U.S.C. § 3729(b). Instead, in the falsity example above, the specific intent that must be pleaded particularly is whatever intent makes the statement false, not any specific intent to defraud.

### 2. *Applicability of Federal Rule of Civil Procedure 9(b) to the FCA*

**\*10** Here, the plaintiff does not dispute that his allegations of direct violations of the FCA must be pleaded with particularity as required by Rule 9(b).[FN15] *See* Plaintiff's Memo. of Law in Opposition to Motions to Dismiss ("Plaintiff's Opp.") at 34-39. Instead, the plaintiff argues that his allegations of direct FCA violations are sufficiently particular to satisfy the "appropriately 'generous' standard" applied by courts in this circuit. *See id.* at 36.

> FN15. Indeed, it is well-established that Rule 9(b) applies to qui tam actions brought under the FCA. *See e.g., Cooper v. Blue Cross & Blue Shield of Fla.*, 19 F.3d 562, 568 (11th Cir.1994); *United States ex rel. Detrick v. Daniel F. Young, Inc.*, 909 F.Supp. 1010, 1019 n. 26 (E.D.Va.1995); *United States ex rel. Robinson v. Northrop Corp.*, 149 F.R.D. 142, 144 (N.D.Ill.1993); *Juliano v. Federal Asset Disposition Ass'n*, 736 F.Supp. 348, 353 (D.D.C.1990), *aff'd*, 959 F.2d 1101 (D.C.Cir.1992); *United States ex rel. McCoy v. California Med. Review, Inc.*, 723 F.Supp. 1363, 1372 (N.D.Cal.1989).

The plaintiff does, however, contest the application of the Rule 9(b) particularity standard to count one of the complaint, which alleges that the defendants conspired to defraud the Navy through the submission of false claims. *See* Plaintiff's Opp. at 39-40 (arguing that "such specificity is not even applicable to the conspiracy counts").

In general, the particularity requirements of Rule 9 do not apply to civil conspiracy claims. *See Rose v. Bartle*, 871 F.2d 331, 336 (3d Cir.1989); *see also Tunstall v. Exolon Corp.*, No. 92-3770, 1993 WL 58760, at \*2 (E.D.Pa. March 2, 1993) (observing that Rule 9(b) pleading requirements are not applicable to claims for civil conspiracy). The question becomes

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1207162 (E.D.Pa.)

more complicated, however, when the action involves a civil conspiracy to defraud. In that case, it is clear that the underlying fraud action must be pleaded with particularity, *see supra,* but it is less certain what pleading standard should be applied to the actual allegations of conspiracy (i.e., whether the elements of the conspiracy, such as the allegation of an agreement, must be pleaded with specificity).

In *Rose v. Bartle,* 871 F.2d 331 (3d Cir.1989), the Third Circuit considered whether a claim for a civil RICO conspiracy needed to be pleaded with specificity. *See id.* at 366-67.The court determined that although the underlying elements of fraud are subject to the heightened pleading standard of Rule 9(b), the allegations "of conspiracy are measured under the more liberal ... [Fed.R.Civ.P. 8(a) ] pleading standard."*See id.* at 366; *see also Smith v. Berg,* No. 99-2133, 1999 WL 1081065, at *2 n. 1 (E.D.Pa. Dec. 1, 1999) (applying Rule 9(b) to the allegations of fraud in the civil RICO claim, but not to the civil RICO conspiracy claim); *Emcore Corp. v. PriceWaterhouseCoopers LLP,* 102 F.Supp.2d 237, 264 (D.N.J.2000) (refusing to apply Rule 9(b) pleading standard to a claim for a civil RICO conspiracy). According to the *Rose* court, the allegations of conspiracy "must be sufficient to 'describe the general composition of the conspiracy, some or all of its broad objectives, and the defendant's general role in that conspiracy.' " *See Rose,* 871 at 336 (citations omitted). Furthermore, two courts in this district that have considered this question as it relates to a conspiracy claim under the FCA both concluded that the heightened pleading requirements are not to be applied to the allegations of the FCA conspiracy. *See United States v. Metzinger,* No. 94-7520, 1996 WL 53002, at *3 (E.D.Pa. Sept. 17, 1996) (holding that, unlike the allegations of direct violations of the FCA, conspiracy to defraud under the FCA need not be pleaded with particularity); *United States v. Warning,* No. 93-4541, 1994 WL 396432, at *5 (E.D.Pa. July 26, 1994) (same). Accordingly, in those cases, the court required the plaintiff to plead with specificity the allegations of direct violations of the FCA (because those allegations sounded in fraud), but did not require the same heightened particularity for the allegations concerning the composition and objectives of the conspiracy. As I agree with the reasoning set forth in these cases, I conclude that the plaintiff is required to allege the underlying fraud with particularity, but the allegations of the conspiracy need only satisfy the notice pleading standards of Rule 8. Therefore, to survive a motion to dismiss on the conspiracy claim, the plaintiff's complaint need only "describe 'the general composition of the conspiracy, some or all of its broad objectives, and defendant's general role in that conspiracy." *See Rose,* 871 at 336 (citations omitted).[FN16]

FN16. The court is aware that other circuit courts, as well as a few lower court decisions in this circuit, have concluded that when a plaintiff is alleging a conspiracy to defraud so that the "conspiracy alleged is directly linked to the fraud allegations," the allegations must be pleaded with particularity pursuant to the requirements of Rule 9(b).*See Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 790 (4th Cir.1999) (holding that a conspiracy claim under the FCA failed because, among other things, it was not pleaded with particularity as required by Rule 9(b)); *Hayduk v. Lanna,* 775 F.2d 441, 443 (1st Cir.1985) (applying Rule 9(b) particularity requirements to claim for conspiracy to defraud); *Segal v. Gordon,* 467 F.2d 602, 607 (2d Cir.1972) (same); *Robison v. Carter,* 356 F.2d 924, 925 (7th Cir.1966) (same); *Kronfeld v. First Jersey Nat'l Bank,* 638 F.Supp. 1454, 1468 (D.N .J.1986) (same); *Klein v. Council of Chem. Ass'ns,* 587 F.Supp. 213, 226-27 (E.D.Pa.1984) (same); *see also Palladino v. VNA of Southern NJ,* No. 96-2252, 1999 WL 793393, at *6 (D.N.J. June 30, 1999) (applying the Rule 9(b) pleading standard to a conspiracy claim under the FCA). I decline to follow these decisions, however, and instead conclude that the requirements of Rule 9(b) apply only to the plaintiff's allegations of the underlying fraud, and not the elements of conspiracy.

## C. INDIVIDUAL COUNTS

### 1. Count One: Conspiracy

**\*11** In count one of his complaint, the plaintiff alleges that "[a]ll defendants are liable to plaintiffs for conspiring to defraud the Government by carrying false and fraudulent claims and reverse false claims

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:04-cv-00186-MBC     Document 125-2     Filed 09/10/2008     Page 14 of 70

Not Reported in F.Supp.2d                                                    Page 13
Not Reported in F.Supp.2d, 2000 WL 1207162 (E.D.Pa.)

allowed or paid in violation of 31 U.S.C. § 3729(a)(3)."*See* Compl. ¶ 104.

As explained above, to state a claim for conspiracy under the FCA, a plaintiff must allege a conspiracy with one or more persons to get a false or fraudulent claim allowed or paid by the government, as well as an overt act in furtherance of the conspiracy. *See Hill, 676 F.Supp. at 1173* (citing *Blusal Meats, 638 F.Supp. at 828).*"The essence of a conspiracy under the Act is an agreement between two or more persons to commit a fraud."*Stinson, 721 F.Supp. at 1259* (citing *Blusal Meats, 638 F.Supp. at 828).* An agreement to commit a lawful act by lawful means, however, is not actionable. *See El Amin, 26 F.Supp.2d at 164-65* (holding that there was no actionable claim for conspiracy because all of the activities alleged consisted "of entirely lawful pursuits" and, therefore, could not constitute a conspiracy to defraud.) If the plaintiff is able to show a conspiracy to commit a fraud or crime the defendants are liable for every action taken in furtherance of the conspiracy by any of the co-conspirators. *See id.* at 165 ("[A]n overt act need not be pleaded against each defendant in a conspiracy, because a single overt act by one of the conspirators can support a conspiracy claim, even on the merits.").

The threshold issue in this case, therefore, is whether the plaintiff has sufficiently alleged an agreement between any of the defendants. *See Stinson, 721 F.Supp. at 1259.* I will first examine whether the plaintiff's complaint alleges an agreement between Sun Ship and any other defendant. To make this determination, it is necessary to examine the allegations in the plaintiff's complaint concerning Sun Ship.

The plaintiff's complaint alleges two agreements between Sun Ship and Penn Ship. First, the plaintiff avers that Penn Ship and Sun Ship agreed that Sun Ship would assist Penn Ship in obtaining Navy work. *See id.* at ¶¶ 29-30.This allegation, however, does not support a finding that there was any agreement to defraud. Indeed, the allegations amount to nothing more than an agreement to act lawfully, which is not an actionable claim for an FCA conspiracy. *See El Amin, 26 F.Supp.2d at 164-65.*

Second, the plaintiff alleges that Sun Ship agreed to release Penn Ship from its restrictive covenants to permit Penn Ship to infuse money into Levingston to delay Levingston's impending bankruptcy until Penn Ship received the Oiler Contract from the Navy. *See id.* at ¶¶ 45-47.This allegation also is not an allegation of an illegal or fraudulent agreement. To make this conduct fraudulent or criminal, the plaintiff would have to allege that Sun Ship knew that the inevitable consequence of releasing Penn Ship from its restrictive covenants was that Penn Ship would fraudulently conceal its loans to Levingston from the Navy. The plaintiff's complaint is devoid of any such allegations. Instead, the plaintiff requires the court to make a large inferential leap that Sun Ship's releasing Penn Ship from restrictive covenants was the functional equivalent of misleading the Navy through the submission of fraudulent financial statements. Thus, the complaint is lacking the fundamental allegations necessary to show how the agreement was fraudulent, and without allegations of an agreement to defraud, the claim must be dismissed. *See United States ex rel. Sanders v. East Alabama Healthcare Auth., 953 F.Supp. 1404, 1410 (M.D.Ala.1996)* (noting that absent an allegation of an agreement among the parties allegedly involved in the conspiracy the section 3729(a)(3) claim must be dismissed for failure to state a claim); *Wilkins, 885 F.Supp. at 1063* (holding that conclusory allegations of an agreement are insufficient to state a claim for conspiracy under section 3729(a)(3)); *Stinson, 721 F.Supp. at 1259* (dismissing conspiracy claim because the complaint was "void of any allegations of an agreement and thus fails to state a claim under section 3729(a)(3)"). Although it is true that the plaintiff need only satisfy the notice pleading requirements of Rule 8 for the allegations of the conspiracy, the plaintiff's complaint fails even under this liberal standard. By not so much as alleging an agreement to do something illegal, or to do something legal by illegal means, the plaintiff fails to give the defendants notice of the precise misconduct with which they are charged. Thus, because the complaint lacks any allegations supporting an agreement to commit a fraudulent act entered into by Sun Ship and any other defendant, [FN17] the court will dismiss the claim for conspiracy against Sun Ship under the FCA without prejudice.[FN18]

> FN17. Even if the plaintiff's conspiracy claim against Sun Ship were pleaded adequately, which it is not, Sun Ship argues that this claim is barred by the applicable statute of limitations. The plaintiff and Sun

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                Page 14
Not Reported in F.Supp.2d, 2000 WL 1207162 (E.D.Pa.)

Ship both agree that a six-year statute of limitations applies to this case. *See* Sun Ship's Memo. at 15; Plaintiff's Opp. at 34. Sun Ship argues that the statute of limitations bars the action because the alleged conspiracy achieved its "goal" when the Oiler contract was awarded to Penn Ship on May 6, 1985, and the claim was not brought within six years of that date. *See* Sun Ship's Memo. at 15. The plaintiff, on the other hand, contends that he alleges a conspiracy "to maintain that contractual relationship so as, *inter alia,* to obtain the payments occasioned by the false claims...."*See* Plaintiff's Opp. at 34. Therefore, the plaintiff contends that the statute of limitations did not begin to run until after all of the payments were made under the contract. *See id.*

The court may consider a statute of limitations defect in a motion to dismiss "where the complaint facially shows noncompliance with the limitations period and the affirmative defense [of a statute of limitations defect] appears on the face of the pleading."*Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 n. 1 (3d Cir.1994). Therefore, if it is clear from the face of the plaintiff's complaint that the statute bars the action, then the complaint shall be dismissed.

In this case, to determine whether the statute of limitations bars the conspiracy claim, the main inquiry is when the statute began to run. In the Third Circuit, the statute of limitations period for a civil conspiracy "runs from each overt act causing damage."*See Wells v. Rockefeller,* 728 F.2d 209, 217 (3d Cir.1984), *cert. denied,*471 U.S. 1107 (1985); *Drum v. Nasuti,* 648 F.Supp. 888, 903 (E.D.Pa.1986), *aff'd,*735 F.2d 1348 (3d Cir.1984) ("[I]n making this assessment, courts distinguish between continuing unlawful acts, and continued ill effects from an original violation"). Therefore, in this circuit, "[f]or each act causing injury, a claimant must seek redress within the prescribed limitations period."*See Wells,*

728 F.2d at 217. The decision of whether the plaintiff has sought redress within the limitations period for each act causing injury can not be determined based on the allegations in the plaintiff's complaint. As a result, further development of the record is necessary before the court can determine whether the statute of limitations period for this conspiracy claim bars the action.

FN18. Because I have concluded that the plaintiff fails to state a claim for conspiracy, it is unnecessary to decide, at this time, whether Sun Ship is correct in its contention that section (a)(3) does not impose liability for a reverse false claims conspiracy. *See* Sun Ship's Memo. at 17. For the same reason, it is unnecessary to determine whether, if such a claim does exist, it would be applied retroactively so as to impose liability for a reverse false claims conspiracy arising out of conduct occurring before 1986. *See id.* at 15-16.

**\*12** Turning now to the claim of conspiracy against Fidelity, the threshold inquiry is whether the plaintiff has sufficiently alleged an agreement to defraud the government entered into by Fidelity. Examining the plaintiff's allegations in the light most favorable to the plaintiff, I find that the plaintiff has not alleged sufficiently such an agreement to defraud the government. Although the plaintiff does claim that Fidelity never recorded the Navy's security interests, he does not claim, in any more than a conclusory fashion, that this was the result of any agreement to defraud. *See* Compl. ¶¶ 70, 104. Indeed, any agreement alleged against Fidelity is alleged in an entirely conclusory fashion. *See id.* ¶ 104.The complaint does not even make clear whether the plaintiff is alleging that Fidelity conspired with Sun Ship, Penn Ship, or some other unknown entity. *See id.* ¶¶ 70-75, 104.Thus, the plaintiff's allegations of an agreement to conspire on the part of Fidelity are woefully insufficient.

In the plaintiff's response to the motions to dismiss, he argues that "the Complaint alleges agreement among all the parties and, in fact, active participation. Fidelity's breach of duty, and its multiple acts in connection therewith, constituted such

Not Reported in F.Supp.2d                                        Page 15
Not Reported in F.Supp.2d, 2000 WL 1207162 (E.D.Pa.)

participation."Plaintiff's Opp. at 31. It may be true that the allegations sufficiently plead the commission of overt acts by Fidelity. These allegations, however, do not alleviate the plaintiff's task of also pleading a vital part of the conspiracy, that is, the existence of an agreement to defraud. Here, there is no allegation that Fidelity agreed with another defendant to defraud the government. Thus, the court will dismiss the conspiracy claim against Fidelity.

For the same reasons that the court finds that the complaint does not state a claim for conspiracy against Sun Ship or Fidelity, the court finds that the complaint does not contain sufficient allegations of an agreement between Penn Ship and any other person or entity to defraud the government. Thus, the plaintiff's complaint also fails to state a claim against Penn Ship for conspiracy. Accordingly, the conspiracy claims against the defendants will be dismissed without prejudice and the plaintiff shall be granted leave to amend this count.

2. Count Two: Penn Ship's September 30, 1984, Financial Statement

In count two, the plaintiff alleges that Penn Ship and Sun Ship "knowingly made, used, or caused to be made or used a false record or statement, namely, [Penn Ship's] financial statement for the fiscal year ending September 30, 1984, to get false or fraudulent claims paid or approved in violation of 31 U.S.C. § 3729(a)(2)." Compl. ¶ 105. Specifically, the plaintiff alleges that although this statement reflected the fact that Levingston owed Penn Ship a significant amount of money, the statement did not contain the loss allowance required by generally accepted accounting principles ("GAAP") and was, thus, a false statement. See id. ¶¶ 44, 105.This allegation is not, however, sufficiently particular under Rule 9(b) to allow the survival of this claim.

*13 In Christidis v. First Pa. Mortgage Trust, 717 F.2d 96 (3d Cir.1983), a fraud action in which the acts alleged were fraudulent only because they violated GAAP, the Third Circuit held that in such a case Rule 9(b) requires a plaintiff to allege with particularity what specific provisions of GAAP were violated and the manner in which the violation occurred.[FN19]See id. at 100; Shapiro v. UJB Fin. Corp., 964 F.2d 272, 284 (3d Cir.) (noting, with approval, the court's holding in Christidis that the

fraud claim would be dismissed in large part "because of failure to identify accounting or auditing standards"), cert. denied,506 U.S. 934 (1992); In re Ikon Office Solutions, No. 98-CV-4286, 1999 WL 734578, at *13 n. 18 (E.D.Pa. Sept. 14, 1999) (acknowledging the Third Circuit's holding in Christidis );see also In re Midlantic Corp. Shareholder Litig., 758 F.Supp. 226, 233 n. 3 (D.N .J.1990) (noting that the holding in Christidis was dependent on falsity turning only on a violation of GAAP). Count two contains the same kinds of allegations as those in Christidis, and, thus, must satisfy the same particularity requirements. The plaintiff claims that Penn Ship's September 30 financial statement was false solely because it violated GAAP. As Penn Ship correctly argues, the plaintiff makes no mention, however, of which particular provisions of GAAP were violated nor the manner in which the violations occurred. See Penn Ship's Memo. at 17 n. 13. Hence, count two's allegations of falsity fail to satisfy the particularity requirements of Rule 9(b) as set forth in Christidis.

> FN19. The facts in this case are distinguishable from the facts in In re Craftmatic Sec. Litig. v. Kraftson, 890 F.2d 628 (3d Cir.1989). The Third Circuit in In re Craftmatic approved the application of a relaxed Rule 9(b) standard when the facts on which fraud turned were "peculiarly within the defendant's knowledge or control."See id. at 645. Here, the plaintiff does not contend that the facts giving rise to the alleged fraud in count two were "peculiarly within the defendant's knowledge or control," but rather, were dependent solely on GAAP. Thus, In re Craftmatic does not dictate the result here.

In its motion to dismiss, Sun Ship contends that there is another separate reason to dismiss count two against Sun Ship. Sun Ship argues that these direct claims consist of allegations of fraud based on nondisclosure, and that there can be no liability for failure to disclose information absent a duty to disclose. See Sun Ship's Memo. at 18-24. The essence of Sun Ship's argument is that it did not defraud the Navy itself, it merely was aware of the fraud perpetrated on the Navy by Penn Ship and failed to disclose this fraud. See id.Sun Ship argues that it cannot be liable for failing to disclose the fraudulent

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 16
Not Reported in F.Supp.2d, 2000 WL 1207162 (E.D.Pa.)

acts committed by another unless it had an affirmative obligation to disclose this information, which it did not have. *See id.*

As support for this proposition, Sun Ship relies substantially on a decision from a court in this district, *United States ex rel. Piacentile v. Wolk,* No. 93-5773, 1995 WL 20833, at *4 (E.D.Pa. Jan. 17, 1995). In particular, Sun Ship points to the finding in *Wolk* that "[m]ere inaction is not enough to constitute a violation of the False Claims Act."*See* Sun Ship's Memo. at 22 (quoting *Wolk,* 1995 WL 20833, at *4). The decision in *Wolk,* however, is distinguishable from the case at hand.

In *Wolk,* the United States brought an FCA action against three defendants, Wolk, Miller, and Advanced Care Associates ("Advanced Care").*See Wolk,* 1995 WL 20833, at *1. Miller and Wolk owned Advanced Care, which was a corporation engaged in the business of selling medical equipment. *See id.*The plaintiff in *Wolk* alleged that employees of Advanced Care, acting on the instructions of Wolk, had submitted false claims for payment under the Medicaid program. *See id.*The allegations involving Miller alleged that he knew about the submission of false documents to the government and failed to "[take] steps to ensure that Advanced Care discontinued the practice."*Id.* It was also alleged Miller knew that Wolk had destroyed evidence in the case. *See id.*

*14 Wolk and Miller both moved to dismiss the plaintiff's complaint for failure to state a claim. *See id.* at *2. The court denied Wolk's motion, but granted Miller's motion to dismiss. *See id.* at *3-4.The court held that Miller could not be held liable for his individual actions "based simply on the allegations that he knew of the fraud and the record destruction."*See id.*The court explained that the plaintiff had "alleged no actions on the part of defendant Miller that constitute 'presenting, or causing to be presented' a false or fraudulent claim. Mere inaction is not enough to constitute a violation of the False Claims Act."*Id.* at *4.

Unlike the defendant Miller in *Wolk,* Sun Ship did not merely know about the fraud committed by Penn Ship and fail to disclose it. Here, the plaintiff alleges that Sun Ship did act by releasing Penn Ship from its restrictive covenants. The issue, therefore, is whether

these actions by Sun Ship caused the submission of false claims so as to trigger liability under section 3729(a)(2) of the FCA. *See*31 U.S.C. § 3729(a)(2).

As discussed above, the plaintiff's complaint includes allegations that, among other things, Sun Ship released Penn Ship from restrictive covenants to permit Penn Ship to infuse capital into the failing, and imminently bankrupt, Levingston. *See* Compl. ¶¶ 45-47.These allegations fail to establish that Sun Ship in any way "made, used or caused to made or used" false statements by Penn Ship to cause Penn Ship to submit claims to the Navy. Nowhere in the complaint is it alleged, much less with the particularity required by Rule 9(b), how the actions of Sun Ship caused Penn Ship to make misrepresentations to the Navy. The plaintiff fails to allege how the release of restrictive covenants by Sun Ship caused Penn Ship to submit false claims. Thus, although the plaintiff may have alleged that Sun Ship caused some of the circumstances that led to the submission of false claims, the plaintiff has not pleaded with adequate specificity any allegations that Sun Ship caused the submission of false claims.[FN20]

> FN20. The typical situation in which a defendant is held liable for "causing" another party to submit a false claim occurs when a subcontractor submits false information to a prime contractor who, in turn, submits the claim to the government. *See, e.g., United States v. Bornstein,* 423 U.S. 303 (1976). In such a case, it is no defense that the subcontractor did not itself submit the false claim to the government; it caused the submission and, thus, is liable under the FCA. *See id.* at 313.That is simply not the case here.

For all of the foregoing reasons, the court will grant Penn Ship's and Sun Ship's motions to dismiss count two and will dismiss this count without prejudice.

3. Count Three: Penn Ship's December 31, 1984, Financial Statement

In count three, the plaintiff alleges that Penn Ship and Sun Ship "knowingly made, used, or caused to be made or used a false record or statement, namely, [Penn Ship's] interim financial statement for the period ending December 31, 1984, to get false or

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                    Page 17
Not Reported in F.Supp.2d, 2000 WL 1207162 (E.D.Pa.)

fraudulent claims paid or approved in violation of 31 U.S.C. § 3729(a)(2)." Compl. ¶ 106. Specifically, the plaintiff alleges that this December financial statement was false because it did not reflect Penn Ship's guarantees of over four million dollars of CMC's debts that existed on December 31, 1984, and that disclosure of these guarantees would have jeopardized Penn Ship's chances of being awarded the Oiler Contract.[FN21] *See id.* at ¶¶ 47-49. Count three survives as it relates to Penn Ship, but does not as it relates to Sun Ship.

> FN21. Penn Ship's contention that the guarantees did not exist until the summer of 1985 and, hence, did not belong on the December 31, 1984, financial statement, *see* Penn Ship's Memo. at 17-18, deals with contested issues of material fact not properly considered in deciding a motion to dismiss.

**\*15** As stated earlier at greater length, in order to state a claim for a violation of section 3729(a)(2), a plaintiff must allege with particularity that a defendant used a false or fraudulent statement to get a false or fraudulent claim approved or paid by the government. *See Stinson, 721 F.Supp. at 1259;* Fed.R.Civ.P. 9(b). The plaintiff must also claim that the defendant did those acts knowingly, but such knowledge may be averred generally. *See* Fed .R.Civ.P. 9(b).

With respect to count three, the plaintiff has alleged that Penn Ship used a false statement-i.e., the December 31, 1984, financial statement-to deceive the Navy into approving the Oiler Contract. *See* Compl. ¶¶ 47-49. The plaintiff has also alleged that this use occurred with Penn Ship's knowledge. *See id.* ¶ 106. The court finds that the plaintiff makes these allegations, including those concerning the falsity of the financial statement, with sufficient particularity to satisfy the requirements of Rule 9(b) and to place Penn Ship on notice as to the specific bad acts with which it is being charged. Thus, the plaintiff has stated a claim against Penn Ship upon which relief can be granted in count three and, consequently, I will deny Penn Ship's motion to dismiss with respect to count three.

I will, however, grant Sun Ship's motion to dismiss this count. As with count two, the averments do not allege how Sun Ship "caused" Penn Ship to submit

false claims to the Navy. *See supra* Part III.C.2. For this reason, I will grant Sun Ship's motion to dismiss count three and will dismiss without prejudice this count against Sun Ship.

4. Count Four: The Best and Final Proposal

In count four, the plaintiff claims that Penn Ship and Sun Ship "knowingly made, used, or caused to be made or used a false record or statement, namely, [Penn Ship's] Best and Final Proposal, to get false or fraudulent claims paid or approved in violation of 31 U.S.C. § 3729(a)(2)." Compl. ¶ 107. Specifically, the plaintiff alleges that Penn Ship deliberately and knowingly understated its estimated costs in the Best and Final Proposal it submitted to the Navy to get the Oiler Contract and points to the omission of the potentially significant cost of architectural and naval drawings for the ships, as well as the cost of any delay associated with preparing such drawings, as an example of this understatement.[FN22] *See id.* ¶¶ 59-60, 107. Further, the plaintiff contends that the Navy relied on the Best and Final Proposal and the numbers contained therein when it awarded the Oiler Contract to Penn Ship. *See id.* ¶ 60.

> FN22. Penn Ship contends that the drawings cost allegations concern an omission only of the cost of preparing the drawings, not the cost of purchasing the drawings from Avondale, which had already built four identical Oilers and prepared such drawings. *See* Penn Ship's Memo. at 15. Penn Ship's interpretation of the plaintiff's allegations, while legitimate, is not the only reasonable interpretation. The complaint states that Penn Ship's "proposal omitted the cost of architectural and naval drawings for the Oilers-millions of dollars-or the incremental delay required to prepare such drawings and the additional financial consequences of that delay." Compl. ¶ 60. Construing the plaintiff's allegations concerning the drawings in the light most favorable to him, as I must when considering a motion to dismiss, I find that the plaintiff claims the omission of the cost of obtaining drawings by any means, whether by preparation or purchase.

As Penn Ship correctly notes, *see* Penn Ship's Memo.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                      Page 18
Not Reported in F.Supp.2d, 2000 WL 1207162 (E.D.Pa.)

at 14-15, the plaintiff's general claims of deliberately understated estimated costs are not sufficiently particular to allege falsity under the Rule 9(b) standard. His specific allegations regarding the falsity of the omission of the cost of drawings do, however, meet the particularity requirements of Rule 9(b). Thus, the plaintiff has alleged with sufficient particularity that Penn Ship knowingly used its Best and Final Proposal, a statement that contained false information, to get the Navy to approve its bid for the Oiler Contract and award the job to Penn Ship. The court finds that the plaintiff has stated a claim against Penn Ship upon which relief can be granted in count four and will deny Penn Ship's motion to dismiss as it relates to that count.

**\*16** This claim as alleged against Sun Ship, however, cannot survive. As with counts two and three, there are no factual allegations in the plaintiff's complaint concerning how Sun Ship "caused" Penn Ship to submit a false statement in the form of the Best and Final Proposal. Accordingly, I will dismiss count four without prejudice as to Sun Ship.

5. Count Five: The Weller Letter

In count five, the plaintiff claims that the March 15, 1985, letter from Penn Ship's Chairman, Thomas Weller, to the Navy violated section 3729(a)(2) because it was a false statement that was knowingly used to get a fraudulent claim approved by the government. *See* Compl. ¶¶ 64, 108. The plaintiff contends that the Weller Letter was a false statement for three reasons: (1) Weller stated that significant cost overruns were highly unlikely despite the fact that such overruns were likely and expected; (2) Weller stated that the trust that would be created by the Trust Indenture would be "irrevocable," as Penn Ship and the Navy understood that word, when the trust to be created by the Trust Indenture was clearly not irrevocable; and (3) Weller stated that the security interest that would represent the *res* of the trust would cover "the entire Penn Ship facility" while, in fact, it would omit seven acres of property housing, among other things, administrative offices. *See id.* ¶¶ 65, 68.The plaintiff alleges that all of these false statements were intended to, and actually did, induce the Navy to accept the Trust Indenture and award the Oiler Contract to Penn Ship instead of re-opening bidding to include performance bonds. *See id.* ¶¶ 64, 66.Penn Ship argues that the three

statements complained of were not false or, alternatively, that falsity was not alleged with sufficient particularity. *See* Penn Ship's Memo. at 19-21. For the reasons explained below, the court holds that the plaintiff has stated claims upon which relief can be granted with sufficient particularity in all parts of count five. Consequently, Penn Ship's motion to dismiss as it relates to that count will be denied.

a. Significant Cost Overruns Are Highly Unlikely

With respect to the statement regarding the likelihood of significant cost overruns, Penn Ship contends that the plaintiff's allegations concerning this statement simply revisit the earlier, insufficiently particular allegations that Penn Ship deliberately understated its expected costs in its Best and Final Proposal. *See id.* at 20. This statement about the likelihood of significant cost overruns could refer to the previous general allegations of understatement, but it could also refer to the previous particular allegations that Penn Ship deliberately omitted the cost of drawings from its Best and Final Proposal. Considering the plaintiff's allegations in the light most favorable to him, as I must, I find that he claims that the Weller Letter's statement that significant cost overruns were highly unlikely was false because the cost of the drawings had not been included in the Best and Final Proposal and would, when paid, represent a significant cost overrun. Thus, the plaintiff alleges that a significant cost overrun was not only likely but virtually inevitable given the necessity of obtaining drawings before building the Oilers.

**\*17** Penn Ship's concerns that this allegation represents a second claim for the same false statement remain, though, regardless of whether the falsity is due to general or particular allegations of cost overruns. The plaintiff's allegation is not, however, that Weller simply resubmitted the Best and Final Proposal. Instead, he claims that Weller reaffirmed the truth of the earlier falsehood as further inducement to get the Navy to accept the Trust Indenture and award the Oiler Contract to Penn Ship instead of re-opening bidding. *See* Compl. ¶¶ 64, 66. In other words, the plaintiff alleges that had Weller failed to confirm his belief in the accuracy of Penn Ship's Best and Final Proposal, the Navy would have re-opened bidding. This allegation of an FCA violation can, thus, be distinguished from the earlier allegations about the Best and Final Proposal. As a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 19
Not Reported in F.Supp.2d, 2000 WL 1207162 (E.D.Pa.)

result, the court finds that the plaintiff has alleged with sufficient particularity that Weller knowingly made this false statement regarding the likelihood of cost overruns to fraudulently induce the Navy to award Penn Ship the Oiler Contract.

b. The Trust to Be Created Will Be Irrevocable

With respect to Weller's statement that the trust to be created by the Trust Indenture would be irrevocable, Penn Ship argues that the trust was an irrevocable trust because it could not be revoked after its creation and, thus, that this statement was not false. *See* Penn Ship's Memo. at 20-21. If the word "irrevocable" was used in its legal sense in the Weller Letter, then Penn Ship is correct that the statement was true because a trust is irrevocable unless the power to revoke it is expressly reserved, and no such reservation is alleged. *See* *Restatement (Second) of Trusts* § 330 (1957). If, however, a different meaning were ascribed to the word "irrevocable," then the statement might, in fact, be false.

In his complaint, the plaintiff alleges that the fact that the trust would be "irrevocable" meant that, in the event of a default, the trust protected the Navy's rights under the Oiler Contract to enter Penn Ship's property and use its equipment, including the floating derrick, to complete construction of the ships.[FN23] *See* Compl. ¶ 68. Given the fact that the drydock was both essential to the construction of the Oilers at the Chester Yard and a unique item, *see* Compl. ¶¶ 33, 68, if the trust allowed the drydock to be sold and removed from the Chester Yard, the trust would not be "irrevocable" under the meaning alleged by the plaintiff. The plaintiff makes just such a claim regarding the provisions of the proposed trust: it would create a fifteen day period between a default event and foreclosure, thereby allowing the drydock to be sold and removed and leaving the Navy with a security interest in the proceeds of the sale of the drydock but not the drydock itself. *See id.* ¶ 65(ii). Thus, the plaintiff's complaint does contain allegations that Weller's statement regarding the irrevocability of the proposed trust was false. The court finds that the plaintiff has alleged with sufficient particularity that Weller knowingly made a false statement as to the proposed trust's irrevocability to trick the Navy into accepting the Trust Indenture and awarding the Oiler Contract to Penn Ship.

FN23. Whether the word "irrevocable" was actually used in the Weller Letter in its legal sense, as argued by Penn Ship, or in the sense alleged by the plaintiff is an issue of fact not properly considered by the court at this time.

c. The Security Interest Will Be in the Entire Facility

*18 Finally, Penn Ship claims that the Weller Letter's statement that the trust's security interest would be "in the entire Penn Ship facility" was not false despite the fact that the property subject to the security interest did not actually contain seven acres of Penn Ship property, including the space housing administrative offices. *See* Penn Ship's Memo. at 21. To support this contention, Penn Ship makes two arguments. First, Penn Ship claims that the meaning of the phrase "the entire Penn Ship facility" on its face excludes those seven acres because that property did not contain "ship repair or construction facilities." *Id.* Second, Penn Ship contends that even if the phrase on its face did not exclude the property in question, the meaning of the phrase must depend on the metes and bounds description contained in the Trust Indenture that accompanied the Weller Letter. *See id.* Although Penn Ship's interpretation of the phrase "the entire Penn Ship facility" is reasonable, the plaintiff's interpretation is also reasonable-that the property in question was included in the description "the entire Penn Ship facility" on its face and that the metes and bounds description did not clearly communicate to the Navy the omission of the seven acres.[FN24] Given the fact that I must consider the allegations in the light most favorable to the plaintiff, I conclude that he has alleged with sufficient particularity that Weller knowingly made a false statement regarding the scope of the security interest protecting the Navy in the event of a Penn Ship default in order to fool the Navy into accepting the Trust Indenture and awarding the Oiler Contract to Penn Ship instead of re-opening bidding.

FN24. Whether the phrase "the entire Penn Ship facility" included or excluded the seven acres is a question of fact not properly considered at this time.

6. Count Six: The Trust Indenture

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1207162 (E.D.Pa.)

In count six, the plaintiff claims that "[Penn Ship] and Fidelity knowingly made, used, or caused to be made or used a false record or statement, namely, the Trust Indenture, the security interests of which they intended not to be perfected, to get false or fraudulent claims paid or approved, in violation of 31 U.S.C. § 3729(a)(2)." Compl. ¶ 109. Specifically, the plaintiff alleges that although Penn Ship had no intention of carrying out its promise, Penn Ship promised in the Trust Indenture to perfect the Navy's security interest in a successful attempt to get the Navy to approve the Trust Indenture and award Penn Ship the Oiler Contract instead of re-opening the bidding to include performance bonds.[FN25] *See id.* ¶¶ 70, 109.

> FN25. The complaint does not, in so many words, allege a promise on the part of Penn Ship to perfect the Navy's security interest. It does, however, claim the functional equivalent: that Penn Ship created and signed a Trust Indenture "that imposed on [Penn Ship] the task of recording those [security] instruments."Compl. ¶ 70.

The falsity of Penn Ship's statement regarding its promise to perfect the Navy's security interest turns on whether Penn Ship intended to carry out this promise at the time it was made. *See Lamers,* 998 F.Supp. at 987. Consequently, Penn Ship's intent-or facts sufficient to give rise to a strong inference of this intent-at the time it made this promise must be pleaded with particularity. *See supra* Part III.B.1. Penn Ship argues that the complaint simply does not contain any facts from which an inference of Penn Ship's intent not to perform at that time can be drawn. *See* Penn Ship's Memo. at 21-22. The court agrees.

**\*19** The plaintiff offers allegations that Penn Ship mortgaged the floating derrick, in which the Navy had a security interest under the Trust Indenture, to Fidelity in December, 1986, after a previous mortgage was satisfied. *See* Compl. ¶ 73. Because the Navy's security interest in the derrick had not been perfected, Fidelity's perfected interest under the mortgage became senior to the Navy's interest. *See id.*A reasonable inference from these allegations is that the second mortgage either would not have been made or would not have been for as much if the Navy's security interest had been perfected and, thus, senior to the interest created by any second mortgage. Although these allegations are sufficient to give rise

to a strong inference that in December, 1986, Penn Ship intended not to fulfill its promise to perfect the Navy's security interest, they are insufficient to give rise to the inference that Penn Ship possessed that intent one and one-half years earlier when the Trust Indenture was drafted and accepted. *See generally Shah,* 44 F.3d at 293 n. 14 (acknowledging that mere nonperformance of a promise does not give rise to an inference of an intent not to perform at the time the promise was made absent the existence of other factors such as the passage of only a short period of time between the promise to perform and the failure to perform). Because Penn Ship's promise to perform is false only if Penn Ship possessed the intent not to perform at the same time that it made the promise, and because the plaintiff has made no allegation that Penn Ship possessed the requisite intent at that time, the court holds that the plaintiff has failed to plead the falsity of the alleged false statement with the requisite particularity. As a result, I will grant Penn Ship's motion to dismiss with respect to count six and will dismiss count six as it relates to Penn Ship without prejudice.

For the same reason, this claim fails to state a claim against Fidelity because there are no allegations that any promise to perform made by Fidelity was false at the time it was made.[FN26]Thus, I will also grant Fidelity's motion to dismiss with respect to count six and will dismiss this count as it relates to Fidelity without prejudice.

> FN26. It is unclear from the complaint that the Trust Indenture contained a promise to perform on Fidelity's part. Because count six fails for another reason to state a claim against Fidelity on which relief can be granted, I do not reach this issue.

### 7. Count Seven: Failure to Perfect the Navy's Security Interest

In count seven, the plaintiff claims that Penn Ship and Fidelity violated section 3729(a)(4) because they had control over property to be used by the Navy, and, with the intent to defraud the Navy, they delivered to the Navy less property than the amount for which the Navy received a receipt. *See* Compl. ¶¶ 70, 110. Specifically, the plaintiff alleges that the Trust Indenture was effectively a receipt issued by Penn Ship and Fidelity to the Navy for the delivery of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1207162 (E.D.Pa.)

perfected security interests but that Penn Ship and Fidelity delivered no more than the unperfected security interests. *See id.* ¶¶ 70, 110.

The plaintiff's allegations, however, reveal a misunderstanding of the elements required for a violation of section 3729(a)(4). The plaintiff claims that Penn Ship and Fidelity issued a fraudulent receipt to the Navy, not that the Navy gave Penn Ship and Fidelity a receipt that did not accurately reflect the amount and kind of property that was delivered to the Navy by Penn Ship and Fidelity. The cases to consider the elements of a section 3729(a)(4) violation are clear that the plaintiff must show that a receipt was issued by the government to the defendant, not the other way around. *See United States ex rel. Aakhus v. Dyncorp, Inc.,* 136 F.3d 676, 681 (10th Cir.1998); *Stinson,* 721 F.Supp. at 1259. Because the plaintiff has made no allegation that the government issued any kind of receipt to Penn Ship or Fidelity in recognition of property delivered by Penn Ship and Fidelity, an essential element of an FCA claim under section 3729(a)(4), the court has no choice but to find that the plaintiff has not stated a claim in count seven upon which relief can be granted. Therefore, the court will grant Penn Ship's and Fidelity's motions to dismiss with respect to count seven and dismiss count seven without prejudice.

**\*20** **8. Counts Eight and Nine: Inducement of First and Second Option Exercises**

Counts eight and nine are essentially the same. In both counts eight and nine, the plaintiff claims that Penn Ship violated section 3729(a)(2) because it knowingly made a false statement to the Navy in both Modification P00001 and Modification P00003 to reassure the Navy of Penn Ship's ability to build the Oilers and to induce the Navy to order another Oiler. *See* Compl. ¶¶ 76-77, 111-12. Specifically, the plaintiff contends that in signing these modification documents on behalf of Penn Ship, Penn Ship's President, Ronald Stevens, confirmed that the terms of the Best and Final Offer were bona fide when, in fact, the terms of the Best and Final Offer were not.[FN27]*See id.* ¶¶ 76-77, 111-12.Having already concluded that the plaintiff pleaded sufficiently particular allegations of falsity in the Best and Final Proposal to allow the survival of an FCA claim based on that falsity, *see supra* Part III.C.4, as well as the

survival of an FCA claim against Penn Ship based on a later statement confirming the accuracy of the terms of the Best and Final Proposal, *see supra* Part III.C.5, the court finds that the falsity of the statement in the modifications confirming for a second time the truth of the terms of the Best and Final Proposal was pleaded with sufficient particularity to survive a Rule 9(b) inquiry. Because all other elements of a section 3729(a)(2) violation have been pleaded with sufficient particularity, the court holds that the plaintiff has stated claims upon which relief can be granted in counts eight and nine and will deny Penn Ship's motion to dismiss with respect to these two counts.

> FN27. The truth or falsity of statements on which the Navy is alleged to have relied in agreeing to these modifications, *see* Compl. ¶¶ 76-77, is not necessarily relevant to the falsity of the statements complained of in the operative paragraphs of counts eight and nine. *See id.* ¶¶ 111-12.The false statements complained of are the modification documents themselves. *See id.*Thus, absent allegations that the modification documents contained those statements-such as the allegation in paragraphs 111 and 112 that signing the modification documents re-represented the bona fide nature of the Best and Final Proposal-counts eight and nine do not allege an FCA violation based on the falsity of those statements. *See id.* ¶¶ 111-12.

**9. Counts Ten and Eleven: Modifications 5 and 11**

Counts ten and eleven are also essentially the same. In both of these counts, the plaintiff claims that Penn Ship violated sections 3729(a)(2) and (a)(7) because it knowingly made a false statement to the Navy in both Modification P00005 and Modification P00011 to get the Navy to release Penn Ship from its obligation to build the two extra Oilers and/or to get the Navy to continue making payments for the construction of the two original Oilers.[FN28]*See* Compl. ¶¶ 80-81, 83, 113-14. Specifically, the plaintiff alleges that each Modification constituted a promise by Penn Ship to complete work on the two original Oilers for a certain price and that Penn Ship had no intention of completing that work when it made these promises. *See id.* ¶¶ 81, 113-14.The court

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1207162 (E.D.Pa.)

finds that the plaintiff has not pleaded the falsity of these promises with sufficient particularity to allow the survival of these claims.

> FN28. As in counts eight and nine, *see supra,* the truth or falsity of statements on which the Navy is alleged to have relied in agreeing to these modifications, *see* Compl. ¶ 82, is not necessarily relevant to the falsity of the statements complained of in the operative paragraphs of counts ten and eleven. *See* Compl. ¶¶ 113-14.Thus, absent allegations that the modification documents contained those statements, counts ten and eleven do not allege an FCA violation based on the falsity of those statements.

As in count six, the falsity of Modifications P00005 and P00011 turns on Penn Ship's intent at the time it entered into those agreements. Penn Ship's promises to build the two original Oilers for a specific price were false only if it intended not to perform at the time it made those promises. *See Lamers,* 998 F.Supp. at 987. Because the falsity of these statements turns on Penn Ship's specific intent, Rule 9(b) requires the plaintiff to allege with particularity that intent or facts sufficient to give rise to a strong inference of that intent. *See supra* Part III.B.1. The plaintiff fails to do so. Although he alleges generally that Penn Ship possessed such intent when it entered into the modifications, the plaintiff makes no particular claims regarding Penn Ship's intent or facts sufficient to lead to any inference that Penn Ship possessed this intent. *See* Compl. ¶¶ 81, 113-14. For this reason, the plaintiff does not allege the falsity of the false statements with the particularity required by Rule 9(b). Because an element of both section 3729(a)(2) and (a)(7) violations is a false statement, the plaintiff's failure to plead that element with particularity is fatal to his claims in counts ten and eleven Therefore, the court will grant Penn Ship's motion to dismiss with respect to counts ten and eleven and will dismiss those counts without prejudice.

**10. Count Twelve: The Default Modification**

**\*21** In count twelve, the plaintiff claims that Penn Ship violated sections 3729(a)(2) and (a)(7) because it knowingly made a false statement to the Navy both to trick the Navy into paying storage fees for the partially constructed Oilers and to reduce Penn Ship's obligation to pay some of the Navy's reprocurement costs. *See* Compl. ¶¶ 87-90, 115. Specifically, the plaintiff alleges that in a security agreement entered into pursuant to the Default Modification, Penn Ship promised to use its best efforts over a period of thirteen months to sell its assets, including the floating derrick, with half of the proceeds going to pay up to five million dollars of the Navy's reprocurement costs. *See id.* ¶ 88.Further, the plaintiff states that this promise was a false statement because, at the time it made the promise, Penn Ship had no intention of carrying out that promise and using its best efforts to sell the floating derrick during the thirteen month period.[FN29]*See id.* ¶ 89.

> FN29. Penn Ship argues that even if this promise were false, such falsity would have been immaterial because the security agreement provided for the calculation of Penn Ship's payment toward the Navy's reprocurement costs as a percentage of one of two equivalent numbers: the sale price of Penn Ship's property sold during the thirteen month period and the liquidation value as determined at the end of the thirteen month period. *See* Penn Ship's Memo. at 25. Although the agreement may have provided for the calculation using one number or the other, the equivalence of the numbers is an issue of fact not properly considered by the court at this time.

Again, the falsity of Penn Ship's promise depends on Penn Ship's specific intent at the time it made that promise. Thus, in order to satisfy Rule 9(b) and plead the statement's falsity with particularity, the plaintiff must particularly allege Penn Ship's intent not to perform or sufficient facts to give rise to a strong inference of such intent. *See supra* Part III.B.1. He has done so. To support his allegation that Penn Ship did not use its best efforts to sell the floating derrick during the thirteen month period, the plaintiff claims that Penn Ship set up a dummy corporation less than two months after it entered into the security agreement and modification. *See* Compl. ¶ 89. Further, he states that Penn Ship sold the floating derrick to this dummy corporation less than five months after the end of the thirteen month period and that the dummy corporation resold the derrick to a third party shortly after recording its bill of sale. *See*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:04-cv-00186-MBC    Document 125-2    Filed 09/10/2008    Page 24 of 70

Not Reported in F.Supp.2d                                                            Page 23
Not Reported in F.Supp.2d, 2000 WL 1207162 (E.D.Pa.)

*id.* ¶¶ 92, 94. Although mere nonperformance of a promise will not give rise to an inference of an intent not to perform the promise at the time the promise was made, nonperformance coupled with other factors, such as the passage of only a short time between the promise and nonperformance, will give rise to such an inference. *See Shah*, 44 F.3d at 293 n. 14. Penn Ship's creation of the dummy corporation does not constitute nonperformance in and of itself, but it is alleged to be the first step in a scheme that resulted in nonperformance. *See* Compl. ¶¶ 88, 92, 94. The short period of time between the promise and what the plaintiff alleges to be the first step in a scheme not to perform the promise, considered in a light most favorable to the plaintiff, is sufficient to give rise to the inference that Penn Ship did not intend to use its best efforts to sell the floating derrick when it promised to do so. Therefore, I find that the plaintiff has pleaded the falsity of Penn Ship's statement with enough particularity to satisfy Rule 9(b). Because the plaintiff has pleaded all other elements of section 3729(a)(2) and (a)(7) violations in count twelve with sufficient particularity, I find that he has stated a claim on which relief can be granted and will deny Penn Ship's motion to dismiss this count.

11. Counts Thirteen and Fourteen: Bills of Sale of the Floating Derrick

**\*22** Counts thirteen and fourteen are essentially the same. In counts thirteen and fourteen, the plaintiff claims that Penn Ship violated section 3729(a)(7) because it knowingly made, and caused to be made, a false statement in each of two bills of sale of the floating derrick in order to conceal its obligation to pay the Navy's reprocurement costs. *See* Compl. ¶¶ 93, 116-17. Specifically, he contends that Penn Ship represented to the buyers that the derrick was free of any liens when, in fact, the derrick was still subject to a lien held by the Navy. *See id.* ¶¶ 93-94, 116-17.

Penn Ship argues that counts thirteen and fourteen must fail because no submissions, inaccurate or otherwise, were ever made to the Navy. *See* Penn Ship's Memo. at 25 n. 19. Penn Ship is correct. Although the language of the FCA does not require the false statements referred to in sections 3729(a)(2) and (a)(7) to be made to the government, at least one court has noted "that in order to have a 'reverse false claim,' the government has to be made aware of the

false statement, misrepresentation or misleading omission in some fashion." *Wilkins*, 885 F.Supp. at 1064. I agree with this statement. Consequently, because the plaintiff has made no allegations whatsoever that the Navy was made aware of Penn Ship's false statement, I find that he has not stated a claim upon which relief can be granted. As a result, I will grant Penn Ship's motion to dismiss with respect to counts thirteen and fourteen and will dismiss those counts without prejudice.

IV. *CONCLUSION*

The court finds that the plaintiff has failed to state a claim as to any count alleged against either Sun Ship or Fidelity. Accordingly, the court will grant Sun Ship's motion to dismiss (Doc. No. 84) and Fidelity's motion to dismiss (Doc. No. 83). The court finds that the plaintiff has stated a claim against Penn Ship for counts three, four, five, eight, nine and twelve of the plaintiff's complaint. Thus, Penn Ship's motion to dismiss (Doc. No. 85) will be denied as to counts three, four, five, eight, nine and twelve. Penn Ship's motion to dismiss will be granted as to all other counts brought against Penn Ship in the plaintiff's complaint. All counts dismissed will be dismissed without prejudice and the plaintiff shall be granted leave to amend within twenty days of the court's order. However, the court notes that the plaintiff filed two complaints in the original action and has now filed three complaints in this action. Thus, the third amended complaint to be filed will constitute the plaintiff's sixth attempt at pleading the cause of action. If another motion to dismiss is filed, the plaintiff is advised that it is very unlikely that any further amendments will be permitted. Therefore, the plaintiff should take great care in his next pleading to meet all of the objections set forth herein as well as any other objections raised by the defendants in their motions to dismiss which have merit but which the court did not need to resolve at this juncture.

**\*23** An appropriate order follows.

*ORDER*

AND NOW, this __ day of August, 2000, upon consideration of defendant Penn Ship Inc.'s Motion to Dismiss and Memorandum of Law (Doc. No. 85), defendant Sun Ship Inc.'s Motion to Dismiss and Memorandum of Law (Doc. No. 84), defendant First

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                    Page 24
Not Reported in F.Supp.2d, 2000 WL 1207162 (E.D.Pa.)

Fidelity Bank, N.A.'s Motion to Dismiss and Memorandum of Law (Doc. No. 83), plaintiff's Memorandum of Law in Opposition to Motions to Dismiss (Doc. No. 90), as well as the defendants' replies thereto (Doc.Nos.91-93), IT IS HEREBY ORDERED AND DECREED that:

1. Penn Ship's motion to dismiss is GRANTED IN PART AND DENIED IN PART. With respect to counts one, two, six, seven, ten, eleven, thirteen, and fourteen of plaintiff's Second Amended Complaint, Penn Ship's motion to dismiss is GRANTED and those counts are hereby DISMISSED WITHOUT PREJUDICE as they relate to defendant Penn Ship. Leave to amend those counts within twenty (20) days of the date hereof is GRANTED. With respect to counts three, four, five, eight, nine, and twelve of plaintiff's Second Amended Complaint, Penn Ship's motion to dismiss is DENIED.

2. Sun Ship's motion to dismiss is GRANTED. As they relate to Sun Ship, counts one through four of plaintiff's Second Amended Complaint are hereby DISMISSED WITHOUT PREJUDICE, and leave to amend those counts within twenty (20) days of the date hereof is GRANTED.

3. Fidelity's motion to dismiss is GRANTED. As they relate to Fidelity, counts one, six, and seven of plaintiff's Second Amended Complaint are hereby DISMISSED WITHOUT PREJUDICE, and leave to amend those counts within twenty (20) days of the date hereof is GRANTED.

E.D.Pa.,2000.
U.S. ex rel. Atkinson v. Pennsylvania Shipbuilding Co.
Not Reported in F.Supp.2d, 2000 WL 1207162 (E.D.Pa.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1686958 (E.D.Pa.)

Page 1

▬U.S. ex rel. Atkinson v. Pennsylvania Shipbuilding Co.
E.D.Pa.,2004.
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
UNITED STATES OF AMERICA ex rel., Paul E. Atkinson, Plaintiff,
v.
PENNSYLVANIA SHIPBUILDING CO. and First Fidelity Bank, N.A., Defendants.
No. Civ.A. 94-7316.

July 28, 2004.

Memorandum and Order

YOHN, J.
*1 This is a *qui tam* action brought by Paul E. Atkinson pursuant to the False Claims Act ("FCA"), 31 U.S.C. § 3729. The lawsuit stems from a pattern of fraud allegedly perpetrated by defendants Pennsylvania Shipbuilding Co. ("Penn Ship" or "PSB") and First Fidelity Bank, N.A. ("Fidelity") on the United States Navy in connection with the bidding for, and construction of, two Henry J. Kaiser class fleet Oiler ships. The case, originally filed on December 5, 1994, features an extensive factual and procedural history, both of which have been delineated at length in two prior opinions by this court. *See Atkinson v. Pennsylvania Shipbuilding Co.,* 2000 WL 1207162 (E.D.Pa. Aug. 24, 2000) ("*Atkinson I*"); *Atkinson v. Pennsylvania Shipbuilding Co.,* 255 F.Supp.2d 351 (E.D.Pa.2002) ("*Atkinson II*").

In his third amended complaint Atkinson asserted twelve claims against defendants, all but one of which I dismissed in *Atkinson II.*Presently before the court are defendants' motions for summary judgment with respect to plaintiff's remaining claim, which asserts that defendants conspired to defraud the U.S. Navy in violation of the FCA. Having considered each of the parties' submissions and the arguments raised therein, I will grant summary judgment for defendants.

I. FACTUAL BACKGROUND

Because the vast majority of the factual and procedural history of this ten-year old case is not relevant to the motions before me, I will reiterate only those facts which give rise to plaintiff's claim for conspiracy.

In 1984, the Navy solicited bids for the construction of oil tanker ships. Penn Ship sought this contract ("Oiler Contract") and ultimately was determined to have submitted the lowest bid. Before the Oiler Contract was awarded to Penn Ship, however, the Navy requested that Penn Ship secure it against the reprocurement costs it would incur should Penn Ship default on the contract.[FN1] To address the Navy's concerns, Penn Ship proposed to secure the Navy through the creation of a trust which, by naming the Navy as the beneficiary, would provide a layer of financial comfort and security to the Navy.[FN2]Penn Ship then drafted this Trust Indenture-akin to an escrow agreement-for which Fidelity served as trustee.[FN3]

> FN1. According to Shauna Russell, a Navy attorney, because Penn Ship was the lowest responsive, responsible bidder there was no legal basis to withhold award of the Oiler contract to Penn Ship, regardless of the presence or absence of additional security.

> FN2. Because Penn Ship proposed the trust indenture to the Navy, *see* Kimener Decl. ¶ 11, PSB App. at 343 ("Penn Ship voluntarily came forward with the idea of a trust indenture"), the Navy did not have to re-solicit bids for the Oiler contract and undertake the entire bidding process for a second time, or undergo the lengthy delay which this would entail, as would have been the case had the Navy demanded such a security arrangement from Penn Ship.

> FN3. The trust indenture was to become effective immediately upon execution of a T-AO contract between Penn Ship and the Navy for construction of the oil tankers. *See* Trust Indenture, PSB App. at 1226.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                          Page 2
Not Reported in F.Supp.2d, 2004 WL 1686958 (E.D.Pa.)

The trust indenture transferred to Fidelity, as trustee for the Navy,[FN4] second lien security interests in (1) all but seven acres of the Chester shipyard, where Penn Ship's building operations were centered; (2) all fixtures and equipment owned by Penn Ship; (3) "Drydock No.4," a floating, 70,000-ton capacity drydock; and (4) "Sun 800," an 800-ton capacity floating crane. These liens secured the Navy for up to $20 million in reprocurement costs in the event that Penn Ship's contract was terminated for default. The Navy's security interests, however, were subordinated to $18 million in existing first liens and mortgages, and provided that Penn Ship had the right to substitute additional first liens up to $24 million. *See* Trust Indenture, PSB App. at 1226. On March 26, 1985, the trust indenture was finalized and signed by all parties.

> FN4. Fidelity was paid an annual fee of $2500.00 for its services as trustee, which involved holding the security instrument documents until directed to act by the beneficiary, the Navy.

*2 The Navy awarded the Oiler contract to Penn Ship on May 6, 1985. Pursuant to its terms, the trust indenture became effective immediately upon execution of the T-AO contract between Penn Ship and the Navy for construction of the oil tankers. *See* Trust Indenture, PSB App. at 1226. Under paragraph 14 of the trust indenture Penn Ship was also required, upon award of the contract, to "promptly file all mortgages, financing statements and other documents necessary to perfect the Trustee's secured status under the Security Instruments."PSB App. at 1236.[FN5]Penn Ship, however, never recorded the documents required to perfect Fidelity's security interest in the various property and equipment identified by the trust indenture. PSB App. at 706.[FN6]

> FN5. The trust indenture provided that Penn Ship would execute several mortgages, security agreements, and financing statements. The indenture refers to them collectively as "security instruments," as will I. Some of the documents were to be recorded, others filed. For clarity I will use the word "recorded" to apply to both.

> FN6. It is this recording requirement-and

Penn Ship's subsequent failure to comply with it-which underlies the conspiracy claim before this court.

Penn Ship experienced financial difficulty in the late 1980s and was unable to complete its responsibilities under the Oiler contract. After two unsuccessful attempts to modify the financing and timing of Penn Ship's construction of the tankers, *see* Mod. 5 and Mod. 11, the Navy and Penn Ship decided on August 24, 1989, to end their contract, terminate the trust indenture, and transfer the two original oil tankers to another shipyard. *See* Mod. 17, PSB App. 159-225.

Modification 17 established Penn Ship's liability for excess reprocurement costs as a fixed liability of $19 million, which was satisfied by the transfer of Drydock No. 4 to the Navy, and a contingent liability of up to $5.09 million. PSB App. at 159-225; *see also id.* at 1054-55.The contingent liability would occur if Penn Ship was able to generate excess cash flow by liquidating its assets over the thirteen-month period following execution of Mod. 17. *Id.* As Penn Ship was unable to produce excess cash flow, the contingent liability never arose. Pl.'s Statement of Facts in Response to PSB's Facts ("Pl.'s Facts"), ¶ 87. On January 12, 1992, Penn Ship and the Navy entered into Modification 20, pursuant to which the Navy fully released Penn Ship from all responsibility and liability under the Oiler contract. PSB App. at 1090-95.

## II. PROCEDURAL BACKGROUND [FN7]

> FN7. For the complete procedural history of *Atkinson v. Pennsylvania Shipbuilding Co.,* Civ. No. 94-7316, see *Atkinson I* at *5-*6 and *Atkinson II* at 360-62.

Atkinson and his former co-relator Eugene Schorsch filed this action-their second *qui tam* action-under seal on December 5, 1994. In addition to the two defendants named in this case, Sun Ship Inc. ("Sun Ship") was originally a named defendant as well. Over the next six years this case underwent substantial delay: the government requested and received multiple extensions of time within which to inform the court of its determination of whether to intervene in the action; [FN8] plaintiffs requested and received several extensions of time within which to serve their amended complaint on the defendants so

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1686958 (E.D.Pa.)

that they could obtain an attorney; this court ordered plaintiffs to file a second amended complaint; and this action was placed in civil suspense while the Supreme Court determined that a private citizen has standing in *qui tam* actions.[FN9]

> FN8. Eventually, on June 6, 1997, the government determined not to intervene in this action. *See* Doc. # 30.

> FN9.*See Vermont Agency of Natural Resources v. United States ex rel. Stevens,* 529 U.S. 765 (2000).

**\*3** Following this delay, each defendant moved, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss every count in the second amended complaint for failure to plead allegations of fraud with sufficient particularity under Rule 9(b). On this basis, I dismissed some of plaintiff's claims against Penn Ship, without prejudice, and dismissed plaintiff's claims against Fidelity and Sun Ship in their entirety, also without prejudice. *See Atkinson I.* On October 16, 2000, Atkinson filed his third amended complaint, which dropped Sun Ship as a defendant and asserted twelve distinct claims against Fidelity and Penn Ship.

On August 30, 2002, I granted defendants' motions to dismiss plaintiff's third amended complaint in large part, holding that I lacked subject matter jurisdiction over counts 2-11. *See Atkinson II.*With respect to plaintiff's first count, which alleged a conspiracy in violation of 31 U.S.C. § 3729(a)(3), I granted defendants' motions to dismiss to the extent that plaintiff's first count is based on reverse false claims and to the extent that it is based on claims subitted prior to December 4, 1988. Defendants' motion to dismiss was denied with respect to Atkinson's first count, however, insofar as it sounded in Penn Ship's non-recording of the Navy's security instruments and Fidelity's failure to ensure such recordation.

### III. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c). This court may not resolve disputed factual issues,

but rather should determine whether there are genuine, material factual issues that require a trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). Where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," however, there is "no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quotations omitted). In order to determine whether summary judgment is appropriate in this particular case, all of the facts delineated above are stated in the light most favorable to the plaintiff as the non-moving party. *See Saldana v. Kmart Corp.,* 260 F.3d 228, 232 (3d Cir.2001). While this court will draw all reasonable inferences in plaintiff's favor, however, plaintiff must do more than rest upon mere allegations, general denials, or vague statements. *Trap Rock Indus., Inc. v. Local 825,* 982 F.2d 884, 890 (3d Cir.1992). Rather, plaintiff "must present affirmative evidence" in order to defeat a motion for summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257 (1986).[FN10]

> FN10. Plaintiff correctly points out that summary judgment may be inappropriate where competing inferences can be drawn from the undisputed facts or when a case implicates questions of "state of mind" or "intent." Resolution of summary judgment in this case, however, does not require the court to resolve disputed issues of material fact. The court has carefully and thoroughly considered the multitude of evidence in this case, and any discrepancy between the parties' factual accounts has been resolved in plaintiff's favor.

### IV. DISCUSSION

In the sole claim remaining before this court, Atkinson alleges that defendants Penn Ship and Fidelity conspired to defraud the United States in violation of 31 U.S.C. § 3729(a)(3). More specifically, Atkinson contends that Penn Ship and Fidelity agreed to defeat the Navy's security interests under the Trust Indenture by not recording its underlying security instruments. Penn Ship's participation, according to Atkinson, consisted of its failure to record, while Fidelity's role involved its failure to ensure that the security instruments were in fact recorded. By Atkinson's account, these actions

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1686958 (E.D.Pa.)

were undertaken in furtherance of an agreement, between defendants, to defraud the government out of monies and property to which it was entitled under the terms of the Oiler Contract.

A. FCA Conspiracy, 31 U.S.C. § 3729(a)(3)

*4 To state a claim under the FCA for conspiracy pursuant to section 3729(a)(3), a plaintiff must show: (1) that the defendant conspired with one or more persons to get a false or fraudulent claim allowed or paid by the United States, and (2) that one or more conspirators performed any act to get a false or fraudulent claim allowed or paid. *United States v. Hill, 676 F.Supp. 1158, 1173 (N.D.Fla.1987)* (citing *Blusal Meats, Inc. v. United States, 638 F.Supp. 824, 828 (S.D.N.Y.1986)aff'd817 F.2d 1007 (2d Cir.1987)).*[FN11] General principles of civil conspiracy apply to FCA conspiracy claims. *See United States v. Murphy, 937 F.2d 1032, 1039 (6th Cir.1991); see also General Refractories Co. v. Fireman's Fund Ins. Co., 337 F.3d 297, 313 (3d Cir.1999)* (the Third Circuit, interpreting Pennsylvania law, held that civil conspiracy requires a showing of "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage") (citing *Strickland v. Univ. of Scranton, 700 A.2d 979, 987-988 (Pa.1997)* (citation and internal quotations marks omitted)).

> FN11. Some courts have phrased the elements of FCA conspiracy in a tripartite structure. *See, e.g., United States v. Bouchey, 860 F.Supp. 890, 893 (D.D.C.1994)* ("To state a claim under § 3729(a)(3), the government must show: (1) that defendant conspired with one or more persons to have a fraudulent claim paid by the United States, (2) that one or more of the conspirators performed any act to have such a claim paid by the United States, and (3) that the United States suffered damages as a result of the claim.") (citing *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Provident Life & Acc. Ins. Co., 721 F.Supp. 1247, 1259 (S.D.Fla.1989)).*

> Because the court's inquiry in the current case hinges upon the existence-or lack

thereof-of an "agreement" under the first prong, it is unnecessary to inquire into the damages sustained by the United States or the precise formulation of the analysis itself.

B. Element One: A "Meeting of the Minds"

The first required element of a conspiracy under section 3729(a)(3), the agreement itself, has typically been described as a "meeting of the minds." *United States ex rel. Durcholz v. FKW Inc., 189 F.3d 542, 545 (7th Cir.1999)*. Indeed, the "essence" of an FCA conspiracy is "an agreement between two or more persons to commit a fraud."*United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Provident Life & Acc. Ins. Co., 721 F.Supp. 1247, 1259 (S.D.Fla.1989)*. Put differently, Atkinson must present evidence that would enable a reasonable juror to conclude that Penn Ship and Fidelity shared a "conspiratorial objective." *Durcholz, 189 F.3d at 545* (holding that an FCA plaintiff cannot withstand summary judgment where the "meager evidence" of the alleged conspirators' silence cannot "support the inferential leaps that would be required" to find a meeting of the minds).

To establish a "meeting of the minds," it is not sufficient for a relator to show that the alleged conspirators "intended to engage in the conduct that resulted in the injury" to the government; rather, the parties must be "aware of the harm or wrongful conduct at the inception of the combination or agreement."*Peavy v. WFAA-TV, Inc., 221 F.3d 158, 173 (5th Cir.2000)* (applying Texas law, which is substantively similar to the Pennsylvania law of civil conspiracy). More specifically, "innocent mistakes and negligence" are not actionable under the FCA. *United States v. Taber Extrusions, LP, 341 F.3d 843, 845 (8th Cir.2003)* (holding that defendants must have "knowledge" of the intended fraud in order to be held liable for conspiracy under the FCA); *see also United States ex rel. Reuter v. Sparks, 939 F.Supp. 636, 638 (C.D.Ill.1996)* (holding that "negligence is not actionable" under the FCA). It is also not the case that "any breach of contract, or violation of regulations or law, or receipt of money from the government where one is not entitled to receive the money, automatically gives rise to a claim under the FCA."*United States ex rel. Hopper v. Anton, 91 F.3d 1261, 1265 (9th Cir.1996)* (quoting

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 5
Not Reported in F.Supp.2d, 2004 WL 1686958 (E.D.Pa.)

and agreeing with the district court's analysis).

**\*5** To demonstrate the existence of the "agreement" required in federal civil conspiracy claims, a plaintiff/relator may rely on either direct or circumstantial evidence. *See Adams v. Teamsters Local 115,* 2003 WL 22205708, *6 (E.D.Pa. Aug. 6, 2003); see also Intervest, Inc. v. Bloomberg, L.P.* 340 F.3d 144, 159 (3d Cir.2003) (evidence of a conspiracy to violate the Sherman Act may be proven by either direct or circumstantial evidence). Because conspiracies, "by their very nature, are not often susceptible to direct proof," *Durcholz,* 189 F.3d at 546, plaintiffs alleging civil conspiracies most often rely upon circumstantial evidence.

Circumstantial evidence can, in certain instances, give rise to the existence of a conspiracy. *See Intervest,* 340 F.3d at 159 ("plaintiffs have been permitted to rely solely on circumstantial evidence (and the reasonable inferences that may be drawn therefrom) to prove a conspiracy") (quoting *Rossi v. Standard Roofing, Inc.,* 156 F.3d 452, 465 (3d Cir.1998)). Where a plaintiff relies upon circumstantial evidence to establish a conspiracy, however, he must "produce more than a whiff of the alleged conspirators' assent" to withstand summary judgment. *Durcholz,* 189 F.3d at 546 (quotations omitted); see also *Scully v. U.S. WATS, Inc.,* 238 F.3d 497, 516 (3d Cir.2001) (holding that while a civil conspiracy "may be proved by circumstantial evidence, the evidence must be full, clear and satisfactory") (quoting *Fife v. Great Atlantic & Pacific Tea Co.,* 356 Pa. 265 (1947)). To "raise a fact question" in an FCA conspiracy case, therefore, plaintiff "must provide proof that [defendants] each intended to commit [ ] fraud, and that they entered into an agreement with that specific objective." *United States ex rel. Reagon v. E. Tex. Med. Ctr. Regional Healthcare Sys.,* 274 F.Supp.2d 824, 857 (S.D.Tex.2003).

More specifically, "a plaintiff cannot withstand a summary judgment motion by establishing only consciously parallel behavior on the part of the defendants." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.,* 998 F.2d 1224, 1232 (3d Cir.1993) (citing *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.,* 346 U.S. 537, 541 (1954)) (assessing circumstantial evidence in the context of an alleged conspiracy to fix prices in violation of

section 1 of the Sherman Act). Ultimately, a court must focus on whether the evidence proffered by the plaintiff "tends to exclude the possibility that [the defendants] were acting independently." *Intervest,* 340 F.3d at 160 (citations omitted) (in the context of a Sherman Act conspiracy).

C. Plaintiff's Evidence of Penn Ship's and Fidelity's "Meeting of the Minds"

In support of its claims that "a jury could easily conclude that a conspiracy involving defendant[s] existed" and that a "concerted breach of contractual and fiduciary duties" occurred, Pl.'s Mem. at 21, plaintiff offers the following evidence.

**\*6** Atkinson claims that a trust indenture provision requiring Fidelity to deliver all recording documents to the Navy-a provision absent from the final version of the trust indenture-was consciously stricken by defendants as part of the conspiracy. The sequence of meetings and revisions which led up to the finalization of the trust indenture is undisputed, as is the sequence and substance of the correspondence stemming from the Navy's award of the Oiler Contract to Penn Ship.[FN12] Due to the critical importance Atkinson places upon these events, it seems worth briefly revisiting the relevant chronology.

> FN12. The inferences which can be drawn from these meetings and revisions, on the other hand, are in dispute.

Greg Leatherbury, an attorney for Penn Ship, prepared the first draft of the trust indenture sometime in early March, 1985. Pl.'s Facts, ¶ 20. Leatherbury then discussed the terms of the trust indenture in greater detail with Terence McPoyle, a corporate trust administrator with Fidelity's Corporate Trust Department, and Stephen Mygatt, a Fidelity in-house attorney. *Id.* ¶¶ 21-22. After these discussions, the initial draft of the trust indenture was signed on March 15, 1985, by Thomas Weller, Chairman of Penn Ship, and McPoyle, on behalf of Fidelity. *Id.* ¶ 23. Later that day, the signed draft was sent to the Navy for revision and approval.[FN13] *Id.* ¶ 24.

> FN13. The first draft of the trust indenture was also sent to Ron Krasnow, a Penn Ship attorney at the firm of Kirkpatrick &

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 6
Not Reported in F.Supp.2d, 2004 WL 1686958 (E.D.Pa.)

Lockhart in Pittsburgh. Leatherbury's cover letter, included with the trust indenture, stated "I understand that you are preparing the financing statements for recording."Pl.'s Facts, ¶¶ 28-29.

The substance of the March 15th trust indenture is undisputed.[FN14]Neither is it disputed that Leatherbury and other Penn Ship representatives met with NAVSEA officials to discuss the trust indenture. *Id.* ¶ 30. During this meeting-which was not attended by anyone from Fidelity-Leatherbury met separately with Gene Angrist, NAVSEA Counsel, and Shauna Russell, associate counsel, to undertake a page-by-page review of the trust indenture. *Id.* ¶¶ 31-34.Leatherbury's notes from this three-person meeting include an additional sentence to paragraph 14, now crossed out, stating "the trustee shall deliver copies of all recording documents to the Navy."*Id.* ¶ 35. Plaintiff does not dispute that this sentence is crossed out in Leatherbury's notes and that it never appeared in any subsequent version of the trust indenture. *Id.* ¶ 36.

> FN14. This version of the trust indenture provided the Navy with second lien security interests in certain assets that Penn Ship shared with its two affiliates, DDSR and MOEL: namely, the Navy took security interests in the shipyard property and equipment, a floating drydock, and a floating crane. These liens secured the Navy for up to $20 million in reprocurement costs in the event that Penn Ship's contract was terminated for default. The Navy's security interests, however, were subordinated to $18 million in existing first liens and mortgages, and provided that Penn Ship had the right to substitute additional first liens up to $24 million. Pl.'s Facts, ¶¶ 25-27, 42.

After this meeting with Russell and Angrist, Leatherbury sent his notes and a marked-up version of the trust indenture to McPoyle and Mygatt, at Fidelity. After separate conversations with Mygatt and Russell, Leatherbury incorporated all changes to the trust indenture and created a final draft. *Id.* ¶¶ 37-38.The final version of the trust indenture was signed by Penn Ship and Fidelity, as trustee for the Navy, on March 26, 1985. *Id.* ¶ 39.

On March 27, 1985, Leatherbury sent an original fully-executed final version of the Trust Indenture to McPoyle. PSB App. at 886. McPoyle responded to this letter on April 1, 1985, thanking him for the copy of the trust indenture and further noting:

We will of course await notification from you regarding the awarding of the contract.

In conjunction with this, we will then expect to receive evidence of insurance on the mortgaged property, a letter from the United States Navy advising us of who to contact in the future, and proof of all filings performed concerning the mortgaged properties.

*7 PSB App. at 894.

A month later, on May 6, 1985, Penn Ship was awarded the Oiler Contract by the Navy, pursuant to the terms of which it would provide the Navy with two ships. PSB App. at 502 ("Contract 2115"). The Oiler Contract triggered Penn Ship's obligation under the trust indenture to record the security instruments. Trust Indenture, ¶ 14 (PSB App. at 1236).[FN15] After receiving the executed UCC-1 financing statements from a Penn Ship attorney at the outside firm of Reid & Priest, *see* Pl.'s Facts, ¶ 60, Leatherbury sent the signed UCC-1 statements to McPoyle at Fidelity on May 21, 1985 with an accompanying letter:

> FN15. Paragraph 14 of the trust indenture required that Penn Ship, upon award of the contract, "promptly file all mortgages, financing statements and other documents necessary to perfect the Trustee's secured status under the Security Instruments."PSB App. at 1236.

Enclosed are the UCC Financing Statements in connection with the trust indenture. Please execute them on behalf of the Bank, as trustee, and return them to me. I am then going to forward the financing statements and mortgages for appropriate filing and recordation.
PSB App. at 896.

McPoyle testified that he never received the May 21st letter and its enclosed financing statements. PSB App. at 968. Plaintiff disputes this fact, arguing that

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:04-cv-00186-MBC     Document 125-2     Filed 09/10/2008     Page 32 of 70

Not Reported in F.Supp.2d                                                    Page 7
Not Reported in F.Supp.2d, 2004 WL 1686958 (E.D.Pa.)

"an inference of receipt follows from the mailing."Pl.'s Facts, ¶ 65. Regardless of whether McPoyle did or did not receive this letter, it is undisputed that he did not respond, and neither he nor Leatherbury undertook to follow-up with one another. Pl.'s Facts, ¶¶ 66-67. McPoyle asserts that he did not learn of the award of the Oiler Contract to Penn Ship until four years later, in late 1989. McPoyle Decl., ¶ 18.

Two to three months after the trust indenture was signed, however, McPoyle did compose a short file memo on the subject of the trust indenture, in fulfillment of the bank's requirement that it "have some kind of a one- or multi-page document just giving a quick overview of a transaction."PSB App. at 957-58, 1008. In his summary of the trust indenture's "purpose," in this file memo, McPoyle noted:

U.S. Navy has contracted with Penn Ship to build (3) T-AO 187 Class Fleet Replenishment Oiler Ships and Penn Ship has given us a Pledge of Mortgage we are to hold in case the ships are not build or on time or to avoid cost overruns, etc.

PSB App. at 1008. With respect to Fidelity's "duties" under the trust indenture, McPoyle wrote that:
We are to do nothing until and if we receive notification from the Navy that there is a problem. At that point, we would have to read and follow procedures in the documents which were modified by S. Mygatt of our legal department.

*Id.*

With respect to his statement that the Navy "has contracted with Penn Ship," McPoyle later testified that this portion of the file memo was in error: "At the time I prepared the summary statement, I was unaware as to whether the contract had been awarded to Penn Ship, and the misstatement in my summary statement on this point is the result of inattentive, sloppy drafting on my part at the time of its preparation."McPoyle Decl., ¶ 16. Atkinson labels this assertion "self-serving" and "facially preposterous," pointing out that McPoyle did not offer any such explanation at his Senate Subcommittee deposition in 1995. Pl.'s Mem. at 9.[FN16]

FN16. Notably, at his Senate deposition McPoyle was asked to explain only the "duties" portion of his memo, not the now-contentious "purpose" section.

### D. Analysis

*8 Plaintiff highlights three main events which he believes demonstrate the existence of a conspiracy. I will address them each in turn.

### (1) *The Crossed-Out Provision*

From the facts discussed above, Atkinson concludes that Penn Ship, "on at least two occasions-in the March 15 Proposal, and in striking the Navy's request-consciously omitted a requirement that the Navy or the Trustee be notified of filing."Pl.'s Mem. at 6. Omitting a provision from a trust indenture, however, does not amount to a conspiracy to defraud the government. First, neither Leatherbury nor Russell, the Navy attorney, recalls why the provision was suggested, by whom, why it was stricken, or whether its subsequent omission was the result of a conscious or extensive discussion. *See* Russell Dep., PSB App. at 383, 439-40 (Russell testified that she could not recall whether the Navy had made any un-granted requests for changes to the trust indenture to Leatherbury and that she had no recollection as to whether the Navy was negotiating for a provision requiring the delivery of copies of all recording documents); Leatherbury Dep., PSB App. at 599 (testifying that he did not recall how the crossed-out provision came into existence in the first place nor why it was ultimately stricken). Such a lack of knowledge and inability to recall cannot reasonably give rise to a "concerted effort," as required by section 3729(a)(3).

Moreover, Leatherbury and other Penn Ship officials deny any illegal purpose underlying this editorial decision. *See* Leatherbury Dep., PSB App. at 672 (Leatherbury's testimony indicated that his intention was to send all relevant documents off to be recorded). Finally-and most importantly-plaintiff has pointed to nothing implicating Fidelity, the supposed co-conspirator, in this alleged conspiracy to consciously omit the provision in question. Plaintiff asserts that "Fidelity actively participated in this glaring omission."In support of this statement, however, plaintiff cites vague references made by

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1686958 (E.D.Pa.)

Fidelity employees to "procedures" in the trust indenture, drafting meetings, and "further documentation." Pl.'s Mem. at 6. From these bits and pieces of unenlightening evidence, Atkinson makes two unsubstantiated legal leaps. First, he assumes that "at the very same time that Leatherbury was striking the requirement that the Trustee-Fidelity-would deliver[ ] copies of the documents to the Navy, he was meeting with Fidelity. *A logical and reasonable inference is that a provision directly dealing with Fidelity's role was expressly discussed.*"*Id.* at 6-7 (emphasis added). Secondly, Atkinson argues that because the delivery requirement would have imposed such a minimal burden on both Penn Ship and Fidelity, "the striking of this basic delivery requirement was part of a broader plan not to record."Pl.'s Mem. at 7.

Plaintiff's proffered evidence in support of these two bold inferences is simply not the type of "full, clear, and satisfactory" evidence required to establish the existence of a conspiracy. The evidence does not suggest a conscious omission. With respect to Atkinson's inferential leap that express discussions were taking place, both Leatherbury and McPoyle-the individuals who would have actually engaged in these purported discussions, had they in fact taken place-specifically deny Atkinson's inference.[FN17]Regarding Atkinson's second argument-that the *de minimus* burden posed by the inclusion of a delivery requirement must mean that the omission of such a requirement stemmed from a conspiracy-plaintiff's logic eludes this court. The fact that undertaking illegal activity would impose a minimal burden does not compel the conclusion that such activity did in fact occur. Plaintiff's argument presupposes a causal relationship for which he has offered no evidence and which, more importantly, is not causal at all. By plaintiff's logic, any time an individual could have completed a crime with little effort, he could be assumed to have in fact committed that crime-despite a total lack of evidence to that effect.

FN17. Both McPoyle and Mygatt, the Fidelity employees involved in reviewing the trust indenture, deny any role in the proposal or rejection of the provision in question. McPoyle Decl. ¶¶ 10-11; Mygatt Decl. ¶¶ 20-21. Leatherbury also denies any specific recollection of talking about the

language of the trust indenture with either Mygatt or McPoyle. Leatherbury Dep., PSB App. at 568-69, 574

*9 Moreover, even if Penn Ship's decision to exclude the sentence in question was a conscious omission, there is nothing in the evidence before this court to suggest that Fidelity participated in this omission. No one from Fidelity attended the March 15, 1985 meeting where the provision was introduced and, subsequently, deleted. Importantly, the provision had been crossed out before Fidelity ever reviewed the document. Furthermore, even if Fidelity had desired that the provision be excluded, plaintiff has introduced nothing indicative of a "conspiratorial objective" or other "meeting of the minds." In fact, plaintiff has barely even *hinted* at the existence of a conspiracy.

In his single reference to an agreement, or conspiracy, Atkinson refers only to his belief that it is inevitable that, during the drafting of the trust indenture, Fidelity and Penn Ship "expressly discussed" the recording provision. A "discussion," however, does not a conspiracy make. In order to be held liable for conspiracy under section 3729(a)(3), defendants must be shown to have formed an "agreement" to "commit a fraud." *Stinson, 721 F.Supp. at 1259.* Coincidental agreement as to the best structure and wording of a draft of the trust indenture, however, is not an agreement to commit fraud. Indeed, courts have repeatedly held that "conscious parallelism" cannot give rise to liability for civil conspiracy. *See, e.g., Petruzzi's, 998 F.2d at 1232.*

Finally, it seems worth noting that the omission of the provision to which Atkinson attaches such great importance had very little effect upon the trust indenture. The Navy had reviewed the trust indenture language and was aware that Fidelity had no obligation to provide it with copies of the recording documents. To the extent that plaintiff's concern regarding the absence of this provision is grounded in a worry that the Navy's interests be secured, the Navy had knowledge that it was not to depend upon Fidelity for the relevant documentation and accepted the trust indenture with this knowledge.[FN18]

FN18. An internal Navy memorandum prepared by Russell and Angrist for Vice

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1686958 (E.D.Pa.)

Admiral E.B. Fowler, dated April 8, 1985, notes that the trust indenture imposed no requirement relating to the provision of recording documents to the Navy: "Although *not covered in the Indenture,* the Navy has requested that Penn Ship provide a list of recorded (i.e.perfected) existing security interests and mortgages in the assets which are personalty and copies of the documents evidencing filing of the security interests covered by the Indenture. This will assure that Uniform Commercial Code requirements are met concerning personal property and that the Navy receives the maximum protection for the mortgaged real property."PSB App. at 457 (emphasis added).

The "conscious omission" of the provision requiring Fidelity to provide copies of all recording documents to the Navy appears neither conscious, conspiratorial, nor relevant. A reasonable juror, therefore, could not find that the absence of this provision in the trust indenture establishes the existence of a conspiracy.

(2) *Fidelity's Knowledge*

The second set of events that plaintiff suggests as giving rise to an inference of conspiracy involves the reach of Fidelity's knowledge concerning the award of the Navy contract to Penn Ship.

As discussed above, McPoyle of Fidelity claims that he was not aware of the contract award which triggered Fidelity's obligations as trustee and Penn Ship's duty to record. According to plaintiff, however, Fidelity's ignorance is a "recent invention" rendered implausible due to the existence of McPoyle's file memorandum, from the spring of 1985, which stated that the "Navy has contracted with Penn Ship to build (3) T-AO 187 Class Fleet Replenishment Oiler Ships."Pl.'s Mem. at 8. Plaintiff places great weight on the inconsistency generated by this memorandum and McPoyle's later testimony that he was unaware that the contract had been awarded. The factual dispute as to McPoyle's level of knowledge, however, is immaterial.

**\*10** Even if McPoyle knew that the Navy had awarded the Oiler contract to Penn Ship, plaintiff has nonetheless failed to establish a conspiracy under the FCA. Fidelity's knowledge of the contract award triggered its status as Trustee.[FN19]Its failure to ensure the perfection of the Navy's security interests, then, could-at most-amount to a breach of its fiduciary duty to the Navy.[FN20]Assuming *arguendo* that the Navy could successfully bring a cause of action for breach of fiduciary duty against Fidelity, this breach neither involves Penn Ship nor a "meeting of the minds," nor does it otherwise suggest the existence of a conspiracy to defraud the Navy. Under the trust indenture, Penn Ship was responsible for recording all security instruments and Fidelity had no obligation to ensure that this recordation occurred. Even if Fidelity knew of Penn Ship's receipt of the contract and subsequent duty to record, this knowledge did not trigger any specific duties of Fidelity with respect to the recording of the trust indenture's security instruments.[FN21] Fidelity's failure to ensure perfection of these interests, therefore, was in line with its contractual duties and can in no way-regardless of whether Fidelity knew of the contract-enable a reasonable juror to find the existence of a conspiracy.

FN19. While the contract award triggered Fidelity's Trustee status, even the Navy admitted that "[t]he duties of the trustee under the Indenture do not arise until the Navy terminates the contractor based upon Subparagraphs (b) and/or (c) of Article 31, Default of Contractor."Fowler Memo., Fid.App. Ex. 15, ¶ 9.

FN20. The theory underlying such a claim, presumably, would involve allegations that Fidelity failed to look out for the Navy's best interests. The Navy, however, was fully aware that it was not Fidelity's responsibility under the trust indenture to provide proof of filing, thus suggesting the implausibility of such a claim. *See* Fowler Memo., Fid.App. Ex. 15, ¶ 10 (*"Although not covered in the Indenture,* the Navy has requested that Penn Ship provide a list of recorded (i.e.perfected) existing security interests and mortgages in the assets which are personalty and copies of the documents evidencing filing of the security interests covered by the Indenture.") (emphasis added).

FN21. Notably, the trust indenture did not

Not Reported in F.Supp.2d                                                                                           Page 10
Not Reported in F.Supp.2d, 2004 WL 1686958 (E.D.Pa.)

even specifically require that Penn Ship provide notice to Fidelity of its filings, only that Penn Ship *make* the filings. *See* Trust Indenture, ¶ 14 (PSB App. 1236).

(3) *Motive*

Plaintiff's final argument in support of finding the existence of an agreement between Penn Ship and Fidelity relates to defendants' motives for creating the trust indenture. Essentially, plaintiff argues that Penn Ship's motives for non-recording were so compelling that there is simply no other explanation-other than the existence of a conspiracy-for the creation of the trust indenture.

More specifically, plaintiff contends that because defendants can point to no legitimate rationale driving the creation of the trust indenture, it must have been the product of a conspiracy. Plaintiff points out that the trust indenture was an uncommon arrangement, was not necessary to protect the Navy's interests, but *was* necessary to Penn Ship's success in obtaining the Oiler contract. Because Penn Ship could have given direct liens to the Navy rather than to a trustee, the only purpose of the trust indenture, according to plaintiff, must have been to facilitate non-recording and fraud.

Plaintiff also highlights the factors encouraging Penn Ship's non-recording, pointing to three specific reasons Penn Ship would have been inclined toward non-recording: first, he claims that perfecting the trust indenture's security instruments would have alerted losing bidders to the existence of the allegedly improper trust indenture and therefore have necessitated a second bidding process, thus delaying construction and posing a risk to Penn Ship's acquisition of the contract; second, plaintiff argues that Penn Ship's non-recording increased the potential collateral value of its properties to other companies and banks, from which it was attempting to secure additional financing; and third, he contends that Penn Ship's failure to record the security instruments enabled it to threaten the Navy with its bankruptcy. With respect to Fidelity, Atkinson claims that because the bank stood to benefit from an ongoing banking relationship with Penn Ship, it had compelling reasons to encourage Penn Ship not to record.

*11 As defendants each note, plaintiff's inability to identify a compelling reason behind the use of a trust indenture does not necessarily mean that no such reason existed, or-even more implausibly-that a conspiracy or fraud must have been the driving force behind the trust indenture's creation. The United States Navy-the party upon which the alleged fraud was perpetrated-had extensive opportunities to review the trust indenture's provisions, make revisions, and discuss the document with Leatherbury. Had the trust indenture been constructed solely as a tool to be employed by defendants in carrying out a conspiracy, two NAVSEA attorneys, Angrist and Russell, would not-after reviewing it and making changes-have accepted the trust indenture. Furthermore, as Penn Ship points out in its reply, "nothing in the Trust Indenture prevented the Navy from checking to determine whether the security interests were recorded."PSB Reply at 3. While the trust indenture may have been unusually structured, the document itself clearly obligated Penn Ship to perfect the Navy's security instruments. An agreement which inured to the benefit of the Navy, while uncommon, cannot be relied upon as evidence of a conspiracy to defraud the Navy itself. No reasonable juror could conclude that the use of the trust indenture structure, despite the lack of an absolute "necessity" that it exist, establishes the requisite "agreement" to defraud the Navy.

If the use of the trust indenture was not itself conspiratorial, plaintiff's argument goes, the failure to record was. Plaintiffs argument that Penn Ship conspired not to record the security instruments because of the risk of alerting other bidders who might, in turn, contest the contract award, ignores the fact that an FCA conspiracy must involve an intent to defraud the government. While non-recording could have-without offending conventional logic-be perceived as having been intended to conceal an unusual contract modification from other bidders, so as not to delay the construction of the oilers, this intent would have been shared by the Navy itself and thus would have benefited the Navy as well as Penn Ship. This allegedly compelling motive not to record, therefore, cannot reasonably give rise to a conspiracy to defraud the Navy.

Furthermore, plaintiff has failed to demonstrate that Fidelity shared this desire-to avoid re-bidding-in any specific way. Atkinson argues that Fidelity stood to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                          Page 11
Not Reported in F.Supp.2d, 2004 WL 1686958 (E.D.Pa.)

profit from Penn Ship's successes because it enjoyed a banking and investment banking relationship with Penn Ship. According to the evidence, however, it is undisputed that Penn Ship never made any corporate investments nor paid any fee to Fidelity for investment banking services. *See* Pl.App. at 71 (Weller Dep. at 53); Pl.App. at 205 (Stevens Dep. at 55).[FN22] Moreover, Atkinson has pointed to no evidence indicating that Fidelity had any opportunity to profit from the avoidance of a second bidding process.

> FN22. While Plaintiff posits that an "investment banking relationship" and a "substantial investment banking relationship" existed between Penn Ship and Fidelity, *see* Pl.'s Mem. at 22-23, he offers no evidence in support of the supposed profits flowing to Fidelity as a result of this relationship. According to Penn Ship, it had "no lending relationship" with Fidelity until December 1986, more than 18 months after the Oiler contract was awarded and the trust indenture was activated. *See* PSB Reply at 1. Moreover, there is no evidence that employees in Fidelity's lending department-which provided these services-were ever aware of the trust indenture.

This position is, at its core, an assertion that Penn Ship's desire to avoid a re-bidding process was so strong that Penn Ship's subsequent failure to record the security instruments constitutes evidence of a conspiracy to defraud the government. Quite simply, plaintiff has failed to connect the dots in this argument. Even assuming that Atkinson is correct, and Penn Ship did desire to avoid a re-bidding process and thus possessed a motivation not to record-both of which are disputed-it also possessed a contractual obligation *to* record, under the trust indenture. Conflicting motivations as to whether or not to comply with a contract requirement do not establish a conspiratorial objective. More significantly, plaintiff has failed to suggest any tangible way in which this particular motivation-even if powerful enough to motivate Penn Ship not to record-involved Fidelity, the alleged co-conspirator.

**\*12** In his second assertion regarding Penn Ship's motivations not to record, plaintiff claims that Penn Ship's non-recording increased the potential collateral

value of its properties to other companies and banks, from which it was attempting to secure additional financing.

The trust indenture specifically permitted Penn Ship to use the trust indenture assets to secure first liens up to $24 million. PSB App. 132-33. With respect to the $5 million line of credit extended to Penn Ship 18 months later by Fidelity itself, because Fidelity knew of the trust indenture liens it was aware that any liens on the trust's assets in favor of Fidelity that exceeded the $24 million cap would have been subordinate to the Navy's interests. The lack of constructive notice through recording does not trump actual notice. Penn Ship's acquisition of this $5 million loan, therefore, cannot be construed as a manifestation of the motive driving Penn Ship not to record.

Penn Ship also obtained a $10 million loan from the Water Facilities Loan Board ("WFLB") in May, 1986. PSB Supp.App. at 12-22. Plaintiff suggests that this additional financing could not have been obtained had Penn Ship properly recorded the security instruments, as the WFLB loan was itself secured by the trust indenture collateral. *See* Pl.'s Mem. at 14. According to defendants, however, Penn Ship's existing $18 million debt to Sun Ship-which counted toward the $24 million cap on Penn Ship's first liens-was reduced by almost $10 million simultaneously with the acquisition of the WFLB loan. PSB Supp.App. at 23-25 (1986 Sun Ship/Penn Ship Mutual Release).

The document cited by Penn Ship in support of its assertion that its WFLB loan did not exceed the trust indenture's $24 million cap, due to a simultaneous loan reduction, does not specify a dollar value for this reduction; it notes only that Penn Ship was released from all obligations under an "Agreement" dated February 8, 1982. *Id.* at 23-24. Plaintiff, however, has offered only vague and unsupported assertions that Penn Ship did exceed the $24 million cap; he has produced no quantitative evidence that such was the case, much less that Penn Ship's motivation to secure additional financing by relying upon the trust assets was so powerful as to constitute a conspiracy.

Finally, plaintiff argues that by failing to record the trust indenture's security instruments, Penn Ship was able to threaten the Navy with bankruptcy during contract modification negotiations. More specifically,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                              Page 12
Not Reported in F.Supp.2d, 2004 WL 1686958 (E.D.Pa.)

Atkinson asserts that the non-recording resulted in a substantially weakened bargaining position for the Navy; because the unrecorded liens would be voidable in a bankruptcy, he claims, the Navy would be an unsecured creditor and thus unlikely to be able, in the event of a bankruptcy, to recoup its reprocurement costs as anticipated by the trust indenture. As Penn Ship points out, however, the Navy was never put in such a compromised position.

*13 Harold Hanson, the NAVSEA officer who negotiated and executed Mod .17 on behalf of the Navy, testified regarding the Navy's bargaining position during these negotiations:

Q: Do you recall whether or not the nonrecording of the security instruments under the trust indenture were [sic] a factor in the negotiations of modification 17?

A: No, it was not a factor.

* * * *

Q: Did the nonrecording of the security instruments under the trust indenture have any impact at all on the negotiations of modification 17 from the Navy's standpoint?

A: No ... had it been recorded or not recorded, I think the end result would have been the same. I think Penn Ship operated in a fashion-I mean, they never came to us and said, hey, these things aren't recorded, so you[ ] really don't have a security interest. I mean, everybody operated as if it were valid and recorded and-so I don't think it had any impact.

Q: In your view, would the Navy had gotten a better deal from Penn Ship if the security instruments had been recorded?

[Objection, form]

A: No, I think we got the best deal we could, recorded or not. As a matter of fact, I don't even know if I was aware that they weren't recorded at that time.

Hanson Dep., PSB App. at 44-45.

While Atkinson makes assertions to the contrary-that is, that the Navy was significantly disadvantaged due to Penn Ship's nonrecording-he offers no evidence in support of this claim.[FN23] Assuming that a Penn Ship bankruptcy could have adversely impacted the Navy's ability to secure its reprocurement costs, plaintiff has failed to suggest a connection between the effects of a Penn Ship bankruptcy in 1989 and the (allegedly conspiratorial) objectives of Penn Ship-let alone Fidelity-in entering into the trust indenture four years earlier.

FN23. The testimony cited by Atkinson does not support his assertion of conspiracy. As plaintiff notes, Hanson did testify that a Penn Ship bankruptcy was a possibility:

Q: In your view, what value did the Navy get out of modification 17?

A: We were able to-to get the two ships out of Penn Ship, which if we hadn't negotiated the deal, in my opinion, Penn Ship would have filed bankruptcy and the ships very well could have been tied up for-for, you know, years.

Hanson Dep., PSB App. at 31. This explanation of the value of the two oilers, however, in no way suggests-as plaintiff would have it suggest-that the Navy was cornered into the execution of Mod. 17. Plaintiff also cites Hanson's testimony regarding the potential effect of a Penn Ship bankruptcy:

Q: Considering the fact that ultimately Penn Ship was unable to pay that $5.09 million [in excess reprocurement costs], do you still believe that Mod.17 was in the best interests on the Navy?

[Objection, form.]

A: ... at the time, we thought that those ships were going to be needed to support carrier battle groups, and regardless of whether we got that $5.09 million back, we got those ships out of there and the goal was to get them completed. And we

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1686958 (E.D.Pa.)

avoided, you know, legal action on the part of Penn Ship. Had they filed bankruptcy, the odds of us getting-recouping those reprocurement costs were certainly not favorable.

Hanson Dep., PSB App. at 115. Hanson's testimony indicates that-in retrospect-the Navy believes that a Penn Ship bankruptcy could have adversely impacted the Navy's ability to secure its reprocurement costs.

As best I can discern, Atkinson's argument runs as follows: in 1985, Penn Ship's desire to exert undue influence over the Navy, should Penn Ship find itself on the verge of bankruptcy in 1989, was so powerful that Penn Ship conspired with Fidelity not to perfect the security instruments upon which the Navy would have a second lien security interest in the event that Penn Ship could not complete an Oiler contract which it had yet to sign. This argument rests on speculation and contingency. Moreover, while the nonrecording of the security instruments in question *could* have had an adverse financial impact upon the Navy in the event of a Penn Ship bankruptcy, the testimony is clear that the nonrecording had no effect at all on the negotiations or terms of the contract's ultimate termination.

### (4) The Absence of a Conspiracy

Despite Atkinson's numerous assertions of conspiracy, he has not offered sufficient evidence of a "meeting of the minds" between Penn Ship and Fidelity. Even if Fidelity knew of the Oiler contract award; even if the trust indenture was a novel form of security agreement; and even if Penn Ship stood to benefit financially from nonrecording; plaintiff has failed to produce any evidence of a conspiratorial objective shared by Penn Ship and Fidelity.

**\*14** In *Durcholz,* the Seventh Circuit affirmed the district court's grant of summary judgment for the defendant in an FCA *qui tam* action. 189 F.3d 542. The plaintiff in *Durcholz,* which involved the bidding process used by the Navy to select a general contractor for a pond-clearing project, alleged that the contracting Naval Officer ("Strange") and FKW, the general contractor, had conspired to defraud the government by selecting the second-lowest

subcontract for dredging, rather than a lower bid submitted by plaintiff.*United States ex rel. Durcholz v. FKW Inc., 997 F.Supp. 1159 (S.D.Ind.1998).* As evidence of this conspiracy, Durcholz submitted testimony that FKW was coerced by Strange, the Naval Officer, into selecting the second-lowest bid.*Id. at 1173.*The district court found that FKW's decision to follow Strange's orders did not amount to an "agreement" as required by the law of civil conspiracy. *Id.* Even if it did constitute an agreement, reasoned the district court, an agreement to select a particular bid-a bid that was not the lowest but that enabled defendants to maintain a business relationship with a valued customer-could not be considered "an agreement in order to defraud the government."*Id.* at 1173 n. 27.

Affirming, the Seventh Circuit reiterated that evidence of one defendant following the instructions of another did not establish a "meeting of the minds." *Durcholz,* 189 F.3d at 545. Noting that the evidence of a conspiracy was actually stronger than the district court had first admitted, however, the court went into some detail with respect to the evidence that Strange had supplied misinformation during the bidding process while Frederick, an FKW manager who was present, remained silent and declined to correct the misstatement. *Id. at 546.*Considering whether a reasonable jury could infer from this silence that Strange and FKW "were in cahoots to withhold the proper information about Durcholz's bid," the court held that it is "impossible" to find a "meeting of the minds from Frederick's silence alone," noting that countless other explanations for silence exist.[FN24]*Id.* Ultimately, the court found it impossible to construe a conspiracy from the paucity of evidence before it:

> FN24. Among the "plausible explanations for Frederick's silence" offered by the court were that he "simply was not paying attention in the meeting" or that he "quickly realized an easy opportunity to pad FKW's profits on the pond project."189 F.3d at 546.

Even were we to believe that Frederick's alleged silence was fraudulent, however, there is nothing to suggest that the objective of his fraud was shared by Strange. In any event and whatever the reason for Frederick's alleged silence, there is no evidence that Frederick was mum in order to advance a plan that he

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:04-cv-00186-MBC     Document 125-2     Filed 09/10/2008     Page 39 of 70

Not Reported in F.Supp.2d                                                    Page 14
Not Reported in F.Supp.2d, 2004 WL 1686958 (E.D.Pa.)

had hatched with Strange. And, in light of all of the other evidence, ... no reasonable jury could infer a conspiracy from the meager evidence of an agreement produced by Durcholz.
*Id.* at 546.

The Seventh Circuit's analysis makes clear that the "meeting of the minds" requirement demands more than an unproven suspicion of fraudulent intent. Rather, the alleged co-conspirators must be shown to have shared a common objective, that objective must be shown to be fraudulent, and the fraudulent nature of the goal must have been, specifically, to perpetrate fraud upon the government.

**\*15** Atkinson has not satisfied that burden. Despite his laundry list of reasons Penn Ship might, conceivably, have wished to avoid its obligation to record, he has failed to offer "more than a whiff of the alleged conspirators' assent."*Durcholz, 189 F.3d at 546.* With respect to Fidelity-whose alleged role in the conspiracy was its failure to ensure recordation-plaintiff has provided this court with no evidence that Fidelity played any role whatsoever in the nonrecording, nor that Fidelity had any incentive to pursue such a goal. Furthermore, the Navy itself-the purported victim of plaintiff's alleged conspiracy-claims that the contract termination process took place *as if the security interests had been recorded,see* Hanson Dep., PSB App. at 45, increasing the likelihood that the non-recording was a mistake or oversight as opposed to a well-orchestrated and far-reaching scheme to defraud the government. And finally, as defendants each point out, the correspondence among Penn Ship, its outside attorneys, and Fidelity, actually reveal an intent to record, or-at the very least-Penn Ship, in working toward completing the UCC-1 financing statements, had set the ball in motion and was taking the initial steps necessary to record the security instruments.[FN25]

> FN25. In addition to Leatherbury's explicit statement-in his May 21, 1985 letter-that Penn Ship intended to record the security instruments, it defies common sense to conclude that Penn Ship went to such great lengths to prepare, sign, and forward to Fidelity the financing statements if it had no intention of recording them.

V. CONCLUSION

I am unable to find any evidence in the record from which a reasonable jury could conclude that Penn Ship and Fidelity formed an agreement. Absent such a "meeting of the minds," no conspiracy in violation of the FCA can exist. Accordingly, summary judgment will be entered for defendants. An appropriate order follows.

And now, on this _____ day of July, 2004, upon consideration of all parties' motions for and in opposition to summary judgment, it is hereby ORDERED that:

1.) Defendant Penn Ship's motion for summary judgment (Doc. # 192) is GRANTED;

2.) Defendant Fidelity's motion for summary judgment (Doc. # 194) is GRANTED;

3.) Judgment is entered in favor of Defendants Pennsylvania Shipbuilding Co. and First Fidelity Bank and against plaintiff-relator Paul E. Atkinson.

E.D.Pa.,2004.
U.S. ex rel. Atkinson v. Pennsylvania Shipbuilding Co.
Not Reported in F.Supp.2d, 2004 WL 1686958 (E.D.Pa.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

--- F.Supp.2d ----                                                      Page 1
--- F.Supp.2d ----, 2008 WL 2791687 (D.D.C.), Med & Med GD (CCH) P 302,472

**H**U.S. ex rel. Pogue v. Diabetes Treatment Centers
of America
D.D.C.,2008.

United States District Court,District of Columbia.
UNITED STATES ex rel. A. Scott POGUE, Plaintiff,
v.
DIABETES TREATMENT CENTERS OF
AMERICA, et al., Defendants.
**Civil Action No. 99-3298 (RCL).**

July 21, 2008.

**Background:** Relator filed action under False Claims
Act (FCA) alleging that operator of diabetes
treatment centers caused false Medicare and
Medicaid claims to be submitted to United States, in
violation of Anti-Kickback Statute (AKS) and Stark
Law, by paying illegal kickbacks to physicians in
return for patient referrals. After transfer by Judicial
Panel of Multidistrict Litigation (JPML), operator
filed motions for summary judgment and to strike.

**Holdings:** The District Court, Royce C. Lamberth,
Chief Judge, held that:
(1) action could properly be pursued under FCA;
(2) fact issues remained as to whether hospitals that
established diabetes treatment centers presented
Medicare claims to United States after operator
knowingly and willingly made excessive payments to
physicians in return for patient referrals; and
(3) operator did not violate Stark Law.

Motions granted in part and denied in part.

**[1] United States 393 ☞120.1**

393 United States
    393VIII Claims Against United States
        393k120 Making or Presentation of False
Claims and Other Offenses Relating to Claims
            393k120.1 k. In General. Most Cited Cases
Three elements must exist for permissible imposition
of liability under False Claims Act (FCA): (1)
defendant submitted claim to government; (2) which
was false; and (3) which defendant knew was false.
31 U.S.C.A. § 3729.

**[2] United States 393 ☞120.1**

393 United States
    393VIII Claims Against United States
        393k120 Making or Presentation of False
Claims and Other Offenses Relating to Claims
            393k120.1 k. In General. Most Cited Cases
Claim can meet False Claims Act's (FCA) falsity
requirement if it is either factually false or legally
false. 31 U.S.C.A. § 3729.

**[3] United States 393 ☞120.1**

393 United States
    393VIII Claims Against United States
        393k120 Making or Presentation of False
Claims and Other Offenses Relating to Claims
            393k120.1 k. In General. Most Cited Cases
Action alleging that operator of diabetes treatment
centers violated Anti-Kickback Statute (AKS) and
Stark Law by making payments to physicians in
return for patient referrals could properly be pursued
under False Claims Act (FCA), despite operator's
contention that offending provider could receive
reimbursement for Medicare claims even if it violated
AKS, where form for submission of claims to
Medicare required certification that payment of
claims was conditioned on compliance with AKS and
Stark Law. 31 U.S.C.A. § 3729; Social Security Act,
§ 1128B(b), 42 U.S.C.A. § 1320a-7b(b); Stark Law,
§ 1877(g)(1), 42 U.S.C.A. § 1395nn(g)(1).

**[4] Health 198H ☞533**

198H Health
    198HIII Government Assistance
        198HIII(C) Federal Medical Assistance to the
Elderly (Medicare)
            198Hk532 Providers
                198Hk533 k. In General. Most Cited
Cases
In order to prove violation of Anti-Kickback Statute,
party must show that defendant knowingly and
willfully made payment or offer of payment as
inducement to payee to refer individual to another for
furnishing of item or service that could be paid for by

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

federal healthcare program. Social Security Act, § 1128B(b), 42 U.S.C.A. § 1320a-7b(b).

**[5] Federal Civil Procedure 170A 🖙2498.4**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2498.4 k. False Claims and Qui Tam Actions. Most Cited Cases
Genuine issue of material fact as to whether hospitals that established diabetes treatment centers presented Medicare claims to United States after operator of centers knowingly and willingly made excessive payments to physicians in return for patient referrals precluded summary judgment in action against operator under False Claims Act (FCA) based on violations of Anti-Kickback Statute (AKS). 31 U.S.C.A. § 3729; Social Security Act, § 1128B(b), 42 U.S.C.A. § 1320a-7b(b).

**[6] United States 393 🖙120.1**

393 United States
   393VIII Claims Against United States
      393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims
         393k120.1 k. In General. Most Cited Cases
Evidence showing submission of actual claim to Government is sine qua non of False Claims Act (FCA) violation. 31 U.S.C.A. § 3729.

**[7] United States 393 🖙122**

393 United States
   393VIII Claims Against United States
      393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims
         393k122 k. Penalties and Actions Therefor. Most Cited Cases
Relator asserting claims under False Claims Act (FCA) based on health care provider's submission of Medicare claims after it allegedly made excessive payments to physicians in return for patient referrals, in violation of Anti-Kickback Statute (AKS), was not required to provide evidence of all claims presented to United States, but rather was only required to highlight sufficient evidence of claim submission in general. 31 U.S.C.A. § 3729; Social Security Act, §

1128B(b), 42 U.S.C.A. § 1320a-7b(b).

**[8] United States 393 🖙120.1**

393 United States
   393VIII Claims Against United States
      393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims
         393k120.1 k. In General. Most Cited Cases
Violation of Anti-Kickback Statute (AKS) under False Claims Act (FCA) must have been made knowingly, which can be proven by actual knowledge, deliberate ignorance, or reckless disregard. 31 U.S.C.A. § 3729; Social Security Act, § 1128B(b), 42 U.S.C.A. § 1320a-7b(b).

**[9] Health 198H 🖙533**

198H Health
   198HIII Government Assistance
      198HIII(C) Federal Medical Assistance to the Elderly (Medicare)
         198Hk532 Providers
            198Hk533 k. In General. Most Cited Cases
Operator of diabetes treatment centers in hospitals did not violate Stark Law by allegedly paying illegal kickbacks to physicians in return for patient referrals, absent evidence that hospitals had requisite knowledge of operator's payment scheme. Stark Law, § 1877(g)(1), 42 U.S.C.A. § 1395nn(g)(1); 42 C.F.R. § 411.354(c)(2).

Jennifer M. Verkamp, Volkema Thomas, LPA, Cincinnati, OH, Don P. McKenna, Hare, Wynn, Newell & Newton, Birmingham, AL, Brian D. Roark, Bryan E. Larson, Bass, Berry & Sims, P.L.C., Kathryn Hays Sasser, Robert J. Walker, Walker, Bryant, Tipps & Malone, Nashville, TN, John R. Hellow, Mark S. Hardiman, Hooper, Lundy & Bookman, Inc., Los Angeles, CA, for Plaintiff.
John G. Despriet, Smith, Gambrell & Russell, L.L.P., Atlanta, GA, for Defendants.

### MEMORANDUM OPINION

ROYCE C. LAMBERTH, Chief Judge.
**\*1** Now before the Court comes defendant Diabetes Treatment Centers of America's Motion for Summary Judgment [167] and Motion to Strike [189]. Upon

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 2791687 (D.D.C.), Med & Med GD (CCH) P 302,472

Page 3

consideration of the motions, the entire record herein, and the applicable law, the Court will GRANT defendant's Motion for Summary Judgment as to claims under the Stark Law and DENY defendant's Motion as to all other claims. The Court will further GRANT defendant's Motion to Strike.

## I. BACKGROUND

Relator A. Scott Pogue filed this suit under the False Claims Act [FN1] against defendants Diabetes Treatment Centers of America, American Healthcorp, Inc., West Paces Medical Center, Dr. Paul C. Davidson, Dr. Bruce W. Bode, Dr. Judson G. Black, Dr. Robert Dennis Steed, and Dr. Anthony E. Karpas, alleging presentation of false Medicare and Medicaid claims to the United States Department of Health and Human Services. After almost fourteen years of litigation, Diabetes Treatment Centers of America remains as the lone defendant. Relator seeks redress in the form of damages, pursuant to the False Claims Act, stemming from defendant's alleged violation of the Anti-Kickback Statute [FN2] and Stark Law [FN3]. Defendant's Motion for Summary Judgment and Motion to Strike are currently before the Court.

### A. Factual Background

Relator filed suit in 1994 in the United States District Court for the Middle District of Tennessee. In 1999, the Judicial Panel on Multidistrict Litigation transferred the action to this Court. Since first appearing before this Court, the parties have engaged in almost nine years of exhaustive discovery and have advanced substantially toward a final resolution of this protracted dispute.

Defendant Diabetes Treatment Centers of America ("DTCA") began in 1984 to establish treatment centers at various hospitals throughout the United States. (Opp.80.) Through management of these centers, DTCA aimed to coordinate specialized care for diabetes patients. (Id.) Between 1984 and May 20, 1996, the time period germane to this action, DTCA contracted with about 120 hospitals, agreeing to establish treatment centers in the facilities in exchange for remuneration. (Opp.81.) Only practicing physicians were able to admit patients to DTCA's treatment centers. (Williams Dep. 130:13-15.)

DTCA contracted with physicians to serve as medical directors at the various treatment centers.[FN4](Mot.Summ. J. 5.) DTCA retained at least one medical director for each of its treatment facilities. (Id.) Between 1984 and 1996, 276 physicians served as medical directors. (See Reply Ex. 1.) DTCA also hired program managers to aid in coordinating efforts at its treatment centers. (Mot.Summ. J. 5.) Program managers enjoyed the primary day-to-day contact with DTCA's medical directors. (Cigarran Dep. Vol. 2, at 121:6-16.)

The relationship between DTCA and its medical directors constitutes the focal point of this dispute. Relator alleges that a purpose of DTCA's compensation of medical directors was to induce referrals to its treatment centers. (See Com pl. 26-34.) Only by contracting with physicians to secure sufficient admissions to its treatment centers could DTCA guarantee hospitals that establishing a diabetes treatment center would be in their best financial interest. (See id.)In contracting with medical directors to induce referrals to treatment centers, relator alleges DTCA caused false Medicare and Medicaid (collectively "Medicare") claims to be submitted to the United States government, in violation of the False Claims Act ("FCA"), Anti-Kickback Statute ("AKS"), and Stark Law. (See Compl. 34, 45.) Relator further alleges that DTCA knowingly and willfully caused these false claims to be submitted to the Government. (See Compl. 34.) In redress for these harms, relator seeks an award of treble the amount of the United States' damages plus a civil penalty of $10,000 for each false claim submitted to the Government. (Compl. Prayer for Relief.)

### B. Statutory Background

#### 1. False Claims Act

*2 The FCA imposes liability to the government on any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States government ... a false or fraudulent claim for payment or approval."31 U.S.C. § 3729(a)(1) (2008). To satisfy the statute's knowledge requirement, a person must "ha[ve] actual knowledge of the information, act [ ] in deliberate ignorance of the truth or falsity of the information, or act [ ] in reckless disregard of the truth or falsity of the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----                                                                                                Page 4
--- F.Supp.2d ----, 2008 WL 2791687 (D.D.C.), Med & Med GD (CCH) P 302,472

information," but "no proof of specific intent to defraud is required."*Id.* § 3729(b).

Though affording no wholly private right to bring suit under the statute, the FCA allows a person to "bring a civil action for a violation of Section 3729 for the person and for the United States government .... in the name of the Government."31 U.S.C. § 3730(b)(1) (2008).

The Supreme Court has affirmed an aggressive reading of the FCA. *See Cook County, Ill. v. United States ex rel. Chandler,* 538 U.S. 119, 129, 123 S.Ct. 1239, 155 L.Ed.2d 247 (2003). Indeed, the Court explained that "Congress wrote expansively, meaning to 'reach all types of fraud, without qualification, that might result in financial loss to the government.'"*Id.* (quoting *United States v. Neifert-White Co.,* 390 U.S. 228, 232, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968)).

### 2. Anti-Kickback Statute

The AKS imposes liability on anyone who

knowingly and willfully offers or pays any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

42 U.S.C. § 1320a-7b(b) (2008).

Congress amended the statute in 1977 in an effort to expand its reach and make enforcement more vigorous. *See United States v. Greber,* 760 F.2d 68, 70-71 (3d. Cir.1985). Concern about fraud and abuse in the Medicare system served as the primary impetus behind these amendments. *Id.* Of moment to this litigation, Congress viewed elimination of kickbacks as central to any efforts to combat Medicare fraud and abuse. *Id.*

### 3. Stark Law

In its current iteration, effective since 1995, the Stark Law prohibits physicians having a "financial relationship" with an entity from

mak[ing] a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health care services pursuant to a [prohibited] referral....

42 U.S.C. § 1395nn(a) (2008). A "financial relationship" is defined as "a compensation arrangement [ ] between the physician [ ] and the entity."*Id.*"[A]ny arrangement involving any remuneration between a physician and an entity" constitutes a compensation arrangement. *Id.* § 1395nn(h).

*3 An indirect compensation arrangement is most germane to this action. Such an arrangement embodies three key characteristics:

(i) between the referring physician [ ] and the entity furnishing [designated health services] there exists an unbroken chain of any number (but not fewer than one) of persons or entities that have financial relationships [ ] between them (that is, each link in the chain has ... a compensation arrangement with the preceding chain);

(ii) the referring physician [ ] receives aggregate compensation from the person or entity in the chain with which the physician [ ] has a direct financial relationship that varies with, or takes into account, the volume or value of referrals or other business generated by the referring physician for the entity furnishing the [designated health services]; and

(iii) the entity furnishing [designated health services] has actual knowledge of, or acts in reckless disregard or deliberate ignorance of, the fact that the referring physician [ ] receives aggregate compensation that varies with, or takes into account, the volume or value of referrals or other business generated by the referring physician for the entity furnishing the [designated health services].

Financial Relationship, Compensation, and Ownership or Investment Interest, 42 C.F.R. §

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 2791687 (D.D.C.), Med & Med GD (CCH) P 302,472

411.354(c)(2).

## II. *ANALYSIS*

### A. *Standards for Summary Judgment*

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."FED.R.CIV.P. 56(c). Affording substantial deference to the nonmoving party, the summary judgment standard mandates that the court "draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true."*Brown v. Paulson,* 541 F.Supp.2d 379, 383 (D.D.C.2008).

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)."In such a situation, there can be no 'genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."*Id.* at 322-23, 106 S.Ct. 2548.

The nonmoving party must clear a certain threshold in surviving a motion for summary judgment: "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," and "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient."*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (holding that the nonmoving party "must do more that simply show that there is some metaphysical doubt as to the material facts"). Summary judgment is not appropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."*Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.Thus, the proper focus of the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."*Id.* at 251-52, 106 S.Ct. 2505.

**\*4** The judge's role at the summary judgment stage is limited. *See id.* at 249, 106 S.Ct. 2505.As the Supreme Court in *Anderson* explained, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."*Id.* Accordingly, the judge may not "assess the credibility of witnesses" at the summary judgment stage. *United States v. Project on Gov't Oversight,* 454 F.3d 306, 313 (D.C.Cir.2006). Indeed, "[e]valuation of the credibility of witnesses must be left to the factfinder...."*Id.*

### B. *Legal Analysis*

Defendant in its motion for summary judgment advances five principal arguments as to why summary judgment is appropriate here: (1) actions alleging violations of the AKS may not properly be pursued under the FCA; (2) relator has failed to produce evidence of claim presentment; (3) relator has failed to produce evidence that defendant sought to induce physician referrals; (4) relator has failed to produce evidence showing that defendant knowingly and willfully caused false claims to be presented to the U.S. government; and (5) relator has failed to produce evidence to show that defendant violated the Stark Law. Though the Court agrees with defendant's fifth argument, it finds the first four unpersuasive. The Court will examine each argument in turn.

### 1. The AKS and Stark Law under the FCA

Apparently unperturbed by two adverse rulings in this litigation alone with respect to an identical argument, defendant first contends that an action alleging violations of the AKS cannot proceed under the FCA. Specifically, defendant asserts that a claim submitted to the government in violation of the AKS is not "false" pursuant to the FCA, since an offending provider may still receive reimbursement for Medicare claims even though it violated the statute. (*See* Mot. Summ. J. 22-29.) Unfortunately for plaintiff, a panoply of case law holding the opposite renders the current iteration of this argument as unsuccessful as its previous attempts.

[1][2] Three elements must exist for permissible

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----                                                                                                          Page 6
--- F.Supp.2d ----, 2008 WL 2791687 (D.D.C.), Med & Med GD (CCH) P 302,472

imposition of FCA liability: "(1) the defendant submitted a claim to the government; (2) which was false; and (3) which the defendant knew was false."*United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.,* 498 F.Supp.2d 25, 57 (D.D.C.2007). A claim can meet the falsity requirement if it is either factually false or legally false. *Id.* at 64."It may be factually false if it incorrectly describes the goods or services provided or a request for goods or services provided, or it may be legally false because of an express false certification or an implied false certification."*Id.*

The theory of implied certification is most relevant to this action. Such a theory rests on the principle that "where the government pays funds to a party, and would not have paid those funds had it known of a violation of a law or regulation, the claim submitted for those funds contained an implied certification of compliance with the law or regulation and was fraudulent."*United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am.,* 238 F.Supp.2d 258, 264 (D.D.C.2002) [hereinafter *Pogue II* ]. This Court in *Pogue II* engaged in a lengthy discussion of implied certification, the most salient of which will be repeated here.

**\*5 [3]** A cursory glance at the current form for submission of claims to Medicare provides compelling evidence for rejecting defendant's argument. The form requires certification that "payment of a claim by Medicare or other federal health care programs is conditioned on the claim and the underlying transaction complying with such laws, regulations, and program instructions (including the anti-kickback statute and the Stark [L]aw)."*Id.* Even though this language was not added until 2001, and hence is not directly applicable to the claims at issue in this action, it nevertheless possesses "evidentiary value ... in proving that the government would not have paid the claims had it known of the alleged violations."*Id.* at 264 n. 2. Indeed, this Court noted that such a certification as found in the current Medicare claim submission form "comports with even the most parsimonious application of the implied certification theory."*Id.* at 264.

Legion other cases have held violations of AKS and Stark can be pursued under the FCA, since they would influence the Government's decision of whether to reimburse Medicare claims. *See, e.g.,*

*United States ex rel. Barrett v. Columbia/HCA Healthcare Corp.,* 251 F.Supp.2d 28, 33 (D.D.C.2003) ("[C]ompliance with [AKS] and Stark laws would affect the government's decision to pay."); *United States ex rel. Ortega v. Columbia Healthcare, Inc.,* 240 F.Supp.2d 8, 13 n. 5 (D.D.C.2003) ("Compliance with these laws [AKS and Stark] is a condition for reimbursement under Medicare, and [defendants] impliedly certified compliance with these law[s] in submitting claims to Medicare."). At least one court has scoffed at the absurdity of defendant's argument, noting that accepting such a position "would put the government in the position of funding illegal kickbacks after the act."*United States ex rel. Bidani v. Lewis,* 264 F.Supp.2d 612, 615 (N.D.Ill.2003).

Finally, the text of the Stark Law expressly brings it under the compass of the theory of implied certification: "[n]o payment may be made under this subchapter for a designated health service which is provided in violation of section (a)(1) of this section."42 U.S.C. § 1395nn(g)(1).

Defendant attempts to escape this seemingly inexorable rejection of its argument, but these attempts likewise fail. It first argues that this Court's reasoning in *Hockett* mandates that relator produce evidence showing that the Government would not have reimbursed defendant for claims had it known of alleged violations. (*See* Reply 37-41.) However, this Court in *Hockett* expressly contrasted the rejection of the implied certification theory in that case (with respect to a different issue at hand) with the embracing of the same theory in the AKS context. 498 F.Supp.2d at 69.Indeed, the Court voiced its approval of the conclusion reached in *Pogue II,* which was relied upon in the preceding discussion. *Id.* at 68.

Defendant further maintains that the deposition testimony of Eric Yospe, who worked for the Government and oversaw reimbursement of Medicare claims, shows that a violation of the AKS would not have affected the Government's decision to reimburse submitted claims. (*See* Mot. Summ. J. 47-51.) First of all, Yospe in his deposition expressly declared that he was testifying on behalf of himself and was not representing the U.S. government in any capacity. (*See* Yospe Dep.) Moreover, other courts have found similar testimony to be of no moment in

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the litigation. *See, e.g., United States v. Rogan,* 517 F.3d 449, 452 (7th. Cir.2008). The *Rogan* court stated that the determination of falsity for purposes of the FCA is an objective standard, and "[t]estimony of a claims-processing officer along the lines of 'I follow the law' is not required."*Id.* The court further expounded on its disregard of testimony, similar to Mr. Yospe's, that an officer would have reimbursed a claim submitted in violation of the AKS:

> *6 [a]nother way to see this is to recognize that laws against fraud protect the gullible and the careless-perhaps especially the gullible and the careless-and could not serve that function if proof of materiality depended on establishing that the recipient of the statement would have protected his own interests.

*Id.*

Finding near unanimity in support of relator's argument that actions alleging violations of the AKS and Stark Law may proceed under the FCA, the Court rejects as meritless defendant's arguments to the contrary.

### 2. Violations of the AKS

[4][5] In order to prove a violation of the AKS, a party must show that the defendant "knowingly and willfully made a payment or offer of payment as an inducement to the payee to refer an individual to another for the furnishing of an item or service that could be paid for by a federal healthcare program."*United States v. Miles,* 360 F.3d 472, 479-80 (5th Cir.2004). In other words, relator here must show that defendant (1) caused claims to be submitted to the Government, (2) remunerated physicians with a purpose to induce referrals, and (3) knew that its actions violated the AKS. The Court finds that relator has satisfied his burden of presenting evidence supporting all three allegations such that there exists a genuine issue of material fact that a finder of fact must resolve.

### a. Submission of Claims to the Government

Defendant argues that relator has produced no evidence showing the presentment of Medicare claims to the Government by hospitals with which it

contracted. (*See* Mot. Summ. J. 18-21.) Such evidence is either entirely lacking in probative value or is inadmissible, according to defendant. The Court accepts as evidence electronic data of presented claims as authenticated by Mr. Frank Cippoloni. Therefore, it is unnecessary to analyze further the admissibility of other contested exhibits proffered by relator.

[6] Evidence showing the submission of an actual claim to the Government is the "sine qua non of a[n][FCA] violation."*United States ex rel. Clausen v. Lab. Corp. of Am., Inc.,* 290 F.3d 1301, 1311 (11th Cir.2002). Indeed, "a central question in [FCA] cases is whether the defendant ever presented a 'false or fraudulent' claim to the government."*Id.* The nonmoving party "is not required to produce evidence in a *form* that would be admissible at trial," but "the evidence still must be capable of being converted into admissible evidence."*Gleklen v. Democratic Congressional Campaign Comm.,* 199 F.3d 1365, 1369 (D.C.Cir.2000).*See also Greer v. Paulson,* 505 F.3d 1306, 1315 (D.C.Cir.2007) ("[S]heer hearsay [ ] counts for nothing on summary judgment.") (internal quotation marks omitted).

A declaration or affidavit made by an official who actually produced claims data is sufficiently authenticated to constitute reviewable evidence for purposes of resolving a summary judgment motion. *See United States v. Rogan,* 459 F.Supp.2d 692, 727 n. 17 (N.D.Ill.), *aff'd,*517 F.3d 449 (7th Cir.2008). The court in *Rogan* held that testimony from an official at the Centers for Medicare & Medicaid Services ("CMS"), regarding the transfer of claims data to a CD and subsequent submission to relator, was sufficient to satisfy admissibility standards. *Id.*

*7 Relator has produced a declaration of Frank Cippoloni, an official at CMS. (*See* Cippoloni Decl.) Mr. Cippoloni stated that he responded to relator's subpoena by assembling claims data on a CD and providing it to relator.(*Id.*) This data included Medicare claims submitted to the Government by hospitals with which defendant contracted, and the data was confined to claims made with respect to patients referred by defendant's medical directors.(*Id.*) Since Mr. Cippoloni could testify to this information at trial, this evidence may be permissibly considered by the Court, in accord with the reasoning of *Rogan.See*459 F.Supp.2d at 727 n.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 2791687 (D.D.C.), Med & Med GD (CCH) P 302,472

Page 8

17.The information contained on the CD is sufficient to meet the first requirement of proving an AKS violation: defendant's causing of submission of claims to the Government. [FN8]

[7] Even if consideration of the CD is allowed, defendant argues that the Court should grant summary judgment with respect to claims against the 187 medical directors whose patients' Medicare claims do not appear on the disc. (*See* Reply 12-13.) Rejecting arguments similar in tenor to that of defendant, courts have found it unnecessary for relators to produce evidence of every single claim submitted to the Government, provided relators can highlight sufficient evidence of claim submission in general. *See, e.g., United States ex rel. El-Amin v. George Washington Univ.,* 522 F.Supp.2d 135, 141-42 (D.D.C.2007). The court in *El-Amin* expressly rejected the defendant's argument that relators' allegations should be dismissed with respect to claims submitted for which they had not produced Medicare forms: "[d]efendant is essentially asking the Court to evaluate the strength of Relators' evidence, which is not a proper consideration on a motion for summary judgment."*Id.* The court emphasized the role of the jury, stating that "[t]he number of false claims submitted by defendant, if any, will be determined by the factfinder."*Id.* Finding clear guidance from the opinion in *El-Amin,* the Court will not grant summary judgment as to claims stemming from referrals by medical directors whose patients' claims do not appear on the CD. Such a determination is properly left to the jury in determining whether defendant violated the FCA, and, if so, in ascertaining the appropriate amount of damages.

**b. Inducement of Referrals**

Defendant contends that relator has not compiled sufficient evidence to show that it compensated physicians with a purpose to induce referrals to DTCA centers. (*See generally* Mot. Summ. J.) Instead, defendant continues, relator relies on sweeping allegations that may be adequate to survive dismissal, but must be disposed of at the summary judgment stage. (*Id.*) The Court rejects defendant's arguments and concludes that relator has produced sufficient circumstantial evidence to support its claim that defendant remunerated physicians with a purpose to induce referrals; a reasonable jury could find for

relator on this issue.

**\*8** Inducement serves a central role in assessing claims of Medicare fraud. *See Polk County, Tx. v. Peters,* 800 F.Supp. 1451, 1455 (E.D.Tex.1992) ("The gravamen of Medicare fraud is inducement.")."Giving a person an opportunity to earn money may well be an inducement to that person to channel potential Medicare payments towards a particular recipient."*Id.* Courts strictly enforce the inducement prohibitions codified in the AKS. *See United States v. Bay State Ambulance and Hosp. Rental Serv., Inc.,* 874 F.2d 20, 30 (1st Cir.1989). In view of this aggressive reading of the statute, "the issue of sole versus primary reason for payments is irrelevant since *any* amount of inducement is illegal."*Id.; accord United States v. Greber,* 760 F.2d 68, 72 (3d. Cir.1985) (finding that payment to physicians violated AKS if, in addition to compensating the physicians for legitimate duties, it was also intended to induce referrals).

Though lacking a "smoking gun," relators may survive summary judgment if they have produced sufficient circumstantial evidence to create a jury question as to whether a defendant violated the AKS. *See Rogan,* 459 F.Supp.2d at 719.Relator here has certainly met that burden and has thereby highlighted genuine issues of material fact.

Legion courts have held that, absent a few exceptions not at issue here, compliance with the AKS requires that a provider pay fair market value to a physician for his services. *See, e.g., id.* at 722-23 (emphasizing physicians' receipt of payment was far in excess of market value for contractual duties performed in finding violation of AKS); *United States ex rel. Obert-Hong v. Advocate Health Care,* 211 F.Supp.2d 1045, 1049 (N.D.Ill.2002). Indeed, "[p]ayment exceeding fair market value is in effect deemed payment for referrals."*Am. Lithotripsy Soc'y v. Thompson,* 215 F.Supp.2d 23, 27 (D.D.C.2002). The AKS statute itself states that impermissible remuneration to physicians includes "transfers of items or services for free or other than fair market value."42 U.S.C. § 1320a-7a(i)(6).

Relator in his opposition produced a detailed fair market value analysis of medical director fees from the time period germane to this action. (*See* Opp. Ex. 105.) Ms. Kathy McNamara, Senior Manager at the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

firm Mayer, Hoffman, McCann, PC ("MHM"), performed the analysis. (*Id.*) The report unequivocally stated that defendant paid its medical directors fees far in excess of the fair market value commensurate with their duties:

> Our findings demonstrate that DTCA's [medical director agreement] terms were not commercially reasonable and the fees paid did not reflect the fair market value of the services rendered. The scope of the directors' work, the prevailing rates of compensation for comparable positions in comparable concerns, the existence of a potential conflict of interest and the salary parity as to all DTCA's employees and internal inconsistency in compensation paid to medical directors are some of the factors that establish DTCA's medical directors were generally unreasonable and did not reflect general market value.

**\*9** (*Id.*) MHM also determined that defendant failed until 1995 to make even a primitive attempt at ascertaining fair market value of services performed by medical directors. (*Id.*) The MHM report certainly constitutes grounds for a reasonable jury to find that a purpose of defendant's remuneration to its medical directors was to induce referrals to its centers.

Defendant does not dispute the relevance of the fair market value analysis, but it instead attempts to call into question the findings. (*See* Reply 19-20.) Defendant contends that alleged inaccuracies in Ms. McNamara's formulaic analysis led to unconvincing results. (*Id.*) This argument overlooks the limited role of the Court in analyzing motions for summary judgment. It is emphatically the province of the finder of fact to weigh evidence and assess the credibility of witnesses. *See Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.As such, consideration of defendant's criticism of the fair market value analysis is inappropriate at the summary judgment stage.<sup>FN6</sup>

Though the preceding discussion of market value is perhaps alone sufficient to create a jury question out of the inducement element of an AKS violation, relator has produced a wealth of additional evidence supporting his claims. The very foundation of DTCA's business model was built chiefly on concerns of census-the number of patients treated on a particular day. (*See* LaRue Dep. 135:1-2.) As the president of DTCA wrote to a fellow DTCA official,

the chief objective of the business consisted of fostering census growth. (*See* Opp. Ex. 77; *see also* Beard Dep. 28:5 ("Ultimately our goal was census enhancement.").) Defendant communicated these goals of increased patient discharges to its contracting hospitals in a number of letters. (*See, e.g.,* Opp Ex. 1 ("Our goal is to assist you in increasing the number of discharges for people with diabetes from one year to the next."); Opp. Ex. 2 ("Our primary goal ... is to significantly increase the volume of business at your center.").) Hospitals, in turn, recognized that DTCA aimed to provide them with an increased number of patients. (*See* Opp. Ex. 4.) Indeed, one hospital proposed to defendant a revised contract term, stating that its purpose was "to incent DTCA to increase the volume over and above existing levels."(*Id.*) At least one medical director voiced concerns over defendant's excessive and "obvious concern about profit rather than giving services."(Opp.Ex.9.)

From its inception, DTCA sought to "increase census" by hiring medical directors who could provide its facilities with the necessary patients through referrals. (*See* Opp. Ex. 113.) An early contract expressly stated that a medical director's performance would be "evaluated ... by measuring census levels generated by his work in establishing quality programs and the credibility of the programs among referral sources...."(*Id.*)Defendant added importance to the outcome of these evaluations by stipulating that "[i]n the event that [the medical director] is unable to accomplish and maintain the above census levels, Company may, at its option, terminate this Agreement...."(*Id.*)Later medical director form contracts required physicians to perform two primary referral-related duties:

> **\*10** (ii) assist Center in development of referral sources for the Center, to include the medical community, and other community organizations and individuals which can enhance the referral patterns of the area ... [and] (iv) identify and encourage other physicians and referral sources whose patients could benefit from services offered by Center to utilize the Center.

(Opp.Ex.12.) As in the original form of the contract, defendant had the right to terminate the agreement in the event the medical director did not meet the referral requirements. (*Id.*) Furthermore, many

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----                                                                          Page 10
--- F.Supp.2d ----, 2008 WL 2791687 (D.D.C.), Med & Med GD (CCH) P 302,472

medical director contracts awarded compensation to the physicians based on a percentage of annual gross revenue of DTCA centers. (Opp.Ex.113.) A medical director thus had incentive to increase revenue, and hence his compensation, by referring more patients to defendant's facilities.

Relator has further produced evidence tending to show that defendant was focused on referral numbers when conducting contract negotiations with both medical directors and hospitals. In one example, a DTCA official recommended offering a medical director position to a physician who would contribute at least seven admissions per month to DTCA facilities. (Opp.Ex.29.) Another DTCA official worried that reducing compensation owed to an existing medical director would create a risk that "he [would] not support the program and may take one-third of his patients elsewhere."(Opp.Ex.26.) In a particularly salient showing of DTCA's intent to induce physician referrals to its centers, a 1991 contact chart describes ongoing negotiations with a reluctant hospital. (*See* Opp. Ex. 22.) Though the hospital initially worried that an arrangement with DTCA would not be sufficiently lucrative, DTCA converted these doubts into enthusiasm by retaining a medical director who "promised to call [a hospital official] to express his willingness to admit all primary diabetes and as many secondary as feasible on a case by case basis."(*Id.*) Such negotiations underscored defendant's attempts to interact with medical directors "as customers" by actively soliciting their referrals. (*See* Opp. Ex. 52.) The chief problem with this approach, however, was that defendant was at the same time paying these directors, thereby in effect providing remuneration for referrals.

In addition to the preceding discussion of probative evidence, relator has produced a few "smoking guns." A former medical director at DTCA, Dr. Melvyn Kramer, shed light on the relationship between defendant and its medical directors:

> my understanding of what I was required to do as a medical director was to refer patients to the Diabetes Treatment Center located at Waltham Weston Hospital and Medical Center and admit them for inpatient care ...*DTCA ostensibly paid us for our referrals.*That was part of the arrangement.

(Ex. 115 (emphasis added).) Additionally, a DTCA program manager, Ms. Mary Beard, testified that DTCA hired medical directors in an effort to "solicit potential admissions." (Beard Dep. 45:4-9.) Ms. Beard expressly stated that DTCA's intent in retaining medical directors "was to solicit the participation, either contractual or through their admitting practices, to admit patients ... to the center."(*Id.* 11:20-24.)Even DTCA's president, Mr. Jim Deal, admitted that a purpose of retaining medical directors was to induce their referrals:

> **\*11** Q: In other words, the purpose of recruiting a medical director in part was to secure that medical director's admissions?
>
> A: The purpose was-that would be the result of recruiting him. That wouldn't be the only purpose. May not even be the first purpose.

(Deal Dep. 236:11-237:2.)

After formally retaining the services of medical directors, defendant closely monitored the directors' contribution to the census, citing a need to "maximize utilization [of DTCA centers] among the directors."(Opp.Ex.3.) The DTCA Marketing Manual succinctly tied a medical director's referral patterns to his compensation: "[t]he ultimate Goal = to increase census, which increases revenues, which increase your bonus."(Opp.Ex.7.) The manual also gave medical directors questions to answer in order to evaluate their performance: "How many patients came in this month? How many new patients came in this month? What is the change since last month? What is the change since this month last year?"(*Id.*) In a brutally candid letter, a DTCA official exhorted medical directors to "join with us in taking whatever steps are necessary to increase volume."(Ex. 8.)

Defendant made clear to its medical directors that their compensation and continuing employment was inextricably linked to the number of patients they provided to the centers. To that end, defendant created an incentive-based compensation system, where medical director performance was articulated in terms of admissions. (*See* Opp. Ex. 107 (Monthly Report).) As a DTCA official said in a letter to a medical director, "[i]ncreased activity will, of course, result in increased value for you."(Opp.Ex.41.) That promise came into fruition through raises doled out to medical directors who showed a "significant impact

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 2791687 (D.D.C.), Med & Med GD (CCH) P 302,472

on the census." (*E.g.,* Opp. Ex. 40.) In brainstorming ways to further the incentive-based compensation system to increase referrals, DTCA officials recommended giving stock to a medical director to "create a feeling of ownership in him" and make him "see ... what a good census at the Center means to him."(Opp.Ex.30.) Such a program "would perhaps encourage him to take a very active part in census building."(*Id.*)

In addition to giving incentives to medical directors in an effort to increase referrals to its centers, defendant actively monitored medical director activity to make sure it was comporting with the goals of increased census. (*E.g.,* Opp. Ex. 21 ("Spoke with the 3 medical directors, informed them of current status. Asked them to contact Pat and express their support and potential admissions.").) Defendant was not hesitant to approach medical directors whose centers had seen a noticeable lapse in discharges. (*E.g.,* Opp. Ex. 106 ("Dr. Hellman has continued to vocalize support of the center, although his census is not reflecting the support.").) In a particularly salient example of defendant's conduct to this end, a DTCA official met with two medical directors:

*12 substance of the dinner was to inform [medical director] that: (1) his admissions to the Center were the least representative in the division; (2) the inability of his office to accommodate emergency referrals and admissions forces us to utilize other physicians ... [the medical director] asked how many patients it would take to "keep the Center." My answer was at least 15 patients everyday in the Center would be necessary, and how did he plan to facilitate that census.

(Opp.Ex.24.)

Even when medical directors were performing satisfactorily, defendant nevertheless continued to seek referrals in its neverending drive for profit. Indeed, a DTCA official described company policy as necessitating "incremental census to justify any expense...." (Opp.Ex.37.) In a profitability analysis, defendant listed ways in which the company could enlarge its profit, one of which involved convincing medical directors to increase admissions to the centers. (*See* Opp. Ex. 31.; *accord* Opp. Ex. 44 (recommending that DTCA officials "[v]isit each Medical Director weekly, at their office, to encourage

DTC admissions" in order to increase profit).)

Defendant's need for medical director referrals was great, owing to the contractual relations with its hospital customers. These form contracts based the amount of remuneration to defendant on the number of discharges or Medicare patient days. (*See, e.g.,* Opp. Ex. 82, 120, 121.) A typical example is a 1990 contract between defendant and a hospital: "[h]ospital shall pay DTCA, for services rendered pursuant to this Agreement, amounts as follows based upon the hospital's total diabetes discharges."(Opp.Ex.121.) Such fee structures provided defendant with a powerful incentive to induce referrals from its medical directors.

Defendant attempts to mitigate the significance of relator's evidence by insisting that the Court impose a greater burden for relator to meet to resist summary judgment. (*See* Reply 26-35.) Defendant first suggests that FCA claims relying on circumstantial evidence must meet a higher bar to survive motions for summary judgment, relying on *Klaczak v. Consol. Med. Transp.,* 458 F.Supp.2d 622 (N.D.Ill.2006), for this proposition. (*See* Reply 5-6.) Defendant ignores the context of the *Klaczak* court's imposition of a seemingly heightened circumstantial evidentiary threshold. The court applied a raised standard only because relator had produced no evidence showing that the defendant was familiar with the AKS and knew it might be violating the statute. *See Klaczak,* 458 F.Supp.2d at 681.Reliance on this discussion is inapposite in this action, since relator has produced evidence supporting its claim that defendant knowingly violated the provisions of the AKS. *See* discussion *infra* Part II.B.2.c.

More important, defendant fundamentally mischaracterizes the applicable summary judgment standards. Relator is under no burden to prove with absolute certainty his claims, as defendant throughout its filings seems to suggest. *See Anderson,* 477 U.S. at 248-49, 106 S.Ct. 2505.Indeed, the Court's discussion is based on the facts as viewed in a light favorable to relator, and all justifiable inferences are drawn in his favor, as mandated by the rules of summary judgment. *See Paulson,* 541 F.Supp.2d at 383.Viewed through this prism, relator's evidence must be sufficient to raise a genuine issue as to material facts such that a reasonable jury could find for relator, and the Court must not inject its own

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 2791687 (D.D.C.), Med & Med GD (CCH) P 302,472

factfinding judgments into the analysis. *See Anderson,* 477 U.S. at 248-52, 106 S.Ct. 2505.In sum, the Court finds that relator has produced a wealth of evidence supporting his claim that defendant compensated physicians for their referrals to DTCA centers, and a reasonable jury could decide the issue in relator's favor. As such, summary judgment as to the inducement element of the AKS is patently inappropriate.

### c. Knowledge

**\*13** Defendant argues that its conduct does not satisfy the knowledge standard codified in the AKS. Though defendant admits that it knew it would be illegal to induce referrals, it asserts a good-faith defense. (*See* Mot. Summ. J. 39-42.) Defendant contends that since it relied in good faith on its counsel's advice as to its contractual relations with medical directors, its conduct necessarily cannot meet the knowledge requirement of the AKS. (*See id.*)The Court finds defendant's argument unpersuasive.

[8] A violation of the AKS under the FCA "must have been made 'knowingly,' which can be proven by actual knowledge, deliberate ignorance, or reckless disregard."*Pogue II,* 238 F.Supp.2d at 266."Summary judgment is appropriate where [relator] produces no evidence sufficient to support a finding of the requisite scienter."*Hockett,* 498 F.Supp.2d at 57-58.Courts do, however, recognize a good-faith defense to claims pursued under the AKS and FCA. *See United States v. Jain,* 93 F.3d 436, 440 (8th Cir.1996).

Relator's evidence shows panoplied warnings from counsel to defendant about potential violations of AKS. (*See, e.g.,* Opp. Ex. 108 (documenting attorneys' advice to defendant regarding potential fraud and abuse claims with respect to its business arrangements and highlighting over fifty relevant documents).) In a 1989 letter to DTCA, counsel bluntly summarized its fears about the company's business practices:

we are receiving an increasing number of requests-several each week-involving different methods of compensating doctors who happen to be the source, or the potential source, of substantial referrals. While some of these proposals are doubtless clean, *some are not* and the mere volume of the

transactions casts a shadow even upon those that might otherwise past [sic] muster. Thus we have an increasing concern about your ability to successfully defend all of the arrangements which are now in place and many of the arrangements for which our opinion has been sought.... We get the feeling that some of your people who are negotiating contracts may not fully appreciate all of the considerations that go into dealing with this problem.

(Opp. Ex. 35 (emphasis added).) Attorney Jay Hardcastle actively kept DTCA officials apprised of the latest developments in relevant case law and made recommendations in accordance with judicial demands. (*See* Opp. Ex. 53 (recommending that directors should be made to perform defined duties to mitigate potential charges of fraud and abuse); Ex. 55.; Ex. 62 ("Thus the problem becomes more difficult and our prior advice to you and others at Healthcorp that contracts should be based upon services to be performed and compensation that is reasonable for those services is again underscored.").) Mr. Hardcastle began keeping a "Fraud & Abuse" file in which to record his various warnings to defendant, and he at one point summarized his efforts: "[advised DTCA officials] that their payments to medical directors (along with their occasional physician recruitment assistance, lease payments, etc.) constitute possible violations of the anti-kickback provisions of the Medicare laws, and that these possible violations were especially dangerous after the *Kats* and *Bay State* decisions."(Opp.Ex.70.)

**\*14** As time went on, counsel called on defendant with vigor, advising that it systematically revise its contracts with medical directors: "it is becoming more and more difficult to sell your product, since legal counsel (who in the recent past would not have raised the issue) are commonly raising fraud and abuse issues."(Opp.Ex.72.) A key component of attorneys' advice to defendant centered on the necessity of conducting a fair market value analysis of medical directors' services in addition to requiring the directors to maintain time logs detailing their work. (*See, e.g.,* Opp. Ex. 14 ("I would strongly advise that you engage a consultant with experience in this area to assist you in determining a fair market value of compensation for DTCA's medical directors."); Ex. 57 ("I cannot overstress the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

importance of keeping [time records].*These sorts of records are absolutely critical in order to demonstrate that [a medical director] is in fact working for his stipend and not being paid for referrals.*") (emphasis added); Ex. 100 (detailing concerns that contracts with medical directors discuss payments that do not reflect market value for services provided).)

Even contracting hospitals expressed concern to defendant that contractual provisions that take into account the volume of referrals may lead to imposition of AKS liability. (*E.g.*, Opp. Ex. 81.) Attorney Hardcastle told DTCA officials that one hospital was uncomfortable with the medical directorship arrangement, since it felt that such a relationship might lead to prosecution against the hospital and DTCA under Medicare fraud and abuse laws. (Opp.Ex.83.) Hospitals reacted to these concerns by insisting upon insertion of amendments to their existing contracts with DTCA, which expressly provided that payment would not be proportional to hospital revenue. (*See* Opp. Ex. 86.)

At first, it seemed as though defendant, recognizing it was on the brink of unlawfulness, was ready to heed the advice of counsel and take measured steps to avoid violations of the AKS. The president of DTCA sent out a letter in 1989 highlighting the company's concern about the current state of Medicare regulations and judicial precedent:

> [w]e do not necessarily believe that this is a proper interpretation of Medicare laws, but it is clear to us that the Medicare program and the courts are taking an aggressive opposite position. This is one time when, even if we are right, we could win the battle but lose the war.

(Opp.Ex.58.) Shortly thereafter, defendant decided it would make an attempt to force medical directors to complete time logs. (*See* Opp. Ex. 16; Stone Dep. 218:16-18.) Furthermore, the highest ranking DTCA officials engaged in regular discussions about the current state of the Medicare fraud and abuse laws in an effort to determine an appropriate course of action to ensure compliance. (*See* LaRue Dep. 118:16-21.) One such official testified he felt at the time that "any payment based upon a census had some risk."(*Id.* 198:14-18.)

*15 Ultimately, however, defendant's apparent concern about violations of the AKS amounted to nothing more than bluster. Confronted with a multitude of alarms regarding potential fraud and abuse allegations, defendant nevertheless decided to deliberately ignore these warnings and continue to carry out its business as usual. One attorney working for defendant noted DTCA officials' propensity "not [to] deal in any substantive way with the issues" he had raised. (Opp. Ex. 60; *see also* Opp. Ex. 73 ("I advised [a DTCA official] of the Medicare risk involved in this arrangement, and he decided to proceed anyway.").) In fact, defendant did not even make an initial attempt until 1995 to clearly define medical director duties and ascertain fair market value for their services. (*See* Williams Dep. 92:10-21; Black Dep. 81-84.) Far from a cogent professional evaluation of appropriate market rates for payment, the 1995 market value "analysis" was based on one DTCA official's "personal judgment" and use of his purported "rule of thumb." (Williams Dep. 243:9-16.)

Defendant responds to this evidence by arguing that since an attorney never told it with certainty that it would be found liable for an AKS violation, it acted in accord with the requisite standard demanded by the good-faith defense. (*See* Mot. Summ. J. 39-42.) Not only does this argument again conveniently overlook the appropriate summary judgment standards, *see* discussion *supra* Part II.B.2.c, but it also ignores the assumptions under which defendant's counsel operated. Indeed, attorney Hardcastle explicitly stated that in his legal analysis he assumed that "aggregate compensation paid to the medical director over the term of the agreement will be consistent with fair market value in arms length transactions and will not be determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties."(Opp.Ex.56.) Such assumptions were dubious at best. *See* discussion *supra* Part II.B.2.b. Attorney Hardcastle further testified that he relied almost completely on statements from DTCA officials in carrying out his analysis and was under the impression that no part of the compensation paid to medical directors was tied to referrals. (Hardcastle Dep. 268:15-22, 445-48; *see also* Mills Dep. 67:18-68:1 (stating all understanding regarding duties actually performed by medical directors and the commensurate fair market values of such services came from defendant).) Attorney Smith made pellucid the assumptions under which he labored for

defendant:

[d]id I search beyond the four corners? No. Do I have a recollection of a specific conversation with [DTCA officials] about the specific activities that were being done? No.... I have no knowledge of the conduct that may have been done by my client or others beyond the four corners of this agreement. So I can't comment on any conduct that may have been done because I don't know what that was.

*16 (Smith Dep. 180:14-19, 182:1-11.) In view of relator's production of evidence regarding defendant's conduct during the relevant time period, it seems as though defendant's counsel may have been misled by the company when analyzing the contracts. Perhaps this was the only reason why most attorneys did not explicitly say that a given contract was patently illegal.

Relator has certainly produced sufficient evidence of defendant's knowledge or reckless disregard of available information about its potential violation of the AKS. The evidence is sufficient for a reasonable jury to find that defendant acted with the requisite level of culpability for imposition of liability under the AKS and FCA.

**3. Violations of the Stark Law**

Relator further alleges that defendant violated the Stark Law with respect to its conduct between January 1, 1992 and May 20, 1996. This claim must be dismissed, however, in view of relator's failure to produce sufficient evidence showing that contracting hospitals had the requisite knowledge of defendant's payment scheme.

[9] To support an actionable claim under the Stark Law and survive summary judgment, relator must point to evidence showing three key characteristics:

(i) between the referring physician [ ] and the entity furnishing [designated health services] there exists an unbroken chain of any number (but not fewer than one) of persons or entities that have financial relationships [ ] between them (that is, each link in the chain has ... a compensation arrangement with the preceding chain);

(ii) the referring physician [ ] receives aggregate compensation from the person or entity in the chain with which the physician [ ] has a direct financial relationship that varies with, or takes into account, the volume or value of referrals or other business generated by the referring physician for the entity furnishing the [designated health services]; and

(iii) the entity furnishing [designated health services] has actual knowledge of, or acts in reckless disregard or deliberate ignorance of, the fact that the referring physician [ ] receives aggregate compensation that varies with, or takes into account, the volume or value of referrals or other business generated by the referring physician for the entity furnishing the [designated health services].

42 C.F.R. § 411.354(c)(2).[FN7] The Court finds defendant has failed to create a genuine issue of material fact as to the third element, and so analysis of the preceding factors is unnecessary.

In stark contrast to the mountain of evidence produced with respect to defendant's alleged AKS violations, relator produces almost no evidence to support a conclusion that the hospitals contracting with defendant (i.e. "the entit[ies] furnishing designated health services") had knowledge of, or acted in reckless disregard or deliberate ignorance of, defendant's compensation schemes. Indeed, relator's discussion of this element is confined to a single sentence in its 166-page opposition memorandum: "[h]ere, the hospitals were directly contracted with DTCA and were well aware of the business model-they paid DTCA to cultivate the business in question."(Opp.164.) Though such a conclusory allegation may survive a motion to dismiss, it must be disposed of at the summary judgment stage. Concluding that no reasonable jury could find that the evidence supports a finding that hospitals acted with requisite knowledge pursuant to the Stark Law, the Court finds summary judgment is appropriate with respect to all claims under the Stark Law.

**C. Suggestion of Remand**

*17 This action was originally filed in the U.S. District Court for the Middle District of Tennessee. The Judicial Panel of Multidistrict Litigation ("JPML") subsequently transferred the case to this

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Court in 1999.

The Court finds that consolidated and coordinated pretrial proceedings have concluded, and pursuant to JMPL Rule 7.6(c)(ii), this Court suggests that the JPML consider remand of this action to the Middle District of Tennessee. Under the multidistrict litigation statute, a case "shall be remanded by the panel at or before the conclusion of such [coordinated or consolidated] pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated."28 U.S.C. § 1407(a). Because both discovery and all necessary proceedings before trial have concluded, this Court suggests that the JPML remand this matter to the Middle District of Tennessee for all remaining purposes.

## III. CONCLUSION

For the foregoing reasons, the Court concludes that defendant's Motion for Summary Judgment will be GRANTED as to claims under the Stark Law and DENIED as to all other claims. The Court further concludes that defendant's Motion to Strike will be GRANTED.

A separate order shall issue this date.

### ORDER

Upon full consideration of defendant's Motion [167] for Summary Judgment, defendant's Motion [188, 189] to Strike, the entire record herein, and the applicable law, it is hereby

ORDERED that the unopposed Motions [186, 187] for Leave to File Excess Pages are GRANTED. It is further hereby

ORDERED that defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part. Defendant's motion is GRANTED as to claims under the Stark Law and DENIED as to all other claims. It is further hereby

ORDERED that relator's claims under the Stark Law are dismissed with prejudice. It is further hereby

ORDERED that defendant's Motion to Strike is

GRANTED. It is further hereby

ORDERED that this action is referred to the Judicial Panel of Multidistrict Litigation for transfer to the United States District Court for the Middle District of Tennessee.

SO ORDERED.

FN1.31 U.S.C. § 3729.

FN2.42 U.S.C. § 1320a-7b.

FN3.42 U.S.C. § 1395nn.

FN4. The precise role of these medical directors serves as the heart of this dispute. Defendant argues that the medical directors were compensated for legitimate duties, which generally involved overseeing management of the treatment facilities. Relator contends that the medical directors were remunerated primarily for their referrals to the centers.

FN5. Defendant filed along with its reply in support of the Motion for Summary Judgment a Motion to Strike certain enumerated exhibits submitted by relator. (SeeDocket No. 189.)The Court will grant defendant's Motion to Strike. The Court notes that the admission of the Cippoloni Declaration as evidence ultimately renders immaterial the effect of the disposition of the Motion to Strike.

Defendant in its reply in support of the Motion to Strike vigorously argues that the Court may not permissibly consider the declaration of Mr. Cippoloni, since the attachment of this document to relator's Opposition to the Motion to Strike purportedly constitutes an "egregious" discovery violation. Defendant's impassioned rhetoric about the sanctity of the discovery process overlooks the stark truth: accepting its argument would jeopardize relator's suit, which has been working its way through the civil justice system for over fourteen years, owing

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

solely to the violation of a procedural nicety. The Court will not allow enforcement of such a technicality to hinder the delivery of justice. *See Foman v. Davis,* 371 U.S. 178, 181-82, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (reasoning that strict enforcement of the technicalities of the Federal Rules of Civil Procedure must not deprive parties of a decision on the merits of the case).

FN6. The Court also notes the breadth of Ms. McNamara's experience in health care, as she has been working in the field for over eighteen years. (Opp.Ex.105.) Moreover, Ms. McNamara in her deposition discussed the holistic nature of the fair market value analysis and vigorously defended the methods used. (*See* McNamara Dep. 216-23.) Her analysis, then, is not so egregiously baseless that the Court must disregard it at this juncture, as defendant suggests.

FN7. Relator relies on *Rogan* in arguing that these regulations cannot be applied to this action, since they were promulgated after 2000 and cannot be applied retroactively. However, the Court agrees with the *Rogan* court in concluding that these regulations, though not technically binding, constitute persuasive authority and provide excellent guidelines with which to analyze the Stark Law claims at issue. *See Rogan,* 459 F.Supp.2d at 712-15.

D.D.C.,2008.
U.S. ex rel. Pogue v. Diabetes Treatment Centers of America
--- F.Supp.2d ----, 2008 WL 2791687 (D.D.C.), Med & Med GD (CCH) P 302,472

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy                                                          Page 1
Slip Copy, 2007 WL 4245736 (E.D.Pa.)

**C**U.S. v. Torkelsen
E.D.Pa.,2007.
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
UNITED STATES of America, Plaintiff,
v.
John B. TORKELSEN, et al., Defendants.
**Civil No. 06-05674.**

Dec. 3, 2007.

Jordan L. Strauss, Brian James McCabe, U.S.
Department of Justice, Washington, DC, Susan R.
Becker, U.S. Attorney's Office, Philadelphia, PA, for
Plaintiff.
John B. Torkelsen, Morgantown, WV, pro se.
Anne D. Peterson, Jay Christopher Rooney, Carmody
& Torrance LLP, New Haven, CT, Walter Weir, Jr.,
Weir & Partners LLP, Philadelphia, PA, for
Defendants.

### MEMORANDUM

GILES, District Judge.

### I. Introduction

*1 Before the court are Defendants Richard D.
Propper, M.D. ("Propper") and Daniel P. Beharry,
Esq.'s ("Beharry") (collectively "Defendants")
Motion to Dismiss for Lack of Personal Jurisdiction
pursuant to Fed.R.Civ.P. 12(b)(2), for Failure to State
a Claim pursuant to Fed.R.Civ.P. 12(b)(6), or, in the
Alternative, to Transfer pursuant to 28 U.S.C. § 1404,
and their Motion for Permission to File Reply Brief.
Also before the court is Defendant John B.
Torkelsen's ("Torkelsen") Motion to Join in
Defendants' Motions to Dismiss or, in the
Alternative, to Transfer. The ultimate issues raised by
the motions and determined by the court are (1) under
federal law, whether the court can assert personal
jurisdiction over the Defendants in a civil suit under
the False Claims Act ("FCA"), 28 U.S.C. § 3729, *et
seq.,* when the FCA confers nationwide jurisdiction
but Defendants contest jurisdiction in this particular
district because of inconvenience; (2) under federal
law, whether Plaintiff has alleged fraud with

sufficient specificity to withstand a motion pursuant
to Federal Rule of Civil Procedure 12(b)(6), and
whether the Complaint sets forth a cognizable claim
under the FCA; and (3) whether this action should be
transferred to the United States District Court for the
District of Connecticut or New Jersey (Newark) for
the convenience of the parties, witnesses and in the
interests of justice.

Defendants' Motion to File Reply Brief and
Torkelsen's Motion to Join in Defendants' Motions to
Dismiss or, in the Alternative, to Transfer are
granted. For the reasons that follow, however,
Defendants' motions to dismiss or, in the alternative,
to transfer are denied.

First, the court finds that asserting personal
jurisdiction is proper. The FCA confers nationwide
personal jurisdiction. Defendants have minimum
contacts with the United States as a whole, and
jurisdiction would not offend traditional notions of
fair play and substantial justice. Second, Plaintiff's
Complaint is pled with sufficient specificity to satisfy
Fed.R.Civ.P. (9)(b). The Complaint adequately puts
the Defendants on notice of the precise misconduct
with which they are being charged. It sufficiently
alleges a prima facie case under the FCA. When the
Complaint is construed in a light most favorable to
the Plaintiff, one can reasonably infer that Propper
and Beharry caused a false claim to be submitted.

Third, Defendants' motion to transfer is denied
because Defendants' specific allegations of
inconvenience do not weigh heavily in favor of
transfer.

### II. General Background

The United States of America, by and through the
Department of Justice and on behalf of its agency, the
United States Small Business Administration
("SBA"), brings this action under the FCA for an
alleged fraud perpetrated on the SBA through its
Small Business Investment Company ("SBIC")
program. Allegedly, Defendants submitted, or caused
to be submitted, false claims and or false statements
in order to receive federal funds from the SBA. This

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                    Page 2
Slip Copy, 2007 WL 4245736 (E.D.Pa.)

case involves false claims submitted in connection with a SBIC known as Acorn Technology Fund, LP ("Acorn").

*2 The Complaint alleges that Defendants Propper and Beharry directed and controlled significant portions of Acorn's investments, made an illegal loan to Acorn, made false representations directly to the SBA, received excessive management fees or other illegal payments from Acorn, and engaged in conflict of interest transactions with Acorn.

### III. Discussion

#### A. Standard of Review

Although the Plaintiff bears the burden of demonstrating the facts that establish personal jurisdiction, in reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(2), this court must accept all of the Plaintiff's allegations as true and construe disputed facts in favor of the Plaintiff. *Pinker v. Roche Holdings Ltd.,* 292 F.3d 361, 368-69 (3d Cir.2002). Additionally, a court should not dismiss a complaint under Rule 12(b)(6) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief. *United States ex rel. Schmidt v. Zimmer, Inc.,* 386 F.3d 235, 240 (3d Cir.2004). In evaluating the propriety of the dismissal, the court accepts all factual allegations as true, construes the complaint in the light most favorable to the plaintiff, and determines whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief. *Id.*

#### B. The Motion to Dismiss is Denied Because Personal Jurisdiction is Proper.

Defendants argue that this court cannot assert personal jurisdiction over them because they do not have minimum contacts with the Eastern District of Pennsylvania. (Defs. Mot. to Dismiss. 7.) Where a plaintiff's claim is based on a federal statute that authorizes nationwide service of process, the Third Circuit has held that the relevant forum for analyzing the extent of the defendant's contacts is the United States as a whole. *Pinker,* 292 F.3d at 369 (stating that "where Congress has spoken by authorizing nationwide service of process ... the jurisdiction of a federal court need not be confined by the defendant's

contacts with the state in which the federal court sits").

Here, the Plaintiff brings suit under the FCA, which states that "any action ... may be brought in any judicial district in which the defendant ... can be found, resides, transacts business, or in which any act ... occurred."31 U.S.C. § 3732(a). The FCA further states that "a summons ... shall be issued by the appropriate district court and served at any place within or outside of the United States."*Id.* Because the FCA authorizes nationwide service of process, the United States as a whole is the relevant forum for analyzing the extent of the Defendants' contacts. *See Pinker,* 292 F.3d at 369.

Generally, jurisdiction may be exercised when the defendant has constitutionally sufficient "minimum contacts" with the forum and where subjecting the defendant to the court's jurisdiction comports with "traditional notions" of fair play and substantial justice. *Id.* at 368-69 (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)).

#### 1. Defendants have Sufficient Contacts with the United States as a Whole.

*3 In assessing the sufficiency of defendants' contacts with the forum, courts examine the extent to which the defendants availed themselves of the privileges of American law and the extent to which they could reasonably anticipate being involved in litigation in the United States. *Pinker,* 292 F.3d at 369. All three of the Defendants have sufficient contacts with the United States as a whole because Defendants Propper, Beharry, and Torkelsen reside and conduct business in the United States. They thereby availed themselves of the privileges of American law and must anticipate being involved in litigation in the United States.

Defendant Torkelsen is currently in federal custody as a result of his guilty plea for making false statements in records he submitted to the SBA. Additionally, Torkelsen was the managing director of Acorn Technology Partners, LLC, which was a New Jersey limited partnership. Defendant Beharry is a resident of and is presently admitted to practice law in Connecticut. Defendant Propper is a resident of California and was previously licensed to practice

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                      Page 3
Slip Copy, 2007 WL 4245736 (E.D.Pa.)

medicine in Massachusetts. Therefore, all three Defendants have sufficient contacts with the United States as a whole.

**2. The Exercise of Personal Jurisdiction Here Does Not Offend Traditional Notions of Fair Play and Substantial Justice.**

Defendants argue, that this court must analyze whether or not asserting personal jurisdiction would comport with traditional notions of fair play and substantial justice. (Defs. Mot. to Dismiss 5.) In contrast, Plaintiff argues that a fairness analysis is not required. (Pl. Resp. to Defs. Mot. to Dismiss 8.) There has been some debate as to whether a fairness analysis ought to apply in the context of a federal statute authorizing nationwide service of process. *See Pinker,* 292 F.3d at 370-71 n. 2 (citations omitted). Although the Third Circuit has not issued an authoritative ruling squarely on this issue, it has indicated that a fairness analysis would be appropriate. *Id.* at 371 n. 2.

Even if this court were to conduct a fairness analysis, the exercise of personal jurisdiction over Defendants would still be proper because the inconvenience of defending this suit in the Eastern District of Pennsylvania does not render jurisdiction unreasonable and the national interest in furthering the policies of the FCA outweighs the burden on the Defendants. To evaluate whether the Fifth Amendment requirements of fairness have been satisfied, courts balance the burdens imposed on defendants against the federal interests involved in the litigation. *Id.* at 370-71.Courts engage in this balancing only when a defendant challenging jurisdiction has presented a compelling case that would render jurisdiction unreasonable. *Burger King,* 471 U.S. at 477;*Carteret Sav. Bank, FA v. Shushan,* 954 F.2d 141, 150 (3d Cir.1992).

Here, Defendants have not presented a compelling case. Defendants assert that the costs of litigating in a jurisdiction that is a day's travel away are significant. (Defs. Reply Br. 5.) Further, Defendants assert that each trip to Philadelphia requires the Defendants to incur travel expenses, overnight accommodations, and the payment to their attorney for ten hours of travel time. (*Id.*) Defendants, however, state that they are able and willing to defend this claim in Newark, New Jersey. (Defs. Mot. to Dismiss 5.) The

inconvenience of litigating in Philadelphia, Pennsylvania versus litigating in Newark, New Jersey does not present a compelling case that would render jurisdiction unreasonable.

**\*4** Moreover, even if the inconvenience to the Defendants rendered jurisdiction unreasonable, Defendants' argument fails because the national interest in furthering the policies of the FCA outweigh the Defendants' inconvenience. The federal interest involved in the litigation here is very strong. Fraud against the Government could cost taxpayers from ten to one hundred billion dollars annually. S. REP. NO. 99-345, at 3 (1986). The growing pervasiveness of fraud necessitated modernization of the FCA, which is the Government's primary litigation tool for combating fraud. *Id.* at 2. Further, the nationwide service of process provision was added because of the recognition of the existence of multi-defendant and multi-district frauds against the Government. *Id.* at 32-33.Prior to the 1986 amendment, which added the nationwide service of process provision to the FCA, a lawsuit had to be commenced in the district where the defendant could be found, which hindered the Government's litigation efforts in cases involving multiple Defendants.*Id.* Multiple suits increased the cost to the Government to pursue these multiple defendant cases, and there was a comparable impact upon the judicial resources required for a complete adjudication. *Id.*

Here, the Plaintiff alleges that Defendants, living in different parts of the United States, conspired to obtain payment for false claims. (Pl. Resp. to Defs. Mot. to Dismiss 11-12.) This is exactly the kind of scenario Congress envisioned when it enacted the amendments to the FCA. The federal policies underlying the statute would be advanced by asserting personal jurisdiction over Defendants pursuant to the nationwide jurisdiction conferred by the FCA. Were Defendants' motion to dismiss granted, it would undermine the purpose of the statute. Therefore, the national interest in effective litigation against alleged frauds committed against the United States, which may cost taxpayers billions of dollars annually, and in the efficient use of judicial resources outweighs Defendants' inconvenience of litigating in Philadelphia and not Newark.

**C. Defendants' Motion to Dismiss is Denied Because the Complaint Satisfies the Pleading**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                    Page 4
Slip Copy, 2007 WL 4245736 (E.D.Pa.)

**Requirements of Fed.R.Civ.P. 9(b) and Establishes a Cognizable Claim under the FCA.**

Defendants argue that the Plaintiff has failed to plead the alleged conspiracy with sufficient specificity and that what is pled does not set forth a cognizable claim under the FCA. (Defs. Mot. to Dismiss. 16-17.) First, this court determines whether the Complaint is pled with particularity in accordance with Rule 9(b) of the Federal Rules of Civil Procedure. *See United States ex rel. Schmidt v. Zimmer, Inc.,* 386 F.3d 235, 242-43 (3d Cir.2004). Then the court determines whether the Complaint, when construed in a light most favorable to Plaintiff, establishes a cognizable claim under the FCA. *See id.*

**1. Plaintiff Has Pled Fraud with Sufficient Particularity.**

**\*5** Plaintiff has pled the details of the alleged conspiracy with sufficient specificity to withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). Federal Rule of Civil Procedure 9(b) requires plaintiffs to plead, with particularity, the circumstances of the alleged fraud, in order to place the defendants on notice of the precise misconduct with which they are charged. *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984). Allegations of "date, place, or time fulfill these functions but nothing in the rule requires them."*Id.* Furthermore, courts must be sensitive to situations in which sophisticated defrauders may successfully conceal the details of their alleged fraud. *Id.* Courts should not focus exclusively on Rule 9(b)'s particularity language because this is "too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules."*Christidis v. First Pa. Mortgage Trust,* 717 F.2d 96, 100 (3d Cir.1983) (citation omitted).

Here, the Government has pled over thirty pages detailing the alleged conspiracy to defraud the SBA. Specifically, the Complaint alleges that Propper and Beharry entered into a side agreement with Torkelsen to control a significant portion of Acorn's funds, and that these agreements were hidden from the SBA. (Pl.Compl.10.) Defendants Propper and Beharry arranged for capital contributions to Acorn that allowed Acorn to meet a $10,000,000.00 minimum of regulatory capital ("Propper-Beharry Investments").(*Id.* at 11 .)In exchange for these

investments, Torkelsen agreed to cede control of the management and investment decisions over a portion of Acorn's funds to Propper and Beharry without SBA approval, this arrangement was in violation of SBA regulations. (*Id.*)

Allegedly, the Propper-Beharry investments were conditioned on the direction by Acorn of a like amount of funds to investments in entities chosen by Propper and/or Beharry ("Investment *Quid Pro Quo*" ); a payment of forty percent of the management fees ("Propper Fee Kickback") and a right to payment of fifty percent of the carried interest ("Profit of the SBIC") of the general partner, Acorn Technology Partners, LLC ("Propper Profit Kickback").(*Id.*) Propper, Beharry and Torkelsen agreed that Acorn would have to return the Propper-Beharry investments in the event the illegal investments and kickbacks were not made. (*Id.*) Collectively, this entire agreement was in violation of SBA regulations. (*Id.*)

This agreement allegedly rendered false the representations made directly to the SBA in Acorn's limited partnership agreement. (*Id* . at 11-12.)Additionally, Propper and Torkelsen allegedly engaged in an illegal loan to Acorn of $1,000,000.00. (*Id.*) Certifications of compliance with SBA regulations, which are pre-requisites for drawing SBA funds, allegedly were rendered false because of *quid pro quo,* kickbacks, false statements, and the loan. (*Id.* at 12.)

**\*6** These agreements allegedly gave Propper the power to direct the management and policies of Acorn and therefore Propper was an associate of Acorn. (*Id.*) Lack of these disclosures, and the failure to seek approval, rendered the certifications associated with payment false. (*Id.* at 12.)Defendant Propper allegedly used his control of Acorn, hidden from the SBA, to cause or support Acorn's investment in four companies [FN1] in which Propper or Beharry served as an officer or director more than thirty days prior to financing and/or in which Propper had at least a five percent ownership interest. (*Id.* at 15.)All of these investments were in violation of SBA regulations, because Propper and Beharry's roles in the companies had to be disclosed prior to funding and approved in writing. (*Id.*)

FN1. The companies were listed in the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2007 WL 4245736 (E.D.Pa.)

Complaint as: Medibuy.com, Fresh Roast, Inc., Endo Surgical Devices, Inc., and Infant Advantage/Parentech.

The Complaint alleges that, by participating in a scheme to violate the SBA rules, Torkelsen, Propper, and Beharry submitted or caused to be submitted false statements and/or false claims to the Government to obtain SBA's approval concerning management fees. (*Id.* at 16.)Further, Propper and Beharry allegedly also submitted documents to the SBA that concealed the illegal control that Propper possessed with respect to Acorn. (*Id.*) Lastly, it is alleged that Propper and Beharry knew that Torkelsen and Acorn were applying for SBA funds and certifying compliance with the SBIC program, and by virtue of their participation in the transactions they caused those false claims and statements to be made to the SBA. (*Id.* at 24.)

Plaintiff has pled the details of the alleged fraud with sufficient particularity so as to put the Defendants on notice of the precise misconduct with which they are charged. From the face of the Complaint, Plaintiff has met the pleading standard of Rule 9(b). Therefore, Defendants' motion to dismiss for failure to state a claim is denied.[FN2]

> FN2. Defendants' reliance on *Bell Atlantic Corp. v. Twombly,* ---U.S. ----, ----, 127 S.Ct. 1955, 1973, 167 L.Ed.2d 929 (2007), for the proposition that the standards for pleading allegations of conspiracy required to survive a motion to dismiss have been significantly altered, is misplaced. The Supreme Court in *Twombly* explicitly did not alter or broaden the scope of the Federal Rules of Civil Procedure. *Id.* at 1973 n. 14.Further, the concern in *Twombly* was that the complaint failed to render any relief plausible. *Id.*

**2. Plaintiff States a Cognizable Claim Under the FCA.**

The Plaintiff has established a prima facie claim under the FCA. The facts construed in a light most favorable to the Plaintiff show that Defendants Beharry and Propper knowingly assisted in causing the government to pay claims which were grounded in fraud. To establish a prima facie claim under §

3729(a)(1), a plaintiff must show that: "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent."*United States ex rel. Schmidt v. Zimmer, 386 F.3d 235, 242 (3d Cir.2004)* (citing *Hutchins v. Wilentz, Goldman & Spitzer, 253 F.3d 176, 182 (3d Cir.2001)*). In order to prove a claim under § 3729(a)(2), a plaintiff must also show that the defendant made or used, or caused someone else to make or use, a false record in order to cause the false claim to be actually paid or approved. *Id.*

These provisions, considered together, show a purpose to reach any person who knowingly assisted in causing the government to pay claims that were grounded in fraud, without regard to whether that person had direct contractual relations with the government. *Id.* at 243 (quoting *United States ex rel. Marcus v. Hess, 317 U.S. 537, 544, 63 S.Ct. 379, 87 L.Ed. 443 (1943)*). Further, "a false certification of compliance with applicable law creates liability under the FCA when certification is a prerequisite to obtaining a government benefit."*Id.* (alterations and citation omitted). Lastly, the Third Circuit has applied ordinary causation principles of negligence law in determining responsibility under the FCA. *Id.* at 244;*see United States ex rel. Cantekin v. Univ. of Pittsburgh, 192 F.3d 402, 416 (3d Cir.1999)* (applying the Restatement (Second) of Torts § 443 to determine responsibility under the FCA).

*7 Here, Plaintiff alleges that Propper and Beharry created and pursued a complex scheme that they knew would require Torkelsen to submit false certifications to the government. If this conduct and this knowledge were proven at trial, a jury could conclude that Propper and Beharry knowingly caused Torkelsen's false claims to be filed. When the Complaint is read in a light most favorable to Plaintiff, it can reasonably be inferred that Propper and Beharry must have known that Torkelsen could not have accepted the $1,000,000.00 loan, provided kickbacks, shared profits, paid excessive management fees and engaged in the self dealing with Propper and Beharry in the manner alleged in the Complaint, unless Torkelsen falsely certified Acorn to be in compliance with federal law. Therefore, Plaintiff's Complaint states a claim upon which relief can be granted, and the Defendants'

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                          Page 6
Slip Copy, 2007 WL 4245736 (E.D.Pa.)

motion to dismiss under Fed.R.Civ.P. 12(b)(6) is denied.

**D. Defendants' Motion to Transfer is Denied Because Transfer to the United States District Court for the District of Connecticut or New Jersey Does Not Better Serve the Interests of Justice.**

Plaintiff's choice of forum, the Eastern District of Pennsylvania, will not be disturbed because other actions collateral to this case have been ongoing in this court for several years and a transfer to the District of Connecticut or New Jersey (Newark) would do nothing more than shift the longer travel commute from the Defendants to the Plaintiff. Section 1404(a) provides: "for the convenience of parties and witnesses, and in the interests of justice, a district court may transfer any civil action to any other district or division where it might have been brought."28 U.S.C. § 1404(a); see Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir.1995). The burden to establish the necessity of a transfer is on the movant. Id.

The Third Circuit has established various public and private interests that should be considered in conjunction with the enumerated factors of § 1404(a).Id. at 879.The public interest factors include practical considerations that could make the trial easy, expeditious, or inexpensive.Id. The private interests include plaintiff's forum preference, whether the claim arose elsewhere, the convenience of the parties as indicated by their physical and financial condition, the convenience of the witnesses [FN3], and the location of books and records. Id.

> FN3. Only to the extent that the witnesses may actually be unavailable for trial in one of the fora. Jumara, 55 F.3d at 879.

Here, Defendants argue that this action should be transferred because the Complaint does not allege a "single operative fact that occurred in Pennsylvania."(Defs. Mot. to Dismiss 29.) Further, they contend that because Beharry resides in and defense counsel is based out of Connecticut, and Plaintiff's counsel is based out of Washington, D.C., this forum would be equally inconvenient to both parties. (Defs. Mot. to Dismiss 31-32.) Defendants also assert that a majority of the non-party witnesses

are found in New Jersey and that those witnesses who would testify as to Acorn are in Connecticut. (Defs. Mot. to Dismiss. 33-34.) Defendants argue that the government has an unfair advantage and that "transfer is the only way to neutralize the government's fundamentally unfair ability to impose an unwarranted cost on Defendants."(Id. at 37.)

*8 Defendants' contentions do not weigh heavily in favor of a transfer. First, all of Acorn's money was funneled through the Eastern District of Pennsylvania, and Acorn moved to New Hope, Pennsylvania at the end of its fiscal life. (Pl. Resp. to Defs. Mot. to Dismiss. 19-20.) Second, the Defendants' contention that this forum is equally inconvenient to both the Defendant and the Plaintiff is incorrect. The Plaintiff is based out of Washington, D .C. and the contention that litigating in New Haven, Connecticut or Newark, New Jersey would be more convenient is flatly rejected.[FN4]Third, the Plaintiff's witnesses are in Washington, D.C., and therefore this forum is more convenient than Connecticut or New Jersey. (Pl. Resp. to Defs. Mot. to Dismiss. 20.)

> FN4. This forum provides a geographic middle point between the parties.

Moreover, the public's interest would be better served by permitting this action to proceed in the Eastern District. As the Plaintiff noted, the receivership and other actions collateral to this instant case have been ongoing before this court for years. Additionally, the Plaintiff avers that much of the evidence in their possession is relevant to these ongoing actions, and that splitting the litigation up further would be extremely burdensome and expensive. (Pl. Resp. to Defs. Mot. to Dismiss 20.) Transferring this case to either New Jersey or Connecticut in essence would do nothing more than shift the longer travel commute from the Defendants to the Plaintiff, while conflicting with the public's interest in judicial economy and the purpose of the nationwide jurisdiction conferred by the FCA. Therefore, Defendants' motion to transfer is denied.

### IV. Conclusion

For the foregoing reasons, Defendants' Motions to Dismiss for Lack of Personal Jurisdiction and for Failure to State a Claim are denied. Further,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Defendants' Motion to Transfer to the United States
District Court for the District of Connecticut or the
District of New Jersey (Newark) is denied.

An appropriate Order follows.

### ORDER

AND NOW, this 3rd day of December, 2007, upon
consideration of Defendants Richard D. Propper,
M.D. ("Propper") and Daniel P. Beharry, Esq.'s
("Beharry") Motion to Dismiss for Lack of Personal
Jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2), for
Failure to State a Claim pursuant to Fed.R.Civ.P.
12(b)(6), or, in the Alternative, to Transfer pursuant
to 28 U.S.C. § 1404 (Doc.Nos.13, 14), Plaintiff's
Response in opposition thereto, and Defendants'
Reply; Defendants Propper and Beharry's Motion for
Permission to File Reply Brief (Doc. No. 36) and
Plaintiff's Response thereto; and Defendant John B.
Torkelsen's ("Torkelsen") Motion to Adopt
Defendants' Motions to Dismiss or, in the
Alternative, to Transfer (Doc. No. 38) and Plaintiff's
Response thereto, it is hereby ORDERED as follows
for the reasons set forth in the attached
memorandum:

1. Defendants Propper and Beharry's Motion to
Dismiss for Lack of Personal Jurisdiction pursuant to
Fed.R.Civ.P. 12(b)(2), for Failure to State a Claim
pursuant to Fed.R.Civ.P. 12(b)(6), or, in the
Alternative, to Transfer pursuant to 28 U.S.C. § 1404
(Doc. Nos.13, 14), in which Defendant Torkelsen
joins, is DENIED;

*9 2. Defendants Propper and Beharry's Motion for
Permission to File Reply Brief (Doc. No. 36) is
GRANTED; and

3. Defendant Torkelsen's Motion to Adopt
Defendants' Motions to Dismiss or, in the
Alternative, to Transfer (Doc. No. 38) is GRANTED.

E.D.Pa.,2007.
U.S. v. Torkelsen
Slip Copy, 2007 WL 4245736 (E.D.Pa.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy
Slip Copy, 2007 WL 4245736 (E.D.Pa.)

Page 1

**C** U.S. v. Torkelsen
E.D.Pa.,2007.
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
UNITED STATES of America, Plaintiff,
v.
John B. TORKELSEN, et al., Defendants.
**Civil No. 06-05674.**

Dec. 3, 2007.

Jordan L. Strauss, Brian James McCabe, U.S.
Department of Justice, Washington, DC, Susan R.
Becker, U.S. Attorney's Office, Philadelphia, PA, for
Plaintiff.
John B. Torkelsen, Morgantown, WV, pro se.
Anne D. Peterson, Jay Christopher Rooney, Carmody
& Torrance LLP, New Haven, CT, Walter Weir, Jr.,
Weir & Partners LLP, Philadelphia, PA, for
Defendants.

### MEMORANDUM

GILES, District Judge.

### I. Introduction

*1 Before the court are Defendants Richard D.
Propper, M.D. ("Propper") and Daniel P. Beharry,
Esq.'s ("Beharry") (collectively "Defendants")
Motion to Dismiss for Lack of Personal Jurisdiction
pursuant to Fed.R.Civ.P. 12(b)(2), for Failure to State
a Claim pursuant to Fed.R.Civ.P. 12(b)(6), or, in the
Alternative, to Transfer pursuant to 28 U.S.C. § 1404,
and their Motion for Permission to File Reply Brief.
Also before the court is Defendant John B.
Torkelsen's ("Torkelsen") Motion to Join in
Defendants' Motions to Dismiss or, in the
Alternative, to Transfer. The ultimate issues raised by
the motions and determined by the court are (1) under
federal law, whether the court can assert personal
jurisdiction over the Defendants in a civil suit under
the False Claims Act ("FCA"), 28 U.S.C. § 3729, et
seq., when the FCA confers nationwide jurisdiction
but Defendants contest jurisdiction in this particular
district because of inconvenience; (2) under federal
law, whether Plaintiff has alleged fraud with

sufficient specificity to withstand a motion pursuant
to Federal Rule of Civil Procedure 12(b)(6), and
whether the Complaint sets forth a cognizable claim
under the FCA; and (3) whether this action should be
transferred to the United States District Court for the
District of Connecticut or New Jersey (Newark) for
the convenience of the parties, witnesses and in the
interests of justice.

Defendants' Motion to File Reply Brief and
Torkelsen's Motion to Join in Defendants' Motions to
Dismiss or, in the Alternative, to Transfer are
granted. For the reasons that follow, however,
Defendants' motions to dismiss or, in the alternative,
to transfer are denied.

First, the court finds that asserting personal
jurisdiction is proper. The FCA confers nationwide
personal jurisdiction. Defendants have minimum
contacts with the United States as a whole, and
jurisdiction would not offend traditional notions of
fair play and substantial justice. Second, Plaintiff's
Complaint is pled with sufficient specificity to satisfy
Fed.R.Civ.P. (9)(b). The Complaint adequately puts
the Defendants on notice of the precise misconduct
with which they are being charged. It sufficiently
alleges a prima facie case under the FCA. When the
Complaint is construed in a light most favorable to
the Plaintiff, one can reasonably infer that Propper
and Beharry caused a false claim to be submitted.

Third, Defendants' motion to transfer is denied
because Defendants' specific allegations of
inconvenience do not weigh heavily in favor of
transfer.

### II. General Background

The United States of America, by and through the
Department of Justice and on behalf of its agency, the
United States Small Business Administration
("SBA"), brings this action under the FCA for an
alleged fraud perpetrated on the SBA through its
Small Business Investment Company ("SBIC")
program. Allegedly, Defendants submitted, or caused
to be submitted, false claims and or false statements
in order to receive federal funds from the SBA. This

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

case involves false claims submitted in connection with a SBIC known as Acorn Technology Fund, LP ("Acorn").

**\*2** The Complaint alleges that Defendants Propper and Beharry directed and controlled significant portions of Acorn's investments, made an illegal loan to Acorn, made false representations directly to the SBA, received excessive management fees or other illegal payments from Acorn, and engaged in conflict of interest transactions with Acorn.

### III. Discussion

#### A. Standard of Review

Although the Plaintiff bears the burden of demonstrating the facts that establish personal jurisdiction, in reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(2), this court must accept all of the Plaintiff's allegations as true and construe disputed facts in favor of the Plaintiff. *Pinker v. Roche Holdings Ltd.,* 292 F.3d 361, 368-69 (3d Cir.2002). Additionally, a court should not dismiss a complaint under Rule 12(b)(6) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief. *United States ex rel. Schmidt v. Zimmer, Inc.,* 386 F.3d 235, 240 (3d Cir.2004). In evaluating the propriety of the dismissal, the court accepts all factual allegations as true, construes the complaint in the light most favorable to the plaintiff, and determines whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief. *Id.*

#### B. The Motion to Dismiss is Denied Because Personal Jurisdiction is Proper.

Defendants argue that this court cannot assert personal jurisdiction over them because they do not have minimum contacts with the Eastern District of Pennsylvania. (Defs. Mot. to Dismiss. 7.) Where a plaintiff's claim is based on a federal statute that authorizes nationwide service of process, the Third Circuit has held that the relevant forum for analyzing the extent of the defendant's contacts is the United States as a whole. *Pinker,* 292 F.3d at 369 (stating that "where Congress has spoken by authorizing nationwide service of process ... the jurisdiction of a federal court need not be confined by the defendant's

contacts with the state in which the federal court sits").

Here, the Plaintiff brings suit under the FCA, which states that "any action ... may be brought in any judicial district in which the defendant ... can be found, resides, transacts business, or in which any act ... occurred."31 U.S.C. § 3732(a). The FCA further states that "a summons ... shall be issued by the appropriate district court and served at any place within or outside of the United States."*Id.* Because the FCA authorizes nationwide service of process, the United States as a whole is the relevant forum for analyzing the extent of the Defendants' contacts. *See Pinker,* 292 F.3d at 369.

Generally, jurisdiction may be exercised when the defendant has constitutionally sufficient "minimum contacts" with the forum and where subjecting the defendant to the court's jurisdiction comports with "traditional notions" of fair play and substantial justice. *Id.* at 368-69 (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)).

**1. Defendants have Sufficient Contacts with the United States as a Whole.**

**\*3** In assessing the sufficiency of defendants' contacts with the forum, courts examine the extent to which the defendants availed themselves of the privileges of American law and the extent to which they could reasonably anticipate being involved in litigation in the United States. *Pinker,* 292 F.3d at 369. All three of the Defendants have sufficient contacts with the United States as a whole because Defendants Propper, Beharry, and Torkelsen reside and conduct business in the United States. They thereby availed themselves of the privileges of American law and must anticipate being involved in litigation in the United States.

Defendant Torkelsen is currently in federal custody as a result of his guilty plea for making false statements in records he submitted to the SBA. Additionally, Torkelsen was the managing director of Acorn Technology Partners, LLC, which was a New Jersey limited partnership. Defendant Beharry is a resident of and is presently admitted to practice law in Connecticut. Defendant Propper is a resident of California and was previously licensed to practice

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                    Page 3
Slip Copy, 2007 WL 4245736 (E.D.Pa.)

medicine in Massachusetts. Therefore, all three Defendants have sufficient contacts with the United States as a whole.

**2. The Exercise of Personal Jurisdiction Here Does Not Offend Traditional Notions of Fair Play and Substantial Justice.**

Defendants argue, that this court must analyze whether or not asserting personal jurisdiction would comport with traditional notions of fair play and substantial justice. (Defs. Mot. to Dismiss 5.) In contrast, Plaintiff argues that a fairness analysis is not required. (Pl. Resp. to Defs. Mot. to Dismiss 8.) There has been some debate as to whether a fairness analysis ought to apply in the context of a federal statute authorizing nationwide service of process. *See Pinker,* 292 F.3d at 370-71 n. 2 (citations omitted). Although the Third Circuit has not issued an authoritative ruling squarely on this issue, it has indicated that a fairness analysis would be appropriate. *Id.* at 371 n. 2.

Even if this court were to conduct a fairness analysis, the exercise of personal jurisdiction over Defendants would still be proper because the inconvenience of defending this suit in the Eastern District of Pennsylvania does not render jurisdiction unreasonable and the national interest in furthering the policies of the FCA outweighs the burden on the Defendants. To evaluate whether the Fifth Amendment requirements of fairness have been satisfied, courts balance the burdens imposed on defendants against the federal interests involved in the litigation. *Id.* at 370-71. Courts engage in this balancing only when a defendant challenging jurisdiction has presented a compelling case that would render jurisdiction unreasonable. *Burger King,* 471 U.S. at 477; *Carteret Sav. Bank, FA v. Shushan,* 954 F.2d 141, 150 (3d Cir.1992).

Here, Defendants have not presented a compelling case. Defendants assert that the costs of litigating in a jurisdiction that is a day's travel away are significant. (Defs. Reply Br. 5.) Further, Defendants assert that each trip to Philadelphia requires the Defendants to incur travel expenses, overnight accommodations, and the payment to their attorney for ten hours of travel time. (*Id.*) Defendants, however, state that they are able and willing to defend this claim in Newark, New Jersey. (Defs. Mot. to Dismiss 5.) The

inconvenience of litigating in Philadelphia, Pennsylvania versus litigating in Newark, New Jersey does not present a compelling case that would render jurisdiction unreasonable.

*\*4 Moreover, even if the inconvenience to the Defendants rendered jurisdiction unreasonable, Defendants' argument fails because the national interest in furthering the policies of the FCA outweigh the Defendants' inconvenience. The federal interest involved in the litigation here is very strong. Fraud against the Government could cost taxpayers from ten to one hundred billion dollars annually. S. REP. NO. 99-345, at 3 (1986). The growing pervasiveness of fraud necessitated modernization of the FCA, which is the Government's primary litigation tool for combating fraud. *Id.* at 2. Further, the nationwide service of process provision was added because of the recognition of the existence of multi-defendant and multi-district frauds against the Government. *Id.* at 32-33. Prior to the 1986 amendment, which added the nationwide service of process provision to the FCA, a lawsuit had to be commenced in the district where the defendant could be found, which hindered the Government's litigation efforts in cases involving multiple Defendants. *Id.* Multiple suits increased the cost to the Government to pursue these multiple defendant cases, and there was a comparable impact upon the judicial resources required for a complete adjudication. *Id.*

Here, the Plaintiff alleges that Defendants, living in different parts of the United States, conspired to obtain payment for false claims. (Pl. Resp. to Defs. Mot. to Dismiss 11-12.) This is exactly the kind of scenario Congress envisioned when it enacted the amendments to the FCA. The federal policies underlying the statute would be advanced by asserting personal jurisdiction over Defendants pursuant to the nationwide jurisdiction conferred by the FCA. Were Defendants' motion to dismiss granted, it would undermine the purpose of the statute. Therefore, the national interest in effective litigation against alleged frauds committed against the United States, which may cost taxpayers billions of dollars annually, and in the efficient use of judicial resources outweighs Defendants' inconvenience of litigating in Philadelphia and not Newark.

**C. Defendants' Motion to Dismiss is Denied Because the Complaint Satisfies the Pleading**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                        Page 4
Slip Copy, 2007 WL 4245736 (E.D.Pa.)

**Requirements of Fed.R.Civ.P. 9(b) and Establishes a Cognizable Claim under the FCA.**

Defendants argue that the Plaintiff has failed to plead the alleged conspiracy with sufficient specificity and that what is pled does not set forth a cognizable claim under the FCA. (Defs. Mot. to Dismiss. 16-17.) First, this court determines whether the Complaint is pled with particularity in accordance with Rule 9(b) of the Federal Rules of Civil Procedure. *See United States ex rel. Schmidt v. Zimmer, Inc.,* 386 F.3d 235, 242-43 (3d Cir.2004). Then the court determines whether the Complaint, when construed in a light most favorable to Plaintiff, establishes a cognizable claim under the FCA. *See id.*

**1. Plaintiff Has Pled Fraud with Sufficient Particularity.**

**\*5** Plaintiff has pled the details of the alleged conspiracy with sufficient specificity to withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). Federal Rule of Civil Procedure 9(b) requires plaintiffs to plead, with particularity, the circumstances of the alleged fraud, in order to place the defendants on notice of the precise misconduct with which they are charged. *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984). Allegations of "date, place, or time fulfill these functions but nothing in the rule requires them."*Id.* Furthermore, courts must be sensitive to situations in which sophisticated defrauders may successfully conceal the details of their alleged fraud. *Id.* Courts should not focus exclusively on Rule 9(b)'s particularity language because this is "too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules."*Christidis v. First Pa. Mortgage Trust,* 717 F.2d 96, 100 (3d Cir.1983) (citation omitted).

Here, the Government has pled over thirty pages detailing the alleged conspiracy to defraud the SBA. Specifically, the Complaint alleges that Propper and Beharry entered into a side agreement with Torkelsen to control a significant portion of Acorn's funds, and that these agreements were hidden from the SBA. (Pl.Compl.10.) Defendants Propper and Beharry arranged for capital contributions to Acorn that allowed Acorn to meet a $10,000,000.00 minimum of regulatory capital ("Propper-Beharry Investments").(*Id.* at 11 .)In exchange for these investments, Torkelsen agreed to cede control of the management and investment decisions over a portion of Acorn's funds to Propper and Beharry without SBA approval, this arrangement was in violation of SBA regulations. (*Id.*)

Allegedly, the Propper-Beharry investments were conditioned on the direction by Acorn of a like amount of funds to investments in entities chosen by Propper and/or Beharry ("Investment *Quid Pro Quo*" ); a payment of forty percent of the management fees ("Propper Fee Kickback") and a right to payment of fifty percent of the carried interest ("Profit of the SBIC") of the general partner, Acorn Technology Partners, LLC ("Propper Profit Kickback").(*Id.*) Propper, Beharry and Torkelsen agreed that Acorn would have to return the Propper-Beharry investments in the event the illegal investments and kickbacks were not made. (*Id.*) Collectively, this entire agreement was in violation of SBA regulations. (*Id.*)

This agreement allegedly rendered false the representations made directly to the SBA in Acorn's limited partnership agreement. (*Id* . at 11-12.)Additionally, Propper and Torkelsen allegedly engaged in an illegal loan to Acorn of $1,000,000.00. (*Id.*) Certifications of compliance with SBA regulations, which are pre-requisites for drawing SBA funds, allegedly were rendered false because of *quid pro quo,* kickbacks, false statements, and the loan. (*Id.* at 12.)

**\*6** These agreements allegedly gave Propper the power to direct the management and policies of Acorn and therefore Propper was an associate of Acorn. (*Id.*) Lack of these disclosures, and the failure to seek approval, rendered the certifications associated with payment false. (*Id.* at 12.)Defendant Propper allegedly used his control of Acorn, hidden from the SBA, to cause or support Acorn's investment in four companies [FN1] in which Propper or Beharry served as an officer or director more than thirty days prior to financing and/or in which Propper had at least a five percent ownership interest. (*Id.* at 15.)All of these investments were in violation of SBA regulations, because Propper and Beharry's roles in the companies had to be disclosed prior to funding and approved in writing. (*Id.*)

FN1. The companies were listed in the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Complaint as: Medibuy.com, Fresh Roast, Inc., Endo Surgical Devices, Inc., and Infant Advantage/Parentech.

The Complaint alleges that, by participating in a scheme to violate the SBA rules, Torkelsen, Propper, and Beharry submitted or caused to be submitted false statements and/or false claims to the Government to obtain SBA's approval concerning management fees. (*Id.* at 16.)Further, Propper and Beharry allegedly also submitted documents to the SBA that concealed the illegal control that Propper possessed with respect to Acorn. (*Id.*) Lastly, it is alleged that Propper and Beharry knew that Torkelsen and Acorn were applying for SBA funds and certifying compliance with the SBIC program, and by virtue of their participation in the transactions they caused those false claims and statements to be made to the SBA. (*Id.* at 24.)

Plaintiff has pled the details of the alleged fraud with sufficient particularity so as to put the Defendants on notice of the precise misconduct with which they are charged. From the face of the Complaint, Plaintiff has met the pleading standard of Rule 9(b). Therefore, Defendants' motion to dismiss for failure to state a claim is denied.[FN2]

> FN2. Defendants' reliance on *Bell Atlantic Corp. v. Twombly,* ---U.S. ----, ----, 127 S.Ct. 1955, 1973, 167 L.Ed.2d 929 (2007), for the proposition that the standards for pleading allegations of conspiracy required to survive a motion to dismiss have been significantly altered, is misplaced. The Supreme Court in *Twombly* explicitly did not alter or broaden the scope of the Federal Rules of Civil Procedure. *Id.* at 1973 n. 14.Further, the concern in *Twombly* was that the complaint failed to render any relief plausible. *Id.*

**2. Plaintiff States a Cognizable Claim Under the FCA.**

The Plaintiff has established a prima facie claim under the FCA. The facts construed in a light most favorable to the Plaintiff show that Defendants Beharry and Propper knowingly assisted in causing the government to pay claims which were grounded in fraud. To establish a prima facie claim under §

3729(a)(1), a plaintiff must show that: "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent."*United States ex rel. Schmidt v. Zimmer,* 386 F.3d 235, 242 (3d Cir.2004) (citing *Hutchins v. Wilentz, Goldman & Spitzer,* 253 F.3d 176, 182 (3d Cir.2001)). In order to prove a claim under § 3729(a)(2), a plaintiff must also show that the defendant made or used, or caused someone else to make or use, a false record in order to cause the false claim to be actually paid or approved. *Id.*

These provisions, considered together, show a purpose to reach any person who knowingly assisted in causing the government to pay claims that were grounded in fraud, without regard to whether that person had direct contractual relations with the government. *Id.* at 243 (quoting *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 544, 63 S.Ct. 379, 87 L.Ed. 443 (1943)). Further, "a false certification of compliance with applicable law creates liability under the FCA when certification is a prerequisite to obtaining a government benefit."*Id.* (alterations and citation omitted). Lastly, the Third Circuit has applied ordinary causation principles of negligence law in determining responsibility under the FCA. *Id.* at 244;see *United States ex rel. Cantekin v. Univ. of Pittsburgh,* 192 F.3d 402, 416 (3d Cir.1999) (applying the Restatement (Second) of Torts § 443 to determine responsibility under the FCA).

*7 Here, Plaintiff alleges that Propper and Beharry created and pursued a complex scheme that they knew would require Torkelsen to submit false certifications to the government. If this conduct and this knowledge were proven at trial, a jury could conclude that Propper and Beharry knowingly caused Torkelsen's false claims to be filed. When the Complaint is read in a light most favorable to Plaintiff, it can reasonably be inferred that Propper and Beharry must have known that Torkelsen could not have accepted the $1,000,000.00 loan, provided kickbacks, shared profits, paid excessive management fees and engaged in the self dealing with Propper and Beharry in the manner alleged in the Complaint, unless Torkelsen falsely certified Acorn to be in compliance with federal law. Therefore, Plaintiff's Complaint states a claim upon which relief can be granted, and the Defendants'

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

motion to dismiss under Fed.R.Civ.P. 12(b)(6) is denied.

**D. Defendants' Motion to Transfer is Denied Because Transfer to the United States District Court for the District of Connecticut or New Jersey Does Not Better Serve the Interests of Justice.**

Plaintiff's choice of forum, the Eastern District of Pennsylvania, will not be disturbed because other actions collateral to this case have been ongoing in this court for several years and a transfer to the District of Connecticut or New Jersey (Newark) would do nothing more than shift the longer travel commute from the Defendants to the Plaintiff. Section 1404(a) provides: "for the convenience of parties and witnesses, and in the interests of justice, a district court may transfer any civil action to any other district or division where it might have been brought."28 U.S.C. § 1404(a); see Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir.1995). The burden to establish the necessity of a transfer is on the movant. Id.

The Third Circuit has established various public and private interests that should be considered in conjunction with the enumerated factors of § 1404(a).Id. at 879.The public interest factors include practical considerations that could make the trial easy, expeditious, or inexpensive.Id. The private interests include plaintiff's forum preference, whether the claim arose elsewhere, the convenience of the parties as indicated by their physical and financial condition, the convenience of the witnesses [FN3], and the location of books and records. Id.

>   FN3. Only to the extent that the witnesses may actually be unavailable for trial in one of the fora. Jumara, 55 F.3d at 879.

Here, Defendants argue that this action should be transferred because the Complaint does not allege a "single operative fact that occurred in Pennsylvania."(Defs. Mot. to Dismiss 29.) Further, they contend that because Beharry resides in and defense counsel is based out of Connecticut, and Plaintiff's counsel is based out of Washington, D.C., this forum would be equally inconvenient to both parties. (Defs. Mot. to Dismiss 31-32.) Defendants also assert that a majority of the non-party witnesses

are found in New Jersey and that those witnesses who would testify as to Acorn are in Connecticut. (Defs. Mot. to Dismiss. 33-34.) Defendants argue that the government has an unfair advantage and that "transfer is the only way to neutralize the government's fundamentally unfair ability to impose an unwarranted cost on Defendants."(Id. at 37.)

**\*8** Defendants' contentions do not weigh heavily in favor of a transfer. First, all of Acorn's money was funneled through the Eastern District of Pennsylvania, and Acorn moved to New Hope, Pennsylvania at the end of its fiscal life. (Pl. Resp. to Defs. Mot. to Dismiss. 19-20.) Second, the Defendants' contention that this forum is equally inconvenient to both the Defendant and the Plaintiff is incorrect. The Plaintiff is based out of Washington, D .C. and the contention that litigating in New Haven, Connecticut or Newark, New Jersey would be more convenient is flatly rejected.[FN4]Third, the Plaintiff's witnesses are in Washington, D.C., and therefore this forum is more convenient than Connecticut or New Jersey. (Pl. Resp. to Defs. Mot. to Dismiss. 20.)

>   FN4. This forum provides a geographic middle point between the parties.

Moreover, the public's interest would be better served by permitting this action to proceed in the Eastern District. As the Plaintiff noted, the receivership and other actions collateral to this instant case have been ongoing before this court for years. Additionally, the Plaintiff avers that much of the evidence in their possession is relevant to these ongoing actions, and that splitting the litigation up further would be extremely burdensome and expensive. (Pl. Resp. to Defs. Mot. to Dismiss 20.) Transferring this case to either New Jersey or Connecticut in essence would do nothing more than shift the longer travel commute from the Defendants to the Plaintiff, while conflicting with the public's interest in judicial economy and the purpose of the nationwide jurisdiction conferred by the FCA. Therefore, Defendants' motion to transfer is denied.

**IV. Conclusion**

For the foregoing reasons, Defendants' Motions to Dismiss for Lack of Personal Jurisdiction and for Failure to State a Claim are denied. Further,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                    Page 7
Slip Copy, 2007 WL 4245736 (E.D.Pa.)

Defendants' Motion to Transfer to the United States District Court for the District of Connecticut or the District of New Jersey (Newark) is denied.

An appropriate Order follows.

### ORDER

AND NOW, this 3rd day of December, 2007, upon consideration of Defendants Richard D. Propper, M.D. ("Propper") and Daniel P. Beharry, Esq.'s ("Beharry") Motion to Dismiss for Lack of Personal Jurisdiction pursuant to <u>Fed.R.Civ.P. 12(b)(2)</u>, for Failure to State a Claim pursuant to <u>Fed.R.Civ.P. 12(b)(6)</u>, or, in the Alternative, to Transfer pursuant to <u>28 U.S.C. § 1404</u> (Doc.Nos.13, 14), Plaintiff's Response in opposition thereto, and Defendants' Reply; Defendants Propper and Beharry's Motion for Permission to File Reply Brief (Doc. No. 36) and Plaintiff's Response thereto; and Defendant John B. Torkelsen's ("Torkelsen") Motion to Adopt Defendants' Motions to Dismiss or, in the Alternative, to Transfer (Doc. No. 38) and Plaintiff's Response thereto, it is hereby ORDERED as follows for the reasons set forth in the attached memorandum:

1. Defendants Propper and Beharry's Motion to Dismiss for Lack of Personal Jurisdiction pursuant to <u>Fed.R.Civ.P. 12(b)(2)</u>, for Failure to State a Claim pursuant to <u>Fed.R.Civ.P. 12(b)(6)</u>, or, in the Alternative, to Transfer pursuant to <u>28 U.S.C. § 1404</u> (Doc. Nos.13, 14), in which Defendant Torkelsen joins, is DENIED;

**\*9** 2. Defendants Propper and Beharry's Motion for Permission to File Reply Brief (Doc. No. 36) is GRANTED; and

3. Defendant Torkelsen's Motion to Adopt Defendants' Motions to Dismiss or, in the Alternative, to Transfer (Doc. No. 38) is GRANTED.

E.D.Pa.,2007.
U.S. v. Torkelsen
Slip Copy, 2007 WL 4245736 (E.D.Pa.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.