# EXHIBIT A

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
ERIE DIVISION


UNITED STATES OF AMERICA, ex rel. )
DILBAGH SINGH, M.D., PAUL KIRSCH, )
M.D., V. RAO NADELLA, M.D., and )
MARTIN JACOBS, M.D., )
                                 )
          Relators, )
                                 )    Civil Action
     vs. )    No. 04-186E
                                 )
BRADFORD REGIONAL MEDICAL CENTER, )
V&S MEDICAL ASSOCIATES, LLC, )
PETER VACCARO, M.D., KAMRAN SALEH,)
M.D., and DOES I through XX, )
                                 )
          Defendants. )


DEPOSITION OF KAMRAN SALEH, M.D.

THURSDAY, AUGUST 9, 2007

          Deposition of KAMRAN SALEH, M.D., called as a

witness by the Plaintiffs, taken pursuant to Notice of

Deposition and the Federal Rules of Civil Procedure,

by and before Joy A. Hartman, a Court Reporter and

Notary Public in and for the Commonwealth of

Pennsylvania, at the offices of Fox Rothschild, 625

Liberty Avenue, 29th Floor, Pittsburgh, Pennsylvania

commencing at 9:31 a.m. on the day and date above set

forth.

CONFIDENTIAL – PROTECTED HEALTH INFORMATION

6

```
 1    V&S Associates?

 2         A.    Well, V&S is what I own.  I am part owner in

 3    that.

 4         Q.    It still exists?

 5         A.    Yes.

 6         Q.    When did you form V&S?

 7         A.    Excuse me?

 8         Q.    When did you form V&S?

 9         A.    2000.  It was April of 2000.

10         Q.    And V&S is a corporation, correct?

11         A.    That's right, L.L.C.

12         Q.    L.L.C., and it's full name is V&S Associates

13    L.L.C.?

14         A.    V&S Medical Associates, L.L.C.

15         Q.    Who were the original shareholders or members

16    of the company?

17         A.    Me, Dr. Saleh, and Dr. Vaccaro.

18         Q.    Is the ownership the same today?

19         A.    Yes.

20         Q.    Have you ever had any other owners?

21         A.    No.

22         Q.    Do you own it 50-50?

23         A.    Yes.
```

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

7

1    Q.    Have you had other doctor employees in the

2    company?

3    A.    We had ones for less than a year.

4    Q.    Just one?

5    A.    Just one.

6    Q.    Who was that?

7    A.    Dr. Khan.

8    Q.    What is his first name?

9    A.    Amir, A-m-i-r.

10   Q.    And when did he work for you?

11   A.    I can't tell you exact dates.

12   Q.    Do you have the year, approximately?

13   A.    Approximately 2003.

14   Q.    Was there a Dr. Jamil?

15   A.    He's renting the space from us.

16   Q.    But he has never been employed by you?

17   A.    No.

18   Q.    Is he currently renting space from you?

19   A.    Yes.

20   Q.    How long has he been renting space?

21   A.    Since 2000.

22   Q.    What is his first name?

23   A.    Qazi, Q-a-z-i.

CONFIDENTIAL    PROTECTED HEALTH INFORMATION

9

1    A.    Yes.

2    Q.    When did you become a citizen?

3    A.    I can't tell you exactly.

4    Q.    Has it been more than ten years?

5    A.    Approximately ten years.

6    Q.    After graduating medical school, have you had

7    any other formal medical education?

8    A.    Residency training.

9    Q.    Where did you do your residency?

10    A.    University of Buffalo.

11    Q.    Was that a general residency, or did you have

12    any specialization?

13    A.    Internal medicine.

14    Q.    Did you complete the residency?

15    A.    Yes.

16    Q.    When did you complete it?

17    A.    '91 to '94.

18    Q.    Any other formal medical training?

19    A.    No.

20    Q.    Do you have any board certifications?

21    A.    Yes.

22    Q.    What would that be in?

23    A.    Internal medicine.

CONFIDENTIAL -- PROTECTED HEALTH INFORMATION

10

1    Q.    When did you receive that?

2    A.    In '94, and then I just -- since that expires

3    in ten years, I just renewed that.

4    Q.    Is that your only board certification?

5    A.    Yes.

6    Q.    Have you always practiced in internal medicine?

7    A.    Yes.

8    Q.    Could you tell me briefly what internal

9    medicine involves?

10   A.    Internal medicine involves taking care of

11   patients both in the office and the hospital, and

12   usually it deals with adult medicine and all the

13   common diseases that you see, like high blood

14   pressure, diabetes, heart disease, they are dealt

15   with.  If there are certain areas where you need

16   subspecialists, then you refer the patients to the

17   subspecialist.

18   Q.    Within the field of internal medicine, do you

19   specialize in any area?

20   A.    No.  I do have an interest in cardiology.

21   Q.    With respect to cardiology, what would an

22   internal physician do?

23   A.    Like, you take care of patients in the

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

11

1    intensive care unit, and most -- if you go into the

2    bigger hospitals, most of the internists are not

3    allowed to take care of patients in the critical care

4    unit when they are having a heart attack or heart

5    failure, congestive heart failure.  We do all that.

6        Q.   Does cardiology make up a substantial

7    percentage of your work, would you say?

8              MR. RYCHCIK:  Objection as to form.

9        A.   Well, it does make up some part of it.  I can't

10   tell you how much.

11       Q.   Where do you currently have hospital

12   privileges?

13       A.   Excuse me?

14       Q.   I'm sorry.  Where do you currently have

15   hospital privileges?

16       A.   I have hospital privileges at Bradford Regional

17   Medical Center, and I have courtesy privileges in

18   Olean General Hospital.

19       Q.   I'm sorry.  I didn't understand the last one.

20       A.   Olean General Hospital.

21       Q.   Oh, Olean, O-l-e-a-n?

22       A.   Yes.

23       Q.   In the last ten years, have you had privileges

**JOHNSON and MIMLESS**
**(412) 765-0744**

1    at any other hospital?

2        A.    Other than these two?

3        Q.    Other than these two.

4        A.    No.

5        Q.    When did you first get your privileges at

6    Bradford?

7        A.    After my residency.  Towards the end of '94.

8        Q.    What about Olean?

9        A.    At the same time.

10       Q.    Has V&S' office been located in the same place

11   since you formed it?

12       A.    Yes.

13       Q.    Where is its office?

14       A.    It is 24 West Washington Street in Bradford.

15       Q.    In Bradford?

16       A.    Yes.

17       Q.    How far is it from Bradford Regional Medical

18   Center?

19       A.    It is about less than a mile.

20       Q.    How far is it from the Olean Hospital?

21       A.    It is about, roughly, 20 miles.

22       Q.    I would like to focus, for a minute, on the

23   time period before you bought the nuclear camera that

CONFIDENTIAL   PROTECTED HEALTH INFORMATION

13

1    is sort of at issue in this litigation.  I said

2    "bought."  I should say "leased."

3         Do you recall when you leased that camera?

4    A.    I don't know the exact dates, but it was around

5    2001.

6    Q.    Now, in the period before you leased the

7    camera, could you briefly describe to me the nature of

8    your practice?

9    A.    Well, we are a two-physician group practice,

10   and we see patients in the office, and if there is

11   somebody who gets sick and needs to go to the

12   hospital, we admit them in the hospital and take care

13   of them in the hospital.

14   Q.    At this period of time that we are talking

15   about, how did most of your patients come to you?

16        MR. RYCHCIK:  Again, just to be clear, at

17        this period of time, we are talking pre2001?

18        MR. SIMPSON:  Right.

19   A.    Pre2001?

20   Q.    Pre2001, before you got the camera, basically.

21   A.    They were mostly our patients that we acquired

22   when we bought the practice from the hospital, and the

23   new patients are patients that come on the basis of

14

1    patient referrals or through the ads, the Yellow

2    Pages.

3       Q.   I guess I meant to ask this before, but I will

4    ask it now:  You referred to buying the practice from

5    the hospital.  At some point, you were employed by

6    Bradford Regional Medical Center; is that correct?

7       A.   That's true.

8       Q.   Was the same true for Dr. Vaccaro?

9       A.   Yes.

10      Q.   What was the nature of that employment?  Were

11   you employed as a fulltime hospital-based physician?

12      A.   Yes.  Yes.

13      Q.   During what period of time were you employed by

14   the hospital?

15      A.   Well, up until 2000 and before, maybe, we were

16   employed for maybe a couple of years.  I don't know

17   exactly.

18      Q.   And while you were employed by the hospital, is

19   that when you came up with the idea to form V&S?

20      A.   (The witness nods his head.)

21              MR. RYCHCIK:  Objection as to the form.

22      A.   We came up with the idea towards the end of the

23   employment, yes.

1    Q.   You mentioned buying out the practice from the

2    hospital.  How did that work?

3    A.   Well, we had a contract with the hospital that

4    had a non-compete clause in it, and we had -- to stay

5    in Bradford, we had to pay the amount that was

6    specified in our contract, so that is what we paid.

7    Q.   Did the non-compete provide that you couldn't

8    compete with Bradford for a certain period of time

9    after you left?

10   A.   That's right.  Two years.

11   Q.   Two years.  Do you recall how much you had to

12   pay to get out of that agreement?

13   A.   I think it was $300,000 for both of us, plus

14   goodwill.

15   Q.   Do you know how much you paid for the goodwill?

16   A.   I don't know what the exact number is.  It is

17   probably around $50,000.

18        MR. RYCHCIK:  Again, I don't at any point

19        in time want you to guess during the

20        deposition, Doctor.  If you have got an

21        understanding or a knowledge, that's fine.

22        THE WITNESS:  Okay.

23        MR. RYCHCIK:  But no one here wants you to

CONFIDENTIAL  PROTECTED HEALTH INFORMATION

16

```
1        try to guess.
2             MR. SIMPSON:  Well, that's not exactly
3        true.  I might want you to --
4             MR. RYCHCIK:  He might want you to try --
5             MR. SIMPSON:  I would like you to
6        estimate.  If you think you know that you paid
7        about 350, but you can't remember if it was 351
8        or 349, then it is perfectly fine for you to
9        estimate, say that it is around 350, knowing
10       that you are not giving me an exact number.
11            MR. RYCHCIK:  I don't want you to guess.
12            MR. SIMPSON:  I don't want you to guess,
13       but if you have a basis for estimating, you can
14       estimate.
15   Q.   So it was sometime in 2000 that you bought out
16   the practice?
17   A.   Yes, sir.
18   Q.   So going back now to the time period when you
19   are with V&S before you bought the nuclear camera, you
20   had mentioned that when patients needed services, you
21   would refer them out to someone --
22   A.   That's right.
23   Q.   -- in a lot of instances?
```

1    A.    No.

2    Q.    Outpatient referrals, they would -- would

3    outpatient referrals primarily be referrals to have

4    tests performed on somebody?

5    A.    Tests, plus evaluation by the doctors.

6    Q.    Were a portion of those outpatient referrals

7    referred to Bradford or any other hospital?

8    A.    Part of it to Bradford, part of it to Hamot

9    Medical Center, some to Cleveland Clinic, and some to

10    UPMC, depending on the need.

11    Q.    What would be your basis for distinguishing

12    which hospital you would refer somebody to for an

13    outpatient test?

14    A.    For the testing?

15    Q.    Yes.

16    A.    That would be for whether the test is available

17    in that facility and what time frame they can get the

18    test done and what kind of reading and the quality of

19    the test performed.

20    Q.    Were there certain types of services that could

21    be performed at multiple hospitals?

22    A.    Yes.

23    Q.    What types of services would those have been?

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

19

1    A.    Like blood work, like chest x-ray.

2    Q.    And if you had to refer people out for those

3    types of services, would it be your typical practice

4    to refer them over to Bradford?

5              MR. RYCHCIK:  Objection as to the form.

6    A.    Well, what we look at when we refer the patient

7    for the lab work or for the x-rays is for the

8    convenience of the patient.  Most of our population is

9    elderly patients, and they actually -- even to come to

10   the doctor's office, they have to find a ride to come.

11   So to send them farther away is more difficult, so

12   they all usually prefer the closest possible testing

13   place.

14   Q.    And that was Bradford, correct?

15   A.    And that is Bradford.

16   Q.    These other places you mentioned -- Hamot

17   Medical Center?

18   A.    Yes.

19   Q.    Where is that?

20   A.    It is in Erie.

21   Q.    How far away is that from Bradford?

22   A.    An hour and a half.

23   Q.    I cannot remember the name of the other medical

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

21

1    Q.    I am trying to focus on how V&S compared to

2    other physicians in the amount of business that they

3    referred to Bradford.  Did you all refer more or less

4    than other physicians in the area?

5         So my question is:  During this time period, do

6    you have any information on which to compare your

7    referrals to other physicians' referrals?

8    A.    I don't have any information on that.

9    Q.    Do you have any belief?

10   A.    Well, I mean we are a two-physician practice.

11   Most of the practices are solo practices, so that

12   increases the number of referrals; but Dr. Jamil and

13   Dr. Kirsch have significant referrals to the hospital.

14   Q.    Did you ever have an occasion to attempt to

15   quantify the number or dollar value of your referrals

16   to Bradford during this period?

17   A.    I don't recall it.

18   Q.    Now, I want to talk a little bit about your

19   decision to lease this nuclear camera.  First off,

20   describe for me what the camera was.

21   A.    It is a GE nuclear camera, and the nuclear

22   camera provides the nuclear testing, and the testing

23   done is like cardiac stress testing, bone scan,

CONFIDENTIAL — PROTECTED HEALTH INFORMATION

22

1    thyroid scan.  It is those kind of tests that are

2    considered specialized x-ray testing.

3        Q.    Is this nuclear testing similar to or different

4    from MRIs and CT scans?

5        A.    It is different.

6        Q.    How is it different?

7        A.    Because the indications are different, and the

8    tests are different.

9        Q.    Are there certain types of tests that --

10   actually, I'm sorry.  I want to rephrase this.  You

11   perform a test in order to learn something about a

12   patient, correct?

13       A.    That's right.

14       Q.    Are there ever circumstances where you could

15   either go with a nuclear camera or with a CT scan or

16   an MRI?

17       A.    Uncommon.

18       Q.    Uncommon?

19       A.    Yes.

20       Q.    So, typically, the type of information you are

21   seeking to acquire would lead you to pick one or the

22   other?

23       A.    That's true.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

23

1     Q.   Usually, you wouldn't have a choice?  I mean,

2  usually, there wouldn't be a gamut of options you

3  could pick; is that correct?

4     A.   The CT scan tests different parts of the body

5  and different kind of testing, and the nuclear camera

6  does different -- the information we receive is

7  different.

8     Q.   Now you mentioned stress tests and bone scans

9  and thyroid scans are things that are done with the

10  nuclear camera, correct?

11     A.   That is true, among some others.

12     Q.   Can you give me some other examples of types of

13  tests that would be done by that nuclear camera?

14     A.   Hepatobiliary scan.

15     Q.   I'm sorry?

16     A.   Hepatobiliary scan.

17     Q.   What is that?

18     A.   That is the gallbladder scan.

19     Q.   Any others?

20     A.   That is all I can remember at this time.

21     Q.   What do you recall when you started thinking

22  about acquiring a nuclear camera for your practice?

23     A.   I don't recall.

CONFIDENTIAL -- PROTECTED HEALTH INFORMATION

24

1    Q.   Do you know how long it was before you actually

2    acquired it?

3    A.   (No response.)

4    Q.   I'm sorry.  That might not have been clear.  Do

5    you know how long you were thinking about it before

6    you actually went ahead and got it?

7    A.   Several months.

8    Q.   Did you look around at different vendors?

9    A.   Yes.

10   Q.   You ultimately ended up acquiring it from GE;

11   is that correct?

12   A.   That's true.

13   Q.   Who else did you approach to shop around?

14   A.   I don't recall.

15   Q.   Do you know if it was, you know, more than one

16   other vendor?

17   A.   I don't recall.

18   Q.   What was it that made you desirous of acquiring

19   this camera?

20   A.   There were certain issues.  One of them was

21   patient convenience.  We can do the test right in the

22   office, and they don't have to wait for the

23   registration and all of that that they had to do in

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

25

1    the hospital.

2         At that time, the hospital had only one nuclear

3    camera and the wait time and the scheduling for the

4    nuclear camera was pretty significant, close to two to

5    three weeks.  If you needed somebody to have an urgent

6    test, it was difficult to get it in a timely fashion.

7    Q.    Are there any other facilities other than

8    Bradford at this time that -- and I say facilities, I

9    mean, in the area that you could be sending patients

10   to that had a nuclear camera?

11        MR. RYCHCIK:  Again, you are talking about

12        the 2001 time frame?

13        MR. SIMPSON:  Yeah.

14   Q.    Right around the time you got the camera.  That

15   is the time period I am focusing on.  Were there any

16   other facilities other than the hospital that had --

17   A.    In town?

18   Q.    Within -- I want to focus on the geographic

19   area to which you would send your patients, whatever

20   that would be.  Okay?

21   A.    (No response.)

22   Q.    In other words, were there any other options

23   available for you to send your patients to if they

1    needed a nuclear camera test?

2       A.    Well, there is a nuclear testing availability

3    in Olean General Hospital, but that is, as I mentioned

4    before, 20 miles away, and most of the patients do not

5    like to travel that much to get the test done.  So

6    apart from that, there was nothing else available.

7       Q.    So pretty much all of your patients that needed

8    a test, you would be sending them to Bradford for that

9    before you got your camera?

10      A.    Most of them.

11      Q.    You said "most of them."  Is that "most" 51

12   percent, or is that "most" 80 percent?

13      A.    I can't tell you.  I mean, "most" means it is

14   definitely more than 50 percent.

15      Q.    Would you characterize the number that you sent

16   to Olean as a small percentage?

17      A.    Yes.

18      Q.    Now, in addition to patient convenience, did

19   having the nuclear camera on site also allow you to

20   bill for things that you wouldn't bill for before?

21      A.    That's true.

22      Q.    What kind of billings were you able to do once

23   you got the nuclear camera that you didn't do before?

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

35

1    frequent as it was before.

2        Q.    What would be the reason you would refer

3    somebody to, say, Bradford rather than doing it in

4    your own office?

5        A.    Sometimes it is the patient's preference.    That

6    is always a factor in the decision where the patient

7    goes.

8        Q.    Would there ever be times when your camera was

9    just too busy and you didn't have -- you couldn't

10    squeeze another patient in, and you would refer them

11    over to Bradford?

12        A.    It could be.    I don't recall.    But sometimes if

13    you have to have an emergent test done, it is

14    possible.

15        Q.    But would you say the vast majority of nuclear

16    tests were done in your office?

17                MR. RYCHCIK:    Objection as to the form.

18        A.    Yes.    Most of them were done in our office when

19    we had the camera.

20        Q.    Now, in addition to the tests that would be

21    done on your nuclear camera, I assume you would also

22    have, you know, patients who would need other types of

23    tests like MRIs or CT scans, correct?

CONFIDENTIAL PROTECTED HEALTH INFORMATION

1    A.    That's true.

2    Q.    Did you have facilities in your office to

3  perform those tests?

4    A.    No.

5    Q.    Have you ever had facilities in your office to

6  perform those kind of tests?

7    A.    No.

8    Q.    Are there any other kind of diagnostic tests

9  that you have performed in your office?

10    A.    We do perform procedures in our office like

11  EKG, halter monitoring, lung function testing and

12  ultrasound testing; but not x-ray-related.

13    Q.    Do you have just a regular x-ray machine in

14  your office?

15    A.    No.

16    Q.    Similar to with the nuclear camera, would you

17  have generally referred your patients to Bradford for

18  those types of tests?

19    A.    For which types?

20    Q.    MRIs, CT scans, x-rays.

21    A.    Yes.  We would refer the patients out where it

22  was more convenient for the patients.

23    Q.    And most of the time, that would have been

1   A.   Yes, we did.

2   Q.   And who was it that you hired as the first

3   attorney you hired to represent you in discussions

4   with the hospital relating to the camera issue?

5   A.   Ed Kabala.

6   Q.   And did you also work with Marc Raspanti?

7   A.   Yes.

8   Q.   But Mr. Kabala came first, I guess?

9   A.   That's true.

10   Q.   At some point, did the hospital come to you

11   with concerns that by getting this nuclear camera that

12   you would be violating a hospital policy on

13   non-competition?

14   A.   Yes.

15   Q.   Was that Mr. Leonhardt that came to you?

16   A.   I don't recall.

17   Q.   Did he do that -- do you recall whether he

18   spoke with you orally about it or whether he wrote you

19   a letter?

20   A.   Both were done.  Orally, and then a letter was

21   sent, too.

22   Q.   I will go through some documents later, but I

23   just want to kind of walk through the general stages

45

1    A.    Yes.

2    Q.    So you didn't see it as a mere bluff?

3    A.    That's true.

4    Q.    Basically, what the hospital was telling you

5    was that if you are in a business that is in

6    competition with the hospital, you are not entitled to

7    have staff privileges with the hospital, correct?

8    A.    That's true.

9              MR. MULHOLLAND:  Objection to the

10             characterization of what the hospital may or

11             may not have told him.

12   Q.    That was your understanding of what the

13   hospital position was, correct?

14   A.    That's true.

15   Q.    Now, you stated you didn't believe it was a

16   bluff; but did it also become apparent to you that the

17   hospital would rather not terminate your privileges,

18   but would rather work out some kind of arrangement

19   with you?

20   A.    That started appearing later in the course,

21   much later in the course.  Initially, it was not

22   obvious.

23   Q.    Who made the first proposal that you and the

1   hospital enter into some kind of arrangement regarding

2   the camera, whether it be an under arrangements, a

3   joint venture, or a sublease?  Was it the hospital, or

4   was it V&S that initially made that proposal?

5        A.   Well, the under arrangements was offered by the

6   hospital.  That was brought in by the hospital, and

7   the sublease was discussed at the hospital attorney's

8   office, but who brought it up, I don't recall.

9        Q.   Initially, the discussions between you and the

10  hospital focused on an under arrangements venture; is

11  that right?

12       A.   That's true.

13       Q.   What was your understanding of what this under

14  arrangements venture would entail?

15       A.   The under arrangements model, as far as I

16  remember, would entail -- it would be a group of

17  physicians who would buy the radiology services

18  machines and then lease it to the hospital, and the

19  hospital would perform the test and pay the group the

20  amount of the lease.

21       Q.   And it was envisioned, I suppose, that you and

22  Dr. Vaccaro and other physicians on the medical staff

23  at the hospital would be involved in this under

1    arrangements venture, correct?

2       A.    That's true.

3       Q.    Was the purpose of the anticipated venture or

4    the scope of the venture limited to the use of nuclear

5    imaging equipment, or was it broader than that?

6       A.    It was broader than that.

7       Q.    What else did it entail?

8       A.    CT scans and MRIs.

9       Q.    So, basically, all different kinds of radiology

10   tests would be done through this under arrangements

11   venture; is that correct?

12      A.    I don't know any more, but CT scan, MRI, and

13   nuclear camera.

14      Q.    Right, Doctor.  I am just trying to get a

15   picture of what you all were talking about at the

16   time, because I understand, it never actually came to

17   pass, did it?

18      A.    No.

19      Q.    Now, the hospital wanted you guys to contribute

20   your nuclear camera as part of the venture, correct?

21      A.    Say that again.

22      Q.    The hospital wanted you, V&S, to contract your

23   nuclear camera to be used as part of this under

48

1    arrangements venture, correct?

2        A.    I don't recall what went on in that regard.

3        Q.    But was there -- did you guys take the position

4    at some point that under the proposal, you all were

5    getting -- you all were, basically, getting a raw

6    deal, because if there were 25 positions, each of you

7    would have 1/25th, but that you were also contributing

8    the nuclear camera?

9        A.    I don't recall that discussion.

10       Q.    But for one reason or another, the discussions

11   regarding the under arrangements venture never came to

12   fruition, correct?

13       A.    That is true.

14       Q.    Is it fair to say that the hospital was the one

15   really pushing the under arrangements venture, and you

16   guys were the ones who weren't really sold on it?

17            MR. RYCHCIK:    Objection as to the form of

18            the question.

19            MR. MULHOLLAND:    Same objection.

20       A.    No.    We actually took the position to promote

21   the joint venture and actually we talked to other

22   physicians to come join us; but most of the physicians

23   said, "If you are in it, we are not going to join it."

CONFIDENTIAL PROTECTED HEALTH INFORMATION

49

1   So it is because of lack of cooperation from the staff

2   that it didn't go through.

3       Q.   Then do you recall who initiated the proposal

4   that instead of doing an under arrangements venture,

5   you instead entered into a sublease arrangement with

6   the hospital?

7       A.   As I said before, I don't recall who actually

8   proposed it, but it was in a meeting.

9       Q.   Was this sublease proposal something that was

10  sort of raised at the end of the day, or was it

11  something that you all had been talking about for a

12  long time?

13      A.   I didn't understand your question.

14      Q.   Was the sublease proposal something that was

15  sort of thrown out at the end of the day after the

16  under arrangements venture talks kind of stalled, or

17  was it something that you had been contemplating all

18  along as an alternative?

19      A.   No.

20      Q.   No to which part of that?

21      A.   No.  It was something that was brought up

22  towards the end of the day.

23      Q.   And were you looking to get, sort of, the same

1    return whether it was done as an under arrangements or

2    as a sublease?

3        A.    I don't understand that.

4        Q.    Were you at V&S, in discussing the sublease

5    proposal, were you essentially attempting to replicate

6    your expected returns that you would have gotten if

7    the under arrangements venture had gone through to

8    your satisfaction?

9        A.    The sublease discussion did not really start

10   when we were doing the under arrangements venture, so

11   the expectations could not be there.

12       Q.    Did you have a face-to-face meeting -- between

13   you guys and the hospital and the attorneys that was

14   dedicated to a discussion of the lease arrangement at

15   some point?

16       A.    I don't recall.

17       Q.    But at some point, you ended up entering into a

18   sublease arrangement with the hospital whereby you

19   subleased the nuclear camera to the hospital, correct?

20       A.    That's true.

21       Q.    And as part of that lease arrangement, the

22   payments to you consisted of really two things:  One,

23   a pass-through payment for the rent that you were

1     paying to GE --

2        A.    Uh-huh.

3        Q.    And then a second component for all other

4     promises under the sublease arrangement, correct?

5        A.    That's true.

6        Q.    And one of those promises was a non-compete

7     agreement that you agreed, essentially, not to compete

8     with the hospital in this nuclear imaging area?

9        A.    I believe so.

10       Q.    Now, at some point after you entered into the

11    sublease, did you change cameras?

12       A.    Yes.

13       Q.    And do you know how long it was after you

14    entered into the lease, entered into the sublease,

15    that you changed cameras?

16       A.    I don't know the exact date.

17       Q.    Did you have to buy out the remaining term of

18    the original camera?

19       A.    Yes.

20       Q.    So do you know how much you paid GE for that?

21       A.    No.

22       Q.    But some of that was paid to GE?

23       A.    That's true.

52

```
 1    Q.    Was that paid by you or by the hospital?

 2    A.    The hospital pays us, and then we paid GE.

 3    Q.    And then you, V&S, entered into a new lease

 4  with GE for a new camera, correct?

 5    A.    It is not GE.  It is Phillips now.

 6    Q.    I'm sorry, Phillips.

 7    A.    That's true.

 8    Q.    Did you enter into a new sublease with the

 9  hospital?

10    A.    No.

11    Q.    The old camera, the first camera, did that

12  camera ever make its way over to the hospital, or did

13  it stay in your office?

14    A.    It stayed in our office.

15    Q.    The new camera, did it stay in your office, or

16  did it go to the hospital?

17    A.    It went to the hospital.

18    Q.    Did it go to the hospital immediately or --

19    A.    Immediately.

20    Q.    So there was never any period of time where it

21  was at your office?

22    A.    That's true.

23    Q.    And there is no new lease agreement, sublease
```

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

53

1  agreement, between the hospital and you relating to

2  the new camera?

3    A.    That's true.  The reason is that when we signed

4  the sublease, there was a provision in there that

5  would upgrade the camera, and that sublease covered

6  the new camera.

7    Q.    The payments from the hospital to you under the

8  sublease, did they go up after you got the new camera?

9    A.    It went up after we got the new camera, because

10  the cost of subleasing went up.

11    Q.    Essentially, the new camera was more expensive

12  to lease for you, so the pass-through cost to the

13  hospital --

14    A.    The pass-through cost went up.

15    Q.    -- went up accordingly?

16    A.    Yes.

17    Q.    Now, while the old camera -- the old camera,

18  you said, stayed on your premises.  Did the hospital

19  pay you any rent to keep that hospital on your

20  premises?

21              MR. RYCHCIK:  Keep that hospital?

22              MR. SIMPSON:  I'm sorry.

23              MR. RYCHCIK:  Do you mean to keep the

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

74

1    Q.    When you say it came out, how did it come?

2    A.    What?

3    Q.    You say it came out.  How --

4         MR. SIMPSON:  Could you read back the

5         portion of his testimony where he said it came

6         out something?

7         (Previous answer read back.)

8    Q.    And when you are talking about the pure

9    competition, that is the competition on the nuclear

10   camera, correct?

11   A.    That's true.

12   Q.    So the only revenue stream that the hospital

13   was losing as a result of the competition was for the

14   nuclear camera tests that you were doing, correct?

15   A.    The tests that we used to do in the hospital,

16   yes.

17   Q.    And was it your belief that the hospital was

18   wanting you to do those tests in the hospital, instead

19   of in your office?

20   A.    No.  They wanted us not to do them in the

21   office.  Anywhere else, it didn't matter to them.

22   Q.    But they expected that given your prior

23   referral patterns, most of those tests would be done

75

1    at their facility?

2                 MR. RYCHCIK:   Objection as to the form of

3           the question.

4                 MR. MULHOLLAND:   Same objection.

5      A.    It would go to the pattern prior of referral.

6      Q.    And as you previously testified, most of them

7    would go to Bradford?

8      A.    Yes.   Most of the tests were done in Bradford.

9      Q.    Did you ever threaten to take your nuclear

10   camera referrals away from Bradford and send them all

11   to Olean or someplace else?

12     A.    I don't recall.

13                MR. MULHOLLAND:   Before you go on to the

14          next exhibit, Mr. Simpson, I just want to state

15          that the fact that this document was produced

16          and does have some references to peer review

17          information doesn't constitute a waiver by the

18          hospital where a peer review privilege may

19          attach to that information.

20                MR. RYCHCIK:   I was going to say that I

21          think, quite frankly, this was inadvertently

22          produced without redactions from the standpoint

23          of peer review privileges.

Case 1:04-cv-00186-MBC   Document 127-8   Filed 09/10/2008   Page 35 of 61

1    Q.   Now, if you can go back to Exhibit 9, in

2    Exhibit 9, Mr. Leonhardt says his thoughts about the

3    agenda for the meeting, and one of the things he says

4    should be on the agenda is whether there is any

5    interest in working together through a joint venture

6    or other appropriate means with regard to the nuclear

7    camera, correct?

8    A.   Uh-huh.

9    Q.   Now, was that actually a topic that was

10   discussed at the meeting?

11   A.   The joint venture?

12   Q.   Yes.

13   A.   Yes.

14   Q.   Do you know if a lease option was raised during

15   that meeting?

16   A.   No.

17   Q.   That would have come later on in the process?

18   A.   Much later, yes.

19   Q.   If you could flip to the second page of Exhibit

20   10, please, in the top paragraph, you state that, "We

21   also advised you that we would be willing to discuss a

22   true joint venture with the hospital on any expansion

23   that it wants to make, and we further advised that we

1    would, solely in the spirit of compromise, be willing

2    to discuss a true and equal joint venture on the

3    nuclear camera if your attorneys can come up with a

4    proposal that they think is legal in today's

5    environment (and our attorneys agree)."

6        A.    Yes.

7        Q.    What were you talking about when you referred

8    to a true and equal joint venture and underlined the

9    word "equal"?

10       A.    I don't remember what it meant at that time.

11       Q.    And when you referred to "solely in the spirit

12   of compromise," what was the issue you were intending

13   to compromise on?

14       A.    Well, our thought was, you know, that we have

15   opened up a nuclear camera, and that's the business we

16   wanted to do.  We didn't want to do anything else at

17   that point.  We were thinking about further expansion.

18   So the economic credentialing issue came up because of

19   the nuclear camera, and then we have been fighting for

20   some time between the legal advice from both sides,

21   and as you know, it becomes very expensive and tiring,

22   so we really didn't want to continue going in that

23   direction and to the point of litigation and go

84

1    through the expense of that.  So that we wanted to

2    come up with something that is more compromising for

3    both of us.

4        Q.    And the issue that you all were compromising on

5    was the economic credentialing issue, correct?  I

6    mean, that is what was driving the dispute?

7        A.    That's right.

8        Q.    Now, did you say you -- did you just say you

9    were or were not intending to expand the practice

10   farther?

11       A.    We were.

12       Q.    You were?  Can you flip back to the previous

13   page, the first page of Exhibit 10?

14       A.    Yes.

15       Q.    In the next-to-the-last paragraph, it starts

16   off by saying, "We do want the Board to understand, as

17   we hope we made you understand, that it is not the

18   intent of Dr. Vaccaro and myself to expand the

19   ancillary services provided by our office."

20            How is that statement consistent with what you

21   just said about that you were wanting to expand?

22       A.    Well, we definitely were wanting to expand, but

23   maybe at this point because of our discussion with the

1    A.    By the legal counsel, yes.

2    Q.    Without telling me anything your attorneys told

3    you, apart from advice that you might have received

4    from the counsel, did you have any independent

5    knowledge about legal requirements relating to Stark

6    or the anti-kickback statute?

7    A.    Yes.  We had the basic understanding.

8    Q.    And how did you have that understanding?

9    A.    From reading the articles and discussion among

10   the colleagues.

11   Q.    Is that something you had done before this

12   issue ever arose, or was that work that you did after

13   the issue arose, because you were trying to

14   familiarize yourself with it?

15   A.    I can't tell you the time frame.

16   Q.    What was your basic understanding as to what

17   the anti-kickback statute provided?

18   A.    The statute -- you know, you cannot get paid

19   for any kind of referrals, and any arrangement that

20   goes along should be a fair market value arrangement.

21   Q.    And does your understanding or did your

22   understanding at the time of the Stark statute differ

23   from that in any way?

1    A.   No.

2    Q.   I will show you Exhibit 11, please.

3         (Saleh Deposition Exhibit No. 11 was

4    marked for identification.)

5    Q.   Exhibit 11 is a June 26th, 2002 letter from

6    George Leonhardt to you and Dr. Vaccaro.  I guess,

7    first, of course, I want to ask if you recall

8    receiving this letter from Mr. Leonhardt?

9    A.   No.

10   Q.   Do you recall receiving any communications from

11   Mr. Leonhardt discussing the Stark law?

12        MR. RYCHCIK:  When you are done reading

13        why don't you repeat the question for the

14        doctor?

15   Q.   Do you recall Mr. Leonhardt ever communicating

16   with you about the Stark law?

17   A.   Well, we had discussions regarding the Stark

18   law, yes.

19   Q.   And were these discussions with or without the

20   presence of counsel?

21   A.   With and without, both.

22   Q.   What did Mr. Leonhardt tell you about the Stark

23   law?

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

88

1    A.    I don't remember the exact --

2              MR. RYCHCIK:  Again, the -- okay.

3    A.    I don't remember the exact statement, the

4    discussion that was done.

5    Q.    Did he reassure you that any proposed venture

6    would satisfy the Stark law?

7    A.    Well, what we talked about is any venture that

8    is going to go through should qualify through the

9    Stark law.

10   Q.    So you discussed the need to qualify with the

11   Stark law, but did you ever have discussions with him

12   about whether any proposed arrangement actually

13   complied with the Stark law?

14   A.    I don't recall that.

15   Q.    Now, you will agree that this letter, this

16   letter talks about structuring an under arrangements

17   deal to comply with the Stark law, correct?

18   A.    Yes.

19   Q.    Did you ever receive a similar communication

20   from Bradford about the need for the sublease

21   arrangement to comply with the Stark law?

22   A.    I don't recall.

23   Q.    Do you recall any communication from Bradford

CONFIDENTIAL    PROTECTED HEALTH INFORMATION

1    about the need for the sublease arrangement to comply

2    with the anti-kickback statutes?

3       A.    Well, we had several discussions between

4    counsel and ourselves, and several letters have been

5    sent back and forth regarding the anti-kickback and

6    the Stark law to make sure it complies with that.

7       Q.    Yeah.  I am asking specifically the sublease

8    arrangement and not the under arrangements venture.

9    Did you have those discussions with respect to the

10   sublease arrangement?

11              MR. RYCHCIK:  Again, you are talking about

12          conversations not with his counsel?

13      Q.    I am not asking about your conversations with

14   your own attorney unless Bradford was present.  But I

15   am asking about any discussions you had with Bradford

16   or with your attorneys and Bradford participating,

17   dealing with the sublease complying with the Stark

18   statute.

19      A.    Yes, I remember discussions where we did talk

20   about it.

21      Q.    And were those discussions along the lines of,

22   "It needs to comply with the Stark statute," or were

23   they along the lines of, "This arrangement does in

1    fact comply with the Stark statute"?

2        A.    Both.

3        Q.    Both?

4        A.    Yes.

5        Q.    Tell me what discussions you had with Bradford

6    or with your attorneys with Bradford participating

7    where anybody told you that the proposed sublease

8    arrangement complied with the Stark statute?

9        A.    Can you repeat the question?

10        Q.    Yes.  I want you to describe for me any

11    conversations you had or discussions or communications

12    that you had with Bradford or that you had with your

13    attorneys while Bradford was participating in the

14    discussion where anybody told you that the proposed

15    sublease arrangement, in fact, did comply with the

16    Stark statute?

17        A.    I don't remember any such particular discussion

18    that I can --

19        Q.    When you say you don't remember it, do you

20    mean, "I don't know if that has occurred," or, "I know

21    it occurred, but I just can't remember the specifics"?

22        A.    That's right.

23        Q.    The latter one?

CONFIDENTIAL — PROTECTED HEALTH INFORMATION

91

1    A.    The latter one.

2    Q.    Who would have been telling you that it did

3    comply?  Would that have been your attorneys or

4    Bradford?

5    A.    The counsel.  I can't tell you which one.

6    Q.    You don't know which one?

7    A.    I don't know.

8    Q.    I'm going to ask you a question and your

9    attorney is going to object, but I'm going to ask it

10   anyway to give him the chance to object.  Okay?  So

11   don't answer it, because he is going to tell you not

12   to.

13   A.    Okay.

14   Q.    Did your attorneys ever advise you that the

15   sublease arrangement as it was actually entered into,

16   in fact, did comply with the Stark statute?

17        MR. RYCHCIK:  Objection.  I'm going to ask

18        you not to -- I'm going to advise you not to

19        testify regarding communications with your

20        counsel.

21   Q.    Now I want to follow up the question by asking

22   you this:  Is it your contention -- do you contend in

23   this lawsuit that you relied on the advice of your

1    Q.    Your answer was that --

2    A.    Not at this time, no.

3    Q.    Is it your contention that you relied upon

4    Bradford's assurance that the sublease arrangement

5    complied with the Stark statute?

6    A.    What is the question again?

7    Q.    I just asked you whether you were relying upon

8    your own attorney's advice.  Now, I am asking you did

9    you rely -- in entering into the sublease agreement,

10   did you rely upon Bradford's assurances that the

11   arrangement complied with the Stark statute?

12             MR. MULHOLLAND:  Objection to the form in

13         that it assumes any assurances were made.

14             MR. RYCHCIK:  Same objection.

15   Q.    I don't think it assumes that.  That is part of

16   the question.  I will do it this way.

17         Did Bradford ever assure you that the sublease

18   arrangement complied with the Stark statute?

19   A.    Not in so many words; but when we have the

20   advice of counsel there and both sides are present and

21   they are talking about the Stark law and the

22   anti-kickback statutes, it is our assumption when we

23   entered into the lease that it is complying with the

94

1    laws.

2        Q.    Because, otherwise, they would have told you

3    differently?

4        A.    They would have told us not to do that.

5        Q.    Does the same answer go for the anti-kickback

6    statute?

7        A.    Yes.

8        Q.    Let me show you Exhibit 12.

9              (Saleh Deposition Exhibit No. 12 was

10   marked for identification.)

11       Q.    I'm showing you Exhibit 12, which is a July 30,

12   2002 letter from George Leonhardt, and one is

13   addressed to Dr. Vaccaro, however, on the second and

14   subsequent pages, the letter pages, the letter says,

15   "Letter to Medical Staff."  Do you recall ever seeing

16   this letter?

17             MR. RYCHCIK:  Why don't you take a look at

18         it first?

19       Q.    Do you know whether you had received this

20   letter?

21       A.    Yes.

22       Q.    Did you receive a separate copy of the letter

23   addressed to you, or did you just see the one that was

CONFIDENTIAL — PROTECTED HEALTH INFORMATION

103

1    is not expected that the per diem would be a mere cost

2    pass-through, but it would be set to provide a fair

3    allocation of the risks and the rewards of the

4    arrangement between BRMC and my clients."

5            To your understanding, what would be the

6    rewards to Bradford of a leasing arrangement?

7        A.   What are the rewards to Bradford?

8        Q.   Uh-huh.

9        A.   Well, I think the rewards for both the parties

10   would be to end the conflict which has lasted almost

11   two years and the legal fight that we have entered,

12   which has cost a significant amount of money on both

13   parties, so that would be the reward for both parties.

14       Q.   Wouldn't another reward for Bradford be that

15   the tests that you were doing in your office, you

16   wouldn't be doing them in your office anymore, so they

17   would get more of that business?

18            MR. RYCHCIK:  Objection to the form of

19            that question.

20       A.   Another reward would be that the tests would be

21   done not in our office, and we wouldn't be in

22   competition anymore.

23       Q.   Right.  And per your usual referring patterns,

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

104

1    most of the tests would go to Bradford?

2              MR. RYCHCIK:  Objection as to the form of

3         the question.

4              MR. MULHOLLAND:  Same objection.

5    Q.   You didn't tell Bradford, "We are going to do

6    this lease, and then I'm going to stop referring to

7    you, and I'm going to send them to Olean," did you?

8    A.   No, I didn't.

9              MR. RYCHCIK:  Objection.

10   A.   I didn't tell them that we are going to get

11   into this lease and start referring the patients to

12   you, either.

13   Q.   But your expectation was that you were going to

14   go back to the way you were doing it before?

15             MR. RYCHCIK:  Objection as to the form of

16        the question.

17   Q.   Correct?

18   A.   Yes.

19   Q.   And in point of fact, it wouldn't make much

20   sense for Bradford to enter into this arrangement if

21   you were going to refer all of your patients to

22   Bradford, correct?

23             MR. RYCHCIK:  Objection as to the form --

1       the question.

2       A.    I don't remember the numbers.  I mean, I

3  remember there were a lot of numbers being thrown out

4  at that meeting, a lot of brainstorming going on to

5  come to some kind of mutual numbers.

6       Q.    Was the purpose of that meeting to discuss the

7  details of the lease arrangement?

8       A.    I don't recall that.

9       Q.    Do you know whether at that time you had

10  already decided the lease arrangement was the way to

11  go, as opposed to the under arrangements venture?

12      A.    No.  There was no time during our discussion it

13  was decided that the lease was the preferred way as

14  opposed to the under arrangements.  Under arrangements

15  was always on the table, and since the under

16  arrangements was taking so much time and needed the

17  approval of OIG, in the interim, the lease was being

18  made as an alternative.

19      Q.    I guess I should rephrase that.  At the time of

20  this meeting, had it been decided to go forward with

21  the lease arrangement now instead of the under

22  arrangements venture, and then to try to continue to

23  see if the under arrangements venture would be worked

1  out?

2      A.   It was decided that we could look into it in

3  more detail at this time.

4      Q.   Now, the letter says that you initially

5  proposed a five-year $2,000 per day lease.  Is it your

6  testimony you don't know whether that number is

7  accurate?

8      A.   I don't recall the numbers.

9      Q.   So you also don't recall whether at the end of

10  the day you agreed to a $1,500 per day lease over five

11  years?

12      A.   (The witness shakes his head.)

13      Q.   You have to --

14      A.   No, I don't recall.

15      Q.   Do you recall that at the end of the day you

16  did come to what you thought was an agreement on some

17  number?

18      A.   I don't recall that, either, whether we made a

19  deal on that day or not.

20      Q.   Do you recall what went in to your number,

21  whatever it was, or how you arrived at whatever number

22  you arrived at?

23      A.   Yeah.  That is based on certain facts that was

1  the amount of income that we were generating from the

2  nuclear camera business, the up-front cost of the

3  nuclear camera itself, and the costs that we will

4  continue to incur as part of the lease that we have to

5  pay to GE, and the fact that we are going to lose our

6  ability to complete the further expansion of MRI and

7  CT scans, so those were all factored in to come to

8  some kind of a number.

9     Q.   But the lease agreement -- did the lease

10 agreement prevent you from competing on MRIs and CT

11 scans or only from nuclear imaging?

12    A.   It prevents us from competing on nuclear

13 medicine, and it asks us for right of first refusal

14 for MRI and CT scan.

15    Q.   Do you recall what the hospital's position was

16 at this meeting about the per diem numbers that you

17 had proposed?

18    A.   I don't recall that.

19    Q.   You don't recall what the hospital's reason was

20 for saying your number was too much?

21    A.   No, I don't recall.

22         MR. SIMPSON:  We will make that Exhibit

23         22.

1   month.

2   Q.  Is this one of the documents that comes out at

3   the end-of-the-the-month report?

4       MR. RYCHCIK:  Are you talking about this

5       time period or these dates?

6       MR. SIMPSON:  Yes.  The time period when

7       these date are.

8   Q.  I am trying to figure out if this is a

9   routinely printed document printed at that time or was

10   this printed out for a special reason?

11   A.  I don't think it was a routinely printed out

12   document, so it must have been prepared to get some

13   information.

14   Q.  You don't know how you used that information?

15   A.  That is right.  It could just be for our own

16   purposes.

17   Q.  I'm going to mark as Exhibit 30 all the

18   documents you handed to us this morning.

19       (Saleh Deposition Exhibit No. 30 was

20   marked for identification.)

21   Q.  Exhibit 30 is Bates labeled 3154 through 3170.

22   The first page is a statement of October 2003.  Is

23   this a statement for -- what is this first page?

1   A.   This is a statement that we sent to the

2   hospital when the hospital was using the nuclear

3   camera at our facility.

4   Q.   So the $4,879.84 is your bill to the hospital

5   for the rent --

6   A.   The cost.

7   Q.   -- the cost of keeping the camera on your site?

8   A.   Not just the cost.  It includes the running of

9   the camera, too.

10   Q.   But it is payments that they are making to you

11   for keeping the camera at your facility instead of at

12   the hospital, right?

13   A.   Yes.

14   Q.   And those payments are in addition to the other

15   payments that would be under the sublease?

16   A.   That's true.

17   Q.   And the next page is a copy of their check to

18   you for that amount, it looks like?

19   A.   Yes.

20   Q.   And the next page 3156 is a similar statement

21   for November of 2003, correct?

22   A.   Yes, sir.

23   Q.   Then the next page, it says, "Receipts," and

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

153

1    there is no date on it, though, that I can see.  Is

2    this a -- how can you tell what period this is for?

3        A.    It is after November, because it says November

4    rental statement.

5        Q.    Oh, I see.  Okay.  So this is, basically, your

6    receipt for the payment that you received, and you

7    received a total -- the top line is "Total receipts,

8    $24,922.31."  What is that payment?  What is that?

9        A.    That is the payment received by use of the

10   nuclear camera.

11       Q.    Is that the sublease payment?

12       A.    No.  The way it was handled initially was after

13   it came into the contract with the hospital for

14   sublease, then the camera stayed at our facility for

15   several months, and then used in our facility; and

16   when it was used, we continued to provide the

17   services, but the income that was generated from that

18   date on was the hospital's money.

19            So this is the income brought in from that day

20   on, and then you can see that there are expenses that

21   are deducted.  So whatever it was less was there, and

22   then their rental statement, and then the actual

23   payment to BRMC was made of this much dollars.

CONFIDENTIAL -- PROTECTED HEALTH INFORMATION

154

1    Q.    So this was a payment made by you to BRMC?

2    A.    Yes.

3    Q.    So the 424,922 is payments that you received

4    from --

5    A.    That's right.

6    Q.    -- from --

7    A.    The operation of the nuclear camera.

8    Q.    At that point, were you billing for the tests?

9    A.    Yes.

10   Q.    So you were billing for them, and then you were

11   collecting --

12   A.    Right.

13   Q.    So the camera had been subleased to Bradford at

14   that time?

15   A.    Right.

16   Q.    But Bradford wasn't billing for the tests?

17   A.    That's true.

18   Q.    You were billing -- you would collect payment

19   from insurers or whoever, and then you would subtract

20   out a 10 percent billing charge, correct?

21   A.    Yes.

22   Q.    And then you would also subtract out a 24

23   percent reading charge for Dr. O'Donnell?

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

155

1    A.    Yes.

2    Q.    Now, is that 24 percent reading charge, is that

3    a pass-through charge?

4    A.    Yes.  It goes to Dr. O'Donnell.

5    Q.    You weren't making any profit on that number?

6    A.    I don't remember exactly.

7    Q.    And then there is something for medication

8    receipts.  What is that?

9    A.    Like Cardiolite and all the medication that is

10   used, you buy the medication, and then the insurance

11   company pays you for that.

12   Q.    So that would be for medication, would you have

13   any profit on that number?

14   A.    No.

15   Q.    So that is your actual cost of purchasing the

16   medication that was used in the test that you are

17   performing for Bradford?

18   A.    That's true.

19   Q.    So when you subtract out that, you come to the

20   9,180.76, and then you subtract out the rental payment

21   that they owed you, and you come to 4,593.94, which

22   you paid to them?

23   A.    That's true.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

156

1    Q.   And then the next two pages show the same stuff

2    for December of 2003?

3    A.   Uh-huh.

4    Q.   And then the next page shows a statement for

5    January of 2004, but I don't see any receipts page, a

6    similar receipts page for January of 2004, and did you

7    think that was omitted, or did they cheat you that

8    month?  No offense.

9    A.   No.  I think maybe the receipt was not enough

10   to go along with that in that month.  So, therefore,

11   it was totaled with the February statement.  After the

12   February statement, you can see.

13   Q.   So you got the February statement on page 3161,

14   and then on 3162, you have the February receipts page,

15   just like we discussed before, which reflects that you

16   all ended up making a payment to Bradford of 7652?

17   A.   That's true.

18   Q.   And then that includes -- does that include --

19   is this, like, a two-month type page?  Does that

20   include January and February?

21   A.   No.  It just saves that February statement, so

22   that did not include a January statement.  So if you

23   go farther, you can see --

Case 1:04-cv-00196-MBC   Document 127-2   Filed 09/10/2008   Page 57 of 61

1    Q.   But your total receipts for that period are

2    42,000 plus, which is substantially more than the

3    27,000?

4    A.   Because this is probably two months.

5    Q.   So it is two months of receipts, less two

6    months of expenses?

7    A.   Yes.

8    Q.   And then you have the same thing the next

9    couple of pages for March of 2004, and then the next

10   two pages are the same thing for April of 2004; and

11   then you have a statement from May of 2004, correct?

12   A.   That is true.

13   Q.   But there is no separate receipts page?

14   A.   That's right.

15   Q.   And then a statement for June and then a

16   receipts page following that, which looks like it

17   includes monies from several months.

18   A.   Yes.

19   Q.   But if you take all of these receipts pages,

20   they cover that whole period that the statements refer

21   to?

22   A.   Right.

23   Q.   And in the last couple of months there, say,

CONFIDENTIAL — PROTECTED HEALTH INFORMATION

158

1    May -- in May, there is a rent charge of 2,500 and a

2    secretarial support of 1,000, and then in June, there

3    is a 25 rent, and no secretarial support.  There are a

4    lot of things that were included in previous months

5    that aren't included in those months?

6       A.   They stopped doing the stress test at that

7    time, so there is no fee for secretarial support or

8    other support.

9       Q.   So at this time, the equipment was in your

10   office, but it wasn't being used?

11      A.   That particular month.

12      Q.   So in April it was not used?

13      A.   April?

14      Q.   Page 3165?

15      A.   April, right.

16      Q.   And then for May, it was not used, correct?

17      A.   Correct.

18      Q.   And then in June it was also not used?

19      A.   Right.

20      Q.   So let's say in April, May, and June, it wasn't

21   being used?

22      A.   That is right.

23      Q.   Do you know if the hospital -- had you gotten

CONFIDENTIAL -- PROTECTED HEALTH INFORMATION

159

1    the new equipment at that time, the new camera by that

2    time?

3        A.    I don't know for sure if that is the time

4    period.

5        Q.    Let me ask you this:  Did you return the old

6    camera at the same time you got the new camera, or was

7    there an overlap?

8        A.    There was an overlap.

9        Q.    There was an overlap of time when you had the

10   old camera and Bradford had the new camera?

11       A.    Yes.

12       Q.    Let's look at the very last page of this

13   exhibit, 3170.  This is another vendor QuickReport

14   like the ones we had talked about before.

15       A.    Yes.

16       Q.    So is that yet one more page?

17       A.    This is just to show the amount that we have

18   talked about in those statements, those are being paid

19   to the hospital, so all the --

20       Q.    These are not receipts by you?  These are

21   payments by you?

22       A.    Yes.

23       Q.    I understood they were --

CONFIDENTIAL    PROTECTED HEALTH INFORMATION

1  this agreement, or upon the execution of the

2  subsequent agreement?

3     A.    No.   The subsequent agreement.

4     Q.    After you executed this agreement, you still

5  kept the camera and operated it as your own?

6     A.    That's true.

7     Q.    No rights passed to the hospital with respect

8  to the equipment under this lease --

9     A.    Yes.

10    Q.    -- under this agreement?

11    A.    That's true.

12             (Saleh Deposition Exhibit No. 32 was

13  marked for identification.)

14    Q.    I am showing you Exhibit 32, and is this a copy

15  of the actual Equipment Sublease that was executed?

16    A.    Yes.

17    Q.    And was it executed on October 1, 2003?

18    A.    That is what the date says.

19    Q.    I'm sorry.  Actually, will you flip over to

20  page 17 which is Bates labeled 0316?

21    A.    It was signed 9-22-03.

22    Q.    But it was effective as of October 1st?

23    A.    October 1st.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

180

1                    C E R T I F I C A T E

2    COMMONWEALTH OF PENNSYLVANIA    :
                                     :    SS.:
3    COUNTY OF ALLEGHENY             :

4          I, Joy A. Hartman, a Notary Public in and for
     the Commonwealth of Pennsylvania, do hereby certify
5    that before me personally appeared KAMRAN SALEH, M.D.,
     the witness herein, who then was by me first duly
6    cautioned and sworn to testify the truth, the whole
     truth and nothing but the truth in the taking of his
7    oral deposition in the cause aforesaid; that the
     testimony then given by him as above set forth was
8    reduced to stenotypy by me, in the presence of said
     witness, and afterwards transcribed by computer-aided
9    transcription under my direction.

10         I do further certify that this deposition was
     taken at the time and place specified in the foregoing
11   caption, and signature was not waived.

12         I do further certify that I am not a relative
     of or counsel or attorney for any party hereto, nor am
13   I otherwise interested in the event of this action.

14         IN WITNESS WHEREOF, I have hereunto set my hand
     and affixed my seal of office at Pittsburgh,
15   Pennsylvania, on this 14th day of August, 2007.

16         The foregoing certification does not apply to
     any reproduction of this transcript in any respect
17   unless under the direct control and/or direction of
     the certifying reporter.

18

19

20   _____
     Commonwealth of Pennsylvania
21      NOTARIAL SEAL
     JOY A. HARTMAN, Notary Public     Joy A. Hartman, Notary Public
     City of Pittsburgh, County of Allegheny   in and for the Commonwealth of
22   My Commission Expires May 9, 2010   Pennsylvania

23   My commission expires May 9, 2010.

                    JOHNSON and MIMLESS
                      (412) 765-0744