# EXHIBIT D

CONFIDENTIAL PROTECTED HEALTH INFORMATION

1

```
         IN THE UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF PENNSYLVANIA
                      ERIE DIVISION


UNITED STATES OF AMERICA, ex rel.  )
DILBAGH SINGH, M.D., PAUL KIRSCH,  )
M.D., V. RAO NADELLA, M.D., and    )
MARTIN JACOBS, M.D.,               )
                                   )
              Relators,             )
                                   )    Civil Action
      vs.                          )    No. 04-186E
                                   )
BRADFORD REGIONAL MEDICAL CENTER,  )
V&S MEDICAL ASSOCIATES, LLC,       )
PETER VACCARO, M.D., KAMRAN SALEH, )
M.D., and DOES I through XX,       )
                                   )
              Defendants.          )
```

DEPOSITION OF PETER VACCARO, M.D.

THURSDAY, AUGUST 9, 2007

Deposition of PETER VACCARO, M.D., called as a witness by the Plaintiffs, taken pursuant to Notice of Deposition and the Federal Rules of Civil Procedure, by and before Joy A. Hartman, a Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania, at the offices of Fox Rothschild, 625 Liberty Avenue, 29th Floor, Pittsburgh, Pennsylvania, commencing at 2:56 p.m. on the day and date above set forth.

CONFIDENTIAL   JOHNSON and MIMLESS
              (412) 765-0744



```
1    Q.    Where did you graduate from medical school?
2    A.    University of Guadalajara, Mexico.
3    Q.    When did you graduate?
4    A.    1985.
5    Q.    After graduating -- well, I guess, are you an
6    American citizen?
7    A.    Yes, I am.
8    Q.    Have you always been?
9    A.    I was born in Brooklyn, New York.
10   Q.    After graduating from medical school, have you
11   had any further formal medical education, including
12   residency programs?
13   A.    Other than residency programs?
14   Q.    Including residency programs.
15   A.    Residency in internal medicine.
16   Q.    And where did you do that residency?
17   A.    I had to do a Fifth Pathway, which is --
18   Q.    What is that?
19   A.    A Fifth Pathway coming from a Mexican school is
20   one of the agreements that the University of Mexico
21   has to get us into the mainstream again to apply for a
22   residency in the United States.
23   Q.    And what does a Fifth Pathway involve?
```

```
 1        (EXAMINATION RESUMED AFTER "ATTORNEYS'
 2   EYES ONLY" EXCERPT OF DEPOSITION OF DR. VACCARO WITH
 3   EXAMINATION RESUMED BY ATTORNEY SIMPSON.)
 4                          - - -
 5                      EXAMINATION
 6   BY MR. SIMPSON:
 7       Q.    Where do you currently have privileges,
 8   hospital privilegeS?
 9       A.    I have privileges at two hospitals.  My first
10   hospital privileges were Bradford Regional Medical
11   Center.
12       Q.    And when did you get those?
13       A.    In 1994.
14       Q.    And you have had those since then?
15       A.    Yes, I have.
16       Q.    And where else?
17       A.    At Olean General Medical Center.
18       Q.    And when did you get those?
19       A.    I don't recall, sir.  Sometime in 2001 or 2 or
20   3, within those times.
21       Q.    Five years, plus or minus ago?
22       A.    Yes.
23       Q.    Have you ever had privileges at any other
```

CONFIDENTIAL PROTECTED HEALTH INFORMATION

18

1  V&S' practice before you acquired the nuclear camera
2  that you disagreed with?
3              MR. RYCHCIK:  Objection as to form of the
4       question.
5     A.   I feel like I'm here to confirm Dr. Saleh's
6  testimony, and I thought you were going to get my
7  testimony.
8     Q.   I am.  I am.  I am just trying -- I'm first
9  going to ask you if there was anything in his
10 testimony that you disagreed with.
11    A.   No.  His testimony in describing the practice
12 as it works was very accurate.
13    Q.   During that period of time, is it fair to say
14 that the vast majority of your inpatient referrals
15 were made to Bradford Medical Center?
16             MR. RYCHCIK:  Objection as to form.
17    A.   During what period OF time?
18    Q.   During the period of time before you acquired
19 the nuclear camera.
20             MR. RYCHCIK:  Objection as to the form of
21      the question.  Go ahead.  You can answer.
22    A.   Could you repeat the question, please?
23    Q.   Is it fair to say that during that period of

1  time before you got the nuclear camera, that the vast
2  majority of your inpatient referrals were to Bradford
3  regional Medical Center?
4         MR. RYCHCIK:  Same objection.  Go ahead
5     and answer.
6  A.  The inpatient referrals were based on a very
7  sensitive issue of where the patients wanted to go and
8  what was accessible, depending on their problem; and,
9  you know, there could be multiple places they could
10 go, but, you know, most of the time they would pick
11 the most convenient, which would be Bradford Medical
12 Center.
13 Q.  So is the answer to my question, then, yes?
14 A.  Yes, according to all the potential options
15 that were available.
16 Q.  The same question for outpatient referrals.  Is
17 it fair to say that most of your outpatient referrals
18 were to Bradford Regional Medical Center?
19        MR. RYCHCIK:  Objection as to the form of
20    the question.  You can answer.
21 A.  Again, Bradford Regional Medical Center was one
22 of the options; and most of the time, the patient
23 wanted to go to Bradford Regional Medical Center, and

1   if that is what they wanted, that is where they went.
2   Q.  I understand there might have been good reasons
3   to send them there.  I am just asking you for just the
4   simple facts.  It is true that most of the outpatient
5   referrals were to Bradford as opposed to somewhere
6   else?
7   A.  I just wanted to make sure that it is
8   understood that it is not just an automatic thing all
9   the time, that most of the time, it is because of
10  patient choices.
11  Q.  My question is not about the reasons.  My
12  question is about the simple fact.  It is a fact, is
13  it not, that most of the outpatient referrals were to
14  Bradford?
15  A.  Yes, they were.
16  Q.  Now, after you leased the nuclear camera --
17  well, let me ask you this:  In the period when you
18  were deciding whether or not to lease the nuclear
19  camera, do you recall doing any projections about the
20  amount of additional income that you would receive?
21  A.  There could have been some discussions.
22  Q.  Do you recall any specific discussions?
23  A.  No.

1     about.  They are exploring the possibilities of a
2     joint venture.
3         Q.   Do you recall any communications from Bradford
4     discussing these same issues with respect to the
5     sublease arrangement, as opposed to the under
6     arrangements?
7         A.   Are you referring to the Stark laws?
8         Q.   Yes.  This letter, basically, says an under
9     arrangements venture, these comply with the Stark law?
10    Do you recall getting any similar letter dealing with
11    the application of Stark law to a sublease
12    arrangement?
13        A.   No, I don't recall.
14        Q.   Do you recall having any discussions with
15    Bradford being in any meeting where Bradford was
16    participating with you and your attorneys, any
17    statements about whether or not the sublease
18    arrangement as proposed, in fact, satisfied the Stark
19    statute?
20        A.   Well, I seem to have acquired, you know, the
21    knowledge that a sublease agreement had to be based on
22    a fair market value, and, most likely, have a
23    non-compete associated with that.  We knew that that

```
 1    would probably -- that that would satisfy the Stark
 2    law.
 3        Q.   Was that based -- you said we knew that.  Was
 4    that based on anything that Bradford told you?
 5        A.   It could have been.  I don't recall.
 6        Q.   Was it based on anything your attorneys stated
 7    in anything that Bradford was present at?
 8        A.   I don't remember exactly where.
 9        Q.   So you have no recollection of any specific
10    such instance where anybody told you, yes, this
11    satisfies Stark?
12             MR. RYCHCIK:  Objection.  Again, I am
13        assuming that you are not asking for
14        attorney-client --
15        Q.   I am not asking for a conversation just between
16    you and your attorney.  I am asking for anything where
17    Bradford was involved.
18        A.   I am sure they must have mentioned that, but I
19    don't remember, because we were always worried about
20    violating Stark or an anti-kickback.
21        Q.   I want to ask you the same question I asked Dr.
22    Saleh.  Are you basing your defense in this case in
23    whole or in part upon a claim that your attorneys
```

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

56

1        C E R T I F I C A T E

2   COMMONWEALTH OF PENNSYLVANIA    :
                                     : SS.:
3   COUNTY OF ALLEGHENY              :

4        I, Joy A. Hartman, a Notary Public in and for the Commonwealth of Pennsylvania, do hereby certify that before me personally appeared PETER VACCARO, M.D., the witness herein, who then was by me first duly cautioned and sworn to testify the truth, the whole truth and nothing but the truth in the taking of HIS oral deposition in the cause aforesaid; that the testimony then given by him as above set forth was reduced to stenotypy by me, in the presence of said witness, and afterwards transcribed by computer-aided transcription under my direction.

         I do further certify that this deposition was taken at the time and place specified in the foregoing caption, and signature was not waived.

         I do further certify that I am not a relative of or counsel or attorney for any party hereto, nor am I otherwise interested in the event of this action.

         IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Pittsburgh, Pennsylvania, on this 14th day of August, 2007.

         The foregoing certification does not apply to any reproduction of this transcript in any respect unless under the direct control and/or direction of the certifying reporter.

                    _____
                    Joy A. Hartman, Notary Public
                    in and for the Commonwealth of
                    Pennsylvania

My commission expires May 9, 2010.

Commonwealth of Pennsylvania
NOTARIAL SEAL
JOY A. HARTMAN, Notary Public
City of Pittsburgh, County of Allegheny
My Commission Expires May 9, 2010

JOHNSON and MIMLESS
(412) 765-0744