# EXHIBIT
# E

                                                          1

1              IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2                     ERIE DIVISION


3

UNITED STATES OF AMERICA, ex rel. )
4   DILBAGH SINGH, M.D., PAUL KIRSCH, )
M.D., V. RAO NADELLA, M.D., and   )
5   MARTIN JACOBS, M.D.,              )
                                      )
6                Plaintiffs,          )
                                      )  Civil Action
7        vs.                          )  No. 04-186E
                                      )
8   BRADFORD REGIONAL MEDICAL CENTER, )
V&S MEDICAL ASSOCIATES, LLC,      )
9   PETER VACCARO, M.D., KAMRAN SALEH,)
M.D., and DOES I through XX,      )
10                                     )
                Defendants.          )
11

12      DEPOSITION OF CORPORATE DESIGNEE OF

13      BRADFORD REGIONAL MEDICAL CENTER

14              THURSDAY, JULY 26, 2007

15      Deposition of CORPORATE DESIGNEE OF BRADFORD

16   REGIONAL MEDICAL CENTER, called as a witness by the

17   Plaintiffs, taken pursuant to Notice of Deposition and

18   the Federal Rules of Civil Procedure, by and before

19   Joy A. Hartman, a Court Reporter and Notary Public in

20   and for the Commonwealth of Pennsylvania, at the

21   offices of Horty Springer, 4614 Fifth Avenue, First

22   Floor, Pittsburgh, Pennsylvania, commencing at 10:03

23   a.m. on the day and date above set forth.

COPY

CONFIDENTIAL   PROTECTED HEALTH INFORMATION

85

1   neighboring community hospital.

2           In that instance, in those kinds of instances,

3   the hospital finds itself -- the community hospital

4   finds itself in the position where it has to provide

5   stand-by services, it has to continue to find a way to

6   provide the most economically unattractive services,

7   and yet can have the people using its services

8   electively choosing where to send the most

9   predictable, the most financially advantageous

10  services.

11      Q.    I am going to show you what we will mark as

12  Deposition Exhibit No. 8.

13              (Deposition Exhibit No. 8 was marked for

14  identification.)

15      Q.    This document actually consists of two

16  documents.  It is really the Resolution of the Board

17  of Directors, and then there is attached to it the

18  Procedures that I am assuming accompanied the Board

19  Resolution.

20      A.    Yes.

21      Q.    But maybe rather than me describe it, why don't

22  you take a look at this document and identify it, if

23  you can.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

86

1       A.      Yes.    That is what it is.

2       Q.      This is the Board resolution you were talking

3    about; is that right?

4       A.      That's correct.

5       Q.      And attached to it is part of the same document

6    or the procedures that were implemented to govern the

7    implementation of the policy; is that right?

8       A.      Correct.

9       Q.      And some of the issues that you have just

10   discussed are actually reflected in the preamble here;

11   is that right?    If you look down there it says,

12   "Facing increasing competition of other health care

13   entities."   Do you see where I am talking about, sort

14   of the preamble or the preface to the resolution.

15   There are several "whereas" paragraphs.

16      A.      Yes.    I was looking for that particular one,

17   but, yes.

18      Q.      Now, am I correct that this would allow the

19   hospital to deny or not renew privileges for a

20   physician that the Board determined had a competing

21   financial interest; is that right?    Is that the --

22      A.      Yes, assuming that we went through all the

23   procedures.

JOHNSON and MIMLESS
(412) 765-0744

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

91

1    point that V&S -- before we get there, strike that.

2          What is V&S?  Explain to me, if you could, what

3    your understanding of V&S is?

4    A.    My understanding is it is a professional

5    corporation consisting of Dr. Vaccaro and Dr. Saleh.

6    Q.    And what did they do?  What business were they

7    in?

8    A.    The practice of medicine.

9    Q.    What was the affiliation with the hospital,

10   let's say, at the beginning of January of 2001?

11   A.    They were members of the medical staff.

12   Q.    In what fields did they practice?

13   A.    Internal medicine.

14   Q.    Had they previously been employed by the

15   hospital?

16   A.    Yes.

17   Q.    When were they employed by the hospital?

18   A.    They were employed by the hospital when the

19   hospital acquired practice where they were employed

20   physicians owned by Dr. Russell Weintraub, and that

21   was several years before that.  I am sorry.  I am

22   having a hard time picking the exact date out.

23   Q.    And so they became employees of the hospital,

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

92

1    right?

2      A.    Right.

3      Q.    And the hospital owned that practice?

4      A.    That's correct.

5      Q.    At some point, did they go on their own?

6      A.    Yes, they did.

7      Q.    Did they buy a practice from the hospital?

8      A.    Yes, they did.

9      Q.    Was that the same practice that --

10     A.    Yes.

11     Q.    -- that they had sold to the hospital?

12     A.    They had not sold it to the hospital.

13     Q.    They were employees?

14     A.    They were employees.

15     Q.    And then the hospital sold the practice back to

16   them at some point?

17     A.    That's correct.

18     Q.    When did that occur?

19     A.    I believe it was early in 2000.

20     Q.    Now, in the spring of 2001, did the hospital

21   become aware of an ancillary venture that Drs. Vaccaro

22   and Saleh were developing?

23     A.    We became aware in approximately April of 2001

CONFIDENTIAL -- PROTECTED HEALTH INFORMATION

142

1      Q.    Well, what was the real purpose of that

2  agreement?

3      A.    As I have said before, the real purpose of the

4  agreement was to get us into a situation where we had

5  a level field to compete in.  We certainly -- we

6  certainly wanted to have the opportunity to compete

7  for V&S' business based on quality, based on the level

8  of service that we could provide to them and their

9  patients.

10     Q.    Well, in order to compete for V&S' business,

11  you entered into an agreement where you would pay them

12  a certain amount a month; isn't that right?

13     A.    We entered into a lease and a non-competition

14  agreement, yes.

15     Q.    What was the amount that you agreed to pay them

16  each month, pursuant to that agreement?  You can refer

17  to the document.

18     A.    We agreed to pay them the pass-through cost of

19  the lease for the equipment and a specific amount for

20  the non-compete agreement and the other

21  considerations.

22     Q.    And what was the -- do you -- if you want to

23  refer to the agreement, I would like you to identify

CONFIDENTIAL -- PROTECTED HEALTH INFORMATION

143

1    what the number was and how you arrived at the number.

2        A.    The number here is $29,250 per month.  This

3    does not split those into the components that I was

4    talking about.

5        Q.    But you said that it was to actually pay for

6    the pass-through cost to the equipment?

7        A.    Correct.

8        Q.    And also to pay for these other issues, I

9    guess, the non-compete?

10        A.    Correct.

11        Q.    Was it paying for anything else?

12        A.    No.

13        Q.    Now, did you evaluate whether the equipment

14    that you were paying for as a pass-through under this

15    agreement was equipment that could be used by the

16    hospital?

17        A.    Yes.

18        Q.    And did you make any kind of evaluation or

19    determination that this was a good value for the

20    rental payments that you were making here?

21        A.    Yes.  It was a good usable piece of equipment.

22    It didn't fit into our long-range plans, but it was a

23    good usable piece of equipment.

1    Q.   Who is Mr. Day?

2    A.   Mr. Day is an accountant and an attorney who

3 does this kind of work, as well as other work.

4    Q.   Is he related to Stroudwater in any way?

5    A.   No.

6    Q.   So he is another consultant that you had assist

7 you with this --

8    A.   Yes.

9    Q.   -- this problem?

10    A.   Yes.

11    Q.   First of all, I guess, I don't think this

12 report is dated.  Do you know when this report was

13 prepared or what time frame?

14    A.   I don't know precisely when without the cover

15 letter that went with it.  It was, you know, right

16 before we entered into the agreement.

17    Q.   Was this prepared in connection with entering

18 into the sublease agreement?

19    A.   Yes.

20    Q.   What was the purpose of obtaining this report

21 at that time?

22    A.   We felt very strongly that the agreement that

23 we were entering into was appropriate, that the value

1    that we were receiving was commensurate with what we

2    were paying, but we did want an independent opinion to

3    that effect.

4         Q.    What was the assignment or the scope that you

5    gave to Mr. Day when you hired him to prepare this

6    report?

7         A.    We gave him a letter of engagement, and I don't

8    remember everything that was in it; but, essentially,

9    it was to evaluate the arrangement and give us an

10   opinion as to whether or not the lease and non-compete

11   were fair market value.

12        Q.    And when you say "fair market value," that

13   would require evaluating the lease arrangement for the

14   equipment?

15        A.    Correct.

16        Q.    But also valuing the other parts of the

17   agreement?

18        A.    Correct.

19        Q.    And, essentially, we are talking about

20   non-compete?

21        A.    Correct.

22        Q.    What you call the non-compete?

23        A.    Correct.

CONFIDENTIAL — PROTECTED HEALTH INFORMATION

149

1    Q.    Is that how you arrived at the amount that V&S

2    would pay under the agreement?

3    A.    No.  We arrived at that amount through

4    negotiations.

5    Q.    Okay.

6    A.    We had a proposed negotiated and agreed upon

7    amount.  We wanted an independent opinion as to

8    whether or not that was fair market value.

9    Q.    You knew what the pass-through cost of the

10   equipment lease was, right?

11   A.    That's right.

12   Q.    So that amount didn't change at all?

13   A.    No.

14   Q.    Now, in the negotiations, explain to me how you

15   arrived at the number for the portion of the agreement

16   that covers the non-compete?

17   A.    Through a long and sometimes arduous

18   negotiation.

19   Q.    What was the value that the hospital placed on

20   the non-compete?

21   A.    I don't know.  If you are asking me where we

22   started, I don't remember.

23   Q.    Do you recall what V&S put on it?

CONFIDENTIAL -- PROTECTED HEALTH INFORMATION

186

1    arrived.

2       Q.    Well, that is what I want you to explain to me

3    next.

4       A.    Okay.

5       Q.    So the payments then were made in this amount

6    up through February of 2004?

7       A.    Correct.

8       Q.    And what happened in February of 2004?

9       A.    This piece of equipment was replaced with the

10   new Philips CardioMD equipment that Mr. Washington

11   described earlier today.

12      Q.    Okay.  And?

13      A.    And the lease pass-through from GE was replaced

14   with a lease pass-through from Philips, and that was a

15   slightly different amount.

16      Q.    Who is the lessee on the lease with Philips?

17      A.    Vaccaro and Saleh.

18      Q.    So Vaccaro and Saleh -- so V&S continues to be

19   the lessee and the Bradford Hospital or BRMC continues

20   to be the sublessee?

21      A.    Yes.

22      Q.    And you said that there was a change in the

23   amount.  Was it more or less?

CONFIDENTIAL   PROTECTED   HEALTH INFORMATION

187

1     A.    It was a little bit more.  I can't remember

2     exactly what the difference is right now.

3     Q.    So the amount that was paid to V&S then

4     increased as a result of that change in the lease?

5     A.    Yes.

6     Q.    So they are actually being paid slightly more

7     than the $30,200?

8     A.    Yes.

9     Q.    Is the only part of it that changed the

10    pass-through amount?

11    A.    Yes.

12    Q.    Do you know whether V&S has made all of the

13    payments to Philips or to GE prior to that?

14    A.    I don't have independent knowledge of that, no.

15    Q.    Have you been notified that they are in -- that

16    they have at any time been in default --

17    A.    No.

18    Q.    -- at any time under the lease agreement with

19    either GE or Philips?

20    A.    No.

21    Q.    Now, beginning in October of 2006, I assume the

22    second rental period began; is that right?

23    A.    The second rental period that was discussed in

1     Q.    And so the adjustments or changes are a

2  reflection of the substitute of new equipment and a

3  new lease?

4     A.    Right.

5     Q.    In all other respects, the agreement is the

6  same?

7     A.    Exactly.

8     Q.    So the amount that is being paid for the

9  non-compete has remained the same in both of the

10  rental periods?

11    A.    Yes.

12    Q.    Now, on page five under Section 7, this is the

13  section that is Representations, Warranties, Covenants

14  of Sublessee, it says that under (c) that by entering

15  into this sublease, the sublessee is not in violation

16  of any of the laws or agreements applicable to a

17  sublessee.  Do you believe that that is still the

18  case?

19    A.    Yes.

20    Q.    Do you believe that you have any obligation to

21  indemnify V&S if that's not the case?

22    A.    No.

23    Q.    Have you entered into any agreements since this

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

216

1                    C E R T I F I C A T E

2    COMMONWEALTH OF PENNSYLVANIA      :
                                       :   SS.:
3    COUNTY OF ALLEGHENY               :

4         I, Joy A. Hartman, a Notary Public in and for
     the Commonwealth of Pennsylvania, do hereby certify
5    that before me personally appeared TINA MARIE HANNAHS,
     GLEN ALAN WASHINGTON, and GEORGE LEONHARDT, the
6    witnesses herein, who then were by me first duly
     cautioned and sworn to testify the truth, the whole
7    truth and nothing but the truth in the taking of their
     oral deposition in the cause aforesaid; that the
8    testimony then given by them as above set forth was
     reduced to stenotypy by me, in the presence of said
9    witness, and afterwards transcribed by computer-aided
     transcription under my direction.
10
          I do further certify that this deposition was
11   taken at the time and place specified in the foregoing
     caption, and signature was not waived.
12
          I do further certify that I am not a relative
13   of or counsel or attorney for any party hereto, nor am
     I otherwise interested in the event of this action.
14
          IN WITNESS WHEREOF, I have hereunto set my hand
15   and affixed my seal of office at Pittsburgh,
     Pennsylvania, on this 31st day of July, 2007.
16
          The foregoing certification does not apply to
17   any reproduction of this transcript in any respect
     unless under the direct control and/or direction of
18   the certifying reporter.

19
     Commonwealth of Pennsylvania
20        NOTARIAL SEAL
     JOY A. HARTMAN, Notary Public                _____
21   City of Pittsburgh, County of Allegheny      Joy A. Hartman, Notary Public
     My Commission Expires May 9, 2010            in and for the Commonwealth of
22                                                 Pennsylvania

23   My commission expires May 9, 2010.


                    JOHNSON and MIMLESS
                      (412) 765-0744