# EXHIBIT G

1

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2                       ERIE DIVISION

 3                        -  -  -

 4   UNITED STATES OF AMERICA, ex rel.  )
     DILBAGH SINGH, M.D., PAUL KIRSCH,  )
 5   M.D., V. RAO NADELLA, M.D.,        )
     and MARTIN JACOBS, M.D.,           )
 6                                      )
                 Relators,             )    Civil Action
 7                                      )    No. 0-4-186E
            vs.                        )
 8                                      )
     BRADFORD REGIONAL MEDICAL CENTER,  )
 9   V&S MEDICAL ASSOCIATES, LLC,       )
     PETER VACCARO, M.D., KAMRAN SALEH, )
10   M.D., and DOES I through XX,       )
                                        )
11               Defendants.           )

12                        -  -  -

13           DEPOSITION OF GEORGE LEONHARDT
               TUESDAY, APRIL 1, 2008
14

15        Deposition of GEORGE LEONHARDT, called as a

16   witness by the Relators, taken pursuant to Notice of

17   Deposition and the Federal Rules of Civil Procedure,

18   by and before Carla L. Lennartz, a Court Reporter and

19   a Notary Public in and for the Commonwealth of

20   Pennsylvania, at the offices of Horty Sprinter, 4614

21   Fifth Avenue, Pittsburgh, Pennsylvania, commencing at

22   10:00 a.m. on the day and date above set forth.

23                        -  -  -
```

COPY

43

1    several occasions over a period of a couple of months

2    to try to resolve this issue.  The March 8th meeting

3    was one of those meetings.

4        Q.    So it might have been scheduled previously?

5        A.    It might have been scheduled previously.

6        Q.    But by the time of this meeting, you were

7    focusing on the lease concept as opposed to the Under

8    Arrangements concept; correct?

9        A.    No, we were focusing on the lease concept as

10   something that we could get done to resolve this

11   dispute at this point in time while we continued to

12   work on the Under Arrangements.

13       Q.    When you say as a means to resolve this

14   dispute, I just want to back up one second.  One

15   possible means of resolving the dispute was simply for

16   the hospital to say, keep your camera, we're not going

17   to revoke your privileges.  That was an option of the

18   hospital; wasn't it?

19       A.    Sure it was.

20       Q.    And to your knowledge, that option would have

21   been acceptable to Drs. Vaccaro and Saleh?

22       A.    I expect it would have been.

23       Q.    At the time of this meeting, was the hospital

1    resistant to the idea of doing a lease or was the

2    hospital open to the idea of doing a lease or was the

3    hospital pushing the idea of doing a lease, if you

4    understand?

5                MR. MULHOLLAND:  I just object to the

6           form; but he can answer to the extent he can.

7    A.   If I was asked to describe it, I would say we

8    were open to the idea of pursuing a lease.

9    Q.   V&S, would you describe them as being open to

10   the idea, resistant to it or pushing it?

11               MR. MULHOLLAND:  Same objection to form.

12           But you can answer.

13   A.   I don't know how to answer that.

14   Q.   I suppose the point I'm trying to get at is:

15   Which side was the one who was the advocate for the

16   lease idea?

17   A.   My impression was that both sides saw it as a

18   potential way to resolve their dispute and that

19   neither side saw it as perfect or, you know, what they

20   ultimately wanted.  It was a way to compromise.

21   Q.   Now, at this meeting, is it correct that V&S

22   initially proposed a five-year 2,000 dollar per day

23   lease?

47

1    great volume on those days.

2        Q.    When V&S was making their per diem proposals,

3    was that a seven-day-a-week per diem or a

4    five-day-a-week per diem?

5        A.    As the sheet says, they initially talked about

6    a three-day-a-week per diem, then a five-day; and then

7    she points out that our response was not to their

8    liking because it raised the possibility that we could

9    use it for seven days.

10       Q.    Now, at this meeting, were you all discussing

11   leaving the camera at V&S or bringing it to the

12   hospital?

13       A.    I don't know whether we discussed that or not.

14   I know the hospital's position was that we wanted the

15   camera at the hospital or we wanted a camera at the

16   hospital.

17       Q.    You had a camera at the hospital; correct?

18       A.    Yeah.   We wanted another camera at the

19   hospital.

20       Q.    At this time, was the hospital exploring the

21   possibility of getting a camera, a second camera, from

22   somewhere other than V&S?

23       A.    We were seeing the need for a second camera.

48

1    Q.    Had you identified any specific vendors or

2    cameras to meet that need other than the V&S one?

3    A.    I can't answer whether that occurred in March

4    of 2003 or not; but very close to that time we were

5    evaluating the options as far as kind of camera, the

6    kind of capabilities that we wanted and needed and who

7    that was available from.

8    Q.    Now, your initial agreement with V&S was signed

9    in April of 2003; correct?

10   A.    I believe there was a -- I'm not sure I'm

11   describing this correctly; but I believe the April

12   agreement was an agreement to agree.

13   Q.    So when you say the hospital was exploring the

14   options of other cameras, was it doing that before it

15   entered into the April agreement or afterwards?

16   A.    I honestly can't answer some of that because

17   some of that exploration was going on by department

18   managers and people in charge of the diagnostic area

19   who were out there exploring things, you know, prior

20   to my knowing about them.

21   Q.    Prior to you entering into the lease with V&S,

22   did anyone ever present to you a proposal to acquire a

23   specific camera?

50

1   A.   Correct.

2   Q.   You didn't want three?

3   A.   No.

4   Q.   Going back to this March 8th meeting, you said

5   the hospital was proposing a monthly figure, you can't

6   remember how much a month; is that correct?

7   A.   I know where we ended up.  I don't really know

8   where we started.

9   Q.   I'm talking this negotiating session.

10   A.   Right.

11   Q.   You don't know what that number was, what the

12   hospital's number was at the negotiating session?

13   A.   No, I do not.

14   Q.   Do you know how you arrived at that number?

15   A.   Yes, I do.

16   Q.   How did you arrive at it?

17   A.   We arrived at that number based upon what we

18   thought -- a combination of what we thought the pass

19   through cost was for the actual lease of a camera and

20   our evaluation of what a fair price was for Vaccaro

21   and Saleh to get out of the business.

22   Q.   And how did you evaluate what a fair price to

23   Vaccaro and Saleh would be?

51

1    A.    Over this period of time, we had been asking

2    for information about their costs, the revenue that

3    was generated from the camera to the practice.

4    Q.    So are you telling me that the numbers proposed

5    by the hospital had nothing to do with how much the

6    hospital figured it could make by using the machine?

7    A.    No, they did not.  They had everything to do

8    with what we thought was a fair price to get them out

9    of the business.

10   Q.    Is it typical for a hospital in deciding how

11   much it wants to pay for a piece of machinery to

12   ignore how much revenue it can obtain by using the

13   machinery?

14   A.    Oh, no; and believe me, we had a pretty good

15   idea what kind of revenue we could generate from this;

16   but the relevant -- in this negotiation, we believed

17   that the relevant issue was what a fair price to pay

18   Vaccaro and Saleh to get out of the business was.

19   Q.    So you were trying to give them a good deal,

20   not the hospital?

21   A.    A fair deal.

22   Q.    Regardless of whether that was a fair deal to

23   the hospital?

54

1    Q.    It was a business arrangement for the hospital,

2    you were looking out for the hospital's interests;

3    correct?

4    A.    And they were looking out for their interests

5    and we expected them to.  You know, we wanted this to

6    be a fair deal.

7              MR. SIMPSON:  Mark this as Exhibit 4.

8              (Leonhardt Deposition Exhibit No. 4 was

9    marked for identification.)

10    Q.    What is this document, I guess?

11    A.    This is an evaluation of the sublease agreement

12    with Vaccaro and Saleh, an independent evaluation.

13    Q.    And it was prepared by Charles T. Day?

14    A.    That's correct.

15    Q.    For the hospital?

16    A.    Yes.

17    Q.    At your direction?

18    A.    I don't know whether it was prepared at my

19    direction or at the direction of Horty & Springer.

20    Q.    But it was for the hospital?  It was prepared

21    for the hospital to evaluate the fair market value of

22    the arrangement -- the lease arrangement with V&S;

23    correct?

1    A.    That's correct.

2    Q.    And you considered it in that context; correct?

3    A.    Absolutely, prior to signing the agreement.

4    Q.    Prior to signing the --

5    A.    Final lease agreement.

6    Q.    Final October lease agreement?

7    A.    That's correct.

8    Q.    But after the agreement to agree?

9    A.    Yes.

10    Q.    If you'd turn to page 17, please, the last full

11   paragraph.  It says that the "table shows the expected

12   quantitative revenues that would accrue to the

13   hospital with a noncompetition agreement in place and

14   a comparison of those benefits to the amounts payable

15   under the noncompetition agreement.  This is based on

16   the assumption that the physicians would likely refer

17   this business to the hospital in the absence of a

18   financial interest in their own facilities or

19   services, although they are not required to do so by

20   virtue of any of the covenants contained in the

21   Agreements or otherwise."

22          Am I reading that right?

23    A.    Yes.

64

1              (Lunch recess from 11:30 a.m.  Until 12:05

2   p.m.)

3     Q.   We just had been talking about this March 8th,

4   2003 meeting.  Mr. Leonhardt, do you recall how the

5   discussions proceeded after that meeting in terms of

6   negotiating a dollar figure for payments under the

7   lease?

8     A.   I recall that there was a significant amount of

9   back and forth between the attorneys and being

10  involved in discussions with probably mostly Mr.

11  Steinberg after that about the various iterations.

12    Q.   Were you intimately involved in figuring out

13  what dollar figure to use for lease payments?

14    A.   As involved as anybody was, yes.

15    Q.   How did the parties ultimately arrive at the

16  numbers that were put in the lease?

17    A.   By coming to I believe some kind of an

18  agreement about what a fair price was for Vaccaro and

19  Saleh to give up that line of business.

20    Q.   Was it just a gut feeling or was there --

21    A.   No.  It was based on information back and

22  forth.  You know, we based our offers on information

23  about the revenue that that was producing for them.

65

1    On a couple of occasions they -- you know, we were

2    reminding them that there were costs involved in that

3    also and were literally asking for information about

4    what is the cost of the drug, how much are you paying

5    to have radioactive waste taken away, what's your

6    license costing you.

7    Q.   Did you view the amount that Vaccaro and Saleh

8    were making by using the machine as a proxy for what

9    the hospital could make?

10    A.   No.  Hospitals and physician practices are paid

11    differently for those services.  They aren't paid

12    exactly the same.

13    Q.   The hospitals are paid more; is that correct?

14    A.   That's correct.

15    Q.   Do you know how much more?

16    A.   That's correct in most instances.  That's a

17    generally true statement.  I don't remember exactly

18    how much more.

19    Q.   At some point this April agreement to agree was

20    entered into and then in October the final lease

21    agreement was entered into; right?

22    A.   That's correct.

23    Q.   Did you have to go to the boards to get

77

1          And we had discussed that issue previously and

2     I think you had mentioned that you were aware that

3     V&S's attorneys had made that accusation.  And this is

4     the letter where they do make that accusation;

5     correct?

6        A.    Right.

7        Q.    Now, ultimately you entered into a lease

8     agreement and executed a final agreement in October;

9     correct?

10       A.    Correct.

11       Q.    After you entered into that agreement, what

12    happened to the nuclear camera?

13       A.    For a period of time it continued to operate at

14    Vaccaro and Saleh's office.

15       Q.    I just wanted to ask some questions about that,

16    but if you wanted to keep going -- were you finished

17    with that answer?

18       A.    Until such time as we were able to get the

19    camera that we desired from Philips in place at the

20    hospital.

21       Q.    Now, you had previously testified that you

22    didn't think it was a good idea for Bradford to lease

23    a camera and then leave it at V&S's office; correct?

1    A.    Correct.

2    Q.    So why did you ultimately decide to do that?

3    A.    Because we couldn't get the camera from Philips

4  that we had wanted at the time that the lease was

5  entered into.  It took us longer to get that than we

6  expected it to.

7    Q.    All right.  You had said that one of the

8  problems with doing it that way would be that other

9  physicians -- it wouldn't be as easy for them to refer

10 patients for tests to be performed on a camera at

11 V&S's office; correct?

12   A.    That's correct.

13   Q.    So for a period of -- do you know how long the

14 camera was at V&S's office?

15   A.    I believe almost until March.

16   Q.    So four or five months?

17   A.    About four or five months.

18   Q.    How was the camera used during that time?

19   A.    It was used essentially by V&S's patients.

20   Q.    Okay.  It was used by V&S's patients but it was

21 Bradford's camera because you had subleased it?

22   A.    We were leasing it at that point, yes.

23   Q.    Did Bradford submit claims for tests performed

79

1   on that camera during that period of time?

2      A.    No.   V&S continued to submit the claims and

3   then provided us with an accounting and the revenue

4   from that.

5      Q.    Did V&S submit the claims under their provider

6   number or under the hospital's?

7      A.    I don't know the answer to that.

8      Q.    How did the hospital make money off of the

9   camera during that period of time?

10     A.    V&S provided us with the revenue.

11     Q.    And did the hospital pay V&S a billing fee?

12     A.    Yes.

13     Q.    Was it ten percent?

14     A.    Yes.

15     Q.    Did the hospital pay V&S rent to keep the

16  equipment at their facility?

17     A.    And to use the space, yes.

18     Q.    Was that $2500 a month?

19     A.    Yes, it was.

20     Q.    Did the hospital make any other payments to V&S

21  in connection with the equipment during that four or

22  five-month period?

23     A.    I believe there were also expense offsets from

80

1    their revenue for the interpretation fees that they
2    were paying and for the cost of the drugs and for the
3    disposal of the nuclear waste.

4    Q.    All right.  What happened at the end of that
5    four or five-month period?

6    A.    When we were able to get the camera from
7    Philips?

8    Q.    Yes.

9    A.    We began to operate the camera at the hospital.

10   Q.    The Philips camera?

11   A.    The Philips camera.

12   Q.    I'm sorry.  I wasn't very clear.  What happened
13   to the GE camera, the old camera, after you got the
14   Philips camera?

15   A.    There was a period of a couple of months where
16   Philips was trying to decide whether they wanted the
17   camera.  The agreement with Philips was they would buy
18   the GE lease out early and their lease payment to
19   Vaccaro and Saleh would reflect that expenditure.

20   Q.    Their lease payment from Vaccaro and Saleh?

21   A.    From Vaccaro and Saleh.  I'm sorry.

22   Q.    What physically happened to the camera?

23   A.    It stayed at Vaccaro and Saleh's office for a

87

1    A.    Billing fee.

2    Q.    Or billing fee.  Associated other costs for

3    minor things, clerical things like that I think you

4    had said?

5    A.    Yes.

6    Q.    And then it paid $200,000 to terminate the

7    lease early; correct?

8    A.    Not until the Philips camera arrived and then

9    that would have been part of the lease payments.

10   Q.    But you did pay that?

11   A.    Ultimately, yes.

12   Q.    Well, the Philips camera had its own lease

13   payments; correct?

14   A.    Yes, but those didn't begin -- the reason that

15   the camera continued to operate in Vaccaro and Saleh's

16   office is that the Philips camera and the arrangement

17   between Philips and GE took longer to accomplish than

18   any of us anticipated.  At that point in time, if we

19   had shut the GE camera down, we didn't have the

20   capacity to accept and do the diagnostic work on

21   Vaccaro and Saleh's patients with only one camera.

22   Q.    You could have waited four or five more months

23   before entering into the lease agreement.

88

1    A.    Had we known it was going to take Philips four

2    or five months longer than they said it was going to

3    take them to deliver the camera, that's likely what we

4    would have done.  Those decisions were essentially

5    being made every month with Philips saying it will be

6    here next week or the week after that or the week

7    after that.

8    Q.    Well, if the Philips camera had gotten there

9    after one month, you still would have had to terminate

10   the GE lease early?

11   A.    Oh, absolutely.  Yeah.

12   Q.    That's a big obligation that the hospital

13   saddled itself with; don't you agree?

14   A.    Yeah.  $200,000 to terminate the lease early,

15   you know, that was the agreement that Vaccaro and

16   Saleh had with GE, but that was a hefty price.

17   Q.    And that was in addition to your noncompete

18   payments and it was in addition to the pass through

19   payments for each of the two leases?

20   A.    Yes.  You do understand that there were no

21   payments to Philips either for the pass through or for

22   the termination until they delivered their equipment

23   and we began to use it.

91

1    A.    I don't know for sure.

2             (Leonhardt Deposition Exhibit No. 8 was

3    marked for identification.)

4    Q.    I'm showing you Exhibit 8 which is an October

5    2nd, 2003 letter to you from Drs. Saleh and Vaccaro.

6    Do you recall receiving this letter?

7    A.    Yes.

8    Q.    Does it accurately reflect those additional

9    charges that we had discussed previously in connection

10   with keeping the old camera at V&S's property?

11   A.    Yeah, I believe so.

12   Q.    Are you aware of any other situation where a

13   hospital has entered into a sublease of a piece of

14   equipment that it intends to use only for a few months

15   and thereby incurred an obligation to pay $200,000 to

16   terminate the lease early?

17             MR. MULHOLLAND:  You're asking for his

18        personal awareness, not expert testimony;

19        correct?

20   Q.    I'm asking if you're aware.

21   A.    No, I'm not aware of any arrangements like

22   that.

23   Q.    The equipment sublease provides that the

**JOHNSON and MIMLESS**
**(412) 765-0744**

104

1              C E R T I F I C A T E

2    COMMONWEALTH OF PENNSYLVANIA    :
                                     :  SS.:
3    COUNTY OF ALLEGHENY             :

4          I, Carla L. Lennartz, a Notary Public in and
     for the Commonwealth of Pennsylvania, do hereby
5    certify that before me personally appeared GEORGE
     LEONHARDT, the witness herein, who then was by me
6    first duly cautioned and sworn to testify the truth,
     the whole truth and nothing but the truth in the
7    taking of his oral deposition in the cause aforesaid;
     that the testimony then given by him as above set
8    forth was reduced to stenotypy by me, in the presence
     of said witness, and afterwards transcribed by
9    computer-aided transcription under my direction.

10         I do further certify that this deposition was
     taken at the time and place specified in the foregoing
11   caption, signature was not waived.

12         I do further certify that I am not a relative
     of or counsel or attorney for any party hereto, nor am
13   I otherwise interested in the event of this action.

14         IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my seal of office at Pittsburgh,
15   Pennsylvania, on this 10th of April, 2008.

16         The foregoing certification does not apply to
     any reproduction of this transcript in any respect
17   unless under the direct control and/or direction of
     the certifying reporter.

18

19                              _Carla L. Lennartz_ (signature)

20   COMMONWEALTH OF PENNSYLVANIA
             Notarial Seal
     Carla L. Lennartz, Notary Public
21   City Of Pittsburgh, Allegheny County    _____
     My Commission Expires Oct. 29, 2011     Carla L. Lennartz, Notary Public
     Member, Pennsylvania Association of Notaries  in and for the Commonwealth of
22                                           Pennsylvania

23   My commission expires October 29, 2011.