# EXHIBIT H

1

```
 1              IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2                       ERIE DIVISION

 3                     -  -  -  -  -

 4        UNITED STATES OF AMERICA,    )
          ex rel., DILBAGH SINGH,      )
 5        M.D., PAUL KIRSCH, M.D.,     )
          V. ROA NADELLA, M.D., and    )
 6        MARTIN JACOBS, M.D.,         )  Civil Action
                                       )  No. 04-186E
 7                  Relators,          )
                                       )
 8                  vs.                )
                                       )
 9        BRADFORD REGIONAL MEDICAL    )
          CENTER, V&S MEDICAL          )
10        ASSOCIATES, LLC, PETER       )
          VACCARO, M.D., KAMRAN        )
11        SALEH, M.D., and DOES I      )
          through XX,                  )
12                                     )
                    Defendants.        )
13
                 DEPOSITION OF EDWARD KABALA
14                 THURSDAY, APRIL 3, 2008

15   Deposition of Edward Kabala, called as a witness by

16   the Relators, taken pursuant to Notice of Deposition

17   and the Federal Rules of Civil Procedure, by and

18   before Constance Lee, a Court Reporter and Notary

19   Public in and for the Commonwealth of Pennsylvania,

20   at the offices of Fox Rothschild, 625 Liberty Avenue,

21   29th Floor, Pittsburgh, Pennsylvania, commencing at

22   11:23 a.m. on the day and date above set forth.

23                     -----
```

COPY

6

1          way.

2     BY MR. STONE:

3       Q.    Mr. Kabala, I guess -- how did you come to be

4     involved in a -- in representing Drs. Vaccaro and

5     Saleh back in 2001, 2000, that timeframe?

6               MR. RYCHCIK:  I'm going to object to

7               that.  I think you're going to be asking him

8               attorney-client communications, and I'm going

9               to instruct him not to answer those

10              attorney-client communications.

11              MR. STONE:  This may be a little

12              difficult.

13      Q.    Maybe the best way to ask the question would

14    be, Mr. Kabala, do you remember attending meetings

15    with Dr. Vaccaro and Dr. Saleh involving the Bradford

16    Regional Medical Center in 2003?

17      A.    Yes.

18      Q.    Do you remember when you attended meetings

19    with your clients and other parties?

20      A.    Not offhand, but I would think it would be

21    around December of '02 and early part of '03.

22      Q.    Do you recall meeting with the Bradford

23    Hospital or the Bradford Regional Medical Center to

7

1    negotiate the terms of a lease agreement?

2      A.    Yes.

3            MR. RYCHCIK:  When you say "Bradford

4            Regional Medical Center," you're talking about

5            representatives of the hospital?

6            MR. STONE:  That's right.

7      Q.    And what were the purpose -- or what was

8    the -- were the substance of those meetings with

9    Bradford relating to a lease agreement?

10            MR. RYCHCIK:  Objection as to the form

11            of the question.  Are you asking him about the

12            particulars, what was discussed?  I mean, the

13            substance is kind of broad.

14      Q.    Let's start -- were your clients invited to

15    meet with the hospital in early 2003?

16      A.    Yes.

17      Q.    And how was that communicated to you or your

18    clients?

19      A.    Probably had discussions with Mr. Steinberg.

20      Q.    And did you understand that Mr. Steinberg

21    represented the hospital or the hospital

22    administration?

23      A.    Yes.

8

1              MR. RYCHCIK:  I want to be careful, Ed.

2          Your understandings -- I don't want you to get

3          into your opinions, your conclusions, those

4          types of areas.  Certainly if he communicated

5          that to you, that's fine.  I would like to try

6          to limit it to what it was communicated and

7          those communications back and forth.

8     Q.    Did Mr. Steinberg tell you that he was

9     representing the hospital and the administration?

10    A.    He was representing the hospital, yes.

11    Q.    And did he tell you why he wanted to meet

12    with you and your clients?

13             MR. MULHOLLAND:  I'll object to the

14          extent that that gets into anything that might

15          constitute work product on behalf of Alan, but

16          I can't instruct him not to answer.

17    Q.    Did he tell you why he wanted to meet with

18    you?

19    A.    Yes.

20    Q.    What did he tell you?

21    A.    That the parties had a dispute, and they

22    wanted to talk about ways of seeing if it could be

23    resolved.

12

1    A.    Not that I can recall.

2    Q.    Do you know whether -- do you remember

3    whether the doctors, your clients, proposed anything

4    with regard to a lease agreement in that second

5    meeting?

6    A.    Probably, but I don't recall specifically

7    when.

8    Q.    Did the parties discuss a -- the possibility

9    of a buyout of the doctors' practice or a portion of

10   the doctors' practice?

11   A.    No.

12   Q.    What was the lease proposal that the doctors

13   made to the hospital at that second meeting?

14   A.    Don't know if there was a specific proposal.

15   The original concept was to discuss how the parties

16   could back off from the precipes that they -- the

17   deadlock, the fight that they were involved in, and

18   whether there were legal ways to resolve the issue.

19       I think a number of things were discussed.  I

20   don't know that anything was specifically proposed.

21   There was some concepts raised.  I think at one point

22   we probably said did they want to buy the camera

23   business, the nuclear camera business, and the

13

1    hospital said they did not, and then we looked at

2    other alternatives.

3    Q.    Did the hospital relate to you at either the

4    first or second meeting what their concerns were with

5    regard to V&S operating this nuclear imaging part of

6    their practice?

7    A.    Well, the concerns had been raised in prior

8    correspondence.

9    Q.    Did they relate to you at the first or second

10    meeting that their business was -- the volume of

11    their business with regard to nuclear imaging and

12    cardiology was being impacted by your clients'

13    business?

14            MR. RYCHCIK:    Objection as to the form

15        of the question.    You're asking if that's what

16        was communicated in one of these letters?

17            MR. STONE:    No.    I'm asking whether that

18        was communicated in either one of the

19        meetings.

20    A.    I don't recall that being a topic of

21    discussion at the meetings.

22    Q.    At either of these meetings did the hospital

23    present any information with regard to the volume of

14

1    referrals or the decline in referrals that was

2    resulting from the V&S imaging practice?

3      A.    No.

4            MR. RYCHCIK:  I just want to be clear.

5         You're talking about the first two meetings?

6            MR. STONE:  Yes.

7            MR. RYCHCIK:  In the event there were

8         subsequent meetings --

9            MR. STONE:  We will get to those.

10     Q.    By the time you got to the end of the second

11   meeting, had the parties reached any agreement with

12   regard to a lease arrangement?

13     A.    Not that I recall.

14     Q.    Was there an agreement or consensus to meet

15   again?

16     A.    I believe there was a thought that we would

17   meet again, but I don't know that anybody had any

18   particular agreement on it.

19     Q.    How long after that do you think you met?

20     A.    Another month maybe.

21     Q.    So that would be possibly early February?

22     A.    Early February, I guess.

23     Q.    And at that time did the hospital request an

JOHNSON and MIMLESS
(412) 765-0744

21

1     we will mark this one as Deposition Exhibit No. 1.

2            This next one we will mark as Deposition

3     Exhibit 2?

4                 (Kabala Exhibit Nos. 1 and 2 were marked

5            for identification.)

6                 MR. RYCHCIK:  Take your time to read

7            through this one as well.

8                 THE WITNESS:  Uh-huh.

9                 (Witness reviews document.)

10    A.    Okay.

11    Q.    Is this letter familiar to you?

12    A.    It is.

13    Q.    Have you previously received it?

14    A.    I have.

15    Q.    And I think you testified that Ms. Hobbs was

16    working with you; is that correct?

17    A.    That's correct.

18    Q.    Now, both Exhibit 1 and 2 refer to this

19    meeting on March 8th, 2003.

20    A.    Yes.

21    Q.    Is it your recollection that that meeting was

22    largely about or substantially about the lease

23    arrangement?

22

1    A.    No.   It was -- it was -- the lease

2    arrangement was discussed.   It was also about the

3    under arrangements model and the hospital's desire to

4    have Drs. Vaccaro and Saleh participate in that.

5    Q.    Okay.   Do you recall where that meeting took

6    place?

7    A.    I think it's in Mr. Steinberg's office.

8    Q.    And Ms. Hobbs' letter refers to Drs. Vaccaro

9    and Saleh being present, yourself, Mr. Steinberg and

10   Mr. Mulholland and Mr. Leonard.   Is that what you

11   remember?

12   A.    As I recall, Mr. Steinberg had some other

13   issues, and he was in and out, but yes.

14   Q.    So those persons would have attended at least

15   some part of that meeting?

16   A.    I believe so.

17   Q.    Do you remember whether the hospital

18   requested this meeting or whether this was a meeting

19   that was requested by your clients?

20   A.    I don't recall whether -- who actually

21   requested it.   I mean --

22   Q.    Do you remember how long this meeting lasted?

23   A.    Pretty much all morning.

23

1    Q.    And what do you remember about the

2  discussions involving the lease?

3           MR. RYCHCIK:  Objection as to the form

4        of the question.

5           You can go ahead and answer.

6           Are you looking to just in general what

7        he remembered, every discussion that took

8        place?  It's a broad area.

9    Q.    Well, I'm certainly not asking you about what

10  you advised your clients out of the presence of other

11  parties, but I'm talking about the discussions

12  between the parties and the lawyers involving the

13  lease.  What do you remember about those discussions?

14    A.    At this stage the concept was to have

15  Drs. Vaccaro and Saleh eventually join in to

16  something called an under arrangements model.  We

17  were discussing whether the parties would wait for

18  the under arrangements model to be implemented or

19  whether there was a way that we could legally develop

20  some methodology for the hospital to take over the

21  nuclear camera and the nuclear camera business at an

22  earlier stage because it would take some time for the

23  under arrangements model to be implemented.

24

1      Q.    You said at the early meetings the hospital

2   did not seem to be interested in a lease arrangement?

3      A.    That's correct.

4      Q.    At this meeting in March did they express or

5   relate to you that they were now interested in the

6   proposal?

7      A.    At the beginning of the meeting, as I recall,

8   they said they were interested in talking about it

9   further, that they had originally said they were not

10  interested, and they were interested in seeing if one

11  could be worked out by the parties in a way that

12  would be satisfactory to the lawyers and the clients.

13     Q.    Who made the first proposal with regard to

14  the amount of the lease payment?

15     A.    Probably me.

16     Q.    And did you relate to the hospital why the

17  doctors felt that it was worth a certain amount in

18  terms of a per diem charge or a monthly charge?

19     A.    I'm sure I did.

20     Q.    And what did you tell -- what did you tell

21  the hospital about what the basis for that proposal

22  was?

23     A.    I told the hospital that although it was just

25

1    basically in its first year, the doctors were making

2    a substantial number of dollars and would anticipate

3    making additional dollars over the period as the

4    business grew, and that if they were to put at some

5    point through the under arrangements model, then

6    that -- that plus some other ventures would be there.

7            But if we were going to be talking about

8    something before the under arrangements model, then I

9    had proposed, I think, something in the area of

10   $2,000 per day as a sublease.

11     Q.   And did you relate to the hospital that it

12   was -- that whatever arrangement was agreed upon

13   would have to compensate the physicians for the loss

14   of the business opportunity or the loss of the

15   profit?  Is that what you were --

16     A.   They were giving up some profit of $240,000

17   initially and then more later, so my proposal was

18   that they compensate the doctors for the camera, the

19   cost of the camera and basically for a noncompete.

20   The form, whether we did it as a sublease or a

21   sublease and a noncompete or whatever, all those

22   things were talked about, and it basically got down

23   to one document.

26

1     Q.   Well, was it the hospital that requested the

2    noncompete, or was it the doctors that proposed the

3    noncompete?

4     A.   I don't know that -- I think probably that I

5    proposed the noncompete. Again, we had been looking

6    for an appropriate methodology that was satisfactory

7    to the government, that was satisfactory to the

8    lawyers and satisfactory to the clients, and that was

9    one that was basically in use in many, many

10    transactions that were ongoing in the '90s and early

11    2000s and still today.

12     Q.   Did the hospital counter your proposal, which

13    was, I guess, the $2,000 plus these other elements

14    that you talked about?

15     A.   The hospital, as I recall, simply said no to

16    the original number, and by the end of the day I

17    believe we had gotten down to where the -- they would

18    at least look at a $1,500 number, but they hadn't

19    agreed to anything.

20     Q.   And did the hospital, during the course of

21    those discussions, did the hospital relate to you a

22    reason or justification for their position that they

23    were willing to pay something, but not as much as you

27

1    were looking for?

2        A.    Well, the hospital wanted to -- if the

3    hospital wanted to take it over, then they are to be

4    certain that what they were paying was fair market

5    value.  They thought the original number wasn't, or

6    even if it was, they weren't ready to pay it.  So

7    they were going to consider what they thought was

8    fair market value for taking over this business and

9    for the noncompete.

10       Q.    When you say "fair market value for taking

11   over the business," at this point the sale of the

12   business was off the table.  Is that true?  Is that

13   correct?

14       A.    Well, there was no purchase of the business.

15       Q.    Okay.

16       A.    But the doctors would give up the business

17   pursuant to the noncompete.  So the hospital would be

18   taking over the tech, the camera, moving it to the

19   hospital, and integrating it into their department

20   initially and ultimately into the under arrangements

21   model, if that took off and went anywhere.

22       Q.    Did the hospital indicate to you that they

23   were evaluating the lease payments based on the --

28

1    the fair market value of the business then?

2        A.    I don't know that the hospital said that, how

3    they were evaluating it.  I just think that we got to

4    a point where we had gone as far as we could that

5    day, we understood the general concepts, and they

6    wanted to look at what their position would be and

7    whether they wanted to go any further with it.

8        Q.    Did the hospital, at that point or at any

9    previous point, request any information from your

10   clients relating to the volume of the business?

11       A.    I think what they requested and what

12   Dr. Saleh eventually gave them was the gross

13   collections and the expenses of the business.

14       Q.    Did the hospital share with you or your

15   clients any information regarding referral rates or

16   business volume from their records?

17            MR. RYCHCIK:  Are you talking about at

18         any time related to a sublease, or are you

19         talking about at this particular meeting?

20       Q.    I'm talking about first this particular

21   meeting, and then I'll ask you a follow-up question.

22       A.    The only information that we ever received

23   from the hospital was information generally at some

29

1    point on the under arrangements model.  There was

2    never any question of referrals.

3        Q.    And at this meeting in March of 2003, was the

4    lease discussed in the context of an ultimate under

5    arrangements venture?

6        A.    There were two phases basically, actually

7    three phases.  An initial phase where the parties

8    would generally have a concept, a period of time

9    where the hospital would obtain a fair market value

10   opinion or the noncompete, and then presumably if the

11   under arrangements model was ready at that time,

12   would it go there.  If it wasn't, then there would be

13   an interim phase if the parties reached an agreement,

14   there would be a takeover before the under

15   arrangements model.

16       Q.    So the discussions involved the terms of this

17   interim arrangement or lease as well as the ultimate

18   under arrangements venture; is that right?

19       A.    It was very limited as to the under

20   arrangements model.  They had to get all of their

21   materials together.  They had to see what -- the

22   hospital's intent as they expressed it to the doctors

23   and to me was to find some mechanism for solidifying

40

1                    C E R T I F I C A T E

2    UNITED STATES DISTRICT COURT )
     WESTERN DISTRICT OF PA - ERIE) SS:
3
              I, Constance Lee, a Notary Public in and
4    for the Commonwealth of Pennsylvania, do hereby
     certify that before me personally appeared EDWARD
5    KABALA, the witness herein, who then was by me first
     duly cautioned and sworn to testify the truth, the
6    whole truth and nothing but the truth in the taking
     of his oral deposition in the cause aforesaid; that
7    the testimony then given by him as above set forth
     was reduced to stenotypy by me, in the presence of
8    said witness, and afterwards transcribed by
     computer-aided transcription under my direction.
9
              I do further certify that this
10   deposition was taken at the time and place specified
     in the foregoing caption, signature was not waived.
11
              I do further certify that I am not a
12   relative of or counsel or attorney for any party
     hereto, nor am I otherwise interested in the event of
13   this action.

14            IN WITNESS WHEREOF, I have hereunto set
     my hand and affixed my seal of office at Pittsburgh,
15   Pennsylvania, on this 7th day of April, 2008.

16            The foregoing certification does not
     apply to any reproduction of this transcript in any
17   respect unless under the direct control and/or
     direction of the certifying reporter.

18

19                                   COMMONWEALTH OF PENNSYLVANIA
                                            Notarial Seal
20   _____       Constance Lee, Notary Public
                                     Reserve Twp., Allegheny County
                                     My Commission Expires Aug. 8, 2009
21   Constance Lee, Notary Public   Member, Pennsylvania Association of Notaries
     and for the Commonwealth of
22   Pennsylvania

23

JOHNSON and MIMLESS
(412) 765-0744

CLee – April 3, 2008

**ERRATA SHEET**                                                    WITNESS NAME:  <u>Edward Kabala</u>

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| 12 | 16 | "precipes" to "precipice" | Misspelled word. |
| 29 | 10 | "or" to "on" | Wrong word. |
| 29 | 12 | "would it" to "it would" | Transcription error. |
| 32 | 16 | "projects" to "projections" | Wrong word. |
| 37 | 1 | delete "to" | Transcription error. |
| 38 | 7 | ".  It's the" to "regarding" | Correct ambiguity and/or transcription error. |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Johnson and Mimless
1334 Fifth Avenue
Pittsburgh, PA  15219