# EXHIBIT J

CONFIDENTIAL PROTECTED HEALTH INFORMATION

1

```
 1              IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2                       ERIE DIVISION

 3

     UNITED STATES OF AMERICA, ex rel. )
 4   DILBAGH SINGH, M.D., PAUL KIRSCH, )
     M.D., V. RAO NADELLA, M.D., and   )
 5   MARTIN JACOBS, M.D.,              )
                                       )
 6              Relators,              )
                                       )   Civil Action
 7        vs.                          )   No. 04-186E
                                       )
 8   BRADFORD REGIONAL MEDICAL CENTER, )
     V&S MEDICAL ASSOCIATES, LLC,      )
 9   PETER VACCARO, M.D., KAMRAN SALEH,)
     M.D., and DOES I through XX,      )
10                                     )
                Defendants.            )
11

12              DEPOSITION OF SAL A. BARBERA

13                 TUESDAY, JULY 1, 2008

14        Deposition of SAL A. BARBERA, called as a

15   witness by the Defendants, taken pursuant to Notice of

16   Deposition and the Federal Rules of Civil Procedure,

17   by and before Joy A. Hartman, a Court Reporter and

18   Notary Public in and for the Commonwealth of

19   Pennsylvania, at the offices of Horty Springer, 4614

20   Fifth Avenue, First Floor, Pittsburgh, Pennsylvania,

21   commencing at 9:15 a.m. on the day and date above set

22   forth.

23
```

JOHNSON and MIMLESS
(412) 765-0744



1  V&S Medical Associates?
2     A.   Yes, sir.
3     Q.   Is there anything unusual, based on your
4  experience as a hospital administrator or otherwise,
5  about a hospital leasing a piece of equipment like a
6  nuclear camera, as opposed to buying it?
7     A.   No.  There is nothing unusual about that.
8     Q.   Are you aware, based on your experience, of
9  hospitals leasing equipment from physicians?
10    A.   I believe it takes place.
11    Q.   Would you would agree with me that this
12 Equipment Sublease is in writing?
13    A.   Yes.
14    Q.   And is it your understanding that it was signed
15 by representatives of both of the parties, the Medical
16 Center and V&S Medical Associates?
17    A.   Correct.
18    Q.   Is it your understanding that the sublease
19 provides the Medical Center with the use of the
20 equipment, the subject of the sublease, on a fulltime
21 basis?
22    A.   Correct.
23    Q.   Are you aware of anyone, other than Bradford

1 A. I am not aware of anyone else having use of it.

2 Q. Is it your understanding that this equipment

3 sublease was for a term of at least one year?

4 A. I believe it was -- I believe it did have a

5 term, yes.

6 Q. Now, do you have any opinion about whether the

7 rental payments described in the sublease are

8 consistent with fair market value?

9 A. I believe that the payments were -- I believe

10 that the rental payments were just a direct

11 pass-through from the payments that were -- from the

12 payments that V&S was paying to GE.

13   I can't render an opinion about fair market

14 value.  That is not what I am here to do.

15 Q. Would you be qualified to render any opinion

16 about fair market value?

17 A. No.

18 Q. Now aside from the pass-through payments for

19 the machine, I believe there are also payments for a

20 noncompete clause and certain other considerations

21 under the lease; is that your understanding?

22 A. Correct.

23 Q. And I believe your report indicates that in

Case 1:04-cv-00186-MBC    Document 127-11    Filed 09/10/2008    Page 5 of 11
CONFIDENTIAL - PROTECTED HEALTH INFORMATION

89

1   are there any other facts or assumptions on which you
2   base your opinion that the payments varied, based on
3   the volume or value of referrals?
4       A.   I believe there is also in the deposition of
5   Mr. Leonhardt, there is comments in there that, to me,
6   clearly illustrate that the purpose of this sublease
7   was to maintain referrals from V&S.
8       Q.   Do you recall any specifics about Mr.
9   Leonhardt's testimony that formed your opinion in this
10  regard?
11      A.   Can I look at my notes?
12           MR. SIMPSON:  Well, no.
13      Q.   We can do that perhaps at a break.  Certainly,
14  you can look at your notes, but if you look at your
15  notes, we would like to see them, obviously.
16           Is there anything in that sublease, per se, in
17  that written document, that requires either V&S or
18  Drs. Saleh and Vaccaro to refer business to the
19  hospital?
20      A.   No.
21           MR. MULHOLLAND:  This is probably a good
22           time for a break, if you would like to take a
23           short break?

JOHNSON and MIMLESS
(412) 765-0744

1  purpose?
2  A.  No.  Just -- no.
3  Q.  Were these in any way intended to be talking
4  points or reminders of things to cover during the
5  deposition?
6  A.  It was just a way for me to recollect in myself
7  what I probably would be asked about this particular
8  case.
9  Q.  Do you recall approximately when you made these
10 notes?
11 A.  Probably during the weekend, sometime.
12 Q.  This past weekend?
13 A.  Yes.
14 Q.  These were prepared, obviously, after you
15 prepared your report, correct?
16 A.  Correct.
17 Q.  Mr. Barbera, are you contending that the
18 noncompetition clause in and of itself would require
19 Drs. Saleh and Vaccaro to refer patients to the
20 hospital?
21 A.  No.
22 Q.  And in your experience, as a hospital
23 administrator, have you had occasion to prepare or

1  negotiate contracts between hospitals and doctors that
2  contain noncompete clauses?
3     A.   Yes.
4     Q.   In your opinion, is there anything inherently
5  illegal or improper about a noncompete clause between
6  hospitals and physicians?
7     A.   No.
8     Q.   Are noncompete clauses common in agreements
9  between hospitals and physicians?
10    A.   I guess whenever there is a financial
11 relationship with a physician, they are more common
12 than not.  They are not common just to have a
13 noncompete agreement with your medical staff.
14    Q.   But in a financial arrangement, it is not
15 uncommon?
16    A.   It is more common.
17    Q.   I see.  Do you recall a contract that might
18 have been one of the subjects of your qui tam
19 complaint with a Dr. Linden?
20    A.   Dr. Linden?  Yes.
21    Q.   That was a practice acquisition arrangement, if
22 you recall?
23    A.   Correct.

CONFIDENTIAL - PROTECTED HEALTH INFORMATION

123

1    Q.    -- as you sit here today?

2    A.    No.

3    Q.    I think on page five of your report, Mr.
4    Barbera, if you can turn back to that -- that was
5    Exhibit 1 that we introduced earlier in your
6    deposition?  I'm sorry.  It is paragraph No. 5, not
7    page five.  It is on page three of your report.

8    A.    Okay.

9    Q.    I believe at that part in your report, you
10   mention BRMC paid $2,500 a month to lease the space in
11   the offices that V&S Medical Associates used to house
12   the equipment; is that correct?

13   A.    Yes.

14   Q.    Have you ever seen the space in question in the
15   offices of V&S Medical Associates where the machine
16   was housed at the beginning of the sublease?

17   A.    No.

18   Q.    Have you ever been to Bradford, Pennsylvania?

19   A.    No.

20   Q.    Do you have any opinion as to what the fair
21   market rental value of that space was or is?

22   A.    No.

23   Q.    Your report also questions why a space rental

1  Mr. Mulholland, but would you agree that noncompete
2  agreements, in and of themselves, can be permissible
3  under the Stark Law and the anti-kickback law?
4      A.   Yes.
5           MR. SIMPSON:  Objection to the extent it
6      calls for a legal opinion.
7           MR. RYCHCIK:  Well, let me rephrase it.
8      Q.   Would you agree, in your opinion, that
9  noncompete agreements can be permissible under the
10 Stark Law and the anti-kickback law?
11          MR. SIMPSON:  Same objection.
12     A.   Yes, I believe they can.
13     Q.   Would you agree, in your opinion, that
14 equipment subleases can also be permissible under the
15 Stark Law and the anti-kickback law?
16          MR. SIMPSON:  Same objection.
17     A.   Yes.
18     Q.   And I believe you testified that you are
19 familiar with the Equipment Sublease in this case
20 which is Exhibit 10 to your deposition?
21     A.   Correct.
22     Q.   And would you agree that the sublease does not
23 expressly require V&S Medical Associates to make any

1   referrals to Bradford Regional Medical Center?
2     A.  That's correct.
3     Q.  And would you also agree that the payment
4   amounts under the sublease do not vary based upon the
5   value or number of any referrals?
6     A.  Correct.
7     Q.  If we could go back to your expert report, Mr.
8   Barbera, which is Exhibit 1, in your report, you
9   provide a number of opinions. However, you also
10  phrase certain questions in your report, too. Is that
11  accurate?
12    A.  I don't know how many questions I raise, but I
13  am only aware of the one about the billing. I don't
14  know of any others.
15    Q.  Would you agree that in those instance where
16  you are asking certain questions, you are not
17  providing any opinion as to that particular issue?
18  You are just raising a question?
19    A.  Correct, and it had no bearing on the question
20  I was asked to answer.
21    Q.  Is this information that you wanted answers to
22  that would -- Would the answers to the questions in
23  any way, shape, or form influence your opinions?

**CONFIDENTIAL — PROTECTED HEALTH INFORMATION**

226

C E R T I F I C A T E

COMMONWEALTH OF PENNSYLVANIA  :
                              : SS.:
COUNTY OF ALLEGHENY           :

I, Joy A. Hartman, a Notary Public in and for the Commonwealth of Pennsylvania, do hereby certify that before me personally appeared SAL A. BARBERA, the witness herein, who then was by me first duly cautioned and sworn to testify the truth, the whole truth and nothing but the truth in the taking of his oral deposition in the cause aforesaid; that the testimony then given by him as above set forth was reduced to stenotypy by me, in the presence of said witness, and afterwards transcribed by computer-aided transcription under my direction.

I do further certify that this deposition was taken at the time and place specified in the foregoing caption, and signature was not waived.

I do further certify that I am not a relative of or counsel or attorney for any party hereto, nor am I otherwise interested in the event of this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Pittsburgh, Pennsylvania, on this 8th day of July, 2008.

The foregoing certification does not apply to any reproduction of this transcript in any respect unless under the direct control and/or direction of the certifying reporter.

Commonwealth of Pennsylvania
NOTARIAL SEAL
JOY A. HARTMAN, Notary Public
City of Pittsburgh, County of Allegheny
My Commission Expires May 9, 2010

_____
Joy A. Hartman, Notary Public
in and for the Commonwealth of
Pennsylvania

My commission expires May 9, 2010.