# EXHIBIT R

# Deloitte.

United States of America, ex, rel. Dilbagh Singh, MD, Paul Kirsch, MD, V. Rao Nadella, MD and Martin Jacobs, MD
Plaintiffs
 vs.
Bradford Regional Medical Center, V & S Medical Associates, LLC, Peter Vaccaro, MD, Kamran Saleh, MD, et al.
Defendants

Civil Action No. 04-186E

## Expert Report of James H. Jordon, CFA, ASA



DEPOSITION
EXHIBIT
Jordon
jah 1   7/2/08

# Deloitte.

Deloitte Financial Advisory Services LLP
333 Clay Street Suite 2300
Houston, TX 77002-4196
Phone: +1 713 982 2966
Fax: +1 713 427 4916
www.deloitte.com

June 5, 2008

Daniel M. Mulholland, III, Esq.
Horty, Springer & Mattern, PC
4514 Fifth Avenue
Pittsburgh, PA 15213

Carl J. Rychcik, Esq.
Fox Rothschild LLP
625 Liberty Avenue, 29th Floor
Pittsburgh, PA 15222

Dear Mr. Mulholland and Mr. Rychick:

Pursuant to your request, I, James H. Jordon, a Senior Manager of Deloitte Financial Advisory Services LLP ("Deloitte FAS"), have prepared an analysis with respect to the below referenced matter.

This expert report includes a brief description of the background, objective and scope of my analysis, as well as a summary of my overall conclusions. The attached valuation analysis presents a more detailed discussion and presentation of the valuation procedures and analyses performed.

## Background

Effective as of October 1, 2003, Bradford Regional Medical Center (the "Hospital") and V&S Medical Associates, LLC, ("V&S") entered into an arrangement (the "Arrangement") whereby the Hospital subleased an SMV SDI Nuclear Camera (the "GE Equipment") from V&S and V&S agreed to non-compete provisions related to certain diagnostic imaging services in the local area. I understand that the Hospital elected to upgrade the GE Equipment as provided for under the expressed terms of the sublease, and a Philips camera (the "Philips Equipment") was then subleased from V&S . The GE Equipment and Philips Equipment are collectively referred to as the ("Equipment").

Mr. Mulholland and Mr. Rychcik
June 5, 2008
Page 2


## Objective and Scope

I was engaged to provide an analysis of the Arrangement between the Hospital and V&S and the related valuation as of October 1, 2003 (the "Valuation Date") and January, 2005 as specifically related to the Philips Equipment. Further, I was engaged to prepare a rebuttal of the expert report prepared by Sal Barbera for the Plaintiffs.

For the purposes of this engagement, the term fair market value is defined pursuant to federal Stark regulations as quoted in Federal Register, Volume 72, No. 171 Pg. 51081 (42 CFR §411.351):

*"...the value in arm's length transactions, consistent with the general market value. 'General market value' means the price that an asset would bring as the result of a bona fide bargaining between well-informed buyers and sellers who are not otherwise in a position to generate business for the other party... With respect to rentals and leases..."fair market value" means the value of rental property for general commercial purposes (not taking into account its intended use). In the case of a lease of space, this value may not be adjusted to reflect the additional value the prospective lessee or lessor would attribute to the proximity or convenience to the lessor when the lessor is a potential source of patient referrals to the lessee..."*

In conducting this engagement, I considered the fair market value of payments made between the parties related to the following:
1) Non-compete provisions of the Arrangement
2) Sublease payment for the GE Equipment and the Philips Equipment

Further, I considered the following payment amounts for the period beginning October 1, 2003 through June 30, 2004 when the GE Equipment was being temporarily operated at V&S:
1) Rent for the real property space where the GE Equipment was functioning
2) A 10 percent billing and collection fee
3) Other miscellaneous pass-through costs

Mr. Mulholland and Mr. Rychcik
June 5, 2008
Page 3

**Conclusions**

Based upon my work to date, my conclusions are outlined as follows:

1. I understand that the Hospital had a policy stating that physicians with competing interests with the Hospital were subject to losing privileges at the Hospital, and the Hospital determined V&S was in violation of this policy. Both V&S and the Hospital were contemplating and discussing several scenarios of how this issue could be best resolved. It is my opinion that the Hospital and V&S, independent of each other, had vested business interests related to the provision of certain diagnostic imaging services and therefore were motivated to resolve these disputed issues by entering into the Arrangement.
2. It is my opinion that the payments made under the Arrangement reflect the fair market value of what was received in return.
3. It is my opinion that the payments between the parties were commercially reasonable even if no referrals were made between the parties.
4. It is my observation that the amounts paid pursuant to the Arrangement did not and do not take into account or vary with any referrals or other business generated between the parties.
5. In my opinion, a legitimate business purpose existed for the Arrangement and every component part thereof
6. In my opinion, the payments made pursuant to the Arrangement did not exceed that which was reasonable and necessary for the business purpose of the Arrangement.
7. It is my observation that the payments made pursuant to the Arrangement were set in advance.
8. As a part of this engagement, I was asked to critique and review the expert report submitted by Mr. Sal Barbera, and I disagree with the conclusions reached in his report. My specific critique and comments with respect to his report appear in section V. of this report.

My conclusions and opinions were in no way influenced by the fee paid for Deloitte FAS's services or by any future outcome of the case.

Mr. Mulholland and Mr. Rychcik
June 5, 2008
Page 4

The opinions and conclusions stated in this report are expressed with a reasonable degree of professional certainty. However, I reserve the right to change or amend my opinions or conclusions should I receive new facts, data, research or other information that may cause me to do so.

Best regards,

James H. Jordon, CFA, ASA
Senior Manager
Deloitte Financial Advisory Services LLP

# Contents

| | Table of Content | Page Number |
|---|---|---|
| I. | Engagement Overview | 6 |
| | • Objective and Scope | 7 |
| II. | Conclusions | 10 |
| | • Non-Compete Provisions | 13 |
| | • Equipment | 14 |
| | • Interim Payments | 15 |
| III. | Background | 16 |
| IV. | Valuation Methodology | 26 |
| V. | Rebuttal of Expert Report Prepared by Sal Barbera | 28 |
| Appendix A | Valuation Analysis – Non-Compete Provisions | 34 |
| Appendix B | Valuation Analysis - Equipment | 45 |
| Appendix C | Valuation Analysis – Interim Payments | 52 |
| Appraisal Assumptions & Limiting Conditions | | |
| Certification & Qualifications | | |
| Data Received, Reviewed, and/or Relied Upon | | |
| Exhibits | | |

# I. Engagement Overview

# Objective and Scope

- I, James H. Jordon (the "Expert Witness"), was engaged to provide an analysis of the Arrangement between the Hospital and V&S and the related valuation as of October 1, 2003 (the "Valuation Date") and January, 2005 as specifically related to the Philips Equipment.  Further, I was engaged to prepare a rebuttal of the expert report prepared by Sal Barbera for the Plaintiffs.

- Specifically, I was engaged to perform the following:

  1) Conduct an evaluation of the Arrangement and provide opinions thereto as previously stated;

  2) Determine the fair market value of the leased radiology Equipment, and evaluate the payments associated with the Equipment, real estate and other administrative costs;

  3) Determine the fair market value of the covenant not to compete arrangement and  evaluate the related valuation as of October 1, 2003;

  4) Critique and respond to the expert report prepared by Mr. Sal Barbera, dated April 30, 2008; and,

  5) Provide an opinion on the Arrangement, as previously stated.

7

# Objective and Scope (cont.)

- Deloitte Financial Advisory Services LLP ("Deloitte FAS") is compensated for the services of its personnel on an hourly basis and is being reimbursed for out-of-pocket expenses. Deloitte FAS billing rates for this engagement, as agreed to in the engagement letter, are as follows:

| | |
|---|---|
| Partner, Principal, Director | $450 |
| Senior Manager | $375 |
| Manager | $300 |
| Senior Associate | $250 |
| Associate | $200 |

- The work performed on this engagement was performed by me, or by Deloitte FAS professionals under my project leadership ("we"). Where appropriate, I received assistance from Deloitte FAS specialists who have specific experience and knowledge related to tangible assets and real estate. Deloitte FAS professionals providing assistance with the engagement include John R. Boettiger, Jr., Principal; Kyle LeFevers, Director; Scott Pemberton, Senior Manager; Mark Davis, Senior Manager; John Valenta, Senior Manager; Missy Schrib, Manager; Tom Kiehl, Senior Associate; Rafiq Lalani, Senior Associate.

- As agreed, I am prepared to testify as to the work and opinions in the above-entitled matter. My resume is included in this report.

8

# Objective and Scope (cont.)

- For the purposes of this engagement, the term fair market value is defined pursuant to federal Stark regulations as quoted in the Federal Register, Volume 72, No. 171, Pg. 51081 (42 CFR §411.351):

  - *"...the value in arm's length transactions, consistent with the general market value. 'General market value' means the price that an asset would bring as the result of a bona fide bargaining between well-informed buyers and sellers who are not otherwise in a position to generate business for the other party... With respect to rentals and leases..."fair market value" means the value of rental property for general commercial purposes (not taking into account its intended use). In the case of a lease of space, this value may not be adjusted to reflect the additional value the prospective lessee or lessor would attribute to the proximity or convenience to the lessor when the lessor is a potential source of patient referrals to the lessee..."*

- Further, we considered the term "commercially reasonable" as described in the Federal Register Vol. 69., No. 59, Pg. 16093 as follows:

*"An arrangement will be considered "commercially reasonable" in the absence of referrals if the arrangement would make commercial sense if entered into by a reasonable entity of similar type and size and a reasonable physician (or family member or group practice) of similar scope and specialty, even if there were no potential DHS referrals."*

- Commercial reasonableness is further described in Federal Register Vol. 66, No. 3, Pg. 919 as follows:

*"With respect to determining what is "commercially reasonable," any reasonable method of valuation is acceptable, and the determination should be based upon the specific business in which the parties are involved, not business in general."*

9

# II. Conclusions

# Conclusions

Based upon our analyses, my conclusions are outlined as follows:

1. I understand that the Hospital had a policy stating that physicians with competing interests with the Hospital were subject to losing privileges at the Hospital, and the Hospital determined V&S was in violation of this policy. Both V&S and the Hospital were contemplating and discussing several scenarios of how this issue could be best resolved. It is my opinion that the Hospital and V&S, independent of each other, had vested business interests related to the provision of certain diagnostic imaging services and therefore were motivated to resolve these disputed issues by entering into the Arrangement.

   - Prior to entering the Arrangement, the Hospital and V&S were in competition with each other with the provision of services using a nuclear camera.

   - The Hospital implemented a policy whereby physicians holding significant competing interests could lose privileges at the Hospital.

   - Litigation concerning the dispute between the Hospital and V&S regarding the Hospital's policy was possible.

2. It is my opinion that the payments made under the Arrangement reflect the fair market value of what was received in return.

   - The non-compete provisions between the Hospital and V&S were based on fair market value and were negotiated between arm's length parties.

   - The Equipment payments were pass-through payments based on contracts negotiated between arm's length third parties.

   - The rental rate paid for the real estate and other administrative expenses were based on market rates for similar arrangements.

3. It is my opinion that the payments between the parties were commercially reasonable even if no referrals were made between the parties.

11

# Conclusions

4. It is my observation that the amounts paid pursuant to the Arrangement did not and do not take into account or vary with any referrals or other business generated between the parties.

   - The level of and frequency of payments under the Arrangement remain fixed, and do not vary based on any level of activity such as referrals or other business.

5. In my opinion, a legitimate business purpose existed for the Arrangement and every component part thereof.

   - The Hospital fulfilled a need for an additional nuclear camera, which was necessary in its efforts towards providing cardiology services.

   - The Hospital resolved the issue of having to enforce the aforementioned policy by entering into the Arrangement.

   - V&S gave up the right to compete with the Hospital in certain defined areas and received a fair cash remuneration for doing so.

   - The Hospital and V&S were able to resolve their issues and avoid the time and expense associated with litigation.

6. In my opinion, the payments made pursuant to the Arrangement did not exceed that which was reasonable and necessary for the business purpose of the Arrangement.

7. It is my observation that the payments made pursuant to the Arrangement were set in advance.

8. As a part of this engagement, I was asked to critique and review the expert report submitted by Mr. Sal Barbera, and I disagree with the conclusions reached in his report. My specific critique and comments with respect to his report appear in section V. of this report.

12

# Conclusions: Non-Compete Provisions

Based on the analysis summarized below and presented in further detail in Appendix A, it is my opinion that the payments made for the non-compete provisions of the Arrangement were fair market value and were commercially reasonable.

The procedures performed were as follows:

- Determined the needs of McKean County, the service area of the Hospital and V&S, for Nuclear Medicine, CT, and MRI services;

- Estimated potential revenues and expenses for the Hospital with the non-compete provisions in place, which implies no competition from V&S in the Nuclear Medicine, CT, and MRI service lines;

- Estimated potential revenues and expenses for the Hospital without the non-compete provisions in place, which implies competition from V&S in Nuclear Medicine (V&S was competing before the non-compete was signed), CT, and MRI service lines (CT and MRI were service lines V&S was considering at the time the non-compete provisions were being negotiated);

- Calculated the difference in value for the Nuclear Medicine, CT, and MRI service lines with and without the non-compete provisions in place for the Hospital;

- Compared the difference in value with and without the non-compete provisions to the present value of the payments made to V&S under the Arrangement related to the non-compete provisions;

- Considered the present value of the cash flow stream provided by the non-compete provisions of the Arrangement as a multiple of V&S' prior year's estimated EBITDA from Nuclear Medicine and Stress Test modalities; and,

- Considered the opportunity cost for V&S with respect to giving up their right to compete with the Hospital.

See Appendix A for further detail regarding the analysis of the non-compete provisions of the Arrangement.

13

# Conclusions: Equipment

Based on the analysis summarized below and presented in further detail in Appendix B, it is my opinion that the payments made for the GE Equipment and the Philips Equipment under the Arrangement were fair market value and were commercially reasonable.

The procedures performed were as follows:

- Confirmed with industry professionals the typical lease arrangements for these types of imaging equipment;

- Confirmed that the lease agreements made between V&S and GE and V&S and Philips were typical lease arrangements and the prices were determined in an "arms length" manner;

- Analyzed the value of the Equipment by estimating the price of the Equipment new less deterioration of the Equipment based on estimated lives of similar equipment;

- Analyzed the net present value of the remaining contractual lease payments and the estimated residual value of the Equipment for both the GE and Philips Equipment; and,

- Confirmed the sublease costs and arrangements made between V&S and the Hospital were a direct pass through with no mark up or additional payments to V&S.

See Appendix B for a detailed analysis with regard to the GE Equipment and the Philips Equipment.

14

# Conclusions: Interim Payments

Based on the analysis summarized below and presented in further detail in Appendix C, it is my opinion that the payments made in the interim period for rental space in V&S' office and other miscellaneous expenses were fair market value and were commercially reasonable.

The procedures performed were as follows:

- Conducted research on the Bradford area real estate market concerning the rental rates of similar space in Bradford;

- Compared rental rates for similar space to the rental rate paid by the Hospital to V&S;

- Confirmed expenses related to internet charges, secretarial support, a physicist, laundry, telephone, reading charges, medication, and supplies were passed through to the Hospital without mark-up; and,

- Compared billing rates to industry data.

See Appendix C for a detailed analysis with regard to the interim payments.

15

16

# III. Background

# Background

**Description of the Hospital**

- The Hospital is a 191-bed acute care hospital in northwest Pennsylvania serving McKean County and surrounding communities.

- The Hospital's service area is rural and is medically underserved, specifically with respect to cardiology services.

- The Hospital's primary services include mental health, oncology and hematology, cardiology, general and vascular surgery, and women's health.

- The Hospital is a non-profit corporation recognized as a charitable tax-exempt organization under Internal Revenue Code Section 501 (c)(3).

- The following table presents the number of beds and inpatient days by selected category:

| Hospital | Beds | Inpatient Days |
|---|---|---|
| Routine Services | 91 | 19,527 |
| Special Care | 5 | 1,118 |
| Nursery | 0 | 646 |
| Total Hospital | 191 | 52,232 |

17

# Background (cont.)

**Description of V&S**

- Dr. Peter Vaccaro ("Dr. Vaccaro") and Dr. Kamran Saleh ("Dr. Saleh") (collectively the "Physicians") practice Internal Medicine in Bradford, Pennsylvania.

- Drs. Vaccaro and Saleh own and operate V&S Medical Associates, LLC. Drs. Vaccaro and Saleh are the sole members of V&S with an equal share ownership.

- Drs. Vaccaro and Saleh maintain hospital privileges at the Hospital. Additionally, each physician has courtesy privileges at Olean General Hospital.

18

# Background (cont.)

**Historical Timeline**

| Date | Description |
|---|---|
| Prior to 2000 | The Physicians were employed by the Hospital. |
| February, 2000 through April 15, 2000 | The Physicians' employment with the Hospital was terminated by mutual agreement, and the Physicians formed V&S and entered an asset purchase agreement to, among other things, buy out the non-compete portion of their contract with the Hospital. The transaction included the buy-out and termination of the non-compete provisions of the Physicians' employment agreements. The Physicians continued practicing medicine through their private practice. We understand the buyout of the non-compete at this time was approximately $300,000. |
| January 2001 | The Board of Directors at the Hospital began developing a policy such that the Hospital could revoke privileges for physicians with significant competing financial interests to those of the Hospital. During this same time period, V&S independently explored the use of a nuclear camera in their office. |
| April 3, 2001 through June 1, 2001 | The Hospital and V&S held several meetings discussing the possibility that V&S might acquire a nuclear camera. The Hospital was concerned that this could negatively impact the Hospital by impairing the Hospital's ability to develop a quality cardiology service line. |
| May 2001 | The Board of Directors at the Hospital adopted an initial policy resolution such that medical staff members who develop an enterprise in competition with the Hospital could lose hospital privileges. The policy resolution also included provisions for the Hospital to use its best efforts to maintain relationships with physicians within legal parameters. |
| June 6, 2001 | V&S entered into a lease agreement with General Electric Healthcare Financial Services for the lease of a SMV SDI Nuclear Camera (the " GE Equipment"). |

# Background (cont.)

## Historical Timeline

| Date | Description |
|---|---|
| December 12, 2001 | The Hospital appointed a fact finding committee to determine if V&S was in violation of the aforementioned policy. |
| May 15, 2002 | The Hospital's Board made a preliminary determination that V&S was a physician group with competing interests. |
| August 2002 | The Hospital invited V&S and other physicians on the medical staff to discuss a potential "under arrangements" joint venture related to certain diagnostic imaging services.  The Hospital engaged Stroudwater Associates ("Stroudwater") to perform analysis of the "under arrangements" joint venture proposal. |
| December 2002 – March 2003 | Several meetings were held between the Hospital, V&S and lawyers for each regarding the effect of the Hospital's policy on V&S; and meetings were held with the same parties to discuss the "under arrangements" model as a way to resolve the dispute.  During these meetings, a possible sublease arrangement was also discussed and considered as a potential option for the parties to resolve the dispute while the under-arrangements joint venture proposal was under consideration. |
| April 2, 2003 | Stroudwater prepared a feasibility analysis (the "Stroudwater Report") concerning an under arrangements joint venture proposal between the Hospital and the Physicians, as well as other physicians that held privileges at the Hospital. |

# Background (cont.)

**Historical Timeline**

| | |
|---|---|
| April 16, 2003 | The Hospital and V&S entered into an agreement whereby the parties agreed to execute document(s) related to an economic relationship. Potential economic arrangements discussed included the following:<br><br>1)An equipment sublease whereby the Hospital will utilize the GE Equipment subleased from V&S;<br><br>2)A non-compete agreement whereby V&S agrees to not enter into interests in competition with the Hospital;<br><br>3)A right of first refusal for the Hospital for interests contemplated by V&S;<br><br>4)An under-arrangement joint venture proposal for the provision of certain imaging services by V&S, subject to OIG approval. |
| April 2003 – September 2003 | The parties negotiated the specific terms of a sublease agreement. We note that it was the intention of the parties that the GE Equipment would be relocated to the Hospital's campus at the cost of the Hospital subsequent to the signing of the Arrangement. |
| September 10, 2003 | Charles T. Day, CPA prepared a report (the "Charles Day Report") relating to the features of a potential sublease relationship between the Hospital and V&S. This report was prepared for the Hospital. |
| October 2003 | The Hospital and V&S entered into the Arrangement whereby the Hospital subleased the Equipment and V&S agreed to non-compete provisions related to certain diagnostic imaging services in the local area. V&S agreed to give the Hospital a right of first refusal for other imaging services. |

21

# Background (cont.)

## Historical Timeline

| | |
|---|---|
| October 1, 2003 through June 30, 2004 | Soon after finalizing the terms of the Arrangement, the Hospital elected to upgrade the GE Equipment to a new specialty cardiology camera; therefore, the GE Equipment was not relocated to the Hospital.  However, there was a delay in obtaining the new Philips Equipment.  Accordingly, the Hospital paid V&S for temporary use of space and services including the following:<br><br>1) Rent for the real property where the GE Equipment was functioning;<br><br>2) Charges related to billing and collecting technical revenue related to the GE Equipment;<br><br>3) Pass-through costs associated with reading the results generated by the GE Equipment, a physicist, and other administrative costs. |
| February 2004 | The Philips Equipment was delivered to the Hospital. |
| April 2004 – December 2004 | The Philips Equipment lease was signed on April 6, 2004.  The terms of buyout of the GE Equipment lease were subsequently negotiated.<br><br>The temporary rent and related interim expenses as set forth between the Hospital and V&S continued through June 2004, to wind down the use of the GE Equipment, collect the remaining billing fees, and other related administrative matters. |
| Spring 2004 | The Hospital elected to not move forward with an under-arrangement joint venture proposal. |
| 2005 to date | The Hospital made payments for the Philips Equipment and the buyout of the GE Equipment. |

22

# Background (cont.)

**Description of the Arrangement**

- According to the Arrangement, the Hospital subleased the GE Equipment from V&S. Additionally, the Arrangement allowed for the Hospital to upgrade the GE Equipment, should it elect to do so.

- Further, V&S agreed that it would not:

  1) Acquire, purchase or lease nuclear cardiology imaging equipment for its office or for any office or facility that is within 30 miles of the Hospital, or invest in any office, venture or facility that has such equipment or wishes to obtain such equipment to perform diagnostic procedures within 30 miles of the Hospital; and,

  2) Perform diagnostic tests in its office or for any venture or facility that is within 30 miles of the Hospital that competes with the testing to be performed by the Hospital with the Equipment, for such time as the Arrangement is in effect.

- If V&S contemplates offering other diagnostic imaging services, such as CT or MRI, within 30 miles of the Hospital, V&S agreed to present a proposal to the Hospital offering an opportunity to participate in a venture with V&S.

- The term of the Arrangement is five years. Within the term of the Arrangement, there were initially two rental periods for the GE Equipment:

  1) The first rental period started as of the date of the Arrangement and would have continued through September 30, 2006. During the first rental period, the monthly rent amount was $30,200, which consisted of $6,545 for the cost of renting the GE Equipment and $23,655 for all other rights and duties under the Arrangement, including the non-compete provisions of the Arrangement.

  2) The second rental period would have begun on October 1, 2006 and continued through September 30, 2008. During the second rental period, the monthly rent amount would have been $26,700, which consisted of $3,045 for the cost of renting the GE Equipment and $23,655 for all other rights and duties under the Arrangement, including the non-compete provisions of the Arrangement.

23

# Background (cont.)

**Description of the Arrangement – cont.**

- From January 2005 forward, after the Hospital and V&S negotiated the terms of the buyout of the GE Equipment lease, the Hospital made monthly payments to Philips of $4,494.77 for the use of the Philips Equipment and $3,159.38 for the negotiated cost of the GE Equipment lease buyout, plus $23,655 for all other rights under the Arrangement, including the non-compete provisions.

- As a further part of the Arrangement, while the Hospital was upgrading to the Philips Equipment, the parties agreed for the Hospital to temporarily keep the GE Equipment on the V&S premises during which time the Hospital reimbursed V&S for the expenses related to the GE Equipment. The expenses were as follows:

  - Rent expense - $2,500 per month

  - Billing – 10% of total collections

  - Laundry – Pass through cost equal to actual expense incurred by V&S

  - Telephone – Pass through cost equal to actual expense incurred by V&S

  - Internet Charges - $24 per month

  - Secretarial Support – 20 hours per week @ $10/hour

  - Other expenses related to performing the nuclear medicine procedures including but not limited to physicist expenses, medicine costs, and supply costs

24

# Background (cont.)

**Description of the Equipment**

The GE Equipment was a SMV/GE DSXi single detector nuclear camera system with accessories.  A further breakdown of what was included in the initial quote from GE Medical Systems revealed that the camera and system included the following:

- (1) DSXi Camera
- (1) POWERstation MPX
- (1) IVY Gate
- (1) Tektronics Printer
- (1) 10 mCi Co-57 Flood
- (3) days of Intermediate Applications Training
- (1) Hot Lab and Licensing including Acceptance Testing
- (1) Treadmill

The Philips Equipment consists of a Philips Medical Systems CardioMD compact system featuring a nuclear cardiology camera fixed at 90 degrees with supporting equipment.

25

# IV. Valuation Methodology

26

# Valuation Methodology

There are three traditional approaches employed in determining the value of an asset or a business. These are comprised of the income, market and cost approaches, each of which is briefly described in the following.

| | |
|---|---|
| **Income Approach** | This approach is a technique by which value is estimated based on the future available cash flows an asset or a business can be expected to generate over its remaining life. |
| **Market Approach** | This approach is a technique by which value is estimated based on arm's-length exchange prices in actual transactions and on asking prices for assets or businesses. |
| **Cost Approach** | This approach is a technique that uses the concept of replacement cost as an indicator of value. The premise of this approach is that a prudent investor would pay no more for an asset or a business than the amount for which the asset or business could be replaced. |

In estimating a range of fair market values for the payments made under the Arrangement for the non-compete provisions, we have relied on the DCF analysis, a variation of the Income Approach.

In estimating a range of fair market values for the Equipment, we have relied on both the Cost Approach and the Income Approach.

In assessing the reasonableness of market rental payments related to the real property, we have relied on the Market Approach, by collecting and analyzing independent research with local knowledgeable real estate participants.

In assessing the reasonableness of the other interim payments, we have relied on the Market Approach, by collecting and analyzing benchmark data.

27

## V.  Rebuttal of Expert Report Prepared by Sal Barbera

# Rebuttal of Expert Report Prepared by Sal Barbera

As a part of the scope of work performed in this analysis, I have been asked to review and respond to the expert report prepared by Mr. Sal Barbera, dated April 30, 2008. My observations, critique, and opinions are summarized below.

1. Mr. Barbera spent an estimated 12 total hours reviewing documents and preparing his expert report. In my opinion, 12 hours is insufficient to adequately understand the historical facts in this case as well as the Arrangement.

2. Mr. Barbera reviewed selected documents in forming his opinions and did not appear to consider available documents including, but not limited to: Drs. Saleh's and Vaccaro's depositions and related exhibits, the Stroudwater Report, and volume data available from the Hospital and V&S.

   - Mr. Barbera did not perform a valuation analysis.

   - It does not appear that Mr. Barbera is a valuation expert.

3. Mr. Barbera expresses the opinion that the Arrangement between the two parties "has no plausible rationalization and makes no economic sense." For reasons stated in this report, I disagree with Mr. Barbera's statement. In making this statement, it does not appear that Mr. Barbera considered the following:

   - As described in Dr. Saleh's deposition, the Physicians were employed by the Hospital in the year 2000 and bought out the terms of the non-compete agreement between the Hospital and the Physicians to establish their own physician practice. This is an indication that precedent existed where the Hospital required physicians to enter into non-compete agreements.

29

# Rebuttal of Expert Report Prepared by Sal Barbera

3. Con't.

- The parties had competing interests and were adverse to each other during much of the negotiation process related to the Arrangement. It appears that the parties conducted sufficient due diligence in reaching the Arrangement. Exhibits 3 through 17 to Dr. Saleh's deposition illustrate the negotiation process and the involvement of counsel throughout the process.

- The Hospital was in the process of recruiting a cardiologist to expand cardiology capabilities in the Hospital's geographic service area. Having V&S performing procedures with a nuclear camera had a detrimental impact on the Hospital's ability to recruit a cardiologist and expand these services. Mr. Barbera does not address the fact that the increased competition in the service area related to the nuclear camera negatively affected the Hospital's ability to fulfill its charitable community service mission of offering cardiology care in the service area.

- V&S were established physicians in the geographic service area, and developed an additional source of revenue by offering nuclear camera tests. V&S faced a loss of privileges at the Hospital if they continued to use the nuclear camera, which would have been very disruptive to their ability to see and monitor their patients.

- V&S also intended to begin offering CT and MRI related services as part of their practice.

- Mr. Barbera does not consider the fact that businesses involving nuclear medicine, CT and MRI involve a high level of fixed costs as a part of the overall cost structure. These costs include equipment, staffing, and maintenance. When volume is split between providers who bear these fixed costs, the services can quickly become unprofitable (i.e., costs are higher than revenue).

30

# Rebuttal of Expert Report Prepared by Sal Barbera

4. The Arrangement did make business sense and served business purposes for the Hospital and V&S, and included the following:

- The Arrangement resolved an ongoing dispute between the Hospital and V&S in an amicable fashion, whereby additional costs incurred in resolving the dispute would be avoided.

- From the Hospital's standpoint, the Arrangement enabled the Hospital to provide cardiology care and fulfill its charitable objectives.

5. It is Mr. Barbera's opinion that because there was discretion involved with the revocation of staff privileges, "this was not going to happen." Based upon my analysis of the documents he reviewed and the additional documents that I relied upon in conducting my analysis, I did not see any evidence that indicated that the Physicians' privileges would not be revoked. As Mr. Leonhardt indicated in his deposition, revocation of privileges was under consideration.

31

# Rebuttal of Expert Report Prepared by Sal Barbera

6. Mr. Barbera alleges that the Hospital had no intention of using the GE Equipment that was subleased from V&S.

- I understand that the Hospital used the GE Equipment on site at the V&S offices as described above.

- Historically, the Hospital maintained two general purpose nuclear cameras, one of which was toward the end of its useful life.

- Around the same time as the sublease was negotiated, the older camera failed and the Hospital needed another camera to continue to maintain two cameras, as the Hospital did not have adequate capacity without two cameras.

- After the Arrangement was reached, the Hospital elected to upgrade the GE camera with a new specialty camera that would better serve the cardiology needs of the community. The Hospital initially intended to move the GE Equipment from V&S offices to the Hospital.

- It appears that the Hospital did intend to use the GE Equipment to meet the demand needs, but elected to upgrade the GE Equipment to offer higher quality cardiology care to the community.

32

# Rebuttal of Expert Report Prepared by Sal Barbera

7. It is Mr. Barbera's opinion that the temporary space rental and billing arrangement while the Philips Equipment upgrade was occurring violated the "set in advance" requirement for physician transactions. I disagree. Based upon the documents reviewed and my understanding of them, it is my opinion that:

- The payment rates and terms were set in advance between the Hospital and V&S.

- The Hospital and V&S negotiated at arm's length to reach the terms specified in this temporary arrangement.

- V&S submitted invoices, which were approved in writing by the Hospital, and maintained billing records related to this temporary arrangement, as it pertained to the Hospital rent payment, billing fees and other expenses.

- The Hospital and V&S both knew and understood that the arrangement pertaining to the real estate, billing fees and expenses was anticipated to be short term in nature, initially expected to last only a few months. In my opinion, it would be unreasonable for the parties to invest significant time and resources into developing a sophisticated lease agreement that was only expected to last for a few months.

33

34

Appendix A:
Valuation Analysis – Non-Compete Provisions

# Valuation Analysis – Non-Compete Provisions

- A non-compete agreement is essentially an agreement between two parties whereby one party agrees not to enter into (or consult with) a business venture in competition with the existing business. In certain transactions, covenants have significant economic value to the beneficiary party. To determine if a non-compete agreement has economic value, four factors must be considered:

  1) The ability of the party agreeing not to compete effectively with the beneficiary party from the activity in question, by virtue of the technical knowledge and business experience of the party agreeing not to compete;

  2) The feasibility, in view of the activity and market in question, of effective competition by the beneficiary party within the time and area specified in the agreement;

  3) The financial ability of the party agreeing not to compete with the beneficiary party and to impair the beneficiary party's financial performance; and,

  4) The intent of the party agreeing not to compete to compete with the beneficiary party in the absence of the covenant.

- The value of a non-compete agreement is the benefit derived from the protection against the expected loss in profits and related cash flows as a direct result of the covenant. A reasonable value can be placed on a non-compete agreement by quantifying the value of the firm's projected cash flow generation capacity over the term of the covenant with the agreement in place as compared to without the agreement in place. The difference in the cash flow streams (i.e., with and without competition), discounted to a present value at a reasonable discount rate, represents the estimated fair value of the non-compete agreement.

- If the Arrangement were not in place, V&S would be free to compete with the Hospital, resulting in an expected economic loss of cash flows for the Hospital. Therefore, we estimated the value of the payments under the Arrangement for the non-compete provisions as the present value of the cash flows that would be lost if V&S were to compete with the Hospital for diagnostic imaging services.

- From V&S' perspective, the value of the non-compete provisions of the Arrangement represented the opportunity cost of foregoing the opportunity of competing for the diagnostic imaging services.

35

# Valuation Analysis – Non-Compete Provisions (cont.)

## Hospital's Perspective
### Demand Analysis

- In order to estimate the expected economic loss of cash flows for the Hospital if V&S was in competition, we began by considering the demand for diagnostic services related to the Equipment, as well as other diagnostic imaging services V&S was considering offering, including CT and MRI. We included CT and MRI because the Hospital had the right of first refusal with regard to these types of service lines and expressed it would exercise that right.

- We considered the needs for Nuclear Medicine, CT, and MRI services for the service area based on procedure utilization data per 1,000 population data. These statistics were applied to our population estimates for McKean County for the five-year projection period. We used the population of McKean County from 2003 census data and decreased it by 0.5 percent per year based on analysis of historical growth in McKean County.

- The procedure volume for each modality per 1,000 population is presented below as well as the procedures demanded based on the procedure volume per 1,000 population and the estimated population for McKean County.

- Because our needs analysis resulted in volume estimates very close to historical volume, we ultimately elected to base our analysis on actual historical volume. Please see Exhibits 3-5 for further detail of our analysis. A summary is provided below:

### Selected Needs per 1,000

| | Selected Value Year 1 (2004) |
|---|---|
| Nuclear Medicine | 102 |
| CT Imaging | 90 |
| MRI Imaging | 42 |

### Imaging Needs for BRMC Service Area

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Nuclear Medicine | 4,550 | 4,528 | 4,505 | 4,483 | 4,460 |
| CT | 4,015 | 3,995 | 3,975 | 3,955 | 3,936 |
| MRI | 1,874 | 1,864 | 1,855 | 1,846 | 1,837 |

36

# Valuation Analysis – Non-Compete Provisions (cont.)

**Revenue Projection – Nuclear Med**

- Using the five-year projection of procedures for Nuclear Medine, we applied an estimated case mix for nuclear medicine services based on information provided by the Hospital and V&S for the most commonly utilized CPT codes to arrive at an estimate of volume for each CPT. The CPTs and their estimated relative weights and first year volumes are presented below.

- To estimate potential total revenue from nuclear medicine procedures, we multiplied the estimated CPT volumes by an estimate of reimbursement per CPT and summed those values. The estimated reimbursement per CPT in year 1 of the projection period as well as the total revenue numbers for each year of the projection period is presented below.

- To estimate the reimbursement per CPT we used the Hospital's payor mix to estimate the Hospital's weighted average reimbursement as a percentage of Medicare reimbursement. We then multiplied that percentage by the reimbursement rates Medicare allowed for the specific CPTs in 2003. Reimbursement amounts were adjusted for inflation (2.5%). For further detail of our analysis, see Exhibit 6.

| Total Net Revenue – Nuclear Medicine | | | | |
|---|---|---|---|---|
| Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
| $882,961 | $900,377 | $918,222 | $937,028 | $955,759 |

| CPT | Case Mix | Volume | Year 1 Reimbursement | Revenue |
|---|---|---|---|---|
| 78010 | 1.0% | 46 | $186 | $8,575 |
| 78223 | 2.0% | 91 | 200 | 18,195 |
| 78305 | 2.0% | 91 | 186 | 16,881 |
| 78306 | 7.5% | 341 | 186 | 63,257 |
| 78315 | 2.0% | 91 | 200 | 18,195 |
| 78320 | 1.0% | 46 | 186 | 8,533 |
| 78465 | 27.5% | 1,251 | 304 | 380,571 |
| 78473 | 1.0% | 46 | 304 | 13,994 |
| 78478 | 27.5% | 1,251 | 138 | 172,781 |
| 78480 | 27.5% | 1,251 | 138 | 172,781 |
| 78805 | 1.0% | 46 | 200 | 9,198 |
| | | 4,550 | | $882,961 |

37

# Valuation Analysis – Non-Compete Provisions (cont.)

**Revenue Projection – Stress Tests**

- Stress test volume was estimated as 26 percent of projected nuclear medicine procedures based on historical data provided by the Hospital and V&S. This analysis and the projected volumes are presented below.

- We used the same methodology as was used for Nuclear Medicine to determine revenue per procedure. The resulting revenue per stress test in year 1 of the projection was approximately $75. The revenue per procedure was applied to the yearly volumes to determine total net revenue for stress tests. Our estimates of total net revenue for the projection period are presented below. For further detail of our analysis, see Exhibit 6.

|  | Fiscal 2002 | Projection Period | | | | |
|---|---|---|---|---|---|---|
|  |  | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
| Nuclear Med Volume | 4,646 |  |  |  |  |  |
| Stress Test Volume | 1,214 | 1,183 | 1,177 | 1,171 | 1,166 | 1,160 |

| Total Net Revenue - Stress Tests | | | | |
|---|---|---|---|---|
| Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
| $88,632 | $90,387 | $92,175 | $94,076 | $95,932 |

38

# Valuation Analysis – Non-Compete Provisions (cont.)

**Revenue Projection – CT**

- Our analysis for CT was similar to that of Nuclear Medicine.  We used volume projections presented earlier as well as the data that follows to estimate revenue for CT.

- We estimated the case mix for CT based on information provided by the Hospital (presented below).

- Reimbursement per procedure for CT was calculated in the same manner as was done for Nuclear Medicine.  The estimated volumes, reimbursement rates, and total revenue for year 1 of the projection period are presented below.  The estimated total revenue per year for the projection period is also presented below.  For a complete presentation of our analysis, see Exhibit 6.

|  | Case Mix | Year 1 | | |
|---|---|---|---|---|
|  |  | Volume | Reimbursement | Revenue |
| With Contrast | 55.0% | 2,208 | $210 | $463,431 |
| Without Contrast | 35.0% | 1,405 | 160 | 225,130 |
| With and Without Contrast | 10.0% | 402 | 250 | 100,522 |
|  |  | 4,015 |  | 789,082 |

| Total Net Revenue - CT | | | | |
|---|---|---|---|---|
| Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
| $789,082 | $804,781 | $820,771 | $837,057 | $854,054 |

# Valuation Analysis – Non-Compete Provisions (cont.)

**Revenue Projection – MRI**

- Our analysis for MRI was similar to that of Nuclear Medicine. We used volume projections presented earlier as well as the data that follows to estimate revenue for MRI.

- We estimated the case mix for MRI based on information provided by the Hospital (presented below).

- Reimbursement per procedure for MRI was calculated in the same manner as was done for Nuclear Medicine. The estimated volumes, reimbursement rates, and total revenue for year 1 of the projection period are presented below. The estimated total revenue per year for the projection period is also presented below. For a complete presentation of our analysis, see Exhibit 6.

|  | Case Mix | Volume | Year 1 Reimbursement | Revenue |
|---|---|---|---|---|
| With Contrast | 5.0% | 94 | $337 | $31,694 |
| Without Contrast | 75.0% | 1,406 | 307 | 432,165 |
| With and Without Contrast | 20.0% | 375 | 431 | 161,471 |
|  |  | 1,874 |  | 625,330 |

| Total Net Revenue - MRI | | | | |
|---|---|---|---|---|
| Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
| $625,330 | $637,214 | $649,979 | $662,952 | $676,200 |

40

# Valuation Analysis – Non-Compete Provisions (cont.)

**Expense Projection**

- The next step of our analysis was to estimate expenses related to the three modalities.

- In order to estimate variable and fixed operating expenses associated with the imaging services, we relied on operating expense data provided by V&S and the Hospital. Based on the data from the different sources, we chose ratios of variable and fixed expenses to revenue for each of the modalities. To check for reasonableness, we looked at data from the Medical Group Management Association and Solucient. Stress test expenses were assumed to be built into the nuclear medicine modality. For further detail, see Exhibit 6.

|  | NM Selected Expense Ratios | CT Selected Expense Ratios | MRI Selected Expense Ratios |
|---|---|---|---|
| Fixed | 51.8% | 43.4% | 38.7% |
| Variable | 21.5% | 9.5% | 6.7% |
| Total | 73.3% | 52.9% | 45.4% |

|  | Solucient 25th Percentile | Solucient 50th Percentile | MGMA 25th Percentile | MGMA 50th Percentile |
|---|---|---|---|---|
| Fixed Expense as a % of Revenue - Nuclear Med | 43% | 60% |  |  |
| Variable Expense as a % of Revenue - Nuclear Med | 27% | 51% |  |  |
| Total Operating Expense as a % of Revenue - Nuclear Med | 70% | 111% | 55% | 72% |
| Fixed Expense as a % of Revenue - CT | 17% | 24% |  |  |
| Variable Expense as a % of Revenue - CT | 9% | 14% |  |  |
| Total Operating Expense as a % of Revenue - CT | 26% | 37% | 55% | 72% |
| Fixed Expense as a % of Revenue - MRI | 21% | 32% |  |  |
| Variable Expense as a % of Revenue - MRI | 10% | 16% |  |  |
| Total Operating Expense as a % of Revenue - MRI | 31% | 48% | 55% | 72% |

41

# Valuation Analysis – Non-Compete Provisions (cont.)

## Cash Flow Analysis

- We utilized the revenue and operating expense projections for all modalities along with estimates for depreciation, capital expenditures, and changes in working capital requirements to model the expected cash flows for the Hospital with the covenant not to compete in place.  See Exhibit 8 for further detail of our analysis.

- We then modeled potential cash flows for the Hospital without the covenant not to compete.  Revenues and variable expenses were adjusted for the projected revenue lost to V&S.  We assumed V&S entered the MRI and CT service lines at the start of the projection period.  See Exhibit 9 for further detail of our analysis.

- Potential cash flows for the Hospital without the covenant not to compete were subtracted from the potential cash flows for the Hospital with the covenant not to compete and discounted to present value using a discount rate estimated from the Hospital's weighted average cost of capital with a premium added for the additional risk associated with an intangible asset such as a covenant not to compete.  An amortization benefit was added to the discounted cash flows to arrive at an estimate of fair value for the covenant not to compete. See Exhibit 9 for further detail of our analysis, a summary is presented below.

- Year 6 was added to reflect the additional period of time after the covenant not to compete expires for which the Hospital will receive additional benefit while V&S could attempt to enter the market.

|  | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 |
|---|---|---|---|---|---|---|
| Debt Free Cash Flow With | 488,819 | 606,241 | 541,397 | 504,508 | 520,722 | 497,163 |
| Debt Free Cash Flow Without | (108,261) | (3,126) | (80,121) | (129,480) | (126,043) | (165,924) |
| Difference | 597,080 | 609,367 | 621,518 | 633,988 | 646,765 | 663,086 |
| | | | | | | |
| Present Value of Difference | $559,216 | $500,635 | $447,911 | $400,788 | $358,653 | $322,547 |

| | |
|---|---|
| **Sum of Present Value of Cash Flow** | **$2,589,751** |
| Probability of Competition | 100.0% |
| Preliminary Value of Non-Compete | 2,589,751 |
| Plus: Amortization Benefit | 574,034 |
| **Fair Value of Non-Compete** | **$3,163,785** |

# Valuation Analysis – Non-Compete Provisions (cont.)

**Cash Flow Analysis - Summary**

- The table below presents the value of the non-compete provisions of the Arrangement compared to the value of the actual payment stream made under the Arrangement for the non-compete provisions (See Exhibit 10).

| | |
|---|---|
| **Preliminary Value of Non-Compete Provisions** | **$3,163,785** |
| **Present Value of Non-Compete Portion of Lease Payments** | **1,016,621** |
| **Difference** | **$2,147,164** |

- The non-compete provisions of the Arrangement had an indicated value in excess of $3 million from the Hospital's perspective.

- The indicated value of the non-compete provisions of the Arrangement exceed the value of the actual non-compete entered into as part of the Arrangement by $2.1 million.

- The present value of the actual non-compete payments made under the Arrangement did not exceed the fair market value of the non-compete provisions of the Arrangement.

43

# Valuation Analysis – Non-Compete Provisions (cont.)

## V&S Perspective

- From the V&S' perspective, the present value of the cash flow stream provided by the non-compete portion of the lease payments represented a 4.4 multiple of the previous year's estimated Earnings Before Interest, Tax, Depreciation, and Amortization ("EBITDA") from Nuclear Medicine and Stress Test modalities, or what could be referred to as the opportunity cost going forward to V&S of entering the Arrangement.

- We estimated depreciation based on our calculation of the GE camera new and 5-year straight line depreciation with a $20,000 salvage value.

- An EBITDA multiple is a common valuation tool to check the reasonableness of a deal of this sort.  In my opinion, the EBITDA multiple of 4.4 is reasonable, especially in light of this being a new business with continued growth prospects, and the additional restriction placed on CT and MRI modalities by the covenant not to compete.

- Refer to Exhibit 11 for transaction data that illustrates comparable EBITDA multiples.

### V&S Fiscal 2002 Data

| | |
|---|---:|
| Nuclear Medicine Procedures | 2,281 |
| Stress Test Procedures | 693 |
| Total Revenue | $586,440 |
| Expenses | 405,456 |
| Net Income | $180,984 |
| Estimated Depreciation & Amortization | 48,000 |
| Estimated EBITDA | $228,984 |
| Present Value of Non-Compete Portion of Lease Payments | $1,016,621 |
| Implied Multiple of 2002 EBITDA | 4.4x |

44

Appendix B: Valuation Analysis - Equipment

# Valuation Analysis – GE Equipment

## Cost Approach

- In order to estimate a fair market value for the GE Equipment, we first analyzed the GE Equipment and related system on a cost approach basis.

- The first step in applying the cost approach is the estimation of a cost new for the GE Equipment. The cost new is an estimate of replacing the GE Equipment with an asset of like or similar composition and utility.

- Second, the estimated loss in value resulting from all forms of obsolescence including physical, functional, and economic are subtracted from the cost new to determine a cost new less depreciation, or fair market value via the cost approach.

- The cost new is developed by using a starting point of the historical acquisition cost of approximately $258,000. To estimate the cost new we utilized inflationary measures in the Producer Price Indices published by the U.S. Bureau of Labor Statistics. The cost new was calculated by multiplying the historical cost by the appropriate trend factor associated with the assets' age.

- After determining the cost new for the subject assets, the next step was to estimate physical deterioration, or the loss in value caused by wear and tear that reduces asset life and serviceability. We estimated this form of depreciation by estimating a depreciation factor using a straight line, or age/life, depreciation curve.

# Valuation Analysis – GE Equipment

**Cost Approach**

- In order to determine a depreciation factor, we first estimated useful life information of the assets based on discussions with hospital personnel and other knowledgeable persons that are familiar with the expected normal useful lives of the assets.

- The next step in the cost approach is to make an estimation of any functional obsolescence associated with the assets.  Functional obsolescence is related to the inefficiencies or inadequacies inherent in the equipment.  Economic obsolescence is a loss in value of the property caused by economic forces such as changes in the supply/demand relationship, legislative enactment, and other external factors that impact the value of the assets.

    1) Based upon our conversations with knowledgeable personnel, including medical equipment resellers, in October of 2003 the GE Equipment did not suffer from the effects of functional obsolescence, and therefore we have deemed adjustments for this to be unnecessary.

    2) Economic obsolescence was considered but also deemed not necessary.

- The results of our cost approach analysis resulted in a fair market value estimate for the assets of approximately $170,000.

47

# Valuation Analysis – GE Equipment

## Income Approach

- The second analysis we performed was to calculate the net present value of the remaining contractual lease payments and the estimated residual value of the GE Equipment at the end of the lease term.

- The lease on the GE Equipment commenced in June 2001 and was for a 63 month term. The first payment was made in September 2001. According to lease documents provided to us, the payment for the GE Equipment was $4,890 per month, or $58,680 per year.

- Based upon the contractual terms of the lease, there were 36 monthly payments remaining in October 2003.

- In order to estimate a residual value for the GE Equipment as of the end of the lease, we contacted knowledgeable used equipment vendors who were familiar with the subject assets. Based upon our conversations with them, we have estimated a residual value of approximately $20,000 at the end of the remaining lease term.

- We then calculated the net present value of the remaining lease payments and the residual value of the GE Equipment using three different discount rates. These rates were based upon (A) the estimated debt component of the weighted average cost of capital estimated for the intangibles of 8.64%; (B) the interest rate of 9.45% inferred from notes in the original bid document provided to V&S by GE Medical; and (C) the weighted average cost of capital estimated for the intangibles of 12.0%. Discounting the remaining lease payments of $58,680 per year for the first two remaining years of the lease and the total of the $58,680 plus the $20,000 estimated residual value of the GE Equipment for the third year resulted in a range of fair market value estimates from $160,000 to $170,000 as shown on the following page.

48

# Valuation Analysis – GE Equipment

## Income Approach

- Based upon the preceding analyses, the fair market value of the GE Equipment via the cost approach and the net present value of the remaining lease payments and the residual value of the GE Equipment using three different discount rates are consistent.

**Scenario Using Debt Portion of WACC as Discount Rate**

| Discount Rate | 8.6% |
|---|---|
| Remaining Payments | |
| Year 1 | $58,680 |
| Year 2 | $58,680 |
| Year 3 (lease payments plus residual) | $78,680 |

| Year | PV Calculation |
|---|---|
| 1 | $54,013 |
| 2 | $49,718 |
| 3 | $61,361 |
| NPV | $165,092 |
| NPV (Rounded) | $170,000 |

**Scenario Using Interest Rate from GE Documents as Discount Rate**

| Discount Rate | 9.5% |
|---|---|
| Remaining Payments | |
| Year 1 | $58,680 |
| Year 2 | $58,680 |
| Year 3 (lease payments plus residual) | $78,680 |

| Year | PV Calculation |
|---|---|
| 1 | $53,614 |
| 2 | $48,984 |
| 3 | $60,009 |
| NPV | $162,607 |
| NPV (Rounded) | $160,000 |

**Scenario Using WACC as Discount Rate**

| Discount Rate | 12.0% |
|---|---|
| Remaining Payments | |
| Year 1 | $58,680 |
| Year 2 | $58,680 |
| Year 3 (lease payments plus residual) | $78,680 |

| Year | PV Calculation |
|---|---|
| 1 | $52,393 |
| 2 | $46,779 |
| 3 | $56,003 |
| NPV | $155,175 |
| NPV (Rounded) | $160,000 |

49

# Valuation Analysis – Philips Equipment

- The same set of income approach procedures were performed in order to analyze the Philips Equipment system. The cost approach is not necessary due to the fact that the Philips Equipment was new in April, 2004. Per lease documents we were provided, the cost new of the Philips Equipment was approximately $266,000.

- The second analysis we performed was to calculate the net present value of the remaining contractual lease payments and the estimated residual value of the Philips Equipment at the end of the lease term.

- The lease on the Philips Equipment commenced in April 2004 and was for a 60 month term. According to lease documents provided to us, the payment for the Philips Equipment was $4,494.77 per month, or $53,937.24 per year.

- Based upon the contractual terms of the lease, there were 60 monthly payments remaining in April 2004.

- In order to estimate a residual value for the Philips Equipment as of the end of the lease, we contacted knowledgeable used equipment vendors who were familiar with the subject assets. Based upon our conversations with them, we have estimated a residual value of approximately $90,000 at the end of the remaining lease term.

- We then calculated the net present value of the remaining lease payments and the residual value of the Philips Equipment using three different discount rates. These rates were based upon (A) the estimated debt component of the weighted average cost of capital estimated for the intangibles of 8.64%; (B) the interest rate of 9.45% inferred from notes in the original bid document provided to V&S by GE Medical; and (C) the weighted average cost of capital estimated for the intangibles of 12.0%. Discounting the remaining lease payments of $ 53,937.24 per year for the first four remaining years of the lease and the total of the $58,680 plus the $20,000 estimated residual value of the equipment for the third year resulted in a range of fair market value estimates from $250,000 to $270,000 as shown on the following page.

50

# Valuation Analysis – Philips Equipment

## Income Approach

- Based upon our analyses, the fair market value of the Philips Equipment via the cost approach and the net present value of the remaining lease payments and the residual value of the Philips Equipment using three different discount rates are consistent.

**Scenario Using Debt Portion of WACC as Discount Rate**

| Discount Rate | 8.6% |
|---|---|
| Remaining Payments | |
| Year 1 | $53,937.24 |
| Year 2 | $53,937.24 |
| Year 3 | $53,937.24 |
| Year 4 | $53,937.24 |
| Year 5 (lease payments plus residual) | $143,937 |

| Year | PV Calculation |
|---|---|
| 1 | $49,648 |
| 2 | $45,699 |
| 3 | $42,065 |
| 4 | $38,719 |
| 5 | $95,110 |
| NPV | $271,241 |
| NPV (Rounded) | $270,000 |

**Scenario Using Interest Rate from GE Documents as Discount Rate**

| Discount Rate | 9.5% |
|---|---|
| Remaining Payments | |
| Year 1 | $53,937.24 |
| Year 2 | $53,937.24 |
| Year 3 | $53,937.24 |
| Year 4 | $53,937.24 |
| Year 5 (lease payments plus residual) | $143,937 |

| Year | PV Calculation |
|---|---|
| 1 | $49,280 |
| 2 | $45,025 |
| 3 | $41,138 |
| 4 | $37,586 |
| 5 | $91,642 |
| NPV | $264,671 |
| NPV (Rounded) | $260,000 |

**Scenario Using WACC as Discount Rate**

| Discount Rate | 12.0% |
|---|---|
| Remaining Payments | |
| Year 1 | $53,937.24 |
| Year 2 | $53,937.24 |
| Year 3 | $53,937.24 |
| Year 4 | $53,937.24 |
| Year 5 (lease payments plus residual) | $143,937 |

| Year | PV Calculation |
|---|---|
| 1 | $48,158 |
| 2 | $42,998 |
| 3 | $38,391 |
| 4 | $34,278 |
| 5 | $81,674 |
| NPV | $245,500 |
| NPV (Rounded) | $250,000 |

51

Appendix C: Valuation Analysis - Interim Payments

# Interim Payments

- We understand that the Hospital and V&S agreed that it was intended for the GE Equipment to be relocated to the Hospital's campus subsequent to the signing of the sublease.

- Further, we understand that the Hospital elected to upgrade the GE Equipment pursuant to the provisions under the sublease, but there was an unexpected delay in obtaining the Philips Equipment.

- Therefore, the Hospital and V&S agreed upon a temporary arrangement whereby the following occurred:

    1) The GE Equipment remained onsite at V&S' office for a period of approximately 9 months;

    2) The Hospital paid V&S an agreed upon amount for retaining the GE Equipment onsite in addition to the other payments being made under the Arrangement; and,

    3) The additional payment included rent for the space in which the GE Equipment was being utilized, a 10 percent administrative fee, and other miscellaneous pass through costs.

- We performed additional valuation analyses related to the payments being made by the Hospital to V&S as part of the temporary arrangement, in addition to the payments made under the Arrangement.

- We understand that the Hospital also paid V&S certain costs incurred related to billing, secretarial, internet access, laundry, and telephone. We also understand that these were direct costs incurred by V&S and were billed as pass-through expenses in addition to the rent expense.

# Real Estate Rent

- For the real estate rent component of the interim payment, we have assessed the reasonableness of rent expense for the space in the building owned by V&S that was dedicated to the camera and supporting areas during the time period between October 2003 and June 2004.

- According to the Physicians, the total of the leased space was approximately 2,500 square feet, and included a room where the camera system itself was situated and additional supporting areas such as dressing rooms, administrative space, and a waiting room area. The rent paid for the space was $2,500 per month, or $12 per square foot per year.

- In order to assess the reasonableness of the rental payments, we performed the following:

    1) Researched all the relevant websites such as RealQuest, CoStar, Loopnet, REIS, and RealCapitalAnalytics to find transactions or listings in between October 2003 and June 2004 that would provide some gauge for the rental rates for the medical/office building in Bradford during that time;

    2) Researched community newspapers such as 'Bradford Era' via Nexis and Bradford Public Library for real estate classified ads;

    3) Performed a 'top-down' approach for both net and gross rents. For net rents, we adjusted downwards (not discounted for time) the current rental rate for the medical/office space similar to the subject in the Bradford area by the average growth rate of office buildings in the closest Proxy-markets. To make sure that the average growth rate was close to the actual rate in the Bradford area, we compared that average growth rate to our expectations based on our research and our conversations with the brokers about the market fundamentals from 2003 to-date. For gross rent, we adjust for any growth rate for market changes and also the inflation rate for the operating expenses; and.

    4) Held conversations with brokers in the Bradford area in order to get both current and retrospective rental rate quotes for properties similar to the subject property owned by V&S.

# Real Estate Rent

- Data for the closest proxy markets - Buffalo, NY (80 miles); Rochester, NY (140 miles) and Pittsburgh, PA (160 miles) – were acquired from REIS for the Class B/C office (medical office not specified) markets since 2003 to the present date. Other than the distance, we also looked at the magnitude of the average asking rental rates in these markets to make sure that they are in-line with the Bradford market. The following is the summary of our research for the proxy markets:

| | ASKING RENTS – (NNN) | | | |
|---|---|---|---|---|
| | 2003 | 2008 | $ change | % change |
| Buffalo, NY | $13.47 | $13.48 | $0.01 | 0.07% |
| Pittsburgh, PA | $16.32 | $16.07 | ($0.25) | -1.53% |
| Rochester, NY | $13.16 | $13.44 | $0.28 | 2.13% |
| | | | | |
| Average | $14.32 | $14.33 | $0.01 | 0.09% |
| Median | $13.47 | $13.48 | $0.01 | 0.07% |

- Based on the above analysis of the proxy markets, the rental rates in markets surrounding the subject area have not really changed since 2003. This date confirms our expectations about the Bradford market, based on our research and our conversations with the brokers as shown below.

- According to the brokers that we had an opportunity to speak with and who were also well-versed with the commercial/office/medical spaces in the Bradford area, the 'NNN or Net rents' have basically stayed the same since 2003 because the market fundamentals for the office space in the Bradford area have stayed the same except for the last few months where the commercial markets have shown some weakness due to slow down in the US economy.

55

# Real Estate Rent

- With respect to gross rents, all brokers agreed that recently, all new leases show a considerable hike in the gross rents due to higher costs of fuel, especially given the cold climate of Bradford. They were unable to comment on the percentage increases. We compiled some data from U.S. Department of Labor for items that affects mainly the electricity cost and HVAC system of a typical building as follows:

| | Oct-03 | Mar-08 | $ change | % Change |
|---|---|---|---|---|
| Electricity per KWH | 0.136 | 0.176 | $0.04 | 29.41% |
| Utility (piped) gas per British thermal unit | 1.144 | 1.593 | $0.45 | 39.25% |
| | | | | |
| Average | | | | 34.33% |

- Assuming that the electricity and the heating and air conditioning costs represent approximately 50% of the total operating costs for a typical 2,500 office/medical space, the current full-gross rental rate will be adjusted downwards by 17%(34.33% x 50%) for the electricity and the heating and 7.5%(15% x 50%) for other operating expenses such as janitorial etc, for a blended rate of 25% in aggregate to reflect the increases in operating costs of a typical office building. The 15% growth rate used for other operating expenses represents an approximate average inflation rate of 3% per year for 5 years. Per our conversation with an official in the City Clerk's office in Bradford, the office has been raising the salary/labor costs for new contracts by 3% to 3.5% each year: thus, this is a reasonable proxy for the average inflation per year.

- Our research of current asking rental rates for commercial buildings in the Bradford, PA area and actual executed leases during the time period between October 2003 through June 2004 (adjusted for any increase in operating expenses as necessary) resulted in a range of full service gross rents of $12.00 to $13.46 per square foot.

- Therefore, the full-service gross rental rate of $12.00 per square foot being paid by the Hospital to V&S was deemed commercially reasonable for the time period analyzed.

56

# Administrative Fee Benchmarks

| | Count | Mean | 10 %ile | 25 %ile | Median | 75th %ile | 90th %ile |
|---|---|---|---|---|---|---|---|
| **Revenue:** | | | | | | | |
| Collections (1) | 1266 | $ 308,322 | $ 116,517 | $ 234,603 | $ 296,034 | $ 362,426 | $ 448,582 |
| **Operating Cost:** | | | | | | | |
| Patient accounting (2) | 35 | $ 17,230 | $ 8,125 | $ 12,931 | $ 15,992 | $ 21,004 | $ 27,132 |
| Billing purchased services (2) | 17 | $ 5,822 | $ 93 | $ 553 | $ 1,307 | $ 4,203 | $ 30,324 |
| Postage (3) | | $ 4,000 | $ 2,511 | $ 3,115 | $ 4,103 | $ 4,856 | $ 6,024 |
| Total | | $ 27,052 | $ 10,729 | $ 16,599 | $ 21,402 | $ 30,063 | $ 63,480 |
| **Percentage** | | | 8.8% | 9.2% | 7.1% | 7.2% | 8.3% | 14.2% |

Sources:
(1) Medical Group Management Associates: Physician Compensation and Production Survey: 2003 Report Based on 2002 Data; Internal Medicine: General
(2) Medical Group Management Associates: Cost Survey for Multispecialty Practices: 2003 Report Based on 2002 Data
(3) Suggested additional cost information estimate from Family Practice Management: http://www.aafp.org/fpm/20040700/ask.html

- According to benchmarks published by Medical Group Management Associates, billing costs as a percentage of collections range from 7.1 percent to 14.2 percent, as shown in the table above.

- Charges for internet, laundry and telephone were pass through expenses equal to costs incurred by V&S.

- Secretarial support was billed based on hourly requirements at a rate of $10 per hour. This rate is only slightly higher than the prevailing minimum wage when the Arrangement was entered into and is not unreasonable.

- Therefore, it is my opinion that the 10 percent billing charge and other miscellaneous pass through costs for the six-month interim period do not appear unreasonable.

57

58

# Appraisal Assumptions and Limiting Conditions

# Appraisal Assumptions and Limiting Conditions

This valuation analysis has been prepared pursuant to the following general assumptions and general limiting conditions:

1. The analyses, advice, recommendations, opinions, or conclusions contained herein are valid only for the indicated purpose.

2. The analyses, advice, recommendations, opinions, or conclusions contained herein are for the exclusive use of the client for the sole and specific purposes noted herein and may not be used for any other purpose by the client or any other party. Furthermore, the analyses, advice, recommendations, opinions, or conclusions are not intended by the author and should not be construed by the reader to be investment advice in any manner whatsoever. The analyses, advice, recommendations, opinions, or conclusions are based on information furnished to it by the client, its representatives, and other sources.  Notwithstanding the foregoing, the Client may use the analyses, advice, recommendations, opinions, or conclusions contained herein consistent with the terms and conditions agreed to in the Engagement Letter dated February 28, 2008.

3. Possession of this valuation opinion report, or a copy thereof, does not carry with it the right of publication or distribution to or use by any third party. Any third party that uses the information contained herein does so  at its sole risk and agrees to hold Deloitte FAS, its subcontractors, and their respective personnel harmless from any claims resulting from use by any other third party. Access by any third party does not create privity between Deloitte FAS and any third party.

4. No part of the contents of this report (especially the analyses, advice, recommendations, opinions, or conclusions; the identity of any Deloitte FAS personnel, or any reference to any of their professional designations or to Deloitte FAS) should be disseminated to the public through advertising media, public relations, news media, sales media, mail, direct transmittal, or any other means of communication without the prior written consent of Deloitte FAS.

5. No item in this report shall be changed by anyone other than Deloitte FAS, and Deloitte FAS shall have no responsibility for unauthorized changes.

6. Neither Deloitte FAS nor its personnel, by reason of this engagement, is required to furnish a complete valuation report, or to give testimony, or to be in attendance in court with reference to the subject assets, properties, or business interests unless arrangements have been previously made in writing.  Notwithstanding the foregoing, the arrangements agreed to in the Engagement Letter dated February 28, 2008 are applicable to this engagement.

7. We conducted interviews with the client or its representatives regarding past, present, and prospective operating results and have assumed that the information gathered in such interviews is accurate and complete.

# Appraisal Assumptions and Limiting Conditions

8. Financial statements and related information were provided to us in the course of this engagement by the client or its representatives.  We have not audited, reviewed, or compiled any financial information provided to us and, accordingly, we express no audit opinion or any other form of assurance regarding such information.

9. If prospective financial information provided by the client or its representatives has been used in this analysis, we have not examined or compiled the prospective financial information and, therefore, do not express an audit opinion or any other form of assurance on the prospective financial information or the related assumptions.  Events and circumstances frequently do not occur as expected and there will usually be differences between prospective financial information and actual results, and those differences may be material.

10. We believe the information obtained from public sources or furnished to us by other sources is reliable. However, we issue no warranty or other form of assurance regarding the accuracy of such information.

11. We assume that the current level of management expertise and effectiveness would continue to be maintained, and that the character and integrity of any subject asset, property, or business interest through any sale, reorganization, exchange, or diminution of the owners' participation would not be materially or significantly changed.

12. Deloitte FAS is not an environmental consultant or auditor, and it takes no responsibility for any actual or potential environmental liabilities. Any person entitled to rely on this report wishing to know whether such liabilities exist, or the scope and their effect on the value of any subject asset, property, or business interest, is encouraged to obtain a professional environmental assessment. Deloitte FAS does not conduct or provide environmental assessments and has not performed one in the course of this engagement.

13. We have not determined independently whether any subject asset, property, or business interest is subject to (1) any present or future liability relating to environmental matters (including, but not limited to, CERCLA/Superfund liability) or (2) the scope of any such liabilities. The analyses, advice, recommendations, opinions, or conclusions contained herein take no such liabilities into account, except as have been reported to us by the client or its representatives or by an environmental consultant working for the client, and then only to the extent that the liability was reported to us in an actual or estimated dollar amount.  Such matters, if any, are noted in the analyses, advice, recommendations, opinions, or conclusions contained herein. To the extent such information has been reported to us, we have relied on that information without verification and offer no warranty or representation as to its accuracy or completeness.

Certification by and Qualifications of Expert Witness

# Certification

I, James Jordon, CFA, ASA, hereby certify to the best of my knowledge and belief the following statements with respect to the tangible and intangible assets included in this report and identified below:

This certification applies to the non-compete provisions, equipment, and real property mentioned in the accompanying report.

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions (with respect to the elements of this certification, the assignment results, and the contents of the appraisal report for which each is individually responsible).

3. I have no present or prospective interest in the property that is the subject of this report, and have no personal interest with respect to the parties involved.

4. I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

5. My engagement in this assignment was not contingent upon developing or reporting predetermined results.

6. My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this report.

7. My analyses, opinions, and conclusions were developed, and the valuation components of this report have been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practice*.

8. I have satisfied the continuing professional education requirements necessary to maintain my professional designation(s).

9. Because of my background, experience, education, and membership in professional associations, I am qualified to make appraisals of the type of property that is the subject of this report.

10. No person other than the undersigned and my Deloitte FAS engagement team under my direction including: John Boettiger, Scott Pemberton, Kyle LeFevers, John Valenta, Mark Davis, Missy Schrib, Rafiq Lalani, and Tom Kiehl, prepared the analyses, values, or conclusions set forth in this report or provided significant valuation assistance to the person(s) signing this certification.

11. I, and other professionals have made a personal inspection of the real property but not the GE Equipment that is the subject of this report.

By: _____    Date: _____ 6/5/2008 _____

# James H. Jordon, CFA, ASA

**Senior Manager**
Deloitte Financial Advisory Services LLP
Telephone: +1 713-982-2966
E-mail: jjordon@deloitte.com

## Profile

Jim Jordon is a Senior Manager in the Houston Financial Advisory Services practice. He has experience in the valuation of businesses, business interests, and intangible assets.  He has over 11 years of experience in business valuation across different industries and sizes of companies.   Mr. Jordon's client responsibilities include providing project leadership, coordinating and overseeing data gathering and analysis, and preparing and delivering reports and analyses.

## Experience

Mr. Jordon has served a variety of healthcare clients including hospitals, hospital districts, large health systems, hospital-owned medical groups, physician-owned medical groups, investor owned-medical groups, managed care organizations, ambulatory surgery centers, hospital-owned laboratories, and independent clinical laboratories.

Mr. Jordon's assignments have included the following:

➤assisting parties on all sides of various transactions, transaction structuring, debt capacity analysis, and valuation studies.

➤Mr. Jordon has provided valuation services related to intellectual property, federal tax, GAAP, and other regulatory purposes including compliance with Stark, anti-kickback, and fraud and abuse laws.

➤He has worked on international valuation assignments involving purchase allocations, impairment testing, and the valuation of private equity portfolios.

63

# James H. Jordon, CFA, ASA

Mr. Jordon has worked with Deloitte FAS project teams providing litigation support, and preparing expert reports, however he has not testified or been deposed in the previous four years.

Prior to joining Deloitte FAS, Mr. Jordon was a Senior Analyst with a Houston-based valuation firm. His previous experience also includes Business Valuation Resources, LLC, in Portland, Oregon, where he was the Managing Editor of *Shannon Pratt's Business Valuation Update*.

Mr. Jordon published numerous articles in his capacity as managing editor described above, but has not published articles within the previous 10 years.

Finally, before entering the field of private equity and business valuation, Mr. Jordon was an investment advisor employed by Bank United Financial Markets and PaineWebber.

## Professional Affiliations & Civic Organizations

➢Mr. Jordon holds the Accredited Senior Appraiser (ASA) designation as awarded by the American Society of Appraisers.

➢Member -  American Society of Appraisers.

➢Mr. Jordon holds the Chartered Financial Analyst (CFA) designation as awarded by the CFA Institute.

➢Member - CFA Institute and Institute of Chartered Financial Analysts.

➢Mr. Jordon is the Vice President and Board Member of the CFA Society of Houston.

➢Member – Association for Corporate Growth.

➢Member – Houston Symphony Society.

Mr. Jordon obtained a B.S. in Finance from Texas A&M University.

64

# James H. Jordon - Recent healthcare experience

• The following table describes multiple recent healthcare client service projects that Mr. Jordon has worked on for different clients:

| Client | Project Description |
|---|---|
| **Community Hospital** | Fair market value analysis of a multi-year restrictive covenant agreement. |
| **Community Hospitals** | Fair market value analysis with respect to physician compensation and/or other agreements between physicians and the Hospital. |
| **Hospital Management Company** | Fair market value analysis with respect to several owned hospitals where the Hospital Management Company is considering a joint venture w/ community physicians. |
| **Hospital Management Company** | Allocation of purchase price, for Financial Reporting Purposes, with respect to the acquisitions of controlling interests in several hospitals.  Purchase price allocations have included valuations of intangible assets in connection with the acquisitions, including customer-based intangibles, contract-based intangibles, and marketing-related intangibles. |
| **Hospital Management Company** | Valuation of various physician specialty practices pertaining to the potential acquisition of a medical group, Ambulatory Surgery Center, or Imaging Center and subsequent allocation of purchase price. |
| **Community Hospital** | Assisted Community Hospital in their development of a new hospital, including financial, operational, and market analysis. Forecasted financial statements were developed and assessed based on assumptions developed through analysis and management interviews.  Capital structure and pro forma operational ratios were also evaluated. |
| **Community Hospital** | Deloitte FAS performed a financial review, market assessment, and prepared a detailed analysis which considered the historical and projected financial performance of the hospital, the projected performance of the expansion, the environmental factors (demand, population, competitors, and reimbursement), return on investment, and the overall medical staff support. |

65

Data Received, Reviewed, and/or Relied Upon

# Data Received, Reviewed, and/or Relied Upon

Pleadings
- Complaint
- Answer and New Matter (Bradford Regional Medical Center)
- Answer (V&S Medical Associates, LLC)
- Joint Motion to Compel Relators to Answer Deposition Questions and Produce Documents
- Brief in Support of Joint Motion to Compel
- Plaintiff's Response to Defendants' Joint Motion to Compel
- Reply to Plaintiff's Response to Defendants' Joint Motion to Compel

Deposition Transcripts with Exhibits
- George Leonhardt, Rule 30(b)(6) as Corporate Designee of BRMC, dated July 26, 2007; individual capacity, dated April 1, 2008
- Glen Washington, Rule 30(b)(6) as Corporate Designee of BRMC, dated July 26, 2007
- Tina Hannahs, Rule 30(b)(6) as Corporate Designee of BRMC, dated July 26, 2007
- Kamran Saleh, M.D., dated August 9, 2007
- Peter Vaccaro, M.D., dated August 9, 2007
- V. Rao Nadella, M.D., dated August 20, 2007
- Paul B. Kirsch, M.D., dated August 20, 2007
- Martin David Jacobs, M.D., dated August 21, 2007
- Dilbagh Singh, M.D., dated August 21, 2007
- Edward Kabala, Esq., dated April 3, 2008
- Alan Steinberg, Esq., dated April 3, 2008

Bradford Regional Medical Center Documents
- HOSP 0000001-0011563; 0020001-0020771

V&S Medical Associates, LLC Documents
- V&S  260-279, 298, 300-318, 327-330, 346, 370, 375-378, 384-387, 666-673, 679-680, 685-686, 688, 935-975, 1003-1004, 1025-1044, 1051-1063, 1076-1078, 1082, 1555-1557, 1562-1563, 1797-1798, 1810-1812, 1829-1831, 1955-2009, 2038, 2146, 2148, 2150-2155, 3154-3170, 3191-3210, 3319-3321

# Data Received, Reviewed, and/or Relied Upon

Information Gathered by Deloitte FAS
- Historical financial data and ratios for Tenet Healthcare, Community Health Systems, Universal Health Services, Health Management Associates, and HealthSouth
- Federal Corporate Tax Rate: http://www.smbiz.com/sbr1001.html
- Pennsylvania Corporate Tax Rate: http://businesstitusville.com/Corporate_Taxes/corporate_taxes.html
- McKean County population statistics: http://recenter.tamu.edu/data/popc/pc42083.htm
- McKean County demographics: http://www.epodunk.com/cgi-bin/popInfo.php?locIndex=14399
- *Utilization of Radiology Services in the United States: Levels and Trends in Modalities, Regions, and Populations* by Mythreyi Bhargavan, PhD and Jonathan H. Sunshine, PhD: http://radiology.rsnajnls.org/cgi/content/full/234/3/824
- Federal Register, Vol. 67, No. 212 / Friday, November 1, 2002 / Rules and Regulations: Addendum B. – Payment Status by HCPCS Code and Related Information
- Federal Register, Volume 72, No. 171, Pg. 51081
- Federal Register Vol. 69., No. 59, Pg. 16093
- Federal Register Vol. 66, No. 3, Pg. 919
- Radnet, Inc. Form 10-K filed 2/18/2003 for the Period Ending 10/31/2002
- Email dated 5/8/2008 from Mike Shanks to Jim Tarasovitch regarding the Hospital's payor mix
- Fax from Horty Springer dated 5/29/2008 regarding the Hospital's reimbursement per procedure for individual payors
- Medical Group Management Associations' Freestanding Diagnostic Imaging Center Performance Survey: 2006 Report based on 2005 and 2004 Data
- Medical Group Management Associates: Cost Survey for Multispecialty Practices: 2003 Report Based on 2002 Data
- Medical Group Management Associates: Physician Compensation and Production Survey: 2003 Report Based on 2002 Data
- Cost data for Nuclear Medicine, CT, and MRI modalities provided by Solucient Action O/I – Fourth Quarter 2004
- REIS, Inc. website – http://www.reis.com
- Real Estate Information: http://www.RealQuest.com
- Real Estate Information: CoStar http://www.costar.com
- Real Estate Information: RealCapitalAnalytics http://www.rcanalytics.com
- Real Estate Information: Loopnet http://www.loopnet.com
- Maps and locations: http://earth.google.com
- Real estate classified ads in community newspapers such as 'Bradford Era' via Nexis and Bradford Public Library
- US Department of Labor Statistics: http://data.bls.gov/cgi-bin/dsrv
- American Hospital Directory: http://www.ahd.com
- Family Practice Management: http://www.aafp.org/fpm/20040700/ask.html
- Quotation #BS0102R1 from GE Medical Systems to Dr. Vaccaro

# Data Received, Reviewed, and/or Relied Upon

Individuals Interviewed
- George Leonhardt -  Bradford Regional Medical Center
- Jim Tarasovich - Bradford Regional Medical Center
- Tina Hannahs - Bradford Regional Medical Center
- Tim Brown - Bradford Regional Medical Center
- Kamran Saleh, M.D. – V&S Medical Associates LLC
- Peter Vaccaro, M.D. – V&S Medical Associates LLC
- Mark J. Goebe – Real Estate Broker
- John McGary – Real Estate Broker
- Scott Truman – Nuclear Camera Technician
- BC Technical, Inc. – Used Equipment Dealer
- Diagnostix Plus, Inc. – Used Equipment Dealer
- R.E.S. Solutions, Inc. – Used Equipment Dealer
- John Peterson – Bradford, PA City Clerk's office

69

Exhibits

**Exhibit 1**
**Bradford Regional Medical Center**
**Valuation Relating to the:**
**Arrangement with V&S Medical Associates, LLC**
**As of October 1, 2003**

List of Assumptions

| Assumption | Value | Description |
|---|---|---|
| Weighted Average Cost of Capital | 12.0% | Based on weighted average cost of capital analysis for comparable hospital companies |
| Non-Compete Additional Risk Premium | 2.0% | |
| Discount Rate | 14.0% | Weighted Average Cost of Capital plus risk premium for Non-Compete provisions of the Arrangeme |
| Working Capital as a % of Revenue | 10.0% | Based on comparable companies' working capital as a percentage of revenue |
| Probability of Competition | 100.0% | Physicians were competing in the market before the non-compete agreement was formed. |
| Cost Inflation | 3.0% | |
| Revenue Inflation | 2.5% | |
| Hypothetical Tax Rate | 41.5% | Blended Federal (35%) and State Tax (10%) |
| Physician Group's Tax Rate | 41.5% | Blended Federal (35%) and State Tax (10%) |
| Population Growth Rate - Hospital / V&S Service Area | -0.5% | Based on historical data (1980 - 2003).  See Exhibit 2. |

**Exhibit 2**
**Bradford Regional Medical Center**
**Valuation Relating to the:**
**Arrangement with V&S Medical Associates, LLC**
**As of October 1, 2003**

## Summary

**Non-Compete Provisions**

| | |
|---|---|
| Preliminary Value of Non-Compete Provisions | $3,163,785 |
| Present Value of Non-Compete Portion of Lease Payments | 1,016,621 |
| Difference | $2,147,164 |

**Exhibit 3**
**Bradford Regional Medical Center**
**Valuation Relating to the:**
**Arrangement with V&S Medical Associates, LLC**
**As of October 1, 2003**

**Population Statistics - Bradford, PA Area**

| Year | County | Population [1] | % Change | Average % Change |
|------|--------|--------------|----------|------------------|
| 1980 | McKean County | 50,635 | N/A | N/A |
| 1981 | McKean County | 50,726 | 0.2% | 0.2% |
| 1982 | McKean County | 50,385 | -0.7% | -0.2% |
| 1983 | McKean County | 50,341 | -0.1% | -0.2% |
| 1984 | McKean County | 49,999 | -0.7% | -0.3% |
| 1985 | McKean County | 49,392 | -1.2% | -0.5% |
| 1986 | McKean County | 48,632 | -1.5% | -0.7% |
| 1987 | McKean County | 47,957 | -1.4% | -0.8% |
| 1988 | McKean County | 47,098 | -1.8% | -0.9% |
| 1989 | McKean County | 46,493 | -1.3% | -0.9% |
| 1990 | McKean County | 47,131 | 1.4% | -0.7% |
| 1991 | McKean County | 47,352 | 0.5% | -0.6% |
| 1992 | McKean County | 47,680 | 0.7% | -0.5% |
| 1993 | McKean County | 47,435 | -0.5% | -0.5% |
| 1994 | McKean County | 47,538 | 0.2% | -0.4% |
| 1995 | McKean County | 47,508 | -0.1% | -0.4% |
| 1996 | McKean County | 47,396 | -0.2% | -0.4% |
| 1997 | McKean County | 46,920 | -1.0% | -0.4% |
| 1998 | McKean County | 46,567 | -0.8% | -0.4% |
| 1999 | McKean County | 46,287 | -0.6% | -0.5% |
| 2000 | McKean County | 45,936 | -0.8% | -0.5% |
| 2001 | McKean County | 45,225 | -1.5% | -0.5% |
| 2002 | McKean County | 45,366 | 0.3% | -0.5% |
| 2003 | McKean County | 44,833 | -1.2% | -0.5% |

| Age | Population [2] | Pct |
|-----|---------------|-----|
| 15 or younger | 8,882 | 19.3% |
| 16-24 | 5,638 | 12.3% |
| 25-44 | 13,092 | 28.5% |
| 45-64 | 10,661 | 23.2% |
| 65+ | 7,663 | 16.7% |
| Total | 45,936 | |

Used to estimate population growth in McKean County.

Notes:
(1) Source: U.S. Bureau of Census. Represents mid-year estimate with the exception of decade years which represent April 1.
(2) Source: U.S. Bureau of Census, 2000 Census

**Exhibit 4**
**Bradford Regional Medical Center**
**Valuation Relating to the:**
**Arrangement with V&S Medical Associates, LLC**
**As of October 1, 2003**

Imaging Needs Study per 1000 Population

| | Ambulatory Setting 2001 [1] | Compound Annual Growth Rate (1998 - 2001) [1] | Estimated Needs (Medicare) 2003 | Medicare Population Weight [2] | Weighted Average Needs for all Enrollees 2003 | |
|---|---|---|---|---|---|---|
| **Medicare Enrollees** | | | | | | |
| Nuclear Medicine ("NM") | 193 | 17.9% | 268 | 20% | NM | 97 |
| Computed Tomography ("CT") | 247 | 11.7% | 308 | 20% | CT | 118 |
| Magnetic Resonance Imaging ("MRI") | 94 | 16.6% | 128 | 20% | MRI | 70 |

| | Ambulatory Setting 2000 [1] | Compound Annual Growth Rate (1998 - 2001) [1] | Estimated Needs (MC) 2003 | Non-Medicare Population Weight [3] |
|---|---|---|---|---|
| **Non-Medicare Enrollees** | | | | |
| NM | 39 | 17.9% | 54 | 80% |
| CT | 56 | 11.7% | 70 | 80% |
| MRI | 41 | 16.6% | 56 | 80% |

| | Needs Analysis 2003 | Hospital Fiscal 2002 | V&S Fiscal 2002 | Combined Hospital and V&S Fiscal 2002 | Stroudwater Projection Year 1 (2004) | Selected Value Year 1 (2004) |
|---|---|---|---|---|---|---|
| **Nuclear Medicine** | 97 | 52 | 50 | 102 | 111 | 102 |
| **CT Imaging** | 118 | 90 | 0 | 90 | 111 | 90 |
| **MRI Imaging** | 70 | 42 | 0 | 42 | 47 | 42 |

Notes:
(1) Based on data from Bhargavan and Sunshine's *Utilization of Radiology Services in the United States: Levels and Trends in Modalities, Regions, and Populations,* 2005.
(2) Based on Age 65+ demographic information for McKean County, PA (See Exhibit 3) plus an estimate for disabled population with Medicare coverage.
(3) Non-Medicare Population Weight = 1 - Medicare Population Weight

**Exhibit 5**
**Bradford Regional Medical Center**
**Valuation Relating to the:**
**Arrangement with V&S Medical Associates, LLC**
**As of October 1, 2003**

**Needs Analysis**

| | Year 1 [1] | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| **Bradford RMC Service Area (Population)** | 44,610 | 44,388 | 44,167 | 43,947 | 43,728 |
| *Yearly Growth - Population [2]* | -0.5% | -0.5% | -0.5% | -0.5% | -0.5% |
| **Population Based Imaging "Needs"** | | | | | |
| NM Procedures per 1000 Population | 102 | 102 | 102 | 102 | 102 |
| *Yearly Growth - Needs per 1000 Population* | | 0.0% | 0.0% | 0.0% | 0.0% |
| Bradford RMC NM "Needs" | 4,550 | 4,528 | 4,505 | 4,483 | 4,460 |
| CT Procedures per 1000 Population | 90 | 90 | 90 | 90 | 90 |
| *Yearly Growth - Needs per 1000 Population* | | 0.0% | 0.0% | 0.0% | 0.0% |
| Bradford RMC CT "Needs" | 4,015 | 3,995 | 3,975 | 3,955 | 3,936 |
| MR Procedures per 1000 Population | 42 | 42 | 42 | 42 | 42 |
| *Yearly Growth - Needs per 1000 Population* | | 0.0% | 0.0% | 0.0% | 0.0% |
| Bradford RMC MR "Needs" | 1,874 | 1,864 | 1,855 | 1,846 | 1,837 |

Notes:
(1) See Exhibit 3 and Exhibit 4.
(2) Yearly Growth based on average population growth in McKean County from 1980 to 2003 as found in the U.S. Bureau of Census.  See Exhibit 3.

Exhibit 6
Bradford Regional Medical Center
Valuation Relating to the:
Arrangement with V&S Medical Associates, LLC
As of October 1, 2003

**Revenue Buildup**

| Payor | % of Total Charges [1] | Reimbursement as % of Medicare [2] |
|---|---|---|
| Managed Care and Commercial | 39.0% | 118.0% |
| Medicaid | 16.0% | 45.0% |
| Medicare | 42.0% | 100.0% |
| Private | 3.0% | 10.0% |
| Total | | 96.0% |

| CPT | Type | Case Mix [3] | Volume [4] | Year 1 Reimb [5] | Total Rev [6] | Volume [4] | Year 2 Reimb [5] | Total Rev [6] | Volume [4] | Year 3 Reimb [5] | Total Rev [6] | Volume [4] | Year 4 Reimb [5] | Total Rev [6] | Volume [4] | Year 5 Reimb [5] | Total Rev [6] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 78010 | Nuclear Med | 1.0% | 46 | $186 | $8,575 | 45 | $191 | $8,598 | 45 | $196 | $8,813 | 45 | $201 | $9,033 | 45 | $206 | $9,259 |
| 78223 | Nuclear Med | 2.0% | 91 | 200 | 18,195 | 91 | 205 | 18,650 | 90 | 210 | 18,906 | 90 | 215 | 19,379 | 89 | 221 | 19,643 |
| 78305 | Nuclear Med | 2.0% | 91 | 186 | 16,881 | 91 | 190 | 17,303 | 90 | 195 | 17,541 | 90 | 200 | 17,979 | 89 | 205 | 18,224 |
| 78306 | Nuclear Med | 7.5% | 341 | 186 | 63,257 | 340 | 190 | 64,648 | 338 | 195 | 65,874 | 336 | 200 | 67,122 | 335 | 205 | 68,595 |
| 78315 | Nuclear Med | 2.0% | 91 | 200 | 18,195 | 91 | 205 | 18,650 | 90 | 210 | 18,906 | 90 | 215 | 19,379 | 89 | 221 | 19,643 |
| 78320 | Nuclear Med | 1.0% | 46 | 186 | 8,533 | 45 | 190 | 8,558 | 45 | 195 | 8,770 | 45 | 200 | 8,990 | 45 | 205 | 9,214 |
| 78465 | Nuclear Med | 27.5% | 1,251 | 304 | 380,571 | 1,245 | 312 | 388,214 | 1,238 | 320 | 396,002 | 1,233 | 328 | 403,936 | 1,227 | 336 | 412,020 |
| 78473 | Nuclear Med | 1.0% | 46 | 304 | 13,994 | 45 | 312 | 14,032 | 45 | 320 | 14,383 | 45 | 328 | 14,742 | 45 | 336 | 15,111 |
| 78478 | Nuclear Med | 27.5% | 1,251 | 138 | 172,781 | 1,245 | 142 | 176,251 | 1,239 | 145 | 179,787 | 1,233 | 149 | 183,389 | 1,227 | 152 | 187,059 |
| 78480 | Nuclear Med | 27.5% | 1,251 | 138 | 172,781 | 1,245 | 142 | 176,251 | 1,239 | 145 | 179,787 | 1,233 | 149 | 183,389 | 1,227 | 152 | 187,059 |
| 78805 | Nuclear Med | 1.0% | 46 | 200 | 9,198 | 45 | ~ 205 | 9,223 | 45 | 210 | 9,453 | 45 | 215 | 9,690 | 45 | 221 | 9,932 |
| **Total Nuclear Medicine [7]** | | | 4,550 | | $882,961 | 4,528 | | 900,377 | 4,505 | | 918,222 | 4,483 | | 937,028 | 4,460 | | 955,759 |
| 93015 | Stress Test | 26.0% | 1,183 | $75 | $88,632 | 1,177 | $77 | $90,387 | 1,171 | $79 | $92,175 | 1,166 | $81 | $94,076 | 1,160 | $83 | $95,932 |
| **Total Stress Test** | | | 1,183 | | 88,632 | 1,177 | | 90,387 | 1,171 | | 92,175 | 1,166 | | 94,076 | 1,160 | | 95,932 |
| With Contrast | CT | 55.0% | 2,208 | $210 | $463,431 | 2,197 | $215 | $472,650 | 2,186 | $221 | $482,041 | 2,175 | $226 | $491,606 | 2,165 | $232 | $501,579 |
| Without Contrast | CT | 35.0% | 1,405 | 160 | 225,130 | 1,398 | 164 | 229,608 | 1,391 | 168 | 234,170 | 1,384 | 173 | 238,816 | 1,378 | 177 | 243,725 |
| With and Without Contrast | CT | 10.0% | 402 | 250 | 100,522 | 400 | 256 | 102,522 | 398 | 263 | 104,560 | 396 | 269 | 106,635 | 394 | 276 | 108,749 |
| **Total CT [7]** | | | 4,015 | | 789,082 | 3,995 | | 804,781 | 3,975 | | 820,771 | 3,955 | | 837,057 | 3,936 | | 854,054 |
| With Contrast | MRI | 5.0% | 94 | $337 | $31,694 | 93 | $346 | $32,141 | 93 | $354 | $32,944 | 92 | $363 | $33,405 | 92 | $372 | $34,240 |
| Without Contrast | MRI | 75.0% | 1,406 | 307 | 432,165 | 1,398 | 315 | 440,449 | 1,391 | 323 | 449,200 | 1,385 | 331 | 458,443 | 1,378 | 339 | 467,530 |
| With and Without Contrast | MRI | 20.0% | 375 | 431 | 161,471 | 373 | 441 | 164,625 | 371 | 452 | 167,836 | 369 | 464 | 171,104 | 367 | 475 | 174,431 |
| **Total MRI [7]** | | | 1,874 | | 625,330 | 1,864 | | 637,214 | 1,855 | | 649,979 | 1,846 | | 662,952 | 1,837 | | 676,200 |
| **Total Revenue** | | | | | $2,386,005 | | | $2,432,759 | | | $2,481,147 | | | $2,531,113 | | | $2,581,944 |

Notes:
(1) Data provided by Management.
(2) Based on data provided by Management
(3) Case mixes based on data provided by Management and V&S Medical Associates.
(4) Volume is based on Case Mix and Total Projected Procedures (see Exhibit 5).  The sum of the volume may not equal the Total Projected Procedures due to rounding.  Stress Test Volume is shown as a percentage of nuclear medicine procedures reflecting data provided by Management and V&S.
(5) Reimbursement is based on the 2003 Medicare Allowable and BRMC's estimated Reimbursement as a % if Medicare, adjusted for inflation (2.5%).  Associated meds are included in reimbursement.
(6) Total Revenue = Volume x Reimbursement
(7) See Exhibit 5

**Exhibit 7**
**Bradford Regional Medical Center**
**Valuation Relating to the:**
**Arrangement with V&S Medical Associates, LLC**
**As of October 1, 2003**

**Expense Analysis**

| | NM Projections | | NM Selected | CT Projections | MRI Projections |
|---|---|---|---|---|---|
| | V&S | Stroudwater | Expense Ratios [1] | Stroudwater [2] | Stroudwater [2] |
| Total Revenue | $ 586,440 | $ 1,192,841 | | $ 1,425,000 | $ 1,245,300 |
| | | | | | |
| Operating Expenses | | | | | |
| Salaries & Benefits | 60,000 | 141,000 | | 122,979 | 116,064 |
| Purchased Labor | 108,000 | 235,000 | | 290,000 | 172,200 |
| Camera | 83,076 | 83,076 | | - | - |
| Service Agreement | - | - | | 99,000 | 92,000 |
| Rent & Electricity | 32,400 | 40,500 | | 32,400 | 32,400 |
| Other Operating Costs | - | 40,000 | | - | - |
| Purchased Services | 1,500 | 3,288 | | - | - |
| Other Expense (CA Giamuso) | 5,280 | 11,574 | | - | - |
| Marketing | - | - | | 5,000 | 5,000 |
| Indirect Expenses | - | 92,000 | | 69,150 | 63,746 |
| Total Fixed Expenses | 290,256 | 646,438 | | 618,529 | 481,410 |
| *Fixed as a % of Revenue* | *49.5%* | *54.2%* | *51.8%* | *43.4%* | *38.7%* |
| Med/Surg Supplies | 19,200 | 43,200 | | 20,000 | - |
| Drugs | - | - | | 50,000 | - |
| Other Supplies | - | - | | - | 10,500 |
| Film and Contrast | - | - | | 65,000 | 73,500 |
| Cardiolite and other drugs | 96,000 | 235,000 | | - | - |
| Total Variable Expenses | 115,200 | 278,200 | | 135,000 | 84,000 |
| *Variable as a % of Revenue* | *19.6%* | *23.3%* | *21.5%* | *9.5%* | *6.7%* |
| Total Operating Expeses | 405,456 | 924,638 | | 753,529 | 565,410 |
| *Total as a % of Revenue* | *69.1%* | *77.5%* | *73.3%* | *52.9%* | *45.4%* |

Notes:
(1) Nuclear Medicine selected expense ratios represents an average of the V&S and Stroudwater projection data.
(2) Excludes interest and depreciation expense.

**Exhibit 8**
**Bradford Regional Medical Center**
**Valuation Relating to the:**
**Arrangement with V&S Medical Associates, LLC**
**As of October 1, 2003**

**Discounted Cash Flow Model (All Modalities) - With Non-Compete**

|  |  | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 |
|---|---|---|---|---|---|---|---|
| Net Revenue - NM |  | $882,961 | $900,377 | $918,222 | $937,028 | $955,759 | $979,652 |
| Net Revenue - Stress Tests |  | 88,632 | 90,387 | 92,175 | 94,076 | 95,932 | 98,330 |
| Net Revenue - CT |  | 789,082 | 804,781 | 820,771 | 837,057 | 854,054 | 875,405 |
| Net Revenue - MRI |  | 625,330 | 637,214 | 649,979 | 662,952 | 676,200 | 693,105 |
| **Total Net Revenue** |  | **2,386,005** | **2,432,759** | **2,481,147** | **2,531,113** | **2,581,944** | **2,646,492** |
| Less: Operating Expenses |  |  |  |  |  |  |  |
| Variable Expense - NM |  | 208,729 | 212,848 | 217,066 | 221,514 | 225,937 | 231,585 |
| *As a percentage of Revenue* |  | *21.5%* | *21.5%* | *21.5%* | *21.5%* | *21.5%* | *21.5%* |
| Variable Expense - CT |  | 74,755 | 76,242 | 77,757 | 79,300 | 80,910 | 82,933 |
| *As a percentage of Revenue* |  | *9.5%* | *9.5%* | *9.5%* | *9.5%* | *9.5%* | *9.5%* |
| Variable Expense - MRI |  | 42,181 | 42,982 | 43,843 | 44,719 | 45,612 | 46,752 |
| *As a percentage of Revenue* |  | *6.7%* | *6.7%* | *6.7%* | *6.7%* | *6.7%* | *6.7%* |
| Fixed Expense | (1) | 1,087,958 | 1,120,596 | 1,154,214 | 1,188,841 | 1,224,506 | 1,261,241 |
| **EBITDA** |  | **972,382** | **980,090** | **988,266** | **996,739** | **1,004,979** | **1,023,981** |
| *EBITDA Margin* |  | *40.6%* | *40.3%* | *39.8%* | *39.4%* | *38.9%* | *38.7%* |
| Less: Depreciation & Amortization | (2) | 381,071 | 657,347 | 489,676 | 389,073 | 416,510 | 334,199 |
| **EBIT** |  | **591,311** | **322,743** | **498,590** | **607,666** | **588,468** | **689,782** |
| Less: Provision for Taxes | 41.5% | 245,394 | 133,938 | 206,915 | 252,181 | 244,214 | 286,259 |
| **Net Income** |  | **345,917** | **188,804** | **291,675** | **355,485** | **344,254** | **403,522** |
| *Cash Flow Adjustments* |  |  |  |  |  |  |  |
| Plus: Depreciation & Amortization |  | 381,071 | 657,347 | 489,676 | 389,073 | 416,510 | 334,199 |
| Less: Capital Expenditures | (3) | 238,169 | 238,169 | 238,169 | 238,169 | 238,169 | 238,169 |
| Less: Changes in Working Capital | (4) 10.0% | - | 1,742 | 1,785 | 1,881 | 1,873 | 2,389 |
| **Debt Free Cash Flow With** |  | **$488,819** | **$606,241** | **$541,397** | **$504,508** | **$520,722** | **$497,163** |

Notes:
(1) Fixed Expenses for Year 1 are calculated using revenue and fixed expense as a percentage of revenue selected in Exhibit 7. Subsequent years are adjusted for inflation (3%) only, volume effects are excluded
(2) Depreciation & Amortization are based on the present value of sublease payments less the maintenance portion of the payment multiplied by 2 to account for the nuclear camera owned by the hospita
    as well as the subleased nuclear camera. Additionally, depreciation for 1 CT machine and 1 MRI machine is included. MACRS 5-Year life used
(3) 7-Year straight line depreciation of the 2 nuclear cameras, 1 CT machine, and 1 MRI machine used to estimate capital expenditures
(4) See Exhibit 1.
(5) V&S ramp-up period assumed to be one year, thus no lost revenue projected in year 6. Revenue and expense adjusted for inflation (2.5% and 3.0% respectively)

Exhibit 9
Bradford Regional Medical Center
Valuation Relating to the:
Arrangement with V&S Medical Associates, LLC
As of October 1, 2003

**Discounted Cash Flow Model (All Modalities) - Without Non-Compete**

| | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 [6] |
|---|---|---|---|---|---|---|---|
| Nuclear Med Revenue | | $882,981 | $800,377 | $918,222 | $937,028 | $955,759 | $978,652 |
| Stress Test Revenue | | 88,832 | 90,387 | 92,175 | 94,076 | 95,932 | 98,330 |
| CT Revenue | | 789,082 | 804,781 | 820,771 | 837,057 | 854,054 | 875,405 |
| MRI Revenue | | 625,330 | 637,214 | 649,979 | 662,952 | 676,200 | 693,105 |
| Total Revenue | | 2,386,005 | 2,432,759 | 2,481,147 | 2,631,113 | 2,681,944 | 2,646,492 |
| Lost NM Revenue due to Competition | | 441,480 | 450,188 | 459,111 | 468,514 | 477,879 | 489,926 |
| *As a percentage of Revenue* | | *50.0%* | *50.0%* | *50.0%* | *50.0%* | *50.0%* | *50.0%* |
| Lost ST Revenue due to Competition | | 44,316 | 45,194 | 46,087 | 47,038 | 47,966 | 49,165 |
| *As a percentage of Revenue* | | *50.0%* | *50.0%* | *50.0%* | *50.0%* | *50.0%* | *50.0%* |
| Lost CT Revenue due to Competition | (1) | 394,541 | 402,390 | 410,385 | 418,529 | 427,027 | 437,702 |
| *As a percentage of Revenue* | | *50.0%* | *50.0%* | *50.0%* | *50.0%* | *50.0%* | *50.0%* |
| Lost MRI Revenue due to Competition | (2) | 312,665 | 318,607 | 324,990 | 331,476 | 338,100 | 346,553 |
| *As a percentage of Revenue* | | *50.0%* | *50.0%* | *50.0%* | *50.0%* | *50.0%* | *50.0%* |
| Total Lost Revenue due to Competition | | 1,193,002 | 1,216,379 | 1,240,573 | 1,265,556 | 1,290,972 | 1,323,246 |
| Revenue without Non-Compete | | 1,193,002 | 1,216,379 | 1,240,573 | 1,265,556 | 1,290,972 | 1,323,246 |
| Less: Operating Expenses | | | | | | | |
| Variable Expense - NM | | 94,844 | 96,715 | 98,632 | 100,652 | 102,664 | 105,230 |
| *As a percentage of Revenue* | | *21.5%* | *21.5%* | *21.5%* | *21.5%* | *21.5%* | *21.5%* |
| Variable Expense - CT | | 37,378 | 38,121 | 38,879 | 39,650 | 40,455 | 41,467 |
| *As a percentage of Revenue* | | *9.5%* | *9.5%* | *9.5%* | *9.5%* | *9.5%* | *9.5%* |
| Variable Expense - MRI | | 21,090 | 21,491 | 21,922 | 22,359 | 22,806 | 23,376 |
| *As a percentage of Revenue* | | *6.7%* | *6.7%* | *6.7%* | *6.7%* | *6.7%* | *6.7%* |
| Fixed Expense | | 1,087,958 | 1,120,596 | 1,154,214 | 1,188,841 | 1,224,506 | 1,261,241 |
| EBITDA | | (48,267) | (60,544) | (73,073) | (85,946) | (99,459) | (108,068) |
| | | *-4.0%* | *-5.0%* | *-5.9%* | *-6.8%* | *-7.7%* | *-8.2%* |
| Less: Depreciation & Amortization | | 381,071 | 657,347 | 489,676 | 389,073 | 416,510 | 334,199 |
| EBIT | | (429,338) | (717,891) | (562,749) | (475,019) | (515,969) | (442,267) |
| Less: Provision for Taxes | 41.5% | (178,175) | (297,925) | (233,541) | (197,133) | (214,127) | (183,541) |
| Net Income | | (251,163) | (419,967) | (329,208) | (277,886) | (301,842) | (258,726) |
| *Cash Flow Adjustments* | | | | | | | |
| Plus: Depreciation & Amortization | | 381,071 | 657,347 | 489,676 | 389,073 | 416,510 | 334,199 |
| Less: Capital Expenditures | | 238,169 | 238,169 | 238,169 | 238,169 | 238,169 | 238,169 |
| Less: Changes in Working Capital | 10.0% | - | 2,338 | 2,419 | 2,498 | 2,542 | 3,227 |
| Debt Free Cash Flow Without | | (108,261) | (3,126) | (80,121) | (129,480) | (126,043) | (165,924) |
| Debt Free Cash Flow With | | 488,819 | 606,241 | 541,397 | 504,508 | 520,722 | 497,163 |
| Debt Free Cash Flow Without | | (108,261) | (3,126) | (80,121) | (129,480) | (126,043) | (165,924) |
| Difference | | 597,080 | 609,367 | 621,518 | 633,988 | 646,765 | 663,086 |
| Periods Discounted | (3) | 0.5 | 1.5 | 2.5 | 3.5 | 4.5 | 5.5 |
| Discount Factor | 14.0% | 0.9366 | 0.8216 | 0.7207 | 0.6322 | 0.5545 | 0.4864 |
| Present Value of Cash Flow | | $559,216 | $500,635 | $447,911 | $400,788 | $358,653 | $322,547 |
| Sum of Present Value of Cash Flow | | $2,589,751 | | | | | |
| Probability of Competition | (4) | 100.0% | | | | | |
| Preliminary Value of Non-Compete | | 2,589,751 | | | | | |
| Plus: Amortization Benefit | (5) | 574,034 | | | | | |
| Fair Value of Non-Compete | | $3,163,785 | | | | | |

Notes:
(1) CT Machine assumed to be purchased by V&S at the beginning of year 1.
(2) MRI Machine assumed to be purchased by V&S at the beginning of year 1.
(3) Mid-year discounting assumed.
(4) See Exhibit 1.
(5) Amortization benefit based on 15-year tax life.
(6) Revenues and expenses adjusted for inflation (2.5% and 3.0% respectively) in years 6.

**Exhibit 10**
**Bradford Regional Medical Center**
**Valuation Relating to the:**
**Arrangement with V&S Medical Associates, LLC**
**As of October 1, 2003**

**Present Value of Non-compete Contracted Payments**

| | | |
|---|---|---|
| Payment | $23,655 | Per Month |
| Periods | 60 | Months |
| Discount Rate | 14.0% | |
| PV Annuity Factor | 42.9770 | |
| | | |
| **Value of Lease Payments** | **$1,016,621** | |

**Exhibit 11**
**Bradford Regional Medical Center**
**Valuation Relating to the:**
**Arrangement with V&S Medical Associates, LLC**
**As of October 1, 2003**

| Date | Acquirer | Target Practice | Location | Price | Revenue | EBITDA | Price to Revenue | Price to EBITDA |
|------|----------|-----------------|----------|-------|---------|--------|------------------|-----------------|
| 7/2/01 | JWCH Merger Corp. | InSight Health Services Corp. | 28 states | $257,400 | $210,400 | N/A | 1.2x | N/A |
| 1/9/01 | Card Guard Technologies, Inc. | Quality Diagnostic Services, Inc. | GA | 18,000 | 16,500 | N/A | 1.1x | N/A |
| 6/5/00 | InSight Health Services Corp. | Wilkes-Barre Imaging Center | PA | 17,400 | 7,785 | $3,718 | 2.2x | 4.7x |
| 3/13/98 | InSight Health Services Corp. | Signal Medical Services | East Coast | 35,700 | 20,700 | N/A | 1.7x | N/A |
| 7/1/97 | InSight Health Services Corp. | Chattanooga Outpatient Center | TN | 10,900 | 4,670 | 2,209 | 2.3x | 4.9x |
| 1/20/97 | U.S. Diagnostics, Inc. | Medical Diagnostics, Inc. | MA | 22,000 | 21,400 | N/A | 1.0x | N/A |
| 1/15/97 | InSight Health Services Corp. | Mobile Imaging Consortium | ME, NH | 7,650 | 7,450 | N/A | 1.0x | N/A |
| 11/13/96 | Diagnostic Heath Services, Inc. | Advanced Clinical Technology | NM | 17,500 | 12,390 | N/A | 1.4x | N/A |
| | | | Third Quartile | | | | 1.9x | 4.9x |
| | | | Second Quartile (Median) | | | | 1.3x | 4.8x |
| | | | Mean | | | | 1.5x | 4.8x |
| | | | First Quartile | | | | 1.1x | 4.7x |

Sources:  Irving Levin Associates, Inc. and Mergerstat
Note:  Transaction financial information (price, revenue and EBITDA) in thousands
N/A:  Information not available